# EXHIBIT 15



*law pro — facts justify*

Last Name ▮▮▮▮▮▮▮▮▮▮▮▮

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:00-CR-0260-Y |
| | § | |
| JULIUS OMAR ROBINSON (02) | § | |

*CAP?  ├— Spectrum —┤*
*defense of poor people,*
*mitigating*

JUROR NO. 36

# JUROR INFORMATION SHEET

*Woman seems very serious about this.*
*Not warming to Fred S.*      *no challenges*
*but Gov't will strike.*

**INSTRUCTIONS:**

Your answers to the following questions are <u>very</u> important to the trial of this case, and are designed to shorten the jury selection process. Do not discuss any of these questions or your answers with anyone else, including any other prospective jurors. Please take as much time as is reasonably necessary to answer each question as completely and as honestly as possible. Please do not accept the assistance or the advice of anyone in answering these questions. If any questions should arise while completing this questionnaire, please contact the presiding judge. Do <u>not</u> speak to anyone else about the questionnaire or any questions you might have.

## <u>YOUR ANSWERS TO THESE QUESTIONS ARE BEING GIVEN UNDER OATH</u>

The answers to these questions will be used by the Court and the attorneys solely for the selection of the jury in this case and for <u>no other reason</u>. The confidentiality of your answers to these questions will be maintained by the Court.

**Ex. 15 - 308**

**PLEASE PRINT YOUR ANSWERS**

**PERSONAL**

1.  NAME: ▮▮▮▮▮▮
    (first)     (middle)     (last)     (maiden, if applicable)

    DATE OF BIRTH ▮▮-1946 AGE: 56 SEX: F RACE: Black

    BIRTHPLACE: Groesbeck, Texas
    (city / town)     (state)

2.  ADDRESS: ▮▮▮▮▮▮ Fort North TX 76107
    (number and street)     (city / town)     (zip)

    HOME PHONE: ▮▮▮▮ 7552 BUSINESS PHONE: ( ) _____

3.  LENGTH OF TIME AT PRESENT ADDRESS: 26 years

4.  SINCE 1990 WHAT OTHER CITIES HAVE YOU LIVED IN AND FOR HOW LONG DID YOU LIVE IN EACH CITY? None

**EMPLOYMENT**

5.  PLACE OF EMPLOYMENT: Unemployed

6.  JOB TITLE OR DESCRIPTION: _____

    BUSINESS HOURS: _____ LENGTH OF PRESENT EMPLOYMENT: _____

    SUPERVISOR: _____

7.  PLEASE LIST YOUR OCCUPATION OR EMPLOYMENT FOR THE PAST TEN (10) YEARS: John Peter Smith Hospital 1973 – Nov. 16, 2001 Management -

8.  WHAT OTHER TYPES OF JOBS HAVE YOU HELD? Nursing

    If you could change your profession, what would you change it to? Consultant

Juror Questionnaire                    2                    Page 2 of 31

**Ex. 15 - 309**

## FAMILY

9.    MARTIAL STATUS: (circle appropriate answer(s))
a)  Married          f) Previously Divorced
b).  Single             (how many times _/_ )
c).  Separated
d).  Divorced          g)  Living With Someone
e).  Spouse Deceased

10.    NAME OF SPOUSE:
(First)          (Middle)          (Last)          (maiden, if applicable)

11.    SPOUSE'S EMPLOYER: _Retired_

Job Title Or Description: _____

Length Of Present Employment: _____

What Other Types Of Jobs Has Your Spouse Held? _Management_

12.    PLEASE INDICATE THE APPROXIMATE TOTAL ANNUAL GROSS INCOME OF YOUR HOUSEHOLD:
Under $10,000 _____          $10,000 to $30,000 _____
$30,000 to $50,000 _____          $50,000 to $70,000 _____
$70,000 to $100,000 _____          Over $100,000 _✓_____

13.    PLEASE PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR CHILDREN AND STEPCHILDREN, IF ANY:

| Name | Sex | Age | School or Occupation |
|------|-----|-----|----------------------|
| a. N/A | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |

14.    IF YOU HAVE GRANDCHILDREN, HOW MANY? _N/A_

Juror Questionnaire                              3                              Page 3 of 31

**Ex. 15 - 310**

15   PLEASE PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR PARENTS AND YOUR STEPPARENTS, IF ANY:

| | Name | Age | City of Residence | Retired | Occupation/Employment (before retirement, if applicable) |
|---|---|---|---|---|---|
| Father | ████ | 9? | Fort Worth | Yes | Driver |
| Mother | ████ | 90 | " " | yes | Domestic Work |
| Stepfather: | | | | | |
| Stepmother: | | | | | |

Were Your Parents Ever Divorced? No

16.  PLEASE PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR BROTHERS AND SISTERS, IF ANY?

| | Name | Sex | Age | School or Occupation |
|---|---|---|---|---|
| a. | ████ | F | 67 | Teacher - |
| b. | ████ | F | 69 | Teacher |
| c. | ████ | F | 65 | Housewife |
| d. | ████ | M | 60 | Mechanic |
| e. | ████ | F | 58 | Computer analysis |
| f. | ████ | F | 51 | Health aide |

Ex. 15 - 311

## EDUCATION

17. Please give your educational background. Please include how far you went in school; the names of any technical or trade schools attended, any college and graduate schools you have attended, together with major subject and degrees received, if any.

*MBA - from Amberton Univ. Register, Nurse from TCC UTA - BS, East Texas State - Health Care administration*

18. Please give your spouse's educational background:

*Completed high School + attended Wiley College*

19. Are you or your spouse presently enrolled as a student? Yes _____ No ✓
If so, please give details: _____

## MILITARY

20. HAVE YOU EVER SERVED IN THE MILITARY? *No* IF SO, PLEASE GIVE THE FOLLOWING INFORMATION:  Branch _____, Years of Service _____,
Enlist? _____, Re-enlist? _____
Highest grade or rank attained: _____
Duties: _____

Did you serve in combat? _____  Year Discharged? _____
Type of Discharge: _____  Did you participate in any
Courts Martial? _____  Please Explain: _____

Did you ever serve in the military police? _____

21. HAS YOUR SPOUSE EVER SERVED IN THE MILITARY? *Yes*
IF SO, PLEASE GIVE THE FOLLOWING INFORMATION:
Branch *Army*, Years of Service *2 Yr.*
Enlist? *yes*, Re-enlist? _____
Highest grade or rank attained: _____
Duties: _____

Did he/she serve in combat? *No*  Year Discharged? *1955*
Type of Discharge: *Honorable*
Did he/she participate in any Courts Martial? *No*
   IF SO, Please Explain _____

Did he/she ever serve in the military police? *No*

Ex. 15 - 312

## RELIGION

22    RELIGIOUS PREFERENCE: _Holiness_
Name And Location Of Church, Temple, Synagogue Or Other Religious Organization with which you are affiliated, if any: _Lake Cama Church of God In christ_

Have you studied for the ministry, priesthood, rabbinic order, or any other clergy position? _No_

23.    How often do you attend services? _seldom_
Past or present church offices held: _None_
Other than attendance, what activities do you participate in at your church? _None_
Have there been any recent changes in your religious activities? Yes _____ No _✓_
If Yes, Please explain: _____

24.    Were you raised in a religion different from the one you now practice?    If so, please explain: _No_

25.    Does your spouse practice a religion different from yours? _~~No~~ Yes_
If so, please explain: _Baptist_

26.    Do you currently, or have you in the past, supported, or routinely watched or listened to any radio or television ministry? _No_
If so, please indicate which ministry:

27.    Do you have a personal philosophy or favorite saying that reflects your personal philosophy that can be expressed in a few sentences or less?    YES _____ NO _____ If yes, please state it: _Treat others as you want to be treated._

**Ex. 15 - 313**

## POLITICAL

28   DO YOU HAVE A POLITICAL PREFERENCE? _____
Democrat ✓    Republican ___    Independent ___    Other _____
Does your spouse have a different preference? _No_
If so, please explain: _____

29   DO YOU IDENTIFY WITH OR SUPPORT A POLITICAL PARTY? If so, which one?
Democrat ✓    Republican ___    Independent ___    Other _____
Is your spouse a member or supporter of a different party? _No_
If so, please explain: _____

30.   DO YOU CONSIDER YOURSELF TO BE POLITICALLY CONSERVATIVE, MODERATE, OR LIBERAL? _Moderate_
Does your spouse have a different political philosophy? _yes_
If so, please explain: _He is a liberal._

31.   HAVE YOU EVER SOUGHT OR HELD A POLITICAL OFFICE? _No_   If yes, please give details: _____
_____

32.   Have you or your spouse ever worked in a political campaign for a candidate or for a political group, seeking change in a law or in enforcement of a law? _No_
If so, please describe: _____
_____

## PHYSICAL/MEDICAL

33.   DO YOU HAVE ANY DIFFICULTY IN READING OR WRITING? _No_   If so, please explain: _____

34.   DO YOU HAVE ANY DIFFICULTY IN SIGHT OR HEARING, OR DO YOU HAVE ANY OTHER DISABILITY OR DISEASE THAT WOULD MAKE JURY SERVICE A HARDSHIP FOR YOU? _No_   If so, please explain: _____
_____

35.   ARE YOU CURRENTLY TAKING ANY MEDICATION? _Yes_
If so, please give the name of the medication and the reason you take it _Lipitor - for high Cholestrol + Estrogen - a hormone tablet._

Ex. 15 - 314

36. ARE YOU OR ANY OF THE MEMBERS OF YOUR FAMILY CURRENTLY BEING TREATED FOR A MEDICAL ILLNESS WHICH WOULD PREVENT OR IMPAIR YOUR JURY SERVICE? *No*
If so, please explain: _____
_____

37. HAVE YOU, ANY FAMILY MEMBERS, OR ANY CLOSE FRIENDS EVER UNDERGONE COUNSELING, TREATMENT, OR HOSPITALIZATION FOR PSYCHIATRIC, EMOTIONAL, FAMILY, BEHAVIORAL, OR SUBSTANCE ABUSE PROBLEMS?
*No*
If so, please give details (including the name of the hospital and/or doctor/counselor seen):
_____
_____

38. DO YOU HAVE A FAMILY MEMBER, FRIEND, OR OTHER PERSON WITH WHOM YOU ARE ASSOCIATED WHO HAS BEEN DIAGNOSED AS MENTALLY RETARDED OR AS HAVING A LEARNING DISABILITY? *Yes*
_____

39. HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER WORKED IN A MENTAL HEALTH FACILITY OR HOSPITAL OF ANY KIND?   If so, please describe: *Yes - I am a nurse and I have worked in several acute care hospital*

40. HAVE YOU EVER READ BOOKS OR ARTICLES DEALING WITH PSYCHIATRY, PSYCHOLOGY, MENTAL HEALTH OR MENTAL RETARDATION?   If so, please describe: *Yes - in nursing school training + when I was working to obtain my master.*

41. DO YOU OR YOUR SPOUSE PERSONALLY KNOW ANY PSYCHIATRISTS OR PSYCHOLOGISTS? If so, please name: *No*

42. HAVE YOU EVER TAKEN ANY COURSES IN THE FIELDS OF PSYCHIATRY OR PSYCHOLOGY? If so, please describe: *Yes - Child psychology + also psychiatry is a part of RN training.*

43. DO YOU HAVE ANY PREJUDICE IN FAVOR OF, AGAINST, OR ANY FIXED OPINIONS CONCERNING PSYCHIATRIC OR PSYCHOLOGICAL TESTIMONY? *No*   If so, please explain: _____
_____

Ex. 15 - 315

## CAPITAL PUNISHMENT/DEATH PENALTY

44. DO YOU HAVE ANY MORAL, RELIGIOUS, OR PERSONAL BELIEFS THAT WOULD PREVENT YOU FROM SITTING IN JUDGMENT OF ANOTHER HUMAN BEING?

    YES _____        NO ✓

45. ARE YOU IN FAVOR OF THE DEATH PENALTY AS A PUNISHMENT FOR CRIME?

    YES _____        NO _____

Please explain: *Yes + No, it depends on the Crime.*

46. DO YOU BELIEVE THAT THE DEATH PENALTY SERVES ANY LEGITIMATE PURPOSE OR PURPOSES IN OUR SOCIETY?

    YES _____        NO ✓

If so, what purpose or purposes do you believe that it serves? _____

47. WITH REFERENCE TO THE DEATH PENALTY, WHICH OF THE FOLLOWING SIX STATEMENTS BEST REPRESENT YOUR BELIEFS: (circle one)

a. "I believe that the death penalty is appropriate for all crimes involving murder."

b. "I believe that the death penalty is appropriate for some crimes involving murder and I could return a verdict which assessed the death penalty in a proper case."

c. "I believe that the death penalty is appropriate for some crimes involving murder, but I could never return a verdict which assessed the death penalty."

(d.) "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it, under the proper set of circumstances."

e. "I could never, regardless of the facts and circumstances, return a verdict which assessed the death penalty."

f. None of the above.

48. FOR WHAT CRIMES DO YOU THINK THE DEATH PENALTY SHOULD BE AVAILABLE? *Murder where victim is brutalized, and for killing children*

Ex. 15 - 316

49. DO YOU BELIEVE THAT THE DEATH PENALTY SHOULD BE USED MORE FREQUENTLY, LESS FREQUENTLY, ABOUT THE SAME AS IT HAS BEEN, OR NOT AT ALL, AS A PUNISHMENT FOR CRIME? *Less frequent*

50. DO YOU KNOW WHETHER YOUR RELIGION OR YOUR SPOUSE'S RELIGION HAS AN OFFICIAL POSITION IN REGARD TO THE USE OF THE DEATH PENALTY AS A PUNISHMENT FOR CRIME? YES _____ NO ✓ If yes, what position has it taken?

_____

Does this conflict with your own personal feelings regarding the death penalty?

_____

50a. DO YOU AND YOUR SPOUSE HAVE CONFLICTING BELIEFS REGARDING THE USE OF THE DEATH PENALTY AS A PUNISHMENT FOR CRIME? YES _____ NO ✓
If yes, how do they conflict? _____

_____

51. DO YOU BELIEVE THAT THE DEATH PENALTY IS NOW BEING, OR HAS IN THE PAST BEEN, APPLIED IN A RACIALLY DISCRIMINATORY MANNER? YES ✓ NO _____
PLEASE EXPLAIN: *Usual the poor can, not afford a good attorney to defend them and the court appointed quite often do not have experience, therefore more poor falks are found guilty.*

52. DO YOU HAVE ANY MORAL, RELIGIOUS, OR PERSONAL BELIEFS THAT WOULD PREVENT YOU FROM RETURNING A VERDICT WHICH WOULD ULTIMATELY RESULT IN THE EXECUTION OF ANOTHER HUMAN BEING? YES _____ NO ✓
If yes, please explain: _____

52a. IF A SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE IS AN OPTION, COULD YOU NEVERTHELESS RECOMMEND A SENTENCE OF DEATH?
YES ✓ NO _____
Please explain: _____

_____

52b. DO YOU BELIEVE THAT AN INNOCENT PERSON HAS EVER BEEN EXECUTED FOR A CRIME IN THE UNITED STATES IN THE LAST 20 YEARS? *yes*

Ex. 15 - 317

53c. DO YOU KNOW OF ANY CASES WHERE THE GOVERNMENT SOUGHT THE DEATH PENALTY AT TRIAL AND WAS UNSUCCESSFUL?
YES ✓ NO _____
IF YES, HOW DID YOU FEEL ABOUT THE OUTCOME OF THE CASE? *The evidence was not presented to jury to support case of death.*

## PERSONAL

53. DO YOU OR THE MEMBERS OF YOUR IMMEDIATE FAMILY OWN A PET(S). If so, what kind? *No*

54. WHAT KIND OF VEHICLE DO YOU DRIVE? *Maximum -*
WHAT KIND OF VEHICLE DOES YOUR SPOUSE DRIVE? *~~Cadillac~~ cadilic*

55. To which civic clubs, societies, professional associations, or other organizations do you belong? Please indicate offices held, if any:
*Nurse Executive*
*ONE*
*Neighborhood Advisory council*
*Lake Como Area Council*

56. Do you contribute money or services to any charitable organization? If so, please describe: *United Way + Boy + Girl Club*

57. Are you or your spouse a member of (Or have you ever been a member of) any neighborhood, local, state, or nationwide crime prevention watch organization? YES ✓ NO _____
If yes, please describe: *Citizen on Patrol*

58. WHAT ARE YOUR HOBBIES? *Reading*

59. DO YOU SUBSCRIBE TO AND/OR REGULARLY READ A NEWSPAPER?
YES ✓ NO _____ If yes, which one(s) *Star Telegram*

60. WHAT ARE YOUR FAVORITE MOVIES? *Sisters, got 7+II Air farce one, Waiting to Exhale*

Ex. 15 - 318

61.  WHAT ARE YOUR FAVORITE TELEVISION SHOWS, OR WHICH SHOWS DO YOU REGULARLY WATCH? *Wheel of Fortune, C N N, Boston Public, Becker, West Wing, Diagnosis Murder Martin, The Practice*

62.  WHAT WAS THE LAST BOOK YOU READ? *Ransom*

63.  WHAT IS YOUR <u>LEAST</u> FAVORITE TYPE OF READING MATERIAL? *Romance, + fiction, + suspense*

64.  HAVE YOU EVER READ A BOOK ABOUT A MURDER TRIAL? YES _____ NO ✔
Which book or trial? _____

65.  WHAT IS YOUR FAVORITE RADIO STATION? *K 10 7. 5*

66.  DO YOU SUBSCRIBE TO OR REGULARLY READ ANY MAGAZINES?
YES ✔ NO _____
If so, which one(s)? *Ebony + Times*

67.  Have you ever written a letter to the editor? YES _____ NO ✔
If so, about what subject? _____

68.  Do you or have you displayed a bumper sticker on your car?
YES _____ NO ✔
If yes, what was the message: _____

69.  HAVE YOU EVER BEEN OPPOSED TO ANY GOVERNMENT ACTION?
YES ✔ NO _____
If so, did you express your opposition? Yes ✔ No _____
How? *Wrote letters to my senator + state representative*

70.  Have you ever owned personalized licensed plates? YES _____ NO ✔ If yes, what was the message: _____

71.  LIST FIVE INDIVIDUALS WHO ARE PUBLICLY KNOWN WHOM YOU MOST RESPECT: *Mike Magniss, Kay B Hutison, Martin L King Michael Jordan, Barbara Jordan, Ethel Kennedy*

Ex. 15 - 319

72.   HAVE YOU, A FAMILY MEMBER OR CLOSE FRIEND EVER HAD A BAD EXPERIENCE
      WITH A PERSON OF ANOTHER RACE?   YES ✓   NO ____   If yes, please explain

~~I have to~~ I do not believe the race had anything
to do with the bad experience, but I was fired by
someone of another race. No more than been treated at
back of resturants + call the N word a few
times.

