# EXHIBIT 41

Cape Fear Valley Medical Center
October 12, 2005

Office Of The Public Defender
Central District Of California
321 East 2Nd St.
Los Angeles, CA 90012

RE:        294911  Robinson, Rose

Enclosed is the medical information you requested.

CFVMC MEDICAL RECORDS CORRESPONDENCE SECTIONS

| | |
|---|---|
| Cape Fear Valley Health System | 8:30AM - 5:00PM EST |
| P.O. Box 2000 | Monday - Friday |
| Fayetteville, NC  28302 | Ph. (910)609-6626 |

ATTN:   Health Information Management Department

| | |
|---|---|
| HighSmith Rainey Memorial | 9:00AM - 5:00PM EST |
| 150 Robinson Street | Monday - Friday |
| Fayetteville, NC  28301 | Ph. (910)609-1153 |

ATTN: Health Information ManagementDepartment

Page 1

**Ex. 41 - 545**

# AFFIDAVIT AND CERTIFICATION

CERTIFICATION OF CUSTODIAN

RE:  ROSE HOLLIMAN (a/k/a ROSE MARY ROBINSON)

The undersigned, being first duly sworn, states as follows:

I

I am the acting Medical Records Custodian employed by Cape Fear Valley Medical Center, in Fayetteville, North Carolina. I maintain in my custody all of the hospital medical records for inpatients, Short Stay Center, Emergency Department, and Observation patients at Cape Fear Valley Medical Center.

II

As such custodian, I do hereby certify that the foregoing and attached medical records are true and accurate copies of the medical records pertaining to the treatment of **ROSE MARY HOLLIMAN (a/k/a ROSE MARY ROBINSON)**, DOB: ███1958, SSN: ███ 4971, at Cape Fear Valley Medical Center from **1974 until 1980**. These records were made and kept under a system whereby it is the practice that such records be made and kept in the regular course of business, at or near the time of acts, conditions or events recorded, and that they were made by doctors, nurses, and other health care professionals having knowledge of the information set forth in the records.

III

That this affidavit/certification, together with a true, accurate copy of said medical records are hereby tendered to the OFFICE OF THE FEDERAL PUBLIC DEFENDER, CENTRAL DISTRICT OF CALIFORNIA, 321 EAST 2nd STREET, LOS ANGELES, CALIFORNIA 90012.

Sworn to and subscribed before me

This 13th day of October , 2005.

_____
NOTARY PUBLIC

My commission expires 5/15/2010 .

-----------------------------------------
SEAL

This 13th day of OCTOBER 2005.

Cathy Watts, RHIA
**Cathy Watts, RHIA**
**Administrative Director**
**Health Information Management**
**Cape Fear Valley Medical Center**
**Fayetteville, North Carolina**

**Ex. 41 - 546**

**CUMBERLAND COUNTY HOSPITAL SYSTEMS, INC.**
FAYETTEVILLE, NORTH CAROLINA

7

NO: 294 911

| 1. HISTORY NO. | 2. PATIENT'S NAME (LAST FIR.., ..., TITLE) | 3. AGE | 4. BIRTH | 5. ADMIT DATE | 6. ADMIT TIME | 7. ROOM NO. 8 A |
|---|---|---|---|---|---|---|
| 294 911 | Robinson, Rose Mary | 018 | -58 | ██76 | 10:40Pm | 0409 |

| 9. PATIENT'S ADDRESS (ST. NO.) | CITY | STATE | COUNTY | ZIP | 10. DISCHARGE DATE | 11. DISCHARGE TIME | 12. DAYS OF CARE |
|---|---|---|---|---|---|---|---|
| ██ | ...t Fayetteville | NC | | 28301 126 | 76 | | 4 |

| 13. S█ | 18. ADMITTING PHYSICIAN | 19. PHYS. NO. | 20 SEX | 21. HOME TELEPHONE | 22. REL. | 23. CHURCH |
|---|---|---|---|---|---|---|
| F B 01 3 E | Dr Daniel | 26895 | 22 | None | P | Baptist |

| 24. PATIENT'S EMPLOYER | 25. EMPLOYER'S ADDRESS | 26. EMPLOYER'S PHONE NO. |
|---|---|---|
| Unemployed | | |

| 27. FATHER'S NAME (RANK) | 28. MOTHER'S NAME | 29. ADMITTED BY |
|---|---|---|
| John H. Holland | Margaret Gross Holland | PB/NO |

| 30. RESPONSIBLE PARTY (RANK) | RELATIONSHIP | 31. RESPONSIBLE PARTY ADDRESS | 32. HOME TELEPHONE |
|---|---|---|---|
| Rose M. Robinson | Self | ████ S kFayetteville | None |

| 33. PLACE OF BUSINESS | 34. B███ DDRESS | 35. BUS. TELEPHONE NO. |
|---|---|---|
| Unemployed | | |

| 36. THIRD PARTY COVERAGE (LIST PRIMARY FIRST) | 37. POLICY HOLDER | 38. GROUP | 39. CERTIFICATE NO. | 40. COVERAGE CODE |
|---|---|---|---|---|
| A. Self Pay | | | | |
| B. | | | | |

| CHAMPUS – I. D. CARD NO. | EFF. DATE | EXP. DATE | S.S. NO. |
|---|---|---|---|
| C. | | | |

**41. ADMITTING DIAGNOSIS**

O   B

**DISCHARGE DIAGNOSIS**

PRIMARY DIAGNOSIS

IUP  42½ wks, delivered

CODE
649
357
131.9

SECONDARY DIAGNOSIS

LOA
SGA infant
Probable poly hydramnios
Trichimonas - treated

COMPLICATIONS

INFECTIONS

PRIMARY SURGERY

Normal spontaneous vaginal delivery over
MLE + repair

73.7

DATE ██76

SECONDARY SURGERY

73.1
75.6

Amniotomy

DATE ██76

SUMMARY OF PATIENT'S STAY

uneventful

_____ M. D.

| CONSULTATIONS | | | | |
|---|---|---|---|---|
| DISCHARGE STATUS | ☑ ALIVE | ☐ DEATH + 48 | ☐ AUTOPSY | ☐ TRANSFERRED |
| ACCOMMODATION | ☐ CORONARY | ☐ INTENSIVE CARE | ☐ SELF CARE | ☐ OTHER |

SIGNATURE OF ATTENDING PHYSICIAN

Ellen B. Hartmann

CONFIDENTIAL
This information is confidential.
Rediclosure prohibited without
the expressed written consent of
the person to whom it pertains.

**Ex. 41 - 547**

OUT-PATIENT MEDICAL RECORD

# CUMBERLAND COUNTY HOSPITAL SYSTEM, INC. No.

FAYETTEVILLE, N.C.

| DATE | TIME | A.M. | DOCTORS |
|---|---|---|---|
| 76 | 10:00P | m.p.m. | |

**PATIENT'S NAME**  LAST  FIRST  MIDDLE  TIME OF NOTICED

Robinson Rose    Mary

**ADDRESS**  NO. & STREET

| CITY | STATE | ZIP CODE | TELE. |
|---|---|---|---|
| Fayetteville | N.C. | 28301 | none |

| AGE | DATE OF BIRTH | SEX | RACE | MARITAL STATUS |
|---|---|---|---|---|
| 12 | 58 | M (F) | B (S) | M W D |

**NEXT OF KIN OR PERSON RESPONSIBLE**  RELATION

Rose XXXXXXX Robinson    Self  Cs

**ADDRESS**  NO. & STREET

| CITY | STATE | ZIP CODE | TELE. |
|---|---|---|---|
| Fayetteville | N.C. | 28301 | none |

**EMPLOYER OF PERSON RESPONSIBLE**

Unemployed

**INSURANCE CO.**  CO. ADDRESS

Self Pay

**POLICY NO.**  GROUP NO.  CERTIFICATE NO.

Margrett Gross  John H. Holland    NO  Baptist

**SSN**

| SELF | B.C. | COMP | COMM | MEDICARE | MEDICAID | COUNTY | STATE | OTHER |
|---|---|---|---|---|---|---|---|---|
| 01 XXX | 02 | 06 | 07 | 34 | 19 | | | |

**PATIENT BROUGHT BY**

Friend walked pub

**CHIEF COMPLAINT**

C/O Ob Clinic Possible Labor

**HISTORY/PHYSICAL**

**TREATMENT – MEDICATION**

☐ LAB REQUEST    ☐ X-RAY REQUEST    ☐ MEDICATION

**DIAGNOSIS**  IUP 42½ wks

**CONDITION ON DISCHARGE**

**INSTRUCTIONS TO PATIENT**

Admit to ...

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

**DOCTORS SIGNATURE**  M.D.    **NURSE**  **PATIENT'S SIGNATURE**  DATE  TIME

| SERVICE | CODE | CHARGE |
|---|---|---|
| EMERG. ROOM FEE | 3400 | |
| DRUGS – NARCOTICS | 5200 | |
| DRUGS | 5000 | |
| X-RAY | | |
| LABORATORY | | |
| DRESSING | | |
| STERILE TRAYS | | |
| SUTURE TRAY | | |
| EKG | 1700 | |
| CAST | | |
| BLOOD | 1672 | |
| TRANSFUSION FEE | 1655 | |
| OPERATING ROOM | | |
| ANES | | |
| OXYGEN | | |
| IV. SOL. | | |
| ER PHYSICIAN | 3450 | |
| MISC. | | |
| TOTAL CHARGE | | |
| TOTAL PAYMENT | | |
| BALANCE DUE | | |

| | | | |
|---|---|---|---|
| TEMP | PULSE | RESP | B.P. |

**DISPOSITION**

| SEEN & OUT | TIME |
|---|---|
| ADMITTED | TIME |
| ROOM NO. 409 | CASE NO. 294-91 |

CAPE FEAR VALLEY HOSPITAL
FAYETTEVILLE, N. C.

Obstetrical Discharge Summary

EDC _____     Date Admitted ████████████ _____

Gravida _____ Para _____ Abortions _____ Date Discharged _____

Stillbirths _____ Children _____

Maternal Complications: _____

_____

Onset of Labor: _____ ____ Spontaneous _____ Induced

Method of Stimulation _____ Medical _____
_____ Surgical – Stripping or rupt of membranes

Membranes Ruptured: _____ Spontaneously _____ Prior to Adm. _____ After Adm.
_____ Artificially
_____ Hours prior to Delivery

Analgesia _____ _____

Position: _____ L O A _____

Episiotomy: _____ MLε _____

Type of Delivery _____ NSVD _____

Anesthesia: _____ Local 1% xylocaine _____

Comments on Labor and Delivery _____ probable poly hydramnios
placenta to Path

Sex of Infant: _✓_ M _____ F     Weight 5-6     ( SGA )

Condition: _____ Apgar 8/9 _____

Post Partum course: _✓_ Normal _____ Abnormal, Specify _____
Hgb 12 ✓ Hct 34.2

_____ Miller _____
Signature

CONFIDENTIAL
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

③

**Ex. 41 - 549**



CONSENT FOR TREATMENT

I hereby authorize the performance of any medical or surgical procedures, under local, saddle block, or general anesthesia which may be advised and recommended by the attending physician or surgeon of _Rose M. Robinson_, a patient at Cape Fear Valley Hospital. Furthermore, I respectfully request the use of any facilities of this hospital which may be regarded as necessary or beneficial in the performance of said procedures.

_____
WITNESS

_____76_____
DATE

_____
SIGNATURE

_____
RELATIONSHIP TO PATIENT

cchn   029   Revised 10-7-70

④

the person to whom it pertains.

**Ex. 41 - 550**

76 - 11939

## NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES
### DIVISION OF HEALTH SERVICES
### PRENATAL RECORD

Hospital                     Doctor                                    Date  76

Hosp. No.         Office No.              Insurance

Name  Robinson, Rose M   Age 17   Race B   Relig.   Country of Birth   Occupation *Unemployed*   11½

Name of Father of Child           Age   Ht.   Wt.   Marital Status S. M. W. D. Sep.   Years Married   Significant Disease   Education

Business Address           Business Phone              Occupation                    Education

FAMILY HISTORY: (Tbc, Hypertension, Heart D., Diabetes, Neuro-Psych., Epilepsy, Allergies, Mult. Births, Congenital Anom.)
Mo. Ros Twins

MENSTRUAL HISTORY: Onset at 11 Yrs.   Interval *Irregular* Days   Duration 7 Days   moderate

Months Preg. Attempted    L.M.P.          75   Normal            E.D.C.   76 (24)

| PRIOR MEDICAL HISTORY | Pos. | Remarks (Include date and time of Rx) | HISTORY SINCE LAST MENSTRUAL PERIOD | Pos. | Remarks (Include date and time of Rx) |
|---|---|---|---|---|---|
| Kidney Disease | | | Nausea | | |
| Heart Disease | | | Vomiting | | |
| Hypertension | | | Indigestion | | |
| Rheumatic Fever | | | Constipation | | |
| Tuberculosis | | | Headache | ✓ | |
| Venereal Disease | | | Bleeding (Specify) | | |
| Gyn. Disorder | | | Vaginal Discharge | | |
| German Measles | | | Edema | | |
| Nervous & Mental | | | Abdominal Pain | | |
| Diabetes | | | Urinary Complaints | | |
| Thyroid Dysfunction | | | German Measles | | |
| Phlebitis, Varicosities | | | Other Virus | | |
| Epilepsy | | | Radiation (Specify) | | |
| Drug Sensitivity | | | Accidents | | |
| Allergies | | | Medications | | |
| Blood Dyscrasia | | | | | |
| Blood Transfusions | | | | | |
| Rh, ABO Sensitivity | | | | | |
| Operations, Accidents | | | | | |

### SUMMARY OF PREVIOUS PREGNANCIES

Full Term 1    Premature 0    Abortions 0    Now Alive 1    Mult. Births 0

| No. | Year | Place of Confinement | Dur. of Gestation | Dur. of Labor | Type of Delivery | Born A or D | Weight | Complications Maternal | Complications Child |
|---|---|---|---|---|---|---|---|---|---|
| | | Arkansas | 40 wks | 33 min. | Vag. | A | 6 lbs. | | Boy |

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

Form developed by the Committee on Maternal and Child Care, Council on Medical Service, American Medical Association, in cooperation with the Committee on Maternal and Child Health of The American College of Obstetricians and Gynecologists

**Ex. 41 - 551**

76-11959

Patient's Name: Robinson, Rose M    Date of Birth: ██ 58

## PHYSICAL EXAMINATION:

T.    P.    R.    B.P. 92/60  Hgt.    Pres. Wt. 113    Wt. at L.M.P. 119

Eyes PERRLA  Teeth ✓    Thyroid    Throat    Skin

Heart NSR S m

Lungs clear to P+A

Breasts no masses  Nipples ✓    Tumors ✓

Abdomen Soft    Height of Fundus 24 cm

Fetal Heart    Presentation and Position

Extremities WNL    Varicosities ✓    Edema

General Body Type

## PELVIC EXAMINATION (bi-manual and speculum):

Vulva WNL

Vagina ll

Perineum ll

Cervix ll

Uterus 24 cm

Adnexae WNL

Rectal Exam. ✓

Diag. Conj.    cm. Trans. Diam. Outlet    cm. Shape Sacrum

Arch    Coccyx    S.-S. notch

Ischial Spines

| Inlet: | Mid Pelvis: | Outlet: | Prognosis for Delivery: |
|---|---|---|---|
| ☐ Adequate | ☑ Adequate | ☐ Adequate | Good |
| ☐ Borderline | ☐ Borderline | ☐ Borderline | |
| ☐ Contracted | ☐ Contracted | ☐ Contracted | |

LABORATORY EXAMINATIONS: For Syphilis    Type STS    Date ██ 76  Result NR

Blood Type and Rh: Patient B Pos    Father of Child

Hemoglobin    Hematocrit or RBC 39

Urinalysis: Albumin neg    Sugar neg    Microscopic

Exam. for Tbc: Type Mosinac    Date 5-6-76  Result

(Cytology, Chemistry, etc.)

██ 76  Class I

FACTS OF SPECIAL IMPORTANCE:
Initial Over-all Evaluation of Patient

Sensitivities none known    Nutritional Status

Type of Del. planned    Anesthesia planned

Physician to call if attending M.D. not available

M.D. who will attend infant    Is breast feeding planned? no

Date ██ 76

CONFIDENTIAL
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

(Original to be submitted to hospital upon completion.)

⑥

**Ex. 41 - 552**

NAME  Robinson, Lola M.    FILE NUMBER  76-11959

RH — B Pos
STS — N.R.
EDC — 7-22

## SUBSEQUENT PRENATAL VISITS

| DATE | Headache | Dizziness | Edema | Nausea & Vomiting | Bleeding | Blood Pressure | Weight | Height of Fundus | Fetal Movement Felt | Position and Presentation | Fetal Heart | Albumin | Sugar | Hemoglobin | Week of Pregnancy | Return Date | Initi. |
|------|----------|-----------|-------|-------------------|----------|----------------|--------|------------------|---------------------|---------------------------|-------------|---------|-------|------------|-------------------|-------------|--------|
| 76 | ✓ | — | — | — | — | 92/60 | 113 | 24 | ✓ | | | 0 | 0 | 39 | 29 | ▮ 76 | JZ |
| 76 | — | — | — | — | — | 90/50 | 113 | | ✓ | | | 0 | 0 | | 32 | ▮ 76 | MA |
| 76 | — | — | — | — | — | 104/78 | 115 | | ✓ | | | 0 | 0 | | 34 | ▮ 76 | JE |
| /76 | — | — | — | — | — | 98/50 | 114 | 30 | ✓ | OH 140 | | 0 | 0 | | 36 | ▮ 76 | JZ |
| 76 | — | — | — | — | — | 90/60 | 116 | | ✓ | | | 0 | 0 | 36 | 37 | ▮ 76 | AR |

| DATE | LABORATORY EXAM | RESULTS | DATE | LABORATORY EXAM | RESULTS |
|------|-----------------|---------|------|-----------------|---------|
| /76 | r. titer | "320 | | | |
| 27 | Hgl. electro | normal | | | |

| DATE | SUBSEQUENT MEDICAL EXAMINATION | Dr's. Signature |
|------|-------------------------------|-----------------|
| 76 | T m. doe — No problems — malloy | |

CONFIDENTIAL
This information is confidential. Redisclosure prohibited without the expressed written consent of the person to whom it pertains.

Ex. 41 - 553

**NURSES NOTES**

NAME *Robinson, Rose M*                                    File No. *76-11939*

| DATE | PROGRESS NOTES | Nurse's Signature |
|---|---|---|
| ██ 76 | 2nd Preg 1" BF 76 problems. General prenatal instructions, diet, danger signs, Keep Well discussed Prescrip. for Iubron quin 1st P.E. | S. Lilley |
| ██ 76 | C/o "heartburn" Admits to eating fried foods. Had fried chicken & cabbage last evening. Explained the need to decrease intake of gas forming foods & not to eat fried ___. Suggested MoM taus' for heartburn. Will give so stressed importance of well bal. Nourishing diet. To buy Job and Preparing for baby R+C 6-28-76. | M.H. Jelley |
| ██ 76 | Very pleasant lady. Still having heartburn but has ↓ fried foods & it is some better. Has many things for baby. Wants IUD for B.C. Recall oped from previous visits. RTC 6-24-76 | J Eason RN |
| ██ /76 | C/o "heartburn" Has decreased fried foods + gas forming foods. Has tried several medications. Is ready ___ baby supplies, EZ admission discussed 3rd tri ✓ | S. Lilley ___ |

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.



CAPE FEAR VALLEY HOSPITAL                    HIGHSMITH-RAINEY MEMORIAL HOSPITAL

LABORATORY REPORTS

DATE _____

URINE

Voided ☐
Catheterized ☐
24 Hr. ☐

ROUTINE URINALYSIS 1042

| Appearance | Clear | amber |
| Sp. Gr. | 1.003 1.040 | 1.006 |
| pH | 4.5-8 | 6 |
| Protein | 1040 NEG | neg |
| Sugar | 1016 NEG | neg |
| Ketone Bodies | NEG | neg |
| Occult Blood | NEG | large |
| MICROSCOPIC | | |
| RBC | 0 | 50+ |
| WBC | 0-10 | 15 |
| Casts | 1-2 | |
| Epithelial Cells | | mod |
| Crystals | 0 | |
| Bacteria | 0 | few |

MISCELLANEOUS URINE

| Urobilinogen | 1046 | |
| Porphobilinogen | 1030 | |
| Uro Porphyrin | 1030 | |
| Copro Porphyrin | 1030 | |
| Sugar - Blue | 1012 | |
| | 1015 | |
| Bence Jones | 1006 | |
| PKU | 1028 | |
| | 1008 | |
| Sulkowitch (Calcium) | 1044 | |
| Osmolality | 1042 | |
| Metabolic Screen | | |

☐ CAPE FEAR VALLEY - I
STOOL URIN
PATIENT

035005

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

**Ex. 41 - 555**



CONSENT FOR TREATMENT

I hereby authorize the performance of any medical or surgical
procedures, under local, saddle block, or general anesthesia which
may be advised and recommended by the attending physician or surgeon
of _____, a patient at Cape Fear Valley
Hospital.  Furthermore, I respectfully request the use of any
facilities of this hospital which may be regarded as necessary or
beneficial in the performance of said procedures.

WITNESS

DATE _____ 76

SIGNATURE

RELATIONSHIP TO PATIENT

ccha    029    Revised 10-7-70

the person to whom it pertains.

CAPE FEAR VALLEY HOSPITAL

LABOR AND DELIVERY RECORD

NAME Robenson, Rosie Mary     EDC [redacted]

ADDRESS [redacted] City     PHONE —

AGE 18  GRAVIDA II  PARA I  Rh pos  SHOW?  ALLERGIES NKA

ONSET OF LABOR 7 $\frac{00}{}$ PM.     SPONTANEOUS ☑     INDUCED ☐

MEMBRANES RUPTURED 2 $\frac{50}{a}$ M. DATE [redacted] 76  SPONTANEOUS ☐  ARTIFICIAL ☑

ATE LAST 5 $\frac{00}{p}$     FOOD B.B.Q. Ribs, P. Chips, Soda   Pepsi - 10$\frac{3}{}$

ARTIFICIAL TEETH —     CONTACT LENS —    T.    P.    R.

