# EXHIBIT 63



VOL II,  1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA     .    CRIMINAL ACTION NO.
                             .    4:00-CR-260-Y
VS.                          .
                             .
JULIUS OMAR ROBINSON   (02)  .    February 5, 2002
                             .    9:12 a.m.
.    .    .    .    .    .    .    .    .    .    .    .

VOLUME II
TRANSCRIPT OF PROCEEDINGS
(Individual Voir Dire)
BEFORE THE HONORABLE TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States:      Mr. Frederick M. Schattman
                            Mr. Reed C. O'Connor
                            Assistant United States Attorney
                            801 Cherry Street, Suite 1700
                            Fort Worth, Texas   76102
                            (817) 252-5200

For Defendant Robinson:     Mr. Wes Ball
                            Ball & Hase
                            4025 Woodland Park Blvd., Suite 100
                            Arlington, Texas   76013
                            (817) 860-5000

                            Mr. Jack V. Strickland
                            Attorney at Law
                            909 Throckmorton Street
                            Fort Worth, Texas   76102
                            (817) 338-1000

Official Court Reporter:    Eileen M. Brewer
                            424 United States Courthouse
                            501 West Tenth Street
ORIGINAL                    Fort Worth, Texas   76102-3637
                            (817) 334-0104

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

U.S. DISTRICT COURT

**Ex. 63 - 941**

don't understand, just stop me and tell me that you don't understand it.

I've looked through your questionnaire, and I was wondering if we could just start with you telling me what your feelings are about the death penalty, in your own words.

VENIREPERSON BROOME:  Well, I believe it would be a necessary evil.  I'd only use it in extreme cases.  I don't think it should be taken lightly.  I think it should be used as a deterrent more than punishment.

MR. O'CONNOR:  All right.  Do you feel that just in your experience, do you feel that you could participate in a process where that -- where the decisions that you make may lead to a person receiving the death penalty?

VENIREPERSON BROOME:  It would be very hard for me.

MR. O'CONNOR:  Okay.  And tell me why that is.

VENIREPERSON BROOME:  Just the fact that another man's life would be partially in my hands.  It's a heavy situation.

MR. O'CONNOR:  Right, right.  Do you feel comfortable being asked to sit in a case where if the law provides for it and the facts justify it, your decision could result in another person being taken, at some appointed time, to what's called a death chamber, and being taken to that death chamber and being executed until they cease to exist.  Do you feel that you could participate in that process if the law allows it and the facts

Ex. 63 - 942

justify it?

VENIREPERSON BROOME:  I believe I could.

MR. O'CONNOR:  Okay.  Because -- and let me tell you why I asked that.  Many people have views on the death penalty, pro-death penalty/anti-death penalty and everywhere in between, and a lot of people feel that they can talk just intelligently about the death penalty and debate it over the water cooler at work or on a radio show or on a TV show.

But when the question is put to you, as I'm trying to do here, where you are in a position to where, if the law allows it and the facts justify it, you would have to make a decision that affects another man's life, it takes it from this sort of water cooler discussion into real life.  And some people say, "In theory, I'm in favor of it and I can debate the pros and cons and make a good argument in favor of it.  But when it comes down to it, I personally don't feel that I should be involved in that process, because it's a heavy decision, it's a weighty decision, and I just personally am not comfortable with it."

VENIREPERSON CHAMBERS:  I'm certainly uncomfortable with it.  I believe when coming down to it, I think I could.

MR. O'CONNOR:  I'm sorry?

VENIREPERSON BROOME:  I'm not really comfortable with it.

MR. O'CONNOR:  Right.

U.S. DISTRICT COURT

**Ex. 63 - 943**

BROOME - Strickland                    VOL II, 86

were, God forbid, on trial for a capital offense that you would rather have a death sentence than to serve your whole life incarcerated.

That's one of those personal opinions that you would have to be able to set aside as you made your decision in the case. You would have to make your decision based upon the law and upon the evidence and not be influenced by what you would rather have happen to you should you be the one on trial.  Do you think you can do that?

VENIREPERSON BROOME:  Yes.

MR. STRICKLAND:  Are there any questions about this process that has been described now by the judge and by the government and by us up to this point?  Any questions about how we go about doing this?

VENIREPERSON BROOME:  No.

MR. STRICKLAND:  Does it seem particularly cumbersome and complex to get from point A to point B on this?

VENIREPERSON BROOME:  Uh-huh.

MR. STRICKLAND:  Actually, it's not point B.  I guess it's more from point A to point Z.

VENIREPERSON BROOME:  Yes.

MR. STRICKLAND:  Do you think that that's good, that the law puts so many hurdles in the path of the death penalty?

VENIREPERSON BROOME:  Yes.

MR. STRICKLAND:  Thank you, sir.

U.S. DISTRICT COURT



III, 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA . CRIMINAL ACTION NO.
. 4:00-CR-260-Y
VS. .
.
JULIUS OMAR ROBINSON (02) . February 6, 2002
. 9:07 a.m.
. . . . . . . . . . . .

VOLUME III
TRANSCRIPT OF PROCEEDINGS
(Individual Voir Dire)
BEFORE THE HONORABLE TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States:    Mr. Frederick M. Schattman
                          Mr. Reed C. O'Connor
                          Assistant United States Attorney
                          801 Cherry Street, Suite 1700
                          Fort Worth, Texas   76102
                          (817) 252-5200

For Defendant Robinson:   Mr. Wes Ball
                          Ball & Hase
                          4025 Woodland Park Blvd., Suite 100
                          Arlington, Texas   76013
                          (817) 860-5000

                          Mr. Jack V. Strickland
                          Attorney at Law
                          909 Throckmorton Street
                          Fort Worth, Texas   76102
                          (817) 338-1000

Official Court Reporter:  Eileen M. Brewer
                          424 United States Courthouse
ORIGINAL                  501 West Tenth Street
                          Fort Worth, Texas   76102-3637
                          (817) 334-0104

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

U.S. DISTRICT COURT

agreement that you're correct. It's probably best you not serve on this jury. We appreciate very much your coming down here on Monday and returning here on Wednesday. And we would ask you, then, in the future there will be a case sometime you can serve on, and we need people who are responsible like yourself who are willing to serve on juries in criminal and civil cases. So with our expression of appreciation, we'll allow you to go back about your business.

VENIREPERSON HICKS: Thank you.

THE COURT: Thank you.

VENIREPERSON HICKS: Sorry, but I can't.

MR. O'CONNOR: Thank you for your honesty.

THE COURT: No, you don't need to apologize. We understand completely.

(Ms. Hicks leaves courtroom, 9:26 a.m.)

MR. O'CONNOR: The government would move for cause.

THE COURT: The government has moved to strike for cause. Hearing no objection -- Am I correct, no objection?

MR. BALL: Yes, Your Honor.

THE COURT: Mary Young Hicks, No. 13, is removed for cause.

We'll hear, then, from Herbert Gossett.

(Mr. Gossett enters courtroom, 9:27 a.m.)

THE COURT: Good morning, Mr. Gossett. How are you, sir?

MR. STRICKLAND: Are you willing to reserve judgment until all of the evidence is in and until you're instructed by the Court and until you can begin your deliberations with your fellow jurors?

VENIREPERSON CHATHAM: Yes, sir.

MR. STRICKLAND: That's an important aspect, too, I would submit to you. You know, a natural inclination is that we make judgments, perhaps snap judgments, and we sometimes form impressions of people just how they look, for instance. But as a juror you have to be willing to be patient, and sometimes real patient, as you probably already are learning.

VENIREPERSON CHATHAM: Yes, sir.

MR. STRICKLAND: And reserve judgment until all of the facts are in, until the case is shut down, if you will, where then you have all of those facts to make your decision upon. You think you can do that?

VENIREPERSON CHATHAM: Yes, sir.

MR. STRICKLAND: You indicated in your questionnaire -- I hope this isn't putting you on the spot -- that some of the questions in this rather lengthy questionnaire made you a bit uncomfortable. Is it going to make you uncomfortable if I ask you which questions made you uncomfortable?

VENIREPERSON CHATHAM: No. Toward the front of it, it asked to list your children and stepchildren. Of course, I have a stepson that's in prison, and I didn't really feel like

thing as a wrong answer here. Nobody is trying to pin you down to one thing or another. We just need to try to get to know you a little better, to do our job, both myself and Mr. O'Connor, and Mr. Ball and Mr. Strickland.

And I guess probably the easiest thing for us to do is kind of listen to you for a while if you don't mind. Would you just give me, you know, in your own words, your sense and outlook about the death penalty.

VENIREPERSON BOULET: The death penalty. (Pause.) To me it serves a purpose. If a person is, you know, in my opinion they are guilty of this, to which I have to be, you know, you have to prove it to me with the evidence. You have to prove to me they're guilty of it, I have no problem with it. To me growing up it was a deterrent. I don't want to get in trouble.

MR. SCHATTMAN: Okay. I notice -- And, again, let me just say that, you know, there are some very personal things that are asked about in this questionnaire, that these are confidential. This is not something that gets published or spread around, but I noticed that in your answers, you know, you, your family, had suffered a loss. I believe it was your cousin.

VENIREPERSON BOULET: Many years ago.

MR. SCHATTMAN: All right. And can you just give us an idea of what -- I believe you said he was murdered or

stabbed.  Can you tell us what you remember about all that.

VENIREPERSON BOULET:  He had an ex-girlfriend who she was older than him and didn't want the relationship to end. And he had broke up with her and moved on and she didn't like it and he came home from work one night and she was in the dark house and when he turned the corner to the bedroom, she stabbed him repeatedly.  When she stabbed him repeatedly, she just left him to die and left.  And they found him the next day because he didn't come to work, and he was in a pool of blood already dead.  They had a trial and I think she only got a couple of years for it.

MR. SCHATTMAN:  And, roughly, how old were you when that happened?

VENIREPERSON BOULET:  That happened when I was about 25.

MR. SCHATTMAN:  Okay.  And did that incident -- Of course, no one can ask you to forget that.  But did that incident in any way shape your -- does it in any way shape or contribute to your views about the death penalty?

VENIREPERSON BOULET:  No.

MR. SCHATTMAN:  Okay.  Would you be able to set that incident out of your mind in deciding this case?

VENIREPERSON BOULET:  No problem there.

MR. SCHATTMAN:  All right.  Is there a -- Let me ask you:  Did you have a sense that the punishment that the woman

BOULET - Schattman                    VOL III, 73

received was -- Well, let's start with, was too harsh, just about right, too lenient?

VENIREPERSON BOULET:  In that case, it was too lenient.

MR. SCHATTMAN:  There are a couple of other things that I noticed in reviewing your questionnaire.  One is that -- and I apologize if I've got you confused with somebody else, but you have, it appears, recently gone from being an assistant manager at one place to running the deli restaurant at another?

VENIREPERSON BOULET:  (Nods head.)

MR. SCHATTMAN:  Is that --

VENIREPERSON BOULET:  Yes.

MR. SCHATTMAN:  Okay.  And you had eleven and a half years at --

VENIREPERSON BOULET:  At two of the jobs I managed in.  Then I left one job because of -- there was some things going on that I had problems with.  The manager of the shift, they were borrowing money from the store safe.  And we got paid on a weekly basis and they would borrow money to pay that and put it back.  But meanwhile corporate was coming up from San Antonio, and corporate could come in and they could open the safe up, and the money wasn't in there.  And it was scaring me. I didn't want to be the one to get hung.  That's not happening.

And I've never had -- in my other job before that I never had any problem, all the years with cash or anything.  And the

BOULET - Schattman                    VOL III, 74

safe is short.  And I'm going, like, they set me up to be the one here when they come in to ask for the amount of money, and I can't do that.

MR. SCHATTMAN:  All right.

VENIREPERSON BOULET:  I couldn't take the fall for that.  I couldn't deal with that.  I had problems with that, so I left that job.

MR. SCHATTMAN:  All right.  That's when you went to work at -- you got the job at Kroger's.

VENIREPERSON BOULET:  Right.

MR. SCHATTMAN:  I also noticed that you seem to like basketball.

VENIREPERSON BOULET:  Major fan.

MR. SCHATTMAN:  Okay.

VENIREPERSON BOULET:  Went to double overtime the other night.  Major fan.  Seventeen-year commitment.  Major fan.  I feel like I own a part of that team, okay?  In certain ways I think they should give me my money back.

THE COURT:  So you like Mark Cuban?

VENIREPERSON BOULET:  I love Mark Cuban.  I think he's fresh.

THE COURT:  Did you go out to the Dairy Queen?

VENIREPERSON BOULET:  You know, if I could have found out where it was I would have went, but when I saw the news and I saw the line, no.  I didn't want to drive to it, either.  I

U.S. DISTRICT COURT

**Ex. 63 - 951**

said that's too far out.

THE COURT: Okay.

MR. SCHATTMAN: And I may be displaying my ignorance here, but among the people that you mention that you admired was -- and it may be just a copying problem or something, but I couldn't tell whether it said Mr. Phil or Dr. Phil.

VENIREPERSON BOULET: Doctor Phil.

THE COURT: You don't watch Oprah?

VENIREPERSON BOULET: He's on every Tuesday.

MR. SCHATTMAN: Tuesday, okay. All right. Well, Ms. Winfrey, apparently, her show isn't on the air, at least during the times that the government wants me to work -- or it apparently is while I am at work.

You heard Judge Means explain the process in the case, and I was actually interested to note that in your questionnaire you indicated that you want to serve as a juror in this case.

VENIREPERSON BOULET: Yeah, I'd like to. To me, it's a learning experience. You learn more. By exposing yourself to this stuff, you learn.

MR. SCHATTMAN: Is there -- You heard the judge describe the process.

VENIREPERSON BOULET: Yes.

MR. SCHATTMAN: And you understand that there are only certain crimes that the death penalty can be considered and that there's nothing automatic about any of this, that this

Just in general terms, do you see what I'm really trying to ask you, is there is a difference in having feelings on the death penalty and having views on the death penalty and its role as a punishment in society. There's a difference in that -- with that view versus being asked to personally participate in an endeavor where the ultimate result in a capital case may be that a person is executed.

And that's really kind of what we're getting at here today -- with everybody, not just -- You're not singled out, I want you to understand. And that's what I'm asking you about. How do you feel about that?

VENIREPERSON MILLS: I think it would bother me a great deal; however, I think there are situations that it's necessary.

MR. O'CONNOR: And do you think you could personally participate in a process where if the law allowed it, as the judge outlined on Monday and the facts justified it, do you feel like you could do that?

VENIREPERSON MILLS: Yes.

MR. O'CONNOR: Okay. Let me talk to you a little bit about -- Since you brought up the process on Monday, let's go through that just for a minute. Do you understand that you would never be asked in any criminal case to decide punishment of any kind unless the government has initially proven a defendant guilty of the crimes charged beyond a reasonable

Ex. 63 - 953

would be called upon to deliberate and to determine what you feel would be the right and appropriate sentence. Do you feel like you could go through that process?

VENIREPERSON MILLS: Yes, yes.

MR. O'CONNOR: And do that sort of deliberating, even in absence of mitigating factors. Yes?

VENIREPERSON MILLS: I believe so, yes.

MR. O'CONNOR: Okay. You mentioned in one of your questions that you felt like you would have a difficult time sentencing a person to death -- to the death sentence, and I don't know if that was in connection with the alternatives, do you feel life without parole is a better option than the death sentence, or if it was just asked that way to you. How do you feel about either one of those concepts? The concept of life without parole or without the possibility of release and how it would apply to your decision making? Are you automatically going to favor life without parole over the death sentence?

VENIREPERSON MILLS: I don't think so. I think what I was thinking of there is just my personal feeling, that it would be -- I think it's something that I could do but I think it would be something that would be very difficult. It would be something, I think, that I would probably think about afterward for, you know, a period of time. But it would be something that would bother me; that it was maybe something that was necessary that I felt I had to do but that it was very

U.S. DISTRICT COURT

**Ex. 63 - 954**

MILLS - Strickland                    VOL III, 148

MR. STRICKLAND: I think the general feeling is likely to be that it's certainly much more cumbersome and much more deliberate than probably most people believe coming into the courthouse.

VENIREPERSON MILLS: Yes.

MR. STRICKLAND: I think that it's clear that the law does not contemplate that jurors make a decision that, after all, could result in the death of someone casually or frivolously or without many, many safeguards being built into the system. You have to go through this whole routine, and at any step along the way, I think you can agree with me, it may be possible to take sort of an off-ramp out of the process and make a decision which will result in a life sentence without parole or without release rather than the death penalty alternative.

VENIREPERSON MILLS: Yes.

MR. STRICKLAND: Now, you clearly have reservations about the seriousness of this whole matter.

VENIREPERSON MILLS: I have -- I think my reservations are more of a personal feeling, that the thought of being responsible for someone's death is something that would not be an easy decision for me. But I think that I could do it. I think if it were necessary to make that decision, then I could do it.

MR. STRICKLAND: All right. Let me address that with

U. S. DISTRICT COURT

# EXHIBIT 64



DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG - 9 2002

CLERK, U.S. DISTRICT COURT
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA    .    CRIMINAL ACTION NO.
                            .    4:00-CR-260-Y
VS.                         .
                            .
JULIUS OMAR ROBINSON  (02)  .    February 7, 2002
                            .    9:21 a.m.
. . . . . . . . . . . .

VOLUME IV
TRANSCRIPT OF PROCEEDINGS
(Individual Voir Dire)
BEFORE THE HONORABLE TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States:       Mr. Frederick M. Schattman
                             Mr. Paul Gartner
                             Assistant United States Attorney
                             801 Cherry Street, Suite 1700
                             Fort Worth, Texas   76102
                             (817) 252-5200

For Defendant Robinson:      Mr. Wes Ball
                             Ball & Hase
                             4025 Woodland Park Blvd., Suite 100
                             Arlington, Texas   76013
                             (817) 860-5000

                             Mr. Jack V. Strickland
                             Attorney at Law
                             909 Throckmorton Street
                             Fort Worth, Texas   76102
                             (817) 338-1000

Official Court Reporter:     Eileen M. Brewer
                             424 United States Courthouse
                             501 West Tenth Street
                             Fort Worth, Texas   76102-3637
                             (817) 334-0104

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

U.S. DISTRICT COURT

There's something a little artificial about it because we're not even at that stage of the proceedings, and by no means has anyone, either the government, the defendant, or the Court, made any predetermination of the guilt of the defendant. You understand that he is presumed innocent as he sits here, and it's going to be our job to prove his guilt of the crimes beyond a reasonable doubt.

VENIREPERSON TRIBOUT:  I do indeed.

MR. SCHATTMAN:  All right.  And I want to talk for -- Actually, I want to let you talk for just a minute about your general views about the death penalty, since that is one of the more important things that we have to talk about.  So if you don't mind, if you would just kind of tell us in general terms what your own personal feelings are concerning the death penalty.

VENIREPERSON TRIBOUT:  I'm very sorry it has to exist.  I'm sorry that there is -- seems like throughout history that there's ever been a need for such a thing.  But I'm not opposed to it.  I think it's hard to say you're for it. I mean, I certainly -- that's not my feeling at all, but I can certainly say I'm not opposed to it.  I just think it's got to be done amazingly carefully.

MR. SCHATTMAN:  Well, I think you may have gotten a sense from Judge Means' explanation, you know, just how careful this process is, and that there is nothing automatic at any

has to exist.  What is the purpose that you see behind the necessity to have it?

VENIREPERSON TRIBOUT:  Well, I think you worded it rather well.  I'm not sure I can do better than that, but I agree with you.  If a person -- to me, nobody has the right to be a danger to other human beings.  Whether you say prison guard, people on the street, whatever, to me if a person is a true -- I'm trying to think of a better word than predator.  I wish I could think of a better word than that, but I think that person, you know, if the world is truly a better place without them and the process can be as sure as things can be as human beings can be on this planet, then I'm not opposed to it.  Again, I have hard trouble saying I'm for it.

MR. BALL:  Sure.

VENIREPERSON TRIBOUT:  It struck me as a hard thing to say you're for that, but I think the right way to say it is I'm not against it.

MR. BALL:  One of the things in the process that was described to you by Judge Means is that after the government -- if the government proves the person guilty of a capital crime and then they prove that threshold factor concerning the defendant's intent or role in the offense, and then if they prove an aggravating factor, or more than one -- An example was a crime was especially heinous or cruel.  Another one might be that a person is a future danger to society.

before you can even consider a sentence of death.

And even if you find in favor of the government on questions about intent and aggravating factors, and even if there's no evidence of a mitigating factor or you simply don't believe any of the evidence that you've heard on any mitigating factor, that even then you are required to weigh and consider, as the judge described, whether those aggravating circumstances are sufficient to justify a sentence of death.

So there's nothing automatic. No one answer leads or compels the next answer or compels the solution until, really, the very end. Do you have any problem with that procedure?

VENIREPERSON BANSER: No.

MR. SCHATTMAN: Okay. Now, I noticed that among your answers to this little questionnaire, that one of the questions asked if, and it's one of those that's directed down toward the very end, that if you were at that very end of the process and if your choices were a sentence of life without parole or life without release, whatever phrase you want to use, meaning that the defendant will be incarcerated until the day he dies under the law, the day of God's choosing, or a sentence of death, that is, on a day of the government's choosing the defendant will die, that you would always say on a day of God's choosing, not the government's, that a life sentence is always appropriate. And, please, I don't want to put words in your mouth.

BANSER - Schattman          VOL IV, 110

VENIREPERSON BANSER:  Right.

MR. SCHATTMAN:  But that's the sense I got.  Am I mistaken?

VENIREPERSON BANSER:  I felt that it's -- it's a hard question to answer, really, because to me, as a Christian, you know, to impose the death sentence on someone it has to be a very, you know -- that's a decision that you have to carry with you for the rest of your life, because you're the one who will impose the sentence to take someone else's life away from them.  And, you know, not only you have to -- I was thinking, gosh, that's not only him or that person, but also their family and someone they care about.

But then, on the other hand, you're thinking of the victim and their families.  And to me, I feel that there's never any -- you know, I feel that there are some people who do not belong with us, who have justified being given the death sentence.  And, you know, you go back to the Ted Bundy, the serial murderers and killers, that they had a taste for it and they're never going to change their way of thinking.

So to me I have to weigh that against, you know, is a person able to change the way they're thinking.  Is there hope for a person to ever, you know, change their way of thinking, to ever become a person that would be, you know, that society would want them back.  That could do good things, or would that person always be out, you know, if they were released would

U.S. DISTRICT COURT

Ex. 64 - 960

discussing the case with anyone and not following any media coverage. And one other thing, I'm sure my daughter will want me to tell you hello.

VENIREPERSON JOHNSON: Tell her I said hello.

THE COURT: Okay. Thank you.

MS. JOHNSON: Thank you.

(Ms. Johnson leaves courtroom, 2:40 p.m.)

MR. SCHATTMAN: Your Honor, may it please the Court, the government would challenge the Venireman No. 34, Frankie Vanzetta Johnson, for cause.

MR. STRICKLAND: Your Honor, we have no objections and for the further reason, of course, that's developed in both the questionnaire and the oral testimony from this lady of her status as a crime victim gives us great concern, regardless of her best intentions to be fair and impartial to the defense. The death penalty is not the only issue to be resolved in this case, clearly; and we believe that her loss last year and the circumstances of that loss might well translate into impartiality contrary to the best interests of the defendant at the first stage of this trial.

THE COURT: Thank you. The government's motion to strike is granted.

Next is Dean Byler.

(Mr. Byler enters courtroom, 2:41 p.m.)

THE COURT: Good afternoon, Mr. Byler. How are you,

believe that if you are killing -- if you happen to kill someone in self-defense and in war, those are killings of adults, okay?  That's the kind -- that's the best example I can give you.

THE COURT:  Okay.  I think it's time for the defense.

MR. SCHATTMAN:  Yes, sir.

MR. STRICKLAND:  May I proceed, Your Honor?

THE COURT:  Yes.

MR. STRICKLAND:  Ms. DeBose, my name is Jack Strickland.  Wes Ball and I represent Mr. Robinson in this case.  And I'm not going to take much more of your time here this afternoon.  In the first place, it's the first nice day we've had for a while.  Let's hope you can enjoy some of the remainder of it.

I think it's clear to you, but I want to make sure that it's clear to you that the death penalty is an extraordinary remedy that's reserved for extraordinary cases.  Would you agree with that proposition?

VENIREPERSON DEBOSE:  I'll agree with that.

MR. STRICKLAND:  And that's the way it should be.

VENIREPERSON DEBOSE:  I'll agree that the death penalty is very serious and it should not be used just frivolous.

MR. STRICKLAND:  And in order for the death penalty to be imposed in a case, number one, the law has to provide for

other.

MR. SCHATTMAN:  Yes, sir.

THE COURT:  Didn't do much today.

MR. SCHATTMAN:  Five the first day, two the second, two the third.

THE COURT:  This group was as strong as the first group easy.  Y'all let some of the first group through.

Okay.  Does the government have any objections to the strikes that have been exercised by the defendant?

MR. SCHATTMAN:  No, Your Honor.

THE COURT:  Does the defendant have any objections to the strikes that have been exercised by the government?

MR. BALL:  Yes, Your Honor, we do.  With regard to Juror No. 36, Dorothy Prescott DeBose, it certainly -- Well, I think the questionnaire reflects it and ask the Court to take notice that she is a member of the black race.  The defendant, Julius Omar Robinson, is a member of the black race.  And by count when the jury was originally impaneled -- I haven't gone through all the sheets -- the representatives of the black race on this entire panel, although we had quite a few up at the front end, is approximately 7 percent of the panel.

We would submit that under *Batson versus Kentucky* and its progeny of cases that a *prima facie* case is made that this is a race-based strike.  Ms. DeBose did not provide any answers indicating an unwillingness to follow and apply the law as

written by Congress.  Nor was there anything else that we could observe in her background of nursing and -- was a government employee for 18 years, a long-time resident of this jurisdiction, well-educated, a spouse with military service, a church goer, a person of moderate political philosophy.

And the long and short of it is there is not any reason, other than race-based that we can observe, from her questionnaire and her answers for striking her, and we would ask that the Court disallow the strike and seat Ms. DeBose as a juror.  She is certainly acceptable to the defendant.

THE COURT:  The defendant may or may not have presented a *prima facie* case suggesting a prohibited motive for the striking of Dorothy Prescott DeBose, No. 36.  Assuming that it has, though, does the government wish to come forward with a a neutral explanation for its striking of that juror -- of that venireperson?

MR. SCHATTMAN:  Yes, Your Honor.  As indicated by Ms. DeBose in her answers to questions, Ms. DeBose is known to members of my family.  I've had, over the course of the years, conversations and have had occasion under circumstances to gain by, for lack of a better phrase, "reputation information" concerning Ms. DeBose.

I would also tell the Court that as an Assistant United States Attorney I have had occasion to review the cases that involved both Ms. DeBose's brother and her spouse for drug

offenses and which is mentioned at -- I believe page 14 in Question No. 73 of Ms. DeBose's questionnaire. And based upon that information, I felt that in this case a woman who has had that experience, who would be of an age, if you will, to be of the same age as perhaps Mr. Robinson's mother, would be that -- I felt that Ms. DeBose would not be a juror acceptable to the state in this kind of a case under these particular circumstances.

THE COURT: So you've looked at those files. Is there anything in those files that would cause you to be concerned about her ability to serve?

MR. SCHATTMAN: Nothing that would implicate Ms. DeBose, Your Honor, and I have only a vague recollection that in my early days in this office when I was looking at -- I believe it was Luster, who was the first name, DeBose, there was a previous conviction. And there was an application for writ of habeas corpus, as I recall. I have only the vaguest of recollection, talking to someone about that case with claims, and I do not recall whether it was Ms. DeBose or a child or a brother, but it was some relative of the defendant DeBose. And so I have some familiarity with, you know, the fact of the convictions and the fact that it was an investigation into drug dealing activities in the Como community where this lady has lived for all of her life. And I just have concerns about this woman sitting as a juror on this kind of a case.

Ex. 64 - 965

THE COURT: Well, but articulate for me what that concern is. I mean, what is the -- what's the fear that would make her impaired?

MR. SCHATTMAN: Your Honor, I think that there is a fact that this woman has had both a spouse and a brother that have had involvement in drug dealing activities, at least something that would give any prosecutor cause. I'm not --

THE COURT: Do you remember the charge on her husband?

MR. SCHATTMAN: Judge, what I recall about the cases is that they were -- there were -- I cannot remember whether it was heroin or cocaine. Most of the -- there were a series of cases that were made by the Drug Enforcement Administration.

THE COURT: So it was federal?

MR. SCHATTMAN: Yes, sir.

THE COURT: Was her husband actually charged and tried and convicted?

MR. SCHATTMAN: Charged and I believe pled guilty and was convicted. I believe it was in front of Judge Belew.

THE COURT: Did he serve time?

MR. SCHATTMAN: I believe that he did, Your Honor. I don't remember -- I don't remember it being a terribly extensive sentence. But my recollection is that it was, you know, seeing, looking at, a case involving Luster DeBose that had been handled by, I believe, then Assistant United States

Attorney Sheehan, and I believe that the case was handled in front of Judge Belew is my recollection.

MR. GARTNER:  Can we have another minute, Your Honor?

THE COURT:  Yes.

(Government counsel confer.)

MR. SCHATTMAN:  Your Honor, I think the government also had a general feeling that Ms. DeBose expressed what I perceived as a reluctance regarding the death penalty, and although people ought to, in fact, be skeptical and we don't -- no one should have, you know, great enthusiasm for it.  I detected both in her answers and in her demeanor a reluctance to a degree that made me uncomfortable.  I don't know any other way to say it.

THE COURT:  Is there a reply?

MR. BALL:  Yes, Your Honor.  With regard to some of the matters related to the Court by Mr. Schattman, we're not in a position to have records, at least this afternoon, to even rebut.  I would point out to the Court that I'm not necessarily convinced, and maybe Mr. Schattman has information to the contrary, that the brother or husband are the same DeBoses that are involved in the DEA cases or investigations, because no inquiry was --

THE COURT:  I don't think it has to be.  I think if the government in good faith believes those facts to be true, I think, as it stated, a satisfactory basis for exercising a

peremptory challenge. It is, after all, peremptory.

MR. BALL: Yes, sir. And I would certainly hope that their belief would be in good faith, but it certainly is at least an observation of mine, they didn't ask is your brother, you know, are you related in any way to Luster DeBose, which is a name that rings familiar to me. And, in fact, I may have represented Mr. DeBose in a matter before a federal grand jury, I think, but --

THE COURT: Doesn't she state the name of her husband?

MR. BALL: Well, if she does, then I stand -- Is he listed here? Okay. He is -- it says retired management. Okay. No, I don't know.

Additionally, Your Honor, some information she provided with us in her questionnaire that I think flies in the face of the government's concerns is she is a member -- she or her spouse is a member of a neighborhood watch organization called Citizen On Patrol. She is a member of the Neighborhood Advisory Council, the Lake Como Area Council. She has a relative --

THE COURT: Well, that would all go to the question of whether the government ought to exercise its challenge and not whether it may.

MR. BALL: Well, Judge, I think circumstances that if you have individuals -- and without going through all the questionnaires this afternoon, I think we may have had other

individuals with family members that might have had some difficulties with the law. I think the proper way to look at this is to look at the whole picture, and I'm just pointing out some things that jump out at me that indicate that this lady is not opposed to -- If the reason is she's got some ax to grind with law enforcement or with prosecution --

THE COURT: If you can find another husband who has been convicted in federal court of a drug trafficking crime --

MR. BALL: I'm not sure I can.

THE COURT: -- and a person who is not African-American who has not been stricken by the government, then we'll revisit it.

MR. BALL: Certainly. And the other thing I'm not in a position to respond to, Your Honor, is Mr. Schattman made some -- something and I don't know if it all had to do with Luster DeBose and the matters we've already discussed about knowing something about her family or her reputation or something. It was just kind of left at that. I don't know what that is. What was the bad thing about her?

THE COURT: Well, I'm not going to get into that because Mr. Schattman has expressed in the -- by stating his belief based on his recollection of a prior involvement of Ms. DeBose's husband in a federal conviction for drug trafficking, that's certainly sufficient for him to have exercised that challenge. So the defendant's objection to the

Ex. 64 - 969

government's exercise of the peremptory challenge as to Ms. DeBose is overruled.

So we're down to nine. Now you're all looking to me about tomorrow. Let's just take a recess for a few minutes and I'll get back to you with tomorrow and next week.

(Court in recess, 4:02 p.m. until 4:11 p.m.)

THE COURT: Okay. Let me ask you a question or two. This doesn't need to be on the record, Eileen. Thank you.

(Off-record discussion.)

(Proceedings concluded for the day, 4:11 p.m.)

-oOo-

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that the transcript fees format comply with the those prescribed by the Court and the Judicial Conference of the United States.

_____          August 9, 2002
Eileen M. Brewer                          Date
Official Court Reporter
Texas CSR No. 3016

U.S. DISTRICT COURT

# EXHIBIT 65

Vol. 7: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA   .  CRIMINAL ACTION NO.
                             .   4:00-CR-260-Y

V.                      .

                          .   Fort Worth, Texas

JULIUS OMAR ROBINSON     .  February 14, 2002

. . . . . . . . . . . . . . .

VOLUME 7
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.

APPEARANCES:

For the Government:         MR. FREDERICK M. SCHATTMAN
                            MR. REED C. O'CONNOR
                            Assistant United States Attorney
                            801 Cherry Street, Suite 1700
                            Fort Worth, Texas   76102-6897
                            (817) 252-5200

For the Defendant:          MR. WES BALL
                            Ball & Hase, PC
                            4025 Woodland Park Boulevard
                            Suite 100
                            Fort Worth, Texas   76013
                            (817) 860-5000

                            MR. JACK STRICKLAND
                            Attorney at Law
                            909 Throckmorton
                            Fort Worth, Texas   76102
                            (817) 338-1000

Court Reporter:             Ana P. Warren
                            U.S. District Court Reporter
                            501 W. 10th Street, Room 201
                            Fort Worth, Texas   76102-3637
                            (817) 850-6681

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COU

**COPY**

Ex. 65 - 971

Vol. 7:  61

THE COURT:  What's not right?

MS. HALL:  To have a sentence of death.  I don't even consider it as an option.

THE COURT:  Okay.  Thank you very much.  We appreciate your being here this morning.  We will ask you to continue to follow the instructions that you not discuss the case with anyone and not follow any media coverage.  We'll let you know in the morning as to whether we'll ask you to serve.

MS. HALL:  Okay.

THE COURT:  Thank you very much.

(Ms. Hall, Juror Number 64, excused at this time)

THE COURT:  Yes, sir.

MR. SCHATTMAN:  Your Honor, the government would challenge the venireman, Carnesia Hall.  We believe she's shown herself to be disqualified and unable to give fair consideration to the imposition of the death penalty in the appropriate case.

THE COURT:  Yes, sir.

MR. BALL:  Your Honor, we would take a contrary view and submit that Ms. Hall is qualified.  Certainly, her answer is equivocated and were on both sides of the spectrum.  But she said -- I think the long and short of it is, she doesn't like the death penalty, but if it was in a proper circumstance -- at least that's the answer she gave me two or three times, even though she gave some different answers -- that she could do it,

U.S. DISTRICT COURT

**Ex. 65 - 972**

Vol. 7:  62

and we submit she's qualified and would, I guess, object to the --

THE COURT:  Well, I tried to rescue her myself, and by adding on the additional layer of, if you were instructed by the Court to follow the law, she equivocated there as well.  So I have no choice, I believe, but to grant the government's motion.

MR. BALL:  Then with due respect, note our exception to the government's ruling.

THE COURT:  Okay.

(Mr. Ziebold, Juror Number 65, present)

THE COURT:  Good morning, Mr. Ziebold.  How are you, sir?

MS. HALL:  Fine.

THE COURT:  Have a seat, please.

Mr. Ziebold, did you have an opportunity to review the three-page summary that we had laid out for you upstairs?

MR. ZIEBOLD:  Yes, I did.

THE COURT:  Did you understand it?

MR. ZIEBOLD:  Yes.

THE COURT:  Did you have any questions about it?

MR. ZIEBOLD:  No.

THE COURT:  Then I'll allow the government to begin your questioning.

MR. O'CONNOR:  Good morning.  My name is Reed

Ex. 65 - 973

Vol. 7:  70

further reflection their views mature when it looks like they may be one of those people in the jury.  And I don't mean -- when I say mature, I suppose -- I don't mean growing up, but you become more focused.

MS. BROADWELL:  Right.

MR. SCHATTMAN:  Can you just tell me how you feel about the death penalty as a possible punishment?

MS. BROADWELL:  I personally do believe in the death penalty.  I questioned myself a lot over the last week about whether or not I could impose that on someone, but I also believe that if you're making the decision whether they are guilty or not, that you should also be prepared to accept the responsibility or the circumstances, what comes of that.  It should all be taken just as seriously.  If you can do one, you can make the other decision, also.

MR. SCHATTMAN:  Well, let me try to boil it down to --

MS. BROADWELL:  How do I just feel about it?

MR. SCHATTMAN:  Well, this is the real gut question that everybody has to resolve themselves.

Assume for me, if you will, that you and your fellow jurors have found the defendant guilty beyond a reasonable doubt, and assume for me, if you will, that you have heard all of the evidence at a punishment hearing.  And assume for me that you have found beyond a reasonable doubt that factor of intent that the judge speaks about in his instruction, premeditated?

U.S. DISTRICT COURT

**Ex. 65 - 974**

Vol. 7: 71

MS. BROADWELL: Okay.

MR. SCHATTMAN: That you have found an aggravating circumstance, maybe more than one aggravating circumstance, that you have come to the conclusion that the aggravating circumstances substantially outweighs any mitigating evidence. And, of course, the defendant has the burden of proof on mitigating evidence.

If you come down to the very end of the process and it is time for your personal decision, you one day -- your personal decision?

MS. BROADWELL: Yes.

MR. SCHATTMAN: And you have come to the conclusion that the law allows, the facts justify, consideration at the penalty phase.

MS. BROADWELL: Yes.

MR. SCHATTMAN: And that is -- and your choices are life without parole or without the possibility of release, which means that this man one day will die in a penitentiary cell on the day that God chooses, or that this man one day will die in a penitentiary cell in an execution chamber on a day that the government chooses.

There are some people who, because of their sense of faith, justice, or mercy, would simply say, let God do it. How does Brenda Broadwell feel?

MS. BROADWELL: If I believed all the facts were

**Ex. 65 - 975**

Vol. 7:  72

there, I would not have a problem making that decision, making that choice.

MR. SCHATTMAN:  And the reason I went through that with you is that in your questionnaire, you had indicated that if it came down to that last moment, that you had a choice between life without parole or death, that you could not impose -- you know, your answer indicated that you could not impose a death sentence?

MS. BROADWELL:  I don't recall that.  No.  That's --.

MR. SCHATTMAN:  I take it -- I'm sorry, ma'am.  I apologize to you.  I just looked at -- did all of this stuff based on something else.

MS. BROADWELL:  Okay.

MR. SCHATTMAN:  We're not as smart as we sometimes think we are.

Now, I'm going to ask you about something else, and I don't mean to -- we're not trying to pry or embarrass you or speak inappropriately.

MS. BROADWELL:  I know, but you will.

MR. SCHATTMAN:  That's right.  It may be intentional on our part, but it's not malicious.

MS. BROADWELL:  I understand.

MR. SCHATTMAN:  You've indicated that you had a most unfortunate circumstance when you were about 14 years old?

MS. BROADWELL:  Uh-huh.

Ex. 65 - 976

Vol. 7:  73

MR. SCHATTMAN:  I think your words were that you were molested?

MS. BROADWELL:  Yes, but we all know.

MR. SCHATTMAN:  Let me ask you.  Do you think that your experience is going to carry forward to or affect your ability to be completely fair and impartial to this defendant in this case?

MS. BROADWELL:  I don't think it will have anything to do with my judgment in this case.  I've gone back and closed the book on that.

MR. SCHATTMAN:  There was a question asked about whether or not you wanted to serve on this jury.  And --

MS. BROADWELL:  I think we're getting to the last few pages.

MR. SCHATTMAN:  It's down there towards the end.  You notice we never did ask you, are you tired of filling out the form.  But your answer was, yes, and then you say natural, competitive nature.  If I'm not, I'll wonder why.  Plus, it gives me real courtroom experience, and I think it will be interesting.

MS. BROADWELL:  Right.

MR. SCHATTMAN:  Do you still feel that way?

MS. BROADWELL:  I don't feel competitive about it any more.  I still think it's my duty.  I vote.  I go to jury duty when I'm called.  I think it's my responsibility, but I no

U.S. DISTRICT COURT

**Ex. 65 - 977**

Vol. 7: 74

longer feel that competitive nature any more.

MR. SCHATTMAN: Your Honor, that's all the questions I have of Ms. Broadwell.

THE COURT: I'm sorry. I've got to take a break, and I know you need to leave. This may be the appropriate time to make your appointment, but I've got to take about a five minute break to sign some stuff that has to be signed right now.

MR. STRICKLAND: Okay.

THE COURT: We'll take about a five minute break. You can stretch your legs if you like.

(Trial recesses, 11:00 - 11:25 a.m. Ms. Broadwell not present)

MR. SCHATTMAN: We advised the defendant that the government intends to exercise a peremptory challenge against Ms. Broadwell. So we can --

(Ms. Broadwell present)

THE COURT: Ms. Broadwell, we decided that you have answered our questions so well that we don't need to ask you any more. So you're free to go. We appreciate it. And we'll ask you to just remember all the instructions we've previously given you about not discussing the case, and we'll let you know in the morning.

MS. BROADWELL: Okay.

THE COURT: Thank you.

(Ms. Broadwell, Juror Number 66, excused at this time)

Ex. 65 - 978

Vol. 7:  75

MR. SCHATTMAN:  Your Honor, for the record, the government would exercise one of its peremptory challenges against venireman, Brenda Broadwell, Number 66.

THE COURT:  And I show that as your 13th peremptory challenge.

So we're ready for Patricia Brown.

MR. SCHATTMAN:  Yes, sir.

MR. BALL:  Yes.

(Ms. Brown, Juror Number 67, present)

THE COURT:  Good morning, Ms. Brown.  How are you?

MS. BROWN:  Good morning.  Fine.

THE COURT:  Good.

Did you have an opportunity to review the three-page summary that I had put up in the jury room for you?

MS. BROWN:  Uh-huh.

THE COURT:  Do you have any questions about how the process works?

MS. BROWN:  No, sir.

THE COURT:  Do you believe that at this point you have a fairly good grasp of how it does work?

MS. BROWN:  Uh-huh.

THE COURT:  Well, there is no reason for me to ask any more questions.  I'll allow the government to begin its questioning.

MR. O'CONNOR:  Good morning, Ms. Brown.

U.S. DISTRICT COURT

**Ex. 65 - 979**

Vol. 7: 76

MS. BROWN: Good morning.

MR. O'CONNOR: My name is Reed O'Connor, and I'm one of the prosecutors assigned to this case along with Mr. Schattman. We're going to take just a couple of minutes to talk to you about some of the issues that may come up in this trial if you're asked to serve. And it's important for you to know that there are no right or wrong answers.

MS. BROWN: I figured that.

MR. O'CONNOR: Great.

And just after reading your questionnaire, I get the distinct impression that you feel that, as far as your personal participation in a process where the death penalty is an option, that you personally could not participate in that type of process. Is that fair?

MS. BROWN: That's fair.

MR. O'CONNOR: It's interesting because looking through your questionnaire, you share -- you're in a similar situation as a lot of people. That is, it appears to me that you personally are in favor of the death penalty as a punishment for some crime in a debate sense or over the water cooler or talking about it in cases in the newspaper, per se.

MS. BROWN: Yeah.

MR. O'CONNOR: But as far as putting you in that chair there today and putting you in the position of having to realize and understand that your decision could very well take

Ex. 65 - 980

Vol. 7:  86

completely fair and impartial in the consideration of this case, we are visiting individually with the idea that it will put prospective jurors more at ease, make it easier for them to be as candid and as truthful as they can be.

So I want to just tell you, there is no such thing as a right answer or a wrong answer here today?

MS. AMARH:  Okay.

MR. SCHATTMAN:  Nobody is going to try to trick you, pull the wool over your sighs, do any such thing.  We are looking for to be just as candid and truthful as you can be about this subject, because, literally, a man's life is at stake.

Now, you have had the occasion to come into court a couple of weeks ago now and fill out one of these questionnaires, and you have heard the judge's explanations back on February 4, I think it was.  And then, again, you have had a chance to read through his -- you know, the judge's summary of the process.

Please don't let me or anybody else put words into your mouth.  We have a fairly short amount of time to talk to you.  So the lawyers intend to say stuff, too, but don't let me put words in your mouth.  All right?

MS. AMARH:  Okay.

MR. SCHATTMAN:  Now, you need to speak up and say either "yes" or "no" because it makes it easier on the court reporter who takes down the words that are spoken.

Ex. 65 - 981

Vol. 7:  87

MS. AMARH:  Okay.

MR. SCHATTMAN:  In your questionnaire, you have indicated in answer to some of the questions, that you generally are not in favor of the death penalty as a punishment; is that correct?

MS. AMARH:  That's true.

MR. SCHATTMAN:  I assume you still feel that way today?

MS. AMARH:  Yes.

MR. SCHATTMAN:  Haven't changed your mind since the 25th?

MS. AMARH:  No.

MR. SCHATTMAN:  I get the impression just from reading through your answers to the questionnaire that that's not some new feeling that you came up with the day that you came in to fill out the questionnaire.  That's the way you have felt for some time?

MS. AMARH:  I won't say some time.  I have thought about it over the years, and I just don't agree with it.

MR. SCHATTMAN:  All right.  We had 125 people in here as prospective jurors, because in a case like this, you're going to have a very wide variety of opinions that people have.  Some held much more strongly than others, and what we're trying to find is 12 people that can be fair and impartial both to the government and the defendant in this case.

Ex. 65 - 982

Vol. 7: 88

You had indicated by your answers that you are generally not in favor of the idea of the death penalty as a punishment.

MS. AMARH:  Right.

MR. SCHATTMAN:  But in a way, you understand why the law provides for it and believe that there may be some cases in which the death penalty might be appropriate.  Is that --

MS. AMARH:  Yes.

MR. SCHATTMAN:  Again, don't let me put words in your mouth.  If I'm saying that wrong, tell me.

MS. AMARH:  No.  You're saying it right.  There are some circumstances that do deserve to have the death penalty.

MR. SCHATTMAN:  Then we have to move from just what I call the academic discussion where you're talking about it as a general rule and having the -- looking at it from the outside, looking at the questions, and we move from sort of thinking about it to the situation in which you might be called upon to participate.  And there are some people who hold the opinion and hold it very dearly and are to be admired for doing so to say that they understand the necessity for a death penalty. They understand why the law might provide for it, but if called upon themselves to participate and to serve as a juror, they know that in their heart of hearts they could not participate. They could not render a verdict that says that death is appropriate for this man in this case based on facts that I have heard, much like you may have someone who is --

Ex. 65 - 983

Vol. 7:  89

understands the necessity for there being an army and a navy and to defend our shores.

MS. AMARH:  Uh-huh.

MR. SCHATTMAN:  But who have a conscientious scruple against -- you know, I cannot participate in the taking of a human life.  I'll be a conscientious objector.  I will help do all kinds of things.  I'll be a nurse.  I'll drive an ambulance, but I ain't picking up a gun, and the law makes provisions for that.  In the criminal justice system, it very well may be that someone who holds the view that they cannot be the person that makes the decision or participates in making the decision.  They can be excellent jurors for all kinds of cases, participate in the process, but just not a death penalty case.

And I get the sense from your answers that, for lack of a better phrase, that you would fall into that conscientious objector status that it may be all right for some but do not ask me to do it?

MS. AMARH:  It's kind of hard to say.  If I have to do it, you know, as a duty, I will do it.  But I just don't like, you know, the death penalty.  I don't know exactly how to say it, but I feel strongly against the death penalty.  But if for some -- it depends on the circumstances.  The circumstances would have to be very strong if I have to do jury duty.

MR. SCHATTMAN:  Okay.  Well, let me talk to you about

U.S. DISTRICT COURT

Ex. 65 - 984

Vol. 7:  90

-- the judge has explained the process a little bit.  And you have a -- first of all, the defendant would have to be found guilty.

MS. AMARH:  Uh-huh.

MR. SCHATTMAN:  Second, the government would put on evidence at a penalty hearing.  The burden is on us.  At the conclusion of that penalty hearing, the jury would go back, and they would have to decide has the government proven that this was an intentional killing, for instance.  The judge gave a list of four or five things, and I'm going to pick a short one, that it was premeditated.  They say that the defendant set out to kill somebody and he did.  So this is a premeditated killing in the course of a drug trafficking crime.

And that's not enough under the law.  You would still have to go on and you would have to determine that the evidence that the government presented also proved an aggravating circumstance, that there was substantial planning, premeditation, or that it was done for gain or done for hire and was done in a heinous or cruel manner.  And if the jury determines that, that aggravating factor, then they weigh and consider the aggravating factors and any mitigating evidence that there might be and decide whether that the aggravating factors are enough such that the death penalty might be warranted.

And when it finally comes down to it, a jury would be faced

U.S. DISTRICT COURT

**Ex. 65 - 985**

Vol. 7:  91

with -- if they're satisfied, if the law allows it and the facts justify it, you finally come down to two choices.  One is that this defendant will be sentenced to life without the possibility of parole or release, which means that he will die some day in the penitentiary and he'll die on the day God chooses to take him.

Or you will recommend to the judge that this man be sentenced to death, which means one day he will die in the penitentiary on a day that the government chooses.  He will be taken from his cell to an execution chamber, and his life will be extinguished.  He will be put to death.  That's going to be the direct result of the decision made by the jury.

So there are some people who, out of a sense of goodness, justice, mercy, faith, whatever it may be, knows that in their heart of hearts that if it came down to that and in any case they know that they would say, let God choose the time.  I just can't do that.

And I suppose the question is, does that describe Marchesia Amarh?

MS. AMARH:  If I have to -- it depends on, like I say, the circumstances, things around the case, you know, that I could agree with the death penalty or give a person life in prison.  Like I say, it just depends.

MR. SCHATTMAN:  Okay.  Thank you.

Pass the witness.

U.S. DISTRICT COURT

Ex. 65 - 986

Vol. 7:  101

THE COURT:  Yes, ma'am.

When it finally gets down to the last decision, what I think I hear you saying -- and please correct me if I'm wrong -- but what I think I hear you saying is, you could consider a life sentence and a death sentence both, fairly consider those, and then choose one or the other.  You would not automatically choose life without parole?

MS. AMARH:  I believe I could choose the death penalty.

THE COURT:  You could choose the death penalty?

MS. AMARH:  Yes.

THE COURT:  All right.  Thank you very much.  I appreciate your help here today.  We'll let you know by in the morning whether we'll ask you to serve.

MS. AMARH:  Okay.

THE COURT:  Thank you.

(Ms. Amarh, Juror Number 69, excused at this time)

THE COURT:  Motion for cause from anyone?

MR. SCHATTMAN:  Not from the government, Your Honor.

MR. BALL:  None from the defendant, Judge.

MR. SCHATTMAN:  Your Honor, I'll just announce for the Court, the government would exercise her peremptory challenge -- I believe it would be Number 14 -- against venireman Marchesia Zsazette Amarh.

THE COURT:  Mr. Schmidt has arrived and will be next..

Ex. 65 - 987

Vol. 7: 102

MR. SCHATTMAN: Judge, may we make a Batson objection?

THE COURT: Oh, all right.

MR. SCHATTMAN: May it please the Court.

Ms. Amarh, Juror Number 69, is a female and a member of the black race. The government has exercised a peremptory challenge on Ms. Amarh, and we would submit that Ms. Amarh's answers exhibit that she is qualified. She has indicated, we submit in her questionnaire by her answer Letter B of Question 47, which is the one most people initially focus on, is the second strongest one, I believe the death penalty is appropriate for some crimes involving murder, and I could return a verdict which assessed the death penalty in a proper case.

She continued to express her opinion that she could vote for the death penalty depending on the circumstances and what the evidence was despite Mr. Schattman's efforts, I guess, to get her to commit that she wouldn't do so. We submit she's qualified. The defendant is a member of the black race. There were only -- by our observation, about seven percent of the panel were members of the black race.

We submit that -- we challenge the government's exercising their peremptory under the authority in Batson versus Kentucky and ask that they provide a race neutral reason for exercising that peremptory, and if they are unable to do so to the Court's satisfaction, that their strike be disallowed and Ms. Amarh be

U.S. DISTRICT COURT

Ex. 65 - 988

Vol. 7:  103

seated as a juror in this cause.

THE COURT:  Does the government believe that the defendant has made a prima facia case?

MR. SCHATTMAN:  Your Honor, I don't believe they have made a prima facia case, but if the Court wants me to respond, I'll be happy to.

THE COURT:  Go ahead, briefly.

MR. SCHATTMAN:  Yes, sir.

Your Honor, we would point out that Mrs. Amarh, while she is technically qualified, or technically not disqualified, she has expressed great reluctance concerning the death penalty, and based upon that reluctance, we do not feel that she would be a proper juror in this case based upon -- and would simply point out to the Court that already today we have exercised a peremptory challenge against Brenda Broadwell, a female of approximately the same age, whose views on the death penalty are quite similar, if not congruent, with those expressed by Ms. Amarh. We felt that she would not be, for lack of a better phrase, a strong juror in such case for the government, and we exercised our peremptory challenge on that basis, her view of the penalty.

THE COURT:  Objection is overruled.

Mr. Schmidt.

(Mr. Schmidt, Juror Number 70, present)

THE COURT:  Hi.

Ex. 65 - 989

# EXHIBIT 66

Vol. 20: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | . CRIMINAL ACTION NO. |
| | . 4:00-CR-260-Y |
| V. | . |
| | . Fort Worth, Texas |
| JULIUS OMAR ROBINSON | . March 12, 2002 |

. . . . . . . . . . . . . . .

VOLUME 20
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.

APPEARANCES:

For the Government:    MR. FREDERICK M. SCHATTMAN
MR. REED C. O'CONNOR
Assistant United States Attorney
801 Cherry Street, Suite 1700
Fort Worth, Texas  76102-6897
(817) 252-5200

For the Defendant:    MR. WES BALL
Ball & Hase, PC
4025 Woodland Park Boulevard
Suite 100
Fort Worth, Texas  76013
(817) 860-5000

MR. JACK STRICKLAND
Attorney at Law
909 Throckmorton
Fort Worth, Texas  76102
(817) 338-1000

Court Reporter:    Ana P. Warren
U.S. District Court Reporter
501 W. 10th Street, Room 201
Fort Worth, Texas  76102-3637
(817) 850-6681

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COU

**COPY**

Ex. 66 - 990

Vol. 20:  8

MR. BALL:  Your Honor, unless, like some other matters we found objectionable, Mr. Schattman and Mr. O'Connor have decided not to go into this.  We believe that the government, based on representations yesterday afternoon at the conclusion of the day, that they seek to try to establish or present to the jury some evidence that Michael Williams, also known as One Love, was either abducted, robbed, assaulted, back in December of 2000 in Arkansas, a matter which we think did occur based on the information provided to us during discovery.  However, there were two or three other individuals arrested for that conduct, a Mr. Eddington -- I forget the other two names off the top of my head.  They simply have no relevance to Julius Robinson.

I think the suggestion is going to be that Mr. Robinson, somehow from the Federal Medical Center, had learned that Michael Williams had spoken with the government or snitched on him or something of that sort and that, somehow, he orchestrated this particular crime.

None of the officers involved in the investigation we suspect are going to testify.  None of the perpetrators who were arrested -- and may well have been convicted.  I don't know -- participated in that.  Mr. Robinson, as best I can determine, is not mentioned in the local police agency's reports as being a perpetrator or involved in that crime.  And it's simply speculation and innuendo, we would suggest, and

U.S. DISTRICT COURT

**Ex. 66 - 991**

Vol. 20: 9

even though both sides are entitled to present what's been referred to in the statute as information to the jury, the rules of evidence and reliability are not out the window.

We would submit that to present extraneous offenses with minimal, if any, connection to the defendant, would be unreliable information, would violate the requirements of Rule 403, and that the probative value, which we suggest is nil, is substantially outweighed by the prejudicial effect. They haven't shown Mr. Williams was robbed by some other people after Mr. Robinson is arrested and then try to create that inference.

We would suggest that extraneous matters, quite frankly, should meet the test of beyond a reasonable doubt if they constitute crimes, and the information that we have about that particular incident in no way rises to that level.

THE COURT: Well, let me say this.

It would surprise me a great deal if Mr. Schattman were just trying to put on evidence of a crime, such as you suggest, that did not have any relevance by being tied somehow to your client.

So I agree with you in everything you have said, but I'm going to suggest or suppose that there may be more to it than what you know. I don't know. So I'm going to --

MR. BALL: Well, Judge, we would ask for a motion in limine because our concern is, once the skunk's in the

U.S. DISTRICT COURT

**Ex. 66 - 992**

Vol. 20:  10

box, ordering the jury not to smell it if it turns out that our position is anywhere near correct, would -- although we think jurors try to follow instructions, it would be insufficient and ineffective to relieve the harm to the defendant.  We would ask that the government at least be required to present some preliminary showing or proffer as to how this particular crime involving Mr. Williams as a victim in Arkansas is tied or connected to this defendant, Julius Robinson.

THE COURT:  Mr. Schattman, do you have a response?

MR. SCHATTMAN:  Your Honor, the government believes that we will have evidence to link the kidnapping of Michael Williams to Mr. Robinson by virtue of the testimony of Mr. Williams himself together with the testimony of the investigating agents and the intercepted -- or the recorded conversations of the defendant during his incarceration at the Federal Medical Center jail unit.  I'm not sure if you want me to go into --

THE COURT:  No.  I think that's sufficient.  Request for limine is denied.

I will say this, though.  Were the government to present evidence of a kidnapping of anybody and not be able to link it to the defendant, it would be irrelevant, improper, and I would certainly instruct the jury to that effect, and my response to the government for putting something like that on would not be favorable, but that has not been my experience with the

Ex. 66 - 993

# EXHIBIT 67

Vol. 20: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA . CRIMINAL ACTION NO.
. 4:00-CR-260-Y

V. .
. Fort Worth, Texas
JULIUS OMAR ROBINSON . March 12, 2002
. . . . . . . . . . . . . . . .

VOLUME 20
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.

APPEARANCES:

For the Government:        MR. FREDERICK M. SCHATTMAN
                          MR. REED C. O'CONNOR
                          Assistant United States Attorney
                          801 Cherry Street, Suite 1700
                          Fort Worth, Texas  76102-6897
                          (817) 252-5200

For the Defendant:        MR. WES BALL
                          Ball & Hase, PC
                          4025 Woodland Park Boulevard
                          Suite 100
                          Fort Worth, Texas  76013
                          (817) 860-5000

                          MR. JACK STRICKLAND
                          Attorney at Law
                          909 Throckmorton
                          Fort Worth, Texas  76102
                          (817) 338-1000

Court Reporter:           Ana P. Warren
                          U.S. District Court Reporter
                          501 W. 10th Street, Room 201
                          Fort Worth, Texas  76102-3637
                          (817) 850-6681

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COU

COPY

Ex. 67 - 994

Direct - O'Connor/Tucker, Sarah   Vol. 20:  12

MR. BALL:  So agreed and stipulated, Your Honor.

THE COURT:  All right.  Do you have a copy for the jurors, or do you just have the one copy?

MR. SCHATTMAN:  We just have the one.  We'll reproduce it as well.

THE COURT:  That's fine.

MR. O'CONNOR:  Can we proceed, Your Honor?

THE COURT:  Yes, sir.

MR. O'CONNOR:  Your Honor, we would call Sarah Tucker, Witness Number 2, on the punishment witness list.

THE COURT:  All right.

THE COURT:  Ms. Tucker, please raise your right hand and be sworn?

(Witness sworn by the Court)

THE COURT:  You may be seated in the witness chair. Please pull the microphone in front of you and speak directly into it.

SARAH TUCKER, testified under oath as follows:

DIRECT EXAMINATION

BY MR. O'CONNOR:

Q.  Ma'am, would you tell us your name, please?

A.  Sarah Michelle Tucker.

Q.  How old are you, Ms. Tucker?

A.  Twenty-six.

Q.  Where are you currently housed?

U.S. DISTRICT COURT

Ex. 67 - 995

Direct - O'Connor/Tucker, Sarah      Vol. 20:  13

A.   South Dakota Women's Prison.

Q.   Where is that?

A.   In Pierre, South Dakota.

Q.   Have you been brought down here and then staying over at the Tarrant County Jail?

A.   Yes, sir.

Q.   And then brought over here this morning?

A.   Yes, sir.

Q.   And, of course, you know why you're here?

A.   Yes, sir.

Q.   Before we get to that, you have a criminal record.  Is that fair?

A.   Yes, sir.

Q.   What kind of criminal record do you have?

A.   I'm in prison for grand theft and forgery.

Q.   Is that what you're doing time for in South Dakota?

A.   Yes, sir.

Q.   Do you have any other record that you can recall other than the grand theft and the forgery up in South Dakota?

A.   Traffic violations.

Q.   Other than traffic violations?

A.   No, sir.

Q.   Okay.  You're here to talk about what happened to you on February 7 of 1995; is that correct?

A.   Yes, sir.

Ex. 67 - 996

Direct - O'Connor/Tucker, Sarah    Vol. 20:  14

MR. O'CONNOR:  Your Honor, can we publish Government's Exhibit 295?

THE COURT:  You may.

MR. O'CONNOR:  The first page?

THE COURT:  Yes, sir.

Q.  (By Mr. O'Connor)  Ms. Tucker, there is introduced into evidence as Government's Exhibit Number 295 -- and on this screen is the first page of it -- is a judgment related to Julius Robinson, and the title of the judgment -- if we could show that -- is discharging a firearm at an individual on February 7, 1995.  Do you know what that judgment relates to?

A.  Yes, sir.

Q.  And who is the individual that the firearm was discharged at?

A.  Me.

Q.  Now, Ms. Tucker, do you know a person by the name of Julius Robinson?

A.  Yes, sir.

Q.  When do you have a memory of meeting that person, Julius Robinson?

A.  I went to high school with Julius.  So it was about when I was about 17.

Q.  What high school did you go to?

A.  Lamar High School.

Q.  Do you recognize the person that you know as Julius

U.S. DISTRICT COURT

Ex. 67 - 997

Direct - O'Connor/Tucker, Sarah    Vol. 20:  15

Robinson here in the courtroom today?

A.  Yes, sir.

Q.  Can you point to him and tell us where he's seated in the courtroom?

A.  He's seated at defendant's table.

Q.  Where at the table?

A.  In the gray suit to the very far right at the end of the table.

MR. O'CONNOR:  Your Honor, may the record reflect she's identified Julius Robinson?

THE COURT:  The record will so reflect.

Q.  (By Mr. O'Connor)  Just describe in general terms what your relationship with Julius Robinson was while you were in high school.  Did you have a business relationship?

A.  In the beginning, we were just acquaintances, friendly.

Q.  Did there ever come a time that you started buying drugs from him?

A.  Right away.

Q.  What kind of drugs did you buy from him?

A.  Crack cocaine.

Q.  Now, how is it that you were getting the money to buy crack cocaine?

A.  I had an insurance settlement at the time.  I was also -- my parents' money.

Q.  When you say you had an insurance settlement, what are you

U.S. DISTRICT COURT

**Ex. 67 - 998**

Direct - O'Connor/Tucker, Sarah    Vol. 20:  16

talking about?  Settle for what?

A.  I sued.  I was in a car accident and sued a company.  I had knee surgery, and I got money out of that.

Q.  About how much money do you think you got out of that?

A.  The total sum was $38,000.

Q.  Did you spend any portion of that on drugs?

A.  Yes.

Q.  About how much do you think you spent on drugs?

A.  Close to about $17,000.

Q.  When you say that you spent about $17,000 of that on drugs, was your supplier at the time Julius Robinson?

A.  Yes.

Q.  And was all or the majority of that money paid to Julius Robinson for drugs?

A.  Yes.

Q.  Which, all or a majority?

A.  All.

Q.  And it was crack cocaine?

A.  Yes.

Q.  Now, did there come a time when you ran out of money?

A.  Yes.

Q.  And were unable to make a drug payment?

A.  Right.  Correct.

Q.  And what did you do when you ran out of money and were unable to make your drug payments?

**Ex. 67 - 999**

Direct - O'Connor/Tucker, Sarah      Vol. 20:  17

A.   I was stealing.

Q.   To make your payment?

A.   Right.

Q.   And some of the things -- some of the people you stole from were your parents?

A.   Right.  Correct.

Q.   And did Mr. Robinson continue to supply you crack cocaine?

A.   Yes.

Q.   Did there ever come a time when that stopped?

A.   No -- when I owed him money and I didn't pay him.  So I discontinued going to him.

Q.   Was that round about the time when this incident occurred?

A.   That was because of this incident.

Q.   All right.  When you say that was because of this incident, describe how this incident arose?

A.   I went to Julius' apartment on a Friday before the 7th, and I had him give me some crack cocaine on front without the money, and it was a total of $120 worth, and I told him I would pay him back.  When I didn't pay him back, he kept coming to my apartment looking for me.  He would stop by my parents' house looking for me.

On my birthday, which is February 7, he came by my apartment beating on the door, and I was in there.  I refused to open the door.  He was hollering.  He knew I was in there. I left my apartment and went to my parents' house, and he

U.S. DISTRICT COURT

**Ex. 67 - 1000**

Direct - O'Connor/Tucker, Sarah    Vol. 20:  18

followed me there, which I didn't know he did.  And I parked in front of my parents' apartment waiting for my parents to come home, and that's when he shot at me in my parents' home.

Q.  When you say you didn't know he followed you to your parents -- did they live in an apartment or home or what?

A.  It was an apartment.

Q.  They lived in an apartment?

A.  Yes.

Q.  So you didn't know he followed you, and you parked there at the apartment.  Did there come a time when you realized that Mr. Robinson was there in the apartment?

A.  Yeah, about five minutes after I got there.

Q.  And how is it that you realized he was there?

A.  The car that he was in.

Q.  Were you in the parking lot or in your parents --

A.  I was sitting in my vehicle in the parking lot.

Q.  Why were you sitting in your car?

A.  Because neither one of my parents were home at the time, and I was waiting for my mother to get home to her house.

Q.  And when you noticed Mr. Robinson and the car he was in, tell us what happened at that point.

A.  I sat in my vehicle, and I saw a car go slow, slow down in the parking lot and pass behind my vehicle, which was a truck, at a real just slow pace.  I noticed the vehicle right away.  I looked out my window and I noticed that Julius was in the car.

U.S. DISTRICT COURT

Ex. 67 - 1001

Direct - O'Connor/Tucker, Sarah    Vol. 20:    19

He drove past to the end of the parking lot, and they did a U-turn and came back.  He wasn't driving.  He was in the passenger seat.  And then his hand came out the window, and he started shooting at my vehicle when I was in it.  So I laid down in my truck.

Q.  Did your truck take some shots?

A.  Several.

Q.  About how many?  Do you remember?

A.  I think it was close to seven bullet holes in my truck.

Q.  And it was Mr. Robinson doing the shooting?

A.  Yes, sir.

Q.  And then did he shoot at anything else?

A.  Yes, my parents' home.

Q.  And did their -- I don't want to be technical with you --

A.  Their apartment.  My parents' apartment, they shot through the walls and the windows.  There were some bullets found in their couch and then in a closet and some of the toys that were in the closet.

Q.  And then what happened after he was shooting at your truck and then shooting at that apartment?

A.  He just casually drove off.  They didn't speed off.  They didn't burn off.  They just drove away.

Q.  And then you say "they."  Do you know who was driving the car he was in?

A.  No, I didn't.

**Ex. 67 - 1002**

Cross - Strickland/Tucker, Sarah    Vol. 20:    20

Q. You didn't know him by name?

A. No, I don't.

Q. Did you know him by sight, recognize him?

A. No. I didn't really see who was in the passenger seat.

Q. The driver's seat or the passenger?

A. I mean, I didn't see who was driving. I couldn't see.

MR. O'CONNOR: Pass the witness, Your Honor.

THE COURT: Cross examination?

MR. BALL: May we have just a second?

(Brief pause in proceedings)

CROSS EXAMINATION

BY MR. STRICKLAND:

Q. Good morning, Ms. Tucker.

A. Good morning.

Q. Let me ask you just a couple of questions.

You indicated, I believe, in response to some questions from Mr. O'Connor that your criminal history involved a grand theft forgery up in South Dakota; is that correct?

A. Yes, sir.

Q. Is that your only criminal history?

A. Yes, sir.

Q. How long were you involved in the use of drugs?

A. I've been doing drugs since I was about 12 or 13.

Q. So the jury should not be laboring under the misapprehension that somehow Julius Robinson got you involved

Ex. 67 - 1003

Cross - Strickland/Tucker, Sarah    Vol. 20:  21

in the use of drugs.  You were doing drugs before you knew Mr. Robinson; is that correct?

A.  Yes, sir.

Q.  You seem to indicate that, perhaps, you knew Julius Robinson from Lamar High School in Arlington; is that correct?

A.  Yes, sir.

Q.  Did you actually attend Lamar High School?

A.  Yes, sir.

Q.  And you were in attendance at Lamar High School at the time that you met Mr. Robinson?

A.  Yes, sir.

Q.  How long had Mr. Robinson been attending Lamar High School, if you recall?

A.  I dropped out of high school right after I met him.  I don't know how long he was in high school because I dropped out.  So I don't know how long.  I was a junior at the time that I met him, and he was a sophomore.

Q.  So he was a sophomore.  You were a junior, and you dropped out of high school in your junior year; is that correct?

A.  Yes, sir.

Q.  So at the time your association with Mr. Robinson began in regard to the drug usage you've described, you were not actually in attendance at Lamar; is that correct?  You had already dropped out by the time you became involved with Mr. Robinson in the drug business?

Ex. 67 - 1004

Cross - Strickland/Tucker, Sarah    Vol. 20:    22

A.    No.    I started buying drugs from him when I was still in high school, probably about a month before I -- I'd say about a month before I dropped out.

Q.    Had you purchased drugs from other persons there at high school prior to the time that you began your association with Mr. Robinson?

A.    Not crack cocaine, no.

Q.    What sort of drugs had you purchased?

A.    Marijuana.

Q.    And that was from other persons there at Lamar High School as well as persons outside of the high school environment?

A.    Yes, sir.

Q.    Had you, in turn -- since the time of your entry into the drug culture, if you will, when you were 12 or 13 years of age, had you likewise been engaged in the selling or the distribution of any controlled substances?

A.    No, sir.

Q.    So you're telling the jury that you simply bought marijuana, but you never sold any marijuana?

A.    At the age of 12 or 13?

Q.    At any age?

A.    No.    I have sold marijuana.

Q.    Did you sell marijuana while you were still in high school?

A.    After I dropped out, yes.    Not while I was attending high school.

U.S. DISTRICT COURT

Cross - Strickland/Tucker, Sarah   Vol. 20:   23

Q. And after you dropped out of high school, how active were you in the drug selling business?

A. It's what I did. I didn't work at the time.

Q. When you say that's what you did, do you mean to tell the jury that that's how you made your living?

A. Yeah -- yes.

Q. Selling marijuana; is that correct?

A. Correct.

Q. Stealing?

A. Correct.

Q. I believe you indicated that you stole from your parents even?

A. Correct.

Q. Were your parents the only folks that you stole from, or did you steal from other people as well?

A. Just my parents and stores, the public.

Q. I'm sorry?

A. The public.

Q. So you were a shoplifter?

A. Correct.

Q. You stole things from your parents' home.
   Were you living with your parents at the time?

A. No.

Q. Your parents had thrown you out, hadn't they?

A. Yes, they had.

Ex. 67 - 1006

Cross - Strickland/Tucker, Sarah    Vol. 20: 24

Q. All right. Had your parents forbidden you to enter their home because of, not only your drug usage, but who you were hanging out with and also your stealing?

A. Correct.

Q. When you went back into your parents' home to steal, did you have to break into the home? How did you gain entry to the home?

A. No. I would go to my parents' home when they were there. If they weren't at their house, I was not permitted there.

Q. I'm sorry?

A. If they weren't home, I was not permitted there. While my parents were home, I would go to their home.

Q. Would they know that you had come to the home to steal from them?

A. No. They didn't know that that's why I was there.

Q. Why did they think you were there?

A. To visit.

Q. To see them? Would they fix dinner for you?

A. Sometimes.

Q. Talk to you about your life, talk to you about what was going on with you?

A. Correct.

Q. And you would take the opportunity to repay this kindness and this interest of your parents by stealing from them?

A. Correct.

U.S. DISTRICT COURT

**Ex. 67 - 1007**

Cross - Strickland/Tucker, Sarah    Vol. 20:    25

Q.   Did they ultimately discover what the purpose -- what the real purpose of your visits were to the home?

A.   Correct.

Q.   And did they then bar you from their home even when they were there?

A.   No.

Q.   They continued to have you come to their home, did they not?

A.   Correct.

Q.   And you continued to avail yourself of the opportunity to steal from them whenever they did?

A.   Correct.

Q.   When did you go to South Dakota?

A.   In January of the next year from the shooting.

Q.   In January after the shooting occurred in 1995?

A.   Uh-huh.   It was '96, January 9, '96.

Q.   On what occasion did you to South Dakota in 1996?

A.   It was to get away from the drugs, get away from the lifestyle I was leading.

Q.   Did you just pick South Dakota out of the blue?  Did that seem like a pretty far away and pretty remote place, or was there some particular reason for choosing South Dakota?

A.   It was far away.   There was also -- my brother use to live there and his ex-girlfriend lived there, and I moved in with her.

U.S. DISTRICT COURT

Ex. 67 - 1008

Cross - Strickland/Tucker, Sarah    Vol. 20:   26

Q. Of course, when you got to South Dakota, you found out that you hadn't gotten away from those sorts of problems at all, didn't you?

A. Correct.

Q. Because you continued your drug usage?

A. Correct.

Q. Did you continue engaging in the business of selling and distributing controlled substances?

A. I did when I lived there, yes.

Q. And you also -- I take it, by virtue of the fact that you're now incarcerated in South Dakota, you either continued in or started to begin the business of grand theft and forgery; is that correct?

A. Correct.

Q. When were you finally arrested for that offense in South Dakota?

A. In 1998.

Q. And in 1998 when you were arrested and charged with the offense, was it the offense of grand theft and forgery, or was it another offense?

A. Grand theft and forgery.

Q. And when was that case finally disposed?

A. I got probation for it in January of '98.

Q. And probation was what, like a second chance?

A. Right. It was three years' probation.

Ex. 67 - 1009

Cross - Strickland/Tucker, Sarah    Vol. 20:  27

Q.  And there were conditions of probation that you were expected to fulfill.  You sort of entered into a contract with the Court whereby you promised that you would do certain things if the Court would promise not to lock you up?

A.  Correct.

Q.  Did you live up to your bargain?

A.  No.

Q.  And you violated the conditions of your probation; is that correct?

A.  Correct.

Q.  And in what manner did you violate the conditions of your probation, if you recall?

A.  I failed UA's for marijuana.

Q.  You failed UA's?

A.  Right.

Q.  Tell the jury what UA's are, please.

A.  Urinalysis.

Q.  And that was a condition of your probation that because of your extensive drug history from at least the age of 12, the Court required you to take frequent, maybe not even regularly scheduled, but random urinalysis to determine if you were violating the conditions of your probation by continuing to engage in the use of illegal substances, correct?

A.  Correct.

Q.  And you did, in fact, continue?

Ex. 67 - 1010

Cross - Strickland/Tucker, Sarah   Vol. 20:   28

A.   Correct.

Q.   And you did, in fact, fail the UA's; is that correct?

A.   Correct.

Q.   And how many of the UA's did you fail, if you recall?

A.   I transferred my probation to Texas when I first got it it.   I failed three UA's in Texas, and my probation was denied and sent back to South Dakota, and then I failed one in South Dakota.

Q.   So you tried to come back to Texas.   Texas wouldn't accept you because you continued to use drugs in spite of your promises; is that correct?

A.   Correct.

Q.   You went back to South Dakota; is that correct?

A.   Correct.

Q.   And then what did South Dakota do based on your history of one failed UA in South Dakota and three failed UA's in Texas?

A.   I was -- my probation was revoked, and I was sentenced to prison.

Q.   And for how long were you sentenced to prison, please?

A.   Four years -- five years with four suspended.

Q.   Five years with four suspended.   Tell us what that means.

A.   I was sentenced to one year in prison.

Q.   And when did you begin serving that one-year sentence?

A.   In July of 2000.

Q.   July of 2000?

Cross - Strickland/Tucker, Sarah    Vol. 20:    29

A.   Correct.

Q.   Yet, you're still in prison; is that correct?

A.   I got out on parole and violated my parole.

Q.   So I'm not sure what number chance that was, but you were paroled out after a year; is that correct?

A.   Correct.

Q.   And you violated your parole in what manner?

A.   Failed urinalysis.

Q.   You were caught?

A.   Correct.

Q.   By the Court?

A.   Uh-huh.

Q.   And what happened to your parole?

A.   It was revoked, and I was sent back to prison.  And I also had a pending felony warrant out for my arrest that caused be to go back to prison.

Q.   What was the pending felony warrant for?

A.   Insufficient check funds.

Q.   So when you said earlier that, perhaps, your criminal history only involved just one grand theft and forgery, you've had these pending felony warrants which figured in your parole violation; is that correct?

A.   Correct.

Q.   And what's the status of that case or those cases?

A.   I was sentenced to two years in prison.

U.S. DISTRICT COURT

Ex. 67 - 1012

Cross - Strickland/Tucker, Sarah    Vol. 20:  30

Q.   And that's to run concurrently?

A.   Consecutive.

Q.   Consecutive.  And consecutive means it's stacked on top of the time you already have.  After you complete your first sentence, then you will begin serving this two-year sentence; is that correct?

A.   Correct.

Q.   So when Mr. O'Connor and I both asked you about your criminal history a few moments ago, had that slipped your mind that, in fact, you had a two-year consecutive sentence as a result of criminal activity while you were actually on parole?  Had you just forgotten to tell us that a moment ago?

A.   Yes.

Q.   Anything else that you have forgotten to tell us about your criminal history or your drug usage?

A.   No.

Q.   Now, in regard to this assault by the discharging of the firearm, which you have talked with us about today, the Arlington police officers were called out to the scene that night, February 7; is that correct?

A.   Correct.

Q.   And did you have a conversation with the police officers that evening?

A.   Correct?

Q.   And were you candid when you talked to the police officers

Ex. 67 - 1013

Cross - Strickland/Tucker, Sarah    Vol. 20:    31

that evening?

A.    No.

Q.    All right.  You lied to them, didn't you?

A.    Yes.

Q.    And you lied to them about a number of things, not only involving your circumstances, your drug usage at that point, which was pretty serious; is that correct?

A.    Correct.

Q.    But you also lied to them and misinformed them about who it was that you believed to have done this; is that correct?

A.    No -- well, I didn't tell them anyone.  I acted like I didn't know who had shot at me.  I tried to protect Julius.

Q.    Okay.  I'm sorry.  I missed the first part of what you said.  You said that you acted like you didn't know who had shot at you; is that correct?

A.    Correct.  I denied the fact that I knew who it was.

Q.    So that was not the truth, was it?

A.    No, it was not.

Q.    All right.  Now, whether we call it a truth or whether we call it dissembling or whether we call it a, you know, purposeful misapprehension by you towards the police officers, the bottom line is it just wasn't the truth, was it?

A.    Correct.

Q.    And your mother was there that evening, also, was she not?

A.    Yes, she was.

U.S. DISTRICT COURT

**Ex. 67 - 1014**

Cross - Strickland/Tucker, Sarah   Vol. 20:   32

Q.   And your mother informed in your presence the police officers of who she believed was responsible for this, did she not?

A.   Yes, she did.

Q.   All right.  And that person that she believed was responsible was not Julius Robinson, was it?

A.   No.  She believed it was Julius.

Q.   It's your recollection that she believed that it was Julius --

A.   Correct.

Q.   -- that had been responsible; is that correct?

A.   Correct.

Q.   But you continued to deny that fact to the police officers, correct?

A.   I didn't deny that it was Julius.  I just denied that I knew who it was.

Q.   Well, from whichever direction we approach it, that was not an accurate -- according to you now -- an accurate rendition of who you believed was responsible for firing the shots, was it?

A.   Correct.

Q.   And how long did you persist in this denial or this misapprehension that you were imposing on the Arlington police officers?

A.   Less than 24 hours.

Q.   Have you ever seen Julius Robinson since that time?

U.S. DISTRICT COURT

**Ex. 67 - 1015**

Cross - Strickland/Tucker, Sarah    Vol. 20:  33

A.  No, I have not.

Q.  Was there anybody else that was with you at the time of this --

A.  No.  I was alone.

Q.  -- this occurrence.

You say that you are not able to, either then or now, recognize the person that you claim was the driver of the vehicle; is that correct?

A.  Correct.

Q.  And how far away from you was this vehicle situated at the time these shots were fired?

A.  The distance is from where you're at to where I am.

Q.  Okay.  Pretty close, then?

A.  Very close.

Q.  Day or night?

A.  It was night.

Q.  When is the last time prior to the events that you've described on the night of February 7, 1995, that is, the shooting at you, that you had indulged in the use of crack cocaine?

A.  Earlier that day?

Q.  About what time?

A.  I would say probably five hours before.

Q.  Crack cocaine is a pretty potent drug, is it not?

A.  Correct.

Ex. 67 - 1016

Cross - Strickland/Tucker, Sarah    Vol. 20:   34

Q.  What are the physiological effects on a person that has used crack cocaine?  What's it do for you so the jury will just know what crack cocaine does?

A.  What does it do for me?  What's the effect of the high?

Q.  Sure.  Yes.  What happens to you when you take crack cocaine?

A.  A euphoric feeling.

Q.  All right.  Euphoric meaning you feel high; is that correct?

A.  Uh-huh.

Q.  All right.  What else?

A.  Paranoia.

Q.  You think people are out to get you?

A.  No, not people out to get me.  Just senses are more heightened.  Everything is more alarming.

Q.  All right.  What other physiological effects, if you can tell us?

A.  That's probably about all.

Q.  Well, let me ask you this.  Does it distort your judgment in some way?

A.  No.

Q.  So it would be okay, for example, if an airline pilot were to take crack cocaine and --

MR. O'CONNOR:  Objection, Your Honor.  Argumentative and that's speculation by the witness.

U.S. DISTRICT COURT

**Ex. 67 - 1017**

Cross - Strickland/Tucker, Sarah    Vol. 20:  35

THE COURT:  I'm going to allow it.

Q.  (By Mr. Strickland)  Is it all right for an airline pilot to take crack cocaine and then take off with a load of passengers, you think?

A.  No.  I'm sure he has a contract that will not allow him to fly under the influence.

Q.  So it's just a matter of contract, but you don't feel that it would in any way alter his judgment and, perhaps, render what he does unsafe?

A.  Well, I can't say that it would or wouldn't.  He could easily smoke crack and still fly perfectly fine.  He could smoke crack and crash.  I wouldn't know.

Q.  Well, let me ask you this.  When you go back to South Dakota, do you think you would be pretty comfortable getting on an airliner with a pilot who has just smoked crack cocaine?

A.  No.

Q.  Does it in some manner alter your perception of reality?

A.  Yes.

Q.  Things pretty dramatically change for a person when they smoke crack cocaine; is that correct?

A.  Correct.

MR. STRICKLAND:  I believe that's all.  Thank you very much, ma'am.

THE COURT:  Is there redirect?

MR. O'CONNOR:  No, sir.

Ex. 67 - 1018

# EXHIBIT 68

Vol. 20: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA    .    CRIMINAL ACTION NO.
                           .      4:00-CR-260-Y
V.                          .
                           .    Fort Worth, Texas
JULIUS OMAR ROBINSON        .    March 12, 2002
. . . . . . . . . . . . . . . .

VOLUME 20
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.

APPEARANCES:

For the Government:          MR. FREDERICK M. SCHATTMAN
                             MR. REED C. O'CONNOR
                             Assistant United States Attorney
                             801 Cherry Street, Suite 1700
                             Fort Worth, Texas  76102-6897
                             (817) 252-5200

For the Defendant:           MR. WES BALL
                             Ball & Hase, PC
                             4025 Woodland Park Boulevard
                             Suite 100
                             Fort Worth, Texas  76013
                             (817) 860-5000

                             MR. JACK STRICKLAND
                             Attorney at Law
                             909 Throckmorton
                             Fort Worth, Texas  76102
                             (817) 338-1000

Court Reporter:              Ana P. Warren
                             U.S. District Court Reporter
                             501 W. 10th Street, Room 201
                             Fort Worth, Texas  76102-3637
                             (817) 850-6681

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COU

**COPY**

Ex. 68 - 1019

THE COURT:  You may step down.

MR. O'CONNOR:  We would call Ozla Tucker, Your Honor, witness Number 3.

THE COURT:  Ms. Tucker, if you will step up here and administer the oath.  Please raise your right hand and be sworn.

(Witness sworn by the Court)

THE COURT:  You may be seated in the witness chair. Please speak directly into the microphone.

OZLA TUCKER, testified under oath as follows:

#### DIRECT EXAMINATION

BY MR. O'CONNOR:

Q.  Would you state your name, please?

A.  Ozla Ann Tucker.

Q.  Ms. Tucker, do you know a person by the name of Sarah Tucker?

A.  Yes.  She's my daughter.

Q.  And Sarah Tucker has a drug problem, doesn't she?

A.  Yes, sir.

Q.  And she's had that drug problem for some time?

A.  Yes, sir.

Q.  And if I could just take you back to February 7, 1995, do you remember that day, Ms. Tucker?

A.  Oh, yes.

Q.  Was that Sarah's birthday?

Ex. 68 - 1020

Direct - O'Connor/Tucker, Ozla    Vol. 20:  37

A.  Yes, it was.

Q.  And was she coming over your house that day?

A.  I was going to meet her to take her out to dinner that night.

Q.  For her birthday?

A.  Uh-huh.

Q.  Is that right?

A.  Yes.

Q.  Before you got home that evening, did you learn -- or as you got home, did you learn that something had happened before you got home?

A.  Yes -- you mean, as I was driving up to my house, and it was surrounded by police and tape, and my daughter was frantic.  Yes, I saw that.

Q.  All right.  As you got there, you learned that a shooting had taken place?

A.  Yes.

Q.  And you didn't witness any of the actual shooting itself?

A.  No.  My daughter's truck was riddled with bullets.  My home was full of bullets.

Q.  Where was the home that you're talking about?  What was the address?  Do you have a memory of that?

A.  I lived on Brown Street in Arlington just off of 360 at that time.

Q.  And was that an apartment complex?

Ex. 68 - 1021

Direct - O'Connor/Tucker, Ozla    Vol. 20:  38

A.  Yes.

Q.  Do you know the name of the complex?

A.  Lands Lake, By The Lake.  I'm nervous.

Q.  Could you just go ahead and speak into that microphone so we can all hear you good and loud?  That microphone will project your voice out real well.

A.  Yes.

Q.  When you got home there that night, you said that Sarah was surrounded by police; is that right?

A.  Uh-huh.

Q.  Is that a "yes"?

A.  Yes, sir.

Q.  At some point, did you and your family decide to move?

A.  Sir, I went into that house because the police asked me to --

MR. STRICKLAND:  Your Honor, we need to object. That's not responsive.

THE WITNESS:  Okay.

THE COURT:  Just try to answer exactly the question that he asked rather than answering a question he hasn't yet asked?

THE WITNESS:  Okay.

Q.  (By Mr. O'Connor)  Did you -- let me back up.

Who was living at your apartment in February of 1995?  Was it just you and your husband, or was there someone else there?

Ex. 68 - 1022

Direct - O'Connor/Tucker, Ozla    Vol. 20:  39

A.  My husband and myself, yes.

Q.  And then in February of 1995, when you come home, see your daughter's truck riddled with bullets and bullets into your apartment, do you and your husband decide to not stay at the apartment anymore?

A.  Never again.

Q.  When did you make that decision?

A.  As soon as the police let me out of the house.

Q.  So you all left then?

A.  Uh-huh.

Q.  Where did you all go?

A.  We stayed in a motel, and then we stayed with a friend until we could locate a place and hide.

Q.  Did you all locate a place and move away from the Arlington area?

A.  Yes, we did.  And to this very day, I use a separate address because I'm still uncomfortable.

        THE COURT:  He didn't ask you that.  So you just have to answer the question that he asked.

        THE WITNESS:  I'm sorry.

        THE COURT:  You may proceed.

        MR. O'CONNOR:  That's all the questions I have.

        THE COURT:  Cross?

        MR. O'CONNOR:  Oh, can I have a moment, please?

        THE COURT:  Yes, sir.

U.S. DISTRICT COURT

**Ex. 68 - 1023**

Cross - Strickland/Tucker, Ozla    Vol. 20: 40

(Brief pause in proceedings)

MR. O'CONNOR:  Can I ask another question?

THE COURT:  Yes, sir.

Q.  (By Mr. O'Connor)  Ms. Tucker, would you describe the kind of effect that this incident had on your family, you and your husband in particular, and how you lived after this incident?

A.  In fear.

Q.  Okay.  And you were --

A.  To this day right now.

Q.  And what sort of steps do you take to this day to protect yourself?

A.  I don't get mail at my home and haven't since that day.  I have alerted utilities, red flagged any accounts or any history that I can find to hide behind.  I don't use my very own given first name on things to try to just hide behind it as best I can in fear.

Q.  Okay.  Thank you, ma'am.

MR. O'CONNOR:  Pass the witness, now, Your Honor.

THE COURT:  All right.

CROSS EXAMINATION

BY MR. STRICKLAND:

Q.  Ms. Tucker, I have just a couple of questions that I need to ask you, ma'am.

I believe that you indicated, in response to Mr. O'Connor's questions, that you were not actually at the apartment at the

Ex. 68 - 1024

Cross - Strickland/Tucker, Ozla    Vol. 20:  41

time that the shooting took place; is that correct?

A.  Yes, sir, that is correct.

Q.  You came upon it sometime but not very long clearly after the time it had occurred; is that also, correct?

A.  Yes, sir.

Q.  And you were interviewed by the Arlington Police Department that night; is that correct?

A.  Yes, sir.

Q.  And on that occasion, you expressed the view to the Arlington Police Department that you believed that for a variety of reasons, perhaps, that we don't even need to get into at this point, that you suspected that your daughter's boyfriend, a young man by the name of Taylor was involved in the shooting; is that correct?

A.  I asked her -- no, not in the shooting.

Q.  All right.  You believed that when they interviewed you about the shooting, that you expressed the opinion that because of some serious difficulties between Taylor and your daughter, that at least Taylor was a person that you suspected might be involved.  Is that not correct?

A.  I didn't know who had done the shooting.

Q.  But my question is, you may not have known, but you did express that view to the Arlington police officer?

A.  I asked her if he had been involved, yes.

Q.  Well, you expressed -- and I don't want to go into some

U.S. DISTRICT COURT

**Ex. 68 - 1025**

Cross - Strickland/Tucker, Ozla    Vol. 20:  42

personal details here, but you talked to the Arlington Police Department and gave them some background as to problems that you believed were significant enough that might warrant them looking at Taylor's involvement in this; is that correct?

A.  I believe I asked them if I could ask her if he was involved.

Q.  And, of course, you were present when your daughter denied to the Arlington Police Department that she knew who it was that was involved; isn't that correct?

A.  Yes.  I asked them.

Q.  Okay.  You were present.  And the Arlington police, of course, they did the first thing police officers do -- well, maybe the second thing.  The first thing, I guess, is to determine whether everybody is okay.  And then the second thing is to determine whether or not people have some idea who is responsible, and you were present when the officers talked to your daughter about that, and she denied having any idea who was responsible; isn't that correct?

A.  I believe she was afraid to answer that.

Q.  Okay.  Listen carefully to my question, please.  Were you you or were you not present when she did so, that is, denied that she knew who was involved in this?

A.  They told me she did, but I didn't hear her deny that.

Q.  And you, in turn, suggested to them that you had some reason to believe, because of personal circumstances that had

Ex. 68 - 1026

Cross - Strickland/Tucker, Ozla    Vol. 20:  43

occurred, that Taylor was somebody at least worth considering here, correct or incorrect?

A.   I asked them if I could ask her about him, and if she knew who was.

Q.   Since that time and you've indicated -- and no one is disputing that -- that you have taken some steps to protect yourself and protect your husband; is that correct?

A.   Yes.

Q.   All right.  Have there been any such occurrences while your daughter has been gone from your home that cause you now to -- have there been any occurrences at your home similar to the one that we've talked about here this morning since that time?

A.   I hope to never that happen again.

Q.   Well, we all hope that it never happens to you again, but my question is, has it?

A.   No.

Q.   Okay.  And, indeed, since Sarah has been in South Dakota, things have been a bit more peaceful, have they not, difficult but peaceful?

A.   I don't understand.

Q.   For you and your husband?

A.   Because she's gone?

Q.   Well, for whatever reason.

A.   No.  I think it's probably more stressful that she's gone and away from us.

Ex. 68 - 1027

Cross - Strickland/Tucker, Ozla    Vol. 20:  44

Q.  But there certainly has been no more shooting at your home?

A.  That's true.

Q.  There has been no more stealing at your home?

A.  No.  That's not true.

Q.  There has been stealing at your home?

A.  Yes.  We have had things stolen throughout our neighborhood, yes, and my home.

Q.  But you don't have any reason to believe that it continues to be your daughter who is stealing from you, do you?

A.  No.

Q.  Of course, she's locked up, right?

A.  Yes.

MR. STRICKLAND:  All right.  Well, we're sorry for your difficulties.  Thank you.

THE COURT:  Is there redirect?

MR. O'CONNOR:  No, sir.

THE COURT:  You may step down, ma'am.  Thank you.  May Ms. Tucker be released?

MR. O'CONNOR:  Yes, Your Honor.

MR. STRICKLAND:  Yes, sir.

THE COURT:  You're free to go as well.  Thank you.  You may call your next witness.

MR. SCHATTMAN:  Thank you, Your Honor.  I call Terrence Holimon.  He is Number 1 on the punishment witness list.

U.S. DISTRICT COURT

# EXHIBIT 69

Vol. 20: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA      . CRIMINAL ACTION NO.
                                 . 4:00-CR-260-Y

V.                         .
                                 . Fort Worth, Texas

JULIUS OMAR ROBINSON       . March 12, 2002

. . . . . . . . . . . . . . .

VOLUME 20
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.

APPEARANCES:

For the Government:       MR. FREDERICK M. SCHATTMAN
                              MR. REED C. O'CONNOR
                              Assistant United States Attorney
                              801 Cherry Street, Suite 1700
                              Fort Worth, Texas  76102-6897
                              (817) 252-5200

For the Defendant:        MR. WES BALL
                              Ball & Hase, PC
                              4025 Woodland Park Boulevard
                              Suite 100
                              Fort Worth, Texas  76013
                              (817) 860-5000

                              MR. JACK STRICKLAND
                              Attorney at Law
                              909 Throckmorton
                              Fort Worth, Texas  76102
                              (817) 338-1000

Court Reporter:           Ana P. Warren
                              U.S. District Court Reporter
                              501 W. 10th Street, Room 201
                              Fort Worth, Texas  76102-3637
                              (817) 850-6681

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COU

**COPY**

Ex. 69 - 1029

Direct - Schattman/Holimon          Vol. 20:  45

(Brief pause in proceedings)

THE COURT:  You'll recall you're still under oath. Please sit down and speak directly into the microphone.

TERRENCE HOLIMON, testified under oath as follows:

DIRECT EXAMINATION

BY MR. SCHATTMAN:

Q.  Tell us your name, please, sir.

A.  Terrence Lance Holimon.

Q.  Mr. Holimon, you have previously told us that you were -- you spent some time growing up in Chicago, lived up there for some time?

A.  Yes, sir.

Q.  During -- can you just tell us what time frame in your life you lived in Chicago?

A.  From when I was born in 1978 to around '92 or '93.

Q.  And during the time that you lived in Chicago, did you become involved in any gangs or gang activity up in Chicago?

A.  Yes, sir.

Q.  And you have previously identified the defendant as your cousin; is that correct?

A.  Yes, sir.

Q.  And there came a time that you came to Dermott, Arkansas to live with your family; is that correct?

A.  Yes, sir.

Q.  And when you came back to Dermott, you were a teenager?

U.S. DISTRICT COURT

**Ex. 69 - 1030**

Direct - Schattman/Holimon                Vol. 20:   46

A.  Yes, sir.

Q.  All right.  And can you tell us whether or not your cousin, Julius Robinson, at the time you returned to Dermott was involved in any gang in Dermott, Arkansas?

A.  No, sir, because he wasn't staying in Dermott when I had came down from Chicago.

Q.  Do you know whether or not your cousin, Julius Robinson, ever became involved in a gang up in Arkansas?

A.  Yes, sir.

Q.  And can you tell us about when it was that Julius became involved in a gang up in Arkansas?

A.  I don't know, sir.  I don't know when.

Q.  About how old were you if you recall?

A.  I was like 16 when I had found out, but I don't know when he began, you know.

Q.  If you were 16, he would have been around 18 or so?

A.  Seventeen or 18.

Q.  Seventeen or 18.

And what gang was he a member of or affiliated with up in Arkansas?

MR. STRICKLAND:  Objection, Your Honor, hearsay, unless there's a showing of some personal knowledge.  The tenor of his previous answers is that there is not some personal knowledge.

THE COURT:  I do think hearsay, though permissible in

U.S. DISTRICT COURT

**Ex. 69 - 1031**

this hearing, has to have some indicia of reliability and some support with personal knowledge.

Mr. Schattman, can you cure the defect?

Q. (By Mr. Schattman)  Mr. Holimon, did you have conversations with your cousin about gangs, gang activities, or hear him talk about those matters?

A. Yes, sir.

Q. And from those conversations, were you able to gain an understanding of what gang he was associated with or affiliated with up in Arkansas?

A. Yes, sir,

MR. STRICKLAND:  Two objections, maybe three objections, Judge.

Number one, it assumes that, indeed, he was affiliated with a gang, and that has not been established.  Number two, it assumes he was affiliated with a gang in Arkansas, and that's not been established.  And, number three, an understanding of or gain some understanding from inferences requires this man to engage in speculation.

I think the indicia of reliability we're looking for is if he made an admission against interest that he was, in fact, involved in a gang and go from there.

And, fourth, we object to --

THE COURT:  I think under the relaxed rules of evidence, or information as the case may be, the objection

Ex. 69 - 1032

Direct - Schattman/Holimon        Vol. 20:  48

should be overruled and the answer should be permitted.

And you did answer, did you not?

THE WITNESS:  Yes, sir.

THE COURT:  You may proceed.

Q.  (By Mr. Schattman)  From your conversations with your cousin, can you tell us what name -- what was the name of the gang with which  --

A.  Crypt.

Q.  -- with which he was associated or affiliated?

A.  Crypt.

Q.  Now, you are familiar by your own --

MR. BALL:  Objection, leading.

Q.  (By Mr. Schattman)  Are you familiar by your own experience with gang signs?

A.  Yes, sir.  Not all of them but some, yes, sir.

Q.  Not all but some.  All right, sir.

Could we display Government's Exhibit 634, please?

Do you recognize the person that is depicted in Government's Exhibit 634?

A.  Yes, sir.

Q.  Who is that person?

A.  Julius Robinson.

Q.  In Government's Exhibit Number 634, your cousin appears to be holding his hand in some particular manner, correct?

A.  Yes, sir.

U.S. DISTRICT COURT

Direct - Schattman/Holimon          Vol. 20:  49

MR. STRICKLAND:  Your Honor, we need to interpose an objection as this exhibit has not been offered or admitted.

THE COURT:  I show it as admitted, 634?

MR. SCHATTMAN:  Yes, sir, from the search of Mr. Robinson's house.

MR. STRICKLAND:  I'm sorry.  I stand corrected.

Q.  (By Mr. Schattman)  Does that configuration with his hand have any significance, mean anything?

A.  That's a Crypt sign.

Q.  A Crypt sign?

A.  Yes, sir.

Q.  And could we have Government's Exhibit Number 629, please?

Do you recognize the persons that are depicted in Government's Exhibit Number 629?

A.  Yes, sir.

Q.  And, if you would, let's begin -- there are four people in there.  How many of them do you recognize?

A.  I recognize all of them.

Q.  All right.  Let's begin as we look at the picture at the far left hand edge and tell us who that person is?

A.  That's L.J. Britt.

Q.  And who is seated in the middle of the red chair?

A.  Julius Robinson.

Q.  And who is seated to the -- on the right-hand edge of the photograph as we're looking at it?

Ex. 69 - 1034

Direct - Schattman/Holimon          Vol. 20:  50

A.   That's me.

Q.   And who is the person who appears to be kneeling down?

A.   Cornelius Richeson.

Q.   For the convenience of the reporter, Richeson is R-I-C-H-E-R-S-O-N -- I'm sorry, E-S-O-N.  There is no "R."

     Mr. Holimon, can you tell us what you are doing in this picture with your left hand?

A.   I'm throwing down five fingers.

Q.   You're throwing down five fingers?

A.   Yes, sir.

Q.   What is that?

A.   That's disrespecting my rival gang.

Q.   That's showing disrespect for your rival gang?

A.   Yes, sir.

Q.   What gang were you a member of?

A.   Gangster Disciples.

Q.   Gangster Disciples?

A.   Yes, sir.

Q.   Cornelius Richeson, what is he doing with his right hand?

A.   He's throwing up West Side, a "W."

Q.   Crossing the two middle fingers?

A.   Like that, yes.

Q.   And West Side means what?

A.   Just West Side.

Q.   Is that another gang?

Ex. 69 - 1035

Direct - Schattman/Holimon          Vol. 20: 51

A.  No, not really.  It's just like a hood, a neighborhood. That's where he from, the west side.

Q.  All right.  Mr. Britt, is there any significance to the way he has either his right hand or his left hand displayed?

A.  No, sir.

Q.  And your cousin, Julius Robinson, what's he doing with his right hand?

A.  That's like a playboy bunny.

Q.  Does that have some significance with regard to Crypts or identifying --

A.  Yes.  That's a kind of Crypt, playboy hustler Crypt?

Q.  Playboy hustler Crypt is one version?

A.  Yes.

Q.  Is there a playboy gangster as well?

A.  Not that I know of.

Q.  All right.  Mr. Holimon, are you familiar with the term "keep it real"?  Have you heard that before?

A.  Yes, sir.

Q.  And what does the phrase, "keep it real," mean?

A.  To my understanding, it means not to do anything fake, you know what I'm saying.  Don't go against the grain or something like that there.

Q.  Don't do anything to be bad or otherwise hurt whoever is saying --

A.  Yeah --

Ex. 69 - 1036

Direct - Schattman/Holimon          Vol. 20:  52

MR. STRICKLAND:  Objection.  Leading the witness, Your Honor.

THE COURT:  Sustained.

Q.  (By Mr. Schattman)  I'm sorry, sir.

Mr. Holimon, we met yesterday evening out at your place of confinement; is that correct?

A.  Yes, sir.

Q.  And I'll show you what we have marked for identification purposes as Government's Exhibit Number 929, a cassette tape. Do you recall listening to that tape last night?

A.  Yes, sir.

Q.  And during the course of our conversation yesterday evening, we asked you about some names and meanings of phrases, correct?

A.  Yes, sir.

Q.  And one of those was "keep it real"?

A.  Yes, sir.

Q.  And you told us that "keep it real" -- did you tell us that "keep it real" can have several meanings?

A.  Yes, sir.

Q.  Let's go through the several meanings that "keep it real" can have.

Why don't you just start.  What's the first thing that comes to mind?

A.  "Keep it real" can mean, you know, don't do nothing fake.

U.S. DISTRICT COURT

Ex. 69 - 1037

Direct - Schattman/Holimon          Vol. 20:  53

"Keep it real" can mean don't go against the grain.  Don't do nothing, you know.  I guess that's it.

Q.  Don't go against the grain?

A.  Right.

Q.  Can you give us an idea of what would be going against the grain?

A.  Hurting me.  Like if I tell somebody keep it real, that means don't do nothing to hurt me.  You know what I'm saying?

Q.  During the time that your cousin, Julius Robinson, was in Dermott at the same time as yourself, can you tell us what his relationship was with other members of the Crypt gang from your conversations with him and observations?

A.  Most of the younger guys, they looked up to him.

Q.  Now, your cousin was not the founder, the initiator, of this gang, correct?

A.  No, sir.

Q.  And that gang was, to your understanding -- or can you tell us who it was that started this Crypt gang in Dermott, Arkansas?

A.  Yeah.  It was a guy named John-John.  He goes by the name of John-John.  I don't know his real name.

Q.  Can you tell us whether your cousin was one of the first or one of the last people to join up with John-John?

A.  He was probably in the beginning because it really wasn't a whole lot of them, you know.  I'm not for sure.

Ex. 69 - 1038

Direct - Schattman/Holimon          Vol. 20: 54

MR. STRICKLAND: We object to hearsay. I think it was established in his earlier testimony that he wasn't even there.

THE COURT: Well, the answer was speculative as well. I sustain.

Q. (By Mr. Schattman) Do you know a person in the Dermott area that goes by the name of Little Cracker?

A. Yes, sir.

Q. And how is it that you know Little Cracker?

A. He would be a little, young cat that would all up in the streets all the time, a young dude be out in the streets all the time?

Q. He's a young dude?

A. Yeah.

Q. Hanging out on the streets?

A. Yeah. I know his mom and dad and everybody. Everybody know everybody down there.

Q. How big a place is Dermott, Arkansas?

A. Population like 5500, or something like that.

Q. Do you know whether Little Cracker is also a gang member?

A. Yes, sir.

Q. Is he or is he not?

A. He is.

Q. Do you know somebody named One Love?

A. Yes, sir.

Q. And do you know what One Love's real name is?

U.S. DISTRICT COURT

Direct - Schattman/Holimon          Vol. 20:  55

A.  Michael Williams.

Q.  Do you know somebody named Skip up in Dermott?

A.  Yes, sir.

Q.  Do you know whether Skip had any relationship or affiliation with One Love?

A.  Yes, sir.  They were kind of tight.

Q.  Now, can you just explain to the jury what you mean when you say "kind of tight"?

A.  They use to be together almost every day.  That's what I'm saying.

Q.  All right.  Do you know a man up in Dermott, a young man in Dermott, whose street name is Little Black?

A.  No, sir.

Q.  Mr. Holimon, last night when we listened to Government's Exhibit Number 900 -- excuse me.  I'll show you the tape.  I'll show you the tape again, sir.  This is the tape that you listened to?

A.  Yes, sir.

Q.  And it is -- Your Honor, I may have misspoken earlier.  I believe I said 929.  It's actually 930.

THE COURT:  All right.

Q.  (By Mr. Schattman)  On the recording that was played for you, sir, were you able to recognize the voices of the persons who were engaged in the conversation that was purported on Government's Exhibit Number 930?

U.S. DISTRICT COURT

**Ex. 69 - 1040**

Direct - Schattman/Holimon          Vol. 20:  56

A.  Yes, sir.

Q.  Did you recognize the voice of your cousin, Julius Robinson?

A.  Yes, sir.

Q.  Do you recognize the voice of Reginald Polk?

A.  Yes, sir.

Q.  Would you just remind us, what is your relationship to Reginald Polk?

A.  That's my brother.

Q.  And on -- I'm going to show you another cassette that last night we also played portions of this cassette tape for you; is that correct?

A.  Yes, sir.

MR. SCHATTMAN:  Your Honor, this would be Government's Exhibit Number 929.

THE COURT:  All right.

Q.  (By Mr. Schattman)  And in listening to portions of Government's Exhibit Number 929, were you able to recognize the voice of your cousin, Julius Robinson?

A.  Yes, sir.

Q.  And you were also able to recognize the voice of someone identified as Josephine Dotson (phonetic)?

A.  Yes, sir.

Q.  And who is Josephine Dotson?

A.  That's my mother.

U.S. DISTRICT COURT

Ex. 69 - 1041

Cross - Strickland/Holimon          Vol. 20:  57

Q.  During the course of the conversations that are on Government's Exhibit 929, Ms. Dotson talks about --

MR. STRICKLAND:  Objection, Your Honor.

MR. SCHATTMAN:  I'm sorry.

Q.  (By Mr. Schattman)  Did you hear any references to yourself?

MR. STRICKLAND:  We still object.  Government's 929 and 930 are not in evidence, and we object to asking questions about items that are not in evidence.

THE COURT:  Sustained.

MR. SCHATTMAN:  Pass the witness at this time.

THE COURT:  I'm sorry?

MR. SCHATTMAN:  I said I'll pass the witness.

THE COURT:  Is there cross?

MR. STRICKLAND:  May we have a moment, Your Honor?

(Brief pause in proceedings)

CROSS EXAMINATION

BY MR. STRICKLAND:

Q.  Mr. Holimon, you were born in Chicago, I think you said, in 1978; is that correct?

A.  Yes, sir.

Q.  And did you live in Chicago until the time that you moved to Dermott?

A.  Yes, sir.

Q.  And when did you move to Dermott, if you remember?

U.S. DISTRICT COURT

Ex. 69 - 1042

Cross - Strickland/Holimon          Vol. 20:  58

A.  '92 or '93, sir.

Q.  So let me see quickly.  You would have been about 14 or 15; is that right?

A.  Yes, sir.

Q.  Did you have family in Dermott?

A.  Yes, sir.

Q.  Who is it in Dermott that's related to you?

A.  I have a whole lot of family, but I stay with my grandmother and grandfather.

Q.  And they had lived in Dermott all their lives; is that correct?

A.  Yes, sir.

Q.  Had you ever visited down in Dermott before you actually moved there when you were 14 or 15?

A.  Yes, sir.  I was real young,

Q.  So you didn't remember ever having been there before?

A.  I don't remember a whole lot of it, no, sir.

Q.  So all of a sudden when you're 14 or 15, you wake up one morning and decide to move to Dermott, or how did that happen?

A.  No.  I had gotten into a lot of trouble up in Chicago as a juvenile.  -

Q.  So you were -- your family was kind of looking for a change of scenery for you, weren't they?

A.  Yes, sir.

Q.  And did they think that sending you down to Dermott was

U.S. DISTRICT COURT

Ex. 69 - 1043

Cross - Strickland/Holimon          Vol. 20:  59

going to help some?

A.  Well, the judge had asked them, you know, was there somewhere they could send me before he sent me off somewhere. So they were like, we can send him to Arkansas.

Q.  So the judge asked them to get you out of Chicago; is that right?

A.  Yes, sir.

Q.  Were you kind of terrorizing Chicago?  I mean, that's pretty drastic for a judge to ask to send a 14-year-old all the way to Arkansas?

A.  No, sir.  I just wasn't doing right.

Q.  You were pretty involved in a gang up in Chicago, weren't you?

A.  Yes, sir.

Q.  And gangs were a pretty big problem in Chicago?

A.  Yes, sir.

Q.  Both then and maybe even now; is that right?

A.  Yes, sir.

Q.  Tell me again what gang you were involved in in Chicago.

A.  Gangster Disciples.

Q.  And when did you become involved with Gangster Disciples?

A.  It was like in the 6th or 7th Grade.

Q.  And you would have been about how old then, do you remember?

A.  Probably about 12 or 10.

U.S. DISTRICT COURT

**Ex. 69 - 1044**

Cross - Strickland/Holimon          Vol. 20:  60

Q.  Anywhere from 10 to 12 years old?

A.  Yeah, somewhere up in there.

Q.  Was that unusually young age for a youngster to become involved in gang activity in Chicago, or was that pretty much normal?

A.  You could say it was normal, but all kids weren't like me, though, no.

Q.  Some were better?  Some were worse?

A.  Some were worse, yes, some were worse, but some were better, too.

Q.  All right.  Now, what sort of things were you involved in as a gang member down in Chicago before you moved down to Dermott?

A.  Mostly just, you know, beating up guys and stuff like that.  It wasn't, you know, nothing too --

Q.  I'm sorry.  I can't hear you.

A.  I said it was nothing too bad, but, you know, beating up guys and stuff like that.  So, I guess, that's bad, yeah.

Q.  Well, it's kind of bad for the guys getting beat up, wasn't it?

A.  Yeah.  I got beat up, too, though.

Q.  All right.  Everybody was doing some beating; is that right?

A.  Yes, sir.

Q.  How about involvement in the drug business?  Were you

U.S. DISTRICT COURT

**Ex. 69 - 1045**

Cross - Strickland/Holimon          Vol. 20:  61

involved in that at all before you moved to Dermott?

A.  Yes, sir.

Q.  And what were you doing in the drug business at that age?

A.  I'd sell rocks, cocaine rocks.

Q.  Crack cocaine?

A.  Yes, sir, crack cocaine.

Q.  Are most of your friends involved in gang activity up there then?

A.  Yes, sir.

Q.  Well, let me ask you this.  Did you have any close friends in Chicago that were not gang members?

A.  No, sir.

Q.  They were all gang members, weren't they?

A.  Yes, sir.

Q.  At some point, suffice it to say, your behavior caught the attention of the juvenile court up there; is that right?

A.  Yes, sir.

Q.  And did they actually file charges on you in juvenile court?

A.  Yes, sir.

Q.  Do you remember what it was that they filed on you?

A.  It was unlawful use of a weapon.

Q.  What kind of weapon were they worried about you using?

A.  I shot a guy with a .38.

Q.  You shot him?

Ex. 69 - 1046

Cross - Strickland/Holimon        Vol. 20:  62

A.  Yes, sir, on accident.

Q.  I'm sorry?

A.  On accident, playing with a gun.

Q.  So you were horsing around with a gun and shot a guy, right?

A.  Yes, sir.

Q.  Did it kill him?

A.  No, sir.

Q.  It didn't do him any good, did it?

A.  No.  That didn't do him no good.

Q.  All right.  Now, was that the first time you had gone up to the juvenile court when you shot this fellow?

A.  No.  I caught a shoplifting charge before that, but that's it.

Q.  But the juvenile judge knew enough about you that he decided that maybe a change of scenery would be good for you and good for the citizens of Chicago, right?

A.  No.  It was like a little while after that had happened.

Q.  Okay.  What else happened that caused him to decide maybe you'd better leave town?

A.  I was violating my probation by truancy.  I wasn't going to school.

Q.  Okay.  So who made the decision to send you down to Dermott?

A.  My mom.

Ex. 69 - 1047

Cross - Strickland/Holimon          Vol. 20:  63

Q.   Your mom was trying to help out, wasn't she, trying to get you on the straight and narrow; is that correct?

A.   Yes, sir.  She did what the judge asked her.

Q.   So when you went down to Dermott, you went down there with the idea of trying to get your life straightened out; is that right?

A.   No, not really.  I just went down there because my mom had made me go down there.

Q.   All right.  It was your mom's idea that you try and get your life straightened out, and you just went because she told you to?

A.   She always told me to, you know, do the right things, but I was making bad decisions.

Q.   When you got down to Dermott, did you quit making bad decisions?

A.   No, sir.

Q.   You kind of went from the frying pan into the fire by going down to Dermott, didn't you?

A.   Yes, sir.

Q.   Because even in this little town back in Arkansas, 5500 people, there were gangs in Dermott, weren't there?

A.   Yes, sir.

Q.   And how long did it take you after you got to Dermott, Arkansas, from the big city of Chicago, did it take you to get involved with a gang in Dermott?

U.S. DISTRICT COURT

**Ex. 69 - 1048**

Cross - Strickland/Holimon        Vol. 20:   64

A.   I really didn't get involved with no gang in Dermott.

Q.   How long did it take you to learn who the gang members were?

A.   It didn't take no time to find out.

Q.   Well, a day, a week, a month?

A.   Probably about a couple of months, two months.

Q.   Did you start hanging out with them?

A.   Well, they was all my family, so, yes, sir.

Q.   All right.  Everybody in your family was involved?

A.   Not everybody, no.

Q.   Well, I guess your grandmother and grandfather weren't involved, were they?

A.   No, sir.

Q.   Okay.  Did you actually transfer -- I mean do you all do that?  Do you transfer your gang membership from Chicago to Dermott, or did you just sort of take a leave of absence?

A.   I didn't take a leave of absence, but the things they was doing down in Dermott was a whole lot different from Chicago.

Q.   In what way were they different?

A.   Because in Chicago it's a whole lot more organized than it was down there.

Q.   So in Dermott, it was just not very organized; is that right?

A.   Yes, sir.

Q.   How about the nature of the activities whether they were

Ex. 69 - 1049

Cross - Strickland/Holimon          Vol. 20:  65

organized or not?  Were they beating up on people and involved in the drug business and that sort of thing?

A.   In Dermott?

Q.   In Dermott, yes.

A.   No, not really.

Q.   What sort of things were the Dermott gangsters do?

A.   They was gang banging.  Like in Chicago, they don't gang bang, as in riding around throwing your little signs up and, you know, hollering and doing a whole lot of crazy stuff that they don't do in Chicago.

Q.   Kind of some of the signs, for example, we saw in the government's exhibits just a few minutes ago?

A.   Yeah, like that.

Q.   Well, was that all there was to it?  I mean, were they throwing up signs, or were they --

A.   You know, like riding around.  You know, trying to aggravate the other gangs that's in the town, you know, stuff like that.  They don't do that up in Chicago.

        THE COURT:  Be sure and let him finish his question before you start answering so the court reporter can get it down.

        THE WITNESS:  Yes, sir.

Q.   (By Mr. Strickland)  Well, what was the point of trying to aggravate these other folks?

A.   I don't understand that.  I still don't understand that.

Ex. 69 - 1050

Cross - Strickland/Holimon          Vol. 20:  66

Q.   It was all pretty juvenile, pretty silly, wasn't it?

A.   Yes, sir.

Q.   Especially, based on what you had been use to up in Chicago where it was kind of serious, right?

A.   Yes, sir.

Q.   Now, when you came to Dermott, if I understood your earlier testimony, Julius Robinson wasn't even living in Dermott at the time; is that right?

A.   Yes, sir.

Q.   Did you know Julius Robinson before you moved to Dermott?

A.   Yes, sir.

Q.   All right.  And how long after you moved to Dermott was it that Julius Robinson came back to Dermott if he ever did?

A.   He didn't.  I seen him before he came back to Dermott.

Q.   So you never lived in Dermott with him at all, did you?

A.   No, sir.

Q.   And as to whether he had been involved or when he had been involved or what he had done in Dermott, you might have heard talk on the street, but you didn't have any personal knowledge at all because he wasn't even living there when you were; is that right?

A.   Yes, sir.

        MR. STRICKLAND:  Okay.  Pass the witness, Your Honor.  Thank you, Mr. Holimon.

        THE COURT:  Redirect?

U.S. DISTRICT COURT

**Ex. 69 - 1051**

REDIRECT EXAMINATION

BY MR. SCHATTMAN:

Q.  Mr. Holimon, after you moved to Dermott, there were times that you would meet your cousin, Julius Robinson, either up there or down here in Texas, correct?

A.  Yes, sir.

Q.  Is it fair to say when you all met, you would visit and talk about things that you had done and places you'd been, things like that?

A.  Yes, sir.

Q.  And one of the subjects that you all talked about -- or did you talk to him and did he talk to you about some of this gang business?

A.  Yes, sir.

Q.  And you mentioned the gangs up in Dermott.  I think you used the expression, gang banging?

A.  Yes, sir.

Q.  Did any of that gang banging involve firearms?

A.  Sir?

Q.  Did any of that gang banging involve firearms in any way?

A.  No, sir.

        MR. STRICKLAND:  May it please the Court.  We would object to the relevance of that.  He's established that Mr. Robinson wasn't even living in Dermott at the time that he's now talking about gang banging and using firearms.  It's

Redirect - Schattman/Holimon        Vol. 20:  68

not relevant as to this defendant at all.

THE COURT:  Response?

MR. SCHATTMAN:  Your Honor -- well, let me back up. I'll see if I can get there.

THE COURT:  All right.

Q.  (By Mr. Schattman)  There were times that your cousin, Julius Robinson, would come back to Dermott and visit, correct?

A.  Yes, sir.

Q.  And did you have occasion to see him up there and meet with some of the other people he was visiting with?

MR. STRICKLAND:  Your Honor, we object to that.  This is not an area that was gone into on cross examination.  This is outside the scope.  I'm not sure what this is in rebuttal to.

THE COURT:  Overruled.

A.  Sir, can you repeat the question?

Q.  (By Mr. Schattman)  You were able to see some of the people that your cousin, Julius, would meet and hang out with up in Dermott?

A.  Yes, sir.

Q.  And can you tell us whether any of those people were gang members of this Crypt gang?

A.  Yes, sir.  They were Crypts.

Q.  In the gang activity of the Crypts up in Dermott, you mentioned gang banging?

U.S. DISTRICT COURT

**Ex. 69 - 1053**

Redirect - Schattman/Holimon          Vol. 20:  69

A.  Yes, sir.

Q.  Now, did any -- when you say gang banging --

A.  Yes, sir.

Q.  -- when you use the term, does that encompass either the carrying of guns or the discharge of guns?

MR. STRICKLAND:  Same objection as to relevance. Further, the question is so global that we have no idea when we're talking about, who we're talking about, under what circumstances we're talking about.

MR. SCHATTMAN:  I'll move on to something else, Judge.

THE COURT:  All right.

MR. SCHATTMAN:  Could I have just a moment, please?

THE COURT:  All right.

(Brief pause in proceedings)

MR. SCHATTMAN:  Pass the witness, Your Honor.

MR. STRICKLAND:  No further questions, Your Honor. Thank you.

THE COURT:  You may step down, sir.

I think now will be just as good a time as any to take a break.  Let's try to keep it to ten minutes.

(Trial recesses, 10:55 - 11:10 a.m.)

MR. STRICKLAND:  Your Honor, may I approach?

THE COURT:  Yes, sir.

(Off-the-record discussion at the bench at this time)

MR. O'CONNOR:  Your Honor, we would call Ms. Asbury.

U.S. DISTRICT COURT

**Ex. 69 - 1054**

# EXHIBIT 70

Vol. 20:  1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA         .   CRIMINAL ACTION NO.
                                 .     4:00-CR-260-Y
V.                               .
                                 .   Fort Worth, Texas
JULIUS OMAR ROBINSON             .   March 12, 2002

. . . . . . . . . . . . . . . .

VOLUME 20
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.

APPEARANCES:

For the Government:          MR. FREDERICK M. SCHATTMAN
                             MR. REED C. O'CONNOR
                             Assistant United States Attorney
                             801 Cherry Street, Suite 1700
                             Fort Worth, Texas  76102-6897
                             (817) 252-5200

For the Defendant:           MR. WES BALL
                             Ball & Hase, PC
                             4025 Woodland Park Boulevard
                             Suite 100
                             Fort Worth, Texas   76013
                             (817) 860-5000

                             MR. JACK STRICKLAND
                             Attorney at Law
                             909 Throckmorton
                             Fort Worth, Texas   76102
                             (817) 338-1000

Court Reporter:              Ana P. Warren
                             U.S. District Court Reporter
                             501 W. 10th Street, Room 201
                             Fort Worth, Texas  76102-3637
                             (817) 850-6681

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

U.S. DISTRICT COU

COPY

Ex. 70 - 1055

Direct - O'Connor/Henderson          Vol. 20:   114

A.  Yes, sir.

Q.  So sometime after that when you're talking to Julius Robinson, he tells you, hey, that Michael Williams --

MR. BALL:  Excuse me.  I'm going to object to leading.

THE COURT:  All right.  Sustained.

Q.  (By Mr. O'Connor)  Okay.  When you're talking to Julius Robinson, after you learned who Michael Williams is, what is it that Julius Robinson is telling you?

A.  He told me Michael Williams was arrested on another case, and he was just telling on everybody trying to get his time down.

Q.  All right.  And did Mr. Robinson when he's talking to you about Michael Williams, does he ever indicate his feelings about Michael Williams talking in connection with this case?

A.  Yes, sir.

Q.  What does he tell you?

A.  He tells me he hope somebody get him.

Q.  And did he tell you what, if anything, he was doing in that regard?

A.  He called down to his hometown a couple of times, but he didn't tell me exactly what was going on.

Q.  All right.  And when you say called down to his hometown a couple of times, do you know where his hometown was?

A.  It's Dermott, Arkansas.

Q.  Did there come a time when he talked to you in more detail

Ex. 70 - 1056

Direct - O'Connor/Henderson          Vol. 20:   115

about Michael Williams' situation?

A.   Yeah.   He told me on New Year's Eve that the youngsters in Arkansas, they got One Love.

Q.   Okay, sir.   And how did that come up?

A.   I mean, it was just a conversation that he had on the phone.  When he got off the phone, he came to my cell and told me they got One Love.

Q.   And did he indicate to you what it is that they had done to One Love?

A.   He told me some youngsters down there had drug him in a car.

Q.   Drug him behind the car?

A.   Yes, sir.

Q.   And when Julius Robinson is talking to his -- talking to the people up in Dermott, Arkansas, do you know whether he is coming out and saying, hey, go get One Love, or how is it that he's communicating to them?

A.   I don't know what kind of conversations they had on the phone.  I just know if someone is snitching in Dermott and there is a message gave to them down there, that means get them.  Stop them from talking.

Q.   Okay.  Dermott's a little town?

A.   Yes, sir.

Q.   And do you -- in connection with your dealings with Mr. Robinson, do you know that he on occasions talks in code on

Ex. 70 - 1057

Cross - Ball/Henderson                    Vol. 20:  121

A.  Yes, it is.

Q.  And you would like to get some leniency, wouldn't you?

A.  Yes, sir.

Q.  That's what you told them when you testified in John Turner's trial; is that right?

A.  Yes, sir.

Q.  Do you recall testifying in John Turner's trial when Mr. Turner's lawyer asked you, are you expecting leniency for this case, telling him, not for this case, for another case?

A.  Yes, sir.

Q.  The case you were referring to was this case here, Julius Robinson; is that right?

A.  Yes, sir.

Q.  Now, while you've -- did you get brought over here this morning?

A.  Yes, sir.

Q.  By the United States Marshal's Service?

A.  Yes, sir.

Q.  You're being held back here behind this door.  Is there some sort of holding tank or cell area back there?

A.  Yes, sir.

Q.  And who else is back there with you?

A.  Michael Williams and Terrence Holimon.

Q.  Michael Williams.  And you have talked back there, have you not, this morning?

Ex. 70 - 1058

# EXHIBIT 71

Vol. 21: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA          .  CRIMINAL ACTION NO.
                                  .   4:00-CR-260-Y
V.                                .
                                  .  Fort Worth, Texas
JULIUS OMAR ROBINSON              .  March 13, 2002

. . . . . . . . . . . . . . .

VOLUME 21
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.

APPEARANCES:

For the Government:               MR. FREDERICK M. SCHATTMAN
                                  MR. REED C. O'CONNOR
                                  Assistant United States Attorney
                                  801 Cherry Street, Suite 1700
                                  Fort Worth, Texas   76102-6897
                                  (817) 252-5200

For the Defendant:                MR. WES BALL
                                  Ball & Hase, PC
                                  4025 Woodland Park Boulevard
                                  Suite 100
                                  Fort Worth, Texas   76013
                                  (817) 860-5000

                                  MR. JACK STRICKLAND
                                  Attorney at Law
                                  909 Throckmorton
                                  Fort Worth, Texas   76102
                                  (817) 338-1000

Court Reporter:                   Ana P. Warren
                                  U.S. District Court Reporter
                                  501 W. 10th Street, Room 201
                                  Fort Worth, Texas   76102-3637
                                  (817) 850-6681

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

U.S. DISTRICT COU

**COPY**

Ex. 71 - 1059

Direct - Ball/Peach                          Vol. 21:  2

P R O C E E D I N G S

(Commencing, 9:15 a.m.  Jury present)

THE COURT:  The defendant may call his first witness.

MR. BALL:  Your Honor, the defense will call Eddie Peach.

THE COURT:  Please step around here, sir, and I'll administer the oath.  Please raise your right hand and be sworn.

(Witness sworn by the Court)

THE COURT:  You may be seated, sir.

Please speak directly into the microphone.

EDDIE PEACH, testified under oath as follows:

DIRECT EXAMINATION

BY MR. BALL:

Q.  Could you tell the ladies and gentlemen of the jury your name, please, sir?

A.  Eddie Peach.

Q.  And, Mr. Peach, how are you employed or occupied, sir?

A.  I'm employed at Arlington ISD.  I'm the head football coach and athletic coordinator at Lamar High School.

Q.  All right.  And Lamar High School is that a high school located within the city of Arlington?

A.  Yes, sir.

Q.  What part of Arlington is Lamar High School?

A.  It's in the north part of Arlington, just north of I-30.

U.S. DISTRICT COURT

Ex. 71 - 1060

Direct - Ball/Peach                    Vol. 21:  3

Q.  And how long have you been in coaching, sir?

A.  I've been in coaching 37 years.

Q.  And how long -- you said you're the head football coach at Lamar High School?

A.  Yes, sir.

Q.  How long have you been the head football coach at Lamar High School?

A.  Thirty-two years.

Q.  And is that the Lamar Vikings?

A.  Yes, sir.

Q.  Okay.  And do you have in your football program not only yourself as head coach but assistant coaches or others that participate in coaching student athletes there at Lamar High School?

A.  Yes, sir, we do.

Q.  Did you have occasion during your coaching career to come into contact or learn to know a young man by the name of Julius Robinson?

A.  Yes, sir.  He was a student athlete for us at Lamar.

Q.  And did he play football for you?

A.  Yes, sir, he did, for three years.

Q.  And would you have occasion during your coaching of Julius Robinson to see him at workouts, playing football, interacting with coaches and players, other students?

A.  Yes, sir.

U.S. DISTRICT COURT

**Ex. 71 - 1061**

Direct - Ball/Peach                    Vol. 21:  4

Q.  And do you see Mr. Robinson that you're speaking of that played football for you at Lamar High School here in the courtroom today?

A.  Yes, sir, I do.

Q.  Would you point him out, please, sir, and maybe describe an article of clothing he might be wearing so that the jury can be confident that you do see him?

A.  He's the young man sitting right over here with the red tie and suit.

MR. BALL:  Your Honor, may the record reflect that the witness has identified the defendant, Julius Robinson?

THE COURT:  The record will so reflect.

Q.  (By Mr. Ball)  Are there any particular characteristics that you look for in a young man that comes to play football for you in terms of attitude, responsibility, work ethic, and things of that sort?

A.  Yes, sir.  We run a pretty disciplined program.  We have a lot of athletes in our program.  We're in a high school of approximately 3,000 students, we have kids that, you know, range from the richest you can have to the poorest and any place in between.  But all of our kids come together.  We have 300 kids in our football program, and those kids come together as one and participate, and most of them do what we ask them to do.  Q.  Okay.  And how would you describe Julius Robinson when you interacted with him, saw him there in the football program

Ex. 71 - 1062

Direct - Ball/Peach                          Vol. 21:  5

interacting with coaches and players?  How would you describe him?

A.  He was just a young man that did everything we asked him to do.  Everything was "yes, sir" and "no, sir," and as a student athlete at Lamar, both in the classroom, in the school, and on the football field, he did anything anyone asked him to do.

Q.  Did he ever cause any problems for coaching staff or other students that you know of?

A.  No, sir.

Q.  Did he appear to be liked or not liked by other players?

A.  He was well liked.  He was part of our football team. Different members of our football team would pick him up at different times to bring him to films and different things, and he was just one of the members of our football team.

Q.  What position did Julius play?

A.  He played what we call a rover linebacker, and he was, also, what we call a slot back.  But he started for us.  He played on junior varsity his sophomore year, and he was on our varsity as a junior and senior, and he started for us on, what we call, a rover linebacker his senior year.

Q.  Did your team ever get involved -- during the course of Julius' participation in your athletic program, did you team ever get involved in any playoffs?

A.  Yes, sir.  We was in the playoffs every year.

Q.  And did Julius play in the playoffs?

Ex. 71 - 1063

Cross - O'Connor/Peach          Vol. 21:   6

A.  Yes, sir, he did.

Q.  And with regard to his dealing with coaches and other players, was Mr. Robinson abrasive or polite?  How did he conduct himself in that respect?

A.  Here again, he did everything we asked him to do, and he was always polite.  He was always "yes, sir," "no, sir."

Q.  Was he someone that always showed up for practices as required by players on your team?

A.  Yes, sir.

Q.  Now, you understand the jury here is going to make a decision about some punishment with regard to Julius Robinson and -- I mean, do you understand that?

A.  Yes, sir.

Q.  Certainly, you don't have any knowledge, maybe other than what you might have seen in the newspaper about any of the activities that the jury's heard about; is that fair?

A.  That's fair.  No, sir, I don't.

        MR. BALL:  Thank you, sir.  I'll pass the witness.

        THE COURT:  Cross?

        MR. O'CONNOR:  Yes, sir.

                        CROSS EXAMINATION

BY MR. O'CONNOR:

Q.  Sir, when was the last time that you had had any contact with Mr. Robinson?

A.  It's probably been two or three years ago now.

U.S. DISTRICT COURT

Ex. 71 - 1064

Cross - O'Connor/Peach                    Vol. 21:  7

Q.  Do you remember the time frame that he played for you out there at Arlington Lamar approximately?

A.  Approximately, it was from probably '92 to '94, '93 to '95 in, that range.  He was on our football team.  His senior year was 1994.

Q.  Senior year was '94?

A.  Yes, sir.

Q.  Do you have a pretty big staff of coaches?

A.  Yes, sir.  We have 16 football coaches.

Q.  And do they -- a part from you, does your staff interact with the student athletes as well?

A.  Yes, sir.

Q.  And you encourage that?

A.  Yes, sir.

Q.  And you have a good staff?

A.  Yes, sir.

Q.  And they care about the kids?

A.  Yes, sir.

Q.  Do you also encourage your staff to be -- I don't know if role models is the correct term -- but to act in an appropriate way in front of the kids?

A.  Yes, sir.

Q.  Because kids could look up to coaches?

A.  Hopefully, yes, sir.

Q.  Do you, as the head coach and your staff of assistant

Ex. 71 - 1065

Cross - O'Connor/Peach          Vol. 21:  8

coaches, are you there for the kids if they need you?

A.  Hopefully, yes, sir.

Q.  If someone comes to you with a problem or some such, you would be there for them?

A.  Yes, sir.

Q.  And in terms of your teaching there -- because essentially you coach athletics, but you're also a teacher?

A.  I'm not.  I'm an athletic coordinator.  I'm in charge of all the sports, yes, sir.

Q.  I understand that, but you are a teacher within the state of Texas?

A.  Yes, sir.

Q.  You don't teach a class, per se, other than athletics?

A.  That's correct, yes, sir.

Q.  But just fundamentally as a coach, as a head coach and an athletic director or coordinator, you are, in effect, a teacher?

A.  Yes, sir.

Q.  You're teaching football; is that correct?

A.  Yes, sir.

Q.  You're teaching skills on the football field, correct?

A.  Yes, sir.

Q.  And part of it, you understand that the kids that you're teaching out there on the football field, a lot of them aren't going to go play college football?

U.S. DISTRICT COURT

Ex. 71 - 1066

A.  Yes, sir, that's correct.

Q.  A lot of them aren't going to play pro football?

A.  Yes, sir, that's correct.

Q.  So part of what you're doing -- when you said you run a disciplined program, part of what you're doing is trying to instill discipline into your student athletes?

A.  Yes, sir.  That's a fair statement.

Q.  For the good of the team, obviously, but also for their own good?

A.  That's correct.

Q.  And hoping that they take the discipline that you're able to instill in them, take the discipline that they learned in playing football and then apply to other situations?

A.  Hopefully, yes, sir.

Q.  In the real world?

A.  Yes, sir.

Q.  Because they are going to have to go out and make a living some day?

A.  Yes, sir.

Q.  You also teach them that they need to fly right?  They need to abide by the rules; is that correct?

A.  Yes, sir.

Q.  Your rules within the football program in particular?

A.  Yes, sir.

Q.  And also the school rules?

Ex. 71 - 1067

Cross - O'Connor/Peach          Vol. 21:  10

A.  Yes, sir.

Q.  Because you know that if they violate, of course, your rules within the football program, they are not going to be able to play football?

A.  That's correct.

Q.  Because you're not going to tolerate that?

A.  Yes, sir.

Q.  And that there are consequences to the violation of those rules within your program?

A.  Yes, sir.

Q.  But there are also consequences to the violation of the school rules as well?

A.  Yes, sir.

Q.  They can violate a school rule and that may kick them out of school, and then they are not going to be able to play football in your program?

A.  That's correct.

Q.  And, again, those are lessons that are instilled in those skids, not just to get them through school, although that's a big part of it, but that's the way of the world?

A.  Hopefully, yes, sir.

          MR. O'CONNOR:  Pass the witness.

          MR. BALL:  That's all, Your Honor.

          THE COURT:  You may step down, sir.  Thank you. You may call your next witness.

Ex. 71 - 1068

Direct - Ball/Burdine                    Vol. 21:  11

MR. BALL:  Landry Burdine.

THE COURT:  Please raise your right hand and be sworn.

(Witness sworn by the Court)

THE COURT:  You may be seated in the witness chair. Speak directly into the microphone.

LANDRY BURDINE, testified under oath as follows:

DIRECT EXAMINATION

BY MR. BALL:

Q.  Would you tell the ladies and gentlemen of the jury your name, please, sir?

A.  Landry Burdine.

Q.  Spell your last name.

A.  B-U-R-D-I-N-E.

Q.  How are you employed or occupied, Mr. Burdine?

A.  I'm in the commercial real estate business here in Fort Worth.

Q.  How long have you been in the commercial real estate business?

A.  Since June of '99.

Q.  Okay.  Did you have occasion in your high school years to know and meet a person by the name of Julius Omar Robinson?

A.  I did.

Q.  And how was it that you came into contact with Julius Robinson?

A.  Through football.  We played football together.  We first

U.S. DISTRICT COURT

Ex. 71 - 1069

Direct - Ball/Burdine                Vol. 21:  12

met as freshmen, I believe, football practice.

Q.    Was that at Lamar High School?

A.    Yes, sir.

Q.    The gentleman that just left here, Eddie Peach, was he one of the coaches?

A.    Yes, he was.

Q.    What position did you play?

A.    Safety.

Q.    And was Julius also on the defensive team?

A.    Yes, sir, he was.

Q.    And did you have contact with Julius in your freshman year up through your senior year?

A.    Mainly, sophomore through senior.  Freshman year we had spring practice together, and then from there, we knew each other the entire time.

Q.    Okay.  And were you all on the -- I'm not sure how it works at Lamar, but was there a varsity team, in other words, the number one team, and then maybe a junior varsity?

A.    Yes, sir.  There's -- when you're a sophomore, you generally play on the junior varsity, and when you become a junior, you automatically move up to varsity.  There are some sophomores that are able to make the varsity team but not very many.·

Q.    Okay.  When you all got into your later high school years, were you. able to start for Lamar?

U.S. DISTRICT COURT

Ex. 71 - 1070

Direct - Ball/Burdine                    Vol. 21:  13

A.   Yes, sir.

Q.   What about Julius?

A.   Yes, sir.

Q.   And the Julius Robinson, incidentally, that you're speaking of, do you see him in the courtroom today?

A.   Yes, I do.

Q.   Would you point him out for the jury and maybe describe an article of clothing he's wearing?

A.   A gray suit and a red tie.

Q.   Which part of the room?

A.   Sorry.  Over there on that side of the room (indicating).

     MR. BALL:  Your Honor, may the record reflect the witness has identified defendant, Julius Robinson?

     THE COURT:  The record will so reflect.

Q.   (By Mr. Ball)  Now, Mr. Burdine, did you just see Julius there when you all would show up for practices or play or did you have other -- describe your contact that you had with him over the course of your high school years?

A.   No, sir.  We -- throughout the course of playing football together, we would have to go to film sessions in the morning, early morning film sessions, where the defensive group would get together and watch film of the opposing opponent for the upcoming week.  And, generally, I would pick Julius up in the morning a lot of times, and we would go and watch that.

     And then after practice, the defense that we had was a

U.S. DISTRICT COURT

Ex. 71 - 1071

Direct - Ball/Burdine                    Vol. 21:  14

pretty close group, generally, all about the same age, and we tended to hang out after practice, after school, together, you know, whether it be at a guy's house or go eat dinner or something after practice.

Q.  All right.  And did you all engage in that type of activity on a pretty regular basis?

A.  I would say it was pretty regular, yes, sir.

Q.  You say you picked him up?

A.  Yes, sir, in the mornings.

Q.  Okay.

A.  Not every morning but, generally, most of the season in the mornings.

Q.  And what kind of a -- well, what kind of a player was Julius?

A.  He was good.  If I remember right -- and granted it's been, you know, I guess six or seven years since we played together -- but his senior year I know he started the entire season.  His junior year, I'm not real sure.  I think he started most of the season, but his senior year definitely.  He put on a lot of weight and learned the defense and was a good linebacker.  I mean, he could play.

Q.  How did he interact with the other players on the team?

A.  Very well.  He was very well respected.  He knew his assignments.  You know, he studied what he was suppose to be doing.  I was a captain on the defense.  I had to call the

Ex. 71 - 1072

Direct - Ball/Burdine                    Vol. 21:  15

defenses my senior year, and, you know, he was a vital link in that defense. We had what I thought was a pretty good defense that year, and I don't remember him messing up in the game. I mean, he knew his stuff, knew his assignments, and the guys enjoyed playing with them. It seemed like he really enjoyed playing football.

Q. Did he have any conflicts or problems with other players or create any disturbances?

A. No. He was more of a friend to everybody pretty much. I mean, everybody enjoyed -- he laughed a lot when he was out there. So he was a likable guy on the football field. Everybody got along with him very well.

Q. What about with coaches? Was he respectful to coaches, did what they asked of him?

A. Yes, he was.

Q. In what year did you graduate, sir?

A. '95.

Q. And what did you go on to do after you graduated?

A. I went on to Texas Christian University and played football there, walked on and played for four years there and graduated.

Q. All right. Did you have a scholarship?

A. After my second year -- in the spring of my second year, I was awarded a scholarship, yes, sir.

Q. Towards the end of your football -- or your high school career, I guess, did you have occasion to look at schools in . .

Ex. 71 - 1073

Direct - Ball/Burdine          Vol. 21:  16

order to determine where you might want to go or see if anybody

A.   Uh-huh, I sure did.

Q.   -- would let you play ball for anybody, things like that?

A.   Right, yeah.

Q.   Did you ever have occasion to go on any of those journeys with anyone?

A.   Yeah, I did.  In fact, Julius and I and our middle linebacker at the time -- a guy named Kevin Meacham -- went down -- we took a visit to Stephen F. Austin University down in Nacogdoches.  We were invited to go down there.  And I believe it was a Friday.  We all loaded up in the car and -- it was a Saturday morning, and we all loaded up in the car and went down to Nacogdoches and watched a game, did the whole deal where they show you around campus and try to convince you to come play football for them basically.

Q.   Okay.  And that was you, another young man, and Julius?

A.   Yes, sir.  That's correct.

Q.   Have you had occasion over the -- after you left Lamar High School to run into Julius?

A.   Uh-huh.  We would -- during the state playoffs, generally, our football season had ended.  My first three years at TCU, we weren't very good.  So we didn't go to any bowl games or anything.  So I would get to come home, and one of the things you do when you play for Lamar is you go to the state playoffs and watch them play, and I would run into Julius there, and I

U.S. DISTRICT COURT

Ex. 71 - 1074

Direct - Ball/Burdine                    Vol. 21:   17

remember running into him.  Before the season would start, they have a scrimmage every year, and I think for the most part, they would play Trinity High School over in Euless every before the season, and I remember running into him there specifically a couple of times with some other friends that I would go to the game with, and we'd sit and watch the game together.

Q.  All right.  Now, you know what the jury has got to make a decision about regarding -- you know they have to make a decision regarding punishment for Julius Robinson?

A.  Yes, sir.

Q.  And would it be correct to say that you don't know all of the evidence that the jury has heard?

A.  That's correct.

Q.  You understand the jury has to make a decision, which may include -- certainly, does include the possibility of a death sentence for Julius Robinson?

A.  Yes.  That's what I've been told.

Q.  And, in fact, is this your first time down here at the courthouse to come down here and testify, or have you been down here on another occasion in the last couple of weeks?

A.  To this particular courthouse?

Q.  Yes.

A.  No, sir.  I was here on Friday for a couple of hours, and that was it.

Q.  Why were you here?

Ex. 71 - 1075

Direct - Ball/Gibson          Vol. 21:  18

A.  I was here because another friend of ours, mutual friend of Julius' and mine, had told me what was going on, had told me that Julius was in a bad spot, and I office real close to here and just wanted to come and tell him I was thinking about him.

Q.  Okay.  Based on your knowledge of Julius Robinson, would you ask the jury to spare his life?

A.  Yes, I would.

MR. BALL:  Thank you, sir.  I'll pass the witness.

THE COURT:  Is there cross?

MR. SCHATTMAN:  No, Your Honor.

THE COURT:  You may step down, sir.  Thank you.

MR. STRICKLAND:  Judge, may we have just a moment?

(Brief pause in proceedings)

MR. BALL:  Your Honor, we would call Stan Gibson.

THE COURT:  Mr. Gibson, if you will step up here I'll administer the oath.

Please raise your right hand and be sworn.

(Witness sworn by the Court)

THE COURT:  You may be seated in the witness chair. Please speak directly into the microphone.

STANLEY GIBSON, testified under oath as follows:

DIRECT EXAMINATION

BY MR. BALL:

Q.  Could you tell the ladies and gentlemen of the jury your name, please, sir?

Ex. 71 - 1076

Direct - Ball/Gibson                    Vol. 21:  19

A.  Yes.  My name is Stanley Gibson.

Q.  How are you employed or occupied, Mr. Gibson?

A.  I'm employed with the Bureau of Prisons.  I'm a correctional officer there.

Q.  All right.  And you have got a jacket with a little name plate and so forth.  Is that, I guess, the uniform or attire that you wear when you work for the Bureau of Prisons?

A.  Yes, it is.

Q.  Where do you work for the Bureau of Prisons, what facility or location?

A.  It's FMC Fort Worth.

Q.  And FMC, does that stand for Federal Medical Center?

A.  Yes, it does.

Q.  And approximately where in Fort Worth is that facility located?

A.  It's on the southeast side of Fort Worth located off of Hardin Street.

Q.  And how long have you been employed with the Federal Bureau of Prisons?

A.  Approximately three years and about four months.

Q.  And has all of that been at FMC, or do you work at other facilities?

A.  Only at FMC Fort Worth.

Q.  And can you just generally describe -- if we were to go out to FMC, what's out there?  What's that facility?  What's the

Ex. 71 - 1077

Direct - Ball/Gibson          Vol. 21:  20

purpose of it?  What kind of inmates are housed out there?  Can you give us a general description?

A.  Well, we have all types of inmates out there.  We have the highs, the lows, and the mediums, because it's a Federal Medical Center.  So for certain regions we are the only medical facility that is close by.  So we have got guys from California, you know, Arkansas, places like that, which may have a high status security level, but we house them because they have medical problems.  So we have all types.  Our facilities is rated as administrative.

Q.  Okay.  Now, are there inmates at the Federal Medical Center that have already been sentenced to serve time that are serving their sentences at that facility?

A.  Yes.  We have regular population, and we also have the presentence inmates or the jail facilities, also.

Q.  And the presentence inmates or the jail facility, are those inmates that may be awaiting trial --

A.  Yes.

Q.  -- in a federal court in this jurisdiction, that they are housed there?

A.  Yes.

Q.  And do they have an area that is generally considered general population?

A.  Yes.  They have an area that is considered general population.  It's open.  Pretty much they are right in that

Ex. 71 - 1078

Direct - Ball/Gibson                    Vol. 21:  21

general area.  They don't -- we have a fence to separate the jail inmates from the regular population sentence inmates.

Q.  So the ones serving sentences that have already been sentence are not mixed in with the people that are awaiting trial; is that right?

A.  No, they are not.

Q.  And do you have an area that's is an administrative or special housing area?

A.  Yes.  We have a special housing unit, which is for administrative and also disciplinary confinement.

Q.  Okay.  Is the special housing area separate from the general population pretrial inmates?

A.  Yes, it is.

Q.  And did you say it's broken down into two different --

A.  Two different sections.

Q.  -- sections.  Ones of those sections I think you said was disciplinary?

A.  Yes, it is.

Q.  What does that mean?

A.  Disciplinary is for people that -- we have general rules at the bureau that the inmates have to follow.  So if they break any of those rules, then they have to go in front of a DHO, disciplinary hearing officer, and if he finds them guilty of a certain rule that they have broken, then they have to serve whatever time that they get in disciplinary housing.

Ex. 71 - 1079

Direct - Ball/Gibson        Vol. 21:  22

Q.  Okay.  And this disciplinary housing, you said there are rules.  Are there rules that are provided all the inmates that -- and I'm going to talk about the jail and pretrial inmates?

A.  Uh-huh.

Q.  Are there rules that are set out for all the inmates to follow regarding their behavior and other things?

A.  Yes, it is.

Q.  And are the inmates advised of those rules?

A.  Yes.  When they are brought into facilities, disciplinary facilities, they are given a rule that they have to sign.  So they can't say that they were not aware of the rules.

Q.  Okay.  So would it be fair to say the disciplinary area of the jail unit is designed for those inmates that do not follow those roles, broken some of the rules.  So they are housed in that section?

A.  Yes.

Q.  For a period of time?

A.  For a period of time.

Q.  And this period of time depends on their infraction?

A.  Yes.  It depends on the infraction.

Q.  What does that consist of?  How is that different from the general population pretrial inmates?

A.  The general population jail inmates are pretty much -- they are confined, but it's not really -- it's open population.

U.S. DISTRICT COURT

**Ex. 71 - 1080**

Direct - Ball/Gibson                Vol. 21:   23

They go to their rooms.  They are able to come out, play, you know, whatever recreation, go to the law library, and stuff like that.  The only time we ever have any kind of jail inmates over is, like I say, if they disobey any rules that they have inside the jail, or if they feel like the jail inmates needs to come over to admin., administrative, but we very rarely get guys from the jail that goes for disciplinary.

Q.  Okay.  And, I guess, the distinction I'm trying to make, Mr. Gibson, is you said the general population jail is kind of open.  Inmates can mingle --

A.  Yes.

Q.  And do a variety of things.  But in the disciplinary area how is the housing?  Is it single cell or --

A.  They are single cells, and, usually, it's maybe just two guys in a cell together in there.  You have -- the first floor is the admin., administrative; the second floor is disciplinary.  So they are all housed in together on certain floors, but they all have separate cells.

As far as mingling or anything like that, you know, we take them out for rec or whatever.  They are all in separate sections that are fenced off after recreation.  So we have like three, maybe six cages, and they are all out there in separate cages.  And they are able to mingle, you know.  Through the cages, you know, they can talk back and forth through the cages out there and recreation.

Ex. 71 - 1081

Direct - Ball/Gibson                Vol. 21:  24

Q.  Okay.  Well, is there more separation of the inmates?

A.  Yes.

Q.  And are the privileges that would be permitted inmates from the general population more restricted in the disciplinary area?

A.  Yes, they are.

Q.  In terms of things like visits or movements or contact with other people, things of that sort?

A.  Yes.

Q.  Now, you mentioned something about administrative housing or administrative detention?

A.  Yes.

Q.  Where is that located?  Is that different from the disciplinary housing you described?

A.  Yes.  It's different, uh-huh.  It's located in the same building, which is also located in the jail facilities.  They are all connected together on one building.  But on the first floor, we have the admin., administrative detention.

Q.  What is the purpose of the administrative detention area as opposed to the disciplinary area?

A.  It varies from investigation, protective custody, to just general -- just security of one of the inmates.  If we feel that the inmate have a high publicity case, we will stick him in there for his safety, you know, because, you know, different things can happen if guys feel biased towards

U.S. DISTRICT COURT

Ex. 71 - 1082

Direct - Ball/Gibson                    Vol. 21:  25

somebody for a certain case or anything.  So we will house them in that area.

Q.  Okay.  And are the housing conditions similar in nature to the housing conditions for the disciplinary inmates?

A.  Yes.  They are pretty much the same.  It's pretty much the same.

Q.  Isn't it a little more restrictive?

A.  It's not more restrictive than the disciplinary.  They are pretty much the same, but they have more privileges.  They get to keep their radios, and they get to keep their commissary, stuff like that, and phone privileges and visitation rights, stuff like that.

Q.  Okay.  Things that might not be permitted the disciplinary prisoners are permitted the administrative prisoners?

A.  Yes, they are.

Q.  And would the reason for that be that they hadn't done anything at all?

A.  They haven't done anything wrong, uh-huh.

Q.  They are just housed there for the needs of the facility?

A.  Yes, uh-huh.

Q.  Have you had occasion -- well, do work at or near, or have you worked at or near, the administrative housing area at the Federal Medical Center?

A.  Yes.  That's the area that I'm assigned to right now.

Q.  And how long have you worked at the administrative area of

Ex. 71 - 1083

Direct - Ball/Gibson                    Vol. 21:  26

the Federal Medical Center?

A.   Going -- it will be five months.  April it will be six, yeah.

Q.   And, incidentally, just in a general sense, how many pretrial inmates, if you know, are out at the Federal Medical Center, both general population, disciplinary, administrative? I realize it may be an approximation.

A.   Maybe around approximately -- I would say maybe 80.

Q.   I'm sorry?

A.   80 to 90.

Q.   80 to 90?

A.   Inmates, uh-huh.

Q.   In your work, your three years four months' work for the Bureau of Prisons and at the Federal Medical Center, are there some inmates that behave and others that are occasional problems and some that are constant problems?

A.   Yes, there are.

Q.   In other words, even though inmates are given rules to follow, are there inmates that disregard the rules, violate the rules?

A.   Yes.

Q.   Are there inmates that have bad attitudes?

A.   Every day.

Q.   Are there inmates that are disrespectful to staff such as yourself and other correctional officers?

U.S. DISTRICT COURT

Ex. 71 - 1084

Direct - Ball/Gibson                         Vol. 21:  27

A.   Yes.

Q.   That's just part of the job that you have?

A.   Part of the job, yes.

Q.   You have all kinds; is that right?

A.   Yes, we do.

Q.   Have you had occasion during your work at the Federal
Medical Center to come into contact with an inmate by the name
of Julius Robinson?

A.   Yes, I have.

Q.   Where have you come into contact with Mr. Robinson?

A.   I came into contact with Mr. Robinson over in the admin.
detention area of the jail facility.

Q.   Is Mr. Robinson housed in the disciplinary area or the
administrative area that you described?

A.   He's housed in the admin.

Q.   All right.  And do you see the inmates that you know from
the Federal Medical Center here in court today?

A.   Yes, I do.

Q.   Would you please point him out if you see him and describe
maybe an article of clothing he's wearing?

A.   It's the gentleman over there with the striped colored suit
with red tie.

        MR. BALL:  Your Honor, may the record reflect that the
witness has identified the defendant, Julius Robinson?

        THE COURT:  The record will so reflect.

U.S.  DISTRICT COURT

Ex. 71 - 1085

Direct - Ball/Gibson                Vol. 21: 28

Q. (By Mr. Ball)  How in your contact with -- well, what kind of work shift do you work?

A. I work the day watch, which is considered from 8:00 to 12:00 -- no.  That's my fault.  I'm going from 8:00 to 12:00.  I'm sorry about that.  I work from 8:00 to 4:00.

Q. 8:00 to 4:00?

A. Yes, 8:00 to 4:00 p.m.

Q. And that's 8:00 a.m. and 4:00 p.m.?

A. Yes.

Q. And when you come into work, I assume you're relieving other correctional officers that are going to go home?

A. Yes.

Q. And how many shifts work that --

A. We have three shifts.  We have the 8:00 to 4:00, which I work, and we have the 4:00 to 12:00, which is the evening watch, and we have the 12:00 to 8:00, which is the morning watch.

Q. And when you come into work -- if the inmates in the housing area that you work in have created problems or things of that nature, is there a procedure or something where that information is passed on to the next shift so that you know there is a problem?

A. Yes, there is.  Yes, we have a briefing.  We'll arrive to work maybe 15 minutes early.  We have a briefing with the officer.  We also have log books, and we also have confidential

U.S. DISTRICT COURT

Ex. 71 - 1086

Direct - Ball/Gibson                                  Vol. 21:  29

reports that we have.

Q.  All right.  So everybody that's coming into work would know or not be unaware of problems that might have existed?

A.  Yes.

Q.  And when you leave work, if there's been a problem with inmates or something, do you also report to the next shift?

A.  Yes, we do.

Q.  And is that something that all correctional officers working out there are expected to do as part of their responsibility?

A.  Yes.  It's part of their job, and paperwork is checked every day to see if anything is going on with the confidential reports and log books.

Q.  Have you ever had any problems with Julius Robinson?

A.  No, I haven't.

Q.  How would you describe Julius Robinson as an inmate there at the Federal Medical Center in your dealings with him?

A.  As far as my eight hours with Mr. Robinson in the last five months, I haven't had any problem with him.  He's one of the better inmates that I have seen in administrative detention or in the housing units over there, period.  Courteous, respectful towards his officers and counselors, even to the other inmates.  So I haven't had any problems with him.

Q.  All right.  And when you have come in to work and checked the log books and the briefings and so forth, has there been

Ex. 71 - 1087

Direct - Ball/Gibson                    Vol. 21:  30

any indication to you that anyone has had a different experience?

A.  No.

Q.  Would you all converse or engage in a little chitchat when you see him?

A.  Yes.  I have talked to Mr. Robinson occasionally about sports.  Most of our conversations have been about the Bible.  You know, we talk about Jesus Christ because I am a believer myself.  We've talked about that.

Q.  So as a Christian, you have had conversations with Mr. Robinson about your faith and his faith?

A.  Yes.

Q.  Do inmates have access to religious materials, like Bibles and things like that?

A.  Yes, they do.

Q.  Have you seen Mr. Robinson with a Bible?

A.  Yes, I've come by.  Like I said, my eight hours there, when I come in the morning, I see Mr. Robinson with a Bible.  Not just in the morning, when I'm leaving, you know, he has his Bible.

Q.  Do you all speak about religious matters, spiritual matters?

A.  Yes.  We speak about scriptural matters.  He may come and ask me, you know, I've read this such and such scripture.  What do you think about that?  You know, or we'll say, yeah, well --

U.S. DISTRICT COURT

Ex. 71 - 1088

Direct - Ball/Gibson                    Vol. 21:  31

you know, I tell him, when I had this experience, this scripture right here helped me get through this certain situation.  So ...

Q.  Okay.  And when he speaks of scriptural passages, are there occasions when you're also familiar with the scriptural passage?

A.  Yes.

Q.  And did it appear that Mr. Robinson seem to have some knowledge or actually had read the material?

A.  Yes.

Q.  Did he appear to be putting on airs or being phony about that in any way?

A.  I can't say that he has or he has not.  I can only tell you, you know, the conversations that we've had.  As far as the conversations, he seemed to know what he was talking about, you know.  And if he had any questions about any scriptures, he would ask me, and I would try my best to give the right interpretation, you know, about the scripture.

Q.  I think you said another subject of discussion might be matters of sports?

A.  Sports, yes.

Q.  Things going on in the sports world?

A.  Yes.

Q.  As an inmate in the administrative detention area, can you give us just a general description what that inmate's day would

Ex. 71 - 1089

Direct - Ball/Gibson                    Vol. 21:  32

be like in terms of when they get up or when meals are or recreation, things of that sort?

A.   Yes.  That inmate's day -- my shift, I come in maybe two days 8:00 to 4:00 and two days 6:00 to 2:00.  So the early mornings 6:00 to 2:00 would start off with breakfast around about 6:30.  The inmates they're waking up about 6:30, and breakfast is given to them through the bean slots that we have in the doors.

Q.   Through the what?

A.   Bean slots.  It's called shoots or food slots.  And after breakfast after taking up the trays, we have a recreation officer who comes around and he gets a list of everybody who wants to go out and shoot basketball, play handball, whatever the guys want to do at the rec, or just run around.  We take them out in hand irons.  They are all taken out separately. They are all places in individual cages.

And after rec, we bring them back in the same way we took them out with the hand irons, only they're placed back in their cages, in their cells.  And then around about 10:30, another chow cart comes, and we hand out the food again, and they eat it and we pick it up.

Pretty much after the noon chow, the counselor usually have like a phone list of any guys that want to use the phone, or if they have any questions with the counselor, if she wants to talk to them or anything like that, and we escort them up to

U.S. DISTRICT COURT

Ex. 71 - 1090

Direct - Ball/Gibson                    Vol. 21:  33

the counselor or to the clinic area if they have any medical needs, attention that they need.  Pretty much that's the end of the day.  I mean, time rolls around and it's time to go home. That's about all we do.

Q.  Even though you're not working that shift, is there a lights out time?

A.  I think lights out time is around 10:30 or 11:00, I believe.

Q.  Okay.  And the cell area where Mr. Robinson is housed out there, can you give us a description of what size it is or what's in the cell itself?

A.  The cell I would say is about six by ten, I think.

Q.  Six feet by ten feet?

A.  Uh-huh.

Q.  And he's single cell?

A.  Single cell.

Q.  Okay.  There is not another inmate in there?

A.  No, there is not.

Q.  Is there bedding or a bed?

A.  Yes.  They have two bunks in the room, toilet facilities, sink.  It's all right there in the room, and a desk for writing.

Q.  Is there a television in there?

A.  No, there is not.

Q.  Do inmates in the administrative area have access to

U.S. DISTRICT COURT

Ex. 71 - 1091

television or not have access?

A.   No.   They have no access to television.

Q.   Are they allowed reading material?

A.   Yes, they are.

Q.   And even though the conditions there are more restrictive than they are in the general population of the jail unit, are there inmates who, even with those restrictions, are difficult to deal with?

A.   Yes.   And because of the limited access to different things that they are use to having like in the jail, TV -- open population they also have TV -- a lot of guys get frustrated that, oh, we can't watch TV or something like that.   We have a lot of guys just being confined in that small area, they do seem to get a little irate at times, but I guess, you know -- anybody, I guess, would probably do something like that.

Q.   Have you had any problems like that with Mr. Robinson?

A.   No, I haven't.

Q.   Has he adjusted -- from your perspective and your experience with the Bureau of Prisons as a correctional officer, has he adjusted to his situation?

A.   Yes.   I would say he has as far as my knowledge of seeing his actions and his conduct.

        MR. BALL:  Thank you, Mr. Gibson.   I'll pass the witness.

        THE COURT:  Is there cross?

Ex. 71 - 1092

Cross - O'Connor/Gibson                    Vol. 21:  35

MR. O'CONNOR:  Yes, Your Honor.

CROSS EXAMINATION

BY MR. O'CONNOR:

Q.  Sir, just a couple of questions.  You have been at the FMC for a little over three years, three years and four months?

A.  Yes.

Q.  Part of your time there at FMC was not in administrative seg?

A.  No.

Q.  It was in, what, general population?

A.  General population.  I worked -- well, we change.  Every quarter we worked a certain position three months at a time, but if you want to stay at that certain area, you can apply for it, and if a person with more seniority bumps you, then, of course, they take that position.  But, fortunately, I've been able to stay over there in that area.

Q.  All right.  And is there like a jail administrator or unit administrator out there at FMC who has been there long time and knows more about the overall workings of the entire unit?

A.  Yes, it is.

Q.  Do you know who that is?

A.  We have a unit manager, Mr. McCauley (phonetic),

Q.  Mr. McCauley?

A.  Yes.

Q.  Has he been there a long time?

U.S. DISTRICT COURT

**Ex. 71 - 1093**

Cross - O'Connor/Gibson                 Vol. 21:  36

A.  I don't know the amount of years he's been there, but he's been there, yes.

Q.  So he has familiarity in detail of this overall -- both the general population and the segregation units -- he has great familiarity with that?

A.  Yes, he does.

Q.  He knows the inner workings of all that?

A.  Yes.

Q.  You mentioned that the FMC was a Federal Medical Center.  I guess that's what FMC stands for?

A.  Yes, it does.

Q.  And that you all take in inmates from all over the place?

A.  Pretty much.

Q.  Who need medical --

A.  Medical, uh-huh.

Q.  Or at least a level of treatment that is only offered in a particular region like FMC out there in Fort Worth?

A.  Yes.

Q.  And so you have inmates that come to FMC out at Fort Worth in all ranges of security problems?

A.  Yes.

Q.  From very, very low security to very, very high security?

A.  Yes.

Q.  Not very dangerous inmates up to very dangerous inmates?

A.  Yes.

U.S.  DISTRICT COURT

Ex. 71 - 1094

Cross - O'Connor/Gibson          Vol. 21:  37

Q.   That in and of itself is a dangerous concept; is that fair?

A.   Yes.

Q.   Based upon on your experience as a correctional officer?

A.   Yes.

Q.   You mentioned a minute ago -- and, of course, that is different from the jail unit itself?

A.   Yes, it is.

Q.   In other words, when you talk about FMC, you're actually talking about a federal prison, correct?

A.   Yes.

Q.   And within the federal prison, it has a jail unit, which is what you call a pretrial unit?

A.   Yes.

Q.   And the two populations don't really mix, do they?

A.   No.   They don't mix at all.

Q.   In other words, the jail unit stays within itself, and then the prison unit stays within itself?

A.   Yes.

Q.   Now, in the jail unit, you described a minute ago that within that unit you have a general population area?

A.   Uh-huh.

Q.   Meaning inmates can kind of come and go from their cells, go watch the TV, recreation, that sort of thing?

A.   Yes.

Q.   And inmates can talk amongst themselves?

U.S. DISTRICT COURT

Ex. 71 - 1095

Cross - O'Connor/Gibson                    Vol. 21:  38

A.   Yes.

Q.   And unless there is some special reason to separate particular inmates, they can be on the same case or not on the same case, know each other or not know each other?

A.   True.

Q.   And they can go into each other's cells and read together, look at material together, and that sort of thing, as long as they are not causing any problems?

A.   True.

Q.   Now, you mention that the segregation unit had the two different functions, the administrative seg and the disciplinary seg, and that the disciplinary seg had to do with inmates who violate your jail rules?

A.   Yes.

Q.   When an inmate violates his jail rules, though, he's not automatically sent to the disciplinary unit.  He has an opportunity to have a hearing?

A.   Yes.

Q.   First?

A.   Yes.

Q.   And there is a hearing officer that would hear the violation?

A.   Yes.

Q.   And then determine if the violation was true or not true?

A.   Well, if the inmates breaks one of the rules and the

Ex. 71 - 1096

officer has -- right then he's taken over to the admin. area of the jail, and he's there until he has the hearing.  And if he's not found guilty, then he's able to go back over to the jail population.

Q.  So the inmate has some due process rights there within the unit?

A.  Yes.

Q.  Consistent with your security needs?

A.  Yes.

Q.  Because you take him over there immediately for security's sake?

A.  Yes.

Q.  And then there is a hearing, a due process hearing, and whatever result happens, happens?

A.  Happens, uh-huh.

Q.  And you, as a correctional officer, you're familiar with some or all or most of the rules that they are required to follow?

A.  Yes.

Q.  You probably don't know them all by heart?

A.  No.

Q.  But you generally know the major ones?

A.  Yes.

Q.  And the ones that you experience on a frequent basis?

A.  Yes.

Ex. 71 - 1097

Cross - O'Connor/Gibson                    Vol. 21:  40

Q.   And is one of the rules that an inmate is suppose to follow is that he's not suppose to three-way call from the jail unit?

A.   That I don't know have knowledge of because SIS usually handles the phone call situation.

Q.   That would be outside your area of expertise?

A.   Yes, it would be.

Q.   You mentioned that the difference between administrative segregation and disciplinary segregation also includes for the people that go into administrative segregation that they may be in protective custody themselves?

A.   True, uh-huh.

Q.   So you have got to house them there to protect them?

A.   Yes.

Q.   And that also includes people who are in that unit on a high profile case?

A.   Yes.

Q.   And it also includes people who need to go in there for security concerns?

A.   Yes.

Q.   People who have -- people who the jail views as needing increased security for one reason or another?

A.   Uh-huh, yes.

Q.   And the people, either for the high publicity, or you're worried about their security or securing other folks from them, is that because there is a lot of talk that can circulate

Ex. 71 - 1098

Cross - O'Connor/Gibson                    Vol. 21:  41

through the jail unit about an inmate?

A.  Yes.

Q.  And messages can be relayed from inmate to inmate about a particular inmate?

A.  Yes.

Q.  So you have got to take extra care and precaution to make sure that you either protect that inmate from other folks or protect other folks from that inmate?

A.  Yes.

Q.  For that reason?

A.  Yes.

Q.  That's not an unusual occurrence in the jail unit, is it?

A.  No.

Q.  Or in FMC at large?

A.  I would say, no.

Q.  No, what?

A.  It's -- very rarely do we have cases that we have to house somebody in for high publicity cases.

Q.  Okay.

A.  Since I've been there.

Q.  I understand that.  I'm talking about -- separate and apart from high publicity, it's not unusual for inmates to talk amongst themselves about another inmate, either in the jail unit or the other part of FMC?

A.  Yes.

U.S. DISTRICT COURT

Ex. 71 - 1099

Cross - O'Connor/Gibson                    Vol. 21:  42

Q. And to circulate things about an inmate?

A. No.  It's not unusual.

Q. That inmate's a snitch.  Watch out for him, for instance?

A. Yes, that's true.

Q. Don't talk to him.  He's an informant?

A. That's true.

Q. He'll go down and talk.

A. That's true.

Q. As a correctional officer, one of the things you're concerned about in those instances is the protection of the people that they think is a snitch?

A. That's true.

Q. And that's not an uncommon event in the jail unit or in the prison unit, is it?

A. No, it's not.

Q. Now, you've also told -- you told Mr. Ball that in either of these segregation units, they are still -- I'm sorry.  In administrative segregation, they are still allowed phone privileges?

A. Yes.

Q. Are they allowed visitation privileges?

A. Yes, they are.

Q. And, of course, they have the reading materials and the Bible materials and that sort of thing?

A. Yes.

Ex. 71 - 1100

Direct - Ball/Nelson                    Vol. 21:  43

Q.  And access to their counselor?

A.  Yes.

Q.  And they talk with their counselor about things that they have problems with?

A.  Yes.

          MR. O'CONNOR:  Can I have just a moment, Your Honor?

          THE COURT:  Yes, sir.

     (Brief pause in proceedings)

          MR. O'CONNOR:  Pass the witness, Your Honor.

          THE COURT:  Redirect?

          MR. BALL:  No, Your Honor.  Thank you.

          THE COURT:  You may step down, sir.  Thank you.

          THE WITNESS:  Thank you.

          THE COURT:  Please call your next witness.

          MR. BALL:  We'll call Mike Nelson.

          THE COURT:  Mr. Nelson, if you will step up here, I'll administer the oath.  Please raise your right hand and be sworn.

     (Witness sworn by the Court)

          THE COURT:  You may be seated in the witness chair.  Please speak directly into the microphone.

          MIKE NELSON, testified under oath as follows:

                    DIRECT EXAMINATION

BY MR. BALL:

Q.  Could you tell the ladies and gentlemen of the jury your

Ex. 71 - 1101

Direct - Ball/Nelson                    Vol. 21:  44

name, please, sir?

A.  My name is Mike Nelson.

Q.  And how are you employed or occupied, Mr. Nelson?

A.  I'm the head track coach, defensive back coach, at Arlington Lamar.

Q.  How long have you been employed at Lamar High School?

A.  I've been there 21 years.

Q.  And how long have you been in coaching?

A.  Thirty-six years.

Q.  I gather with my math you worked somewhere else.  Where did you coach?

A.  I started coaching at Emerald High School for three years. Then I coached at Greenvillle for one year and Fort Worth Southwest High School for 11 years.

Q.  All right.  And during your work at Lamar High School, did you ever have occasion to come into contact with a student by the name of Julius Robinson?

A.  Yes, sir, I did.

Q.  And what was your -- can you just describe generally what your contact with Mr. Robinson consisted of?  Did you coach him?

A.  No.  I really didn't coach him, but one day a couple of coaches were in the coach's office, and Julius came in and handed me a billfold and told me that he found it in the locker room underneath the bench, and then he left.  And I opened the

Ex. 71 - 1102

Direct - Ball/Nelson                    Vol. 21:  45

billfold and saw a young man's name in it.  Called the young

man on the phone and asked him if he lost anything.  He said he

didn't think so and then told me later that, yeah, he lost his

billfold.

    And I said, well, did you have any money in it?

    And he said, well, I might have had $20 in it, something

like that.

    And I said, well, can I have the rest of the money that's

in there?

    He said, you mean there's more in there?

    I said, yeah, there's about 120 bucks in there.

    And then he remembered that he was going to have his car

worked on or something, and he had the money in the billfold.

I said, well, Julius Robinson brought this billfold in that he

had found, and the $120 was still in there.

Q.  And why did that stick out in your mind?

A.  We have a lot -- over the course of 36 years, we've had

things stolen, you know.  We find billfolds laying around, but,

usually, the money's missing.  It just stuck out in my mind.

Q.  And you said one of your jobs there is as track coach?

A.  Yes, sir.

Q.  Maybe you said and I missed it, is there more than one

track coach?

A.  Yes, sir.  I'm the head track coach, and then we have three

other coaches that work with the boys' team, and then we have

Ex. 71 - 1103

Direct - Ball/Jones                    Vol. 21:  46

some girls' coaches.

Q.  And did Julius ever go out or try to go out for track?

A.  Yes, he did.  I didn't coach his position.  Being the head coach, I'm more of an administrative coach, really, than some of the other guys.  I pass out equipment, get the equipment to them, you know, schedule, things like that.

Q.  Since you didn't coach Julius, would it be fair to say it wasn't a day-to-day interaction with him?

A.  Right.

Q.  But you do recall that one episode regarding the wallet?

A.  Yes.

        MR. BALL:  Thank you.  I'll pass the witness.

        THE COURT:  Cross?

        MR. SCHATTMAN:  No, Your Honor.

        THE COURT:  You may step down, sir.   Thank you.
    Please call your next witness.

        MR. BALL:  Elvin Jones.

        THE COURT:  Mr. Jones, if you will step up here, I'll administer the oath.

    (Witness sworn by the Court)

        THE COURT:  You may be seated in the witness chair. I'll ask you to please speak directly into the microphone.

        ELVIN JONES, testified under oath as follows:

                    DIRECT EXAMINATION

BY MR. BALL:

U.S. DISTRICT COURT

Ex. 71 - 1104

Direct - Ball/Jones                    Vol. 21:  47

Q.  Could you tell the ladies and gentlemen of the jury your name, please, sir?

A.  Elvin Jones.

Q.  How are you employed or occupied, Mr. Jones?

A.  I'm a coach and teacher at Lamar High School.

Q.  How long have you worked at Lamar High School?

A.  Ever since the school was opened in 1970.

Q.  So that would be, roughly, 32 years or so?

A.  Yes, sir.

Q.  And how long have you been in teaching and coaching?

A.  I started teaching coaching in 1964.

Q.  Where did you work prior to Lamar?

A.  I coached at Post, Texas, and when I left Post, Texas, I came to Arlington, and I coached at Ferguson Junior High, and then I went to Arlington High School, and from Arlington High School, I went to Lamar High School.

Q.  All right.  You said you teach and you coach?

A.  Yes.  I teach Algebra 2.

Q.  Algebra 2.

     I guess percentage-wise, how much of your time is spent teaching class class and how much is spent with sports activity?

A.  Normally, I have a full class load of math classes, and then I have football and track.

Q.  Okay.  And maybe you mentioned it and I missed it.  What's

Ex. 71 - 1105

Direct - Ball/Jones                              Vol. 21:  48

your role with the football team?

A.  I'm the offensive coordinator at Lamar High School.  I coach the offensive line.

Q.  Have you had occasion, either during your work at Lamar or outside of your work at Lamar, to come into contact with a young man by the name of Julius Robinson?

A.  Yes, I did.

Q.  When did you first -- what were your circumstances of your first contact with Julius?

A.  I think it was close to the year 1988.  He was approximately in the 6th grade at that time.  My son was the same age level, and he was playing basketball for the Boys Club.  So I decided to coach one of the teams, and Julius was one of the members of that team.

Q.  Did you have occasion to see Julius at practices with the Boys Club basketball team and games?

A.  Yes.

Q.  And did you later have occasion -- I mean, your son and Julius were of the same age group; is that right?

A.  Right.

Q.  Did you keep in contact with him after that, or was there a gap, and then you --

A.  There was a gap in there.  He didn't finish out the whole season with us in basketball at that time, and I lost contact with him up until when he came to Lamar High School.

U.S. DISTRICT COURT

**Ex. 71 - 1106**

Q.  All right.  And what were the circumstances that you came into contact with him at Lamar High School?

A.  He was a football player.

Q.  And as I understand it, he was a defensive player?

A.  Yes, sir.

Q.  Did you still have occasion to come into contact with him during practices, games?

A.  Yes.

Q.  Converse with him, see him interact with other players and other coaching staff?

A.  Yes.

Q.  And how would you describe Julius in terms of how he behaved and how he met his responsibilities as a student athlete?

A.  He was reasonably quiet, but he was very respectful to the coaches and the other members of the team.  He never gave us any problem whatsoever.  He was always willing and excited about working.

Q.  All right.  I mean, are there some responsibilities that you expect of student players, things that they are obligated to do to play for teams that you coach?

A.  Oh, yes.  We have our rules and guidelines for all the kids.  They have to abide by these rules and guidelines in order to stay on the team.

Q.  And if a student athlete chooses not to comply with the

Direct - Ball/Jones                          Vol. 21:   50

rules, violate the rules, ignore their responsibilities, not show up for practice, things of that sort, what happens to that student athlete?

A.   Well, it kind of depends on how -- how many times they -- you know, we take some form of discipline whenever they break the rules.  It kind of varies according to what the rule is that they break and how many times they break it, because if they break it once, we'll make the discipline on it a little more harsh the second time they do it.

Q.   Okay.  Eventually, someone who persists in rule breaking and not meeting their responsibilities, do they get to stay on the team if they persist in that behavior?

A.   Well, not generally, no.

Q.   Did you ever have any problems or know of any problems with respect to following the rules and what was asked of him with regard to Julius Robinson?

A.   No, sir.

Q.   Incidentally, the Julius Robinson that you knew and had contact with at Lamar High School and on the Boys Club basketball team, do you see him in court today?

A.   Yes, over here.

Q.   You were pointing somewhere.  Would you point again and describe what he's wearing?

A.   Yes, over here.

        THE COURT:  What is he wearing?

**Ex. 71 - 1108**

Cross - Schattman/Jones          Vol. 21:  51

THE WITNESS:  He's wearing a red tie, a coat and tie.

MR. BALL:  Your Honor, may the record reflect he's identified the defendant, Julius Omar Robinson?

THE COURT:  The record will so reflect.

Q.  (By Mr. Ball)  And after -- did you have any contact with Julius after he finished his football career there at Lamar, or did you lose contact with him?

A.  He may have came back -- up to school at some time and come by and visited or something of that nature.  I can't remember -- most of the kids do.  So I would say he probably did.

Q.  Okay.

MR. BALL:  Thank you, Coach.  I'll pass the witness.

THE COURT:  Cross examination?

MR. SCHATTMAN:  Very briefly, Your Honor.

THE COURT:  All right.

CROSS EXAMINATION

BY MR. SCHATTMAN:

Q.  Part of the skill that you want to teach and pass on to your students is teamwork and discipline; is that correct?

A.  Yes, sir.

Q.  And from your dealings with and your memory of Julius Robinson, was he disciplined and able to work with a team to accomplish a goal?

A.  I personally never had to discipline him, but as far as him

Ex. 71 - 1109

Cross - Schattman/Jones          Vol. 21:  52

working within the team, yes, he worked within the team, worked with other kids as a team member.

Q.   And exercised some self-discipline?

A.   Yes.

Q.   For the good of the team, for the final effort?

A.   Yes, sir.

Q.   You mentioned that in the -- when we're talking about imposing discipline for infractions or rule violations, is it fair to say that you impose a system so that repeat violations, you have a progressively harsher punishment?

A.   Right.  Now, you and I both know that when you make a rule, most rules are made to be broken just about.  So what happens is you try to handle all situations as an individual case.  So there are certain things that happen to a certain individual -- you know, you try to consider each case as an individual case.

Q.   And it's fair to say there is no one blanket rule that you're going to cover everybody.  You're not going to be hard and fast and rigid in your enforcement?

A.   We try to be fair with it, yes, sir.

Q.   Be fair?

A.   Yes.

Q.   All right.  You can't paint everybody with the same brush?

A.   No, sir.

Q.   In your -- I'm sorry.  I guess -- you were dealing mainly with the offense, and Mr. Robinson played defense?

U.S. DISTRICT COURT

Cross - Schattman/Jones                    Vol. 21:  53

A.  Yes, sir.

Q.  So, I guess, part of your job in terms of scrimmage and practice was to try to get your guys on the offensive team to take care of the defensive team, to block them, knock them down, fool them, whatever it was that needed to be done?

A.  Yes, sir.

Q.  Of course, your counterpart on the other side is trying to get his defensive team to pay attention, keep their eye on the ball, know what the plan is, and know how to execute the plan?

A.  Yes, sir.

Q.  And from your association with Mr. Robinson and your observations, was he one of the those students who could -- student athletes who was able to keep his eye on the ball, accept his responsibility, and execute the plan?

A.  Yes, sir.  He stayed focused.

Q.  And since he -- he graduated from high school in about 1995, I believe.  Does that sound about right to you?

A.  '94, '95, somewhere in that area.

Q.  And pretty much you have had no contact with him since then?

A.  No, sir.

        MR. SCHATTMAN:  That's all, Your Honor.

        MR. BALL:  No redirect, Judge.

        THE COURT:  All right.  You may step down, sir.  Thank you.

U.S. DISTRICT COURT

Ex. 71 - 1111

You may call your next witness.

MR. BALL:  Frederick Wagner, please.

THE COURT:  Mr. Wagner, if you will please step up here, I'll administer the oath.

Raise your right hand and be sworn, please.

(Witness sworn by the Court).

THE COURT:  You may be seated in the witness chair. Please speak directly into the microphone.

THE WITNESS:  Okay

FREDERICK WAGNER, testified under oath as follows:

### DIRECT EXAMINATION

BY MR. BALL:

Q.  Could you tell the ladies and gentlemen of the jury your name, please, sir?

A.  Frederick Wagner.

Q.  And, Mr. Wagner, how are you employed or occupied, sir?

A.  Excuse me?

Q.  How are you employed?  Where do you work?

A.  I'm a correctional officer at the Federal Medical Center Fort Worth.

THE COURT:  You're going to have to speak directly into the microphone, or we won't be able to hear you.

A.  I'm a correctional officer at FMC Fort Worth.

Q.  (By Mr. Ball)  How long have you been a correctional officer?

Direct - Ball/Wagner            Vol. 21:  55

A.   About seven-and-a-half years.

Q.   Prior to becoming a correctional officer, what did you do before -- well, you worked for the Bureau of Prisons; is that right?

A.   I spent six months with a private facility and ten years in the military.

Q.   All right.  And what was the military experience, generally, if you can just give a general description about it?

A.   Spent ten years in special forces, special operations command.

Q.   Special forces?

A.   Special operations command.

Q.   Mr. Wagner, you will need to speak up a little bit so these folks can all here you?

A.   Okay.

Q.   Did you work with NATO?

A.   Yes, NATO allied forces in Italy, 3325 Airborne Battalion out of 82nd Airborne Division and First Special Forces Group.

Q.   Now, you also said after your military career, which extended ten years, I believe you said you worked for a period of time for a private company that was in corrections; is that right?

A.   Yes, Wackenhut (phonetic) Correctional Facility.

Q.   And Wackenhut Correctional Facility, where is that located?

A.   It's on Blue Mound Road in Fort Worth, Texas.

Ex. 71 - 1113

Direct - Ball/Wagner              Vol. 21:  56

Q.  Okay.  Locally here?

A.  Yes.

Q.  After that, you went to work for the Bureau of Prisons?

A.  Yes, sir.

Q.  Where are you assigned now?

A.  I started in FMC Seagoville, and I'm now at FMC Fort Worth this is my second institution.

Q.  All right.  So you worked at the prison unit in Seagoville. That's in Texas; is that right?

A.  Yes, Kaufman County in Dallas.

Q.  It's, what, an hour or less than an hour's drive maybe from here?

A.  About an hour from here.

Q.  South of Dallas?

A.  Yes.

Q.  And how long did you work at Seagoville, approximately?

A.  I was there for about two years.

Q.  And what area in -- that's a prison unit; is that right?

A.  Yes, sir.

Q.  Do they have pretrial detainees at Seagoville?

A.  Yes, sir.

Q.  What section or parts of Seagoville did you work in, both the general inmate population of the jail or just one?

A.  General population and special housing.

Q.  In special housing.

Ex. 71 - 1114

Direct - Ball/Wagner                    Vol. 21: 57

And when you came to work for FMC Fort Worth, about when was that?

A.    About '97 -- '96.

Q.    Okay.  And what parts of FMC Fort Worth have you worked in as a correctional officer?

A.    Well, I've spent most of my time in special housing, at least four-and-a-half, maybe five years.

Q.    Four-and-a-half, five years in special housing?

A.    Yes, sir.

Q.    And we've already heard some testimony about that.  Does that consist of both the administrative detention area and the disciplinary detention area?

A.    Yes, sir.

Q.    So that's the area that you work in?

A.    Yes, sir.

Q.    What shift do you generally work or have you worked or have you worked all of them?

A.    I've worked them all but mostly 4:00 to midnight.

Q.    And during your work in the special housing area of the Federal Medical Center in Fort Worth, have you had occasion to come into contact with an inmate there by the name of Julius Robinson?

A.    Yes, sir.

Q.    And were you working in that area when Julius Robinson first came to the special housing area?

Ex. 71 - 1115

Direct - Ball/Wagner                Vol. 21:  58

A.  Yes, sir, about June 2001.

Q.  June of 2001?

A.  Yes, sir.

Q.  And was it your understanding that he had previously been in the general population of the jail unit?

A.  Yes, sir.

Q.  And was that transfer as a result of any disciplinary matter, or what was the reason for the transfer if you know, sir?

A.  Because of a high profile case.

Q.  That's one of the categories.  There are some rules and procedures that some inmates would go into administrative housing because of the nature of their case, would be one reason; is that right?

A.  Yes, sir.

Q.  Inmates who misbehaved, is that where they go, or do they go somewhere else?

A.  Same place, sir.

Q.  Well, do they go to the administrative detention or disciplinary detention?

A.  Disciplinary.  It's on a separate floor.

Q.  And so, generally, when you would come to work at the special housing area of the jail there at FMC Fort Worth, would you generally have some contact with Julius pretty much on a daily basis?

U.S. DISTRICT COURT

Ex. 71 - 1116

Direct - Ball/Wagner                    Vol. 21:  59

A.  Yes, sir.

Q.  During your work shift

A.  Yes, sir.

Q.  Did you have any problems with Mr. Robinson as an inmate there?

A.  None whatsoever, sir.

Q.  And how would you describe his behavior in general as an inmate there as you've known him?

A.  He's pretty respectful and quiet.  He does a lot of reading.  He doesn't give me any problems at all.

Q.  All right.  Have you had occasion during your seven-and-a-half years or so working for the Bureau of Prisons to deal with inmates who have misbehaved, have bad attitudes, and even prone to violence?

A.  On a daily basis.

Q.  On a daily basis?

A.  Yes.

Q.  Has Julius Robinson ever been an inmate of that type?

A.  No, sir.

Q.  Now, we've visited before out at the Federal Medical Center.  It's been a few weeks ago, I believe, roughly; is that right, sir?

A.  Yes.

Q.  Have you used the -- do you have a category that you put inmates in, a couple of categories?

U.S. DISTRICT COURT

Ex. 71 - 1117

Direct - Ball/Wagner                    Vol. 21:  60

A.  My own personal, yes.

Q.  Okay.  I realize this may not be a Bureau of Prisons category.  This is a --

A.  My own personal.

Q.  Mr. Wagner's observations of seven and a half years?

A.  I put them in two different categories, inmates and convicts.

Q.  Tell us what an inmate is and tell us what a convict is?

A.  A convict is someone who is -- he has a lot of time, and he's just trying to make it as comfortable as possible.  He doesn't give me any hard time.  He's just trying to do his time.  An inmate is usually young, and they will usually test you.  They are young and really facing a lot of time and just don't care.

Q.  All right.  Does the difference have a lot to do with attitude?

A.  Yes, big time.

Q.  And would it be fair to say the persons you call inmates, the second group you described, are they people who have good attitudes about their situation or not good attitudes?

A.  Usually they don't care, no.  They have bad attitudes.

Q.  Does that reflect in their behavior, the way they deal with the prison staff, the way they deal with other inmates?

A.  Yes, sir.

Q.  And with regard to these categories between inmate and

Ex. 71 - 1118

Direct - Ball/Wagner                           Vol. 21:  61

convict, how would you categorize Julius Robinson as you have known him there at the Federal Medical Center?

A.   If I had to put him in one of those two categories, I'd say he's a convict.

Q.   Does he appear to have -- given his circumstances of loss of freedom and so forth, does he appear to have a proper attitude?

A.   Yes, sir.

Q.   And does he -- has he adjusted to the institutional setting as best you can observe that he's in?

A.   Yes, sir.

Q.   And having dealt with inmates over seven-and-a-half years, at least based on your observations and knowledge, does he appear to be someone who can adjust to further confinement, extended confinement?

A.   I think so.

Q.   Now, these inmates that you described, as opposed to convicts, do they complain about things?

A.   Constantly.

Q.   What about Mr. Robinson?  Does he complain about things?

A.   No, not at all.

Q.   Now, the conditions back there back in the special housing area in terms of restrictions on inmates, it's certainly more restricted than the general population?  Is that fair to say?

A.   Yes.

Ex. 71 - 1119

Direct - Ball/Wagner                    Vol. 21:   62

Q.   In spite of that and having worked in special housing for a number of years, if an inmate is in the inmate category or has a bad attitude, do they still misbehave?

A.   Yes, they do.

Q.   Disrupt things?

A.   Yes.

Q.   Be disrespectful to staff?

A.   Yes.

Q.   Be physically -- I mean are there inmates that are physically violent towards other inmates and staff?

A.   Sometimes.

Q.   All right.  I mean, there are procedures to deal with that? Is that fair to say?

A.   Yes, sir, incident reports.

Q.   I'm sorry?

A.   Incident reports.

Q.   Okay.  There is not only a walk in the unit and observing inmates and moving inmates around, there's some paperwork that's involved in your job?

A.   Yes, sir.

Q.   And when you come to work on your shift, do you confer with your the shifts or have some information from the shift that preceded you if there's been a problem with an inmate or something?

A.   Yes, sir.  We have a confidential report.

Ex. 71 - 1120

Direct - Ball/Wagner                Vol. 21:  63

Q.   So that you would be aware of it and not be caught unaware?

A.   Yes, sir.

Q.   And, likewise, if you have a problem with an inmate or there's a situation when you leave your shift, do you pass that information on to the next shift?

A.   Yes, sir.

Q.   And you mentioned something about an incident report.  If there is a violation, a problem, a disciplinary problem with an inmate, is there some paperwork that's generated?

A.   Yes, sir.

Q.   Is one of those documents an incident report?

A.   Yes, sir.  We'll will give them an incident report, and it will be handled by our DHO, which is our disciplinary hearing officer.

Q.   Okay.  And if there is found to be a violation of rules or procedures by an inmate, discipline can be imposed depending on the severity of the violation and so forth; is that right?

A.   Yes, sir.

Q.   Have you ever had any such problems with Mr. Robinson?

A.   No, sir.

Q.   Thank you -- oh.

     And the inmate we've been talking about, Julius Robinson, do you see him here in court here today?

A.   Yes, sir.

Q.   Would you point him out, please, sir, for the jury and

U.S. DISTRICT COURT

Ex. 71 - 1121

Cross - O'Connor/Wagner          Vol. 21:  64

maybe describe an article of clothing that he's wearing?

A.  He's sitting right to the right wearing a maroon tie.

MR. BALL:  Your Honor, may the record reflect the witness has identified the defendant, Julius Robinson?

THE COURT:  The record will so reflect.

MR. BALL:  Thank you, Mr. Wagner.  I'll pass the witness.

CROSS EXAMINATION

BY MR. O'CONNOR:

Q.  Mr. Wagner, you said that you have a recollection of Mr. Robinson coming into your unit in June of 2001?

A.  Yes, sir, roughly.

Q.  Sir?

A.  Yes, sir, roughly around June 2001.

Q.  Approximately.  It's not a quiz but just your general memory, right?

A.  Yes.

Q.  Why is it that he came into your unit?

A.  Because a high profile case.

Q.  Meaning it's a capital case?

A.  Yes.

Q.  You knew that back then, I guess, when he first -- or found out about it when he came into the unit; is that right?

A.  Yes, sir.

Q.  And of course, he knew about it at that time, is that

Cross - O'Connor/Wagner                Vol. 21:  65

correct, why he was coming into the unit?

A.  Yes, sir.

Q.  I mean, you all don't just stick somebody in the unit and not tell them why, do you?

A.  Usually, the counselor will come around after a day and let them know why they have been placed in special housing.

Q.  In other words, you don't keep it a secret from them?

A.  No, sir.

Q.  They learn why they are in the unit, either disciplinary problems, security, or high profile case, whatever; is that correct?

A.  Yes, sir.

Q.  And so at least within a day or two Mr. Robinson knew that he was in that unit because he was charged with a capital case, which potentially could carry the death penalty?

A.  Yes, sir.

Q.  And knew that, at least within a day or two, knew that this process here that he had been engaged in for the last couple of weeks would be taking place?

A.  Yes, sir.

Q.  Now, you described for Mr. Ball the convict versus the inmate definition that you personally apply to people; is that right?

A.  Yes, sir.

Q.  And when you talk -- when you described for Mr. Ball the

Ex. 71 - 1123

Cross - O'Connor/Wagner          Vol. 21:  66

inmate definition, you said that they really don't care, and they are usually young, and they are trying to test you?

A.  Yes, sir.

Q.  When you say they don't care, what do you mean they don't care, care about what?

A.  Normally, they are facing a lot of time, and they realize they have wasted their lives, and they just don't care.

Q.  I'm sorry -- I feel like I'm cutting you off and I truly apologize.  Go ahead.  I'm sorry.

A.  When they're facing a lot of time, they just really don't care, normally.

Q.  And when you say that they are facing a lot of time, you mean they're facing a long prison sentence?

A.  Yes, sir.

Q.  And they realize, as you say, that they are going to waste their lives.  So they really don't have anything to lose?

A.  Basically.

Q.  So when they don't have anything to lose, there is really not an incentive to not test the guards?

A.  Yes, sir.

Q.  And to sort of show themselves out to the other inmates that they are going to be housed with for a long time?

A.  Yes.

Q.  And show their worth within their new confinement there in prison?

Ex. 71 - 1124

Redirect - Ball/Wagner                    Vol. 21:   67

A.   I guess you can say that.

Q.   And that's not only towards the guards.  It's also towards -- could potentially be towards the other inmates?

A.   Yes, sir.

          MR. O'CONNOR:  Pass the witness.

          THE COURT:  Redirect?

          MR. BALL:  Yes.

                    REDIRECT EXAMINATION

BY MR. BALL:

Q.   Officer Wagner, one thing.  You said you worked four-and-a-half years in special housing?

A.   Yes, sir.

Q.   Is that by choice or not by choice?

A.   It's by choice.

Q.   And why is that, sir?

A.   It's challenging.

          MR. BALL:  Thank you.

          THE COURT:  You may step down, sir.  Thank you.

     You may call your next witness.

          MR. BALL:  Your Honor, we would call Stephen Sabolchick.  And for the court reporter, I believe that's S-A-B-O-L-C-H-I-C-K, Stephen with a P-H.

          THE COURT:  Mr. Sabolchick, if you will step forward, step up here, I'll administer the oath.  Please raise your right hand and be sworn.

Ex. 71 - 1125

Direct - Ball/Sabolchick          Vol. 21:  68

(Witness sworn by the Court)

THE COURT:  You may be seated in the witness chair. Please speak directly into the microphone.

THE WITNESS:  Yes, sir.

STEPHEN SABOLCHICK, testified under oath as follows:

DIRECT EXAMINATION

BY MR. BALL:

Q.  Could you tell us your name, please, sir?

A.  Stephen George Sabolchick.

Q.  And, Mr. Sabolchick, where do you work, sir?

A.  At the Federal Medical Center in Fort Worth, the federal prison.

Q.  All right.  And how long have you -- you're an employee of the Federal Bureau of Prisons; is that right, sir?

A.  Yes, sir, I am.

Q.  And how long have you worked for the Federal Bureau of Prisons, approximately?

A.  Six years and six months, sir.

Q.  And the Federal Medical Center in Fort Worth, was that your first assignment or work location, or did you work somewhere else before coming to the Federal Medical Center?

A.  I worked at the federal prison in Seagoville from 1995 to -- September of 1995 to September of 2000, sir.

Q.  So most of your time was spent, at least so far, at Seagoville; is that right?

Ex. 71 - 1126

Direct - Ball/Sabolchick          Vol. 21:  69

A.  Yes, sir.

Q.  When you worked at Seagoville, did you work in -- well, does Seagoville have a jail unit and a convicted inmate population or just a convicted inmate population?

A.  They have a jail unit, sir, and they also have an isolation unit where they keep -- they have a segregated housing unit, sir, but it's not right there in the jail with the -- excuse me.  The segregated housing unit in Seagoville, sir, is not right there with the jail.  It's located on the compound side where the general population is.

Q.  Okay.  And when you talk about the segregated housing, are you talking about the same thing as special housing?

A.  Yes, sir.

Q.  Administrative segregation and disciplinary detention?

A.  Yes, sir.

Q.  Okay.  And at least at the units you have worked at, is there always an administrative segregation area and a detention facility for disciplinary problems?

A.  Yes, sir.

Q.  Which part of the Seagoville prison did you work in, or did you work in all parts of it?

A.  I worked in all parts, sir.

Q.  So you have dealt with inmates who have been convicted of crimes that are serving time as well as inmates who are awaiting trial?

Ex. 71 - 1127

Direct - Ball/Sabolchick                Vol. 21:   70

A.  Yes, sir.

Q.  When you came to work at the Federal Medical Center in Fort Worth, where was your assignment?  I believe you said you got there in September of 2000.

A.  Yes, sir.  I got there in September 2000, and I worked on the compound.  I worked in the special housing unit.  I worked different posts, different areas, sir.

Q.  All right.  Did you ever have -- you had occasion to work in the special housing unit, which includes the administrative segregation and the disciplinary detention area?

A.  Yes, sir, I did.

Q.  And with regard to your work in the Bureau of Prisons, have you dealt, would you say, with all varieties of inmates, well behaved and not well behaved?

A.  Yes, sir.

Q.  And are there some inmates who have bad attitudes and engage in rule violations?

A.  Yes, sir.

Q.  And are there other inmates who follow rules violations are respectful to staff?

A.  Yes, sir.

Q.  Did you have occasion when you worked in the jail unit at the Federal Medical Center in Fort Worth to come into contact with an inmate by the name of Julius Robinson?

A.  Yes, sir, at the special housing unit, yes, sir.

Ex. 71 - 1128

Direct - Ball/Sabolchick          Vol. 21:  71

Q.  Okay.  And was he in the administrative segregation section of the special housing unit?

A.  Yes, sir, he was.

Q.  He wasn't in the disciplinary detention area, was he?

A.  No, sir.  He was AD, sir.

Q.  And what shift were you working -- are you still working in the special housing unit now, or are you back out in the general population?

A.  General population, sir.  I work in the general population right now.

Q.  Okay.  Is that of the jail unit, or is that what's sometimes referred to as the compound?

A.  That's the compound, sir.

Q.  So now you're in the section with the inmates who have been convicted serving various sentences; is that right?

A.  Yes, sir.

Q.  When you came into contact with Julius Robinson, what shift did you work at the jail unit?

A.  4:00 to 12:00, sir.

Q.  4:00 p.m. to 12:00 midnight?

A.  Yes, sir.

Q.  And what kind of an inmate -- from your observation and contact with Mr. Robinson, what kind of an inmate was he?

A.  He followed the rules.  He never gave anybody problems. He's what you would say a cooperative inmate, sir.

U.S. DISTRICT COURT

**Ex. 71 - 1129**

Direct - Ball/Sabolchick          Vol. 21:  72

Q.. And as an employee of the Federal Bureau of Prisons, having to work in a correctional facility with inmates, was Julius Robinson in his behavior the kind of inmate you would like to be dealing with?

A.  Yes, sir.

Q.  Are there inmates that frustrate you or difficult to deal with that you almost sometimes don't want to go to work to deal with inmates like that -- I can't talk this morning.  Are there such inmates like that?

A.  Yes, sir, there is.

Q.  Julius, has he ever been an inmate like that from your experience?

A.  No, sir.

Q.  Has he adjusted well from your observations to the circumstances that he was in when you had contact with him?

A.  Yes, sir, he did.

Q.  And with regard to his behavior and the behavior of other inmates would you say Mr. Robinson was worse than average or better than average, or what would you say in that regard?

A.  I would say average or better, sir.

MR. BALL:  Thank you, Mr. Sabolchick.  Pass -- oh, I'm sorry.  I keep forgetting.

Do you see the inmate, Julius Robinson, that you've been discussing here in the courtroom today?

A.  Yes, I to.

U.S. DISTRICT COURT

Ex. 71 - 1130

Cross - Schattman/Sabolchick    Vol. 21:    73

Q.  Would you, please, point him out and maybe describe an article of clothing he's wearing?  You can stand up if you need to.

A.  He's right there wearing a red tie.

MR. BALL:  All right.  Thank you.

Your Honor, may the record reflect that the witness has identified the defendant, Julius Robinson?

THE COURT:  Yes.  The record will so reflect.

MR. BALL:  You may be seated, Mr. Sabolchick.  Thank you.  The government may have some questions.

THE COURT:  Cross?

MR. SCHATTMAN:  Very briefly, Your Honor.

CROSS EXAMINATION

BY MR. SCHATTMAN:

Q.  Mr. Sabolchick, for the convenience of our court reporter, could you spell your last name?

A.  Yes, sir, I will, S-A-B-O-L-C-H-I-C-K.

Q.  Thank you.

I don't believe you ever told us when it was that you were assigned to the special housing unit?

A.  I was assigned, sir, September 2001 until December -- yes, September 30, 2001 to December 30, 2001.

Q.  And that's one -- I believe the jury has already heard that within the Bureau of Prisons, they try to rotate staff assignments on a 90-day basis?

Ex. 71 - 1131

Direct - Ball/York                    Vol. 21:  74

A.  Yes, they do.

Q.  They try to help keep you all on your toes a little bit and give you something different to do from time to time?

A.  Yes, sir.

Q.  And Mr. Robinson was already in the special housing unit when you came to that staff assignment, correct?

A.  Yes, sir, he was.

        MR. SCHATTMAN:  That's all.  Thank you.

        MR. BALL:  No redirect, Judge.

        THE COURT:  All right.  You may step down, sir.  Thank you.

        THE WITNESS:  Yes, sir.

        THE COURT:  Let's try one more witness.

        MR. BALL:  Sure.  We would call David York.

        THE COURT:  Did you say York?

        MR. BALL:  Yes, sir, Y-O-R-K.

        THE COURT:  Mr. York, if you will step up here, I'll administer the oath.  Please raise your right hand and be sworn.

    (Witness sworn by the Court)

        THE COURT:  You may, seated, sir.  Please speak directly into the microphone.

        DAVID YORK, testified under oath as follows:

                    DIRECT EXAMINATION

BY BY MR. BALL:

U.S. DISTRICT COURT

Ex. 71 - 1132

Direct - Ball/York                    Vol. 21:    75

Q.  Could you tell the ladies and gentlemen of the jury your name, please, sir?

A.  David York.

Q.  And how are you employed or occupied, Mr. York?

A.  I'm a school teacher/coach at the Arlington Independent School District.

Q.  Do you work at any particular facility or school there in Arlington?

A.  Lamar High School.

Q.  How long have you been in the teaching or coaching business?

A.  Twenty-eight years.

Q.  And how long of that was at Lamar High School?

A.  Eighteen.

Q.  And prior to Lamar High School, where did you teach or coach?

A.  I coached at Bowie High School and at Gunn Junior High.

Q.  Those are both schools in Arlington?

A.  Yes.

Q.  What subjects do you teach at Lamar?  Do you have class responsibilities?

A.  I teach health, and I'm also the girls' track coach.

Q.  And with respect to the -- are you involved with the boys' football program?

A.  Yes, sir.  I'm a defensive coordinator, football.

U.S. DISTRICT COURT

Ex. 71 - 1133

Q. And so would it be fair to say you're involved more directly with the defensive players on the team?

A. Yes, sir, totally.

Q. And during your work as a defensive coordinator and coach at Lamar High School, did you have occasion to come into contact with a student by the name of Julius Robinson?

A. Yes, sir.

Q. And approximately when do you recall that might have been?

A. It was during the years '94, '95, in that area.

Q. All right. And was Julius a player on your football team?

A. Yes, sir.

Q. And was he a defensive player?

A. Yes, sir.

Q. So as a defensive player, would it be fair to say you were one of the coaches that had more direct contact with him?

A. Yes, I did.

Q. And what kind of a -- first of all, what kind of athlete or player was Julius?

A. Julius was a good football player. He played for us and started for us his senior year and ended up being star line backer and did well.

Q. Do you recall during the seasons that Julius was starting for you how successful or unsuccessful was the Lamar Viking team? Did you all do all right?

A. Yes, sir. We went to the play-offs. I can't remember if

Direct - Ball/York                    Vol. 21:  77

we went more than one round deep in the play-offs, something like the regionals, something like that, those years.

Q. When you go to the play-offs or during the regular football season, would there be occasions you would be playing teams where there might be a trip of some distance on a bus or some other conveyance?

A. Yeah. Most of the time we play pretty locally unless we go all the way out to West Texas, and that's normally about the third round of play-offs. We play at Texas Stadium and those areas like that.

Q. Okay. With respect to Julius Robinson and your contact with him, did his -- how did he interact with coaching staff, other players? Could you give us description of your recollection of his interaction with those two groups?

A. Well, Julius was always the kid that played the game hard, and he was very coachable. Never at any time to my recollection was there any type of a confrontation, because we try to play the game hard, defensively especially, and from his standpoint, he always, you know, gave a good effort. It was basically, yes, or, no, sir, and always seemed to be pretty easy to get a long type of kid.

Q. All right. As a defensive coordinator, were there things that you required of your players in terms of discipline, effort, attendance, things of that sort?

A. Yeah. First of all, they had to be there regularly. They

Direct - Ball/York                    Vol. 21:  78

weren't going to miss practice.  Naturally, as a defensive player, we really stressed to do what our responsibilities are, and from those respects, you have to be fairly disciplined on what you're doing to take care of your position and do the job well.  And when you do it well, your record normally shows it.

Q.  All right.  And with respect to following rules, putting into the effort, the discipline, and attendance, how would you describe Julius Robinson as a player?

A.  He was -- to my recollection, he was there every day.  Like I say, learned what he was suppose to do and did it to the best of his ability while we played in the practices or games.

Q.  Was his attitude good or bad?

A.  Always good with me.

Q.  And is Lamar High School -- in the area of students that it draws on, does it include young people who grow up in very well off financial circumstances or people that are in not too good of financial circumstances?  How would you describe the students that you draw off of?

A.  We are probably both ends of the spectrum.  We have very affluent people in our area.  We have probably kids that are very much at-risk kids that grow up with government housing and things like that, and they come together under the same building and play on the same football teams.

Q.  All right.  Was Julius one from your sense and understanding of his situation, was he in the well-to-do

Ex. 71 - 1136

Direct - Ball/York                    Vol. 21:  79

category, or what category would you put him in?

A.  Most likely not.  But, there again, I mainly dealt with the kids on the football field.  Unless there was an outside problem, I wouldn't get into always, you know, where they lived and all that.  But at the same time, he probably could have been from the lower end.

Q.  All right.  And with respect to Julius and the other players, was he liked or not well liked?

A.  Like I say, my recollection, Julius never had confrontations with the players in the school.  This is, again, a situation that most of the time, if there would have been confrontation within the school or with other players, we would have seen or known about it because there would have been something that probably had happened that would have caused us, especially during the season, have to do something about it.

Q.  Okay.  Would the problems that a student created in high school -- I mean, you deal with them in the athletic program, but if a student is disruptive or misbehaving to a significant extent in the classroom outside of the program, could that affect their situation being in the athletic program?

A.  Well, sometimes if they are taken out of the classroom and, say, put in an alternative class or an alternative situation for what they have done, then it will reflect their ability to practice or play in games.

Q.  All right.  Any problems of that sort that you recall with

Ex. 71 - 1137

Direct - Ball/York                    Vol. 21:  80

respect to Mr. Robinson?

A.   No, sir.

Q.   The Julius Robinson that we've been speaking of, do you see him here in court today?

A.   Yes, sir.

Q.   Would you please point him out if you see him and describe maybe an article he's wearing?

A.   Julius is sitting right there.  He's got on a red tie and it looks like a gray jacket.

          MR. BALL:  Your Honor, may the record reflect the witness has identified the defendant, Julius Omar Robinson?

          THE COURT:  The record will so reflect.

          MR. BALL:  Thank you, Mr. York.  I'll pass the witness.  The government may have some questions.

          THE COURT:  Is there cross --

          MR. SCHATTMAN:  We do not, Your Honor.

          THE COURT:  All right.  You may step down, sir.  Thank you.

     We'll take a break of ten minutes.

     (Trial recesses, 11:00 - 11:20 a.m.  Jury present)

          THE COURT:  The defendant may call their next witness.

          MR. BALL:  Your Honor, the defendant would call Frank Logan.

          THE COURT:  Mr. Logan, if you will step up here, I will administer the oath.  Please raise your right hand and be

U.S. DISTRICT COURT

Ex. 71 - 1138

sworn.

(Witness sworn by the Court)

THE COURT:  You may be seated in the witness chair. Please speak directly into the microphone.

FRANK LOGAN, testified under oath as follows:

DIRECT EXAMINATION

BY MR. BALL:

Q.  Could you tell the ladies and gentlemen of the jury your name, please, sir?

A.  Frank Logan.

Q.  And where do you work, Mr. Logan?

A.  I work at the Federal Medical Center in Fort Worth, Texas.

Q.  And how long have you worked for the Federal Bureau of Prisons?

A.  A little over nine years, sir.

Q.  Has all of it been at FMC Fort Worth, or have you worked at other facilities or institutions?

A.  It's all been here in Fort Worth.

Q.  Have you had occasion to be assigned to -- well, where are you presently assigned out there?

A.  Presently, I'm assigned on what we call sick and annual relief.  Basically, when someone goes on annual leave vacation or extended sick leave for an amount of time, I'm the guy that goes in and fills in for them.

Q.  All right.  Over the course of nine years working at FMC

Direct - Ball/Logan                    Vol. 21:  82

Fort Worth or the Federal Bureau of Prisons, have you had a variety of assignments?

A.   Yes, sir.

Q.   Have you had occasion to work in an area that's known as the jail unit, which includes general population, administrative segregation, and disciplinary detention?

A.   Absolutely.

Q.   And during the course of your work -- have you worked there on multiple occasions over the course of the nine years or any extended period.  Describe your experience out there?

A.   Yes, sir.  I have worked there on multiple occasions, on various shifts.  Most recently, just this last quarter, we go by quarterly rotations, I was the number one officer in the special housing unit on the day shift.

Q.   All right.  And when you say number one officer, how does that distinguish you with other officers that might work on the day shift?  Is it a ranking system?

A.   Somewhat, sir.  It's not necessarily that I'm their supervisor, but I'm the lead of the crew.  There's a crew of three to four of us over there on that shift.

Q.   Is that designation made based on tenure, experience, qualifications?

A.   Yes, sir.  And it's, generally, the officer's main responsibility, the administrative work that goes on, the paperwork, basically.

U.S. DISTRICT COURT

**Ex. 71 - 1140**

Direct - Ball/Logan                    Vol. 21:   83

Q.   So a good part of your responsibility as the number one officer in the special housing unit would be dealing with paperwork that must be generated?

A.   Exactly, that as well as moving the inmates and interacting with the inmates.

Q.   Is there a significant volume of paperwork involved with regard to inmates that are kept in files so that one might go back and review things such as disciplinary history, things of that nature?

A.   Yes, sir.  To a degree, the bulk of that information is kept with case management in the MH central file.  We have just kind of an outline that's in our paperwork.  Most of our paperwork is done on a shift and 24 hour basis.

Q.   All right.  And would it be fair to say, when you come on shift, do you get reports from the previous shift regarding any problems that may have occurred, and, likewise, you pass such information on to the shift that follows you?

A.   That's correct.

Q.   During your course of work in the special housing area, did you have occasion to come into contact with an inmate by the name of Julius Robinson?

A.   Yes, sir.

Q.   And would you see Julius Robinson when you worked in the jail unit, in the special housing area, on a daily basis as you worked there?

Ex. 71 - 1141

Direct - Ball/Logan                    Vol. 21:  84

A.  Absolutely.

Q.  Have conversations with him, see him?  Did you have occasion to move him from one location to the other, that sort of work?

A.  Yes, sir.

Q.  And how would you describe Julius in terms of his behavior as an inmate in the special housing unit there where you worked?

A.  In the course of my dealings with the inmate, I've never had any problems from him.  He always does what we tell him to do.  He's never created a management problem for me or my crew while I was over there.

Q.  All right.  Was Julius Robinson a rule violator back there in the special housing unit?

A.  No.

Q.  Have you had occasion over the nine years you have worked for the Federal Bureau of Prisons to deal with inmates with bad attitudes who don't follow the rules?

A.  Absolutely.

Q.  Was that on an infrequent or on a frequent basis?

A.  Sometimes more frequent than we would like for it to be.

Q.  Is that a situation which correctional officers look forward to dealing with such inmates, or --

A.  No.  You never really look forward to it.  You know how to deal with it.  There are tools, you know, sanctions at hand to

Ex. 71 - 1142

Direct - Ball/Logan                    Vol. 21:  85

deal with those types of individuals, but you never look forward to it.

Q.  Have you had any problems at all with Mr. Robinson's attitude when you dealt with him?

A.  No.

Q.  And did Mr. Robinson appear from your observation to adjust reasonably well to the situation that he was in?

A.  I think given his situation, he adjusted quite well.

Q.  And with regard to Mr. Robinson's -- your opinion about Mr. Robinson's behavior and how he's conducted himself there in the institution where you worked, would you describe him as below average, above average?  How would you categorize him in terms of other inmates that you have to deal with on a daily basis?

A.  Given the average inmate that's in administrative detention, I'd say above average.

Q.  And was he polite, respectful to you, when he would have conversations with you?

A.  Always.

Q.  Did you see him have any difficulty or problems with other inmates?

A.  Not that I can recall.

Q.  Certainly, with respect to an inmate and the administrative work that you have to do as the first officer on a shift, if there is an incident involving an inmate, rule violation,

Ex. 71 - 1143

Direct - Ball/Logan                    Vol. 21:  86

disciplinary problem, an act of violence, regression towards the staff or inmate, would that be documented and reported in files?

A.  Absolutely.

Q.  And kept as part of the records of the institution?

A.  Sure.

Q.  The inmate that we've been talking about, Julius Robinson, do you see him here in the courtroom today?

A.  Yes, sir.

Q.  Would you please point him out if you see him and describe an article of clothing he's wearing?

A.  The gentleman sitting right over there in a gray pinstripe suit.

MR. BALL:  Your Honor, may the record reflect the witness has identified the defendant, Julius Robinson?

THE COURT:  The record will so reflect.

MR. BALL:  Thank you, Mr. Logan.  The government may have some questions.

MR. SCHATTMAN:  No, Your Honor, we do not.

THE COURT:  You may step down, sir.  Thank you.

THE WITNESS:  Yes, sir.

THE COURT:  Please call your next witness.

MR. BALL:  Your Honor, we would call Dan McCauley.

THE COURT:  Mr. McCauley, if you will step up here, I'll administer the oath.  Please raise your right hand and be

Direct - Ball/McCauley          Vol. 21:  87

sworn.

(Witness sworn by the Court).

THE COURT:  You may be seated sir.  Please speak directly into the microphone.

DANIEL MCCAULEY, testified under oath as follows:

DIRECT EXAMINATION

BY MR. BALL:

Q.  Could you tell us your name, please, sir?

A.  Daniel Joseph McCauley.

Q.  And for the court reporter's benefit, would you please spell your last name?

A.  M-C-C-A-U-L-E-Y.

Q.  Mr. McCauley, how are you employed or occupied, sir?

A.  I'm the unit manager at the jail unit at the Federal Medical Center in Fort Worth, and I'm also the long-term care unit manager at that facility.

Q.  All right.  And I want to ask you a little bit about your work history in corrections, if you will.  How long have you been in corrections-type work?

A.  I've been with the Bureau for 21 years, and I've worked for a state agency for approximately three years before that.

Q.  And your first job in corrections with the state agency, what state agency was that?

A.  Kansas State Penitentiary in Lansing, Kansas.  My title was a correctional counselor at that facility.

Ex. 71 - 1145

Direct - Ball/McCauley                    Vol. 21:  88

Q.   And is that a penitentiary, a prison unit, that houses state convicted felony inmates in the state of Kansas?

A.   Yes, at the penitentiary for the state of Kansas.

Q.   And was your education involved in corrections, or is that something you just landed into when you got out of school?

A.   No.  I also went to the Kansas State University in Manhattan, and I majored in sociology with an emphasis in criminal justice.

Q.   After leaving the Kansas Department of Corrections in Lansing, Kansas, is that when you started working for the Federal Bureau of Prisons?

A.   Yes.

Q.   And where was your first assignment for the federal government?

A.   The United States Penitentiary in Leavenworth, Kansas.

Q.   And how long did you work at the United States Penitentiary in Leavenworth, Kansas?

A.   Approximately seven or eight years.

Q.   And is that a facility that houses federal convicted felons, inmates serving felony federal time?

A.   Yes, sir.

Q.   What sort of inmates generally are housed at Leavenworth? Are they low security or high security, or is it both?

A.   Actually, it's both.  The penitentiary would be high security inmates.  We also had a camp, still have a camp at

U.S. DISTRICT COURT

Leavenworth, and it housed minimum security.  I worked in both parts of the facility.

Q.  All right.  Are inmates housed generally within the federal system according to the category of offense, risk considerations, things of that sort?

A.  There is a classification system they use, and it takes into consideration a wide variety of factors to come up with a level of security that would be appropriate for the individual.

Q.  When you worked at the Leavenworth penitentiary in Kansas, did you -- was that seven or eight years one assignment, or did you have a variety of jobs, worked your way up the scale?  Describe that for us.

A.  When I hired on with the bureau, I hired on as a correctional officer and worked in that capacity for approximately two years.  I was promoted to a case manager at the facility.  I worked as a case manager for probably four, maybe, five years, and then I was what they call the case management coordinator at the facility and had some oversight on the paperwork that was being produced in the units.

Q.  Okay.  And after working in Leavenworth, were you transferred, or what happened?

A.  Yes, sir.  I transferred to the regional office in Kansas City and worked in correctional programs in that office.

Q.  And was that out of the context of working directly with inmates in that position?  Was it more of an administrative

Ex. 71 - 1147

Direct - Ball/McCauley                    Vol. 21:  90

type job?

A.   That's correct.   There were no inmates at the regional office.   It was purely an administrative facility.

Q.   And how long did that tour of duty last?

A.   Eighteen months, something like that.

Q.   After leaving that position, where did you go?

A.   I was transferred to the Federal Medical Center for inmates in Springfield, Missouri, and I was a unit manager in a psychiatric treatment center in that facility.

Q.   Now, you've used the term Federal Medical Center.   There is one in Springfield, and there is one in Fort Worth; is that right?

A.   That's correct.

Q.   How is that different from a regular prison or prison camp, or something?   What's the purpose of a Federal Medical Center?

A.   Inmates get sick.   We have facilities, all the facilities have some health care capability.   Some inmates require more in-depth treatment for post-surgery recovery, or they may have chronic illnesses that a regular facility cannot handle.   So it would be more appropriate to house them in a federal medical facility.   Springfield is unique because it also had a psychiatric referral center.   So inmates who suffered from significant psychological, psychiatric problems could be transferred there for treatment.

Q.   All right.   And do some inmates have extended stays in

U.S. DISTRICT COURT

Direct - Ball/McCauley                    Vol. 21:  91

Federal Medical Centers because of their medical requirements, and others are in transit?  They get back recovered and go back in the general prison population?

A.  That's correct.

Q.  And how long did you work at the Springfield, Missouri Federal Medical Center?

A.  Approximately four years.

Q.  And what was your responsibility or job assignments in Springfield?

A.  I was the unit manager for the psychiatric unit for treatment.

Q.  Okay.  And after leaving Springfield, where did you go?

A.  I went to the regional office in Dallas, Texas.

Q.  And would it be fair to say that was another administrative position, not at a unit or a physical location where inmates are housed?

A.  That's correct.  It's similar to the one in Kansas City. It was a regional office.  It did not have inmates at that facility.

Q.  And are there such regional offices that govern or handle responsibilities with respect to a variety of federal prisons within a geographic area?

A.  Yes, sir.  You're right.  The one in Dallas is called the South Central Regional Office.  It's the umbrella region for the facilities in the south central part of the country.  The·

Ex. 71 - 1149

Direct - Ball/McCauley                Vol. 21:  92

one in Kansas City was the North Central.

Q.  All right.  And after working in the Dallas office in the administrative position, where did you go after that?

A.  To Fort Worth, the Medical Center in Fort Worth, sir.

Q.  And when did you arrive to take on your job assignments at the Fort Worth Medical Center, approximately?

A.  I believe it was January of '99.

Q.  And what assignment were you given when you arrived at the Federal Medical Center?

A.  The general unit manager.

Q.  Could you generally describe what the jail unit manager's responsibilities are?

A.  We house approximately 100 inmates for the United States Marshal's service here in the Northern District of Texas.  We do the intake screening for these inmates, decide whether they should be housed in the jail unit, which is a semi-open unit, or they need to be housed in a more secure part of the jail in administrative detention.

We monitor their comings and goings to court.  We review these inmates every 90 days just to keep track of where they're at in their trial process.

Q.  All right.  And so the jail unit that you have oversight over is generally housing pretrial type detainees or inmates; is that right?

A.  That's correct.

U.S. DISTRICT COURT

Ex. 71 - 1150

Q.  And there may be from time to time witnesses who are people that are in custody somewhere who may be housed out there, or is that done elsewhere?

A.  I guess I don't understand your question.

Q.  Okay.  Are there witnesses, inmates who might be witnesses who are serving time somewhere, are they housed in the jail unit or --

A.  Oh, I see.  I'm sorry.  Yes, sir.  An inmate may be serving a sentence at a federal facility, and he may be brought back on a writ to testify, and we may hold them as a holdover during the time he's testifying.  That would also be somebody that we would house in the jail.

Q.  All right.  Would it be fair to say over the 21 years with the Federal Bureau of Prisons and your time with the Kansas Department of Corrections that you have had a variety of experiences and job assignments in the area of corrections dealing with inmates and prison facilities?

A.  I think that's probably fair.

Q.  All right.  And are there continuing education or training programs for persons who work in corrections, either on-site or off-site?

A.  There are opportunities on-site and off-site for skill development.  If you're trying to move into another type of job at the prison, there are training programs you can volunteer for to learn some new information.

Q.  And at the jail unit of the Federal Medical Center, that includes the general population area, the special housing area, which has within it, administrative segregation or detention; is that correct?

A.  I have some jail inmates that are in the special housing unit, but not all the special housing units are jail inmates. We also have inmates there from the compound who violate rules have to be removed from that environment.

Q.  Okay.  At FMC Fort Worth, if an inmate's already been convicted and is serving time and engages in certain misbehavior, rule violations, and disciplinary problems, there is not a separate disciplinary detention area for them.  They go into the special housing area, and their disciplinary penalty is served there; is that correct?

A.  That's correct.  They won't be housed with the jail inmates.  They'll be housed separately, but they'll be in the same building, same part of the building.

Q.  And what sort of individuals are placed within administrative segregation or detention area of the special housing unit?  Are these folks with disciplinary problems, or are there other criteria that causes an inmate to be placed in that area?

A.  They could be disciplinary.  They could be under investigation for some rule violation where we don't have all the information and we're trying to sort it out.  It could the

Ex. 71 - 1152

Direct - Ball/McCauley          Vol. 21:  95

result of a fight or something like that.  If they come back with a urinalysis where they've used drugs, then we would put them in there as well.

Q.  All right.  Well, I was trying to distinguish between the disciplinary part of special housing and the administrative section of special housing.  Is there a distinction between those two areas?

A.  Well, the disciplinary would be after somebody has already gone through the due process disciplinary hearing and they've had a finding.  While all that was pending, they would be in administrative detention.

Q.  Okay.  Are there other reasons where inmates might be transferred or placed in administrative segregation as opposed to the general population with regard to maybe the type of offense they're accused of or high profile considerations?  What category --

A.  Well, for my jail inmates, there certainly is.  If it's a very serious offense, sometimes they will be placed over in administrative detention because of the nature of the charge.  That's happened on a number of occasions.

Q.  All right.  And with respect to the jail unit there, did you have occasion in your job responsibilities to deal with, know of, deal with records involving, an inmate by the name Julius Robinson?

A.  I have.

Direct - Ball/McCauley                Vol. 21:  96

Q.  And was Julius Robinson an inmate there at the jail unit at FMC during your work there?

A.  He has been.

Q.  Was he always in -- did there come a time when he was placed in administrative housing or administrative segregation?

A.  Yes, sir.  When Mr. Robinson first came in, he was placed in the open jail unit, the unit with the two-man cells that's locked from 10:30 at night until 7:00 -- probably about 7:00 in the morning.  He was in that unit for a number of months.  I believe he came in in November of 2000, and I think he was in that status until probably June of 2001.

Q.  Would the staff out there be advised, for example, if an indictment against a jail inmate was upgraded to something like a capital murder involving the possibility of death?  Would you all get some information about that, perhaps, and make adjustments in an inmate's status?

A.  Yes.  We are in frequent contact with the marshal's service here in this building, and they would advise us if something like that was happening, and we would potentially take appropriate action.

Q.  And did you all get some information of that type around June of 2001 with regard to the inmate Julius Robinson?

A.  Yes, sir.

Q.  And so did that change his status based on you-all's criteria as to where he was to be housed?

Direct - Ball/McCauley                    Vol. 21:  97

A.   Yes, sir.

Q.   And did that cause him to be moved from the general population that you described into the special housing administrative segregation?

A.   That's correct.

Q.   And so was his movement to the administrative segregation -- it didn't have anything to do with any disciplinary problem involving Mr. Robinson, or was that not --

A.   No.  It was purely an administrative decision based on the charge that was pending.

Q.   And from your review of records dealing with jail staff, correctional staff, correctional officers, anything that you have under your supervision and responsibility, are you generally familiar with Mr. Robinson's conduct there in the jail unit that you have responsibility for?

A.   Yes, sir.

Q.   And could you tell us what sort of conduct or behavior from your review of records and discussions with staff and so forth, what sort of behavior has Mr. Robinson exhibited while under your care, custody and control?

A.   Mr. Robinson hasn't been a problem for the officers in the jail unit or the segregation unit that he's now housed.

Q.   All right.  If there were a problem -- there was a period of time from November -- sometime in November of 2000 until June of 2001 when he was in the general population; is that

U.S. DISTRICT COURT

Ex. 71 - 1155

right?

A.   That's true.

Q.   And is he in a position, when the cell doors open at 7:00 a.m., or whatever time in the morning that is, to mingle with other inmates that are also housed in that area?

A.   He would have been out with other inmates at that time, yes.

Q.   All right.  In your review of the records, did it reflect any difficulties or problems when Mr. Robinson was housed in that type of confinement?

A.   I'm not aware of any.

Q.   And are records kept of inmates if inmates violate rules, engage in disciplinary violations, aggression or violence towards inmates, other inmates or staff?  Is there documentation kept of that?

A.   That would be what we call an incident report, and that would be part of his permanent file.

Q.   Are you aware of any such reports with regard to the inmate, Julius Robinson?

A.   No, sir.

Q.   Now, when you work out there, do you walk the unit from time to time?  Are you familiar enough where you can recognize inmates that might be housed there for an extended period of time?

A.   Yes, sir.

Direct - Ball/McCauley                Vol. 21:  99

Q.  Have you ever had occasion to see Mr. Robinson, an inmate out there?

A.  When he was in the jail unit?

Q.  Either the jail ---

A.  Or either way?  Yes, sir.

Q.  Okay.  On few or many occasions have you seen him?

A.  Many.

Q.  Have you ever had a problem with him when you've seen him in passing?

A.  No, sir.

Q.  And do you see the inmate, Julius Robinson, that you know to be an inmate out at your facility here in court today?

A.  Yes, sir.

Q.  Would you please describe him -- well, would you please point him out if you see him and describe an article of clothing he's wearing?

A.  Mr. Robinson is sitting at the table.

Q.  And an the article of clothing?

A.  Red tie.

        MR. BALL:  Okay.  May the record reflect, Your Honor, that the witness has identified the defendant, Julius Robinson?

        THE COURT:  The record will so reflect.

Q.  (By Mr. Ball)  Has Julius Robinson ever been required to be placed in the disciplinary portion of your facility, or did your review of the records indicate that he never had to go

U.S. DISTRICT COURT

Ex. 71 - 1157

there?

A.   Well, the disciplinary portion is more of a status than a place.  So it's a further withholding of some privileges.  It doesn't really depend on where you're at physically in the building.

Q.   Well, with regard to that status, would it be fair to say Mr. Robinson has never been a disciplinary problem?

A.   That's true.

MR. BALL:   Thank you, Mr. McCauley.  I'll pass the witness.   The government may have some questions.

THE COURT:   Cross examination?

MR. O'CONNOR:   Yes, sir.

CROSS EXAMINATION

BY MR. O'CONNOR:

Q.   Mr. McCauley, as the jail unit administrator, do you supervise some of the guards that have been down here today who have already testified?

A.   Yes, sir.  I know all of them.

Q.   And are you kind of at the top of the supervisory chain in terms of the jail unit itself?

A.   Well, it works off of an almost parallel tier.  I don't directly supervise the correctional officers.  We have a captain and a jail lieutenant that have direct supervision of him, but I certainly have influence in their supervision.

Q.   Okay.  You told Mr. Ball a minute ago about some of the

Cross - O'Connor/McCauley          Vol. 21:  101

things related to disciplinary segregation, and Mr. Robinson is not in disciplinary segregation?

A.   That's correct.

Q.   And to your knowledge -- well, has never been disciplined such that his status would change --

A.   That's correct.

Q.   -- to your knowledge.

And so it's not the case where you would actually take, for instance, Mr. Robinson from where he is and move him to another location if he was in disciplinary, correct?

A.   That's correct.

Q.   It would just be a status change, where he is?

A.   Right.

Q.   But with respect to the disciplinary segregation, you mentioned that people are taken there when, for instance, they have fights in the population?

A.   That's correct.

Q.   That would be a reason to send someone to disciplinary segregation?

A.   Well, initially -- like I said before, initially, they would be placed in administrative detention, and that's pending the outcome of the disciplinary process, the incident report that would be written or the investigation that would be completed.  And at the conclusion of that, they would go to a disciplinary hearing officer, and that person could impose

Ex. 71 - 1159

sanctions like disciplinary segregation or loss of good time or loss of privileges.

Q. Because you don't -- even though an inmate is locked up in prison, you or other people in your position as a prison official can't just unilaterally and arbitrarily take action against an inmate?

A. That's correct.

Q. And that disciplinary hearing is like a due process hearing?

A. It is a due process hearing.

Q. To make sure what you're doing is fair and not arbitrary?

A. That's correct.

Q. And one of the infractions that can take an inmate to a disciplinary hearing is fighting with other inmates?

A. Correct.

Q. Or fighting or attacks on guards?

A. Correct.

Q. And throughout your 21 years in the BOP, that has happened on occasion, hasn't it?

A. It has.

Q. That an inmate has fought with guards and/or fought with the other inmates?

A. Correct.

Q. It's not an uncommon occurrence within any sort of prison, is it?

**Ex. 71 - 1160**

A.   It's not a daily occurrence, but it's not uncommon.

Q.   For instance, one of the places that you've been in was the U.S. Penitentiary at Leavenworth in Kansas?

A.   That's correct.

Q.   And there are fights up there in Leavenworth, isn't there?

A.   Yes, sir.

Q.   And Leavenworth has a general population, doesn't it?

A.   Yes, sir.

Q.   In terms of the general population of a place that you're familiar with, say, Leavenworth, is it similar to a general population of, say, the jail unit or not?

A.   No.   Leavenworth is actually closer to the way the jail unit housing is structured than the rest of the institution at Fort Worth because the inmates at Leavenworth are locked in their cells at night and secured the same as in the jail unit. The inmates in the main compound at Fort Worth are more in dormitory housing.   So you might be able to lock the building, but they're free to move around inside the building.

Q.   But let's take it out of the compound and put it in the jail unit.   That would be a similar environment?

A.   Similar, yeah.   I mean, there are some very significant differences because the jail unit is a small unit that doesn't offer a great deal of programs where as at Leavenworth they would.   But, still, as far as the security of the housing, it's similar, because they are locked in small two-man cells at

Ex. 71 - 1161

Cross - O'Connor/McCauley                    Vol. 21:  104

night and then let out during the day to work.

Q.   All right.  Now, you also mentioned to Mr. Ball that one of the things that can get you before this disciplinary hearing officer and, perhaps, in administrative segregation is a positive urinalysis?

A.   That's correct.

Q.   What is a positive urinalysis?

A.   We do random drug testing.  We do targeted drug testing for people that have tested positive in the past for the use of any illegal drugs, illicit drugs.

Q.   And is that -- I'm sorry?

A.   Anything not prescribed.

Q.   Is that inmates who have -- newly arrived inmates at the facility, or does that also include inmates who have been at the facility for awhile?

A.   It could be anybody.

Q.   And so there are inmates who have been at the facility for awhile who are using drugs?

A.   That's correct.

Q.   And those drugs get smuggled into the facility?

A.   Somehow.

Q.   Correct?

A.   Correct.

Q.   And those drugs either get used or sold amongst inmates there in the facility, and sometimes you all are able to figure

Ex. 71 - 1162

Cross - O'Connor/McCauley          Vol. 21:  105

that out and give someone a test and find out about it?

A.   That's correct.

Q.   Now, have you had experience during your 21 years, either as a counselor or as an administrator up at the medical center in Springfield or here, to experience contact with inmates whereby they act one way with the prison guards and then act another way when they are out of sight of the prison guards?

A.   Yes.

Q.   In other words, they put on a show for you guys; is that correct?

A.   That's correct.

Q.   And then when you're not directly supervising or having direct contact with them, they act in a completely different way?

A.   That's correct.

Q.   That's not an uncommon occurrence for inmates, is it?

A.   No.

Q.   Now, you mentioned to Mr. Ball another way to get someone before this discipline hearing officer is a rule violation, correct?

A.   Correct.

Q.   Meaning the jail unit that you run has specific rules that inmates are suppose to follow?

A.   That's correct, sir.

Q.   And if they don't follow them, there are certain

Ex. 71 - 1163

Cross - O'Connor/McCauley                    Vol. 21:  106

consequences that follow if they break them?

A.  Correct.

Q.  It can be little rules up to big rules?

A.  They are four tiers of rule violations.

Q.  On a scale of importance?

A.  Right.  And some are fairly minor, and some are very serious.

Q.  Let me ask you about a rule as it relates to telephone usage.  When -- let me back up.  When you're in general population, do you have access to a telephone to be able to call outside the prison?

A.  Yes.

Q.  And how would you characterize that access?  Is it on a limited basis?  Do you have to make an appointment, or is it frequent, or what?

A.  Now, are you referring to the jail unit, or are you referring to the main compound?

Q.  Let me just limit it to the jail unit.

A.  In the jail unit they have telephones that they have access to just for inmate use, and the phone calls are all collect calls.

Q.  All right.  How often can they go to make a phone call?

A.  As often as -- they are 15 minute calls.  They're limited to 15 minute calls, but then they can make successive calls. If the phone is free and they have got time before a count or

U.S. DISTRICT COURT

**Ex. 71 - 1164**

Cross - O'Connor/McCauley                    Vol. 21:  107

something that they otherwise have to do, then they can make a phone call.

Q.  And then those telephone calls are monitored?

A.  Yes, sir.

Q.  By what you call an SIS person?

A.  The SIS staff.

Q.  What does that mean, SIS, do you know?

A.  It's a special investigation section.

Q.  And is every single telephone call monitored?

A.  I'm not aware of -- I don't know the details of that.  I'm not sure what extent of monitoring occurs or how much they can monitor.  I just technically don't know the answer to that question.

Q.  Is there a rule regarding three-way calling?

A.  Yes, sir.

Q.  Tell the jury what a three-way call is.

A.  A three-way call would be where the inmate would call out to somebody that would accept the phone call from them, and then they would, in turn, transfer the call to a third party.  That is prohibited.  And if we do discover one, that -- somebody would be subject to a rule violation at that point.

Q.  Can you tell us why it is that within the jail unit there is a prohibition against three-way calling?

A.  When you call out collect, the person has to accept the call.  They have to announce who they are, and the person

U.S. DISTRICT COURT

Cross - O'Connor/McCauley          Vol. 21:   108

that's being called has to physically touch a button to accept the call and let the call continue.  On a three-way call, you don't have -- and, of course, the otherwise is true.  If you don't want to receive a call from that person, you can decline the call.  You don't have to talk to them.

On a three-way call, you would lose that.  The person may not be aware that they are being called by somebody in a prison and may not have the opportunity to decline the call at that point.

Q.   Does the fact that a person that is prohibited from three-way calling, does it assist the jail unit in determining who they have called if an issue arises with respect to telephone calls?

A.   It makes it more difficult, I think.  I'm not sure -- I think they can still determine the third party call, but it makes tracking it and monitoring it much more difficult.

Q.   And that's because inmates have a call list of telephone numbers; is that right?

A.   Not at the jail.

Q.   Not at the jail?

A.   On a collect call, that's not necessary, because the person that they're calling either accepts or declines the call.

Q.   Okay.

A.   Now, you're talking about the compound, and that's kind of a different story.  Inmates can initiate calls in the main

Ex. 71 - 1166

Cross - O'Connor/McCauley          Vol. 21:  109

compound, but they can only initiate calls to people that are on their telephone list.  People that have already said I want to be on this person's list.

Q.  Okay.  Is the three-way calling prohibition the same in the compound as well?

A.  It's the same bureau-wise.

Q.  Oh, bureau-wise.

A.  The entire bureau.

Q.  I'm sorry?

A.  The entire bureau prohibits three-way calling.

Q.  And have you, while you've been in charge or administrating over there at the jail, did you know whether or not Julius Robinson was doing any three-way calling?

A.  No, sir.

Q.  And you've since become aware of that, haven't you?

A.  Yes, sir.

Q.  Only because I've told you that?

A.  Yes, sir.

Q.  And that would be a rule violation?

A.  It would.

Q.  And, of course, before any action would be taken, you would have to go to a disciplinary hearing, I take it?

A.  Right.  We'd have to go back to the phone tapes, and they would have to observe the three-way switch on the telephone tapes, and then they would write an incident report, and then I

U.S. DISTRICT COURT

Cross - O'Connor/McCauley                Vol. 21:  111

A.  That's happened.

Q.  And then, likewise, in your experience, in your 21 years of experience, you are familiar with how people can be treated who have cooperated with the government against other inmates; is that fair?

A.  Can be treated by who?

Q.  By other inmates?

A.  Oh, certainly.

Q.  I'm sorry?

A.  Yes, sir.

Q.  And how are they treated or looked upon?

A.  It varies.  Some inmates because of their testimony and their cooperation become pariahs with other inmates, and they will not be able to stay in a general population.  We have to try to transfer them to another facility.

Q.  And are you generally familiar with how inmates report violent acts that take place within the prisons if they are the victims of violent acts?

A.  Yes, sir.

Q.  How would they go about doing that?

A.  Well, there's a variety of ways, but the most direct would be they come to a staff member and explain what happened to them.

Q.  Are you familiar, based upon your 21 years of experience in the Bureau of Prisons, that many such acts go unreported?

Ex. 71 - 1168

Redirect - Ball/McCauley          Vol. 21:  112

A.   Some do.

Q.   And why is that?

A.   I think it's probably for a variety of reasons.  Sometimes I think the inmates are thinking they can handle it themselves.  They don't need the protection of staff, that this is something they can manage.  So they don't report it.

Q.   Can some of the reasons be intimidation, that they are afraid to report it?

A.   To a point, yeah.  I mean, if they continue to feel like they are going to be victimized, then they will request protective custody, which means that they are off the compound.

          MR. O'CONNOR:  May I have a moment, please?

          THE COURT:  Yes, sir.

     (Brief pause in proceedings)

          MR. O'CONNOR:  Pass the witness.

          MR. BALL:  May I have a moment, Judge?

          THE COURT:  Yes, sir.

     (Brief pause in proceedings)

                    REDIRECT EXAMINATION

BY MR. BALL:

Q.   Mr. McCauley, I want to talk to you just briefly about the three-way calling prohibition and see if I understand this correctly.

     When inmates call out of the facility, would it be fair to say one of the main reasons for that policy is there may be

U.S. DISTRICT COURT

Ex. 71 - 1169

Redirect - Ball/McCauley          Vol. 21:  113

persons who wish to talk to inmates and ones who do not wish to talk to inmates?

A.  Yes, sir.

Q.  In fact, when someone makes a call out of a jail unit or out of a federal facility, are those generally collect calls?

A.  From the jail unit, they are all collect calls.  Now, in the main compound, the inmates can initiate their own calls by phone credits that they have purchased, or they can make a collect call.

Q.  All right.  And if I were to be a jail inmate at FMC, and I wanted to call out, make a local call, to an, let's say, 817 area code number or something, it would be a collect call, and I would be charged a toll of some sort; is that correct?

A.  That's correct.

Q.  If I wish to place a call, let's say, to someone in New York City from -- or Arkansas, let's say, instead of an 817 area code, likewise, it would have to be a collect call; is that right?

A.  That's correct.

Q.  Would the charges to the recipient likely reflect the long distance charges of the phone carrier, or would it be the same cost as the recipient of an 817 call, if you follow my question?

A.  I follow your question.  I don't know that I know the answer to it.  I don't know what the rates -- I'm not aware of

U.S. DISTRICT COURT

Redirect - Ball/McCauley          Vol. 21:  114

what the rates are between a local collect call and a call like to Arkansas.  I'm not sure what the change would be.  I think it's fairly expensive either way you go.

Q.  All right.  But suffice it to say, if someone were to call out of the Fort Worth -- or the FMC jail unit to a local Fort Worth number and then that person were to three-way to Arkansas, the cost wouldn't be borne by the recipient likely in Arkansas?

A.  I'm sorry.  I don't know the answer to that question.

Q.  All right.  But you certainly don't want complaints from the citizenry that somebody is calling from your prison when they didn't want to receive the call?

A.  No.

Q.  And that's the main reason for that rule is to avoid that so that the recipient is able to elect to accept or reject the call?

A.  Right.

Q.  And you mentioned something about escapes.  I believe Mr. O'Connor asked you about escapes.  Did you say you heard someone mail themselves out of prison?

A.  Something to that effect.  They didn't actually mail themselves.  I think they were secured in mail bags and they were driven out, but I don't know the details.  I wasn't at the institution at the time.

Q.  Did the post office lose them?

U.S. DISTRICT COURT

Ex. 71 - 1171

Redirect - Ball/McCauley          Vol. 21:  115

A.  No.  I don't think they were actually posted.

Q.  Is that a frequent occurrence in the federal prison system or an infrequent occurrence?

A.  Any time you have one it's too frequent.  So ...

Q..  All right.  Are the institution's facilities available to the Federal Bureau of Prisons of a variety of types of facilities from low risk to high risk, from maximum security to low security?

A.  Yes, sir.

Q.  Are, virtually, some federal prison institutions or camps where an inmate could probably just -- if they wanted to walk on out the gate?

A.  We have camp facilities.  There are no barrier fences around the facilities.  The things that keep that person there are within that person himself.

Q.  I mean, literally maybe walk out to put a quarter in a pay phone and call a cab?

A.  You could do that.

Q.  And, certainly, those inmates would be looked for, and if apprehended, would they go back to a camp like that?

A.  No.

Q.  They would be re-classified as a flight risk, correct, sir?

A.  Right.  Yes, sir.

Q.  And with regard to -- are those facilities designed for inmates convicted of violent crimes serving very long

U.S. DISTRICT COURT

Ex. 71 - 1172

Redirect - Ball/McCauley          Vol. 21:  116

sentences?  What type of inmates go to a facility where they can walk down the road and call a cab?

A.   It would be a variety of inmates.  But I think your question, really, was, are there violent inmates there?  No. We typically screen out anybody with a history of violence from that sort of facility.

Q.   And are there facilities that are, perhaps, like Leavenworth or other FCI, Atlanta, Marion, Illinois, places like that, where the security level is very strict?

A.   The perimeter, yes.  The security compared to the camp is much higher.

Q.   Are there facilities available to put severe restrictions on inmate movement and decrease or, perhaps, even eliminate any chance of risk of escape by an inmate?

A.   A lot of the perimeter security measures are to prevent escape attempts.

Q.   And the idea of the penitentiary system is to have units available for a variety of types of inmates depending on their category, the crime, the length of sentence, things of that sort?

A.   That's correct.

Q.   And the longer the sentence, the more severe the crime that the person is serving time for, facilities are made available for that type of inmate?  Is that fair to say?

A.   Yes.  There, again, they look at a lot of factors, prior

U.S. DISTRICT COURT

Ex. 71 - 1173

Redirect - Ball/McCauley          Vol. 21:  117

criminal history, things like that.

Q.   Do you have any idea from your work experience what the escape rate is at maximum security facilities within the federal prison system?  You said any escape is one too many. Is it like a sieve where they're just flying out of their on conveyor belts?

A.   No, sir.  I'm not aware of the rates.

Q.   Now, with regard to the inmates in the jail unit, did I understand you to say they are periodically reviewed?

A.   I'm sorry?

Q.   Are the inmates in the jail unit periodically reviewed?

A.   Yes, sir, every 90 days.

Q.   And are there -- among the staff there at the jail unit, are there psychologists and those sorts of professionals who participate in the screening and evaluation of inmates?

A.   No, not on a routine basis, no.  A little caveat from how I was describing the unit before.

We have a forensic study component of the jail, and we have psychologists that do studies for the courts on inmate's competence or inmate's responsibilites at the time of the offense, and we have a number of these folks also sent to us for a 30 or 45 day period, and they would be in contact with the mental health folks very extensively while they were there.  But that's really for the purpose of providing a report to the Court.  On a routine basis, when we review inmates and

Ex. 71 - 1174

Redirect - Ball/McCauley          Vol. 21:  118

their behavior, we don't have psychology staff with us at that time.  We always have the ability to refer people that need those services to a psychology staff.

Q.  Do you know an individual by the name of -- I believe his name is Jim Womack?

A.  Yes, sir.

Q.  And who is Mr. Womack?

A.  Mr. Womack is the staff psychologist at the medical center.

Q.  All right.  Would he have been involved in any kind of evaluation of Mr. Robinson in terms of reviews, risk assessments?

A.  As a part of his -- Mr. Robinson is placed in administrative detention, and he is periodically reviewed by psyche staff.  Anybody in that status is reviewed periodically by psyche staff to see how they're doing, and that would be something I could see him doing on a routine base.  But that's separate from my review.  That's a separate time scale and a separate review process.

Q.  All right.  Do you know whether or not psychologists -- I guess Dr. Womack consistently reported Mr. Robinson's potential for harm to others is low?

A.  I'm not aware of his reports.  I haven't read them.

Q.  You haven't been privy to those; is that right?

A.  No.  I haven't read them.

Q.  Do you know whether Mr. Robinson, while in the general

U.S. DISTRICT COURT

Ex. 71 - 1175

Redirect - Ball/McCauley                Vol. 21:  119

population, worked in the laundry -- do jail inmates have either the opportunity or the requirement to work in work assignments while they are waiting for their cases to be concluded?

A.  We have limited work assignments for inmates.  Mostly, it's going to be orderlies in the unit.  They can assist with the food service during mealtimes as far as dishing out the food when inmates come through the line.  And we do have a laundry in the jail where inmates wash their own clothing.  They'll wash the jumpsuits that they wear, the towels, the sheets, for the whole building.

Q.  Do you know or from your review of records, or just generally, whether Mr. Robinson participated in any work activity while in general population?

A.  I don't recall.  He could have, and I'd have to go back and review the records to determine that, but I don't recall him doing that.  But, there again, it's been awhile.  So he could have.  It turns over quite a bit.

Q.  And with respect to inmates who have been convicted of federal crimes serving time in federal penitentiaries or camps or whatever category they're placed in, consistent with their medical conditions and the security needs of the institution, are inmates generally required, if they are able to do so and security permits, to work?

A.  Yes, sir.

U.S. DISTRICT COURT

Ex. 71 - 1176

Redirect - Ball/McCauley        Vol. 21: 120

Q.  In other words, is it just all -- if an inmate is healthy and not a security risk, do they just get to lay around all day?

A.  No.

Q.  Or are they obligated to perform some sort of work obligation?

A.  Yeah.  Most inmates, who are physically able to, will be assigned a job within their capabilities.

Q.  I guess, it depends.  Does it depend on their capabilities, maybe their background and the work assignments available?

A.  Work assignments available.  I mean, the background could be a part of it.  If they had experience as a plumber or something like that, I could see that happening.

Q.  Does the Bureau of Prisons, for cost saving reasons, endeavor to use inmate labor to provide some reduced expense to taxpayers for the upkeep and care of inmates in terms of having them do things like plumbing, cook, the things that must go on in a prison institution?

A.  Yeah.  I think you could say that, because they take care of a lot of the maintenance of the institution and the grounds.  Those are things that you wouldn't hire people to do since you have an inmate work force.

        MR. STRICKLAND:  Thank you, sir.  I'll pass the witness.

        MR. O'CONNOR:  No more questions.

Ex. 71 - 1177

Direct - Ball/Wesson          Vol. 21:  121

THE COURT:  You me step down, sir.  Thank you.

Let's counsel about timing.

(Off-the-record discussion at the bench at this time)

THE COURT:  We'll break until 1:30.

(Trial recesses, 12:15 - 1:30 p.m.  Jury not present)

THE COURT:  Raise your right hand and be sworn.

(Witness sworn by the Court)

THE COURT:  Please speak directly into the microphone.

(Jury present)

THE COURT:  This witness has previously been sworn.

MR. BALL:  May I inquire, Your Honor?

THE COURT:  Yes, sir.

DEBBIE WESSON, testified under oath as follows:

DIRECT EXAMINATION

BY MR. BALL:

Q.  Ma'am, could you tell us your name, please?

A.  Debbie Wesson.

Q.  Spell your last name for us.

A.  W-E-S-S-O-N.

Q.  Ms. Wesson, how are you employed?  Where do you work?

A.  I work at CCI Training Center.

Q.  And was CCI Training Center?

A.  It is a computer school.

Q.  Does CCI stand for anything?

A.  No.

Ex. 71 - 1178

Q.  No?  Okay.

Where is it located?

A.  In Arlington, in Lincoln Square.

Q.  Lincoln Square?

A.  Uh-huh.

Q.  Is that near Collins/I-30 area?

A.  30 and Collins.

Q.  Could you tell the ladies and gentlemen of the jury generally what you do for CCI Training Center, what your job is?

A.  I keep the student records.  I do their accounting, general office, oversee the general office.

Q.  How long have you worked for CCI Training?

A.  A little over four years.

Q.  And pursuant to a request from us, did you locate some records at CCI Training Center that pertained to a student by the name of Julius Robinson?

A.  Yes.

Q.  And was the person by the name of Julius Robinson a student there at CCI Training Center during some period of time?

A.  Yes, he was.

Q.  What kind of things does CCI -- what's the curriculum?  If I want to go to CCI to learn something, what do you have available for me?

A.  We do Microsoft training and Autocat training.

Ex. 71 - 1179

Direct - Ball/Wesson                    Vol. 21:  123

Q.  Okay.  You need to speak up just a little bit.

A.  Okay.

Q.  Microsoft training --

A.  Microsoft training and Autocat.

Q.  -- and Autocat.  And do both of those have to do with computers and computer technology?

A.  Yes.  Autocat is more drafting.

Q.  Drafting?

A.  Autocat is.

Q.  All right.  And you mentioned the word "Microsoft."  Is that the large corporation?  And I think everyone's familiar with --

A.  Yes.

Q.  -- maybe Bill Gates has something to do with that?

A.  Yes.

Q.  When students come to your school, do they have to pay tuition, some kind of tuition?

A.  Yes.

Q.  What course, if you know, was Julius Robinson?  What was he taking there when he was a student?

A.  He was taking the course to get his MCSE, the Network Administration Program.

Q.  MCSE, what is that?

A.  Microsoft Certified Systems Engineer.

Q.  All right.  Generally, your school, is it training people

Ex. 71 - 1180

to get skills involving computers and computer technology so that they are employable in the workplace, in the technology areas of industry?

A.  Yes.

Q.  And the Microsoft certification that a student can attain from your school, what do those do for somebody?  Does it make you marketable or employable?  What's the benefit?

A.  It does make them more marketable.  It helps them get a higher salary.  Employers look for that quite often.

Q.  All right.  And is a Microsoft certification kind of a standardized thing that might be available in a variety of schools such as CCI Training around the country?

A.  Yes.  Microsoft sets the guidelines.

Q.  Microsoft sets the guidelines?

A.  Yes.

Q.  Does one have to be tested in order to get these certifications, or do they just go to the classes and they give you a certificate?

A.  No.  We train them, and they have to go to a Microsoft center to take their test.

Q.  And if your training is successful and the person is picking up the curriculum, the course of instruction, does that prepare them to take these tests and attain these certifications?

A.  Yes, it does.

Ex. 71 - 1181

Direct - Ball/Wesson                    Vol. 21:  125

Q.  And did you examine and look for in your records -- there at CCI Training, did you find some records pertaining to the student Julius Robinson?

A.  Yes, I did.

Q.  And do you know when it was that he became enrolled there when he started?  And if you need to refer to anything, please do so?

A.  August of 2000, August 7 of 2000.

Q.  And is there a number of hours that -- the curriculum he was signed up for, is there a specified number of hours of instruction that one would have to attend in order to complete the curriculum?

A.  The complete course is 308 hours.

Q.  308 hours?

A.  Yes.

          MR. BALL:  May I approach the witness, Your Honor?

          THE COURT:  You may.

Q.  (By Mr. Ball)  Ms. Wesson, let me show you what I have had marked for identification purposes as Defendant's Exhibit Number 1.  I apologize.  I made a little notation, and I have marked it out.

     Have you had an opportunity to examine this document out in the hallway?

A.  Yes, I have.

Q.  And do you recognize the contents of Government's Exhibit

Number 1?

A.  Yes.

Q.  In fact, you have another copy you have been looking at or referring to available to you that are the same records?

A.  Yes.

Q.  Is this a business record of CCI Training pertaining to the student Julius Robinson?

A.  Yes.

Q.  And are you one of the people that keeps control of records like Defendant's Exhibit 1?

A.  Yes, I am.

MR. BALL:  Your Honor, we would offer into evidence Defendant's Exhibit Number 1.

MR. O'CONNOR:  Your Honor, we have no objection to Defendant's 1.

THE COURT:  Defendant's 1 is admitted.

MR. BALL:  Thank you.

Q.  (By Mr. Ball)  Ms. Wesson, referring to your copy up there, is there an indication in your records of the 308 hours of curriculum that would have been the complete course of Mr. Robinson?  Does it indicate how many hours of that he actually was in attendance?

A.  He attended 200 hours.

Q.  And up to the point that he attended 200 hours, was that the amount of hours scheduled, or was there some -- did he miss

any hours, and if so, how much?

A.   He missed 12 hours.  212 hours were scheduled.

Q.   So out of 212 hours scheduled at the time that these records were generated, he had missed 12 and attended 200; is that correct?

A.   Yes.

Q.   And are you familiar with the attendance habits of students at CCI Training?

A.   Yes.

Q.   How would you characterize his attendance, average, below average, above average?

A.   Above average.

Q.   Now, he didn't do the 308 hours.  Was there a reason why he didn't complete the entire curriculum?

A.   At that time he was arrested, I believe.

Q.   All right.  And do your records reflect when his last attendance was or when he might have withdrawn -- did he withdraw from CCI Training?

A.   Not himself, no.

Q.   Okay.

A.   After a certain period of time, we had to drop him.

Q.   Okay.  Do you recall when he was dropped or when this event might have occurred which ceased his attendance?

A.   His last date of attendance was November 7, and we dropped him on November 22.

Ex. 71 - 1184

Direct - Ball/Wesson                Vol. 21:  128

Q.   When you say November 7, was that of the year 2000?

A.   Of the year 2000.

Q.   Now, these Microsoft certifications that you described, do your records reflect in Defendant's Exhibit Number 1 whether or not he attained any certifications during his course of attendance at your school?

A.   He obtained one.

Q.   What would that have been, ma'am?

A.   Microsoft Work Station.

Q.   And you mentioned a moment ago that people go to the classes, and then they go to a Microsoft center and take some sort of examination?

A.   Yes.

Q.   And at the end of the examination, you all received information as to whether they passed or did not pass?

A.   Correct.

Q.   Your records, Defendant's Exhibit Number 1, what does it reflect with regard to the Work Station examination that you just mentioned?

A.   That he passed the exam.

Q.   Did he obtain any kind of certificate as a result of passing that examination?

A.   He gets a report saying he passed, but -- yeah.  That's it.

Q.   Would there have been more testing to come if he had been able to complete the curriculum?

U.S. DISTRICT COURT

Cross - Schattman/Wesson          Vol. 21:  129

A.  Right.

Q.  Such as the Microsoft Work Station just further advancing through the certifications?

A.  Yes.

Q.  And one of the documents that appears in Defendant's Exhibit Number 1 appears to be something referred to as a diploma from Lamar High School.  Do you see that in your records?

A.  I know it's here.  Yes, I do.

Q.  And why would that be a part of CCI's training records?  Why would you have a copy of Mr. Robinson's diploma?

A.  We have to have proof of education.

Q.  And so that's why it was provided and kept in his file; is that right?

A.  Yes.

        MR. BALL:  Thank you, ma'am.  I'll pass the witness.  The government may have questions.

        THE COURT:  Cross examination?

        MR. SCHATTMAN:  Yes, sir.

                    CROSS EXAMINATION

BY MR. SCHATTMAN:

Q.  The training center itself, are there -- is this a self-schooling sort of thing, or are there instructors there --

A.  It's instructor led.

Q.  It's instructor led?

U.S. DISTRICT COURT

Ex. 71 - 1186

Direct - Ball/Hollimon, John        Vol. 21:  130

A.  Uh-huh.

Q.  So there is an instructor in the classroom, and stuff comes up on the computer screen, and you work through it, correct? Is that basically how it works?

A.  They have books and hands-on experience with the computers.

Q.  In Mr. Robinson's case, he came in for four hours each evening, roughly speaking?

A.  Yes.

MR. SCHATTMAN:  That's all, Your Honor.

MR. BALL:  No redirect, Your Honor.

THE COURT:  You may step down.  Thank you.

MR. BALL:  May she be excused to return to her duties?

THE COURT:  Yes, sir.

You're free to go as well, ma'am.

You may call your next witness.

MR. BALL:  Thank you, Your Honor.  We call John Hollimon.

THE COURT:  Mr. Hollimon, would you please raise your right hand and be sworn.

(Witness sworn by the Court)

THE COURT:  You may be seated in the witness chair. Please speak directly into the microphone.

JOHN HOLLIMON, testified under oath as follows:

<u>DIRECT EXAMINATION</u>

U.S. DISTRICT COURT

Ex. 71 - 1187

Direct - Ball/Hollimon, John      Vol. 21:  131

BY MR. BALL:

Q.  Could you tell the ladies and gentlemen of the jury your name, please, sir?

A.  John Hollimon.

Q.  And for the benefit of the court reporter, could you spell your last name?

A.  H-O-L-L-I-M-O-N.

Q.  And, Mr. Hollimon, how are you employed?  What do you do?

A.  I work at the Arlington -- Medical Center of Arlington.  I work for MCA Hospital, is actually what it is.

Q.  MCA Hospital?

A.  Yes.

Q.  Is that located on Matlock?

A.  Yes, 3301 Matlock Road.

Q.  In the city of Arlington, Texas?

A.  Yes.

Q.  And how long have you worked for the hospital there?

A.  Just about two years.  It will be two years next month, actually.

Q.  In what city do you live, Mr. Hollimon?

A.  I live in Arlington.

Q.  And do you know a person by the name of Julius Omar Robinson?

A.  Yes.

Q.  And how is it that you know Julius Omar Robinson?

Ex. 71 - 1188

Direct - Ball/Hollimon, John       Vol. 21:  132

A.  He's my nephew.

Q.  And do you see your nephew, Julius Omar Robinson, here in the court today?

A.  Yes, I do.

Q.  Would you please point him out if you see him and maybe describe an article of clothing that he's wearing?

A.  He's sitting right there next to the white haired gentleman.

THE COURT:  Once again, he says hair.

MR. BALL:  I'll take that, Judge.

A.  His suit is gray, I believe.  I don't have my glasses on, but I believe it's a white shirt, red tie.

MR. O'CONNOR:  We'll stipulate to that, Your Honor.

MR. BALL:  May the record reflect he's identified the defendant?

THE COURT:  Everyone agrees.  Thank you.

MR. BALL:  And the man with the white hair.

Q.  (By Mr. Ball)  He's your nephew.  Do you have any brothers or sisters?

A.  Do I?

Q.  Yes, sir.

A.  Oh, yes.

Q.  Who are they?

A.  You want me to name all my brothers and sisters?

Q.  Well, how many do you have?

Ex. 71 - 1189

Direct - Ball/Hollimon, John       Vol. 21:  133

A.  Okay.  I have four brothers and four sisters.

Q.  Do you know a person by the name of Rosa Mae Hollimon?

A.  Yes.

Q.  And who is she?

A.  That's my sister.

Q.  And does Rosa Mae Hollimon have any connection to Julius Robinson?

A.  Yes.  That's Julius' mother.

Q.  Where did you grow up in your younger years, Mr. Hollimon?

A.  My younger years I grew up in Arkansas, a little town called Dermott.

Q.  All right.  And who was your mother and father?

A.  Margaret Hollimon and John Hollimon.  We have a Junior.  So John Hollimon, Sr. is my father, and Margaret Hollimon, which is here with me now, is my mother.

Q.  Would Margaret Hollimon be Julius' grandmother?

A.  Yes.

Q.  And you said she's Margaret Hollimon, your mother and Julius' grandmother.

A.  That's correct.

Q.  Is she in the courtroom?

A.  She's in the courtroom.

Q.  Would you please point her out and describe where she's sitting?

A.  That's my mother sitting next to that young lady back there

U.S. DISTRICT COURT

Direct - Ball/Hollimon, John          Vol. 21:  134

on the first row behind Mr. Cummings, I believe, Bruce --

Q.  Behind our investigator.

          THE COURT:  Just have her stand.

          THE WITNESS:  Waive your hand, Mom.  Stand.

That's my mother.

Q.  (By Mr. Ball)  Thank you, ma'am.

Where does Margaret live?

A.  She lives in Dermott, Arkansas.

Q.  Do you know how old a lady Margaret is?

A.  How old is she?

Q.  Yes.

A.  Seventy-eight.

Q.  All right.  And when you were growing up there in Dermott, Arkansas with your brothers and sisters, did you live there with Margaret and John?

A.  Oh, yes.

Q.  And is John living, your grandfather -- I mean, your father?

A.  No, no, he's not.  No, my father's not living.

Q.  When did he pass away?

A.  He died four years ago.

Q.  And would you describe your growing up?  Were you all wealthy people, not wealthy?  What was your financial circumstances of your upbringing there in Dermott?

A.  Not wealthy.  My father was blind.  So -- and my mother --

U.S. DISTRICT COURT

Ex. 71 - 1191

Direct - Ball/Hollimon, John        Vol. 21:  135

well, my father was blind, and we grew up -- we was on welfare. So, Mother, she couldn't write or read. So they brought us up, all of us, in one home, sisters and brothers alike.

I have no regrets. I didn't go hungry. I had food to eat. We just was -- we was a poor family, but we was a loving family, and we stuck together.

Q. All right. And you said your father John was blind?

A. Yes.

Q. Did that interfere with his ability to work?

A. Yes, it did.

Q. All right. And you said your mother, Margaret, was not able to read and write; is that correct?

A. That's correct.

Q. Did you attend school there in Dermott?

A. Did I? Yes.

Q. Along with your brothers and sisters?

A. Yes.

Q. How old a man are you, John?

A. Forty-seven.

Q. Did there come a time when you left Dermott, and if so, where did you go?

A. Yes. I left Dermott at a young age. I moved to Texas, moved here -- well, not here. I moved to Wichita Falls, Texas.

Q. And with respect to yourself -- you said you're 47 years

Ex. 71 - 1192

Direct - Ball/Hollimon, John          Vol. 21:  136

old.  Julius's mother, Rosa Mae, do you have any idea how old she is?  Is she younger?

A.  She's younger.

Q.  Did you generally keep track of your family, go back and visit even though you had moved to Wichita Falls?

A.  Oh, yes.  We stayed in touch with my father.  My father and I had a real close relationship, real close.  So we stayed in touch.

Q.  And did there come a time when Rosa Mae met someone, had children, married?

A.  Yes.

Q.  Who was it that she met and married?

A.  Well, Jimmy Robinson -- Jimmy Lee Robinson, she married him.

Q.  Had you already left and moved to Wichita?

A.  I had left, yes, when that happened.

Q.  Okay.

A.  But I did know Jimmy Lee Robinson.  We grew up together.

Q.  Did he grow up there in that part of Arkansas?

A.  Yes.

Q.  Did that marriage stay in tact, or did it dissolve at some point?

A.  It didn't stay in tact.  My father kind of kept me informed about it.  It didn't stay in tact.  No, it didn't.

Q.  All right.  As a result of that marriage that Rosa Mae had

Ex. 71 - 1193

Direct - Ball/Hollimon, John       Vol. 21:  137

with Jimmy Lee Robinson, did that marriage produce any children?

A.  Yes.

Q.  What children did it produce?

A.  Julius and Marcus Robinson.

Q.  All right.  Marcus is a little older; is that right?

A.  Yes.  Marcus is older, yes.

Q.  What kind of work, if you know, did Jimmy Lee Robinson, Julius's father, do?  What does he do for a living?

A.  I'm not for sure.  I was told he was chef, that he had went to school and became a chef, but I never -- I talked to Jimmy when my father passed away.  I hadn't seen him in a long time. I believe he told me that himself, that he was a chef, but he had moved away.

Q.  All right.  Was he ever associated with the United States Military?

A.  Yes.  He was in the military, yes.

Q.  Was there a time when -- well after Julius and Marcus were born, do you have any notion about how long the marriage of Rosa Mae and Jimmy Lee lasted?

A.  No.  I don't exactly know when that marriage -- I don't know exactly, only what my father told me.  He kept me kind of informed about things.

Q.  About the family history?

A.  Yes, what was going on with the family and with my sister

U.S. DISTRICT COURT

Ex. 71 - 1194

Direct - Ball/Hollimon, John      Vol. 21:  138

and her boys, and the situation with Rosa and Jimmy Lee.

Q.  When that marriage -- when Rosa Mae and Jimmy Lee split up, was Julius still pretty young?

A.  Yes.  He was pretty young.  My mother -- like I said, my mother and father told me what happened in that situation and how they ended up with my parents.

Q.  Okay.  Was there a time -- and all this time you're living in Wichita Falls?

A.  I was living in Wichita Falls, yes.

Q.  Did you have a family?  Did you marry or have any children?

A.  Do I have children?

Q.  Did you marry or have children?

A.  Yes.  I'm married, and I have children, yes.

Q.  And were you working in Wichita Falls?

A.  Yes.

Q.  Did there come a time in your family where Rosa Mae came to stay --

A.  With me?

Q.  Yes.

A.  Yes, that's correct she did.

Q.  All right.  When she came to stay with you, did she have her children, Marcus and Julius, with her?

A.  No.

Q.  What was the circumstances -- who was raising Marcus and Julius after Rosa Mae split up with Jimmy Lee.  Who was raising

U.S. DISTRICT COURT

Ex. 71 - 1195

Direct - Ball/Hollimon, John    Vol. 21:  139

the boys?

A.   My parents, Margaret and John Hollimon, Sr., was raising the boys.

Q.   Were they living there with Margaret and the boys?  Were they living there with Margaret in Dermott, Arkansas?

A.   Yes.

Q.   When they reached the age of attending school, were they attending elementary, junior high school, in Arkansas?

A.   Yes.  I traveled back there from time to time, and they was there in school with my parents.

Q.   All right.  Well, where was Rosa Mae -- if John and Marcus were raising Marcus and Julius, where was Rosa Mae?

A.   Where was Rosa Mae?  Well, she was in Wichita Falls at one time with me for a period of time, and then, I believe, she moved here to Arlington for a period of time.  I'm trying to remember everything.  She might have even gone back home for a short period of time.  She kind of moved around a little bit.

Q.   So when she came to Wichita Falls and then when she moved to Arlington, did Julius and Marcus continue to live in Dermott and raised by Margaret and John at least initially?

A.   Well, when she moved to Wichita Falls with me, she was there by herself with me, and the boys were with my parents then.  And -- I want to get this correct.  I believe she moved to Arlington, and the boys were still with my parents.  I think after then, it was at some point that she went and got the

Ex. 71 - 1196

Direct - Ball/Hollimon, John      Vol. 21:  140

boys, I believe, and bright them to Arlington.  I'm trying to be as precise as I can.  It's been a long time.

Q.· Okay.  Now, Jimmy Lee who split with Rosa, is he in the picture?  Is he helping take of the boys, providing support, visiting, anything of that sort?

A.  No, I'm afraid not.  Perhaps, Rosa can tell you, but from what my parents told me, that he wasn't -- he wasn't in the picture.  It was mainly my parents, my mom and dad, that did all the raising.  So he wasn't there.

Q.  All right.  When Rosa Mae moved to Arlington, I think you said that at some point, she got Julius and Marcus and brought them to stay with her; is that right?

A.  Yeah, at some point.  I don't know exactly when, but at some point, she did.

Q.  I mean, did you know whether or not Julius attended high school in Arlington?

A.  Yes.  I did know that, yes.

Q.  Okay.  And would you keep in touch somewhat with Rosa Mae?  When she moved to Arlington, you were living in Wichita Falls?

A.  Well, I did.  I made a few trips here to visit her and to address some things with her.  Yes, I did.

Q.  And while Julius and Marcus were living and staying here in the Arlington with Rosa Mae, was Rosa Mae having any problems?  And if so, what kind?

A.  I'm sorry.  Would you repeat that?

Direct - Ball/Hollimon, John      Vol. 21:  141

Q. Okay.  While Rosa Mae and the boys were living in Arlington and Julius and Marcus are attending school with Rosa Mae, did she begin to have some problems?

A. Yes.

Q. What kind of problems did Rosa Mae have?

A. Well, my sister Rosa Mae, she drink a lot.  She did that. And then marijuana, that, too.  And any other drugs, I'm not sure, but the marijuana part, she kind of got mixed up with that.  I know that for sure.

Q. You said you occasionally came to visit?

A. Yes.

Q. Did you ever see Rosa Mae either under the influence of alcohol or some kind of drug when she would visit or see her here in Arlington?

A. Oh, yes, uh-huh.

Q. Was that on more than one occasion?

A. Yes, on more than one occasion, you know, when I'd visit her.  I don't drink.  So if someone that drinks is drunk, I can tell.  It hits me right in the face, so, yes.

Q. Did it appear to you -- well, at that time was Rosa Mae a single mom?

A. Yes.

Q. Trying to raise Marcus and Julius?

A. That's correct.

Q. And at the same time, she's having these problems with

Ex. 71 - 1198

alcohol and maybe some drug use?

A.   Yes.

Q.   What kind of home environment did that appear to you to present for the boys?  Were you concerned about it?

A.   Very concerned, because they was in a stable home for most of their life until they got to be in junior high and maybe going into high school.  And they move to a city, and my sister was having problems, you know, with the drinking and the marijuana.  And when I visited her, I was concerned about that because I could see that raising boys, young men, was going to create a problem for their mom, and I was concerned about that. So I visited her a couple of times, and she knows how I felt about, you know, that, a different environment for these boys to come from a little country town into a city, and then the mom, you know, is not as strong as she need to be.  I felt that those boys were left on their own, or just about, and I was concerned about that.  That's why I made those visits.

Q.   Okay.  And you knew they had lived with John and Margaret in their younger years.  Were John and Margaret the sort of folks that were drinking and drugging, or anything like that?

A.   No.  My parents didn't do that.  They raised eight children, and they did a pretty good job.

Q.   Okay.  So you found a different environment that Julius and Marcus were in here in Arlington?

A.   A very dangerous environment I felt at the time.  I was . .

Direct - Ball/Hollimon, John    Vol. 21:  143

concerned.

Q.  At some point, did you stay -- you said you live in Arlington now.  How did you come -- when did you come from Wichita Falls to Arlington?

A.  Okay.  That happened two years ago.  It would be two years, like I said, in April.  I moved from Wichita Falls to Arlington.  I had some problems myself.  So I moved here, and I contacted Julius, my nephew.  And when I contacted him and we discussed my problem, he told me, well, I'm your nephew. You're welcome to move in with me.  As long as you need, you know, to get yourself together and to get your own place, you're welcome to live in my home.

Q.  All right.  And, incidentally, during Julius' high school years, he's living with his mother.  Do you know whether or not -- I mean, was there a man of the house?

A.  Was there a man of the house?

Q.  Uh-huh.

A.  Yes.

Q.  Who was the man of the house?

A.  I would say Julius.

Q.  All right.  Was he having to kind parent the parent a little bit?

A.  Did he have what now?

Q.  Was Julius having to parent his own parent a bit because of her problems?

Ex. 71 - 1200

Direct - Ball/Hollimon, John        Vol. 21:  144

A.  Well, he was kind of on his own.  He was, you know, a young man that was kind of on his own, you know.  I'm not trying to paint my sister as a bad person.  She had problems.  So, therefore, Julius or Marcus had to step up to the plate and try to do what they could do to help in the home.

Q.  All right.  And you said you stayed.  Did you stay with Julius during a period of time when you came from Wichita Falls and needed a place to stay?

A.  Yes.  I stayed with Julius from March to July, I believe.

Q.  Okay.  Of which year, 2000?

A.  Yes, uh-huh.

Q.  Okay.  And at that point, Julius was out of school, out of high school, wasn't he?

A.  Yes.  He was out of high school, yes.

Q.  And, incidentally, do you know whether or not after high school Julius attended any other schools?

A.  The school that the young lady was up here testifying about, he had talked about that school with me, and I would always come back and visit him, you know, after I left.  I was always checking on him.  He was excited about going to school, going to computer class.  I saw the excitement in his face. You know, I was happy for him because he was saying that, it's something I want to do.  And I can do it.  And I'm going to do it.  So that's the only time that we discussed about his going to another school.

Ex. 71 - 1201

Direct - Ball/Hollimon, John      Vol. 21:  145

Q.  I mean, did he have any aspirations in terms of what he wanted to do with regard to this computer school and go on to do?

A.  Well, he talked about marketing, you know, in that area. To me, he wanted to be his own boss, or maybe have his own business.  That's what we briefly talked about.

Q.  Okay.

A.  I don't know the class that he took.  I don't know if it would help him or not.

Q.  Did you ever know him to own a business?

A.  Yes, uh-huh.

Q.  What kind of business did he own, if you know?

A.  It was a clothes store I visited three or four times.

Q.  Do you know the name Looking Tight?

A.  Yeah.  That's the name of it, Looking Tight, yeah.

Q.  At some point did he lose that business?  Did it burn or something?  Do you know about that?

A.  Yes.  I know about that.  I was living with him at the time it burned.  We had went out, him and I and his girlfriend.  He had invited me out to go see a movie.  So we went out and we was at the movie, and he got a call saying that his place was on fire.  I don't remember the dates, but I remember the phone call that he got.

Q.  Okay.  After Julius left high school, did he move out from Rosa and get his own place?

Ex. 71 - 1202

Direct - Ball/Hollimon, John      Vol. 21:  146

A.  You know, at that time, I don't know how that came about. When I moved here, he had his own place then.  I visited Julius once, when he lived on the north side of Arlington.  He had his own place then.  I remember that part.

Q.  Okay.  How did Julius treat you, his uncle?

A.  Well, he treat me fine, respect.  He had a lot of respect for me as I have a lot of respect for him.  But he treated me like a nephew, I think, the way he should treat his uncle.  He treated me nice.

Q.  And with regard to your parents, his grandparents, John and Margaret, what was the relationship?  Even after Julius left them, was there a relationship between them?  How did he treat your folks as grandparents?

A.  Well, Julius was great with his grandparents.  I have a close relationship with my parents, and it appeared that Julius had an even closer relationship.  It appears that way maybe because they raised him from, really, a young age, but the relationship between my parents, his grandparents, was great.

Q.  Was he respectful to them?

A.  Was he what?

Q.  Was he respectful to John and Margaret?

A.  Oh, yes.  That's one thing I can say.  He never disrespected my mom or my father.  It just wasn't in him to do that.

Q.  All right.  And you said your father, John, died.  What was

Ex. 71 - 1203

Direct - Ball/Hollimon, John        Vol. 21:   147

the circumstance?  Did he have an illness?

A.  Yes, he did.  Yes, he had cancer.

Q.  All right.  Was there a period of time when he went through treatments until it kind of went downhill?

A.  Yes.  It was a long, laid out treatment for my father.

Q.  Did Julius ever help with regard to John's illness, either in a financial way or any other way?

A.  Oh, most definite, yes.  Always.  I would send money. Julius would send money.  My sister would send -- we was always, you know -- my parents were still poor.  So we would try to send some money to help them to pay bills.  Even when my father was sick, the nearest hospital was 150 miles.  So it would cost to go back and forth, and so he would send money to help pay for the driver who was going to drive them there, pay for their food, buy them lunch or dinner.  And then I would do that, and we would just chip in and help in that area.

Q.  And with respect to being around Julius, associating with him, at least in your presence, did you ever see Julius exhibit any signs of violence?

A.  Violence, no, not around me.  I never saw it.

Q.  Okay.  And, Mr. Hollimon, you understand the jury has heard evidence over the course of a few weeks regarding some events. You understand that?

A.  Oh, yes.  I understand that, uh-huh.

Q.  All right.  And you didn't hear all the evidence they

Ex. 71 - 1204

Direct - Ball/Hollimon, John        Vol. 21:  148

heard, and you don't have knowledge of all the things that they

may have heard.  Is that fair to say?

A.    That's fair to say.

Q.    You're speaking from your experience in dealing with

Julius; is that correct?

A.    Yes, I am.

Q.    You understand this jury has a decision to make with

respect to punishment options for your nephew, Julius Robinson?

A.    Yes, sir, I understand.

Q.    And you know that one of the options that they have is they

could vote in such a way that would result in an order that

your nephew, Julius Robinson, be sentenced at some point to die

at the hands of the state or government?  Do you understand

that's one option they have?

A.    Yes, I understand that, uh-huh.

Q.    Are you asking this jury to spare your nephew's life,

Mr. Hollimon?

A.    Yes, I am.  Yes.

Q.    Why?

A.    Why?  I haven't heard all the evidence, as you said,

because I haven't been here or wanted to be here.  And I sat in

on one day of the trial and heard some things from the

prosecution and then from the defense.  You want to know why I

think they should spare his life?  That's what you asked me,

correct?

U.S. DISTRICT COURT

Ex. 71 - 1205

Direct - Ball/Hollimon, John        Vol. 21:  149

Q.   Yes, sir.   Understand the jury has heard things you may not be privy to or know?

A.   Uh-huh.

Q.   What from your knowledge of Julius, focusing in on your experience with him, is worthy of saving Julius' life?

A.   I don't think that he's a cold blooded murderer as he's been painted out to be.  I don't feel that he is.

Q.   Certainly, that's been -- your observation and experience are inconsistent with that?  Would that be fair to say?

A.   That's my -- yes, uh-huh.

Q.   Do you love your nephew?

A.   Well, sure I love my nephew.  Yes, I do.

Q.   You understand another option may be that he serve confinement in the custody of the United States Government, in prison, for the rest of his natural life?  You understand that that's an option?

A.   Yes, I do.

Q.   If that were to be the result of the jury's verdict, are you someone consistent with your family obligations and other things that you must do, write to Julius and try to keep his spirits up and visit him as best as you could?

A.   Yes.

     MR. BALL:  Thank you, Mr. Hollimon.

     I'll pass the witness.

     The government may have some questions for you, sir.

Ex. 71 - 1206

Cross - Schattman/Hollimon, John    Vol. 21:    150

THE COURT:  Will there be cross?

MR. SCHATTMAN:  Yes, sir.

CROSS EXAMINATION

BY MR. SCHATTMAN:

Q.  Mr. Hollimon, my name is Fred Schattman.  I'm one of the representatives of the government here in this case.

Your father, John, Sr., was a highly respected man within the community up in Dermott?

A.  Yes.

Q.  And you grew up, I think you said, in, you know, a poor but loving household?

A.  Yes, uh-huh.

Q.  And your mother and your father saw to it that you and your brothers and sisters got an education?

A.  Yes.  We all didn't finish.  Some of us got GED, but we went -- some of us did.  Some of us didn't.

Q.  And everybody had -- you all went to church every Sunday. Your family were members of the church up there?

A.  Yes.  We were church members, yes.

Q.  And your grandparents helped raise -- or from what I hear you saying, your grandparents -- your parents?

A.  My parents.

Q.  Your parents were the primary caregivers for Julius and Marcus during their very early years?

A.  Yes.

U.S. DISTRICT COURT

Ex. 71 - 1207

Cross - Schattman/Hollimon, John    Vol. 21:    151

Q.  And you know from knowing your parents that your parents love their grandchildren very much?

A.  Correct, yes.

Q.  And they saw to their needs to the best of their ability? Got them to school.  Got them to church.  Did everything they could to raise them right?

A.  That's correct.

Q.  All right.  And you've told us that in, I believe, it was between March and July of 2000, that you came down here and were visiting with -- excuse me, you were living with Julius?

A.  Yes.

Q.  And during -- and even before that time, you still had contact with Julius from time to time?

A.  From time to time, yes.

Q.  And you, as an uncle, were always available to help Julius when he needed help if there was a way you could help?

A.  Yes.

Q.  And he knew that?

A.  Yes.

Q.  All right.  During the time that you lived with Julius between March and July of 2000, did you have occasion to see him engaged in any criminal activity?

A.  No.  I lived in his home with him.  I was amazed because Julius -- I lived there.  There was no activity that much.  It was kind of a place where there is no traffic.  You know, it

U.S. DISTRICT COURT

Ex. 71 - 1208

Cross - Schattman/Hollimon, John    Vol. 21:  152

was quiet to where he didn't have many people visit while I was there. And so it was -- I never saw any activities, criminal activities, nothing like that.

Q.  And when you were there between March and July of 2000, you know that Julius would leave town from time to time going up to Little Rock?

A.  Little Rock?

Q.  Yes, Arkansas.

A.  Not Little Rock.  I know a few times he might have went to Dermott, and maybe like on a deer hunt, maybe visit my parents at times.  I noticed that.

Q.  Well, did you go with him on these trips, or this is just what he told -- this is what he told you that he's going to go visit?

A.  No.  I went once during that time.  I made the trip.  We went in the same vehicle, but we made the trip.  I made the same trip that he made, and we was there in Dermott together.

Q.  And there were, of course, other times that he was out of town during the time you were living there?

A.  There was maybe once he might have went somewhere, once, maybe twice at the most, I think.

MR. SCHATTMAN:  Thank you.

THE COURT:  Is there redirect?

MR. BALL:  No, Your Honor.

THE COURT:  You may step down, sir.  Thank you.

U.S. DISTRICT COURT

Ex. 71 - 1209

Direct - Ball/Hollimon, Rosa    Vol. 21: 153

You may call your next witness.

MR. BALL: Rosa Mae Hollimon.

THE COURT: Ms. Hollimon, if you will step up here, I'll administer the oath. Please raise your right hand and be sworn.

(Witness sworn by the Court)

THE COURT: Please be seated in the witness chair and speak directly into the microphone.

ROSA MAE HOLLIMON, testified under oath as follows:

DIRECT EXAMINATION

BY MR. BALL:

Q. Could you tell us your name, please, ma'am?

A. Rose Hollimon.

Q. And where do you live currently, Ms. Hollimon?

A. In Dayton, Ohio.

Q. And how long have you lived in Dayton, Ohio?

A. Four years, three-and-a-half.

Q. And are you working up in Dayton?

A. Yes, I am.

Q. What kind of work do you do up there, ma'am?

A. I work in labor and delivery. I'm an OB tech.

Q. Labor and delivery?

A. Yes.

Q. OB tech?

A. Yes.

Ex. 71 - 1210

Direct - Ball/Hollimon, Rosa        Vol. 21:  154

Q.  Okay.  Is that at a hospital, or where is that?

A.  It's a medical center.  It's a hospital, yes.

Q.  Okay.  How long have you worked for them approximately?

A.  Three years.

Q.  Now, do you know Julius Robinson?

A.  Yes.

Q.  And how do you know Julius Omar Robinson?

A.  He's my youngest child.

Q.  And where were you born and raised, Ms. Hollimon?

A.  Dermott, Arkansas.

Q.  And were your parents John and Margaret?

A.  Yes.

Q.  And the gentleman that just left the witness stand, John Hollimon, is he one of your brothers?

A.  Yes.

Q.  How many brothers and sisters did you have coming up?

A.  It's nine of us in all.

Q.  And would you describe your circumstances there in Dermott -- well, did you live with your parents, John and Margaret, the whole time, or was there a time when you lived elsewhere?

A.  There was a time that I lived somewhere else.

Q.  All right.  When was that, generally, and what were the circumstances of your living somewhere else other than with your parents, John and Margaret?

U.S. DISTRICT COURT

Ex. 71 - 1211

Direct - Ball/Hollimon, Rosa      Vol. 21:  155

A.   It was one of my parent's friends, and her son had just passed away, and she was lonely.  So I went to stay with her.

Q.   Did she live in Dermott or was this all somewhere else?

A.   No, in Dermott.

Q.   Okay.  So you were right there.  You were just living under a different roof; is that right?

A.   Most of the time, yes, sir.

Q.   Okay.  But still you would regularly see your mom and your dad, your brothers, and your sisters?

A.   Yes, sir.

Q.   And how far did you go in school, Ms. Hollimon?

A.   To the 11th grade.

Q.   Was that there in Dermott?

A.   Yes.

Q.   I know ladies don't like to answer this necessarily.  How old a lady are you, ma'am?

A.   I'm 43.

Q.   Your parents, were they able to work, or what were the circumstances of the working environment there in your home with John and Margaret there in Dermott?

A.   Well, my father was blind.  He was unable to work, and my mother did like odds and ends work.

Q.   All right.  And the location where you all were living there in Dermott, Arkansas where you grew up, is that a city-type location?  Is it in town?  Is it out in the country?

Ex. 71 - 1212

Direct - Ball/Hollimon, Rosa      Vol. 21:  156

A.  I would say it would be a town, living in the city.

Q.  Okay.  Now, is Dermott a big city or a rural kind of city?

A.  Tiny city.

Q.  Tiny city?

A.  Yes.

Q.  Did there come a time when you grew up and got married?

A.  Yes.

Q.  And about how old were you when you got married?

A.  Fifteen.

Q.  What was your husband's name when you married?

A.  Jimmy L. Robinson.

Q.  Is that Jimmy Lee Robinson?

A.  Yes, sir.

Q.  And where did you meet him.  Was he from the area where you grew up or somewhere else?

A.  Yes.  We was neighborhood kids right next door to each other.

Q.  All right.  And as a result of that marriage, did you and Jimmy Lee have any children?

A.  Yes.  We had two boys.

Q.  Who was the first boy to arrive in your family?

A.  Marcus Jerome Robinson.

Q.  Who was the second boy to arrive in your family?

A.  Julius Omar Robinson.

Q.  And, incidentally, before I neglect to do so, do you see

Ex. 71 - 1213

Direct - Ball/Hollimon, Rosa     Vol. 21:  157

your son, Julius Omar Robinson, here in the court today?

A.  Yes, I do.

Q.  Would you please point him out to the jury and describe something that he's wearing, ma'am?

MR. O'CONNOR:  We would stipulate again, Your Honor.

THE COURT:  All right.  It's been stipulated that she would identify the defendant.

Q.  (By Mr. Ball)  And how far apart were Marcus and Julius in terms of age?  Marcus came along.  How quick did --

A.  A year.

Q.  About a year apart?

A.  Yes.

Q.  What kind of work did Jimmy Lee do?  What was he doing to earn a living?

A.  He was military.

Q.  Do you know what branch of service he was in?

A.  82nd Airborne.  I think that's what it was.

Q.  Is that the army?

A.  Yes.

Q.  Okay.  And did you all remain -- after you got married and the boys were born and so forth, did you all remain in Dermott?  Where did you all live?

A.  We lived in Killeen, Texas and Fort Bragg, North Carolina.

Q.  Okay.  Is Killeen the location of Fort Hood?

A.  Yes.

U.S. DISTRICT COURT

Ex. 71 - 1214

Direct - Ball/Hollimon, Rosa    Vol. 21:  158

Q.  So was Jimmy Lee stationed at Fort Hood for a time?

A.  We was there for about two-and-a-half years.

Q.  And then was he stationed at Fort Bragg, North Carolina?

A.  Yes.

Q.  Which was the first place you went, Killeen or Fort Bragg?

A.  Killeen.

Q.  And so did you and Jimmy move to these locations, along with the boys, Marcus and Julius?

A.  Yes.

Q.  And did there come a time when your marriage to Jimmy Lee dissolved?

A.  Yes.

Q.  And from the time, I guess, you got married until the time your marriage dissolved, about how much time are we talking about?

A.  Six years.

Q.  Okay.  And were you all in North Carolina then, or where were you living when the thing came to an end?

A.  North Carolina.

Q.  What did you and the boys do after your marriage dissolved, Ms. Hollimon?

A.  We went to Wichita Falls, Texas.

Q.  Okay.  And how long were you in Wichita Falls?

A.  I can't really remember, but I can say about a year or two.

Q.  Okay.  And how old were the boys during that time frame?

Direct - Ball/Hollimon, Rosa        Vol. 21:  159

A.  Four and five, I think.

Q.  Okay.  So Marcus is approximately five.  Julius is approximately four?

A.  Yes, sir.

Q.  At this point, are you now -- due to the dissolution of your marriage, are you now a single mom?

A.  Yes, I am.

Q.  And how much financial support was Jimmy Lee providing to you and the boys?

A.  Not any.

Q.  None?

A.  None.

Q.  And what about personal support like coming and checking on them, visiting and holidays, things like that?  How much of that was Jimmy Lee providing to the boys?

A.  I can't remember not one time.

Q.  Is that none?

A.  No, not at all.

Q.  And how are you doing trying to raise the boys, four and five, as a single mom?  Were you doing just fine, or was --

A.  No.  I was young and I was unexperienced, and I had a hard time.  That's when I left and went to Wichita Falls with my brother.

Q.  Did there come a time when the responsibility, due to your age and struggling as a single mom, where you felt like you · ·

U.S. DISTRICT COURT

Ex. 71 - 1216

Direct - Ball/Hollimon, Rosa          Vol. 21:  160

wouldn't be able to handle this at that time?

A.  Yes.

Q.  So what did you do with the boys?

A.  I took them to my mother and father.

Q.  In Dermott, Arkansas?

A.  Yes, sir.

Q.  And did they agree to help you and their grandsons and try to help raise them?

A.  Yes, sir.

Q.  And took them in their home; is that right?

A.  Yes, sir.

Q.  And what did you try to do to get yourself going and get along?  Would you stay in Dermott?  Did you go somewhere else?  Where did you go?

A.  I went back to Wichita Falls.

Q.  Okay.  And at some point, did you move to the city of Arlington, Texas?

A.  Yes, sir.

Q.  On the second trip to Wichita Falls, how long were you there before you decided to move to Arlington?

A.  I'm sorry.  I didn't understand you.

Q.  Okay.  Well, you said you went to Wichita Falls after you left Marcus and Julius with your folks.  How long were you there in Wichita Falls before you moved to Arlington?

A.  I was in Wichita Falls for about three or four years, I'd

Direct - Ball/Hollimon, Rosa    Vol. 21:  161

say.

Q.  Okay.  Why did you go to Arlington?  What were the circumstances there?

A.  Job.

Q.  Okay.  What kind of work were you doing in Wichita Falls and Arlington to try to support yourself?

A.  Nurse's assistant.

Q.  Okay.  And all this time, are Marcus and Julius in Dermott being raised by your folks?

A.  Yes, sir.

Q.  Would you be able to travel to Dermott, Arkansas from time to time to visit with Marcus and Julius there in Dermott with your folks?

A.  Yes, sir.

Q.  Check up on them and their well being?

A.  Yes, sir.

Q.  And all this time -- would you go on holidays or try to hook up with them on holidays, things like Christmas?

A.  When I could, I would, according to my job.

Q.  If the schedule with your job permitted, you would try to get there on holidays?

A.  Yes, sir.

Q.  And, incidentally, all this time that Julius and Marcus are growing up, when it would roll around Christmas time, would there be presents under the tree for Marcus and Julius from

Ex. 71 - 1218

Direct - Ball/Hollimon, Rosa      Vol. 21:  162

Jimmy Lee?

A.   No, sir.

Q.   A card saying Merry Christmas?

A.   No, sir.

Q.   Anything?

A.   Not to my -- I can't -- no, sir.

Q.   What about birthdays when Marcus or Julius would have a birthday?  Presents for Julius from Jimmy Lee or not?

A.   Not to my knowledge, no, sir.

Q.   Cards, letters, visits, anything?

A.   No, sir.

Q.   Is, basically, Jimmy Lee, your former husband and the father of Julius and Marcus, did he just drop off the picture?

A.   Yes, sir.

Q.   Provided no support, emotional, financial, anything?

A.   No, sir.

Q.   All right.  John and Margaret, despite their -- well, despite John's blindness and Margaret -- Margaret couldn't read and write; is that true?

A.   Correct.

Q.   Despite those things, were they the kind of folks that did the best they could to try to help you with your sons?

A.   Yes, sir.

Q.   Provide them a decent home?

A.   Yes, sir.

U.S. DISTRICT COURT

Ex. 71 - 1219

Direct - Ball/Hollimon, Rosa    Vol. 21:  163

Q.  Try to get them to school and church and things like that?

A.  Yes, sir.

Q.  And at some point, did Julius and Marcus leave your folks, John and Margaret's home, to come and stay with you?

A.  Yes, sir.

Q.  And what kind of age range are we talking about?  Where in terms of school would they have been?

A.  When Julius first got here, I think he was in the 9th grade.

Q.  All right.  So would it be fair to say that all of Julius' elementary school years and at least most of his junior high years would have been in Dermott, Arkansas?

A.  Yes, sir.

Q.  And when they came to Arlington, where were you living?

A.  I was living Cooper Ridge Apartments.

Q.  In an apartment complex?

A.  Yes, sir.

Q.  And is that where they came to stay?

A.  Julius, yes.

Q.  Where was Marcus?  Was he --

A.  Marcus was at that time still in Arkansas, I think.

Q.  Did Marcus later come, or did he always just remain in Arkansas?

A.  No.  He came down later.

Q.  Okay.  And when Julius got to Arlington, did he get

Ex. 71 - 1220

Direct - Ball/Hollimon, Rosa      Vol. 21:  164

enrolled in Arlington schools, start attending school?

A.  Yes, sir.

Q.  And did he end up going to at some point Lamar High School?

A.  Yes, sir.

Q.  Did Julius play sports?

A.  Yes.

Q.  Did you ever go to any of the sporting activities?

A.  Yes.

Q.  Was he attending classes, going to school like he was supposed to?

A.  Yes, sir.

Q.  Would you see occasionally from time to time report cards, things that would indicate his progress, his grades, his attendance?

A.  Yes, because I would have to sign them.

Q.  Pardon?

A.  Yes, I seen his report cards because I would have to sign them.

Q.  Okay.  And did report cards indicate to you whether or not, in fact, when he would leave to go to school that he was arriving at school?

A.  I didn't understand you.  I'm sorry.

Q.  Did the report cards that you saw show he was attending school?

A.  Yes.

U.S. DISTRICT COURT

Ex. 71 - 1221

Direct - Ball/Hollimon, Rosa      Vol. 21:  165

Q.  Okay.  And do you have any recollection about what sort of grades Julius was making in a general sense?

A.  He would average out to B's and some C's.

Q.  Okay.  He wasn't a failing student?  He wasn't a straight A student.  He was in the average range; is that right?

A.  Average range, yes, sir.

Q.  Did Julius end up finishing school and graduating?

A.  Yes, sir.

Q.  What did he do after he finished school and graduate?  Did he discontinue his education?  Did he go somewhere to school further?

A.  He went to Tyler, Texas Junior College after he graduated.

Q.  All right.  And was that a long time between the time he? Finished high school until he went to Tyler, or was it like the next class session or pretty quick that he went to Tyler?

A.  It was pretty quick.

Q.  And did he attend class out there?

A.  Yes, sir.

Q.  Was he in a position to afford to pay -- or you to afford to pay for schooling out at Tyler Junior College, or was there some help or financial help?

A.  Well, he had -- he got a scholarship in football, and that helped us out a whole lot.

Q.  Okay.  Did he continue on at Tyler Junior College?  Did the scholarship continue on, or did it end in some way?

Ex. 71 - 1222

Direct - Ball/Hollimon, Rosa      Vol. 21:   166

A.   It ended.

Q.   The scholarship ended?

A.   Yes, sir.

Q.   Was Julius able to afford to pay to continue to attend school out there in east Texas?

A.   No, sir.

Q.   So did he come back to Arlington?

A.   Yes, sir.

Q.   Were you familiar with -- I don't know if you know the name of it or not -- CCI Training Center, any computer schooling that Julius tried to get into?

A.   Yes, sir.

Q.   And, incidentally, when was it -- you now live in Dayton, Ohio.  When was it that you left Arlington and went to Dayton, Ohio?

A.   I left Arlington in '99.

Q.   And what was the purpose of going up to Dayton?  Did you have friends, relatives?  Was there work up there?  What was the purpose of that?

A.   Relatives.

Q.   And after going up to Dayton, Ohio, did you keep in touch with your son by phone or mail?

A.   By phone.

Q.   Now, let me direct your attention back to Julius' years in high school here in Arlington, in the Arlington area, attending

Ex. 71 - 1223

Direct - Ball/Hollimon, Rosa       Vol. 21:  167

Lamar High School.  Were you working then?  What was going on?

A.  Yes, sir, I was working.

Q.  Ms. Hollimon, did you have occasion to have some problems of your own -- and, certainly, no disrespect intended -- of a personal nature with regard to too much drinking or drugs or anything of that sort?

A.  Yes, I did.

Q.  Could you tell us a little bit about that, ma'am?

A.  Well, my serious problem was I was a person that drink constantly all the time, alcohol, you know.  And then I got with some friends of mine that worked on my job, and we started smoking things called primos.

Q.  What's a primo?

A.  That's like cocaine, crack, and marijuana mixed in a joint.

Q.  It would be smoked?

A.  Yes, sir.

Q.  All right.  And this would be a combination of marijuana and crack cocaine that would be smoked all rolled up together; is that right?

A.  Yes, sir.

Q.  And you had some friends or work associates that they were involved in that, and they got you involved in that; is that correct?

A.  Yes, sir.

Q.  And did you struggle with that situation -- or did you

Ex. 71 - 1224

Direct - Ball/Hollimon, Rosa    Vol. 21:  168

continue on with that for awhile and, finally, beat that problem?

A.  I continued for a little while, and then I beat it.

Q.  Okay.  I mean, today are you involved in drug use anymore, or did you get shed of that?

A.  No drugs.

Q.  Okay.  With regard to -- you said you drank alcohol to excess.  Do you still have an occasional battle with that problem?

A.  Well, no.

Q.  Okay.  Back when Julius and Marcus were living in Arlington and Julius was going to school, was some of that drinking activity and the drug activity going on during that time?

A.  Yes, sir.

Q.  Okay.  And was it something you wanted to be doing, or you just got caught up in it, and it just happened?

A.  I just got caught up in the drug scene.

Q.  Okay.  Up to the time that Julius left your home -- well, from the time of the end of your marriage to Jimmy Lee Robinson until the time Julius grew up and left your home, as far as you know, did Jimmy Lee ever provide any support of any kind whatsoever to Julius?

A.  Not to my knowledge.

Q.  Okay.  And did you essentially lose contact with Jimmy Lee after the dissolution or break-up of your marriage?

Ex. 71 - 1225

Direct - Ball/Hollimon, Rosa     Vol. 21:  169

A.  Yes, sir.

Q.  In other words, he wasn't coming and visiting you either?

A.  No, sir.

Q.  And, incidentally, Jimmy Lee's folks, your ex-husband's parents, where do they live?

A.  They lived in Dermott, Arkansas next door to my mother.

Q.  Even though Jimmy Lee's own parents live right next door to your mother and father, still Jimmy Lee didn't visit or provide presents at Christmas, birthdays, money, nothing; is that right?

A.  That's right.  He was in a different state.

Q.  Now, you understand this jury has a decision to make with regard to some choices or options of punishment for your son for what they found him guilty of doing?

A.  Yes, sir.

Q.  And I believe you have been in the courtroom some.  You've been down here from Ohio, had to go back to work awhile, and then came back.  Is that -- over the last few weeks?

A.  Yes, sir.

Q.  But you have been in the courtroom some; is that correct?

A.  Yes, sir.

Q.  Now, you don't have any -- you didn't see all the evidence the jury heard.  Is that true?

A.  True.

Q.  And you don't have any personal knowledge of all the events

Ex. 71 - 1226

Direct - Ball/Hollimon, Rosa    Vol. 21:    170

or activities that might have been going on in Arlington or this area while you were up in Ohio because you were in Ohio. Is that fair to say?

A.   Yes, sir.

Q.   In regards to that fact, you understand the jury has the option of sentencing your son to confinement for the rest of his natural life in a federal prison facility?

A.   Yes, sir.

Q.   You understand they have another option.  They can vote in such a way that your son would be sentenced to be executed by lethal injection at sometime in the future, that he would die. You understand that's an option they have?

A.   Yes, sir.

Q.   Do you love your son, Ms. Hollimon?

A.   Excuse me.  I didn't hear you.

Q.   Do you love your son, Julius?

A.   Yes, I do.  I love both of my sons.

Q.   And are you asking this jury to spare Julius' life?

A.   Yes, sir, I sure am.

MR. BALL:  Thank you, Ms. Hollimon.  I'll pass the witness.  One of the government's lawyers may have questions for you.

THE COURT:  Is there cross?

(Brief pause in proceedings)

MR. SCHATTMAN:  No questions, Your Honor.

Ex. 71 - 1227

Vol. 21:  171

THE COURT:  You may step down, ma'am.  Thank you. You may call your next witness.

MR. BALL:  Your Honor, may we approach?

THE COURT:  Yes, sir.

(Off-the-record discussion at the bench at this time)

THE COURT:  We have -- the defendant has an expert who is in Michigan today.  So we cannot complete today.  They will put him on at 9:30 in the morning.  The government will have rebuttal, also, I believe an expert.  Is that correct?

MR. SCHATTMAN:  Yes, Your Honor.

THE COURT:  And that will complete, I expect, the presentation of this phase of the case.

Depending on when we stop tomorrow, I don't know when we would have the charge ready for you.  More than likely, I'll let you go home after we finish testimony tomorrow so that we can work on the charge without your having to wait around on us.  That would mean, probably, you will receive the charge and hear final argument on the punishment phase Friday morning.

Ms. Esposito, do you have to travel on Monday?

MS. ESPOSITO:  Tuesday.

THE COURT:  But you can deliberate on Monday?

MS. ESPOSITO:  Uh-huh.

THE COURT:  How long will you be gone?

MS. ESPOSITO:  Two days.

THE COURT:  So you will be gone Tuesday and Wednesday?

U.S. DISTRICT COURT

Ex. 71 - 1228

Vol. 21:  172

MS. ESPOSITO:  I'll be back Wednesday night.

THE COURT:  So, conceivably, if we took a break for you to go on your trip, you could resume deliberations by Thursday morning?

MS. ESPOSITO:  Yes.

THE COURT:  Let me think about that.

And as far as for the necessity of your being there, I believe you told us that some people are coming to St. Louis to hear your presentation; is that correct?

MS. ESPOSITO:  Yes.

THE COURT:  Think about whether you believe that that is important enough to you to cause us to take a recess.  If it is, we're willing to do it, but only -- you know better than I do how important that is to your job and your future career and to the people that you might be inconveniencing by not being there on Tuesday.  So think about that, and we'll talk again tomorrow.

MS. ESPOSITO:  Okay.

THE COURT:  Any other questions or comments?

All right.  As you can imagine, it's all the more important every day that you follow all the instructions about not discussing the case among yourselves or with anyone else and that you avoid media coverage.  If someone should try to talk to you about the case, you should bring that to our attention immediately by talking to Mr. Bowen first, and we'll take care

U.S. DISTRICT COURT

Ex. 71 - 1229

Vol. 21:  173

of that.

Any other questions, comments?

MR. STRICKLAND:  Judge, may we approach the bench on one more issue?

THE COURT:  Let me say this while they're coming up. We'll start tomorrow at 9:30 due to a matter we need to take care of before 9 o'clock.

(Off-the-record discussion at the bench at this time)

THE COURT:  Yesterday there was a verdict that came out in Houston.  Some of you probably saw Andrea Yates' case. So what I want you to do is just avoid all coverage in the media of any kind of a case.  I don't want you to be influenced in the slightest by what has happened anywhere else.  This decision, as you can imagine, has to be based on what you see and hear right here, only that.  Sometimes we are so easily influenced by things that we are not even aware of it.

So for the next -- until we get a verdict in this case on the final question, let's just avoid all media coverage whatsoever of any kind of trial or anything like that.  That may mean in good conscience you just don't watch TV for awhile or newspapers for awhile, at least not on anything that might cause you to get into consideration of trials and criminal accusations.

Fair enough?

And all seem to say so.  Okay.  Thank you.  See you at 9:30

Ex. 71 - 1230

Vol. 21:  174

in the morning.

(Jury not present)

THE COURT:  Let's be seated and see if there is anything we need to talk over.

I'm not sure if the government's proposed verdict form is the best way to go.  I'm trying to re-work it to go a different way, and it may be, once I've done that, I'll come back to the government's version and say that was the best that could be done.  It's just the way it combines threshold eligibility factors all together and aggravating factors all together did not suit my preliminary notions of good organization.  But as I said, I see the logic, and I may come back around to it.

In that regard, what does the defendant have in the way of objections and/or suggestions for additions to the charge?

MR. BALL:  Judge, we did file some requested instructions and objections.

THE COURT:  Is that your latest version?

MR. BALL:  Well, that was the first salvo, and I would suggest it's also the latest salvo.

THE COURT:  Okay.  I have that.

MR. BALL:  I intended to take a look at this verdict form deal over the noon hour.  Because of some witness scheduling things and so forth, I didn't get to do so.  I'll do that this evening.  I did hear the Court's discussion about the way it's ordered.  That might need to be re-worked in that

Ex. 71 - 1231

Vol. 21:  175

regard.

THE COURT:  As I say, it may turn out.  I want you to go through it.  Obviously, somebody else did this and thought that that was the best way.  Fred, it looks like you borrowed this from someplace because some of the names were not changed.

MR. SCHATTMAN:  The general format came from a case in the Eastern District of Virginia where they had multiple killings, multiple counts, which is what we have here.

THE COURT:  Multiple killings and multiple panels?

MR. SCHATTMAN:  Multiple killings and multiple counts.

THE COURT:  Counts.  I'm sorry.  I think we can go off the record here, can't we?

MR. SCHATTMAN:  Yes.

(End of proceedings, 3:00 p.m.)

-oOo-

U.S. DISTRICT COURT

Vol. 21:   176

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Eddie Peach | 2 | 6 | | |
| Landry Burdine | 11 | | | |
| Stanley Gibson | 18 | 35 | | |
| Mike Nelson | 43 | | | |
| Elvin Jones | 46 | 51 | | |
| Frederick Wagner | 54 | 64 | 67 | |
| Stephen Sabolchick | 68 | 73 | | |
| David York | 74 | | | |
| Frank Logan | 81 | | | |
| Daniel McCauley | 87 | 100 | 112 | |
| Debbie Wesson | 121 | 129 | | |
| John Hollimon | 130 | 150 | | |
| Rosa Mae Hollimon | 153 | | | |

-oOo-

E X H I B I T S

| Exhibit Number | Offered | Admitted |
|---|---|---|
| Defendant's 1 | 126 | 126 |

-oOo-

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, and that the transcript was prepared by me and under my supervision.

*Ana P. Warren*                          11-6-02

Ana P. Warren, CSR #2302                 Date
U.S. District Court Reporter

-oOo-

U.S. DISTRICT COURT

Ex. 71 - 1233

# EXHIBIT 72

Vol. 22:  1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA          .  CRIMINAL ACTION NO.
                                  .    4:00-CR-260-Y
V.                                .
                                  .  Fort Worth, Texas
JULIUS OMAR ROBINSON              .  March 14, 2002

.   .   .   .   .   .   .   .   .   .   .   .


VOLUME 22
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.


APPEARANCES:

For the Government:              MR. FREDERICK M. SCHATTMAN
                                 MR. REED C. O'CONNOR
                                 Assistant United States Attorney
                                 801 Cherry Street, Suite 1700
                                 Fort Worth, Texas   76102-6897
                                 (817) 252-5200

For the Defendant:               MR. WES BALL
                                 Ball & Hase, PC
                                 4025 Woodland Park Boulevard
                                 Suite 100
                                 Fort Worth, Texas   76013
                                 (817) 860-5000

                                 MR. JACK STRICKLAND
                                 Attorney at Law
                                 909 Throckmorton
                                 Fort Worth, Texas   76102
                                 (817) 338-1000

Court Reporter:                  Ana P. Warren
                                 U.S. District Court Reporter
                                 501 W. 10th Street, Room 201
                                 Fort Worth, Texas   76102-3637
                                 (817) 850-6681

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COU

COPY

Ex. 72 - 1234

Morales, and Edy Sonia Zamudio, with respect to the killing of Rudolfo Resendez.

That has been dated and signed by all four counsel in the case.

THE COURT:  All right.

MR. STRICKLAND:  Your Honor, if it please the Court, we call Mark Cunningham.

THE COURT:  Please raise your right hand and be sworn.

(Witness sworn by the Court)

THE COURT:  Please speak directly into the microphone.

MR. STRICKLAND:  May I proceed, sir?

THE COURT:  Yes, sir.

MARK CUNNINGHAM, testified under oath as follows:

DIRECT EXAMINATION

BY MR. STRICKLAND:

Q.  State your name to the Court and jury, please, sir.

A.  Mark Douglas Cunningham.

Q.  Mr. Cunningham, how are you employed, please?

A.  I'm a clinical and forensic psychologist in private practice.

Q.  And do you have some degree or other achievement which would require me to call you "Doctor"?

A.  Yes, sir.

Q.  So do you prefer Dr. Cunningham or Mr. Cunningham, or does it matter?

Direct - Strickland/Cunningham    Vol. 22:  14

A.  It doesn't matter to me.

Q.  All right.  Dr. Cunningham, how long have you been a psychologist?

A.  About 25 years now.

Q.  And where were you first licensed to practice psychology?

A.  I first practiced psychology in the navy as an active duty clinical psychologist.  I was first licensed in Connecticut, which is where I was station, and I think that license was in 1979 or 1980.

Q.  And, thereafter, did it happen that you were licensed to practice psychology in the state of Texas among other jurisdictions?

A.  That's correct.

Q.  Does each jurisdiction in the United States have independent requirements for the licensing of professionals, including psychologists?

A.  Yes, they do.

Q.  And do you know at this time, without giving us a laundry list of such jurisdictions, how many jurisdictions in which you are licensed to practice psychology at the current time?

A.  Twelve.

Q.  And have you, in fact, had an opportunity in each of those 12 jurisdictions to undertake work as a psychologist?

A.  Yes, I have.

Q.  And by that, I mean you're not simply trying to get a

Ex. 72 - 1236

Direct - Strickland/Cunningham     Vol. 22:  15

license so you can put the license on a resume or on the wall, but you, actually, have done work in each of those 12 jurisdictions; is that correct?

A.    That's correct.

Q.    Where did you get your education, Dr. Cunningham?

A.    I got my bachelor's degree from Abilene Christian College and then got my master's and doctorate degrees in clinical psychology from Oklahoma State University, and did a one year clinical psychology internship at the National Naval Medical Center in Bethesda, Maryland.

Q.    Was that concurrent with the time that you were serving on active duty in the navy?

A.    Yes, sir.  I did my internship in the navy, and then I was assigned as a staff clinical psychologist to the submarine base medical center in Groton, Connecticut, where I was an active duty naval officer and psychologist.

Q.    You didn't actually have to go down in those things, did you?

A.    No, sir.  I was always attempting to, and the trips got scheduled and then cancelled.  So I never ended up going out on one of the boats.

Q.    All right.  Well, my view is you didn't miss much.

      While you were on active duty with the navy, did you pursue any post-doctoral education or training other than the day-to-day duties which you have, not gone into great detail,

U.S. DISTRICT COURT

Ex. 72 - 1237

Direct - Strickland/Cunningham     Vol. 22:   16

but which were consistent with your responsibilities and assignments in the navy?

A.   Yes, I did.

Q.   And what sort of post-doctoral education did you pursue, please?

A.   I did two years of part-time post doctoral study at Yale University in a program accredited and sponsored by the National Institutes of Mental Health and also taught part-time in the community college system there.

Q.   All right.  I'm going to need you to speak up just a little bit -- we're in a cavernous courtroom here -- and not speak too quickly, if you would, please.

     Now, Dr. Cunningham, at some point, I take it, you decided to leave the navy, active service?

A.   That's correct.

Q.   How long did you actually serve in the navy?

A.   I was in the navy for just less than four-and-a-half years.

Q.   And after the time that you left the navy, what profession did you embark on, please?

A.   I took a full-time job as an assistant professor at a college, a small college in Abilene, Hardin-Simmons University, and was in that role for two years.

Q.   Is Abilene where you're from?

A.   It's where I've lived the last 20 years.  I grew up in Houston.

U.S. DISTRICT COURT

Ex. 72 - 1238

Direct - Strickland/Cunningham    Vol. 22:    17

Q. All right. And you continue to reside in Abilene; is that correct?

A. That's correct.

Q. At the same time that you were teaching at Hardin-Simmons after your tour in the navy, did you also embark on any private practice in the field of psychology?

A. Yes, I did.

Q. And when did you become a full-time private practitioner?

A. In 1983.

Q. Now, you said earlier that you were licensed in various jurisdictions, including the state of Texas. Is it necessary in order for a professional psychologist to keep his license current to undertake various -- well, what lawyers would call continuing legal education courses and seminars and training in order to keep abreast of developments in your field?

A. That's correct.

Q. And so it's not enough simply to get licensed, is it, in a jurisdiction? You have to work in these jurisdictions to keep your license current by meeting various requirements?

A. Yes, sir.

Q. All right. And is your license, in fact, current in the state of Texas?

A. Yes, it is.

Q. Has your license in any of the jurisdictions that you have mentioned to us ever been suspended or currently in question?

Ex. 72 - 1239

Direct - Strickland/Cunningham   Vol. 22:   18

A. Oh, no, sir.

Q. All right. So you're in good standing in each of those places; is that correct?

A. Yes, sir.

Q. Dr. Cunningham, how long did you teach after the time that you left the navy?

A. For two years.

Q. And after you finished your tour of teaching, what did you do, please?

A. Well, then I've been in the full time practice of clinical psychology, initially doing just a little forensic psychology, but an increasing proportion of that practice was forensic in nature over the years since then.

Q. All right. Now, let's explain some distinctions. First, tell the jury the distinction between a psychologist and a psychiatrist, if you would, please?

A. Well, a psychologist, at the end of a bachelor's degree where there is usually a major in psychology, goes to graduate school and gets a master's and a Ph.D in psychology and then does an internship. And, typically, there is a requirement for some additional supervised training or residency after internship.

A psychiatrist has an undergraduate degree, often in some pre-med major, and then goes to medical school instead of graduate school and gets an MD, or a doctor of medicine degree,

U.S. DISTRICT COURT

Ex. 72 - 1240

Direct - Strickland/Cunningham    Vol. 22:    19

and then does a residency, which is sort of an apprenticeship in psychiatry and so specializes in that fashion.

Q.   Now, in order to become a licensed and certified psychologist, both in the state of Texas and, presumably, in these other jurisdictions you've described, is it enough just to get a bachelor's degree, or do you have to go beyond that before you can actually practice psychology as opposed to having a degree, for example, in psychology?

A.   You have to go beyond, well beyond, that bachelor's degree.

Q.   And you mention that very often people that get a degree in psychology then go on to post-bachelor's level study in order to become licensed and certified as a health care provider and a psychologist.  It's not necessary that you have a bachelor's degree in psychology to do that, is it?

A.   In order to be licensed as a psychologist, you have to have a doctorate degree.  You have to have a Ph.D.  You have to have done an internship, a year of training in a supervised setting and, in Texas, have to have an additional year of supervised experience beyond that internship, and then meet all the other testing and evaluation requirements.

Q.   In your particular case, you didn't have a bachelor's degree in psychology, but your master's and your Ph.D, your doctoral degree, were in psychology; is that correct?

A.   No, sir.  My bachelor's degree was in psychology, and then I also did a master's and Ph.D in clinical psychology.

U.S. DISTRICT COURT

Ex. 72 - 1241

Direct - Strickland/Cunningham     Vol. 22:   20

Q.  All right.  I misunderstood, then.  But your bachelor's was also in psychology?

A.  Yes, sir.

Q.  Doctor, you mentioned, also, in addition to the distinction between a psychologist and a psychiatrist, you have mentioned the term several times a clinical psychologist and a forensic psychologist?

A.  Yes, sir.

Q.  First, let me ask you to explain what a clinical psychologist is?

A.  Clinical psychology is the evaluation and treatment of psychological disorders.

Q.  Do you routinely, if one is practicing clinical psychology, see patients in your office, for example?

A.  Yes, sir.  At this point, very little of my practice is clinical.  But that is the role of a clinical psychologist, is to evaluate and treat patients in an office setting, or he may follow individuals in a hospital as well.

Q.  And how is that different from what you've described as a forensic psychologist, please?

A.  Forensic psychology is the application of psychological research and techniques to legal issues in any way that psychological research or data can illuminate, can assist the Court.

Q.  You mentioned that now very little or not very much, at

U.S. DISTRICT COURT

Ex. 72 - 1242

Direct - Strickland/Cunningham    Vol. 22:  21

least, of your practice can be classified as clinical

psychology; is that correct?

A.   That's correct.

Q.   Do I take it from that that the majority of your practice

that follows is in the field of forensic psychology?

A.   Yes, it is.

Q.   Are there any special certifications that one may achieve

in the field of forensic psychology such as you've described?

A.   Yes, there are.

Q.   And tell the jury just very briefly, if you would, please,

what those are?

A.   There is board certification in forensic psychology that's

offered by the American Board of Professional Psychology.  It's

a very arduous credential to pursue.  There are fewer than 200

board certified forensic psychologists in the United States.

Q.   And, certainly, to practice forensic psychology, you do not

have to be board certified, do you?

A.   That's correct.

Q.   But board certification is available in psychology for this

particular area of expertise as it may be in the field of

medicine, in the field of law, various other professions; is

that correct?

A.   Yes, sir.  It's somewhat different than in the field of

medicine where board certification is very routine and

typically follows the end of a residency.  In psychology, board

U.S. DISTRICT COURT

Ex. 72 - 1243

Direct - Strickland/Cunningham    Vol. 22:   22

certification is usually not pursued until a mid-career level, and it's intended to represent the highest levels of practice.

Q.   And how long have you been board certified as a forensic psychologist, please?

A.   Seven  years.

Q.   Doctor, without going into tremendous detail, let me ask you whether or not you have, over the course of the years, been involved in the publishing of any scholarly works relating to the field of psychology in general or, more specifically, the narrower certification field of forensic psychology?

A.   Yes, I have.

Q.   And do you have some idea as to the number of publications which you have authored or co-authored in the field of forensic psychology?

A.   Yes, sir.  I have -- I've co-authored and have had published six peer reviewed papers in forensic psychology in the last four years.  There are two more papers, peer reviewed scholarly papers, that are in press, and three edited book chapters that are in press.

Q.   Doctor, have you had the occasion as a forensic psychologist to consult in criminal cases or forensic cases as a forensic psychologist?

A.   Yes, I have.

Q.   And when did your consultation work, if you will, as a forensic psychologist begin, please?

Ex. 72 - 1244

Direct - Strickland/Cunningham    Vol. 22:  23

A.  Well, I first did forensic related consultations when I was in the navy evaluating individuals that were facing court marshal proceedings.  So that was in the 1978 to 1981 range, about 24 areas ago.

Q.  Now, as we've already discussed with the jury the differences between psychologists and psychiatrists and clinical versus forensic, would you tell the jury, if you will, whether there is a difference between consulting in a case and actually testifying in a case, and, if so, what that difference is?

A.  Yes, sir.  There are many cases where I may be called upon to evaluate someone or to provide some consultation where I'm then not called to testify, either because the case settles or pleads, or because my findings are not helpful to the party that asked me to undertake the evaluation.

There are other instances where a psychologist may serve as a consultant where there was never an intention to call them to testify but simply was present to provide information and perspective about psychological research to one of the parties involved, and I have done that on a few occasions.

Q.  So if I understood what you said, if you are retained as a consultant by one side or the other in a case, whether it be a criminal case or a civil case, and they don't like what you have to say, they're not going to put you on.  They're not going to go forward and ask you to testify; is that correct?

U.S. DISTRICT COURT

Ex. 72 - 1245

Direct - Strickland/Cunningham     Vol. 22:   24

A. That's correct.

Q. Or at least that's their option; is that correct?

A. That's correct.

Q. Do you, in any manner, when you're called upon to be involved in the case, do you in any manner skew what your findings are or what your opinions are in a case so that you do get to testify versus simply laying it out and letting whoever has retained you or appointed you make the decision as to whether to call you as a witness?

A. No, sir. I call it as I see it based on the best research data that I have.

Q. Now, in regard to one other distinction I would like you to make before the jury -- and I don't know that this is an official distinction or designation, but is there in your mind a distinction between being asked to testify in a case as a -- what I'm going to call as an evaluating psychologist versus what I'm going to call, for lack of a better term -- and forgive me if this isn't very artful -- a teaching psychologist, or teaching witness?

A. There's a difference between those, yes.

Q. Okay. And what would be the difference in your view between those two?

A. Well, a teaching witness describes the most reliable method for how you go about whatever the task is and what kind of research data, what information you need to plug into that

U.S. DISTRICT COURT

**Ex. 72 - 1246**

Direct - Strickland/Cunningham     Vol. 22:  25

method, but then does not go on to specifically apply it to a particular person.  It's sort of, I guess, like going about telling you how to change the brakes out on a car without actually changing out the brakes on your car in front of you. An evaluating witness would also provide that same, here's how you do it, and here is the information you need to do it.  But would additionally say, here is the specific information about this defendant or this person.  And here is how they plug into that broader model.

Q.  Now, in order to give some reasonably accurate and objective information concerning a particular individual as an evaluating expert, it would be necessary, I presume, for you to interview that individual to subject them to a battery of tests, standardized tests, perhaps, as well as undertake a number of other steps in order to properly evaluate that specific individual; is that correct?

A.  Yes, sir.  Depending on the nature of the consultation, it might include one or more of those things.  Would typically involve an interview.  Might or might not include testing depending on what it is we're evaluating.  Often would include interviews of third parties so that there are additional data points, as well as extensive review of records.

Q.  So by way of example, if in a case -- and understand I'm not talking about this case.  But in a hypothetical case, if there was a concern that a person on trial was mentally

Ex. 72 - 1247

retarded, was functioning well below average, dramatically below average, because of some sort of mental impairment, some sort of trauma that had caused them to, indeed, become retarded.  If I understand what you're saying, before you can testify about that retardation, you would find it necessary to be an evaluating witness.  You would have to interview that person, test that person, and go into great detail before you can reach an opinion as to whether, indeed, that person was retarded under the law; is that correct?

A.  Yes, sir.  If I wanted to describe that particular person's IQ level, then I would need to test them or somebody would need to test them in order to provide that information to the Court. That would be an evaluating witness.

A teaching witness would describe the standards under which mental retardation is determined and, perhaps, descriptive information about how people at different levels of mental retardation function.

Q.  Were you asked in this particular case to serve as a evaluating witness or, for lack of a better term, a teaching witness?

A.  I was asked to be a teaching witness in this case.

Q.  And is that the role in which you are here today?

A.  Yes, sir.

Q.  Prior to this morning, had you ever met Julius Robinson?

A.  No, sir.

Direct - Strickland/Cunningham    Vol. 22:  27

Q.  When did you first meet him this morning?

A.  About 20 minutes ago as he was brought into the courtroom.

Q.  Have you ever undertaken any evaluation or testing of Mr. Robinson?

A.  No, sir.

Q.  Are you, in very general terms and in summary fashion, familiar with what were the allegations and now are the facts of the offenses for which Mr. Robinson has been convicted?

A.  In a general sense, yes.

Q.  And in a general sense, what is your understanding of the offense for which Mr. -- or offenses for which Mr. Robinson has been convicted by this jury earlier this week?

A.  Mr. Robinson has been convicted of participating in and being a leader of a continuing criminal enterprise that was involved in drug trafficking.  He's additionally been convicted of the murders of three individuals in the course of that continuing criminal enterprise.  Those include Johnny Lee Shelton, who was killed on Central Expressway in the early morning hours.  It also includes a Juan Reyes, who was shot to death on a sidewalk in front of his residence, and it includes Rudolfo Resendez, who was shot twice in the back of the head and, I think, six times in the back and the shoulders while a passenger in a vehicle by someone who was sitting behind him, not the defendant, but someone who was sitting behind him in that vehicle.

U.S. DISTRICT COURT

Ex. 72 - 1249

Direct - Strickland/Cunningham    Vol. 22:  28

Q.  And you understand that in each of those -- in regard to each of those matters, that Mr. Robinson has been found guilty by the jury?

A.  Yes, sir.

Q.  All right.  Have you, also -- in the course of your preparation to appear here today to share some findings with the jury concerning -- I'm going to jump ahead here -- what I'm going to characterize as risk assessment, have you also had the opportunity to review some records in regard to Mr. Robinson specifically?

A.  Yes, sir, I have.

Q.  And in particular, let me ask you if you have had the opportunity to review some jail records from the Bureau of Prisons relative to his incarceration at Federal Medical Center here in Fort Worth since about the middle of November of the year 2000?

A.  Yes, I have.

Q.  We'll talk more about those in just a few minutes. However, in particular, let me ask you whether or not, as you you reviewed those records, you've had the opportunity to review what has now been marked and introduced before the jury as Defendant's Exhibit Number 2, more specifically, being 11 pages of psychological reports from the correctional psychologists employed by the Bureau of Prisons and assigned to the Federal Medical Center here in Fort Worth?

**Ex. 72 - 1250**

Direct - Strickland/Cunningham    Vol. 22:    29

A.   Yes, I did.   Those were the records of Dr. Jim Womack.

MR. STRICKLAND:   And, Your Honor, if I may be permitted to approach the witness?

Q.   (By Mr. Strickland)   Dr. Cunningham, let me show you what is now before the jury as Defendant's Exhibit Number 2 and ask you if these appear to be the 11 pages that you say that you have examined?

A.   Yes, they are.   These are the monthly reports of Dr. Jim Womack.

Q.   And those were contained within the Bureau of Prison records, jail records, that you earlier examined; is that correct?

A.   That's correct

Q.   Dr. Cunningham, without going into further detail, you're a member of various professional organizations relative to the practice of psychology and, in particular, forensic psychology?

A.   Yes, I am.

MR. STRICKLAND:   Your Honor, number one, we tender Dr. Cunningham as a witness, an expert witness, in the field of forensic psychology.   And, then, in particular, we further, in support of his qualifications as an expert, offer what has been marked for identification purposes as Defendant's Exhibit Number 3, which is Dr. Cunningham's CV.   This is a three-page -- I'm sorry, four-page CV.

MR. SCHATTMAN:   No objection to the exhibit, Your

Direct - Strickland/Cunningham     Vol. 22:   30

Honor.

THE COURT:  Exhibit 3 is admitted.

Is there objection to the Court's allowing this witness to answer questions requiring an opinion?

MR. SCHATTMAN:  I'm sorry, Your Honor?

THE COURT:  I'm sorry.  I said, is there any objection to the Court's allowing this witness to answer questions requiring an opinion?

MR. SCHATTMAN:  As -- no, sir.

THE COURT:  All right.  He will be so permitted.

MR. STRICKLAND:  Thank you, Your Honor.

Q.  (By Mr. Strickland)  Dr. Cunningham, let me -- before we get off into the gist of what we're going to talk about here for the next few minutes, let me ask you about something called risk assessment?

A.  Yes, sir.

Q.  And when I use the term "risk assessment," does that have some particular meaning to you as a forensic psychologist?

A.  Yes, it does.

Q.  And would you please share with the jury what the term or the concept "risk assessment" means?

A.  For psychologists, the concept of risk assessment means what's the likelihood that this person will engage in serious violence.  It's a probability estimate.  What's the relative likelihood?  It's not an up or down prediction, yes, he will,

Direct - Strickland/Cunningham    Vol. 22:  31

no, he won't.   It's a what's the relative likelihood, the percentage chance, the odds, of engaging in serious violence.

Q.   And when you say the likelihood of engaging in serious violence, are you of necessity talking about the question of future violence?

A.   Yes, sir.

Q.   You understand the jury has already determined that there is not just a likelihood, but beyond a reasonable doubt, there has been a certainty that Mr. Robinson has engaged in violence in the past?

A.   Yes, sir.

Q.   So when you risk assessment, you're talking about future dangerousness; is that fair?

A.   In a broad sense.  Dangerousness -- all violent felons are dangerous.  That's why they are locked down or locked up in prison.  And so --

Q.   Let me interrupt you there.  Based on what you know about the allegations in this case and the offenses for which Mr. Robinson has been convicted, would you so characterize Mr. Robinson?

A.   Oh, yes, sir.

Q.   You're not quibbling with the fact that this jury has found him to be a dangerous person?

A.   Oh, not at all.

Q.   All right.

Ex. 72 - 1253

Direct - Strickland/Cunningham    Vol. 22:    32

A.   Risk assessment does not involve whether the person is dangerous in terms of having committed acts of serious violence in the past or might if they were in the free community.  Risk assessment is focused on what's the likelihood that they are going to act in a seriously violent way in the future in whatever context they are in.  So, for example, you might have someone who is --

MR. SCHATTMAN:  Excuse me, Your Honor.  I'm going to object.  This is becoming nonresponsive.

THE COURT:  Sustained.

Q.  (By Mr. Strickland)  When you talk about future danger or risk assessment, is your assessment of risk assessment based upon speculation or are there some -- is there some manner of evidence upon which you can make in your professional opinion, some reasonable judgments concerning the level of risk assessment in the future?

A.   There are both reliable methods and also specific evidence and research data.

Q.  Now, in regard to risk assessment, is this a concept that you, in all candor, have engineered or have thought up on your own, or is this whole concept of risk assessment one that's well recognized in the field of forensic psychology?

A.  No, sir.  It's not my pet theory.  This is broadly recognized and accepted in forensic psychology.

Q.  Have you had the occasion to testify -- well, to consult

Direct - Strickland/Cunningham      Vol. 22:  33

and testify in regard to risk assessment in the past?

A.  Yes, I have.

Q.  And would that be on one occasion or more than one occasion?

A.  On more than one occasion.

Q.  Would that be on few occasions or many occasions?

A.  On many occasions, sir.

Q.  Now, just for our purposes here today -- well, let me ask you this.  Have you testified in both civil and criminal matters?

A.  Yes, I have.

Q.  But we're going to talk about criminal matters because you understand, of course, we're here on a criminal prosecution?

A.  Yes, sir.

Q.  When I talk about -- unless you need to, for illustrative purposes, make a point about some civil theory, but for our purposes here today, let's confine our remarks and our testimony to the jury about criminal matters and the risk assessment in regard to persons convicted of crimes.  All right?

A.  Yes, sir.

Q.  On how many occasions have you testified in court -- and I'm not going to break it down between state and federal court -- in regard to the concept of risk assessment?

A.  Approximately 45 times.

Ex. 72 - 1255

Direct - Strickland/Cunningham       Vol. 22:  34

Q.   Have all of those been in behalf of the defense?

A.   Yes, sir.  In the capital cases that I've been called, I've been called by the defense to provide this information.

Q.   So you draw a distinction between capital and noncapital cases, correct?

A.   Yes, sir.

Q.   Let's start with capital.  Have you testified in both state and federal government capital prosecutions?

A.   Yes, I have.

Q.   Do you know how many times you have so testified?

A.   I've testified in approximately 19 federal capital cases and approximately 45 state capital cases.

Q.   Now, in regard to the federal capital cases and the 19 times that you have testified, have any of those occasions of your testimony been in behalf of the government, or have all 19 been in behalf of the defense?

A.   I've never been called by the government in a federal capital case.

Q.   We'll come back to that in just a moment.

     In regard to the times that you have testified in state capital prosecutions, all in behalf of the defense or all in behalf of the state or some of each?

A.   I would re-define that I'm testifying on behalf of the Court.  I have always been called by the defense --

          MR. SCHATTMAN:  Excuse me, Your Honor.  I'm going to

U.S. DISTRICT COURT

Ex. 72 - 1256

Direct - Strickland/Cunningham        Vol. 22:  35

object to the answer.  He's called by a party.  He's not testifying on behalf of the Court.

THE COURT:  Sustained, but his answer related to how he saw himself, but, technically, the objection should be sustained.

Next question, please.

Q.  (By Mr. Strickland)  Let's explore that issue a little bit.  Do you see yourself, Dr. Cunningham, as being an advocate in behalf of one side or the other in a case?

MR. SCHATTMAN:  Excuse me, Your Honor.  We are going to object.  I believe it calls for a self-serving answer on behalf of this witness, and as to whether he perceives himself in one way or another is not relevant to the question that the jury has.  It's their perception, not his.

THE COURT:  I have to sustain the objection.

MR. SCHATTMAN:  Thank you, Your Honor.

Q.  (By Mr. Strickland)  Doctor, do you bring to these cases any bias in behalf of one side or another?

MR. SCHATTMAN:  Same objection, Your Honor.

THE COURT:  Sustained.

Q.  (By Mr. Strickland)  Dr. Cunningham, in regard to the cases that you have described, are you retained by one side or the other, or sometimes are you not retained by one side or the other and, instead, appointed by the Court?

MR. SCHATTMAN:  Excuse me, Your Honor.  I'm going to

U.S. DISTRICT COURT

Ex. 72 - 1257

Direct - Strickland/Cunningham    Vol. 22:  36

object, again, first, as to leading the witness, and I have the same objection as to relevance.

MR. STRICKLAND:  Your Honor, first, in regard to leading, I believe it's been established that Dr. Cunningham is an expert, and I believe the rules allow -- even if we were operating under the strictly evidentiary rules at this stage of the proceeding, which we're not as the Court has previously pointed out to us, that leading is more appropriate in regard to experts.

Secondly -- I'm sorry.

THE COURT:  I'm going to rule.  I'm going to allow that question.  It's about the same question, do you sometimes testify as appointed by the Court as opposed to testifying or being called for one side or the other?

You may answer.

A.  Yes, sir.  In criminal cases, I'm often appointed by the Court and not by either party.  In capital cases, I have been retained on behalf of the defense.  That appointment is typically through the Court, and the fee is authorized and paid by the Court.

Q.  And is that your understanding of the circumstance in this case?

A.  Yes, sir.

THE COURT:  Well, let me make a clarification there. That payment is not made under the auspices of this Court.

Ex. 72 - 1258

Direct - Strickland/Cunningham    Vol. 22:  37

That payment is made by the United States Government in order to make sure that the defendant is allowed to have the same resources as the government in this regard.  So I don't want to give the imprimatur of the Court to this witness.  I did not hire him.

THE WITNESS:  I apologize if I left that impression.

Q.  (By Mr. Strickland)  And, indeed, you have never appeared before Judge Means before, have you?

A.  I may have in the past.

Q.  Really?  Okay.

MR. STRICKLAND:  He has, Your Honor?

THE COURT:  I believe so.  He thinks I look familiar, and I think he looks familiar.

MR. STRICKLAND:  All those psychologists have beards, Judge.

THE WITNESS:  Yes, sir.

Q.  (By Mr. Strickland)  Mr. Schattman knows that you appeared before Judge Means in 1995?

A.  Yes, sir.

Q.  Now, in regard to the subject of pay, are you, in fact, paid for the time that you spend on a case?

A.  Yes, I am.

Q.  Are you paid for the testimony that you give in a case?

A.  No, sir.  It's strictly a function of time.

Q.  In this case or in any other case, are the opinions that

U.S. DISTRICT COURT

Ex. 72 - 1259

Direct - Strickland/Cunningham     Vol. 22:  38

you express, the conclusions that you reach, the testimony that you give, in some manner determined by either how many you're paid or who is paying you?

MR. SCHATTMAN:  Excuse me, Your Honor.  I'm going to again object.  It calls for a self-serving declaration on the part of the witness.  That's a matter for the jury to determine, not the witness to determine for them.

MR. STRICKLAND:  Judge, if I could be permitted to respond --

THE COURT:  You don't need to.  Overruled.

Q.  (By Mr. Strickland)  Do you remember the question?

A.  Yes, sir.  My opinion is not driven by whether I'm paid in a case or how much I'm paid.

Q.  I mean, you are paid?

A.  Oh, yes, sir.

Q.  You're making a living?

A.  Yes, sir.

Q.  All right.  Would you be surprised, Doctor, if experts who are called as witnesses for either side in a case were not, in fact, paid for their time?

A.  I would expect they would be.

Q.  Now, Doctor, let's move into this area we have been talking about sort of tangentially, and that's this area of risk assessment.

A.  Yes, sir.

Ex. 72 - 1260

Direct - Strickland/Cunningham      Vol. 22:  39

Q.  All right.  Is the area -- or is the topic risk assessment a topic about which you have testified in, if not all, at least some of the criminal cases, both state and federal, both capital and noncapital, in the past?

A.  Yes, sir.

Q.  Do you always testify concerning risk assessment, or does it depend on the circumstances of the particular case?

A.  It depends on the circumstances.

Q.  Do you understand that you're here today to talk about risk assessment, however?

A.  Yes, sir.

Q.  And are you prepared to do so?

A.  Yes, I am.

Q.  In order to express some opinions, Doctor, concerning the likelihood that the defendant, Julius Omar Robinson, will engage in violence in prison, what are some of the essential questions that you would ask yourself in order to arrive at conclusions concerning that question?

A.  If I could have the first slide.  Next, please.

      I'm sorry.  That's not the next one.

Q.  Here we go.

A.  Let's go to the next one, please.  Number 3 is the one we want.

      Thank you.

·     There are four primary questions.  The first one is what's

Ex. 72 - 1261

Direct - Strickland/Cunningham    Vol. 22:  40

the probability.  It's not an either/or question.  It's a relative likelihood.  The second question is --

Q.  What is the likelihood of what?

A.  What's the probability of a serious act of violence?  We're looking down here in this zone.  What's the probability?  What form of violence, is the second question.  As the severity of violence increases, it's likelihood drops dramatically.

At what time period?  That means at what time period in the person's life.  As someone ages in prison or in the community, their likelihood of being involved in serious violence or criminal activity is falling steadily.

And the forth question is, in what context?  Are we talking about the open community, the free public?  Are we talking about in prison?  At what level of custody?  Are we talking about in some sort of super maximum custody?  So context is also a fundamental question.

Q.  Okay.  Let me stop you there.

In regard to several of the matters as to whether or not there will be violence, number one, do you or do you not understand that the very best Mr. Robinson can hope for in this is confinement in a penitentiary -- in a penal institution of some variety for life?

A.  Yes, sir.

Q.  Okay.  Does that in some manner, that is, the absolute certainty that Mr. Robinson will never again be on the streets,

Ex. 72 - 1262

Direct - Strickland/Cunningham    Vol. 22:    41

does that in some manner factor into your question or your assessment of whether or not violence is likely to occur in the future?

A.    Yes, sir, it does.    I have restricted the information I'm going to present about risk to a prison context, most of it in terms of in a general prison population but, also, about what preventive mechanisms can be brought to bear, what increases in security are available that will result in reducing opportunities for violence.

Q.    And you, I think, already anticipated the next question that I wanted to ask you, and that is, without getting into specifics at this time, whether or not there is a different assessment as to the likelihood of risk in a community versus the likelihood of risk in a penal institution setting?

A.    Yes, sir.    The predictors of risk in the community are very different than the predictors of risk in prison, and you make serious errors in your risk assessment if you assume that the same thing that predicts serious violence in the community also predicts it in prison.

Q.    Without jumping ahead too much here, you're not saying that the fact that a person has engaged in violent behavior in the community is of no consequence as to whether they will engage in acts of violence in the penal institution, are you?

A.    It has very little relationship.    There are some characteristics of the offense that modestly increase the risk,

Direct - Strickland/Cunningham    Vol. 22:  42

but violence in the community is not predictive of violence in prison, and that's what psychologists call a counter-intuitive finding.  That's different than what we might expect.

Q.  Well, counter-intuitive, is that another way of saying that that's contrary than what your common sense ought to tell us?

A.  Oh, yes, sir.

Q.  That if somebody kills somebody on the streets of Fort Worth that they are likely to kill somebody in Leavenworth?

A.  That would be a common expectation or a jump that is unfounded when we actually look at the follow-up of murderers and capital offenders in prison.  There is not a connection between the seriousness of the offense and serious violence in prison.

Q.  Speaking of jumps, have I jumped ahead now?  Am I kind of --

A.  It's a preview.

Q.  -- goofing up your presentation.

A.  No.

Q.  All right.  Now, is this risk assessment, is this based upon some statistical information, or is this simply a gut feeling that you have in regard to the likelihood of future violence?

A.  Much of it is based on statistical information.

Q.  And let's talk about the statistical information which you have available to you and upon which you are basing a good

U.S. DISTRICT COURT

Ex. 72 - 1264

Direct - Strickland/Cunningham    Vol. 22:  43

part, if not all, of your testimony here today.

What sort of statistical information have you been able to accumulate, which enables you to make some judgments concerning the likelihood of future violence?

A.  I have reviewed all of the studies that have tracked capital offenders in prison.  There are a number of studies that have followed offenders who were sentenced to death but, subsequently, because of appellate-related issues, end up being taken off death row and being placed in a general prison population where we can then follow them and track them to see how they behave in that prison setting.  And I'm familiar with those studies and have summarized those as part of the presentation today.  Some of that research I've been involved in personally collecting in a study that followed offenders in Indiana who were taken off death row.

I have also familiarized myself with studies that have looked at violence rates in federal prisons and in state prisons that have looked at how murderers -- not just capital murderers, but how murderers behave in prison, at the relationship between the seriousness of the offenses that sent somebody to prison and then how they end up behaving after they get there.

Q.  Do I understand that some of this is data that you have collected and some of this is data collected by others?

A.  Yes, sir.  Only a very modest, a very small part of it, is

Ex. 72 - 1265

Direct - Strickland/Cunningham     Vol. 22:    44

data that I've been involved in collecting.  Much of it has been collected in other peer reviewed studies.  A great deal of it comes from government sources, from the justice department, from the Bureau of Prisons, from different departments of correction around the country.

Q.   So that was my question.  It's not necessarily private individuals or academicians that are collecting this, but, indeed, information that's gleened from the various agencies or departments responsible at the state and the federal level for the incarceration of individuals and the keeping of those statistics; is that correct?

A.   That's correct.

Q.   Are there, in fact, voluminous statistics that are kept by various penal authorities, both at the federal and the state level, to track, for example, recidivism, the rate of violence, the nature of offenses, of persons that are committed to various institutions in this country?

A.   Yes, sir.

Q.   What group statistics are you able to tell the jury are relevant to an assessment of future risk of capital inmates serving a life term in the Federal Bureau of Prisons?

A.   Let me have the next slide, please.  And I think that the question you're asking is the next slide after this one, if I could have the next slide.

Q.   I don't know if it's the next slide or not.

U.S. DISTRICT COURT

**Ex. 72 - 1266**

Direct - Strickland/Cunningham    Vol. 22:  45

A.  Maybe back up to this one.  Next, please.  That's fine.

There are a number of different ways of grouping a federal capital offender and then following our experience with that group of inmates.  The idea is the same as the automobile insurance industry uses of grouping all 16 year old male unmarried drivers and tracking their driving performance in the community.  We can group capital offenders as capital offenders and murderers who are then in a general prison population and track our experience with those individuals.  We can look at the frequency of assaults by inmates in federal prisons.

Q.  Let me stop you there.  When you say assaults by inmates in federal prisons, are we talking about assaults only on other inmates, assaults only on staff, or a combination?

A.  There is statistical data on both of those, on inmates and on staff, and also by level of injury, whether there was a significant injury that occurred, serious or major injury as the federal system describes it.

We can also group our data and look at how likely it is that an inmate will kill another inmate or will kill a staff member in prison.  Because capital offenders are going to be long-term inmates, we can also look at studies that track and compare long-term inmates with short-term inmates.  And, also, we can look at group data on the effects that aging has on criminality and violence.  Those are all different ways of grouping capital offenders and then using our experience with

U.S. DISTRICT COURT

Ex. 72 - 1267

Direct - Strickland/Cunningham     Vol. 22:  46

those inmates and those classes to identify the level of risk.

Q.  In regard to the base rates 1 through 5 which you have just discussed, number one, the various penal institutions, both state and federal, collect data or statistics in regard to those questions?

A.  Oh, yes, sir.  Base rates are what psychologists -- it's a term we use to just describe how often something happens.  It's the annual frequency.  So if there is one assault per 100 inmates per year, that's the base rate, or maybe across 15 years, 15 percent of them engage in an assault.  That's the rate.  That's our anchoring point for our risk assessment.

Q.  And then, secondly, why is it that various penal institutions, both state and federal, would care about collecting statistics in regard to these five issues?  Who cares?

A.  Well, it lets them evaluate how successful their security is, and it also allows them to begin to study what factors may give them some predictability about that or identify problem areas in their facility or in their procedures.

Q.  And though the statistics in regard to these base rates then have application, not only to the individual prisoners that find themselves incarcerated, but also to the nature of the various institutions, for example, that are constructed in order to hold those prisoners?

A.  Yes, sir.  It influences staffing and procedures and how

Direct - Strickland/Cunningham    Vol. 22:    47

you go about building your prison depending on how your numbers are turning out.

Q.    So is this purely an academic exercise of counting beans and gathering statistics, or does this have day-to-day practical application in the running of the prisons in this country?

A.    This has practical application.

Q.    Now, you have several times made mention of group statistics, base rate statistics in regard to capital defendants being imprisoned as a result of state prosecutions versus federal prosecutions; is that correct?

A.    That's correct.

Q.    Well, what difference does that make?  I mean, clearly we're in a federal capital case.  What does the state experience have to teach us, if anything, and why does that make any difference in your testimony regarding risk assessment?

A.    Much of the research that has followed capital offenders in prison, almost all of it involves the follow-up of state inmates, state capital offenders, in state prison.  So the question then is one of, can we apply that data that we collected in various state settings and reasonably apply that over here in a federal setting?  And there are a number of reasons why, in fact, that looks like that is sound science to do that.

Direct - Strickland/Cunningham    Vol. 22:  48

If I could have the next slide?

Sorry.  Our presentations -- what I'm expecting and what's coming up is not the same thing.  We may want to see the group view.  If you could go down to -- scroll down just a little bit, please.  A little bit more.  Go to Number -- I'm sorry.  We're going to have to scroll back up.  I apologize.

Q.  Well, without the necessity of trying to find that, just tell us what it is?

A.  Certainly.  There are a number of reasons why those state studies would seem to apply in a federal system.

Number one, in all of these cases, these are offenders who are identified as warranting death penalty prosecution.  Among all of the offenders that were out there, there are a minority that are selected for death prosecution.  So they all have offenses and histories that rose to that level of prosecution and subsequent conviction.

Q.  Let me stop you there.  In fairness, what may be a death penalty offense in one state may vary from what's a death penalty offense in another state, correct?

A.  That's correct, but there is a -- even in whatever state it was, whatever statute it was, this rose to the top as being one that they sought prosecution of in a death penalty arena.

Q.  Has the federal death penalty statute been in place nearly as long as the various -- at least the states that have the death penalty statutes been in place?

Ex. 72 - 1270

Direct - Strickland/Cunningham    Vol. 22:  49

A.  Not in terms of the significant death prosecution.  That's been since 1994, 1995, that the federal government has been actively involved in death penalty prosecution in the modern era.

Q.  And you know that state death penalty prosecutions have been in place and been pursued since sometime in the mid-'70s, in most instances?

A.  That's correct.  It existed before the '70s.  In the modern era it's been present since the mid-'70s.

Q.  Does it stand to reason that we have a much greater state capital murder convicted population flowing from those state prosecutions than we do from federal prosecutions?

A.  Yes, sir.  That's why there is so much more data that's been collected on state inmates.

Q.  Statistically is that good for you, or is that bad for you that you have more prisoners, more data, a longer period of time over which to watch and to assess these persons?

A.  The more data that you have, the more reliable your findings are.  The more places that data has been drawn from the more reliable it is assuming that it's consistent from state to state.

Q.  All right, sir.

A.  And in response to your earlier question, that was one of the reasons why this has application.  There are about four other reasons that I could briefly describe.

Ex. 72 - 1271

Direct - Strickland/Cunningham     Vol. 22:  50

Q. Let me -- as I go through this doctor, I'm going to try and speed this up a bit. Let me ask you whether or not you have been able to collect some data concerning the frequency of serious rule violators who are in prison for capital offenses over the years?

A. Yes, sir.

Q. Do you need a slide, which we probably won't be able to pull?

A. I think I can find this one.

Q. Okay. Well, we can hope.

A. Number 6, please.

Q. Is that the one?

A. That's the one. Click again, please.

Q. We're on a roll, now, are we?

A. We're on a roll.

Q. Go ahead, if you would, please, and talk to us about serious violations for capital offenders over a period of time.

A. The first study is of 533 inmates who were on death row nationwide in 1972 and then had their sentences commuted to a term of years in prison.

Q. Let's stop there. You're saying somebody gets a death penalty, and then for some reason or another, some decision is made, some Court makes a decision, to change that death penalty to a life in prison sentence; is that correct?

A. That happened in 1972, yes, sir, as a result of a Supreme

Ex. 72 - 1272

Direct - Strickland/Cunningham     Vol. 22:  51

Court decision called Furman v. Georgia that found that the death penalty, as it was then being practiced in the United States, was unconstitutional.  So everybody who was on death row nationwide got relief from their death sentence and were placed in the general population of the prison.  And there they are available to be followed, and this study followed them across the next 15 years.

Q.  So on day one -- or one day they have a death sentence. The Supreme Court throws out all the death penalties in the '70s, and these people are not simply released, but those death sentences are commuted to life imprisonment; is that correct?

A.  That's correct.

Q.  And is that the basis of the data which you are now going to provide for the jury?

A.  Yes, sir.

Q.  Excuse me.

A.  There then followed across the next 15 years, and what we find is that just less than 70 percent, 69.5 percent, have no serious rule violations.

Next, please.

Fifteen percent have one violation.  That's important because if somebody is malignantly violent, we would expect to see that demonstrated more than one time in 15 years.  So that likely has some situational components to it.

·   Next, please.

Ex. 72 - 1273

Direct - Strickland/Cunningham    Vol. 22:  52

Q.  And these were people the juries had already assessed the death penalty for?

A.  That's correct.

Q.  Okay.  Now, when you say serious rule violations, tell us what we're talking about here.

A.  This is homicide, assault -- aggravated assault, assault with a weapon, rioting, work strike, aggressive sexual assault.  As I recall, those are the categories. Seven-and-a-half percent had two violations in 15 years.

Next, please.

And seven-and-a-half percent had three or more violations. In fact, this small portion of the group right here was responsible for about half of the violence in the whole group, that even among this group of capital offenders, it was only a small portion of them that were repetitively violent in prison.

Q.  Based upon your experience, was that because these were nice guys, or is this because there were sufficient safeguards in place to prevent the commission of violations, serious rule violations in the penitentiary in which they were housed?  How can you explain this?

A.  Absolutely, they are not nice guys.  The difference is that prison is a fundamentally different context.  It's a fundamentally different environment than the community in a number of ways.

In the community, you may never have to face your victim

Ex. 72 - 1274

Direct - Strickland/Cunningham    Vol. 22:  53

again, but in prison -- who doesn't even know who you are, perhaps.  But in prison, whoever you are aggressive with knows who you are, and you are going to have to deal with them and/or their cousins or friends or whoever from now on.

In prison, who is doing what is much more known within the inmate community and, also, because inmates inform staff, is also known to the staff who are there.  So they are able to bring consequences to bear much more quickly.

You have taken out the handguns and the extent of drug dependency that can be maintained out in the community, and you have intensive staffing and supervision and structure.  So that even though you have a population that would otherwise seem to be at pretty high risk, in fact, the rate of serious violence in prison is very, very low, not at all like watching Oz on HBO.  So prison is a fundamentally different context, and much of the security that is brought to bear in a prison works.

Q.  You're not suggesting that prison violations, serious violations, crimes of violence, do not occur?

A.  Oh, no, sir.  They do occur.  They do occur.  But what we're beginning to see here is the frequency with which they occur within this capitally convicted population.  So it's not that they don't occur.  This is the frequency with which they occur.  Out of this study, about seven-and-a-half percent of the inmates had three or more serious rule infractions.  Eighty-five percent had one or less.  Seventy percent didn't ·

Direct - Strickland/Cunningham    Vol. 22:   54

have any at all.

Q.   Is there any significance to the fact that these statistics or these individuals were tracked over a period of 15 years?

A.   That gives us a good long time of follow-up with these folks.  Our research indicates that if an inmate has not engaged in serious violence in ten years, if we haven't seen it in ten years, the likelihood of serious violence after that is extraordinarily low.  It's almost zero.  I suppose it's not unlike a driver who goes for ten years without a traffic ticket.  That's somebody who is unlikely to get a reckless driving, high rate of speed, extraordinarily high rate of speed, ticket.

Q.   Not that it doesn't happen?

A.   It can happen, but that's a very low likelihood.

Q.   Well, let me ask you this, because it occurs to me as I see this, that these are people that were tracked that had received the death penalty, and then by, from their perspective, good fortune, maybe from other perspectives bad fortune, those death penalties are commuted, and they are suddenly sentenced to life.  Am I still correct about that?

A.   Yes, sir.

Q.·  Well, perhaps, the fact that they received the death penalty was a life changing experience.  It was an epiphany. It caused them to resolve to go on the straight and narrow, and that fact standing alone explains the low rate of serious

Ex. 72 - 1276

violations over the time period we're talking about?

A.   That's an interesting theory.  It makes sense intuitively. What psychologists do when we're confronted with a possibility is rather than speculating --

MR. SCHATTMAN:  Excuse me, Your Honor.  I object to nonresponsive.

THE COURT:  Sustained.

Q.   (By Mr. Strickland)  Well, why isn't it -- I mean, I think you're telling me that my common sense theory is not borne out by facts?

A.   That's correct.

Q.   All right.  And what information, what evidence, do you have that my common sense theory is not borne out by facts?

A.   Let me have the next slide, please.  Next, please.  Next, please.

This study does what scientists do.  If we want to know the answer to something, we do research on it.  We look in the horse's mouth and count the teeth.

This compares 47 death row commutees that were commuted under Furman and compares them to 156 inmates who were sentenced to life at their capital trials.  Now, this included both murderers and rapists because, under Furman, there were capital murderers -- most of these were capital murderers, but there were some capital rapists.  About 80 of the 533 were capital rapists as opposed to capital murderers.

Direct - Strickland/Cunningham    Vol. 22:  56

Q.    That was pre-Furman; is that right?

A.    This was before 1972 and the way the death penalty statutes existed at that time, and I think in that group there were four robbers -- four robbers, 80 rapists, 450 or so capital murderers.

Q.    Without going into detail, prior to Furman, in some jurisdictions it might be possible to get the death penalty for offenses other than capital murders?

A.    That's correct.  That's correct.

They are about the same age when we begin to follow them, and they are both followed for an approximately ten-year period of time.  Now, neither group has any prison homicides.

Next slide, please -- I mean, next portion of this.  Next. Next.  Next.  Next.

As we look at serious infractions, about 75 percent of the guys that got relief from their death sentences did not have any serious infractions across ten years in the general prison population as compared to about 70 percent of guys that got sentenced to life in the beginning.

As we move up the severity in terms of aggravated assault or fighting with a weapon, 93 percent of our guys taken off of death row did not have any aggravated assault or fighting with a weapon compared to 90 percent of those who were sentenced to life.  These numbers are not particularly discrepant from each other.  It's not a very significant difference in outcomes.

Ex. 72 - 1278

Direct - Strickland/Cunningham     Vol. 22:  57

And so it appears that, in fact, being sentenced to death was not the factor that was substantially responsible for the majority of these individuals not being violent in prison.

Q.  All right.  Now, thus far, we have been talking about persons that are convicted of capital offenses, some of whom, perhaps, have received the death penalty and had it commuted; is that correct?

A.  That's correct.

Q.  Now, I'd like to talk to you about how the population of non-death penalty assessed prisoners or inmates in these institutions compare to death penalty sentenced capital offenders -- not death penalty sentence but life assessed capital offenders?

A.  Yes, sir.

Could I have the next slide?

Q.  Did I botch that up or --

A.  I think that's pretty close.

Q.  All right.

A.  Well, let's skip this one and go on to the next one to do that comparison information.

Next, please.

In this study, we're looking at the number of violations per hundred inmates per year.  We're looking at an annual rate.

Next, please.

Right down here we're talking about -- in this number of

Direct - Strickland/Cunningham      Vol. 22:  58

violations, we're looking at homicide, assault on an inmate with a weapon, sex by force, and assault on staff.  And we're going to look at 90 inmates that were released from death row. These are defendants that were convicted after Furman.  So this is another whole sample now than what we were looking at before.

Next, please.

And we're going to compare them to 107 who, at their capital trials, their death penalty trials, were sentenced to life in prison.

Next, please.

We're going to compare them to 38,000 inmates that represented all the inmates in the Texas prison system in 1986.

Next, please.

And 1700 inmates that were on a higher security unit in Texas.  They weren't locked down, but it was a higher security unit.  It was a kind of unit where these inmates, or capital inmates, were kept when they were taken off of death row or sentenced to prison.

Next, please.

As we look at how they did, our release from death row group had 1.61 serious violent rule infractions per 100 inmates per year.  This is an average over a seven-year period of follow-up.  So they are averaging about 1.6 of these violations

Ex. 72 - 1280

Direct - Strickland/Cunningham    Vol. 22:  59

per year.

Next, please.

Our life sentence group is averaging about two-and-a-half, 2.5.

Q.  Now, when you say life sentence, are you talking about life sentence as a result of capital prosecution or life sentence from non-capital prosecution?

A.  No.  This is a result of a capital prosecution at their death penalty trials, they were sentenced by the jury to life in prison rather than death.

Q.  Okay.

A.  And they have 2.5 per hundred inmates per year.

Next, please.

The Texas prison system as a whole, they average about 11 per hundred inmates per year.

Next, please.  And the high security unit averages almost 20 per hundred inmates per year.

Q.·  I'm sorry.  Go ahead.

A.  So our capital offenders, rather than being disproportionately likely to be violent in the general prison population, had only a fifth of the incidents of serious rule violations as the general population of prisoners around them and only about an eighth, one-eighth, of the incidents that this high security unit had.

Q.  Wouldn't it make sense that if a person is sentenced to

U.S. DISTRICT COURT

**Ex. 72 - 1281**

Direct - Strickland/Cunningham    Vol. 22:  60

prison for life with no hope of parole, that under the theory that they have nothing to lose, that, in fact, that they would be a higher risk or fall into a higher risk category than someone who thought that by behaving well that, perhaps, they might speed the release from that incarceration?

A.   That's another notion that would seem to have a common sense supporting it but, in fact, is not borne out.

Q.   How -- if you can, do you have any -- have you either collected any data, familiar with any data, have any basis of explanation for that what appears to be that incongruity?

A.   Yes, sir.  In prison there is always something to lose. There is "how much out of cell time" do I get.  In other words, an inmate can spend the next 40 years in a walk-in closet, essentially, 24 hours a day.  The ability to have access to commissary and to get a package of potato chips becomes terribly important when you're eating institutional food for decades at a time.  The ability to get out and go to a job to help occupy yourself and your time becomes incredibly important as opposed to just sitting in a room by yourself.  The ability to get out and interact with other inmates instead of being confined in your own cell all the time.  All of those things are very powerful incentives to people whose lives have been incredibly restricted.

And so those things exist, not so the prison can caudle the inmates, but because there are very powerful ways of

Ex. 72 - 1282

Direct - Strickland/Cunningham    Vol. 22:  61

controlling inmate behavior and providing incentives for them to cooperate.  And so long-term inmates take a different response to doing time.  This is where they are going to be from now on, and they can either make that terribly arduous on themselves, or they can make it just slightly more tolerable.  They don't become wonderful people just because they went to prison, but they are figuring out, this is what I need to do in order to make this more tolerable.  Then there is also a study that looks at this, too.

Q.  Before I get to a study on that, let me ask you whether or not you would agree with -- and it's not an official distinction by any means -- but a distinction between someone who I'm going to call for our purposes an inmate versus a convict, somebody who, perhaps, is new to the prison environment, somebody who is not well institutionalized, somebody who, perhaps, retains some false hope of their release or that things are all going to work out well, or that, miraculously, they are going to be -- everything is going to go away, all their problems are going to go away, and someone who is aware of, who understands and accepts the finality and the permanence and the inevitability of their incarceration?

A.  I'm familiar with those two terms, inmates and convicts, and broadly what they represent.

Q.  And are you saying that whether or not a person adopts the role of a convict because of the restrictions -- the safeguards

Direct - Strickland/Cunningham    Vol. 22:  62

that the prison can put upon him is likely to do so because they come to a realization, not in every instance, but in most instances by far, of the finality of their circumstances?

A.  That's correct.

Q.  Doctor, do you have some specific information statistics concerning assaultive infractions by Bureau of Prison inmates, and, specifically, that is, capital defendants in the federal system that are sentenced to life rather than death?

A.  Yes, I do, if we could have the next slide, please.

Q.  Tell us about that, please.

A.  Next.

Did you want to see the research that compared life with and life without parole inmates, or shall we skip this?

Q.  Well, why don't you just summarize it for the jury as best we can --

A.  Next please.

Q.  -- so we can move on here.

A.  This study compared life with and life without parole inmates as well as death row inmates who've had contact with other inmates and followed them across 15 years.  As we look at that disciplinary data, their assaults across 15 years, it didn't matter what the sentence was.  The rate of violence was the same whether they were sentenced to life with parole, life without parole, or death.

Across 15 years, 80 percent had no assaults very similar to

Ex. 72 - 1284

Direct - Strickland/Cunningham     Vol. 22:  63

what our other studies showed.  Of the 21 percent that did have assaults, a third were minor.  Two-thirds were more serious.  About one percent of the inmates in each group killed another inmate.

Next, please.

This is follow-up data that was prepared as of December 1998 by Miles Herrer (phonetic), who at that time was a researcher with the Bureau of Prisons at the request of a U.S. Attorney in Richmond, Virginia, and this provided follow-up up to that point on 25 federal capital inmates, who, at their trials, had been sentenced to capital life instead of death and tracked their performance in the Bureau of Prisons across that period of time.  During that time, two inmates, or eight percent, were involved in aggravated assaults, two inmates were involved in simple assault, and one inmate had a weapons contraband charge.

Eighty percent of the inmates had not been involved in any assault or disciplinaries.  Eleven inmates had had no disciplinary write-ups of any sort for anything after their arrival in BOP.

Q.   When you say any write-ups, any disciplinary write-ups of anything, does that include only serious matters, or could that include --

A.   Not making your bed, not being in the right place, giving a smart answer to a staff member, anything that represents a rule

U.S. DISTRICT COURT

Ex. 72 - 1285

Direct - Strickland/Cunningham     Vol. 22:   64

infraction.

Q.   Is this a statistic that you -- you may have already said this -- a statistic that you collected, or one that was collected and is now -- that you received from the Bureau of Prisons?

A.   I received this -- this was compiled by a researcher with the Bureau of Prisons and provided to the U.S Department of Justice and, subsequently, made available to me.

Q.   Well, tell me this.  How can you make any kind of prediction, if you will -- you may not like that term prediction, but how can you make any assessment of future risk based on the information that you have just either told the jury or, thus far, told the jury?

A.   Well, one of the things that this information provides us is an anchor point of about what the degree of risk is.  From these studies, we've seen that there is about a 20 to 30 percent likelihood that an inmate will be involved, a capital inmate in prison, will be involved in a serious violent rule infraction, 70 to 80 percent that he won't have any.  There is about a ten percent likelihood, perhaps, of being involved in repetitive incidents.  Based on these statistics, there would be about a one percent likelihood of an inmate killing another inmate across a capital life term.

     So like our insurance companies, these are kind of anchoring points, and that's one of the applications that you

U.S. DISTRICT COURT

**Ex. 72 - 1286**

Direct - Strickland/Cunningham     Vol. 22:  65

would make is to identify -- this is kind of our starting place.  This is kind of the anchoring points.

You can also look at this person's pattern of adjustment to prison.  It's the idea that the best predictor of future behavior is past behavior, which is true as long as we're talking prison violence predicts prison violence.  As I described, community violence does not predict prison violence, but we could look at what the person's adjustment has been to incarceration, and the longer period of time that they have been in prison that we have to observe them, the more inference we have about their track record.

Q.  Has there been any studies whatsoever that attempt to track the nature of a person's free world, if you will, offense history with their adjustment to prison, their following of prison regulations, the likelihood or non-likelihood of them committing violence in prison.

A.  Oh, yes, sir.  There are have been a number of studies that have examined or looked for that relationship between community violence and prison violence.

Q.  And what is the relationship -- if you can tell the jury, based upon the information that has been gathered and what you're discussing here today, what is the relationship, if any, between community violence or criminal history in the community and violations in a prison setting?

A.  Can I have the next slide, please?  Well, let me talk about

Ex. 72 - 1287

Direct - Strickland/Cunningham    Vol. 22:  66

-- let's skip over this one.  Let's go to the next one.

These are conclusions from studies that were sponsored by the United States Department of Justice, or quasi governmental agencies, such as the National Council on Crime and Delinquency, and those conclusions -- and supported by other research as well -- is that past violence in the community is not strongly or consistently associated with prison violence.

Next, please.

Current offense, prior convictions, and escape history are only weakly associated with prison misconduct.

Next, please.

Severity of offense is not a good predictor of prison adjustment.  So these are conclusions from justice department related summaries of the research.

Q.  Would you characterize each of those three findings from the federal government as being --

A.  Counter-intuitive.

Q.  Counter-intuitive?

A.  Yes, not what you would expect.

Q.  Now, have you been making a distinction up to this point between  what I'm going to call serious violations -- I mean, we pretty clearly have an idea what serious violations are and any disciplinary infraction whatsoever?

A.  Yes, sir.

Q.  And true or not true, that the most serious concern for

U.S. DISTRICT COURT

Ex. 72 - 1288

Direct - Strickland/Cunningham    Vol. 22:  67

you, as you talk about this risk assessment, is the likelihood of future serious violations?

A.   That's correct.

Q.   And that the making of the bed issue that you discussed a moment ago is pretty far down on the radar screen; is that correct?

A.   Yes, sir.  It represents varying degrees of management challenge for the staff but is not the sort of violence that we're tracking for risk assessment purposes, this sort of problem.

Q.   You also mentioned, I think, just a moment ago that, perhaps, more indicative of future risk than what a person did in the community is what they have done previously in a penal setting.  Is that correct or incorrect?

A.   That's correct.

Q.   Now, you are aware, are you not, that in this particular case that Mr. Robinson has been incarcerated since on or about the middle of November of the year 2000?

A.   That's my understanding.

Q.   I think that you have previously said that you had an opportunity to review the jail records or the Bureau of Prison records that have been provided through discovery to the defense in this case, and then you, in turn, have examined those; is that correct?

A.   That's correct.

Direct - Strickland/Cunningham    Vol. 22:  68

Q.  And I think you have already identified that portion of those records now before the jury in regard to these psychological evaluations by the correctional staff; is that correct, also?

A.  That's correct.

Q.  In regard to the remainder of the records, Doctor, without going through each and every page in there, were you able to gain some sort of understanding as to whether or not Mr. Robinson had, in fact, been a rule violator while he has been confined out at FMC Fort Worth?

A.  His adjustment was repeatedly characterized as good.

Q.  Did you find anything adverse in there?

A.  Not that I recall, no.

Q.  And, certainly, if there was anything adverse, was it any more than not making a bed or a third-party phone call or something such as that, which you would understand to be a violation?

A.  That's correct.

Q.  In regard to that which you have already identified and which is before the jury as Defendant's Exhibit Number 2, being these psychological evaluations, did you see that portion of the psychological evaluations, these 11 psychological evaluations, which found that -- well, let me read the whole thing --

MR. SCHATTMAN:  Excuse me, Your Honor.  Can we

Direct - Strickland/Cunningham     Vol. 22:   69

approach for just a moment?

THE COURT:  Yes.

(Off-the-record discussion at the bench at this time)

Q.  (By Mr. Strickland)  Dr. Cunningham, you did see in Defendant's Exhibit Number 2 that the prison psychologists rated Mr. Robinson's current potential for harm to others to be low; is that correct?

A.  That's correct.

Q.  Doctor, let me ask you whether or not you are a -- whether or not you're an expert on the facilities available for incarceration under the Bureau of Prisons of the United States?

A.  I have greater expertise than most non-bureau prison psychologists or psychiatrists.  I wouldn't claim to have the expertise of someone who has been employed in some of these high security institutions, but I have some familiarity with them.

Q.  But you're not holding yourself out by any means as an expert; is that correct?

A.  As compared to what?  As compared to most psychologists, yes.  As compared to a Bureau of Prison psychologist who is there at this facility, no.

Q.  Or somebody from the Bureau of Prisons, that, perhaps, works in the regional office in Dallas, for example?

A.  Sure.

Q.  Or a supervisor who has been employed for 25 years with the

Ex. 72 - 1291

Direct - Strickland/Cunningham    Vol. 22:  70

Bureau of Prisons?

A.  Yes, sir.  My familiarity is limited to a tour of ADX Florence in Marion and review of extensive regulations associated with the operation of those facilities.

Q.  Let me move through this quickly.

Does the Bureau of Prisons maintain some sort of classification manual that enables them to -- or assists them to assign persons who are convicted of various level offenses, including those that are given life sentences as a result of capital murder convictions, to various institutions of the United States Government?

A.  Yes, they do.

Q.  All right.  And are all of these -- are all of the institutions to which a person might be assigned upon conviction of the same level of security, or does the level of security of these institutions vary?

A.  The level varies very marketedly.

Q.  And how would you characterize the level of security of these institutions?

A.  There is a steady increase from the lower level minimum low security through medium to higher security like a U.S. penitentiary, and the difference between those is fences and how many fences, of what degree of security and reinforcement, whether there are gun towers, intensity of staffing, concentric layers of security and control within the prison itself.  The

U.S. DISTRICT COURT

Ex. 72 - 1292

Direct - Strickland/Cunningham    Vol. 22:    71

degree of supervision of the inmates.  So as you move up that security level, you're steadily increasing the security around them, both to hold them within the facility and also to monitor their behavior and control it within the facility.

Q.  You're not presuming to tell the jury that you know that in the event that Mr. Robinson is sentenced to life imprisonment, which sort of institution he is going to be sentenced, do you?

A.  I know the minimum level of institution that he will be sent to.

Q.  Well, let me start off.  You know he's not going to go to a camp where it's already been described you can walk out and put a quarter in the phone and call a cab?

A.  Yes, sir.  At the lowest, he's going to go to a U.S. penitentiary level facility.

Q.  Now, in regard to a U.S. penitentiary facility, how many of those facilities are there to the best of your knowledge?

A.  There are 11.

Q.  There are a couple of those facilities which are characterized as super max; is that correct?

A.  No.  There are 11 that are designated as USP's, U.S. Penitentiaries.

Q.  Right.

A.  One of those is USP Marion that exists as a mid-level facility between the other USP's and another institution called ADX, or administrative maximum or super max, which is in

Ex. 72 - 1293

Direct - Strickland/Cunningham    Vol. 22:  72

Florence, Colorado, and that super max is separate from the 11 USP's.

Q.  You're not suggesting, are you, that based upon your understanding of the law and understanding of the circumstances, that it would be likely that Mr. Robinson would be sentenced to a super max, or ADX facility, at this time?

A.  I'm not sufficiently familiar with the specifics of his case.  There are offenders who are sent to ADX from their capital trials without having to commit violence and BOP before they get there.

Q.  But that's up to the BOP?

A.  That's up to the BOP.  It's their determination whether or not an offender requires more security than is provided by a U.S. penitentiary.

Q.  But you are of the belief, based upon your training, your education, and your experience, that the minimum level institution to which Mr. Robinson would be assigned would be a United States penitentiary; is that correct?

A.  That's correct.  That's by classification regulation that he can't drop below that level unless something called the publish safety factor is weighed, unless there is a special hearing that identifies that for whatever reason, we're going to waive any public safety concerns.

Q.  So if I understand what you're saying, that due to the nature of the offense for which he has now been convicted, you

Ex. 72 - 1294

Direct - Strickland/Cunningham     Vol. 22:  73

know that under the law he's going to a United States pentitentiary should he be assessed a life sentence?

A.   At least that high on the list.

Q.   I believe you said there are 11 such facilities; is that correct?

A.   That's correct.

Q.   Do you have -- do you have any slides or diagrams of a typical United States penitentiary cell, or do you only have slides and diagrams of ADX facilities?

A.   I have a typical cell.  If we could see the slide --

MR. SCHATTMAN:  Excuse me, Your Honor.

I believe the witness has testified he has been on a tour of ADX and, thereby, would suggest to the Court that he has no qualifications as to what a typical cell in a penitentiary is.

MR. STRICKLAND:  Well, perhaps, I can clear that up a bit, Judge.

THE COURT:  All right.

Q.   (By Mr. Strickland)  You say that you do have, although we haven't seen it yet, a schematic or a drawing or a photograph of a typical cell in the United States penitentiary; is that correct?

A.   Yes, I do.

Q.   And what was the source of that, please, from where did you get that?

A.   That was provided by the Bureau of Prisons through the U.S.

Ex. 72 - 1295

Direct - Strickland/Cunningham    Vol. 22:  74

Department of Justice.

Q.  All right.  So this isn't a photograph that you took or that you acquired from a private source?

A.  It's a diagram, a sketch, if you will, of a cell that was part of materials that were provided again out of the Bureau of Prisons.

MR. STRICKLAND:  Your Honor --

THE COURT:  You may proceed.

MR. STRICKLAND:  Thank you.

A.  If we could scroll down, please, Number 24.

This is a cell at the U.S. Penitentiary, which is at Florence.  This is a separate facility from ADX Florence, but there are two or three prisons in that same compound.  There is a bunk bed, a shelving unit, a small table, a sink, a toilet, stainless mirror.  There is a pipe chase here that allows access between the cells to change out the light or work on the plumbing without actually entering the cell.  In a USP, most of the inmates are not in their cells for the biggest part of the day.  They are participating in programming outside the cell or lock down at counts and at night.

Q.  Do you have some -- well, can you tell us the approximate dimensions of the cell which is displayed here on the graphic?

A.  I don't know that if I have the specific dimensions.  It's about 8 by 12, 90 square feet, something like that.

Q.  Now, within the United States prisons, are there also

areas, if you will, or facilities, for the further segregation of prisoners should the need arise?

A.  Yes, sir.  Every U.S. penitentiary has administrative detention capability where they can lock somebody down within that unit.  Then there is Marion USP, which exists as a mid-level between the other USP's and super max.  There is super max, ADX Florence.  There are also other special housing units that are in other prison facilities around the country.

Q.  Would it be fair to say that as you go up on the scale, if you will, that the conditions under which you're held are increasingly restrictive?

A.  Yes, sir, there are.  Even in ADX, there is a prison within the prison called the control unit that is even more restrictive than the rest of the super maximum is.

Q.  And would it also be fair to say that as you go up on the scale, that the privileges, such as they are that an inmate would enjoy, become fewer and fewer?

A.  Yes, they are, if we can have the next slide.

This depicts a drawing of a cell at ADX Florence, and here the individual is single celled rather than double celled. They are in a cell by themselves.  These cells are called boxcar or vestibule cells, and so there is an outer sliding steel door.  The hall is out here.  There are no rooms across -- no cells across the hall.  There is an outer sliding steel door, then an inner vestibule that's about three feet

Direct - Strickland/Cunningham    Vol. 22:  76

deep, and then a wall of bars or a grate that also has a sliding door on it and a port in that door that food can be passed through, a food tray, and where the inmate backs up to to be handcuffed behind his back before the door is opened.

The window in the back faces an inner recreation yard. None of the windows face the outer perimeter of the facility. So you never get any idea about outer security or the rounds the correctional officers make or that sort of thing.

The fixtures in the cell are reinforced concrete that are poured into the structure of the cell itself. So, for example, this bed, if you will, is a concrete structure that's poured into the wall and poured into the floor of the cell and simply has a mat laying across it. That prevents any crevices where something might be hidden between the -- if you had a concrete bed, but it was simply set on this floor, then you would have a crevice that you could slip something under.

Similarly, there is a stool here that is concrete and is poured into the floor. There is shelf here that's poured into the wall and a small TV shelf that's poured into the wall. There is a one-piece stainless toilet without a toilet seat, sink, water fountain here. There is a hole on the side of it for a toilet paper roll that does not have an axle on the toilet paper. So there is nothing that can be used as a weapon, which is why there is no toilet seat either. That way it can't be torn off.

Ex. 72 - 1298

Direct - Strickland/Cunningham    Vol. 22:  77

There is a stainless steel shower in the back of the cell that has a push button timer on it that you push the button and it comes on for a period of time and then shuts off automatically to reduce the likelihood of being able to flood a cell.

Q. What just -- very quickly, Doctor. What contact with other inmates and/or staff, guards, if you will, does a prisoner who finds himself in these circumstances have?

A. Well, if he is in the general population of ADX, then he is in this kind of a cell 23 hours a day. He gets out an hour a day where he may exercise with two or three other inmates.

When he has any staff contact, he is handcuffed behind his back. Feet are typically shackled, and he's double escorted by staff members that are carrying a baton. It's a steel tipped baton that is most often used as a thrusting instrument into the rib cage.

There are two 15-minute phone calls monthly that are monitored. There are no contact visits. No visits where you can touch someone. Instead the visitation is over the phone and through a very thick kind of armored glass that has a high hammer rating. In other words, you can beat on it for a period of time with a hammer before you can produce any kind of hole at all. And the mail is x-rayed and opened and, depending whether it's legal mail, read as well. Meals are taken here in the cell.

Ex. 72 - 1299

Direct - Strickland/Cunningham    Vol. 22:  78

Someone, if they went to ADX -- most of the inmates there are not seen as permanent residents at ADX, but instead there is a program to try to move them back into a USP setting.  And so there is what's called a step down program where somebody would spend a year, a minimum of a year, in this kind of a setting and then would progress through a gradual relaxation of -- or closer approximation to the way a regular prison would operate through some other levels of this system, ultimately hoping to return them back to a general population after three years, minimum of three years.

There are certainly inmates that are held there for much longer than that.  There are inmates in this control unit, the prison within a prison, that have a longer term stay.

Q.  Doctor, do you hold the opinion or do you not hold the opinion that the United States Bureau of Prisons certainly takes into account in its classification and housing of prisoners the various risk assessment that those prisoners present?

A.  Yes, they do.

Q.  And do you hold the opinion that the United States Bureau of Prisons certainly has sufficient experience and resources to make adequate arrangements for the housing of those prisoners both for the safety of not only the other inmates, but the safety, more importantly, the guards and staff of those institutions?

U.S. DISTRICT COURT

Ex. 72 - 1300

A.  Yes, sir.  BOP can bring extraordinary levels of security to bear that marketedly minimize the likelihood of serious violence to other inmates or staff as they designate that someone requires.  It's not perfect control, but it is a high degree of security.

Q.  It's a pretty well run government program, organization, agency?

A.  Yes, it is.

Q.  Competent and well staffed; is that correct, sir?

A.  Yes, sir.

MR. STRICKLAND:  All right, sir.  Thank you.

Pass the witness, Your Honor.

THE COURT:  Let's take a break -- let me talk to the attorneys about whether to make it a lunch break or just a regular break.

(Off-the-record discussion at the bench at this time)

THE COURT:  We'll take a ten minute break.

(Trial recesses, 11:30 - 11:45 a.m.  Jury present)

THE COURT:  You may proceed, sir.

MR. SCHATTMAN:  Thank you, Your Honor.

CROSS EXAMINATION

MR. SCHATTMAN:

Q.  Dr. Cunningham, you mentioned early on in your testimony that you are hired by the defense, paid by the government, through funds provided to the Court, correct?

Ex. 72 - 1301

Cross - Schattman/Cunningham         Vol. 22:   80

A.   In capital cases to date, that's correct.

Q.   Well, in this case, today?

A.   Yes, sir.

Q.   And you are paid at some rate, I suppose, with those funds?

A.   Yes, sir.

Q.   And I think you said that it is an hourly rate, or you charge by the hour, something like that?

A.   That's correct.

Q.   And what is your hourly rate, sir?

A.   That rate in this case is $210 per hour.

Q.   Okay.  Well, then I'll try to be real quick.

     You have conducted a study of studies done by others about the Furman -- I think your slide called the Furman commutees.

A.   Yes, sir.  That was the basis of that slide, was the study done by others.

Q.   And so you have studied the study?

A.   Yes, sir.  I have conducted some research myself, and others' research I have summarized or analyzed.

Q.   And with regard to Furman, though, that is, you did not participate in that particular study.  You simply looked at their data, correct?

A.   That's correct.

Q.   And part of your teaching here today is based upon a principal similar to what insurance companies would use in actuarial science, correct?

U.S. DISTRICT COURT

Ex. 72 - 1302

Cross - Schattman/Cunningham        Vol. 22:  81

A.  That's correct.

Q.  And actuarial science is, in fact, a science?

A.  Yes, sir.

Q.  And people take courses and get degrees and practice actuarial science, other people do?

A.  I'm not familiar with exactly what training pipeline folks in the insurance industry have, but I'm sure that there are courses that address some of the statistical methods that they bring to bear.

Q.  And that is a statistical examination, as you've said, of data, correct?

A.  Yes, sir.

Q.  And an evaluation of the significance of data?

A.  That's correct.

Q.  And the significance that is attached to the data is done by whoever is doing the analysis?

A.  That's not entirely correct.  If they report what the incidence is of certain things from that data, for example, in Furman, if they are describing the rate of violence, that is a report of simply counting the incidents against the total number of inmates.  There is not a lot of determination of statistical significance in that.  They are just describing what they see.

Q.  All right.  And, of course, it's a matter of choosing from among the data that is collected?

Cross - Schattman/Cunningham      Vol. 22:  82

A.  Yes, sir.  For example, in the Furman case, they are selecting out the serious rule violations that have some connection to violence.

Q.  And there is a subjective element to what's serious and what's not?

A.  Sometimes that's going to be defined by the code, by the prison regulation itself.  In the federal system, there is a coding of serious or major offenses that's described by BOP. And so there is very little subjective -- I suppose when the person is initially kind of arrested for that offense or charged with it within the system, they are going to classify that by a level of injury.  It may have some suggestive component that way.  But it doesn't necessarily have a great deal of subjective effect for the statistician who is doing the study.

Q.  Well, for instance, let's say you had a circumstance in which an inmate either -- well, let's just say he scoops down into the toilet and takes out feces and urine and throws it on a guard.  That would be a minor assaultive infraction within the prison, correct?

A.  Different prisons classify it different ways, but it's on the milder end, yes.

Q.  On the milder end.

    And that's the subjective determination made by the people who are writing the rules up at the top, whether it's major or

Cross - Schattman/Cunningham          Vol. 22:  83

minor, correct?

A.  In the prison, that's correct.

Q.  Now, as to the guard who has had feces and urine hit his face or the rest of him, it may not seem so minor to him?

A.  Yes, sir.  And BOP, if it hits them in the face, then it is a more severe assault than if it hits some other part of his body.

Q.  And in your work, there is that -- there is the same element of subjectivity involved by the various researchers on classifications, correct?

A.  I wouldn't call it subjectivity.  There are -- different researchers would draw the line of what they're studying and reporting at different levels and are going to report, here is what I'm counting and here is what I'm not.

Q.  Excuse me, Doctor.  It's all terribly interesting, but --

MR. STRICKLAND:  Your Honor, we object to the side bar.

THE COURT:  Well, let me ask both sides.  Ask the question.  Answer just the question asked, and then I think we'll be right back where we need to be.

Go ahead.

Q.  (By Mr. Schattman)  Your field is risk assessment for long-term incarcerated individuals.  That's one of the areas that you're specializing in now, correct?

A.  Yes, sir.  That's one of my areas.

U.S. DISTRICT COURT

**Ex. 72 - 1305**

Cross - Schattman/Cunningham      Vol. 22:  84

Q.  In terms of your profession of forensic psychology, that risk assessment is not recognized by any of the licensing or certificating, for lack of a better phrase -- it's not a recognized sub-specialty of a field; is that correct?

A.  I can't answer that "yes" or "no."

Q.  Well, let's try it this way.

You are a diplomate in forensic psychology?

A.  Diplomate, that's correct.

Q.  Diplomate, oh, all right.

And you are board certified by the American Board of Professional Psychologists?

A.  That's correct.

Q.  And within this board certification process, there are -- forensic psychology is recognized as a specialty within the field of psychology; is that correct?

A.  Yes, it is.

Q.  And then within the field of forensic psychology, are there or are there not then recognized sub-specialties?

A.  There are recognized sub-specialties but not ones that a separate certificate would be provided for.

Q.  And risk assessment is not a recognized sub-specialty of forensic psychology?

A.  No, sir.  I believe that it is a sub-specialty of forensic psychology.

Q.  The question was, is it recognized by the American Board of

U.S. DISTRICT COURT

Ex. 72 - 1306

Cross - Schattman/Cunningham    Vol. 22: 85

Professional Psychology, which grants these various certificates? Is it a recognized sub-specialty?

A. There is not an additional certificate that is supplied or provided for any sub-specialty area within forensic psychology, but a forensic psychologist wouldn't undertake just any role within there because he is board certified. It is recognized as being an area of special knowledge and expertise. There is not a special certificate that goes with it.

Q. And it's recognized by whom?

A. By forensic psychologists.

Q. All right. On the issues that you have described for us this morning, you talked about base rates and studies; is that correct?

A. That's correct.

Q. And this actuarial approach that you have described would involve -- I think you used the analogy of looking at 16 year olds that have a driver's license. It's the same sort of a process that an insurance company would use?

A. In general, yes.

Q. Do you have any teenage sons or daughters?

A. I have got a teenage daughters, yes. My sons have moved out of the -- well, they are still less than 25. So I still have the high rates, but they are not teenagers.

Q. And you know that, from your own experience, when you talk about this actuarial business that males under 25 pay a higher

Ex. 72 - 1307

Cross - Schattman/Cunningham          Vol. 22:  86

rate than females under 25?

A.  Yes, sir, they do.

Q.  And in the actuarial field, one of the other things that drives the rates for insurance companies, for instance, would be such things as what kind of a car the person is operating, correct?

A.  Yes, sir.  If it's a high performance, high horsepower car, there would be a bump in the rate.

Q.  Because that's a greater risk?

A.  Yes, sir.

Q.  And in the Furman study that you mentioned, the people that were actually selected were simply males whose sentences had been commuted, correct?

A.  That's correct.  I don't recall if there were any females under Furman or not.

Q.  And within this Furman study as to likelihood of future -- or likelihood of acts of violence, serious acts -- serious infractions, is that the right phrase?

A.  Yes, sir.

Q.  Within the Furman study, does it further break down the data to tell you, for instance, which of the commutees that are committing serious infractions were convicted of multiple homicides?

A.  No, sir.  The data doesn't break it down.

Q.  And with regard to the study that you have said helped set

Ex. 72 - 1308

Cross - Schattman/Cunningham      Vol. 22:  87

a base rate, is there a way from the data to distinguish whether the rate of infraction is higher for those persons who committed their crimes in conjunction with other people on multiple occasions?

A.   I've lost the question.  I apologize.

Q.   Okay.  With regard to the Furman study --

A.   Yes, sir.

Q.   -- that you have testified about and the thing that sets the base rate, which you say is the important thing to look at?

A.   It's one of the contributions to that base rate.

Q.   With regard to that, is the data such that you can ascertain the base rate for those persons whose crimes involved the organization and coordination of actions by multiple persons?

A.   No, sir.

Q.   And you would agree, I assume, that when it comes to making an actuarial analysis and trying to come up with something regarding likelihood, that the -- one of the important components is looking for common characteristics?

A.   That's correct.

Q.   And that the more of the factors that you can match up, then the more accurate your estimate of incidents and likelihood is going to be?

A.   Yes, sir.  The more factors you can match up and the larger your pool that you're studying.

Ex. 72 - 1309

Cross - Schattman/Cunningham        Vol. 22:  88

Q.  Yes, sir.  And speaking of the largeness of the pool, in one of your slides, you had a three-year study of the Bureau of Prisons statistics concerning 25 inmates, correct?

A.  That's correct.  That was the extent of the follow-up of that small number.

Q.  And that small number and that short period of time are -- in actuarial terms, or statistical terms, that's not a significant number of people or a significant period of time, is it?

A.  I wouldn't characterize it as non-significant or not a sufficient period.  It's a small enough number that you would want to be cautious about generalizing from it.  But if it's as much data as we have about a given group and if that follow-up is pretty consistent from what we've seen from much larger samples in other places, then at least we say this seems to be going in the same direction.

Q.  Okay.  You mentioned early on in your testimony that you have been -- very little of your practice is clinical at this point?

A.  That's correct.

Q.  And in terms of a percentage of your time, can you give the jury an idea of how much of your time is devoted to the clinical practice versus the time that you are spending in a circumstance such as today, either testifying or preparing to testify as a witness?

Ex. 72 - 1310

Cross - Schattman/Cunningham        Vol. 22:  89

A.  At this point in time, less than five percent of my practice is clinical in nature, and over 95 percent of it is forensic.  And that involves a spectrum all the way from child custody to civil to various criminal kinds of evaluations that I may participate in.

Q.  All right, sir.  And, as a matter of fact, yesterday you were in the state of Michigan testifying in a capital case?

A.  That's correct.

Q.  And I assume that was one of the 45 state cases that you mentioned earlier?

A.  No, sir.  That was a federal case.

Q.  Oh, that was a federal case.  All right.

And you are scheduled sometime later today or, perhaps, tomorrow to testify 10 or 12 blocks away in a state case down at the state courthouse; is that correct?

A.  That's correct.

Q.  And in each of the instances where you have been called in to court to testify, it has been at the -- you've been either appointed by the Court at the request of the defendant or are hired by a defendant in a capital case; is that correct?

A.  That's correct, as a teaching witness.

Q.  And can you give the jury an idea of -- and I assume that your rate doesn't -- you're not charging the federal government a higher rate than you would charge the state courts?

A.  No, sir.

Ex. 72 - 1311

Cross - Schattman/Cunningham          Vol. 22:  90

Q.  So everybody pays the same 210 an hour?

A.  Yes, sir.  That was the rate at the time these two cases were undertaken.

Q.  All right.  Well, let's just say for the year 2001, since we're approaching April 15, can you give us an idea of how much your income was from these capital cases in which you were appointed or retained on behalf of the defendant?

A.  I can't give you a precise number.  I can give you a general estimate.

Q.  Well, you don't have to get precise until April 15.  You still have got a little bit of time.  So let's settle for a general number.

A.  My income last year was about 320,000.  About 70 to 75 percent of that by my best estimate is derived from doing capital consultations of one sort or another.  That may be all the way from teaching witness to evaluations to appellate related cases to competency to be executed.

Q.  All right, sir.  So --

A.  $250,000, perhaps.

Q.  All right.  And I assume as part of your teaching, part of your life and income, that you have addressed various workshops sponsored by either psychology -- you know, psychological-type groups or legal aid defender's society?

A.  American Bar Association, both scholarly meetings for psychologists, joint scholarly meetings of psychologists and

Ex. 72 - 1312

Cross - Schattman/Cunningham      Vol. 22:  91

attorneys, and at times by defender organizations as well.

Q.    And I believe that you have participated in workshops for various defender organizations in a number of different states?

A.    That's correct.

Q.    Texas, Idaho, California, Oregon, Florida, Indiana, and Tennessee?

A.    Yes, sir.  I enjoy talking about this even when it's not by the hour, and I will address whatever professional group is interested in hearing this research.

Q.    Okay.  I believe that you have said on many other occasions that you have no opinion one way or the other about the death penalty?

A.    That's correct.

Q.    Well, is that a consequence of some internal discipline of, I'm not going to think about it.  I'm not going to have an opinion, or have you just not thought about it?

A.    Well, let's just say I'm not an advocate on either side of this issue.  I understand the arguments in favor and opposed to the death penalty and see merit in those arguments on both sides.

Now, I have many opinions about the death penalty in terms of the demand that it be done fairly, the concern with innocent people being identified on death row, with being sure that the quality of representation, the quality of science that's brought to bear, equips the jury to do the very sobering task

U.S. DISTRICT COURT

Ex. 72 - 1313

Cross - Schattman/Cunningham        Vol. 22:  92

that they have.

So I have many opinions about the level of reliability that this kind of proceeding calls for, but I'm not an advocate on one side or the other.

Q.  So you have an opinion about the process but not the result?

A.  That's correct.

Q.  In your direct testimony, I believe that you have indicated that you are not really here to talk about future dangerousness of anyone in particular?

A.  That's correct.

Q.  That's not your field.  Future dangerousness is not your field?

A.  Well, future dangerousness is a buzz word that is used to describe violence risk assessment.  I have used that buzz word or phrase sometimes myself.  The core issue, as I described, is not dangerousness.  It's likelihood of engaging in serious violence.

Q.  And, of course, from your own experience, your education, your training, your study of psychology, especially in the forensic field, you have come to the conclusion that violent felony offenders, people who are convicted of capital murder, are, in fact, dangerous?

A.  Yes, sir.  By definition, all violent felons are dangerous.

Q.  And that the issue of their dangerousness and the

U.S. DISTRICT COURT

**Ex. 72 - 1314**

Redirect - Strickland/Cunningham   Vol. 22:   93

likelihood of a -- I'm sorry.  Let's back up for just a minute.

Someone who is a violent and dangerous person convicted of violent and dangerous crimes, is it fair to say that those crimes and characteristics are the result of an act of volition, you know, a conscious choice made been an individual?

A.   Yes, sir.  If there had not been an element of choice, they would have been not guilty by reason of insanity.  They wouldn't have gotten to the sentencing phase.

Q.   And these are crimes that are committed out of some motivation one way or the other.  They are motivated by something to engage in some particular act?

A.   Certainly.

Q.   And not only is there motivation involved, there is opportunity, that they actually had an opportunity to engage in the conduct that brought them here today?

A.   Yes, sir.  There was an intersection of motivation and opportunity.

Q.   And it is that intersection of motivation and opportunity and looking back at their past that helps us say -- or helps you in this case say that they are dangerous?

A.   Yes, sir, dangerous in the community and dangerous with sufficient interaction of motivation and opportunity, yes.

MR. SCHATTMAN:  That's all, Your Honor.

THE COURT:  Is there redirect?

REDIRECT EXAMINATION

U.S. DISTRICT COURT

Ex. 72 - 1315

Redirect - Strickland/Cunningham   Vol. 22:  94

BY MR. STRICKLAND:

Q.   Number one, Doctor, is there a distinction between the question of risk assessment in the community for a violent offender and the assessment of risk when that same violent offender is incarcerated in a penal institution such as we've been discussing today?

A.   Oh, absolutely.

Q.   Mr. Schattman asked you some questions about subjectivity in regard to some of the matters that you've discussed; is that correct?

A.   That's correct.

Q.   To the degree scientifically possible, has there been an effort, not only by you, but, also, presumably, by the Department of Justice and the Bureau of Prisons to remove the subjectivity which is presented by these statistics?

A.   Yes, sir.  The way we describe that as researchers is that we make operational definitions.  In other words, we describe very clearly what we're going to categorize as violence, what it takes to meet that standard, and why we have made that election, that determination.  So that's done in a very clear and direct sort of way.

Q.   Because from a scientific standpoint, the more subjectivity that's involved in the process, perhaps, the less reliable the result may be; is that correct?

A.   That's correct.  And so most of this research relies on

**Ex. 72 - 1316**

records that have been accumulated by the department of corrections and the way they classified the event.

Q.    Is it possible in your opinion to absolutely 100 percent remove subjectivity from the process that we've been talking about here this morning?

A.    No, sir.  It's not possible to remove it absolutely.  You can very narrowly limit it.

Q.    Would you agree or disagree with the proposition that subjectivity is a factor which was going to be presented throughout the process, such as we're engaged in here, that is, the trial of a serious case?

A.    Yes, sir.

Q.    And so by way of example, there is subjectivity involved in the decision as to who to even charge with and seek the death penalty on; is that correct?

A.    Oh, yes, sir.

Q.    Are you aware of any statistics or any studies that demonstrate that persons charged with convicted of multiple homicides present a greater or a lesser degree of risk in a penal institution?

A.    Yes, I am.

Q.    And just -- no slides.

A.    No slides.

Q.    I'll goof this up.

A.    There is a recent study that tracks 6400 murderers in

**Ex. 72 - 1317**

Redirect - Strickland/Cunningham    Vol. 22:   96

prison and, on the basis of that, extrapolates their likelihood of serious violence across a 40-year capital prison term.  The group as a whole has a 40-year likelihood of serious violence of about 16.4 percent.  If they killed multiple individuals in their capital offense, then you add about four or five percentage points to that risk.  It takes them from about 16 percent up to about 20 percent.

The factors that are subtracted from that -- there are some other factors that might always produce modest bumps you subtract for age.  For example, if the person is, as I recall, 25 or older, you subtract five or six points from the risk.  The older they are, the more you would subtract.  It's because of the extraordinary size of that study that it's finally let us get some information on very small increments the offense seems to have in raising or lowering the risk estimate.

Q.   Speaking of the size of the study, Mr. Schattman asked you a question about a Bureau of Prisons -- not your study, but a Bureau of Prisons study, that dealt with, I believe, a 25 person death eligible but life sentenced federal population during the period 1995 to 1998.  Do you recall that?

A.   Yes, I do.

Q.   All right.  And, yet, there are only 25 persons that were included in the group about which statistics were gathered; is that correct?

A.   Yes, sir.  It wasn't a formal study.  The U.S. Attorney's

Redirect - Strickland/Cunningham   Vol. 22:  97

Office had asked the BOP and Miles Herrer to provide them with follow-up on capital offenders in prison, primarily in response to this line of testimony about how people in prison behave. And that was the information that was gathered.

Q.   You couldn't have a larger group of 50 or 100 or 2500 people because they weren't there; is that right?

A.   Twenty-five was all that were there at that time.

Q.   All right.  And so if that's what the number was, that's what the number is that had to be discussed; is that correct?

A.   That's correct.

Q.   Do you see your job in any manner as attempting to put a spin on the statistics that you have been discussing here today, or do you consider your position to be that of a, for lack of a better term, messenger to bring this information for the jury's consideration?

         MR. SCHATTMAN:  Excuse me, Your Honor.  We would object to the form of the question asking the witness to characterize himself.  I think that's a question --

         MR. STRICKLAND:  But, Judge --

         THE COURT:  Sustained.

Q.   (By Mr. Strickland)  Well, let me ask you this.  There seemed to be some suggestion that because you're paid $180 an hour -- excuse me, $210 an hour, that somehow is that that skews your testimony, that skews your findings and conclusions.  Is that accurate or not accurate?

U.S. DISTRICT COURT

**Ex. 72 - 1319**

Redirect - Strickland/Cunningham    Vol. 22:    98

MR. SCHATTMAN:  Same objection, Your Honor.

THE COURT:  I'll allow it.

A.   That's not accurate.  I have presented or were prepared to present all of the studies that deal with the follow-up of capital offenders in prison.  I haven't cherry picked the studies that are consistent with -- simply for the consistency sake of them.  I'm prepared to present the data from the justice department on the frequency --

MR. SCHATTMAN:  Excuse me, Judge.  We object now as being nonresponsive.

THE COURT:  Sustained.

MR. STRICKLAND:  And I'll agree.  Thank you.

THE WITNESS:  I'm sorry.

Q.   (By Mr. Strickland)  In that regard, Dr. Cunningham, did you actually offer to meet with and share your testimony with the government prior to your appearance here today so there would be no surprise about any of it?

MR. SCHATTMAN:  Excuse me, Your Honor.  We would object as being outside the scope of cross examination.

THE COURT:  Sustained.

Q.   (By Mr. Strickland)  Well, before today have you met with the government, Mr. Schattman or Mr. O'Connor?

MR. SCHATTMAN:  Same objection.

THE COURT:  Sustained.

Q.   (By Mr. Strickland)  You indicate, finally, that you hold

U.S. DISTRICT COURT

Ex. 72 - 1320

Redirect - Strickland/Cunningham    Vol. 22:  99

no personal opinion about the death penalty but, rather, in your role as a scientist, if you will, are concerned about the process by which the death penalty may be imposed or not imposed; is that correct?

A.  That's correct.

Q.  And I believe -- correct me if I'm wrong -- that you indicated that you believed that there were merits on both sides of the argument, both pro and con death penalty; is that correct?

A.  That's correct.

Q.  Did your feeling or lack of feeling about the death penalty, your personal feeling or lack of feeling about the death penalty, in any manner influence the testimony concerning these statistics and this risk assessment which you have offered to the jury today?

MR. SCHATTMAN:  Excuse me, Your Honor.  I'm going to object as to the witness giving an opinion about whether he's influenced or not.

MR. STRICKLAND:  Judge, if it please the Court, he has suggested that there is a bias or a motive or a prejudice on the part of this man, and other than to ask him whether or not he holds such a bias or prejudice or motive in regard to his testimony, I don't know how else to clear the matter up.

THE COURT:  Well, I allowed it earlier, but I don't see as this is responsive to the questions asked by the

Ex. 72 - 1321

Redirect - Strickland/Cunningham    Vol. 22: 100

government.  So I sustain the objection.

Q.  (By Mr. Strickland)  Have you presented any workshops or seminars or lectures on behalf of, not defender organizations, but prosecution organizations?

A.  Not in ones that I have presented orally.  I have provided written materials.  One of the papers that Dr. Reedy and I co-authored, we provided to the Prosecutor's Brief, which is a magazine that goes to all the district attorneys in California that was intended as a continuing education piece to educate them about a particular concept in psychology and its association with sentencing considerations.

MR. STRICKLAND:  Thank you.

Pass the witness, Your Honor.

MR. SCHATTMAN:  No questions, Your Honor.

THE COURT:  You may step down, sir.  Thank you.

THE WITNESS:  Thank you, sir.

THE COURT:  You may call your next witness.

MR. STRICKLAND:  May we approach, Your Honor?

THE COURT:  Yes, sir.

(Off-the-record discussion at the bench at this time)

THE COURT:  I'm going to give you a longer break today, not, honestly, just for you, but I'm working on the charge, and it will give me a chance to do some of that while you're out.  So if you'll come back at 2 o'clock.

(Jury not present)

U.S. DISTRICT COURT

# EXHIBIT 73

Vol. 23:  1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA        .  CRIMINAL ACTION NO.
                                .    4:00-CR-260-Y
V.                              .
                                .  Fort Worth, Texas
JULIUS OMAR ROBINSON           .  March 15, 2002
. . . . . . . . . . . . . . . . . .


VOLUME 23
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.


APPEARANCES:

For the Government:        MR. FREDERICK M. SCHATTMAN
                           MR. REED C. O'CONNOR
                           Assistant United States Attorney
                           801 Cherry Street, Suite 1700
                           Fort Worth, Texas   76102-6897
                           (817) 252-5200

For the Defendant:         MR. WES BALL
                           Ball & Hase, PC
                           4025 Woodland Park Boulevard
                           Suite 100
                           Fort Worth, Texas   76013
                           (817) 860-5000

                           MR. JACK STRICKLAND
                           Attorney at Law
                           909 Throckmorton
                           Fort Worth, Texas   76102
                           (817) 338-1000

Court Reporter:            Ana P. Warren
                           U.S. District Court Reporter
                           501 W. 10th Street, Room 201
                           Fort Worth, Texas   76102-3637
                           (817) 850-6681

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COU

**COPY**

Ex. 73 - 1323

Vol. 23:  68

now the targets of opportunity are numerous.

You will hear that as to the killing of Rudolfo Resendez that everybody was in on this and that these are all terrible people, and we shouldn't believe them.  We shouldn't have anything to do with them.  And you ought to spare this man's life because it is his no good friends who have turned him in. And, ladies and gentlemen of the jury, the killing of Rudolfo Resendez was a plot born in hell and such a plot born in hell has no angels as witnesses.

Let justice be done.  Let it rain down like water.  Let righteousness be a mighty stream.  Do justice in this case. That is what your government asks of you, justice, that and that alone.

THE COURT:  Mr. Ball, do you want any warnings?

MR. BALL:  Your Honor, if you can let me know when I reach the 20 minute mark if I'm still speaking.

THE COURT:  All right.

MR. BALL:  May it please the Court, members of the government, prosecution, ladies and gentlemen.

Where we are now is a decision that you have to make that is undoubtedly, extraordinarily serious, maybe the most serious kind of decision you make in your lifetime.  I don't know.

I want to tell you with regard to the verdict you've reached,  I'm not here to quarrel with you.  You heard the evidence.  You had the responsibility.  You made the decision.

Ex. 73 - 1324

Vol. 23:  69

You reviewed the law, the evidence, and Mr. Strickland and I, when the verdict comes back, we know that there is more work to be done. And we have presented information to you at the second phase of the trial for you to consider, because I don't know that anyone can be trained or schooled or know how to make a decision that you're being asked to make. I mean, where do you go? What do you rely on? What do you do in your life that's anything like this? And it's an awesome responsibility.

And, certainly, Mr. Strickland and I -- I know I have a fear that somehow I will fail in what I'm suppose to do or say. I've neglected something. I haven't done something. I haven't said something right. I won't be eloquent enough because of the responsibility that I have for Julius Robinson to make sure that when you go back to your deliberations, that you have the tools necessary from our perspective to make your decision.

Because have no doubt about what the result of this process can be, if the verdict on any count is death, it's not an academic exercise. As most of you were asked during the jury selection process, it was lengthy and involved -- and maybe now you know why -- that if the verdict is death one day at the government's choosing, based on a verdict from this Court, that Julius Robinson, a human being, a human being who has done bad, bad things, will be taken to some chamber, some room, strapped down on a gurney, and injected with substances until his life

U.S. DISTRICT COURT

Ex. 73 - 1325

Vol. 23:  70

expires, and that is final.  That can never be undone.  And so this is a grave, serious situation.

It struck me, in listening to Mr. Schattman's argument, that somehow someone was proposing that Mr. Robinson be returned to the streets, to be returned to free society with us.  And no one is proposing that because there are alternatives here.  There are three choices that you can make.

You can vote that Mr. Robinson be executed.  You can vote that he be confined for the rest of his natural life without the possibility of release or parole in a facility such as -- perhaps, you have seen on a diagram with a little toilet in a small room.  Ladies and gentlemen, that's punishment.  I don't care how you slice it.  Some might say it's worse than death to live every day, day in and day out, in that environment thinking about what put you there under the control of correctional officers, a professional staff.  And I'll get to that in just a moment.

But no one is proposing that you open the door of freedom for Julius Robinson.  What is proposed here is that you consider the options.  And then there is the last one, a sentence of something less than life that would be determined by the Court.  And while we always on the defense side hesitate to concede anything, I submit that you are more likely to look at the life without the possibility of parole or release.

You heard from guards, correctional officers, professional

Ex. 73 - 1326

Vol. 23:  71

people, professional staff.  You may not have known that there was a whole category of business called corrections and that you can study corrections.  You can learn about it and so forth.  You heard from the warden.  And these are folks that are are employees of the United States Government.

You heard from coaches, from Coach Eddie Peach and down to the other coaches.  You heard from player friends, Landry Burdine.  You heard from people who took time out of their lives, even though it's been sometime since they have had contact with Julius Robinson, who came down here and told you what they knew and what their experience was.

And you heard from some family members.  You didn't hear in person, but Defendant's Exhibit Number 2 -- and you can take that back and look at it -- that's that 11-page document from the Federal Medical Center with reports of correctional psychologists who tell you that Mr. Robinson, based on the information available, is a low risk of harm to others, another government employee.  Did they bring these folks down here?  Would it have been satisfactory for them to just let you go back and make your decision and not have this information?

You heard from Dr. Cunningham who told you some things that may fly in the face of conventional wisdom about our penitentiary systems and the rates of violence and so forth.  And it goes on.  There is no way to stop them entirely.  You know, the only way to stop it, let's just kill them all.  Let's

Vol. 23:  72

just execute them all, because any one of them might commit a violent act.  Well, that's not sensible, and you know that.

What's interesting is the common thread about Julius Robinson.  In the free world, in free society, without much structure in general, there should be some concern.  When is it that Julius Robinson seems to have this good behavior?  When is it that he seems to thrive?  In structured environments, in controlled environments, where he's given directions, instructions, orders?

And where do we find that?  We find that in a football program at Lamar High School where those coaches who try to build young men's lives and lead them through the competitiveness of sports, and Mr. Robinson is courteous, a hard worker.  He's there at practice.  He's polite, and he's a friend of everyone's.

And that football practice doesn't go on just one day.  That's day in, day out, during the football season, during the school year, and if there was anything wrong with that, if that was incorrect, they would have brought somebody from Lamar High School to say he was a miscreant.  He misbehaved.  He was bad to the teachers, and not one shred like that.  So you know that's true.

And then you go to computer class, structured environment.  Course hours have to be completed.  Tests have to be taken.  What does Julius do?  In that environment, he thrives.

Ex. 73 - 1328

Vol. 23:  73

And then you go to the Fort Worth Medical Center in Fort Worth, Texas, where he is housed, and there he adjusts to the system.

You know, we can bring experts.  We can bring Dr. Cunningham and folks with degrees and that sort of thing, but you know the most telling expert I submit that we had was the correctional officer who told us about maybe it's not in the psychology books.  Maybe there aren't treatices or papers written on it, and maybe he doesn't teach seminars on it, and maybe it's just kind of learned from the school of hard knocks or the correctional officer.

But the fellow that was in the 82nd Airborne and special forces told you that they have got inmates and they have got convicts, and inmates are these young kind of punk guys who haven't adjusted.  And they're aggressive and they're ornery, and they're hard to deal with.  Then you have got the convicts, the people that realize their situation, and they settle in, and they say, well, I'm going to make the best of a bad set of circumstances.  And you know from his mouth, I submit to you, there is no doubt about it that Julius Robinson fits into his category of convict.

And so the consistent theme here is a structured environment, and, certainly, the defense here is asking you not to impose a death sentence on Julius Robinson, but to put him in the most structured environment there is available, and that

U.S. DISTRICT COURT

**Ex. 73 - 1329**

Vol. 23:    74

is a high security federal penitentiary for life because you know how it operates.  You heard some things about how it operates, and the security and the environment and the professional staff.  So I would ask you to consider that.

I was struck by what Mr. Schattman said about some of the mitigating factors, and there were a number of them, and I don't know that you would choose to find all of them, but I would submit there are some I do want to talk to you a little bit about, and why they are there and what's the point of it and so forth.

And one is that the conviction was based largely on the testimony.  And when you get down to it, when you get right down to who was there and saw and knew what happened, when you get right down to that, accomplices, and people who got cut deals and 5K's -- and you've heard, probably, about 5K's until you're sick of hearing about it.  But the point of that is not to say that's a mitigating factor because my friends or associates came down here, but death is different.  Death is final.

And when you leave this place and you go home with your families and you do whatever it is you do in your normal life, and you get up in the morning and you look yourself in the mirror and you brush your teeth and your hair and you get ready to go to work, then maybe go pick up the newspaper, and this could be five, ten, 15 years from now, and now Julius Robinson

U.S. DISTRICT COURT

**Ex. 73 - 1330**

Vol. 23:   75

is no more.  He is dead.  He has been executed.  The sentence has been carried out, and then it is discovered -- and I would suggest to you that you know this has happened -- it's found out one of these accomplices on something very significant lied and recants what they've had to say.  And there is no going back, folks.  It's final.  It's done.  So when you leave this place, be satisfied with what you have done that it is absolutely right because it could be final and irreversible.

And the same thing with physical evidence because, you see, physical facts don't lie.  If a fingerprint's on something, it's on there.  If there is DNA, the experts can come in, and that's it.  Physical evidence doesn't lie, but people do.  And so I would suggest to you that the standard here is maybe somewhat different because of the finality of the decision you have got to make than the one that's to decide whether someone's guilty because it is so irreversible.

Other persons.  Congress says, hey, we're going to set out some mitigating factors, and one of them that you can consider is, are there other people involved in these crimes who aren't facing death?  And that's in these instructions and you can consider that.

I would suggest to you, for example, in the Reyes killing Mr. Harris.  Well, you know there are two guns going off out there on Michigan Street.  And how do you know that?  Not because somebody tells you, because, like I said, people can

Ex. 73 - 1331

Vol. 23:  76

lie, but because there are shell casings from two different weapons at the scene.  And so I would suggest to you that the government's theory is Mr. Harris is out there.  Mr. Robinson is out there.  Then Mr. Harris is doing some shooting, and maybe he's the one that shot -- that was Isaac Rodriguez's first recollection of it.  His first identification of it was the guy doing the shooting had the tatoo on his arm.  That's the man that's shooting Mr. Reyes.  That's what Mr. Rodriguez said.  And it was kind of cute.  He came in and changed that after he sits back here.  You know, it's not real hard for inmates back here, when the other one's come back, to know it's the guy in the gray suit, the red tie, that you've heard so many times before.

But Mr. Harris is not facing execution.  Why would Congress say this is a factor for you to consider?  I would submit to you that it is because it's a basic fundamental, fairness question, because, you see, there is some arbitrariness about this whole thing, on who gets selected and who doesn't, and I would submit that you can consider that.

With respect to Rudolfo Resendez, I think that mitigating factor I submit to you has even more prominence, because Mr. Robinson, according to the government's theory, is in the follow car.  Certainly as responsible in that matter is Mr. Bryant who is driving that car and I submit to you certainly less responsible than Mr. Tunstall, who is in the

Ex. 73 - 1332

front car shooting Mr. Resendez, who is not facing the death penalty, or Mr. Morales who is driving this man out for this robbery, and Mr. Morales, you heard testimony from Mr. Bryant, fired shots into the body of Mr. Resendez, but he's not facing the death penalty, because, you see, that's the choice that's made. You can consider that. Is that fair? And Sonia Zamudio who sets up the plan and so forth and so on, and I submit to you that the fairness of that is fairly questionable and you can consider it.

With respect to Mr. Shelton, you know, some might have you believe that Mr. Gehring is simply a cabby or a chauffeur and not deep into it up to here. I mean, if you're driving the car, the government's theory was that he was driving the car, and there's armed men firing guns out the window. And do you say, hey, I'm out of here. Let off the gas. Pull over. You guys are on your own. No. The accelerator stays mashed down. The car stays steered on course. So he's just as responsible, I submit to you, but Mr. Gehring is not facing death, that final penalty. So I submit to you you can consider that.

There is a special issue, and I won't repeat it. You have it with you and will when you deliberate regarding some things about Julius' upbringing. Well, what do you know about his upbringing? He had grandparents who are good, fine people, and I believe his grandmother -- she's here right now, Margaret, fine salt of the earth kind of folks. And John, a blind man,·

Ex. 73 - 1333

Vol. 23:  78

and they did the best they could to help out and try to raise these two boys in Dermott, Arkansas when Rosa left them with them in a good environment.

Mr. Robinson then goes to stay with his mother, and now we're in our formative years.  This is when we worry about our children, not when they are four or five years old so much, but when they get into those teenage years, when the temptations start to come to bear on us and tempt us, and the bad associates and who our children hang out with, who our teenagers hang out with.  And we should all be diligent about that, but, unfortunately, with all due disrespect, Rosa has an appointment with a bottle and some primos, some marijuana cigarettes with crack rolled up into it, and that's the environment and ask yourself what kind of a life that might be.

And Jimmy Lee, the father, not a present, not a card, not any help at all.  And I'm not saying that's a reason to go out and deal drugs or shoot anybody, but I submit to you it's a factor.  It's something you can consider.  It's in the instructions.

One of the mitigating factors, life without parole is a consideration, and I submit it should be, because if you look at this death thing, you go, well, we found this guy did some bad stuff.  So what are our choices here?  If we don't go with death, what happens?  You know what happens.  You can choose the second choice, life without release or parole.  And you saw

U.S. DISTRICT COURT

Ex. 73 - 1334

Vol. 23:  79

the diagram, and you heard the testimony about these structure, you know about the security. And you know that that option tells you that Julius Robinson will not be among us, and you can consider that.

Now, I did want to talk to you real briefly about this Michael Williams' business, One Love, from the Federal Medical Center. Well, look at those transcripts. Listen to those tapes. You see that first call is not -- the deal with Michael Williams has been over and done. If you look at the date and time, it's already happened. And if you listen to those calls, it's somebody telling Julius what's happened. Is he upset about it because the guy ratted him out? No, he's not upset about it. But is there anything on there ordering anybody to do anything?

And you know they record every single phone call that went out from that facility. It is available to the government, and if he called somebody, three-way or not, and said, do Mr. One Love in, go get Mr. One Love, then that tape would have been in here, because we certainly know that tapes can be brought and headphones can be brought, and we can sit here and listen to one right after another, after another, after another. Not. Didn't happen.

They have the burden of proof at this phase of the trial, and you can consider that. So, no, Mr. Robinson's comments didn't appear to indicate that he was upset, but he was asking

Vol. 23:  80

questions about it like, you know, what happened?  What guy, or something?  You look at the transcript, and you make your own decision about it.

Finally, I want to talk to you about the death penalty, and what's it for?  Why do we have it?  Well, there are a whole lot of people that have a lot of theories about why we ought to have it --

THE COURT:  You're 20 minutes in.

MR. BALL:  Thank you.

If we ought to have it because it deters other people. Well, we've had it, and folks that get bent on doing certain things, I submit to you, it's not a deterrent to them.  In fact, there are some people we have you can pick up the paper occasionally, and these guys like to go out in a blaze of glory.  So I submit to you that's not the best reason for the death penalty.

So what's another reason?  Well, another reason I would submit to you is self-defense for society.  I mean, there are some people that are so bad, so malicious, so constant in their violence and aggression, it never stops.  It matters not where they are.  It matters not if they are in a structured environment.  It matters not whether they are in a prison. They continue to be a danger, and it's self-defense for society, and I submit to you that's, perhaps, the most legitimate reason to have a death penalty if we should have

Ex. 73 - 1336

Vol. 23: 81

one.

And what do we know about that? Well, I submit to you that Mr. Robinson has adjusted to incarceration, has adjusted to structured environments, will adjust, as he must, to a life sentence without parole and not be a danger to correctional officers, inmates, prison staff, nurses, and what have you, as he has demonstrated that he can do. So self-defense for the society that Mr. Robinson is going to live in does not necessitate a required death.

I ask you to take your time, consider and follow the law in the instructions here, because, folks, this is a final kind of a deal, and it's serious and would ask you to spare Mr. Robinson's life. Please do so. Thank you.

THE COURT: Mr. Strickland, do you wish to receive any warning?

MR. STRICKLAND: I think two minutes would be sufficient, Your Honor. How much time do I have left?

THE COURT: You have 23 minutes.

MR. STRICKLAND: Thank you.

May it please the Court, ladies and gentlemen of the jury, counsel.

In the 23 minutes that I've just been advised that I have to speak with you, I would like to talk to you about two matters, essentially, two matters that I think that you will find as you find as you go through, as I know you will, the

Ex. 73 - 1337

# EXHIBIT 74

Vol. 20:  1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA                .   CRIMINAL ACTION NO.
                                        .     4:00-CR-260-Y
V.                                      .
                                        .   Fort Worth, Texas
JULIUS OMAR ROBINSON                    .   March 12, 2002
    . . . . . . . . . . . . . . . .

VOLUME 20
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.

APPEARANCES:

For the Government:          MR. FREDERICK M. SCHATTMAN
                             MR.  REED C. O'CONNOR
                             Assistant United States Attorney
                             801 Cherry Street, Suite 1700
                             Fort Worth, Texas  76102-6897
                             (817) 252-5200

For the Defendant:           MR. WES BALL
                             Ball & Hase, PC
                             4025 Woodland Park Boulevard
                             Suite 100
                             Fort Worth, Texas   76013
                             (817) 860-5000

                             MR. JACK STRICKLAND
                             Attorney at Law
                             909 Throckmorton
                             Fort Worth, Texas   76102
                             (817) 338-1000

Court Reporter:              Ana P. Warren
                             U.S. District Court Reporter
                             501 W. 10th Street, Room 201
                             Fort Worth, Texas  76102-3637
                             (817) 850-6681

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COU

COPY


Ex. 74 - 1338

A.  Yes.

Q.  Do you remember about when it was that these people came up on you?

A.  I believe it was around December 28, probably around after lunch or sometime like that.

Q.  And do you remember who the people were that came up on you?

A.  Yes, I remember.

Q.  Do they go by nicknames?

A.  Yes.

Q.  Do you know their nicknames?

A.  Yes.

Q.  Tell us who they are, by whatever name you know them.

A.  One of the individual's name was -- they called him Cracker, Kendall Pitts, or something like that.  I think the other name was Keith Eddington.  They called him Black.

Q.  All right.

A.  And the other name was Wayne Jordan.  They called him Little Wayne or something.

Q.  All right.  So just tell the jury how it is that you're in Dermott, Arkansas and these people come up on you.  What happened?

A.  I was riding around, me and a guy named Louis Johnson.  We was just riding, and they stopped the car and asked Louis, can he get out.  They need to holler at him for a second.

Q.  Speak on into that microphone because everybody has to hear what you say.

A.  Yeah.  They say, can you get out?  We need to holler at you a minute.  And he got out and talked to them for a few minutes. The next thing I know, one of them approached the car with -- I believe it was a .38 long barrel pistol.

Q.  All right.  And do you know who that was that had the .38?

A.  Yes.  It was Kendall Pitts.

Q.  What was his name?

A.  Cracker.

Q.  So Cracker comes up to you?

A.  Yeah.

Q.  And when he comes up to you with the .38, what does he do or say?

A.  He pointed in the car at me and told me cut the car off. And then he came around and got on the driver's side and told me to move over and told me to drop it off.  Then the other two individuals entered the car.

Q.  All right.  Did Cracker do anything with that .38 to let you know that he meant business?

A.  Yeah.  He swung at me and strike me right here on the side of the jaw.

Q.  And when he did that, you felt like he was serious?

A.  Yes.

Q.  About doing something with that .38?

Ex. 74 - 1340

Direct - O'Connor/Williams         Vol. 20:  142

A.  Yes.

Q.  And then you say the other two people got in the car with him?

A.  Yes.

Q.  What did Louis Johnson do, the guy you were driving with?

A.  He stayed there.  He walked off.

Q.  Okay.  And this is in Dermott?

A.  Yes.

Q.  Where in Dermott?

A.  I can't remember the exact street.  I think it was Connor.  It was over by the trailer park in Dermott.

Q.  When Cracker got in the car with the .38, what does he say?

A.  He said -- if I remember correctly, he said that --

        MR. STRICKLAND:  Objection, Your Honor, hearsay.

A.  He said --

        MR. O'CONNOR:  Hold on, please, Mr. Williams.  Just a moment.

        MR. STRICKLAND:  Objection, hearsay.

        THE COURT:  I'm going to allow it.

A.  He said -- I remember him telling me to drop it off, and that I snitched on his cousin -- I mean, on his OG down in Texas, and they was going to -- I was suppose to be dead.  They were going to kill me and all that stuff.

    Then he asked me how much money I had.  He went in my pocket and got $20 out.  We road around.  When he asked me how

Ex. 74 - 1341

Direct - O'Connor/Williams          Vol. 20:  143

much money I had, I told him I didn't have none with me.  I told him, what's this all about, money or something?  I said, how much they paying you all?  You know, I can pay you all what they trying to pay.

And I convinced them that I had some money hid -- or I had the money -- I convinced them at first that I had money at a bank account.  So we went up to the bank, and I'm stalling all this time trying to figure out how to get away from them.

And we made like --

MR. BALL:  Object to the narrative, Judge.

THE COURT:  It's all right.  Go ahead.

A.  We made two or three attempts to go to the bank.  So I just told them forget it, you know.  Just go and do what you got to do.  Let's ride out and do what you all got to do.

And we was going -- we was going past my grandparent's house, and I remember telling them that I had some money hid up in the house.  So we'll stop and get that.  But I told them, all three of you all can't come in the house.  Probably just one of you all can come in the house, because my grandparents, they didn't like youngsters.  So the one named Pitts came in the house with me.

Q.  And is he Cracker?

A.  Yes.

Q.  With the gun?

A.  Yes.

Ex. 74 - 1342

# EXHIBIT 75



U.S. Department of Justice

Federal Bureau of Prisons

*South Central Regional Office*

4211 Cedar Springs Road, Suite 300
Dallas, Texas 75219

June 8, 2007

Craig A. Harbaugh
Deputy Federal Public Defender
Central District of California
321 East 2nd Street
Los Angeles, California 90012-4202

Re:   Subpoena in a Civil Case for United States v. Julius Robinson, Case No. 4:00-CR-00260-2
      Our Inmate:  ROBINSON, Julius, Register No. 26190-177

Dear Mr. Harbaugh:

This is in response to the subpoena received in our office on Monday, May 14, 2007 regarding visiting records for your client, Julius Robinson. You specifically request copies of Bureau of Prisons' records pertaining to attorney visits for Julius Robinson for the time period from November 27, 2000 to June 14, 2002.

A thorough search has been conducted and a total of seven (7) pages were located in response to your request. These documents have been reviewed and all seven are being released with certain information excised. The aforementioned withholding and/or excision of information is pursuant to:

Title 5, United States Code Section 552 (b) (7) (C), because release of the information which is compiled for law enforcement purposes would constitute an unwarranted invasion of the personal privacy of individuals.

We trust that the information furnished will be of assistance to you.

Sincerely,

Jason Sickler
Regional Counsel

Enclosures: 7

**Ex. 75 - 1343**



3-19-02 | 3:43 | Bruce Cummings | | Julius Robinson |

In mate Visiting

Opened: 3/12/02
Closed: 5/23/02

Ex. 75 - 1344



| Date | Time | Visitor Print | Visitor Signature | Inmate Name | Inmate Number | Time In | Time Out |
|------|------|---------------|-------------------|-------------|---------------|---------|----------|
| 3-1-02 | 8:35 | John Holliman | John Hellrm | Julius Robinson | 26190477 | | 10:00 |

Inmates
Log

Opened: 12/22/01

Closed: 3/11/02

Ex. 75 - 1345

| Date | Time | Visitor/Sign | Visitor print | Inmate name | I/m number | T |
|---|---|---|---|---|---|---|
| 1-22-01 | 9:45 | Alex Tarby | Alex Tarby | Julius Robinson | 26190-177 | ( |
| 1-22-01 | 9:45 | Barby D. Black | | Julius Robinson | 26190-177 | ( |
| 1/22/01 | 10:00 | Louis Sandbote | | Julius Robinson | 26190-177 | 1 |
| 1/22/01 | 10:00 | Guy Walga | | Julius Robson | 26190-177 | 1 |
| 1/22/01 | 10:01 | Michael Gregory | Michael Gregory | Julius Robinson | 26190-177 | ( |

Inmates Visitor
Log

Opened  11-30.00
Closed 5-26-01

**Ex. 75 - 1346**



Inmate Visitor

Log

Opened : 11·30·00
Closed : 5·26·01

**Ex. 75 - 1347**



Inmate Visitor
Log

Opened: 11.30.00
Closed: 5.26.01



| Date | Time | Visitor Print | Visitor Signature | Inmate Name | Inmate Number | Time Out |
|---|---|---|---|---|---|---|
| 10-10-01 | 1.00 | John Hollinon | John Heller | Julius Robinson | 2 680-177 | 1:50 |

In mate Visiting Log

Opened: 5.26.01

Closed: 10.22.01

Ex. 75 - 1349

| DATE | TIME | Visitor Name ; Signature | ; INMATE NAME | , Reg # |
|------|------|--------------------------|---------------|---------|
| 5-24 | 1:05 | Neil Ball | | Ju Gus O. Robinson | |
| 5/24 | 1:20 | Hack Strickland | | Julius Robinson | |

Inmate Visiting

Opened: 5·23·02
Closed: 5-31·02

Ex. 75 - 1350



Date    Time    Visitor Print    Visitor Signature    Inmate Name    Inmate Number    Lou

Inmates Log

Opened: 12/22/01
Closed: 3/11/02

1-21-02  |12:30  | Luke Ball  | Luc Ball  | Jules Robinson | 88835-019  |  33



| DATE | TIME | Visitor Print 1 | Visitor Signature | Inmate Name | Inmate Number | |

Inmates Log

opened: 12/22/01

Closed: 3/11/02

| 12-4-01 | 2500 | Wes Ball | Ca Ball | Julius Robinson | | | 3 |

# EXHIBIT 76

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Agofsky, Shannon | ED TX [2004] | Affirmed<br><br>516 F.3d 280 (2008) | Ongoing in Dist. Court 07-CV-0511 | Undecided | -- |
| Allen, Billie | ED MO [1998] | Affirmed<br><br>406 F.3d 940 (8th Cir. 2005)(en banc) | Denied<br><br>829 F.3d 965 (8th Cir. 2016) | Yes<br><br>2014 WL 2882495 (E.D. Miss. 2014) | Yes<br><br>Circuit Court 829 F.3d 965 (8th Cir. 2016) |
| Aquart, Azibo | D. CT [2011] | Remanded for a new penalty proceeding 912 F.3d 1 (2nd Cir. 2018) | As of 12/2/20, no motion on file. | -- | -- |
| Barnette, Aquilia | WD NC [1998] | Affirmed<br><br>644 F.3d 192<br><br>(4th Cir. 2011) | Ongoing in Dist. Court 12-CV-327 | Undecided | -- |
| Barrett, Kenneth | ED OK [2005] | Affirmed<br><br>496 F.3d 1079 (10th Cir. 2007) | Ongoing - On Appeal<br><br>10th Cir. Case No. 19-7049 | Yes<br><br>797 F.3d 1207 (10th Cir. 2015) | Yes<br><br>District Court No. CIV-09-105 (E.D. OK 2019)<br><br>Circuit Court 797 F.3d 1207, 1211 (10th Cir. 2015) |

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Basham, Brandon | D SC [2004] | Affirmed<br><br>561 F.3d 302 (4th Cir. 2009) | Denied<br><br>789 F.3d 358 (4th Cir. 2015) | Yes<br><br>789 F.3d 358 (4th Cir. 2015) | Yes<br><br>District Court 789 F.3d 358 (4th Cir. 2015) |
| Battle, Anthony | ND GA [1997] | Affirmed<br><br>173 F.3d 1343 (11th Cir. 1999) | Denied<br><br>419 F.3d 1292 (11th Cir. 2005) | Yes<br><br>264 F. Supp. 2d 1088 (N.D. Ga. 2003) | Yes<br><br>District Court 291 F. Supp. 2d 1367 (N.D. Ga. 2003) |
| Bernard, Brandon | WD TX [1999] | Affirmed<br><br>299 F.3d 467 (5th Cir. 2002) | Denied<br><br>762 F.3d 467 (5th Cir. 2014) | No<br><br>762 F.3d 467 (5th Cir. 2014) | No<br><br>762 F.3d 467 (5th Cir. 2014) |
| Bolden, Robert | ED MO [2006] | Affirmed<br><br>545 F.3d 609 (8th Cir. 2008) | Ongoing (On Appeal)<br><br>8th Cir. Case No: 17-1087 | No<br><br>171 F.Supp.3d 891 (E.D. MO 2016) | Yes<br><br>Circuit Court 8th Cir. Case No. 17-1087 at 5/23/18 Entry. |

**Ex. 76 - 1354**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Bourgeois, Alfred | SD TX [2004] | Affirmed<br><br>423 F.3d 501 (5th Cir. 2005) | Denied<br><br>537 F. App'x. 604 (5th Cir. 2013) | Yes<br><br>No. 07-CV-223 (S.D. Tex. May 19, 2011) | No<br><br>537 F. App'x. 604 (5th Cir. 2013) |
| Brown, Meier | SD GA [2003] | Affirmed<br><br>441 F.3d 1330 (11th Cir. 2006) | Denied<br><br>720 F.3d 1316 (11th Cir. 2013) | No<br><br>407-CV-085 at Dkt. 74. | Yes<br><br>District Court 2009 WL 307872 (S.D. GA 2009)<br><br>Circuit Court 720 F.3d 1316 (11th Cir. 2013) |
| Caro, Carlos | WD VA [2007] | Affirmed<br><br>597 F.3d 608 (4th Cir. 2010) | Denied<br><br>733 F. App'x. 651 (4th Cir. 2018) | No<br><br>733 F. App'x. 651 (4th Cir. 2018) | Yes<br><br>District Court 102 F.Supp.3d 813 (W.D. Virginia 2015)<br><br>Circuit Court 733 Fed.App'x. 651 (4th Cir. 2018) |

**Ex. 76 - 1355**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Chandler, David Ronald | ND AL [1991] | Affirmed, in part 996 F.2d 1073 (11th Cir. 1993)<br><br>Sentence commuted by President Clinton in 2001 | Denied<br><br>218 F.3d 1305 (11th Cir. 2000) (en banc) | Yes<br><br>950 F.Supp.1522 (N.D. Ala. 1996) | Yes<br><br>District Court USDC Case No. 95-CV-08005 at Dkt. 501 (N.D. Ala. 1997) |
| Chanthadara, Bountaem | D. KS [1996] | Conviction affirmed; death sentence vacated; remanded for resentencing 230 F.3d 1237 (10th Cir. 2000)<br><br>District court resentenced Chantadara to life. USDC Case No. 94-CR-10128 at Dkt. 650 (D. KS 2002) | -- | | |
| Coonce, Wesley | WD MO [2014] | Affirmed<br><br>932 F.3d 623 (8th Cir. 2019) | As of 12/2/20, no 2255 motion on file. | -- | |

**Ex. 76 - 1356**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Corley, Odell | ND IN [2004] | Affirmed<br><br>519 F.3d 716 (7th Cir. 2008) | Ongoing in Dist. Court 02-CR-116 | Yes<br><br>USDC Case No. 02-CR-116 at Dkt. 998, 1004. | -- |
| Council, Brandon | D. SC [2019] | Pending<br><br>4th Circuit Case No. 20-1 | As of 12/2/20, no 2255 motion on file | | |
| Cramer, Christopher | ED TX [2018] | Pending<br><br>5th Circuit Case No. 18-40598 | As of 12/2/20, no 2255 motion on file | | |
| Davis, Len | ED LA [1996] | Remanded for new sentencing hearing United States v. Causey, 185 F.3d 407 (5th Cir. 1999)<br><br>Re-sentenced to death. Affirmed 609 F.3d 663 (5th Cir. 2010) | Denied<br><br>971 F.3d 524 (5th Cir. 2020) | No<br><br>2018 WL 1419351 (E.D. LA. 2018) | No<br><br>971 F.3d 524 (5th Cir. 2020) |

**Ex. 76 - 1357**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Duncan, Joseph | D. ID [2008] | Reversed and remanded 643 F.3d 1242 (9th Cir. 2011)] Affirmed 599 F. App'x. 679 (Mem) (9th Cir. 2015)] | Appeal pending Ninth Circuit Case No. 20-99001 | No 2019 WL 6053010 (D. ID 2019) | Undecided on appeal Ninth Circuit Case No. 20-99001 |
| Ebron, Joseph | ED TX [2009] | Affirmed 683 F.3d 105 (5th Cir. 2012) | Ongoing in District Court 14-CV-00539 | Undecided | -- |
| Fackrell, Ricky | ED TX [2018] | Pending 5th Circuit Case No. 18-40598 | As of 12/2/20, no 2255 motion on file. | -- | -- |
| Fell, Donald | D. VT [2005] | Affirmed 531 F.3d 197 (2nd Cir. 2008) | Granted 2:01-CR-12, 2014 WL 3697810 (D. Vt. July 24, 2014) Re-sentenced to life USDC Case No 01-CR-00012 Dkt. 1719 (D. Vt. 2018) | Yes 2014 WL 3697810 (D. Vt. July 24, 2014) | -- |

**Ex. 76 - 1358**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Fields, Edward | ED OK [2005] | Affirmed<br><br>516 F.3d 923 (10th Cir. 2008) | Pending after remand<br><br>USDC Case No. 10-CV-115 | Yes<br><br>949 F.3d 1240 (10th Cir. 2019) | Yes<br><br>Circuit Court 949 F.3d 1240 (10th Cir. 2019) |
| Fields, Sherman | WD TX [2004] | Affirmed<br><br>483 F. 3d 313 (5th Cir. 2007) | Denied<br><br>761 F.3d 443 (5th Cir. 2014) | No<br><br>761 F.3d 443 (5th Cir. 2014) | No<br><br>761 F.3d 443 (5th Cir. 2014) |
| Fulks, Chadrick | D. SC [2004] | Affirmed<br><br>454 F.3d 410 (4th Cir. 2006) | Denied<br><br>683 F.3d 512 (4th Cir. 2012) | Yes<br><br>683 F.3d 512 (4th Cir. 2012) | Yes<br><br>District Court 875 F. Supp. 2d 535 (D.S.C. 2010) |

**Ex. 76 - 1359**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Gabrion, Marvin | WD MI [2002] | Affirmed<br><br>719 F.3d 511<br>(6th Cir. 2013) (en banc) | Appeal Pending<br><br>Sixth Circuit Case No. 18-2382 | No<br><br>2018 WL 4786310<br>(W.D. Mi. 2018) | Yes<br><br>Circuit Court<br>820 F. App'x. 442<br>(6th Cir. 2020) |
| Garcia, Edgar | ED TX [2010] | Affirmed<br><br>704 F.3d 368<br>(5th Cir. 2013) | Ongoing in Dist. Court<br><br>13-CV-723 | Undecided | -- |
| Garza, Juan Raul | SD TX [1993] | Affirmed<br><br>63 F.3d 1342<br>(5th Cir. 1995) | Denied<br><br>165 F.3d 312<br>(5th Cir. 1999) | No<br><br>97-CV-00273 at Dkt. 3<br>(S.D. T.X. 1998) | No<br><br>165 F.3d 312<br>(5th Cir. 1999) |
| Hager, Thomas | ED VA [2007] | Affirmed<br><br>721 F.3d 167<br>(4th Cir. 2013)] | Pending in District Court 05-CR-00264 | Undecided | --  |
| Hall, Charles | WD MO [2014] | Affirmed<br><br>945 F. 3d 1035<br>(8th Cir. 2019) | As of 12/2/20, no 2255 motion on file. | -- | -- |

**Ex. 76 - 1360**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Hall, Orlando | ND TX [1995] | Affirmed<br><br>152 F.3d 381 (5th Cir. 1998) | Denied<br><br>455 F.3d 508 (5th Cir. 2006) | Yes<br><br>455 F.3d 508 (5th Cir. 2006) | No<br><br>455 F.3d 508 (5th Cir. 2006) |
| Hammer, David Paul | MD PA [1998] | Appeal dismissed - 226 F.3d 229 (3rd Cir. 2000) | Granted, in part, death sentence vacated.<br><br>404 F.Supp.2d 676 (M.D. PA 2005) | Yes<br><br>404 F.Supp.2d 676 (M.D. PA 2005) | No<br><br>404 F.Supp.2d 676 (M.D. PA 2005) |
| Hardy, Paul | ED LA [1996] | Remanded for resentencing. 185 F.3d 407 (5th Cir. 1999)<br><br>On remand, Hardy was sentenced to life in prison.<br><br>The 5th circuit affirmed. 499 F. App'x. 388 (5th Cir. 2012) | -- | -- | -- |
| Higgs, Dustin | D MD [2001] | Affirmed<br><br>95 F. App'x. 37 (4th Cir. 2004) | Denied<br><br>663 F.3d 726 (4th Cir. 2011) | No<br><br>663 F.3d 726 (4th Cir. 2011) | Yes<br><br>Circuit Court 663 F.3d 726 (4th Cir. 2011) |

**Ex. 76 - 1361**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Holder, Norris | ED MO [1998] | Affirmed<br><br>247 F.3d 741 (8th Cir. 2001) | Denied<br><br>721 F.3d 979 (8th Cir. 2013) | Yes<br><br>721 F.3d 979, 986 (8th Cir. 2013) | Yes<br><br>District Court 2008 WL 2909648 (E.D. Mo. July 22, 2008) |
| Honken, Dustin | ND IA [2005] | Affirmed<br><br>541 F.3d (8th Cir. 2008) | Denied<br><br>8th Circuit Case No. 14-1329 | Yes<br><br>42 F. Supp 3d 937, 982 (ND Iowa 2013) | No<br><br>8th Circuit Case No. 14-1329 at Dkt. 5/2/14 Order. |
| Jackson, David Lee | ED TX [2005] | Affirmed<br><br>549 F.3d 963 (5th Cir. 2008) | 2255 proceedings dismissed and Jackson re-sentenced to life in prison based on joint motion of the parties.<br><br>USDC Case No. 09-cv-01039 at Doc. 175 (E.D. TX 2013) | -- | -- |

**Ex. 76 - 1362**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Jackson, Richard Allen | WD SC [2001] | Affirmed<br><br>327 F.3d 273 (4th Cir. 2003) | Denied<br><br>638 F.Supp.2d 514 (W.D.N.C. 2009) | No<br><br>04-CV-00251 at Dkt. 8 (W.D.N.C. 2005) | No<br><br>4th Circuit Case No. 09-10 at Dkt. 30. |
| Johnson, Angela | ND IA [2005] | Affirmed in part and vacated in part.<br><br>495 F.3d 951 (8th Cir. 2007) | Granted in part, death sentences vacated 860 F.Supp.2d 668 (N.D. IA 2012)<br><br>Resentenced to life without parole. USDC Case No. 01-CR-03046 at Dkt. 1138 (N.D. IA 2014) | Yes<br><br>860 F.Supp.2d 668 (N.D. IA 2012) | -- |
| Johnson, Cory | ED VA [1993] | Affirmed<br><br>United States v. Tipton, 90 F.3d 861 (4th Cir. 1996) | Denied<br><br>378 F.3d 382 (4th Cir. 2004) | No<br><br>USDC 92-CR-68 (E.D. Va. 2003) | Yes<br><br>District Court 378 F.3d 382, 393 (4th Cir. 2004) |

**Ex. 76 - 1363**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Johnson, Darryl | ND IL [1997] | Affirmed<br><br>223 F.3d 665 (7th Cir. 2000) | Granted<br><br>2010 WL 11668097 (N.D. IL 2010) | No<br><br>2003 WL 1193257 (N.D. IL 2003) | --<br>2003 WL 1193257 (N.D. IL 2003)<br><br>Appeal dismissed, case settled for life sentence. |
| Jones, Louis | ND TX [1995] | Affirmed<br><br>132 F.3d 232 (5th Cir. 1998) | Denied<br><br>287 F.3d 325 (5th Cir. 2002) | No<br><br>287 F.3d 325 (5th Cir. 2002) | No<br>287 F.3d 325 (5th Cir. 2002) |
| Kadamovas, Jurijus | CD CA [2007] | Affirmed<br><br>889 F.3d 1003 (9th Cir. 2018) | As of 12/2/20, no 2255 motion on file.<br><br>USDC 02-CR-2200 (C.D. CA. 2019) | -- | -- |
| Lawrence, Daryl | SD OH [2006] | Affirmed<br><br>735 F.3d 385 (6th Cir. 2013) | Pending in Dist. Court 05-CR-11 at 328 (S.D. Ohio) | Undecided | -- |

**Ex. 76 - 1364**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Lecroy, William Emmet | ND GA [2004] | Affirmed<br><br>441 F.3d 914 (11th Cir. 2006) | Denied<br><br>739 F.3d 1297 (11th Cir. 2014) | Yes<br><br>2012 U.S. Dist. LEXIS 47030 (N.D. GA. Mar. 30, 2012) | Yes<br><br>District Court USDC 02-CR-00038 Dkt. 564 (N.D. GA 2012) |
| Lee, Daniel | ED AR [2000] | Affirmed<br><br>274 F.3d 485 (8th Cir. en banc 2002); 374 F.3d 637 (8th Cir. en banc 2004). | Denied<br><br>715 F.3d 215 (8th Cir. 2013); 792 F.3d 1021 (8th Cir. 2015) | No<br><br>06-CV-1608 (W.D. AR 2008) | Yes<br><br>District and Circuit Courts 715 F.3d 215, 217, 221 (8th Cir. 2013) |
| Lighty, Kenneth | D. MD [2005] | Affirmed<br><br>616 F.3d 321 (4th Cir. 2010) | Pending in Dist. Court<br><br>USDC 03-CR-00457 at Dkt. 539 (D. MD (2012) | Undecided | -- |
| McCullah, John | ED OK [1993] | Convictions affirmed but case remanded for a new penalty phase 76 F.3d 1087 (10th Cir. 1996)<br><br>Re-sentenced to life in prison. 136 F. App'x. 189 (10th Cir. 2005) | -- | -- | -- |

**Ex. 76 - 1365**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| McVeigh, Timothy | D. CO [1997] | Affirmed<br><br>153 F.3d 1166 (10th Cir. 1998) | Denied<br><br>118 F.Supp.2d 1137 (D. CO 2000) (No appeal) | No<br><br>118 F.Supp.2d 1137 (D. CO 2000) | No<br>118 F.Supp.2d 1137 (D. CO 2000)<br><br>Circuit Court did not rule on a COA. |
| Mikhel, Iouri | CD CA [2007] | Affirmed<br><br>889 F.3d 1003 (9th Cir. 2018) | As of 12/2/20, no 2255 motion on file. | -- | -- |
| Mikos, Ronald | ND IL [2005] | Affirmed<br><br>539 F.3d 706 (7th Cir. 2008) | Pending in Dist. Court.<br><br>10-CV-6331 (ND IL) | Undecided | -- |
| Mitchell, Lezmond | D. AZ [2003] | Affirmed<br><br>502 F.3d 931 (9th Cir. 2007) | Denied<br><br>790 F.3d 881 (9th Cir. 2015) | No<br><br>2010 WL 3895691 (D. Ariz. Sept. 30, 2010) | Yes<br><br>District Court 2010 WL 3895691 (D. Ariz. Sept. 30, 2010) |
| Montgomery, Lisa | WD MO [2007] | Affirmed<br><br>635 F.3d 1074 (8th Cir. 2011) | Denied<br><br>8th Circuit Case No. 17-1716 at 1/25/2019 Judgment. | Yes<br><br>USDC 12-CV-08001 at Dkt. 213 (W.D. MO. March 3, 2017) | No<br><br>8th Circuit Case No. 17-1716 at 1/25/2019 Judgment. |

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Nelson, Keith | WD MO [2002] | Affirmed 347 F.3d 701 (8th Cir. 2003) | Denied 909 F.3d 964 (8th Cir. 2018) | Yes 97 F.Supp.3d 1131 (W.D. MO 2015) | Yes Circuit Court 909 F.3d 964 (8th Cir. 2018) |
| Ortiz, Arboleda | WD MO [2000] | Affirmed 315 F.3d 873 (8th Cir. 2002) | Denied (after remand) 664 F.3d 1151 (8th Cir. 2011); 8th Cir. Case No. 13-3399. | Yes 664 F.3d 1151 (8th Cir. 2011) | Yes District and Circuit Courts 664 F.3d 1151 (8th Cir. 2011) |
| Paul, Jeffery | WD AR [1997] | Affirmed 217 F.3d 989 (8th Cir. 2000) | Denied 534 F.3d 832 (8th Cir. 2008) | No 534 F.3d 832, 834 (8th Cir. 2008) | Yes Circuit Court 534 F.3d 832, 834 (8th Cir. 2008) |
| Purkey, Wesley | WD MO [2003] | Affirmed 428 F.3d 738 (8th Cir. 2005) | Denied 729 F.3d 860 (8th Cir. 2013) | No 729 F.3d 860, 862 (8th Cir. 2013) | Yes Circuit Court 729 F.3d 860 (8th Cir. 2013) |
| Roane, James | ED VA [1993] | Affirmed U.S. v. Tipton, 90 F.3d 861 (4th Cir. 1996) | Denied 378 F.3d 382 (4th Cir. 2004) | Yes 378 F.3d 382 (4th Cir. 2004) | Yes District Court 378 F.3d 382 (4th Cir. 2004) |

**Ex. 76 - 1367**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|------|---------------------------|----------------------|--------------|-----------------------------------------------|------------------------------------------------------------------------------|
| Robinson, Julius | ND TX [2004] | Affirmed<br><br>367 F.3d 278 (5th Cir. 2004) | Denied<br><br>2010 U.S. App. LEXIS 11675 (5th Cir. 2010) | No<br><br>2008 WL 4906272 (5th Cir. 2008) | No<br><br>2010 U.S. App. LEXIS 11675 (5th Cir. 2010) |
| Rodriguez, Alfonso | D. ND [2007] | Affirmed<br><br>581 F.3d 775 (8th Cir. 2009) | Ongoing in District Court 04-CR-55 at Dkt. 752 (D. ND) | Yes<br><br>04-CR-55 | -- |
| Roof, Dylann | D. SC [2017] | Appeal Pending<br><br>4th Cir. Case No. 17-3 | As of 12/2/20, no 2255 motion on file. | -- | -- |
| Runyon, David | ED VA [2009] | Affirmed<br><br>707 F.3d 475 (4th Cir. 2013) | Appeal Pending<br><br>4th Circuit Case No. 17-5 | No<br><br>228 F.Supp.3d 569 (E.D. Va. 2017) | Yes<br><br>Circuit Court 4th Circuit Case No. 17-5 at Dkt. 46 |
| Sampson, Gary | 1st Conviction D. MA [2007]<br><br>Retrial D. MA [2017] | 1st conviction Affirmed 486 F.3d 13 (1st Cir. 2007)<br><br>Retrial conviction: appeal ongoing | 2007 conviction: 2255 motion granted, new trial ordered. 920 F.Supp.2d 151 (D. Mass 2011)<br><br>Retrial: As of 12/2/20, no 2255 motion on file. | Yes<br><br>1st case 920 F.Supp.2d 151 (D. Mass 2011) | -- |

**Ex. 76 - 1368**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Sanchez, Ricardo | SD FL [2009] | Affirmed 733 F.3d 1125 (11th Cir. 2013) | Pending in Dist. Court 16-CV-80693 Doc. 112 (S.D. FL 2018) | Undecided | -- |
| Sanders, Thomas | WD LA [2014] | Appeal Pending 5th Cir. Case No. 15-31114 | As of 12/2/20, no 2255 motion on file. | -- | -- |
| Savage, Kaboni | ED PA [2013] | Affirmed 970 F.3d 217 (8th Cir. 2020) | As of 12/2/20, no 2255 motion on file. | -- | -- |
| Sinisterra, German | WD MO [2000] | Affirmed 315 F.3d 873 (8th Cir. 2002) | Closed. Sinisterra died after the evidentiary hearing in district court, but before the court issued a decision. 04-CV-8003 at Dkt. 124. | Yes Remanded for an evidentiary hearing 600 F.3d 900, 903 (8th Cir. 2010) | Yes Circuit Court 600 F.3d 900 (8th Cir. 2010) |

**Ex. 76 - 1369**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Snarr, Mark Isaac | ED TX [2010] | Affirmed<br><br>704 F.3d 368 (5th Cir. 2013) | Pending in district court<br><br>13-CV-724 | Undecided | -- |
| Stitt, Richard | ED VA [1999] | Affirmed<br><br>250 F.3d 878 (4th Cir. 2001) | Granted<br><br>441 F.3d 297 (4th Cir. 2006)<br><br>Stitt re-sentenced to life in prison. 552 F.3d 345 (4th Cir. 2008); 98-CR-47 at Dkt. 470 | Yes<br><br>369 F.Supp.2d 679 (E.D. VA 2005) | Yes<br><br>District Court 369 F.Supp.2d 679 (E.D. VA 2005)<br><br>Circuit Court 441 F.3d 297 (4th Cir. 2006) |
| Taylor, Rejon | ED TN [2008] | Affirmed<br><br>814 F.3d 340 (6th Cir. 2016) | Pending in Dist. Court 19-CV-147 at Dkt. 49. | Undecided | -- |
| Tipton, Richard | ED VA [1993] | Affirmed<br><br>90 F.3d 861 (4th Cir. 1996) | Denied<br><br>378 F.3d 382 (4th Cir. 2004) | No<br><br>378 F.3d 382 (4th Cir. 2004) | Yes<br><br>District Court 92-CR-68 (E.D.Va. May 1, 2003) |

**Ex. 76 - 1370**

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Torrez, Jorge Avila | ED VA [2014] | Affirmed<br><br>869 F.3d 291 (4th Cir. 2017) | As of 12/2/20, no 2255 motion on file. | -- | -- |
| Troya, Daniel | SD FL [2009] | Affirmed 733 F.3d 1125 (11th Cir. 2013) | Pending in Dist. Court<br><br>16-CV-80700 | Undecided | -- |
| Tsarnaev, Dzhokhar | D. MA [2015] | Reversed<br><br>968 F.3d 24 (1st Cir. 2020). | As of 12/2/20, no 2255 motion on file. | -- | -- |
| Umana, Alejandro | WD NC [2010] | Affirmed<br><br>750 F.3d 320 (4th Cir. 2014) | Pending in Dist. Court<br><br>16CV57-RJC (W.D.N.C. 2020)] | Undecided | -- |
| Vialva, Christopher Andre | WD TX [2000] | Affirmed<br><br>299 F.3d 467 (5th Cir. 2002) | Denied<br><br>762 F.3d 467 (5th Cir. 2014) | No<br><br>762 F.3d 467 (5th Cir. 2014) | No<br><br>762 F.3d 467 (5th Cir. 2014) |
| Webster, Bruce | ND TX [1996] | Affirmed<br><br>162 F.3d 308 (5th Cir. 1998) | Denied<br><br>421 F.3d 308 (5th Cir. 2005) | No<br><br>2003 WL 23109787 (N.D. TX 2003) | Yes<br><br>District Court 421 F.3d 308 (5th Cir. 2005) |

| Name | Conviction District [Year] | Direct Appeal Status? | 2255 Status? | Was the movant granted an evidentiary hearing? | Was the movant granted a COA by either the district court or circuit court? |
|---|---|---|---|---|---|
| Wilson, Ronell | ED NY [2007] | Convictions affirmed, remanded for new sentencing hearing 610 F.3d 168 (2nd Cir. 2010)<br><br>On remand, jury again sentenced him to death 967 F.Supp.2d 673 (E.D. NY 2013)<br><br>In light of *Hall*, Wilson resentenced to life in prison 170 F.Supp.3d 347 (E.D. NY 2016) | -- | -- | N/A |