IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JULIUS OMAR ROBINSON,<br><br>    Petitioner<br><br>  v.<br><br>T.J. WATSON, WARDEN, FEDERAL CORRECTIONAL COMPLEX (FCC) TERRE HAUTE;<br>UNITED STATES OF AMERICA,<br><br>    Respondents. | **CAPITAL CASE**<br><br>Case No. 20-cv-00640-JPH-DLP |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS

CUAUHTEMOC ORTEGA
Federal Public Defender
JONATHAN C. AMINOFF (Cal. Bar No. 259290)
(E-Mail:  Jonathan_Aminoff@fd.org)
CELESTE BACCHI (Cal. Bar No. 307119)
(E-Mail:  Celeste_Bacchi@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-5374
Facsimile:  (213) 894-0310

Counsel for Petitioner
**JULIUS OMAR ROBINSON**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................1

II.    JURISDICTION ...................................................................................3

III.   FACTUAL AND PROCEDURAL HISTORY ...................................................3

IV.    GENERAL ALLEGATIONS..................................................................7

    A.     The Savings Clause Allows this Court to Consider this Petition Because a Section 2255 Motion is Inadequate or Ineffective to Test the Legality of Robinson's Convictions and Sentences................7

        1.     Section 2255 Movants Receive Less Process In the Fifth Circuit Than Similarly Situated Movants in Every Other Circuit In the Country ..................................................................8

        2.     Section 2255 Movants Are Much Less Likely to Receive Evidentiary Hearings in District Courts within the Fifth Circuit..................................................................................11

        3.     Section 2255 Movants Are Not Afforded an Appeal in the Fifth Circuit..................................................................................13

        4.     Because of the Fifth Circuit's Overly Strict View of Post-Judgment Motions, Section 2255 Movants have no Means to Remedy the Deprivation of Process by the Fifth Circuit .....16

        5.     The Fifth Circuit's Failure to Afford Capital Movants Adequate or Effective Process Violates the Constitution.........20

V.     CLAIMS FOR RELIEF.........................................................................21

    A.     CLAIM ONE: The Trial Court Lacked Jurisdiction Over the Death-Eligible Offenses Because the Superseding Indictment Did Not Charge Robinson with a Capital Offense...................................21

1.   The Right to Indictment for a Capital Offense Is Not Waivable ..................................................................21

2.   Robinson's Superseding Indictment Did Not Charge a Capital Offense, and Therefore his Death Sentences Must be Vacated................................................................22

3.   Robinson's Superseding Indictment Did Not Charge a Capital Offense, and Yet the Government Unsuccessfully Sought Death Sentences on Two Additional Counts which Therefore Must be Vacated......................................27

4.   Section 2255(e)'s Savings Clause Permits Robinson to Raise His Indictment-Clause Claim in a Section 2241 Petition ......................................................................28

     a.   Standards for satisfying the section 2241 savings clause .................................................................28

     b.   Robinson's claim is properly raised under section 2241 because the section 2255 remedy is inadequate or ineffective to test the legality of his detention ..........31

B.   CLAIM TWO: Robinson is entitled to relief because the prosecutor presented false and misleading evidence and trial counsel unreasonably failed to challenge this evidence.....................36

     1.   Factual Background ..............................................................38

          a.   Robinson's Penalty Phase Proceedings and Post-Conviction Proceedings..................................................38

          b.   The strikingly similar proceedings in *United States v. Darryl Johnson* ............................................................43

          c.   Robinson's Post-2255 revelations about the BOP's ability to control an inmate's communications .............47

     2.   Robinson Is Entitled to Relief Based on the Government's Presentation of Material, False Evidence. ...............................51

a.    Relevant law ...................................................51

b.    Carlson's testimony was false. ......................51

c.    The Government knew or should have known Carlson's testimony was false. ......................57

d.    There is a likelihood the false testimony affected the jury's decision................................................58

3.    Robinson Is Entitled to Relief Because Trial Counsel Unreasonably Failed to Challenge Carlson's False Testimony................................................................61

a.    Relevant law ...................................................61

b.    Counsel's failure to effectively cross-examine Carlson and present an expert rebutting Carlson's false testimony was unreasonable ..................62

c.    But for counsel's deficient performance, there is a reasonable probability at least one juror would have changed his or her verdict................................66

4.    Robinson Is Entitled to Relief Because the Prosecutor Failed to Disclose Mitigating Information..............70

5.    The Savings Clause does not bar this Court from considering this claim. ............................................71

C.    CLAIM THREE: Trial counsel was ineffective for failing to object to the prosecutor's racially motivated peremptory strikes. ......74

1.    Factual Background ................................................74

2.    Legal Standards.....................................................75

3.    Appellate counsel's failure to present Robinson's *Batson* claim on appeal was deficient. ................................77

iii

4.    Robinson demonstrates prejudice because there is a reasonable probability an appellate court would have found his *Batson* claim meritorious. ....................................79

     a.    Statistical disparities support an inference of discrimination satisfying Batson's step one and a conclusion of substantial racial motivation at step three. ...............................................................79

     b.    The strike of juror M. A. was substantially motivated by race..........................................................80

     c.    The strike of juror D. D. was substantially motivated by race..........................................................84

     d.    The prosecution's strike of juror C. B. provides additional support for the conclusion that its strikes were substantially motivated by race. ...........................87

5.    The Savings Clause Permits this Court to Consider this Claim................................................................88

D.    CLAIM FOUR: Trial Counsel was ineffective at the penalty phase of Robinson's trial. ..............................................91

1.    Procedural History ...................................................91

2.    Relevant Law ..........................................................93

3.    Factual Background ..................................................94

     a.    Trial counsel conducted a woefully deficient penalty phase investigation. .........................................94

     b.    During the penalty phase, the prosecution presented unrebutted evidence supporting future dangerousness...99

          (1)    Unrebutted allegation that Robinson ordered a "hit" of Michael "One Love" Williams ...............99

iv

(2)     Unrebutted allegation that Robinson was a member of a violent gang...................................101

(3)     Unrebutted allegation that Robinson attempted to murder Sarah Tucker......................................102

c.     Instead of effectively rebutting the Government's future-dangerousness argument, trial counsel presented the jury with a profoundly incomplete picture of Robinson's character and background.........103

4.     Robinson's trial counsel were ineffective for failing to investigate and present readily available evidence rebutting the prosecution's case in aggravation. ....................................107

a.     The prosecution's allegation that Robinson ordered a "hit" on One Love was false...........................................108

b.     The "notorious" street gang Robinson allegedly participated in was nothing more than a group of rowdy, misguided teenagers. .......................................110

c.     Robinson did not intend to murder Sarah Tucker over a "petty debt," but rather shot into a parked truck without knowledge that anyone was inside..................112

d.     Robinson was prejudiced by trial counsel's failure to investigate and rebut the Government's future dangerousness allegations.............................................114

5.     Robinson's trial counsel were ineffective for failing to investigate and present readily available mitigation evidence. ...............................................................118

a.     Robinson suffered a chaotic childhood rife with violence, addiction, poverty, and neglect. ....................120

b.     Robinson struggled throughout his adolescence and early adulthood to help his drug-addicted, emotionally absent mother...........................................130

v

        c.     Robinson suffered cognitive impairments as a result of his chronic exposure to alcohol *in utero* and pesticides in childhood. ...............................................133

        d.     Trial counsel's failure to investigate prejudiced Robinson. ....................................................................142

        (1)    Cumulative Prejudice ..........................................145

    6.    The Savings Clause Permits This Court to Consider This Claim. ................................................................................146

E.    CLAIM FIVE: Robinson's rights under the American Declaration of the Rights and Duties of Man have been violated in multiple ways warranting habeas relief with respect to both the guilt and penalty portions of his trial...............................................................153

    1.    Robinson's Rights Under the American Declaration are judicially cognizable. .............................................................153

    2.    The Savings Clause permits the Court to consider this petition. ..................................................................................154

VI.    PRAYER FOR RELIEF ............................................................................155

STATEMENT PURSUANT TO LOCAL CRIMINAL RULE 38-2(C)...............156

## I.   INTRODUCTION

Petitioner Julius Omar Robinson (hereafter "Robinson" or "Petitioner") petitions this Court for a writ of habeas corpus.  This petition includes five claims for relief based on gross violations of Robinson's constitutional rights.

Robinson's case was fraught with constitutional error from the beginning, when the Government failed to charge Robinson with capital crimes in his indictment. The Fifth Amendment requires that all capital crimes be charged by an indictment issued by a Grand Jury.  This requirement may not be waived, Robinson made no such waiver, and the Government conceded that the operative indictment did not allege the statutory aggravating factors required to make Robinson eligible for the death penalty.  On appeal, the Fifth Circuit agreed that the indictment was defective, but held that the absence of aggravating factors was harmless.  As a result, Robinson currently sits on federal death row having been tried by a federal court that lacked jurisdiction over the death-eligible offenses, on an indictment that alleged no capital crimes.  *See* Claim One, *infra*.

The Government committed further egregious errors by presenting false and misleading evidence in support of its future dangerousness case.  *See* Claim Two, *infra.*  The Government's expert falsely claimed that the Bureau of Prisons ("BOP") would not be able to limit Robinson's access to the phone if he were sentenced to life, and therefore Robinson would be able to use the phone to

1

continue to run his drug operations.  However, as the Government and BOP well knew, there are a variety of ways to limit an inmate's ability to communicate with the outside world, including an order from a federal judge.  But Robinson's jury was mistakenly led to believe that BOP would have no way of protecting the public unless Robinson were sentenced to death.  This constitutional violation was compounded by trial counsel's failure to reasonably investigate and present evidence to counter the Government's false testimony.

Robinson's counsel provided ineffective assistance during other phases of the trial as well.  Counsel unreasonably failed to object to the prosecutor's racially motivated peremptory strikes during jury selection; as a result, Robinson, a Black man, was convicted and sentenced to death by 11 white jurors and one Black juror in a district that is nearly 50% non-white.  *See* Claim Three, *infra*.  Then, during the penalty phase, counsel failed to adequately investigate and present readily available evidence countering the Government's case in aggravation, as well as evidence showing that Robinson suffered from severe trauma and organic brain damage.  *See* Claim Four, *infra*.  These and other serious errors during the guilt and penalty phases were found by the Inter-American Commission on Human Rights to violate Robinson's rights under the American Declaration on the Rights and Duties of Man.  *See* Claim Five, *infra*.

2

Robinson has attempted to find relief from these errors and vindicate his constitutional rights pursuant to 28 U.S.C. § 2255, but those proceedings have proven inadequate and ineffective to resolve these issues.  At this point, a habeas petition filed in this venue is Robinson's only option to defend his constitutional rights, and is Robinson's last chance to have a federal court consider his claims on the merits.

## II.  JURISDICTION

Robinson is incarcerated in the U.S. Penitentiary at Terre Haute, Indiana. This Court has jurisdiction pursuant to 28 U.S.C. § 2241 to adjudicate the claims raised in this petition because Robinson's convictions and death and life sentences violate the United States Constitution and laws or treaties of the United States. Robinson explains in detail in the General Allegations section, *infra*, and in support of each individual claim, why jurisdiction is properly invoked under section 2241.

## III.  FACTUAL AND PROCEDURAL HISTORY

In a multi-count indictment, Julius Robinson was charged, along with 43 other alleged co-conspirators, with various drug and weapons offenses stemming from his involvement in a wholesale marijuana and cocaine selling operation led

by co-defendant Nathan Henderson.[1]  *United States v. Henderson, et. al.*, N.D. TX 00-CR-260 at Dkt. 1.  In this course of this alleged criminal enterprise, three people were killed: Johnny Shelton, Juan Reyes, and Rudolfo Resendez.  Robinson was accused of directly participating in the killings of both Shelton and Reyes.  Although Robinson was not indicted for any death-eligible offenses, the Government noticed its intent to seek the death penalty against Robinson for five counts relating to the deaths of Shelton, Reyes, and Resendez.  *Id.* at Dkt. 1222.

Robinson was represented at trial (and on appeal) by Jack Strickland and Wessley Ball.  After a guilt trial where neither Strickland nor Ball put on any significant defense to the criminal charges, Robinson was convicted of various charges including the five charges relating to the deaths of Shelton, Reyes, and Resendez.  *Id.* at Dkt. 1636, 1641.  Following a short penalty trial, Robinson was sentenced to death on three counts and life on the remaining two.  *Id.* at Dkt. 1740.

In addition to Robinson, the Government sought death against Robinson's co-defendant L.J. Britt, who was directly involved in the killings of Shelton and Resendez.  Unlike Robinson, Britt's indictment specifically alleged that he had committed death-eligible offenses.  In contrast to Ball and Strickland, Britt's counsel conducted an intensive penalty-phase investigation and presented

---

[1] Robinson briefly summarizes the facts of his case in this section, but provides the relevant detailed facts in each individual claim for relief.

4

extensive information about Britt's background and life circumstances.  Britt was sentenced to life in prison.  *Id*. at Dkt. 2055, 2058.

Ball and Strickland appealed Robinson's convictions and sentences, but the attorney-client relationship broke down significantly following the trial.  Robinson moved the Fifth Circuit to either appoint new counsel or temporarily halt the appeal and require counsel to discuss the contents of the appeal with Robinson, but the Fifth Circuit refused to intervene.  The Fifth Circuit affirmed Robinson's convictions and sentences.  *United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004), *cert. denied Robinson v. United States*, 543 U.S. 1005 (2004).

Robinson timely moved, pursuant to 28 U.S.C. Section 2255, to vacate his convictions and sentences.  N.D. TX CR-260-2 at Dkt. 2279.[2]  Although the United States Attorney's Office ("USAO") twice conceded Robinson's entitlement to an evidentiary hearing, the district court summarily denied Robinson's section 2255 motion and denied his request for a certificate of appealability (COA).  *Id.* at Dkt. 2453, 2473.  The Fifth Circuit affirmed, *United States v. Robinson*, 2010 U.S. App. LEXIS 11675 (5th Cir. 2010), and the Supreme Court denied certiorari, *Robinson v. United States*, 565 U.S. 827 (2011).

---

[2] Although the district court assigned a civil case number to Robinson's section 2255 proceedings, the court instructed Robinson to file all pleadings under the criminal case number.

In 2018, Robinson moved to reopen his section 2255 proceedings pursuant to Federal Rule of Civil Procedure 60(b) based on recent Supreme Court precedent indicating that the Fifth Circuit had denied Robinson adequate process in his section 2255 proceedings, but the district court transferred the motion to the Fifth Circuit as an unauthorized second or successive section 2255 motion. *Robinson v. United States*, N.D. TX Case No.  05-CV-756, Dkt. 10, 18.[3]  The Fifth Circuit concurred with the district court, finding that Robinson's motion was a second or successive section 2255 motion and denying authorization to file such a motion. *In re Robinson*, 917 F.3d 856 (5th Cir. 2019) *cert. denied Robinson v. United States*, 140 S. Ct. 1128 (2020).

Robinson timely filed a petition alleging violations of his human rights in the Inter-American Commission on Human Rights on April 3, 2012. *Robinson v. United States*, Case No. 13.361.  On August 14, 2020, the Commission ruled in Robinson's favor and published its report finding multiple instances in which the United States had violated Robinson's human rights. *Id*. at Report No. 162/19.

---

[3] The district court instructed Robinson to file all pleadings related to the Rule 60(b) litigation under the previously assigned civil case number.

## IV.  GENERAL ALLEGATIONS

**A.     The Savings Clause Allows this Court to Consider this Petition Because a Section 2255 Motion is Inadequate or Ineffective to Test the Legality of Robinson's Convictions and Sentences**

The Seventh Circuit has held that section 2255 is an adequate substitute for habeas corpus proceedings when it affords "a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998). Section 2255 is not an adequate substitute for habeas corpus in the Fifth Circuit because the Fifth Circuit systematically deprives capital section 2255 movants of the process needed to vindicate their claims.  As demonstrated in Robinson's case and in numerous other post-conviction proceedings, the Fifth Circuit routinely conflates merits-based analyses with threshold procedural and jurisdictional questions in reviewing requests for post-conviction relief.  Instead of focusing on the nature and substance of a petitioners' allegations, the Fifth Circuit regularly looks to the merits of petitioners' claims in deciding whether they have met the threshold requirement of "alleging" or "asserting" a proper claim for relief under the relevant rule or statute. *See, e.g., Buck v. Davis*, 137 S. Ct. 759, 773-775 (2017).  This practice violates petitioners' due process rights by permitting merits-based rulings without affording the petitioners a full and fair opportunity to litigate those merits before the district court.  As a result, section 2255 relief is not

available in the Fifth Circuit, and the savings clause permits this Court to adjudicate Robinson's petition.  28 U.S.C. § 2255(e).[4]

Because the savings clause refers to "an application for writ of habeas corpus," *id.*, rather than individual claims within an application for writ of habeas corpus, should any one claim satisfy the savings clause, Robinson asserts that his petition at-large is cognizable under section 2241.

### 1.   Section 2255 Movants Receive Less Process In the Fifth Circuit Than Similarly Situated Movants in Every Other Circuit In the Country

In Texas, federal prosecutors are significantly more likely to request authorization to seek the death penalty against Black defendants, the DOJ is significantly more likely to grant authorization to seek the death penalty against Black defendants, and black defendants are overwhelmingly more likely to be sentenced to death than non-Black defendants.  Ex. 1, S. Phillips Decl, at ¶¶ 5-7. Compounding this bias, the Fifth Circuit then systematically deprives federally death-sentenced people due process in post-conviction review and, as a result, section 2255 proceedings are inadequate or ineffective to test the legality of a 2255 movant's detention.

---

[4] Alternatively, within each claim pled below, Robinson explains how 28 U.S.C. 2255(e) does not preclude habeas jurisdiction on the specific facts of that claim.

As of the date of filing this petition, approximately 75 people have been sentenced to death in federal courts post-*Furman v. Georgia*, 408 U.S. 238 (1972). Most of those people were sentenced by district courts within the Fourth, Eighth, and Fifth Circuits, with the latter making up 25% (19 people) of all federal death sentences. A statistical analysis indicates that people sentenced to death in the Fifth Circuit receive far less post-conviction process than individuals sentenced anywhere else in the country. Ex. 76, Reference Table.

Setting aside: (1) the people whose convictions or sentences were overturned on direct appeal (none of which originated from the Fifth Circuit) and (2) people who were granted post-conviction relief on their initial section 2255 motions (none of which originated from within the Fifth Circuit); there are 39 people[5] whose convictions and death sentences have been affirmed on appeal and whose initial section 2255 motions have been processed through appeal. *Id.*

Examining the process this group of 39 people received in post-conviction review reveals the inability of section 2255 movants to vindicate their rights in the Fifth Circuit. Fourteen (approximately 36%) of the 39 people were granted evidentiary hearings in district court to develop their section 2255 claims and, when their 2255 motions were ultimately denied, they received certificates of

---

[5] This number includes those people put to death and those who have died of natural causes.

appealability (COA) from either the district or circuit courts. *Id.* An additional 17 (approximately 44%) of people received either an evidentiary hearing (4) or a COA (13). *Id.* In total, 31 (approximately 80%) of the 39 people received either an evidentiary hearing, a COA, or both. *Id.* The final 8 (approximately 21%), however, were granted neither an evidentiary hearing nor a COA. *Id.* Of the 8 people that received no process, 7 were sentenced to death in the Fifth Circuit. *Id.* Indeed, of the 39 death-sentenced individuals, 10 were sentenced within the Fifth Circuit, but only one received a COA and only two received evidentiary hearings. *Id.*; *see also* Carol Steiker & Jordan Steiker, *A Tale of Two Nations: Implementation of the Death Penalty and Executing v. Symbolic States of the United States*, 84 TEX. L. REV. 1869, 1902 (2006) ("courts within the Fifth Circuit were less likely than courts in most other circuits to authorize full appeals of capital claims denied in federal district court"). *See also id.*: "District courts within the Fifth Circuit have also been less inclined to hold evidentiary hearings than courts in other circuits," and *id.* at 1903: "The Fifth Circuit has a relatively low rate of granting relief in cases addressed on the merits."

For comparison, the only other circuit with 10 or more death judgments in this group of 39 is the Eighth Circuit with 11 death judgments. The difference in process between the Fifth Circuit and the Eighth Circuit is striking: of those 11 people sentenced to death in the Eighth Circuit, seven received evidentiary

10

hearings in district court and nine received COAs; *none* received neither a hearing nor a COA. *Id.*

### 2. Section 2255 Movants Are Much Less Likely to Receive Evidentiary Hearings in District Courts within the Fifth Circuit

Section 2255 creates a presumption in favor of an evidentiary hearing, mandating that: "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. 2255(b). The Seventh Circuit has repeatedly recognized the importance of evidentiary hearings in the post-conviction context. *See, e.g., United States v. Flores*, 739 F.3d 337, 340 (7th Cir. 2014) ("[C]ounsel's strategic choices are presumed to be competent. As a practical matter that presumption cannot be overcome without an evidentiary hearing at which the defendant explains his view of what went wrong and counsel can justify his choices.").

Yet the Fifth Circuit does not honor this presumption. In the vast majority of capital section 2255 proceedings, courts within the Fifth Circuit denied movants hearings, and the Fifth Circuit has failed to remand cases for hearings in district courts. Indeed, the numbers establish that 55% of movants received a hearing when litigating outside of the Fifth Circuit, while only 20% received a hearing in

11

the Fifth Circuit.  It is indisputable that a movant is significantly more likely to receive an evidentiary hearing if tried and convicted in a court outside of the Fifth Circuit.  *See Steiker & Steiker*, *supra,* at 1902.  Such a procedural obstruction to fully and adequately adjudicate a claim on the merits renders section 2255 proceedings inadequate.

The district courts within the Fifth Circuit exhibit such an extreme aversion to evidentiary hearings that they are denied even when, as in Robinson's case, the Government conceded that an evidentiary hearing was required.  Answer, N.D. TX CR-260-2 at Dkt. 2365 at 90 ("Because there are factual disputes raised by the pleadings on the ineffectiveness issue, and because this is a death penalty case, the Court should probably schedule a limited evidentiary hearing."); Response to Supplement to § 2255 Motion, Dkt. 2439 at 10 ("As the government stated in its initial response, it would be appropriate for the court to hold a limited evidentiary hearing to resolve any purely factual disputes raised by the pleadings on the ineffectiveness issue.").  Yet consistent with the general practice of the district courts within the Fifth Circuit, Robinson's section 2255 motion was summarily denied.  Order and Judgment; Dkt. 2453 and 2454; *Robinson v. United States*, 2008 U.S. Dist. LEXIS 90879 (N.D. TX 2008).  This deprivation of process makes section 2255 proceedings entirely inadequate to review movants' convictions and sentences.

12

### 3.    Section 2255 Movants Are Not Afforded an Appeal in the Fifth Circuit

Perhaps more surprising than the denial of evidentiary hearings to 8 of 10 Fifth Circuit capital section 2255 movants, are the denials of COAs by the district courts and the Fifth Circuit to all but one of the death-sentenced movants. The Fifth Circuit has a long-standing "troubling" pattern of misapplying Supreme Court precedent in denying COAs. *Jordan v. Fisher*, 135 S. Ct. 2647, 2652 n.2 (2015) (Sotomayor, J., dissenting from the denial of certiorari). Indeed, on multiple occasions, the Supreme Court has granted certiorari to, in part, correct the Fifth Circuit's misapplication of the COA standard resulting in the denial of a COA. *See, e.g., Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Tennard v. Dretke*, 542 U.S. 274, 283 (2004); *Banks v. Dretke*, 540 U.S. 668 (2004); *Buck v. Davis*, 137 S. Ct. 759 (2017).[6]

---

[6] The Supreme Court obviously cannot grant certiorari in every case in which the Fifth Circuit erroneously failed to grant a COA, and the denial of certiorari petitions in the 11 capital cases discussed here does not indicate the Court's tacit approval of the Fifth Circuit's practice. *Atlantic Coast Line R. Co. v. Power*, 283 U.S. 401, 404 (1931) (quoting *United States v. Carver*, 260 U.S. 482, 490 (1923)) ("The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times."); *see Darr v. Burford*, 339 U.S. 200, 227 (1950) (Frankfurter, J., dissenting) ("Nothing is more basic to the functioning of this Court than an understanding that denial of certiorari is occasioned by a variety of reasons which precludes the implication that were the case here the merits would go against the petitioner").

The Seventh Circuit has consistently held that the "essential function" of section 2255 proceedings is to "give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998). The Seventh Circuit has further interpreted the savings clause's reference to "inadequate or ineffective to test the legality of his detention" as a focus on procedure, rather than outcome. *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002). The systemic denial of COAs, and to a lesser extent evidentiary hearings, in the Fifth Circuit constitutes a denial of procedure that deprives death-sentenced inmates of an opportunity to test the legality of their detention. *See Steiker & Steiker*, *supra*, at 1902-03.

Recently, the Seventh Circuit determined that the Fifth Circuit's denials of petitioner Christopher Vialva's requests for certificates of appealability do not entitle him to relief under section 2241. *Vialva v. Watson*, 975 F.3d 664 (7th Cir. 2020). Vialva echoes the long-standing position of this Circuit that the savings clause is not satisfied simply because the petitioner's section 2255 motion was denied. Robinson does not argue to the contrary; he does not ask this Court to find that because he did not receive a COA, section 2255 relief was not available to him. Rather, Robinson has established that the Fifth Circuit systematically deprives inmates facing federal death sentences of adequate process to allow them

14

to vindicate their section 2255 claims.  Indeed, Robinson has put forward significant statistical evidence to establish that although the Fifth Circuit goes through the motions of affording federally death-sentenced inmates post-conviction review, that right is illusory because of a lack of process.  *See Tennard*, 542 U.S. at 283 ("Despite paying lip service to the principles guiding issuance of a COA, the Fifth Circuit's analysis proceeded along a distinctly different track." (internal citation omitted).)  As *Vialva* explained, "[o]ne opportunity for one round of review suffices."  *Id*. at 666.  Movants are not afforded an opportunity for one round of review in the Fifth Circuit, and therefore section 2241 jurisdiction is appropriately invoked in this case.