**Ex. 15 - 320**

## CRIMINAL JUSTICE SYSTEM/LAW ENFORCEMENT

73. HAVE YOU, YOUR SPOUSE, ANY FAMILY MEMBER, OR CLOSE FRIEND EVER BEEN ACCUSED, ARRESTED, INDICTED, CHARGED BY ANY MEANS, OR CONVICTED (including probation, deferred adjudication, conditional discharge, etc.) OF A CRIME OTHER THAN A TRAFFIC TICKET? YES ✓    NO _____
If yes, please give details: *a brother committed for drug possession, also my spouse convicted for drug possession.*

74. HAVE YOU, YOUR SPOUSE, OR ANY FAMILY MEMBER EVER USED THE SERVICES OF AN ATTORNEY FOR ANY REASON? YES ✓    NO _____
If yes, please give details and name of attorney, *I do not know my husband attorney, this occurred before we married.*

75. DO YOU, YOUR SPOUSE, OR ANY FAMILY MEMBERS KNOW OR HAVE ANY FRIENDS WHO ARE ATTORNEYS? YES ✓    NO _____
If yes, please give attorneys' names and the types of practice they have. *Kaye de Walt - ass't D.A. - Houston + now work for Houston I SD.*

76. WHAT IS YOUR IMPRESSION OF PROSECUTORS IN GENERAL? *There are good + bad prosecutors that will go to the extreme to win a case*

77. WHAT IS YOUR IMPRESSION OF CRIMINAL DEFENSE ATTORNEYS IN GENERAL? *There are good + bad defense attorneys that were very hard for their clients*

78. PLEASE INDICATE WHICH OF THE FOLLOWING YOU BELIEVE WOULD BE THE GREATER WRONG:

_____  For a jury to find a guilty person "not guilty,"
✓  For a jury to find an innocent person "guilty."

79. PLEASE RANK IN ORDER OF IMPORTANCE TO YOU THE FOLLOWING PURPOSES FOR PUNISHMENT IN A CRIMINAL CASE:

(1)  Punishment/retribution
(3)  Deterrence/prevention
(2)  Rehabilitation/reform

Ex. 15 - 321

80. Do you know anyone who has been in jail, or who has been to prison, or who is in prison?
YES ✓ NO _____
If yes, please give details: *My brother is in prison.*

81. Have you or any member of your family ever been associated or worked with any program involved with the prevention of crime, the apprehension or punishment of offenders, or the rehabilitation of persons convicted of a crime? YES _____ NO ✓ If yes, please give details: _____

82. Have you, your spouse, any family member or close friend ever been the victim of a crime, a witness to a crime, or been interested in the outcome of any criminal case (either personally or through the media)?
YES _____ NO ✓ If yes, please give details: _____

83. Have you ever been to any of the Federal, State, or County courthouses before?
YES ✓ NO _____
If yes, for what reason: *Served on a jury in State court*

84. Have you ever used the services of the United States Attorney's office or any other prosecutor's office (for example: hot checks, child support)?
YES ✓ NO _____
If yes, please give details: _____

85. HAVE YOU OR YOUR SPOUSE EVER SERVED ON A GRAND JURY?
YES ✓ NO _____
If yes, please give details: *State court grand jury*

86. HAVE YOU OR YOUR SPOUSE EVER BEEN A JUROR IN A CIVIL CASE?
YES ✓ NO _____    If Yes, please provide the following information:
Who (i.e. you, your spouse, or both)? *Me* _____ When? *1980th*
What type of case? *Back Injuries* Were you/spouse the foreperson? Yes ✓ No _____
What Court was it in? *Civil* _____ Did the jury assess damages? Yes _____ No ✓
Is there anything about your/your spouse's experience as a juror in that case which would affect your service in this case? Yes _____ No ✓ If yes, please give details: _____

Ex. 15 - 322

87    HAVE YOU OR YOUR SPOUSE EVER BEEN A JUROR IN A CRIMINAL CASE?
         YES _✓_ NO ____           If Yes, please provide the following information.
Who (i e you, your spouse, or both)? _me_           When? _In the late 80_
What type of case? _Injury to Child_    Were you/spouse the foreperson? Yes ____ No _✓_
What Court was it in? _State_           Did the jury reach a verdict? Yes _✓_ No ____
What was your verdict? _Not Guilty ~~total~~ due to insanity_
Was the jury called upon to assess punishment? Yes ____ No _✓_
What was the punishment assessed: _____
Is there anything about your/your spouse's experience as a juror in that case which would affect your service in this case?  Yes ____   No _✓_   If yes, please give details:
_____
_____

88.    HAVE YOU, YOUR SPOUSE, A RELATIVE OR CLOSE FRIEND, PRESENTLY OR IN THE PAST, BEEN A MEMBER OR EMPLOYEE OF A LAW ENFORCEMENT AGENCY OR ORGANIZATION? (Example: city, county, state or federal police officer; constable; deputy sheriff; ranger; Texas Department of Public Safety officer; auxiliary or reserve of any such organization or agency?) If so, please give name and describe: _No_ _____
_____
_____

89.    HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER APPLIED FOR A JOB IN LAW ENFORCEMENT? If so, please describe: _No_ _____

90.    HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER BEEN CONNECTED WITH LAW ENFORCEMENT IN ANY OTHER WAY?
If so, please describe: _Nr_ _____
_____

91.    HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER STUDIED LAW?
YES _✓_ NO ____ If yes, please give details: _Neice is a lawyer_
_____

92.    HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER HAD AN UNPLEASANT EXPERIENCE INVOLVING LAW ENFORCEMENT?
YES ____   NO _✓_   If yes, please give details _____
_____

Ex. 15 - 323

93    HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER WORKED AS A SECURITY GUARD OR FOR A SECURITY SERVICE?    If so, please give details:
_No_

94    Do you have any strong personal feelings about law enforcement in general, or police officers in particular?    YES _____    NO _✓_
If yes, please explain: _____

95    What is your personal opinion about the criminal justice system and the way it works? _The system works best when there both lawyers are competent one for the defense + the prosecutor_

95a    What is your opinion of plea bargaining? _This is part of system that seems to work._

95b    Do you believe the testimony of an accomplice to a violent crime is generally reliable? Yes _✓_, No _✓_, Please explain _depend on the circumstances + what is in it for the accomplice._

95c    Do you believe that the testimony of witnesses that have admitted committing crimes and who have entered plea agreements with the government calling for the possibility of leniency for their assistance is generally reliable? Yes _____ No _✓_
Please explain _____

96    Do you believe that there are any changes which we could make in our criminal justice system which would make it more efficient in dealing with the problem of crime? Yes _✓_ No ___
If so, what changes could be made? _Ensure correct the public defense lawyers are competent + have experience. Do a serious investigation to identify the guilty party_

97    Do you believe that trial by jury is the best system for the trial of criminal cases? YES _✓_ NO ___ What factors about the jury trial system make you feel this way? _If the defense lawyer is prepared to defend the client._

98    Do you believe the question of punishment, once a person has been found guilty of a crime, should be decided by a judge or by a jury? _Jury_

Ex. 15 - 324

99   Do you believe that the death penalty should be assessed by a judge or by a jury? _Jury_
Why do you believe this method is more appropriate? _Usually the jury has not been involved in many cases like the judge + they should be able to weigh the facts & make a decision._

100.   Do you believe that a person who is charged with committing a violent crime should be allowed to be released from custody on a reasonable bail pending the trial of that case? ~~...~~
~~...~~ _Yes, if this crime was in self defense + this is the first crime._

101.   Do you believe that most people charged with having committed a crime are actually guilty of that crime? _No, not until all facts are presented._

102.   Do you believe that most eyewitnesses to violent crimes are generally reliable in their recollections of the facts? _No,_

103.   HAVE YOU EVER BEEN ACCUSED OF DOING SOMETHING THAT YOU DID NOT DO? If yes, please explain: _No_

104.   HAVE YOU EVER VISITED INSIDE A PRISON OR A JAIL? YES ✓ NO ____ If yes, what was your impression? _Not a place I would want to be in._

105.   Do you believe our penal system is ever successful in rehabilitating/reforming persons convicted of crime? YES ____ NO ✓
Please explain your answer: ____

106.   Do you believe that innocent people ever actually get convicted of crimes? _yes_

107.   Do you believe that there is more, less, or about the same amount of violent crime in your community as there was ten years ago? _less_
If you believe there is _more_ or _less_ crime now, for what reason do you believe there has been a change? _The citizen becoming involved in the citizen on patrol programs_

**Ex. 15 - 325**

## CASE SPECIFICS

108. DO YOU KNOW OR BELIEVE YOU KNOW, ANYTHING ABOUT THE FACTS OR PURPORTED FACTS OF THIS CASE, EITHER FROM THE NEWSPAPER, TV OR OTHER SOURCES? _No_ If so, what facts or purported facts and from what source (be as specific as possible--include information about all publicity related to this case to which you have been exposed):

_____

_____

_____

_____

_____

_____

_____

108a Did you know Rudolfo Resendez or any of his family members during his lifetime? Yes _____ No _✓_. If yes, in what capacity? _____

108b Did you know Juan Reyes or any of his family members during his lifetime? Yes _____ No _✓_. If yes, in what capacity? _____

108c Did you know Johnny Shelton or any of his family members during his lifetime? Yes _____ No _✓_. If yes, in what capacity? _____

108d Have you ever been to Dermott, Arkansas? Yes _____ No _✓_. If yes, why, when and how long were you there? _____

109. DO YOU KNOW OR HAVE YOUR HEARD OF EITHER OF THE DEFENSE ATTORNEYS IN THIS CASE, Wes Ball or Jack Strickland? YES _____ NO _✓_ If yes, how do you know them or what have your heard about them?

_____

_____

_____

110. DO YOU KNOW OR HAVE YOU HEARD OF ANY OF THE PROSECUTORS IN THIS CASE, Fred Schattman or Reed O'Connor ? YES _____ NO _✓_ If yes, how do you know them or what have your heard about them?

_____

_____

_____

111 DO YOU KNOW OR THINK YOU MIGHT KNOW THE DEFENDANT IN THIS CASE, JULIUS OMAR ROBINSON. OR ANY OF HIS FAMILY? YES _____ NO _✓_

Ex. 15 - 326

If yes, in what capacity? _____

112. DO YOU KNOW JUDGE TERRY R. MEANS OR ANY OF THE COURT PERSONNEL?
YES _____ NO __✓__ If so, please list their names and in what capacity you know them:
_____
_____

113. DO YOU KNOW RICHARD STEPHENS, THE UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF TEXAS, OR ANY OTHER MEMBERS OF HIS STAFF?
YES _____ NO __✓__ If so, please list their names and in what capacity you know them:
_____

114. DO YOU KNOW ANY OF THE OTHER PROSPECTIVE JURORS IN THIS CASE?
YES _____ NO __✓__ If so, please list their names and in what capacity you know them:
_____
_____
_____

115. DO YOU CURRENTLY HAVE ANY PERSONAL PROBLEMS THAT WOULD PREVENT YOU FROM GIVING YOUR FULL ATTENTION TO THE TESTIMONY DURING THE TRIAL? YES _____ NO __✓__ If yes, please explain: _____
_____

116. If you have any plans to be out of the Fort Worth area during February and/or early March 2002, please indicate the dates and the reason for your absence:
_____
_____
_____

117. How do you feel about being asked to answer the questions contained in this juror information sheet?
*I know you need information, but this is a little much to ask of ~~a person~~ someone.*

118. Have you, from any source, formed an opinion in this case? Yes _____ No __✓__
If yes, please explain what opinion you have: _____
_____
_____

119. Do you want to serve as a juror in this case? Yes _____ no __✓__ please explain:
*To decide where a person live or die is no something I am excited about doing. If possible I would like to not have this experience.*

**Juror Questionnaire**                    20                    Page 20 of 31

Ex. 15 - 328

120    Is there any information about you which you feel the judge and the attorneys should know in reference to your ability to serve as a juror in this case that has not been set forth above?
Yes _____ no ✓
If yes, please explain: _____

_____

_____

121.    Do you believe that there may be any reason why it would be difficult or impossible for you to be completely fair and impartial in this case? _____ *No* _____ if so, what reason is there?

_____

_____

122.  Do you know or have you heard of any of the following potential witnesses in this cause; if so, please circle their name(s):

## GOVERNMENT'S WITNESSES

1.  Tim McAuliffe
2.  Ben Lopez
3.  Brian Finney
4.  Andrew Merlino
5.  Jamilla Camp
6.  Leteisha Barnett
7.  Jason Gehring
8.  Dakari Warner
9.  Carmen Byrd
10. Nathan Henderson
11. Luis Patino
12. Wendy Patino
13. Nicholas Marquez
14. Raul Patino
15. Vivian Clinkscales
16. Willie Mae Merritt
17. Anita Brown
18. Yolanda Reyes
19. Marcus Robinson
20. Brandi Scales
21. Paulino Toscano
22. Sheila Spotswood, M.D.
23. Terry Weber
24. Juan Hinohosa
25. Sgt. Bassinger
26. Linda Crum
27. Umberto Resendez
28. Isaac Rodriguez
29. Alfred Garcia
30. Arlia Cheater
31. Robert Cheater
32. Jerry Robinson
33. Detective David Rivers
34. Leon Jenkins
35. Maria Reyes
36. Robert Plummer
37. Officer Richards
38. Toy Payne
39. Investigator R.A. Pope

**Ex. 15 - 329**

40. Dr. Guileyardo
41. Dr. Ross
42. Dr. Townsend-Parchman
43. Dr. Joni McLain
44. Dr. Barnard
45. Dr. Joseph Prahlow
46. Dr. Charles Odom
47. Derrick Frazier
48. Roderick Fridia
49. Johntan Smith
50. Dettective Danny Muniz
51. CSSU Daniel Wojcik
52. CSSU Donald Whitsitt
53. CSSU Daniel Cannon
54. Jerrell Gardner
55. Donald Ray Britton
56. Rodney O'Neal Wilson
57. Cheryl Chappel
58. Quinton Knox
59. Sheila Shelton
60. Mark A. Johnson
61. Phillip E. Jones
62. Tyrone Bryant
63. Hendrick Ezell Tunstall
64. Dr. Marc Krouse
65. Dr. Nizam Peerwani
66. Dr. Sissler
67. Dr. Konzelmann
68. J. Randy Owen
69. Haitham Jabsheh
70. Anita Bonds
71. Clifford Rogers
72. Andy Farrell
73. Larry Taylor
74. Paul Escamillo
75. Edvette Russell
76. Michael Williams
77. Lisa Hernandez
78. Crystal Mancilla
79. Shannon Vega
80. Ron Fazio
81. Misty Grounds
82. Shanita Tarvette Lewis
83. Kiesha Johnson
84. Dorothy Hodges

**Ex. 15 - 330**

Ex. 15 - 331

85.   Selena Carter
86.   Jennifer Edwards
87.   Lindsey Hoy
88.   Richard Smart
89.   Cantrall Huggins
90.   Jewell Ewing
91.   Myesha Harmon
92.   Dalia Davidson
93.   Trooper Brian Sturgill
94.   LaQuita Delasbour
95.   Lynn Griffin
96.   Tom Ekis
97.   Max Courtney
98.   Richard Dawes
99.   Karla Davis
100.  Raymond E. Cooper
101.  T.L. Armstrong
102.  Leslie May
103.  Herschel Tebay
104.  Stephen Hester
105.  Paul DesCamps
106.  Ray Perez
107.  Michael Kropff
108.  Richard Clough
109.  Stephen Farrow
110.  Kevin Brown
111.  Perry Moore
112.  Dale Malugani
113.  Ray Hinojosa
114.  Terry Tabor
115.  Richard Martinez
116.  Bill Vivoni
117.  Daniel Garza
118.  Rico Lucero
119.  Leslie Tate
120.  Vince Ramsour
121.  James Malloy
122.  Nancy Gilchrest
123.  Dan Poe
124.  Jeff Rogers
125.  Bob Calhoun
126.  Dan Goss
127.  Stephanie Stanley
128.  Mindy Price
129.  A.J. Reed