PEDIATRICIAN On call     WILL NURSE     WILL NOT NURSE ✓

| DATE | TIME | B/P | FHR | CONT. | EFF. | DIL. | STA. | R/V | COMMENTS AND SIGNATURE |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  | 12 |  |  |  | 100% | 4 | -2 | ✓ |  |
|  | 12 am |  |  |  |  |  |  |  |  |
|  |  | 104/68 | 120 |  |  |  |  |  |  |
|  |  |  | 128 |  |  |  |  | ✓ |  |
|  | 2 | 98/60 | 132 |  |  |  |  |  |  |
|  |  | 100/64 | 132 |  | 100 | 4 | -1/2 | ✓ | Acom |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  | c |  |  |  |

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

Ex. 41 - 557

DATE DELIVERED ████ 76    TIME 349 A.M.

SEX m    WEIGHT 5-6    APGAR SCORE 9

PLACENTA 3    M.    SPONTANEOUS ___    MANUAL ___

EPISIOTOMY m cl    LACERATION ___    REPAIR _____

TYPE OF DELIVERY spn    POSITION vc

OXYTOXIC pidosin dv    BLOOD LOSS ___

TOTAL HOURS OF LABOR ___    FIRST STAGE ___    SECOND STAGE ___

SCRUB NURSE Ba___—Tombana—n Jar.ld    CIRCUMCISION ___

REMARKS ___

OBSTETRICIAN Joe millal mmish

ANESTHESIA STARTED ___    ENDED ___

ANESTHESIA local infiltration - Xylocain

POST-ANESTHESIA REMARKS - TO RECOVERY ROOM 4'%

CONDITION OF PATIENT ___    B/P 110/70 130/80

ANESTHETIST J. D. millc

COMPLICATIONS ___

CONFIDENTIAL Miller MD    S SIGNATURE
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

BEST AVAILABLE COPY

REMARKS
ADMITTED

Name _____
Last

Room 409

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

ccha    084    3/11/70

Ex. 41 - 559

Name: ROBINSON, ROSE

Pathology No.: S76-4634

Hospital No.: 294 911    Room No.: 409

Age:    18    Sex:    F    Race: N

Date of Operation: ▮▮76

Surgeon:  Dr. Daniel

Clinical Diagnosis:

Specimen:    Placenta

**PATHOLOGY REPORT**

Cape Fear Valley Hosp. — Highsmith-Rainey Memorial Hosp.

323-6151              485-3111, Ext. 247

Fayetteville, N. C. 28302

CHARLES L. WELLS, M.D., F.C.A.P., DIRECTOR
ROY A. WEAVER, M.D., F.C.A.P., ASSOCIATE
GEORGE B. LUTMAN, M.D., F.C.A.P., ASSOCIATE

GROSS:

Tissue submitted identified as "placenta" and it consists of a placenta 14.5 cm. in diameter and measuring from 2.0 to 3.0 cm. in thickness. At the margins are attached the membranes which appear adequate. Slightly eccentrically attached is the umbilical cord 30.0 cm. in length, and 1.4 cm. in diameter with a normal complement of vascular spaces. The maternal surface of the placenta is composed of cotelydons which appear intact. Serial slicing of the placenta reveals it to be pink in color with occasional gray-white foci of infarction. No particularly unusual features are noted. Representative portions of the placenta and umbilical cord are submitted.

WBL/bw

MICROSCOPIC:    Sections of umbilical cord reveal a normal compliment of vascular spaces. Placenta is of a term type with multiple small chorionic villi showing occasional areas of hyalinization and infarction. There is a thin layer of decidual tissue on the maternal surface. The fetal surface is intact and shows no evidence of inflammation.

DIAGNOSIS:    Term placenta and portion of umbilical cord histologically unremarkable. (NC)

Code 1
WBL/ck
▮▮76

William B. Leach, M.D.
Pathologist

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

(14)

**Ex. 41 - 560**

CAPE FEAR VALLEY HOSPITAL                HIGHSMITH-RAINEY MEMORIAL HOSPITAL

PROGRESS NOTES

DATE

Cx 4cm, 100%  √ tx  at -2/-3  8 felt too high to rupture  will wait for descent of head.  / J Miller  External Monitor.

in dil slowly.  Lts still high.  will wait another hour for progress.  Ext Mon'g on  / J Miller

VH now -1/-2  Has descended & is against cervix.  ARom c clear fluid  / J Miller

Delivery time  3.49 AM
NSVD over MLE + repair
Male, 5-6 oz, Apgar 8/9
Probable polyhydramnios c leakage large amt fluid post delivery
Cord c 3 Vessels; Placenta c few cot
EBL 200 cc's

Fetal tracing from monitor – OK, no evidence of distress  / J Miller

Day of delivery – Doing well.  Minimal bleeding  / F Miller

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

CAPE FEAR VALLEY HOSPITAL                    HIGHSMITH-RAINEY MEMORIAL HOSPITAL

PROGRESS NOTES

DATE

18 year old Sep BF para 1-0-1 gr ii who presents in early labor

LMP  10/15/75

EDC  7/22/76

Labor   cut q5' @ 1400                    BT · B+

Meds    I                                 Bottle Feed.

Bleeding Show

Prenatal cervix essentially uncomp x now 42½ wks. Missed last

clinic appt.

Exam    T: 98²      P - 88       R = 18       BP = 112/78

HEENT  ok

neck supple

chest  clear to P+t

heart  S₁S₂ ok  gr i/vi  pulm flow ⊙

breast  preg

abd     FH 32    FHT  120-140

pelvis  Cx 3½ cm    50-75%    @ 2300

        Vtx  -3

Extrem  OK        DTR 2+

Imp  Pt P 42½ wks, early labor

Dis  Admit

Atrium ₚ descent of head    J miller

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

Pelvis  qm

ccbc   003   11/4/74                              ADDRESSOGRAPH



CAPE FEAR VALLEY HOSPITAL                    HIGHSMITH-RAINEY MEMORIAL HOSPITAL

PROGRESS NOTES

DATE

PP #1

S: ō %

O: afebrile, uterus firm, voiding, mod.
D/C

A: doing well

P: cont present tx

E Hartmann

PP #2

S: ō %

O: afebrile, uterus firm, voiding, D/C < pd.,
Trichimonas found on routine urine - d'ex c̄
Flagyl 2gm po

A: doing well

P: D/C in AM

E Hartmann

PP #3

S: ō %

O: afebrile, uterus firm, D/C ~ pd.

A: doing well

P: D/C today

E Hartmann

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

CAPE FEAR VALLEY HOSPITAL
FAYETTEVILLE, N.C.

DOCTORS' ORDER SHEET

DOCTOR _____

_____ Will not nurse

| ORDERED DATE | TIME | POST PARTUM ORDERS | DISC. |
|---|---|---|---|
| | | 1.  Bed rest for 8 hrs., then ambulate with assistance. | |
| | | 2.  Diet and fluids as tolerated after 1 hr. | |
| | | 3.  Catheterize q 6 hrs. prn if unable to void.  Insert foley catheter with second catheterization. | |
| | | 4.  Instruct patient in perineal care and use of peri bottle. | |
| | | 5.  Heat Lamp bid prn. | |
| | | 6.  Hgb., Hct., and voided urine specimen on 1st PP day if not already done. | |
| | | 7.  APC with Codeine grs. ss, tab. ii q 3-4 hrs. prn or Darvon Comp. 65 x 5 days. | |
| | | 8.  Seconal grs. iss HS prn x 5 days. | |
| | | 9.  Senokot tab. ii HS until normal BM and prn. Dulcolax supp. on 3rd PP day if no BM.  Fleets enema on 3rd PP day if Supp. unsuccessful. | |
| | | 10.  Methergine tab. i tid x 6 doses. | |
| | | 11.  Breast support and ice packs prn. | |
| | | 12.  B/P, Pulse, Check fundus and bleeding q 15 min. x 1 hr., then q 1 hr. x 4 hrs., then bid x 2 days. | |
| | | 13.  TPR qid. | |
| | | 14.  _____ _____ | |
| | | 15.  American spray prn | |
| | | 16.  Ice pack to perineum x 1 hr | |

CONFIDENTIAL
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

(18)

Ex. 41 - 564

**CAPE FEAR VALLEY HOSPITAL**
FAYETTEVILLE, NORTH CAROLINA

DOCTORS ORDER SHEET

DOCTOR _____     DATE _____ ████ 1976

Will not nurse

ORDERED                                         DISC.
DATE     TIME                 ORDERS

████  Admit to labor and delivery
      Prep
      Enema
11⁹   1000 cc  D5 ¼ NS @ 100 cc/hour
      P.O. DR. J. Miller / S. Hoffman RN
████  Fetal ECG Monitor
      Demerol 50 mg   I.V. @ 3½
      Laigan 20 mg
      Dr. J. Miller

████  1976   Flagyl  2 gm po now
      5% A. McLellan w/sec.         E Hartmann MD

████  1976

████  1976   ✓ D/C today
                                    E Hartmann

      7²⁰am  H. Jessie R.N.

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

19

**Ex. 41 - 565**



CAPE FEAR VALLEY HOSPITAL
FAYETTEVILLE, N. C.

GRAPHIC SHEET

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

## CUMBERLAND COUNTY HOSPITAL SYSTEM, INC.

### CAPE FEAR VALLEY HOSPITAL

#### OBSTETRIC FLOW SHEET

| DATE | ▆ 76 | | ▆ 76 | | ▆ 76 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| OBSERVATIONS | A.M. | P.M. | A.M. | P.M. | A.M. | P.M. | A.M. | P.M. | A.M. | P.M. |
| Breast | soft | Soft | Supp Soft | soft | Supp Soft | | | | | |
| Nipples | soft | Soft | Soft | soft | soft | | | | | |
| Lochia | mod | mod | Mod | sml | Mod | | | | | |
| Fundus | firm | Six | firm | firm | firm | | | | | |
| Bladder | vd. | vd | vds Ps | vdg | vdgs | | | | | |
| Perineal Area | clean | clean | clean | clean | clean | | | | | |
| Stools | ō | ō | / | c̄ | Had BM | | | | | |
| Perineal Care | self | Say | self | self | self | | | | | |
| | | | BP 120/68 | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Drs. Visit | small | mula | SMH | | SMMH | | | | | |
| Nurses Sig. | | Kruter | WRN notad | | | | | | | |
| Diet | Reg | Reg | Reg | Reg | Reg | Reg | Reg | | | |

TEACHING INSTRUCTIONS: _____ given IN FR 8/10 Jo baby care class M Zungwith RN PHN @ 1²⁰pm

DISCHARGE INSTRUCTIONS: 8/11/76 re: p/p home care and 9/52 check-up. discharged per w/c c̄ baby in stbls condition. accompanied by family S Coston RN _____ RN 0489

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

## CUMBERLAND COUNTY HOSPITAL SYSTEM, INC.

Cape Fear Valley Hospital ___          ___ HIGHSMITH-RAINEY MEMORIAL HOSPITAL

### NURSES PROGRESS NOTES

| DATE | NOTES |
|------|-------|
| 8 AM<br>9 AM | *[illegible handwriting]* DIET TAKEN *[illegible]* — *[illegible]* VISITED<br>SLEPT MOST OF MORNING — *[illegible]*<br>*[illegible]* FUNDUS *[illegible]* — *[illegible]* BREAST *[illegible]* |
| 12 PM<br>2:00 PM | DIET CONSUMED. 98" 76-18<br>B— 130/82 *[illegible handwriting]* |
| | *[illegible handwriting]* |
| | 4pm OOB — *[illegible]* q·s    *[illegible]*<br>5pm Reg diet taken well    *[illegible]*<br>*[illegible]*<br>*[illegible]* q·s<br>BP 110/80 |
| | *[illegible handwriting]* |
| 1976<br>1976<br>1976 | *[illegible handwriting]* |
| | *[illegible handwriting]* |

**CONFIDENTIAL**<br>This information is confidential.<br>Rediclosure prohibited without<br>the expressed written consent of<br>the person to whom it pertains.



## CAPE FEAR VALLEY HOSPITAL
### FAYETTEVILLE. N. C.

## Medication Record

Doctor:                                                                                    Date _____ 1976

| MEDICATIONS | METHOD | AM 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | PM 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Doctor _____ Visited _____

Indicate by check / mark should any of these services used on day of discharge.

LABORATORY                    X-RAY                    PHYSICAL THERAPY

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

Name: _____    Last    First    Middle    Number                    Room _____

CAPE FEAR VALLEY HOSPITAL
FAYETTEVILLE, N. C.

**BEST AVAILABLE COPY**

## Medication Record

Daniel

Date: _____ 1976

| MEDICATIONS | METHOD | AM 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | PM 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | Gm | | | | | | | | | | * | | | |
| Methergine | B | | | | | | | | | Gm | | | Gm | | | | | | H | | | |
| Senekot tab ii | PO | | | | | | | | | | | | | | | | | | K | | | |

3-11 F Knutson End ♯
Garcia RN 7-3 GM

Doctor: _____   Visited _____
Indicate by check ✓ mark should any of these services used on day of discharge.

LABORATORY

Name: _____
Last ____ First ____ Middle

X-RA

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

PHYSICAL THERAPY

Room _____

**Ex. 41 - 570**

# CAPE FEAR VALLEY HOSPITAL
### FAYETTEVILLE, N. C.

## Medication Record

Doctor: _____    Date _____

| MEDICATIONS | METHOD | 12 | AM 1 | 2 | 3 | 4 | 5 | 6 | | 8 | 9 | 10 | 11 | 12 | PM 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Methergine tab-i | PO | | | | | | | | | | ⌀ | | | | ⌀ | | | | | | ✗ | | | | |
| Tace 12mg | PO | | | | | | | | | | ⌀ | | | | ⌀ | | | | | | | | | | |
| Elavye 2gm | ℞ | | | | | | | | | | | | | | | | | | | | | | | | |
| Senekot tbs ii | ℞ | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | |

3-11 L. Knudsen Rn HK
7-3 C Carter Rn

Doctor _____ Visited

Indicate by check ✓ mark should any of these services used on day of discharge.

LABORATORY        X-RAY        PHYSICAL THERAPY

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

Name: _____    Hospital Number
    Last        First



CAPE FEAR VALLEY HOSPITAL
FAYETTEVILLE. N. C.

## Medication Record

Doctor:                                                                                    Date

| MEDICATIONS | METHOD | 12 | AM 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | PM 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Doctor                          Visited

Indicate by check ✓ mark should any of these services used on day of discharge.

LABORATORY                    X-RAY                         PHYSICAL THERAPY

Name:                                                                                    Room.
  Last            First

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

CUMBERLAND COUNTY HOSPITAL SYSTEM, INC.

CAPE FEAR VALLEY HOSPITAL                                    HIGHSMITH-RAINEY MEMORIAL HOSPITAL

NURSES ADMISSION HISTORY

COMPLAINT: Pregnant

ADMITTED VIA                    SENSORIUM:                                  ABNORMALITIES:
         AM        WALKING        ALERT         UNCOOPERATIVE        DEAF          **OTHER
11 —PM            WHEELCHAIR     DROWSY         UNRESPONSIVE         BLIND
                  ✓STRETCHER     COOPERATIVE    COMBATIVE            LOSS OF MOTION
ADMITTED THROUGH EMERGENCY ROOM  ✓YES    NO     OFFICE              HOME     TRANSFER

MOBILITY STATUS:

DIAGNOSIS:        SKIN:                                  VALUABLES:
                  WARM & DRY        CYANOTIC             RINGS (No.)   WIGS
                  COLD & CLAMMY     **RASH               GLASSES       **OTHER
                  PALE              **REDDENED AREA      WATCH
        **OTHER   FLUSHED           **DECUBITI           MONEY

VALUABLES SENT TO ADMITTING OFFICE:    YES    NO    CLOTHING SENT HOME    ON WARD

                                        arrived in pt gown

TEMP.        PULSE        RESP.        B/P        HT.        WT.

PHYSICIAN NOTIFIED:                                     IF UNABLE TO CONTACT, MESSAGE LEFT
WITH
WHAT MEDICATIONS ARE YOU TAKING?

ANY MEDICATIONS BROUGHT TO THE HOSPITAL?    YES    NO    (IF YES, MEDICATION(s) PLACED IN
MEDICATION CABINET BY:

PREVIOUS HOSPITALIZATION                                OTHER
OTHER MEDICAL PROBLEMS?

PRESENT DIET                                           APPETITE
    DIET RESTRICTIONS                                  PREFERENCE
SLEEP PATTERN:  USUAL HOURS                            NAP
    INSOMNIA OR WALKING                                WHY
    SOLUTION FOR SLEEPLESSNESS
HYGIENE:   TUB       SHOWER       BED BATH        FEET CARE
    ORAL CARE:                                   SKIN CARE:
ELIMINATION PROBLEMS:    URINARY                 SOLUTION
                        BOWELS                   SOLUTION
ALLERGIES  NKA
PAIN & DISCOMFORT

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

NOTE:   PLEASE COMPLETE REVERSE SIDE                    ADDRESSOGRAPH

Ex. 41 - 573

Cape Fear Valley Medical Center
October 12, 2005

Office Of The Public Defender
Central District Of California
321 East 2Nd St.
Los Angeles, CA 90012

RE:        294912  Robinson, Julius

Enclosed is the medical information you requested.

CFVMC MEDICAL RECORDS CORRESPONDENCE SECTIONS

Cape Fear Valley Health System        8:30AM - 5:00PM EST
P.O. Box 2000                          Monday - Friday
Fayetteville, NC  28302                Ph. (910)609-6626

ATTN:  Health Information Management Department

HighSmith Rainey Memorial              9:00AM - 5:00PM EST
150 Robinson Street                    Monday - Friday
Fayetteville, NC  28301                Ph. (910)609-1153
ATTN: Health Information ManagementDepartment

Page 1

**Ex. 41 - 574**

# AFFIDAVIT AND CERTIFICATION

CERTIFICATION OF CUSTODIAN

RE: JULIUS ROBINSON

The undersigned, being first duly sworn, states as follows:

I

I am the acting Medical Records Custodian employed by Cape Fear Valley Medical Center, in Fayetteville, North Carolina. I maintain in my custody all of the hospital medical records for inpatients, Short Stay Center, Emergency Department, and Observation patients at Cape Fear Valley Medical Center.

II

As such custodian, I do hereby certify that the foregoing and attached medical records are true and accurate copies of the medical records pertaining to the treatment of **JULIUS OMAR ROBINSON, DOB:** ██████**1976, SSN:** ████**-6554**, at Cape Fear Valley Medical Center from **1974 until 1980**. These records were made and kept under a system whereby it is the practice that such records be made and kept in the regular course of business, at or near the time of acts, conditions or events recorded, and that they were made by doctors, nurses, and other health care professionals having knowledge of the information set forth in the records.

III

That this affidavit/certification, together with a true, accurate copy of said medical records are hereby tendered to the OFFICE OF THE FEDERAL PUBLIC DEFENDER, CENTRAL DISTRICT OF CALIFORNIA, 321 EAST 2nd STREET, LOS ANGELES, CALIFORNIA 90012.

Sworn to and subscribed before me

This 13th day of October, 2005.

_____
NOTARY PUBLIC

My commission expires 5/15/2010 .

--------------------------------------
SEAL

This 13th day of OCTOBER 2005.

_Cathy Watts, RHIA_
**Cathy Watts, RHIA**
**Administrative Director**
**Health Information Management**
**Cape Fear Valley Medical Center**
**Fayetteville, North Carolina**

**Ex. 41 - 575**

FAYETTEVILLE, NORTH CAROLINA                    NO: 294356

| 1. HISTORY NO. | 2. PATIENT'S NAME (LAST - FIRST - INITIAL - TITLE) | 3. AGE | 4. BIRTH D | 5. ADMIT DATE | 6. ADMIT TIME | 7. ROOM NO. |
|---|---|---|---|---|---|---|
| 294912 | Robinson/Male/Rose | NB | -76 | -76 | 3:49AM | 0070 7 |

| 9. PATIENT'S ADDRESS (ST. NO) | CITY | STATE | COUNTY | ZIP | 10. DISCHARGE DATE | 11. DISCHARGE TIME | 12. DAYS OF CARE |
|---|---|---|---|---|---|---|---|
| | Fayetteville,NC | 126 | | 28301 | 76 | | |

| 13. SEX | 14. | 15. | 16. MS | 17. COND | 18. ADMITTING PHYSICIAN | 19. PHYS. NO. | 20. SER | 21. HOME TELEPHONE | 22. REL | 23. | CHURCH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M | N | 01 | 1 | U | Shaw/J.Miller/Daniel | 75530 | 32 | none | | | |

| 24. PATIENT'S EMPLOYER | 25. EMPLOYER'S ADDRESS | 26. EMPLOYER'S PHONE NO. |
|---|---|---|
| Newborn | | |

| 27. FATHER'S NAME (RANK) | 28. MOTHER'S NAME | 29. ADMITTED BY |
|---|---|---|
| | Rose Mary Robinson | 1m/nb |

| 30. RESPONSIBLE PARTY (RANK) | RELATIONSHIP | 31. RESPONSIBLE PARTY ADDRESS | 32. HOME TELEPHONE |
|---|---|---|---|
| Rose Mary Robinson, | Mother | same as above | same |

| 33. PLACE OF BUSINESS | 34. BUSINESS OR MILITARY ADDRESS | 35. BUS. TELEPHONE NO. |
|---|---|---|
| Unemployed | | |

| 36. THIRD PARTY COVERAGE (LIST PRIMARY FIRST) | 37. POLICY HOLDER | 38. GROUP | 39. CERTIFICATE NO. | 40. COVERAGE CODE |
|---|---|---|---|---|
| A. Self Pay | | | | |
| B. | | | | |

| CHAMPUS - I. D. CARD NO. | EFF. DATE | EXP. DATE | S.S. NO. |
|---|---|---|---|
| C. | | | |

**41. ADMITTING DIAGNOSIS**

Newborn  Mother rose Mary 294911

**DISCHARGE DIAGNOSIS**                                    CODE

PRIMARY DIAGNOSIS

SECONDARY DIAGNOSIS

COMPLICATIONS

INFECTIONS

PRIMARY SURGERY

DATE

SECONDARY SURGERY

DATE

SUMMARY OF PATIENT'S STAY

_____ M. D.

CONSULTATIONS

**CONFIDENTIAL**
This information is confidential. Redisclosure prohibited without the expressed written consent of the person to whom it pertains.

| DISCHARGE STATUS | ☐ ALIVE | ☐ DEATH + 48 | ☐ AUTOPSY | ☐ STILLBORN | ☐ TRANSFERRED | SIGNATURE OF ATTENDING PHYSICIAN |
|---|---|---|---|---|---|---|
| ACCOMMODATION | ☐ CORONARY | ☐ INTENSIVE CARE | ☐ SELF CARE | ☐ OTHER | | |



NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES
DIVISION OF HEALTH SERVICES - VITAL RECORDS BRANCH

## CERTIFICATE OF LIVE BIRTH

REGISTRATION DISTRICT NO. ___ LOCAL NO. ___    BIRTH NO. 132

**CHILD**

| NAME OF CHILD | FIRST | MIDDLE | LAST | SEX |
|---|---|---|---|---|
| | Julius | Omar | Robinson | Male |

THIS BIRTH: Single | IF NOT SINGLE BIRTH | DATE OF BIRTH: [redacted] 1976 | HOUR OF BIRTH: 3:49 A. M.