*Vialva* was careful to note that the Seventh Circuit will not "sit in judgment on the decisions of [its] sister circuits."  *Id*. at 666.  The issue presented here is not whether the Fifth Circuit was correct in this particular case concerning its denial of a COA, rather the issue is whether it is possible for a capital section 2255 movant to receive the appellate process to which they are entitled.  The numbers again tell the tale: outside of the Fifth Circuit, 26 of 29 movants (approximately 90%) received COAs; while only 1 of 10 (10%) received a COA in the Fifth Circuit. The systemic denial of process renders section 2255 inadequate and unavailable in the Fifth Circuit.

15

4.    **Because of the Fifth Circuit's Overly Strict View of Post-Judgment Motions, Section 2255 Movants have no Means to Remedy the Deprivation of Process by the Fifth Circuit**

In *Gonzalez v. Crosby*, 545 U.S. 524 (2005), the Supreme Court held that although motions filed under Federal Rule of Civil Procedure 60 apply to habeas corpus proceedings, motions that seek to advance a substantive claim for relief are actually disguised second or successive habeas petitions. *Id*. at 533-34. However, when the motion does not present a claim for relief (i.e., a basis by which the underlying criminal conviction or sentence should be set aside), then the motion is a valid Rule 60 motion and the rules governing second or successive habeas petitions will not apply. *Id*. at 533. In *Gonzalez*, the Court found that Petitioner Gonzalez's motion, which challenged the district court's finding that his petition was barred by the AEDPA statute of limitations, was not a second or successive petition because it challenged only a procedural ruling by the district court, rather than a substantive claim for habeas relief. *Id*. at 533.

Robinson attempted to utilize Rule 60(b) to challenge erroneous procedural rulings in his section 2255 litigation. When Robinson was litigating his section 2255 motion, he moved the district court for authorization to interview his trial jurors. The Northern District of Texas has a local rule that prohibits counsel from interviewing jurors post-verdict, so counsel requested permission to interview Robinson's trial jurors in order to conduct an adequate post-conviction

16

investigation.  The district court denied Robinson's motion, finding that Robinson had not provided any evidence that merited allowing him to investigate possible juror misconduct.  The district court subsequently denied Robinson's section 2255 motion and the Fifth Circuit affirmed the denial of a COA.

After the Supreme Court issued its decision in *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), holding that the Sixth Amendment requires that courts be permitted to consider post-verdict statements by jurors establishing that racism infected the jurors' deliberations, Robinson moved the district court to re-open his section 2255 proceedings to allow him to interview the trial jurors.  The Fifth Circuit affirmed the district court's denial of Robinson's request to conduct reasonable discovery as a second or successive section 2255 claim.  Although the Fifth Circuit acknowledged that Robinson's Rule 60(b) motion did not present a new claim or seek to revisit a previously denied claim, the Fifth Circuit concluded that Robinson's motion was actually a second or successive 2255 motion because if the motion were granted, and Robinson was permitted to interview his trial jurors, he could potentially locate new evidence which he might use to bring a new claim.  *Robinson*, 917 F.3d at 865-66.

The Fifth Circuit's limited view of Rule 60 is contrasted with that of the Ninth Circuit.  In *Mitchell v. United States*, 958 F.3d 775 (2020), Mitchell filed a Rule 60 motion in light of *Pena-Rodriguez* with a renewed request to interview his

17

trial jurors.  Like the Northern District of Texas, the District of Arizona has a local

rule that bars defendants, like Mitchell, from interviewing the trial jurors post-

verdict.  Mitchell sought to re-open his previously-denied section 2255

proceedings under Rule 60 for the exact same reasons as Robinson.  The district

court denied Mitchell's motion on the merits, *Mitchell v. United States*, 2018 WL

4467897 (D. AZ September 19, 2018), and the Ninth Circuit granted a COA.

Following full briefing and oral argument, the Ninth Circuit affirmed the district

court's on-the-merits denial, finding that Mitchell's motion was not a disguised

second or successive petition.  Relying on *Gonzalez*, the Ninth Circuit found that

Mitchell had not presented a new claim for relief, and simply requesting evidence

that may in the future support a new claim for relief did not render Mitchell's

motion a second or successive petition.  *Mitchell,* 958 F.3d at 786.  Indeed, because

granting Mitchell's motion would not entitle him to relief of his convictions or

sentences, his motion by definition did not present a claim for relief.  *Id*. at 786.

The Fifth Circuit's erroneous approach to *Gonzalez* improperly narrows

relief under Rule 60(b).  In the Fifth Circuit, movants may only raise challenges to

strictly procedural errors; if the hypothetical outcome of relief on a procedural

challenge could lead to a substantive claim, then it is a forbidden merits-based

challenge.  *Id*. at 786.  This binary situation (anything not procedural is merits-

18

based) is not supported by *Gonzalez*; *Gonzalez* simply holds that movants may not bring substantive claims in Rule 60 motions.

By this petition, Robinson does not seek to revisit the Fifth Circuit's holding in *In re Robinson*, 917 F.3d 856 (5th Cir. 2019). Rather, the Fifth Circuit's denial in *Robinson* establishes that the issues that make section 2255 relief unavailable to capital post-conviction movants in the Fifth Circuit cannot be remedied within the Fifth Circuit. This point is further demonstrated by the fact that, in his Rule 60 motion, Robinson additionally raised that he had been denied a COA on his initial section 2255 motion, *United States v. Robinson*, 2010 U.S. App. Lexis 11675 (5th Cir. 2010), and the Supreme Court's recent decision in *Buck v. Davis,* 137 S. Ct. 759 (2017), confirmed that that decision was erroneous. The Fifth Circuit affirmed the district court's finding that Robinson's Rule 60 motion was a disguised second or successive section 2255 motion because the claim upon which Robinson had sought a COA, his ineffective-assistance-of-counsel claim at the penalty trial, had been denied on its merits by the district court. *Robinson*, 917 F.3d at 863-64. *Robinson* establishes that although the Fifth Circuit serially denies capital movants

19

an opportunity to litigate an appeal in the ordinary course, capital movants have no ability to cure this serial denial of due process within the Fifth Circuit.[7]

### 5. The Fifth Circuit's Failure to Afford Capital Movants Adequate or Effective Process Violates the Constitution

The Fifth Circuit places capital movants in legally untenable situation. Movants, like Robinson, are required to litigate their post-conviction motions within the Fifth Circuit, where their post-conviction rights are honored in name only. These sham procedures then deprive movants of litigating habeas petitions in the Seventh Circuit due to the savings clause. The result is an unconstitutional suspension of the writ of habeas corpus. Art. I § 9 cl.2. Unless this Court considers Robinson's petition under section 2241, Robinson will have no meaningful opportunity for post-conviction review.

Capital movants from the Fifth Circuit stand in stark contrast to capital movants from the rest of the country. This Equal Protection violation cements the necessity for this Court to validly take jurisdiction under section 2241.

---

[7] Justice Sotomayor has previously noted the Fifth Circuit's limited reading of *Gonzalez* and Rule 60(b)(6). *Crutsinger v. Davis*, 140 S. Ct. 2 (2019) (Sotomayor, J., respecting the denial of certiorari).

## V.   CLAIMS FOR RELIEF

**A.      CLAIM ONE: The Trial Court Lacked Jurisdiction Over the Death-Eligible Offenses Because the Superseding Indictment Did Not Charge Robinson with a Capital Offense**

**1.      The Right to Indictment for a Capital Offense Is Not Waivable**

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]"  U.S. Const., amend. V.  "The Fifth Amendment made the rule mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings."  *Smith v. United States*, 360 U.S. 1, 9 (1959).  Deprivation of this "basic right" to be tried only on charges returned by a grand jury is "serious": "The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."  *Stirone v. United States*, 361 U.S. 212, 218 (1960).

While a noncapital offense may be prosecuted by information if a defendant waives the right to indictment, *see* Fed. R. Crim. P. 7(b), the right to indictment for a capital offense cannot be waived.  *See Smith*, 360 U.S. at 9.  In *Smith*, the petitioner was charged in an information with transporting a kidnapping victim

21

across state lines, an offense punishable by death if the victim was not released unharmed. *Id.* at 7. The information did not specify whether the victim had been released harmed or unharmed. *Id.* In light of that omission, the Supreme Court construed the information to charge an offense "which may be punished by death and thus must be prosecuted by indictment." *Id.* at 8. Further, because this was a capital case, the petitioner's waiver of indictment was not binding. *Id.* at 10. The *Smith* Court held that under Rule 7, the safeguard of a grand-jury indictment may be waived "only in those proceedings which are noncapital." *Id*. at 9. "To construe the provisions of the Rule loosely to permit the use of information where, as here, the charge states a capital offense, would do violence to that Rule and would make vulnerable to summary treatment those accused of one of our most serious crimes." *Id.* Thus, the petitioner's waiver of indictment was "not binding and did not confer power on the convicting court to hear the case." *Id.* Accordingly, the Supreme Court reversed the judgment and conviction and remanded the case to district court with instructions to dismiss the information. *Id.*

**2. Robinson's Superseding Indictment Did Not Charge a Capital Offense, and Therefore his Death Sentences Must be Vacated**

Robinson's death sentences must be vacated because the operative charging instrument in his case did not hold him to answer for a capital crime, thus violating the Fifth Amendment's Grand Jury Clause. On direct appeal, the government conceded, and the Fifth Circuit agreed, that the indictment "fail[ed] to allege the

22

statutory aggravating factors that make Robinson eligible for the death penalty."

*United States v. Robinson*, 367 F.3d 278, 283 (5th Cir. 2004).  It is thus undisputed that the Superseding Indictment, filed on June 19, 2001, lacks the requisite statutory aggravators that would make the offense death-eligible:

- *Count Three*:  The Superseding Indictment simply charged a violation of 21 U.S.C. § 848.  It did not allege any of the statutory aggravating factors set forth in the former 21 U.S.C. § 848(n) (1996).[8]  Ex. 3, Superseding Indictment at 20-27.

- *Count Seven*:  This Count was charged as a violation of 18 U.S.C. § 924(j).  The Superseding Indictment did not allege any of the gateway intent factors in 18 U.S.C. § 3591(a) or statutory aggravating factors in 18 U.S.C. § 3592(c).  *Id.* at 29.

- *Count Eleven*:  As with Count Seven, this Count was charged as a violation of 18 U.S.C. § 924(j).  The Superseding Indictment did not allege any of the gateway intent factors in 18 U.S.C. §3591(a) or statutory aggravating factors in 18 U.S.C. § 3592(c).  *Id.* at 31.

By contrast, the corresponding counts in the Fourth Superseding Indictment filed against co-defendant L.J. Britt on October 16, 2002, alleged the aggravating factors in Section 848(n) or Section 3591(a) and Section 3592(c), respectively.  Ex. 4, Britt 4th Superseding Indictment at 20-21, 23-24.

---

[8] In 2006, Section 848 was amended to delete Section 848(n) and other federal death penalty procedures applicable only to certain Controlled Substances Act cases.  Pub. L. No. 109-77, § 221(2) (2006).

The Supreme Court's decision in *Alleyne v. United States*, 570 U.S. 99 (2013), makes clear that the Superseding Indictment, devoid of allegations of statutory aggravators and gateway intent factors, did not charge Robinson with a capital offense. In *Alleyne*, the Supreme Court held that "[w]hen a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a *new offense* . . . ." *Alleyne*, 570 U.S. at 114-15 (emphasis added). A federal death sentence cannot be imposed without a finding of at least one aggravating factor in Section 848(n)(1) and (n)(2-12) (for Count Three), or a gateway intent factor in 18 U.S.C. § 3591(a)(2) *and* aggravating factor in 18 U.S.C. § 3592 (for Counts Seven and Eleven). *See* 21 U.S.C. § 848(k) (1997) ("If an aggravating factor set forth in subsection (n)(1) of this section is not found to exist or an aggravating factor set forth in subsection (n)(1) is found to exist but no other aggravating factor set forth in subsection (n) is found to exist, the court shall impose a sentence, other than death, authorized by law."); 18 U.S.C. § 3591(a)(2) (defendant shall be sentenced to death if a gateway intent factor in subsection (a)(2) is proved "beyond a reasonable doubt" and it is determined that imposition of death sentence is justified after considerations of factors in Section 3592); 18 U.S.C. § 3593(d) ("If no aggravating factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death authorized by

24

law."). The statutory aggravators and gateway intent factors in Section 848(n) and Section 3591(a)/Section 3592(c) represent elements of a new, *capital* offense.

In the absence of these statutory aggravators and gateway intent factors, the Superseding Indictment did not charge any capital offense, and Robinson should not have been held to answer for a capital crime. "In order for a person to be 'held to answer for a capital . . . crime" under the Fifth Amendment, the charging instrument must expose him to capital punishment. *Matthews v. United States*, 622 F.3d 99, 102-03 (2d Cir. 2010). That is, "[t]he Fifth Amendment guarantees an unwaivable right to indictment by grand jury . . . when the charging instrument holds the defendant to answer for a capital crime. A charging instrument that alleges no aggravating elements authorizing capital punishment does not do so." *Id.* at 103. Here, the Superseding Indictment alleged no aggravating elements authorizing capital punishment. Therefore, while it may have charged a violation of § 848 and violations of § 924(j) punishable by a maximum of life imprisonment, it did not expose Robinson to capital punishment.

As a result, the trial court lacked jurisdiction over Counts Three, Seven, and Eleven, which were tried as capital offenses, and on which Robinson was sentenced to death. In *Smith*, the Supreme Court held that the violation of the Grand Jury Clause in a capital case resulted in a lack of subject-matter jurisdiction, as the waiver of indictment "did not confer power on the convicting court to hear

25

the case." *Smith*, 360 U.S. at 10. The same is true of the Fifth Amendment violation here.

The Supreme Court's decision in *United States v. Cotton*, 535 U.S. 625 (2002), is not to the contrary. In *Cotton*, a noncapital case, the Supreme Court held that "defects in an indictment do not deprive a court of its power to adjudicate a case." *Id.* at 630. The Supreme Court based this conclusion in part on the fact that while jurisdictional defects "require correction regardless of whether the error was raised in district court," "the grand jury right can be waived," a proposition for which it cites *Smith* and Rule 7. *Cotton*, 535 U.S. at 630. But this aspect of *Smith*'s holding was limited to noncapital cases; *Smith* also holds, of course, that the grand jury right cannot be waived in capital cases. *Smith*, 360 U.S. at 9. Because its holding was premised on the waivability of the grand jury right in noncapital cases, nothing in *Cotton* undermines *Smith*'s holding that a nonwaivable defect in an indictment is jurisdictional, and therefore can be raised at any time. Regardless, the issue was not waived in Robinson's case because he raised the issue pre-trial, and the issue was not found to have been waived by the Fifth Circuit.

While it is true that the *Cotton* Court explained it had "some time ago departed from [the] view that indictment defects are 'jurisdictional,'" *Cotton*, 535 U.S. at 631, this statement must be considered in its proper context. In support of

26

Case 2:20-cv-00640-JPH-MG    Document 4    Filed 12/04/20    Page 34 of 165 PageID #: 1669

this finding, the *Cotton* Court relied upon *Lamar v. United States*, 240 U.S. 60 (1916) and *United States v. Williams*, 341 U.S. 58 (1951). Both *Lamar* and *Williams* rejected jurisdictional challenges based on defective indictments. *Lamar*, 240 U.S. at 64; *Williams*, 341 U.S. at 58. But both *Lamar* and *Williams* were noncapital cases, and both predated *Smith*. *See Lamar*, 240 U.S. at 64; *Williams*, 341 U.S. at 59. Because the Supreme Court decided *Smith* notwithstanding *Lamar* and *Williams*, those cases obviously did not preclude *Smith*'s holding regarding the jurisdictional nature of a nonwaivable grand jury error in a capital case.

In *Smith*, the remedy for a Grand Jury Clause violation was reversal of the judgment and conviction, and a remand with instructions to dismiss the indictment. *Smith*, 360 U.S. at 9. Because Robinson was held to answer, and sentenced to death, based on a Superseding Indictment that charged no capital offenses, this Court should grant the writ with respect to Counts Three, Seven, and Eleven.

3.   **Robinson's Superseding Indictment Did Not Charge a Capital Offense, and Yet the Government Unsuccessfully Sought Death Sentences on Two Additional Counts which Therefore Must be Vacated**

In addition to Counts Three, Seven, and Eleven, the Government sought the death penalty against Robinson on Counts Twelve and Fifteen. Ex. 5, Notice of Intent to Seek the Death Penalty.

- *Count Twelve*:  The Superseding Indictment charged a violation of 21 U.S.C. § 841(a)(1); the punishment for which it alleged is found at 21 U.S.C. § 848(e)(1)(A).  It did not allege any of the statutory aggravating factors set forth in the former 21 U.S.C. § 848(n) (1996).  Ex. 3, Superseding Indictment at 32.

- *Count Fifteen*:  This Count was charged as a violation of 18 U.S.C. § 924(j).  The Superseding Indictment did not allege any of the gateway intent factors in 18 U.S.C. § 3591(a) or statutory aggravating factors in 18 U.S.C. § 3592(c).  *Id.* at 35.

Although the jury rejected death sentences on these counts, Robinson's ensuing life sentences must similarly be vacated because the Government was permitted to argue for death sentences and Robinson was made to stand trial, through a penalty trial, for alleged capital crimes that were never presented to a grand jury and included in his indictment, thus violating the Fifth Amendment's Grand Jury Clause.  As in *Smith*, where the petitioner was *not* sentenced to death, the constitutional violation occurs when the defendant is made to stand trial for death-eligible offenses despite a violation of his Fifth Amendment rights.  Such was the case here with regard to counts Twelve and Fifteen, and thus relief is warranted.

4.     **Section 2255(e)'s Savings Clause Permits Robinson to Raise His Indictment-Clause Claim in a Section 2241 Petition**

a.     **Standards for satisfying the section 2241 savings clause**

"Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective

28

jurisdictions."  28 U.S.C. § 2241(a).  The court may grant a writ of habeas corpus to a prisoner who "is in custody in violation of the Constitution or laws or treaties of the United States."  *Id.* § 2241(c)(3).

Generally, a motion brought under 28 U.S.C. § 2255 represents "the exclusive postconviction remedy for a federal prisoner."  *Purkey v. United States*, 964 F.3d 603, 611 (7th Cir. 2020).  Section 2255 motions involve strict procedural requirements, including a one-year statute of limitations.  *Id.*  The criteria for filing a second or successive Section 2255 motion are even more "draconian": they require "compelling newly discovered evidence of innocence or 'a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court.'"  *Id.*  (quoting 28 U.S.C. § 2255(h)).

Section 2255 provides, however, that a federal prisoner may file a Section 2241 petition for a writ of habeas corpus if it "appears that the remedy by [Section 2255] motion is inadequate or ineffective to test the legality of his detention."  22 U.S.C. § 2255(e).  This provision is called the "savings clause," *Beason v. Marske*, 926 F.3d 932, 935 (7th Cir. 2019), or "safety valve," *Purkey*, 964 F.3d at 611.

The Seventh Circuit has rejected the notion of "rigid categories delineating when the safety valve is available" as "inconsistent with the standard-based language of section 2255(e)."  *Purkey*, 964 F.3d at 614-15.  But, in the context of Section 2255(e), "the words 'inadequate or ineffective . . . must mean something

29

more than unsuccessful." *Id.* at 615. The Seventh Circuit has been flexible in defining "something more." *See In re Davenport*, 147 F.3d 605, 610-11 (permitting a section 2241 petition due to the structure of Section 2255 itself); *Garza v. Lappin*, 253 F.3d 918, 922-23 (7th Cir. 2001) (allowing a section 2241 claim based on an international treaty that could not be invoked until the petitioner had exhausted national remedies); *Webster v. Daniels*, 784 F3d 1123, 1137-39 (7th Cir. 2015) (en banc) (Section 2241 is the appropriate vehicle because of the timing of the discovery of critical evidence that went to a constitutional claim in a capital case). *See Purkey*, 964 F.3d at 615. To make use of the savings clause, "there must be a compelling showing that, as a practical matter, it would be impossible to use section 2255 to cure a fundamental problem. It is not enough that proper use of the statute results in denial of relief." *Id.* at 615.

That Robinson's indictment claim relates to his death sentence, and does not assert innocence of the underlying offense, does not prevent him from utilizing Section 2241 to test the legality of his detention. "[A] core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence." *Webster*, 784 F.3d at 1139. The Seventh Circuit has indicated that the savings clause can encompass "an argument that a particular sentence was *constitutionally forbidden* (either as a matter of law or as a matter of fact), rather than just outside the scope of a statute." *Id.* at 1137.

30

> **b.**    **Robinson's claim is properly raised under Section 2241 because the Section 2255 remedy is inadequate or ineffective to test the legality of his detention**

As a general matter, the Section 2255 remedy is "inadequate or ineffective" "when it cannot be used to address novel developments in either statutory or constitutional law, whether those developments concern the conviction or the sentence." *Roundtree v. Krueger*, 910 F.3 312, 313 (7th Cir. 2018). Section 2255 is inadequate to test the legality of Robinson's non-waivable grand jury and indictment claim.

Robinson raised his *Fifth* Amendment claim concerning the indictment's failure to charge a capital offense as the first issue in his direct appeal: "The Indictment Did Not Include Aggravating Factors and Thus the Death Penalty was not Authorized Under the Indictment Clause of the Fifth Amendment." *United States v. Robinson*, Fifth Circuit Case No. 02-10717, at Dkt. 5186314 (Opening Brief) at pages 2-10. But the Fifth Circuit, relying on the Supreme Court's recent *Sixth* Amendment decision in *Ring v. Arizona*, 536 U.S. 584 (2002), concluded that while the government was constitutionally required "to charge, by indictment, the statutory aggravating factors it intends to prove to render a defendant eligible for the death penalty," the error was harmless. *United States v. Robinson*, 367 F.3d 278, 284-89 (5th Cir. 2004). Crucially, the Fifth Circuit focused on *Ring*'s holding that an aggravating factor rendering a defendant eligible for death is "'the

31

*functional equivalent* of an element of a greater offense.'"  *Robinson*, 367 F.3d at 284 (quoting *Ring*, 536 U.S. at 609) (emphasis added).  The *Ring* Court drew this "functional equivalent" language from *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000), and invoked it twice in the opinion.  *See Ring*, 536 U.S. at 605, 609. In *Apprendi*, the Supreme Court explained the difference between "sentencing factors," which support a sentence within the range authorized by the jury's finding and a "sentence enhancement," "used to describe an increase beyond the maximum authorized statutory sentence," which "is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict."  530 U.S. at 494 n.19.  Thus, the Fifth Circuit relied on the so-called distinction between "functional equivalents" and "formal elements" of an offense in denying Robinson's defective indictment claim on appeal.

However, that distinction disappeared with the Supreme Court's decision in *Alleyne v. United States*, when the Supreme Court dispensed with the "functional equivalent" terminology featured in *Apprendi* and *Ring.*  In *Alleyne*, the Supreme Court made clear that an aggravating fact that produced a higher sentencing range *is*, in fact, an element of a "new," "distinct," and "aggravated" crime.  570 U.S at 113 ("[T]he core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime . . . ."); *id.* at 114-15 ("[w]hen a finding of fact alters the legally prescribed punishment so as to aggravate it, the

32

fact necessarily forms a constituent part of a *new offense . . . .*"); *id.* at 115-16 ("The essential point is that the aggravating fact produced a higher range, which, in turn, conclusively indicates that the fact is an element of a distinct and aggravated crime.").

Despite *Alleyne*, the Fifth Circuit continues to draw a distinction between "functional equivalents" and "formal elements" of an offense. *United States v. Daniels*, 723 F.3d 562, 572-74 (5th Cir. 2013). Under Fifth Circuit law—both at the time of Robinson's appeal and presently[9]–*Ring*'s description of a statutory aggravator in a capital case as the "functional equivalent" of an element rather than as a formal element of a new, aggravated offense controls the analysis. In the Fifth Circuit's view, while the failure to prove a "formal element" of an offense requires vacatur of a conviction, the failure to prove the "functional equivalent" of an element requires only a remand for resentencing. *Id.* Such "functional equivalents" include drug quantity and type in a prosecution under 21 U.S.C. §§ 841 and 846, *see id.*, and the statutory aggravators in a federal capital prosecution, *see Robinson*, 367 F.3d at 284.

---

[9] In *Daniels*, the Fifth Circuit traced this view of "functional equivalents" as far back as *United States v. Hayes*, 342 F.3d 385 (5th Cir. 2003), a case that predates Robinson's direct appeal and Section 2255 motion. *Daniels*, 723 F.3d at 573-74.

The Fifth Circuit's view of "functional equivalents" as inferior to "formal elements" necessarily, and improperly, colored its view of Robinson's indictment claim. Because the right to indictment is waivable and nonjurisdictional in noncapital cases, and nonwaivable and jurisdictional in capital cases, the threshold question under the Fifth Amendment is whether an indictment charges a "capital . . . crime" in the first place. U.S. Const. amend. V; *see also Smith*, 360 U.S. at 8; *Matthews*, 622 F.3d at 102-03. But in the Fifth Circuit's view, "functional equivalents," unlike "formal elements," are distinct from the core offense of conviction. *See Daniels*, 723 F.3d at 572-74. Under this logic, an indictment could charge a capital crime even if it did not allege the statutory aggravators, because those statutory aggravators are mere "functional equivalents," *see Robinson*, 367 F.3d at 284. Significantly, in *Daniels*, the Fifth Circuit noted that it was "mindful" of *Alleyne*'s discussion of an aggravating fact "necessarily form[ing] a constituent part of a new offense," which might bear on its traditional distinction between "functional equivalents" and "formal elements." 723 F.3d at 574. Nevertheless, it maintained that the government's failure to prove the five-kilogram quantity alleged in the indictment did not invalidate the defendants' conspiracy convictions; it required only a remand for resentencing. *Id.*

Robinson may seek relief under Section 2241 because Section 2255 "does not now and has never provided an adequate avenue for testing [his] present

34

challenge to the legality of his sentence." *See Garza*, 253 F.3d at 923. At the time Robinson filed his Section 2255 motion in the Northern District of Texas, he could not have invoked *Alleyne* because *Alleyne* had not yet been decided. He may therefore raise the claim in a Section 2241 petition. *See Chazen v. Marske*, 938 F.3d 851, 861 (7th Cir. 2019) (Seventh Circuit has "held that a petitioner seeking relief under § 2241 need only show that the case on which he relies had not yet been decided at the time of his § 2255 petition") (citing *Brown v. Rios*, 696 F.3d 638, 640 (7th Cir. 2012)).