130.  R C. Adams
131.  Robert Durko
132.  Tim Pinckney
133.  Tony Folkers
134.  Kirk Dunlop
135.  Jerry Wenzel
136.  Gregory Cuppett
137.  Stephanie Pearson
138.  Mark Cox
139.  Task Force Agent Thomas Vohsen
140.  Frank Christopher
141.  Andrew Christopher
142.  Tim Heller
143.  Tony Dyess
144.  TFO Barry Ragsdale
145.  Scott Giovanelli
146.  Troy Lee Simpson
147.  Victor Jiminez
148.  Vic Routh
149.  Juan Villareal
150.  Joe Mata
151.  Tim Gilpin
152.  Kim Sanders
153.  Tony Rivera
154.  Matthew Fihlman
155.  Anthony Shell
156.  Frank Cook
157.  Mike Hodges
158.  Charmane Camp
159.  Special Agent Michael R. Weir
160.  Gerardo Briones
161.  Carlos Aponte
162.  William Claus
163.  Patricia Fernandez
164.  Ignacio Aranda
165.  Wilberto Hernandez
166.  Mary Lu Martinez
167.  Vince Edsall
168.  Richard Mendez
169.  Dwayne Birton
170.  N. Jeniece Heggins
171.  Tim Starmer
172.  Ryan Black
173.  Dennis K. Pridgen
174.  Claybion Cloud III

Ex. 15 - 332

175.  Jeanna Oxenham
176.  Darin Marcinkiewicz
177.  Jody Augsberger
178.  Jeanne D. Wilkins
179.  Trooper Brian Wworley
180.  Sgt. David Beasley
181.  Iris Wade
182.  Dawn Wallace
183.  Takenya Weston
184.  Reginald Kinchen
185.  Angie Franco
186.  Kimball Hardeman
187.  Joey Branch
188.  Troy Pitcock
189.  Trooper Bruce Dalme
190.  Lidelle Kendrick
191.  Collin Hill
192.  Tommy Ballentine
193.  Andrew Jeager
194.  Cody Elliott
195.  Javier Aguilar
196.  Angela Leach
197.  Jennifer White
198.  Sean Sowards
199.  Jennifer Nelson
200.  Kimberly Johnson
201.  Brian Newell
202.  Tommy Sawyer
203.  Howard Ringer
204.  Michael Pines
205.  Chief Carl McCree
206.  Bobby Robinson
207.  Trooper J.D. Abernathy
208.  Brenda Anderson
209.  Jim Harris
210.  Terrence Holimon
211.  Timothy Caldwell
212.  Sandra Ramsey
213.  Steve Thomas
214.  Deputy Andrew Hawks
215.  Vicki Anderson
216.  Sherry Alsbury
217.  John McLemore
218.  Phil Foster
219.  Daria Hogg

**Ex. 15 - 333**

Ex. 15 - 334

220. Jeff Green
221. Earl Hewitt
222. Detective Gary Sodoma
223. Detective Quinn Turner
224. Officer Peeler
225. Ginger Courtney
226. Officer Ryan Eastlick
227. Officer Glenn Norwood
228. Dennis Craig
229. Ozla Ann Tucker

## DEFENDANT'S WITNESSES

1. John Turner
2. Misty Grounds
3. Michael S. Poche
4. Fanisha Hill
5. Detective Karney
6. Hendrick (Hank) Tunstall
7. Isaac Rodriquez
8. Robert Henry
9. Margaret Holiman
10. Rosa Mae Robinson (Holiman)
11. Betty Britt
12. Lynette Wolfe
13. Sgt. Michael Wolfe
14. Kim Burnett
15. Michelle Washington
16. Katrina Washington
17. Cassandra Washington
18. Arlin Cheeter
19. Richard Smart
20. Jerry Robinson
21. Sheila Spotswood, M.D.
22. Jerell Gardner
23. Dakari Warner
24. Nicolas Marquez
25. Wendy Patina
26. Raul Patina
27. Chris Gant
28. Detective Crum

Ex. 15 - 335

29. Victoria Nieto
30. Yolanda Reyes
31. Rodney Tilley
32. Jason Barrett
33. Polino Toscano
34. Mike Aginada
35. Marc Krouse, M.D.
36. Ronald Fazio
37. Detective Osegara
38. Shannon Vega
39. Benjamin Garcia
40. Tim McAuliffe
41. Ben Lopez
42. Brian Finney
43. Andrew Merlino
44. Daniel McCauley
45. S.G. Sabolchick
46. John Holimon
47. Josephine Holimon
48. Willie White
49. Eddy Peach
50. Correctional Officer Wagner
51. Correctional Officer Logan
52. Correctional Officer Gibson
53. Shanita Lewis
54. LaToya Logan
55. Travis Dixon
56. Terrance Holimon
57. Jamila Camp
58. Spyra Holimon
59. Mark Cunningham

DIRECTIONS: Below, you will find a number of statements expressing different attitudes toward the Death Penalty. Place a check in one of the spaces next to each statement indicating your agreement and/or disagreement with the statement.

| | Strongly Agree | Agree | Slightly Agree | Slightly Disagree | Disagree | Strongly Disagree | |
|---|---|---|---|---|---|---|---|
| A. | | | | ✓ | | | The death penalty is wrong. |
| B. | | | | | | ✓ | The death penalty is the best crime preventative. |
| C. | | | | ✓ | | | The death penalty is absolutely never justified. |
| D. | | | ✓ | | | | I think the death penalty is necessary. |
| E. | | ✓ | | | | | I wish the death penalty were not necessary. |
| F. | | | | | ✓ | | Any person (man or woman, young or old) who commits murder should pay with his own life. |
| G. | | | ✓ | | | | The death penalty cannot be regarded as a sane method for dealing with crime. |
| H. | | | | | ✓ | | The death penalty is wrong, and it is unnecessary even in our imperfect civilization. |
| I. | | | | | | ✓ | The death penalty has never been effective in preventing crime. |
| J. | | ✓ | | | | | We must have the death penalty for some crimes. |
| K. | | | | | ✓ | | I think the return of the whipping post would be more effective than the death penalty. |
| L. | | | | | ✓ | | The death penalty is not necessary to modern civilization. |
| M. | | | | ✓ | | | Life imprisonment is more effective than the death penalty. |

Ex. 15 - 336

| | Strongly Agree | Agree | Slightly Agree | Slightly Disagree | Disagree | Strongly Disagree | |
|---|---|---|---|---|---|---|---|
| N | | | | | ✓ | | Execution of criminals is a disgrace to a civilized society. |
| O. | | | ✓ | | | | The death penalty gives the criminal what he deserves. |
| P | | | | | ✓ | | The State cannot teach the sacredness of human life by destroying it. |
| Q | | | | | ✓ | | It doesn't make any difference to me whether we have the death penalty or not. |
| R. | | ✓ | | | | | The death penalty is justified only for premeditated murder. |

DIRECTIONS: Please mark the blank that best corresponds with your opinion as to each of the following statements.

| | Strongly Agree | Slightly Agree | Agree | Disagree | Slightly Disagree | Strongly Disagree | |
|---|---|---|---|---|---|---|---|
| a | | | | ✓ | | | Black males commit most of the violent crimes in our society. |
| b | | | | ✓ | | | Today's welfare society is the major cause of crime. |
| c. | | | | | | ✓ | People in prison live a better-quality life than most of the taxpayers who support their lifestyle. |
| d. | | | | | | ✓ | Death by lethal injection is too good/easy for people convicted of capital murder. |
| e. | | | | ✓ | | | There are too many technicalities in the law that allow guilty people to go free. |
| f | | | | | ✓ | | The law should concern itself more with victims of crime than with those accused /convicted of crimes. |
| g. | | | | | | ✓ | Police officers must be obeyed without question because they have society's best interests at heart. |

**Ex. 15 - 337**

| | Strongly Agree | Slightly Agree | Agree | Disagree | Slightly Disagree | Strongly Disagree | |
|---|---|---|---|---|---|---|---|
| h. | | | | | | ✓ | It is not wrong to lie if it is for a good reason. |
| i. | | | | ✓ | | | Only a guilty person would object to a warrantless search of their home, car, or person. |
| j. | | | | | | ✓ | People sentenced to prison do not serve any significant portion of their punishment. |
| k. | | | ✓ | | | | Parolees are the major cause of crime in today's society. |
| l. | ✓ | | | | | | It is morally wrong to be racially prejudiced. |
| m. | | | ✓ | | | | Black people who kill white people have received harsher punishment in the past than blacks who kill blacks. |
| o. | | ✓ | | | | | The high incidence of violent crime in the United States is largely attributable to the fact that this country is a "melting pot" for different cultures, races, and religions |
| p. | | | | ✓ | | | Eyewitness testimony is the strongest evidence that could be offered to prove who committed a crime. |
| q. | | | | ✓ | | | Minorities blame too many problems on racial discrimination |

## DECLARATION

I declare under penalty of perjury that the information I have provided in this Juror Information Sheet is true and correct.

Executed on ___Jan 25, 2007___
(Date)

Juror's Signature

Ex. 15 - 338

# EXHIBIT 16

Mr. Julius O. Robinson
26190-177
Post Office Box33
Terre Haute, Indiana 47808



Mr, Charles R. Fulbruge, Clerk
United States Court of Appeals
Fifth Circuit
600 Camp Street
New Orleans, LA 70130

ATTN: Court of Appeal & Clerk

        RE: 02-10717 U.S.A. vs Julius Omar Robinson
            USDC No. 4:00-CR-260-2-Y

Dear Mr. Fulbruge:

        I'm writing this court to ask if you could halt my appeal
that my lawyers just file on June 21,2003. The reason am asking
this is because I just found out what my lawyers file on my appeal.
Before they file my appeal I had little or no communication between
us and I had been writing them letters,telling them I needed my
trial record and never receive them as of yet.(July, 1 2003)
I believe that there are some more issue that could be raise on
my appeal, but without my court records I can't find out and
don't want this to hurt my chance on my other appeals because
my lawyers didn't raise them now or ask me if I wanted them
raise.

I hope that you could take this in consideration so that my
lawyer & I could properly go over this together.

                Thank you for your assistance.

                        Sincerely,


                        Julius O. Robinson



W/R/P

# United States Court of Appeals

FIFTH CIRCUIT
OFFICE OF THE CLERK

CHARLES R. FULBRUGE III
CLERK

TEL. 504-310-7700
600 CAMP STREET
NEW ORLEANS, LA 70130

July 25, 2003



Mr Julius O Robinson
#26190-177
PO BOX 33 Building
Terre Haute, IN 47808

No. 02-10717 USA v. Robinson
USDC No. 4:00-CR-260-2-Y

We will take no action on your request to "halt your appeal". Only
your attorney can file motions or other documents on your behalf.
Your motion is being forwarded to your attorneys' for whatever action
they deem necessary.

Sincerely,

CHARLES R. FULBRUGE III, Clerk

By: Debbie Kranz, Deputy Clerk
504-310-7698

cc:  Ms Susan B Cowger
     Mr Jack V Strickland
     Mr Wessley Thompson Ball

BR-9

**Ex. 16 - 340**

July 30, 2003

Mr. Julius O Robinson
#26190-177
P.O. BOX 33
Terre Haute, IN    47808

Mr. Charles R. Fulbruge III Clerk
United States Court of Appeals
Fifth Circuit, office of the clerk
600 CAMP STREET
NEW ORLEANS, LA 70130



RE: No. 02-10717 USA v. Robinson
USDC No.  4:OO-CR-260-2-Y

Mr. Fulbruge:

   I recieved your response to my letter where you stated that you will take no action on my request to halt my appeal. My issue is with my attorney on the fact that he "isn't" filing issues in my brief that may later be denied by this court because I didn't raise them at the proper time. I'm also being denied " effective" counsel by my counsels failure to work with his client, which is me. I haven't recieved my transcripts, all my F.B.I. 302 forms which I need to help put on a defense for myself.

In U.S. v Greig 967 F.2d 1018,1022(5th Cir.1992) the court stated that it was a (violation of right to effective assistance of counsel when trial "court" knew of conflict of interest but failed to conduct further inquiry.) I understand that we are past the trial stage of this process, but what makes my case more important is that my life is on the line and if something doesn't get filed I'm the one that suffers. The conflict between my attorney and I is effecting not only my case but also my right to a fair appeal. If I can't turn to the courts, than I can"t turn to nobody.

Sincerely,
Julius O Robinson

*Julius Robin*

W/R/P

Signed Before Me
July 30, 2003
Rivera, Juea -Notary
State of Indiana, Vigo Co
exp. Aug. 28, 2010

Ex. 16 - 341

## *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**CHARLES R. FULBRUGE III**
**CLERK**

**TEL. 504-310-7700**
**600 CAMP STREET**
**NEW ORLEANS, LA 70130**

August 6, 2003



Mr Julius O Robinson
#26190-177
PO BOX 33
Terre Haute, IN 47808

No. 02-10717 USA v. Robinson
USDC No.  4:00-CR-260-2-Y

We will take no action on your letter dated July 30, 2003.  Only
your attorney can file motions or other documents on your behalf.
Your motion is being forwarded to your attorney for whatever action
he deems necessary.

Sincerely,

CHARLES R. FULBRUGE III, Clerk

By: _Debbie Kranz_
Debbie Kranz, Deputy Clerk
504-310-7698

cc:  Mr Jack V Strickland
     Mr Wessley Thompson Ball
     Ms Susan B Cowger

P.S. To Mr Ball and Mr Strickland:  Please discuss the enclosed letter
     with your client and advise the court as needed.

BR-9

**Ex. 16 - 342**

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JULIUS OMAR ROBINSON<br>aka Face, aka Scar, aka Scarface<br>    Defendant-Petitioner,<br><br>v.<br><br><br>UNITED STATES OF AMERICA,<br>    Plaintiff-Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 4:00-CR-260-Y<br>(Civil No. 4:05-CV-756-Y)<br>**DEATH PENALTY CASE** |

## AFFIDAVIT OF BRUCE CUMMINGS

I am in all respects competent to make this affidavit.

I do not have a criminal history. I became a licensed private investigator in 1989. From 1989 to 1991, I was primarily involved in asset searches for lending institutions. It was the period in time when most of the Savings & Loan industry had collapsed and I was involved in helping banking institutions finds assets. I began doing criminal defense investigations in 1991. Since 1991, over 95% of my work has been felony court-appointed and client paid work in State District Courts. My work in the felony courts has primarily involved Capital Murders, Murders, Aggravated Sexual Assault, and Crimes Involving Serious Bodily Injury. I have readied hundreds of cases for trial and have gone to trial on many Capital Murder cases, both when the State was seeking the death penalty and when they were not.



GOVERNMENT EXHIBIT
C

Ex. 17 - 343

In regards to this case in particular, I reviewed the case material provided and proceeded with the investigation under the direction of the two attorneys and with input from Mr. Robinson. I had worked for both Wes Ball and Jack Strickland in the past, but more often for Mr. Ball. Our working relationship was that he would provide me material to review or give me specific tasks that I needed to accomplish. I would typically interview witnesses that we had determined need to be interviewed either with Mr. Ball or in those instances that I interviewed them by myself, I would typically call Mr. Ball with the substance of the interview and he would make a determination if more needed to be done or whether the information was not helpful and we would move on to the next area of concern.

In my first conversation with Mr. Robinson, it was quickly determined that he was not denying being at the crime scenes that the government was alleging. Mr. Robinson did not attempt to have me prepare an alibi case for him as he did not deny being at these murders. This, of course, did not preclude making the government prove its case against Mr. Robinson.

With respect to the penalty phase, Mr. Robinson was asked about his upbringing and was questioned about who might make good fact witnesses for him. It should be noted that at all times that I spoke to Mr. Robinson, it was my observation that he was intelligent and fully aware of the circumstances that he was involved in and I felt that he was providing accurate information to us. I

**Affidavit of David Bruce Cummings – Page 2**

**Ex. 17 - 344**

asked him about church, school teachers, and people of good character that might be willing to speak on his behalf. Mr. Robinson told me that he had been an average student in school. Mr. Robinson was not involved for the most part with people and/or activities that would bode well for him from the witness stand. A positive activity that he was involved in prior to his arrest was his attendance at CCI, a computer training school, in Arlington. It was my belief from speaking to Mr. Robinson that he was trying to use this computer training class to leave the life he was leading. I obtained his school records from the school and interviewed his instructor, Debbie Wesson. She testified on his behalf.

Other persons that Mr. Robinson directed me to were his football and track coaches at Lamar High School. I interviewed Eddy Peach, Mike Nelson, and David York who were all coaches at Lamar. All three had very limited knowledge of Mr. Robinson's activities away from school, but all remembered him fondly and were willing to testify for him. I also spoke with Willie Parker, a Dermott coach.

The attorneys wanted to show that Julius Robinson could and would adapt well in a structured environment like prison confinement which would be one of the future dangerousness considerations that the jury would have to decide. Mr. Ball, while being escorted to visit Mr. Robinson, learned from the guard that he had a pretty high opinion of Mr. Robinson. Following this conversation, we asked Mr. Robinson if there were any guards that he thought might speak for him on

**Affidavit of David Bruce Cummings – Page 3**

these issues and he gave us the names of those guards. I worked with Mr. Al Monguie and the warden of FMC, Dan McCauley to set up a meeting whereby we could interview those guards. Permission was granted and we interviewed Dan McCauley, and guards Frank Logan, Steve Sabolchick, Frederick Waggonner and Stan Gibson. All of the guards were of the same mind that we were, that Mr. Robinson would do well in confinement and they could not understand that of all the people involved in this case, why it was Julius Robinson that they were seeking the death penalty on. On the issue of a structured environment, I was also involved in the meetings with Dr. Cunningham.