PLACE OF BIRTH COUNTY: Cumberland | USUAL RESIDENCE OF MOTHER: North Carolina | COUNTY: Cumberland

CITY OR TOWN: Fayetteville | CITY OR TOWN: Fayetteville

NAME OF HOSPITAL: Cape Fear Valley | INSIDE CITY LIMITS: Yes | STREET ADDRESS OR R.F.D. NO.: [redacted] | INSIDE CITY LIMITS: Yes

**PARENTS**

| NAME OF FATHER | FIRST | MIDDLE | LAST | AGE AT TIME OF THIS BIRTH | STATE OF BIRTH |
|---|---|---|---|---|---|
| | Jimmie | Lee | Robinson | 23 YEARS | Arkansas |
| MAIDEN NAME OF MOTHER | Rosie | Mary | Hollimon | 18 YEARS | Arkansas |

MOTHER'S SIGNATURE — I CERTIFY THAT I HAVE INSPECTED THIS CERTIFICATE FOR ACCURACY | RELATION TO CHILD IF MOTHER CANNOT SIGN: Mother

**ATTENDANT**

I CERTIFY THAT THE ABOVE NAMED CHILD WAS BORN ALIVE AT THE PLACE AND TIME AND ON THE DATE STATED ABOVE. ATTENDANT | DATE SIGNED

ATTENDANT'S NAME: Joseph M. Miller, Jr., M.D. | ADDRESS: Cape Fear Valley Hospital

DATE REC'D BY LOCAL REG. | SIGNATURE OF REGISTRAR | DATE NAME ADDED | DATE AMENDED

### FOR MEDICAL AND HEALTH USE ONLY

**FATHER**

| COLOR OR RACE | EDUCATION — ELEMENTARY | HIGH SCHOOL | COLLEGE | PREVIOUS DELIVERIES — ARE NOW LIVING | WERE BORN ALIVE NOW DEAD | WERE BORN DEAD FETAL DEATH AT ANY TIME AFTER CONCEPTION |
|---|---|---|---|---|---|---|
| Negro | | 12 | | 1 | 0 | |

**MOTHER**

| COLOR OR RACE | EDUCATION — ELEMENTARY | HIGH SCHOOL | COLLEGE | DATE OF LAST LIVE BIRTH | DATE OF LAST FETAL DEATH |
|---|---|---|---|---|---|
| Negro | | 11 | | 1974 | 0 |

DATE LAST NORMAL MENSES BEGAN: [redacted] 1975 | MONTH OF PREGNANCY PRENATAL CARE BEGAN (FIRST, SECOND, THIRD, ETC.): 1st | TOTAL NUMBER OF PRENATAL VISITS (IF NONE SO STATE): 15

CHILD'S WEIGHT AT BIRTH: 5 LBS 6 OZS | IS MOTHER MARRIED? Yes | DID MOTHER HAVE BLOOD TEST FOR SYPHILLIS? Yes

DHS-1201 FORM 15 REV. 9-73

the person to whom it pertains.

Ex. 41 - 577

3923

**MOTHER**

Age _18_ Race _Negro_ Gr _II_ P _I_ ▓ ▓ Neonatal deaths ▓ Blood group ▓ Rh _pos_ Diabetes? ___
General Health ___

**PREGNANCY**

Prenatal care: Pvt ___ Clinic _√_ None ___ STS (include date) _N/C_ ▓ _76_ Toxemia? ___
Other complications ___ EDC ▓ Length _40+ wk_
Mother's health during pregnancy ___

**LABOR AND DELIVERY**

Onset labor _1°° PM_ ▓ _76_ Membranes ruptured at _2³⁰_ ▓ _76_ Spontaneous ___ Artificial ←
Amniotic fluid _clear_ ___ Drugs during labor (include date, time, dose, route): ___
___
Type delivery _spont_ Anesthesia _local infiltration_
Presentation _crt_ Forceps ___ Complications _0_
Date and time of delivery ▓ _76_ _347/a_ Length of labor ___

**NEWBORN IN DELIVERY ROOM**

General appearance _good - nslc_
Respiration ___
Resuscitation _(c) C_
AgNO₃ in eyes _(a)_
Bottle _√_ Breast ___
Obstetrician _Miller, monica_
Delivery Room Nurse _n. Ba q_
PEDIATRICIAN _Shea_

| | APGAR SCORE at 1' _8_ | | 5' (if 6 or less at 1') _9_ | |
|---|---|---|---|---|
| | (please circle one in each category) | | | |
| HEART RATE | RESPIRATORY EFFORT | MUSCLE TONE | REFLEX IRRITABILITY | COLOR |
| 0 Absent | 0 Absent | 0 Limp | 0 No response | 0 Blue, pale |
| 1 Below 100 | 1 Slow, Irregular | 1 Some flex. ext. | 1 Grimace | 1 Body pink, ext. blue |
| 2 Over 100 | 2 Good, Crying | 2 Active motion | 2 Cough or sneeze | 2 Completely pink |

**NEWBORN IN NURSERY**

General appearance ___ Temp. _98°_ Sex _male_ Race _Negro_
Admitted to nursery by ___

**PHYSICAL EXAM**
O–Normal   X–Abnormal

| | ADMISSION | | | DISCHARGE | | ▓ _76_ |
|---|---|---|---|---|---|---|
| Height | Weight | Head circ. | Comment by number | Weight | Head circ. | |
| | 5-6 | | 1 Gen. appearance | 5-3 | | |
| | | | 2 Skin | | | |
| | | | 3 Head, neck | _1) Jittery_ | | |
| | | | 4 Eyes | | | |
| | | | 5 E. N. T. | | | |
| | | | 6 Thorax | | | |
| | | | 7 Lungs | | | |
| | | | 8 Heart | | | |
| | | | 9 Abdomen | | | |
| | | | 10 Genitalia | | | |
| | | | 11 Trunk & Spine | | | |
| | | | 12 Extremities | | | |
| _J. Shea_ M.D. ▓ _76_ | | | 13 Reflexes | _M_ M.D. _8/11_ | | |
| (Signature)    (date) | | | 14 Anus | (Signature)    (date) | | |

Hct ___ Blood Group ___ Rh ___ Coombs ___ Serology ___ PKU _5-11-76 A_

**PROGRESS NOTES**

Circumcised (Date & Doctor): ___

**DISCHARGE DIAGNOSIS:**

**DISPOSITION:**

Mother's name _Robinson Rose_
Address ▓
Home telephone # ▓ Hosp. # **CONFIDENTIAL**
Room # _409_ Newborn's Hosp. # ▓

This information is confidential. Redisclosure prohibited without the expressed written consent of the person to whom it pertains.

③

**Ex. 41 - 578**



CONSENT FOR CIRCUMCISION

I hereby authorize the performance of a circumcision on baby Boy Robinson which is advised by the attending physician, Dr. _____.
Furthermore, I respectfully request the use of any facilities of this hospital which may be regarded as necessary or beneficial in the performance of said procedure.

| | |
|---|---|
| 76 | |
| DATE | SIGNATURE |
| S.B. ullam RN | |
| WITNESS | RELATIONSHIP TO PATIENT |

ccha  076        2/16/71

the person to whom it pertains.

Ex. 41 - 579





CAPE FEAR VALLEY — HIGHSMITH RAINEY
BLOOD CHEMISTRY I
PATIENT'S CHART

the person to whom it pertains.

Ex. 41 - 581



| GLUCOSE | | | Lipase 1362 | 0.5-1.5 Units | |
|---|---|---|---|---|---|
| Fasting 1342 | 65-110 MG% | | Acid-Base Studies 1279 | See Special Report Found | |
| 2 Hr. P.P. 1344 | < 120 MG% | | Acid-Base And PO2 1280 | See Special Report Found | |
| Acetone 1277 | O | | T3 1399 | 25-35% | |
| Serum Osmolality 1301 | 230-300 mOsm/Kg | | T4 | 5.4-13 μG% | |
| Sodium 1386 | 135-150 mEq/L | | | 1.35-4.55 | |
| Potassium 1378 | 4.0-5.4 mEq/l | | PBI 1354 | 4.8 MCG% | |
| Chloride 1328 | 100-110 mEq/L | | Serum Iron 1356 | 50-150 μG% | |
| Carbon Dioxide 1324 | 23-30 mEq/L | | Total IBC 1358 | 250-350 μG% | |
| BUN 1406 | 8-20 MG% | | Cholesterol Esters 1332 | 65-75% of Total | |
| Creatinine 1338 | 0.5-1.2 MG% | | Triglycerides 1404 | 37-150 MG% | |
| Calcium 1322 | 8.5-11.0 MG% | LO | Sweat Chlorides 1390 | 4-60 mEq/L | |
| Phosphorus 1374 | 2-5.5 MG% | 8.3 | Salicylates 1382 | O | |
| Uric Acid 1408 | MEW 2.7 M AVG% | | Bromide 1318 | O | |
| Cholesterol 1330 | 150-300 MG% | | Lithium 1363 | O | |
| Microbilirubin (Infants) 1316 | | | Cholinesterase 1334 | | |
| Total Bilirubin 1278 | 0.2-1.0 MG% | | Heavy Metals 1350 | | |
| Direct Bilirubin | 0.1-0.4 MG% | | Phenylalanine 1378 | 3-5 MG% | |
| Indirect Bilirubin | 0.1-0.6 MG% | | | | |
| CPK 1336 | 0-50 IU | | | | |
| SGOT 1398 | 5-40 Units | | | | |
| SGPT 1402 | 5-40 Units | | | | |
| LDH 1361 | 100-225 IU | | | | |
| fLDH | Varies | | | | |
| Total Protein 1380 | 6-8 GM% | | | | |
| Albumin | 3.5-5.5 GM% | | | | |
| Globulin | 1.5-3.5 GM% | | | | |
| A/G Ratio 1306 | 1.5-2.5 To 1.0 | | | | |
| Ammonia 1308 | 18-48 μG% | | | | |
| BSP 1320 | 0-5% | | | | |
| Cephalin Floc. 1326 | 2 Plus 48 Hrs. | | | | |
| Thymol Turbidity 1389 | 0-4 Units | | | | |
| Alkaline P'tase 1372 | 4-10 Units | | | | |
| Acid P'tase 1370 | 0.5-0.95 Units | | | | |
| Amylase 1310 | 40-120 Units | | | | |

☐   CAPE FEAR VALLEY — HIGHSMITH RAINEY   ☐
BLOOD CHEMISTRY I
PATIENT'S CHART

30085

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

CUMBERLAND COUNTY HOSPITAL SYSTEM, INC.
CAPE FEAR VALLEY HOSPITAL

DOCTORS ORDER SHEET
"HOUSE FORMULA"

| ORDERED | | | DISC. |
|---|---|---|---|
| DATE | TIME | ORDERS | |
| | | 1. Vitamin K 1mg. I. M. | |
| | | 2. Nothing by mouth for 3-4 hours. | |
| | | Sterile water orally x 1; followed by "House" formula. | |
| | | 3. Phisoderm bath including cord care every day. | |
| | | 4. P. K. U. blood sample to be obtained before discharge. | |

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.



CAPE FEAR VALLEY HOSPITAL

INFANT RECORD

BEST AVAILABLE COPY

| DATE HOUR | WT. | TEMP. | FEEDINGS | URINE | STOOLS | REMARKS OR MEDICATIONS |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | 9 | | | | |
| | | | | | | |
| | | | | | | |
| | | 98/99 | form 3 | | | spit lg amt from i mucous, eyes rinsed i vacuace |
| | | | | | | |

**CONFIDENTIAL**
This information is confidential.
Rediscosure prohibited without
the expressed written consent of
the person to whom it pertains.

(9)

BEST AVAILABLE COPY

CAPE FEAR VALLEY HOSPITAL

INFANT RECORD

| HOUR | WT. | TEMP. | FEEDINGS | URINE | STOOLS | REMARKS OR MEDICATIONS |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| 8ᵃ | 3-3 | 98/ | | | | |
| 10ᵃ | | | SPIT | | | |
| A | 98 | | | | | |
| 1ᵖ | | | | | | mother |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**CONFIDENTIAL**
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

Robinson
mother Rou
294912

CAPE FEAR VALLEY HOSPITAL

INFANT RECORD

| DATE HOUR | WT | | | URINE | STOOLS | REMARKS OR MEDICATIONS |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| 2 pm | | 2 | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| 2 pm | | | | | | |
| | | | | | | |
| 4 p | 98⁶ | form ī | | vd | sq | |
| | | | | | | |
| | | | | | | |
| | 1976 | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| 8A | 99 | | | vd | sq | |
| | | | | | | |
| | | | | | | |
| 1 pm | | | | | | |
| | | | | | | |
| | | | | | | |

CONFIDENTIAL
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

Ex. 41 - 586



CAPE FEAR VALLEY HOSPITAL

INFANT RECORD

BEST AVAILABLE COPY

| DATE HOUR | WT | TEMP. | FEEDINGS | URINE | STOOLS | REMARKS OR MEDICATIONS |
|---|---|---|---|---|---|---|
| | 9/6 | | | | | |
| | | | | | | Discharged to mother |
| | | | | | | |

CONFIDENTIAL
This information is confidential.
Redisclosure prohibited without
the expressed written consent of
the person to whom it pertains.

ccha    033    3/11/70

**Ex. 41 - 587**



CAPE FEAR VALLEY HOSPITAL
Fayetteville, North Carolina

NEWBORN IDENTIFICATION

BEST AVAILABLE COPY

| | Hospital No. | INFANT Name | | Hospital No. |
|---|---|---|---|---|
| ROBINSON, Rose | 294911 | ROBINSON | | 294912 |

| Infant's Birth Date | | Time | Sex |
|---|---|---|---|
| 76 | | 3 41/2 | m |

| Color or Race | Weight | Length |
|---|---|---|
| Negro | 5-6 | 18 1/2" |

Signature, Person Taking: K. Sambone

INFANT'S LEFT FOOTPRIN (or palmprint)

INFANT'S REGT FOOTPRINT (or palmprint)

Signatures, Persons Confirming Sex and Identification:

Physician: Joseph m. miller J wD

Delivery Room Nurse: P. Berry

Nursery Nurse: C. Hamilton, R.N.

9924

Date 76

I CERTIFY that during the discharge procedure I received my baby, examined it and determined that it was mine. I checked the Ident-A-Band parts sealed on the baby and on me and found that they were identically numbered 9924 and contained correct identifying information.

Signed Rosie M. Robinson
Mother

Witness Carretha Adams
Hospital Representative

**CONFIDENTIAL**
This information is confidential. Redisclosure prohibited without the expressed written consent of the person to whom it pertains.

**Ex. 41 - 588**

# EXHIBIT 42

**Evaluation of Teratogenic Exposure**
**as Mitigating Evidence in the Case of**
**United States v. Julius Robinson**

**A Report Submitted by**
**Kate Allen, Ph.D.**

**3-14-07**

## Purpose

I was retained by the Office of the Federal Public Defender, Central District of California, to conduct an evaluation of Julius Robinson. It is my understanding that in 2001 Julius Robinson was convicted of murders committed in 2000 and was sentenced to death. I was asked to determine the evidence of substance exposure-in-utero (teratogens) and conduct an evaluation of its likely effects on the cognitive, emotional, and behavioral functioning of Mr. Robinson.

This report, therefore, is an application of the principles of behavioral teratology to the life circumstances of this defendant to enable the judgment of his capacity. In the task of sentencing, these documented developmental injuries are fundamental and significant components of a mitigation presentation.

## Background

For 32 years I have practiced as a clinical social worker and I have been licensed in Texas and California. I am currently a forensic consultant and clinical trainer. I am also Professor Emerita at California State University, Sacramento, having retired from the Department of Social Work. During my tenure as associate professor at CSUS, I taught clinical courses, including psychiatric diagnoses (DSM-IV-TR) and child abuse and neglect. I have also taught on a temporary basis in the graduate school at the University of Texas at Austin, Texas Tech University, and Baylor University. In addition to graduate instruction, I have also provided a variety of professional training, mostly in California, for child welfare and mental health professionals. From 1987 to the present, I have provided numerous clinical consultations and evaluations. My practice has included extensive clinical social work in hospital settings including Shoal Creek Psychiatric Hospital in Austin, Scott and White Hospital in Temple, Texas, and University of California, Davis Medical Center in Sacramento, California. As well, I have provided clinical supervision of other social workers. In recent years I have worked extensively in a forensic capacity. Specifically, I have worked on 18 capital murder cases. I have qualified as an expert witness in both civil and criminal courts in Texas, Nebraska, Oklahoma, California, and Georgia.

Through a combination of study, practice, and research over twenty years in social work, I have developed expertise in the field of Alcohol Related Neurodevelopmental Disorder (ARND). ARND is a spectrum disorder involving developmental disability and brain injury due to maternal use of alcohol while pregnant. Since 1992 I have conducted perhaps 100 day-long

2

training workshops (and some conference presentations) in a number of child abuse and neglect areas, but principally specializing in fetal alcohol syndrome and attachment disorder. Federal Title 4-E funds to provide clinical training to child welfare workers have been the source of much of my sponsored trainings. In this capacity, social workers must acquire the skills to recognize ARND and its sequelae, much of which is explained in this report. A great number of children currently receiving services in the child welfare system meet the criteria for ARND; my expertise has long been utilized by California training units to transmit these skills. I have consulted with and provided training to foster parents and adoptive parents with children displaying signs of ARND.

An additional area of expertise I have utilized during the last 15+ years is in the area of attachment disorder. This condition—resulting in grave developmental injuries—is also ubiquitous in the child welfare field. A large number of my training activity has focused on the assessment of attachment disorder from infancy through adolescence. The two conditions—ARND and attachment disorder—are very often seen in tandem and specialized training in each and both areas are at the center of my training career. These two topics are the core of specialized clinical training in practice with abused and neglected children. My trainings have been extensively requested in the San Francisco Bay Area (Bay Area Training Academy), in the Sacramento/Chico/Fresno corridor, in the Humboldt County area. I have also trained social workers in Los Angeles and will be training in May in San Diego. Participants in my trainings have included social workers, psychologists, psychiatrists, attorneys, foster parents, and adoptive parents.

My expertise was also the center of the course offerings at the graduate level at CSUS in the program which sponsored the graduate training of future child welfare workers. I have a reputation as the expert in these clinical areas throughout Northern California.

**Sources**

The sources used in my review of the case file include the following:
- ❑ Declaration of Mark Cunningham, Ph.D. (a comprehensive review of the case covering all factors of mitigation interest)
- ❑ Statement of and discussion with Stephen Martin, Ph.D. (neuropsychological evaluation)
- ❑ Declarations of the following friends and family members:
  --Jamila Camp
  --Josephine Dotson
  --John Hollimon, Jr.
  --Robert Hollimon
  --Jana Hollimon
  --Rose Hollimon
  --Bernice Johnson
  --Beotha Moore
  --Jimmie Lee Robinson

Ex. 42 - 590

3

  --Marcus Robinson
  --Willie White
- ❑ School records of Julius Robinson
- ❑ Hospital birth records of Julius Robinson
- ❑ Interview with Julius Robinson (1-29-07)
- ❑ A number of research documents on behavioral teratology (a sample of which are listed in the Bibliography)

## Opinion

After a thorough review of his case files, a lengthy interview with the defendant, and an application of behavioral teratology knowledge to this case, it is my opinion that Mr. Robinson manifests an array of the negative sequelae of substance exposure-in-utero, specifically the eventual criminal consequences of brain injury due to alcohol-related neurodevelopmental disorder (ARND), a subset of Fetal Alcohol Spectrum Disorders, as well as the teratogens nicotine, cigarette smoke, and marijuana. Because Julius's mother injured him in utero, he was at high risk for other maternal failures (impaired attachment) and was made particularly vulnerable to the dangerous challenges of high-risk environments (abuse, neglect, poverty, drugs, discrimination, violence). These three causative factors (teratogenic exposure, poor attachment, severe neglect amidst danger)—the latter two a direct link or correlate to fetal toxic exposure— are ample explanations of how this defendant traveled the road to criminal behavior.

## Fetal Alcohol Spectrum Disorders

### 1. History

Fetal Alcohol Spectrum Disorder is a permanent birth defect caused by maternal consumption of alcohol during pregnancy. Alcohol is a teratogen that inhibits and disrupts fetal development by causing structural and functional damage to developing organs and systems, including the brain and central nervous system. The damage starts at the cellular level, where alcohol can induce excessive cell death and disrupt cell responses to molecules that regulate neuron proliferation, migration, and differentiation. Because alcohol causes widespread damage throughout the developing fetus, there is a broad array of physical anomalies and neurobehavioral defects.