In addition, Robinson had already raised the claim on direct review, to no avail. *See Robinson*, 367 F.3d at 284-89. In *Beason v. Marske*, 926 F.3d 932 (7th Cir. 2019), the Seventh Circuit held that a Section 2241 petitioner had been "actually foreclosed" from raising an argument in Section 2255 proceedings, where the argument had been rejected on direct appeal and law of the case precluded relitigation of the same issue in a collateral proceeding. *Id.* 937. In the Seventh Circuit's view, it did not matter that the argument advanced on direct appeal was "a bit different" than the argument raised in the Section 2241 petition, where the general contention was the same. *Id.* The Seventh Circuit reasoned that a petitioner in this situation, "[a]s a practical and legal matter, . . . needed a superseding development," such as an intervening judicial decision, to receive

35

renewed consideration of the argument. *Id.* Here, that intervening judicial decision is *Alleyne*.

Finally, even if the indictment claim does not fall within the savings clause, Robinson may pursue it because the indictment error raised by Robinson is jurisdictional in nature and can therefore be raised at any time. *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) ("Subject-matter jurisdiction can never be waived or forfeited. The objections may be resurrected at any point in the litigation[.]").

At a minimum, Robinson's argument for entitlement to Section 2241 relief is "not such an outlandish claim that . . . jurisdiction [is] defeated." *Purkey*, 964 F.3d at 613. This Court should decide Robinson's indictment claim on the merits.

**B.   CLAIM TWO: Robinson is entitled to relief because the prosecutor presented false and misleading evidence and trial counsel unreasonably failed to challenge this evidence.**

Robinson's conviction and death sentence were imposed in violation of the Fifth, Sixth, and Eighth Amendments to the Constitution because a government witness, Peter Carlson, provided false and misleading testimony at the penalty phase of Robinson's trial. Specifically, Carlson testified that unless Robinson was sentenced to death, the Bureau of Prisons ("BOP") could not house Robinson in such a way that he would not present a continuing danger to society. Carlson's testimony relied on a the false premise that the BOP could not limit Robinson's

36

access to the telephone, and therefore Robinson could use the telephone to

continue to run his drug-dealing operation.  Not only does the BOP have many

ways of limiting an inmate's ability to communicate with the outside world, but a

federal judge can, in fact, order that such restrictions be placed on a federal inmate.

Robinson's jury were never told of the various ways in which a federal inmate's

communications can be limited.

Robinson is also entitled to relief because the prosecutor knowingly

introduced Carlson's false testimony, and the false evidence had a likelihood of

impacting the jury's decision.  *Napue v. Illinois,* 360 U.S. 264, 269 (1959).  Even if

the prosecutor did not know that Carlson's testimony was false, the prosecutor had

in his constructive possession evidence that impeached Carlson's testimony and

therefore he violated Robinson's due process rights under *Brady v. Maryland,* 373

U.S. 83 (1963).

Finally, trial counsel failed to rebut Carlson's false testimony through

effective cross-examination and the presentation of an expert witness qualified to

discuss BOP classifications and conditions of confinement.  *Strickland v.

Washington*, 466 U.S. 668 (1984).  Counsel's actions and omissions fell below an

objective standard of reasonableness under prevailing professional norms and there

could have been no rational tactical justification for counsel's failings.  But for

37

counsel's actions and omissions, it is reasonably probable the trier of fact would have returned a more favorable verdict.

### 1. Factual Background

#### a. Robinson's penalty phase proceedings and post-conviction proceedings

At the penalty trial, the prosecution introduced evidence that Michael "One Love" Williams, a witness called by the Government at the guilt phase, had been abducted and threatened by three assailants. The prosecution introduced tape-recorded recorded telephone conversations Robinson had made during the trial in which Robinson, while speaking with his aunt and brother, stated: "That dude [Williams], Man that dude right there go hard." Ex. 6, Phone Transcript. In closing, the prosecutor argued Robinson used coded language in that call to order a hit on Williams.[10] Ex. 8, Govt Penalty Phase Closing Arg., at 136, 144-45.

The defense presented the testimony of Mark Cunningham, a forensic psychologist. Ex. 72, M. Cunningham Trial Testimony, at 1252. Based on studies done, mostly by other researchers, Cunningham testified the rate of serious violence committed by inmates serving lengthy prison sentences is very low, and the rate is consistent among inmates sentenced to death, those sentenced to life

---

[10] An adequate investigation would have revealed that Robinson never ordered anyone to take any action against Williams. *See infra* Claim Four.

without the possibility of parole, and those sentenced to life with the possibility of parole. *Id.* at 1275, 1284. At minimum, Cunningham testified that Robinson would be designated to a U.S. penitentiary, as opposed to a lower security facility, whether sentenced to life or death. Cunningham acknowledged that he had no experience working in the BOP and could not say what classification Robinson would be assigned. *Id.* at 1291, 1294. It would be up to the BOP to determine whether Robinson should instead go to a higher-security supermax prison. *Id.* at 1293-94. Cunningham noted inmates in a U.S. Penitentiary "are not in their cells for the biggest part of the day. They are programming outside the cell or lock down at counts and at night." *Id.* at 1296. In contrast, inmates in supermax prisons must be in their cells 23 hours a day. *Id.* at 1299. Cunningham opined that the BOP has the resources to make adequate arrangements to house inmates in a way that minimizes other inmates and guards being harmed. *Id.* at 1300-01.

In its rebuttal case, the prosecution presented the testimony of Peter Carlson, a former BOP warden and BOP regional director, as an expert on security classifications in the federal prison system, conditions in certain prisons, and factors used in predicting future dangerousness in prison. Ex. 7, P. Carlson Testimony, at 96-128. Carlson testified the "Ad-Max" facility in Florence, Colorado, was the highest-security federal prison facility. *Id.* at 99. Carlson testified that 99% of the people at the Ad-Max "earn their way there" by

39

committing violence against inmates or staff or planning to escape from another federal prison. *Id.*

Carlson opined that if Robinson were sentenced to life, he would likely be designated to a high-security program, which is less secure than an Ad-Max facility. *Id.* at 105. He testified that unless the facility was on lock down due to a significant event, inmates at the high security facility lived in "a rather open environment." *Id.* at 106. Inmates eat in a communal dining room with several hundred other inmates; they worked and attended classes with other inmates; and were free to engage in recreational activities throughout the facility in the evenings after work. *Id.* at 105-06. Significantly, Carlson testified high-security inmates have "reasonable access to outside telephones." *Id.* at 106. Noting that inmates are only supposed to use the telephone to call people on an approved list, Carlson testified that it is "difficult to control" who an inmate speaks with because the recipient of the phone call could always connect a third party to the line. *Id.* at 107. He admitted there was a concern over inmates connecting with their colleagues outside of prison in order to commit further crimes, and testified that there is a "public safety problem that [prisons] struggle with in terms of having a kingpin locked up who wants to continue directing illegal activities outside." *Id.*

On cross-examination, defense counsel did not dispute Carlson's opinion about Robinson's classification level or his testimony that very few inmates could

40

be sent straight to Ad-Max from sentencing. *Id.* at 112. Nor did counsel dispute the conditions of confinement with regard to high-security prisons. Counsel's sole goal appeared to be to establish that, over time, inmates appear to become less violent and the rates of inmate-on-inmate homicide are not particularly high.

In the prosecutor's closing rebuttal argument, he argued Robinson would continue to be a danger to society if sentenced to life in prison. The prosecutor argued, "[Robinson] ain't going to Ad-Max . . . he's going to some general population somewhere," with the "same kind of set up" as the prison where Robinson used a three-way call to order a hit on Williams. Ex. 8, Govt Penalty Phase Closing, at 144-47. The prosecutor argued that all the witnesses who testified for the prosecution now had "a target sign on their chest" and that Robinson would find someone to "take care of" them as well. *Id.* at 147. Robinson would also "take it out" on anyone who "crosses him in prison." *Id.* The prosecutor argued that "with the telephone available to him as will be available to him at any prison setting, [Robinson] is prepared to carry out whatever it takes to seek revenge on anybody." *Id.* at 150. Defense counsel did not address Carlson's testimony in his closing arguments.

The special verdict forms indicate the jury unanimously found Robinson a future danger to the lives of others based on each conviction. Ex. 9, Special Verdict Form, at 157, 165, 173, 180, 188, 195, 202.

41

Consistent with their approach at trial, Ball and Strickland, who were also appointed to represent Robinson on appeal, raised no issue regarding Carlson's testimony on appeal.  The Fifth Circuit affirmed Robinson's convictions and sentences, and the Supreme Court denied Robinson's petition for writ of certiorari on November 29, 2004.  *Robinson v. United States*, 543 U.S. 1005 (2004).

On January 10, 2005, approximately 5 weeks after the one-year statute of limitation began running on filing a timely the district court for the Northern District of Texas appointed Mike Charlton and Gary Taylor to represent Robinson in his section 2255 proceedings.  Dkt. 2218.  On January 21, 2005, Robinson moved to add the Federal Public Defender for the Central District of Counsel (undersigned counsel) as co-counsel for Robinson, the District Court for the Norther District of Texas denied that motion on February 8, 2005.  Dkt. 2221, 2222.  On July 8, 2005, Taylor moved to withdraw as counsel for Robinson, and the FPD moved for appointment as co-counsel.  Dkt. 2264.  On July 21, 2005, the district court appointed the FPD as co-counsel with Charlton and removed Taylor from the case.  Dkt. 2271.  Four months later, on November 29, 2005, Robinson timely filed a motion to vacated under section 2255.  Dkt. 2279.  Robinson subsequently moved to amend his section 2255 motion, and although the district court allowed him to supplement claims raised in the original section 2255 proceedings, the court denied his request to add an additional claim.  Dkt. 2430.

In his section 2255 motion, Robinson raised a claim of ineffective assistance of counsel at the penalty trial based, in part, on counsel's failure to investigate the circumstance of the alleged hit on Michael Williams. Robinson provided declarations from Wayne Jordan, Alquantis Pitts, and Keith Edington, the three men who had assaulted Williams prior to trial. Ex. 10, Jordan, Pitts, and Edington Decl. All three men confirmed that although they had assaulted Williams, their doing so had nothing to do with Robinson. Indeed, they had no relationship with Robinson, they were not acting on orders from Robinson or anyone associated with Robinson, and attacked Williams for their own motivations. Even Williams himself submitted a declaration stating that he did not believe the men had assaulted him based on his involvement in Robinson's prosecution, but rather the attack was a simple robbery based on the fact that he was a known drug-dealer who carried large amounts of cash. Ex. 11, M. Williams Decl. Robinson raised no claim regarding Carlson's testimony.

   b.  **The strikingly similar proceedings in *United States v. Darryl Johnson***

Five years before Robinson's trial, Darryl Johnson, a high-ranking member of the notorious Gangster Disciples street gang, was convicted of ordering two murders in furtherance of a continuing criminal enterprise and various other offenses in the Northern District of Illinois. In the penalty phase of his death penalty trial, his trial counsel similarly offered Mark Cunningham's expert

43

testimony on the supermax facility in Colorado and other confinement issues. In rebuttal, the Government called former Bureau of Prisons (BOP) warden John Vanyur, who testified that most murderers and gang leaders do not serve their prison terms in the supermax facility, most of the prisoners at the supermax facility had been transferred there after misbehaving at another prison, even prisoners in the most restrictive area of the supermax facility known as the "control unit" still have access to telephone, and BOP policy does not permit inmates to be left in the control unit indefinitely. *United States v. Johnson*, 223 F.3d 665, 671 (7th Cir. 2000). Trial counsel failed to confront Vanyur's testimony on these points, and Johnson was sentenced to death.

On appeal, Johnson argued *inter alia*, that he was entitled to a new sentencing hearing because the Government misled the jury regarding future dangerousness. *United States v. Johnson*, 7th Circuit Case No. 99-1327, Opening Brief on Appeal at 21-36. The substance of the claim was that Vanyur's testimony was false in that it indicated that the government was powerless to permanently house Johnson in a manner that would prevent him from having contact with other prisoners or with persons outside the prison. *Id.* at 21. Specifically, Johnson claimed that Vanyur's testimony was false with respect to his conclusion that: (1) Johnson could not be immediately committed to the control unit; (2) Johnson could not be kept in solitary confinement for the rest of his life; (3) Johnson would

44

eventually be placed in an open-population prison environment; (4) and that regardless where Johnson was placed, he would have some access to the telephone. *Id.* at 24-25.  Following the trial, defense counsel learned of two cases wherein the defendants' sentencing orders severely limited their contact with the outside world, effectively resulting in sentences of life in solitary confinement.  *Id.* at 26-28 (citing *United States v. Felipe*, S16-96-CR-395 (SD NY); *United States v. Ramzi Yousef*, S12-93-CR-180 (SD NY)).

The Seventh Circuit affirmed Johnson's convictions and sentences. *Johnson*, 223 F.3d 665 (2000).  In so doing, the Court found that Vanyur's testimony was not necessarily false because BOP regulations require that wardens consider six factors in determining whether an inmate should be placed in the control unit, and the nature of the inmate's criminal conviction is not enough, on its own, to warrant commitment to the control unit.  *Id.* at 672.  Further, an inmate's placement in the control unit must be reviewed every 60-90 days to consider whether the inmate is ready for release from the control unit.  *Id.* Moreover, although Special Administrative Measures (or SAMs) restrictions can be applied to an inmate which can include housing the inmate in administrative detention or limiting privileges such as correspondence, visitation, use of the telephone, etc. can be applied to inmates, these restrictions can only be applied in 120-day increments, not lifetime commitments.  *Id.* at 672.  By focusing on the

45

apparent fact that regardless of where he was initially placed, there was no guarantee that Johnson would spend the rest of his life in solitary confinement, the Seventh Circuit held that Vanyur's testimony was not false.

In its opposition to Johnson's petition for writ of certiorari, the government conceded that Vanyur's testimony was incomplete in that he failed to testify about the SAMs procedure or a sentencing judge's ability to order that certain restrictions be applied to an inmate to prevent them from involvement in an illegal enterprise. *See United States v. Johnson*, 2010 WL 11668097 at *3 (N.D. IL December 13, 2010) (noting the government's concession and citing 28 C.F.R. 501.3 and 18 U.S.C. § 3582(d)). Regardless, Johnson's cert petition was denied. *United States v. Johnson*, 534 U.S. 829 (2001).

In his section 2255 proceedings, Johnson presented a claim of ineffective assistance of trial counsel, arguing that his attorneys were deficient for failing to confront Vanyur with the SAMs procedures or a sentencing judge's authority under 18 U.S.C. section 3582[11] to restrict the inmates ability to communicate with persons aside from his attorney. Johnson relied on a declaration from former BOP Warden Mark Bezy to establish that there were various means by which the BOP

---

[11] Both Mark Bezy's declaration and the Johnson Decision refer to 18 U.S.C. § 3582(d), as opposed to subsection (e). In 2018, the statute was amended and the provision that used to be section (d) was moved to section (e).

46

could limit or totally restrict an inmate's ability to communicate with the outside world.  In addition to its concession that Vanyur's testimony was incomplete, the government additionally conceded that trial counsel performed deficiently, but argued that Johnson was not prejudiced under *Strickland v. Washington*, 466 U.S. 668 (1984).  In 2010, the district court for the northern district of Illinois granted Johnson's section 2255 motion, finding that Johnson received ineffective assistance of counsel at the penalty trial and ordered a new sentencing hearing. *U.S. v. Johnson*, 2010 WL 11668097 (N.D. IL 2010).  In finding that Johnson had established prejudice, the district court focused on the importance of the future dangerousness aggravating factor, the government's closing argument which focused on future dangerousness, and a similar case wherein the BOP's confinement options were accurately portrayed and the defendant was not sentenced to death. *Id. at* *3-4.

Although the government filed a notice of appeal, it later moved to dismiss the appeal prior to filing its opening brief and ultimately settled Johnson's case for a life sentence. *U.S. v. Johnson*, Seventh Circuit Case No. 11-1326 at Documents 6, 12.

### c.   Robinson's Post-2255 revelations about the BOP's ability to control an inmate's communications

After learning about Johnson's case, undersigned counsel retained Mark Bezy to consult on Robinson's case.  Bezy reviewed Carlson's testimony from

47

Robinson's trial, Robinson's BOP file, and other documents. *See* Ex. 12, M. Bezy Decl, at 226-27. In explaining the role of the BOP in confining inmates, Bezy was unequivocal: "the BOP has, at all times, the authority and ability to house inmates in the most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's future dangerousness." *Id.* at 228. Bezy explained that this includes "housing inmates in conditions of confinement where they do not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or by mail." *Id.* Bezy continued that the Administrative Maximum (ADX) prison, regardless of placement in the control unit or general population, is designed to neutralize the threats of future danger, and had Robinson been placed there, his ability to contact anyone could have been limited. *Id.* at 229. After reviewing Robinson's convictions and Robinson's alleged attempt to orchestrate a hit on a witness, Bezy confirmed that Robinson would have been eligible for direct commitment to ADX after his trial. *Id.* at 230.

Bezy flatly rejected Carlson's testimony that the BOP is in any way powerless to prohibit inmates from committing crimes while incarcerated. Contrary to Carlson's testimony wherein he discussed the general practices of the BOP and standard rules that most inmates would be expected to follow, Bezy explained that regardless of general rules, the BOP crafts individualized conditions of confinement to neutralize the individual inmate's threat of future danger. *Id.* at

48

231. Bezy summarized the problem: "Carlson's testimony improperly advanced an either/or proposition – i.e., either an individual is sentenced to death (or incarcerated at ADX) or he receives a great deal of freedom." *Id.* at 232. However, as Bezy explained, even if an inmate is not sentenced to death or ADX, individual penitentiaries have designated cells known as "side pockets" which are isolated cells that provide an increased level of restriction for inmates who are deemed particularly difficult or dangerous. *Id.* Bezy offered specific examples of how these side pockets are successfully used to neutralize inmates who pose a specific risk. *See id.* at 233-34 (discussing the K-Unit at USP Marion, the I-Up unit at USP Marion). Bezy also provided several examples adjustments that the BOP made to house specific individuals who posed a particularized risk of harm. *See, e.g, id.* at 235 (describing the incarceration of Thomas Silverstein at USP Atlanta, Leavenworth, Marion and ADX). In addition to the "side pockets," Carlson's testimony failed to address the Special Management Unit at USP Lewisburg and the Special Confinement Unit at USP Terre Haute, both of which can be used to impose increased restrictions on inmates who pose any kind of security risk. *Id.* at 236. And finally, Carlson failed to mention the Special Housing Units present at all federal penitentiary where inmates are removed from the general population and receive increased restrictions. *Id.* at 236-37.

In addition to various housing, Bezy outlined how SAMs allows BOP to construct individualized conditions of confinement plans, codified at 28 CDR 501.3(a). Although it is true that SAMs must be periodically reviewed, inmates have been kept under SAMs restrictions for over a decade until such time as whatever threat that inmate presented is no longer deemed a concern. *Id.* at 237.

And aside from specific housing locations and formal SAM restrictions, Bezy further explained that an individual inmate's telephone privileges can be restricted or suspended if the BOP believes the inmate has abused the privilege. *Id.* at 241.

Significantly, after reviewing Robinson's prison files, Bezy noted that despite Carlson's testimony and the prosecutor's closing argument concerning the continuing danger that Robinson posed, the prosecutor did not seek any enhanced confinement for Robinson either pre-trial or post-trial. 18 U.S.C. § 3582(d) allowed the prosecutor to seek an order from the trial court restricting Robinson's ability to communicate with specific persons as part of his sentence. Although the prosecutor claims to have believed that Robinson called out a hit from his jail cell, the prosecutor made no effort to seek any kind of restrictions on Robinson's use of the telephone. Moreover, the prison did not place any restrictions on Robinson's ability to communicate with the outside world either pre-trial or in the 18 years since he was sentenced to death. Robinson has had consistent and repeated access

50

to the telephone since he was sentenced to death in 2002, and has never been accused of abusing that privilege, nor has he ever received a disciplinary write up. *Id.* at 242-44.

### 2. Robinson Is Entitled to Relief Based on the Government's Presentation of Material, False Evidence.

#### a. Relevant law

A conviction obtained by the use of false evidence, or the failure to correct false evidence, violates due process. *Napue v. Illinois,* 360 U.S. 264, 269 (1959); *United States v. Agurs,* 427 U.S. 97, 103 (1976). To prevail on a *Napue* claim, a petitioner must show that (1) there was false testimony, (2) the prosecution knew or should have known that the evidence was false, and (3) there is a likelihood the false testimony affected the judgment of the jury. *United States v. Freeman,* 650 F.3d 673, 678 (7th Cir. 2011). The good or bad faith of the prosecutor who fails to correct false testimony is not relevant. *Giglio v. United States,* 405 U.S. 150, 154 (1972).

#### b. Carlson's testimony was false

False evidence includes evidence relevant only to impeach the witness' credibility, *Napue,* 360 U.S. at 265, as well as incomplete or misleading statements that give jurors a "false impression" about the matter being discussed. *Alcorta v. Texas,* 355 U.S. 28, 31 (1957).

Carlson's testimony was incomplete to the point of misleading, and undeniably gave the jurors the false impression that the BOP could not control Robinson or limit his contact with the outside world.  Specifically, Carlson's testimony failed to mention:

- The Special Management Unit at USP Lewisburg
- Special Confinement Units at USP Terre Haute
- The Special Housing Units at any of the U.S. Penitentiaries
- SAMs restrictions
- The Court's ability to order special restrictive conditions pursuant to 18 U.S.C. section 3582
- The BOP's ability to create an individualized confinement plan to suit Robinson's individualized needs.

In fact, Carlson gave jurors the false impression that once Robinson entered a BOP facility, the prison staff would be powerless to control Robinson's access to the telephone, to limit his ability to visit with people outside the prison; and that the BOP could not limit Robinson's ability to communicate with people inside the prison.  Ex. 7, P. Carlson Testimony, at 106-07. Carlson also gave the false impression that Robinson could not be sent directly to the Ad-Max facility upon sentencing.  *Id.* at 99.  Thus Robinson's jury was left with the false impression that the only options for Robinson were either death row or a general population where he could not be controlled.

52

Bezy found numerous portions of Carlson's testimony either affirmatively false or false by omission.  According to Bezy, Carlson's failure to acknowledge the BOP's ability to authorize individualized confinement conditions, was "seriously in error."  Ex. 12, M. Bezy Decl., at 231.  Similarly, Bezy descsribed Carlson's testimony that general population inmates in a high security were free to roam in a "rather open environment" and that phone use was "difficult to control" as "gross distortions and mischaracterizations of the BOP's role, function, and abilities".  *Id.* at 232.  Carlson's failure to discuss specialty units at various prisons designed to control problematic inmates, as well as Carlson's testimony that the BOP is powerless to prohibit specific inmates from committing serious crimes while incarcerated, were also seriously problematic.  *Id.* at 230-31.  Bezy also found Carlson falsely stated 99% of the Ad-Max population consists of inmates from other high security institutions and that entry into the facility is totally based on an inmate's historical performance in an institution.  *Id.* at 230.

In *Johnson,* the Seventh Circuit found that Vanyur's testimony was not false and therefore denied Johnson's claim under *Napue*.  In so doing, the Court focused specifically on whether the testimony was literally false.  The Court examined statements such as the fact that the control unit can only house 68 inmates at any one time, and that most murderers and gang leaders are not housed at ADX, let alone in the control unit.  *Id.* at 671.  Moreover, the Court noted that Vanyur's

53

statements about a ban on permanent solitary confinement were technically correct, because solitary confinement must be renewed every 120 days. *Id*. at 972. Indeed, the Court focused almost exclusively on whether a defendant could be sentenced by a trial court to life-in-prison in a control unit, and concluded that the answer, notwithstanding the *Felipe* case, was no. *Id.* at 673-74 (citing and disagreeing with *United States v. Felipe*, 1997 WL 220302 (S.D. N.Y. Apr. 29, 1997). The Court's ultimate conclusion was that Vanyur testified that there "can be no assurance that if the defendant were sentenced to life in prison he could not commit further serious crimes" and this testimony was not false and "the impression that he conveyed of practice and legal policy was correct." *Id.* at 672.

Robinson's claim differs from Johnson, and therefore *Johnson* does not foreclose relief. The issue in Robinson's case is not the technicalities of the control unit at ADX, but rather the false impression that Carlson's testimony created that the BOP was without any means of controlling Robinson's access to the outside world. Indeed, Carlson's testimony is clear that if Robinson was not sentenced to death, he would serve his sentence in a high security prison which, unless on lockdown, are "very open" and inmates have access to use the telephone, which are open and "difficult to control," during their off-duty hours. Ex. 7, P. Carlson Testimony, at 105-07. Carlson further explained that this setup poses security risks, explaining that:

Well, it's certainly an issue in terms of the agency being worried about connections with colleagues on the outside in terms of institution security, in terms of continuing enterprise with illegal activities on the street that do impact the correctional environment. And, finally, it's a public safety problem that they struggle with in terms of having a kingpin locked up who wants to continue directing illegal activities outside.

*Id.* at 107. If BOP believed Robinson to be a kingpin who wanted to continue directing illegal activities and who posed a danger to institutional security and public safety, according to Carlson, then he would not have been left in a regular facility without increased security measures. This was the primary misleading aspect of Carlson's testimony, that the BOP was simply powerless to take any action to limit Robinson's contact with the outside world. Of course, no method of security is 100% foolproof, *Johnson*, 223 F.3d at 672, but contrary to Carlson's testimony, there are numerous things the BOP can do to neutralize the risk any given inmate may pose.