We asked Mr. Robinson to provide us names and contact information of family members or people that could help us in understanding his upbringing and background. I spoke to Margaret Hollimon, Rosa Hollimon, Brenda Hollimon, Josephine Hollimon, Marcus Robinson, and Willie White. I met with Margaret Hollimon and Brenda Hollimon to review his upbringing. Mr. Ball interviewed John Hollimon, Jr., and perhaps others. We also interviewed Rosa Hollimon at length about the living environment that she provided for Julius Robinson in Arlington, Texas. Ms. Hollimon seemed to determine to paint a rosier picture of her role as a parent and to not take responsibility for the upbringing of Mr. Robinson. We were given permission by the Marshal's service to allow us to have her meet with Julius Robinson in the Marshal's office in an attempt to have her see

**Affidavit of David Bruce Cummings – Page 4**

the need to portray a more realistic accounting of what kind of mother she actually was. Those efforts proved fruitless.

D. BRUCE CUMMINGS

THE STATE OF TEXAS          §

COUNTY OF TARRANT          §

BEFORE ME, the undersigned authority, on the 26 th day of April, 2006, personally appeared BRUCE CUMMINGS, who under oath states that the allegations in the foregoing affidavit are true and correct.



LOU LADD
Notary Public, State of Texas
My Commission Expires
November 25, 2007

NOTARY PUBLIC, STATE OF TEXAS

**Affidavit of David Bruce Cummings – Page 5**

Ex. 17 - 347

# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JULIUS OMAR ROBINSON,<br>aka Face, aka Scar, aka Scarface<br>Defendant-Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Plaintiff-Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NO. 4:00-CR-260-Y<br>(Civil No. 4:05-CV-756-Y)<br>**DEATH PENALTY CASE** |

## AFFIDAVIT OF WESSLEY T. BALL

I am in all respects competent to make this affidavit.

I, along with Jack Strickland, represented Julius Omar Robinson in this case, before and during trial, through the direct appeal, and through the filing and rejection of a petition for certiorari in the U.S. Supreme Court. I was appointed by this Court on or about July 12, 2001, and I was permitted to withdraw from the representation in about December, 2004, after certiorari had been denied.

I was licensed as a lawyer in Texas in 1980. I am admitted to practice in the State of Texas, the United States District Court for the Northern District of Texas, the United States Court of Appeals for the Fifth Circuit, and the United States Supreme Court. I graduated from the Texas Tech University School of Law in 1980. I was employed as a prosecutor for the Tarrant County District Attorney's Office from 1980 to 1987 when I entered private practice. My last position with the Tarrant County District Attorney's Office was in a supervisory capacity.

**AFFIDAVIT OF WES BALL – Page 1**

GOVERNMENT EXHIBIT
A

Ex. 18 - 348

I have been a named partner in the firm Ball & Hase, P.C. (formerly Ball, Hase & Wisch) since 1987. My practice is limited to the defense of criminal cases in both state and federal courts, trial and appellate. I became a Board Certified Specialist in Criminal Law in 1985 and have remained so certified to the present (renewable every 5 years).

I am a former board member of the Texas Criminal Defense Lawyers Association and a past President of the Tarrant County Criminal Defense Lawyers Association (TCCDLA). I received the first "Roland Hill" award from my colleagues in TCCDLA for exceptional achievement in criminal defense in 2004. This award was started due to my successes in criminal trial work. It has been awarded subsequently to only one other attorney in my county. I have never had any meritorious grievances filed against me, nor have I been disciplined by any court

I have tried approximately 200 cases to a conclusion before a jury. All of these were criminal cases and this includes both state and federal matters. I have handled approximately 80 appellate matters in both state and federal courts. I have tried at least 8 cases in which the death penalty was sought. One of those cases was in my position as an Assistant District Attorney for Tarrant County, Texas.

Julius Robinson has made several claims regarding Mr. Strickland's and my representation of him, all of which lack merit.

First, Robinson claims we did not use the services of a skilled investigator. This is false. Our investigator was David Bruce Cummings of Fort Worth. I have known Mr. Cummings since at least the early 1990s. I likely met Mr. Cummings through his wife, the Honorable Jamie Cummings, presiding judge of County Criminal Court Number 5, of

**AFFIDAVIT OF WES BALL – Page 2**

Tarrant County, Texas. I have made use of his investigative services in at least 20, maybe as many as 50, cases that have gone to a jury trial. I have used Mr. Cummings' services in cases where I was appointed as counsel, as well as cases where I was retained by the client. I have used Mr. Cummings' services in well over 100 cases that did not ultimately proceed to trial. Mr. Cummings has worked with me on at least 5 murder trials in which the death penalty was sought. I have found Mr. Cummings' work to be first rate. His services are available to attorneys in our area and he is used by many attorneys with excellent reputations. I have used other experienced investigators in criminal cases over the years, but I have almost always selected Mr. Cummings when I have had a choice.

Due to our longstanding professional relationship, I have become accustomed to the manner in which Mr. Cummings conducts his investigative activities and I am confident he has become accustomed to how I conduct the defense of criminal cases. It has been quite common for me to provide Mr. Cummings with oral, not written, instructions regarding investigative activities that I believe need to be accomplished or attempted. It is also common for Mr. Cummings to provide me with a mix of oral and written reports concerning his work, and the results of my investigative requests. It is typical that these investigative instructions that I provide to Mr. Cummings will include copies of either a complete set or a portion of discovery materials, *e.g.*, government investigative reports, witness statements, etc., as I deem necessary. It is also typical that strategy meetings are held when instructions are provided to Mr. Cummings. Mr. Cummings will also provide his recommendations and suggestions from time to time in a given case. In our work on the Julius Robinson case, these typical procedures were

**AFFIDAVIT OF WES BALL – Page 3**

utilized. Accordingly, in some instances there may be written documentation of an investigative activity, and in other instances the reports and instructions were purely oral.

Mr. Robinson claims that Mr. Cummings had a criminal record. This claim is not true. Mr. Cummings has the same exact name and date of birth as an individual that apparently resides in California. It is my understanding that this individual served one or more prison sentences in California. This issue arose when Mr. Cummings sought entry to the federal correctional facility where Mr. Robinson was being housed prior to his trial. Mr. Cummings had gone to that facility pursuant to his investigative responsibilities. A cursory record check by the staff at that facility discovered the criminal record of the California individual with the same name. A few telephone calls resolved the problem, permitting Mr. Cummings to proceed with his work.[1]

Mr. Cummings interviewed witnesses and potential witnesses in this case, met with Mr. Robinson, and followed our instructions. At times, I was in the company of Mr. Cummings when witnesses were interviewed, at other times he would report to me (typically orally) the results of his interviews or attempts to interview. We had considered whether to travel, or have Mr. Cummings travel, to Arkansas. We were able to conduct the interviews and obtain the information that we believed to be reasonably necessary through communications by telephone. Had we believed it necessary to travel to Arkansas or anywhere else, we would have done so. Mr. Cummings arranged for some

---

[1] I have to say that during a telephone interview with investigators working on Mr. Robinson's § 2255 application, while Mr. Cummings and I were on the line, no one bothered to ask Mr. Cummings about this claim. Had they done so, it could have quickly been explained.

**AFFIDAVIT OF WES BALL – Page 4**

witness interviews that were conducted at places of confinement. Permissions had to be obtained from these witnesses' legal counsel before we could ethically meet with them. In some instances we were not able to secure the approval of legal counsel for the witnesses and accordingly the interviews were not conducted.

Mr. Robinson alleges, correctly, that we did not use the services of a so-called "mitigation specialist." My reasons for this choice are several. At the time of Mr. Robinson's trial, the use of mitigation specialists was in my professional opinion not as common as it is today. My view of mitigation specialists is that they are another form of investigator, doing investigative work that had traditionally been done by ordinary investigators and the attorneys themselves. Since Mr. Robinson's trial, I have used mitigation specialists in capital cases and am still of the opinion that this investigative work can be done by others. I can say without reservation that I have done effective mitigation investigation in many cases without the use of such a titled specialist. An example would be where I have identified a mental health issue in a case. I would simply in that instance employ mental health professionals to examine and report to me their findings in that regard. The current proliferation of the use of "mitigation specialists" is in some instances simply a response to the fear of "ineffective assistance" claims on the premise that the mere failure to employ one is on its face ineffective. I disagree with this view.

Mr. Robinson alleges that we did not adequately represent him with respect to presenting mitigation evidence, and defending against aggravation evidence. I disagree.

**AFFIDAVIT OF WES BALL – Page 5**

On the subject of mitigation generally, it was fairly clear to me that Mr. Robinson's mother had neglected him and provided a poor example for him. Also, based on what was told to me by family members of Mr. Robinson and Mr. Robinson himself, I believed that his upbringing by his grandparents was for the most part functional. I was of the opinion that Mr. Robinson's grandparents were poor in terms of money and things of material value, but they provided a decent home for him. It was after Mr. Robinson came to Arlington, Texas that things largely started to go awry.

We had some evidence of Mr. Robinson having a connection to a criminal street gang in Arkansas. However, it has been my experience that gang evidence is almost always detrimental to a defendant as jurors are very frightened of gangs. Accordingly, we did not go into any gang type evidence, the effects of gangs on young people, etc. in the defense of Mr. Robinson. It was and remains my opinion that the better strategy was to depict Mr. Robinson's upbringing in Arkansas as largely positive and concentrate on the changes that began to occur when he was living with his drug-abusing mother in Arlington.

I spoke with Mr. Robinson's mother on at least two occasions before she traveled to Texas.[2] Prior to Mr. Robinson's mother's testimony, I attempted to convince her not to minimize her dysfunction. Mr. Strickland and I even made arrangements with the U.S. Marshal's Service for Mr. Robinson to meet privately with his mother so she could

---

[2] I do not recall whether Mr. Cummings interviewed Mr. Robinson's mother independently from me on any other occasions. Mr. Cummings may have been instrumental in making the travel arrangements for her.

**AFFIDAVIT OF WES BALL – Page 6**

understand the seriousness of his plight. Unfortunately, Mr. Robinson's mother in my opinion was not willing to portray herself in a light that was too negative.

I also conducted the interviews of other relatives, including John Hollimon who testified at the trial. I have some notes that indicate I interviewed other relatives and acquaintances by telephone. Those witnesses were not called to testify because in my judgment they would not have aided the defense case, at least to the extent and degree that would have merited calling them as witnesses. There were witnesses that might have provided some information useful at punishment, but they were involved in the conspiracy at issue in our case and we decided that what potential benefit they would offer was offset by their involvement in the criminal enterprise.

Mr. Cummings was instructed to interview coaches and personnel at Lamar High School regarding their knowledge of Mr. Robinson while he was a student at Lamar. Mr. Cummings reported back to me the nature of those interviews and the results. I do not independently recall whether I spoke with any of the Lamar witnesses by telephone, but think I did follow up on Mr. Cummings' information. I believe there were more of those types of witnesses interviewed than were actually used. I also know that these witnesses were summoned to the courthouse and I spoke with each of them, out of the presence and hearing of the others at the courthouse, before they were presented to the jury. I noticed in their affidavits that they do not recall that occurring, but I have never in my legal career presented any witness before personally reviewing their testimony with them. There are times when those reviews are brief, but they always occur.

**AFFIDAVIT OF WES BALL – Page 7**

I also know that we had a variety of records to review. Many of those records were obtained in discovery requests from the government, and others were obtained outside of the government's participation. I remember reviewing school records and criminal records on Mr. Robinson, as well as records from prison and from the computer school Mr. Robinson attended.

In addition to the work that we asked of Mr. Cummings, Mr. Strickland and I made conscious and strategic choices about the conduct of the penalty phase of the case. With regard to Mr. Robinson's mental/emotional condition, it was my professional opinion that Mr. Robinson did not suffer from any such condition to an extent and degree that would be considered mitigating by any jury that was likely to hear his case. While Mr. Robinson's current lawyers try to make the case that we should have investigated exposure to pesticides, we did not see any indication for doing such a thing. Mr. Robinson in my opinion is intelligent. He possessed a sophisticated understanding of his legal plight and circumstances, and never declined to provide information in response to our requests about either his life, or the allegations against him.

Moreover, my experienced opinion is that a jury would find a defensive tactic based on pesticide exposure either laughable or offensive, from the perspective that if exposure to pesticides would cause a child to grow into a murderer, then the entire town should have turned out the same way. The same holds true for a defense based on poverty or less than excellent performance in school. And while I do not profess to be a mental health professional, I have extensive experience with clients who have presented a variety of forms of mental health issues and concerns. I have used mental health

**AFFIDAVIT OF WES BALL – Page 8**

**Ex. 18 - 355**

professionals where I believed they were warranted. Additionally, we had in place documentation from the government's own staff psychologist, Dr. Womack, characterizing the defendant as a low risk for harm to others in the future. It was my opinion that Dr. Womack's conclusion would carry a good deal of weight since he was working for the Federal Bureau of Prisons, and that using a defense specialist who had analyzed Mr. Robinson would be counterproductive.

Part of my concern in that regard was that an expert who met and interviewed Mr. Robinson would draw unfavorable conclusions. Mr. Robinson made the comment to me during a visit at his place of confinement that if he had everything to do over again, he would choose white collar crime instead of narcotics because the consequences would be less punitive and the earnings would be better. It was my opinion based on this comment and on my experience that a mental health professional would likely deem Mr. Robinson to be a sociopath. A sociopathic personality would not in my opinion be a useful mitigating circumstance and would correctly be considered aggravating. Mr. Strickland and I discussed this view and we were in agreement on this point and our opinions regarding Mr. Robinson were the same.

With regard to Dr. Mark Cunningham, as I recall, Mr. Strickland worked primarily with this expert witness. I had attended a portion of a state death penalty trial where Dr. Cunningham testified for five (5) hours concerning risk assessment and his actuarial method, among other testimony that he provided in that case. It was my professional opinion that Dr. Cunningham's effectiveness was damaged due to the length of his testimony, the number of slides in his presentation, and the broad nature of the topics he

**AFFIDAVIT OF WES BALL – Page 9**

covered. The defendant in that state prosecution was sentenced to death. It was my opinion that while Dr. Cunningham had information that was useful, it was much too long and would put a jury to sleep. When we decided to use him as a witness in Robinson's case, it was my opinion that his presentation needed to be cut down in length, the numbers of slides reduced and the testimony narrowed to the probability of a defendant in our client's situation engaging in an act of violence against another. I believed that portion of his presentation was potentially effective. We chose not to have Dr. Cunningham actually examine or interview Mr. Robinson as the cross-examination material that would be exposed would be more likely damaging to our position.

Clearly one of the mitigation avenues we wanted to use was to demonstrate to the jury the relatively exemplary behavior Mr. Robinson exhibited at his place of confinement. I personally spoke to at least one correctional officer at the prison during one of my visits with Mr. Robinson. I came to understand that Mr. Robinson was generally well-liked and that the opinions of the rank and file correctional officers were positive. It is my professional opinion that this type of evidence can be extremely significant to a jury. We devoted considerable efforts to identify and interview these correctional officers. Since they were employees of the Federal Bureau of Prisons, we had to interview the officers through the approval of legal counsel of the Bureau. After jumping through those hoops, we met with the officers that we had identified individually and, as the trial record reflects, called several of the correctional officers and a supervisor. We also submitted records from the prison showing essentially no disciplinary problems with Mr. Robinson.

**AFFIDAVIT OF WES BALL – Page 10**

As for the claim that we were ineffective regarding the government's theory that Mr. Robinson had ordered a "hit" on Michael Williams, aka "One Love," it is my opinion that the claim does not have merit. We reviewed the events involving One Love including the intercepted recording of Mr. Robinson's calls from jail. I also believe that either Mr. Cummings or I spoke to a police official in Arkansas concerning this event and Mr. Robinson. I do not find where I made any notes concerning that contact. I do not recall if we attempted to interview the purported assailants on Mr. Williams. I have read their declarations submitted with Mr. Robinson's application and they appear to be inconsistent with one another, but I do not believe we ever spoke with them.

It was my opinion that the telephone calls from prison were not persuasive government evidence. It did not appear to us that Mr. Robinson was ordering a killing or "hit" on One Love, but only that he was being told what had happened. In reviewing files that I turned over to Mr. Robinson's current attorneys and have since been returned to me, I found a handwritten note that I made to that effect, adding that although the government was recording all of Mr. Robinson's calls, there was no call where he ordered or instructed anyone to do anything to One Love. Mr. Strickland and I discussed the potential impact of the "One Love" testimony and we felt as a matter of strategy that since the government's "hit" theory was relatively weak, a decision not to focus time and attention on that evidence would be better than a fight that would likely give it more credence. I was also of the opinion that the evidence tying Mr. Robinson to any conspiracy with the three assailants on Mr. Williams was not very reliable and that

**AFFIDAVIT OF WES BALL – Page 11**

Ex. 18 - 358

therefore, the trial court would be justified in excluding their statements as hearsay, or merely unreliable. However, the trial court overruled our objections on this point.