Diagnostic labels applied to fetal alcohol impairment have changed over time to reflect increasing diagnostic precision. In 1996, the four broad diagnostic criteria for FAS were reaffirmed in a report by the Institute of Medicine that delineated five specific categories of diagnosis:
- Type 1: FAS With Confirmed Maternal Alcohol Exposure;
- Type 2: FAS Without Confirmed Maternal Alcohol Exposure;
- Type 3: Partial FAS With Confirmed Maternal Alcohol Exposure;
- Type 4: Alcohol-related Birth Defects (ARBD); and

**Ex. 42 - 591**

4

- Type 5: Alcohol-Related Neurodevelopmental Disorder (ARND).

(Institute of Medicine, *Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention, and Treatment*, 1996).

FAS Type 1 is the "classic" FAS diagnosis and includes all four of the features typically associated with the syndrome:   a) confirmed maternal alcohol exposure, b) characteristic facial abnormalities or dysmorphology, c) pre- and/or postnatal growth retardation, and d) evidence of central nervous system neurodevelopmental abnormalities.  FAS Type 2 has all of these features except confirmed maternal alcohol exposure.  FAS Type 3 is differentiated from FAS Type 1 by virtue of the fact that only some of the facial abnormalities are present, and in addition to confirmed prenatal alcohol exposure, the individual manifests growth retardation, evidence of CNS neurodevelopmental abnormalities, and a complex pattern of behavioral or cognitive abnormalities that are inconsistent with developmental level and cannot be explained by familial background or environment alone (e.g., learning difficulties, deficits in school performance, poor impulse control, problems in social perception, language deficits, poor capacity for abstraction, specific deficits in mathematical skills, and problems in memory, attention, or judgment).  FAS Type 4 (Alcohol-Related Birth Defects, or ARBD) requires confirmed maternal alcohol exposure and one or more congenital defects including malformations and dysplasias of the heart, bone, kidney, vision, or hearing systems.  FAS Type 5 (Alcohol-Related Neurodevelopmental Disorder or ARND) requires confirmed maternal alcohol exposure, CNS neurodevelopmental abnormalities, and/or a complex pattern of behavioral or cognitive deficits.

In 2004, several federal agencies (National Institutes of Health, CDC, and Substance Abuse and Mental Health Services Administration) along with experts in the field were convened at a summit sponsored by the National Organization on FAS (NOFAS) developed a consensus definition of Fetal Alcohol Spectrum Disorders (FASD).

### 2.  Disabilities Resulting from Fetal Alcohol Exposure

According to research in the 1990s, disabilities stemming from FASD are categorized as either "primary" or "secondary" depending upon whether they are a direct manifestation of central nervous system malfunction (i.e., primary disabilities) or whether they are mediated by environmental influences (i.e., secondary disabilities).  "Primary disabilities" are defined as functional deficits that stem directly from structural brain damage and CNS dysfunction caused by prenatal ethanol exposure (e.g., Streissguth et al., 1996).  Individuals with FASD are typically born with some or many of these primary disabilities.  "Secondary disabilities" are behavioral deficits that an individual acquires over time that presumably could have been ameliorated if there had been early diagnosis and intervention in childhood.  Secondary disabilities include mental health problems, disrupted school experience, trouble with the law, confinement, inappropriate sexual behavior, alcohol/drug problems, dependent living, and problems with employment.  Postnatal environmental factors exert positive or negative influence on the expression of these secondary disabilities but have nothing to do with the expression of primary disabilities.  However, with effective treatment of primary disabilities, secondary disabilities can be prevented or at least reduced (Streissguth, 1997).  However, without accurate

5

diagnosis and treatment, secondary disabilities manifest in adolescence and adulthood as extreme problems in psychosocial functioning that lead to adverse life outcomes.

### a.  Primary Disabilities

The most serious and pervasive damage occurs in the central nervous system (CNS). Brain imaging studies over the last decade have shown that prenatal alcohol exposure causes significant malformation in structures throughout the brain (e.g., corpus callosum, basal ganglia, cerebellum) that are necessary for normal development and functioning.  [See all Bookstein, et al articles.]

Research has shown that the frontal lobe of the brain, particularly the prefrontal cortex, is particularly sensitive to the effects of prenatal alcohol exposure (e.g., Bookstein et al., 2002). Alcohol seems to target the corpus callosum in particular (Bookstein et al., 2001), which is the brain structure that separates the two hemispheres and relays information (electrical impulses) between the right and left sides of the brain.  When executive functions are compromised by prenatal alcohol exposure, an individual will:

- have difficulty perceiving, prioritizing, and storing information,
- have difficulty processing and retrieving that information,
- be unable to generalize and apply consequences from past actions to potential future actions,
- lack motivation and initiative,
- need external motivators such as frequent cues or guidance from others,
- be unable to perceive the effect of his/her actions on others or the social inappropriateness of those actions,
- display exaggerated emotions,
- be unable to control behaviors that stem from emotion-evoked urges, and, consequently,
- engage in a wide range of socially (and often legally) inappropriate behaviors.

### b.  Secondary Disabilities

A large number of individuals with fetal alcohol impairment display secondary disabilities (Streissguth et al., 1996; Streissguth & O'Malley, 2000).  For example, 60% of those in the large study sample (Streissguth et al., 1996) had been arrested, charged, and/or convicted of a crime; 50% had been in a confinement setting (i.e., psychiatric hospital, jail, prison, residential substance abuse treatment); and 30% had alcohol or drug abuse problems.  The most prevalent secondary disability, experienced by 94% of those in the 1996 study, was mental health problems.  For example, during childhood, 60% of children with FASD have attention deficit/hyperactivity disorder, and during adulthood, most adults with FASD become clinically depressed.  The study also revealed that 23% of adults had attempted suicide, and 43% had threatened to commit suicide.  Other common mental health diagnoses that co-occur with FASD include conduct disorders, oppositional defiant disorder, antisocial personality disorder, anxiety

6

disorders, adjustment disorders, sleep disorders, and severe mental illness such as schizophrenia and bipolar disorder (Streissguth & O'Malley, 2000; Streissguth et al., 1996).

Trouble with the law (i.e., involvement with police or being charged and/or convicted of crime) was experienced by 60% of adolescents and adults in the secondary disabilities study (Streissguth et al., 1996). The most common crimes committed (by almost half of individuals with FASD ages 12-20) were crimes against persons (e.g., theft, burglary, assault, murder, domestic violence, child molestation, running away), followed by property damage, drug possession/selling, sexual assault, and vehicular crimes.

Secondary disabilities associated with fetal alcohol impairment are not just modifiable but preventable if an individual is diagnosed early and receives appropriate intervention. According to the University of Washington secondary disabilities study (Streissguth et al., 1996), specific "risk factors" *increase* the probability that a fetal alcohol impaired individual will go on to develop secondary disabilities, and specific "protective factors" *reduce* that probability. The risk and protective factors apply to an individual's childhood up to 18 years of age and are mutually exclusive. These mediating factors include the following: living in a nurturing and stable home for at least 72% of childhood, receiving a diagnosis of fetal alcohol impairment prior to age six (which permits positive interventions to be applied early in life), never having experienced violence, living for at least 2.8 years in each household, experiencing a good quality home ("good quality" was operationally defined by 12 specific factors), and having basic needs met at least 13% of the time during childhood.

**Principles of Behavioral Teratology Which Apply to This Case**

Teratogens are substances known to cause adverse effects on offspring as a result of gestational exposure; those effects include death, malformation, growth deficiency, and functional deficits. Research into the consequences of teratogenic exposure must account for the effects of a wide range of variables, such as which substances, use-in-tandem, when ingested, how much, for how long, as well as a host of post-natal complications. Although death and physical birth defects are the most dramatic and easily recognizable results, society is most seriously affected when deficits in the neurological development, especially in executive functioning, handicap the fundamental thinking, judgment, and decision-making of a person-and when these deficits are permanent and have wide-ranging implications (as in the case of fetal alcohol spectrum disorder) (Chasnoff, 2001).

There are some common and significant misperceptions which need clarification.

- ❑ Teratogenic effects on a newborn can be mild, moderate, or severe.
- ❑ They may be temporary, reversible, or permanent.
- ❑ Fetal exposure to multiple teratogens strengthens the overall damage.
- ❑ All illegal and prescribed substances have the capacity to harm the newborn, but those which produce the most overall damage are, in this order: 1) alcohol; 2) nicotine/cigarette smoke (Chasnoff, 2001). Marijuana is arguably ranked third. Fetal alcohol damage causes *a <u>variation</u> of permanent mental retardation*. Nicotine, cigarette

**Ex. 42 - 594**

7

smoke, and marijuana have mostly indirect effects on development, but these effects, especially when taken with those of alcohol, can be severe.

❏ There is a dose/effects relationship for *each* outcome and *between* outcomes.  This means that a higher dose is required to produce malformation than that needed to produce growth deficiency (Streissguth, et al, 1988).  *Functional deficits can be produced at lower levels of exposure than those producing malformations and growth deficiency* (Connor, et al, 2000).

❏ Fetal alcohol damage which results in facial dysmorphology may reflect *higher use and/or use in the first trimester.*  Executive functioning (EF) capacity is *damaged at lower doses of use throughout the pregnancy, but more likely in the second and third trimesters.*

❏ Many women who use teratogenic substances do so *when they may not know they are pregnant* (in the first trimester or even later).

❏ Research on ARND (Connor, et al, 2001, and others) distinguishes the brain damage caused by fetal alcohol exposure as it differs from conventional IQ scores or disturbances in physical features , e.g.

--*there is no correlation between executive functioning and facial dysmorphology (though these terms are falling out of use, Fetal Alcohol Syndrome has historically been used to refer to the presence of irregular facial features; Fetal Alcohol Effects has referred to functional deficits when facial features are more or less normal)*

--*significant deficits in executive functioning are not correlated with standard measures of IQ*

--*while there are direct effects of generally lowered IQ scores due to exposure (the average Full Scale IQ score of those with FAS is 79, while the FSIQ score of those with FAE is 90), there are also serious indirect effects which are, in fact, mediated through IQ (as evidenced in other cognitive tests such as WCST, Stroop Word-Color Test, Trail Making Test, Ruff's Figural Fluency Test, Consonant Trigrams Test)*

What is relevant is that the thinking and behavioral problems which arise from deficits in executive functioning are the most disturbing effects of the most damaging teratogen-alcohol. These deficits *occur at lower fetal alcohol exposure dosages* and are not correlated with IQ (which makes it not consistent with the normal mental retardation IQ criteria of FSIQ below 70) or with facial dysmorphology:  neither of these "hard" measures has bearing on the seriousness of the teratogenic effect on the frontal cortex.  *In summary, an individual can have a normal IQ score and still have significant deficits in thinking, learning, and judgment*.  To understand the full impact on an individual's cognitive and behavioral functioning, it is necessary to understand and apply these principles which are unique to ARND.

The group of cognitive abilities that are produced in the frontal cortex of the brain and referred to as executive functioning are the following:

8

- ❑ self-regulation of behaviors
- ❑ sequencing of behaviors
- ❑ cognitive flexibility
- ❑ response inhibition
- ❑ planning
- ❑ organization of behavior

While these are judgment-related higher cognitive processes which have some direct measurability (though not necessarily by conventional IQ scores), they are also dependent on the integration of more basic processes such as motor activity, sensation, perception, attention, or memory. In brain damage due to fetal alcohol exposure, disturbances in each and all of these more basic areas is commonly found.

**Indicators of Teratogenic Damage of Julius Robinson**

A. Damage due to Marijuana Use in Pregnancy

It is reported that Rose Hollimon smoked 12 marijuana cigarettes a day during her pregnancy with Julius. Marijuana use in pregnancy constricts blood vessels in the uterus, cutting down on blood supply, oxygen, and nutrients available to the fetus. Neurophysiological research focuses on the number, kind, and place of receptor sites and binding sites (e.g., one of the major cannibinoid receptor sites in the human brain is in part of the forebrain associated with higher cognitive functions). Cannabinoids are able to affect the expression of key genes for neural development leading to neurotransmitter and behavioral disturbances. Specifically, it affects the process of cell proliferation and migration and synaptogenesis. *The effects are shown to be greater in males than in females.* Research also shows no major deficits in development until the child reaches 3 to 4 years (the time frame consistent with major development of executive functioning (Fried, et al, 2001).

In later childhood, prenatal marijuana use can cause the following effects which are present in the functioning history of Julius Robinson:
- ❑ attention and memory deficits
- ❑ visual analysis/hypothesis testing
- ❑ language comprehension
- ❑ poor ability to interpret alerting or threatening cognitive stimuli (results in poor emotional processing)
- ❑ greater rates of depression

B. Damage Due to Use of Nicotine/Exposure to Cigarette Smoking in Pregnancy

When a pregnant woman smokes cigarettes in pregnancy—a fact attested to by Rose, herself, as well as others (one pack a day in addition to the inhalation of smoke from many marijuana cigarettes daily)—the blood vessels to the uterus are constricted. This constriction causes a reduction of blood supply, oxygen, and nutrients that need to come to the fetus. Many of the affects of smoking on the fetus also occur in children born to mothers merely exposed to

**Ex. 42 - 596**

9

second-hand smoke.  Research, despite the presence of confounding variables, has been able to establish dose-response relationships (Ernst, et al, 2001).  As a matter of fact, research has documented effects of prenatal smoking in adults up to the age of 28 years old in a Skandinavian study of 15,000 subjects:  maternal prenatal smoking was a *robust* predictor of violent offenses and persistent offenses in boys and criminal outcomes in general (Ernst, et al, 2001). Abnormalities in cell proliferation and differentiation is a fundamental effect of this teratogen—a circumstance which underlies neurodevelopmental disorders of executive functioning.

The documented evidence of sequelae of maternal use of nicotine and her exposure to smoke while pregnant which are found in the functioning of Julius Robinson are the following:

- ❑ lower birth weight (Julius's weight at birth was 5 lbs. 6 oz.; 6 lbs. is the beginning of the "normal" birth weight range) and the effect of such; lower birth weight usually recovers over time *except* when exposure to alcohol is present, which is true in this case)
- ❑ deficits in sustained attention
- ❑ lower verbal comprehension
- ❑ deficits in receptive language
- ❑ reduced auditory acuity; impaired auditory processing
- ❑ poorer reading scores, and in reading comprehension, especially the auditory-dependent aspects of reading:  all of these deficits have been found to be strongly dose-dependent
- ❑ increase in hyperactivity
- ❑ decrease in inhibiting responses
- ❑ deficits in short-term memory
- ❑ a decrease in IQ points
- ❑ some evidence of lower stress thresholds
- ❑ increased risk of conduct disorder
- ❑ increased risk of substance abuse

C.  The Alcohol-Spectrum Disorder Effects of Prenatal Exposure

Julius Robinson qualifies as alcohol exposed-in-utero in the following cognitive and emotional functional areas:
- ❑ low birth weight (noted above);
- ❑ learning disabilities (Dr. Stephen Martin, who performed a neuropsychological evaluation of Julius, reports a number of mild to moderate language skills deficits (dysnomia, spelling apraxia, and central dysarthia).  Dr. Martin notes he met low-grade equivalence scores:  Reading—7th grade; Spelling—4th grade; Arithmetic—6th grade. Julius says that he had to study much harder for the grades he received.  Jamila Camp thought of him as having dyslexia and noted how confusing she found his writing;
- ❑ auditory processing (Dr. Martin found deficits involving sustained auditory attention);
- ❑ sensory proprioceptive disorder (Julius states he stuttered as a child, which may indicate a touch-feedback disorder; the psychological literature has also long documented the poor psychological effect on development in the presence of stuttering);
- ❑ perseveration:  difficulties in shifting tasks, in changing strategies, in moving on after the

**Ex. 42 - 597**

10

end of fruitful lines of thinking (Julius recounts a number of circumstances in which, as I describe this to him, this perseveration quality is a common experience, "I feel like I'm not being understood and I can't let it go," often coming across as argumentative.) This results in inability to apply new options in coping. Dr. Martin found deficits in mental flexibility;

❑ ability to maintain complex attention (Julius recalls having had longstanding problems with concentration and distractibility and complains of not being able to focus, of having a habit of "starting 5 or 6 things at the same time");

❑ short-term memory deficits (Julius reports he often experiences "blocks" of memory that force him to "just let go" for the time being of what he is trying to remember);

❑ poor response-inhibition and general impulse-control deficits (Julius likely has had difficulties with *confabulation*, a common fetal alcohol result (as well as alcoholic dementia in long-term alcoholics) in which elements of differing memories are spontaneously issued (confusion and fusion of time/event facts and imagination) during times of stress and fear and which appear to be lies, though there is actually no control or ego-based motivation for lying). As well, Jamila Camp, his former girlfriend, described his confusion with words, appearing to be linked in his poor ability to communicate in writing;

❑ deficits in motor skills (Dr. Martin reported bilateral impairment on a measure assessing simple motor skills);

❑ inability to normally tolerate frustration;

❑ poor ability to self-soothe (as reported by family members as Julius, as a child, being unable to comfort himself, having extensive crying tantrums, "sitting in the corner and stewing for long periods." Julius believes that he drank so much cognac as a way of self-regulating his negative emotions. Sometimes he would feel the same comfort in the routine of gun-cleaning or video cleaning, but those more benign choices did not replace his alcoholism);

❑ poor ability to internally regulate negative feelings, producing a tendency to act out his frustration;

❑ loss of adaptation under stress;

❑ the above five deficits logically result in behavioral dyscontrol—especially externalizing of personal control as outside of oneself (external locus of control).

[Dr. Martin also states that Mr. Robinson's routine exposure to pesticides in his childhood playground is also known to cause learning disabilities.]

It must be noted that a simple view of these areas in and of themselves can render a quite invalid presentation. The specific areas of abnormality correspond to the evidence-based enumeration of the documented use of teratogens in his mother's pregnancy with him and may not appear powerful when taken individually. Yet it is the overall presentation of cognitive and emotional deficits we see with Mr. Robinson—and the obvious compromising of his executive functioning capacity—which we must use in understanding how he came to criminal actions.

**Ex. 42 - 598**

11

**Dr. Mark Cunningham's Evaluation**

Dr. Cunningham's lengthy exposition of the mitigation factors which should have been presented at Mr. Robinson's trial is comprehensive and well-documented.  In that bio-psycho-social evaluation, he reviews essentially the same sources I have used and explains how the many factors revealed by family members and relevant others are exactly those which social science has identified as causing critical developmental injuries.  When a child experiences such fundamental challenges to cognitive, emotional and behavioral development—and additionally is exposed to high-risks in the environment without parental protection—he is unable to take the same level of moral responsibility in decision-making as can an individual for whom these seriously accumulative injuries were absent.

In my report which focuses attention specifically on the sequelae of neurological damage experienced during the fetal period, I will not reproduce the body of work from Dr. Cunningham; yet I will make indirect referral to what is contained there and will, from time to time, specifically take from his evaluation.

**How Substance Exposure-in-Utero Can Lead to Criminality**

In order to demonstrate how Julius Robinson's experience of substance exposure-in-utero is connected to behaviors which resulted in the capital murder convictions, it will be necessary to examine the intervening variables of attachment disorder and early exposure to a highly toxic social environment (given his compromised neurology and psychological functioning).

First, I will present the connections between teratogenic exposure to impaired attachment capacity.  Second, I will connect resulting neurodevelopmental vulnerability with the lack of parental protection from and involvement with high-risk environments.  And last, I will document the particular research-identified elements of neurodevelopmental damage that has occurred in Julius's life and how such damage has affected his functioning in later adolescence and early adulthood.

A.  How prenatal damage affects earliest development of attachment

The "laying down" of attachment during infancy is, profoundly, the basis of emotional and behavioral self-control that begins in the toddler years and remains rather set (without effective intervention) into adulthood.  The process of acquiring attachment to the mother could be said to be the "psychological birth" which follows on the heels of the biological birth.  Within the first 9 months of life, the newborn is experiencing a critical cycle of bonding which occurs dozens, if not hundreds, of times a day (Siegel, 1999).  In a "good enough" attachment environment, not only does the mother need to be almost fully attentive to responding to the needs of the child, the baby also must have enough sound brain development—-regulatory, auditory processing, and memory capacity-to receive and store the consistent and relevant nurturing of the mother (Siegel, 1999, Shore, 2002).

12

If a child is negatively impacted by being over-challenged in the fetal period, he is not ready to cope with and grow through the challenges of the human environment after birth. In such a case, an unusually attentive and stable maternal response is necessary in order to compensate for the lagging "hardware." This was not the mothering Julius received.

Rose Hollimon had begun drinking and smoking marijuana in the 7th or 8th grade. She was admonished about drinking during pregnancy, but (by Jimmie Lee Robinson's report) she claimed that her own mother had drunk alcohol while pregnant with her, so she thought there must be nothing wrong with it. [There are substantial indications that Rose Hollimon is intellectually impaired.] She has stated she didn't know she was pregnant with Julius until she was 6 months along. Rose verifies she both drank and smoked cigarettes throughout her pregnancy. [She reports that years later she began using crack cocaine, and when she quit crack use, she went back to drinking alcohol ranging from a 12-pack to a case of beer per day.] Julius' father, Jimmie Lee Robinson, remembers Rose as drinking a minimum of 2-3 beers per day, smoking cigarettes, and smoking an average of 12 marijuana joints per day. Beotha Moore, a family friend and neighbor in Dermott, also states she saw Rose drinking beer and smoking cigarettes during the pregnancy. Jimmie Lee also says Rose became a heavy cocaine abuser probably during her pregnancy with Julius, but certainly shortly afterward. And their neighbor, Beotha Moore, believed Rose was abusing cocaine at a minimum after Julius was born. This can easily be inferred because she was distributing it at the time during her "soap opera parties" and later developed a crack cocaine addiction. Further, Jimmie Lee found she "blew $12,000" in the first few months of Julius's life, with nothing to show for it.