"The government's duty to assure the accuracy of its representations has been well stated, many times before." *United States v. Freeman*, 650 F.3d 673, 680 (7th Cir. 2011) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935); *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *United States ex rel. Wilson v. Warden Cannon*, 538 F.2d 1272, 1277 (7th Cir.1976)). In *Alcorta v. Texas*, the Supreme Court considered a writ of habeas corpus regarding misleading testimony. 355 U.S. 28

55

(1957).  There, petitioner Alcorta had been convicted of murdering his wife while in the presence of Mr. Castilleja.  Alcorta's defense was that he observed his wife and Castilleja kissing and killed her in a heat of passion, which according to Texas law at the time would have made him guilty of non-malice murder and resulted in a sentence of approximately five years.  Instead, Castilleja testified that he had driven Mrs. Alcorta home, they sat in the car briefly, and then she got out of the car, and that they were casual friends.  He further testified that they were not in love with each other, they had never gone on any dates, but that they worked together and Castilleja had driven her home from work several times.  *Id. at* 29-30. The Court described Castilleja's testimony as "plainly inconsistent with petitioner's claim that he has come upon his wife kissing Castelleja" in the car.  *Id.* at 30.  The jury convicted Alcorta of malice murder and he was sentenced to death. Following the trial, Castilleja signed a sworn statement in which he admitted that he had a sexual relationship with Mrs. Alcorta.  *Id.* at 30.  Castilleja testified at an evidentiary hearing that he told the prosecutor that he had had sex with Mrs. Alcorta on five or six occasions and the prosecutor told him not to volunteer this information, but to testify truthfully if asked directly.  The prosecutor's testimony was consistent with Castilleja's on this point.  *Id. at* 31.  The Supreme Court held that Castilleja's testimony was unconstitutionally misleading because it left the jury with the false impression that Mrs. Alcorta and Castilleja did not have a sexual

relationship, and a full and accurate description of their relationship would have bolstered Alcorta's heat-of-passion defense.  *Id. at* 31-32.

Similarly here, a full and accurate description of BOP procedure would have bolstered Robinson's penalty-phase defense that even if the jury believed that Robinson had attempted to kill Williams, the BOP was capable of housing Robinson in such a way that he could not direct criminal activity from prison. Instead, because of Carlson's misleading testimony, the jury was left with the wrong impression that if they did not sentence Robinson to death, Robinson could freely order hits against any witness who testified against him.

### c.    The Government knew or should have known Carlson's testimony was false

The prosecution, at minimum, *should have known* about the BOP's internal policies and manner of operations.  *See United States v. Santiago,* 46 F.3d 885, 894 (9th Cir. 1995) (finding general knowledge held by BOP is imputed to the United States Attorney's Office).  Certainly, the prosecutor would have been aware of the statutory rules granting BOP wardens and courts broad discretion to implement special conditions of confinement tailored to an inmate's particular needs and risks.  28 C.F.R. 501.3; 18 U.S.C. § 3582(e).  Further, numerous BOP reports and policy guides regarding the BOP's ability to address security risks were readily available to the prosecution.  One 1999 BOP report provides that telephone use is "subject to any limitations that individual wardens determine are necessary to

ensure the security or good order of the institution or to protect the public." Ex. 12, M. Bezy Decl., at 238. The BOP "Special Investigation Supervisors Manual" encourages wardens to take a "proactive approach to deterring criminal conduct." *Id.* at 240. A 1997 Inmate Telephone Monitoring field guide stated that inmates identified "as having a high likelihood of engaging in crime while incarcerated . . . should be targeted and their telephone conversations subject to intense review." *Id.* at 241. Moreover, given Carlson's own extensive history within the BOP, it is highly unlikely that the prosecution, in the course of consulting with him, did not learn about the various means the BOP would have had to minimize the risks Robinson would have posed to people inside and outside prison.[12] As in *Alcorta*, an evidentiary hearing would be useful on this point, but at the very least the prosecution here should have known about the misleading nature of Carlson's testimony.

> **d.    There is a likelihood the false testimony affected the jury's decision**

Robinson faces a relatively low burden in this case. Given that "it only takes one juror to nix a death sentence," he only needs to show that one juror was likely

---

[12] Undersigned counsel has attempted to speak with Carlson about his testimony in this case, but he refused to speak without representatives from the United States Attorney's Office present. Requests to set up a meeting with the United States Attorney's Office for the Northern District of Texas and Carlson went unanswered.

58

influenced by Carlos's testimony and the prosecutor's resulting argument. *United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000). Carlson's testimony on future dangerousness was devastating. He gave jurors the false impression that the BOP was powerless to prevent Robinson from committing another hit from prison. In his closing and rebuttal, the prosecution repeatedly flagged the risk of Robinson harming people inside and outside of prison while in BOP custody. *See* Ex. 8, Govt Penalty Phase Closing Arg., at 130 (arguing that Robinson has "problem solvers" outside of prison who can carry out his orders); 131 (arguing Robinson carries out hits from prison); 136 (discussing Robinson's alleged efforts to call a hit on Williams); 144 (discussing Robinson's use of three-way calls to order hit while in custody); 146 ("as long as [Robinson] has access to a telephone, [he] continues to be a danger to society"); 147 ("if anybody crosses him in prison, he is going to take it out on them"); *id.* ("[The trial witnesses] have got a target sign on their chest"). The prosecutor then repeated Carlson's testimony that Robinson would not go to "Ad-Max"–instead, "he's going to some general population somewhere," with the same open conditions as the facility from which Robinson allegedly ordered his hit on Robinson. *Id.* The prosecutor concluded that "with the telephone available to him as will be available to him at any prison setting, he is prepared to carry out whatever it takes to seek revenge on anybody," *id.* at 150, essentially leaving jurors with no choice but to vote for a death sentence in order to

59

protect the trial witnesses. *See Skipper v. South Carolina,* 476 U.S. 1, 5 n.1 (1986) (finding the relevance of future dangerousness "underscored" where prosecutor urged the jury to return a death verdict in part because "petitioner could not be trusted to behave if he were simply returned to prison).

The records show at least some jurors believed Robinson could successfully and lawfully carry out a life sentence without the possibility of parole in BOP custody. Ex. 9, Special Verdict Forms at 160-61, 168-69, 176-77, 183-84, 190, 197-98, 205-06. Had Carlson not testified falsely and the prosecutor not relied on his testimony in argument, there is a likelihood at least one juror would have been convinced a life sentence without the possibility of parole was an appropriate sentence for Robinson.

The court in *Johnson*, considering almost identical testimony, found the unchecked evidence prejudicial and granted relief. *Johnson*, 2010 WL 11668097 at *3-4. There, the court concluded that the future danger aggravating factor was the single most prejudicial factor in a death penalty case. *Id.* at *3. The court cited the Government's closing argument in the case which focused heavily on future danger and the Government's inability to control Johnson in prison. *Id.* The court also cited empirical research in support of the conclusion that evidence supporting future danger is particularly prejudicial in death penalty cases. *Id.* at *3 ("A number of studies suggest that future dangerousness is one of the most issues, if

60

not the most significant, for juries deciding whether or not to sentence a defendant to death."). And the court looked to another similar case wherein the jury found that the defendant's future danger was significantly reduced because the BOP was empowered to limit the defendant's communications with the outside world. *Id.* at *3-4. Similarly here, future danger dominated the Government's closing argument and the jury unanimously found Robinson to be a future dangerous without the ability to find that the BOP could control him in the future.

For all of these reasons, Robinson has established prejudice and is entitled to relief.

### 3.    Robinson Is Entitled to Relief Because Trial Counsel Unreasonably Failed to Challenge Carlson's False Testimony

#### a.    Relevant law

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith,* 510, 521 (2003). The "proper measure of attorney performance [is] simply reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 688. To establish prejudice, a petitioner "'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins,* 539 U.S. at 534.

At the time of Robinson's trial, trial counsel in a federal death penalty case had a duty to "discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* at 524; National Legal Aid & Defender Association Standards for the Appointment and Performance of Counsel in Death Penalty Cases ("NLADA Standards") (1997), 11.4.1(C). Counsel also had a duty to "secure the assistance of experts where it is necessary or appropriate for" the preparation of the defense, adequate understanding of the prosecutor's case, rebuttal of any portion of the prosecution's case at the penalty trial, or the presentation of mitigating evidence. NLADA Standards, 11.4.1(D)(7).

> **b.      Counsel's failure to effectively cross-examine Carlson and present an expert rebutting Carlson's false testimony was unreasonable**

Counsel did not challenge Carlson's false testimony and the prosecutor's arguments based on the false testimony. Counsel left unchallenged, for example, Carlson's testimony that the BOP is powerless to prohibit specific inmates from committing serious crimes while incarcerated and that Robinson, despite an allegation that he ordered a hit on the witness, would be classified as a general population inmate allowed to "roam around freely" in prison. *See* Ex. 12, M. Bezy Decl., at 230-32. Counsel also failed to present affirmative evidence that the BOP could control the conditions of an inmate's confinement by limiting his phone,

mail and visiting privileges or by prohibiting an inmate from congregating with other inmates in prison. *See id.* at 232, 241. This fell below the standard of prevailing professional norms.

Information rebutting Carlson's testimony, admissible either via cross-examination of Carlson or through a sur-rebuttal expert, was readily available to counsel. Title 28 C.F.R. § 501.3(a) clearly established the BOP could control the conditions of an inmate's confinement by employing Special Administrative Measures designed to "protect persons against the risk of death or serious bodily injury." The Rule explicitly authorizes the BOP to house an inmate in administrative detention and limit privileges "including but not limited to, correspondence, visiting, interviews with representatives of news media, and use of telephone." § 501.3(a). Title 18 U.S.C. § 3582(e)[13] also provided that both the court and the BOP could order a person in BOP custody to "not associate or communicate with a specified person" to prevent him from participating in criminal activity. And though Bezy was still working for the BOP when Robinson was tried, counsel could have retained an expert with the same knowledge of BOP procedures and policies to rebut and correct Carlson's false testimony.

---

[13] Both Mark Bezy's declaration and the Johnson Decision refer to 18 U.S.C. § 3582(d), as opposed to subsection (e). In 2018, the statute was amended and the provision that used to be section (d) was moved to section (e).

To the extent defense counsel believed the testimony of Cunningham was adequate to undermine Carlson's, counsel's belief was unreasonable. As trial counsel himself established during Cunningham's direct examination, Cunningham could not "hold[] [himself] out by any means as an expert" on BOP facilities. Ex. 72, M. Cunningham Trial Testimony, at 1291-92. Unlike Carlson, who worked for decades within the BOP in various capacities, including as a Warden and regional director, Cunningham, a psychologist, merely toured ADX-Florence and reviewed facility regulations. (*Id.* Further, Cunningham could only state, based on other peoples' studies, that most inmates with lengthy sentences did not go on to commit serious crimes against other inmates or BOP staff in prison. *Id.* at 1265. Cunningham could not speak specifically to Robinson's likelihood of committing serious crimes against other inmates or BOP staff. Nor could he speak with any authority about the BOP facility's ability to deter Robinson's from committing crimes outside of prison through the telephone, mail, or other inmates. Because defense counsel opened the door to Carlson's rebuttal with Cunningham's testimony, a reasonable defense attorney would have either conducted an adequate cross-examination of Carlson or been prepared with a sur-rebuttal expert to accurately testify regarding BOP policy and procedure.

In *Johnson,* the Northern District of Illinois ultimately granted Johnson penalty relief under *Strickland* based on trial counsel's failure to rebut Vanyur's

64

testimony.  (Case No. 02-6998 (2010).  Like in this case, defense counsel in

*Johnson* presented general evidence about the different conditions of confinement

in various BOP facilities.  (Johnson Decision 2-3.)  In rebuttal, the prosecution in

*Johnson* presented a BOP expert who testified that petitioner, an alleged gang

leader, would enter the general population, rather than a more restrictive setting;

that inmates could order hits from prison; that individuals cannot be assigned

directly to an Ad-Max facility from trial; and that even if the BOP could impose

restrictions on an inmate's ability to talk to others, such restrictions could only be

imposed temporarily.  (Johnson Decision at 3.)  Like the prosecutor here, the

prosecutor in *Johnson* falsely argued in closing that the BOP was powerless to

prevent Johnson from ordering hits from prison.  (Johnson Decision at 6)

("[N]obody is safe; no witness, no witness's family, anybody who stands in his

way . . . .")

In habeas, the government in *Johnson* conceded that trial counsel did not

effectively impeach the testimony of the Government's expert regarding petitioner

Johnson's future dangerousness.  (Johnson Decision at 4.)  This Court should find

the same.  Both the expert here and in *Johnson* gave jurors the wrong impression

that the BOP had no power to impose conditions to reduce the possibility of

inmates in prison committing future crimes unless they have already misbehaved

while in BOP custody.  In both cases, counsel failed to cross-examine the

65

government witness based on the language in 28 C.F.R. § 501.3(a) or 18 U.S.C. § 3582(e).

Reasonable counsel here would not have allowed Carlson's false testimony to stand unchallenged. Reasonable counsel would have instead, discovered and employed the available statutory information to effectively cross-examine Carlson and presented an expert to rebut Carlson's false testimony. Especially where, as here, trial counsel opened the door to Carlson's testimony with Cunningham's testimony, counsel had a duty to educate himself on the BOP policies at issue. Counsel's failure to do so fell below an objective standard of reasonableness.

### c. But for counsel's deficient performance, there is a reasonable probability at least one juror would have changed his or her verdict

Had counsel performed reasonably, the jurors would have learned that much of Carlson's testimony was false.

Based on conditions of confinement Bezy personally observed, administered, and imposed while working for the BOP, Bezy stated "there is no doubt that the BOP has, at all times, the authority and ability to house inmates in the most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's future dangerousness." Ex. 12, M. Bezy Decl., at 228. Bezy stated BOP officials have the power to place inmates in conditions where they would not have the ability to freely communicate with anyone from

66

outside the prison, whether by phone, in person or mail. *Id.* Such conditions could be imposed "for as long as the BOP deems it necessary to ensure the safety of either prison staff, other inmates, or the public." *Id.* Bezy found that given Robinson's convictions and the allegation he used the phone from jail to order a hit, the BOP would have been authorized to limit and conduct an "intensive monitoring" of his communications, "whether they be in person or by telephone or mail . . . no matter where his placement." *Id.* at 242.

According to Bezy, most facilities within the BOP, regardless of classification, have the ability to house and create specialized conditions of confinement for high-risk inmates. *Id.* at 231. For example, USP-Marion had a special unit called the K-Unit housing high security inmates who were held in single cells, exercised and worked by themselves, and had no contact with other inmates. *Id.* at 233. USP-Marion also had the I-Up Unit where the BOP housed one inmate affiliated with the Aryan Brotherhood to ensure he did not commit, order, or direct any criminal activity – the inmate was separated from the rest of the prison population and continuously monitored by an office. *Id.* at 234. The Special Management Unit at USP-Lewisburg, Pennsylvania has controls similar to those at ADX. *Id.* at 236. USP-Terre Haute also maintains a Special Confinement Unit not limited to inmates on death row. *Id.* Moreover, all maximum-security federal prisons contain a Special Housing Unit. *Id.* Bezy found that many of these

67

specially restrictive units were available at the time of Robinson's sentencing and Robinson could have been assigned to them. *Id.* at 244.

The prosecutor seized on the errors and gaps in Carlson's testimony, which falsely advanced an "either/or proposition: either an individual is sentenced to death or he receives a great deal of freedom." *Id.* at 232. In closing, the prosecutor argued that the trial witnesses all "have got a target sign on their chest" and as long as Robinson could "get word out to take care of" them, no one would be safe. Ex. 8, Govt Penalty Phase Closing Arg., at 147. Such an argument basically left jurors with no choice but to vote for death. The argument was particularly impactful as it was given towards the end of rebuttal, ensuring it was among the last words from an attorney that were heard by the jury before deliberations. Moreover, defense counsel said nothing about Carlson's testimony in their closing, which had the likely effect of signaling to jurors it could not be rebutted. Not surprisingly, the jury unanimously found Robinson to pose a future danger to the lives of others as to each count charged. Ex. 9, Special Verdict Form, at 157, 165 173, 180, 188, 195, 202.

As noted by the district court in *Johnson,* jurors consider future dangerousness to be among the most important factors to sentencing in capital trials. *See, e.g.* Stephen P. Garvey & Paul Marcus, Virginia's Capital Jurors, 44 Wm. & Mary L. Rev. 2063, 2089-91 (2003) (analyzing Virginia capital jurors

68

based on the research results from the Capital Jury Project, a consortium of studies on the decision-making of jurors in capital cases); John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397, 402 (2001) note 76, at 406-07 (discussing significance of future dangerousness to capital jury deliberations).  In *Johnson,* the government admitted in briefing that the prosecution expert's failure to address the BOP's ability to tailor restrictive conditions of confinement to the particular needs of an inmate "may have" caused the jury to hold "the mistaken impression that no such legal authority existed." (Govt Johnson Brief at 16.) A mistaken impression of the BOP's helplessness would have been particularly impactful here given that the prosecution argued Robinson would be ordering hits from prison if sentenced to LWOP and sent into the general population.

The jury verdict forms support finding that the jurors gave significant thought to Robinson's future dangerousness and were open to the possibility of a life sentence in this case.  The forms show a number of jurors believed that Robinson could adapt to prison if sentenced to life without the possibility of parole; that the availability of a life sentence mitigated against the death penalty; and that Robinson presented a low risk of harm to others in prison.  Ex. 9, Jury Verdict Forms, at 160-61, 168-69, 176-77, 183-84, 190, 197-98, 205-06.  These findings were not enough for any one juror to vote in favor of a life sentence.  But

69

if counsel acted reasonably and rebutted Carlson's testimony, there is a reasonable probability at least one juror would have voted for a life sentence.[14]

### 4.   Robinson Is Entitled to Relief Because the Prosecutor Failed to Disclose Mitigating Information

To the extent this Court finds any information that could have rebutted Carlson's testimony was not reasonably discoverable by trial counsel through due diligence, Robinson is entitled to penalty relief under *Brady v. Maryland,* 373 U.S. 83 (1963).  Under *Brady,* prosecutors have a duty to provide the defense with exculpatory evidence material to the issue of guilt and punishment.  *Id. at* 87. Material evidence also includes evidence that could be used to impeach prosecution witnesses.  *Kyles v. Whitley,* 514 U.S. 419, 433 (1995).  The prosecutor's non-disclosure is prejudicial if "the net effect of the evidence withheld by the state . . .  raises a reasonable probability that its disclosure would have produced a different result." *Id. at* 422.

Information about the ability of the BOP to house Robinson in way that minimized the risk of him harming others would have been material to the issue of

---

[14] Aspects of this claim are included in Claim Four.  Claim Four is focused on trial counsel's ineffective assistance of counsel.  *Strickland* prejudice is assessed cumulatively, *Myers v. Neal*, 975 F.3d 611, 623 (7th Cir. 2020) and therefore to the extent the Court finds Robinson's counsel's performance deficient but not necessary prejudicial, counsel's deficiencies should be considered in conjunction with those raised in Claim Four.

penalty, specifically to the jury's assessment of Robinson's future dangerousness. Had such information been disclosed, defense counsel could have used it to undermine Carlson's false testimony regarding the BOP's inability to control Robinson from committing further crimes in prison. For the reasons set forth in Section B.3 and C.4, there is a reasonable probability that disclosing to defense counsel information that could have been used to rebut Carlson's testimony would have resulted in at least one juror changing their penalty decision.

**5.      The Savings Clause does not bar this Court from considering this claim.**

On June 8, 2010, the Fifth Circuit denied Robinson's request for a certificate of appealability regarding his section 2255 motion. *United States v. Robinson*, 2010 U.S. App. LEXIS 11675. At that time, Robinson was unaware of the nature of this claim, and remained unaware of the nature of the claim until after the *Johnson* decision was issued by the Northern District of Illinois on December 13, 2010. By that time, there was no way to raise this claim either to the trial court or to the Fifth Circuit. 28 U.S.C. § 2255(h); *see Webster v. Daniels*, 784 F.3d 1123, 1134-35 (2015) (summarizing the Fifth Circuit's finding that because the new evidence only supports a challenge to the death sentence, relief is not available under section 2255(h)).

The Seventh Circuit has previously held that, when newly discovered evidence surfaces after an inmate's section 2255 proceedings have resolved, and

71

that evidence does not satisfy the strictures of section 2255(h), the inmate's case can proceed under section 2241. *Webster*, 784 F.3d at 1140-41. The Court provided an example wherein an individual was sentenced to death and then, after his section 2255 proceedings concluded adversely to the individual, he discovered new evidence establishing that he was only 17 at the time of the crime. The Court explained that in order to avoid an execution in plain violation of the Eighth Amendment, "the defendant is entitled to be heard under section 2241." *Id. at* 1141. Similarly here, to avoid Robinson's execution in violation of the Sixth Amendment Due Process Clause, Robinson has satisfied the savings clause.

With respect to the ineffective assistance of counsel aspect of this claim, or any argument concerning whether the prosecutorial misconduct aspect could have been raised sooner, Robinson refers back to the limited period of time that undersigned counsel received to prepare and file Robinson's initial section 2255 motion. Section 2255 movants are entitled to one year to investigate and present their post-conviction claims for relief. But because the trial court rejected the FPD's initial request to be appointed and only eventually appointed the FPD four months prior to the due date for a timely filed section 2255 motion, Robinson's counsel was significantly hampered in its ability to conduct an adequate investigation and present all viable claims for relief.

72

In the alternative, if the Court finds that post-conviction counsel should have raised this issue in the section 2255 motion, then Robinson pleads that his post-conviction counsel were ineffective in their representation of counsel.[15]  In *Purkey v. United States*, a three-judge panel of the Seventh Circuit held that ineffective assistance of post-conviction counsel under *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013) does not satisfy the savings clause. 964 F.3d 603, 618 (7th Cir. 2020).  The Court, however, believed that if its interpretation of the savings clause was too narrow, Purkey would have significant issues to litigation.  The Court chose to stay Purkey's pending execution such that the full Court could decide the issue *en banc* if it so chose.  *Purkey*, 964 F.3d at 618.  This order was entered less than two weeks prior to Purkey's scheduled execution, however, and the Supreme Court voted 5-4 to vacate the stay.  *Purkey v. United States*, Supreme Court Case Number 20A4.  As a result, the full court was never permitted to consider the propriety of the *Purkey* decision.  Because this case presents the identical issue, Robinson preserves this argument for later review.

---

[15] None of Robinson's initially assigned attorney's at the FPD are still actively working on Robinson's case, and therefore undersigned counsel does not believe there is a conflict in the FPD raising this issue about its prior representation of Robinson.  If the Court disagrees, Robinson requests appointment of counsel for the limited purpose of litigating this issue.

**C.    CLAIM THREE: Trial counsel was ineffective for failing to object to the prosecutor's racially motivated peremptory strikes.**

Robinson's conviction and death sentence were imposed in violation of the Fifth, Sixth, and Eighth Amendments to the Constitution because the government unconstitutionally excluded African-American people from serving on Robinson's jury, and Robinson's counsel failed to enforce Robinson's rights on appeal.

**1.    Factual Background**

Robinson's 125-person venire panel included ten Black people (nine black women and one black man).  Eighty-two jurors were questioned during voir dire; eight of those questioned (9.7%) were Black.  The prosecution struck two Black jurors for cause, citing the venirepersons' opposition to the death penalty.  Ex. 63, Voir Dire Excerpts, at 946 (M. H.); Ex. 65, Voir Dire Excerpts, at 972 (C. H.).[16] Two other Black jurors were excused for cause by stipulation.

Counsel for each side was allowed 21 peremptory strikes.  The prosecution used 15 of its peremptory challenges.  Three of those strikes, or 20% of the prosecutor's strikes, were used against Black jurors.  Ex. 64, Voir Dire Excerpts, at 964 (D. D.); Ex. 65, Voir Dire Excerpts, at 987 (M. A.).  The prosecutor used

---

[16] The defense objected to the causal strike of Carnesia Hall on the grounds that she repeatedly indicated that she could impose the death penalty, given the proper circumstances.  Ex. 65, Voir Dire of C. Hall, at 972-73.

peremptory challenges to eliminate three of the four (75%) Black potential jurors. Ultimately, of the 12 jurors and two alternates, only one was Black.

Trial counsel objected to the prosecutor's strikes citing *Batson*, but the trial court overruled the objections. On appeal, counsel failed to raise a *Batson* claim.

### 2.    Legal Standards

Criminal defendants have the right to effective assistance of counsel on appeal. *Smith v. Robbins*, 528 U.S. 259 (2000); *Smith v. Murray*, 477 U.S. 527 (1986). Claim of ineffective appellate counsel are evaluated under the familiar framework of *Strickland v. Washington*, 466 U.S. 668 (1984). *Robbins*, 528 U.S. at 285-86. "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 514, 522, 524 (2003). Under the deficient-performance prong, "[t]he proper measure of attorney performance [is] simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. To establish prejudice, a petitioner "'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins*, 539 U.S. at 534. In the context of appellate counsel, this means showing a reasonable probability that petitioner would have prevailed on appeal. *Robbins*, 528 U.S. at 285-86.

"The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008); *Flowers v. Mississippi*, 139 S. Ct. 2228, 2242 (2019 ("[E]ach removal of an individual juror because of his or her race is a constitutional violation."). "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Id. at* 86. *Batson* set forth a three-part, burden-shifting test. At step one, the defendant must make out a prima facie case by showing facts that give rise to an inference of discrimination. *Batson*, 476 U.S. at 93-94. Defendants need only produce "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005). If the court finds a prima facie case of discrimination, the burden shifts to the State at step two "'to explain adequately the racial exclusion' by offering race-neutral justifications for the strikes." *Id. at* 168. At step three, the court evaluates whether the defendant has established purposeful discrimination. *Id. at* 168. *Batson*'s third step requires a searching inquiry including considering "all relevant circumstances." *Miller-El v. Dretke* ("*Miller-El II*"), 545 U.S. 231, 240 (2005). Comparative juror analysis is one way to determine whether the prosecutor's stated reasons were pretextual. *Id. at* 240-42. If the proffered reason for striking a Black potential juror applies just as well to an otherwise similar non-Black potential juror

76

who is permitted to serve, that amounts to evidence "tending to prove purposeful discrimination." *Id.* at 241; *see also Flowers*, 139 S. Ct. at 2243 (listing types of evidence of racial motivation).