It is my opinion that the death penalty verdict was due largely to the proof of three homicides that each had characteristics of brutality, recklessness, and premeditation. I am of the opinion that premeditation is perceived by capital jurors as particularly reprehensible. At least with regard to the victims Shelton and Reyes, the killings were conducted with assault rifles and the victims were sought out, in the case of Mr. Shelton by a vehicle with Mr. Robinson firing an AK-47 out of the window as they flew down the freeway attempting to kill Mr. Shelton without regard to the other motorists. When I went into this case and began to review all of the evidence, I believed that if the government could prove direct participation in at least the two murders and some participation in the events leading to the Resendez murder, saving Mr. Robinson's life would be likely an impossible task. I personally liked Mr. Robinson and found him to be a pleasant individual, which motivated me to do the best I could to save his life. Unfortunately, the facts of the crimes were too horrific and we were unsuccessful.

Finally, Mr. Robinson alleges that Mr. Strickland and I were deficient in our treatment of the jury selection process, both at trial and on appeal. Again, I disagree. I have interviewed thousands of jurors over my career. I have a general idea what I am looking for and what I want to avoid. In a case that was going to have evidence of the brutality that this case would involve, the jury composition can make the difference between life and death. We enlisted a jury service that does considerable work in civil cases in determining not only what type of jurors to look for, but what evidence seemed

**AFFIDAVIT OF WES BALL – Page 12**

**Ex. 18 - 359**

to matter to jurors in making decisions. We had feedback from what was essentially a mock jury presented with a scaled-down version of the facts likely to be presented in our case, and we incorporated it into our strategy. It was our strategy to conduct jury selection with the primary goal being to attempt to seat twelve (12) jurors who would ultimately vote in a way that would spare Mr. Robinson's life. This strategy is not always consistent with what are "legal" strategies, e.g., running out of all of your peremptories to protect the appellate record regarding erroneous rulings of the court. Also, in this case, victim Shelton was a member of the black race which in my view mandates against any assumptions that black jurors are necessarily good defense jurors.

It is also my practice to confer with my client regarding whether we want to strike or keep a particular juror. We conducted jury selection in this case in that manner. We consulted with Mr. Robinson, providing our insight and opinions, and considered his views. Upon review of the boxes of files provided to Mr. Robinson's current counsel, I have found a jury list that appears to be one Mr. Robinson used in court during his trial and upon which he made notes regarding jurors. I compared each time he wrote "strike" or "we got to strike" with my copy of our defense strike list. It appears that on each occasion where Mr. Robinson indicated "we got to strike," that is exactly what we did. In one instance Mr. Robinson wrote next to the juror's name "ByeBye." A review of my copy of our strike list shows that we caused that juror to go "ByeBye."

Speaking more specifically with regard to two jurors who were members of the black race, Mr. Strickland and I are very familiar with the *Batson* case and its principles. We endeavored to identify any *Batson* issues that occurred. One prospective juror that

**AFFIDAVIT OF WES BALL – Page 13**

Ex. 18 - 360

was a member of the black race that was struck by the Government was juror #36, Dorothy DeBose. I believe we objected to the government's strike on Ms. DeBose based on *Batson* which prompted the government to provide a race-neutral explanation. Assistant United States Attorney Fred Schattman explained that he seemed to recall that the juror's husband had somehow been involved in a criminal narcotics investigation that Mr. Schattman had worked on. As a matter of fact, Mr. DeBose was the target and subject of a serious federal narcotics investigation in the Northern District of Texas involving a drug king-pin, Billy Ray Maddox. Late one evening Mr. DeBose received a federal grand jury subpoena to appear the following morning to testify. Mr. DeBose hired me as legal counsel to represent him in the matter. In the course of the representation, I talked to his wife, the juror under consideration. Mr. DeBose was not indicted in the matter, but his parole for possession with intent to deliver was revoked. I represented Mr. Debose in the parole matter. I believed then, and I believe now, that Mr. Schattman's explanation was correct and that Ms. DeBose was being stricken as a juror for proper reasons.

A second juror at issue was #18, Ms. Charline Boulet. Ms. Boulet was a member of the black race. It would appear that Ms. Boulet was struck by both the government *and* the defense. I cannot independently recall what the specific reason was that caused us to strike this juror, but it would have been consistent with the strategy I have referred to previously. We would not have struck Ms. Boulet had we been of the opinion that she would be a good defense juror. Sometimes the exercise of peremptory challenges can hinge, not only on the content of the juror's answers, but also their demeanor and other

**AFFIDAVIT OF WES BALL – Page 14**

considerations not apparent from a cold reading of the trial record. It also would have been after conferring with Mr. Robinson. Since we struck this juror, I am not aware that we could make a valid *Batson* claim on her. Our decision to eliminate Ms. Boulet was made based on her merits, irrespective of whether she would have made good *Batson* fodder.

I have known both trial prosecutors for the government for a number of years: Mr. Schattman in the neighborhood of 25 years. It is and always has been my opinion that Mr. Schattman is not a prosecutor who uses race as a criterion to strike jurors. I have known Mr. O'Connor for a period of time and have the same opinion of him. I have experienced prosecutors who unfortunately do make juror strikes based on race. I do not believe either of the prosecutors in Mr. Robinson's trial engaged in that behavior in his trial, nor have I seen or heard of them doing it in any other criminal trial.

Finally, Mr. Robinson contends that there was a breakdown in the attorney-client relationship during the appeal process. I would agree that Mr. Robinson's tone with Mr. Strickland and me turned during his direct appeal. It was my view that Mr. Robinson wanted us to raise claims that we felt professionally did not have merit. It is my opinion that as an appellate attorney, I should not raise claims that I do not believe have legal merit. We believed that we did have one extremely meritorious claim involving the failure to aver the aggravating factors in the indictment following the logic of *Ring v. Arizona*. Unfortunately, we were not successful on that issue. I believe we presented the issues on direct appeal that had legal merit as was our responsibility. Whether Mr.

AFFIDAVIT OF WES BALL – Page 15

Robinson got along with Mr. Strickland and me during his appeal process was not a professional requirement as I understand it.

In summary, I do not believe that I provided deficient representation to Mr. Robinson, nor that anything I did or omitted to do would have made for a different penalty if it had been handled differently. I am prepared to testify at any evidentiary hearing the Court may schedule on the matter.

_____
WES BALL

SUBSCRIBED AND SWORN TO before me, the undersigned Notary Public, on

April 20 , 2006.



ERMALINDA A. DAVIS
MY COMMISSION EXPIRES
December 22, 2006

**AFFIDAVIT OF WES BALL – Page 16**

# EXHIBIT 19

## MEMORANDUM
**FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF CALIFORNIA**

**TO:** Craig Harbaugh; Sean Kennedy; Mike Charlton       **DATE:** August 16, 2006

**FROM:** Jesse Wallis

**RE:** <u>**USA v. Robinson**</u> - CJA Fee Voucher Analysis


I have reviewed the CJA Vouchers and timesheets submitted by Wes Ball and Jack Strickland. The following is a breakdown of the investigative-related hours and expenses incurred by Ball and Strickland before and during the trial:

| DATE | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|
| | **WES BALL ANALYSIS** | | |
| 01/25/2002 | Tel. Conf. investigator. Memo to investigator, Research and Work on Jury Instructions[1] | 5.4 | $ 675.00 |
| 01/25/2002 | Fax to investigator | .3 | $ 37.50 |
| 01/25/2002 | Correspondence for investigator re: access | .4 | $ 50.00 |
| 02/07/2002 | Telephone conference with client's niece | .3 | $ 37.50 |
| 02/13/2002 | Telephone conference with John Hollimon | 1.6 | $ 200.00 |
| 02/19/2002 | Conference with J. Strickland, investigator | 1.8 | $ 225.00 |
| 02/20/2002 | Tel. Conf with client's mother | 1.0 | $ 125.00 |
| 02/20/2002 | Conference with J. Strickland, investigator | 1.0 | $ 125.00 |
| 02/20/2002 | Tel. Conf with client's mother | 1.2 | $ 150.00 |
| 03/12/2002 | Tel. Conf. with witness Landry Burdine & defense witnesses/coaches | 4.2 | $ 525.00 |
| **TOTAL SPENT BY WES BALL:** | | 17.2[2] | $ 2,150.00 |

[1] The voucher does not indicate how the total time was divided between the various tasks.

[2] According to the CJA Voucher submitted by Wes Ball, his hours were broken down by categories, including "Witness Interviews" and "Consultation with Investigators & Experts." For the "Witness Interviews" category, he noted 19.5 hours billed; for the "Investigators & Experts" category, he billed 54.9. I have reviewed his timesheets for any investigative entries, and the 13.8 hours listed here is all I could find based on the descriptions.

**Ex. 19 - 364**

Memo re: Fee Voucher Analysis
August 16, 2006
Page 2

| JACK STRICKLAND ANALYSIS | | | |
|---|---|---|---|
| **DATE** | **DESCRIPTION** | **HOURS** | **AMOUNT** |
| 01/22/2002 | t/c x 2: witnesses | .3 | $ 37.50 |
| 01/27/2002 | Conf - witnesses | 4.3 | $ 537.50 |
| 01/30/2002 | Conf witnesses | .7 | $ 87.50 |
| 02/20/2002 | Conf - witness | 1.0 | $ 125.00 |
| 03/09/2002 | EXPENSE: Plane ticket - grandmother | | $ 122.50 |
| 03/11/2002 | EXPENSE: Plane ticket - mother | | $ 310.50 |
| 03/12/2002 | Conf - witness | 1.0 | $ 125.00 |
| **TOTAL SPENT BY JACK STRICKLAND:** | | 7.3[3] | $ 1,345.50 |

## SUMMARY OF INVESTIGATIVE HOURS/EXPENSES

### WES BALL

TOTAL HOURS BILLED................ 777.5
TOTAL PAID.................................. $97,529.50 (@ $125/hour + expenses)
TOTAL INVESTIGATIVE
    HOURS SPENT............................17.2 (2.2% of total hours billed)
TOTAL INVESTIGATIVE
    EXPENSES.................................. $2,150

### JACK STRICKLAND

TOTAL HOURS BILLED................ 540.6
TOTAL PAID.................................. $88,991.45 (@ $125/hour + expenses)
TOTAL INVESTIGATIVE
    HOURS SPENT............................7.3 (1.4% of total hours billed)
TOTAL INVESTIGATIVE
    EXPENSES................................. $1,345.50

---

[3] According to the CJA Voucher submitted by Jack Strickland, he noted 6.3 hours billed in the "Witness Interviews" category, and he noted 44.0 hours in the "Investigators & Experts" category. I have reviewed his timesheets for any investigative entries, and the 7.3 hours listed here is all I could find based on the descriptions.

**Ex. 19 - 365**

# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JULIUS OMAR ROBINSON, §
    aka Face, aka Scar, aka Scarface §
    Defendant-Petitioner, §
§
v. §     No. 4:00-CR-260-Y
§         (Civil No. 4:05-CV-756-Y)
§     **DEATH PENALTY CASE**
§
UNITED STATES OF AMERICA, §
    Plaintiff-Respondent. §

## AFFIDAVIT OF JACK V. STRICKLAND

My name is Jack V. Strickland. I am the same Jack V. Strickland who was appointed by

Judge Terry Means, United States District Judge for the Northern District of Texas, Fort Worth

Division, to represent Julius Omar Robinson ("Robinson") before and during his trial, through his

direct appeal to the Fifth Circuit Court of Appeals, and through the filing of his petition for writ of

*certiorari* to the United States Supreme Court.

I have been licensed as an attorney by the Supreme Court of Texas since September, 1971.

My license is in good standing. I am also admitted to practice in the United States District Courts

of the Northern, Eastern, and Southern Districts of Texas, the Fifth Circuit Court of Appeals, and the

United States Supreme Court. I have been certified as a specialist in criminal law from 1977 to the

present, and have been a member of the Texas Board of Law Examiners since 1997. I have served

as chair of that Board since 2003. I have been continuously listed in *Best Lawyers in America* since

1995. I have never had a meritorious grievance filed against me, have never been disciplined by any

court, and have never been found to have rendered ineffective assistance of counsel.

I have tried approximately 400 felony jury trials during my career, including sixteen death



GOVERNMENT
EXHIBIT
B

**Ex. 20 - 366**

penalty cases, five for the State and eleven as defense counsel.

At the outset and before responding to the complaints raised by Robinson in his writ application, I wish to emphasize that I do so only to the extent that I reasonably believe necessary in order to respond to Robinson's allegations concerning the representation rendered by my co-counsel Wes Ball and me. R. 1.05, *Texas Disciplinary Rules of Professional Conduct* (TDRPC). Absent a need to do so, I have not, and will not, reveal either privileged or unprivileged confidential information regarding Robinson.

Robinson has made several claims regarding the representation rendered him by Mr. Ball and me. Mr. Ball, who was lead counsel in this case, has responded to those claims in some detail in his affidavit. I have reviewed Mr. Ball's affidavit carefully and discussed both the claims and his responses with him. Like Mr. Ball, I dispute all of Robinson's claims with the single exception that there arose a break-down in the attorney-client relationship during the appeal of his case. For the sake of brevity, I concur with the facts and conclusions as stated by Mr. Ball and incorporate them into this affidavit without the necessity of restating them. However, notwithstanding my intention to be brief, I do wish to elaborate on several issues.

Let me turn first to Robinson's criticism of the manner in which we presented the testimony of Mark Cunningham, a forensic psychologist called in behalf of the defense. Dr. Cunningham was an expert witness retained for the purpose of offering mitigation/risk assessment testimony at Robinson's trial. I was primarily responsible for preparing and presenting Dr. Cunningham to the jury. Prior to the Robinson case, I had used Dr. Cunningham as an expert witness in several cases, including death penalty litigation. In addition, I had watched Dr. Cunningham testify in other cases, been on at least one CLE program with him, and spoken to other defense lawyers, prosecutors,

2

judges, and mental health professionals about him. Perhaps most importantly, I had interviewed jurors who had served in cases in which Dr. Cunningham had testified, a permissible practice in State court. At the risk of being rude, the consensus was, and is, that Dr. Cunningham is long-winded, pedantic, and frequently viewed as being arrogant. He is perceived as being often argumentative, and talking down to both lawyers and jurors. I do not mean to imply by these rather blunt observations that he is not knowledgeable or conscientious; I think he is both. But it is a fact that Dr. Cunningham is a difficult witness to present effectively. My job was to elicit what I could from Dr. Cunningham, to keep the jurors awake, to not unduly test the patience of the trial court, and to not open any doors for the government. Prior to his testimony I, along with Mr. Ball, spent considerable time with Dr. Cunningham reviewing Robinson's background and the details of his criminal offenses. Dr. Cunningham's own bill to the court reflects almost 30 hours in conference and discussions with Wes Ball and me. My bill to the court reflects 16 long-distance telephone calls made on my office phone to Dr. Cunningham. That figure is not a true reflection however, as it does not include calls placed on my cell phone, my home phone, Mr. Ball's phone, or calls placed by Dr. Cunningham to me. We also reviewed some prior testimony given by Dr. Cunningham in other cases, as well as going over his written materials, slides, and his anticipated testimony. It was my decision to cut his presentation dramatically. I take responsibility for that decision and would do so again under the circumstances. Had I not done so, and simply allowed Dr. Cunningham to go on at will, it is conceivable that direct and cross-examination would have run on for many more hours, if not days. That is, of course, assuming that the court would have tolerated that approach, an assumption I deem unlikely.

It was also my decision that Dr. Cunningham not interview Robinson or conduct a mental

3

**Ex. 20 - 368**

status examination of him. After investigating Robinson's background and the circumstances of these three homicides, it was Mr. Ball's and my concern that an examination of Robinson could well have led to the conclusion that he exhibits the classic symptoms of an antisocial personality disorder. In my view, Robinson unquestionably meets the diagnostic criteria for such a diagnosis. *See*, DSM, IV, 301.7.    While experienced trial lawyers realize that such a diagnosis might in fact be fairly benign because it describes many, if not most, persons charged with a crime, a skilled prosecutor can nonetheless quickly transform such a benign diagnosis into an impressively ominous disorder. It is a simple task to emphasize the commonly misunderstood concept of the "psychopath" who is aggressive, disregards the safety or well-being of others, lacks remorse and fails to learn from his mistakes into a potent prosecutorial argument. I know; I have made that argument myself and seen good prosecutors do the same. The seriousness of such a diagnosis is aggravated when the defendant appears to be as intelligent and charming as Robinson was.  A further issue arises when your expert examines the client.   Doing so then allows the government's expert to likewise examine your client, in my experience usually not a helpful development.  That is not to say that there are no situations in which a mental status examination may be imperative or at least tactically sound; there clearly are. But in my judgment this was not such a case.

A close reading of Dr. Cunningham's affidavit illustrates many of his traits which I have already noted. For example, Dr. Cunningham's affidavit demonstrates his inclination to second-guess every decision made by the lawyers in a case and to attempt to supersede their judgment with his own. I contend that it is well outside Dr. Cunningham's area of expertise to characterize our decision not to make an opening statement at punishment as "inexplicable" or to suggest that our use of the term "future dangerousness", rather than the term "probability of future acts of criminal violence" was

4

**Ex. 20 - 369**

detrimental to Robinson. "Criminal violence" is in fact a broader term than "dangerousness," inasmuch as violence can be committed against both persons and property. Furthermore, not all violence is *per se* dangerous. Not to put too fine a point on this, but these examples illustrate Dr. Cunningham's rather inflated view of his own personal opinions.

In addition, Dr. Cunningham's affidavit consists in large part of boiler-plate data, not specifically developed in connection with this case. Having worked with Dr. Cunningham and having listened to his testimony in other cases, I can state with some certainty that this is "research" which Dr. Cunningham uses time and again to bolster his conclusions. The prosecutors in this case were well-prepared for Dr. Cunningham, having reviewed his testimony in other cases. It was my belief that they were poised to vigorously cross-examine Dr. Cunningham by in part demonstrating the predictability of his testimony.