From these reports, it is clear that his mother was seriously affected by chemical dependencies; it is only reasonable that she would have continued such use during the crucial attachment period. Therefore, not only was Julius in need of extraordinary nurturing, but Rose was not available to do even an average job of maternal bonding. Jimmie Lee Robinson, as well, failed Julius in his duties as a father and did not mitigate the damage done by Rose's lack of bonding.

An additional condition hindered Julius's early growth: there was much domestic violence in the Robinson household before and after his birth, as reported by Julius's father, mother, and other family members. [Jimmie Lee Robinson was also seriously chemically dependent; he reports that in Julius's toddler years, he was a "terrible alcoholic," smoked cigarettes and abused marijuana. Later he became addicted to crack cocaine for 15 years.] In fact, while pregnant with Julius, the parents relinquished Marcus, his older toddler brother, to the family friend, Sarah Pittman, who had mostly reared Rose from age four until she met Julius's father (about age 15). She could see the harm done to Marcus because of the parents' physical fighting. This violent domestic environment continued until the couple split up. With Julius's precarious developmental capacity, his exposure to child abuse-by-proxy (domestic violence has the same traumatic neurological consequences as does direct violence perpetrated on the child) sealed his already injured process of attaching. It is this vital course of being attached—first to the mother and later as a component of all relationships—that was compromised by the decisions and addictions of Julius's parents.

**Ex. 42 - 600**

13

Attachment disorder results from child neglect and abuse in crucial phases of development. Infant mental health research has located attachment at the intersection of biology and psychology: it begins as a result, but quickly moves into a cause of neurodevelopmental deficits (Siegel, 1999, 2001; Schore, 2002; LeDoux, 1996). In this case, the impaired ability to attach-a result of the interplay of Julius's special needs due to prenatal substance damage and Rose's and Jimmie Lee's inability to provide for his needs-is the strongest intervening variable that paved the way for teratogenic damage to result in later criminal behavior in Julius's life.

B. How Julius's Heightened Developmental Vulnerability Responded to Lack of Protection from a High-Risk Environment

Once again, Dr. Cunningham's report details extensively the science as it applies to Julius Robinson's life in a range of mitigation issues which should serve as the overall source of inferences in this report. In order to draw the linkages of harmful prenatal toxic exposure to unhealthy behavioral responses in later years, it is necessary to identify 1) the effects of parental abandonment and 2) the pernicious childhood environment, both psychoactive factors which geometrically increase the morbidity from the prenatal injuries.

*Effects of parental abandonment*

Maternal deprivation refers to both the failure of attachment in the first 2 years of life, as well as the lack of emotional nurturing that a child needs in the next several years of psychological development. Child abuse and neglect in these early years has a strong deleterious effect on brain development—both in cell proliferation and in the formation of synapses. Between 24 and 36 months, after a rapid growth in brain cells and connections, one of the notable "pruning" events emerges in which the "states" of coping capacity become more enduring "traits" (Schore, 2002 and others). Simply and forcefully stated: cells which fire together wire together. Therefore, thinking processes, behavioral habits and coping skills which errantly developed will become the backdrop for more advanced cognitive and personality development. And though the human brain certainly remains flexible for many years, the pruning process insures that there is a reliable pattern of responses to fall back on and will require much attention to alter in future years. In addition, this same rapid proliferation and cutting back process emerges once again in early adolescence: what is happening in a child's life is eminently important in the developing years. When the mothering response is so lacking, the child will not be able to developing critical judgment, relationship, and empathy in the areas of
- ❑ foundation for a stable identity;
- ❑ emotional self-regulation;
- ❑ capacity for empathy;
- ❑ capacity for intimacy and reciprocity;
- ❑ responsible social behavior.

Perhaps the most important loss due to maternal deprivation is the development of

**Ex. 42 - 601**

14

capacity to self-soothe, the prerequisite to emotional and behavioral self-control.  As well, one must be able to comfort oneself—not at the expense of another—in order to experience the empathy and intimacy that, in turn, enables relationships to reciprocally provide a hurting or frightened person with assurance, comfort, and nurturance.  Perhaps the highest level of human experience is the capacity for empathy, and infant mental health and behavioral science is replete with research that point in the direction of self-soothing ability as the cornerstone of empathic response.

Willie White, Julius's paternal uncle, described his memories of Rose's lack of attachment to her children:  "She showed no signs of caring and didn't treat them as if they were kids.  It was as if they were her little brothers and she didn't bear any responsibility for them."

*The effects of child abuse by proxy:  domestic violence*

The first 2+ years of Julius's life were dedicated to coping with his parents' unavailability and severe domestic violence.  Jimmie Lee Robinson states "drugs, alcohol, and violence were the order of the day in our house."  Milton Hollimon, a maternal uncle, stated, "the authorities were getting ready to take the children away from them" due to the extreme violence.  Of course, the provision of such a "safety net"—being placed in foster care—could well have resulted in a completely different outcome both for Julius and for the victims of these later crimes.

Instead both parents were either under the influence, preoccupied with drug-seeking, or engaged in primitive levels of violence.  [Though Julius would leave his parents' care until he returned to live with his mother in his mid-teens, when he did reunite with her, little had changed-she still engaged in abandonment of him, yet the roles had been reversed, Julius becoming the parent to his mother.]

Childhood trauma which replaced the attachment environment Julius should have been receiving finds many routes to produce later pathology, as stated by Cunningham,

> frequently taking the form of Posttraumatic Stress Disorder (PTSD), depression, relationship disturbances, personality disorder, and/or antisocial behavior.  Traumatic experience in childhood from abuse or other insults can result in impairments of perception, judgment and behavior; vulnerability to poor role models and negative influences; chronic self-defeating behavior; chronic agitation; poor problem-solving skills; an inability to predict the consequences of one's behavior accurately; an inability to modulate or understand one's emotions; an inability to use emotions as guides for appropriate action; an inability to assign language to emotions; a constant state of internal and external fear; a foreshortened sense of future; chronic self-medication and substance addiction; a fragmented sense of self; an inability to successfully achieve developmental milestones; pervasive low self-esteem; a chronic and inescapable sense of shame and worthlessness; and behavioral misconduct and criminal conduct.  There is evidence that these symptoms and disorders stem from trauma-initiated changes in brain structure and metabolism that can be persistent.  Chronic victimization can also result in survival

15

responses of attempting to emulate the toughness of those that perpetrated the victimization (i.e. identification with the aggressor).  The legacy of traumatic experience is strongly implicated in Julius's developmental trajectory and outcome (Cunningham, p. 45-46).

Dr. Cunningham documents the strong correlation in social science literature between maternal deprivation, teenage pregnancy, and paternal abandonment with criminal violence and murder.  In fact, these variables are stronger predictors of criminal violence and murder than are poverty and the ills that usually come with it.

*The effects of pervasive lack of parental supervision and household instability*

During his childhood, care of Julius shifted from his parents, to Miss Sarah, to his maternal grandparents, to his paternal grandmother off and on, and to his mother (though, clearly it was Julius who cared for his mother).  As well, when deaths occurred and Rodney White came to town, Julius was, effectively, turned over to the emerging gang in Dermott.  As is seen in so many cases such as Julius's, participation in a gang for a youthful adolescent often presents the first really stable and "protective" environment the child has experienced.

While still a toddler, Julius's parents completely abandoned him and he was sent to live within a constellation of three households, none of which could completely do the job of offering a stable, prosocial, supervised, and nurturing childhood home.  He also patently lacked male role models.  This long-term household instability was the least effective parenting environment possible to meet Julius's neurodevelopmental needs.  Providing the majority of his supervision, his maternal grandmother, Margaret, was illiterate and permissive.  Her daughter, Mildred, said, "I never saw or heard of my parents disciplining the boys."  Jimmie Lee reports that John, Julius's maternal grandfather, was blind and "couldn't really keep on top of things, either." Bernice Johnson, a maternal great aunt, noted that Julius was easily able to play both grandparents against each other.  Though wheelchair-bound, his paternal grandmother, Bertha, was interested in his learning, provided some structure, and was loving to Julius, but was also unable to control the environment.  Her death when Julius was 10 or 11 was a grievous loss.  [As Marcus said, "We lost a really strong person in our lives when she died."]  "Mama Sarah," perhaps the most effective maternal figure in his life, was a loving and helpful parent when she had responsibilities off and on for Julius, though she, too, was permissive (she introduced him to beer when he was 7).  All three of these women had reared both of Julius's parents and were getting older and ill by the time Julius needed them.  When Bertha and Sarah became ill and died, generally around the time Julius was becoming an adolescent, he lost the little structure and source of love that he had experienced in his childhood years.  Bertha was very sick with cancer for two years; Sarah's death was a severe loss to the entire community.  There is no sign that Julius had the opportunity to grieve; indeed, an older cousin, Rodney White and John-John (the California gang planter) arrived to take over when the two caregivers had died.  When children's lives are in such turmoil and instability that they are unable to grieve parental losses, many signs of distress—not the least of them being behavioral disturbances—will emerge and remain.

16

As Leroy Kennedy, The Delta Youth and Family Services caseworker who checked in on Julius during his 14th year said:

> I remember being concerned that the grandparents' home was somewhat chaotic.  They had a revolving door policy, with young people coming and going all the time.  Friends and relatives seemed to live there for a few days, then disappear.  It was not a stable environment (Dr. Cunningham, p. 53).

*The effects of early onset substance abuse-*

During his growing up years, parental supervision was sorely lacking as evidenced by his heavy use of alcohol by the age of 11 or 12.  Indeed, it had been Mama Sarah who had introduced him to beer at the age of 7.  He was drinking heavily during his pre-adolescence, another neurodevelopmental marker—a time when cell proliferation and synapse wiring experience another pruning process, resulting in the imprinting of existing damage.  At this time, his earlier cognitive, emotional and behavioral deficit traits experienced the infusion of addiction to alcohol.  There was already a readiness for alcoholism to manifest at a very early age, and with Julius's history of developmental trauma, alcohol abuse can be conceptualized an as attempt at self-medication of emotional pain, of cognitive processing difficulties, of learning disabilities, and the anxiety and depression that was guaranteed with parental abandonment and the death of his surrogate parents.

Overlaid with impaired attachment, "wired in" traumatic memories, and early onset of alcohol abuse, Julius's teenage development was fraught with risk.  From Dr. Cunningham (p. 33),

> Maladaptive behaviors, including criminal activity and violence, may also be the result of sequential emotional damage.  In other words, individuals who have been significantly emotionally damaged in childhood come into adulthood with limited emotional resources . . .  Sequential generational neglect is particularly damaging. . . The problematic effects of early abandonment and disrupted primary parental attachment may not be evident until adolescence or early adulthood.

When Julius found his way back to Texas to try living with his mother when he was entering high school, he found his own drinking problem in ironic relationship to the frenzy of drug and alcohol use by his mother.  Jamila Camp, Julius's former girlfriend described how Rose was unable to stop with just one drink; she would get "falling down drunk" if Julius didn't stop her.  Marcus was amazed that Rose could get up each day and go to work at her nursing home aide job each morning after the drunken binges of the night before.  Rose had also become addicted to crack cocaine.  One of Julius's run ins with the law occurred when he assaulted Vernon, a crack addict then living with Rose, in a effort to get his mother off crack.  Rose used each non-working hour of the day to alter her mood with a steady use of marijuana, alcohol, and crack cocaine.  Julius made consistent but ineffective efforts to halt his mother's addiction.  It is safe to say that, although Julius didn't seem to express them, his feelings about the state of his

17

parents—now the only people left as adult models—and the loss of his childhood were likely those of depression and anger.

And, before Julius's incarceration as an adult, he reported that he drank approximately a fifth of cognac per day.

*How the maturational process was compromised*

Adolescence is typically a time of exposed immaturity:  uneven cognitive capability; poor judgment; unreliable impulse control; instability of emotions and their expression; self-centeredness which hinders moral development.  However, in Julius's life, the elements of the "container" for developing maturity were all but completely missing.  The *container* refers both to 1) the internal neurological development that advances the appropriate expression and self-control of emotions and behaviors as well as 2) the external structure of the authoritative environment which monitors, gives feedback, and serves as a corrective mechanism for experiments in adult challenges.  Julius entered his adult-making years without the benefit of either an intact internal or external container.  As Mark Cunningham points out (p. 26), there are two lines of evidence supporting this assertion:

1. The neuropsychological deficits and learning problems exhibited by Julius point to mild nervous system dysfunction that would serve to reduce the effectiveness of cognitive processes associated with 'maturity.'
2. The adverse developmental factors in Julius's childhood would act to delay functional emotional maturity.  These are factors associated with disrupted developmental trajectory.

*In essence, Julius had mildly compromised "hardware" with which to negotiate a severely compromised "software program" during a developmental window presenting a major challenge to growing the maturity necessary for adulthood.*

Dr. Cunningham details the science of brain immaturity in adolescence (pp. 24-26).  There are clear neurological reasons for the kinds of immature judgment and behaviors we see in youth and, under conditions of compromised neurology-due to brain damage in utero and/or early brain-damaging abuse of drugs/alcohol-adults who pose criminal problems for society.  The elements of neurological immaturity are many of the very same areas of damage caused by ARND:  functions of "executive functioning" (EF) that emanate from the frontal and pre-frontal cortex of the brain.  In short, when damaged in utero, processes designed to bring an immature brain into mature functioning cannot fulfill that developmental imperative.

From Dr. Cunningham (p. 25):

Executive functions associated with frontal lobe functioning include insight, judgment, impulse control, frustration tolerance, recognition and

18

appreciation of the emotional reactions of others, and recognition of consequences.   Significant age-related growth in these capabilities, conventionally referred to as 'maturing' or 'growing up,' occurs even between the ages of 18 and 22 in all individuals.  While the age-related endpoint of adolescence varies by function or role, neurologically it can be considered to continue through this full frontal lobe mylenization in the early to mid-twenties.  All individuals less than 22 years old are thus 'immature' in brain development and in relation to adults.  This neurological immaturity is reflected in limitations in psychological functioning and behavior control, and accounts for the poor decision-making and poor impulse control often observed in adolescents, even in their late teens.

Compounding the judgment and behavior control problems associated with frontal lobe immaturity, the adolescent male brain is experiencing markedly rising levels of testosterone, and subject to the aggression-inducing effects of this hormone.

*The emergence of corruptive influences and early emancipation*

During this time in Julius's life, without the effective functioning of a healthy brain and a healthy social environment, he was, nevertheless, exposed to a number of corruptive male models and influences.  Rodney White and others who shaped his entry into the new gang of about 30 African American males in Dermott, Arkansas provided the container which had been abdicated by his parents.  This is usually a process by which the maternal figure—weary of and critically ineffective in controlling a young male—will unconsciously allow the "informal" adoption of that child by the neighborhood gang.  It is the only obvious answer to what to do with a young man who is not ready to be a man but has no alternatives.  He was "beaten in" to gang membership at the age of 14.  Though Julius, himself, plays it down, Margaret has said he needed medical care (which she provided at home) for one month.  If nothing else, gang dynamics must surround the acquisition of drugs and money.

This is where Rose and Jimmie Lee served well as models—they had spent their lives not only as addicts, but were often *drug traffickers*.  Julius had advance knowledge of how to manage himself in the drug business.  And certainly, acquiring large amounts of money and the power and status that accompanies having money provided a structure and guidelines for survival like none Julius had ever known before.  That these activities inherently involved a willingness to be violent was an accepted, if unconscious, cost.

*The dynamics of criminal violence within this constellation*

Again, Mark Cunningham (pp. 20-21) ably describes the research that links neuropsychological deficits—by now the background of all of Julius's functioning—to the emergence of a lifestyle of violence and criminality.

**Ex. 42 - 606**

19

> There is a growing body of psychological, psychiatric, and
> neurological literature which identifies that brain damage is
> present in disproportionately high incidence among violent
> offenders. . . . evidence of frontal lobe dysfunction in 64%"
> (from a study of persons with murder convictions).

There is obviously much research which chronicles the relationship of substance abuse and dependence to criminality and violence. And, Cunningham aptly explains that it is not necessary to be intoxicated at the moment of the crime to have compromised judgment directly due to the state of addiction (p. 24).

But perhaps one of the most significant elements of cognitive deficits due to brain damage is the perception of threat and the resultant lack of impulse inhibition. It is well documented that young males with this neurological deficit presentation are unable to "read" others' cues accurately. For example, they will have difficulty in making use of peripheral information and will often screen out too much in their perceptions. This produces a lack of planful thought and sound judgment. As well, they will tend to attend selectively to aggressive cues, interpreting ambiguous and benign situations in aggressive ways. When imprecise interpretation of cues—with a bias toward interpretation of threat—is coupled with a rigid response capacity and a predisposition to poor impulse control and frustration tolerance, it is easy to see how violent responses can ensue (Gabardino, 1999; Meloy, 1992; Dutton, 1998 and others). These are brain functioning deficiencies that are commonly observed both in those who have been affected by fetal alcohol syndrome as well as organic brain damage due to alcohol abuse of the child/youth, himself. These are the kinds of impacts as Julius's own prenatal exposure.

*The capacity for conforming behavior legally within a pernicious social environment*

Dermott, Arkansas was not a positive environment for African-American young men in recent years and perhaps in the historical past. The legacy of racial prejudice and discrimination is a toxic element in the lives of these men which is not exactly measurable and is often socially invisible in its effects. Jimmie Lee Robinson eloquently states how a black man perceived his changes in that town. There exists within Julius's many relatives memories and passed along stories of racially-motivated violence, social degradation, and economic hardship. This legacy does not endure without taking a toll on the generations of young males growing up in Dermott.

Dr. Cunningham's lengthy review of the literature-based explanation of community dangers present in Julius Robinson's youth needs not be replicated here. Yet these many pernicious factors, which this defendant found himself facing, presented an overall environmental challenge to his development—again under already challenged conditions—and he failed to adequately negotiate this mine field. These factors are:

20

❑ The consistent threat of racially motivated violence, economic hardship and social desperation which was Dermott's legacy for African-American males like Julius. The intergenerational transmission of post-traumatic stress disorder is a condition we are just beginning to understand in the social science and psychiatric literature.

❑ The positive aspects of his extended family could not protect him from the critical influence of his cousin, Rodney White and others brought in to the mix in his early teen years.

❑ Gang recruitment and its promises of structure, protection, and movement into manhood—not to mention its ability to offer a way to make a living to young, disenfranchised, unskilled men—was the only path Julius had presented to him at this time in his life when two of his maternal caregivers had died and the role of men in the gang was the substitute for paternal abandonment in his life

❑ The life of drugs, criminal theft, drug use and drug dealing was the manner of "higher education" that was offered to Julius. Simply put, with parents who modeled drug trafficking and no other family members or friends who could model any other lawful route to adulthood, Julius simply did what he was taught.

There is no way to fully account for and measure the combustible combination of this young man who suffered the worst forms of parental neglect and an impoverished moral environment coming into young adulthood with such an overwhelmingly negative and criminal container.

**Conclusion**

The evidence of substance exposure-in-utero at the very beginning of Julius Robinsons's life is clear, as documented by reports of his mother, his father, and other family members and friends. The three teratogens, amply documented to have affected the pregnancy, are marijuana, cigarettes, and alcohol. Cocaine may well have also been used. The literature on behavioral teratology is clear in specifying that of all the substances which can harm the fetus, it is alcohol and cigarettes—especially used in tandem—which are known to cause the most pernicious and overall damaging effects, first in area cognitive functioning and then the derivation to emotional and behavioral functioning

Because the injury to the "hardware" at the beginning of his life rendered him at high risk for injuries to his attach—the process of his psychological birth—his mother's inability to meet his basic needs meant this meaningfully damage affected every other developmental stage necessary to normal child growth. The moves and changes in caregivers, the ineffectiveness of caregivers, abandonment by both parents, and finally, exposure restricted to the most degraded of social environments for adolescent development were variables which ensured Mr. Robinson would find no other non-criminal passage to adulthood. The interplay of these forces begun in a prenatal life that went terribly wrong is the most valid explanation of how the crimes for which he has been convicted could occur.

This explanation is also the most compelling route to constructing an effective mitigation argument, had one been presented in his original trial.

21

# Bibliography

Bookstein, F.L., Sampson, P.D., Streissguth, A.P., & Connor, P.D. "Geometric morphometrics of corpus callosum and sub-cortical structures in the fetal-alcohol-affected brain," in *Teratology*, 62:4-32; 2001.

Bookstein, F.L., Streissguth, A.P., Sampson, P.D., Connor, P.D., & Barr, H.M. [a.] "Corpus collosum shape and neurophysiological deficits in adult males with heavy fetal alcohol exposure," in *NeuroImage*, 15:233-25l; 2002.

Bookstein, F.L., Sampson, P.D., Connor, P.D., & Streissguth, A.P. [b.] "Midline corpus collosum is a neuroanatomical focus of fetal alcohol damage," in *The Anatomical Record*, 269: 162-174; 2002.

Chasnoff, Ira. *The Nature of Nurture: Biology, Environment, and the Drug-Exposed Child.* Chicago: NTI Publishing (childstudy.org), 2001.

Connor, Paul, Paul Sampson, Fred Bookstein, Helen Barr and Ann Streissguth. "Direct and indirect effects of prenatal alcohol damage on executive function," in *Developmental Neuropsychology,* 18 (3), 331-354.

Dutton, Donald. *The Abusive Personality.* New York: Guilford Press, 1998.

Ernst, Monique, Eric Moolshan, Miqun Robinson. "Behavioral and neural consequences of prenatal exposure to nicotine," in *Journal of the American Academy of Child and Adolescent Psychotherapy,* 40:6, June, 2001.

Fried, P. A. and A. M. Smith. Invited Review: "A l iterature review of the consequences of prenatal marijuana exposure: an emerging theme of a deficiency in aspects of executive function," in *Neurotoxicology and Teratology.* 23:1-22, 2001.

Gabardino, James. *Lost Boys: Why Our Sons Turn Violent and How We Can Save Them.* New York: Anchor Books, 1999.

Institute of Medicine. *Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention, and Treatment*, 1996.

James, Beverley. *Handbook for Treatment of Attachment-Trauma Problems in Children.* New York: Lexington Books, 1994.