### 3. Appellate counsel's failure to present Robinson's *Batson* claim on appeal was deficient.

Appellate counsel unreasonably failed to present Robinson's *Batson* claim in his direct appeal. At the time of Robinson's direct appeal, his appellate counsel had a professional duty to be familiar with relevant law, including precedent relating to jury selection. 2003 ABA Guidelines, Guideline 10.10.2(B). Counsel was expected to evaluate all available legal claims and present legal claims that were "arguably meritorious," making an effort to "preserve them for subsequent review." *Id.* at Guideline 10.15.1(C). The Guidelines explicitly advise caution in winnowing claims because "[w]hen a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited." *Id.* at Commentary to Guideline 10.15.1.

Robinson's trial counsel also represented him on direct appeal. Thus, it is clear that appellate counsel was aware of *Batson* because they raised the objection at trial. They were also aware that Robinson is Black, which would give a reasonable attorney cause to carefully consider any racial issues. *Id.* at Commentary to Guideline 10.10.2 ("Bearing in mind that the history of capital punishment in this country is intimately bound up with its history of race relations,

counsel should determine whether discrimination is involved in the jury selection process."). Moreover, it is clear that they thought the issue had some possible merit, because they made the objection at trial. Given that *Batson* constitutes structural error, a reasonable appellate attorney would have particular motivation for carefully considering presenting this claim. This is all the more true because failing to pursue a *Batson* claim on direct appeal risks permanent waiver.

Given the facts and circumstances surrounding the strikes at Robinson's trial, a reasonable appellate attorney would have presented this claim on appeal. Although the *Batson* objection was denied at trial, this is of course true of every appellate claim. On appeal, counsel could have engaged in comparative juror analysis, which it did not argue at trial and which would have been difficult for trial counsel to conduct on the spot. Moreover, pursuing the issue on appeal and preserving it for further review might have given counsel an opportunity to further develop the record, such as by seeking prosecution voir dire notes, which have sometimes provided powerful evidence of racial motivation. *See, e.g., Foster v. Chatman*, 136 S. Ct. 1737, 1750 (2016) (finding support for racial motivation among prosecution notes); *Miller-El v. Dretke*, 545 U.S. 231, 266 (2005) ("The prosecutors' own notes proclaim that the Sparling Manual's emphasis on race was on their minds when they considered every potential juror.").

78

**4.    Robinson demonstrates prejudice because there is a reasonable probability an appellate court would have found his *Batson* claim meritorious.**

**a.    Statistical disparities support an inference of discrimination satisfying Batson's step one and a conclusion of substantial racial motivation at step three.**

Because the prosecution explained the strikes of juror M. A. and juror J. B. and decided the ultimate issue, *Batson*'s step one is moot. *Hernandez v. New York*, 500 U.S. 352, 359 (1991).  Regardless, Robinson satisfies that step because the statistical disparities are sufficient to raise an inference of discrimination.

As described above, the prosecutor's use of peremptory strikes disproportionately focused on Black jurors in two ways.  The prosecution used 20% of its peremptories against Black jurors, who made up less than 10% of the jurors voir dired.  As a result of these strikes, 75% of the potential Black jurors were struck.  By contrast, the prosecution's peremptories eliminated only 11 out of 70 White jurors who were questioned, less than 16%.  These disparities support an inference of racial motivation.  *Batson*, 476 U.S. at 93, 97 (statistical disparities can raise an inference of discrimination); *see also Harris v. Hardy*, 680 F.3d 942, 961-62 (7th Cir. 2012) (fact that state used a disproportionate percentage of its peremptories to remove 71% of Black jurors supported an inference of discrimination).

The same disparity is relevant to the Court's ultimate conclusion at step three of the analysis. *Flowers*, 139 S. Ct. at 2243 (listing statistical disparities in peremptory strikes as relevant evidence of racial motivation); *Miller-El II*, 545 U.S. at 240-41. The prosecution's causal strikes also disproportionately affected Black jurors. The prosecution used two of its six total cause challenges (33%) against Black jurors who constituted less than 10% of those who were questioned. While the ultimate question in a *Batson* claim is about the motivation for peremptory strikes, the use of causal strikes is also part of the wide range of evidence that the Court can consider. *Flowers*, 139 S. Ct. at 2243 (defendants may present "other relevant circumstances that bear upon the issue of racial discrimination").

> **b.    The strike of juror M. A. was substantially motivated by race.**

When the prosecution used a peremptory strike against juror M. A., a Black woman, defense counsel objected citing *Batson*. Ex. 65, Voir Dire Excerpts, at 987-88 (M. A.). The prosecution justified its strike by claiming that this juror "expressed great reluctance" to impose the death penalty." *Id.* at 989.

Review of the record demonstrates that this excuse was pretextual. Although juror M. A. gave some ambiguous answers on her questionnaire regarding the death penalty, she noted that its use "depend[s] on the circumstances of the crime." Ex. 13, Juror Questionnaire of M. A. She further indicated she

80

believed "that the death penalty is appropriate for some crimes involving murder and I could return a verdict which assessed the death penalty in a proper case." *Id.* at 46. Similarly, during voir dire, she stated that "there are some circumstances (sic) that do deserve the death penalty." Ex. 65, Voir Dire Excerpts, at 983 (M. A.). When the prosecutor asked if she was a conscientious objector regarding the death penalty, she affirmed that she could impose it depending on the circumstances. *Id.* at 984. The prosecutor then offered an extended version of the same question:

> ...there are some people who out of a sense of goodness, justice, mercy, faith, whatever it may be, know in their heart of hearts that if it came down to that and in any case, they know they would say 'let God choose the time.' I just can't do that. And I suppose the question is, does that describe [M. A.]?

*Id.* at 986.

The prosecutor engaged in lengthy and repetitive questioning of this jurors. Moreover, review of the voir dire shows that no other juror was presented with the "conscientious objector" colloquy. This difference in questioning of a Black juror supports the conclusion that the strike was substantially racially motivated. *Flowers*, 139 S. Ct. at 2243.

In justifying the peremptory strike of juror M. A., the Government referenced its prior strike of B. B., a 45-year-old white woman, claiming that her

81

"views on the death penalty were quite similar, if not congruent, with those expressed by [M. A.]." Ex. 65, Voir Dire Excerpts, at 989 (M. A.). The record also disproves this claim. Juror B. B. expressed clear support for the death penalty, noting in her questionnaire that "certain types of behaviors will not be tolerated." Ex. 14, Juror Questionnaire of B. B., Nos. 45-46, 52a; *see also* Ex. 65, Voir Dire Excerpts, at 974 (M. A.). During voir dire she said she "would not have a problem" evaluating the penalty. *Id.* at 976. The Government's questioning of this juror focused on the fact that she had been molested as a child and that she had expressed an unusual interest in serving on the jury. *Id.* The prosecution's false comparison to justify its strike undermines its stated reasons. *Flowers*, 139 S. Ct. at 2243 ("[A] prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing" may be evidence of racial motivation).

"If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise similar non-black who is permitted to serve, that is evidence tending to prove purposeful discrimination at *Batson*'s third step." *Miller-El II*, 125 S. Ct. at 2325. The prosecution allowed White jurors with comparable views of the death penalty to serve, undermining its stated justification for striking juror M. A.

For example, seated juror J. B., a White man, stated on voir dire that he would only use the death penalty in "extreme cases," that it would be "very hard"

for him to participate in the penalty process, that he was "certainly uncomfortable" with capital punishment, and that he thought it was good that the law puts so many hurdles in the path of the death penalty.  Ex. 63, Voir Dire Excerpts, at 942-44 (J. Broome).  Seated juror S. M., a White woman, stated it would "bother her a great deal" to participate in a process where the ultimate result may be execution, that although she could vote for the death penalty, it would be "very difficult" and that "the thought of being responsible for someone's death is something that would not be an easy decision" for her.  Ex. 63, Voir Dire Excerpts, at 953-55 (S. M.).  D. T., a White juror, stated that he was "very sorry" the death penalty had to exist, that the imposition had to be done "amazingly carefully," and that he "had a hard time" saying he was for capital punishment though he was not against it either.  Ex. 64, Voir Dire Excerpts, at 957-58 (D. T.).  Finally, D. B., a white woman who was seated, indicated that she would always vote for life imprisonment over the death penalty, and that as a Christian she believed that imposing the death penalty is a decision she would carry with her the rest of her life.  *Id.* at 959-60 (D. B.).  That the prosecution allowed White jurors with equivalent views to juror M. A.'s to serve demonstrates that the stated justification was pretextual.

Because even a single racially motivated strike is a constitutional violation, this showing alone is sufficient to demonstrate prejudice.  *Flowers*, 139 S. Ct. at 2242.

83

### c.    The strike of juror D. D. was substantially motivated by race.

The prosecution used another peremptory strike against juror Debose, a 56-year-old Black woman.  Ex. 64, Voir Dire Excerpts, at 963.  The prosecutor initially stated that she was "known to members of [his] family" and that he had "reputation information concerning [D. D.]."  *Id.* at 964.  He then added that he had reviewed the cases D. D.'s of husband and brother for drug offenses and felt that "a woman [such as D. D.] who has had that experience" and "who would be of the same age as the defendant's mother, would not be a juror acceptable to the state."  *Id.* at 964-65.  When the trial court asked for specific information, the prosecutor claimed "only a vague recollection . . . in my early days in this office" that there was a "writ of habeas corpus" for "some relative of the defendant [D. D.]."  *Id.* at 964-66.  Finally the prosecutor claimed that D. D.'s husband had pleaded guilty to a federal drug trafficking crime before another judge in that district. *Id.* at 966-67.  When the court's questioning persisted, the prosecutor conferred with co-counsel and added another justification, that the Government had a "general feeling that [D. D.] expressed what I perceived to be a reluctance regarding the death penalty."  *Id.* at 967.

The prosecutor never stated what he supposedly knew about juror D. D.'s reputation.  Upon inquiry from defense counsel, the court declined to ask for elaboration, instead relying on the fact that her husband supposedly had been

84

convicted of a drug crime. *Id.* at 969-70. This vague reference to "reputation," without any explanation whatsoever, fails to articulate any basis for the strike. Defense counsel could not rebut such a statement and the court could not evaluate either its accuracy or the sincerity with which the prosecutor believed it. Given that the trial court declined to rely on it, it should not be considered here.

The Government's failure to question D. D. on the nature and effect of any prior conviction suggests that the proffered reason was not truly of concern to the Government. *See Miller-El II*, 545 U.S. at 246 ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination."). Further suggesting that the criminal record of family members was not a true concern, the Government made no inquiry of potential juror M. C., upon his disclosure that his stepson was in prison. Ex. 63, Voir Dire Excerpts, at 947. The Government did not strike this White juror who had a family member with a criminal record.

The prosecutor's claim that this juror might relate to Robinson because she would be a similar age to his mother is equally baseless. The prosecutor allowed several White jurors of similar ages to D. D. to serve: Juror J. R. B. Broome (age 53), Juror M. C. (age 55), Juror S. M. (age 59), Juror R. B. (age 53), and Alternate Juror B. S. (age 57). Juror D. D. stated that she had no children, further

85

undermining any suggestion that she would identify with Robinson's mother.  Ex. 15, Juror Questionnaire of D. D., at 13.  Finally, the prosecutor did not ask her any questions related to this issue, which one would expect if it were a true point of concern.  *Harris*, 680 F.3d at 961-62.  The fact that this explanation provided by the prosecutor is obviously pretextual should cause the Court to view the other stated reasons with skepticism.  *Id.* at 960 ("A pretextual reason bears on the plausibility of other reasons given.") (citing *Snyder*, 552 U.S. at 478; *Miller-El II*, 545 U.S. 251-52).

The prosecutor's stated concern about this juror's death-penalty views was also pretextual.  First, it should be noted that the trial court did not rely on that justification in denying the objection and therefore made no credibility finding regarding it.  Ex. 64, Voir Dire Excerpts, at 969-70.  Juror D. D. stated she could assess the death penalty under the proper set of circumstances, could recommend a sentence of death even if life without parole was an option, and agreed that "we must have the death penalty for some crimes."  Ex. 15, Juror Questionnaire of D. D., at Nos. 29, 47, 52a.  Indeed, as the prosecutor pressed her for examples of times when the death penalty would be inappropriate, she offered killings in self-defense or during war–situations where the death penalty (or possibly even a murder conviction) would not be possible.  Ex. 64, Voir Dire Excerpts, at 962.  As discussed above, the prosecutor allowed various White jurors to serve whose views

86

of the death penalty were equivalent or more opposed.  This fact further supports

the conclusion that the strike of Juror D. D. was substantially racially motivated.

Because even a single racially motivated strike is a constitutional violation,

this showing alone is sufficient to demonstrate prejudice.  *Flowers*, 139 S. Ct. at

2242.

> **d.     The prosecution's strike of juror C. B. provides additional support for the conclusion that its strikes were substantially motivated by race.**

The prosecution also used a peremptory strike against Black prospective

juror C. B.  Trial counsel raised no objection (likely because the defense also

struck her) but this strike should be considered among the circumstances relevant

to evaluating the two challenged strikes.  *Hardy*, 680 F.3d at 951 (explaining that

peremptory strikes not objected to are among the relevant circumstances courts

should consider in a *Batson* challenge).

Though the Government was not forced to justify its peremptory strike of

juror C. B., nothing in her jury questionnaire or voir dire would indicate that she

would be an unacceptable juror for the Government.  She expressed firm support

for the death penalty, stating "it serves its purpose" and that she "ha[s] no problem

with it" so long as the evidence proved the defendant guilty.  Ex. 63, Voir Dire

Excerpts, at 948 (C. B.).  Juror C. B. revealed that her cousin was murdered by an

ex-girlfriend who was sentenced to only a few years in prison, a punishment C. B.

felt was too lenient. *Id.* at 948-50. Much of the Government's questioning of C. B. was focused on non-legal matters, including her work as a restaurant manager, her love of basketball, and her admiration for Dr. Phil, a regular guest on the Oprah Winfrey Show. *Id.* at 950-52. The fact that the defense struck juror C. B. underscores the point: defense counsel apparently thought she would be a poor juror for its side. The prosecution's strike of a Black juror who would appear to be a prosecution-friendly choice supports the conclusion that this strike and others were substantially motivated by race. *Harris*, 680 F.3d at 957 ("The fact that a stricken juror 'should have been an ideal juror in the eyes of a prosecutor' is one of those relevant circumstances to be considered in deciding whether Harris has raised an inference of purposeful discrimination.") (quoting *Miller-El II*, 545 U.S. at 247).

### 5. The Savings Clause Permits this Court to Consider this Claim

Robinson demonstrates that he could have presented a strong claim of structural error on appeal by raising this *Batson* claim. No reasonable appellate attorney would have foregone it. Robinson is entitled to relief due to the ineffective assistance of his appellate counsel.

Robinson's section 2255 proceedings were inadequate to resolve this issue. First, these issues should have been raised on appeal, not in 2255, but because the Fifth Circuit appointed Robinson's trial counsel as appellate counsel, Robinson

88

was left with the same ineffective attorneys.  Robinson tried to remedy this situation by writing to the Fifth Circuit and requesting that the court intervene.  He explained that he had not seen the appellate brief until after it was filed, his attorneys had been refusing to cooperate with him and failed to provide him with copies of his trial record, and that he wanted additional issues raised.  The Fifth Circuit refused to take any action on his letter.  In response, Robinson again wrote to the Fifth Circuit and informed the court that the issue had not been resolved and that there was a conflict between he and his attorneys that was affecting his right to a fair appellate procedure.  Ex. 16, J. Robinson Ltrs to Fifth Cir.  The Fifth Circuit failed to order a hearing to conduct any kind of hearing with respect to Robinson's representation or the status of his appeal, and affirmed his convictions and sentences.

Robinson was thus forced to raise the *Batson* issues as ineffective-assistance-of-appellate counsel claims in his section 2255 motion.  After Robinson filed his section 2255 motion, Robinson's trial lawyers and the defense trial investigator met with the Government and provided affidavits in response to allegations made in Robinson's 2255 motion.  Their cooperation with the Government was contrasted with trial counsel Strickland's refusal to provide habeas counsel with Robinson's trial file for over two months and only after litigating a subpoena for the files.  Dkt. No. 2223, 24, 28, 29, 2237.

89

Despite this ongoing conflict between Robinson and his trial counsel that played out in front of the Fifth Circuit and the district court, the district court denied Robinson's section 2255 motion without a hearing. With respect to his ineffective assistance claims, the district court relied heavily on Strickland, Ball, and Cummings' affidavits to deny Robinson's claims. Dkt. 2453 at 15 (citing Strickland Affidavit in response to Robinson's claim that trial counsel failed to hire a skilled investigator); 16 (citing Cummings' affidavit in support of trial counsel's investigation); 23 (citing Ball and Strickland's affidavits to explain why counsel did not fire a mitigation specialist); 26 (citing Ball, Strickland, and Cummings' affidavits in support of counsel's decision not to present mental health deficiencies); at 27 (citing Ball affidavit to explain counsel's failure to rebut aggravating evidence).

In response to this particular claim, the district court relied on an affidavit executed by the trial prosecutor establishing race neutral reasons for exclusion of Black potential jurors. *Id. at* 34, 35. Robinson was never given an opportunity to confront the affiants' statements used against him. To the contrary, however, the district court largely disregarded multiple affidavits filed by Robinson in support of his claims. Relying on the government's untested evidence, of itself, demonstrates a deficient fact-finding proceeding. But that process, in combination with the

90

district court disparate treatment of Robinson's affiants, demonstrates that section 2255 relief was not available to Robinson in the Fifth Circuit.

**D.    CLAIM FOUR: Trial Counsel was ineffective at the penalty phase of Robinson's trial.**

### 1.    Procedural History

The District Court for the Northern District of Texas sentenced Julius Robinson to death on June 5, 2002.  *United States v. Robinson*, CR-260-2, Dkt. 1740.  The Fifth Circuit affirmed Robinson's convictions and sentences, *United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004), and the Supreme Court denied certiorari.  *Robinson v. United States*, 543 U.S. 1005 (2004).

Pursuant to 28 U.S.C.  Section 2255, Robinson filed a motion in the Northern District of Texas to vacate his convictions and sentences.  *United States v. Robinson*, CR-260-2, Dkt. 2279.  Notwithstanding the government's concession that Robinson was entitled to an evidentiary hearing on his penalty-phase ineffective assistance of counsel claim (*id.*, Dkt. 2365 at 90, 2439 at 10), the district court summarily denied Robinson's Section 2255 motion.  *Id.*, Dkt. 2453.  The district court also denied his request for a certificate of appealability ("COA"), finding that because Robinson had failed to produce "independent indicia of the likely merit of either [*Strickland* prong] . . .  it does not appear that reasonable jurists would disagree with the denial of this claim." *Id.*, Dkt. 2473 at 4.  Much of the Court's Order was a defense of the Court's merits denial.  *Id. at* 3-4.

91

The Fifth Circuit affirmed, *United States v. Robinson*, 2010 U.S. App. LEXIS 11675 (5th Cir. 2010).  On review of Robinson's request for a COA, the Fifth Circuit skipped an analysis of the deficient performance prong, and instead decided that even if Robinson could establish deficient performance, he could not establish prejudice–i.e., he failed to win his *Strickland* claim on the merits.  *Id. at* *11.  The Supreme Court denied certiorari.  *Robinson v. United States*, 565 U.S. 827 (2011).

On February 28, 2018, Robinson filed a motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(6) in the United States District Court for the Northern District of Texas.  Relying on *Buck v. Davis*, 137 S. Ct. 759 (2017) (reversing the denial of Buck's Rule 60(b) motion and motion for COA), Robinson argued, *inter alia*, that the denial of a COA on this claim was erroneous and a denial of due process in his post-conviction proceedings.  *Robinson v. United States*, 2018 U.S. Dist. Lexis 102960 (N.D. TX June 20, 2018).  The district court deemed Robinson's Rule 60(b)(6) motion a second or successive § 2255 motion and transferred it to the Fifth Circuit Court of Appeals.  *Id*.  That order was a final, appealable order, requiring no certificate of appealability ("COA").  *United States v. Fulton*, 780 F.3d 683, 687-88 (5th Cir. 2015).

Robinson filed a timely notice of appeal.  The Fifth Circuit ruled that Robinson's Rule 60(b)(6) motion was a second or successive section 2255 motion

92

and that Robinson failed to meet the standard for certification of such a pleading. In a published opinion, the Fifth Circuit denied his motion for authorization and dismissed the appeal for want of jurisdiction. *United States of America v. Julius Omar Robinson (In re Robinson)*, 917 F.3d 856 (5th Cir. 2019).

## 2.    Relevant Law

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith,* 510, 521 (2003).  The "proper measure of attorney performance [is] simply reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 688.  To establish prejudice, a petitioner "'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins,* 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 695).

The Sixth Amendment requires that trial counsel not only provide effective representation during the trial, but also that counsel conduct a sufficient investigation, both factual and legal, to insure that all available defenses are explored and considered.  The Supreme Court has held that "defense counsel must obtain information that the [government] has and will use against the defendant." *Rompilla v. Beard*, 545 U.S. 374, 387.  Additionally, in capital cases, a reasonable

93

and effective defense requires investigation of the client's social history. *Williams (Terry) v. Taylor*, 529 U.S. 362 (2000); *Wiggins*, 539 U.S. at 510; National Legal Aid & Defender Association Standards for the Appointment and Performance of Counsel in Death Penalty Cases ("NLADA Standards") (1997), 11.4.1(C). Counsel also has a duty to "secure the assistance of experts where it is necessary or appropriate for" the preparation of the defense, adequate understanding of the prosecutor's case, rebuttal of any portion of the prosecution's case at the penalty trial, or the presentation of mitigating evidence. NLADA Standards, 11.4.1(D)(7).

### 3.    Factual Background

#### a.    Trial counsel conducted a woefully deficient penalty phase investigation.

The federal government charged Robinson, along with forty-four other individuals, with participating in a drug-trafficking enterprise. The prosecution also charged Robinson with the murders of Johnny Shelton and Juan Reyes, and for being a member of the conspiracy when Rudolfo Resendez was killed. All three charges carried the possibility of the death penalty. In support of a death sentence, the prosecution alleged that Robinson was a "future danger[] to the lives and safety of other persons, as evidenced by a lack of remorse, poor rehabilitative potential, and specific threats and acts of violence." Ex. 3, Superseding Indictment. The prosecution supported its case for death with evidence of three alleged prior bad acts: (1) a 1996 state conviction for "Deadly Conduct by

94

Discharging Firearm at an Individual," Sarah Tucker, for which Robinson received "deferred adjudication"; (2) an uncharged allegation that Robinson ordered the murder of prosecution witness Michael "One Love" Williams; and (3) Robinson's prior membership in the "Playboy Hustler Crips." Dkt. 1222 (Notice of Intent to Seek the Death Penalty).

From the beginning, trial counsel Wesley T. Ball and Jack Strickland failed to mount a reasonable defense strategy and presentation for the penalty phase. Ball and Strickland refused to hire a mitigation specialist or mental health expert to evaluate their client. Instead, they retained a defense investigator, Bruce Cummings, who was not qualified to develop a mitigation case. Ball first retained Cummings less than a month before trial. Ex. 17, D. B. Cummings Decl. And it was not until two weeks before trial that Ball finally complied with a request from death penalty resource counsel to contact Dr. Mark Cunningham, a forensic psychologist, to assist on Robinson's case. But counsel would not allow Cunningham to evaluate Robinson under the mistaken belief that simply conducting a psychological evaluation "allows the government's expert to likewise examine your client." Ex. 20, J. Strickland Aff., at 369. As a result, Cunningham's testimony was limited to countering the prosecution's allegations of future dangerousness, even though Cunningham never evaluated Robinson.

95

The defense team rarely met with Robinson. Incredibly, Strickland's only jail visit occurred a full two months *after* the jury sentenced Robinson to death. Ex. 75, Bureau of Prisons Jail Logs. Similarly, investigator Bruce Cummings' first and only jail visit with Robinson occurred after the jury rendered the death verdict. *Id.* And Ball only visited his client twice: the first time almost five months after his appointment, and the second less than a month before trial. Ball admitted that he was resigned to the inevitability of a death sentence for Robinson even before conducting any investigation into the case, claiming that "if the government could prove [the murder charges], *saving Mr. Robinson's life would likely be an impossible task.*"[17] Ex. 18, W. Ball Aff., at 359. This dismal outlook was reflected in the minimal amount of time Ball spent on penalty-phase investigation—only 20 hours out of 1,318 hours billed. Ex. 19, J. Wallis Memo.

Unfortunately, in the minimal amount of time the defense team spent on the penalty phase, they failed to conduct a reasonable investigation into the allegations

---

[17] The fallacy of Ball's excuse is illustrated by the trial of Robinson's co-defendant, L.J. Britt. Like Robinson, Britt was accused of participating extensively in the interstate drug trafficking operation and actually fatally shooting two victims. Like Robinson, Britt grew up in Dermott and experienced many challenges and deprivations associated with poverty and racism in rural Arkansas. However, Britt had a substantial record–much greater than Robinson's record. But Britt's counsel conducted a reasonable investigation of mitigation, including going to Dermott and investigating his client's background and social history. The jury that heard the mitigation in Britt's case voted to spare his life. *United States v. Britt*, 112 Fed. Appx. 352 (5th Cir. 2004).

used by the Government to support future dangerousness. Trial counsel did not investigate the circumstances of the One Love incident or try and talk to the victim, witnesses, or perpetrators. Counsel did not bother to obtain the court file on the Sarah Tucker case, even though the prosecution relied heavily on this case to establish future dangerousness, and even though the file was stored just ten blocks from where Robinson was being tried. They didn't consult a gang expert or do any research into the history or activities of the Playboy Hustler Crips, or Robinson's role within that group. No defense team member thought to interview Robinson's guards in jail until one of the guards told Ball about Robinson's positive adjustment during a chance encounter. Ex. 54, W. Ball Memo to File, at 782.