I have examined many mental health professionals over the years, both on direct and cross-examination, for both the government and the defense. It is my view that the average juror regards such experts, whether psychiatrists, psychologists, or psychiatric social workers, with a great deal of skepticism. Jurors are attentive only to a point and they harbor a great deal of resentment against experts who appear to rationalize or trivialize horrific criminal behavior with what the juror may perceive as psycho-babble. While that may not be true in cases of demonstrable retardation, chronic psychosis, or mental defect caused by trauma, jurors are usually very skeptical of psychological testimony when a bright and ambitious defendant such as Robinson is on trial. I think it is worth noting that although Robinson did not take the stand, he nonetheless in effect testified throughout his trial. The government's evidence included playing hours of tape recordings of Robinson speaking intelligently, recounting facts, giving orders, often speaking in guarded language, and planning

5

criminal enterprises. In addition, the jury heard evidence from friends, prison guards, and former teachers about Robinson's outgoing personality, his strong work ethic, and his ability to conform to the rules of the federal prison in which he was held while awaiting trial. It would have been ludicrous to suggest to the jury to a greater extent than we did that Robinson's upbringing by a decent, well-intentioned grandmother in rural Arkansas rendered him unable to conform to legal and societal prohibitions against killing people. I do acknowledge however, that such a tactic might seem perfectly logical to lawyers or psychologists who have limited or no trial experience.

Robinson also complains that Mr. Ball and I failed to employ the services of a so-called "mitigation expert." That is superficially correct, inasmuch as no such "expert" was employed. However, I am unclear as to what such an expert can do that a skilled investigator and conscientious attorneys cannot do and in fact did in this case. "Mitigation experts" may simply be another in an ever-expanding group of cottage industry self-proclaimed "experts" who have sprung up and carved out a niche for themselves in criminal prosecutions in general, and death penalty litigation specifically. In any event, it is my view that such an expert would have been redundant, and therefore unnecessary in this case.

Robinson raises a claim that our decision not to travel to Dermott, Arkansas, was deficient. I was then, and am now, of the opinion that such a trip would have yielded nothing material that we did not otherwise know.

The testimony of "One Love" was almost laughably far-fetched and is a case in point. His testimony was inconsistent and the jury appeared to be less than impressed with his demeanor, as well as the substance of his testimony. The witness recounted his own criminal history in some detail. Mr. Ball and I decided that by far the better approach was to minimize "One Love's" testimony. That was

6

**Ex. 20 - 371**

a judgment call, based on the state of all of the evidence heard by the jury up to that point, the witness' lack of credibility, and the lack of what appeared to be any clear directives from Robinson that he had ordered or even wished a "hit" on "One Love."

It is rank speculation to suggest that it was this testimony that resulted in two death penalties for Robinson. In my professional judgment, what most disturbed the jurors and ultimately sealed Robinson's fate was the premeditated nature of these murders, coupled with the fact that they appeared to stem from cold-blooded decisions made by Robinson to further and enhance his interstate narcotics business.

Lastly, allow me to address the concern that there was a breakdown in the attorney-client relationship during the Robinson appeal. I agree that matters deteriorated following Robinson's conviction and sentencing. However, I dispute any contention that this breakdown was caused by any dereliction on the part of Mr. Ball or me. Robinson quickly turned from being a personable, congenial, cooperative client, fully involved in his defense, to an inmate who made unreasonable demands on us. Of course, anyone who has tried more than a handful of criminal cases recognizes this as an often predictable development. When a defendant is suddenly convicted, sentenced to death, and transferred to death row, the enormity of the matter becomes much more apparent. In spite of the growing tension between us, Mr. Ball and I were willing to discuss potential claims and issues with Robinson, although he increasingly demanded that we raise what we considered to be unmeritorious claims in his appeal. When we attempted to discuss those demands, he was resistant, continuing to insist that we raise claims that in our view lacked factual and/or legal merit. Robinson also demanded that we either copy the trial record or petition the court for a copy of the record. I would not do the former without the permission of the court reporter. When I petitioned the Fifth

7

**Ex. 20 - 372**

Circuit to order the latter, the court declined to do so. Mr. Ball and I eventually obtained permission from the court reporter to copy the reporter's record and Robinson was provided a copy. However, if Robinson in fact suffers from the mental impairments now claimed by writ counsel, I am puzzled by the value of providing him the record.

Suffice it to say that Mr. Ball and I share the opinion that a lawyer has a professional obligation not to simply channel the thoughts, wishes, and strategies of a client. That is true regardless of the client's intelligence, education, and sophistication. I have represented lawyers in the past and I harbor the same opinion regarding my professional obligations to them and to the court.

In conclusion, I do not agree that Mr. Ball or I rendered deficient or ineffective representation to Robinson. Mr. Ball is an extremely conscientious, competent, and ethical lawyer. We are both experienced and skilled in all aspects of criminal defense, from pre-trial through appeal. In addition, I must say that I greatly resent lawyers with limited or no trial experience casually slandering the efforts and reputations of lawyers who labor in the trenches, doggedly defending extremely difficult and unpleasant cases against often overwhelming evidence. Although it has become an all-too common tactic to do so during the writ process, it is an abusive practice which often achieves little good for applicants, while imposing considerable harm on the legal process.

JACK V. STRICKLAND
State Bar No. 19397000

8

**Ex. 20 - 373**

THE STATE OF TEXAS            §

COUNTY OF TARRANT            §

BEFORE ME, the undersigned authority, on the 26th day of April, 2006, personally appeared

JACK V. STRICKLAND, who, after being duly sworn, stated that the allegations contained in the

foregoing affidavit are true and correct.



DEBORAH K. FITZPATRICK
MY COMMISSION EXPIRES
August 19, 2009

NOTARY PUBLIC, STATE OF TEXAS

9

**Ex. 20 - 374**

# EXHIBIT 21

## DECLARATION OF ROSE MAE HOLOMN

I, Rose Mae Holomn, declare:

1.      I am Julius Robinson's mother. I was born in 1958 in Dermott, Arkansas. Julius is the second of my two children. Marcus Robinson is my firstborn son.

2.      My parents, Margaret and John Hollimon, raised nine children. Only my mother's first child, Roosevelt, was by a different father. After Roosevelt came Margorie, Josephine, Robert, John, Jr., Adolf, me and finally my twin brother and sister, Mildred and Milton. My dad was blind by the time I was born, although he was not born blind. He had an accident while chopping wood when he was around 30 years old and he became blind. Before that, he was a farmer.

3.      While I was growing up, my dad stayed home and did some of the cooking and cleaning. My mother couldn't read or write. My mom and my brothers and sisters worked in the fields, chopping cotton and picking beans. My dad could get around our town using just his cane and his memory of the streets.

4.      When I was small, my family had a next door neighbor named

1

R.H.

Sarah Pittman. She was an older lady and we called her Mama Sarah. She didn't have anyone to help her because her son died in a tree felling accident. Mama Sarah asked my parents if I could stay with her and my parents said yes. I was in elementary school when I began to live with her. I had my own room in her house. I also spent lots of time at my own house, with my brothers and sisters. We walked to school together and we went to church together on Sundays. I went to Bible study on Wednesday nights at the Ash Street Baptist Church. When I was about 15 years old, I stayed full time with Mama Sarah.

5.     Mama Sarah couldn't read or write either. I would help her by reading her mail and telling her about her bills. I would explain her food stamps to her, or at least I tried to.

6.     My brothers and sisters worked in the cotton and soybean fields alongside my mother. Mama Sarah wouldn't allow me to go with them even though I begged her to let me go. The one time she said it was alright for me to go with them, I cut my ankle with the blade used for cutting beans so badly that I had to go to the doctor. Dr. Thomas was a white man and I was really scared. It was the first time a white person had ever touched me. I ended up having 14 stitches. Usually when one of us kids got sick, we used folk remedies. When

R.H.

2

we got the chicken pox, I remember they rubbed cow dung on us to relieve the itch. For hives, they used watermelon rind.

7. My family was very poor when I was growing up. Blacks in the country mostly bought things from peddlers. Going downtown to the stores was not a pleasant experience. Storekeepers were very rude to blacks. Dermott was segregated and black people lived on their own side of town. The schools were segregated when I started going to school. I went to Chicot School in elementary school. I only went to the integrated school for a short time in high school because I got pregnant and left school.

8. I started drinking beer when I started to go to Dermott High School in the seventh or eighth grade. That is also when I started smoking marijuana. I would walk home from school every day with a group of my friends and one person or another would have some marijuana and we would all smoke it. That was just about every day. After a basketball game or a football game, I would go with my friends to someone's house and we would drink beer and often smoke marijuana. I also would steal beer from my Mama Sarah sometimes. Mama Sarah kept some beer in the house. She and I would go fishing together and she would give me a can of beer to drink. She noticed that I was stealing

3

R.H.

her beer, so she told me to stop stealing it and she started to give it to me occasionally.

9.    Jimmie Lee Robinson lived with his mother down the street from my family on Deer Street. Jimmie was in college when I started seeing him and I got pregnant when I was 16 years old. I didn't realize I was pregnant until I was five months pregnant. My daddy took me to the doctor's. After that, I had monthly check ups and the doctor gave me vitamins. I never took the vitamins because they made me feel sick. Jimmie went into the military. We were married in 1974 in Dermott and Jimmie went overseas. I stayed in Dermott, and lived at Mama Sarah, my mother and Jimmie Lee's mother's house at different times during my pregnancy. I gave birth to Marcus Jwain Robinson in November of 1974.

10.    When I was about 15 years old, I had a teacher named Mr. Carr. I know some people said that he was the father of my first son, Marcus, but I only went to parties with him and had drinks with him.

11.    When Jimmie Lee returned from his overseas duty, we both went to live at Fort Bragg in North Carolina. Marcus was four or five months old. When I was in North Carolina with Jimmie, I asked Mama Sarah to come stay

*R.H.*

4

R.H.

**Ex. 21 - 378**

with us. I think Marcus was just under a year old when she came.

12. When I was in North Carolina, I would drink about a six-pack of beer every weekend. In addition, if I was socializing with my friends, I would drink more. I was also a big cigarette smoker. I would smoke about a pack of cigarettes a day and sometimes more.

13. I got pregnant with Julius, but I didn't realize I was pregnant until I was into my sixth month and I fainted while I was at a barbeque some friends were having. The next thing I knew, I woke up in the hospital. Once I found out I was pregnant, I stopped smoking. The doctor said I should stop drinking beer, but I didn't. I got prenatal care and gave birth to Julius at the Cape Fear Valley Hospital in Fayetteville.

14. Marcus weighed seven pounds, but Julius was very small, although he was a full term baby. Once Julius was born, I started smoking cigarettes again and continued drinking beer. When Julius was only about a year old, Jimmie was transferred to Fort Hood in Texas. I went with Jimmie and our boys to Killeen, Texas and Mama Sarah left to take care of her mother who was 100 years old and lived in Little Rock.

15. I stayed with Jimmie Lee for five years in all. He never abused the

R H
_____
R.H.

5

Ex. 21 - 379

kids, but he was a womanizer. We sometimes got in arguments. Jimmie didn't allow me to work and I wasn't allowed to go to clubs. One night, I decided to go to a club with another military wife. We just happened to go to the same club that Jimmie Lee was at, with another woman. I always suspected Jimmie of seeing other women, but as long as he didn't bring it home and kept it outside, I could ignore it. At the club, I didn't see him, but he saw me and came over to my table and hit me in the head. I didn't loose consciousness, but was I groggy. He carried me to the car and took me home. After he hit me at the club, that was the end. I didn't call the police and I didn't report him because I didn't want to ruin his military career. I stayed with him for another month or so, planning to leave. As soon as Jimmie went on some overnight operations, I packed up, took the kids and left.

16.    I went back to Dermott and stayed with my parents. Jimmie got a 30-day leave and came to Dermott wanting to get me back, but I wouldn't go. He came back another time also, about six months later. Even my daddy didn't want my boys to have too much contact with Jimmie, because of his violence.

17.    I stayed in Dermott for about a year and then I moved to Witchita, Texas where my brothers, Robert and John and my sister Margie lived. I left

6

R.H.

Marcus and Julius with my mother and father. John got me a job on the base, in the mess hall where he was a supervisor. I then got a job at a nursing home in Witchita Falls called Cottonwood Nursing Home and I worked there for about a year. I came back to Dermott and got my two boys and brought them back to Witchita Falls. We all lived with John, his wife Brenda and their three girls.

18. After a while, I took my two boys back to Dermott to live with my parents. I can't remember how old the boys were, but I know that neither one of them had started school yet. I was young and I was going, going, going. I still had a lot of party in me. I went back to Witchita Falls and continued to work.

19. A friend of mine told me that there were better jobs in Arlington, so I moved there. This was in 1990 or 1991. I got a job at Arlington Villa as a nurse's assistant and I worked there for about five years. I then worked at the Villa of Arlington, an assisted living facility.

20. When Julius was approximately 16, he got into some kind of trouble. It had something to do with the law. My dad told me that the chief of police, a man named Payne who is now deceased, came to him and told him to get Julius out of town or Julius would get killed. I never asked my father anything about the details of what Julius had done to cause the police chief to

RH
_____
R.H.

7

want him out of town. I never asked Julius anything about it either. Julius was a quiet person around me.

21. By the time Julius came to live with me, I was smoking marijuana regularly. I would smoke about 20 dollars worth of marijuana a night. In those days, 20 dollars would buy about a half full sandwich baggy of marijuana. I was working the day shift at the nursing home, from 7:00 in the morning until 3:30 in the afternoon. On days when I didn't have to work the next morning, I would drink about a six-pack of beer or sometimes more.

22. When Julius got to Texas, he went to Lamar HS. We were living in an apartment complex and my boyfriend at the time, Vern, was living in the same complex with his brother. At some point, possibly in 1997, I was driving home with some girls from our job at Arlington Villa Nursing Home. One of the girls had a marijuana cigarette and we all smoked it. I felt really good after I smoked and I asked what kind of marijuana it was. That is when I learned it contained crack cocaine. We smoked five or six marijuana cigarettes containing crack cocaine, or primos, that evening. That was the beginning of my involvement with primos. Julius was in the eleventh grade.

23. Vern was smoking crack with a pipe, but I was never on the pipe. I

8

R.H.

started buying crack and smoking it with marijuana more and more and missing work. I also started hanging out with a man named Dave, who lived in the same apartment complex I did. I tried to never be home at the same time Julius was because I didn't want him to see me. Eventually, the nursing home let me go.

24.    After I lost my job, I stayed home for three months before I found another job. Julius scared Dave away, which slowed down my using. After approximately two years of using, I knew I needed to stop. I asked Vern to leave and he refused. I warned him that Julius told him he didn't want to see Vern there when he got back, but Vern still refused to leave. When Julius came back to the apartment, he attacked Vern with a board on the back of his head. Vern was bleeding a lot and I ran out to get the police. The police picked Julius up and kept him overnight, but Vern never pressed charges. After that night, I never did primos again.

25.    By the time Julius and Nathan started working together, I had stopped using primos. I did drink, however. At this time, I was drinking between a 12 pack and a case (24 cans) per day, of English 800. I still drink beer, but much less now.

26.    In the summer of 1999, my dad was dying of cancer. I went back to

9

R.H.

Ex. 21 - 383

Dermott for about 6 months to help take care of him. After he died, I moved to Dayton, Ohio.

27.    I first heard that Julius had been arrested when my sister, Josephine, called and told me. At some later point, Julius's lawyer, Wes, called me. He told me he was going to send me a ticket to come to Arlington and testify in Julius's trial. When I asked him what I was going to testify about, he told me he would tell me more about it when I got there. I flew from Dayton, Ohio to Dallas and Marcus came and picked me up. I stayed with my brother, John. After about three days, Wes called me and asked me to come to his office in Fort Worth. Marcus's girlfriend drove me to his office. I asked him about the charges against Julius and he explained them to me. He then asked me about my drug problem. We talked for maybe ten minutes. He never asked me about anything else.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26 day of November, 2005 in Dayton, Ohio.

Rose Holomn

10

**Ex. 21 - 384**

# EXHIBIT 22

STATE OF TEXAS                            )
                                         )
COUNTY OF TARRANT                        )

AFFIDAVIT OF DANNY DUANE BURNS

   Before me, the undersigned Notary Public, personally appeared Mr. DANNY DUANE BURNS, who, being by me first duly sworn deposed and said:

"I, Danny Duane Burns, being first duly sworn, state and depose as follows:

1. I am an attorney and have been licensed to practice law in the State of Texas for over 28 years. I have been admitted to practice in the United States District Court for the Northern District of Texas, the United States Court of Appeals for the Fifth Circuit, and the United States Supreme Court as well as several other federal appellate and district courts. I have been representing criminal defendants at both trial and on appeal since May 15, 1978. Throughout my legal career, I have tried to jury trial approximately 450 cases, including capital cases. Of these capital cases, 3 actually went to trial, including through completion of the penalty phase with one resulting in a death penalty. A number of other cases started out as death eligible cases with death penalty preparation completed but the death penalty was waived prior to or during jury selection. I have worked with several other attorneys assisting them in preparation for capital cases as well.