Kopera-Frye, K., Dehaene, S., Streissguth, A.P. *Impairments of Number Processing Induced by Prenatal Alcohol Exposure*, 1996.

22

LeDoux, Joseph.  *The Emotional Brain:  Why It Can Matter More than IQ.*  New York:  Simon and Shuster, 1996.

Meloy, J. Reid.  *The Psychopathic Mind:  Origins, Dynamics, and Treatment.*  Northvale, NJ: Jason Aronson Press, 1992.

Olson,  H.C.,  Streissguth,  A.P.,  Sampson,  .PD.,  Barr,  H.M.,  Bookstein,  F.L.,  Thiede,  K. "Association of prenatal alcohol exposure with behavioral and learning problems in early adolescence," in *Journal of  American  Academy of  Child and  Adolescent Psychiatry,* 36(9):1187-94, 1997.

Sampson, P.D.,  Streissguth, A.P.,  Bookstein, F.L.,  Little, R.E., Clarren, S.K., Dehaene, P., Hanson, J.W.,  Graham, J.M.  "Incidence of fetal alcohol syndrome and prevalence of alcohol-related neurodevelopmental disorder" in *Teratology*, 56(5):317-26 , 1997.

Schore, Allan.  "Dysregulation of the right brain:  a fundamental mechanism of traumatic attachment and the psychopathogenesis of posttraumatic stress disorder," in *Australian and New Zealand Journal of Psychiatry,* 36:9-20, 2002.

Siegel, Daniel.  *The Developing Mind:  Toward a Neurobiology of Interpersonal Experience.* New York:  Guilford Press, 1999.

Siegel, Daniel and Mary Hartzell.  *Parenting from the Inside Out.*  New York:  Jeremy Tarcher, 2003.

Streissguth A.P.,  O'Malley K.  "Neuropsychiatric implications and long-term consequences of fetal alcohol spectrum disorders" in *Seminar in Clinical Neuropsychiatry,* 5(3):177-90,  2000.

Streissguth, Ann P., Robin LaDue, and Sandra Randels.  *A Manual on Adolescents and Adults with Fetal Alcohol Syndrome (with Special Reference to American Indians).*  Seattle, WA: University of Washington, Department of Psychiatry and Behavioral Sciences (Indian Health Services Grant), 1988.

# EXHIBIT 43

# Fetal Alcohol Syndrome:



## Guidelines for Referral and Diagnosis

National Center on Birth Defects and Developmental Disabilities
Centers for Disease Control and Prevention
Department of Health and Human Services

in coordination with

National Task Force on
Fetal Alcohol Syndrome and Fetal Alcohol Effect

    

Ex. 43 - 611

# Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis

National Center on Birth Defects and Developmental Disabilities
Centers for Disease Control and Prevention
Department of Health and Human Services

in coordination with

National Task Force on Fetal Alcohol Syndrome and Fetal Alcohol Effect
American Academy of Pediatrics
American College of Obstetricians and Gynecologists
March of Dimes
National Organization on Fetal Alcohol Syndrome

## July 2004

*(2nd printing, August 2004)*
*(3rd printing, May 2005)*

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Centers for Disease Control and Prevention
*Julie Louise Gerberding, M.D., M.P.H., Director*

National Center on Birth Defects and Developmental Disabilities
*José Cordero, M.D. M.P.H., Director*

Division of Birth Defects and Developmental Disabilities
Fetal Alcohol Syndrome Prevention Team
*R. Louise Floyd, D.S.N., R.N., Team Leader*

Ex. 43 - 612

*Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis*

---

### Table 3: Brief Outline of Diagnostic criteria for Fetal Alcohol Syndrome

Facial dysmorphia
Based on racial norms, individual exhibits all three characteristic facial features:
- Smooth philtrum (University of Washington Lip-Philtrum Guide rank 4 or 5)
- Thin vermillion border (University of Washington Lip-Philtrum Guide rank 4 or 5)
- Small palpebral fissures (at or below 10th percentile )

Growth problems
Confirmed prenatal or postnatal height or weight, or both, at or below the 10th percentile, documented at any one point in time (adjusted for age, sex, gestational age, and race or ethnicity).

Central Nervous System Abnormalities
    I. Structural
        1) Head circumference (OFC) at or below the 10th percentile adjusted for age and sex.
        2) Clinically significant brain abnormalities observable through imaging.
    II. Neurological
        Neurological problems not due to a postnatal insult or fever, or other soft neurological signs outside normal limits.
    III. Functional
        Performance substantially below that expected for an individual's age, schooling, or circumstances, as evidenced by:
        *1. Global cognitive or intellectual deficits representing multiple domains of deficit (or significant developmental delay in younger children) with performance below the 3rd percentile (2 standard deviations below the mean for standardized testing)*
        *or*
        *2. Functional deficits below the 16th percentile (1 standard deviation below the mean for standardized testing) in at least three of the following domains:*
          a) cognitive or developmental deficits or discrepancies
          b) executive functioning deficits
          c) motor functioning delays
          d) problems with attention or hyperactivity
          e) social skills
          f) other, such as sensory problems, pragmatic language problems, memory deficits, etc.

Maternal Alcohol Exposure
    I. Confirmed prenatal alcohol exposure
    II. Unknown prenatal alcohol exposure

Criteria for FAS Diagnosis
Requires all three of the following findings:
    1 Documentation of all three facial abnormalities (smooth philtrum, thin vermillion border, and small palpebral fissures);
    2. Documentation of growth deficits
    3. Documentation of CNS abnormality

---

**Ex. 43 - 613**

# EXHIBIT 44



AAFP Home Page > News & Publications > Journals > American Family Physician® > Vol. 58/No. 6 (October 15, 1998)

Articles | Departments | Patient Information

# Intrauterine Growth Retardation

ROBERT C. VANDENBOSCHE, M.D., and JEFFREY T. KIRCHNER, D.O.
Lancaster General Hospital,
Lancaster, Pennsylvania

> **O** A patient information handout on intrauterine growth retardation, written by the authors of this article, is provided on page 1393.

Intrauterine growth retardation (IUGR), which is defined as less than 10 percent of predicted fetal weight for gestational age, may result in significant fetal morbidity and mortality if not properly diagnosed. The condition is most commonly caused by inadequate maternal-fetal circulation, with a resultant decrease in fetal growth. Less common causes include intrauterine infections such as cytomegalovirus and rubella, and congenital anomalies such as trisomy 21 and trisomy 18. When IUGR is recognized, it is important to attempt to correct reversible causes, although many of the conditions responsible for IUGR are not amenable to antenatal therapy. Close fetal surveillance with delivery before 38 weeks of gestation is usually recommended. Some infants born with IUGR have cognitive and medical problems, although for most infants the long-term prognosis is good.

References in the medical literature to underweight infants date back to 1919, when it was suggested[1] that all newborns weighing less than 2,500 g (5 lb, 8 oz) should be classified as "premature." However, it was not until 1961 that the World Health Organization (WHO) acknowledged that many infants defined as "premature" were not born early but were simply of "low birth weight."[2] The current WHO criterion for low birth weight is a weight less than 2,500 g (5 lb, 8 oz) or below the 10th percentile for gestational age.

Low birth weight includes two pathologic conditions and one normal condition. The normal condition refers to the healthy but constitutionally small baby. The pathologic conditions include preterm delivery and intrauterine growth retardation (IUGR). Synonymous terms found in the literature to describe infants with IUGR include intrauterine growth restriction and fetal growth retardation. In the United States, IUGR

is linked to an increase of six to 10 times in perinatal mortality.[1,3]

## Epidemiology

According to the common definition of IUGR as a birth weight under the 10th percentile, the expected incidence of IUGR should be 10 percent. The actual incidence, however, is only about 4 to 7 percent. About one fourth of infants who are below the 10th percentile have a normalized birth weight when it is corrected for low maternal weight, paternal phenotype or residence at higher altitudes.[4] Some regional variations in birth weight may exist within the United States and Canada. Previously published standards found variations of 100 to 200 g (3.5 to 7 oz) when comparing 10th-percentile infants of the same gestational age who were born in Canada with those born in Denver or California.[3]

The approximately 3.5 million annual births in the United States translate to about 350,000 infants who are born weighing less than 2,500 g (5 lb, 8 oz).[1] Approximately one third of these infants (about 100,000) have true IUGR, and the remaining two thirds (about 250,000) are constitutionally small.[3] Some authors apply the term "small for gestational age" to the latter group of infants.

Most authorities prefer to maintain the strict and more inclusive definition of IUGR as less than 10 percent of predicted fetal weight for gestational age. Using the 10th percentile as a standard results in overdiagnosis of IUGR. Other authors, however, have suggested using the 5th percentile to define IUGR infants.[1] The counter argument in favor of a strict definition is that birth weight is probably the single most important factor affecting neonatal morbidity and mortality and should be aggressively screened for.[5] A lack of consensus among perinatologists makes it difficult to fully define the extent of IUGR and the subsequent effectiveness of interventions.

## Etiology

Many different factors cause IUGR, but they may be divided into two large categories, based on etiology. These categories include fetoplacental factors and maternal factors. Within the categories of maternal and fetoplacental factors are many specific causes (*Table 1*).

**TABLE 1**
**Conditions Associated with Intrauterine Growth Retardation**

| Medical | Maternal | Infectious |
|---|---|---|
| Chronic hypertension | Smoking | Syphilis |
| Preeclampsia early in gestation | Alcohol use | Cytomegalovirus |
| | Cocaine use | Toxoplasmosis |
| Diabetes mellitus | Warfarin (Coumadin, Panwarfin) | Rubella |
| Systemic lupus erythematosus | Phenytoin (Dilantin) | Hepatitis B |
| | Malnutrition | HSV-1 or HSV-2 |
| Chronic renal disease | Prior history of pregnancy with | HIV-1 |

Ex. 44 - 615

| Inflammatory bowel disease<br>Severe hypoxic lung disease | intratuterine growth retardation<br>Residing at altitude above 5,000 feet | **Congenital**<br>Trisomy 21<br>Trisomy 18<br>Trisomy 13<br>Turner's syndrome |
| --- | --- | --- |

HSV=herpes simplex virus; HIV=human immunodeficiency virus.

Information from references 1 and 3.

Historically, IUGR has been categorized as symmetric or asymmetric. Symmetric IUGR refers to fetuses with equally poor growth velocity of the head, the abdomen and the long bones. Asymmetric IUGR refers to infants whose head and long bones are spared compared with their abdomen and viscera. It is now believed that most IUGR is a continuum from asymmetry (early stages) to symmetry (late stages).

Maternal causes of IUGR account for most uteroplacental cases. Chronic hypertension is the most common cause of IUGR. Moreover, the infants of hypertensive mothers have a three-fold increase in perinatal mortality compared with infants with IUGR who are born of normotensive mothers. Because of their significant risk, one author[6] recommends delivering these infants by 37 weeks of gestational age.

Preeclampsia causes placental damage that results in uteroplacental insufficiency. The pathogenic mechanism is thought to be a failure of trophoblastic invasion by maternal spiral arterioles by 20 to 22 weeks of gestation.[1] This failure causes luminal narrowing and medial degeneration, leading to diminished blood flow to the developing infant. Consequently, these infants fail to grow normally.

Infectious causes of fetal growth delay account for about 10 percent of all cases of IUGR. These causes include the "TORCH" group: Toxoplasma gondii, rubella, cytomegalovirus and herpes simplex virus types 1 and 2. Other potential pathogens include hepatitis A and hepatitis B, parvovirus B19, human immunodeficiency virus (HIV) and Treponema pallidum (syphilis).

Maternal prepregnancy weight and weight gain during pregnancy are considered strong indicators of birth weight.[7] During World War II, a population of women in Leningrad who underwent prolonged malnutrition delivered infants with an average birth weight of 400 to 600 g (14 to 21 oz) less than expected.[5] In a later study of Guatemalan Indians,[8] it was found that protein malnutrition occurring before 26 weeks of gestation resulted in IUGR. The current consensus is that a maternal weight gain of less than 10 kg (22 lb) by 40 weeks of gestation is clearly a risk factor for IUGR.[3]

> Head circumference that does not change over a four-week period is worrisome and may be an indication for prompt delivery.

Maternal smoking may be the cause of 30 to 40 percent of U.S. cases of IUGR. One study[9] found a dose-dependent decrease in fetal weight with an increasing number of cigarettes smoked each day (a 7.4 g [0.26 oz] decrease for each cigarette smoked per day). Another study[10] found that women who smoked 11 or more cigarettes daily had infants weighing 330 g (11.5 oz) less than predicted and measuring 1.2 cm shorter than control subjects.

Early use of alcohol by the pregnant mother may lead to fetal alcohol syndrome, while second- or third-trimester use may result in IUGR. As little as one to two drinks per day have been shown to result in a growth-delayed child.[11] Not surprisingly, maternal cocaine use has been linked to IUGR, as well as to reduced head circumference. Other drugs associated with IUGR include steroids, warfarin (Coumadin, Panwarfin) and phenytoin (Dilantin).

Intrauterine growth retardation occurs 10 times more frequently in twin deliveries than in single gestations. The incidence of IUGR in twins is about 15 to 25 percent.[5] Decreased birth weight is second only to respiratory distress syndrome as a cause of infant mortality in twins. Reasons for IUGR in twin pregnancies include poor placental implantation, placental crowding and twin-to-twin transfusion.

## Diagnosis

Before the development of ultrasonography, delayed fetal growth was indicated by low maternal weight gain, Leopold maneuvers and fundal height measurement. Currently, IUGR is still often suspected on the basis of fundal height measurements. A significant lag in fundal height is a 4-cm or greater difference than expected for gestational age. However, even carefully performed fundal height measurements only have a 26 to 76 percent sensitivity in predicting IUGR.[12] IUGR is frequently detected in a pregnancy with a less-than-expected third-trimester weight gain (100 to 200 g [3.5 to 7 oz] per week) or as an incidental finding on ultrasound examination when fetal measurements are smaller than expected for gestational age.

The main prerequisite for determining IUGR is precise dating. The most accurate dating method uses ultrasound examination at eight to 13 weeks. Later ultrasound examinations are helpful, but the margin of error is increased. The date of the last menstrual period, early uterine sizing and detection of fetal heart tones are helpful ways to accurately date the pregnancy. Most cases of IUGR present during the third trimester, which makes them difficult to accurately diagnose. This is especially true if the patient has presented for prenatal care at a late stage. The physician must determine if the dating is incorrect and the fetal size is actually normal or if the mother truly needs further evaluation for IUGR.

When the suspicion of IUGR is strong, a complete assessment of maternal risk factors should be undertaken. This includes past medical and obstetric history, medication use, recent infections, occupational or toxic exposures, and a history of tobacco, alcohol or illicit drug use.

Ultrasonography is normally the first study done to assess IUGR. This test loses its accuracy as the pregnancy progresses, but the sensitivity and positive predictive

Ex. 44 - 617

value can be improved if several variables are combined.[13] These variables include estimated fetal weight, head circumference and abdominal circumference.

Estimated fetal weight is the most common screen. It is based on the measurements of head circumference, abdominal circumference and femur length. These measurements are plotted on a preexisting standardized chart. In about 95 percent of cases, ultrasound examination allows an estimation of fetal weight with a 15 to 18 percent variance.[13] An estimated fetal weight of less than the sixth percentile strongly correlates with growth retardation, and an estimated fetal weight of greater than the 20th percentile virtually rules out IUGR. An estimated fetal weight at the 15th percentile or less, or a decreasing estimated fetal weight as determined by serial ultrasound examination, is suggestive of IUGR.

In all growth-retarded fetuses, the abdominal circumference is the first biometric measure to change. This translates to an increased ratio of head circumference to abdominal circumference. The ratio of head circumference to abdominal circumference is normally one at 32 to 34 weeks and falls below one after 34 weeks. A ratio of greater than one detects about 85 percent of growth-restricted fetuses.[14]

The first radiographic sign of IUGR may be decreased amniotic fluid volume. About 85 percent of IUGR infants have oligohydramnios.[15] This condition occurs because blood flow from peripheral organs (kidneys) is diverted to the brain. Renal perfusion and urinary flow rates are commonly reduced in infants with IUGR.[16] An amniotic fluid index of less than 5 cm increases the risk of IUGR. A vertical pocket of amniotic fluid less than 1 cm, regardless of gestational age, is found in about 39 percent of cases of IUGR.[14]

Maternal arterial umbilical blood flow increases from 50 mL per minute early in pregnancy to about 700 mL per minute at term. The increase is secondary to a gradual decrease in vessel resistance to blood flow throughout the pregnancy. Doppler velocimetry uses ultrasound to measure peak-systolic and end-diastolic blood flow through the umbilical artery. Three measurements are averaged as the systolic/diastolic ratio. As the pregnancy progresses, diastolic flow increases, and the systolic/diastolic ratio should

**TABLE 2**
**Indications for Delivery Based on the Biophysical Profile**

BPP<2

BPP=4 at >32 weeks

BPP=4<32 weeks; repeat same day; induce if <6

BPP=6 with normal AFI, >36 weeks with favorable cervix

BPP=8 with oligohydramnios

BPP=6 at <36 weeks and cervix unfavorable; repeat in 24 hours; induce if <6; follow if >6

BPP=biophysical profile; AFI=amniotic fluid index.

NOTE: The biophysical profile consists of five components, including fetal breathing movements, gross body movements, tone,

Ex. 44 - 618

gradually decrease. In a large number of IUGR pregnancies, an alteration in placental blood flow occurs. As a result, researchers have correlated an increased systolic/diastolic ratio with IUGR. The ratio is increased in about 80 percent of cases of IUGR diagnosed by ultrasound examination.[17] An average systolic/ diastolic ratio greater than three at 30 or more weeks of gestation has a sensitivity of 78 percent and a specificity of 85 percent in predicting IUGR.[18]

> amniotic fluid index and a nonstress test. Each component is scored as either zero or 2, with a maximum score of 10.
>
> Information from reference 21.

Ultrasonographic placental grading has been studied with respect to IUGR. Normally, a grade 3, or mature, placenta would not be detected before 36 weeks of gestation. The presence of a grade 3 placenta before 36 weeks, along with an estimated fetal weight of less than 2,700 g (5 lb, 14 oz), carries a four-fold risk of IUGR.[19]

## Antenatal Surveillance

When the diagnosis of IUGR has been established, it is helpful to determine a specific etiology. Therapy may be nonspecific but should try to address the underlying cause. Many infants thought to be growth-retarded are, in retrospect, found to be constitutionally small. The key management issues are the gestational age of the pregnancy at the time of diagnosis and the urgency to expedite delivery. Most fetal deaths involving IUGR occur after 36 weeks of gestation and before labor begins.[1] The clinician must balance the risk of delivering a premature infant against the potential for intrauterine demise.

Ultrasonography at three- to four-week intervals is recommended to assess fetal growth.[1,5] It is important that the physician communicate with the ultrasonographer, indicating that suspected IUGR is the reason for the serial examinations. Appropriate attention must be given to estimated fetal weight, biparietal diameter, head circumference, abdominal circumference and amniotic fluid volume. Third-trimester fetal weight gain should be 100 to 200 g (3 lb, 8 oz to 7 lb) per week. Head circumference that does not change over a four-week period is worrisome and may be an indication for prompt delivery.[1]

Twice-weekly nonstress testing (NST) is an appropriate surveillance method in following a fetus with IUGR. A reactive NST (two accelerations in fetal heart rate of more than 15 beats per minute lasting for more than 15 seconds in a 20-minute span) has been shown to correlate with fetal well-being.[1] Spontaneous variable decelerations in fetal heart rate on the NST may indicate oligohydramnios and an increased risk of perinatal

**TABLE 3**
Diagnostic Studies for Evaluation of Possible Intrauterine Growth Retardation

Chemistry panel

Ex. 44 - 619

mortality.[20] A nonreactive NST indicates possible fetal hypoxemia and should be followed by a contraction stress test or a biophysical profile. The biophysical profile includes an NST, fetal breathing movements, gross body movements, fetal tone and amniotic fluid index. Two large studies[21,22] found the biophysical profile to be predictive of fetal well-being, fetal distress and ultimate perinatal mortality. Guidelines for antepartum management are based on biophysical profile scoring (*Table 2*).

Doppler velocimetry, previously discussed as a diagnostic technique for IUGR, has not found a place in routine antenatal surveillance. It has helped physicians understand the pathophysiology of IUGR with regard to diminished blood flow. Results of this procedure correlate with increased fetal morbidity and mortality: an absent or reversed end-diastolic umbilical flow is an ominous finding and necessitates aggressive intervention. As a screening test, however, the procedure appears to be lacking in benefit; some studies[23] have shown that 40 to 60 percent of infants with IUGR had normal Doppler velocimetry results just before birth. Currently, the American College of Obstetrics and Gynecology[24] classifies fetal Doppler studies as investigational. *Table 3* summarizes diagnostic studies used in the evaluation of IUGR.

Complete blood count

Maternal antibody titers ("TORCH" titers--IgM, IgG)

Ultrasound examination

Biophysical profile

Doppler velocimetry

Amniocentesis (to check fetal maturity before induction)

---

TORCH=Toxoplasma gondii, rubella, cytomegalovirus and herpes simplex virus types 1 and 2.

## Treatment

Treatment of the mother and the growth-restricted fetus is, when possible, dictated by the etiology of the condition. As previously noted, many of the conditions responsible for IUGR are not amenable to antenatal therapy.

### Prenatal Management

Maternal hyperoxygenation has been evaluated in several studies, but only limited data prove its efficacy. In one study,[25] nasal oxygen at 2.5 L per minute administered to mothers at 27 to 28 weeks of gestation improved neonatal blood gas measurements but resulted in an increased incidence of hypoglycemia and thrombocytopenia in the infants. One report[1] suggests that supplemental oxygen may have a role in short-term prolongation of pregnancy, while steroids can be administered to accelerate fetal lung maturity.