Trial counsel similarly failed to conduct a reasonable investigation into Robinson's life history. Ball and Strickland disparaged the use of mitigation specialists and refused to hire one, despite the fact that no member of the defense team had the training or experience to assess Robinson for mental or neurological impairments. Exs. 18 and 20. Instead, trial counsel relied on Cummings, who limited the scope of his penalty phase investigation to witnesses Robinson identified who "might make good fact witnesses for him." Ex. 17, D. B. Cummings Decl., at 344.

Robinson spent the majority of his childhood raised by his aging and infirm grandparents in Dermott, Arkansas, a deeply impoverished and racially segregated

97

town in Chicot County about a six hour drive from the Northern District of Texas.

Dermott was known for its entrenched racism and widespread drug use.  Ex. 57, R.

Holliman Decl., at ¶¶ 11-12.  Despite Robinson's deep family ties there and the

expressed willingness of a number of witnesses who wanted to assist with

Robinson's case, not a single defense team member went to Dermott.  Exs. 18, 20,

22.  Instead, the defense contacted only a handful of witnesses in Dermott, all by

telephone.  Ex. 18, W. Ball Aff., at 351.[18]  Even then, the inquiries were almost

entirely unrelated to mitigation, and family members' suggestions of other relatives

to speak with went unheeded.  *See, e.g.*, Ex. 60, B. Holliman Decl.; Ex. 30, M.

Robinson Decl.; Ex. 31, J. Doston Decl.; Ex. 47, W. White Decl.

Ultimately, the defense team interviewed only two witnesses about

Robinson's life history: his mother, Rose Holliman, and his uncle, John Holliman,

Jr.  Both of those interviews were insufficient to develop a case in mitigation.

Rose's interview focused on her son's adolescence in Arlington, Texas.  Despite

the fact that counsel were aware of Rose's struggles with addiction, she was never

questioned about Robinson's earlier years, when she subjected him to drugs and

alcohol in utero, exposed him to violence as an infant, and abandoned him during

---

[18] Although trial counsel claims that he relied on phone calls and correspondence to conduct the social history investigation in Dermott, the trial files do not reflect any notes of telephonic interviews or any investigation-related correspondence.  Ex. 19, Wallis Memo; Ex. 23, Connor Decl.

98

his childhood.  Similarly, John Holliman had no first-hand knowledge of the difficulties of Robinson's daily life in Dermott, as John had left Dermott as a teenager, long before Robinson was born.  Ex. 24, J. Holliman, Jr. Decl.  The remainder of the penalty-phase investigation was limited to interviewing those people Robinson identified who "might be willing to speak on his behalf," including "football and track coaches" from Robinson's time in Arlington.  Ex. 17, D. B. Cummings Decl., at 345.  Cummings interviewed those witnesses as a group a few weeks before trial began; counsel did not meet with them until trial had already begun.  Ex. 25, W. Nimmer Decl, ¶ 4.

> **b.    During the penalty phase, the prosecution presented unrebutted evidence supporting future dangerousness.**

Relying on Robinson's alleged prior bad acts, the prosecution attempted to prove that Robinson would pose a continuing danger to society unless he was put to death.  Robinson's alleged future dangerousness was the crux of the prosecution's case in aggravation.  But rather than reasonably investigating and presenting evidence to counter the prosecution's case, trial counsel allowed the following unrebutted evidence to be presented to the jury.

> **(1)    Unrebutted allegation that Robinson ordered a "hit" of Michael "One Love" Williams**

First, the prosecution argued that Robinson ordered people to kill Michael "One Love" Williams, a fellow drug dealer who was cooperating with the

99

government against Robinson. Williams testified that he was robbed at gunpoint by a group of three young men, Kendall Pitts, Keith Eddington, and Wayne Jordan. Williams said that Pitts told him they were going to kill Williams because he had "snitched off" their "OG down in Texas." Exs. 10, 74. Additionally, the prosecution offered a tape recording of a three-way telephone conversation between Robinson, his aunt Josephine, and brother Marcus wherein Robinson gave the purported murder directive: "That dude ONE LOVE, Man that dude right there go hard." Ex. 6, Phone Transcript. Finally, Nathan Henderson, kingpin of the drug trafficking conspiracy, testified that Robinson expressed hope that someone would "get" Williams. Ex. 70, N. Henderson Trial Testimony, at 1056. According to Henderson, Robinson and Henderson had this discussion in the presence of another inmate, Steven Totson, while they were in jail together awaiting trial. However, Henderson "didn't hear [Robinson] instruct anyone to do anything," and he admitted that he "[didn't] know what kind of conversation they had on the phone." *Id.* at 1057. Henderson had been offered leniency in exchange for his testimony. *Id.* at 1058.[19]

---

[19] Henderson pled guilty to possession of over 100 kilograms of marijuana and possession of a firearm, and faced a punishment range from ten years in prison to incarceration for life. Pursuant to his plea agreement, the Government agreed to move for a downward departure of Henderson's sentence under the sentencing guidelines. Henderson served approximately 22 years and was released from prison in 2019.

During the prosecution's rebuttal, the Government tried to link Robinson's role in the assault on Williams to the future dangerousness allegation. *See supra* Claim Three. Peter Carlson, a former warden with the United States Bureau of Prisons, testified that if Robinson was sentenced to life without the possibility of parole, Robinson would still have a number of privileges, including access to telephones during off-duty hours, with a phone list and a limited number of minutes each month. According to Carlson, it would be difficult for the BOP to restrict Robinson's use of three-way calls to commit additional offenses from prison, and therefore Robinson would remain a danger to society even while incarcerated. Ex. 7, P. Carlson Testimony, at 106.

### (2) Unrebutted allegation that Robinson was a member of a violent gang

In the absence of any defense objection, the prosecution also portrayed Robinson as a gang member. Ex. 69, T. Holliman Trial Testimony, at 1030-54. Terrence Holliman testified that Robinson had once been part of the "Playboy Hustler Crips" gang in Dermott, Arkansas. *Id.* at 1033. Both Terrence and Robinson were young boys at the time. Terrence identified a photo of Robinson, claiming that Robinson was making a gang sign with his hands. *Id.* at 1034. Terrence described the gang as poorly organized, "pretty juvenile [and] pretty silly," with gang activity essentially limited to driving around "throwing little 'gang' signs up and . . . hollering and doing a whole lot of crazy stuff." *Id.* at

101

1051. Terrence testified that the group were not involved in "beating up on people or [being] involved in 'the drug business.'"  *Id.* at 1049-50.

The prosecution relied upon its prison expert, Peter Carlson, to link Robinson's prior gang membership to future violence in prison.  Ex. 7, P. Carlson Testimony, at 97.  The prosecution elicited testimony from Carlson that "[p]rison gangs play a significant role in prison operations.  Nearly all violence, serious violence, within a correctional setting, can be traced back to gang rivalries.  . . ."  *Id.* at 102-03.

### (3)  Unrebutted allegation that Robinson attempted to murder Sarah Tucker

Sarah Tucker, who was in prison for grand theft and forgery, testified regarding the events leading to Robinson's conviction for deadly conduct.  The prosecution presented evidence that in 1995, Robinson tried to recover money Tucker owed him for drugs.  Ex. 67, S. Tucker Trial Testimony, at 1001-02.  Tucker testified that when she refused to answer the door at her apartment, Robinson came looking for her at her parents' residence.  *Id.* at 1001-03.  According to Tucker, Robinson made eye contact with her shortly before firing seven shots into the truck where she was sitting.  *Id.* at 995-97, 1003.  Tucker's mother, Ozla Ann Tucker, testified regarding the shots that struck her empty residence.  Ex. 68, O. Tucker Trial Testimony, at 1020-28.  The jury also received

the final judgment for the deadly-conduct conviction. Ex. 67, S. Tucker Trial Testimony, at 995.

### c. Instead of effectively rebutting the Government's future-dangerousness argument, trial counsel presented the jury with a profoundly incomplete picture of Robinson's character and background.

Trial counsel's response to the Government's future dangerousness argument was weak and incomplete. To explain his life history, trial counsel relied exclusively on his mother Rose and his maternal uncle, John Holliman, Jr. Trial counsel's focus on Rose was problematic from the beginning, as the defense team was aware that Rose was "determine[d] to paint a rosier picture of her role as a parent and to not take responsibility for the upbringing of Robinson." Ex. 17, D. B. Cummings Decl., at 346. Rose, with an IQ score of 65, has an intellectual disability. Ex. 26, R. Holliman Psych Eval., at 400. Trial counsel was unaware of Rose's diagnosis, although Ball admitted that it was clear Rose had difficulties but she "minimize[d] her dysfunction." Ex. 18, W. Ball Aff., at 353. And as defense counsel suspected, Rose omitted critical information about her son's difficult and traumatic upbringing during her penalty phase testimony. *See* Section D.4, *infra.*

Rose's trial testimony provided the barest outline of Robinson's life story. She explained that she married Julius's father, Jimmie Lee Robinson, at age 15, and that the marriage ended after six years. Ex. 71, J. Robinson Penalty Phase Case-in-Chief ("Robinson Penalty Phase"), at 1215-16. She implied that the

103

marriage ended amicably, *id.*, though it actually ended due to Jimmie Lee's arrest for domestic abuse. Counsel failed to elicit that Rose was still a teenager when she gave birth to both Robinson and his brother Marcus; that she dropped out of high school immediately after becoming pregnant; that she abused alcohol and drugs, including while pregnant with Robinson; and that her marriage to Jimmie Lee was beset with violence and trauma. *Compare,* Ex. 71, Robinson Penalty Phase, at 1213-17 and Ex. 21, Rose Holliman Decl.; *see also* Ex. 38, J. L. Robinson Decl. Rose grudgingly admitted to drinking "all the time," but only when Robinson reached adolescence. Ex. 71 at 1224-25. Rose downplayed the severity of her addiction, claiming only that she "continued for a little while, and then [she] beat it." *Id.* at 1225.

Robinson's uncle, John Holliman, Jr., was the only witness to testify regarding Robinson's childhood in Dermott. Robinson was sent to live in Dermott with John, Jr. and Rose's parents when he was only two years old. Drawing from his own experiences as a child, John described his parents as providing Robinson and his brother Marcus a "stable environment" in a "decent home." *Id.* at 1199, 1208. However, John, Jr. left Dermott long before Robinson was born and lacked any firsthand knowledge of Robinson's day-to-day life with his grandparents. Ex. 24, J. Holliman, Jr., Decl., ¶ 5.

The remainder of the mitigation presentation was limited to witnesses who knew Robinson in only a limited capacity and who were barely prepared for their testimony by trial counsel.[20]  The mitigation witnesses were comprised primarily of football players and coaches, who described Robinson as hardworking and respectful.  *See generally*, Ex. 71, Robinson Penalty Phase, at 1060-64, 1069-73, 1102-03, 1105-06, 1133-34.  Several guards from the detention center testified favorably regarding Robinson's behavior based upon the limited time he spent in pretrial confinement on the capital charges.  *Id.* at 1077-79, 1112-21, 1126-30, 1139-43, 1145-55.  Additional evidence included Robinson's BOP records and periodic reviews by prison psychologist Jim Womack, who judged Robinson's "current potential for harm to others" to be low.  *Id.* at 1175.

Finally, trial counsel called Dr. Mark Cunningham in an attempt to address the future dangerousness aggravation evidence.  *See supra* Claim Two; Ex. 72.  But Cunningham's testimony was severely circumscribed because counsel did not allow him to interview or test Robinson, and because he only discussed future dangerousness for death row inmates generally.  Ex. 72, M. Cunningham Trial Testimony, at 1235-52.  Cunningham's opinion was based exclusively on Robinson's prison records and Cunningham's own studies that tracked capital

---

[20] One of the witnesses, Landry Burdine, was called only after being discovered in the courtroom gallery during trial.  Ex. 28, L. Burdine Decl., ¶¶ 3-4.

offenders in prison and violence rates in federal and state prisons. *Id.* at 1250.

Based on that limited evidence, Cunningham concluded that Robinson posed no

threat if incarcerated for life. *Id.* at 1265.

Not surprisingly, during closing argument the prosecution emphasized the

strength of its aggravation evidence to the jury. Ex. 8, Govt Penalty Phase Closing

Arg., at 133, 136-37, 144, 151. Twice, the prosecutor implied that Robinson

attempted to murder Tucker over a petty debt. *Id.* at 133, 144. The prosecutor also

emphasized the allegation that Robinson ordered Williams to be killed. *Id.* at 136.

The prosecutor claimed that the "One Love" incident proved Robinson would

continue to pose a risk of violence in prison, because "with the telephone available

to him as will be available to him at any prison setting, he is prepared to carry out

whatever it takes to seek revenge on anybody." *Id.* at 150. And the prosecutor

intimated that Robinson would try to take revenge on the witnesses who testified

against him: "[T]he overwhelming evidence on that future dangerousness issue

sadly is that Julius Robinson will always be a future danger . . . Every one of the

courageous individuals who came down here to testify against him is now a

target." *Id.* at 134. Finally, the government characterized the defense presentation

as a charade, claiming that "the real Julius Robinson" has "two faces"—one who is

kind to his coaches and teammates, and the other who "sell[s] dope" and "shoot[s]

at Sarah Tucker." *Id.* at 134-35.

106

In the absence of any rebuttal evidence from the defense, the jury sided with the prosecution.  As part of the penalty phase verdict, the jury was required to answer whether Robinson "is a future danger to the lives and safety of other persons." Ex. 9, Special Verdict Forms, at 157.  The jury unanimously answered the question in the affirmative, finding that it warranted the imposition of the death penalty.  *Id.*  Another special verdict form, crafted and submitted by defense counsel, asked whether "Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?" *Id.* at 160.  Not one of the jurors concluded that Robinson's background justified a lesser sentence.  *Id.*  The jury ultimately imposed two death sentences for the murders of Shelton and Reyes and a sentence of life without possibility of parole for the murder of Resendez.

**4.    Robinson's trial counsel were ineffective for failing to investigate and present readily available evidence rebutting the prosecution's case in aggravation.**

As Robinson's trial counsel admitted to the jury, their client's future dangerousness was the "key consideration" in the case and the factor that is "most important to most jurors." Ex. 73, Defense Penalty Phase Closing Arg., at 1337.  The Government argued over and over again that life in prison without parole was not an appropriate penalty because Robinson could continue to direct murders or

107

violent activities from a jail cell.  Ex. 8, Govt Penalty Phase Closing Arg., at 144-48.  But despite the availability of evidence countering the Government's narrative, the defense chose to present only limited information about Robinson's life history and character.  Had Robinson's counsel reasonably investigated the aggravating evidence, the defense could have refuted the Government's contention that Robinson posed a future danger from prison.

> **a.    The prosecution's allegation that Robinson ordered a "hit" on One Love was false.**

If trial counsel had investigated the incident involving Michael "One Love" Williams, they would have learned that the Government's "hit" allegation was not true.  The alleged co-conspirators in the kidnaping of Michael Williams denied any connection to Robinson whatsoever.  Alquantis Kentrel Pitts, the mastermind behind the Williams attack, admitted he was unable to pay for car repairs so he "decided to rob One Love to get money to get [his] car back."  Ex. 10, A. Pitts Decl., ¶ 3.  Pitts' cohorts also confirmed that Robinson played no role in the spontaneous  robbery of Williams.  Ex. 10, K. Edington Decl., ¶ 2 (denying having any "relationship with  Julius" or "tak[ing] orders from him."); *id.*, W. Jordan Decl., ¶ 15 ("At no time during the entire incident did I hear anyone threaten to kill One Love, nor did I hear anyone make any comment about One Love providing information or giving testimony against Julius Robinson.")

Even the victim and his companion during the incident, Louis Johnson, confirm the story of their attackers.  Johnson never heard Robinson's name mentioned, much less thought that the incident was a botched vengeance killing. Ex. 29, L. Johnson Decl., ¶ 7.  For his part, Williams expressed skepticism about Robinson's involvement: "I believe that the young men wanted money from me, and this was the cause of the incident.  I do not believe that they had really been ordered by Julius Robinson to kill me."  Ex. 11, M. Williams Decl., ¶ 3.

Josephine Dotson and Marcus Robinson, the relatives who allegedly relayed Robinson's "hit" order, also denied the allegations.  According to Marcus, the phrase "go hard" simply meant that a person "would do anything, say anything." Ex. 30, M. Robinson Supp. Decl., ¶ 4.  Marcus did not believe that Robinson was asking him to convey a message and he did not tell anyone about the conversation. *Id.*  Josephine "certainly did not do anything following that conversation or talk [to] anyone about it," and neither did Marcus.  Ex. 31, J. Dotson Supp. Decl., ¶ 6; *see also* Ex. 30, M. Robinson Supp. Decl., ¶ 4.

Finally, the defense could have impugned Henderson's testimony that Robinson made these incriminating statements in the presence of his cellmate, Steven Toston.  Had they interviewed Toston, he would have contradicted Henderson's story.  According to Toston, "[a]t no time did Julius ever say to Nate in my presence that Julius intended to harm or 'get' One Love or anyone else, or

109

that he intended to ask someone in Dermott to harm One Love." Ex. 61, S. Toston Aff., ¶ 4.

Despite the obvious importance of the alleged hit on Williams, the record before the district court indicated that trial counsel did nothing to investigate the incident. Exs. 19 and 23 (averring that nothing in defense counsel's files indicated an investigation of the Williams incident took place); *see also* Ex. 18, W. Ball Aff., at 351-52 (admitting that counsel did not conduct any investigation in Dermott, Arkansas, where both Williams and his assailants lived). It was unreasonable and deficient performance under *Strickland* for trial counsel to fail to investigate the prosecution's case in aggravation and develop a defense to that aggravation where one is readily available. *Rompilla*, 545 U.S. at 387; *Wiggins*, 539 U.S. at 524; *Mosley v. Butler*, 762 F.3d 579 (7th Cir. 2014) (finding counsel ineffective in a murder and arson case for failing to interview and present exculpatory testimony of witnesses to the crime).

      **b.    The "notorious" street gang Robinson allegedly participated in was nothing more than a group of rowdy, misguided teenagers.**

Supreme Court precedent holds that the introduction of irrelevant gang membership evidence in a capital proceeding is constitutional error. *Dawson v. Delaware*, 503 U.S. 159, 165-67 (1992) (vacating petitioner's death sentence where the prosecution introduced irrelevant evidence of defendant's membership

110

in the Aryan Brotherhood at sentencing).  Here, trial counsel could have successfully barred the gang evidence altogether as irrelevant to Robinson's sentencing proceedings, or at the very least greatly minimized its impact.

Had trial counsel gone to Dermott, they would have learned that the "Playboy Hustler Crips" were no more than a group of wayward young boys and teenagers, not a criminal street gang.  Jerry Melton, Dermott's Police Chief when the Dermott "Playboy Hustler Crips" would have been active, scoffed at the suggestion that the group was a fearsome gang with any ties to violent prison gangs.  According to Melton, "They didn't fight each other [like criminal street gangs] . . . I looked at them as kids trying to imitate what they saw on television. They were little wannabes."  Ex. 32, J. Melton Decl., ¶ 4.

Additionally, if trial counsel had consulted a gang expert, they would have learned that the Playboy Hustler Crips failed to meet the criteria for a traditional gang based upon the U.S. Department of Justice's own standards.  *See* Malcolm W. Klein, Cheryl L. Maxson, *Gang Structures, Crime Patterns, and Police Responses: A Summary Report* (2001).[21]  According to gang expert Malcolm Klein, gangs are generally classified into five categories, four of which (Traditional, Neo-Traditional, Collective, and Specialty) are considered dangerous.  The fifth

---

[21] Available at www.ncjrs.gov/pdffiles1/nij/grans/188510.pdf.

category, Compressed gangs, are characterized by their small size, total absence of stratification, short life span, and relative lack of violent criminal activity. Dr. Malcolm Klein, a gang expert retained by Robinson's post-conviction counsel, opined that the Dermott Crips met none of the criteria for the four most dangerous categories, and instead was closer to a Compressed gang. Ex. 33, M. Klein Decl., at 432.

> **c.     Robinson did not intend to murder Sarah Tucker over a "petty debt," but rather shot into a parked truck without knowledge that anyone was inside.**

Readily available witnesses, police reports, and court records would have impeached Tucker's testimony that Robinson knowingly fired shots at her. Ex. 34, Tucker Incident Records. In her initial account to police, Tucker said she had been parked in front of her mother's house for ten minutes when she saw Robinson traveling in a brown car. *Id.* at 453. Tucker stated that Robinson's vehicle passed her truck without confrontation and then departed the scene "very slowly." *Id.* at 455. At no time did Tucker tell the police, as she claimed at trial, that Robinson had initially gone to her apartment or that he followed her to her parents' home. *Id.* at 451-56. Incredibly, trial counsel never obtained the file for the Tucker case, even though it was a cornerstone of the prosecution's case in aggravation.

Trial counsel similarly failed to interview the driver of the brown car, Richard Smart, who was a prosecution witness. Had counsel interviewed or

112

questioned Smart about the incident, they would have discovered that Smart and

Robinson "did not see anyone inside [the truck] . . . [and] both [men] believed

the truck was empty." Ex. 35, R. Smart Decl., ¶ 3. This statement is corroborated

by crime scene investigators, who confirmed that all of the bullet entry points were

found in the rear portions of the vehicle, rather than directly into the passenger cab.

*See* Ex. 34 at 458. All of these facts provide strong circumstantial evidence that

Robinson did not intentionally shoot at Tucker, but instead fired in frustration at

what he believed to be her empty truck.

The court disposition of the Tucker case confirms the minor nature of the

offense. Robinson pled guilty to deadly conduct and the knowing discharge of a

firearm, a third-degree felony. Ex. 36, Tarrant County court records. The

punishment range for this offense was from two to ten years in prison. *See* Texas

Penal Code § 22.05(e). Instead, the judge gave Robinson five years of probation

and "deferred [proceedings] without entering an adjudication of guilt." Ex. 36,

Tarrant County Court Records, at 465. Robinson's defense attorney in the Tucker

case, Michael Gregory, would have confirmed that the disposition of deferred

adjudication was based upon a substantial lack of evidence of the attempted

murder charge, as the state prosecutor believed that "the evidence may not have

supported a finding that there was any intent to kill." Ex. 37, M. Gregory Decl.,

¶ 4. Based on his experience with the state prosecutor, Gregory believed that

113

"[t]he fact that a deferred probation was offered also indicates that the State did not feel that Robinson was a threat to commit further acts of violence." *Id.* But again, trial counsel unreasonably failed in their duty to obtain this information. All of this evidence would have provided a powerful rebuttal to the government's claim that Robinson was a predator who deserved a death sentence; but the jury never heard the whole story.

"[I]t takes only one juror to nix a death sentence." *United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000). Even if the rebuttal evidence didn't conclusively prove the falsity of the Government's allegations regarding the Williams and Tucker incidents, it provided enough "to establish a reasonable probability that one juror would have voted for life in prison rather than death." *Walbey v. Quarterman,* 309 Fed. Appx. 795, 806 (5th Cir. 2009) *(quoting Wiggins*, 539 U.S. at 537); *Johnson*, 2010 WL 11668097, *11 (N.D. IL 2010).

> **d.    Robinson was prejudiced by trial counsel's failure to investigate and rebut the Government's future dangerousness allegations.**

Trial counsel's deficient performance in this case echoes the *Strickland* violations that occurred in *Rompilla*, where defense counsel failed to review records of prior convictions that would have helped them rebut aggravating evidence in the penalty phase. In light of the Sixth Amendment requirement that a lawyer must "make reasonable efforts to obtain and review" aggravation evidence,

114

the *Rompilla* Court found that there could be no valid strategic reason for counsel's failure to conduct such an important task:

> With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense.

*Rompilla*, 545 U.S. at 385. The Court stressed that obtaining and investigating evidence the prosecution plans to use against the defendant "is not simply a matter of common sense," but a "duty." *Id. at* 386 (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d Ed. 1982 Supp.). Because Rompilla's counsel "failed to make reasonable efforts" to investigate the prosecution's case in aggravation, a new penalty phase was warranted.

Similar relief is warranted in Robinson's case, as trial counsel's ignorance of the truth about Government's aggravation case prejudiced Robinson's defense in several respects. For example, trial counsel moved *in limine* to prevent the Government from presenting evidence that Robinson had "orchestrated" the abduction after that Williams had "snitched" on him. Ex. 66 at 991. The

115

prosecution responded that it would "link the kidnaping of Michael Williams to Robinson by virtue of Williams himself together with the testimony of investigating agents." *Id.* at 993.  Because trial counsel had not investigated this incident, he did not know that both the victim and the perpetrators had information rebutting the prosecutor's conclusory statement.  The motion *in limine* was denied, and the Williams incident became the backbone for the Government's penalty phase case.  *Id.*

But the impacts of counsel's failure to investigate went far beyond the erroneous denial of a motion in limine to permeate Robinson's penalty phase.  According to the Government, sentencing Robinson to life imprisonment would put others' lives at risk because ordering a hit against Williams from the detention center demonstrated that Robinson could and would continue to pose a risk of violence to other people not withstanding his incarceration.  Coupled with evidence that Robinson allegedly sought violent revenge on Sarah Tucker and was once part of a street gang, the Williams case provided strong support for the Government's argument for a death sentence.  But instead of conducting a reasonable investigation (including the bare minimum of collecting court records and interviewing witnesses), trial counsel simply assumed that the allegations were true.