2. In any capital case where the government (State or Federal) is seeking the death penalty, the facts of the case have to be throughly investigated. From all sides–guilt and punishment. A capital case requires a team effort between investigators, co-counsel, consulting counsels, and experts. Mitigation evidence must be explored. It has always been my practice to work on the punishment evidence first because a trial lawyer will convince himself he is going to win in the guilt phase and will not complete the punishment investigation. Talking with the client, family members, friends, former employers, teachers (if possible), church members (if any), and neighbors is essential. One must check the prior criminal history of the client, whether those arrests resulted in convictions or not and determine if the arrests may lead to either mitigation material or prosecution evidence which needs to be addressed. Visiting the scenes of events which are being prosecuted is always helpful.

3. I was originally appointed to represent Mr. L.J. Britt on a charge of marijuana and cocaine conspiracies. I had investigated the case on the basis of defending the marijuana charges and had traveled to Oklahoma to investigate some information regarding cars and car rentals. After the

1

**Ex. 22 - 385**

Government decided to seek death, I filed for additional counsel and requested Mr. Read as co-counsel. Mr. Read and I had tried over 250 felony level jury trials together in the past, including handling some capital cases and I had consulted with him on some cases that went to trial on seeking a death verdict. We tried mini-caps (capital cases in which the death penalty had been waived) in the past and both were familiar with the obligations adequately to investigate the case in both guilt and mitigation and I knew John would have the commitment to do the traveling and work necessary to prepare for trial.

4. In the background investigation, we made numerous trips to meet with the various family members, friends, cooperating individuals, and fact witnesses connected to Mr. L.J. Britt. In my opinion, an attorney should not conduct these interviews over the phone. We made several trips to Arkansas, one trip to Mississippi, one to Oklahoma, one trip to El Paso, one trip to California for several days, and another trip to a different State for which we paid the expenses to avoid disclosing a possibly prejudicial witness to the Government.

5. In this case, we first started with talking with the family and determined what friends would need to be interviewed to find out what type of person Mr. L.J. Britt was inside. We found out that he had a couple of girlfriends (each of which knew about the other but each was o.k. with the situation) and he did a lot of babysitting for people. It they could afford to pay him, fine, if not, he would do it for free. In addition to babysitting, he sold some pot (small amounts) to get by. He also did odd jobs for people. He was a football hero in the area. We toyed with the idea of presenting him as a football star. The problem with that was his coaches and teammates knew about his misdemeanor fights and everybody talked about his aggression and how he liked to run over people as a football player. We interviewed the neighbors and attended the church in the same block with his house, talked to family members and members of the local sheriff's office. We talked with the family about L.J.'s past. He had no mental health issues nor any medical issues. We had a psychologist examine his records and talk with L.J. and he determined that he did not have any mental health issues we could use. We used our psychologist at that point to help us review the juror questionnaires and talked about how best to present our strategy. We also talked with the jailers who were watching Mr. Britt and found out that the head jailer in his sector wished "I had twenty like him in my pod." He told us of how L.J. was a calming influence and how he had started a bible study group in his group. We talked with the psychologist about how to present this testimony and how to argue it. In my experience "jailhouse religion" is a negative rather than a mitigator. We determined that, since we had a very friendly witness, we would present the testimony as a throw away statement by the witness. We had him answer a general question about what Mr. Britt was like as a prisoner and he told about how Mr. Britt was stopping fights and started his own Bible study group. We never argued that and we did not present it as a mitigation question. We decided to leave it to the jury to find that as a mitigator which a majority of them did . I worked up and presented most of the mitigation part of the trial and Mr. John Read and I worked up the defense to the charges and he presented most of the witnesses in guilt.

2

Ex. 22 - 386

6. As in all capital cases I have handled, we looked for the classic mitigation evidence--sexual or physical abuse, bad upbringing, mental health problems, physical health problems, bad environment, etc.. There really was not any. He had a loving, close family. He had good friends as well as some criminal elements in his associations. He did average or better in school and was very popular in school. The only adverse elements of his background was his poverty, the racial segregation, whether de facto or governmentally imposed did not matter. But he adjusted and made the best of his situation which was something we could sell to the jury. Most of them have never lived in that kind of poverty but they heard their parents or grandparents talk about it and they turned out alright. We decided to show that L.J. Britt did alright as well, except for hanging around with some thugs. We talked to the witnesses and got what documents and evidence they could give us. The police helped us by providing the jail records (which the Government never had).

7. Traveling to the places where the mitigation witnesses lived helped us in many ways. First, we needed to see our witnesses and determine who would make a favorable impression, who could hold up under cross-examination, and who appeared to be telling the truth. Second, we were able to critical information to support our alibi defense. We were able to look at the photo albums, to see corroboration in the documents the witnesses had to show why they remembered L.J. Britt being with them when the killings occurred. If we had not been in the home of the one witness and talking about the items in her home we probably would never have found the guns which exculpated L.J. from the one shooting. Finally, being physically present in these areas enabled us to collect letters the family members, friends, teachers, and coaches. This allowed us to introduce some great character evidence from people who could not for one reason or another get to testify.

8. The background investigation was crucial in order to present a viable defense. Our defense and our mitigation theme was alibi (which we never abandoned even after the guilty verdict) and that Mr. L.J. Britt was "The Babysitter." We also determined before trial that we would never refer to our client as "Capone" and if a government witness answered us referring to "Capone" we asked if they meant Mr. L.J. Britt. We were prepared in the event (which did not come about) Judge Means noted that Mr. Britt's nickname was Capone, to respond that both Mr. Britt and Mr. Robinson had taken nicknames of Al Capone--Capone for Britt and Scarface for Robinson--and therefore, we needed the record clarified as to which "Capone" the witness may be referring. We also had to determine how our client should look in Court. His folks brought some really nice three piece "gangster" suits for him to wear. Goodwill appreciated the donations. Mr. Britt never appeared in a three piece suit. We had Mr. Britt dressed in suits one day a little too small and the next a little too big. It was our opinion that babysitters don't look good in suits.

3

5. During our first trip to Durmott, Arkansas, the witnesses we talked to kept asking why Julius' lawyers were not coming up there like we were and we simply told them that his lawyers were developing their case for Mr. Robinson. L.J.'s sister and the Deputy Sheriff we talked with that day asked if they could help Julius and we told them to call his lawyers. One day in the coffee area behind one of the Courts in State Court in Fort Worth, I talked with Wes Ball and told him that some of the witnesses we were talking to were asking about Julius and if they could help. I don't know if they did anything about it. I had told the witnesses in Dermott, Arkansas that they should call Wes Ball or Jack Strickland if they felt they could help Julius Robinson. I do not know if they did or not as we were on a busy schedule to defend L.J.

Further, affiant saith naught.

Sworn to and signed this 25th day of August, 2006.

Danny Duane Burns

Notary Public No_____

My Commission Expires  4-20-10                .

Ex. 22 - 388

# EXHIBIT 23

## DECLARATION OF CHRISTOPHER SCOTT CONNOR

I, Christopher Scott Connor, declare:

1.    I am a paralegal employed with the Office of the Federal Public Defender in the Central District of California.  The facts set forth herein are true and correct of my own personal knowledge and if called upon as a witness, I could testify thereto.

2.    Our office received six (6) boxes of documents from the office of Gary Taylor, prior counsel of record in this case.  The six boxes consisted of the original files of Wes Ball, one of the defense attorneys representing Julius Robinson at the time of his capital trial.

3.    I personally reviewed the records in Mr. Ball's boxes.  During my review of Mr. Ball's records, I was unable to locate any memos and/or notes of defense interviews or investigation at the time of the trial.

4.    Upon receipt of Mr. Ball's 6 boxes of documents, our office made an electronic copy of the records, and the integrity and order of the originals were not disturbed.  The original six boxes of Mr. Ball's records were returned to Mr. Taylor on February 28, 2005.

///

///

///

1

**Ex. 23 - 389**

I declare under penalty of perjury under the laws of the United States of

America that the foregoing statements are true and correct.

Executed this 28th day of November, 2005, in Los Angeles, California.

CHRISTOPHER SCOTT CONNOR

2

**Ex. 23 - 390**

# EXHIBIT 24

## DECLARATION OF JOHN HOLLIMON, JR.

I, John Hollimon, Jr., declare:

1. I am Rose Holiman's older brother and Julius Robinson's uncle. I was born in 1954 in Dermott, Arkansas, the fifth child of nine in our family.

2. My father was blind and he was on welfare. My mother cannot read or write and she worked in the fields. Our family was very poor, we usually only had one extra set of clothes, but we always had something to eat.

3. Our family lived next door to an older woman named Miss Sarah. She really liked Rose and because Miss Sarah didn't have anyone living with her to help her, she started having Rose sleep at her house. All of my brothers and sisters, including Rose, all played together and spent time together. Rose slept at Miss Sarah's house and Miss Sarah bought her school things. Miss Sarah, like my mother, couldn't read or write and Rose could help her by reading to her.

4. I am one year older than Jimmie Lee Robinson and when we were growing up, we were friends. We lived on the same street. Jimmie and his mother were members of the Jehovah's Witness church. Jimmie was very into his religion and when I was in elementary school, I attended his church with

1

_JH_
J.H.

**Ex. 24 - 391**

him for two or three years. We would walk to services. My family was Baptist at that time, but my mother let me go with Jimmie. We also played ball together and went fishing and hunting together. When we were young, Jimmie was very easy going and I never saw a mean streak in him.

5. In 1970, I got my girlfriend, who later became my wife, pregnant. I was sixteen years old. I left Dermott and came to Wichita Falls, Texas. In Dermott, there were no jobs for young people. When I was growing up in Dermott, the closest place to find a summer job would have been Monticello or Pine Bluff and they were 50 miles away. Even adults didn't have many options outside of farm work, picking cotton and other crops. My uncle, Leroy Smith, was able to get me a summer job at Shepherd Air Force Base. After the summer, I was able to stay on at my job and send for my wife. I worked at the air force base for 22 years.

6. Rose came and stayed with my family in Wichita Falls after she left Jimmie. Her two children stayed with my parents back in Dermott. She lived with us for about a year. She got a job at a nursing home. Although Rose never talked about it with me, my dad told me that Jimmie was violent with her. While she stayed with us, she was drinking and smoking marijuana. She also had several boyfriends during the time she stayed with us. I can remember only one of her

2

_JH_
J.H.

boyfriends, Zebediah Young. He was very rough and violent. One time, I came home and found that he had broken the coffee table and the chandelier was down.

7. Rose then moved to Arlington, Texas. I didn't see her for quite a while. I always kept in contact with my family through my dad back in Dermott. We would talk on the telephone. He and my mother were raising Rose's two boys. When Julius was about 14 or 15 years old, my dad brought him to live with Rose in Arlington. He told me that Julius was being accused by the police of doing something. My dad wanted to protect Julius from how the law treated young black men in Dermott. If the police wanted to arrest someone and charge them with a crime and make the charge stick, whether the person was in fact not guilty of that crime, they could and would do it.

8. I came to Arlington several times while Julius was in high school and I stayed with him and my sister, Rose. I was very concerned by what I saw. Rose was drinking and smoking marijuana. Julius was on his own. My sister was not capable of raising up a boy. Julius was more or less taking care of her.

9. On my two visits, Rose was really out of it. She was often drunk. She would go to work and when she came home, she would begin drinking. She drank whiskey then. When she drank, you couldn't talk to her. She has a real temper. I

3

_J H_

J.H.

would say to her, Rose, you have been drinking too much and I think you should slow down. She would get really mad at me, yell "don't tell me how to live my life," and walk out, slamming the door. She would be staggering drunk and slurring her words.

10. When Julius was arrested, he called me from jail. He called me several times. He gave me his attorney's telephone number and I called. I called a couple of times and left messages. I finally got through and went to one of the attorney's offices. I can't remember his name, but I met with one of Julius's attorneys for about 30 minutes. We had a casual conversation about Julius. I testified at his detention hearing. Later, when his trial started, I came to the courtroom. I was told I couldn't stay because they were going to ask me to testify. I met with his attorney and he told me questions he was going to ask me. We talked for about 15 minutes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _13_ day of November, 2005 in Arlington, Texas.

John Hollimon, Jr.

4

**Ex. 24 - 394**

# EXHIBIT 25

DECLARATION OF WILLIE NIMMER

I, Willie Nimmer, Declare:

1.    I served on the Dermott, Arkansas police force from 1984 to 1994. In the late 1980's, a man named Johnny Wright moved to Dermott and started a Crip gang. After that, break-ins, theft, fighting and gunplay all increased dramatically in Dermott. Chief Melton was interviewed on the national news regarding the problem of gangs coming to small towns like Dermott. The police in Dermott threatened to lock up the parents of kids who were caught engaging in gang activity. That plan didn't go over very well, and was quickly abandoned.

2.    With the gang activity came drug activity. They'd give it to the kids for free at first, to get them hooked. Then they'd sell it to them. They had kids working for them. We had young kids walking around Dermott with $400 or $500 in their pockets. People who had never worked a day in their lives were suddenly driving around in fancy cars.

3.    An 11:00 p.m. curfew was instituted in Dermott.

4.    I remember once picking up Julius Robinson for a curfew violation. We weren't allowed to put the kids in a cell, so I cuffed him to the door and called his grandparents. He started crying when his grandparents arrived.

5.    Once, after Julius moved to Texas, he came back to Dermott for a funeral. He approached me and said: "I'm sorry for any trouble I caused you. I wish I'd listened to your advice." Julius then purchased twenty-five raffle tickets to support

1

**Ex. 25 - 395**

my daughter's basketball team.

6.    It's my understanding that Julius moved to Texas, upon the advice of his grandmother, because too much stuff was being put on him that he didn't do.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

10-20-05 , 2005

_Willie G. Nimmer_

WILLIE NIMMER

2

**Ex. 25 - 396**

# EXHIBIT 26

James Daniel Barna, Ph.D., J.D.
FORENSIC CLINICAL PSYCHOLOGIST

7181 CHADBOURNE DRIVE    HUBER HEIGHTS, OHIO 45424-2630    937.236.2398    937.236.0085

CONFIDENTIAL - For Professional Use Only

PSYCHOLOGICAL EVALUATION
OF
ROSIE MAE HOLOMN aka HOLLIMON
DOB: MAY 16, 1958
SSN:  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

**REASON FOR REFERRAL**

Ms. Rosie Mae Holomn is a 47 year old divorced, Black female who was referred to Dr. Barna by Deputy Federal Public Defender Sean K. Kennedy who wondered if Ms. Holomn was mentally retarded.

**EXAMINATION PROCEDURE**

Ms. Holomn was initially interviewed and psychologically tested with the Wechsler Adult Intelligence Scale-Third Edition and the Letter-Word Identification subtest of the Woodcock-Johnson III Tests of Achievement, for 1.75 hours on March 2, 2006, at her home. With the Vineland-II Adaptive Behavior Scales this examiner, for 40 minutes interviewed Ms. Holomn's college educated son Marcus Jwain Robinson on March 15, 2006 at his and Rosie's home, and for 35 minutes interviewed Ms. Holomn's boyfriend Mack McCullough, age 60, on March 16, 2006.  Finally Ms. Holomn was interviewed again and psychologically tested with the Passage Comprehension subtest of the Woodcock-Johnson III Tests of Achievement for 35 minutes on March 25, 2006.

Records reviewed included her 1999 psychiatric treatment records from Good Samaritan Hospital.

The nature and purpose of this examination plus the limits of confidentiality were explained to Ms. Holomn.  She indicated that she comprehended the nature and purpose of the evaluation and the limits of confidentiality.  Initially her cooperation was adequate, but subsequent to the first session it was difficult to recontact and reschedule with her.

**BRIEF BACKGROUND INFORMATION**

Ms. Holomn twice gave the same information that she was born on May 16, 1958 (but only 46 years old now) in Dermott, Arkansas, the seventh born child, followed by fraternal twins.  Her father farmed for others, and her mother was a housewife.  She said that she left Dermott High School in the tenth grade, where she took "English, math, science, physical education and biologist," after "I got pregnant."  She said that she should have graduated in 1975 and that in high school "I wanted to be a nurse."  She married Jimmy Robinson for six years and they produced two sons, Narcus Robinson now age 31 and Julius Robinson now age 26.

Ex. 26 - 397

Ms. Holomn and her military husband moved to Ft. Bragg, NC, but she left her family "to go to Texas" where she divorced. She said that she lived in Wichita Falls, Texas, "for some years; I don't remember how many," moved back to Dermott, Arkansas, then back to Texas, before moving to the Dayton, Ohio area where she had some friends in 1999. In the Dayton area she first found employment at the Hampton Inn in Englewood for 4 months, at Summerville Assisted Living for 3 months, and then at the Kettering Medical Center for the last six years, full time, as an OB technician. Her Good Samaritan Hospital records noted that in 1999 she had worked ten months as a receptionist at Your Ideal.

Recently she has moved to her current residence because her son Marcus and his three children moved in with her in December, 2005. She drives a 1997 white Pontiac, and she said that she has a valid driver's license and insurance on her car.

Ms. Holomn said that she had only one prior psychiatric hospitalization for depression for three days, that she was not given any psychotropic medication, and that she never received any outpatient mental health counseling. However, her Good Sam Hospital records report two brief psychiatric admissions in 1999. The first admission was on August 12, 1999 for 23 hours and her second was on December 12, 1999 for 24 hours. Both discharge diagnoses were for depression.

She said that she never had any arrests. She will "go to church a little bit, every other weekend when I'm off," at the Omega Baptist Church on Salem Avenue near her home. She said that in the past year she will "get a bottle" of champagne to celebrate, "not every day," but that she drinks approximately four cans of beer every day without her alcoholic consumption interfering with her daily functioning. She denied using street drugs during the past year. She said that she "quit smoking before they (her son and his three daughters) got here," but that she resumed smoking cigarettes on March 20, 2006 because of the stress of working 12 hour shifts and having to drive her son to and from work and her granddaughters to where they wanted to go.