Low-dose aspirin (150 mg per day) as a treatment for IUGR has been studied over the past several years. One study[26] found that when aspirin was given to women in the third trimester who had abnormal umbilical Doppler indices, fetal weight and head circumference parameters were improved compared with a placebo group. In a second trial,[27] aspirin, given in a dosage of 150 mg per day with dipyridamole in a dosage of 225 mg per day and administered at 15 to 18 weeks of gestation in

Ex. 44 - 620

high-risk patients, resulted in a lower incidence of still-birth, placental abruption and IUGR. Birth weight was improved, and no excess of maternal or fetal aspirin-related side effects occurred. It would seem prudent to consider low-dose aspirin therapy in selected patients with risk factors for IUGR (*Table 1*).

**Labor and Delivery Management**
Approximately one half of infants with IUGR have intrapartum asphyxia and lower Apgar scores than control subjects. A higher incidence of meconium aspiration has also been noted in these infants. Therefore, continuous monitoring of fetal heart rate throughout labor is recommended in cases of IUGR.[1,3] Amnioinfusion may also have a role in these cases, especially in the presence of olgihydramnios. Late decelerations are more predictive of fetal hypoxia and a resultant adverse outcome in this group of high-risk infants. A lower threshold for the choice of cesarean section is therefore recommended. Neonatal resuscitation and subsequent care of the growth-restricted infant should follow in the same manner used with other newborns. Problems to closely watch out for in infants with IUGR include hypoglycemia, hypocalcemia, polycythemia secondary to intrauterine hypoxia and hypothermia due to decreased body fat.[1,5]

## Neonatal Outcomes

In most cases, infants with IUGR ultimately have good outcomes, with a reported mortality rate of only 0.2 to 1 percent.[1] These infants often exhibit fast catch-up growth in the first three months of life and attain normal growth curves by one year of age. Some early studies[28,29] have found a variety of long-term complications in infants with IUGR. These complications include hyperactivity, clumsiness and poor concentration. Other studies[30,31] have found growth-restricted infants to be at increased risk for development of hypertension, abdominal obesity and type 2 (noninsulin-dependent) diabetes as adults.

In a recent British study,[32] records of 1,576 men and women born between 1920 and 1943 for whom birth weight and anthropomorphic measurements were recorded in detail after birth were examined. No definite association was found between cognitive function (intelligence quotient and vocabulary) and birth weight, head circumference or ratio of head circumference to abdominal circumference. Collectively, developmental studies demonstrate that many factors contribute to the ultimate intellectual development of infants with IUGR, including birth weight, time of onset of IUGR, head circumference, gestational age at delivery, etiology of the IUGR and postnatal environment. Most infants with IUGR have an excellent long-term prognosis.

---

## The Authors

ROBERT C. VANDENBOSCHE, M.D.,
is currently on staff at St. Clair Medical Center, Morehead, Ky. He completed a residency in family practice at Lancaster General Hospital, Lancaster, Pa. He is a graduate of the University of Maryland School of Medicine, Baltimore.

Ex. 44 - 621

Case 2:20-cv-00640-JPH-MG    Document 1-4    Filed 12/03/20    Page 82 of 119 PageID #: 830

JEFFREY T. KIRCHNER, D.O.,
is associate director of the family practice residency program at Lancaster General Hospital. He is a graduate of the Philadelphia (Pa.) College of Osteopathic Medicine. Dr. Kirchner completed a rotating internship at the Osteopathic Medical Center of Philadelphia and a residency in family practice at Abington (Pa.) Memorial Hospital.

Address correspondence to Jeffrey T. Kirchner, D.O., Lancaster General Hospital, 555 N. Duke St., Lancaster, PA 17604. Reprints are not available from authors.

## REFERENCES

1. Bernstein I, Gabbe SG. Intrauterine growth restriction. In: Gabbe SG, Niebyl JR, Simpson JL, Annas GJ, eds. Obstetrics: normal and problem pregnancies. 3d ed. New York: Churchhill-Livingstone, 1996;863-86.
2. Dunn PM. The search for perinatal definitions and standards. Acta Paediatr Scand Suppl 1985;319:7-16.
3. Creasy RK, Resnik R. Intrauterine growth restriction. In: Creasy RK, Resnik R, eds. Maternal-fetal medicine: principles and practice. 3d ed. Philadelphia: Saunders, 1994;558-74.
4. Gardosi J, Chang A, Kalyan B, Sahota D, Symonds EM. Customized antenatal growth charts. Lancet 1992;339(8788);283-7.
5. McCormick MC. The contribution of low birth weight to infant mortality and childhood morbidity. N Engl J Med 1985;312:82-90.
6. Piper JM, Langer O, Xenakis EM, McFarland M, Elliott BD, Berkus MD. Perinatal outcome in growth-restricted fetuses: do hypertensive and normotensive pregnancies differ? Obstet Gynecol 1996;88:194-9.
7. Abrams BF, Laros RK Jr. Prepregnancy weight, weight gain, and birth weight [published erratum appears in Am J Obstet Gynecol 1986;155:918]. Am J Obstet Gynecol 1986;154:503-9.
8. Lechtig A, Yarbrough C, Delgado H, Martorell R, Klein RE, Behar M. Effect of moderate maternal malnutrition on the placenta. Am J Obstet Gynecol 1975;123;191-201.
9. Dougherty CR, Jones AD. The determinants of birth weight. Am J Obstet Gynecol 1982;144:190-200.
10. Nilsen ST, Sagen N, Kim HC, Bergsjo P. Smoking, hemoglobin levels, and birth weights in normal pregnancies. Am J Obstet Gynecol 1984;148;752-8.
11. Mills JL, Graubard BI, Harley EE, Rhoads GG, Berendes HW. Maternal alcohol consumption and birth weight. How much drinking during pregnancy is safe? JAMA 1984;252:1875-9.
12. Calvert JP, Crean EE, Newcombe RG, Pearson JF. Antenatal screening measurements by symphysis-fundal height. BMJ [Clin Res] 1982;285:846-9.
13. Doubilet PM, Benson CB. Sonographic evaluation of intrauterine growth retardation. AJR Am J Roentgenol 1995;164:709-17.
14. Hadlock F. Ultrasound evaluation of fetal growth. In: Callen P, ed. Ultrasonography in obstetrics and gynecology. 3d ed. Philadelphia: Saunders, 1994; 129-42.
15. Queenan JT, ed. Management of high-risk pregnancy. 3d ed. Boston: Blackwell Scientific, 1994:402-12.
16. Veille JC, Kanaan C. Duplex Doppler ultrasonographic evaluation of the fetal renal artery on normal and abnormal fetuses. Am J Obstet Gynecol 1989;161(6 Pt 1):1502-7.
17. Ferrazzi E, Bellotti M, Vegni C, Barbera A, Della Peruta S, Ferro B, et al. Umbilical flow waveforms versus fetal biophysical profile in hypertensive pregnancies. Eur J Obstet Gynecol Reprod Biol 1989;33:199-208.
18. Fleischer A, Schulman H, Farmakides G, Bracero L, Blattner P, Randolph G. Umbilical artery velocity waveforms and intrauterine growth retardation. Am J Obstet Gynecol

Ex. 44 - 622

1985;151:502-5.

19. Kazzi GM, Gross TL, Sokol RJ, Kazzi NJ. Detection of intrauterine growth retardation: a new use for sonographic placental grading. Am J Obstet Gynecol 1983;145:733-7.

20. Pazos R, Vuolo K, Aladjem S, Leuck J, Anderson C. Association of spontaneous fetal heart decelerations during antepartum nonstress testing and intrauterine growth retardation. Am J Obstet Gynecol 1982;144:574-7.

21. Manning FA, Morrison I, Harman CR, Lange IR, Menticoglou S. Fetal assessment based on fetal biophysical profiling scoring: experience in 19,221 referred high-risk pregnancies. II. An analysis of false-negative fetal deaths. Am J Obstet Gynecol 1987;157(4 Pt 1):880-4.

22. Manning FA, Snijders R, Harman CR, Nicolaides K, Menticoglou S, Morrison I. Fetal biophysical profile score. VI. Correlation with antepartum umbilical venous fetal pH. Am J Obstet Gynecol 1993;169: 755-63.

23. Divon MY, Hsu HW. Maternal and fetal blood flow velocity waveforms in intrauterine growth retardation. Clin Obstet Gynecol 1992;35:156-71.

24. American College of Obstetricians and Gynecologists. Antepartum fetal surveillance. ACOG Technical Bulletin no. 188; January 1994.

25. Ribbert LS, van Lingen RA, Visser GH. Continuous maternal hyperoxygenation in the treatment of early fetal growth retardation. Ultrasound Obstet Gynecol 1991;1:331-6.

26. Trudinger BJ, Cook CM, Thompson RS, Giles WB. Low-dose aspirin therapy improves fetal weight in umbilical placental insufficiency. Am J Obstet Gynecol 1988;159:681-5.

27. Uzan S, Beaufils M, Breart G, Bazin B, Capitant C, Paris J. Prevention of fetal growth retardation with low-dose aspirin: findings of the EPREDA trial. Lancet 1991;337 (8755):1427-31.

28. Lipper E, Lee K, Gartner LM, Grellong B. Determinants of neurobehavioral outcome in low-birth-weight infants. Pediatrics 1981;67:502-5.

29. Robertson CM, Etches PC, Kyle JM. Eight-year school performance and growth of preterm, small for gestational age infants: a comparative study with subjects matched for birth weight or for gestational age. J Pediatr 1990;116:19-26.

30. Barker DJ, Hales CN, Fall CH, Osmond C, Phipps K, Clark PM. Type 2 (non-insulin-dependent) diabetes mellitus, hypertension and hyperlipidaemia (syndrome X): relation to reduced fetal growth. Diabetologica 1993;36:62-7.

31. Phipps K, Barker DJ, Hales CN, Fall CH, Osmond C, Clark PM. Fetal growth and impaired glucose tolerance in men and women. Diabetologica 1993; 36:225-8.

32. Martyn CN, Gale CR, Sayer AA, Fall C. Growth in utero and cognitive function in adult life: follow-up study of people born between 1920 and 1943. BMJ 1996;312:1393-6.

Copyright © 1998 by the American Academy of Family Physicians.
This content is owned by the AAFP. A person viewing it online may make one printout of the material and may use that printout only for his or her personal, non-commercial reference. This material may not otherwise be downloaded, copied, printed, stored, transmitted or reproduced in any medium, whether now known or later invented, except as authorized in writing by the AAFP.

Ex. 44 - 623



## MedlinePlus
### Trusted Health Information for You

A service of the U.S. NATIONAL LIBRARY OF MEDICINE and the NATIONAL INSTITUTES OF HEALTH

Search MedlinePlus

About MedlinePlus | Site Map | FAQs | Contact Us

Home | Health Topics | Drugs & Supplements | Encyclopedia | Dictionary | News | Directories | Other Resources

español

## Medical Encyclopedia

Other encyclopedia topics: A-Ag  Ah-Ap  Aq-Az  B-Bk  Bl-Bz  C-Cg  Ch-Co  Cp-Cz  D-Di  Dj-Dz  E-Ep  Eq-Ez  F  G  H-Hf  Hg-Hz  I-In  Io-Iz  J  K  L-Ln  Lo-Lz  M-Mf  Mg-Mz  N  O  P-Pl  Pm-Pz  Q  R  S-Sh  Si-Sp  Sq-Sz  T-Tn  To-Tz  U  V  W  X  Y  Z  0-9

## Small for gestational age (SGA)

 Printer-friendly version    E-mail to a friend

### Contents of this page:

- Alternative names
- Definition
- Information

### Alternative names

Intrauterine growth restriction (IUGR); Low birth weight

### Definition    *Return to top*

The term "small for gestational age", or SGA, means a fetus or infant is smaller in size than is expected for the baby's gender, genetic heritage, and gestational age.

### Information    *Return to top*

Ultrasound is used to identify intrauterine growth restriction (a developing fetus that is smaller-than-normal for its age). The most widely used definition of SGA is birth weight below the 10th percentile.

Neonatal growth restriction is a syndrome that includes small size and specific metabolic abnormalities. These abnormalities include hypoglycemia (low blood sugar level), hypothermia (low body temperature), and polycythemia (increased level of red blood cells).

### Update Date: 8/8/2005

Updated by: Sharon Roseanne Thompson, M.D., M.P.H., Clinical Fellow, Department of Obstetrics & Gynecology, Brighan and Women's Hospital, Boston, MA. Review provided by VeriMed Healthcare Network.

**✦ADAM**



A.D.A.M., Inc. is accredited by URAC, also known as the American Accreditation HealthCare Commission (www.urac.org). URAC's accreditation program is the first of its kind, requiring compliance with 53 standards of quality and accountability, verified by independent audit. A.D.A.M. is among the first to achieve this important distinction for online health information and services. Learn more about A.D.A.M.'s editorial process. A.D.A.M. is also a founding member of Hi-Ethics (www.hiethics.com) and subscribes to the principles of the Health on the Net Foundation (www.hon.ch).

The information provided should not be used during any medical emergency or for the diagnosis or treatment of any medical condition. A licensed physician should be consulted for diagnosis and treatment of any and all medical conditions. Call 911 for all medical emergencies. Adam makes no representation or warranty regarding the accuracy, reliability, completeness, currentness, or timeliness of the content, text or graphics. Links to other sites are provided for information only -- they do not constitute endorsements of those other sites. Copyright 2005, A.D.A.M., Inc. Any duplication or distribution of the information contained herein is strictly prohibited.

Home | Health Topics | Drugs & Supplements | Encyclopedia | Dictionary | News | Directories | Other Resources

Copyright | Privacy | Accessibility | Quality Guidelines

**Ex. 44 - 624**

U.S. National Library of Medicine, 8600 Rockville Pike, Bethesda, MD 20894
National Institutes of Health | Department of Health & Human Services

Page last updated: 11 August 2006

Ex. 44 - 625



| All Databases | PubMed | Nucleotide | Protein | Genome | Structure | OMIM | PMC | Journals | Bool |

Search PubMed ▓ for     [Go] [Clear]

Limits   Preview/Index   History   Clipboard   Details

Display AbstractPlus     Show 20 ▓ Sort by ▓ Send to ▓

All: 1   Review: 0  ✖

---

☐ **1:** Community Genet. 1999;2(1):36-42.

Links

Full Text

### Study of 290 cases of polyhydramnios and congenital malformations in a series of 225,669 consecutive births.

**Stoll CG, Roth MP, Dott B, Alembik Y.**

Service de Genetique Medicale, Centre Hospitalo-Universitaire, Strasbourg, France. Claude.Stoll@chru-strasbourg.fr

OBJECTIVES: To provide data on polyhydramnios associated with congenital anomalies in 225,669 consecutive pregnancies. MATERIAL AND METHODS: The information in this study came from births of known outcome recorded in our registry of congenital malformations. Routine ultrasonographic examination was performed. Polyhydramnios was diagnosed ultrasonographically. A case-control study allowed the examination of genetic and environmental causal factors of polyhydramnios associated with congenital malformations. RESULTS: The prevalence of this association was 1.28/1,000 (290 cases). Polyhydramnios associated with congenital malformations was diagnosed prenatally in 44.5% of the cases, 10.3% of the infants were stillborn. Forty-one percent of the cases had more than one malformation, 14.5% had a chromosomal aberration, and 20.0% had multiple malformations that do not constitute a syndrome. The more frequent malformations associated with polyhydramnios were cardiac, digestive, central nervous system, musculoskeletal, and urinary. There was increased parental consanguinity. The incidence of polyhydramnios and congenital anomalies among first-degree relatives was 4.1% and first-degree relatives had more malformations than controls (6.2 vs. 3.2%, p < 0.05). Threatened abortions and diabetes mellitus were significantly more frequent among mothers of children with congenital malformations associated with polyhydramnios than among controls. CONCLUSIONS: Our study demonstrated that careful fetal examination has to be performed when polyhydramnios is diagnosed as congenital malformations are often associated with polyhydramnios. We recommend the use of fetal chromosome analysis and careful ultrasonographic examination in every pregnancy complicated by polyhydramnios.

PMID: 15178961 [PubMed]

---

**Related Links**

Study of 224 cases of oligohydramnios and congenital malformations in a series of 225,669 consecutive births. [Community Genet. 1998]

Study of 156 cases of polyhydramnios and congenital malformations in a series of 118,265 consecutive [Am J Obstet Gynecol. 1991]

Epidemiology of congenital eye malformations in 131,760 consecutive births. [Ophthalmic Paediatr Genet. 1992]

Risk factors in internal urinary system malformations. [Pediatr Nephrol. 1990]

Congenital eye malformations in 212,479 consecutive births. [Ann Genet. 1997]

See all Related Articles...

**Ex. 44 - 626**

Display  AbstractPlus        ▓ Show  20  ▓  Sort by      ▓  Send to  ▓

Write to the Help Desk
NCBI | NLM | NIH
Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer

Aug 14 2006 08:07:58

**Ex. 44 - 627**



All Databases    PubMed    Nucleotide    Protein    Genome    Structure    OMIM    PMC    Journals    Book

Search PubMed     for     Go    Clear

Limits    Preview/Index    History    Clipboard    Details

Display AbstractPlus     Show 20     Sort by     Send to

All: 1    Review: 0

**1:** Ann Ist Super Sanita. 2006;42(1):46-52.

**Full text**    Links

### Brain imaging and fetal alcohol spectrum disorders.

**McGee CL, Riley EP.**

Joint Doctoral Program in Clinical Psychology, San Diego State University, San Diego (CA), USA.

Over thirty years of research has revealed that prenatal exposure to alcohol has a devastating impact on the structure and function of the developing central nervous system. Imaging studies over the past ten years have improved our understanding of the structural alterations related to prenatal alcohol exposure and provided researchers with potential hypotheses for brain-behavior relationships. Structural alterations associated with prenatal alcohol exposure have been found in overall brain size, shape, and symmetry, along with regional decreases in white and gray matter. In addition, abnormalities have been noted in specific structures such as the cerebellum, basal ganglia, and corpus callosum. This review demonstrates that specific areas of the brain may be more vulnerable to prenatal exposure to alcohol.

PMID: 16801725 [PubMed - as supplied by publisher]

**Related Links**

A review of the neuroanatomical findings in children with fetal alcohol syndrome or prenatal exposure to alcohol.    [Alcohol Clin Exp Res. 1998]

Fetal alcohol spectrum disorders: an overview with emphasis on changes in brain and behavior. [Exp Biol Med (Maywood). 2005]

Teratogenic effects of alcohol: a decade of brain imaging. [Am J Med Genet C Semin Med Genet. 2004]

Regional brain shape abnormalities persist into adolescence after heavy prenatal alcohol exposure. [Cereb Cortex. 2002]

Interhemispheric transfer in children with heavy prenatal alcohol exposure.    [Alcohol Clin Exp Res. 2002]

See all Related Articles...

Display AbstractPlus     Show 20     Sort by     Send to

Aug 14 2006 08:07:58

**Ex. 44 - 628**

# EXHIBIT 45

DECLARATION OF BERNICE JOHNSON

I, Bernice Johnson, declare:

1.    I am the half sister of Julius Robinson's grandmother, Margaret Hollimon.  Our mother was Josephine Smith.  Margaret's father was John Henry Gross.  He and Josephine separated and then my mother was with my father, James Johnson.  I had thirteen brothers and sisters.

2.    I was born in Lake Village, Arkansas in 1936.  I believe that Margaret was born in Lakeport, Arkansas and she was much older than me.  I am the youngest girl in the family.  Margaret was already out of the house by the time I can remember.

3.    The father of Margaret's first child, Roosevelt, was only with Margaret for a short time.  She was with John Hollimon, the father of all her other children, until he died in 1999.

4.    When Margaret's daughter, Rose, was a little girl, her neighbor, Sarah, took Rose into her house.  Sarah was like a godmother to Rose.  She was a widow and was afraid to live alone.

5.    Rose started going with Jimmie Lee Robinson.  Jimmie Lee could be a wild person.  He would go after Rose with a gun.  One time, after Rose's first child, Marcus, was born, Jimmie Lee came into my house looking for Rose.  He had a gun with him.  I asked him what he was doing with the gun.  He told me "I'm going to kill her".  I kept telling him Rose wasn't at my house and he better leave.

1

B.J.

6.    I heard that Jimmie Lee was violent with Rose, even when she was pregnant with Julius.  They didn't live in Dermott then, so I didn't see them.  When Rose left Jimmie Lee and came back to Dermott to stay with her mother and father, her two boys were little.  Julius was still in diapers.  Rose left to get work and Margaret and John kept the boys because it was too hard to work and take care of two small children.

7.    Julius always had a temper when he was young, often over nothing.  If he wanted something and couldn't have it, he would have a tantrum and scream and cry.

8.    At the time Julius and his brother Marcus were living with Margaret and John, I was living down the street from them.  One Sunday when Julius was about 8 or 9 years old, he and a group of children were playing in my front yard.  Some of the children came in and told me Julius doesn't want to play right, he just wanted to fight.  I went outside and told Julius, "There's no fighting here, the only one you'll fight with is me.  Do you want me to whip you?"  Julius just said "No, you're not going to whip me." I sent Julius home.

9.    When I went to talk to Margaret about his behavior, Julius told her "Grandma, I didn't do it".  Margaret said she would whip Julius but I never saw her do it.  I did see Margaret try to whip Julius on some other occasions, but John would always stop her.  Margaret would say one thing and then John would say

2

B.J.

the opposite.  If Julius asked Margaret for permission to do something and Margaret said no, he would go to his grandfather, John, who would say oh, go on ahead.

10.    John was blind, so he wasn't always aware of what Julius was doing and he didn't really want to hear what was going on with him if it differed from the picture he had of Julius. Margaret was not that competent.  She had a lot of memory loss and wasn't that aware of Julius's problems.

11.    Margaret did make Julius and Marcus go to church every Sunday and when they were little, every night of the week also. They belonged to a sanctified church and they would all walk the several miles there every evening.  Some member of the church would often bring them home by car.

12.    I have a son around Julius' age, Tony Billup.  When the boys were young, a man named Satra came to town from out of state and he started the gang.  Lots of the boys around ten to twelve years old were very attracted to Satra and got involved in his gang.  I was overprotective of my son, so he didn't get involved, but Julius did.