116

Counsel's failures were devastating, as the jury verdict forms illustrate the jurors' focus on the question of future dangerousness. Ex. 9, Special Verdict Forms, at 160-61, 168-69, 176-77, 184-84, 190, 197-98, 205-06. The forms show that a number of jurors believed that the availability of a life sentence mitigated against the death penalty, and that Robinson could adapt to prison if given a life sentence. While these findings were not enough to lead any one juror to vote for life, they demonstrate that jurors were open to that possibility. Unfortunately, counsel's choice of penalty phase defense–namely, that Robinson was well-liked and trusted by a variety of people–was easily rebutted by the Government's claim that he could easily arrange to have people harmed, even from a prison cell. Had the jurors been presented with the substantial rebuttal evidence described above, there is a reasonable probability that the result of the penalty phase would have been different. All it would have taken is for "one juror [to] have struck a different balance" between the competing stories and choose life, rather than death. *Wiggins*, 539 U.S. at 537. Robinson was prejudiced because counsel's lassitude resulted in a false presentation regarding the issue of "future dangerousness" and directly led to Robinson's death sentence. *See Andrus v. Texas*, 140 S. Ct. 1875, 1877-78 (2020) (*Strickland* error where failure to investigate the State's case in aggravation "fettered the defense's capacity to contextualize or counter the State's evidence of Andrus' alleged incidences of past violence").

117

**5.     Robinson's trial counsel were ineffective for failing to investigate and present readily available mitigation evidence.**

At the time of Robinson's trial, it was "unquestioned" that a capital defense attorney has an "obligation to conduct a thorough investigation of the defendant's background." *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (analyzing norms at a 1988 trial); *Williams (Terry)*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, cmt, p. 4-55 (2d ed. 1980). The ABA guidelines similarly instructed capital defense attorneys that "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence." *Wiggins*, 539 U.S. at 524 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)) (emphasis in original).

The Supreme Court has found *Strickland* error based on defense counsel's failure to investigate and present mitigating evidence in a number of cases with facts similar to Robinson's case. In *Williams*, for example, trial counsel did not begin to prepare for the penalty phase of the proceeding until a week before trial began. 529 U.S. at 395. As a result, counsel failed to properly investigate and present evidence supporting mitigation, including extensive records describing a "nightmarish" childhood. *Id.* The Supreme Court found that failure to investigate was ineffective assistance of counsel. *Id.* at 395.

Similarly, in *Wiggins*, trial counsel failed to investigate the background and history of their client.  There, counsel were aware of some of their client's background, but they made a decision to limit the scope of their investigation into potential mitigating evidence, focusing instead on a tactic which sought to portray the client's limited involvement in the crime.  539 U.S. at 521.  The Court in *Wiggins* held that defense counsel's failure to uncover voluminous mitigating evidence at sentencing could not be justified as a valid tactical decision because counsel "had not fulfilled their obligation to conduct a thorough investigation of defendant's background." *Id.* at 522 (quoting *Williams*, 529 U.S. at 396).  Having failed to conduct a thorough examination, counsel's tactical decision not to present such mitigating evidence was also objectively unreasonable, and ultimately prejudicial to their client.  *Id.* at 527-28.

In *Rompilla*, counsel erroneously believed that there was no mitigation based on a cursory investigation of the social history, which consisted of interviews of five family members and one report from a mental health expert.  Counsel failed to discover school reports, incarceration records and a court file regarding a prior conviction which would have alerted them to substantial mitigation.  The Supreme Court held that counsel was ineffective for failing to investigate such relevant social history documents, even when a capital defendant or his family members

119

suggest that little or no mitigating evidence is available. *Rompilla*, 125 S. Ct. at 2459.[22]

In post-conviction proceedings, federal habeas counsel completed the requisite mitigation investigation that trial counsel refused to undertake at the time of trial. This presentation, which consisted of hundreds of pages of records and statements from dozens of witnesses, paints a much different picture of Robinson's life history than the one provided to Robinson's jury.

### a.    Robinson suffered a chaotic childhood rife with violence, addiction, poverty, and neglect.

Julius Robinson grew up in an environment beset with neglect, racism, poverty, abuse, and addiction. These factors negatively impacted Robinson in utero and continued to harm him throughout his childhood.

There is a history of addiction and substance abuse on both sides of Robinson's family. His father, paternal grandfather, and paternal great-grandfather were all serious alcoholics. Ex. 38, J. L. Robinson Decl., ¶¶ 3, 5. His maternal

---

[22] Such recalcitrance was not present in Robinson's case, however. Robinson and his family members were more than willing to help the defense team. *See, e.g.,* Ex. 18, W. Ball Aff., at 355 (Robinson never declined to provide information in response to his defense team's requests); Ex. 20, J. Strickland Aff., at 372 (Robinson was a "cooperative client, fully involved in his defense"); Exs. 27, 30, 31, 32, 48, 50 (declarations from Robinson's relatives explaining that were willing and able to speak with counsel and testify if necessary).

grandfather struggled with alcohol abuse for decades, until a religious conversion let him to stop drinking. Ex. 31, J. Dotson Decl., ¶ 8. Rose Holliman, Robinson's mother, began to drink alcohol and smoke marijuana almost every day when she was 12 or 13 years old. Ex. 21, Rose Holliman Decl., ¶ 8. Rose quit school at age 16, after she became pregnant with Robinson's brother, Marcus; she was only 18 when Robinson was born. Rose drank alcohol and abused drugs daily. While at a party, Rose fainted and discovered at the hospital that she was six-months pregnant with Robinson. She stopped using drugs, but could not stop drinking, even though the doctor told her she needed to stop to protect her baby. Ex. 21, Rose Holliman Decl., ¶ 13; Ex. 38, J. L. Robinson Decl., ¶ 17; Ex. 40, B. Moore Decl., ¶ 3; *cf.* Ex. 41, J. Robinson Birth Records, at 547, 551.

The effects of *in utero* alcohol exposure were apparent at Robinson's birth. Growth retardation, such as low birth weight or height, is one of the diagnostic criterion for fetal alcohol syndrome. Ex. 42, K. Allen Rpt., at 594-55; Ex. 43, FAS Guidelines. At delivery, Robinson weighed only five pounds, six ounces, after 42 weeks of gestation. Ex. 41, J. Robinson Birth Records, at 557. The doctors designated Robinson as "SGA," or "small for gestational age." *Id.* at 546; *see also* Ex. 44. Rose also had a condition known as "polyhydramnios," commonly caused by *in utero* alcohol exposure, which resulted in too much amniotic fluid in her uterus. Ex. 44. As explained further *infra*, Robinson's prenatal exposure to

121

alcohol would cause profound difficulties later in his life. *See infra* at Section D.5.c; *see also* Ex. 42.

Rose's chronic drug and alcohol abuse continued throughout Robinson's infancy and early childhood. According to Jimmie Lee, "[d]rugs, alcohol, and violence were the order of the day in our home." Ex. 38, J. L. Robinson Decl., ¶ 19. By this time, Jimmie Lee was also an alcoholic. And just as his father and grandfather routinely used physical abuse against their wives and children, Jimmie Lee repeated what he learned from his parents and would often inflict violence on Rose when they fought. *Id.*, ¶¶ 19-21. Fueled by their constant intoxication, Robinson's parents were hostile toward one another and frequently combative. The violence continued even while Rose was pregnant with Robinson; Jimmie Lee would hit Rose in her face and throw her to the ground. *Id.*; *see also* Ex. 40, B. Moore Decl. On one occasion, Rose and Jimmie Lee were intoxicated and arguing while riding in a car, and Rose, pregnant with Julius, jumped out of the car in the middle of the highway. Ex. 38, J. L. Robinson Decl., ¶ 17. Jimmie Lee eventually got her back in the car and proceeded to punch her in the chest so hard that she had bruises. *Id.* Jimmie Lee often beat Rose until she had visible bruises and injuries. *Id.*; *see also* Ex. 40, B. Moore Decl. Once, Jimmie Lee burst into the home of Bernice Johnson armed with a gun, looking for his wife to kill her. Ex. 45, B. Johnson Decl., ¶ 5. For her part, Rose "had a serious habit of picking things up

122

and hitting [Jimmie Lee] with them," including glass bottles.  Ex. 38, J. L. Robinson Decl., ¶ 19.

Many members of the Holliman family exhibited signs of learning disabilities and other cognitive problems.  Ex. 38, J. L. Robinson Decl., ¶ 37; Ex. 39, G. Gorins Decl., ¶ 2.  Rose is intellectually disabled, with an IQ of approximately 65.  Unfortunately, due in part to her disability and in part because of her struggles with addiction, Rose constantly endangered her sons' health and well-being.  Ex. 26, R. Holliman Psych Eval, at 398, 400.  Instead of caring for Robinson and his brother, Rose hosted "Soap Opera" parties, informal gatherings devoted to drug and alcohol consumption.  Ex. 38, J. L. Robinson Decl., ¶ 18. Robinson's parents sold drugs to support themselves, and Rose often squandered their family savings to purchase cocaine for herself and her friends.  *Id.*  Rose frequently requested money from her sister and father because she did not have enough to cover food or rent.  Ex. 31, J. Dotson Decl., ¶ 15.  She was also physically violent to and in front of the children.  Marcus remembers seeing his parents "hitting and punching" each other, and recalls how Rose would "yell at me and whip me with a switch or hit me with her hand" when he would try to follow her as she left the house.  Ex. 30, M. Robinson Decl., ¶¶ 2-3.

At this time, Rose and Jimmie Lee were living in North Carolina; they had moved there shortly after they got married because Jimmie Lee joined the Army.

123

Sarah Pittman, a family friend who helped raise Rose when she was young, moved with the Robinsons to North Carolina before Robinson was born to help care for Marcus. While there, she grew increasingly concerned about violence in the home and the effect it had on Marcus. For Marcus's protection, Pittman decided to remove him from his parents and raise him in Dermott. Ex. 31, J. Dotson Decl., ¶ 14. However, once Robinson was born, Rose reclaimed Marcus from Pittman and returned to North Carolina, where the violence continued. *Id.*, ¶ 15.

As Marcus recalled, "My parents were always arguing and when they fought, it was physical fights with hitting and punching." Ex. 30, M. Robinson Decl., ¶ 3. When the family relocated to Fort Hood, things got even worse. After one argument, Jimmie Lee was arrested by military police and taken away in handcuffs. Ex. 38, J. L. Robinson Decl., ¶ 20. As their fighting intensified, the Robinsons feared that child protective services would remove the boys from their home. Ex. 31, J. Dotson Decl., ¶ 16. Unable at that time to mend their ways, they sent their children 850 miles away to Dermott to live with Rose's parents. Robinson was just two years old when he was separated from his parents.

What was originally thought to be a temporary placement turned into a permanent desertion. According to Jimmie Lee, "[M]y boys ended up without a mother or a father." Ex. 38, J. L. Robinson Decl., ¶ 25. For the next ten years, Robinson lived with his grandparents, Margaret and John Sr., and rarely saw his

124

parents.  Even after Jimmie Lee resigned from the Army and returned to Dermott–

a "completely demoralizing" event that led to him becoming "a terrible alcoholic"

–he had little contact with his sons before moving away from Dermott once again.

*Id.*, ¶ 23.  After that, he saw them rarely, "a few times during my vacation." *Id.*,

¶ 32; *see also* Ex. 30, M. Robinson Decl., ¶ 16.

According to Marcus, Rose had even less involvement in her children's lives

after she left Dermott (first for Wichita Falls, then for Arlington, TX):

> She came to see us once or twice in all the time we lived with our
>
> grandparents and she never sent us anything.  When our mother visited
>
> Dermott, she was on the go all the time, partying and going out with
>
> her friends.  She really didn't spend the time with my brother and me.
>
> I cried when she would go out partying.

Ex. 30, M. Robinson Decl., ¶ 6; *see also* Ex. 57, R. Hollimon Decl., ¶ 10 ("During

the time [Rose and I] lived in Wichita Falls, I never knew her to go home to

Dermott and visit her two sons.").

Robinson also suffered from the loss of his parents.  Following his

abandonment, Robinson began exhibiting signs of trauma.  He struggled with

anxiety, and would often have temper tantrums.  Ex. 46, B. Johnson Decl., ¶ 7.

Paternal grandmother Bertha Robinson, who lived nearby and saw Robinson and

his brother often, noticed "something odd about [Robinson].  When he became

125

angry, he would sit in a corner and cry and stew for an inordinate amount of time for a child." Ex. 38, J. L. Robinson Decl., ¶ 32. Jimmie Lee recalls seeing his young son "cry and cry and cry." *Id.*, ¶ 33. Bernice Johnson, an older relative, also observed Robinson's difficulties: "Julius always had a temper when he was young, often over nothing. If he wanted something and couldn't have it, he would have a tantrum and scream and cry."[23] Ex. 46, B. Johnson Decl., ¶ 7.

Due to the psychological and emotional trauma Robinson experienced as an infant, he required more, not less, attention during his formative years. Unfortunately, in addition to being abandoned by his parents, Robinson was passed off from grandparent to grandparent, each incapable of providing the care essential for stable, healthy development. Rose's parents had already struggled to raise their own children. Ex. 32, J. Dotson Decl., ¶ 4; Ex. 47, W. White Decl., ¶ 9. John Sr. was a field hand, schooled only until the fourth grade, who was blind by the time the Robinson children came to live with him and his wife Margaret. The elderly couple survived on John's welfare benefits and struggled to provide the boys with

---

[23] What Robinson's relatives describe as having a "temper" or being "angry" are actually classic signs of trauma in a young child. For children ages 0-5, who lack the ability to express and process the difficulties they have experienced, common behaviors associated with trauma include frequent tantrums, irritability, fussiness, and being difficult to calm. *See* Child Welfare Information Gateway, "Parenting a Child Who Has Experienced Trauma," available at https://www.childwelfare.gov/pubPDFs/child-trauma.pdf (last visited Oct. 21, 2020).

the bare necessities.  Ex. 50, W. Parker Decl., ¶ 3.  Due to their own limited education, Robinson's grandparents were ill-prepared to educate and care for their grandchildren.  They were also too feeble to provide the structure, emotional support, and guidance that young Robinson needed.  Margaret suffered from memory loss and "wasn't that aware of Robinson's problems."  Ex. 46, B. Johnson Decl., ¶ 18; *see also* Ex. 38, J. L. Robinson Decl., ¶ 29 ("Margaret is a simple person who could not deal with the difficulties [Robinson] had.").  Margaret maintained the same hands-off approach with Robinson she had with her own children when it came to day-to-day caretaking, and John's blindness impaired his ability to engage with and monitor the young children.  Ex. 46, B. Johnson Decl., ¶ 10.  When discipline was meted out, it usually involved their grandmother "us[ing] a switch from a tree and . . . whip[ping] our butts."  Ex. 31, M. Robinson Decl., ¶ 5.  According to Marcus, Robinson "got into much more trouble than I did."  *Id.*

With minimal supervision from their grandparents, Robinson and his brother Marcus spent most of their time unattended and roaming outside.  The Holliman property was very near a farm which was sprayed two to three times a week with pesticides by crop-dusting aircraft.  Robinson and other children would be hit by the spray as they were playing in the fields.  Ex. 31, M. Robinson Decl.), ¶ 7; Ex. 32, J. Dotson Decl., ¶ 17; Ex. 38, J. L. Robinson Decl., ¶ 12; *see also* Exs. 31, 49,

127

51.  In addition to pesticide-spraying in soybean fields, the entire area was also sprayed for mosquitos with Malathion and Fenthion, both of which are highly toxic and known to affect the human nervous system.[24]  As a result, Robinson suffered from sustained and damaging exposure to pesticides throughout his young childhood.

At age five, Robinson was sexually molested by a neighbor.  Ex. 38, J. L. Robinson Decl., ¶ 33.  When his father questioned him about the assault, Robinson became hysterical:  "He pitched a fit the likes of which I had never seen anyone throw in my life.  He thrashed about, hitting and throwing himself against things and screaming uncontrollably."  *Id.*  Nothing was done to the molester, or to help Robinson.  *Id.*

At age eight, Robinson started drinking alcohol, and he first got drunk at age 12.  Ex. 51, M. Cunningham Decl., at 675.  By seventh grade, Robinson was consuming large quantities of liquor on a regular basis and occasionally went to school intoxicated.  *Id.*

Unfortunately, there was no one at home willing or able to look out for Robinson.  Leroy Kennedy, Robinson's youth counselor, described the

---

[24] Groves RL, Dame DA, Meek CL, Meisch MV, *Efficacy of three synthetic pyrethroids against three mosquito species in Arkansas and Louisiana*, J Am Mosq Control Assoc . Jun;1 3(2):184-8 (1997).

grandparents' home as a "chaotic" and "[un]stable environment." Ex. 52, L. Kennedy Decl., ¶ 5. Willie Parker, Robinson's childhood football coach, held a similar view, surmising that Robinson "grew up in the streets without parental guidance." Ex. 49, W. Parker Decl., ¶ 12. Occasionally, Robinson's paternal grandmother, Bertha Scales, would take care of him and Marcus. Although Bertha had greater mental acuity than Margaret, and could help the boys with their homework, she was paralyzed and bed-ridden. Ex. 30, M. Robinson Decl., ¶ 8; Ex. 38, J. L. Robinson Decl., ¶ 4. Still, the boys respected her authority, and she was a source of strength and love for them until her decline and eventual death from cancer. Ex. 30, M. Robinson Decl., ¶ 9. With her death, Robinson lost yet another caretaker, and her death hit he and his brother hard. *Id.*

Due to the neglect he suffered at home, Robinson sought attention from his peers and teachers at school. As one teacher observed, "[t]he attention Julius would have needed to come from his parents, he ended up getting from his peers." Ex. 49, W. Parker Decl., ¶ 4. Although he struggled academically (*see infra* at Section V.D.5), Julius was well-liked by many. His former coach described him as "an exceptional child considering the material and emotional poverty in which he grew up," a kind boy who was "appreciative of every little thing" anyone did for him. Ex. 49, W. Parker Decl., ¶¶ 3-4. But at home, after the death of his grandmother Bertha, the only person to provide Robinson with the attention and

129

support he craved was his gang-affiliated cousin, Rodney White, who had moved in with Bertha to care for her before her death. Ex. 30, M. Robinson Decl., ¶¶ 10-11. White filled the void in Robinson's world; one-by-one, White and his associate "John-John" Wright "initiated" Dermott youth, including Robinson, into their pseudo-gang, the Playboy Hustler Crips, through violent beatings. *Id.*, ¶ 11; Ex. 53, C. McCree Decl., ¶ 5.[25] The beating Robinson suffered was brutal: "[T]he other kids had hit [Robinson] with bottles" and injured him so severely that it took [] one month to cure him." Ex. 38, J. L. Robinson Decl., ¶ 35. Robinson was not taken to the doctor; instead, his grandmother, Margaret, used "home remedies" to treat his severe injuries. *Id.*

> **b.    Robinson struggled throughout his adolescence and early adulthood to help his drug-addicted, emotionally absent mother.**

At age 13, Robinson's grandparents told him that he had to leave town at the police's insistence. Most of the family believed Robinson was being "set up" for

---

[25] While the initiation may have been brutal, the "gang" itself was not. As noted *supra*, the "Playboy Hustler Crips" were a group of wayward young boys and teenagers, described by the local police chief as "little wannabes" who did not engage in the violence committed by actual criminal street gangs. Ex. 33, J. Melton Decl., ¶ 4. Julius's only contact with Dermott police was for a curfew violation. Ex. 54, C. McCree Decl., ¶ 4.

an offense that he did not commit.[26]  Ex. 31, J. Dotson Decl., ¶ 18.  John Holliman, Robinson's uncle, confirms that Robinson was sent to Arlington to protect him "from how the law treated young black men in Dermott."  Ex. 24, J. Holliman, Jr. Decl., ¶ 7.  According to Dermott police officer Willie Nimmer, "Julius moved to Texas, upon the advice of his grandmother, because too much stuff was being put on him that he didn't do."  Ex. 25, W. Nimmer Decl., ¶ 6.  Thus, against his will, Robinson's life was once more upended as he was shipped off to live with his mother, a virtual stranger, in Arlington, Texas.

Unfortunately, Robinson's life worsened when he lived with his mother. Rose still struggled with severe alcohol and drug addiction.  She smoked crack and marijuana and drank copious amounts of alcohol on a daily basis.  Ex. 38, J. L. Robinson Decl., ¶¶ 15, 18; Ex. 24, J. Holliman, Jr., Decl., ¶ 4.  Her behavior became increasingly erratic, fluctuating unpredictably between rage and stupor. Ex. 24, J. Holliman, Jr. Decl.; Ex. 30, M. Robinson Decl., ¶¶ 16, 18.

---

[26] Current counsel filed an Arkansas State Public Information Act request with the Chicot County District Attorney's office seeking every report of criminal activity involving Robinson.  No documents were provided because his name was never mentioned in any offense report.  Counsel spoke with the Chicot County District Attorney who grew up in Dermott; he had never heard of Robinson.

Rose was incapable of meeting any of Robinson's emotional or physical needs.  Still, Robinson loved his mother and often pleaded with Rose to quit using drugs and drinking, always to no avail.  Ex. 56, J. Camp Decl., ¶ 12; Ex. 30, M. Robinson Decl., ¶ 16.  Rose denied her addictions, even when she was "staggering drunk and slurring her words."  Ex. 24, J. Holliman, Jr. Decl., ¶ 9.  David York, one of Robinson's football coaches in high school, "had the impression that Robinson didn't really have anyone at home to care for him."  Ex. 55, D. York Decl., ¶ 2.  York was right—although Rose was occasionally employed, the majority of her paycheck went to supporting her addictions.  She once again relied on her family for financial support because "she didn't have any money for the rent or food."  Ex. 31, J. Dotson Decl., ¶ 15.  Her siblings would help as they could, but as Marcus recalled, the situation was bleak: "I remember not having anything to eat but potatoes with ketchup or hot sauce for days, waiting for my mother to get her paycheck.  That's all the food there was in the house."  Ex. 30, M. Robinson Decl., ¶ 15.  Because Rose was "not capable of raising up a boy," Robinson was forced to take care of her.  Ex. 24, J. Holliman, Jr. Decl., ¶ 8.

Rose's addictions led her to quit working, after which Robinson's home situation became dire.  Desperate and destitute, still a young teenager in high school, Robinson knew that he was going to have to be responsible for making sure he and his mother had a roof over their heads and something to eat.  Ex. 56, J.

132

Camp Decl., ¶ 12.  He resorted to selling drugs.  Ex. 31, J. Dotson Decl., ¶ 19.  By 17, he was solely responsible for covering rent and other family expenses.  Those around him saw how much Robinson struggled and tried to care for his mother, even though she had never been able to care for him:

> My experience working with kids has taught me to recognize the kids whose home life is compromised.  I am convinced that if Robinson had grown up in a different environment, he would have had another kind of life.  I say this because he tried so hard to do well.  He showed a real need to take care of people.

Ex. 55, D. York Decl., ¶ 2; *see also* Ex. 56, J. Camp Decl., ¶¶ 11-12.

### c.   Robinson suffered cognitive impairments as a result of his chronic exposure to alcohol *in utero* and pesticides in childhood.

As noted above, trial counsel failed to reasonably and effectively investigate Robinson's family history.  They never obtained his full school records or talked to any of his teachers.  They never had Robinson evaluated to determine the impact of his mother's alcohol abuse, drug use, or tobacco use during pregnancy, or the effect severe emotional neglect and trauma had on Robinson's development.  They never traveled to Dermott or talked to people who knew of Robinson's day-to-day experience there, so they never investigated their client's exposure to pesticides,

133

and never had him evaluated to determine its effects. As a result, the jury never learned of the serious cognitive and developmental impairments Robinson suffered due to drug, alcohol, and pesticide exposure.

The harmful and often lifelong neuropsychological effects of alcohol on a developing fetus are well-documented. Learning disabilities, attention-related problems, and behavioral disorders are common in children who, like Robinson, are exposed to alcohol *in utero*. The extent of alcohol exposure Robinson suffered produced significant neuropsychological deficits. As post-conviction experts Dr. Cunningham and Dr. Allen explain, one of the most profound consequences would have been felt in the area of executive functioning.[27] Just some of the negative sequelae resulting from alcohol exposure include learning disabilities, auditory processing, poor response-inhibition and general impulse-control deficits, and "perseveration," which is the difficulty in abandoning ineffective strategies. Ex. 51, M. Cunningham Decl., at 671; Ex. 42, K. Allen Rpt., at 591-95.

Independent of information regarding Robinson's exposure to alcohol and drugs *in utero* and toxic pesticides as a child, trial counsel should have been aware of Robinson's academic difficulty throughout his life, encouraging them to explore

---

[27] Executive functioning refers to the group of cognitive abilities produced in the frontal cortex of the brain such as self-regulation of behaviors, sequencing of behaviors, cognitive flexibility, response inhibition, planning and organization of behavior. Ex. 77 at 5.

134

his intellectual capabilities further. Robinson had a documented history of academic problems in school. From the beginning, he was considered a "slow learner." Ex. 49, W. Parker Decl., ¶ 5. Due to their own limited education, his grandparents were unable to help Robinson with his school work. This was harmful for Robinson, who was learning disabled. His grades were seldom above the "C" level, and he repeated the third grade. Robinson was placed in remedial classes to aid in his progress, and because he was a gifted athlete, he received extra help to meet the grade requirements. He was eventually labeled a "resource student," meaning that he required special assistance with his school work, and his academic struggles continued throughout his life. *Id.*, ¶ 5; Ex. 62, J. Robinson School Records; Ex. 27, A. Gorins Decl.; Ex. 58, C. Wilson Decl. In high school, although he had a "C" grade average, those grades were actually "inflated by his physical education grades." Ex. 58, C. Wilson Decl., ¶ 5. While Robinson did graduate from high school, he had to transfer to Venture Alternative School, an institution for students who had difficulty dealing with regular instruction methods. *Id.*

In addition to academic difficulties, Robinson's fetal exposure to drugs and alcohol compromised his overall executive functioning. As Dr. Karen Allen, another expert retained in post-conviction, explains:

135

> Because Julius's mother injured him *in utero,* he was at high risk for
> other maternal failures (impaired attachment), and was made
> particularly vulnerable to the dangerous challenges of high-risk
> environments (abuse, neglect, poverty, drugs, discrimination,
> violence). These three causative factors (teratogenic exposure, poor
> attachment, severe neglect amidst danger)–the latter two being
> correlated to fetal toxic exposure–are ample explanations of how
> this defendant traveled the road to criminal behavior.