**TEST RESULTS**

On the Wechsler Adult Intelligence Scale, Third Edition, she obtained 68 verbal IQ, 68 performance IQ and 65 full scale IQ scores, all of which are in the Extremely Low Range. Both her Similarities (for her ability to abstract and generalize) subtest score and her Digit Span (for her ability to repeat nominal numbers forward and backwards) subtest score were at scaled 7 in the Low Average range and her strongest intellectual assets. Her other verbal reasoning subtest scores were in the Extremely Low range.

On the Woodcock-Johnson III Tests of Achievement her Letter-Word Identification was at the 3.4 grade level, while her Passage Comprehension was at the 4.0 grade level. When asked to write out a paragraph about what she did the day before, she produced a

2

Ex. 26 - 398

print and cursive combination of twelve words/numbers with no period at the end of the passage.

On the Vineland-II Adaptive Behavior Scales her reading and writing subdomain score was in the Low range with an 8.0 year age equivalence. Her other subdomain scores were in the Average or Below Average range; however, this examiner questioned the veracity of the reports by her college educated son who has lived with her for six months in the past ten years, and her boyfriend of six years, because they seemed to simply say that she can do everything well and has no deficits of which they are aware.

## MENTAL STATUS EXAMINATION

Ms. Holomn was a Black female who said that she was 4'11" tall and weighed 118 pounds. She noted that she regularly weighed 110-111 pounds for years, but recently went up to 118 pounds. She said that her appetite was bad and that she only ate one meal a day with "no urge to eat no more." She said her elimination was regular. She said that her sleep was poor in the past two weeks, with frequently waking up every hour during the night.

She did not wear corrective eyeglasses, but she said had a pair in her purse which she used for both reading and driving. She was right handed when using a writing instrument. Hygiene and grooming were casual and adequate for being at home.

She denied thoughts of suicide, homicide, crying spells, severe depression, and mood swings for no reason, but she reported being depressed because of the burdens placed on her by her son and his three daughters moving in with her, and due to working long hours at her full time job. She denied and did not display any signs of any form of hallucinations or that people were working against her. She did serial threes to 40 with no errors. Her future goal was to enroll in a nursing training program and obtain her RN license; she anticipated checking that out through the local Job Center.

## CLINICAL FORMULATION

It is my professional opinion that Rosie Mae Holomn is mildly mentally retarded but is not mentally ill with any serious mood or thought disorder. Intellectually she has an Extremely Low range of cognitive functioning as defined by her 65-68 scores on the WAIS-III. For the record the WAIS-III uses the term extremely low in place of the term mentally retarded which was used in the earlier edition of the WAIS-R. While her son reported that she has and uses a debit card and that he helps her with her e-mail, she has a significant deficit or impairment in the adaptive functioning of reading and writing. Mild Mental Retardation is her appropriate diagnosis in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision.

3

**Ex. 26 - 399**

FORENSIC CONCLUSIONS

    Ms. Rosie Mae Holomn aka Hollimon is a 47 year old divorced Black woman who is mildly mentally retarded but not mentally ill.

*James Daniel Barna*

James Daniel Barna, Ph.D., J.D.
Forensic Clinical Psychologist
Ohio License No. 55
25 March 2006

**Ex. 26 - 400**

# EXHIBIT 27

## DECLARATION OF ARLETTE GORINS

I, Arlette Gorins, declare as follows,

1.    I began my teaching career in 1970 at the Chicot County School, the school for black children. One year later, the Chicot County School and the Dermott School, where the white children attended, consolidated. I taught at the integrated school until I retired in May of 1997. I am an English teacher and a certified Reading Specialist. Julius Robinson was my student when he was in the seventh grade.

2.    As can be seen in his school records, Julius was in my Remedial English class. He was academically slow but was not a trouble maker. He received an F in my class. In looking at Julius Robinson's grades, I notice he received a B in geography. I had observed that most students in that particular geography class received either an A or a B, whether they earned it or not.

3.    If a student was good in sports but had a lot of difficulty in academic subjects, the coaches would request that he or she receive some special attention in the form of one-on-one help. The student, thereby, would be able to meet the grade requirements needed to participate in sports.

4.    On October 21, 2005, I was contacted by an investigator for the Office of the Federal Public Defender. This was the first time I spoke with anyone from Julius Robinson's legal team. Had I been asked before, I would have willingly provided the information contained herein.

I declare under penalty of perjury under the laws of the United States of America this ___ day of October, 2005, at Dermott, Arkansas.

Arlette Gorins

**Ex. 27 - 401**

# EXHIBIT 28

## DECLARATION OF LANDRY BURDINE

I, Landry Burdine, declare:

1. I played high school football with Julius Robinson at Lamar High School in Arlington, Texas.

2. During Julius' capital trial, I ran into a mutual friend and former teammate, Trace Anderson, and he told me that Julius was on trial at the federal courthouse. I went to the courthouse and sat in the audience.

3. During one of the breaks in the trial, a member of Julius' defense team approached me and asked me who I was. I believe it was an investigator, rather than an attorney. I told him how I knew Julius.

4. At the next break, one of Julius' attorneys came over and asked if I would be willing to testify for Julius. I said that I would. The attorney told me to come back on a certain date and said that he would ask me a few questions.

5. I returned to the courthouse on the date specified by the attorney and testified. I did not receive any additional instruction or preparation. I just got up there and answered whatever they asked me.

6. After the trial, I ran into a number of our former teammates on various occasions. I told them about my experience at Julius' trial, and most, if not all of them



1

**Ex. 28 - 402**

said that they would have testified or helped in any way they could if anyone had asked them to. Julius was a well-liked and well-respected player on our team.

I declare under penalty of perjury under the laws of the United States of America this 22 day of November, 2005.

LANDRY BURDINE

2

# EXHIBIT 29

<u>DECLARATION OF LOUIS JOHNSON</u>

I, Louis Johnson, Declare:

1.  I grew up in Dermott, Arkansas, and have known Julius Robinson since he was a kid. We would hang out together, drinking beer and talking. Sometimes we would go to movies, but mostly we would just hang out together. I also hung out with Julius' brother, Marcus Robinson, when we were growing up.

2.  I know a guy named Michael Williams. He has one leg, and his nickname is *One Love*. Back in the late 1990's and 2000, One Love was selling drugs. He was living in Pine Bluff, Arkansas. In December of 2000, One Love came to Dermott for a visit. I was with him when he sold some cocaine to Wayne Jordan, Keith Eddington and Kentrel Pitts. It was bad cocaine; it was mostly baking soda.

3.  The next day, Jordan, Eddington and Pitts approached me. They were very upset at being sold bad product. They wanted their money back.

4.  I passed this information on to One Love when I saw him, and he just laughed.

5.  Later that day, while I was driving around Dermott with One Love, Jordan, Eddington and Pitts flagged us down. One Love turned to me, smiled, and said: "Watch me sell them some more cocaine."

6.  We pulled over, and the three guys came up to the car. Pitts pulled out a gun. He demanded their money back. One Love said he would give them their money, but he didn't have it with him.

7.  Pitts told me to get out of the car. When I got out, the three guys got in the car

1

*L.J*

**Ex. 29 - 404**

with One Love and Pitts said: "Let's go get the money." The car drove off. At no time did I hear any mention of Julius Robinson or his case. As far as I could tell, the whole incident was about being sold bad cocaine. Jordan, Eddington, and Pitts are about seven years younger than Julius Robinson. As far as I know, they have never had any business relationship with Julius.

8.    I was interviewed by the F.B.I. in connection with the *One Love* incident. I told the F.B.I. that I believed *One Love* had sold Jordan, Eddington, and Pitts some bad drugs and that this had been the cause of the incident. I denied being in the car with *One Love* to the F.B.I. because I didn't want to get involved with a legal matter at that time. Prior to being contacted by a Federal Public Defender investigator, I had never been contacted by any member of Julius Robinson's defense team. If I had been contacted earlier, I would have provided all of the information contained in this declaration.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

10-19— , 2005

*Louis Johnson*

LOUIS JOHNSON

2

# EXHIBIT 30

## DECLARATION OF MARCUS JWAIN ROBINSON

I, Marcus Jwain Robinson, declare:

1. I am Julius Robinson's older brother. I was born in 1974 in Dermott, Arkansas, two years before my brother, Julius.

2. My earliest memories are of me and Mama Sarah, who helped my mother take care of me and my brother, sitting outside of our house. I could hear my mother and father fighting inside the house. I heard their voices, yelling at each other. I think it must have been when we lived in North Carolina where my dad was stationed. I can't remember my brother being there, although he may have already been born. I can also remember my mother going out and I wanted to go with her, so I would follow her. She would yell at me and whip me with a switch or hit me with her hand on my butt. She would tell me I couldn't come with her and that made me cry. I remember that happening often.

3. My parents were always arguing and when they fought, it was physical fights with hitting and punching. When I was a little boy, Mama Sarah would say to me, "When you grow up, don't fight and drink and do drugs like they do. And, don't you hit ladies." The fighting was always my daddy's fault

*M R*

_____

M.R.

1

Ex. 30 - 406

because my mother could do no wrong in Mama Sarah's eyes.

4. Our parents split up when my brother and I were very young and we were sent to live with my mom's mother and father. Mama Sarah would also stay off and on with my grandparents and take care of us when we were little. I felt closer to her when I was growing up than I felt to either my mother or my grandmother, Margaret.

5. Mama Sarah was much easier on my brother and me than our grandparents who we lived with. My grandmother was the one who disciplined us. She used a switch from a tree and she would whip our butts. Julius got into much more trouble than I did.

6. Our father would send clothes and shoes for me and my brother. He visited us maybe two or three times that I can remember. One of the times, he came with his second wife, Linda Love. I must have been eight or ten years old. Our father at least made an effort to do something for us. Our mom wasn't doing anything. She came to see us once or twice in all the time we lived with our grandparents and she never sent us anything. When our mother visited Dermott, she was on the go all the time, always partying and going out with her friends. She really didn't spend the time with my brother and me. I cried when

*M R*

2                                                    M.R.

**Ex. 30 - 407**

she would go out partying.

7. Julius and I played in the fields behind my grandparent's house all the time when we were kids. During the summer, we played ball there with our cousins or flew kites. Soybeans or cotton was grown there and during certain times of the year, especially in the summer, a crop duster sprayed pesticides on the fields. They sprayed at least three times a week. We would be playing out there and they sprayed right on top of us.

8. My father's mother, Grandmother Bertha, lived next door to us. She was in a wheel chair. I heard from the family that my grandfather, who I never met, shot her accidentally when he was cleaning his gun. That never made sense to me, why would he be cleaning his gun with bullets in it? She may have been in a wheelchair but she could make us mind better than our grandmother, Margaret. Grandma Bertha was more aware, you couldn't slip anything by her. Unlike Grandma Margaret, Grandma Bertha didn't cuss but if we heard her say "Darn it!", we'd say, "Oh, oh, she hot. We're in big trouble."

9. Grandma Bertha was the only one who could help us with our school work because Grandma Margaret was illiterate. Our grandfather was blind so he had his limits, but he was good at math. We just had to tell him the problem

_MR_

3

M.R.

**Ex. 30 - 408**

and he would give us the answer. It didn't help us learn just to get the answers, though. He didn't show us the process like Grandma Bertha did. We got all our school work help and guidance from her.

10. It was hard when she got sick with cancer. It hurt to see her fall apart like she did, especially when she was getting chemotherapy. I was around twelve or thirteen when she died. The chemotherapy really changed her. She had long hair and all her hair fell off. It was scary the way she looked. We lost a really strong person in our lives when she died.

11. Our cousin, Rodney White, came to stay with our grandmother, Bertha, when she got sick. After she died, he stayed on and lived with our great-grandmother, Mahaela. Our great-grandmother died one year after Grandma Bertha. Julius was really taken with Rodney, who was older. My brother admired Rodney and started spending as much time as he could with him. Rodney ran with a guy from California named John-John Wright. John-John brought the whole idea of gangs to Dermott. It was around this time that my brother started getting into trouble. He was listening to the wrong music and he was listening to the wrong people.

12. I was playing a lot of sports, football, basketball and baseball when I

4

M.R.

was in school. I also ran track. Julius also played sports in school in Dermott but he had other things on his mind. He looked up to Rodney and John-John.

13. After John-John brought gangs to Dermott, most of the young boys became interested in belonging to a gang. You had to pick a side. Even if you weren't initiated, you had certain people you hung out with. I was never initiated but I was associated with the Gangster Disciples, started by Larry Hoover in Chicago. The GDs then turned into Growth and Development in the late 1980's. It became more a program about developing your knowledge and staying away from drugs. The kids in Dermott had a lot of little made-up gangs which were just the people you hung out with.

14. There were a lot of drugs in Dermott, even when I was growing up there. There was crack cocaine and marijuana. The same guys who sold it when I was in high school are still selling it there today. In Dermott, you've got to survive and there is absolutely no work there. When I was growing up in Dermott, there were no jobs and there still aren't any jobs.

15. I visited my mother and brother in Arlington twice, during the summers when I was going to high school. I stayed with them for about a month each time. My brother was in high school. I remember not having

5

M.R.

Ex. 30 - 410

anything to eat but potatoes with ketchup or hot sauce for days, waiting for my mother to get her paycheck. That's all the food there was in the house. When she got paid, she bought food and also a big bottle of whiskey. The bottle would last her about four or five days.

16. I was a really angry young man my last years in high school. I felt our mother had abandoned us when we were kids. After spending time with our mother during the summers and seeing her drinking, smoking dope and running around with men, I thought she was just no good. Except for when she woke up in the morning, she was always drunk or high on marijuana or both. Julius would sometimes tell our mother she needed to stop doing all the drinking and smoking she was doing, but that never changed her. I don't know if Julius was angry like I was because he kept his feelings from showing.

17. I graduated from Dermott High School in 1993. I married Roshelle Bethune when I was seventeen and six months before I graduated my son, Marcus Jr., was born. Roshelle is one year older than I am. Little Marcus stayed at my grandparents house when Roshelle joined the Navy. After my graduation, I joined Roshelle in Virginia. We stayed together for about a year and then I came back to Dermott. I went to the University of Arkansas at Pine

6

*M R*

M.R.

Bluff on a football scholarship. I was there about one year and then I returned to Dermott. In 1994 or 1995, I came to Arlington where my mother and brother were living. My brother had left Dermott around five years before.

18. I moved to Arlington in 1994 or 1995. I lived with my mother and brother for about five months. My mother was working as a nurse's aide. When she came home from work, she smoked marijuana. She smoked every day. She also drank. When she drank, her speech would become slurred and she would yell. Sometimes she would leave the apartment and sometimes she would just go to bed. I was always amazed that she could get up the next morning and go to work after how much she had been drinking the night before. Sometimes Julius would leave the apartment, also, and sometimes he wasn't even there.

\\\

\\\

\\\

\\\

\\\

\\\

\\\

7

M.R.

19.  My mom had a boyfriend living with her then, a guy named Vernon Ozby, who I knew for a fact was on crack.  He wasn't allowed to drive my mother's car so he had me give him a ride and I saw him buy the crack.

20.  Had I been asked before I would have willingly provided the information which appears in this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _13_ day of November, 2005 in Arlington, Texas.

_____
Marcus Jwain Robinson

8

SUPPLEMENTAL DECLARATION OF MARCUS JWAIN ROBINSON

I, Marcus Jwain Robinson, declare:

1.    I have been infomed that Mr. Bruce Cummings provided a declaration indicating that he had spoken to me during the course of his pre-trial investigation. On August 14, 2006, I spoke with an investigator from the Office of the Federal Public Defender representing Julius Robinson and I was asked to respond to this allegation.

2.    Shortly before Julius Robinson's trial started, I met with two people working on his case.  We met at Colter's Restaurant and ate lunch there.  My brother's attorney, Mr. Wes Ball and another gentleman whose name I don't remember, asked me some questions.  They wanted to know what I knew about Julius' drug business.  They also asked me what I had heard about the shootings. Those were the only things that they asked me about, no more than that.

3.    Mr. Ball did not ask me any background questions about Julius or what his life was like.  Specifically, he didn't ask me any questions about our upbringing or my memories of our father and mother.  He did not ask me about what life was like in Dermott.  He didn't ask about the conditions of the places where we played. He did not ask me about any of my relatives.  He did not ask me any questions about my mother or her drug use.  He never asked me about the conditions at my mother's

1

_MSR_
M.J.R.

house in Arlington when she and Julius were living together there.  We spoke for no more than thirty or thirty-five minutes.

4.    Mr. Ball never asked me about a telephone conversation that I had with Julius and my Aunt Josephine when Julius was in jail before his trial.  I do not recall exactly what was said during this conversation.  I was informed that during this phone call, Julius said "That dude "One Love," man that dude right there go hard Joe."  I did not think Julius was asking me and our aunt to do anything to "One Love" Williams.  That's crazy.  I thought he was saying that "One Love" would do anything, say anything.  Anyway, I did not talk to anyone about this conversation.  Mr. Ball never asked me what I understood Julius to mean by that.

5.    Had Mr. Ball and his associate asked me about any of the things mentioned above and in my declaration, I would have willingly provided them with that information.  I have read and reviewed this _1_ page declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _18_ day of August, 2006 in Dayton, Ohio.

Marcus Jwain Robinson

2

**Ex. 30 - 415**