\\\

\\\

\\\

\\\

\\\

3

_B. J._
B.J.

13.    No one has ever come and talked to me about Julius Robinson.  Had I been asked, I would have willingly given the foregoing information.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this /9 day of September, 2005 in Dermott, Arkansas.


Bernice Johnson

Bernice Johnson


4

**Ex. 45 - 632**

# EXHIBIT 46

DECLARATION OF MILDRED HOLLIMAN

I, Mildred Holliman, declare:

1.   I am Julius Robinson's aunt on his mother's side.  Rose Holliman, Julius' mother, is my sister.  My twin brother, Milton, and I are the youngest children of my parents, John and Margaret Holliman.  We were born prematurely, at seven months.  I also got polio and I spent a lot of time in the hospital before I could come home.

2.   I have eight brothers and sisters, but I remember the most that Milton, Josephine and Adolf were living at home as I was growing up.  The older kids left home and moved away.  My brothers, John and Robert, didn't finish high school. John left home for Texas when he was 15 years old.  My sister Rose lived down the street with an older widow named Sarah Pittman.  We called her Mama Sarah.

3.   My dad was blind, he never saw us.  He cooked and cleaned the house.  My mom and my brothers and sisters worked in the fields, chopping cotton.  I stayed home with my dad and helped with the housework.  I did the sweeping and mopping and the washing.  My dad did the cooking.  He dressed himself and made his bed.  He was also able to get around town by himself. He had some friends who lived on Shepard Street, several blocks away, and he would walk over there and visit them, using his cane.

1

M.H.

**Ex. 46 - 633**

4.    My dad did most of the disciplining in our family, but he didn't really have to do too much.  We knew our parents weren't playing when they told us not to do something.  I can remember one time my mom told Rose and me not to go out of the house.  We sneaked out and went riding in a car with some boys.  When we got home, my dad whipped us both with a switch.  Another time, I was arguing with my brother, Adolf, and I broke a window.  My mom whipped me that time.  Those are the only times I remember getting a whipping.  And I never saw my dad hit my mom.

5.    I have five children.  I had my first child, Kelvin Ford, when I was 16 years old.  My sister had already had her first son, Marcus, and had left Dermott.  I went back to school after Kelvin was born and finished the eleventh grade.  My other children are Jana, Antonio, Monique and Cliff.

6.    Around the time I had my third child, I moved to the house next door to my parents on Deer Street.  This was around the time when Marcus and Julius came to live with my parents.  Mama Sarah stayed with them also.  She told us that Rose's husband, Jimmie Lee, was beating on Rose.  Rose did not come home to Dermott when she left Jimmie Lee.

7.    Both my parents and my houses on Deer Street were backed by fields.  Those fields were farmed by Bob Green.  He grew soybeans.  Bob Green would spray the fields.  The kids would be playing outside in the fields and would get sprayed on.  No

*M H*

2

M.H.

**Ex. 46 - 634**

one thought to come inside.

8.   When Julius and Marcus were little, my mom would take the boys to church three times a week.  They walked to church, a walk of 20 or 30 minutes.  I never saw or heard of my parents disciplining the boys.  I also can't remember a time when my sister, Rose, came home to see her boys.

9.   When my own son, Tony, started getting into trouble, Julius sent for him and brought him to Arlington, Texas.  Tony went to high school in Arlington and was doing really well.  He played football there until he tore some ligaments in his leg and had to drop out of school.  He came home to Dermott a week or so after Julius was arrested.

10.   I have never been interviewed by anyone representing Julius in his criminal case until now.  Had I been asked before, I would have willingly provided the information contained in this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22 day of October, 2005 in Dermott, Arkansas.


_Mildred Holliman_

Mildred Holliman


3

**Ex. 46 - 635**

# EXHIBIT 47

## DECLARATION OF WILLIE WHITE

I, Willie White, declare as follows:

1.    I am Jimmie Lee Robinson's half-brother. My brother and Rose Hollimon had two children, Marcus and Julius Robinson.

2.    Jimmie and I have the same mother. Our mother, Bertha Scales, had me when she was seventeen years old. She later married Eddie Robinson, Jimmie's father. Jimmie was born almost three years after I was.

3.    Eddie Robinson didn't give a damn about me. He never said more than twenty-five words to me. I lived with our grandparents, Eddie and Mahaela Scales. My mother's husband was an alcoholic, he would be brought home early on Sunday mornings from his Saturday night binges. In the summer, he would be lying out on the front yard, sleeping off his drunk. Eddie would sometimes be arrested for being drunk.

4.    What I heard from the family about the event which caused my mother to end up in a wheelchair was that my stepfather shot my mother on purpose one day they were arguing about her going to church. My mother was walking out the door and Eddie Robinson had been cleaning his gun at the table when it happened. I use to fantasize about shooting my stepfather for leaving my

1

_u/ u/_
WW

**Ex. 47 - 636**

mother paralyzed.  I looked forward to reaching age twelve, the time when I would be allowed to handle shotguns for hunting.

5.    Eddie Robinson was in the habit of gambling and drinking away the money he earned.  It was customary for the men to travel to Florida to work in the fields during the harvests.  Eddie was the only one who would come back with nothing to show for it.  It was a good thing that Eddie left Dermott for good.

6.    At one time, all of the land in back of the Scales/Robinson and the Hollimon's houses was owned by grandfather Scales and his two brothers, Hoss and William.  Hoss Scales still owned the land when my nephews, Marcus and Julius Robinson, were coming up.  The land was worked by other people at times. There was cotton planted there as well as soybeans.

7.    Before crop dusters were used to spray pesticides on the fields, people sprayed ammonia nitrate on the crops with spray guns, and then everyone waited around hoping it would rain.  The rain was the only irrigation we had. Planes started to be used in 1960s`.  The pesticides the planes dropped killed all of our game.  We would find dead rabbits and racoons after the planes dropped the pesticides.  These were animals we hunted and ate.

8.    In 1970 and 1971, during my junior and senior years in high school, I

2

WW

**Ex. 47 - 637**

worked in Dumas, a town close to Dermott, at the Experimental Station, an agricultural program out of the University of Arkansas. The other workers and I pulled weeds and had other tasks. When the crop dusters sprayed, we would be moved to other fields and were told to cover our faces. In Dermott, people would just watch the white stream coming out of the airplanes, they wouldn't move elsewhere.

9.    I never could understand why of all the women around, my brother Jimmie had to go and pick Rose Hollimon for a spouse. Jimmie had done better than I did in school and the family was counting on him to have a better future than the rest. Jimmie had a better head on his shoulders for school but not for picking mates. The people in the town downgraded and ridiculed the Hollimons. The Hollimons struggled like the rest of us but they were worse off. Their kids were dirty and they kept the one dirty spot in the neighborhood. The father, John Hollimon, was blind and Margaret Hollimon, the mother, was on the slow side and didn't seem to be grounded enough to keep control of the family. Besides, Margaret didn't have much of an education, if any, and she was running everything. This situation still existed when Marcus and Julius eventually went to live at the Hollimon home.

3

WW

Ex. 47 - 638

10.    The Hollimons were less disciplined than our family by a wide margin.  And, with Rose Hollimon, the question one asked was, not who had she slept with but was there anyone she hadn't slept with, so I was not happy when I heard that my little brother had hooked up with her.  Even our granddaddy Scales had warned Jimmie not to let Rose pull him in.  It was obvious to everyone but Jimmie that Rose couldn't dedicate herself to only one man.  Even when she was married , if Rose wanted someone different, she would go out and get them.

11.    Once, when they were already married, Rose and Jimmie visited my wife and I in Little Rock.  Both Jimmie and Rose` drank and smoked marijuana.  I told them they had to go outside on the porch to smoke the marijuana, I didn't want them to do that in the house.  During that visit, my wife and I and Rose and Jimmie went to a club.  Rose found nothing better to do than to start talking with some dude there.  Once back at my house, Jimmie and Rose got into a shouting match and a fight on account of Rose's behavior.  I walked in when Jimmie had just slapped Rose.  I got in between them and Jimmie was still reaching around me trying to get at Rose.  I had heard from our mother that Jimmie and Rose were having lots of problems.  Our mother was on the protective side with Jimmie and he would tell her everything that was going.

4    WW

**Ex. 47 - 639**

12.    Rose had always been rough with her mouth. She was verbally abusive, talking like she was a 6'5", 260 lbs. man. The things she said would make someone want to kill her.

13.    A couple of years ago, I went to Dermott for a visit. I was walking down the street and a ways down the block, I saw three women walking towards me. I'm a little deaf but, even with the distance between the women and me and my bad ear, I could still hear the woman in the middle making suggestive remarks about me. She was talking about how good I looked and other stuff - me, an old man! As I neared the women, I realized that Rose was the middle one making the remarks. I said to her, "You fool, can't you see I'm your ex brother-in-law?" Rose made up some silly excuses and started back peddling from what she had been saying. Rose hadn't changed.

14.    I knew that my brother was messing with drugs at Fayetteville, and, from his visits to Little Rock, I knew that Jimmie couldn't get up in the morning without having a beer and smoking a marijuana joint. I would get after him all the time about this.

15.    By and large, Jimmie and Rose ignored their children. They didn't have time for them so the boys had no guidance from their parents, no teaching. I

5

WW

had occasion to see Rose with her sons one time when they were young. She showed no sign of caring and didn't treat them as if they were kids. It was as if they were her little brothers and she didn't bear any responsibility for them.

16.    Julius and Marcus came to live at an already full house when their mother brought them to live in Dermott. There were around ten persons living at the house on Deere Street. I saw this when I would visit Dermott once or twice a month. Julius and Marcus would flock to my mother's house when they were little. My mother told me that the boys were getting no guidance at the Hollimon house and that she was doing what she could with her grandsons.

17.    Julius and Marcus played in the fields planted with cotton and soybeans when they were little, just like all the kids did. Another childhood activity, which could earn them a whipping if caught, was wading in the drainage ditches running alongside the street. The ditches were dangerous because the water could move quickly when there was a lot of it, the water was dirty and, though it was not much of a consideration at that time, the water included the pesticide laden runoff from the fields. Every street had drain ditches. The Hollimons, who lived south of my mother's house on Deere Street, were right by a big ditch.

*w w*
WW

6

18.     The Hollimons lived in what was called a "quick house." The house had white siding, a water resistant fabric coated with asbestos, a predecessor of aluminum and vinyl siding.

19.     My son, Rodney White, lived in Dermott for a while when Julius was around eleven or twelve years old. Rodney is the son I had with my first girlfriend. I was not able to have much influence with him when he was an adolescent because of a very contentious situation with his mother and her husband. I came to find out later that they had exposed my son to a lot of drugs and had even made him get high when he was a boy. Consequently, my son had a lot of problems. Rodney ended up doing time in prison because of his illegal activities. Julius followed Rodney around in Dermott, and looked up to his older cousin. I don't believe that Rodney was a good influence on Julius.

20.     Had I been asked to provide the information contained in this declaration previously, I would have done so willingly.

I declare under penalty of perjury under the laws of the United States of America this ____ day of November, 2005.

*Willie White*
Willie White

7

**Ex. 47 - 642**

## SUPPLEMENTAL DECLARATION OF WILLIE WHITE

I, Willie White, declare:

1. Before his trial began, my nephew, Julius Robinson, told me to expect a call from his attorneys. He had given them my phone number and had told them to call me. Sometime later, I received a telephone call here in Little Rock from a man who identified himself as the investigator in Julius's case. I do not remember the man's name, nor did I write it down. The trial was going to start "real soon", the man said. It was my impression that it was to begin in a couple of weeks but I don't know if that was the time frame the investigator gave.

2. The investigator told me that they might have to talk with me and perhaps have me come out to Texas. He asked me if I knew what kinds of activities Julius was involved in. I told him that I knew that Julius was taking clothes and jeans to Dermott and selling them there. The man asked questions about this topic, which I understood to mean Julius's possible participation in criminal activities. He asked about nothing else.

3. I asked the investigator if the charges against Julius were serious. He said, "I tell you right now, they want to kill him."

4. It was a brief conversation, ten to fifteen minutes. The investigator

1

*Willie E White*
WW

gave me his phone number, (817) 946-1588, which I wrote down in my address book. He also said that they would contact me if they needed anything else and if they decided to have me testify, though he did not mention the purpose of my testimony.

5.     Julius's investigator did not seek information about Julius's family history. I was not told that I could provide information which could be used to seek a lower sentence for Julius. Had I been informed of this, I would have told him what I knew and would have given the names and contact information of persons who could provide more details, for example, my brother Jimmy Lee Robinson, Julius's father.

6.     On August 9th, 2006, I was contacted by an investigator from the Office of the Federal Public Defender to whom I provided the information contained herein. I have reviewed and signed this two page declaration.

I declare under penalty of perjury under the laws of the United States of America this 22 day of August, 2006.

_Willie E White_
Willie White

2

**Ex. 47 - 644**

# EXHIBIT 48

DECLARATION OF MILTON WILLIS HOLLIMAN

I, Milton Holliman, declare:

1.    I am the youngest brother of Rose Hollimon, who is Julius Robinson's mother.  My twin sister, Mildred, and I were born on July 15th, 1959, the last two children of my parents' eight children.

2.    When I was growing up, my family lived in three different houses that I can remember.  We lived on Shepard Street, Wolfe Street and Deer Street.  My oldest brother, Roosevelt, who is my mother's son by a different man than my father, left home in about 1971 to move to Buffalo, New York.  My brother John and my sister Margie both left in 1972 or 1973 for Witchita Falls, Texas.  I grew up with my sisters, Mildred and Josephine and my brother, Adolph in the house.  My sister, Rose, lived next door with our neighbor, Miss Sarah.

3.    My mother and all my siblings except Rose and Mildred had to help our family by chopping or picking cotton.  Rose lived with our neighbor, Miss Sarah.  My twin sister Mildred was handicapped from childhood polio.  I began picking cotton when I was twelve.  The most I ever picked in one day was 75 pounds of cotton.  When I was 16 years old, I switched to chopping cotton because picking cotton was too hard.  Each person, children and adults, earned five dollars a day chopping cotton in the 1970's.

4.    My father was blind, so he stayed around the house.  He

1

_M.H._

did the cooking and the cleaning.  Even though he was blind, he could get around Dermott really well.  He used a cane and he knew the roads better than me.

5.    When I was very little, my dad would go down the street to be with his friends.  They would hang out and drink.  My dad would bring me with him.  He drank whiskey and most of his friends drank beer.  He always bought me a soda pop.  My dad would get drunk and then it was my job to guide him home.  When we got home, my mom would be mad and they would argue.  After 15 or 20 minutes of argument, my dad would go to bed.  My dad also smoked cigarettes that he rolled himself.

6.    One time when I was ten years old,  my brother and sisters and I were in the yard chasing the chickens.  My dad told us to leave those chickens alone, but I ignored him.  I caught a chicken and wrung its neck.  I really wanted a chicken dinner.  My dad was really mad at me and he used a switch on me.  He really tore up my butt.  That was the last time my dad ever disciplined me and I never messed with the chickens again.  My mom never disciplined any of us.

7.    After Rose got married and left Dermott, she would come back home sometimes.  When she was home, I saw her smoke marijuana and I also saw her drink alcohol.

8.    I was still living at home with my parents on Deer street in Dermott when Miss Sarah came back to Dermott from North

2

*m H*
M.H.

Carolina. She brought Rose's children, Marcus and Julius with her. They all stayed at our house. Julius was just a little boy still in diapers. Miss Sarah told us she came because Rose and Jimmie Lee were fighting too much and the authorities were getting ready to take the children away from Rose.

9. I have never been interviewed by anyone representing Julius in his criminal case until now. Had I been asked before, I would have willingly provided the information contained in this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _21_ day of October, 2005 in Dermott, Arkansas.


_Milton Holliman_

Milton Holliman


3

**Ex. 48 - 647**

# EXHIBIT 49

## DECLARATION OF WILLIE PARKER

I Willie Parker, declare as follows:

1.  I have been a coach at the Dermott School for approximately thirty years. I coached Julius Robinson and his older brother, Marcus.

2.  Julius was a nice boy but he grew up in the streets without parental guidance. I would see him around town on his own. My years of experience with kids have taught me to recognize the ones who are lacking TLC, tender loving care, and Julius was someone who was not getting it. The Dermott School sets aside certain athletic events to recognize the parents of the students. These are called Parent Appreciation Days. On the special day, each student athlete gets to escort his parent or parents to the reserved seats before the game begins, while everyone watches. During the time he played sports, Julius never had a parent to accompany.

3.  Julius was an exceptional child considering the material and emotional poverty in which he grew up. I knew the family and their situation. Julius's grandparents, his guardians, were simple country people without any kind of education and with the added impediment of John Holiman, who could have been the bread-winner, being blind. The grandparents were good people but were ill-prepared to educate and care for their grandchildren. I don't know if the family was on welfare but Julius participated in the free lunch program at the school. I believe the income and resource criteria to qualify for the program was the same as for welfare - it was reserved for children from poor families.

4.  The attention Julius would have needed to come from his parents, he ended up getting from his peers. Nevertheless, Julius was appreciative of any little thing. Even if I just sat with him on the bleachers and chatted, his thank-yous and his face showed that these moments meant a lot to him.


WP

1

Ex. 49 - 648

Furthermore, Julius stood out in how receptive he was when a teacher called his attention to something he was doing. Sometimes after a game, the boys would get a little rowdy and the coaches would have to bring some order to the group. Julius was always responsive to our requests. He was a nice kid.

5. Julius was a slow learner but his personality helped him. Although Julius was not a Special Education student, he was a Resource student. These students receive special assistance with their school work. My feeling is that if a student is doing his best, he shouldn't be held back. About half of the Dermott students need special assistance, and the ones that do are not always identified. It is very frustrating to be a teacher here. It is an overwhelming problem.

6. In Dermott, we have an ongoing relationship with the police department when it comes to kids who participate in sports. The police would come by and let us know if the athletes were getting into trouble. No one ever said anything to me about Julius.

7. There are two criminal detention facilities in the Dermott area, one is for juveniles. I am involved in special sports program with the juveniles. Most of the time, I feel I am not making a difference. I cannot fight the extreme poverty these kids come from. The kids in custody tell me that they at least have food and a bed when they are detained.

8. Had I been asked about the information contained in this declaration previously, I would have provided it willingly.

I declare under penalty of perjury under the laws of the United States of America this 1-2 of November, 2005.

Willie Parker

2

Ex. 49 - 649

# EXHIBIT 50

DECLARATION OF JANA HOLIMAN

I, Jana Holliman, declare:

1.    I am Julius Robinson's cousin.  His mother and my mother are sisters.  I was born in 1977, one year after Julius was born and I grew up in Dermott, Arkansas.

2.    Until I was about six years old, I lived with my mother, Mildred Holliman, in a house right next to my grandparents on Deer Street.  Julius and his brother, Marcus, lived with my grandparents.  From the time I was in the first grade until I was about ten years old, I lived with an older woman named Alice Johnson.  My mother and my grandmother both knew her from church and from the neighborhood.  We lived on Main Street, about four blocks away from my mother's house.

3.    In the summers, from the time I was seven years old until I was eleven, I spent most of my days playing with my friends and cousins at my grandmother's house.  We played ball between the rows of soybeans in the fields behind her house. During the summer, the fields were dusted two or three times a week.  When the planes came on a week day, they sprayed in the early evening.  If they came on a Saturday, they would spray in the morning.  We would be in the fields and the airplane would spray right over us.  I can remember a white airplane with a company name on the side.  I was often playing with Julius when this happened.  It would be hot in the fields and the spray was a

J. H.
J.H.

1

**Ex. 50 - 650**

kind of mist, like a light rain. The airplane would go back and forth up and down the field. Dermott also had mosquito trucks which sprayed an insecticide from the truck to kill the mosquitoes. We called this insecticide "Ocean Spray". The mist the airplanes sprayed on the fields and on the kids smelled like this Ocean Spray.

4. One summer when I was about ten or eleven years old, I went to stay with Julius and his mother, Rose, in their apartment in Arlington, Texas. I remember staying with them for several months. No one else lived in the apartment but the three of us. I went to vacation bible school during the day. Rose would come home from work every day and go into her room or else the bathroom and smoke marijuana. I knew what marijuana smelled like and I could smell it. On the weekends, Rose would go to the apartment of her cousin, Pinky, which was a few blocks away from her apartment. Pinky, her husband and Rose would play cards, drink beer and smoke marijuana and primos. Primos are marijuana cigarettes mixed with cocaine. I know what they were smoking was sometimes primos because I saw Pinky's husband putting white powder into the marijuana cigarettes he was rolling.

5. In the early 1980's, several people, Satra and John John, came from Los Angeles and brought the gangs with them. They began doing initiations. The person being initiated was put in the center of a circle of between seven and ten gang members.

2

*Jo H.*
J.H.

The O.G., or oldest gang member, would ask person in the center what he wanted to be.  If he said a Playboy Hustler Crip, the O.G. would hit him in the face really hard with his closed fist. Then the other gang members from the circle would fight the newcomer for four or five minutes, hitting, kicking and punching him.  The newcomer could fight back.  If at the end of the time, the newcomer was still standing, he was initiated.  If he fell down during the fighting, he would have to go another round. After the initiation, they would get drunk and high.  The process was the same for the girls.  I went through the initiation myself.

6.    I did not see Julius' initiation, but I knew when he became a Crip because he started wearing a blue bandana.  Members of the Crips did not wear any red, they only wore blue or black. In Dermott there were two branches of the Crips, the Playboy Hustlers and the East Coast Crips.  I was a member of the East Coast Crips.  We hung out at the projects in Dermott and at the trailer court.

\\\

\\\

\\\

\\\

\\\

\\\

3

*J.H*
_____
J.H.

**Ex. 50 - 652**

7.    I have never been interviewed by anyone representing Julius in his criminal case until now.  Had I been asked before, I would have willingly provided the information contained in this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23 day of October, 2005 in Little Rock, Arkansas.

_Jana Holliman_

Jana Holliman

4

**Ex. 50 - 653**