Ex. 42, K. Allen Rpt., at 591, 596.

Dangerous chemicals found in pesticides had similar adverse effects on Robinson. The pesticides used near Robinson's home in Arkansas–pesticides that were actually sprayed on Robinson and other children as they played in the fields– are highly toxic and known to wreak considerable damage on the central nervous system. According to neuropsychologist Dr. Stephen Martin, who evaluated Robinson for his post-conviction litigation, Robinson suffers from "subtle cognitive deficits" and "general learning disabilities" consistent with chronic exposure to organophosphate pesticides. Ex. 59, S. Martin Rpt. at 800. After completing a series of neuropsychological tests, Martin concluded that Robinson suffers from "subtle cognitive deficits" and "general learning disabilities." *Id.* at 799-800. On the Wide Range Achievement Test (WRAT-3), Robinson's reading

level was at the 7th grade level, or bottom 12%; his spelling was at the third grade level, or bottom 3%; and his math skills were at the 6th grade level, or bottom 9%. *Id.* Dr. Martin also determined that Robinson's impairments correlate to Robinson's fetal alcohol and drug exposure. *Id.* at 801.

Finally, the trauma and neglect Robinson suffered during his infancy and childhood directly affected his actions as an adult. According to Dr. Cunningham, who evaluated Robinson post-trial, "[N]eglect has been identified as more psychologically and developmentally damaging than physical abuse." Ex. 51, M. Cunningham Decl., at 702. Post-conviction expert Dr. Allen agreed:

> The "laying down" of attachment during infancy is, profoundly, the basis of emotional and behavioral self-control that begins in the toddler years and remains rather set (without effective intervention) into adulthood.
>
> * * *
>
> If a child is negatively impacted by being overchallenged in the fetal period, he is not ready to cope with and grow through the challenges of the human environment after birth. In such a case, an unusually attentive and stable maternal response is necessary in order to compensate for the lagging "hardware." This was not the mothering Robinson received.

137

Ex. 42, K. Allen Rpt., at 599-600.

The background information detailed above would have prompted competent counsel to have Robinson examined by a mental health expert. At a minimum, trial counsel were required to commission a neurological evaluation. *See* Updated Guidelines § 10.4 cmt; Guidelines § 11.4.1.D.7 cmt. But counsel failed to do so, and their decision not to have Robinson evaluated by a competent mental health professional was based, at least in part, upon a misunderstanding of the law. Trial counsel claim that they feared that a psychologist would diagnose Robinson with a "sociopathic personality" that "would correctly be considered aggravating." Ex. 20, J. Strickland Aff., at 369-70. Even if Robinson did receive such a diagnosis—which he never has—defense counsel failed to recognize that the diagnosis would not have been immediately discoverable under the Federal Rules of Evidence. *See* Fed. R. Crim. Pro. 12.2(c)(2) (mandating confidentiality of mental health reports unless "the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition"). In addition, trial counsel presumed that merely conducting a psychological evaluation "allows the Government's expert to likewise examine your client." Ex. 20, J. Strickland Aff., at 369. But, again, trial counsels' decision is underscored by their ignorance of this fundamental element of capital defense. Such ignorance, combined with counsel's failure to perform basic investigation and research on the subject, "is a

quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014); *see also Williams v. Taylor*, 529 U.S. 362, 395, (2000) (*Strickland* relief warranted where counsel "failed to conduct an investigation that would have uncovered extensive records [that could be used for death penalty mitigation purposes], not because of any strategic calculation but because they incorrectly thought that state law barred access to such records"); *Soffar v. Dretke*, 368 F.3d 441, amended, 391 F.3d 703 (5th Cir. 2004) ("[A]n actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results.").

In any event, Robinson would not have received an adverse diagnosis. All experts who have evaluated Robinson agree that his cognitive, neuropsychological, and emotional impairments stem from a combination of trauma, chronic prenatal exposure to drugs and alcohol, and pesticide exposure. Ex. 42, K. Allen Rpt.; Ex. 51, M. Cunningham Rpt.; Ex. 59, S. Martin Rpts. The Government has never offered any evidence to rebut any of Robinson's expert conclusions, or experts of their own who could provide contrary diagnoses.

Robinson's case is strikingly similar to *Andrus v. Texas*, 140 S. Ct. 1875 (2020), the Supreme Court's most recent opinion applying *Strickland*. In *Andrus*, trial counsel presented a limited mitigation case which focused on basic biological information. *Id.* at 1878. Andrus' mother testified about her son's "excellent"

relationship with his family and insisted that drugs played no part in her or her son's life. *Id.* Andrus' father, with whom Andrus lived for only one year (but had not seen Andrus for more than six years before trial), testified that Andrus had been "good" during the time they lived together. *Id.* at 1879. An expert witness who did not evaluate Andrus testified generally on the effects of drug use on developing adolescent brains. *Id.* Finally, Andrus himself testified that "[c]ontrary to his mother's depiction of his upbringing," his mother sold drugs out of the home since he was child and that he first started using drugs regularly when he was 15 years old. *Id.* In aggravation, the State presented unrebutted evidence tying Andrus to a robbery; that Andrus had tattoos indicating gang affiliations; and that Andrus had displayed "aggressive and hostile behavior" while incarcerated. *Id.* at 1878. The jury sentenced Andrus to death.

Post-conviction investigation revealed that the truth of Andrus's life was far more traumatic, "marked by extreme neglect and privation, a family environment filled with violence and abuse." *Id. at* 1879. Andrus' mother was 17 when he was born, and they lived in a neighborhood "known for its frequent shootings, gang fights, and drug overdoses." *Id.* Throughout Andrus's childhood, his mother engaged in prostitution and drug sales at home, in view of Andrus and his four siblings. "She also habitually used drugs in front of them, and was high more often than not. In her frequently disoriented state, she would leave her children to fend

140

for themselves.  Many times, there was not enough food to eat." *Id.*  Starting at age 12, Andrus "assumed responsibility as the head of the household," even though he was just a child who "struggled with mental-health issues." *Id. at* 1880.

The Supreme Court found that Andrus' attorney was deficient under *Strickland*.  By "overlooking vast tranches of mitigating evidence," the meager mitigation case counsel did present "backfired by bolstering the State's aggravation case."  Counsel also acted unreasonably by failing to investigate the State's aggravation evidence, "thereby forgoing critical opportunities to rebut" the State's argument for a death sentence.  *Id.* at 1881-82.  The Court remanded the case to the Texas Court of Criminal Appeals to determine whether counsel's deficient performance was prejudicial.

As in *Andrus*, Robinson's counsel failed to investigate compelling mitigating evidence of childhood trauma, deprivation, and neglect; parental drug addiction, violence, and abandonment; and mental impairments that affected Robinson's executive functioning and have proven to be strong mitigating factors in other cases granting relief under *Strickland*.  *Compare*, *id.* at 1878-82 *and supra* at Section V.D.4.  Robinson's counsel similarly failed to investigate the Government's aggravating evidence, "thereby forgoing critical opportunities to rebut" the future dangerousness allegations.  *Compare*, *id.* at 1881-82 and *supra* at Section V.D.5.  As demonstrated below, counsel's unreasonable deficiencies

141

prejudiced Robinson by giving his jury an incomplete and misleading picture of the man they sentenced to die.

### d.    Trial counsel's failure to investigate prejudiced Robinson.

Under *Strickland*, a petitioner shows prejudice by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 695. "To assess [the] probability [of a different outcome under *Strickland*], we consider the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding–and reweig[h] it against the evidence in aggravation." *Porter*, 558 U.S. at 41 (internal quotation marks omitted). To establish prejudice, a petitioner need only raise "a reasonable probability that one juror would have voted for life in prison rather than death." *Walbey v. Quarterman*, 309 Fed. Appx. 795, 806 (5th Cir. 2009); *Wiggins*, 539 U.S. at 537.

If counsel had done a reasonable investigation and presented evidence of Robinson's mental impairments and the true story of his traumatic social history, it is reasonably probable that one juror would have voted to save Robinson's life. The failure to investigate mitigation did not just deprive the jury of information to which they were entitled–namely, evidence that would "humanize [Robinson]" and "allow them to accurately gauge his moral culpability." *Porter*, 558 U.S. at 41. It also resulted in a false and misleading presentation about who Robinson was, and

142

is.  Contrary to what the jury heard, Robinson did not grow up in the "stable

environment" of a small town, Ex. 71 at 1199, with grandparents who raised him

right.  *Id.* at 1201.  His mother did not visit her boys whenever her schedule

permitted, *id.* at 1218, and her alcoholism and crack addiction was not a recent or

temporary development in her and the boys' lives.  *Id.* at 1225.  While it is true, as

the jury heard, that Robinson was loved by his grandparents, and was a "good kid"

despite his circumstances, that evidence did little to lessen Robinson's moral

culpability for the crimes he committed.  The most important evidence the jury

could and should have heard about Robinson was the trauma he experienced as a

child and the lifelong brain damage he sustained.  Time and time again, courts

have held that this kind of mitigating evidence is crucial to an understanding of a

defendant's moral culpability.  *Porter*, 558 U.S. at 41; *Wiggins*, 539 U.S. at 535;

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("Evidence about the defendant's

background and character is relevant because of the belief, long held by this

society, that defendants who commit criminal acts that are attributable to a

disadvantaged background . . .  may be less culpable than defendants who have no

such excuse").  The omission of evidence that *would* have addressed the jury's

concerns about moral culpability is unreasonable, especially where such evidence

was readily available to counsel.  *See, e.g., Griffin v. Pierce*, 622 F.3d 831, 845

(7th Cir. 2010) (Counsel ineffective in capital sentencing for failing to adequately

143

investigate and presenting an incomplete and inaccurate mitigation case during penalty phase; counsel portrayed petitioner as having a normal childhood with good relationships with his parents when petitioner's "childhood was anything but normal.").

As in *Porter* and *Sears v. Upton*, 561 U.S. 945, 954 (2010), counsel could have used evidence of Robinson's brain damage to mitigate the punishment in this case. Specifically, trial counsel could have explained how Robinson's cognitive impairments contributed to his ultimate involvement in selling drugs. *See, e.g.,* Exs. 43 and 52. Although Robinson desperately tried to support himself and his family through menial labor, this was never enough. In light of his significant learning disabilities, coupled with the limited opportunities available to someone in Robinson's socio-economic situation, Robinson resorted to the only thing he knew how to do at the time: sell drugs. Evidence of Robinson's compromised executive functioning would have helped the jury understand his moral culpability, as his cognitive impairments made him both more likely to engage in irrational behavior, and also *less* likely to have control over such behavior. *See* Ex. 51, M. Cunningham Decl., at 702; *Porter*, 558 U.S. at 36, 41 (trial counsel unreasonable under *Strickland* for failing to present evidence of brain damage that made petitioner more likely to engage in "impulsive, violent behavior;" such evidence "might well have influenced the jury's appraisal of [Porter's] moral culpability")

144

(citing *Williams*, 529 U.S. at 398); *Pruitt v. Neal*, 788 F.3d 248 (7th Cir. 2015) (finding a reasonable probability that evidence of mental illness affecting executive functioning might have affected the assessment of the defendant's "moral culpability," thereby leading the jury to conclude that death was not warranted).

The fact that counsel was aware of and presented some mitigating evidence does not defeat Robinson's claim. Mere possession of "some information with respect to petitioner's background . . . [did not put counsel] in a position to make a tactical choice not to present a mitigation defense." *Wiggins*, 539 U.S. at 527. Counsel's failure to investigate further prevented Robinson's jury from knowing who they were sentencing to die. But "[a] capital jury cannot make its decision with only half of the story before it, or worse, with objectively inaccurate information." *Overstreet v. Wilson*, 636 F.3d 404, 418 (7th Cir. 2012) (Wood, J., dissenting) (citing *Wiggins*, 539 U.S. at 537; *Williams*, 529 U.S. at 396). Robinson was prejudiced when that opportunity slipped away because of his counsel's unreasonable decisions.

### (1)   Cumulative Prejudice

A single, serious error by counsel may be a sufficient basis on which to grant relief on a claim of ineffective assistance of counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). Nonetheless, it is not necessary that any one error alone rise to the level of prejudice; multiple errors considered together may also warrant

relief under *Strickland*. When assessing the reasonable probability of a different result, errors must be "considered collectively, not item-by-item." *See Kyles v. Whitley*, 514 U.S. 419 (1995).

Here, "counsel's conduct so undermined the proper functioning of the adversarial process that [Robinson's] trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. For the foregoing reasons, Robinson's convictions were obtained in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, and must be vacated.

### 6. The Savings Clause Permits This Court to Consider This Claim.

Robinson specifically incorporates the facts and argument set forth in Section IV.A, supra, in support of his argument that the savings clause does not prohibit this Court's consideration of his *Strickland* penalty phase claim. In addition, the specific treatment of this claim by the Northern District of Texas and the Fifth Circuit further demonstrate that Robinson did not receive the one reasonable shot at section 2255 relief to which he is entitled. The district court's denial of a *non-contested* evidentiary hearing, and the Fifth Circuit's denial of a COA for Robinson's section 2255 appeal and his Rule 60(b) proceedings, reflect the Fifth Circuit's ongoing and harmful practice of unduly restricting the rights of capital habeas petitioners. *See Steiker & Steiker*, *supra*, at 1902-03. Because of this practice, Robinson was denied "a reasonable opportunity to obtain a reliable

146

judicial determination of the fundamental legality of his conviction and sentence."

*In re Davenport*, 147 F.3d at 609.

Federal habeas petitioners enjoy a presumption in favor of an evidentiary

hearing, to resolve the factual issues in the case. 28 U.S.C. § 2255(b) (2009); *see*

*also Flores*, 739 F.3d at 340. In the Northern District of Texas, Robinson

supported his § 2255 motion and request for an evidentiary hearing with over 80

exhibits totaling more than 1,000 pages. These exhibits included 56 lay witness

declarations, four expert examinations, and numerous police reports, court

documents, and public records. In their answering briefs, the Government

conceded that the district court should hold an evidentiary hearing "[b]ecause there

are factual disputes raised by the pleadings on the [ineffective assistance of counsel

claims]." *United States v. Robinson*, CR-00-260, Dkt. 2365 at 90 and Dkt. 2439 at

12. Yet the Northern District of Texas denied Robinson's motion without

authorizing depositions or conducting an evidentiary hearing, because Robinson's

additional evidence, coupled with the record, either did not present any "contested

fact issues," or the Court decided the claims based on "legal, not factual" bases.

*Id.*, Dkt. 2543 at 45.

Considering the voluminous amount of new evidence submitted by

Robinson, and the Government's concession that factual disputes existed which

warranted an evidentiary hearing, the District Court's ruling is astonishing and a

147

clear denial of Robinson's rights under section 2255.  Robinson adhered to the

Fifth Circuit's "independent indicia" standard, which holds that a section 2255

movant is entitled to an evidentiary hearing only if he "produces independent

indicia of the likely merit of her allegations, typically in the form of one or more

affidavits from reliable third parties."  *United States v. Cervantes*, 132 F.3d 1106,

1110 (5th Cir. 1998).  In support of his *Strickland* claim, Robinson filed over 40

declarations from third parties, but the Court, without a hearing, found that some of

Robinson's declarants were not reliable.  *See, e.g United States v. Robinson*, CR-

00-260, Dkt. 2453 at 26 (finding witness's "credibility is questionable").  By

definition, questionable credibility is at least debatable, and thus an evidentiary

hearing should have been held, and a COA should have issued.  *Miller-El*, 537

U.S. at 336-37.  Yet both the District Court and the Fifth Circuit denied Robinson a

COA, a practice that has prejudiced capital petitioners in that jurisdiction for years.

*See supra* Section IV.A.

The Northern District of Texas erred further by finding that much of

Robinson's post-conviction evidence could be dismissed as it was cumulative to

what was presented at trial.  This holding was not only belied by the record, but

was also directly contrary to Supreme Court jurisprudence, which has never

limited the prejudice inquiry under *Strickland* to cases in which there was only

"little or no mitigation evidence" presented.  *Sears*, 561 U.S. at 954.  The Court

148

also betrayed the *Strickland* standard by assessing prejudice seriatim and independently. Yet *Strickland* clearly holds that courts should not look at each new piece of mitigating evidence independently to determine whether it would have made a difference in the outcome. *Porter*, 558 U.S. at 40; *Williams*, 529 U.S. at 397-98; *Strickland*, 466 U.S. at 694. Rather, the Supreme Court's long line of *Strickland* jurisprudence requires that the prejudice analysis be a holistic inquiry:

> To assess [the] probability [of a different outcome under *Strickland*], we consider the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding– and reweig[h] it against the evidence in aggravation. That same standard applies–and will necessarily require a court to "speculate" as to the effect of the new evidence–regardless of how much or how little mitigation evidence was presented during the initial penalty phase. . . . In all circumstances, this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation.

*Id. at* 955-56. The District Court's deeply flawed *Strickland* analysis, in combination with its denial of a non-contested evidentiary hearing, demonstrates that section 2255 relief was not available to Robinson in that court.

149

Similarly, the District Court and the Fifth Circuit's COA denials demonstrate that Robinson did not receive a reasonable opportunity for section 2255 relief.  In refusing to grant Robinson a COA,  the District Court and the Fifth Circuit once again erroneously conflated merits-based analyses with threshold procedural and jurisdictional questions–an approach the Supreme Court has roundly condemned.  *See, e.g., Buck*, 137 S. Ct. at 773-74; *see also Jordan*, 135 S. Ct. at 2652 n.2 (2015) (Sotomayor, J., dissenting from denial of certiorari) (describing the Fifth Circuit's COA jurisprudence as "troubling").  As discussed *supra* in Section IV.A, and as Robinson argued to the Northern District of Texas and the Fifth Circuit, proper COA standards were not followed in Robinson's case. Instead, the District Court and the Fifth Circuit effectively required Robinson to prove he would succeed on appeal before granting him the right to appeal–an approach which imposed an erroneously high burden on Robinson's COA requests, and failed to abide by the COA guidelines set forth by the Supreme Court.  The COA denials issued by the Northern District of Texas and by the Fifth Circuit in this case were improper because they were contrary to the requirements of Section 2253 and "placed too heavy a burden on [Robinson] *at the COA stage*."  *Buck*, 137 S. Ct. at 774 (italics in original) (internal citations omitted).

For example, in its review of Robinson's request for a COA, the Fifth Circuit skipped an analysis of the deficient performance prong, and instead decided

150

that even if Robinson could establish deficient performance, he could not establish

prejudice. *United States v. Robinson*, 2010 U.S. App. LEXIS 11675 (5th Cir.

2010). The Fifth Circuit decided that despite Robinson's specifically named

deficiencies in his trial attorneys' representation, "no reasonable jurist would find

that Robinson was prejudiced by the [] alleged deficiencies." *Id*. at *11. Similarly,

the Fifth Circuit found that trial counsel was not ineffective for failing to challenge

the future dangerousness evidence because "no jurist of reason would believe that

a dent in that evidence, which Robinson alleges, would have created a reasonable

probability of a different verdict." *Id* at *11-12. And these are not isolated

examples. *See id.* at *14 ("Robinson's case for a difficult childhood's mitigating

his culpability is far less compelling than the showing in recent cases in which the

Supreme Court found the omission of mitigation evidence prejudicial. . . . No

reasonable jurist would find [the mitigation evidence's] omission prejudicial.").

Thus, like in *Buck*, the Fifth Circuit "phrased its determination in proper

terms–that jurists of reason would not debate that [Robinson] should be denied

relief, but it reached that conclusion only after essentially deciding the case on the

merits." *Buck*, 137 S. Ct. at 773. The Fifth Circuit's sole reason for denying a

COA is its belief that Robinson failed to establish prejudice–i.e., that he failed to

win his *Strickland* claim on the merits. Yet as *Buck* makes clear, it was error for

the Fifth Circuit to make such merits determinations and *then* deny Robinson a

151

COA.  Whether a reasonable jurist would find prejudice is the ultimate issue to be decided.  At the COA stage, the only relevant inquiry is whether reasonable jurists would debate whether Robinson could establish prejudice.  "Indeed, a claim can be debated even though every jurist of reason might agree, after the COA has been granted and the case received full consideration, that the petitioner will not prevail." *Miller-El*, 537 U.S. at 338.

The Fifth Circuit's practice of conflating merits-based analyses with threshold procedural questions is not limited to Robinson's section 2255 appeal or his Rule 60(b) litigation.  The court has similarly violated due process by denying other COAs and dismissing habeas petitions on procedural grounds.  And while *Buck* is the Supreme Court's latest admonishment to the Fifth Circuit about its inordinately rigorous standard for a COA, it is certainly not the only one.  *See, e.g., Penry v. Johnson*, 532 U.S. 782 (2001); *Miller-El*, 537 U.S. 322; *Tennard v. Dretke*, 542 U.S. at 283; *Banks*, 540 U.S. at 703-05; *Abdul- Kabir v. Quarterman*, 550 U.S. 233, 245 (2007); *Jimenez v. Quarterman*, 555 U.S. 13 (2009).

It shouldn't matter where Robinson's section 2255 motion was litigated, but the reality of the Fifth Circuit's section 2255 jurisprudence means that it does. Robinson's case is yet another example of the Fifth Circuit's long-standing practice that results in the premature dismissal of potentially meritorious post-conviction claims for capital habeas petitioners.  "That the law confers no right

152

without a remedy to secure it is a maxim of the law." *Globe Newspaper Co. v. Walker*, 210 U.S. 356 (1908) (citations omitted). Yet Robinson was left without an adequate remedy to test the legality of his detention. Section 2255(e) provides a corrective—a necessary mechanism to protect litigants, like Robinson, who have been actively harmed by the Fifth Circuit's incorrect COA standard.

E.  **CLAIM FIVE: Robinson's rights under the American Declaration of the Rights and Duties of Man have been violated in multiple ways warranting habeas relief with respect to both the guilt and penalty portions of his trial.**

1.  **Robinson's Rights Under the American Declaration are judicially cognizable.**

The Inter-American Commission on Human Rights (IACHR) found that the Government violated the American Declaration in its prosecution of Robinson in multiple ways, including violating Robinson's right to equality before the law, access to effective remedies, right to a fair trial, and due process of law. Robinson is mindful of the Seventh Circuit's decision in *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001), which held that the American Declaration does not create judicially enforceable rights. *Id. at* 925. Robinson notes, however, that *Garza* predates *Medellin v. Texas*, 552 U.S. 491 (2008), which differentiates between the federal government's obligation to abide by international law and state government's obligations to do so absent enacting legislation. This distinction merits further review of Robinson's federal convictions and sentences. Robinson maintains that

153

he is entitled to relief for each violation of the American Declaration, and preserves this issue for later review.

### 2. The Savings Clause permits the Court to consider this petition.

The Seventh Circuit has previously held, in the identical posture, that a petition raising claims stemming from an IACHR report satisfied the savings clause and was cognizable under section 2241. *Garza*, 253 F.3d at 922-24. As in *Garza*, this petition satisfies the savings clause. Indeed, the savings clause refers to "an application for writ of habeas corpus" not individual claims within an application for writ of habeas corpus. As such, because this claim satisfies the savings clause, Robinson's petition at-large is cognizable under section 2241.

## VI.  PRAYER FOR RELIEF

Wherefore, in order to prevent Defendants from continuing to violate Robinson's constitutional rights, Robinson requests that the Court:

Grant Robinson discovery power, including access to subpoenas and depositions, and conduct a full and fair evidentiary hearing to determine .

Issue a judgment in favor of Robinson on all claims declaring that his convictions and sentences violate the Constitution.

Enter an injunction barring the Defendants from scheduling Robinson's execution and making any preparations therefore.

Grant further relief as the Court deems just and proper.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: December 4, 2020          By /s/ Jonathan C. Aminoff
                                 JONATHAN C. AMINOFF
                                 CELESTE BACCHI
                                 Deputy Federal Public Defenders

                                 Attorney for Petitioner
                                 JULIUS OMAR ROBINSON

155

## STATEMENT PURSUANT TO LOCAL CRIMINAL RULE 38-2(C)

Pursuant to Local Criminal Rule 38-2(c), Petitioner identifies the following other legal actions, by cause number and jurisdiction, challenging the sentence challenged in the current petition, as well as any corresponding relevant judicial opinion, memorandum, or order.

Criminal case

United States v. Julius Omar Robinson, No. 00-CR-260-2 (N.D. TX)

Direct appeal

United States v. Julius Omar Robinson, No. 02-10717 (5th Cir.)

Relevant Opinion: 367 F.3d 278 (5th Cir. 2004)

Motion to Vacate Pursuant to 28 U.S.C. § 2255

United States v. Julius Robinson, No. 00-CR-260-2 (N.D. TX)

Relevant Opinion Dkt. No. 2453 (denying Section 2255 motion); 2465 (denying motion for reconsideration)

Appeal: Fifth Circuit Case No. 09-70020

Relevant Opinion: 2010 U.S. App. LEXIS 11675 (Affirming)

Motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60

United States v. Julius Robinson, 05-CV-756 (N.D. TX)

Relevant Opinion Dkt. No. 18 (transferring motion to the 5th Circuit as a second or successive section 2255 motion).

156

Appeal: 5th Circuit Case Nos. 18-10732, No. 18-70022

Relevant Opinion: 917 F.3d 856 (5th Cir. 2019)

## PROOF OF SERVICE

I, Iliana Hernandez, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No. (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached **AMENDED PETITION FOR WRIT OF HABEAS CORPUS; EXHIBITS** on the following individual(s) by:

| [ ] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [X] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [ ] Faxing same via facsimile machine addressed as follows: |
|---|---|---|---|

| T.J. Watson, Warden, USP-Terre Haute U.S. Penitentiary 4700 Bureau Road South Terre Haute, IN 47802 | Gail A. Hayworth, AUSA 1100 Commerce Street Suite 300 Dallas, TX 75242 |
|---|---|

This proof of service is executed at Los Angeles, California, on December 4, 2020.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

/s/ Iliana Hernandez                .
Iliana Hernandez

158