# EXHIBIT 1

## DECLARATION OF SCOTT PHILLIPS

I, Scott Phillips, declare that:

1.  I am an Associate Professor in the Department of Sociology and Criminology at the University of Denver. I have spent several years studying the application of the death penalty in Texas. A copy of my curriculum vitae is attached.

2.  Julius Robinson's attorneys asked me to conduct a statistical analysis regarding the possible effect of race on the federal death penalty in Texas.

3.  I based my study on a compilation of raw data collected by Kevin McNally, the Director of the Federal Death Penalty Resource Counsel Project (FDPRCP). McNally is an attorney who has served as resource counsel at FDPRCP since its inception in 1992. Funded by the Defender Services Division of the Administrative Office of the United States Courts, the mission of the FDPRCP is to assist, advise, and consult with court-appointed and defender attorneys engaged in the defense of capital cases in the federal courts throughout the United States. The Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Judicial Conference of the United States (U.S. Judicial Conference Subcommittee) has described the work of the FDPRCP as "essential to

**Ex. 1 - 001**

the delivery of high quality, cost-effective representation in death penalty cases."[1] In the course of his duties, McNally monitors all potential federal capital prosecutions throughout the United States. McNally has collected information on the cases of all criminal defendants in Texas who were eligible for a federal death sentence from the reinstatement of the federal death penalty in 1988 through 2010.[2] Race of the defendant is one factor which McNally and the FDPRCP have collected and recorded on the 172 defendants in Texas who were eligible for a federal death sentence.

4.      For decades, scholars have demonstrated that race influences the administration of the death penalty in the United States.[3] My analysis of all

_____

[1] U.S. Judicial Conference Subcommittee, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* 50 (May 1998).

[2] *See* 21 U.S.C. § 848(e) *et seq.* and the "Federal Death Penalty Act of 1994" or Violent Crime Control and Law Enforcement Act of 1994, Pub.L.No. 103-322, 108 Stat. 1796.

[3] *See* David C. Baldus, *Keynote Address: The Death Penalty Dialogue Between Law and Social Science,* 70 Ind. L.J. 1033, 1039-40 (1995); Stephen B. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in Infliction of the Death Penalty*, 35 Santa Clara L. Rev. 433, 434 (1995); Erwin Chemerinsky, *Eliminating Discrimination in Administering the Death Penalty: The Need for the Racial Justice Act*, 35 Santa Clara L. Rev. 519, 529 (1995) ("After *McCleskey*, it will be extremely difficult to successfully challenge a death sentence on equal protection grounds. Even though a majority of the Justices on the Supreme Court have recognized that racism seriously infects the capital process, current law simply fails to provide any remedy."); David C. Baldus & George Woodworth, *Race Discrimination in the Administration of the Death Penalty: An Overview of the Empirical Evidence with Special Emphasis on the Post-1990 Research*, 39 Crim. L. Bull. 194, 214-15 (2003); Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 Hous. L. Rev. 807, 811-12 (2008) (asserting that the death penalty is more likely to be imposed on black defendants than white defendants).

potential death penalty cases filed in the four federal judicial districts in Texas reveals the same troubling patterns.

5. Federal prosecutors in Texas have requested authorization to seek the death penalty against 32 men and obtained a death verdict in 13 cases. Ten of the 13 men who received the federal death penalty in Texas are black. Thus, while blacks make up 12% of the Texas population, they constitute 77% of all the federal death verdicts within the State of Texas.

6. To understand the nature of the disparities, it is important to examine how race influences each stage of the process: the federal prosecutors' request for authorization to seek the death penalty, the Attorney General's decision to grant authorization (made in consultation with the Capital Case Unit, the centralized U.S. Department of Justice committee that reviews all requests), and the jury's decision to render a death verdict. Notably, the impact of race is amplified across the stages of a case.

7. To begin, federal prosecutors in Texas were almost **six times** more likely to request authorization to seek the death penalty against black defendants (prosecutors requested authorization in 56% of the cases with a black defendant, compared to 10% of the cases with a non-black defendant). Moreover, authorization was almost **eight times** more likely to be granted in cases with black defendants (authorization was granted in 53% of all the cases with a black

**Ex. 1 - 003**

defendant, compared to 7% of all the cases with a non-black defendant). Finally, a death verdict was about **sixteen times** more likely to be rendered in cases with black defendants (a death verdict was rendered in 32% of all the cases with a black defendant, compared to 2% of all the cases with a non-black defendant). The relationships in question are statistically significant. See Table 1, Panel A, for details.

8. Because the black defendant in the case under consideration, Julius Robinson, was sentenced to death in the Northern District of Texas, it was also important for me to examine the Northern District separately to see if the same patterns hold true. Here, the racial disparities are interchangeable (and, technically speaking, slightly greater): a death verdict was rendered in 36% of all the cases with a black defendant, compared to 0% of all the cases with a non-black defendant. The relationship in question is statistically significant. See Table 1, Panel B, for details.

9. Typically, the next step in the analysis would be to control for potential confounders in a multivariate logistic regression model. Such a model would reveal whether race-neutral factors can "account for" or "explain" the disparities. However, the United States Department of Justice (DOJ) has declined to share the data necessary to conduct such an analysis.

10.    I began the research without any preconceived notions – I had no idea what the analysis would demonstrate.  Moreover, I remain more than willing to expand the analysis to include other factors for consideration suggested by the DOJ.  I will entertain any challenge to the results, test any rival hypothesis, and conduct all appropriate statistical tests.  But to do so the DOJ must provide access to additional information about the cases – information known only to the DOJ.

11.    Despite my willingness to expand the statistical analysis if the DOJ provides the necessary information, I am confident that the findings would remain the same.  Because the magnitude of the racial disparities is so substantial, controlling for race-neutral explanations in a multivariate logistic regression model would almost certainly not change the overall pattern.  It is highly unlikely that a race-neutral factor or factors could explain why black defendants were 16 times more likely to be sentenced to death.  The racial disparities are almost surely too extreme to have a benign explanation.  Indeed, the racial disparities are the most acute I have seen in my years of research on the subject.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

DATED:  March 29, 2011

_____
Scott Phillips
Associate Professor
Chair, Dept. of Sociology and Criminology
Director, Socio-Legal Studies

Ex. 1 - 005

| Table 1. Did the Race of the Defendant Influence the Federal Death Penalty in Texas from 1988 to 2010? | | | | | | |
|---|---|---|---|---|---|---|
| | USAO Requested Authorization | | AG Granted Authorization | | Death Sentence Imposed | |
| Panel A. All Texas Districts (172 cases) | Number | Percentage | Number | Percentage | Number | Percentage |
| Black Defendants | 18/32 | 56% | 17/32 | 53% | 10/31 | 32% |
| Non-Black Defendants (white, Hispanic) | 14/140 | 10% | 10/140 | 7% | 3/140 | 2% |
| Disparities across stages | Chance of authorization being requested is about 6 times greater for black defendants than non-black defendants (56/10) | | Chance of authorization being granted is about 8 times greater for black defendants than non-black defendants (53/7) | | Chance of a death sentence is about 16 times greater for black defendants than non-back defendants (32/2) | |
| Conclusion | RACIAL DISPARITIES ORIGINATE IN THE USAO DECISION TO REQUEST AUTHORIZATION, AND ARE THEN AMPLIFIED IN BOTH OF THE SUBSEQUENT STAGES. SPECIFICALLY, THE ATTORNEY GENERAL GRANTED AUTHORIZATION IN 17 OF THE 18 BLACK DEFENDANT CASES, COMPARED TO 10 OF THE 14 NON-BLACK DEFENDANT CASES. JURIES RETURNED A DEATH SENTENCE IN 10 OF THE 17 BLACK DEFENDANT CASES IN WHICH AUTHORIZATION HAD BEEN GRANTED, COMPARED TO 3 OF THE 10 NON-BLACK DEFENDANT CASES IN WHICH AUTHORIZATION HAD BEEN GRANTED. | | | | | |
| | USAO Requested Authorization | | AG Granted Authorization | | Death Sentence Imposed | |
| Panel B: Northern District (29 cases) | Number | Percentage | Number | Percentage | Number | Percentage |
| Black Defendants | 5/11 | 46% | 5/11 | 46% | 4/11 | 36% |
| Non-Black Defendants (white, Hispanic) | 3/18 | 17% | 3/18 | 17% | 0/18 | 0% |
| Notes: 1. In Panel A, the difference between the handling of black and non-black cases is statistically significant at p < .01 for requesting authorization, granting authorization, and death sentences. In Panel B, the difference between the handling of black and non-black cases is statistically significant at p < .10 for requesting and granting authorization, and statistically significant at p < .01 for death sentences. Statistical significance is arguably not relevant because the results are based on a population of cases rather than a random sample. Nonetheless, statistical significance is reported for the interested reader and to follow conventional practice. 2. In Panel A, the number of cases drops from 172 to 171for the death sentence outcome because one defendant died after authorization (thus, there is no way to know if the jury would have returned a death sentence). | | | | | | |

**Ex. 1 - 006**

# CURRICULUM VITAE

## Scott Phillips
## March 2012

Department of Sociology and Criminology
University of Denver
2000 East Asbury Avenue
Denver, CO 80208
Scott.Phillips@du.edu
303-871-2059

## Education
Ph.D., Sociology, University of Georgia, 2000
M.A., Sociology, Louisiana State University, 1996
B.A., History, Texas Christian University, 1993

## Professional Experience
Director, Socio-Legal Studies Program, University of Denver, July 2011-present
Chair, Department of Sociology and Criminology, University of Denver, July 2010-present
Associate Professor, Department of Sociology and Criminology, University of Denver, 2007-present
Assistant Professor, Department of Sociology and Criminology, University of Denver, 2005-2007
Assistant Professor, Department of Sociology, Rice University, 2003-2005
Assistant Professor, Department of Sociology, University of Houston, 2000-2003

## Research Interests
Capital Punishment
Conflict Management
Police Use of Force

## Awards (selected)
- Winner of 1996 ASA Sociology of Law Graduate Student Paper Competition for paper entitled: "Judicial rhetoric, meaning-making, and the institutionalization of hate crime law" (Master's thesis).
- Winner of 2001 Law and Society Association Article of the Year for paper entitled: "Judicial rhetoric, meaning-making, and the institutionalization of hate crime law" (with Ryken Grattet; Law and Society Review, volume 34).
- Recipient of 2006 University of Denver Campus Life Award

**Ex. 1 - 007**

Phillips, 2

## Articles

- Lin, Jeffrey and Scott Phillips.  Forthcoming.  "Media coverage of capital murder:  Exceptions sustain the rule."  Justice Quarterly.

- Phillips, Scott.  Forthcoming.  "Continued racial disparities in the capital of capital punishment?  The Rosenthal era."  Houston Law Review 50(1).

- Phillips, Scott and Jacqueline Lapuck.  Forthcoming.  Social geometry and the success of moral ideas:  The case of capital punishment."  International Journal of Law, Crime, and Justice.

- Phillips, Scott, Laura Potter, and James E. Coverdill.  2012.  "Disentangling victim gender and capital punishment:  The role of media."  Feminist Criminology 7(2):130-145.

- Phillips, Scott.  2009.  "Status disparities in the capital of capital punishment."  Law and Society Review 43(4): 807-837.

- Phillips, Scott.  2009.  "Legal disparities in the capital of capital punishment."  Journal of Criminal Law and Criminology 99(3):717-756.

- Phillips, Scott.  2008.  "Racial disparities in the capital of capital punishment."  Houston Law Review 45(3):807-840.

  o  Reprinted in:  Vincent R. Jones and James R. Coldren (eds.).  The Death Penalty in Focus: A Special Topics Anthology.    San Diego, CA: Cognella, 2011.

- Hagan, Jacqueline and Scott Phillips.  2008.  Border blunders: The unanticipated human and economic costs of the U.S. approach to immigration control, 1986-2007.  Criminology and Public Policy 7(1):83-94.

- Phillips, Scott and Michael O. Maume.  2007.  "Have gun will shoot?  Weapon instrumentality, intent, and the violent escalation of conflict."  Homicide Studies 11(4):272-294.

- Phillips, Scott, Jacqueline Matusko, and Elizabeth Tomasovic.  2007.  "Reconsidering the relationship between alcohol and lethal violence."  Journal of Interpersonal Violence 22(1):66-84.

- Phillips, Scott, Jacqueline Hagan, and Nestor Rodriguez.  2006.  "Brutal borders?  Examining the treatment of deportees during arrest and detention."  Social Forces 85(1):93-110.

- Phillips, Scott and Mark Cooney.  2005.  "Aiding peace, abetting violence:  Third parties and the management of conflict."  American Sociological Review 70(2):334-354.

**Ex. 1 - 008**

Phillips, 3

**Articles (continued)**

- Phillips, Scott.  2003.  "The social structure of vengeance: A test of Black's model."  <u>Criminology</u> 41(3):673-708.

- Geiger-Oneto, Stephanie and Scott Phillips.  2003.  "Driving while black:  The role of race, sex, and social status."  <u>Journal of Ethnicity in Criminal Justice</u> 1(2):1-25.

- Kan, Yee and Scott Phillips.  2003.  "Race and the death penalty:  Including Asian Americans and exploring the desocialization of law."  <u>Journal of Ethnicity in Criminal Justice</u> 1(1):63-92.

- Horan, Patrick and Scott Phillips.  2003.  "Theory-mapping in social research: An application to social learning theory." Pp. 289-315 in <u>Advances in Criminological Theory</u>, Vol. 11, Social Learning Theory and the Explanation of Crime, edited by Ronald L. Akers and Gary F. Jensen.  New Brunswick, NJ: Transaction.

- Phillips, Scott, Nestor Rodriguez, and Jacqueline Hagan.  2002.  "Brutality at the border?  Use of force in the arrest of immigrants in the United States."  <u>International Journal of Sociology of Law</u> 30:285-306.

- Cooney, Mark and Scott Phillips.  2002. "Typologizing violence:  A Blackian perspective."  <u>International Journal of Sociology and Social Policy</u> 22(7-8):71-104.

- Phillips, Scott and Ryken Grattet.  2000.  "Judicial rhetoric, meaning-making, and the institutionalization of hate crime law."  <u>Law and Society Review</u> 34 (3):567-606.

**Other Publications**

- Phillips, Scott.  2010.  "Testimonial."  Pages 198-199 in <u>The Behavior of Law</u> by Donald Black.  Bingley, England (special edition; first edition 1976).

- Phillips, Scott.  February 23, 2010.  Issue Brief.  "Hire a lawyer, escape the death penalty?" http://www.acslaw.org/IssueBrief

- Phillips, Scott.  March 4, 2010.  Blog.  "The need for a public defender in the capital of capital punishment." http://www.acslaw.org/acsblog

- Phillips, Scott.  2009.  "Racial disparities in capital punishment:  Blind justice requires a blindfold."  <u>Advance: The Journal of the American Constitution Society Issue Groups</u> 3(1):149-158 (http://www.acslaw.org/AdvanceVol3No1)

- Phillips, Scott.  October 7, 2008.  Issue Brief.  "Racial disparities in capital punishment:  Blind justice requires a blindfold."  http://www.acslaw.org/IssueBrief

- Phillips, Scott.  October 14, 2008.  Blog.  "Racial disparities in capital punishment:  Desocialization offers a plausible plan to ensure equal justice."  http://www.acsblog.org/

**Ex. 1 - 009**

Phillips, 4

**<u>Media Coverage of Capital Punishment Research</u>** (selected)

Print

- Liptak, Adam.  April 29, 2008.  "A new look at race when death is sought."  *The New York Times*: A10.

- Turner, Allan.  May 1, 2008.  "Study suggests bias in death penalty cases."  *The Houston Chronicle*: B3.

- Falkenberg, Lisa.  May 1, 2008.  "Remedying unequal punishment."  *The Houston Chronicle*: B1.

- Kolkers, Claudia.  May 4, 2008.  "Body of evidence:  Defendant's race appears to sway Harris County death sentencing."  *The Houston Chronicle*: E2.

- Griffith, Kristal.  Winter 2008.  "Crime and Punishment."  *University of Denver Magazine*:  19.

- O'Hare, Peggy.  March 4, 2010.  Study figures odds of killer getting death."  *The Houston Chronicle:* B5.

- Research featured in the winter 2011 issue of the ASA magazine <u>Contexts</u>:  "Choose Your Victims Wisely" (volume 10, number 1: page 6).

Internet

- Koppelman, Alex.  April 29, 2008.  "Racial bias in the death penalty."  www.salon.com

- Weiss, Debra Cassens.  April 29, 2008.  "Houston has a problem with death-penalty disparities, study says." ABA Journal Law News Now.  www.abajournal.com

- Death Penalty Information Center.  May 5, 2008.  "Study finds evidence of race-of-defendant bias in Texas death penalty."  http://www.deathpenaltyinfo.org/

- Griffith, Kristal.  May 16, 2008.  "New study shows race influences death penalty cases."  DU Today. http://www.du.edu/today/stories/2008/05/2008-05-16-race.html

- Death Penalty Information Center.  October 20, 2009.  "Disparities in legal representation in Harris County, Texas."  http://www.deathpenaltyinfo.org/

- Jennings, Diane.  November 10, 2009.  "Professor surprised by disparity between hired and appointed counsel." The Dallas Morning News, Texas Death Penalty Blog:  http://deathpenaltyblog.dallasnews.com/

- Griffith, Kristal.  November 13, 2009.  "Research shows type of legal counsel affects death penalty cases."  DU Today.  http://www.du.edu/today/stories/2009/11/2009-11-13legal.html

- Death Penalty Information Center.  April 19, 2010.  "Victims' social status plays influential role in death cases." http://www.deathpenaltyinfo.org/

Radio Interviews

- Smart City Radio:  May 15, 2008.  http://www.smartcityradio.com/show/1483/transportation-capital-punishment-and-chattanooga

- KPFT in Houston, Texas:  May 6, 2008.

- KTSU in Houston, Texas:  June 2, 2008.

Phillips, 5

## Conference Participation

- Phillips, Scott and Jacqueline Lapuck. 2011. "Is support for the Marshall hypothesis a methodological artifact? The social geometry of ideas as a demand characteristic." American Society of Criminology: Washington, DC.
- Cooney, Mark and Scott Phillips. 2011. "With God on one's side: The social structure of death row apologies." American Society of Criminology: Washington, DC.
- Invited participant in Michigan State University Law School's 2011 Death Penalty Conference entitled: "Moving Beyond Racial Blindsight."
- Phillips, Scott. 2010. Organizer for Author Meets Critics panel on Mark Cooney's 2009 book: "Is Killing Wrong? A Study in Pure Sociology." American Society of Criminology: San Francisco, California.
- Phillips, Scott. 2010. "Gender, media, and death in the capital of capital punishment." American Society of Criminology: San Francisco, California.
- Phillips, Scott. 2008. "Status disparities in the capital of capital punishment." American Society of Criminology: St. Louis, Missouri.
- Phillips, Scott. 2007. "Legal counsel, socioeconomic status, and death in the capital of capital punishment." American Society of Criminology: Atlanta, Georgia.
- Phillips, Scott. 2007. "Racial disparities in the capital of capital punishment." American Sociological Association: New York, New York.
- Phillips, Scott. 2006. "The vertical structure of execution: Geometrical patterns in the capital of capital punishment, 1992-1999." American Sociological Association: Montreal, Canada.
- Phillips, Scott, Jacqueline Hagan, and Nestor Rodriguez. 2006. "Brutal borders? Examining the treatment of deportees during arrest and detention." American Sociological Association: Montreal, Canada.
- Phillips, Scott, Jacqueline Matusko, and Elizabeth Tomasovic. 2005. "Reconsidering the relationship between alcohol and lethal violence." American Society of Criminology: Toronto, Canada.
- Phillips, Scott. 2005. Panel Member for Professional Development Session entitled: "Teaching experience: How much is enough?" American Society of Criminology: Toronto, Canada.
- Lockett, Elizabeth and Scott Phillips. 2005. "Burden of proof, burden of wrongful conviction: An examination of the evidence used to secure death sentences in the capital of capital punishment." Law and Society Association: Las Vegas, Nevada.
- Phillips, Scott and Michael O. Maume. 2004. "Have gun, will shoot? Disentangling weapon instrumentality from intent." American Society of Criminology: Nashville, Tennessee.
- Phillips, Scott and Mark Cooney. 2004. "Aiding peace, abetting violence: Third parties and the management of conflict." American Sociological Association: San Francisco, California.
- Phillips, Scott. 2002. "The social structure of violence: A test of Black's theory of vengeance." American Society of Criminology: Chicago, Illinois.
- Phillips, Scott. 2002. Discussant for panel on "Black's theory of conflict management." Law and Society Association: Vancouver, British Columbia.
- Phillips, Scott, Nestor Rodriguez, and Jacqueline Hagan. 2002. "Brutality at the border? Use of force in the arrest of immigrants in the United States." Southwest Sociological Association: New Orleans, Louisiana.
- Phillips, Scott. 2001. "Interviewing violent offenders: Factors related to participation in research and reliability." American Society of Criminology: Atlanta, Georgia.
- Phillips, Scott and Mark Cooney. 2001. "The forging of violence: A test of Black's theory of partisanship." American Sociological Association: Anaheim, California.
- Phillips, Scott. 2000. Organizer for Author Meets Critics panel on Mark Cooney's 1998 book: "Warriors and Peacemakers: How Third Parties Shape Violence." American Society of Criminology: San Francisco, California.
- Horan, Patrick M. and Scott Phillips. 1999. "Theory-mapping in social research: An application to social learning theory." American Society of Criminology: Toronto, Ontario.
- Cooney, Mark and Scott Phillips. 1999. "Typologizing violence: A Blackian perspective." American Sociological Association: Chicago, Illinois.
- Phillips, Scott and Ryken Grattet. 1997. "Judicial rhetoric, meaning-making, and the institutionalization of hate crime law." American Society of Criminology: San Diego, California.

Phillips, 6

**Invited Presentations**
- University of Colorado Law School.  2008.  "Legal disparities in the capital of capital punishment."
- University of Denver, Humanities Institute Lecture, 2007:  "Those with the capital don't get the punishment."
- University of Denver, Sturm College of Law, Death Penalty Awareness Week, 2006:  "Is justice blind in the capital of capital punishment?  The impact of race on death sentences in Harris County, Texas from 1992-2000."
- Rice University Student ACLU, 2005:  "Is justice colorblind?  Death in the capital of capital punishment."
- Rice University, Families Weekend, 2004:  "Is justice colorblind?  Death in the capital of capital punishment."
- Galveston Young Lawyers Association, 2003:  "Equal justice?  The impact of hired and appointed counsel on capital punishment."


**Service to the University of Denver**
- Member of Renew DU Initiative, Interdisciplinary Incubator
- Outside Chair of Biology Dissertation Committee (Richard Kristinsson:  Mitochondrial DNA Analysis by Denaturing High-Performance Liquid Chromatography for the Characterization and Separation of Mixtures in Forensic Samples) (2011)
- Member of the Directions Initiative, Faculty Success Working Group (2011)
- Member of Social Sciences Divisional Promotion and Tenure Committee (2010)
- Speaker for "Fridays@DU" (2009 to present)
- AHSS Representative to ASEM Committee (2009 to present)
- NCAA Self-Study and Certification Process, Member of Academic Integrity Subcommittee (2009-2010)
- AHSS Representative to CORE Committee (2009-2010)
- AHSS Mentor to New Faculty (2008-2009, 2009-2010)
- AHSS Representative to PROF Award Committee (2009)
- AHSS Representative to Undergraduate Council (2006-2009)
- Department Representative to Faculty Senate (2006-2009)
  - Member of Student Relations Committee
  - Member of Tuition Exchange Task Force
- Provided assistance to DU Sexual Assault Response and Prevention Coordinator (2006-2007)
  - Presentations on sexual assault to campus groups (fraternity, residence hall)
  - Assisted in design of campus questionnaire regarding sexual assault and analyzed data
- Member of Quantitative Reasoning Lab Committee (2007)
- Facilitator for Men's Ally Session at the 12th Annual DU Women's Conference (2007)
- Facilitator for Men's Ally Session at the 11th Annual DU Women's Conference (2006)
- Member of DU Alcohol Workout Group (2006)
- Facilitator for session entitled "Safety: Improving Social Environments" at Provost's Conference (2006)

**Service to the Profession**
- Organizer, Crime, Law, and Deviance Roundtables for 2008 American Sociological Association Conference
- Member, Law and Society Association Nominating Committee, 2003
- Judge, Law and Society Association Graduate Student Paper Competition, 2003

**Service to the Community**
- Provided research assistance to Denver's Urban Debate League
- Analyzed quantitative data regarding race and capital punishment for Texas Defender Service (2009)
- Consulted with McGuireWoods regarding research to support habeas petition for Jose Noey Martinez (2009)
- Consulted with Faegre and Benson regarding research to support habeas petition for Brandyn Josephe Benjamin (2008)

**Ex. 1 - 012**

Phillips, 7

**Referee** (selected)
American Journal of Sociology; American Sociological Review; British Journal of Sociology; Criminology; Drug and Alcohol Review; Feminist Criminology; Journal of Criminal Justice; Journal of Quantitative Criminology; Journal of Research in Crime and Delinquency; Justice Quarterly; Law and Society Review; Law and Policy; National Science Foundation; Psychology, Crime, and Law; Social Science Quarterly; The Sociological Quarterly; Violence and Victims

**Current Courses**
Capital Punishment; Criminology; Quantitative Methods; Wrongful Conviction

**Mentoring Students**
- Master's Theses:  Raquel Flores (Chair); Stephanie Geiger-Oneto (Chair); Theresa Jach (Reader); Laura Potter (Chair); Roderick White (Chair)
- Senior Honors Theses:  Lisa Kan (Chair); Jackie Lapuck (Chair); Sara Rappaport (Chair); Rachel Tucker (Chair); Lindsay VanGilder (Reader)

**Professional Affiliations**
American Society of Criminology; American Sociological Association; Law and Society Association

**References**
Available upon request

Ex. 1 - 013

# EXHIBIT 2

# OMITTED

# EXHIBIT 3

07/20/01  11:23 FAX 817 978 3094        US ATTORNEY OFFICE                    ☑002



IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | |
| | § | |
| NATHAN DESHAWN HENDERSON | § | |
| a.k.a. "Cash", a.k.a. "Nate"   (01) | § | |
| JULIUS OMAR ROBINSON | § | |
| a.k.a. "Scarface, a.k.a. "Scar", | § | |
| a.k.a. "Face"   (02) | § | |
| JASON GEHRING   (03) | § | |
| VICTOR JIMENEZ, a.k.a. "Vic"   (05) | § | |
| JAVIER GUADALUPE AGUILAR   (06) | § | |
| MARCUS JWAIN ROBINSON   (07) | § | |
| JOHN TURNER,   (08) | § | |
| FANISHA HILL   (10) | § | CRIMINAL NO.4:00-CR-0260-Y |
| JEWELL EWING, a.k.a. "Duke"   (12) | § | [Supersedes Indictments Returned Nov. 2, 2000 and |
| CANTRAL HUGGINS, | § | April 19, 2001 as to the named defendants] |
| a.k.a. "Crumb"   (13) | § | |
| TERRENCE HOLIMON, | § | |
| a.k.a "Bone"   (14) | § | |
| L.J. BRITT, a.k.a. "Capone"   (15) | § | |
| RICHARD SMART, a.k.a "Black"   (16) | § | |
| TRAVIS DIXON   (21) | § | |
| STEVEN TOSTON   (22) | § | |
| ANGELO HARRIS, a.k.a. "Step"   (23) | § | |
| KIMBERLY JOHNSON   (24) | § | |
| TAMIEKA SIBLEY   (26) | § | |
| HENDRICK EZELL TUNSTALL   (38) | § | |
| TYRONE BRYANT   (39) | § | |
| CHRISTHIAN MORALES   (40) | § | |
| EDY SONIA ZAMUDIO   (41) | § | |
| DAKARI WARNER | § | |
| a.k.a. "Dakari Sells" | § | |
| a.k.a. "DK"   (43) | § | |
| LEON JENKINS   (44) | § | |

The following box appears at upper right:

```
U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 1 9 2001

CLERK, U.S. DISTRICT COURT
By _____
            Deputy
```

**UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.**
**SUPERSEDING INDICTMENT**                                            **Page 1 of 37**

Ex. 3 - 015

## THE GRAND JURY CHARGES:

### Count One

Commencing on or about January 1, 1997, the exact date being unknown, and continuing thereafter until at least November 8, 2000, in the Fort Worth Division of the Northern District of Texas, and elsewhere, including diverse locations in the states of Texas, Louisiana, Oklahoma, Arkansas, Missouri, Florida, and Kentucky, **Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"; Julius Omar Robinson, a.k.a. "Scarface, a.k.a. "Scar", a.k.a. "Face"; Jason Gehring; Victor Jimenez, a.k.a. "Vic"; Javier Guadalupe Aguilar; Marcus Jwain Robinson; John Turner; Fanisha Hill; Jewell Ewing, a.k.a. "Duke"; Cantral Huggins, a.k.a. "Crumb"; Terrence Holimon, a.k.a "Bone"; L.J. Britt, a.k.a. "Capone"; Richard Smart, a.k.a "Black"; Travis Dixon; Steven Toston; Angelo Harris, a.k.a. "Step"; Kimberly Johnson; Tamieka Sibley,** defendants, and others both known and unknown to the Grand Jury, did intentionally and knowingly combine, conspire, confederate, and agree to engage in conduct in violation of Title 21, United States Code, §841(a)(1), namely to distribute more than 100 kilograms of a mixture and substance containing a detectable amount of marijuana, a Schedule I, controlled substance.

### *Manner and Means*

To promote, facilitate, carry on, and perpetrate the aforesaid conspiracy, the following manner and means were, from time to time, employed by one or more of the conspirators:

1. It was a part of the conspiracy that **Victor Jimenez, a.k.a. "Vic"**, defendant, and **Javier Guadalupe Aguilar**, defendant, would each provide bulk quantities - amounts in excess of 10 kilograms - of marijuana to defendants **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar"**

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                      Page 2 of 37

Ex. 3 - 016

a.k.a. "Face" and Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate" for distribution to others.

2. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate" and John Turner, defendants, would transport and cause to be transported bulk quantities of marijuana to others in the states of Texas, Louisiana, Oklahoma, Arkansas, Missouri, Florida, and Kentucky for further distribution to others.

3. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate" and Jason Gehring, " and John Turner, defendants would ship by commercial interstate carrier and the United States Mail, quantities of marijuana to others in the states of Arkansas, Missouri, and Kentucky.

4. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate", defendants, utilized communication facilities in interstate commerce including cellular telephones and the Internet to monitor the progress of shipments of marijuana.

5. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate" and John Turner, defendants, would establish and operate businesses in order to disguise and conceal their income from the unlawful sale and distribution of controlled substances.

6. Throughout the course of the conspiracy and despite changes in the membership of the conspiracy from time to time, it was a part of the conspiracy that defendants Julius Omar Robinson,

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                                    Page 3 of 37

a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate" would obtain bulk quantities of marijuana which they would distribute to others for further distribution; such distributors included Jason Gehring; Marcus Jwain Robinson; John Turner; Jewell Ewing, a.k.a. "Duke"; Cantral Huggins, a.k.a. "Crumb"; Terrence Holimon, a.k.a "Bone"; Travis Dixon; Steven Toston; Tamieka Sibley; L.J. Britt, a.k.a. "Capone"; and Richard Smart, a.k.a "Black"; defendants, and other persons known to the Grand Jury, including Jamila Marie Camp; Leteshia Lenore Barnett; Angela Leach; Edward Jenkins, a.k.a. "Bear"; Santana Minor; Timothy Dewayne Caldwell, a.k.a "Timmy"; Troy Lee Simpson; Cody Elliott; Misty Grounds; Jeanne Denice Wilkins, Howard Edward Ringer, Stephen Williams, Dorothy Hodges, and Reginald Kinchen;

7. It was a part of the conspiracy that Jamila Marie Camp and Leteshia Lenore Barnett, aided and abetted by defendants Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate", and John Turner, would open and maintain places for the storage, processing, and distribution of bulk quantities of marijuana.

8. It was a part of the conspiracy that Jamila Marie Camp, Leteshia Lenore Barnett and defendant Marcus Jwain Robinson would transport quantities of marijuana, to the facilities of interstate commercial carriers, including United Parcel Service, for shipment to others in the states of Arkansas and Oklahoma.

9. It was a part of the conspiracy that the conspirators, when using the services of interstate common carriers, would employ false and fictitious names and/or addresses on shipping or mailing labels purporting to show the identity of the person(s) sending the package.

10. It was a part of the conspiracy that the conspirators would purchase shipping boxes and

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                    Page 4 of 37

07/20/01  11:24 FAX 817 978 3094          US ATTORNEY OFFICE                         ☑006

materials from commercial establishments to utilize in sending quantities of marijuana to other conspirators by interstate commercial carriers.

11. It was a part of the conspiracy that money derived from the sale and distribution of marijuana would be used to purchase additional quantities of marijuana.

12. It was a part of the conspiracy that **Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"** would from time to time use counterfeit United States currency to pay for quantities of marijuana.

13. It was a part of the conspiracy that **Fanisha Hill**, defendant, would from time to time act as a lookout for **Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**, defendant, when Henderson was conducting marijuana transactions.

14. It was a part of the conspiracy that **Richard Smart, a.k.a. "Black"**, defendant, would assist **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, in taking delivery of quantities of marijuana and in transporting quantities of money obtained from the sale and distribution of marijuana.

15. It was a part of the conspiracy that **Kimberly Johnson**, defendant, would assist **Jason Gehring**, defendant, in delivering monies to **Victor Jimenez, a.k.a. "Vic"**, defendant.

16. It was a part of the conspiracy that **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"** and **Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**, and **L.J. Britt, a.k.a. "Capone"**, defendants, in conjunction with others whose full identities are unknown, would contrive to obtain monies to finance their drug acquisition and distribution by robbing and/or burglarizing third persons of money and other things of value including controlled substances..

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                                   Page 5 of 37

Ex. 3 - 019

17. It was a part of the conspiracy that defendant **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face"**; would recruit defendant **L.J. Britt, a.k.a. "Capone"** to assist **Robinson** in the commission of acts of force and violence against others.

18. It was a part of the conspiracy that defendant **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face"**, would, by means of force and violence, seek retribution against others whom the defendant **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face"** believed had cheated him in drug transactions, had failed to pay him for marijuana, or had become informers for law enforcement.

19. It was a part of the conspiracy that the conspirators would possess, carry, use, brandish, and discharge firearms.

### *Overt Acts*

In furtherance of the conspiracy and to effect and accomplish the objects thereof, one or more of the conspirators committed diverse overt acts within the Northern District of Texas, and elsewhere, among which were the following:

a. In or about March 1997, **Terrence Holimon, a.k.a. "Bone"**, defendant, possessed approximately 17 pounds of marijuana in the Eastern District of Arkansas.

b. On or about September 17, 1998, approximately $14,615 in United States Currency was sent by United States Mail from Saint Louis in the Eastern District of Missouri addressed to "Platinum Sounds", 3201 East Pioneer Parkway, Arlington, Texas.

c. On or about September 18, 1998, **John Turner**, defendant, as the owner of "Platinum Sounds" disclaimed any knowledge of, or claim to, the $14,615 in United States Currency

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                            **Page 6 of 37**

Ex. 3 - 020

07/20/01  11:25 FAX 817 978 3094            US ATTORNEY OFFICE                           ☑008

which had been mailed to his business.

d.  On or about December 3, 1998, **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, and **L.J. Britt, a.k.a. "Capone"**, defendant, did possess, carry, and use firearms.

e.  On or about December 3, 1998, **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, and **L.J. Britt, a.k.a. "Capone"**, defendant, did intentionally cause the death of Johnny Lee Shelton, by shooting him with firearms.

f.  On or about January 13, 1999, **Travis Dixon**, defendant, utilizing the services of United Parcel Service, sent $3,500.00 in U.S. currency from Conway in the Eastern District of Arkansas to "That Sounds Good, 916 East Arkansas Lane, Arlington, Texas 76014", in the Northern District of Texas.

g.  On or about January 19, 1999, **Steven Toston**, defendant, utilizing the services of United Parcel Service, sent $27,400.00 in U.S. currency from Fayetteville in the Western District of Arkansas to "That Sounds Good, 916 East Arkansas Lane, Arlington, Texas 76014", in the Northern District of Texas.

h.  On or about January 21, 1999, **Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**, defendant, utilized the name of "James Stevens" and attempted to send approximately 38 pounds of marijuana from Arlington in the Northern District of Texas to "D&D Detail" 1126 Harkrider, Conway, Arkansas in the Eastern District of Arkansas utilizing the services of United Parcel Service.

i.  On or about March 2, 1999, a package containing approximately 20 pounds of marijuana was transported from the Northern District of Texas to the Eastern District of Arkansas,

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
**SUPERSEDING INDICTMENT**                                                      **Page 7 of 37**

addressed to "Mrs. Freeman, 2840 Dave Ward Dr., Conway, Arkansas".

j. On or about September 24, 1999, a person known to the Grand Jury utilized the name of "Teshia Barnett" and sent a 2 pound parcel from Arlington in the Northern District of Texas to Little Rock in the Eastern District of Arkansas utilizing the services of United Parcel Service.

k. On or about December 29, 1999, **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, obtained cellular telephone service from Southwestern Bell Wireless, Dallas, Texas, for telephone number, 817-454-8015 bearing Electronic Serial Number 23514252463.

l. On or about January 25, 2000, a parcel containing approximately $5,500 in United States Currency was sent by Express Mail to "Platinum Sounds, 2540 East Arkansas Lane, Suite #106, Arlington, TX. 76014" in the Northern District of Texas, which parcel bore a fictitious address in Berkeley in the Eastern District of Missouri.

m. On or about February 14, 2000, **Marcus Jwain Robinson**, defendant, utilized the name of "James Lewis" and attempted to send a parcel containing approximately one pound of marijuana from the Northern District of Texas to the residence of **Terrence Holimon, a.k.a "Bone"**, defendant, at 707 North Drew in Dermott in the Eastern District of Arkansas by means of United Parcel Service, a commercial interstate carrier.

n. On or about March 7, 2000, **Marcus Jwain Robinson**, defendant, utilized the name of "James Lewis" and attempted to send parcels containing approximately six pounds of marijuana from the Northern District of Texas to addresses in the Eastern District of Arkansas by means of United Parcel Service, a commercial interstate carrier.

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                              Page 8 of 37

Ex. 3 - 022

07/20/01  11:26 FAX 817 978 3094          US ATTORNEY OFFICE                    ☒010

o. On or about March 9, 2000, **Jason Gehring**, defendant, utilized the name of James Johnson, and attempted to send a parcel containing approximately 35 pounds of marijuana to the residence of **Jewell Ewing**, defendant, at 3114 Alameda Drive in Little Rock in the Eastern District of Arkansas by means of United Parcel Service, a commercial interstate carrier.

p. On or about May 30, 2000, **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**, defendants, sent a parcel containing approximately 19 pounds of marijuana to an address in Louisville in the Western District of Kentucky by means of United Parcel Service, a commercial interstate carrier.

q. On or about May 31, 2000, **Jason Gehring and Kimberly Johnson**, defendants, met with **Victor Jimenez, a.k.a. "Vic"**, defendant, at a residence located at 823 Winston, Dallas, Texas.

r. On or about June 2, 2000, **Victor Jimenez, a.k.a. "Vic"**, defendant, engaged in a telephone conversation with **Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**, defendant, concerning the purchase price for a quantity of marijuana.

s. On or about June 2, 2000, **Victor Jimenez**, defendant, delivered approximately 104 pounds of marijuana to **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**, defendants, for delivery to others.

t. On or about June 2, 2000, **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar"**

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                              Page 9 of 37

07/20/01  11:26 FAX 817 978 3094          US ATTORNEY OFFICE                        ☑011

a.k.a. "Face" and Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate", defendants, delivered approximately 104 pounds of marijuana to a person known to the Grand Jury, for delivery to others in the state of Arkansas.

u. On or about June 3, 2000 Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face", defendant, engaged in a telephone conversation with Richard Smart, a.k.a. "Black" defendant, concerning the carrying on of the business of the sale and distribution of controlled substances and the commission of acts of force and violence to obtain money to carry on such business.

v. On or about June 11, 2000, Terrence Holimon, a.k.a. "Bone", defendant, possessed approximately 4 pounds of marijuana.

w. On or about June 22, 2000, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face", and Richard Smart, a.k.a. "Black" defendants met with Javier Guadalupe Aguilar, defendant, at a residence in Dallas, Texas.

x. On or about June 28, 2000, Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate", and Victor Jimenez, defendants met in Arlington, Texas.

y. On or about June 30, 2000, Jason Gehring, defendant, engaged in a coded telephone conversation with Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate", defendant, concerning the distribution of approximately 20 pounds of marijuana.

z. On or about June 30, 2000, John Turner, defendant, engaged in a coded telephone conversation with Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate", defendant, concerning the distribution of approximately 10 pounds of marijuana.

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                          Page 10 of 37

Ex. 3 - 024

07/20/01  11:26 FAX 817 978 3094          US ATTORNEY OFFICE          ☑012

aa. On or about July 2, 2000, **Jason Gehring**, defendant, engaged in a coded telephone conversation with **Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**, defendant, concerning the distribution of approximately 10 pounds of marijuana.

bb. On or about July 8, 2000, **Fanisha Hill**, defendant, acted as a lookout for delivery of approximately 20 pounds of marijuana by **Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**, defendant, to others.

cc. On or about July 12, 2000, **Javier Guadalupe Aguilar and Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendants, met at the premises of "That Sounds Good", 2540 East Arkansas Lane, Suite 106, Arlington, Texas.

dd. On or about July 12, 2000, **Javier Guadalupe Aguilar**, defendant, transported away from the premises of "That Sounds Good", 2540 East Arkansas Lane, Suite 106, Arlington, Texas approximately $22,546 in United States Currency.

ee. On or about July 13, 2000, in the Eastern District of Arkansas, **Jewell Ewing**, defendant, possessed $4,880 in United States Currency, one Rossi .38 caliber Revolver, serial number 805205, marijuana, and drug paraphernalia at his residence located at 3114 Alameda Drive, Little Rock, Arkansas.

ff. On or about November 8, 2000, **Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**, defendant, possessed with intent to distribute 4.316 kilograms (approximately 9 pounds) of marijuana, a Schedule I controlled substance.

gg. On or about November 8, 2000, **Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**, defendant, possessed two firearms, to wit: one BFI .223 caliber semi-automatic

**UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.**
**SUPERSEDING INDICTMENT**                                    **Page 11 of 37**

Ex. 3 - 025

assault rifle, serial number P05130; and one 45 caliber UZI pistol, serial number UP52637.

hh.  On or about November 8, 2000, **Julius Omar Robinson, a.k.a. "Scarface", a.k.a.
"Scar" a.k.a. "Face"**, defendant, possessed three firearms, to wit: one 9mm UZI pistol,
serial number 18740; one Smith & Wesson .357 caliber pistol, serial number 5224575; and
one SKS 7.62x39 semi-automatic assault rifle, serial number 1510198P.

ii.  On or about November 8, 2000, **John Turner**, defendant, possessed a ballistic
vest at his residence located at 1010 Judy Lynn Drive, Arlington, Texas.

### Criminal Forfeiture

I.  Pursuant to the provisions of Title 21, United States Code, §853, **Javier Guadalupe
Aguilar**, defendant, from his engagement in the aforesaid offense, shall forfeit to the United States
any and all property constituting or derived from, any proceeds the defendant obtained directly or
indirectly as a result of the aforesaid offense; as well as any of the property of **Javier Guadalupe
Aguilar**, defendant, used or intended to be used, in any manner or part, to commit, or facilitate the
commission of the offense alleged in Count 1 of this Indictment; such property including, but not
limited to the following:

1.  $22,546 in United States Currency seized on July 12, 2000 from Javier Guadalupe
Aguilar.

II.  Pursuant to the provisions of Title 21, United States Code, §853, **Julius Omar
Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, from his engagement in the
aforesaid offense, shall forfeit to the United States any and all property constituting or derived from,
any proceeds the defendant obtained directly or indirectly as a result of the aforesaid offense; as well

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                          Page 12 of 37

07/20/01  11:27 FAX 817 978 3094          US ATTORNEY OFFICE                        ☑014

as any of the property of **Julius Omar Robinson**, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face",
defendant, used or intended to be used, in any manner or part, to commit, or facilitate the
commission of the offense alleged in Count 1 of this Indictment; such property including, but not
limited to the following:

1. One 1991 Nissan Infiniti sedan, VIN: JNKCP01P1MT206841, bearing Texas License

MYN20B, assigned Texas Certificate of Title 22025936201103735.

2. Cash and Money Market and Mutual Funds held under the name of **Julius Robinson**, and

designated as assets of Edward Jones Account Number 491-07869-1-4

*All in violation of Title 21, United States Code, §846, the penalty for*

*which is found at Title 21, United States Code, §841(b)(1)(B).*

**UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.**
**SUPERSEDING INDICTMENT**                                                **Page 13 of 37**

**Ex. 3 - 027**

07/20/01  11:27 FAX 817 978 3094          US ATTORNEY OFFICE                                    ☑015

## Count Two

Commencing on or about January 1, 1997 and continuing thereafter until November 8, 2000, in the Fort Worth Division of the Northern District of Texas, and elsewhere, including diverse locations in the states of Texas, Louisiana, and Oklahoma, Julius Omar Robinson, a.k.a. "Scarface, a.k.a. "Scar", a.k.a. "Face"; Victor Jimenez, a.k.a. "Vic"; John Turner; L.J. Britt, a.k.a. "Capone"; Angelo Harris, a.k.a. "Step"; Hendrick Ezell Tunstall; Tyrone Bryant; Christhian Morales; Edy Sonia Zamudio; Dakari Warner, a.k.a. "Dakari Sells, a.k.a. "DK"; Leon Jenkins, defendants, and others both known and unknown to the Grand Jury, did intentionally and knowingly combine, conspire, confederate, and agree to engage in conduct in violation of Title 21, United States Code, §841(a)(1), namely to distribute more than 5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II, controlled substance.

### *Manner and Means*

To promote, facilitate, carry on, and perpetrate the aforesaid conspiracy, the following manner and means were, from time to time, employed by one or more of the conspirators:

1. Throughout the course of the conspiracy and despite changes in the membership of the conspiracy from time to time, it was a part of the conspiracy that defendant Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" would obtain quantities of cocaine from suppliers, including Victor Jimenez, a.k.a. "Vic", Dakari Warner, a.k.a. "Dakari Sells, a.k.a. "DK", Christhian Morales; and Edy Sonia Zamudio, defendants, which would be distributed to others for further distribution.

2. It was a part of the conspiracy that defendant Julius Omar Robinson, a.k.a. "Scarface",

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                              Page 14 of 37

Ex. 3 - 028

07/20/01  11:27 FAX 817 978 3094        US ATTORNEY OFFICE                         ☑016

a.k.a. "Scar" a.k.a. "Face" would distribute quantities of cocaine to defendants Jason Gehring; John Turner; Angelo Harris, a.k.a. "Step"; and Leon Jenkins, and others for further distribution to others.

3. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" defendant, would establish and operate businesses in order to disguise and conceal his income from the unlawful sale and distribution of cocaine.

4. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face"; and L.J. Britt, a.k.a. "Capone" and Hendrick Ezell Tunstall; and Tyrone Bryant; and Christhian Morales; and Edy Sonia Zamudio; defendants, in conjunction with others whose full identities are unknown, would obtain quantities of cocaine, a Schedule II controlled substance by means of force and violence against others.

5. It was a part of the conspiracy that defendant Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face"; would recruit defendant L.J. Britt, a.k.a. "Capone" to assist Robinson in the commission of acts of force and violence against others.

6. It was a part of the conspiracy that defendant Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", would, by means of force and violence, seek retribution against others whom the defendant Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face" believed had cheated him in drug transactions, had failed to pay him for cocaine, or had become informers for law enforcement.

7. It was a part of the conspiracy that the conspirators would possess, carry, use, brandish, and discharge firearms.

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                              Page 15 of 37

Ex. 3 - 029

07/20/01  11:28 FAX 817 978 3094          US ATTORNEY OFFICE                    ☑017

8. It was a part of the conspiracy that defendant **Julius Omar Robinson, a.k.a. "Scarface",** **a.k.a. "Scar", a.k.a. "Face"**, would recruit others to transport quantities of cocaine in interstate commerce from the state of Texas to the state of Arkansas.

9. It was a part of the conspiracy that the defendants would utilize common carriers to transport cocaine from one state to another.

### Overt Acts

In furtherance of the conspiracy and to effect and accomplish the objects thereof, one or more of the conspirators committed diverse overt acts within the Northern District of Texas, and elsewhere, among which were the following:

a. On or about March 16, 1999, **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, met with **Carmen Nicole Byrd**, defendant, and a person known to the Grand Jury at Robinson's residence in the Northern District of Texas.

b. On or about March 16, 1999, **Carmen Nicole Byrd**, defendant, possessed with intent to distribute approximately one kilogram of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance.

c. On or about May 8, 1999, defendant **Angelo Harris, a.k.a. "Step"** traveled in interstate commerce from the state of Oklahoma to the Northern District of Texas and met with defendants **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"** and **Dakari Warner, a.k.a. "Dakari Sells, a.k.a. "DK"**, for the purpose of obtaining cocaine.

d. On or about May 8, 1999, defendant **Angelo Harris, a.k.a. "Step"** and defendant **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, obtained what they

Ex. 3 - 030

07/20/01  11:28 FAX 817 978 3094          US ATTORNEY OFFICE                              ☑016

believed to be one kilogram of cocaine from Dakari Warner, a.k.a. "Dakari Sells, a.k.a. "DK", and another.

e.  On or about May 8, 1999, defendant **Angelo Harris, a.k.a. "Step"** caused what he believed to be a kilogram of cocaine to be transported from the Northern District of Texas to Oklahoma City, Oklahoma.

f.  On or about May 9, 1999, defendant **Angelo Harris, a.k.a. "Step"** traveled in interstate commerce from the state of Oklahoma to the Northern District of Texas and met with defendant **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, for the purpose of seeking retribution against suppliers of cocaine.

g.  On or about May 9, 1999, defendants **Angelo Harris, a.k.a. "Step"** and **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"** did possess, carry, and use firearms.

h.  On or about May 9, 1999, defendants **Angelo Harris, a.k.a. "Step"** and **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"** did intentionally cause the death of Juan Reyes, by shooting him with firearms.

i.  On or about July 12, 1999, defendants **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face"; and L.J. Britt, a.k.a. "Capone"; and Hendrick Ezell Tunstall; and Tyrone Bryant; and Christhian Morales;** met in Arlington, Texas and thereafter did, by force and violence, obtain twenty kilograms of cocaine from Rudolfo Resendez.

j.  On or about July 12, 1999, defendants **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face"; and L.J. Britt, a.k.a. "Capone" and Hendrick Ezell Tunstall;** and

Ex. 3 - 031

Tyrone Bryant; and Christhian Morales; acting in concert and at the behest of Edy Sonia Zamudio, defendant, did intentionally cause the death of Rudolfo Resendez by shooting him with firearms.

k. On or about July 21, 1999, **Angelo Harris**, defendant, and **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, delivered approximately one kilogram of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, to a person known to the Grand Jury for delivery to others in the Western District of Oklahoma.

l. On or about September 29, 1999, **Angelo Harris, also known as "Step"** and **Brandi Scales**, defendants, transported approximately $8,000 in United States Currency from the Northern District of Texas to the Western District of Oklahoma.

m. On or about November 3, 1999, defendants **Leon Jenkins, Angelo Harris, a.k.a. "Step", and Brandi Scales** were present in Arlington, Texas.

n. On or about June 2, 2000, **L.J. Britt, a.k.a. "Capone"**, defendant, engaged in a telephone conversation with **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant.

o. On or about June 14, 2000, **John Turner**, defendant, engaged in a coded telephone conversation with **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, concerning the distribution of approximately 500 grams of cocaine.

p. On or about June 15, 2000, **L.J. Britt, a.k.a. "Capone"**, defendant, engaged in a series of telephone conversations with **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar"**

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                    Page 18 of 37

a.k.a. "Face", defendant concerning the payment of monies by Robinson to Britt.

q.  On or about November 8, 2000, **Julius Omar Robinson**, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face", defendant, possessed three firearms, to wit: one 9mm UZI pistol, serial number 18740; one Smith & Wesson .357 caliber pistol, serial number 5224575; and one SKS 7.62x39 semi-automatic assault rifle, serial number 1510198P.

r.  On or about November 8, 2000, **John Turner**, defendant, possessed a ballistic vest at his residence located at 1010 Judy Lynn Drive, Arlington, Texas.

> *A violation of Title 21, United States Code, §846, the penalty for which is found at Title 21, United States Code, §841(b)(1)(A)*

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                            Page 19 of 37

Ex. 3 - 033

### Count Three

1. From on or about January 1, 1997 and continuing thereafter until the date of the return of this Indictment, **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, did engage in a continuing criminal enterprise, that is to say that **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, in concert with more than five other persons with respect to whom the defendant occupied a position of organizer and a supervisory position and a position of management, did, as part of a continuing series of felonious violations of subchapter I of Chapter 13 of Title 21, United States Code, intentionally and knowingly violate the provisions of such subchapter and from such continuing series of violations, **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, obtained substantial income and resources.

2. The persons with respect to whom **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, occupied a position of organizer and a supervisory position and a position of management included, among others, the following:

| | |
|---|---|
| Jason Gehring, | John Turner, |
| Misty Grounds, | Leteshia Lenore Barnett, |
| Angelo Harris, a.k.a. "Step" | Reginald Kinchen, |
| Jewell Ewing, a.k.a., "Duke", | Cantral Huggins, a.k.a. "Crumb", |
| Jeanne Denise Wilkins, | Steven Toston, |
| Carmen Byrd, | Brandi Scales, |
| Edward G. Jenkins, a.k.a. "Bear", | Jamila Marie Camp, |
| Santana Minor, | Dorothy Hodges, a.k.a. "Dorry", |
| Marcus Jwain Robinson, | L.J. Britt, a.k.a. "Capone", |

Ex. 3 - 034

07/20/01  11:29 FAX 817 978 3094          US ATTORNEY OFFICE                        ☑022

Richard Smart, a.k.a. "Black",                    Hendrick Ezell Tunstall,

Tyrone Bryant,                                    Christhian Morales,

Dakari Warner, a.k.a. "Dakari Sells, a.k.a "DK", and

Leon Jenkins,.

3. The continuing series of felonious violations of subchapter I of Title 21, United States Code, included the following:

i. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately 38 pounds of marijuana on or about January 21, 1999;

ii. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately 25 pounds of marijuana on or about March 2, 1999;

iii. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately one kilogram of cocaine on or about March 16, 1999;

iv. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the distribution of a quantity of cocaine on or about May 8, 1999

v. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the distribution of approximately twenty kilogram of cocaine on or about July 12, 1999 in Fort Worth, Texas.

vi. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately five kilograms of cocaine on or about July 22, 1999 in Little Rock, Arkansas;

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                    Page 21 of 37

Ex. 3 - 035

vii. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately 10 pounds of marijuana on or about March 20, 2000;

viii. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately 19 pounds of marijuana on or about May 30, 2000;

ix. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately 104 pounds of marijuana on or about June 2, 2000;

x. The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 1 pound of marijuana on or about May 30, 2000;

xi. The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 1 pound of marijuana on or about June 1, 2000;

xii. The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21,

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                          Page 22 of 37

07/20/01  11:30 FAX 817 978 3094          US ATTORNEY OFFICE                          ☑024

United States Code, namely the distribution of approximately 104 pounds of marijuana on or about June 2, 2000;

xiii.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 2 pounds of marijuana on or about June 2, 2000;

xiv.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 1 pound of marijuana on or about June 4, 2000;

xv.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 1 pound of marijuana on or about June 5, 2000;

xvi.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 1 pound of marijuana on or about June 6, 2000;

Ex. 3 - 037

07/20/01  11:30 FAX 817 978 3094          US ATTORNEY OFFICE                                     ☑025

xvii.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter 1 of chapter 13 of Title 21, United States Code, namely the distribution of approximately 1 pound of marijuana on or about June 8, 2000;

xviii.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 4 pounds of marijuana on or about June 10, 2000;

xix.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter 1 of chapter 13 of Title 21, United States Code, namely the distribution of approximately 1 pound of marijuana on or about June 12, 2000;

xx.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 1 pound of marijuana on or about June 13, 2000;

xxi.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                                    Page 24 of 37

07/20/01  11:30 FAX 817 978 3094          US ATTORNEY OFFICE                      ☑026

constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 25 pounds of marijuana on or about June 13, 2000;

xxii.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 1 pound of marijuana on or about June 14, 2000;

xxiii.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 1 pound of marijuana on or about June 15, 2000;

xxiv.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 1 pound of marijuana on or about June 16, 2000;

xxv.  The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 2 pounds of marijuana

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                          Page 25 of 37

Ex. 3 - 039

on or about June 16, 2000;

xxvi.  The knowing and intentional use of a communications facility, namely a

telephone, in committing, and in causing and facilitating the commission of acts

constituting a felony under the provisions of subchapter I of chapter 13 of Title 21,

United States Code, namely the distribution of approximately 1 pound of marijuana

on or about June 20, 2000;

xxvii.  The knowing and intentional use of a communications facility, namely a

telephone, in committing, and in causing and facilitating the commission of acts

constituting a felony under the provisions of subchapter I of chapter 13 of Title 21,

United States Code, namely the distribution of approximately 25 pounds of marijuana

on or about June 27, 2000.

4.  While engaging in, and working in furtherance of the aforesaid Continuing Criminal

Enterprise, on or about December 3, 1998, defendants **Julius Omar Robinson, a.k.a. "Scarface",**

**a.k.a. "Scar" a.k.a. "Face"** and **L.J. Britt, a.k.a. "Capone** did intentionally kill Johnny Lee

Shelton, by shooting him with firearms.

5.  While engaging in, and working in furtherance of the aforesaid Continuing Criminal

Enterprise, on or about May 9, 1999, defendants **Angelo Harris, a.k.a. "Step"** and **Julius Omar**

**Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"** did intentionally kill, and counsel,

command, induce, procure, and cause the intentional killing of Juan Reyes, by shooting him with

firearms, and such killing resulted.

6.  While engaging in, and working in furtherance of the aforesaid Continuing Criminal

Enterprise, on or about July 12, 1999, defendants **Julius Omar Robinson, a.k.a. "Scarface", a.k.a.**

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                          Page 26 of 37

07/20/01  11:31 FAX 817 978 3094          US ATTORNEY OFFICE                    ☑028

"Scar", a.k.a. "Face"; and L.J. Britt, a.k.a. "Capone" and Hendrick Ezell Tunstall; and Tyrone

Bryant; and Christhian Morales and Edy Sonia Zamudio; acting in concert, did intentionally kill,

and counsel, command, induce, procure, and cause the intentional killing of, Rudolfo Resendez by

shooting him with firearms, and such killing resulted.

  *A violation of Title 21, United States Code, §848.*

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                          Page 27 of 37

Ex. 3 - 041

07/20/01  11:31 FAX 817 978 3094          US ATTORNEY OFFICE                        ☑029

### Count Four

On or about December 3, 1998, in the Northern District of Texas, defendants Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and L.J. Britt, a.k.a. "Capone did intentionally and knowingly possess firearms in furtherance of a drug trafficking crime for which the said defendants may be prosecuted in a court of the United States, namely: the offenses alleged in Count 1 and Count 3 of this Indictment.

*A violation of Title 18, United States Code, §924(c)(1)(A)(i).*

### Count Five

On or about December 3, 1998, in the Northern District of Texas, defendants Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and L.J. Britt, a.k.a. "Capone did intentionally and knowingly carry and use firearms, and did brandish such firearms, during and in relation to a drug trafficking crime for which the said defendants may be prosecuted in a court of the United States, namely: the offenses alleged in Count 1 and Count 3 of this Indictment.

*A violation of Title 18, United States Code, §924(c)(1)(A)(ii).*

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                                                 Page 28 of 37

Ex. 3 - 042

## Count Six

On or about December 3, 1998, in the Northern District of Texas, defendants **Julius Omar Robinson**, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and **L.J. Britt**, a.k.a. "Capone did intentionally and knowingly carry and use firearms, and did discharge such firearms, during and in relation to a drug trafficking crime for which the said defendants may be prosecuted in a court of the United States, namely: the offenses alleged in Count 1 and Count 3 of this Indictment.

*A violation of Title 18, United States Code, §924(c)(1)(A)(iii).*

## Count Seven

On or about December 3, 1998, in the Northern District of Texas, defendants **Julius Omar Robinson**, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and **L.J. Britt**, a.k.a. "Capone did intentionally and knowingly carry and use firearms, and did discharge such firearms, during and in relation to a drug trafficking crime for which the said defendants may be prosecuted in a court of the United States, namely: the offenses alleged in Count 1 and Count 3 of this Indictment; and in the course of such violation did cause the death of Johnny Lee Shelton through the use of such firearms, such killing being murder as defined in Title 18, United States Code, §1111.

*A violation of Title 18, United States Code, §924(j).*

Ex. 3 - 043

07/20/01  11:31 FAX 817 978 3094          US ATTORNEY OFFICE                               ⓐ031

### Count Eight

On or about May 9, 1999, in the Northern District of Texas, defendants **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"** and **Angelo Harris, a.k.a. "Step"**, did intentionally and knowingly possess firearms in furtherance of a drug trafficking crime for which the said defendants may be prosecuted in a court of the United States, namely: the offenses alleged in Count 2 and Count 3 of this Indictment.

*A violation of Title 18, United States Code, §924(c)(1)(A)(i).*

### Count Nine

On or about May 9, 1999, in the Northern District of Texas, defendants **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"** and **Angelo Harris, a.k.a. "Step"**, did intentionally and knowingly carry and use firearms, and did brandish such firearms, during and in relation to a drug trafficking crime for which the said defendants may be prosecuted in a court of the United States, namely: the offenses alleged in Count 2 and Count 3 of this Indictment.

*A violation of Title 18, United States Code, §924(c)(1)(A)(ii).*

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                              Page 30 of 37

Ex. 3 - 044

07/20/01  11:32 FAX 817 978 3094          US ATTORNEY OFFICE                    ☑032

## Count Ten

On or about May 9, 1999, in the Northern District of Texas, defendants Julius Omar
Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and Angelo Harris, a.k.a. "Step", did
intentionally and knowingly carry and use firearms, and did discharge such firearms, during and in
relation to a drug trafficking crime for which the said defendants may be prosecuted in a court of the
United States, namely: the offenses alleged in Count 2 and Count 3 of this Indictment.

*A violation of Title 18, United States Code, §924(c)(1)(A)(iii).*

## Count Eleven

On or about May 9, 1999, in the Northern District of Texas, defendants Julius Omar
Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face" and Angelo Harris, a.k.a. "Step", did
intentionally and knowingly carry and use firearms, and did discharge such firearms, during and in
relation to a drug trafficking crime for which the said defendants may be prosecuted in a court of the
United States, namely: the offenses alleged in Count 2 and Count 3 of this Indictment; and in the
course of such violation did cause the death of Juan Reyes through the use of such firearms, such
killing being murder as defined in Title 18, United States Code, §1111.

*A violation of Title 18, United States Code, §924(j).*

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                                    Page 31 of 37

Ex. 3 - 045

## Count Twelve

1. On or about July 12, 1999, in the Fort Worth Division of the Northern District of Texas, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face", L.J. Britt, a.k.a. "Capone, Hendrick Ezell Tunstall, Tyrone Bryant, Christhian Morales, and Edy Sonia Zamudio, defendants, aided and abetted by each other, did intentionally and knowingly possess with intent to distribute more than 5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance.

2. While engaging in such offense, which is punishable under the provisions of Title 21, United States Code, §841(b)(1)(A), the aforesaid defendants did intentionally kill Rudolfo Resendez and did intentionally counsel, command, induce, procure, and cause the intentional killing of Rudolfo Resendez ,and such killing resulted.

> *A violation of Title 21, United States Code, §841(a)(1); the penalty*
>
> *for which is found at Title 21, United States Code, §848(e)(1)(A).*

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                        Page 32 of 37

Ex. 3 - 046

### Count Thirteen

1. On or about July 12, 1999, in the Fort Worth Division of the Northern District of Texas, **Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face", L.J. Britt, a.k.a. "Capone, Hendrick Ezell Tunstall, Tyrone Bryant, Christhian Morales,** defendants, did intentionally and knowingly possess firearms in furtherance of a drug trafficking crime for which the said defendants may be prosecuted in a court of the United States, namely: the offenses alleged in Count 2 and Count 3 and Count 12 of this Indictment.

2. For the conduct alleged in paragraph 1 of this Count, **Edy Sonia Zamudio,** defendant, is criminally responsible as a co-conspirator of the aforesaid defendants in the conspiracy alleged in Count 2 of this Indictment, such conduct having been committed in furtherance of the such conspiracy and being reasonably foreseeable by the defendant **Edy Sonia Zamudio.**

3. For the conduct alleged in paragraph 1 of this Count, **Edy Sonia Zamudio,** defendant, is criminally responsible in that she did willfully aid, abet, counsel, command, induce and procure the commission of such conduct.

*A violation of Title 18, United States Code, §924(c)(1)(A), the penalty for which is found at Title 18, United States Code, §§ 924(c)(1)(A)(i) and 924(c)(1)(C).*

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                          Page 33 of 37

Ex. 3 - 047

### Count Fourteen

1. On or about July 12, 1999, in the Fort Worth Division of the Northern District of Texas, L.J. Britt, a.k.a. "Capone, and Hendrick Ezell Tunstall, defendants, did intentionally and knowingly carry and use firearms, and did discharge such firearms, during and in relation to a drug trafficking crime for which the said defendants may be prosecuted in a court of the United States, namely: the offenses alleged in Count 2 and Count 3 and Count 12 of this Indictment.

2. For the conduct alleged in paragraph 1 of this Count, Edy Sonia Zamudio, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face", Tyrone Bryant, and Christhian Morales, defendants, are each criminally responsible as a co-conspirator of the aforesaid defendants in the conspiracy alleged in Count 2 of this Indictment, such conduct having been committed in furtherance of the such conspiracy and being reasonably foreseeable by the defendants Edy Sonia Zamudio, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face", Tyrone Bryant, and Christhian Morales,.

3. For the conduct alleged in paragraph 1 of this Count,, Edy Sonia Zamudio, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face", Tyrone Bryant, and Christhian Morales, defendants, are each criminally responsible in that she did willfully aid, abet, counsel, command, induce and procure the commission of such conduct.

*A violation of Title 18, United States Code, §924(c)(1)(A), the penalty for which is found at Title 18, United States Code, §§ 924(c)(1)(A)(iii) and 924(c)(1)(C).*

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                    Page 34 of 37

**Ex. 3 - 048**

07/20/01  11:32 FAX 817 978 3094          US ATTORNEY OFFICE                    ☑036

### Count Fifteen

1. On or about July 12, 1999, in the Fort Worth Division of the Northern District of Texas, **L.J. Britt, a.k.a. "Capone,** and **Hendrick Ezell Tunstall,** defendants, did intentionally and knowingly carry and use firearms, and did discharge such firearms, during and in relation to a drug trafficking crime for which the said defendants may be prosecuted in a court of the United States, namely: the offenses alleged in Count 2 and Count 3 and Count 12 of this Indictment; and in the course of such violation did cause the death of Rudolfo Resendez through the use of such firearms, such killing being murder as defined in Title 18, United States Code, §1111.

2. For the conduct alleged in paragraph 1 of this Count, **Edy Sonia Zamudio, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face", Tyrone Bryant,** and **Christhian Morales,** defendants, are each criminally responsible as a co-conspirator of the aforesaid defendants in the conspiracy alleged in Count 2 of this Indictment, such conduct having been committed in furtherance of the such conspiracy and being reasonably foreseeable by the defendants **Edy Sonia Zamudio, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face", Tyrone Bryant,** and **Christhian Morales,.**

3. For the conduct alleged in paragraph 1 of this Count,, **Edy Sonia Zamudio, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face", Tyrone Bryant,** and **Christhian Morales,** defendants, are each criminally responsible in that she did willfully aid, abet, counsel, command, induce and procure the commission of such conduct.

*A violation of Title 18, United States Code, §924(j).*

**UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.**
**SUPERSEDING INDICTMENT**                                        Page 35 of 37

Ex. 3 - 049

07/20/01  11:33 FAX 817 978 3094          US ATTORNEY OFFICE                    ☑037

## Count Sixteen

On or about November 8, 2000, in the Fort Worth Division of the Northern District of Texas,

**Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**, defendant, possessed two firearms,

to wit: one BFI .223 caliber semi-automatic assault rifle, serial number P05130; and one 45 caliber

UZI pistol, serial number UP52637 in furtherance of a drug trafficking crime for which the defendant

may be prosecuted in a court of the United States, namely, the offense alleged in Count 1 of this

Indictment and the possession by **Nathan Deshawn Henderson, a.k.a. "Cash", a.k.a. "Nate"**,

defendant, with the intent to distribute 4.316 kilograms (approximately 9 pounds) of marijuana, a

Schedule I controlled substance.

*A violation of Title 18, United States Code, §924(c)(1)(A), the penalty for which is found at Title 18, United States Code, § 924(c)(1)(A)(i).*

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                           Page 36 of 37

Ex. 3 - 050

## Count Seventeen

On or about November 8, 2000, in the Fort Worth Division of the Northern District of Texas,

**Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar" a.k.a. "Face"**, defendant, possessed three

firearms, to wit: one 9mm UZI pistol, serial number 18740; one Smith & Wesson .357 caliber pistol,

serial number 5224575; and one SKS 7.62x39 semi-automatic assault rifle, serial number 1510198P,

in furtherance of a drug trafficking crime for which the defendant may be prosecuted in a court of

the United States, namely, the offense alleged in Counts 1, 2, and 3 of this Indictment.

*A violation of Title 18, United States Code, §924(c)(1)(A), the penalty for which is*

*found at Title 18, United States Code, §§ 924(c)(1)(A)(i) and 924(c)(1)(C).*

A TRUE BILL

Foreman of the Grand Jury

PAUL E. COGGINS
UNITED STATES ATTORNEY

FREDERICK M. SCHATTMAN
Assistant United States Attorney
State Bar of Texas No. 17728400
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone:    (817) 252-5200
Facsimile:    (817) 978-3094

UNITED STATES OF AMERICA v. NATHAN DESHAWN HENDERSON, et al.
SUPERSEDING INDICTMENT                                          Page 37 of 37

Ex. 3 - 051

# EXHIBIT 4



ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

### FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | **CRIMINAL NO.4:00-CR-0260-Y** |
| | § | [Supersedes Indictments Returned Nov. 2, 2000 and |
| L.J. BRITT, a.k.a. "Capone"    (15) | § | April 19, 2001, June 19, 2001, and August 22, 2002 |
| | § | as to L.J. Britt] |

**THE GRAND JURY CHARGES:**

<u>Count One</u>

### I. The Conspiracy

Commencing on or about January 1, 1997, the exact date being unknown, and continuing thereafter until at least November 8, 2000, in the Fort Worth Division of the Northern District of Texas, and elsewhere, including diverse locations in the states of Texas, Louisiana, Oklahoma, Arkansas, Missouri, Florida, and Kentucky, **L.J. Britt, a.k.a. "Capone",** defendant, and others both known and unknown to the Grand Jury, did intentionally and knowingly combine, conspire, confederate, and agree to engage in conduct in violation of Title 21, United States Code, §841(a)(1), namely to distribute more than 100 kilograms of a mixture and substance containing a detectable amount of marijuana, a Schedule I, controlled substance.

### II. The Conspirators

Among those persons known to the Grand Jury who participated in the aforesaid conspiracy were the following, who are named herein: Nathan Henderson, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", Jason Gehring, Victor Jimenez, Javier Aguilar, Iris Wade,

**UNITED STATES OF AMERICA v. L.J. BRITT**
**FOURTH SUPERSEDING INDICTMENT**                                        **Page 1 of 28**



**Ex. 4 - 052**

Marcus Robinson, John Turner, Jewell Ewing, a.k.a. "Duke", Cantral Huggins, a.k.a. "Crumb", Terrence Holimon, a.k.a "Bone", Richard Smart, a.k.a "Black", Reginald Kinchen, Steven Toston, Misty Grounds, Leteshia Barnett, Jeanne Wilkins, Dorothy Hodges, and Jamila Camp.

### III. Manner and Means

To promote, facilitate, carry on, and perpetrate the aforesaid conspiracy, the following manner and means were, from time to time, employed by one or more of the conspirators:

1. It was a part of the conspiracy that Victor Jimenez and Javier Aguilar, would each provide bulk quantities - amounts in excess of 10 kilograms - of marijuana to Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and Nathan Henderson, for distribution to others.

2. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and Nathan Henderson, and John Turner, would transport and cause to be transported bulk quantities of marijuana to others in the states of Texas, Louisiana, Arkansas, Missouri, Florida, and Kentucky for further distribution to others.

3. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", Nathan Henderson, Jason Gehring, and John Turner, would ship by commercial interstate carrier and the United States Mail, quantities of marijuana to others in the states of Arkansas, Missouri, and Kentucky.

4. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and Nathan Henderson, utilized communication facilities in interstate commerce including cellular telephones and the Internet to monitor the progress of shipments of marijuana.

5. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", Nathan Henderson, and John Turner, would establish and operate businesses in order

UNITED STATES OF AMERICA v. L.J. BRITT
**FOURTH SUPERSEDING INDICTMENT**                                    **Page 2 of 28**

to disguise and conceal their income from the unlawful sale and distribution of controlled substances.

6.  Throughout the course of the conspiracy and despite changes in the membership of the conspiracy from time to time, it was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and Nathan Henderson would obtain bulk quantities of marijuana which they would distribute to others for further distribution; such distributors included Jason Gehring, Marcus Robinson, John Turner, Jewell Ewing, a.k.a. "Duke", Cantral Huggins, a.k.a. "Crumb", Terrence Holimon, a.k.a "Bone", Travis Dixon, Steven Toston, L.J. Britt, a.k.a. "Capone", and Richard Smart, a.k.a "Black", Jamila Camp, Leteshia Barnett, Angela Leach, Edward Jenkins, Santana Minor, Timothy Caldwell, Troy Lee Simpson, Cody Elliott, Misty Grounds, Jeanne Wilkins, Howard Edward Ringer, Stephen Williams, Dorothy Hodges, and Reginald Kinchen.

7.  It was a part of the conspiracy that Jamila Camp and Leteshia Barnett, aided and abetted by Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and Nathan Henderson, and John Turner, would open and maintain places for the storage, processing, and distribution of bulk quantities of marijuana.

8.  It was a part of the conspiracy that Jamila Camp, Leteshia Barnett and  Marcus Jwain Robinson would transport quantities of marijuana, to the facilities of interstate commercial carriers, including United Parcel Service, for shipment to others in the states of Arkansas and Oklahoma.

9.  It was a part of the conspiracy that the conspirators, when using the services of interstate common carriers, would employ false and fictitious names and addresses on shipping or mailing labels purporting to show the identity of the person(s) sending the package.

10.  It was a part of the conspiracy that the conspirators would purchase shipping boxes and materials from commercial establishments to utilize in sending quantities of marijuana to other

UNITED STATES OF AMERICA v. L.J. BRITT
FOURTH SUPERSEDING INDICTMENT                                                    Page 3 of 28

conspirators by interstate commercial carriers.

11.  It was a part of the conspiracy that money derived from the sale and distribution of marijuana would be used to purchase additional quantities of marijuana.

12.  It was a part of the conspiracy that facilities in interstate commerce would be used to disperse the proceeds derived from the sale and distribution of marijuana.

13.  It was a part of the conspiracy that Richard Smart, a.k.a. "Black", would assist Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", in taking delivery of quantities of marijuana and in transporting quantities of money obtained from the sale and distribution of marijuana.

14.  It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", Nathan Henderson, and **L.J. Britt, a.k.a. "Capone"**, defendant, in conjunction with others both known and unknown, would contrive to obtain, and would obtain, monies to finance their drug acquisition and distribution by robbing and burglarizing third persons of money and other things of value including controlled substances.

15.  It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face"; would recruit defendant **L.J. Britt, a.k.a. "Capone"** to assist Robinson in the commission of acts of force and violence against others.

16.  It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and defendant **L.J. Britt** would, by means of force and violence, seek retribution against others whom Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", believed had cheated him in drug transactions, or had failed to pay him for marijuana, or had become informers for law enforcement.

Ex. 4 - 055

17.  It was a part of the conspiracy that the conspirators would possess, carry, use, brandish, and discharge firearms.

### IV.  Overt Acts

In furtherance of the conspiracy and to effect and accomplish the objects thereof, one or more of the conspirators committed diverse overt acts within the Northern District of Texas, and elsewhere, among which were the following:

a.  In or about March 1997, Terrence Holimon, a.k.a. "Bone", possessed approximately 17 pounds of marijuana in the Eastern District of Arkansas.

b.  On or about September 17, 1998, approximately $14,615 in United States Currency was sent by United States Mail from Saint Louis in the Eastern District of Missouri addressed to "Platinum Sounds", 3201 East Pioneer Parkway, Arlington, Texas.

c.  On or about September 18, 1998, John Turner, as the owner of "Platinum Sounds" disclaimed any knowledge of, or claim to, the $14,615 in United States Currency which had been mailed to his business.

d.  On or about December 3, 1998, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and **L.J. Britt, a.k.a. "Capone"**, defendant, did possess, carry, and use firearms in Dallas, Texas.

e.  On or about December 3, 1998, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and **L.J. Britt, a.k.a. "Capone"**, defendant, in Dallas, Texas, did intentionally cause the death of another, namely, Johnny Lee Shelton, by shooting him with firearms.

f.  On or about January 19, 1999, Steven Toston, utilizing the services of United Parcel Service, sent $27,400.00 in U.S. currency from Fayetteville in the Western District of

UNITED STATES OF AMERICA v. L.J. BRITT
**FOURTH SUPERSEDING INDICTMENT**                                                    **Page 5 of 28**

**Ex. 4 - 056**

Arkansas to "That Sounds Good, 916 East Arkansas Lane, Arlington, Texas 76014", in the Northern District of Texas.

g. On or about January 21, 1999, Nathan Henderson, utilizing the name of "James Stevens", attempted to send approximately 38 pounds of marijuana from Arlington in the Northern District of Texas to "D&D Detail" 1126 Harkrider, Conway, Arkansas in the Eastern District of Arkansas utilizing the services of United Parcel Service.

h. On or about September 24, 1999, Leteshia Barnett, sent a two pound parcel from Arlington in the Northern District of Texas to Little Rock in the Eastern District of Arkansas utilizing the services of United Parcel Service.

i. On or about January 25, 2000, a parcel containing approximately $5,500 in United States Currency was sent by Express Mail to "Platinum Sounds, 2540 East Arkansas Lane, Suite #106, Arlington, TX. 76014" in the Northern District of Texas, which parcel bore a fictitious address in Berkeley in the Eastern District of Missouri.

j. On or about February 14, 2000, Marcus Robinson, utilizing the name of "James Lewis", attempted to send a parcel containing approximately one pound of marijuana from the Northern District of Texas to the residence of Terrence Holimon, a.k.a "Bone", at 707 North Drew in Dermott in the Eastern District of Arkansas by means of United Parcel Service, a commercial interstate carrier.

k. On or about March 7, 2000, Marcus Robinson, utilized the name of "James Lewis" and attempted to send parcels containing approximately six pounds of marijuana from the Northern District of Texas to addresses in the Eastern District of Arkansas by means of United Parcel Service, a commercial interstate carrier.

**UNITED STATES OF AMERICA v. L.J. BRITT**
**FOURTH SUPERSEDING INDICTMENT**                                           **Page 6 of 28**

l. On or about March 9, 2000, Jason Gehring, utilizing the name of "James Johnson", attempted to send a parcel containing approximately 35 pounds of marijuana to the residence of Jewell Ewing, at 3114 Alameda Drive in Little Rock in the Eastern District of Arkansas by means of United Parcel Service, a commercial interstate carrier.

m. On or about May 30, 2000, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and Nathan Henderson, sent a parcel containing approximately 19 pounds of marijuana to an address in Louisville in the Western District of Kentucky by means of United Parcel Service, a commercial interstate carrier.

n. On or about June 2, 2000, Victor Jimenez, engaged in a telephone conversation with Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", concerning the purchase price for a quantity of marijuana.

o. On or about June 2, 2000, Victor Jimenez, delivered approximately 104 pounds of marijuana to Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and Nathan Henderson, for delivery to others.

p. On or about June 2, 2000, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and Nathan Henderson, aided and abetted by others, attempted to cause approximately 104 pounds of marijuana to be delivered to others in the state of Arkansas.

q. On or about June 2, 2000, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", engaged in a telephone conversation with **L.J. BRITT**, defendant, concerning the interception by law enforcement of a shipment of marijuana.

r. On or about June 3, 2000 Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", engaged in a telephone conversation with Richard Smart, a.k.a. "Black", concerning

UNITED STATES OF AMERICA v. L.J. BRITT
**FOURTH SUPERSEDING INDICTMENT**                                    **Page 7 of 28**

Ex. 4 - 058

the carrying on of the business of the sale and distribution of controlled substances and the commission of acts of force and violence to obtain money to carry on such business.

s. On or about June 11, 2000, Terrence Holimon, a.k.a. "Bone", possessed approximately 4 pounds of marijuana.

t. On or about June 22, 2000, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and Richard Smart, a.k.a. "Black" met with Javier Aguilar, at a residence in Dallas, Texas.

u. On or about June 28, 2000, Nathan Henderson, and Victor Jimenez, met in Arlington, Texas to discuss payment of money for marijuana.

v. On or about June 30, 2000, Jason Gehring, engaged in a coded telephone conversation with Nathan Henderson, concerning the distribution of approximately twenty (20) pounds of marijuana.

w. On or about June 30, 2000, John Turner, engaged in a coded telephone conversation with Nathan Henderson, concerning the distribution of approximately ten pounds of marijuana.

x. On or about July 2, 2000, Jason Gehring, engaged in a coded telephone conversation with Nathan Henderson, concerning the distribution of approximately ten pounds of marijuana.

y. On or about July 12, 2000, Javier Aguilar and Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", met at the premises of "That Sounds Good", 2540 East Arkansas Lane, Suite 106, Arlington, Texas for the purpose of Aguilar receiving a partial payment of money for drugs supplied on consignment.

z. On or about July 12, 2000, Javier Aguilar, transported away from the premises of "That Sounds Good", 2540 East Arkansas Lane, Suite 106, Arlington, Texas approximately

UNITED STATES OF AMERICA v. L.J. BRITT
**FOURTH SUPERSEDING INDICTMENT**                                                        **Page 8 of 28**

$22,546 in United States Currency.

aa.  On or about July 13, 2000, in the Eastern District of Arkansas, Jewell Ewing, possessed $4,880 in United States Currency, one Rossi .38 caliber Revolver, serial number 805205, marijuana, and drug paraphernalia at his residence located at 3114 Alameda Drive, Little Rock, Arkansas.

bb.  On or about November 8, 2000, Nathan Henderson, possessed with intent to distribute 4.316 kilograms (approximately 9 pounds) of marijuana, a Schedule I controlled substance.

cc.  On or about November 8, 2000, Nathan Henderson, possessed two firearms, to wit: one BFI .223 caliber semi-automatic assault rifle, serial number P05130; and one .45 caliber UZI pistol, serial number UP52637.

dd.  On or about November 8, 2000, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", possessed three firearms, to wit: one 9mm UZI pistol, serial number 18740; one Smith & Wesson .357 magnum caliber pistol, serial number 5224575; and one SKS 7.62x39 semi-automatic assault rifle, serial number 1510198P.

*All in violation of Title 21, United States Code, §846, the penalty for which is found at Title 21, United States Code, §841(b)(1)(B).*

**UNITED STATES OF AMERICA v. L.J. BRITT**
**FOURTH SUPERSEDING INDICTMENT**                                                   **Page 9 of 28**

**Ex. 4 - 060**

## Count Two

### I. The Conspiracy

Commencing on or about January 1, 1997, and continuing thereafter until November 8, 2000, in the Fort Worth Division of the Northern District of Texas, and elsewhere, including diverse locations in the states of Texas, Louisiana, and Oklahoma, **L.J. Britt, a.k.a. "Capone"**, defendant, and others both known and unknown to the Grand Jury, did intentionally and knowingly combine, conspire, confederate, and agree to engage in conduct in violation of Title 21, United States Code, §841(a)(1), namely to distribute more than 5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II, controlled substance.

### II. The Conspirators

Among those persons known to the Grand Jury who participated in the conspiracy were the following: Julius Omar Robinson, a.k.a. "Scarface, a.k.a. "Scar", a.k.a. "Face", Victor Jimenez, John Turner, Angelo Harris, a.k.a. "Step", Hendrick Ezell Tunstall, Tyrone Bryant, Christhian Morales, Edy Sonia Zamudio, Dakari Warner, a.k.a. "Dakari Sells, a.k.a. "DK", and Leon Jenkins.

### III. Manner and Means

To promote, facilitate, carry on, and perpetrate the aforesaid conspiracy, the following manner and means were, from time to time, employed by one or more of the conspirators:

1. Throughout the course of the conspiracy and despite changes in the membership of the conspiracy from time to time, it was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", would obtain quantities of cocaine from suppliers, including Victor Jimenez, Dakari Warner, a.k.a. "Dakari Sells, a.k.a. "DK", Christhian Morales; and Edy Sonia Zamudio, which would be distributed to others for further distribution.

**UNITED STATES OF AMERICA v. L.J. BRITT**
**FOURTH SUPERSEDING INDICTMENT**                                                    **Page 10 of 28**

**Ex. 4 - 061**

2. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", would distribute quantities of cocaine to Jason Gehring, John Turner, Angelo Harris, a.k.a. "Step", and Leon Jenkins, and others for further distribution to others.

3. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", would establish and operate businesses in order to disguise and conceal his income from the unlawful sale and distribution of cocaine.

4. It was a part of the conspiracy that facilities in interstate commerce would be used to disperse the proceeds derived from the sale and distribution of cocaine.

5. It was a part of the conspiracy that **L.J. Britt, a.k.a. "Capone"**, defendant, and Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", Hendrick Ezell Tunstall, Tyrone Bryant, Christhian Morales, Edy Sonia Zamudio; in conjunction with others whose full identities are unknown, would obtain quantities of cocaine, a Schedule II controlled substance by means of force and violence against others.

6. It was a part of the conspiracy that defendant **L.J. Britt, a.k.a. "Capone"** would assist Julius Omar Robinson, a.k.a "Scarface, a.k.a. "Scar", a.k.a. "Face", in the commission of acts of force and violence against others.

7. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", would, by means of force and violence, seek retribution against others whom Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", believed had cheated him in drug transactions, had failed to pay him for cocaine, or had become informers for law enforcement.

8. It was a part of the conspiracy that the conspirators would possess, carry, use, brandish, and discharge firearms.

UNITED STATES OF AMERICA v. L.J. BRITT
FOURTH SUPERSEDING INDICTMENT                                          Page 11 of 28

9. It was a part of the conspiracy that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", would recruit others to transport quantities of cocaine in interstate commerce from the state of Texas to the state of Arkansas.

10. It was a part of the conspiracy that the defendants would utilize common carriers to transport cocaine from one state to another.

### IV. Overt Acts

In furtherance of the conspiracy and to effect and accomplish the objects thereof, one or more of the conspirators committed diverse overt acts within the Northern District of Texas, and elsewhere, among which were the following:

a. On or about March 16, 1999, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", met with Carmen Nicole Byrd, and a person known to the Grand Jury at Robinson's residence in the Northern District of Texas.

b. On or about March 16, 1999, Carmen Nicole Byrd, possessed with intent to distribute approximately one kilogram of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance.

c. On or about May 8, 1999, Angelo Harris, a.k.a. "Step" traveled in interstate commerce from the state of Oklahoma to the Northern District of Texas and met with Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and Dakari Warner, a.k.a. "Dakari Sells", a.k.a. "DK", for the purpose of obtaining cocaine.

d. On or about May 8, 1999, Angelo Harris, a.k.a. "Step" and Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", obtained what they believed to be one kilogram of cocaine from Dakari Warner, a.k.a. "Dakari Sells, a.k.a. "DK", and another.

UNITED STATES OF AMERICA v. L.J. BRITT
FOURTH SUPERSEDING INDICTMENT

Page 12 of 28

**Ex. 4 - 063**

e. On or about May 8, 1999, Angelo Harris, a.k.a. "Step", caused what he believed to be a kilogram of cocaine to be transported from the Northern District of Texas to Oklahoma City, Oklahoma.

f. On or about May 9, 1999, Angelo Harris, a.k.a. "Step", traveled in interstate commerce from the state of Oklahoma to the Northern District of Texas and met with Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", for the purpose of seeking retribution against suppliers of cocaine.

g. On or about May 9, 1999, Angelo Harris, a.k.a. "Step" and Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", did possess, carry, and use firearms.

h. On or about May 9, 1999, Angelo Harris, a.k.a. "Step" and Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", did intentionally cause the death of Juan Reyes, by shooting him with firearms.

i. On or about July 12, 1999, defendant **L.J. Britt, a.k.a. "Capone"**, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", Hendrick Ezell Tunstall, Tyrone Bryant, Christhian Morales, met in Arlington, Texas and thereafter did, by force and violence, obtain twenty kilograms of cocaine from Rudolfo Resendez.

j. On or about July 12, 1999, defendant **L.J. Britt, a.k.a. "Capone",** acting in concert with Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face"; and Hendrick Ezell Tunstall; and Tyrone Bryant; and Christhian Morales and Edy Sonia Zamudio; did in the Northern District of Texas, intentionally kill, and counsel, command, induce, procure, and cause the intentional killing of, Rudolfo Resendez by shooting him with firearms, and such killing resulted.

k.  In or about July 1999, defendant **L.J. Britt, a.k.a. "Capone"** and Julius Omar Robinson distributed cocaine in Little Rock, Arkansas.

l.  On or about July 21, 1999, Angelo Harris, and Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", delivered approximately one kilogram of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, to a person known to the Grand Jury for delivery to others in the Western District of Oklahoma.

m.  On or about December 8, 1999, Julius Omar Robinson, a.k.a. "Scarface", a.k.a "Scar", a.k.a. "Face" transmitted to **L.J. Britt**, defendant, by means of interstate wire communications from the state of Texas to the state of Arkansas a Western Union Money-Gram in the amount of $500.00.

n.  On or about June 2, 2000, **L.J. Britt, a.k.a. "Capone"**, defendant, engaged in a telephone conversation with Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face".

o.  On or about June 14, 2000, John Turner, engaged in a coded telephone conversation with Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", concerning the distribution of approximately 500 grams of cocaine.

p.  On or about June 15, 2000, **L.J. Britt, a.k.a. "Capone"**, defendant, engaged in a series of telephone conversations with Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", concerning the payment of monies by Robinson to **Britt**.

q.  On or about June 15, 2000, Richard Smart, a.k.a. "Black" at the instruction of Julius Omar Robinson, a.k.a. "Scarface", a.k.a "Scar", a.k.a. "Face", transmitted to **L.J. Britt**, defendant, by means of interstate wire communications from the state of Texas to the state of Arkansas a Western Union Money-Gram in the amount of $925.00.

UNITED STATES OF AMERICA v. L.J. BRITT
FOURTH SUPERSEDING INDICTMENT

Page 14 of 28

r. On or about June 20, 2000, Julius Omar Robinson, a.k.a. "Scarface", a.k.a "Scar", a.k.a. "Face" transmitted to **L.J. Britt**, defendant, by means of interstate wire communications from the state of Texas to the state of Arkansas a Western Union Money-Gram in the amount of $925.00.

s. On or about November 8, 2000, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", possessed three firearms, to wit: one 9mm UZI pistol, serial number 18740; one Smith & Wesson .357 magnum caliber pistol, serial number 5224575; and one SKS 7.62x39 semi-automatic assault rifle, serial number 1510198P.

### V. Circumstances of the Death of Rudolfo Resendez

With respect to the killing of Rudolfo Resendez:

a. The defendant, **L.J. BRITT**, did intentionally kill Rudolfo Resendez by shooting and killing him with a firearm (21 U.S.C. § 848 (n)(1)(A));

b. The defendant, **L.J. BRITT**, intentionally inflicted serious bodily injury which resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(B));

c. The defendant, **L.J. BRITT**, intentionally engaged in conduct intending that Rudolfo Resendez be killed or that lethal force be employed against Rudolfo Resendez, which resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(C));

d. The defendant, **L.J. BRITT**, intentionally engaged in conduct, namely, shot at Rudolfo Resendez, which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and which resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(D));

e. The defendant, **L. J. BRITT**, committed the offense as consideration for the receipt, or in the

UNITED STATES OF AMERICA v. L.J. BRITT
**FOURTH SUPERSEDING INDICTMENT**                                              **Page 15 of 28**

Ex. 4 - 066

expectation of the receipt, of anything of pecuniary value (21 U.S.C. § 848(n)(7));

f. The defendant, **L. J. BRITT**, committed the offense after substantial planning and premeditation to cause the death of a person (21 U.S.C. § 848(n)(8)); and

g. The defendant, **L.J. BRITT**, was more than eighteen years of age at the time of the commission of the offense.

> *A violation of Title 21, United States Code, §846, the penalty for which is found at Title 21, United States Code, §841(b)(1)(A) and §848(e)(1)(A).*

**Ex. 4 - 067**

## Counts Three and Four

### *The Continuing Criminal Enterprise*

1. From on or about January 1, 1997 and continuing thereafter until November 8, 2000, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", did engage in a continuing criminal enterprise, that is to say that Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", in concert with more than five other persons, including **L.J. Britt, a.k.a. "Capone"**, defendant, with respect to whom Robinson occupied a position of organizer and a supervisory position and a position of management, did, as part of a continuing series of felonious violations of subchapter I of Chapter 13 of Title 21, United States Code, intentionally and knowingly violate the provisions of such subchapter and from such continuing series of violations, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", obtained substantial income and resources.

2. The persons with respect to whom Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", occupied a position of organizer and a supervisory position and a position of management included, among others, the following:

| | |
|---|---|
| **L.J. Britt, a.k.a. "Capone"**, defendant, | Jason Gehring |
| Misty Grounds | Leteshia Barnett |
| Angelo Harris, a.k.a. "Step" | Reginald Kinchen |
| Jewell Ewing, a.k.a., "Duke" | Cantral Huggins, a.k.a. "Crumb" |
| Jeanne Denise Wilkins | Steven Toston |
| Carmen Byrd | Brandi Scales |
| Edward G. Jenkins | Jamila Camp |
| Santana Minor | Dorothy Hodges, a.k.a. "Dorry" |

UNITED STATES OF AMERICA v. L.J. BRITT
FOURTH SUPERSEDING INDICTMENT

Page 17 of 28

**Ex. 4 - 068**

Marcus Robinson                         John Turner

Richard Smart, a.k.a. "Black"          Hendrick Ezell Tunstall

Tyrone Bryant                          Christhian Morales

Dakari Warner, a.k.a. "DK"             Leon Jenkins.

3.  The continuing series of felonious violations of subchapter I of Title 21, United States Code, included the following:

i. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately 38 pounds of marijuana on or about January 21, 1999;

ii.  Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately 25 pounds of marijuana on or about March 2, 1999;

iii. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately one kilogram of cocaine on or about March 16, 1999;

iv.  Aiding, abetting, counseling, commanding, inducing, procuring, and causing the distribution of a quantity of cocaine on or about May 8, 1999;

v. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the distribution of approximately twenty kilogram of cocaine on or about July 12, 1999 in Fort Worth, Texas;

vi. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately five kilograms of cocaine on or about July 22, 1999 in Little Rock, Arkansas;

UNITED STATES OF AMERICA v. L.J. BRITT
FOURTH SUPERSEDING INDICTMENT                                      Page 18 of 28

Ex. 4 - 069

vii. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately 10 pounds of marijuana on or about March 20, 2000;

viii. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately 19 pounds of marijuana on or about May 30, 2000;

ix. Aiding, abetting, counseling, commanding, inducing, procuring, and causing the attempted distribution of approximately 104 pounds of marijuana on or about June 2, 2000;

x. The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 104 pounds of marijuana on or about June 2, 2000;

xi. The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 4 pounds of marijuana on or about June 10, 2000;

xii. The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21,

Ex. 4 - 070

United States Code, namely the distribution of approximately 25 pounds of marijuana on or about June 13, 2000;

xiii.   The knowing and intentional use of a communications facility, namely a telephone, in committing, and in causing and facilitating the commission of acts constituting a felony under the provisions of subchapter I of chapter 13 of Title 21, United States Code, namely the distribution of approximately 25 pounds of marijuana on or about June 27, 2000.

### Count Three

The Grand Jury realleges and incorporates herein the allegations made under the heading "The Continuing Criminal Enterprise".  While engaging in, and working in furtherance of the aforesaid Continuing Criminal Enterprise, on or about December 3, 1998, Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a. "Face", and defendant **L.J. Britt, a.k.a. "Capone"**, did in the Northern District of Texas, intentionally kill another person, namely: Johnny Lee Shelton, by shooting him with firearms.  With respect to the killing of Johnny Lee Shelton,

a. The defendant, **L.J. BRITT, a.k.a. "Capone"**, did intentionally kill Johnny Lee Shelton by shooting and killing him with a firearm (21 U.S.C. § 848 (n)(1)(A));

b. The defendant, **L.J. BRITT, a.k.a. "Capone"**, intentionally inflicted serious bodily injury which resulted in the death of another person, namely: Johnny Lee Shelton (21 U.S.C. § 848 (n)(1)(B));

c. The defendant, **L.J. BRITT, a.k.a. "Capone"**, intentionally engaged in conduct intending that Johnny Lee Shelton be killed or that lethal force be employed against Johnny Lee Shelton, which resulted in the death of Johnny Lee Shelton (21 U.S.C.

UNITED STATES OF AMERICA v. L.J. BRITT
**FOURTH SUPERSEDING INDICTMENT**                                                      **Page 20 of 28**

Ex. 4 - 071

§ 848 (n)(1)(C));

d. The defendant, **L.J. BRITT, a.k.a. "Capone"**, intentionally engaged in conduct, namely, shoot at Johnny Lee Shelton, which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of another person, namely: Johnny Lee Shelton (21 U.S.C. § 848 (n)(1)(D));

e. The defendant, **L.J. BRITT, a.k.a. "Capone"** knowingly created a grave risk of death to one or more persons in addition to the victims of the offense (21 U.S.C., § 848(n)(5));

f. The defendant, **L.J. BRITT, a.k.a. "Capone"**, committed the offense after substantial planning and premeditation to cause the death of another person, namely: Johnny Lee Shelton (21 U.S.C. § 848(n)(8)); and

g. The defendant, **L.J. BRITT**, was more than eighteen years of age at the time of the commission of the offense.

*A violation of Title 21, United States Code, §848 the penalty for which is found at Title 21, United States Code, §848(e)(1)(A).*

### Count Four

The Grand Jury realleges and incorporates herein the allegations made under the heading "The Continuing Criminal Enterprise". While engaging in, and working in furtherance of the aforesaid Continuing Criminal Enterprise, on or about July 12, 1999, defendant **L.J. Britt, a.k.a. "Capone",** acting in concert with Julius Omar Robinson, a.k.a. "Scarface", a.k.a. "Scar", a.k.a.

**Ex. 4 - 072**

"Face"; and Hendrick Ezell Tunstall; and Tyrone Bryant; and Christhian Morales and Edy Sonia Zamudio; did in the Northern District of Texas, intentionally kill, and counsel, command, induce, procure, and cause the intentional killing of, Rudolfo Resendez by shooting him with firearms, and such killing resulted.  With respect to the killing of Rudolfo Resendez:

a.  The defendant, **L.J. BRITT**, did intentionally kill Rudolfo Resendez by shooting and killing him with a firearm (21 U.S.C. § 848 (n)(1)(A));

b.  The defendant, **L.J. BRITT**, intentionally inflicted serious bodily injury which resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(B));

c.  The defendant, **L.J. BRITT**, intentionally engaged in conduct intending that Rudolfo Resendez be killed or that lethal force be employed against Rudolfo Resendez, which resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(C));

d.  The defendant, **L.J. BRITT**, intentionally engaged in conduct, namely, shoot at Rudolfo Resendez, which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(D));

e.  The defendant, **L. J. BRITT**, committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value (21 U.S.C. § 848(n)(7)); and

f.  The defendant, **L. J. BRITT**, committed the offense after substantial planning and premeditation to cause the death of a person (21 U.S.C. § 848(n)(8)); and

g.  The defendant, **L.J. BRITT**, was more than eighteen years of age at the time of the

UNITED STATES OF AMERICA v. L.J. BRITT
**FOURTH SUPERSEDING INDICTMENT**                                                      **Page 22 of 28**

commission of the offense.

*A violation of Title 21, United States Code, §848 the penalty for which is found at Title 21, United States Code, §848(e)(1)(A).*

### Count Five

On or about December 3, 1998, in the Northern District of Texas, **L.J. Britt, a.k.a. "Capone"**, defendant, did intentionally and knowingly possess firearms in furtherance of a drug trafficking crime for which the said defendant may be prosecuted in a court of the United States, namely: the offenses alleged in Count 1 and Count 3 of this Indictment.

*A violation of Title 18, United States Code, §924(c)(1)(A)(i).*

### Count Six

1. On or about December 3, 1998, in the Northern District of Texas, **L.J. Britt, a.k.a. "Capone"**, defendant, during and in relation to a drug trafficking crime for which the defendant may be prosecuted in a court of the United States, namely: the offenses alleged in Count 1 and Count 3 of this Indictment, did intentionally and knowingly carry and use a firearm, and did discharge such firearm.

2. In the course of such violation, **L.J. Britt, a.k.a. "Capone"**, defendant, did cause the death of another, namely: Johnny Lee Shelton, through the use of such firearms, such killing being murder as defined in Title 18, United States Code, §1111. With respect to the killing of Johnny Lee Shelton:

a. The defendant, **L. J. BRITT**, did intentionally kill another person, namely: Johnny Lee

**UNITED STATES OF AMERICA v. L.J. BRITT**
**FOURTH SUPERSEDING INDICTMENT**                                          **Page 23 of 28**

Shelton, by shooting and killing him with a firearm (18, U.S.C. § 3591(a)(2)(A));

b. The defendant, **L.J. BRITT**, intentionally inflicted serious bodily injury on another person, namely: Johnny Lee Shelton, that resulted in the death of Johnny Lee Shelton (18, U.S.C. § 3591 (a)(2)(B));

c. The defendant, **L.J. BRITT**, did intentionally participate in an act, contemplating that the life of a person would be taken, and intending that lethal force would be used in connection with a person, other than one of the participants in the offense; and Johnny Lee Shelton died as a direct result of the act (18 U.S.C. § 3591 (a)(2)(C));

d. The defendant, **L.J. BRITT**, intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and Johnny Lee Shelton died as a direct result of the act  (18 U.S.C. § 3591 (a)(2)(D));

e. The defendant, **L.J. BRITT**, in the commission of the offense knowingly created a grave risk of death to one or more persons in addition to Johnny Lee Shelton, the victim of the offense (18 U.S.C. § 3592(c)(5));

f. The defendant, **L.J. BRITT**, committed the offense after substantial planning and premeditation to cause the death of a person (18, U.S.C. § 3592(c)(9)); and

g. The defendant, **L.J. BRITT**, was more than eighteen years of age at the time of the commission of the offense.

*A violation of Title 18, United States Code, §924(c) the penalty for which is found at Title 18, United States Code, §924(j).*

**UNITED STATES OF AMERICA v. L.J. BRITT**
**FOURTH SUPERSEDING INDICTMENT**                                    **Page 24 of 28**

**Ex. 4 - 075**

### Count Seven

1. On or about July 12, 1999, in the Fort Worth Division of the Northern District of Texas, **L.J. Britt, a.k.a. "Capone"**, defendant, aided and abetted by others, did intentionally and knowingly possess with intent to distribute more than 5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance.

2. While engaging in such offense, which is punishable under the provisions of Title 21, United States Code, §841(b)(1)(A), **L.J. Britt, a.k.a. "Capone"**, defendant, did intentionally kill Rudolfo Resendez and did intentionally counsel, command, induce, procure, and cause the intentional killing of Rudolfo Resendez, and such killing resulted. With respect to the killing of Rudolfo Resendez:

a. The defendant, **L.J. BRITT**, did intentionally kill Rudolfo Resendez by shooting and killing him with a firearm (21 U.S.C. § 848 (n)(1)(A));

b. The defendant, **L.J. BRITT**, intentionally inflicted serious bodily injury which resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(B));

c. The defendant, **L.J. BRITT**, intentionally engaged in conduct intending that Rudolfo Resendez be killed or that lethal force be employed against Rudolfo Resendez, which resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(C));

d. The defendant, **L.J. BRITT**, intentionally engaged in conduct, namely, shoot at Rudolfo Resendez, which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(D));

UNITED STATES OF AMERICA v. L.J. BRITT
**FOURTH SUPERSEDING INDICTMENT**                                    **Page 25 of 28**

e.  The defendant, **L. J. BRITT**, committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value (21 U.S.C. § 848(n)(7));

f.  The defendant, **L. J. BRITT**, committed the offense after substantial planning and premeditation to cause the death of a person, namely: Rudolfo Resendez (21 U.S.C. § 848(n)(8)); and

g.  The defendant, **L.J. BRITT**, was more than eighteen years of age at the time of the commission of the offense.

*A violation of Title 21, United States Code, §841(a)(1); the penalty for which is found at Title 21, United States Code, §848(e)(1)(A).*

### Count Eight

1. On or about July 12, 1999, in the Fort Worth Division of the Northern District of Texas, **L.J. Britt, a.k.a. "Capone"**, defendant, did intentionally and knowingly possess a firearm in furtherance of a drug trafficking crime for which the said defendant may be prosecuted in a court of the United States, namely: the offenses alleged in Count 2, Count 4, and Count 7 of this Indictment.

*A violation of Title 18, United States Code, §924(c)(1)(A), the penalty for which is found at Title 18, United States Code, §§ 924(c)(1)(A)(i) and 924(c)(1)(C).*

**UNITED STATES OF AMERICA v. L.J. BRITT**
**FOURTH SUPERSEDING INDICTMENT**                                    **Page 26 of 28**

**Ex. 4 - 077**

### Count Nine

1. On or about July 12, 1999, in the Fort Worth Division of the Northern District of Texas, **L.J. Britt, a.k.a. "Capone",** defendant, aided and abetted by others, did intentionally and knowingly carry and use firearms, and did discharge such firearms, during and in relation to a drug trafficking crime for which the said defendant may be prosecuted in a court of the United States, namely: the offenses alleged in Count 2 and Count 4 and Count 7 of this Indictment.

2. In the course of such violation, **L.J. Britt, a.k.a. "Capone"**, defendant, did cause the death of another, namely: Rudolfo Resendez through the use of a firearm, such killing being murder as defined in Title 18, United States Code, §1111. With respect to the killing of Rudolfo Resendez:

a. The defendant, **L.J. BRITT**, did intentionally kill Rudolfo Resendez by shooting and killing him with a firearm (18 U.S.C. § 3591 (a)(2)(A));

b. The defendant, **L.J. BRITT**, intentionally inflicted serious bodily injury that resulted in the death of Rudolfo Resendez (18 U.S.C. § 3591 (a)(2)(B));

c. The defendant, **L.J. BRITT**, did intentionally participate in an act, contemplating that the life of a person would be taken, or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Rudolfo Resendez died as a direct result of the act (18 U.S.C. § 3591 (a)(2)(C));

d. The defendant, **L.J. BRITT**, intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and Rudolfo Resendez died as a direct result of the act  (18 U.S.C. § 3591 (a)(2)(D));

e.  The defendant, **L. J. BRITT**, committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value (18 U.S.C. § 3592(c)(8));

f.  The defendant, **L. J. BRITT**, committed the offense after substantial planning and premeditation to cause the death of Rudolfo Resendez (18 U.S.C. § 3592(c)(9)).; and

g.  The defendant, **L.J. BRITT**, was more than eighteen years of age at the time of the commission of the offense.

*A violation of Title 18, United States Code, §924(c) the penalty for which is found at Title 18, United States Code, §924(j).*

A TRUE BILL

_____
Foreman of the Grand Jury

JANE J. BOYLE
UNITED STATES ATTORNEY

_____
FREDERICK M. SCHATTMAN
Assistant United States Attorney
State Bar of Texas No. 17728400
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone:     (817) 252-5200
Facsimile:     (817) 978-3094

**UNITED STATES OF AMERICA v. L.J. BRITT**
**FOURTH SUPERSEDING INDICTMENT**                              **Page 28 of 28**

**Ex. 4 - 079**

No.  CRIMINAL NO.4:00-CR-0260-Y          [Supersedes Indictments Returned Nov. 2, 2000, April 19, 2001, June 19, 2001 and August 22, 2002 as to the named defendant]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

THE UNITED STATES OF AMERICA

VS.

L.J. BRITT, a.k.a. "Capone"  (15)

INDICTMENT

21 U.S.C. § 846, 848, 841(a)(1),
18 U.S.C. 924(j), 924 (c)(1)(A)(i)

Conspiracy to Distribute More Than 100 Kilograms of Marijuana
Conspiracy to Distribute More Than 5 Kilograms of Cocaine and Murder
Murder in Furtherance of A Continuing Criminal Enterprise
Possession of Firearm in Furtherance of Drug Trafficking Crime
Possession of More than 5 Kilograms of Cocaine with Intent to Distribute
Murder Using a Firearm in Relation to Drug Trafficking Crime

(9 COUNTS)

A True bill,

_____

                                                                                          Foreman
FORT WORTH
Filed in open court this 16th day of October, 2002

_____

                                                                                          Clerk

NO WARRANT TO ISSUE

UNITED STATES ~~DISTRICT~~ JUDGE
*MAGISTRATE*

**Ex. 4 - 080**

# EXHIBIT 5





IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

|                           |   |                              |
|---------------------------|---|------------------------------|
| UNITED STATES OF AMERICA  | § |                              |
|                           | § |                              |
| vs.                       | § | Criminal No.4:00-CR-0260-Y  (2) |
|                           | § |                              |
| JULIUS OMAR ROBINSON      | § |                              |

## NOTICE OF INTENT TO SEEK THE DEATH PENALTY

COMES NOW the United States of America, by and through the United States Attorney for the Northern District of Texas, and files, pursuant to Title 18, United States Code, Sections 3591 through 3593, and Title 21, United States Code, Section 848, this notice of its intent to seek the death penalty against the defendant, **JULIUS OMAR ROBINSON**, in the event **ROBINSON** is convicted of Count Three, Seven, Eleven, Twelve, or Fifteen of the superseding indictment, which charges defendant with using, carrying, and discharging firearms during and in relation to a drug trafficking crime and in the course of such violation did cause death, in violation of Title 18, United States Code, Section 924(j), Establishing a Continuing Criminal Enterprise in violation of Title 21, United States Code, Section 848, and Possession With Intent to Distribute a Controlled Substance and while engaging in such offense intentionally caused the death of another in violation of Title 21, United States Code, Section 841 (a)(1) and 848 (E)(1)(A).

Government's Notice of Intent to Seek the Death Penalty          -          Page 1

**Ex. 5 - 081**

I.

## TITLE 18 OFFENSES

The United States of America believes that the circumstances of the offenses of using/carrying/discharging a firearm and causing the death of Johnny Lee Shelton, Juan Reyes, and Rudolfo Resendez are such that if the defendant, **JULIUS OMAR ROBINSON**, is convicted a sentence of death is justified for each offense under Title 18, United States Code, Sections 3591(a), 3592(a), and 3592(c).

The United States of America will prove, at a hearing held pursuant to Title 18, United States Code, Section 3593, that:

**Count Seven**

a.  On or about December 3, 1998, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, did intentionally kill Johnny Lee Shelton by shooting and killing him with a firearm (18 U.S.C. § 3591 (a)(2)(A));

b.  On or about December 3, 1998, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally inflicted serious bodily injury that resulted in the death of Johnny Lee Shelton (18 U.S.C. § 3591 (a)(2)(B));

c.  On or about December 3, 1998, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, did intentionally participate in an act, contemplating that the life of a person would be taken, or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Johnny Lee Shelton died as a direct result of the act (18 U.S.C. § 3591 (a)(2)(C));

d.  On or about December 3, 1998, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally and specifically engaged in an act of violence,

Ex. 5 - 082

knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and Johnny Lee Shelton died as a direct result of the act  (18 U.S.C. § 3591 (a)(2)(D));

e. the defendant, **JULIUS OMAR ROBINSON**, in the commission of the offense knowingly created a grave risk of death to one or more persons in addition to Johnny Lee Shelton, the victim of the offense (18 U.S.C. § 3592(c)(5));

f. the defendant, **JULIUS OMAR ROBINSON**, committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9));

g. Johnny Shelton's personal characteristics and the severe and detrimental effect of the instant offense on Johnny Shelton's family.  See  18 U.S.C. § 3593(a) and Payne v. Tennessee, 501 U.S. 808, 111 S. Ct. 2597 (1991);

h. future dangerousness to the lives and safety of other persons, as evidenced by a lack of remorse, poor rehabilitative potential, and specific threats and acts of violence. See Jurek v. Texas, 428 U.S. 262, 272-273, 96 S. Ct. 2950, 2956- 2957 (1976) ("probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society");

i. Defendant engaged in a prior act of violence: he pleaded guilty to Deadly Conduct by Discharging Firearm at an Individual on March 11, 1996.  **ROBINSON** received deferred adjudication on this crime.

**Count Eleven**

a. On or about May 9, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, did intentionally kill Juan Reyes by shooting and killing him with a firearm (18, U.S.C. § 3591 (a)(2)(A));

Government's Notice of Intent to Seek the Death Penalty          -          Page 3

**Ex. 5 - 083**

b. On or about May 9, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally inflicted serious bodily injury that resulted in the death of Juan Reyes (18, U.S.C. § 3591 (a)(2)(B));

c. On or about May 9, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, did intentionally participate in an act, contemplating that the life of Juan Reyes would be taken, or intending that lethal force would be used in connection with Juan Reyes, a person other than one of the participants in the offense, and Juan Reyes, the victim, died as a direct result of the act (18 U.S.C. § 3591 (a)(2)(C));

d. On or about May 9, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, did intentionally engage in an act of violence, namely, shoot Juan Reyes, knowing that the act created a grave risk of death to a person other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, Juan Reyes, died as a direct result of the act (18 U.S.C. § 3591 (a)(2)(D));

e. the defendant, **JULIUS OMAR ROBINSON**, in the commission of the offense knowingly created a grave risk of death to one or more persons in addition to Juan Reyes, the victim of the offense (18 U.S.C. § 3592(c)(5));

f. the defendant, **JULIUS OMAR ROBINSON**, committed the offense in an especially heinous, cruel, and depraved manner in that it involved torture or serious physical abuse to the victim (18 U.S.C. § 3592(c)(6));

g. the defendant, **JULIUS OMAR ROBINSON**, committed the offense after substantial planning and premeditation to cause the death of Juan Reyes (18 U.S.C. § 3592(c)(9));

h. the defendant, **JULIUS OMAR ROBINSON**, intentionally killed or attempted to kill more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16));

i. future dangerousness to the lives and safety of other persons, as evidenced by a lack of remorse, poor rehabilitative potential, and specific threats and acts of violence. See Jurek v. Texas, 428 U.S. 262, 272-273, 96 S. Ct. 2950, 2956- 2957 (1976) ("probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society");

j. Defendant engaged in a prior act of violence: he pleaded guilty to Deadly Conduct by Discharging Firearm at an Individual on March 11, 1996. **ROBINSON** received deferred adjudication on this crime.

**Count Fifteen**

a. On or about July 12, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, did intentionally participate in an act, namely, the luring of Rudolfo Resendez into Fort Worth, Texas, the plan to take Rudolfo Resendez to some remote location, and the plan to ultimately kill Rudolfo Resendez, all the while contemplating that the life of Rudolfo Resendez would be taken or intending that lethal force would be used in connection with Rudolfo Resendez, and Rudolfo Resendez, the victim, died as a direct result of the act (18 U.S.C. 3591 (a)(2)(C));

b. the defendant, **JULIUS OMAR ROBINSON**, committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value (18 U.S.C. § 3592(c)(8));

c. the defendant, **JULIUS OMAR ROBINSON**, committed the offense after substantial planning and premeditation to cause the death of Rudolfo Resendez (18 U.S.C. § 3592(c)(9));

d. future dangerousness to the lives and safety of other persons, as evidenced by a lack of remorse, poor rehabilitative potential, and specific threats and acts of violence. See Jurek v.

Ex. 5 - 085

Texas, 428 U.S. 262, 272-273, 96 S. Ct. 2950, 2956- 2957 (1976) ("probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society");

e. Defendant engaged in a prior act of violence: he pleaded guilty to Deadly Conduct by Discharging Firearm at an Individual on March 11, 1996. **ROBINSON** received deferred adjudication on this crime.

II.

TITLE 21 OFFENSES

The United States of America believes that the circumstances of the instant offenses of Continuing Criminal Enterprise and Possession With Intent to Distribute a Controlled Substance and while engaging in such offenses defendant intentionally killed Johnny Lee Shelton and Juan Reyes and Rudolfo Resendez are such that, if the defendant, **JULIUS OMAR ROBINSON**, is convicted, a sentence of death is justified for each offense under Title 21, United States Code, Section 848 (e)(1)(A).

The United States of America will prove, at a hearing held pursuant to Title 21, United States Code, Section 848, that:

**Count Three**

a. On or about December 3, 1998, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, did intentionally kill Johnny Lee Shelton by shooting and killing him with a firearm (21 U.S.C. § 848 (n)(1)(A));

b. On or about December 3, 1998, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally inflicted serious bodily injury which resulted in the

Government's Notice of Intent to Seek the Death Penalty          -          Page 6

**Ex. 5 - 086**

death of Johnny Lee Shelton (21 U.S.C. § 848 (n)(1)(B));

c.  On or about December 3, 1998, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally engaged in conduct intending that Johnny Lee Shelton be killed or that lethal force be employed against Johnny Lee Shelton, which resulted in the death of Johnny Lee Shelton (21 U.S.C. § 848 (n)(1)(C));

d.  On or about December 3, 1998, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally engaged in conduct, namely, shoot at Johnny Lee Shelton, which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of Johnny Lee Shelton (21 U.S.C. § 848 (n)(1)(D));

e.  On or about December 3, 1998, the defendant, **JULIUS OMAR ROBINSON**, in the commission of an offense in violation of Title 21, United States Code, Section 841 (a) and 848, knowingly created a grave risk of death to one or more persons in addition to the victims of the offense (21 U.S.C., § 848(n)(5));

f.  the defendant, **JULIUS OMAR ROBINSON**, committed the offense after substantial planning and premeditation to cause the death Johnny Lee Shelton (21 U.S.C. § 848(n)(8));

g.  On or about May 9, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, did intentionally kill Juan Reyes by shooting and killing him with a firearm (21 U.S.C. § 848 (n)(1)(A));

h.  On or about May 9, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally inflicted serious bodily injury which resulted in the death of Juan Reyes (21 U.S.C. § 848 (n)(1)(B));

i.  On or about May 9, 1999, in the Northern District of Texas, the defendant, **JULIUS**

Government's Notice of Intent to Seek the Death Penalty          -          Page 7

**Ex. 5 - 087**

**OMAR ROBINSON**, intentionally engaged in conduct intending that Juan Reyes be killed or that lethal force be employed against Juan Reyes, which resulted in the death of Juan Reyes (21 U.S.C. § 848 (n)(1)(C));

j.  On or about May 9, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally engaged in conduct, namely, shoot at Juan Reyes, which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of Juan Reyes (21 U.S.C. § 848 (n)(1)(D));

k.  On or about May 9, 1999, the defendant, **JULIUS OMAR ROBINSON**, in the commission of an offense in violation of Title 21, United States Code, Section 841 (a) and 848, knowingly created a grave risk of death to one or more persons in addition to the victims of the offense (21 U.S.C., § 848(n)(5));

l.  the defendant, **JULIUS OMAR ROBINSON**, committed the offense after substantial planning and premeditation to cause the death of Juan Reyes (21 U.S.C. § 848(n)(8));

m.  the defendant, **JULIUS OMAR ROBINSON**, committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim (21 U.S.C. § 848(n)(12));

n.  On or about July 12, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally engaged in conduct intending that Rudolfo Resendez be killed or that lethal force be employed against Rudolfo Resendez, which resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(C));

o.  On or about July 12, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in

Government's Notice of Intent to Seek the Death Penalty    -    Page 8

**Ex. 5 - 088**

the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(D));

p. the defendant, **JULIUS OMAR ROBINSON**, committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value (21 U.S.C. § 848(n)(7));

q. the defendant, **JULIUS OMAR ROBINSON**, committed the offense after substantial planning and premeditation to cause the death of Rudolfo Resendez (21 U.S.C. § 848(n)(8)).

r. future dangerousness to the lives and safety of other persons, as evidenced by a lack of remorse, poor rehabilitative potential, and specific threats and acts of violence. See Jurek v. Texas, 428 U.S. 262, 272-273, 96 S. Ct. 2950, 2956- 2957 (1976) ("probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society");

s. Defendant engaged in a prior act of violence: he pleaded guilty to Deadly Conduct by Discharging Firearm at an Individual on March 11, 1996. **ROBINSON** received deferred adjudication on this crime.

## Count Twelve

a. On or about July 12, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally engaged in conduct intending that Rudolfo Resendez be killed or that lethal force be employed against Rudolfo Resendez, which resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(C));

b. On or about July 12, 1999, in the Northern District of Texas, the defendant, **JULIUS OMAR ROBINSON**, intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of Rudolfo Resendez (21 U.S.C. § 848 (n)(1)(D));

Government's Notice of Intent to Seek the Death Penalty        -        Page 9

c. the defendant, **JULIUS OMAR ROBINSON**, committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value (21 U.S.C. § 848(n)(7));

d. the defendant, **JULIUS OMAR ROBINSON**, committed the offense after substantial planning and premeditation to cause the death of Rudolfo Resendez (21 U.S.C. § 848(n)(8)).

e. future dangerousness to the lives and safety of other persons, as evidenced by a lack of remorse, poor rehabilitative potential, and specific threats and acts of violence. See Jurek v. Texas, 428 U.S. 262, 272-273, 96 S. Ct. 2950, 2956- 2957 (1976) ("probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society");

f. Defendant engaged in a prior act of violence: he pleaded guilty to Deadly Conduct by Discharging Firearm at an Individual on March 11, 1996. **ROBINSON** received deferred adjudication on this crime.

Ex. 5 - 090

Respectfully submitted,

RICHARD H. STEPHENS
United States Attorney

by: _____

FREDERICK M. SCHATTMAN
Assistant United States Attorney
State Bar of Texas No. 17728400
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone:    (817) 252-5200
Facsimile:    (817) 978-3094

by: _____

REED C. O'CONNOR
Assistant United States Attorney
State Bar of Texas No. 15187980
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone:    (817) 252-5200
Facsimile:    (817) 978-3094

## CERTIFICATE OF SERVICE

I certify that on this the 19th day of October, 2001, a true and correct copy of the

Government's Notice of Intent to Seek the Death Penalty was served by United States First Class

mail on the attorney for defendant.

_____

FREDERICK M. SCHATTMAN
Assistant United States Attorney

Ex. 5 - 091

# EXHIBIT 6

**Bureau of Prisons, Federal Medical Center, Fort Worth**
Recorded Telephone Call of JULIUS ROBINSON
12/28/2000
7:48 PM

**Partial transcript of phone call between JULIUS ROBINSON and MARCUS ROBINSON and others**

Telephone voice - Thank You

Ringing

Marcus - Hello.

Julius - Yeah.

Recorded telephone message - This call is from a federal prison

Marcus - Hello

Julius - Yeah, yeah

Marcus - ...U/I   Man, hey look

Julius - Huh

Marcus - I ain't ...U/I contact with your boy that's what ...U/I these days

Julius - Yeah but just tell him you know what I'm saying

Marcus - I know man I tried to call him last night, I guess he saw the number and just don't wanna talk to me

Julius - Don't talk to him on the phone.  His phone might be tapped but uh it probably is tapped but uh they, they recorded every conversation we had you know what I'm saying

Marcus - I haven't even talked to my um.  My homeboy he's gonna be gone till January um 3 or something, one

Julius - Oh, OK.  Well anyway call Joe back so I can talk to her for a minute

Marcus - Hold on

**Marcus places three way call to JOSEPHINE DOTSON residence**

Criminal No.:   4:00-CR-260-Y

USA v. Nathan Henderson, et al

**GOVERNMENT EXHIBIT**



929a

Miscellaneous conversation with JOSEPHINE including ROBINSON asking JOSEPHINE about her sons (three), particularly TERENCE

## Conversation continues

Julius- Hmm man Joe

Josephine- Huh

Julius- That dude ONE LOVE, Man that dude right there go hard Joe

In background
Marcus - He is lying and shit

Josephine- Uh huh

Julius- He still out he still down there ain't he

In background
Josephine- ...Have any of y'all seen one love

Josephine - I haven't seen him.  I have not seen him.

## Conversation Continues

Julius- oh, so how's grandma doing

# EXHIBIT 7

Vol. 22:  1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | CRIMINAL ACTION NO. |
| | . | 4:00-CR-260-Y |
| V. | . | |
| | . | Fort Worth, Texas |
| JULIUS OMAR ROBINSON | . | March 14, 2002 |

. . . . . . . . . . . . . .

VOLUME 22
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.

APPEARANCES:

For the Government:               MR. FREDERICK M. SCHATTMAN
                                  MR. REED C. O'CONNOR
                                  Assistant United States Attorney
                                  801 Cherry Street, Suite 1700
                                  Fort Worth, Texas   76102-6897
                                  (817) 252-5200

For the Defendant:                MR. WES BALL
                                  Ball & Hase, PC
                                  4025 Woodland Park Boulevard
                                  Suite 100
                                  Fort Worth, Texas   76013
                                  (817) 860-5000

                                  MR. JACK STRICKLAND
                                  Attorney at Law
                                  909 Throckmorton
                                  Fort Worth, Texas   76102
                                  (817) 338-1000

Court Reporter:                   Ana P. Warren
                                  U.S. District Court Reporter
                                  501 W. 10th Street, Room 201
                                  Fort Worth, Texas   76102-3637
                                  (817) 850-6681

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COU

**COPY**

Ex. 7 - 094

THE COURT:  Then it's my understanding that the defendant does not wish to testify and will not testify in this punishment phase of the case.

MR. STRICKLAND:  It's our understanding and our intent, Judge, immediately upon the jury's return to rest.

THE COURT:  All right, sir.  Thank you.

DEFENDANT ROBINSON:  Thank you.

THE COURT:  We'll be in recess until 2 o'clock.

(Trial recesses, 12:30 - 2:00 p.m.  Jury present)

THE COURT:  The defendant may call its next witness,

MR. STRICKLAND:  Your Honor, may it please the Court.  The defendant, Julius Omar Robinson, rests his case at this time.

THE COURT:  All right.  The government may call its first witness.

MR. O'CONNOR:  Your Honor, we would call Mr. Peter Carlson.

MR. STRICKLAND:  Judge, may we approach?

(Off-the-record discussion at the bench at this time)

THE COURT:  Raise your right hand and be sworn.

(Witness sworn by the Court)

THE COURT:  Speak directly into the microphone.

MR. O'CONNOR:  May I proceed?

THE COURT:  Yes, sir.

PETER CARLSON, testified under oath as follows:

DIRECT EXAMINATION

BY MR. O'CONNOR:

Q.   State your name, please, sir.

A.   Peter M. Carlson.

Q.   And, Mr. Carlson, where do you live?

A.   I currently reside in Smithfield, Virginia.

Q.   And what do you do for a living at this point in Virginia?

A.   I'm an associate professor at Christopher Newport University, which is the newest of the Virginia State Universities?

Q.   And how long have you been an associate professor there at the university?

A.   Two years and four months total.

Q.   Before you go into work there at the university, did you have another career?

A.   I did.  I was -- I spent 32 years in corrections, two years with state corrections in Oregon, and 30 years with the Federal Bureau of Prisons.

Q.   Just in general terms and, you know, as succinctly as possible, would you describe your career in the Bureau of Prisons?

A.   I entered on duty in 1970 at the United States Penitentiary at McNeil Island as a case manager.  I transferred a total of 12 times throughout my career from prison to prison to administrative offices throughout the country.  I served in any

Ex. 7 - 096

number of developmental positions.  I served as the associate warden at the United States Penitentiary in Atlanta, Georgia. I served as the warden of three federal prisons.  In my last seven years, I served as assistant director of the agency and regional director for the western part of the country.

Q.  And in connection, particularly, with your last duty assignment, had you had an occasion to get some familiarity with an institution in Florence, Colorado?

A.  Yes.  As assistant director, I was responsible for the activation of the institution.  It's a prison complex, really, at Florence, but the piece of it that I was directly hands on with was the development and activation of the administrative maximum institution in Florence.

I would travel to Florence to the Ad-Max every quarter, every three months, to conduct control unit hearings at the institution.

Q.  All right, sir.  And before we get into some more of the Florence deal, are we paying you to come done here to talk about Florence here today?

A.  Yes.

Q.  Tell us how it is we're paying you or how much money we're paying you?

A.  I charge a consulting fee for this, and it's $200 an hour.

Q.  Okay.  Do you charge like travel time and courtroom time?

A.  Travel time and courtroom time -- travel time is at a

Direct - O'Connor/Carlson          Vol. 22:  108

different rate.   Travel time is $500 a day, and courtroom time is $400 an hour.

Q.   All right.   And in terms of your percentage of income, what would your consulting on these type issues be in terms of your percentage of your annual income?

A.   Less than five percent of my income.

Q.   Now, as it relates to the complex in Florence, Colorado, would you just give us a description of that complex, please?

A.   The federal correctional complex in Florence is a large piece of property that has four separate federal prisons within the contiguous boundary of the facility within one piece of property.   There is a minimum security federal prison camp, a low security, a medium security, and -- I apologize.   There is not a low security.   There is a medium security.   There is a high security, and there is the Ad-Max.

Q.   Would you give the jury just a kind of a short overview of what you call Ad-Max?

A.   Maybe just a short word on the classification program for the federal prison system.   That is, every institution of the 100 plus institutions has a security level designation that is based upon, essentially, the perimeter security, the internal security, and the level of staffing at the facility.   That ranges from a minimum security institution, which, basically, is an honor camp, has no perimeter security whatsoever.   The next step up would be a low security, and that is a fully

Ex. 7 - 098

Direct - O'Connor/Carlson          Vol. 22:  109

secure institution but does not have the security systems inside and a smaller staffing pattern.

The next level up would be a medium, and it's, of course, a step above the low, and then, finally, a high security institution which houses the inmates that are considered to be more dangerous and more difficult to work with.

On top of this classification scheme, then we have several administrative institutions for the agency. Some are medical facilities. Some are -- two are designated for those inmates who are unable to adjust to a normal high security penitentiary, such as Leavenworth or Louisburg or Atlanta. One of these institutions is in Marion, Illinois and the other is in Florence, Colorado.

Q.  Could you tell us what the difference between the Marion facility and the Florence, Colorado facility is?

A.  Marion is one step above a normal United States penitentiary or high security institution, and then beyond Marion is the Ad-Max, which is the ultimate security that we have for the federal government in the penal system.

Q.  In general terms, how does an inmate get into Ad-Max?

A.  Nearly -- I would say 99 percent of the inmates at the Ad-Max get there by virtue of having earned their way there by misbehaving in violent conduct, either in trying to harm other people, staff or inmates, at a high security institution, or by their propensity to escape.

Ex. 7 - 099

Direct - O'Connor/Carlson          Vol. 22:  110

Q.  And then when they do some of those things that would earn their way up to the Florence Ad-Max facility, what happens when they get there at that stage?

A.  The Ad-Max is a mix of different programs once an inmate comes in.  There are really three programs at the Ad-Max.  One is referred to as a high security unit, and that is for protective custody inmates who have for one reason or another offended their former colleagues and are in need of protection.  They require the additional security because they were in their own right difficult -- making difficult adjustments at their former institution.  That's the high security unit.

There is also the control unit at the Ad-Max.  It's a very small unit.  It houses under -- well, it's approximately 70 inmates, and the control unit is for the very bad inmates, those who have either assaulted staff members at other institutions, or attempted to kill another inmate, or developed a very complicated escape plot from another high security institution.  So the control unit is very much the most controlled unit we have within the federal penal system.

There is a third group at the Ad-Max, and that is inmates who have misbehaved to a significant degree at the high security institutions, although not to the level where they have earned their way into the control unit, and inmates coming into what we refer to as the general population.  There are . .

Ex. 7 - 100

Direct - O'Connor/Carlson                    Vol. 22:  111

three general population units at the Ad-Max.  And they are in there for a minimum of three years.  They have got to earn their way out just as they have earned their way in by their misbehavior.

Q.  And so within the Ad-Max facility itself, there are those inmates, either earning their way up or earning their way back out who are in a general population setting?

A.  Exactly.  They go through a progression of housing assignments and program assignments where, basically, when they come in, they have no freedom.  They, certainly, don't interact with staff other than through a protective barrier, and they don't interact with other inmates other than occasionally yelling down the range.

After one year of successful adjustment in that general population unit, they are allowed to progress on to a transitional unit, a step down unit.

Q.  And what's the purpose of that transitional unit?

A.  To begin to give them a little more open movement, to kind of test how they will do interacting with other inmates and other staff members.

Q.  Have you written any literature or have you written any articles that were for publication?

A.  Yes, I have.

Q.  And were those generally on correctional issues, prison issues, based upon your training and experience?

U.S. DISTRICT COURT

Ex. 7 - 101

Direct - O'Connor/Carlson          Vol. 22:  112

A.  Yes.

Q.  And are you familiar, as it relates to the Bureau of Prisons, with any imperical research regarding the predictability of future dangerousness of inmates?

A.  As assistant director of the agency, I asked our research staff to come up with some usable data that we could actually use to help us in our inmate classification practice.  I wanted them to re-validate the actual classification standards that we used, and in the process of doing that, we found two significant factors of those inmates who had been involved in violent behavior since they have been confined.  Neither of those factors will come as a big surprise to anybody, but the two factors that will best predict future behavior are, number one, past behavior.  If a person has been violent in the past, that tends to lend to their predictability for future dangerousness.  And, secondly, the factor that was very clear was age.  Younger people engage in more aggressive behavior than do older inmates.

Q.  Based upon your experience and familiarity with the Bureau of Prisons, do you know whether or not gangs play a role within the prison population?

A.  Prison gangs do play a significant role in prison operations.  Nearly all violence, serious violence, within a correctional setting, can be traced back to gang rivalries, racial rivalries that tie to the prison gangs, and

U.S. DISTRICT COURT

Direct - O'Connor/Carlson          Vol. 22:  113

to their continuing interactions with each other in looking for a balance of power between inmate groups.

Q.  And then, in that regard, based upon your training and experience and familiarity within the prison system, are you aware of whether or not all such acts of violence are, in fact, reported to the BOM staff?

A.  I'd like to think that we know everything that happens inside a correctional facility, but that is not true.  Inmates are often times not willing to report when they are assaulted. And if we don't see it, if staff do not see it personally or if we don't see it on a camera, then, if it's not reported, staff are unable to deal with it.

Q.  Can you tell the jury -- are you familiar, based upon your training and experience, with violent behavior that occurs there at the Ad-Max up in Florence, Colorado?  Are you familiar that violence takes place within the Ad-Max facility?

A.  Bad things happen in any correctional setting, including the Ad-Max.  Bad things happen even within the most controlled setting of the administrative maximum facility, and that would be in the control unit.  Years ago before the Ad-Max opened, we had our control unit at the United States Penitentiary in Marion, Illinois, and on one very bad day, indeed --

MR. STRICKLAND:  Excuse me.  We're going to object, number one, the question is nonresponsive.  Number two, it's not relevant to the issue before the jury, and, number three,

Ex. 7 - 103

it asks this witness to re-count facts and circumstances to cases other than this case.  Therefore, it's not probative to any issue.

THE COURT:  Sustained on responsiveness.  Overruled on the other.

Q.  (By Mr. O'Connor)  There have been bad things that happened in very secure prisons?

A.  Yes.

Q.  Now, let me just ask you this.  You are familiar with the classification system of inmates as they come into the Bureau of Prisons in terms of where to house them.  Is that fair?

A.  Yes, that's fair.

Q.  And you told us earlier how you are familiar with that. You have extensive familiarity with that?

A.  I do.

Q.  And we don't need to go through that again, do we?

A.  No, sir.

Q.  All right.  As it relates to the case involving Julius Robinson, did I talk to you on the telephone and give you an idea of the nature of the crimes with which he's been convicted, both in this court and the probation that he's serving for deadly conduct, discharging a firearm at an individual?

A.  Yes, you did, the number of counts in which he was convicted and the nature of the offense.

Direct - O'Connor/Carlson          Vol. 22:  115

Q.  Do you have an opinion, based upon your experience and training and familiarity with the classification system for the Bureau of Prisons, as to what type of prison he would likely be assigned to?

A.  Given his recent convictions of a violent nature, given the fact that he is currently looking at either a life sentence or a death sentence, the agency would classify the amount of time he would be serving as greater than 30 years.  That would put him in a public safety factor category in his classification that would designate him to a high security institution.

Q.  And so if the end sentence in this case is a death sentence, he would go to a death row; is that correct?

A.  That's correct.

Q.  And then if it's not a death sentence, he would go to a high security prison?

A.  That's correct.

Q.  And in a high security prison, can you tell us, are they locked down 23 hours a day and let out only one hour for recreation?

A.  High security institutions operate in a very normal manner unless they happen to be in a lock down status because of a major incident going on.  The normal routine in a United States Penitentiary would be to run a very open institution within the controlled security envelope.  That would mean, basically, the inmates in the penitentiary would be up to eat in the main

Direct - O'Connor/Carlson          Vol. 22:  116

dining room with several hundred other inmates.  Would at work call 7:30 go to work somewhere in the facility.

Again, go to main line at noon with several other inmates supervised by the staff.  Afternoon, work assignment again, back to the job, or a school assignment with other offenders. Following the evening count at 4:00 p.m., if they don't have an evening work assignment, the typical inmate's day ends as far as their assigned work, and they are then free for evening recreational activities throughout the facility.  It's a rather open environment for the most part.

Q.  Within the prison?

A.  Within the prison.

Q.  In other words, there are walls and that sort of thing. It's not like the camp?

A.  Exactly.

Q.  But they will have interaction with other inmates and other guards and medical staff, that sort of thing?

A.  Yes.

Q.  Would they have access to telephones when they're in the general population at a high security prison that you've just described?

A.  During their off-duty hours, inmates have reasonable access to outside telephones.  There are some restrictions in terms of numbers of approved folks that can be on their phone list and how many minutes they can spend every month on the telephone, .

U.S. DISTRICT COURT

Ex. 7 - 106

but it's, basically, fairly open and difficult to control given the lack of technology today in terms of third person phone calls connecting to an approved person and letting that person then connect you on to somebody else.

Q.   Does that pose some security risks as it relates to the Bureau of Prisons?

A.   Very much so.

Q.   Why is that?

A.   Well, it's certainly an issue in terms of the agency being worried about connections with colleagues on the outside in terms of institution security, in terms of continuing enterprise with illegal activities on the street that do impact the correctional environment.  And, finally, it's a public safety problem that they struggle with in terms of having a kingpin locked up who wants to continue directing illegal activities outside.

          MR. O'CONNOR:  Pass the witness, Your Honor.

          THE COURT:  Cross examination.

                    CROSS EXAMINATION

BY MR. STRICKLAND:

Q.   Good afternoon, sir.

A.   How are you, sir?

Q.   I'm fine.  And you?

A.   Good.  Thank you.

Q.   Welcome to Texas.

Cross - Strickland/Carlson          Vol. 22:  118

A.  Thank you.

Q.  Have you spent time down here before?

A.  Well, as a Washington Redskins fan, I don't feel very welcome here.

Q.  You know, I may have no further questions.

Mr. Carlson, let me ask you, sir.  I think that you indicated in response to some questions from Mr. O'Connor concerning your rate of pay, you would not in any way infer by virtue of the answer to those questions that your testimony in some manner is skewed because you make, frankly, a lot of money for testifying; is that correct?

A.  That's correct, sir.  I certainly didn't mean to imply that.

Q.  No.  And you would agree with me, I take it, as a general proposition that experts, people that are honest and fair experts, regardless of whether they make money at it, don't make money at it, how much money they make at it, that's really incidental to their objectivity if they are intellectually honest; is that correct?

A.  I agree with that.

Q.  And you would characterize yourself in that manner, would you not?

A.  I would, sir.

Q.  Mr. Carlson, let me ask you about some of the matters that you have discussed here this afternoon.  And I guess probably

U.S. DISTRICT COURT

the first matter is you indicated that there are two factors based upon your training, your education and your experience, which you believe are most germane to the issue of the predictability of future acts of violence when one is in prison; is that correct, sir?

A.  Yes, sir.

Q.  And the first of these that you mentioned, of course, was one that probably most of us were not surprised to hear and that is a person's past behavior?

A.  Right.

Q.  Now, when you say their past behavior is an indicia of future criminal violence while in prison, do you make any distinction between past behavior on the streets versus past behavior in a penitentiary setting, for example?

A.  In the agency's classification scheme, convictions on the street are what account for most of the points in arriving at their data.  However, adjudicated disciplinary reports within the facility are also counted as history, particularly, if they are of a serious nature, what they would refer to as a 100-level incident report.

Q.  Now, aside from the issue of whether or not behavior prior to the time that an individual reaches an institution -- and some manufactures into the classification -- in terms of scientific predictability -- if I can put those two terms together -- in terms of scientific predictability, do you have

an opinion as to whether or not offenses committed outside a prison setting carry the same weight in terms of likelihood of future of acts of violence?  I'm not talking about how they are classified but whether, in fact, of course, it makes it more likely that violence will occur while a person is incarcerated?

A.    Likelihood -- and in the sense of predictability, a sense of trying to get ahead of the violent curve of inmate behavior is what the classification scheme is geared to.  It makes sense, probably, to all of us that what you've done in the past is how you will react to stress and problems in the future.  It is not a direct relationship, not necessarily a direct relationship.  If you have done this in the past, we guarantee this will happen in the future.  None of us have --

Q.    And while it's not an absolute guarantee, neither is it a matter that the Bureau of Prisons, acting responsibility for the welfare of the community and the country, is simply going to ignore, is it?

A.    That's correct.

Q.    And the classification system that you described is a, for lack of a better term, proactive classification system.  You don't wait to classify people until they have been in prison for awhile and see how they are doing.  You classify them upon their entry into the institution; is that correct?

A.    That's exactly correct.

Q.    And I take it that the classification is a -- the

Cross - Strickland/Carlson    Vol. 22: 121

classification process that you have described, I suspect, in some sort of superficial detail, because from what I understand, it's quite convoluted and complex; is that correct?

A.   It is.  The point accrual scheme -- I mean, once you work with it, it's really not, but for the person just looking at it for the first time, it can seem very complex.

Q.   And that classification of an inmate, I take it, is a matter of constant reevaluation and reconsideration while the person is within the institution -- I'm using institution, not in the specific term of art sense that you do federal institutions, but just institutions in general.

A.   Correct.  The initial designation of an inmate into a correctional facility is a based on a series of historical factors.  Once the individual is in custody, they begin to re-classify him after seven months at the facility.  And that starts taking into account such things as any change in maybe another jurisdiction coming along and putting a detainer on the inmate, a notice that they want the inmate for prosecution in their area.  The reclassification would consider, at the seventh month point and every set period throughout his or her confinement, their behavior in the institution, amount of time they've served and amount of time left to serve.  So those factors will, obviously, change as time moves forward.

Q.   And you made reference, particularly, as you were talking about the administrative -- the Ad-Max, I'm going to call it,

**Ex. 7 - 111**

unit at Florence, that a person can earn their way in. I guess "earn" is not quite the best way to describe it, but they can sort of earn their way into a higher level institution; is that correct?

A.   Yeah.  An easy way to look at -- you just mentioned appropriately that the classification scheme is a proactive sense of trying to predict behavior, and it's based on trying to get ahead of potential institution or public threats.  The Ad-Max program is totally based upon their historical performance in an institution.  So they, actually, have been engaged in misbehavior for the most part.  There are a few inmates who are designated directly into the Ad-Max, but there are very few.

Q.   Very few.

Now, I take it when you're given the situation such as you've described and when you're dealing with a very serious business such as you've described, the Bureau of Prisons wishes to -- we've used the term proactive, but they wish to attempt to head off problems before they occur; is that correct?

A.   Absolutely.

Q.   I think we have had some testimony in this case to this point that any escape is one escape too many, and I take it any bad incident or act of violence in the penitentiary system of the United States is one act too many, also, correct, sir?

A.   Yes, sir.

Cross - Strickland/Carlson        Vol. 22: 123

Q.  So I take it that there is this constant reevaluation in an effort, not to just deal with what a person has demonstrated, but with what you and your colleagues -- at least while you were on active duty with the bureau -- but you and your colleagues believed to be indicators of, perhaps, future problems, problems that are incipient?

A.  Yes.

Q.  All right.  You indicated, also, that the second significant factor which you found to be an indicia of predictability is the question of age; is that correct, also?

A.  That's correct.

Q.  And in what regard is age an indicator of either problems or overcoming problems in the prison system?

A.  When they actually did the analysis of data in our attempt to re-validate the classification system, we specifically were looking for -- of those cases that had demonstrated violent behavior in the institution, we listed what we thought would be key factors.  And in the analysis of all those factors, those were the two issues that stood out.  Age, of course, is a variable, and it wasn't just a very specific cut-off up until age 22 it's an issue, but in general, it's probably fair to say that violence is more attributed to younger inmates than the older inmates, and, probably, 35 or 40 is where it begins to really fade.

Q.  So it's sort of on a continuum, would that be fair to say,

Ex. 7 - 113

Cross - Strickland/Carlson        Vol. 22:  124

as opposed to a distinct and abrupt beginning point, ending point, but --

A.   That's a good way to put it.

Q.   You would hope that a person's behavior is sufficiently modified the longer that they spend in the institution, less likely a problem; is that correct?

A.   Correct.

Q.   Has it been your experience -- and I realize that every case is different, but as a general proposition, has it been your experience that as inmates and inmates become institutionalized, that their behavior becomes increasingly acceptable, modified and acceptable, in the penitentiary system, not in every case, but as a general proposition?

A.   It's very hard to categorize that in a general way, but I guess that's fair to say that over the long stretch of time, aging process, et cetera, inmates do behave more as they age.

Q.   This business about a prisoner's behavior becoming modified and more benign, hopefully, the longer that they are institutionalized or the older they become, I mean, that's not really new imperical information, is it?

A.   No, it really isn't.

Q.   You're aware of, I take it, of studies as long ago as the 1840's in England, which showed exactly the same thing and continue on the general graph, if you will, showing decreased criminality as age increases even until today?

Ex. 7 - 114

Cross - Strickland/Carlson          Vol. 22:  125

A.  True.

Q.  True.  All right.

You indicated that you had spoken with Mr. O'Connor briefly and received a brief overview of the circumstances of this case.  So you certainly know what it is that Mr. Robinson was initially charged with and now has been convicted of; is that correct?

A.  Yes, sir.

Q.  And as a result of that, you were of the opinion for a variety of reasons, not only the nature of the offense, but also the public safety factor which you mentioned, that Mr. Robinson would be assigned to a federal prison penitentiary level; is that correct?

A.  Yes.

Q.  Is that a matter that is discretionary, or is that a matter that's established by law?

A.  It's discretionary only in terms of scoring each individual out.  There are, particularly when you get into re-classification of an inmate, certain judgmental calls that are made by the case management staff.  Has the inmate demonstrated responsibility?  That's a judgment call since they have been down.  So there are factors that are judgmental, not created or defined by law, but by administrative policy.

Q.  I take it that when we talk about the classification system that we've been discussing, not only earlier today before you

Ex. 7 - 115

Cross - Strickland/Carlson                Vol. 22:  126

appeared, but also during your testimony, that the

classification decisions are made by persons with some

considerable experience with the Bureau of Prisons?

A.   Yes.

Q.   In other words, we don't leave it up to the -- no

disrespect meant to the individual correctional officers, but

it's certainly steps removed from what the man who is patroling

the cell block for eight hours a day, the decision that he's

going to make; is that correct?

A.   Actually, we take a lot of input from the correctional

officers.

Q.   Sure.

A.   Many of them have degrees.  Many of them eventually become

case managers.  So they do participate in the process, but the

case manager and the unit team are responsible for all

classification matters.

Q.   I mean, it just makes sense.  You would like to get input

from the guy who day by day is dealing with this individual,

can see how he behaves, what he says, get some idea of his

mood, what sets him off, what doesn't set him off.  Those are

all factors that you would want to know about; is that correct?

A.   That's correct.  I mean, that's the concept behind the

management philosophy they refer to it in the agency as unit

management.  The head of the unit, the unit manager, usually

has a number of staff, one or two case managers, one, two or

U.S. DISTRICT COURT

**Ex. 7 - 116**

three counselors, an educational representative, a psychologist, either part or full time, and correctional officers, and that group makes up the unit staff and their offices are physically in the housing unit, so they get to know the inmates and their charts.

Q.  You mentioned correctional officers.  The truth of the matter is that the correctional officers in the Bureau of Prisons are a pretty good group, are they not?

A.  I think that they are, yes.

Q.  They tend to be more career oriented than, perhaps, are often found in the state penitentiary systems for a variety of reasons, maybe more career oriented, but, also, perhaps, receive better pay, better benefits, better qualified?

A.  That varies considerably from state to state.  In some states, the Federal Bureau of Prisons employees are not as well compensated.  California, for instance --

Q.  Oh, really?

A.  -- pays their correctional officers considerably more than the Federal Bureau of Prisons.  Move to Virginia and they earn less than the Federal Bureau of Prisons.  So it varies considerably across the country.

Q.  Why doesn't it surprise me that California pays more?

A.  Well, they have got to pay for all the freeways.

Q.  As a general rule, are the men, I guess, and women, that are correctional officers in dealing with these prisoners on a

Cross - Strickland/Carlson        Vol. 22:  128

day-by-day basis, usually, if they have had some experience, are pretty astute judges of that individual, whether they are respectful or not respectful, potentially violent or not potentially violent?

A.  I think that's a fair statement.  When I worked as an officer in the housing unit, I felt I was by far and a away the better judge of character than the old warden who was a long ways away from my housing unit.

Q.  That's right.

A.  Of course, when I was a warden, I probably disagreed with that.

Q.  Sure.  You re-thought that position, did you?

A.  I believe you said that there are 11 penitentiaries, is that correct, in the United States system?

A.  I didn't say that.

Q.  I'm sorry if I --

A.  I'm actually not sure how many there are.

Q.  Okay.

A.  They just opened -- they've opened two since I retired.  So that would take it to 11.  I think that's correct, Lee County, Virginia and Castle Air Force Base in California.

Q.  And I think we need not to revisit it, but suffice to say, those are maximum security short of the Ad-Max units in Marion and in Florence; is that correct?

A.  That's correct.

U.S. DISTRICT COURT

Ex. 7 - 118

Cross - Strickland/Carlson        Vol. 22: 129

Q.  In regard to, perhaps, difficulties in the penitentiary, I'm sure you're familiar with a publication called The Source Book of Criminal Justice Statistics published by the U.S. Department of Justice; is that correct?

A.  I am.

Q.  All right.  And did you have occasion, both while you were on active duty with the Bureau of Prisons and, perhaps, now in your role as a consultant, to from time to time make reference to that particular source book?

A.  I do on occasion.

Q.  Do you find it to be genuinely and generally a reliable source of statistical information?

A.  Generally, as reliable as statistics can ever be.

Q.  All right.  Under the theory -- as you've already pointed out, maybe some information is not either reported or transmitted, and that could tend in some way, perhaps, tend to skew the statistics?

A.  Right.

Q.  You would not expect, however, that something as serious, for example, as an inmate on inmate homicide or an inmate on staff homicide to be a matter that would not be reported?

A.  Absolutely not.  That would be very clear.

Q.  That would find its way into the source book regardless of whether some less consequential matters were not.

During the -- let me see if I can read my fine print here.

Ex. 7 - 119

Cross - Strickland/Carlson        Vol. 22:   130

During the period of time, 2000 -- the two years, 2000-2001, are you aware of any statistics in regard -- in the federal system, in regard to any statistics as to inmate on inmate homicide per 100,000 inmates?

A.   No, I'm not.

Q.   Approximately how many inmates, looking back to the period of time I'm talking about, the years 2000-2001, would you estimate to be confined in the Bureau of Prisons?

A.   I would estimate in that period of time there were probably in federal custody 125,000 inmates, I guess.

Q.   Do you have any information as to whether or not the rate of homicide, inmate on inmate, during that period of time, 2000-2001, would be in the neighborhood of six per 100,000 inmates?  Does that sound reasonable to you?

A.   That sounds reasonable.

Q.   By the same token, do you have information concerning inmate on staff homicides in the federal system being as low as one per million?

A.   That also sounds over a course of time to be reasonable.

Q.   And, of course, we don't have a million inmates in the federal system.  So that percentage is considerably less even in the percentage rate that we were discussing in regard to inmate and inmate?

A.   That's true.  In point of fact, over the history of the agency, there have been 23 staff homicides in the course of

Ex. 7 - 120

Cross - Strickland/Carlson          Vol. 22:  131

staff working on duty in a correctional facility in the federal system.

Q. And over what period of time did those occur?

A. From the time of the incorporation of the Federal Bureau of Prisons. So that was 1930 to today.

Q. So some 71, 72 years, right there in that range, 70 years?

A. Yes.

Q. As a general proposition, do the numbers, such as you've described, seem to, as a general trend, be increasing or decreasing?

A. Well, I can't say that it's increasing or decreasing. The last staff homicide occurred in 1997 at the United States Penitentiary at Lompolk, California, and they have not had one since. The agency seems to be doing very well right now in that respect.

Q. And, of course, the extremely high tech, high security institutions as you've described, those are institutions that have come on line in relatively recent years; is that correct?

A. Yes. And even the older ones have been brought up to speed in terms of technology.

Q. So the institution, for example, at Marion, the Ad-Max institution at Marion, when did it actually come on line?

A. At Marion?

Q. Yes, sir.

A. It was called -- it wasn't referred to as the Ad-Max, but

U.S. DISTRICT COURT

the control unit operation at Marion went -- I really don't know the date, but I would guess it to be about 1976 and 1977.

Q.  And how about in regard to the Ad-Max unit at Florence, please?

A.  Until the Ad-Max opened in Florence, yes.

MR. STRICKLAND:  May I have one moment, Your Honor?

THE COURT:  Yes.

(Brief pause in proceedings)

Q.  (By Mr. Strickland)  In regard to the various federal penitentiaries that you've described, is it necessarily true, for example, that a person convicted, sentenced to, let's say, life to the United States penitentiary, is going to go to a nearby institution, or does the government retain the right to send that individual any place within the system that they wish to do so?

A.  The Bureau of Prisons policy is to send an inmate, to designate an inmate, to an institution that matches his or her security needs as close to home as possible.  Close is usually defined as within 500 miles of home.  However, they do reserve the right to exercise their prerogative to move the individual further from home.  Sometimes it's for programmatic needs.  An institution in painting may not be available at that institution at that, let's say, high security institution, and that's one that the inmate wants.  He makes the request.  The inmate's moved on.

Cross - Strickland/Carlson        Vol. 22:  133

Or it could be because of administrative reasons.  An inmate cannot be confined at the nearest appropriate facility because he or she may have a separatee there, somebody that has testified against them.  So for administrative reasons, they keep that option open.

Q.  So the Bureau of Prisons is certainly not operating in a vacuum when they make these designations, is it?  They know, for example, who co-defendants may be, who may be members of a a rival gang, persons with whom the individual, the inmate, has had some difficulties, and those are all factors which are put into the mix, I take it?

A.  Yes.  Those are all factors that are considered.  The agency tries very hard to make the decision that will be the safe decision for other inmates and for staff.

Q.  And overriding all of that is, perhaps, as we use to say in the navy, where the needs of the service were paramount, the needs or the requirements of the Bureau of Prisons is first and foremost consideration which will be adhered to; is that correct?

A.  That which will do the greatest amount of good for the greatest amount of people.  Safety within the system, yes.

MR. STRICKLAND:  Thank you, sir.

It's been a pleasure to talk to you this afternoon.  Thank you.

THE WITNESS:  Thank you, Mr. Strickland.

U.S. DISTRICT COURT

Vol. 22:  134

MR. O'CONNOR:  No more questions.

THE COURT:  You may step down, sir.  Thank you.

THE WITNESS:  Thank you, sir.

MR. O'CONNOR:  Your Honor, the government would close its case on punishment.

MR. BALL:  Your Honor, defendant will close.

THE COURT:  All right.  That concludes the testimony in this case on the second phase of the trial.  We will now begin work immediately upon the charge to properly apprise you as to the law to apply to the facts in this case so that you can make your final decisions.

We'll be doing that the rest of the afternoon, I hope, but cannot guarantee that we'll have it ready for you by 9:00 in the morning.  So you should come on in at 9:00 and be ready to either hear the final argument -- charge and the final argument, or wait awhile and then hear it.  We will try as hard as we can to get it to you by first thing in the morning.

Do any of you have any questions?

Let me confer with counsel just one moment before I let you go.

(Off-the-record discussion at the bench at this time)

THE COURT:  Please remember all of your previous instructions about not discussing the case with anyone and bringing it to the Court's attention should anyone try to discuss it with you.  Please avoid all media coverage about any

U.S. DISTRICT COURT

Ex. 7 - 124

# EXHIBIT 8

Vol. 23: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA      . CRIMINAL ACTION NO.
                              . 4:00-CR-260-Y

V.                       .
                              . Fort Worth, Texas

JULIUS OMAR ROBINSON      . March 15, 2002

. . . . . . . . . . . . . . . . . .

VOLUME 23
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, AND A JURY.

APPEARANCES:

For the Government:          MR. FREDERICK M. SCHATTMAN
                              MR. REED C. O'CONNOR
                              Assistant United States Attorney
                              801 Cherry Street, Suite 1700
                              Fort Worth, Texas  76102-6897
                              (817) 252-5200

For the Defendant:          MR. WES BALL
                              Ball & Hase, PC
                              4025 Woodland Park Boulevard
                              Suite 100
                              Fort Worth, Texas  76013
                              (817) 860-5000

                              MR. JACK STRICKLAND
                              Attorney at Law
                              909 Throckmorton
                              Fort Worth, Texas  76102
                              (817) 338-1000

Court Reporter:             Ana P. Warren
                              U.S. District Court Reporter
                              501 W. 10th Street, Room 201
                              Fort Worth, Texas  76102-3637
                              (817) 850-6681

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COU

**COPY**

Ex. 8 - 125

Vol. 23:  56

beliefs, national origin, or sex of the defendant or of the victim.

Signatures of all jurors.  I hope there are 12 there, counting the presiding juror, and a date.

All right.  You have heard now the charge and the special verdict form explained to you.  Do you have any questions?

MR. SCHATTMAN:  Your Honor, might we approach?

THE COURT:  Yes.

(Off-the-record discussion at the bench at this time)

THE COURT:  We're going to take a break.  Let's try to keep it to about ten minutes.  Then you'll hear from -- we'll decide then how far we go.  I'm going to give each side 45 minutes for argument.  So we'll work out breaks around that, about ten minutes.

(Trial recesses, 11:30 - 11:45 a.m.  Jury present)

THE COURT:  As I informed you, I have awarded each side 45 minutes to argue.  Mr. Schattman will speak first for the government.

MR. SCHATTMAN:  Thank you.

THE COURT:  Did you want a warning on your 25 minutes?

MR. SCHATTMAN:  If you would warn me when I've used 23 minutes, Your Honor.

THE COURT:  Okay.

MR. SCHATTMAN:  If I'm not already finished.

U.S. DISTRICT COURT

Vol. 23:  57

THE COURT:  Okay.

MR. SCHATTMAN:  May it please the Court, counsel, your honors.

The United States of America comes to you today on what you have to say is a sad day, because it is a day upon which she comes to you and asks you to undertake the very grave responsibility for determining whether or not you should recommend to this judge that this man suffer death.  And there is no great pleasure to be taken in that.

It is sad that the life of Julius Omar Robinson as he has lived it, the crimes that he has committed, has brought us all here today.  It is sad that the actions of Julius Robinson bring us here to the brink, if you will.  But as Judge Means has told you in his instructions, this is a task that must be undertaken without passion or prejudice.  This is a task that has come to us and to you by virtue of free and voluntary choices made by Julius Omar Robinson.

And one of the first things that you must decide is whether or not Julius Omar Robinson was, in fact, 18 years of age or older at the time that these offenses were committed.  And the first place that you can look to find that is in Government's Exhibit Number 295, which I think you will find to be an instructive document throughout your deliberations, and that document consists of the records of the 213th District Court of Tarrant County, Texas.  It sets out the defendant's plea of

U.S. DISTRICT COURT

Ex. 8 - 127

Vol. 23:   58

guilty to the offense of deadly conduct, discharging firearm at an individual, that being, Sarah Tucker. And in there you will find among those records, the records that show you that Julius Omar Robinson was born on August 8, 1976. So he was 18 years old on August 8 of 1994.

As you go through this process, through your deliberations, the judge has told you that we are here to seek justice. Justice in this case requires that you carefully weigh and consider all of the evidence, that you look at the three different murders that have been committed, that you have found to have been committed by Julius Robinson and his cohorts, and to look at those and ascertain from the evidence that has been presented whether the ultimate sanction is called for in this case.

And the things that distinguish the murderous activities of Julius Robinson from, for lack of a better phrase, a casual homicide, but we look at those things, and as you work your way through the special verdict form, you are first asked to determine the threshold eligibility factors. And I believe and the government believes -- the United States says to you that she believes she has proven each and every one of those threshold eligibility factors as to each and every one of the murders that you must consider. And she would ask you to take that little bit of extra time as to each of the threshold eligibility factors and answer, answer as to everyone. You can

U.S. DISTRICT COURT

Vol. 23:  59

stop when you read the first "yes" answer if you choose as to each count.  Take that extra moment.  Justice deserves that extra moment.

Let's talk about for a moment the killing of Johnny Lee Shelton, and you will find questions relating to the murder of Johnny Lee Shelton at Questions 2 and 5 of the special verdict form.  In this case, the government says that the threshold eligibility factors that have been proven to you are:

That Johnny Lee Shelton was intentionally murdered by Julius Robinson.  That Johnny Lee Shelton had serious bodily injury inflicted upon him and that that injury caused his death.  That this defendant engaged in conduct or participated in an act -- that's asked two different ways because Congress wrote it two different ways under two different statutes -- that he participated in an act or engaged in conduct intending that lethal force be used against some nonparticipant, and that as a result, Johnny Lee Shelton dies.  That the defendant engaged in conduct or participated in an act of violence knowing that it would create a grave risk of death to a nonparticipant and Johnny Lee Shelton dies.

And what you know about the events of December 3, 1998 already tells you how to answer those questions we believe, and that is, that on December 3, 1998, Julius Omar Robinson comes over to join up with Nathan Henderson and others, and they are planning a retaliation against Big Friday.  And they are

U.S. DISTRICT COURT

planning how to get at Big Friday, looking for his car.  And they see the car, and they plan -- they have already planned a retaliation against that person, and they intentionally go out to kill the man in the white car that they believed to be Big Friday.  They set out to do it.

Mr. Robinson brings the guns.  He brings L.J. Britt, the designated hitter, perhaps, in this case.  And he brings L.J. Britt with him, and off they go, and they chase that vehicle down the expressway firing at it, firing at it, firing at it, spraying bullets throughout that concrete canyon of Central Expressway.  As the bullets fly through the car, Cheryl Chappell gets out of the way because of the gunfire that is coming all around her.

Rodney Wilson is riding in a car with his friends when a bullet comes ripping through their vehicle tearing the driver's shirt, causing little shards of glass to hit Rodney Wilson in the face.  This was an intentional murderous act.  It is an act that shows utter disregard for the value of human life, utter disregard for the safety of anyone, anyone in the path, anyone in the line of fire, anyone who might be in the way of his retribution against someone who has done something wrong.  Anyone is available.  It doesn't matter to that man who is firing the gun, and it's fired over and over and over and over again.

Julius Robinson has his problem solvers.  They lay here on

Vol. 23: 61

the floor before you. They are up on the table as well. When he had a problem, the solution lies in firearms and phones. They are the instruments by which he carries out retribution, carries out the furthering of what it is that he wants to do, carries out retribution against those who he believes may have wronged him. Carries out, just plain hits, to get an advance.

With regard to the killing of Johnny Lee Shelton, there is no question your United States believes that each of those statutory -- that each of those threshold eligibility factors should be found by you, and your answer to them should be "yes."

As to the statutory aggravating factors regarding the death of Johnny Lee Shelton, you should find from the evidence that you have heard about the attack on this vehicle from behind and anybody else who happened to be in the way, that Mr. Robinson created a grave risk of death to one or more persons in addition to the victim, Johnny Lee Shelton. You know that from the evidence that you have heard and from the verdict that you have rendered.

Was there substantial planning and premeditation that caused the death of Johnny Shelton? Someone had to come over all the way from Fort Worth over into Dallas to bring the guns that are used in the murder of Johnny Shelton. This was a premeditated hit on Friday. Friday wasn't there. It must have come as a great surprise to Johnny Shelton as he is driving

Ex. 8 - 131

down the road and is murdered, murdered, for looking like someone else, murdered for driving a car.

Now, let's talk about some of the mitigating factors that have been proposed to you with regard to the murder of Johnny Shelton.

That Julius Omar Robinson was under unusual and substantial duress.  He was under duress.  How can that be?  How can that be?  He is in a vehicle coming up from behind with semi-automatic weapons, firing at a vehicle that's in front of him.  He's under duress.  What duress is he under?  Well, I mean, after all, he lost some money.  That's a lot of duress. That's a reason to go out and just start shooting at everybody on the highway.  That ought to be reason to show him some mercy.  After all, he lost money.  He had lost something.

Mitigating factor.  Well, he's not -- even though he might be punishable as a principal, well, there are other people that -- I mean, it was relatively minor.  After all, there were two people shooting.  It's relatively minor because I was only half of the shooters.  Silliness.  That he could not reasonably have foreseen that his conduct would create a grave risk of death or danger to Johnny Lee Shelton.  He must have thought they were plastic bullets, perhaps, or maybe he was just playing, and surprised him when the gun went off.

He was youthful, old enough to know what he wanted and when he wanted it and how he wanted to get it.  You heard him on the

Vol. 23:  63

phone.  You heard exactly how mature he is and how much he knows what he's doing.  He did not have a significant prior criminal record.  Well, what's significant about it?  The significant thing about a prior criminal record is back from the time that he is 19 years of age, his problem solver, his gun, Sarah Lee Tucker owed him a $100 for crack cocaine. So she's a problem.  We'll take care of that.  Roderick Friday had gotten in his way.  So we'll take care of that problem.

And how is it significant, his prior criminal record?  It's significant because it tells you what kind of a person that you are dealing with.  Then is there a mitigating factor that there are other equally culpable defendants who will not be punished by death?  Who would those people be?  They suggest Jason Gehring, the driver of the car who is not shooting.  Is he as culpable as Mr. Robinson?  In your mind, you may think so. Nathan Henderson, who called him over and said, hey, I saw Friday, is he as culpable as the man who is firing the weapon? I suggest not.

The other non-statutory mitigating factors that are raised throughout, that Mr. Robinson was raised as -- you know, by a single parent.  Therefore, that would mitigate against having the death penalty, or that there is a possibility of a life sentence may mitigate against it.

The testimony that came to you to show that he is a murderer came from accomplices.  Now, there's a reason.  I've

U.S. DISTRICT COURT

**Ex. 8 - 133**

Vol. 23:    64

been caught fair and square.  I have been proven to be guilty, but you really ought not kill me because it's not fair that the people that I trusted, the people that I worked with, came in and talked about what I did.

The fact that there is little or no physical evidence.  I did a good job shooting at this guy and trying to save his life.  Somebody lost a bullet, and nobody can find my gun.  So that's a reason I ought not be put to death.

That Julius Robinson is a low risk of harm to others in prison.  He's adjusted well in an institutional setting.  What do you know about that?  Let's talk about that mitigating factor for just a moment.

What you know about that is the same thing you know about Julius Omar Robinson throughout the course of his criminal conduct his adult life, and that is Julius Robinson has two faces.  The face that he portrays to all of his coaches, good, kind, polite, ready to work hard, teamwork.  You bet.  You bet, as long as somebody's looking at him.  And when they are not looking at him, he's selling dope, and he's shooting at Sarah Tucker.

When he is in the dope business during the time that the Drug Enforcement Administration and those agents are looking at him, he's fine.  He's doing all right.  You know, he is keeping the promise that he made to the Court that deferred finding him guilty of engaging in this deadly conduct and put him on

U.S. DISTRICT COURT

**Ex. 8 - 134**

probation.  No adverse reports from his probation officer.  He seems to have a business.  He's doing quite well, but you know from being on the inside and listening to what's going on that this fellow was in the dope business, and he is slinging it as fast as he can, as much as he can.  He is breaking the law as much as he can as long as it will advance him and make a profit for him.  You know that's the other face of Julius Robinson.

His uncle, John Holimon, as a fine a fellow as anybody would hope to meet, comes down and is living with him at the very same time that this drug dealing is going on, and John Holimon doesn't have a clue that his nephew, who appears to be so generous, is, in fact, slinging dope all over several states, riding around, carrying his gun, talking to his best friend, Richard Smart, telling him if I thought you were undercover, man, I'd put one through you're dome.  You know the biz, man.

That's the real Julius Robinson.  And when he comes to the Federal Medical Center at the jail unit after a week or so and he is in jail and being held in jail, and there in the medical center, you have heard him as he talks on the telephone saying, well, watch out.  These things may be tapped.  You've got to watch what you say.  You've heard him in that context, and you know that one of the things he has learned is that Michael Williams is one of the reasons that he's in jail, and he knows that people are looking at him on these murders at this stage:

He knows that there is an investigation going on, and he knows that it was the information given by Michael Williams that is keeping him in jail.

And what does he do? You know from the testimony that he starts calling up to Arkansas using that little three-way call -- that nobody knew about -- talking, trying to see if he can get something done about Michael Williams. And what happens Michael Williams is, in fact, kidnapped, taken away. People are going to kill him. The little youngsters, little gangsters up in Dermott, Arkansas, come in, and they are going to kill that guy because he's talking about his OG, my OG. Talking on my OG. My OG is sitting down here -- my OG is in the jailhouse down in Texas, ladies and gentlemen.

The compliant, easy going, obedient, cheerful, thrifty, Julius Omar Robinson is the OG, and he wants Michael Williams dead, just like he wanted Roderick Friday dead because Roderick Friday crossed him, Big Friday. Just in the same way that he wanted Rudolfo Resendez dead because he had something Julius wanted. That, ladies and gentlemen, is the Julius Omar Robinson that you judge.

Julius Omar Robinson throughout his adult life has been able to demonstrate the two faces to those who are immediately charged with looking after him. He maintains a euphoria of innocence. He's very polite. He returns the wallet. At the same time, he is willing to shoot up that pickup truck with

this little girl in it, shoot up her parents' house because they have his $130.  Now, who do those people think they are?

Let's talk about Juan Reyes for a moment.

THE COURT:  You're at 23 minutes.

MR. SCHATTMAN:  Those same four factors are present, the threshold eligibility factors, and those same statutory aggravating factors are present.

But there is one more thing in the Reyes killing, and that is Juan Reyes is shot.  He's hopping around, and he falls down. And it's not just enough.  It's not just enough shooting. Spray him with bullets so that pieces of concrete as those projectiles strike underneath him as he lay on the ground ripple up that man's back.  That must have been a lot of fun, to spray bullets throughout the neighborhood.  Shoot at Isaac Rodriguez as he flees away.  Shoot at the houses.  Shoot at the car.  Shoot at the people.  Shoot at anybody.  Why?  Why?  It's a zone of danger.  He creates
this danger zone.  Everyone who is anywhere close to what it is that Julius Robinson decided he wanted is in danger, and that remains true and it will remain true as long as he draws breath.

Now, that target of opportunity has expanded by the young men and the young women who have come in here and have told you what it is that was going on, whose information has been substantiated by the work of these investigating agents, and

now the targets of opportunity are numerous.

You will hear that as to the killing of Rudolfo Resendez that everybody was in on this and that these are all terrible people, and we shouldn't believe them.  We shouldn't have anything to do with them.  And you ought to spare this man's life because it is his no good friends who have turned him in. And, ladies and gentlemen of the jury, the killing of Rudolfo Resendez was a plot born in hell and such a plot born in hell has no angels as witnesses.

Let justice be done.  Let it rain down like water.  Let righteousness be a mighty stream.  Do justice in this case. That is what your government asks of you, justice, that and that alone.

THE COURT:  Mr. Ball, do you want any warnings?

MR. BALL:  Your Honor, if you can let me know when I reach the 20 minute mark if I'm still speaking.

THE COURT:  All right.

MR. BALL:  May it please the Court, members of the government, prosecution, ladies and gentlemen.

Where we are now is a decision that you have to make that is undoubtedly, extraordinarily serious, maybe the most serious kind of decision you make in your lifetime.  I don't know.

I want to tell you with regard to the verdict you've reached,  I'm not here to quarrel with you.  You heard the evidence.  You had the responsibility.  You made the decision.

Vol. 23:  94

and at the same time, I continue to be overwhelmed by the degree of diligence and care which I see jurors abandon their every day life and come in here to serve. And, frankly, you all have been no exception whatsoever. You have discharged your duties with patience and with close attention to detail, and, although, I don't know for certain, I would, I think, assume with some degree of good humor in spite of a very unpleasant time. And I am confident that you will continue to deliberate with that same integrity and conscientious attention to detail that you have demonstrated throughout this trial.

So in closing, let me tell you that our system of justice thanks for your service. And Wes Ball, Bruce Cummings, our investigator, and I thank you for your service. Your community thanks you for your service, and Julius Omar Robinson thanks you for your service.

Good luck. God speed.

THE COURT:  Let's see. You have 21 minutes remaining.

MR. O'CONNOR:  Thank you. Can you tell me when I have three left?

THE COURT:  Yes, sir.

MR. O'CONNOR:  Ladies and gentlemen, let me just assure you right off the bat that I plan on looking each one of you in the eye and assuring you without doubt and without question that Julius Omar Robinson was not culled out of some pack to come in here and to stand and face these charges that

Ex. 8 - 139

have been brought against him.

I can assure you and look you in the eye and tell you that Julius Omar Robinson has earned his seat at the table in this courtroom.  And there has been a great deal of talk by Mr. Ball, by Mr. Strickland, about this equally culpable defendant theory proposition and the fact that it's in the jury charge that you will have with you when you go back there.

I ask you, ladies and gentlemen, when you go back there to consider that issue and all of the issues, ask yourself this one very basic and fundamental question.  When you try to determine whether we somehow or some bureaucrat improperly culled Julius Robinson out of the pack, ask yourself which one of the pack that is in the jury charge, which one of those individuals was involved in three separate homicides.

Look at the Resendez killing.  Some mule named Sonia Zamudio running cocaine from Laredo.  Was she involved in the Juan Reyes homicide?  Was she involved in the Johnny Shelton homicide?

Look at Angelo Harris.  Was Angelo Harris involved in any other homicide that you have heard any evidence about whatsoever?  Was Nathan Henderson, Jason Gehring, were they involved in any other homicide that you have heard information about?  And they both testified in this case, and don't you know in your heart of hearts, don't you just know that if Jason Gehring or Nathan Henderson played even the smallest part in . .

another homicide, in another bad act, in another wrong in any way, you would have heard about it on cross examination? Don't you just know that?

So I would suggest to you when you get back there -- and I hate to lead off with that point, but there is so much talk about that, I felt compelled to do so. When you get back there and you talk about that argument, ask yourself that question. Why has Julius Robinson earned his way into this courtroom? Because Julius Robinson, the cold-blooded, calculated, manipulative killer that he is, has participated in the three homicides.

I want to follow-up on one thing that Mr. Ball talked to you about. He told you towards the end of his argument. He said, you know what, when you go back there, be sure you do the right thing. Be sure you're comfortable with what you're about to do. And I, certainly, echo that. There is, certainly, no question that there is not a soul in this courtroom that wants you to feel uncomfortable about what you're about to do, because, ladies and gentlemen, what you're about to do is going to be based on the evidence and the facts that you have heard in this case and the law that the judge has given you. You are not doing anything. You will be following the law and applying the law to the facts as you know it.

But what else does Mr. Ball tell you? Be sure, because death is final. There is no coming back from death. Death is

Vol. 23:  97

different.  And I, certainly, agree with that.  But let's talk about that for a minute, because he said, you know, one day you may hear in the newspapers or wherever that Julius Robinson, that his date of death came and went, and he was executed.

But ask yourself this.  Ask yourself what happened to little Maricruz and Maria Reyes on the date of death of Juan Reyes?  And, you see, that date of death didn't come about after this long exhaustive process.  There weren't 50 pages of written instructions that Julius Robinson and Angelo Harris considered in determining whether they were going to execute and pump bullets into the body of Juan Reyes as he lay in the ground at his house, as he orphaned -- or at least as the father was taken from Maricruz Reyes.  You see, Maricruz Reyes is going to grow up the rest of her life without the possibility of a Christmas card from her father, without the possibility of her father helping her blow the candles out on her birthday cake.

And don't you know, ladies and gentlemen, whatever you want to think about Juan Reyes, go ahead and think about, but don't you just know that on May 9, 1999 on that afternoon, don't you just know that Juan Reyes would have loved before he was executed to give his little girl a hug or at least tell her he loved her or to tell his wife?  Don't you just know that?  And so when Mr. Ball tells you, be comfortable.  Be sure about what you do, because it's irrevocable.  There is no   .    .

U.S. DISTRICT COURT

Ex. 8 - 142

Vol. 23:  98

question about it.

And the same holds true for the Shelton family. Don't you just know that Johnny Shelton would have loved to give his sister a hug? Tell his father, I love you. Give his son a hug. Yes, it's irrevocable. Ladies and gentlemen, evil acts, murderous acts, have grave consequences, and I would suggest that probably the first times in your lives when you've had the opportunity, the unfortunate opportunity, to get inside the criminal mind and criminal activities that getting inside it in this case has exposed you to somebody that you'd probably rather never have been exposed to, because you know that Julius Robinson is, as Mr. Schattman, called it two-face. You know that Julius Robinson has a public persona and a private persona. And you heard it abundantly on the DEA wiretaps.

You heard how he talks about his friends, his girlfriends. You heard the things that he plans out, just plans them out in his mind, putting a bullet in someone's head, robbing an armored car, hitting a lick. You know the true Julius Robinson because you were able to hear the true Julius Robinson through those wiretaps.

Now, the probation department down at Tarrant County did not know the true Julius Robinson. Coach Eddie Peach and all those coaches, they didn't know the true Julius Robinson. But because you were able to get in on the inside, both in the offense conduct and in his prior past violent conduct, you know

U.S. DISTRICT COURT

Ex. 8 - 143

Vol. 23:  99

that underneath the nose of Coach Eddie Peach and his staff, Julius Robinson was selling cocaine to Sarah Tucker, and he had him a good steady source of supply.  Sure he gave $120 back to one of those coaches, but he was expecting $120 from Sarah Tucker.  And don't you know, when she wasn't paying it, pumped her truck full of holes and a couple of rounds in her mother's apartment for good measure?  That's the true Julius Robinson, ladies and gentlemen.

And let's talk about the correctional staff for just a moment, because, yet again, Julius Robinson is able to con and convince people to believe things about him that suits Julius Robinson's needs.  You heard the same 82nd Airborne correctional officer testify on cross examination within one or two days of Julius Robinson hitting that segregation unit, he knew what he was facing.  You heard that same officer tell you it is not out of the ordinary that people who hit that thing convince people and act in a way that is untrue because they know they are manipulative enough that it will come back to help them.

And you know that once Julius Robinson hit that jail unit, that Julius Robinson ordered the kidnapping and killing of Michael Williams, and to somehow suggest that all of a sudden Julius Robinson, with his extensive use of the phones, with his extensive use of code words on the phones, three-waying calls out there -- and you heard the CIS tech tell you, if we don't

Ex. 8 - 144

Vol. 23:  100

know the number they're calling, we can't really find it.  We can't really find that telephone call.  And don't you know, with his experience on those telephone calls, he gets those messages out.  He gets those messages back to Dermott, Arkansas.

And let me tell you.  You have heard enough about Dermott, Arkansas where you don't want to hear about Dermott, Arkansas, again.  It's not any big secret that Michael Williams is informing on Julius Robinson and cooperating with the government on Julius Robinson.

And so when you hear Nathan Henderson tell you that Julius Robinson was really trying to find someone to take care of One Love, I would suggest to you that, based upon the words of Julius Robinson on those telephone calls, he corroborates everything that Nathan Henderson had to say.

And on December 28th of 2000 when he's locked up, what does he do?  Hey, Josephine, that One Love goes hard.  Well, wonder what that means?  You think that just might be code?  He certainly goes hard.  You all seen him around?  Anybody seen him around?  She's asking around.  No, ain't nobody seen him around.  Sure, that may not be the telephone call where he ordered the hit, but he's certainly is following up on the hit.  Hey, remember he goes hard.  Hey, you heard anything?  Has anything taken place?

And you know he's interested in that because January 6th of

U.S. DISTRICT COURT

Ex. 8 - 145

Vol. 23:  101

2001, after he told Nathan Henderson the youngsters took care of One Love, you ain't got to worry about him any more, he's talking to his cousin Pork Chop, Reginald Polk, up in Dermott, Arkansas.  And what's Reginald Polk telling you?  Hey, Little Black took care of that business, Cracker.  Are those names foreign to you?  I suggest they're not.  Michael Williams got up on the stand and told you, Cracker came up and had a .38 pistol with me.  Black was with me.  Yeah, I hang out with Skip.  Yeah, I sold that car later.  Read that transcript from the January 6 call.

Julius Robinson isn't just all of a sudden just curious about what's going on up in Dermott about some violent activity taking place in Dermott.  Julius Robinson is following up on his hit, because he knows, he thinks, if I can get rid of Michael Williams, boy, I've got a lot of problems solved here.

Then Mr. Strickland talked to you a great deal about the future dangerousness issue.  One issue, one issue, that you have got to decide among a host of issues, certainly, not the only issue, but I would suggest to you that as long as Julius Robinson has access to a telephone, Julius Robinson continues to be a danger to society.  People inside the prison -- because you heard from all of those experts -- except for Dr. Cunningham -- there are prison gangs inside prison.  That's a big surprise.

You heard from Mr. Carlson that they congregate together, .

Ex. 8 - 146

Vol. 23:  102

and they cause the prison a lot of problems.  You know Julius Robinson is a gang member.  You know that if anybody crosses him in prison, he is going to take it out on them.  And why do you know that?  Because that's exactly what Julius Robinson has done his entire life.  If you cross him, you're dead.  If there is an economic opportunity that you have that I don't have, I'm going to kill you because I want it.  If you cross me, I'm going to kill you, and if I don't get you right away and I happen to get somebody else, well, so be it.  I'm going to get you next.

So I would submit to you, ladies and gentlemen, that the overwhelming evidence on that future dangerousness issue sadly is that Julius Robinson will always be a future danger, and his target environment just got a little bit bigger because "H" and every one of the courageous individuals who came down here to testify against him is now a target.  They have got a target sign on their chest to anyone that he can get word to to take care of.

Now, let's talk just a minute about this Ad-Max.  He ain't going to Ad-Max.  Nobody said he's going to Ad-Max.  In fact, the evidence is he's going to some general population somewhere, and Mr. McCauley, their witness, told you the general population out at the jail unit, where he ordered this hit on Michael Williams, is the same kind of set up that he's going to face up there in Leavenworth if that's the general

Ex. 8 - 147

population that he goes to.

So that's just absurd. Let me just tell you this. If he gets to Ad-Max, God knows what he's done to get to Ad-Max, and I would suggest to you Dr. Cunningham keeps bringing that up, because Dr. Cunningham knows, as he testified, that Julius Robinson as he sits here today is a dangerous person. And he had all these statistics and these slides. Have slide show. Will travel. He's up in Michigan doing this. He's at the county today. He was over here yesterday. But what he tells you is that's all just a percentage. You know statistics can mean what anybody wants statistics to mean.

But what does he tell Mr. Schattman on cross examination? Yeah, there is a new study about the number of homicides that you are convicted of, and it certainly will play a part in their risk assessment. He didn't tell that to Mr. Strickland on direct, but Mr. Schattman got it out of him, didn't he. And Mr. Schattman got out of him that without even talking to Julius Robinson, without examining the underlying facts of this case, without considering the fact when Julius Robinson is talking to Jason Gehring at a restaurant breaking bread together, he simply, clinically and calmly re-counts the pumping of bullets into the body of Juan Reyes.

The attempt to assassinate Isaac Rodriguez as he tried to just get out of the way, and he pumped three bullets into Isaac Rodriguez and riddling the car that Nicholas Marques was

Vol. 23:  104

sitting in.  An attempt at a triple homicide, he participated in.  And how does he tell that to Jason Gehring?  He just simply re-counts it.

After he kills -- and, of course, you know that, by this time, he knows he's killed the wrong guy, because, please do not forget that his intended victim was some dude named Nino Toscano, Paulino Toscano.  And when he clinically re-counts this episode to Jason Gehring, this attempt at a triple homicide to Jason Gehring, he just does it.  Well, got the wrong guy.  I sure would have liked to have got the guy that ripped me off.

Same thing happens when he takes Johnny Shelton's life.  When he takes Johnny Shelton's life, he selects Johnny Shelton on December 3 of 1998 mistakingly, but he selects him and decides that he should die that day, and, of course, that's what happens.

What does he do the next day?  Is the remorse of the very next day just so crushing?  Is it so guilt-ridden the next day that he's upset and can barely function?  He drives over to Jason Gehring's house, hey, man, give me my guns.  Give me my guns out of your car.  I need my guns.

Ladies and gentlemen, I would submit to you that Julius Robinson lacks a conscience.  Of course, Dr. Cunningham doesn't know that because he didn't interview him.  Met him 20 minutes before he came down to testify, but he doesn't know that.  He

U.S. DISTRICT COURT

Ex. 8 - 149

isn't able to do that sort of evaluation.  He certainly wouldn't say he could do it in 20 minutes.  But Julius Robinson lacks a conscience.

So when you ask yourself whether or not Julius Robinson is a future danger, ladies and gentlemen, the overwhelming evidence is that he is, because with the telephone available to him as will be available to him at any prison setting, he is prepared to carry out whatever it takes to seek revenge on anybody.

Take it a step further, ladies and gentlemen, because you know from the evidence in this case that anybody who is capable of clinically, in a detached way, re-counting the attempt at a triple homicide that occurred on Michigan Street on Mother's Day in front of the neighborhood that was out there partying and celebrating Mother's Day and the way he talks and dealt with the Johnny Shelton killing, lacks a conscience.  Not only does Julius Robinson lack a conscience, ladies and gentlemen, but Julius Robinson does not value the sanctity of life.

And it's interesting in recent days, there has been all these elections going on.  It's right around election time. And all these people hanging up posters and planting signs, and they want to be your representative.  They want to be our community representative and speak for the community and the legislature and the judiciary on the city council.  But, ladies and gentlemen, today and in this courtroom, it will be the 12

Vol. 23:  106

of you who go back to deliberate on this case, who will be our legislators.  It will be the 12 of you who will speak on behalf of the community about what is and what is not acceptable.

And you know in the jury charge that the judge tells you, just because somebody is convicted -- and you know from voir dire because it was told to you a whole bunch -- just because somebody is convicted of capital murder, does not mean that they automatically receive the death penalty.  It's a weighing of all those factors.

And, again, jumping back to -- responding to what Mr. Strickland had to say, you know that Julius Robinson is the only person among those listed people that are in that jury charge whose been involved in all three killings.  So you know, based on the evidence in this case, that Julius Robinson is a present danger, in addition to what Mr. Cunningham said. That's the one thing that he said that was common sensical.  At least he would admit that.  So you know he's a present danger. You, certainly, know he was a past danger, because pumping bullets into the truck that Sarah Tucker was sitting in and pumping a few rounds into her apartment for good measure, certainly, qualifies him to have a significant criminal history, such that he is a past danger.

And you know because of his lack of conscience, you know because of the value that he places on lives that are not important to him, that Julius Robinson does not value life

U.S. DISTRICT COURT

Ex. 8 - 151

appropriately.

THE COURT:  Three minutes.

MR. O'CONNOR:  Thank you, Your Honor.

So, ladies and gentlemen, I would submit to you because Julius Robinson is willing to personally inflict great damage and destruction and suffering on people -- can you imagine the Juan Reyes killing?  Look at the guns on the ground there, ladies and gentlemen.  Those are guns that are designed to shoot and kill from far away.

And remember the scene as Isaac Rodriguez described it to you.  They shoot Juan Reyes in the leg, and he says, I don't know.  I don't know anything about it.  I don't know what you're talking about.  And when goes on the ground and Isaac runs, and those guys, Julius Robinson and Angelo Harris, are pumping him with bullets, they are close enough to Juan Reyes to riddle him with bullets, to personally hear the suffering that must have been going on on that ground on Mother's Day, and they are right up next to him as the life of Juan Reyes leaves his body.  As Dr. Spotswood told you, it must have happened very soon thereafter.

And so you know, if Julius Robinson is that kind person and when you weigh the aggravating factors that I would submit to you clearly exist in this case without question, when you weigh those factors and compare them with any other factor that you want to compare them to, there can only be one decision, and

Vol. 23: 108

there can only be one true and honest verdict that is appropriate, and that is that Julius Robinson must receive the death penalty.  Thank you.

THE COURT:  That completes the trial of this case. Entrusted to you are all of those questions that are set before you in the special verdict form.  Mr. Bowen has the original of that form, and he will hand it to the person you designate to be your presiding juror.

We will ask you to retire at this time.  We will ask the alternates to remain behind.

Do you need to go back and get some things?

Go ahead and get those and then come back down and we'll take your telephone numbers again to find you if we need you.

I'll say to the alternates.  Please remember all of the instructions that you have previously been given.  Were one of the jurors to fall ill or otherwise be unable to serve, we would ask you to come back and to serve during deliberations.

We will ask you -- I presume you're going to want to take a lunch break, but you don't have to.  We'll just ask you as you did before to communicate to the rest of us through Mr. Bowen so we can adjust our schedule to yours.

Do any of you have any questions?

(Jury not present)

THE COURT:  Any matter that the parties want to bring to the Court's attention before we recess?

Ex. 8 - 153

# EXHIBIT 9

# COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | ACTION NO. 4:00-CR-260-Y |
| | § | |
| JULIUS OMAR ROBINSON (2) | § | |

SPECIAL VERDICT FORM

Question No. 1:

Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson was eighteen years of age or older at the time of the offenses alleged in the Second Superseding Indictment?

Answer "Yes" or "No."

Answer: __Y_____.

Instruction: If you answered "Yes" to Question No. 1, proceed to Question No. 2. If you answered "No" to Question No. 1, you are finished with your deliberations.

SPECIAL VERDICT FORM - Page 1
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 154**

Question No. 2--Count Three--Killing of Johnny Lee Shelton While Engaging in or Working in Furtherance of a Continuing Criminal Enterprise:

2(A).    Threshold Eligibility Factors

Instruction: If you answer "Yes" to **any** of the four following questions, you may immediately proceed to Question No. 2(B) on the following page.  If you answer "No" to **all** of the four following questions, proceed to Question No. 3.

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally killed Johnny Lee Shelton?

Answer "Yes" or "No."

Answer:____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally inflicted serious bodily injury that resulted in the death of Johnny Lee Shelton?

Answer "Yes" or "No."

Answer:____Y_____.

(3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct intending that Johnny Lee Shelton be killed or that lethal force be employed against Johnny Lee Shelton, which conduct resulted in the death of Johnny Lee Shelton?

Answer "Yes" or "No."

Answer:____Y_____.

(4) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct that he knew would create a grave risk of death to a person, other than one of the participants in the offense, which conduct resulted in the death of Johnny Lee Shelton?

Answer "Yes" or "No."

Answer:____Y_____.

SPECIAL VERDICT FORM - Page 2
chr - 00cr260\robinson\vrdctpunish

2(B).   <u>Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson knowingly created a grave risk of death to one or more persons in addition to the victim, Johnny Lee Shelton?

Answer "Yes" or "No."

Answer:____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Johnny Lee Shelton after substantial planning and premeditation to cause the death of Johnny Lee Shelton?

Answer "Yes" or "No."

Answer:____Y_____.

<u>Instruction:</u> If you answered "Yes" to **either** portion of Question No. 2(B), proceed to Question No. 2(C) on the following page.  If you answered "No" to **both** portions of Question No. 2(B), proceed to Question No. 3.

<u>SPECIAL VERDICT FORM - Page 3</u>
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 156**

Ex. 9 - 157

2(C).  Non-Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Johnny Lee Shelton, poor rehabilitative potential, specific threats, or acts of violence?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer:_____Y_____.

Instruction: Proceed to Question No. 2(D) regardless of how you answered either part of Question No. 2(C).

SPECIAL VERDICT FORM - Page 4
chr - 00cr260\robinson\vrdctpunish

2(D).    Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence.  A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Johnny Lee Shelton?

Number of jurors who so find:____0_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Johnny Lee Shelton, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

Number of jurors who so find:_____0_____

(3) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson could not reasonably have foreseen that his conduct in the course of the killing of Johnny Lee Shelton would cause, or would create a grave risk of causing, death to any person?

Number of jurors who so find: _____0_____

(4) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Johnny Lee Shelton, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: _____1_____

SPECIAL VERDICT FORM - Page 5
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 158**

(5) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Johnny Lee Shelton, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____4_____

(6) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Johnny Lee Shelton, will not be punished by death?

Number of jurors who so find: _____9_____

(7) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

Number of jurors who so find: _____2_____

Instruction: Proceed to Question No. 2(E) regardless of how you answered any part of Question No. 2(D).

SPECIAL VERDICT FORM - Page 6
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 159**

2(E).    Non-Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

Number of jurors who so find:_____5_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____0_____

(3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

Number of jurors who so find: _____4_____

(4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Johnny Lee Shelton consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____3_____

SPECIAL VERDICT FORM - Page 7
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 160**

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Johnny Lee Shelton, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____6_____

(6) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____1_____

(7) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| | 0 |
| | |
| | |
| | |
| | |
| | |
| | |

Instruction: Proceed to Question No. 2(F) regardless of how you answered any part of Question No. 2(E).

SPECIAL VERDICT FORM - Page 8
chr - 00cr260\robinson\vrdctpunish

Ex. 9 - 162

2(F).  Recommendation

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Johnny Lee Shelton while engaging in or working in furtherance of a continuing criminal enterprise:

_____X_____Death

_____Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence

Instruction: Proceed to Question No. 3 regardless of how you answered Question No. 2(F).

SPECIAL VERDICT FORM - Page 9
chr - 00cr260\robinson\vrdctpunish

Question No. 3--Count Three--Killing of Juan Reyes While Engaging in or Working in Furtherance of a Continuing Criminal Enterprise:

3(A).    Threshold Eligibility Factors

Instruction: If you answer "Yes" to **any** of the four following questions, you may immediately proceed to Question No. 3(B) on the following page.  If you answer "No" to **all** of the four following questions, proceed to Question No. 4.

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally killed Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally inflicted serious bodily injury that resulted in the death of Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct intending that Juan Reyes be killed or that lethal force be employed against Juan Reyes, which conduct resulted in the death of Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(4) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct that he knew would create a grave risk of death to a person, other than one of the participants in the offense, which conduct resulted in the death of Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

SPECIAL VERDICT FORM - Page 10
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 163**

3(B).   <u>Statutory Aggravating Factors</u>

    (1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson knowingly created a grave risk of death to one or more persons in addition to the victim, Juan Reyes?

    Answer "Yes" or "No."

    Answer:_____Y_____.

    (2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Juan Reyes after substantial planning and premeditation to cause the death of Juan Reyes?

    Answer "Yes" or "No."

    Answer:_____Y_____.

    (3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Juan Reyes in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Juan Reyes?

    Answer "Yes" or "No."

    Answer:_____Y_____.

    <u>Instruction:</u> If you answered "Yes" to **any** portion of Question No. 3(B), proceed to Question No. 3(C) on the following page. If you answered "No" to **all** portions of Question No. 3(B), proceed to Question No. 4.

<u>SPECIAL VERDICT FORM - Page 11</u>
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 164**

3(C).   <u>Non-Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Juan Reyes, poor rehabilitative potential, specific threats, or acts of violence?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer:_____Y_____.

<u>Instruction:</u> Proceed to Question No. 3(D) regardless of how you answered either part of Question No. 3(C).

SPECIAL VERDICT FORM - Page 12
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 165**

3(D).    <u>Statutory Mitigating Factors</u>

<u>Instruction:</u>  For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence.  A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Juan Reyes?

Number of jurors who so find:_____0_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Juan Reyes, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

Number of jurors who so find:_____0_____

(3) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson could not reasonably have foreseen that his conduct in the course of the killing of Juan Reyes would cause, or would create a grave risk of causing, death to any person?

Number of jurors who so find: _____0_____

(4) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Juan Reyes, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: _____1_____

<u>SPECIAL VERDICT FORM - Page 13</u>
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 166**

(5) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Juan Reyes, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____3_____

(6) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Juan Reyes, will not be punished by death?

Number of jurors who so find: _____12_____

(7) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

Number of jurors who so find: _____1_____

Instruction: Proceed to Question No. 3(E) regardless of how you answered any part of Question No. 3(D).

SPECIAL VERDICT FORM - Page 14
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 167**

3(E).    <u>Non-Statutory Mitigating Factors</u>

     <u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

     (1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

     Number of jurors who so find:_____3_____

     (2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

     Number of jurors who so find: _____0_____

     (3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

     Number of jurors who so find: _____4_____

     (4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Juan Reyes consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

     Number of jurors who so find: _____2_____

<u>SPECIAL VERDICT FORM - Page 15</u>
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 168**

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Juan Reyes, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____2_____

(6) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____3_____

(7) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| _____ | ____0____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

Instruction: Proceed to Question No. 3(F) regardless of how you answered any part of Question No. 3(E).

**Ex. 9 - 169**

3(F).    Recommendation

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Juan Reyes while engaging in or working in furtherance of a continuing criminal enterprise:

_____X_____Death

_____Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence

Instruction: Proceed to Question No. 4 regardless of how you answered Question No. 3(F).

Question No. 4--Count Three--Killing of Rudolfo Resendez While Engaging in or Working in Furtherance of a Continuing Criminal Enterprise:

4(A).    Threshold Eligibility Factors

Instruction: If you answer "Yes" to **either** of the following questions, you may immediately proceed to Question No. 4(B) on the following page.    If you answer "No" to **both** of the following questions, proceed to Question No. 5.

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct intending that Rudolfo Resendez be killed or that lethal force be employed against Rudolfo Resendez, which conduct resulted in the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer: ___*NO*___ .

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct that he knew would create a grave risk of death to a person, other than one of the participants in the offense, which conduct resulted in the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer: ___*Y*___ .

SPECIAL VERDICT FORM - Page 18
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 171**

Ex. 9 - 172

4(B).   Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson participated in the killing of Rudolfo Resendez as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Rudolfo Resendez after substantial planning and premeditation to cause the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer:_____Y_____.

Instruction: If you answered "Yes" to **either** portion of Question No. 4(B), proceed to Question No. 4(C) on the following page.  If you answered "No" to **both** portions of Question No. 4(B), proceed to Question No. 5.

SPECIAL VERDICT FORM - Page 19
chr - 00cr260\robinson\vrdctpunish

4(C).    Non-Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Rudolfo Resendez, poor rehabilitative potential, specific threats, or acts of violence?

Answer "Yes" or "No."

Answer: _____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer: _____Y_____.

Instruction: Proceed to Question No. 4(D) regardless of how you answered any part of Question No. 4(C).

SPECIAL VERDICT FORM - Page 20
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 173**

4(D).   Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence.  A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Rudolfo Resendez?

Number of jurors who so find:____0_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Rudolfo Resendez, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

Number of jurors who so find:____6_____

(3) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson could not reasonably have foreseen that his conduct in the course of the killing of Rudolfo Resendez would cause, or would create a grave risk of causing, death to any person?

Number of jurors who so find: ____1_____

(4) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: ____1_____

SPECIAL VERDICT FORM - Page 21
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 174**

(5) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____3_____

(6) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Rudolfo Resendez, will not be punished by death?

Number of jurors who so find: _____12_____

(7) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

Number of jurors who so find: _____2_____

Instruction: Proceed to Question No. 4(E) regardless of how you answered any part of Question No. 4(D).

SPECIAL VERDICT FORM - Page 22
chr - 00cr260\robinson\vrdctpunish

Ex. 9 - 175

4(E).   Non-Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

Number of jurors who so find:____3____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Number of jurors who so find:____0____

(3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

Number of jurors who so find:____8____

(4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Rudolfo Resendez consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

Number of jurors who so find:____12____

SPECIAL VERDICT FORM - Page 23
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 176**

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Rudolfo Resendez, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: ___12___

(6) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: ___3___

(7) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
|  | 0 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Instruction: Proceed to Question No. 4(F) regardless of how you answered any part of Question No. 4(E).

SPECIAL VERDICT FORM - Page 24
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 177**

**Ex. 9 - 178**

4(F).  <u>Recommendation</u>

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Rudolfo Resendez while engaging in or working in furtherance of a continuing criminal enterprise:

_____Death

\_\_\_\_\_X\_\_\_\_Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence

<u>Instruction:</u> Proceed to Question No. 5 regardless of how you answered Question No. 4(F).

<u>SPECIAL VERDICT FORM - Page 25</u>
chr - 00cr260\robinson\vrdctpunish

Question No. 5--Count Seven--Killing of Johnny Lee Shelton in the Course of Carrying or Using a Firearm During and in Relation to a Drug-Trafficking Crime:

5(A).    Threshold Eligibility Factors

Instruction: If you answer "Yes" to **any** of the four following questions, you may immediately proceed to Question No. 5(B) on the following page.    If you answer "No" to **all** of the four following questions, proceed to Question No. 6.

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally killed Johnny Lee Shelton?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally inflicted serious bodily injury that resulted in the death of Johnny Lee Shelton?

Answer "Yes" or "No."

Answer:_____Y_____.

(3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally participated in an act, contemplating that the life of a person would be taken, or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Johnny Lee Shelton died as a direct result of the act?

Answer "Yes" or "No."

Answer:_____Y_____.

(4) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and Johnny Lee Shelton died as a direct result of the act?

Answer "Yes" or "No."

Answer:_____Y_____.

SPECIAL VERDICT FORM - Page 26
chr - 00cr260\robinson\vrdctpunish

.

5(B).    Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson, in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to Johnny Lee Shelton, the victim of the offense?

Answer "Yes" or "No."

Answer: _____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Johnny Lee Shelton after substantial planning and premeditation to cause the death of Johnny Lee Shelton?

Answer "Yes" or "No."

Answer: _____Y_____.

Instruction: If you answered "Yes" to **either** portion of Question No. 5(B), proceed to Question No. 5(C) on the following page. If you answered "No" to **both** portions of Question No. 5(B), proceed to Question No. 6.

SPECIAL VERDICT FORM - Page 27
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 180**

5(C).    Non-Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Johnny Lee Shelton, poor rehabilitative potential, specific threats, or acts of violence?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer:_____Y_____.

Instruction: Proceed to Question No. 5(D) regardless of how you answered any part of Question No. 5(C).

SPECIAL VERDICT FORM - Page 28
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 181**

5(D). <u>Statutory Mitigating Factors</u>

   <u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

   (1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Johnny Lee Shelton?

   Number of jurors who so find:_____0_____

   (2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Johnny Lee Shelton, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

   Number of jurors who so find:_____0_____

   (3) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Johnny Lee Shelton, will not be punished by death?

   Number of jurors who so find: ____10_____

   (4) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

   Number of jurors who so find: ____1_____

   <u>Instruction:</u> Proceed to Question No. 5(E) regardless of how you answered any part of Question No. 5(D).

**Ex. 9 - 182**

5(E).    Non-Statutory Mitigating Factors

    Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

    (1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

        Number of jurors who so find:_____3_____

    (2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

        Number of jurors who so find: _____0_____

    (3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

        Number of jurors who so find: _____3_____

    (4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Johnny Lee Shelton consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

        Number of jurors who so find: _____1_____

Ex. 9 - 183

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Johnny Lee Shelton, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____10_____

(6) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Johnny Lee Shelton, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: _____1_____

(7) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Johnny Lee Shelton, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____5_____

(8) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____3_____

(9) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

Instruction: Proceed to Question No. 5(F) regardless of how you answered any part of Question No. 5(E).

SPECIAL VERDICT FORM - Page 31
chr - 00cr260\robinson\vrdctpunish

Ex. 9 - 184

Ex. 9 - 185

5(F).    Recommendation

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Johnny Lee Shelton in the course of carrying or using a firearm during and in relation to a drug-trafficking crime:

_____X_____Death

_____Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence


Instruction: Proceed to Question No. 6 regardless of how you answered Question No. 5(F).

Question No. 6--Count Eleven--Killing of Juan Reyes in the Course of Carrying or Using a Firearm During and in Relation to a Drug-Trafficking Crime:

6(A).    Threshold Eligibility Factors

Instruction: If you answer "Yes" to **any** of the four following questions, you may immediately proceed to Question No. 6(B) on the following page.  If you answer "No" to **all** of the four following questions, proceed to Question No. 7.

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally killed Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally inflicted serious bodily injury that resulted in the death of Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally participated in an act, contemplating that the life of a person would be taken, or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Juan Reyes died as a direct result of the act?

Answer "Yes" or "No."

Answer:_____Y_____.

(4) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and Juan Reyes died as a direct result of the act?

Answer "Yes" or "No."

Answer:_____Y_____.

SPECIAL VERDICT FORM - Page 33
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 186**

6(B).    Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson, in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to Juan Reyes, the victim of the offense?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Juan Reyes in an especially heinous, cruel, and depraved manner in that it involved torture or serious physical abuse to Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(3) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Juan Reyes after substantial planning and premeditation to cause the death of Juan Reyes?

Answer "Yes" or "No."

Answer:_____Y_____.

(4) Do you unanimously find beyond a reasonable doubt that, during the killing of Juan Reyes, Julius Omar Robinson intentionally killed or attempted to kill more than one person in a single criminal episode?

Answer "Yes" or "No."

Answer:_____Y_____.

Instruction: If you answered "Yes" to **any** portion of Question No. 6(B), proceed to Question No. 6(C) on the following page. If you answered "No" to **all** portions of Question No. 6(B), proceed to Question No. 7.

SPECIAL VERDICT FORM - Page 34
chr - 00cr260\robinson\vrdctpunish

Ex. 9 - 187

6(C).  <u>Non-Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Juan Reyes, poor rehabilitative potential, and specific threats, and acts of violence?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer:_____Y_____.

<u>Instruction:</u> Proceed to Question No. 6(D) regardless of how you answered any part of Question No. 6(C).

Ex. 9 - 188

6(D). <u>Statutory Mitigating Factors</u>

    <u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

    (1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Juan Reyes?

    Number of jurors who so find:_____0_____

    (2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Juan Reyes, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

    Number of jurors who so find:_____0_____

    (3) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Juan Reyes, will not be punished by death?

    Number of jurors who so find: _____11_____

    (4) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

    Number of jurors who so find: _____2_____

    <u>Instruction:</u> Proceed to Question No. 6(E) regardless of how you answered any part of Question No. 6(D).

**Ex. 9 - 189**

6(E).   Non-Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

Number of jurors who so find:_____3_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____0_____

(3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

Number of jurors who so find: _____4_____

(4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Juan Reyes consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____2_____

Ex. 9 - 190

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Juan Reyes, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____0_____

(6) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Juan Reyes, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: _____1_____

(7) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Juan Reyes, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____4_____

(8) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____3_____

(9) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| | 0 |
| | |
| | |
| | |
| | |

Instruction: Proceed to Question No. 6(F) regardless of how you answered any part of Question No. 6(E).

6(F).  <u>Recommendation</u>

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Juan Reyes in the course of carrying or using a firearm during and in relation to a drug-trafficking crime:

_____X____Death

_____Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence


<u>Instruction:</u> Proceed to Question No. 7 regardless of how you answered Question No. 6(F).

<u>SPECIAL VERDICT FORM - Page 39</u>
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 192**

Question 7--Count Fifteen--Killing of Rudolfo Resendez in the Course of Carrying or Using a Firearm During and in Relation to a Drug-Trafficking Crime:

7(A).    Threshold Eligibility Factor

Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally participated in an act, contemplating that the life of a person would be taken, or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Rudolfo Resendez died as a direct result of the act?

Answer "Yes" or "No."

Answer: _____Y_____.


Instruction: If you answered "Yes" to the question above, proceed to Question No. 7(B) on the following page.    If you answered "No" to question above, proceed to Question No. 8.

SPECIAL VERDICT FORM - Page 40
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 193**

7(B).    Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson, participated in the killing of Rudolfo Resendez as consideration for the receipt, or in the expectation of the receipt of anything of pecuniary value?

Answer "Yes" or "No."

Answer:_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Rudolfo Resendez after substantial planning and premeditation to cause the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer:_____.

Instruction: If you answered "Yes" to **either** portion of Question No. 7(B), proceed to Question No. 7(C) on the following page. If you answered "No" to **both** portions of Question No. 7(B), proceed to Question No. 8.

SPECIAL VERDICT FORM - Page 41
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 194**

7(C).    Non-Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Rudolfo Resendez, poor rehabilitative potential, and specific threats, and acts of violence?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer:_____Y_____.

Instruction: Proceed to Question No. 7(D) regardless of how you answered any part of Question No. 7(C).

SPECIAL VERDICT FORM - Page 42
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 195**

7(D). <u>Statutory Mitigating Factors</u>

 <u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

 (1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Rudolfo Resendez?

 Number of jurors who so find:____0_____

 (2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Rudolfo Resendez, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

 Number of jurors who so find:____1_____

 (3) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Rudolfo Resendez, will not be punished by death?

 Number of jurors who so find: ____12_____

 (4) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

 Number of jurors who so find: ____2_____

 <u>Instruction:</u> Proceed to Question No. 7(E) regardless of how you answered any part of Question No. 7(D).

SPECIAL VERDICT FORM - Page 43
chr - 00cr260\robinson\vrdctpunish

Ex. 9 - 196

7(E).   <u>Non-Statutory Mitigating Factors</u>

<u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

Number of jurors who so find:_____3_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____0_____

(3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

Number of jurors who so find: _____4_____

(4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Rudolfo Resendez consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____10_____

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Rudolfo Resendez, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____12_____

(6) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: _____1_____

(7) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____5_____

(8) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____3_____

(9) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| _____ | 0 |
| _____ | ___ |
| _____ | ___ |
| _____ | ___ |
| _____ | ___ |

Instruction: Proceed to Question No. 7(F) regardless of how you answered any part of Question No. 7(E).

SPECIAL VERDICT FORM - Page 45
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 198**

7(F).    <u>Recommendation</u>

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Rudolfo Resendez in the course of carrying or using a firearm during and in relation to a drug-trafficking crime:

_____Death

_____X_____Life Imprisonment Without Possibility of Release

_____Some Other Lesser Sentence

<u>Instruction:</u> Proceed to Question No. 8 regardless of how you answered Question No. 7(F).

SPECIAL VERDICT FORM - Page 46
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 199**

Question No. 8--Count Twelve--Killing of Rudolfo Resendez While Engaging In Drug-Trafficking Crime:

8(A).    Threshold Eligibility Factors

Instruction: If you answer "Yes" to **either** of the following questions, you may immediately proceed to Question No. 8(B) on the following page.   If you answer "No" to **both** of the following questions, proceed to the next-to-last page of this Special Verdict Form.

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct intending that Rudolfo Resendez be killed or that lethal force be employed against Rudolfo Resendez, which conduct resulted in the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer: _____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson intentionally engaged in conduct that he knew would create a grave risk of death to a person, other than one of the participants in the offense, and that resulted in the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer: _____Y_____.

SPECIAL VERDICT FORM - Page 47
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 200**

8(B).    Statutory Aggravating Factors

(1)  Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson, participated in the killing of Rudolfo Resendez as consideration for the receipt, or in the expectation of the receipt of anything of pecuniary value?

Answer "Yes" or "No."

Answer:_____.

(2)  Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson committed the offense against Rudolfo Resendez after substantial planning and premeditation to cause the death of Rudolfo Resendez?

Answer "Yes" or "No."

Answer:_____.

Instruction:  If you answered "Yes" to **either** portion of Question No. 8(B), proceed to Question No. 8(C) on the following page.  If you answered "No" to **both** portions of Question No. 8(B), proceed to the next-to-last page of this Special Verdict Form.

SPECIAL VERDICT FORM - Page 48
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 201**

Ex. 9 - 202

8(C).   Non-Statutory Aggravating Factors

(1) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson is a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the killing of Rudolfo Resendez, poor rehabilitative potential, specific threats, and acts of violence?

Answer "Yes" or "No."

Answer:_____Y_____.

(2) Do you unanimously find beyond a reasonable doubt that Julius Omar Robinson engaged in a prior act of violence, namely discharging a firearm at Sara Tucker on February 7, 1995?

Answer "Yes" or "No."

Answer:_____Y_____.

Instruction: Proceed to Question No. 8(D) regardless of how you answered any part of Question No. 8(C).

SPECIAL VERDICT FORM - Page 49
chr - 00cr260\robinson\vrdctpunish

8(D).   Statutory Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, as to the killing of Rudolfo Resendez?

Number of jurors who so find:____0_____

(2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson is punishable as a principal in the killing of Rudolfo Resendez, which killing was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge?

Number of jurors who so find:_____6_____

(3) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson could not reasonably have foreseen that his conduct in the course of the killing of Rudolfo Resendez would cause, or would create a grave risk of causing, death to any person?

Number of jurors who so find: ____0_____

(4) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson was youthful, although not under the age of eighteen?

Number of jurors who so find: ____1_____

SPECIAL VERDICT FORM - Page 50
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 203**

(5) Do **any** of you find by a preponderance of the evidence that at the time of the killing of Rudolfo Resendez, Julius Omar Robinson did not have a significant prior criminal record?

Number of jurors who so find: _____4_____

(6) Do **any** of you find by a preponderance of the evidence that another defendant or defendants, equally culpable in the killing of Rudolfo Resendez, will not be punished by death?

Number of jurors who so find: _____12_____

(7) Do **any** of you find by a preponderance of the evidence that other factors in Julius Omar Robinson's background or character mitigate against imposition of the death penalty?

Number of jurors who so find: _____2_____

Instruction: Proceed to Question No. 8(E) regardless of how you answered any part of Question No. 8(D).

SPECIAL VERDICT FORM - Page 51
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 204**

8(E).    <u>Non-Statutory Mitigating Factors</u>

    <u>Instruction:</u> For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence. A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

    (1) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson has exhibited good behavior in a jail, prison, institutional setting, or other structured environment and would adapt to prison if he were sentenced to life imprisonment without the possibility of release or parole, and that this mitigates against imposition of the death penalty?

    Number of jurors who so find:_____3_____

    (2) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson was subjected to emotional abuse, abandonment, or neglect as a child and was deprived of the parental guidance and protection that he needed, and that this mitigates against imposition of the death penalty?

    Number of jurors who so find: _____0_____

    (3) Do **any** of you find by a preponderance of the evidence that the fact that Julius Omar Robinson can be sentenced to life in prison without any possibility of parole or release if he is not executed mitigates against imposition of the death penalty?

    Number of jurors who so find: _____1_____

    (4) Do **any** of you find by a preponderance of the evidence that a substantial portion of the evidence against Julius Omar Robinson regarding the killing of Rudolfo Resendez consisted of the testimony of either accomplices in the killing and/or persons who have made agreements with the government in expectation of possible leniency for their criminal conduct, and that this mitigates against imposition of the death penalty?

    Number of jurors who so find: _____9_____

<u>SPECIAL VERDICT FORM - Page 52</u>
chr - 00cr260\robinson\vrdctpunish

Ex. 9 - 205

(5) Do **any** of you find by a preponderance of the evidence that there was little or no physical evidence against Julius Omar Robinson linking him to or proving his involvement in the killing of Rudolfo Resendez, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____11_____

(6) Do **any** of you find by a preponderance of the evidence that Julius Omar Robinson presents a low risk of harm to others in a prison or institutional setting, and that this mitigates against imposition of the death penalty?

Number of jurors who so find: _____3_____

(7) Do **any** of you find by a preponderance of the evidence the existence of any other mitigating factor, outside of those provided for by statute or proposed by Julius Omar Robinson?

| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| | 0 |
| | |
| | |
| | |
| | |
| | |
| | |

Instruction: Proceed to Question No. 8(F) regardless of how you answered any part of Question No. 8(E).

SPECIAL VERDICT FORM - Page 53
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 206**

Ex. 9 - 207

8(F).   Recommendation

      Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend, by unanimous vote, that Julius Omar Robinson should be sentenced as follows for the killing of Rudolfo Resendez while engaging in a drug-trafficking crime:

      _____Death

      _____X\_\_\_\_\_Life Imprisonment Without Possibility of Release

      _____Some Other Lesser Sentence


Instruction: Proceed to the next page.


SPECIAL VERDICT FORM - Page 54
chr - 00cr260\robinson\vrdctpunish

The answers to the preceding questions represent the verdict of the jury.

_____/s/_____          _____3-18-02_____
Presiding Juror                          Date


      Instruction: Proceed to the next page.

SPECIAL VERDICT FORM - Page 55
chr - 00cr260\robinson\vrdctpunish

**Ex. 9 - 208**

Ex. 9 - 209

Certification:

By signing below, each juror certifies that, in considering whether a sentence of death is justified, consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decisions, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim.

**SIGNATURES OF ALL JURORS:**

_/s/_

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

PRESIDING JUROR

Date: _3/8-0L_

SPECIAL VERDICT FORM - Page 56
chr - 00cr260\robinson\vrdctpunish

# EXHIBIT 10

DECLARATION OF KEITH EDINGTON

I, Keith Edington, Declare:

1.  I was born on November 23, 1982, and grew up in Dermott, Arkansas. As a kid, I looked up to Julius Robinson. He is about six years older than me, and he was always good at sports back in Dermott. ████████████████████████ ████████████████████████████ I have never been involved in any financial dealings with Julius Robinson.

2.  I recall the December 28, 2000 incident involving Michael "*One Love*" Williams. I have been told that the prosecutor in Julius Robinson's capital case argued that Kentrel Pitts, Wayne Jordan and I received an order from Julius Robinson to kill One Love. That is not true. We were seventeen years old at the time and had no relationship with Julius, other than being from the same town. We did not take orders from him. We did not take orders from anyone.

3.  I have been told that One Love testified that he took the three of us to a bank to get some money. That is not true. I have never been to a bank with One Love.

4.  What I know about the incident is this: I heard Kentrel bought some bad drugs from One Love. I was not there when the purchase was made. The next day, Wayne, Kentrel and I were chillin' on the corner, near the projects in Dermott. I think it was the corner of Walnut and Maple. Kentrel spotted One Love and approached him. Kentrel told him he wanted his money back. We rode around in One Love's car for awhile and then went to a house. One Love and Kentrel went inside to get

1

**Ex. 10 - 210**

*A short time later, ~~X. Edgr~~*

Kentrel's money. ~~████████████████~~ Kentrel came out. We left without Kentrel getting his money.

5.      Later, the police arrested us and said that One Love had accused us of trying to rob him.

6.      I have been shown One Love's handwritten statement in the police report. My nickname back then was "*Little Black.*" However, I did not make the statement One Love says I did. I never told One Love we were going to kill him. That is a lie.

7.      In October of 2005, I was contacted by an investigator from the Office of the Federal Public Defender. Prior to that time, I had never been contacted regarding Julius Robinson's capital case. If I had been contacted earlier, I would have provided all of the information in this declaration.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

_10/22_, 2005

_____
KEITH EDINGTON

2

**Ex. 10 - 211**

## DECLARATION OF WAYNE JORDAN

I, Wayne Jordan, Declare:

1.    I was born on December 15, 1982, and grew up in Dermott, Arkansas. I knew Julius Robinson and his family, but because I was about six years younger than Julius, I didn't hang out with him as a kid. I did hang out with a couple of guys that are related to Julius, Cliff Holiman and Antonio Ford.

2.    I remember an incident that occurred in late December of 2000 involving Michael Williams, also known as *One Love*. That day, I was walking up Maple, toward Main Street, in Dermott, and I ran into a friend of mine named Alquantis Kentrel Pitts, who goes by *Kentrel*. My recollection is that another friend of ours, Keith Eddington, was with Kentrel at the time.

3.    Kentrel said that he had purchased some crack cocaine from One Love either earlier that day or the day before, and the crack was bad. It was mostly baking soda.

4.    I used to sell drugs for One Love, and I knew that he would sell bad drugs from time to time. I never sold drugs for Julius Robinson, nor did I ever have any financial dealings with him.

5.    Kentrel wanted to find One Love and confront him about the bad drugs.

6.    Keith, Kentrel, and I walked up Maple and encountered One Love, in a car with Louis Johnson, near the intersection of Maple and Walnut.

7.    Kentrel confronted One Love about the bad drugs. One Love offered to replace the drugs or refund Kentrel's money. Kentrel said he wanted his money back.

1

W.J

**Ex. 10 - 212**

8. During the confrontation, I did not see any gun.

9. Kentrel got into the car with One Love and they drove off. I don't know where they went. If someone later told me where they went, I don't remember.

10. A short time later, Kentrel and One Love returned. Keith and I got in the car with them and we drove to a house that I believe was owned by One Love's grandparents.

11. One Love and Kentrel went into the house to get the money. Keith and I got out of the car, and sat on the hood to wait.

12. After a little while, I heard a *thump* or *bonk* noise from inside the house. Then I heard some shouting. Someone was yelling about being robbed.

13. Kentrel came out of the house, followed by One Love and some of his relatives.

14. Keith, Kentrel, and I walked away from the house.

15. At no time during the entire incident did I hear anyone threaten to kill One Love, nor did I hear anyone make any comment about One Love providing information or giving testimony against Julius Robinson.

16. I was arrested in connection with the incident, and charged with attempted robbery. I spend a couple of days in jail and ultimately was put on probation. I knew that it had not been a robbery attempt, but after the whole thing dragged on for awhile, I decided it wasn't worth it to try to fight the case.

17. In October of 2005, I was contacted by an investigator from the Office of the Federal Public Defender. Prior to that time, I had never been contacted regarding Julius Robinson's capital case. If I had been contacted earlier, I would have

2

W.5

**Ex. 10 - 213**

provided all of the information provided in this declaration.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

_10/20_____, 2005                                          Wayne Jordan

                                                          WAYNE JORDAN

3

**Ex. 10 - 214**

## DECLARATION OF ALQUANTIS KENTREL PITTS

I, Alquantis Pitts, Declare:

1. I was born on April 15, 1983, and grew up in Dermott, Arkansas.

2. In December of 2000, I was living with my girlfriend, LaToya, at 201 E. Hickory, apartment 1, in Dermott. At that time, I owned a 1987 Cadillac DeVille, but the manager of my apartment building had it towed away. I needed $60 to get my car back.

3. I new that Michael "*One Love*" Williams was someone who would have cash. He was a drug dealer in Dermott who had a reputation of cheating people on drug deals. For example, he would *Blow up* his cocaine, mixing it with baking soda, so that he would have more to sell and increase his profits at the expense of his customers. I decided to rob One Love to get money to get my car back.

4. I went and got my friend, Keith Edington, and we were joined by another friend, Wayne Jordan. Wayne used to sell drugs for One Love, but he stopped when One Love didn't pay him on a deal. We went looking for One Love.

5. We found One Love in a car, with Louis Johnson and Skip Thompson, on a dead end street by the trailer park in Dermott. I called Louis and Skip out of the car and told them that if they didn't want to get robbed they should move on. They walked away.

6. I went to the driver's side window and asked One Love if he had an 8-ball of crack cocaine. He said that he was sold out. Then I pulled my .38 Special and told him I

1

**Ex. 10 - 215**

wanted money. At first, he thought I was joking, so I hit him in the side of the head to show him I was serious. I told him to slide over, and I got in the driver's seat. I told Keith and Wayne to get in the car, and they climbed into the back seat.

7. I had Keith and Wayne shake One Love down, but he only had about $17 dollars on him. One Love said he had $1,500 in an account at the Simmons First bank, in Dermott, so we decided to go there and have him make a withdrawal.

8. When we got to the bank, One Love wanted me to go in with him. I didn't think that was a good idea. One Love said he had some more money at his grandfather's house on Drew Street, so we went there.

9. On the way to his grandfather's house, Keith said something about One Love snitching on people in Texas and that he ought to be killed for it. Keith was just talking. We had not been given any order to kill One Love. Keith was just stating his opinion. I have never had any business dealing with Julius Robinson, nor have I ever received any kind of order from him.

10. About two weeks prior to this incident, I had gambled with One Love and won $500 and a shotgun from him. A week later, we gambled again and One Love won the money and the shotgun back. As we were driving to his grandfather's house, I told One Love I wanted the shotgun in addition to some money.

11. When we got to the grandfather's house, One Love's brother, Jose Thompson, came to the car. One Love told him to get the shotgun. He went next door, got the empty shotgun and brought it to the car. He handed it to One Love, who handed it to Keith and Wayne in the back seat.

2



12.     One Love's grandfather came out of the house. One Love told him to get the yellow envelopes on his computer, and the grandfather went to get them. When he came back, he had the wrong envelopes. One Love said he would go in and get the money, so I went into the house with him.

13.     We went back to where the computer was, and One Love began unscrewing a plate from the back of the computer. I stopped paying attention and One Love rushed me.

14.     The gun in my pants fell down my pant leg when One Love wrapped his arms around me. We fell to the floor and he started yelling that he was being robbed. I was able to get hold of the gun. I hit One Love on the leg with the gun and he let go of me. I ran to the front of the house, kicked open the door, and ran into the yard. I told Keith and Wayne to get out of the car, and we ran off.

15.     About two weeks later, I was arrested for the incident. While I was at the jail, Officer Bryson hit me in the face. My face swelled up and I was seen by a doctor. My father cut a deal with the Chief of Police, Carl McCree. I agreed to *not* sue the police department and they agreed to drop the robbery charges.

16.     In October of 2005, I was contacted by an investigator from the Office of the Federal Public Defender. Prior to that time, I had never been contacted by any member of Julius Robinson's defense team. If I had been contacted earlier, I

3

**Ex. 10 - 217**

would have provided all of the information in this declaration.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

October 27, 2005

ALQUANTIS PITTS

4

**Ex. 10 - 218**

# EXHIBIT 11

DECLARTION OF MICHAEL WILLIAMS

I, Michael Williams, Declare:

1.    I was born on June 17, 1970, and grew up in Dermott, Arkansas.

2.    On December 28, 2000, I was involved in an incident in Dermott which resulted in a police report being filed against three young men: Kentrel Pitts, Wayne Jordan, and Keith Edington.

3.    I believe that young men wanted money from me, and that this was the cause of the incident. I do not believe that they had been ordered by Julius Robinson to kill me. If they had been ordered to kill me, or if they had really wanted to kill me for some other reason, I would have been killed on that date. It was three against one, and they had a gun.

4.    The young men knew that I kept large sums of money. Back then, I was a drug dealer. One of the young men, Wayne Jordan, actually sold drugs for me from time to time. I would have him pick up drug payments and bring them to me. These sometimes reached as high as $800. So the young men knew I kept large amounts of cash.

5.    While we were riding in my car, the young men said things about my cooperating with the prosecution in the Julius Robinson capital case. They said that I had *snitched* and that they ought to kill me. I think they said these things to scare me and to convince me that they meant business. I think they were trying to justify going after my money.

1

6.    In October of 2005, I was contacted by an investigator from the Office of the

Federal Public Defender.  I don't recall being interviewed about the December 28,

2000 incident by any member of Julius Robinson's defense team before.  If I had

been contacted earlier, I would have provided all of the information in this

declaration.

I declare under penalty of perjury, under the laws of the United States of America, that the

foregoing is true and correct.

_10/22_, 2005

_____
MICHAEL WILLIAMS

2

# EXHIBIT 12

## DECLARATION OF MARK A. BEZY

I, MARK A. BEZY, do state and declare as follows:

I am over the age of eighteen, and I am competent to testify to the matters stated herein. The statements in this affidavit are based upon my personal knowledge.

**Experience and Expertise**

I am the principal/owner of Mark A. Bezy and Associates, LLC, a consulting firm specializing in corrections management; conditions of confinement; correctional facility activation, operation, and management; inmate transportation; correctional work programs; prison gangs and security threat groups; and institutional disturbances and crisis management.

Prior to establishing Bezy and Associates, I was employed by the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006. I began my BOP career as a correctional officer at the Federal Correctional Institution in Oxford, Wisconsin. Five years later, I was promoted to the rank of lieutenant and served in that capacity at the Federal Prison Camp in Duluth, Minnesota and the Federal Correctional Institution in Phoenix, Arizona. In 1988, I was promoted to the rank of captain and served in that capacity at the Federal Correctional Institution in Ray Brook, New York, the Federal Medical Center in Lexington, Kentucky, and the United States Penitentiary in Marion, Illinois ("USP-Marion").

At the time I served as a captain at USP-Marion, that facility was the highest-security federal correctional facility in the country. USP-Marion housed many of what

1

Ex. 12 - 221

were considered the most incorrigible and difficult inmates in the BOP and did so under highly secure and restrictive conditions of confinement.  This included, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.  At USP-Marion, I was a member of the review and classification committee for the movement of high-security inmates through the facility's step-down process.

While the hope of the BOP was that inmates sent to the general population at USP-Marion would modify their behavior and program out of USP-Marion to a mainstream maximum-security facility after completing the three year program and staff determining the inmate no longer posed a threat to the institution's safety and security needs, including the safety and security of staff, other inmates, and the public.  There were many inmates who were housed at USP-Marion for much longer and were unable to transfer out of the program after staff have determined the inmate is no longer a threat to staff, inmates or the public.  The BOP recognized that a small percentage of individuals would most likely require such restrictive security measures during the entire term of their incarceration because of the continuous danger they posed.  These inmates, such as T.D. Bingham, Barry Mills, and Jeff Fort, were later transferred directly to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado ("ADX") when that facility opened in 1994, where they remain today.  Although many inmates came to USP-Marion as a result of a demonstrated inability to function in other, less-restrictive environments, a number, such as John

2

Gotti, came directly to USP-Marion from the sentencing court.

From 1995 to 1999, I served as correctional services administrator for the BOP North Central Regional Office in Kansas City, Kansas. In that management position, I provided on-site advice and consultation to 18 BOP facilities in that region. I also created and implemented the tactical inmate movement plan for "Flo-Max II," the final movement of high-security offenders from USP-Marion to ADX. In this position, I administered the disciplinary transfer program and was responsible for evaluating and classifying all disciplinary transfers and close supervision and protective custody cases – some 4,000 cases in all.

In 1999, I was named Associate Warden at the United States Penitentiary in Leavenworth, Kansas, an institution housing nearly 2,500 inmates. At Leavenworth, I directed the "KC Model Program" which effectively managed disruptive and predatory inmates within the general population through identification, classification, and housing changes. The KC Model Program has since been successfully implemented in other penitentiaries.

I was named the Chief Executive Officer (Warden) of the Federal Correctional Institution in Elkton, Ohio in 2002. I managed the safe and secure operation of this low-security facility and was responsible for providing programs and services to 2,300 adult male offenders. I supervised a staff of 300 and managed an annual budget of $42 million.

In August 2004, I became Chief Executive Officer (Warden) of the Federal

3

**Ex. 12 - 223**

Correctional Complex at Terre Haute, Indiana ("FCC-Terre Haute"). At FCC-Terre Haute, I managed programs and services provided to 1,500 adult male high-security offenders at the U.S. Penitentiary ("USP-Terre Haute"), 1,200 adult male medium-security offenders at the Federal Correctional Institution, 450 minimum-security adult male offenders at the Federal Prison Camp and 37 adult offenders under the sentence of death, including Julius Omar Robinson. I oversaw 675 personnel and managed an annual budget of $64 million. At FCC–Terre Haute, I implemented a number of security enhancements that have now been adopted throughout the BOP. Moreover, I managed several emergency situations that occurred while I was warden at FCC-Terre Haute, including a homicide and numerous inmate assaults and emergency lockdowns. As warden, I received top-secret clearance in order to review classified documents relating to particular inmates.

I received a number of awards during my service with the BOP, including being selected for the Senior Executive Services, a merit-based special compensation program; being named Associate Warden of the Year for the North Central Region in 2001; and receiving the Director's Award in 1997 for my contributions to security technology. As that honor demonstrates, I am very familiar with the security capacity of BOP facilities and have in fact pioneered the use of some of the security protocols and equipment that the BOP maintains to this day.

For example, when I activated the current USP-Terre Haute in March 2005, that facility was the first in the nation to deploy a wireless microwave camera system. That

4

system was part of my changes in the deployment and accessibility of emergency response equipment which were designed to allow the facility to deal better with serious disturbances. Other facilities adopted the use of wireless microwave camera systems. In fact, the equipment at USP-Terre Haute was transferred to and installed at ADX after I retired from BOP.

I retired from the BOP in October 2006. After my retirement, I served as the warden of Central Arizona Correctional Facility, a private prison for sex offenders in Florence, Arizona. A copy of my Curriculum Vitae is attached hereto as Attachment 1.

I have been certified as an expert in BOP policies and procedures in a number of federal court districts and in the state of Arkansas.

**Referral Question**

In the instant case, I have been retained by counsel for Julius Omar Robinson and have been asked to provide my opinion and evaluation, based on my thirty-year history in corrections, regarding the following matters:

1. The ability of the Bureau of Prisons to neutralize inmates deemed to be a threat to institutional security as well as a threat to the safety and well-being of individuals outside prison walls at the time of Mr. Robinson's 2002 trial, and

2. The risk of future danger posed by Mr. Robinson, considering BOP policies and practices at the time of his trial, Mr. Robinson's history in institutional settings, and the circumstances of the crimes of which Mr.

5

Robinson was convicted.

In the course of my evaluation, I have reviewed the following materials:

- Federal Bureau of Prisons records relating to Mr. Robinson's confinement before and during trial at the Federal Medical Complex in Fort Worth, Texas ("FMC-Fort Worth") and his post-trial incarceration at USP-Terre Haute up to November, 2017.

- Portions of the trial record, including the closing argument and rebuttal statements of the government at the penalty portion of Mr. Robinson's trial and the testimony of Peter Carlson, Ph.D.;

- Transcript of Mr. Robinson's Phone Call

- Declarations of Michael Williams, Keith Eddington, Kentrel Pitts, and Wayne Jordan; and

- BOP regulations and Program Statements.

- Program Statement 5212.07 Control Unit

- Program Statement 5265.14 Correspondence

- Program Statement 5270.09 Inmate Discipline

- Program Statement 5270.011 Special Housing Unit

- Program Statement 5264.08 Inmate Telephone

- Program Statement 5227.02 Special Management Units

- Program Statement 5100.08 Inmate Security Designation and Custody

6

Management

- Program Statement 5214 Communication Management Units

- Institutional Supplement 5321.07 General Population and Step Down Program Operations

Any expert called to answer the queries posed by Mr. Robinson's current counsel would reasonably rely upon all of the above materials.

**Expert Opinion**

**Background**

The BOP's primary mission is to safely and securely house individuals accused and/or convicted of federal criminal offenses, ranging from nonviolent drug and fraud-related offenses to more serious offenses, such as treason, acts of terrorism, racketeering, and murder. Inmates in federal custody are classified according to a number of factors, including: their criminal history; history and circumstances of incarceration; the circumstances of the current offense(s); affiliations with gangs, militant organizations, or other security threat groups; medical and mental health needs; and length of sentence(s) for the current offenses. The stated purpose of the BOP's classification scheme is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." Program Statement 5100.08, p. 1.

As it had during my entire tenure, the BOP retains a great deal of discretion to fashion conditions of confinement and classify inmates to meet its penological

7

**Ex. 12 - 227**

objectives and mission. The BOP's discretion is not absolute – it must comply with the United States Constitution as well as those mandates handed down by Congress, the courts, and the Department of Justice. In keeping with these principles, the BOP has many tools in its arsenal that it may use to deal with inmates presenting both commonplace and extraordinary threats to the security of prison staff, other inmates, and those in society at large.

Based on my experience at the BOP (including the orders I gave and the conditions of confinement I observed, administered, and imposed), there is no doubt that the BOP has, at all times, the authority and ability to house inmates in the most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's future dangerousness. This includes, but is not limited to, housing inmates in conditions of confinement where they do not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or by mail. The BOP can, and does, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deems it necessary to do so for the security of prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" – not "rights" – so they can be taken away whenever it is deemed necessary. Moreover, these strict conditions of confinement can be, and are, imposed for as long as the BOP deems it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

8

**Ex. 12 - 228**

## Inmate Classification and Placement

One way in which the BOP addresses the dangers posed by prisoners is through the initial classification process. At the time of Mr. Robinson's trial in 2002 (the same is true today), inmates convicted of federal offenses could, generally speaking, be sent to four types of federal institutions (in increasing order of security): (1) Federal Prison Camps (minimum security); (2) Federal Correctional Institutions (low/medium security); (3) United States Penitentiaries (high security); and (4) ADX (Administrative high security/control unit).[1] Due to the circumstances of Mr. Robinson's offenses and his sentence being greater than thirty years, he would have not been eligible for placement anywhere less secure than a United States Penitentiary.

As described further below, in my professional opinion, ADX is a facility that maintains security protocols capable of neutralizing the threats of future danger that the Government alleged warranted Mr. Robinson's death sentence. In other words, placement at this facility could have effectively limited his contact with any individual within or without the confines of the prison.

Although direct court commitments to ADX[2] are not the norm, they are not

---

[1] There are a number of other specialty prisons, such as medical and reception centers, but the vast majority of federal inmates have no contact with these specialty institutions.

[2] When I refer to a direct court commitment to ADX, I am referring to the BOP's ability to designate a criminal defendant to ADX directly from the location of the defendant's pre-trial custodial confinement. A direct court commitment can be instituted either by the trial judge, the BOP, or at the recommendation of the prosecuting United States Attorney's Office.

9

**Ex. 12 - 229**

prohibited, either. While the vast majority of ADX inmates come directly from other institutions, approximately ten percent of ADX inmates were direct court commitments at the time of Mr. Robinson's trial.[3] Given the circumstances of his current convictions, his history, and his alleged attempt to orchestrate a hit on a government witness from jail, Mr. Robinson is one of those few inmates eligible for direct court commitment to ADX. The testimony of the Government's expert, Dr. Peter Carlson, was somewhat misleading on this point. For example, his statement that: "The Ad-Max program is totally based upon [the inmate's] historical performance in an institution" is false. 22 RT 122:8-10. His statement that "There are a few inmates who are designated directly into the Ad-Max, but there are very few," is generally accurate, although his statement that 99% of the Ad-Max population consisted of inmates from other high security institutions was false. 22 RT 122:11-13, 22 RT 109:221-25.

The more misleading aspect of Dr. Carlson's testimony, however, is the notion that the BOP is powerless to prohibit specific inmates from committing serious crimes while incarcerated. That notion is false. ADX is the most restrictive facility in the federal prison system. All the cells at that facility – whether they are in the general-population area of the prison or in the control unit – hold a single inmate. Generally,

---

[3] In a capital trial that occurred approximately two years before Mr. Robinson's (*United States v. Dean Beckford, et al*), former ADX Associate Warden John Vanyur, Ph.D. testified that some nine percent of ADX's 388 inmates were direct court commitments. That nine percent was composed of "very special cases, typically, high ranking organized crime figures, high ranking drug cartel individuals or international terrorists." Transcript. at 5.

10

from 1994 to 2005, inmates in general population at ADX had the opportunity to recreate with other inmates, but there was no requirement that they be allowed to do so (and, as will be illustrated below, there are a multitude of examples where inmates are prohibited from congregating or having any contact whatsoever with other inmates). In 2005, an inmate in general population was murdered during group recreation and, as a result of the homicide, single recreation enclosures were constructed and all general population recreation is one inmate per recreation enclosure (single recreation). Moreover, those in the control unit have no opportunity to recreate or otherwise have limited contact through woven steel material of the enclosures with other inmates and have no human contact with anyone, except guards during feeding recreation escort and normal unit activities. Given the nature of Mr. Robinson's convictions and the allegations of his pretrial misconduct, had Mr. Robinson been sentenced to life in prison, ADX placement would have been an option if the Government felt it was warranted.

However, regardless of whether Mr. Robinson was eligible for placement in ADX's general-population unit or its control unit, the BOP would have retained the ability to craft conditions of confinement that would have neutralized any risk of threats presented by Mr. Robinson. Indeed, the BOP individualizes confinement conditions on a regular basis. Dr. Carlson's trial testimony was seriously in error on this point. (*See generally* 22 RT 115:17-117:16; *see especially* 115:22-223 ("The normal routine in a United States Penitentiary would be to run a very open institution with the controlled

11

**Ex. 12 - 231**

security envelope".); 116:6-10 ("Following the evening count at 4:00 p.m., if they don't have an evening work assignment, the typical inmate's day ends as far as their assigned work, and they are then free for evening recreational activities throughout the facility. It's a rather open environment for the most part."); 116:22-117:16 ("During their off-duty hour, inmates have reasonable access to outside telephones ... it's, basically, fairly open and difficult to control given the lack of technology today in terms of third person phone calls connecting to an approved person and letting that person then connect you to somebody else... it's a public safety problem that they struggle with in terms of having a kingpin locked up who wants to continue directing illegal activities outside."). Dr. Carlson's testimony improperly advanced an either/or proposition – i.e., either an individual is sentenced to death (or incarcerated at ADX) or he receives a great deal of freedom. However, his characterizations of the security measures available in a United States Penitentiary are, at best, serious misstatements and, at worst, gross distortions and mischaracterizations of the BOP's role, function, and abilities to house prisoners under secure and restrictive conditions of confinement at the time of Mr. Robinson's trial and presently.

For many years, the BOP has maintained and set aside facilities, units, and cells for difficult and dangerous inmates. For example, ADX and other prisons have cells that are termed "side pockets." These side pockets, which are isolated and restrictive to confine an inmate who needs that level of restrictive confinement. For example, Luis Felipe – considered by the Court and BOP to be exceptionally dangerous and sent to

12

ADX directly by the sentencing court – was placed in Range 13, a side pocket at ADX immediately upon receipt there. In the side pocket, Felipe was kept in total isolation from other inmates and all of his communications were strictly monitored.

These strict conditions are not solely the province of ADX, nor are they unusual or novel. Every prison in the federal system has the ability, policies, and procedures to guard against future acts of violence by prisoners confined in BOP prisons. As discussed further below, these include imposing restrictions on contact with people on the outside by telephone and mail. Yet Dr. Carlson's testimony omits entirely any discussion of federal penitentiaries having these abilities.

For example, USP-Marion had what it termed the "K-Unit" from at least the mid-1980s through the mid-1990s. The K-Unit held inmates who posed a high security risk and housed them under extremely strict conditions of confinement. These inmates were held in single cells, recreated by themselves, and had no contact with other inmates. One officer was responsible for monitoring six inmates (a very low guard-to-inmate ratio). Additionally, K-Unit inmates conducted their work (electronic cable assembly) in their cells instead of reporting to a workshop within the prison. Inmates housed in the K-Unit due to security and/or future-dangerousness concerns included convicted spies John Walker and Jonathan Pollard and former CIA operatives Ed Wilson and Christopher Boyce. These inmates were held in the K-Unit for as long as the BOP deemed it necessary to ensure secure operation of the facility and to minimize their future dangerousness.

13

Furthermore, USP-Marion maintained an inmate housing unit called the "I-Up Unit." David Sahakian, an inmate affiliated with Aryan Brotherhood, was accused of serious crimes, including ordering the murders of others. Sahakian was held in the I-Up Unit during his pretrial detention in the mid-2000s in order to protect others and ensure that he did not commit, order, or direct any additional criminal activity. Sahakian and another Aryan Brotherhood members were separated from the rest of the prison population (they were held on the top floor of the prison hospital) and were continuously monitored by an officer. The conditions of confinement created by the BOP for Sahakian were certainly available at the time of Mr. Robinson's trial in 2002.

As a result, the prosecutor's penalty phase closing argument to the jury that Mr. Robinson poses a future danger "because with the telephone available to him as will be available to him at any prison setting, he is prepared to carry out whatever it takes to seek revenge on anybody" (23 RT 105:6-9) is false. Indeed, Title 18 of the United States Code, Section 3582(d) allowed the prosecutor to move the trial court for an order restricting Mr. Robinson's ability to communicate with specified persons as part of his sentence. 18 U.S.C. § 3582(d). I understand that the prosecutor did not make a motion under Section 3582, nor did the prosecutor request the BOP place Mr. Robinson on any communication restrictions during or after the trial.

The BOP has used other facilities within the system to hold pretrial defendants with special security needs. For example, Timothy McVeigh and Terry Nichols were held at the Federal Correctional Institution at Englewood, Colorado prior to their trials

14

**Ex. 12 - 234**

on charges stemming from the 1995 bombing of the federal building in Oklahoma City, Oklahoma. An entire wing of the facility was cleared out to accommodate the two defendants.

There are numerous other examples of individuals who have been subject to special security measures due to the special challenges that they present. Rodney Hamrick, a convicted bomber, was housed at USP-Marion when I worked there. I recall that all of Hamrick's mail was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Former Panamanian leader Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the risk that he would order crimes or violence while incarcerated. Other inmates that have or continue to be housed under very strict conditions of confinement due to security concerns include T.D. Bingham, Barry Mills, Thomas Silverstein, Clayton Fountain, Eric Rudolph, Ramzi Yousef, Anthony Jones, Terry Nichols, Theodore Kaczynski, and Dzhokhar Tsarnaev. Silverstein has been held in conditions at various prisons – including USP-Atlanta, USP-Leavenworth, USP-Marion, and ADX – where he has had virtually no human contact since the 1980s. Although many of these individuals have shown an inability to adjust to incarceration in the federal prison system, the strict conditions of confinement detailed above have successfully lessened the risk that these inmates pose to other individuals.

Additionally, the BOP maintains specialty units at various prisons that are designed to deal with problematic inmates. Dr. Carlson's testimony omitted any

15

**Ex. 12 - 235**

reference to these specialty units.

For example, the Special Management Unit at the United States Penitentiary in Lewisburg, Pennsylvania has controls similar to those found at ADX and is designed to house inmates who have had difficulty abiding by the rules and regulations of other institutions. In addition, USP Terre Haute maintains a Special Confinement Unit ("SCU"). Although the SCU is home to the federal government's death row, the FCC-Terre Haute warden may place non-condemned inmates with disciplinary problems in that unit as he or she sees fit. Indeed, as FCC-Terre Haute warden, I placed a number of individuals in the SCU who had previously been involved in an incident at another prison. For example, Hakeem Shaheed and Tyrone Davis were involved in a major disturbance at USP-Marion in 2005 and were immediately transferred to USP-Terre Haute, where I was the Warden at the time. My superiors at the BOP instructed me to put Shaheed and Davis into the SCU indefinitely so that they could be closely monitored. I followed these instructions, and these two men were not involved in any incidents while they were in the SCU.

Moreover, all maximum-security federal prisons contain a Special Housing Unit ("SHU") where inmates can be placed when they have violated (or are suspected of violating) prison rules.

A SHU is, in essence, a prison within a prison where security and conditions of confinement are stricter than those imposed on the general population within the maximum-security facility. A Warden has the authority to place any inmate into a

16

**Ex. 12 - 236**

SHU if the inmate is under investigation for a serious violation of prison rules. Inmates can be housed in a SHU for a variety of reasons, including concerns about security and/or an inmate's future dangerousness. Inmates may be placed in the SHU for extended periods of time, but facility administrators must periodically review placement to determine continued appropriateness.

Special Administrative Measures ("SAM") also allow the BOP to construct individualized conditions of confinement as are "reasonably necessary to protect persons against the risk of acts of violence or terrorism." *See* 28 CFR § 501.3(a). Each SAM order is totally unique and is nearly limitless in terms of the conditions of confinement available to BOP personnel (subject to the constraints of the United States Constitution, of course). Although SAM orders are required to be periodically reviewed, they may be extended for as long as conditions persist. A number of inmates have been held under SAM orders for more than a dozen years. For example, Iouri Mikhel was placed under SAM restrictions for more than a decade due to an escape attempt from his pre-trial confinement at MDC-Los Angeles. SAM orders are rare, but they were available to the BOP and the Department of Justice at the time of Mr. Robinson's trial had officials been concerned that Mr. Robinson presented a risk of violence while incarcerated. Dr. Carlson's testimony makes no mention of SAM restrictions.

Again, these strict conditions of confinement were (and are, to my knowledge) routinely imposed on high-risk inmates by the BOP for as long as it deems those

17

Ex. 12 - 237

conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

**Telephone, Visitation, and Correspondence Restrictions**

Generally speaking, federal prison inmates do not have unlimited rights to visitation, correspondence, use of telephones, or contact with other inmates. As a matter of policy, the BOP grants access to these privileges consistent with the requirement of sound correctional management. These privileges can be revoked if they are abused.

Misuse of telephone, mail, and visitation privileges are of particular concern to BOP personnel because of the possibility that a federal inmate will facilitate the commission of a crime through communications with other inmates or associates in society at large. The BOP retains a large amount of flexibility in dealing with this threat. As the Justice Department's Inspector General found in a 1999 report:

> According to the BOP's program statement "Telephone Regulations for Inmates," conditions and limitations may be imposed on an inmate's telephone use to ensure that it is consistent with the BOP's correctional management responsibilities. Additionally, inmate telephone use is subject to any limitations that individual wardens determine are necessary to ensure the security or good order of the institution or to protect the public. Restrictions on inmate telephone use may also be imposed as a disciplinary sanction.
>
> BOP regulations direct wardens to refer incidents of unlawful inmate telephone use to law enforcement authorities. According to BOP regulations, telephone "misuse" refers to such things as using the telephone to intimidate a potential witness or for other criminal purposes. Using another

18

**Ex. 12 - 238**

inmate's phone access code (PAC) or providing a PAC to another inmate is considered "misuse" and is subject to discipline. Inmates who violate the telephone rules may have their privileges restricted or revoked.

Each warden is required by BOP's program statement to establish procedures to enable monitoring of inmate telephone conversations on any telephone located within the institution. The term "monitoring" is not defined in the BOP program statement, so it is not clear whether this means recording of calls or live-monitoring by the BOP staff. According to the BOP's program statement, the purpose of monitoring is to preserve the security and orderly management of the institution and to protect the public.

In all BOP facilities, a notice is placed on inmate telephones advising the user that all conversations are subject to monitoring. Use of the telephones by inmates, therefore, constitutes their consent to this monitoring. Inmate calls to attorneys are an exception to this rule and will not be monitored by BOP staff if the inmate follows proper procedures, established by the warden at each institution, to arrange and place attorney calls.

BOP Headquarters has not issued any policy detailing how much "live monitoring" or review of recorded calls staff at each institution should conduct. Rather, determinations about the amount and methods of monitoring are left to individual wardens. Some institutions have remote monitoring locations. At these locations, officers randomly listen to some calls as they are occurring. This monitoring is in addition to their regular duties. Most of these institutions require the officers to monitor a minimum number – usually five – telephone calls during their shift. The officers are required to fill out a form describing the content of each monitored call and submit these reports to the institution's SIS office. The SIS offices are supposed to review the reports and decide if any further action is required.

Most institutions without remote monitoring locations have established a fixed listening post where a staff member

19

assigned as the telephone monitor listens to inmate calls in addition to other duties, such as reviewing inmate mail. This telephone monitor normally works only during the day shift. However, wardens at several institutions have assigned a telephone monitor to the evening shift as well.

In its "Special Investigative Supervisors Manual" (SIS Manual), the BOP encourages a proactive approach to deterring criminal conduct by inmates. The SIS Manual directs SIS staff to use threat analysis, risk assessment, analysis of connections between inmates, and intelligence sources to prevent illegal conduct by inmates while still in the planning stage. The manual also states that the SIS should determine which inmates are engaged in activities that pose a threat to the welfare of the community. The SIS Manual provides examples of how the current version of ITS can assist staff in this task.

In August 1997, the Intelligence Section at BOP Headquarters issued an Inmate Telephone Monitoring field guide for wardens and SIS staff. The guide states that one of the BOP's primary concerns is to ensure that inmates who were convicted for playing leadership roles in major drug trafficking organizations do not continue their criminal operations using prison telephones. The guide stresses that inmates should not be permitted to talk on the telephone when they should be at their job or educational assignments. The guide notes that some inmates may require reassignment from orderly jobs or similar positions that provide them a great deal of flexibility and autonomy so that their time is more fully engaged. The guide also cautions against permitting a small number of inmates to dominate the telephones.

In addition, the guide suggests that "population profiling" should be a major component of an institution's monitoring operations. For example, the guide acknowledges that it is not possible for staff to consistently listen to 100 percent of inmate calls. For this reason, the guide states that any inmate telephone monitoring should place the highest priority on identifying and tracking inmates with the greatest likelihood of using their telephone privileges to engage in criminal or illicit

20

> activity. Inmates identified as having a high likelihood of engaging in crime while incarcerated, such as drug dealing and escape plots, should be targeted and their telephone conversations subject to intense review.

*See* USDOJ/OIG Special Report: A Review of the Bureau of Prisons' Management of Inmate Telephone Privileges, August, 1999 (Found online at: http://justice.gov/oig/special/9908/).

As a captain, associate warden, and warden at numerous federal correctional facilities, I recall numerous instances where prison management (myself included) completely suspended or otherwise severely restricted telephone privileges because of concern that an inmate was abusing the privilege. While no system is 100 percent foolproof, we were successful in curbing inmate abuse of telephones in the overwhelming majority of cases where the issue arose through the use of targeted and contemporaneous monitoring and severe restrictions on numbers of calls and to whom inmate calls can be made.

The same can be said for inmate abuse of correspondence and visitation privileges. Indeed, as a senior manager or head of numerous correctional facilities, I was involved in countless decisions to closely monitor visitation of and correspondence to and from specific individuals where there was a concern about institutional or individual safety. Actions taken to deter or detect unlawful conduct included real-time monitoring and recording of visitation and the interception and translation of letters written in foreign languages or code. For example, at USP-Marion, Yu Kikumura, a

21

**Ex. 12 - 241**

member of the Japanese Red Army, a terrorist organization, had all incoming and outgoing mail inspected and translated. It was not uncommon for prison officials to inspect every piece of incoming and outgoing mail pertaining to a targeted inmate. Gotti and Felipe are examples of inmates who received this sort of treatment.

Given Mr. Robinson's convictions for serious, violent offenses and the allegation that he had used the jail telephone to commit a serious, violent offense, intensive monitoring of and restrictions on his communications, whether they be in person or by telephone or mail, would have been warranted and available to BOP personnel – no matter where his placement. Dr. Carlson's testimony makes no mention of such restrictions.

### Mr. Robinson's History of Incarceration

Based on my experience of over thirty years in the field of corrections, it is my opinion that one of the best predictor of an individual's future performance in prison is that person's prior behavior and history of incarceration (if one exists). This view is shared by other corrections professionals. The circumstances of an individual's prior incarceration, if known, are taken into account by prison officials in determining placement and classification so as to tailor a placement that meets the needs of the inmate, the correctional facility, and society in general. In the four years that I served as a correctional services administrator, I routinely reviewed inmates' prison records for evidence of past conduct to determine proper placement.

Although Dr. Carlson testified that Mr. Robinson would most likely have been

22

placed at a United States Penitentiary, I believe that ADX would have been the most proper placement, given the nature of Mr. Robinson's convictions, his alleged leadership role in a violent drug ring with ties to a criminal street gang with a large prison population, and his alleged attempt to call out a hit on a government witness from jail.

I have reviewed Mr. Robinson's records from FMC-Fort Worth and his records from USP Terre Haute up to November, 2017. The records are remarkable for the lack of any disciplinary infractions. Indeed, the records indicate that Mr. Robinson has been able to effectively program with a consistently low threat assessment rating.

Of note, however, is the allegation that Mr. Robinson attempted to place a hit on a government witness. I have reviewed declarations from Keith Eddington, Kentrel Pitts, and Wayne Jordan, the alleged hitmen, and Michael Williams, the target of the alleged hit. I have also reviewed the transcripts of two phone calls made by Mr. Robinson and I understand that Mr. Williams was kidnapped by the alleged hitmen. Regardless of the conflicting version of events, the BOP could – and should – have taken this conduct into account in crafting Mr. Robinson's conditions of confinement – both pretrial and post-trial – had it believed it to be a serious threat. Curiously, it does not appear to have done so. And although Mr. Robinson was in the SHU at FMC-Fort Worth, his records appear to indicate that this placement was due to the publicity his case received and he spent a significant amount of time out of his cell on a work assignment and he had a good deal of freedom to use the telephone. Both of these facts

23

**Ex. 12 - 243**

are completely inconsistent with the sentiment that the BOP viewed him as a security risk. Indeed, it appears that FMC-Fort Worth officials did not consider Mr. Robinson to be a major security risk. Of course, if the BOP later determined Mr. Robinson to be a security risk, it could take those steps required to neutralize that risk.

Time has now told that Mr. Robinson was in fact not at risk for being a future danger, as long as he was held in the appropriate conditions of confinement. Since his arrival at USP-Terre Haute's SCU – death row – Mr. Robinson's record has been free of any allegations of violence and has been nearly spotless. He has shown himself to be an inmate who can program and adept at following the rules and regulations of that institution. Given his conduct in prior periods of incarceration, his good adjustment is not only unsurprising, but could have been predicted at the time of Mr. Robinson's trial.

Those special cells and units described previously are as restrictive (if not more so) than the conditions under which Mr. Robinson is currently held in USP-Terre Haute's SCU. Many of them would have been available at the time of Mr. Robinson's sentencing and would have been considered for placement had BOP classification personnel found them appropriate.

Finally, as warden of FCC-Terre Haute, I was responsible for Mr. Robinson's custody and care for over two years. Mr. Robinson's BOP records confirm my recollection of him as a mild-mannered, respectful inmate who adjusted well to life in a maximum-security prison.

24

**Ex. 12 - 244**

Ex. 12 - 245

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed on November 20, 2018, at __1:00__, __pm__.

_____
Mark A. Bezy

25

**Ex. 12 - 245**

# EXHIBIT 13

Last Name ________

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:00-CR-0260-Y |
| | § | |
| JULIUS OMAR ROBINSON (02) | § | |

JUROR NO. 69

# JUROR INFORMATION SHEET

INSTRUCTIONS:

Your answers to the following questions are <u>very</u> important to the trial of this case, and are designed to shorten the jury selection process. Do not discuss any of these questions or your answers with anyone else, including any other prospective jurors. Please take as much time as is reasonably necessary to answer each question as completely and as honestly as possible. Please do not accept the assistance or the advice of anyone in answering these questions. If any questions should arise while completing this questionnaire, please contact the presiding judge. Do <u>not</u> speak to anyone else about the questionnaire or any questions you might have.

### <u>YOUR ANSWERS TO THESE QUESTIONS ARE BEING GIVEN UNDER OATH</u>

The answers to these questions will be used by the Court and the attorneys solely for the selection of the jury in this case and for <u>no other reason</u>. The confidentiality of your answers to these questions will be maintained by the Court.

Ex. 13 - 246

**PLEASE PRINT YOUR ANSWERS**

## PERSONAL

1. NAME: M█████ ██ A███████ ~~(maiden, if applicable)~~
   (first)      (middle)      (last)

   DATE OF BIRTH: ███ 62  AGE: 40  SEX: F  RACE: Black

   BIRTHPLACE: Fairfield, Texas
   (city / town)        (state)

2. ADDRESS: ████████████ Fort Worth, Texas 76119
   (number and street)      (city / town)        (zip)

   HOME PHONE: (███████ 0774  BUSINESS PHONE: ███████ 602

3. LENGTH OF TIME AT PRESENT ADDRESS: 24 yrs

4. SINCE 1990 WHAT OTHER CITIES HAVE YOU LIVED IN AND FOR HOW LONG DID YOU LIVE IN EACH CITY? None

## EMPLOYMENT

5. PLACE OF EMPLOYMENT: University of Texas at Arlington

6. JOB TITLE OR DESCRIPTION: Administrative Clerk

   BUSINESS HOURS: 9am 5 5:30pm LENGTH OF PRESENT EMPLOYMENT: 13 yrs

   SUPERVISOR: ████████████

7. PLEASE LIST YOUR OCCUPATION OR EMPLOYMENT FOR THE PAST TEN (10) YEARS: At UTA work as a Custodian from 1988-1997

   Begin working as Administrative Clerk from 1997 - Present

8. WHAT OTHER TYPES OF JOBS HAVE YOU HELD? None

   If you could change your profession, what would you change it to? Supervisor of the Department of Human Resources

Juror Questionnaire                    2                    Page 2 of 31

**Ex. 13 - 247**

## FAMILY

9.    MARTIAL STATUS: (circle appropriate answer(s))
a). Married                                                f).Previously Divorced
b). Single                                                     (how many times _1_ )
c). Separated
d). Divorced
e). Spouse Deceased                              g).  Living With Someone

10.    NAME OF SPOUSE: _____
                                        (first)          (middle)          (last)      (maiden, if applicable)

11.    SPOUSE'S EMPLOYER: _____

         Job Title Or Description: _____

         Length Of Present Employment: _____

         What Other Types  Of Jobs Has Your Spouse Held? _____
         _____

12.    PLEASE INDICATE THE APPROXIMATE TOTAL ANNUAL GROSS INCOME OF YOUR
         HOUSEHOLD:
         Under $10,000 _____        $10,000 to $30,000 $20,000.00
         $30,000 to $50,000 _____     $50,000 to $70,000 _____
         $70,000 to $100,000 _____      Over $100,000 _____

13.    PLEASE  PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR CHILDREN
         AND STEPCHILDREN, IF ANY:

                  Name                    Sex    Age              School or Occupation
         a. _____        m      9          Child Study Center
         b. _____
         c. _____
         d. _____
         e. _____
         f. _____

14.    IF YOU HAVE GRANDCHILDREN, HOW MANY?  No

**Ex. 13 - 248**

15. PLEASE PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR PARENTS AND YOUR STEPPARENTS, IF ANY:

| Name | Age | City of Residence | Retired | Occupation/Employment (before retirement, if applicable) |
|------|-----|-------------------|---------|----------------------------------------------------------|
| Father: ███████████ | 60 | Dallas, Tx | | Truck Driver |
| Mother: ███████████ | 59 | FortWorth, Tx | | Administrative Secretary |
| Stepfather: | | | | |
| Stepmother: | | | | |

Were Your Parents Ever Divorced? Yes

16. PLEASE PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR BROTHERS AND SISTERS, IF ANY?

| | Name | Sex | Age | School or Occupation |
|---|------|-----|-----|----------------------|
| a. | ███████████ | F | 24 | Substitute Teacher FWISD |
| b. | | | | |
| c. | | | | |
| d. | | | | |
| e. | | | | |
| f. | | | | |

**Ex. 13 - 249**

## EDUCATION

17.  Please give your educational background. Please include how far you went in school; the names of any technical or trade schools attended; any college and graduate schools you have attended, together with major subject and degrees received, if any:

_Tarrant County Junior College – Major Media Communication_

18.  Please give your spouse's educational background:

19.  Are you or your spouse presently enrolled as a student? Yes _____ No ✓
     If so, please give details: _____

## MILITARY

20.  HAVE YOU EVER SERVED IN THE MILITARY? _No_   IF SO, PLEASE GIVE THE
     FOLLOWING INFORMATION:   Branch _____, Years of Service _____,
     Enlist? _____, Re-enlist? _____
     Highest grade or rank attained: _____
     Duties: _____

     Did you serve in combat? _____   Year Discharged? _____
     Type of Discharge: _____   Did you participate in any
     Courts Martial? _____   Please Explain: _____

     Did you ever serve in the military police? _____

21.  HAS YOUR SPOUSE EVER SERVED IN THE MILITARY? _NA_
     IF SO, PLEASE GIVE THE FOLLOWING INFORMATION:
     Branch _____, Years of Service _____,
     Enlist? _____, Re-enlist? _____
     Highest grade or rank attained: _____
     Duties: _____

     Did he/she serve in combat? _____   Year Discharged? _____
     Type of Discharge: _____
     Did he/she participate in any Courts Martial? _____
          IF SO, Please Explain: _____

     Did he/she ever serve in the military police? _____

Ex. 13 - 250

## RELIGION

22. RELIGIOUS PREFERENCE: _Christian_
Name And Location Of Church, Temple, Synagogue Or Other Religious Organization with which you are affiliated, if any: _Pilgram Valley Missionary Baptist Church_
_South Fort Worth_

Have you studied for the ministry, priesthood, rabbinic order, or any other clergy position?
_No_

23. How often do you attend services? _2 Sunday of Month_
Past or present church offices held: _None_
Other than attendance, what activities do you participate in at your church?
_No_
Have there been any recent changes in your religious activities? Yes _____ No _✓_
If Yes, Please explain: _____

24. Were you raised in a religion different from the one you now practice?   If so, please explain:
_No_

25. Does your spouse practice a religion different from yours? _____
If so, please explain: _____

26. Do you currently, or have you in the past, supported, or routinely watched or listened to any radio or television ministry?
If so, please indicate which ministry:
_No_

27. Do you have a personal philosophy or favorite saying that reflects your personal philosophy that can be expressed in a few sentences or less?  YES _____  NO _✓_  If yes, please state it:
_____
_____
_____
_____
_____

Ex. 13 - 251

## POLITICAL

28.  DO YOU HAVE A POLITICAL PREFERENCE? _____
Democrat ✓        Republican ___        Independent ____        Other _____
Does your spouse have a different preference? _____
If so, please explain: _____

29.  DO YOU IDENTIFY WITH OR SUPPORT A POLITICAL PARTY? If so, which one?
Democrat ✓        Republican ___        Independent ____        Other _____
Is your spouse a member or supporter of a different party? _____
If so, please explain: _____

30.  DO YOU CONSIDER YOURSELF TO BE POLITICALLY CONSERVATIVE, MODERATE, OR LIBERAL? *Conservative* _____
Does your spouse have a different political philosophy? ____
If so, please explain: _____

31.  HAVE YOU EVER SOUGHT OR HELD A POLITICAL OFFICE? *No* _____ If yes,
please give details: _____
_____

32.  Have you or your spouse ever worked in a political campaign for a candidate or for a political group, seeking change in a law or in enforcement of a law? *No*_____
If so, please describe: _____
_____

## PHYSICAL/MEDICAL

33.  DO YOU HAVE ANY DIFFICULTY IN READING OR WRITING? *No* _____ If so,
please explain: _____

34.  DO YOU HAVE ANY DIFFICULTY IN SIGHT OR HEARING, OR DO YOU HAVE ANY OTHER DISABILITY OR DISEASE THAT WOULD MAKE JURY SERVICE A HARDSHIP FOR YOU? *No* If so, please explain: _____
_____

35.  ARE YOU CURRENTLY TAKING ANY MEDICATION? *Yes* _____
If so, please give the name of the medication and the reason you take it:
*Cardura (Blood Pressure)* _____

Ex. 13 - 252

36.    ARE YOU OR ANY OF THE MEMBERS OF YOUR FAMILY CURRENTLY BEING TREATED FOR A MEDICAL ILLNESS WHICH WOULD PREVENT OR IMPAIR YOUR JURY SERVICE?  *No*
If so, please explain: _____
_____

37.    HAVE YOU, ANY FAMILY MEMBERS, OR ANY CLOSE FRIENDS EVER UNDERGONE COUNSELING, TREATMENT, OR HOSPITALIZATION FOR PSYCHIATRIC, EMOTIONAL, FAMILY, BEHAVIORAL, OR SUBSTANCE ABUSE PROBLEMS?
_____
If so, please give details (including the name of the hospital and/or doctor/counselor seen):
_____
_____

38.    DO YOU HAVE A FAMILY MEMBER, FRIEND, OR OTHER PERSON WITH WHOM YOU ARE ASSOCIATED WHO HAS BEEN DIAGNOSED AS MENTALLY RETARDED OR AS HAVING A LEARNING DISABILITY?  *Yes, ADHD Family member*
_____

39.    HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER WORKED IN A MENTAL HEALTH FACILITY OR HOSPITAL OF ANY KIND?   If so, please describe:
*No* _____
_____

40.    HAVE YOU EVER READ BOOKS OR ARTICLES DEALING WITH PSYCHIATRY, PSYCHOLOGY, MENTAL HEALTH OR MENTAL RETARDATION?  If so, please describe:
*I've read some on ADHD* _____
_____
_____

41.    DO YOU OR YOUR SPOUSE PERSONALLY KNOW ANY PSYCHIATRISTS OR PSYCHOLOGISTS? If so, please name: *No* _____
_____

42.    HAVE YOU EVER TAKEN ANY COURSES IN THE FIELDS OF PSYCHIATRY OR PSYCHOLOGY? If so, please describe: *No* _____
_____

43.    DO YOU HAVE ANY PREJUDICE IN FAVOR OF, AGAINST, OR ANY FIXED OPINIONS CONCERNING PSYCHIATRIC OR PSYCHOLOGICAL TESTIMONY? *No*  If so, please explain: _____
_____
_____

Ex. 13 - 253

## CAPITAL PUNISHMENT/DEATH PENALTY

44.    DO YOU HAVE ANY MORAL, RELIGIOUS, OR PERSONAL BELIEFS THAT WOULD PREVENT YOU FROM SITTING IN JUDGMENT OF ANOTHER HUMAN BEING?
           YES _____                            NO _✓_

45.    ARE YOU IN FAVOR OF THE DEATH PENALTY AS A PUNISHMENT FOR CRIME?
           YES _____                            NO _✓_
       Please    explain:    It depend on the circumstances of
       the crime

46.    DO YOU BELIEVE THAT THE DEATH PENALTY SERVES ANY LEGITIMATE PURPOSE OR PURPOSES IN OUR SOCIETY?
           YES _____                            NO _✓_
       If so, what purpose or purposes do you believe that it serves? _____

47.    WITH REFERENCE TO THE DEATH PENALTY, WHICH OF THE FOLLOWING SIX STATEMENTS BEST REPRESENT YOUR BELIEFS: (circle one)

       a.     "I believe that the death penalty is appropriate for all crimes involving murder."

       (b.)   "I believe that the death penalty is appropriate for some crimes involving murder and I could return a verdict which assessed the death penalty in a proper case."

       c.     "I believe that the death penalty is appropriate for some crimes involving murder, but I could never return a verdict which assessed the death penalty."

       d.     "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it, under the proper set of circumstances."

       e.     "I could never, regardless of the facts and circumstances, return a verdict which assessed the death penalty."

       f.     None of the above.

48.    FOR WHAT CRIMES DO YOU THINK THE DEATH PENALTY SHOULD BE AVAILABLE?
       Planned Murder

**Ex. 13 - 254**

49.   DO YOU BELIEVE THAT THE DEATH PENALTY SHOULD BE USED MORE FREQUENTLY, LESS FREQUENTLY, ABOUT THE SAME AS IT HAS BEEN, OR NOT AT ALL, AS A PUNISHMENT FOR CRIME?  _I would say less Frequently._

50.   DO YOU KNOW WHETHER YOUR RELIGION OR YOUR SPOUSE'S RELIGION HAS AN OFFICIAL POSITION IN REGARD TO THE USE OF THE DEATH PENALTY AS A PUNISHMENT FOR CRIME?  YES _____  NO _✓_  If yes, what position has it taken?
-----------------------------------

Does this conflict with your own personal feelings regarding the death penalty?
_____

50a.  DO YOU AND YOUR SPOUSE HAVE CONFLICTING BELIEFS REGARDING THE USE OF THE DEATH PENALTY AS A PUNISHMENT FOR CRIME?  YES _____  NO _✓_
If yes, how do they conflict? _____

51.   DO YOU BELIEVE THAT THE DEATH PENALTY IS NOW BEING, OR HAS IN THE PAST BEEN, APPLIED IN A RACIALLY DISCRIMINATORY MANNER?  YES _____  NO _____
PLEASE EXPLAIN: _I don't know_

52.   DO YOU HAVE ANY MORAL, RELIGIOUS, OR PERSONAL BELIEFS THAT WOULD PREVENT YOU FROM RETURNING A VERDICT WHICH WOULD ULTIMATELY RESULT IN THE EXECUTION OF ANOTHER HUMAN BEING?  YES _____  NO _✓_
If yes, please explain: _____

52a.  IF A SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE IS AN OPTION, COULD YOU NEVERTHELESS RECOMMEND A SENTENCE OF DEATH?
      YES _____  NO _✓_
Please explain: _I would like to give a person life without parole That way They won't be let in to Scciuty to heart any one again._

52b.  DO YOU BELIEVE THAT AN INNOCENT PERSON HAS EVER BEEN EXECUTED FOR A CRIME IN THE UNITED STATES IN THE LAST 20 YEARS?  _Yes_

Ex. 13 - 255

53c.  DO YOU KNOW OF ANY CASES WHERE THE GOVERNMENT SOUGHT THE DEATH PENALTY AT TRIAL, AND WAS UNSUCCESSFUL?
YES _____  NO _✓_.
IF YES, HOW DID YOU FEEL ABOUT THE OUTCOME OF THE CASE?
_____

## PERSONAL

53.  DO YOU OR THE MEMBERS OF YOUR IMMEDIATE FAMILY OWN A PET(S).
If so, what kind? _Dogs_____

54.  WHAT KIND OF VEHICLE DO YOU DRIVE? _Chevey / Lumina_____
WHAT KIND OF VEHICLE DOES YOUR SPOUSE DRIVE? _____

55.  To which civic clubs, societies, professional associations, or other organizations do you belong?
Please indicate offices held, if any:
_NONE_____
_____
_____

56.  Do you contribute money or services to any charitable organization?
If so, please describe: _No_____
_____

57.  Are you or your spouse a member of (Or have you ever been a member of) any neighborhood, local, state, or nationwide crime prevention watch organization? YES _____  NO _✓_
If yes, please describe: _____
_____

58.  WHAT ARE YOUR HOBBIES? _Photography, Reading,_____
_____

59.  DO YOU SUBSCRIBE TO AND/OR REGULARLY READ A NEWSPAPER?
YES _____  NO _✓_ If yes, which one(s): _____
_____

60.  WHAT ARE YOUR FAVORITE MOVIES? _Comedy_____

Ex. 13 - 256

61. WHAT ARE YOUR FAVORITE TELEVISION SHOWS, OR WHICH SHOWS DO YOU REGULARLY WATCH?   *Cartoons. This is the only thing I got to watch because of my son.*

62. WHAT WAS THE LAST BOOK YOU READ?  *Bible*

63. WHAT IS YOUR <u>LEAST</u> FAVORITE TYPE OF READING MATERIAL?  *Poetry*

64. HAVE YOU EVER READ A BOOK ABOUT A MURDER TRIAL?  YES ____  NO ✓
Which book or trial? _____

65. WHAT IS YOUR FAVORITE RADIO STATION?  *K-104*

66. DO YOU SUBSCRIBE TO OR REGULARLY READ ANY MAGAZINES?
YES ____  NO ✓
If so, which one(s)? _____

67. Have you ever written a letter to the editor? YES ____  NO ✓
If so, about what subject? _____

68. Do you or have you displayed a bumper sticker on your car?
YES ____  NO ✓
If yes, what was the message: _____

69. HAVE YOU EVER BEEN OPPOSED TO ANY GOVERNMENT ACTION?
YES ____  NO ✓
If so, did you express your opposition?  Yes _____  No _____
How? _____

70. Have you ever owned personalized licensed plates?  YES _____  NO ✓  If yes, what was the message: _____

71. LIST FIVE INDIVIDUALS WHO ARE PUBLICLY KNOWN WHOM YOU MOST RESPECT:
_____
_____
_____

Ex. 13 - 257

72.  HAVE YOU, A FAMILY MEMBER OR CLOSE FRIEND EVER HAD A BAD EXPERIENCE WITH A PERSON OF ANOTHER RACE?    YES _____ NO ___✓___ If yes, please explain:

_____
_____
_____
_____

**Ex. 13 - 258**

## CRIMINAL JUSTICE SYSTEM/LAW ENFORCEMENT

73. HAVE YOU, YOUR SPOUSE, ANY FAMILY MEMBER, OR CLOSE FRIEND EVER BEEN ACCUSED, ARRESTED, INDICTED, CHARGED BY ANY MEANS, OR CONVICTED (including probation, deferred adjudication, conditional discharge, etc.) OF A CRIME OTHER THAN A TRAFFIC TICKET? YES _____ NO ✓
If yes, please give details: _____
_____
_____

74. HAVE YOU, YOUR SPOUSE, OR ANY FAMILY MEMBER EVER USED THE SERVICES OF AN ATTORNEY FOR ANY REASON? YES ✓ NO _____
If yes, please give details and name of attorney: _Divorce - Turne Carter_
_Bankruptcy - Johnson & Johnson_____

75. DO YOU, YOUR SPOUSE, OR ANY FAMILY MEMBERS KNOW OR HAVE ANY FRIENDS WHO ARE ATTORNEYS? YES _____ NO ✓
If yes, please give attorneys' names and the types of practice they have:
_____
_____

76. WHAT IS YOUR IMPRESSION OF PROSECUTORS IN GENERAL? _____
_In General the Accuser_____

77. WHAT IS YOUR IMPRESSION OF CRIMINAL DEFENSE ATTORNEYS IN GENERAL?
_In General the person that defend A persons_____

78. PLEASE INDICATE WHICH OF THE FOLLOWING YOU BELIEVE WOULD BE THE GREATER WRONG:

_____ For a jury to find a guilty person "not guilty;"
___✓___ For a jury to find an innocent person "guilty."

79. PLEASE RANK IN ORDER OF IMPORTANCE TO YOU THE FOLLOWING PURPOSES FOR PUNISHMENT IN A CRIMINAL CASE:

___1___ Punishment/retribution
___3___ Deterrence/prevention
___2___ Rehabilitation/reform

Ex. 13 - 259

80. Do you know anyone who has been in jail, or who has been to prison, or who is in prison?
YES ____ NO ✓
If yes, please give details: _____
_____
_____

81. Have you or any member of your family ever been associated or worked with any program involved with the prevention of crime, the apprehension or punishment of offenders, or the rehabilitation of persons convicted of a crime? YES _____ NO ✓ If yes, please give details: _____
_____

82. Have you, your spouse, any family member or close friend ever been the victim of a crime, a witness to a crime, or been interested in the outcome of any criminal case (either personally or through the media)?
YES _____ NO ✓    If yes, please give details: _____
_____

83. Have you ever been to any of the Federal, State, or County courthouses before?
YES ✓ NO ____
If yes, for what reason: _Jury duty, Divorce Court, Bankruptcy Court_
_____
_____

84. Have you ever used the services of the United States Attorney's office or any other prosecutor's office (for example: hot checks, child support)?
YES _____ NO ✓
If yes, please give details: _____
_____

85. HAVE YOU OR YOUR SPOUSE EVER SERVED ON A GRAND JURY?
YES _____ NO ✓
If yes, please give details: _____
_____

86. HAVE YOU OR YOUR SPOUSE EVER BEEN A JUROR IN A CIVIL CASE?
YES ✓ NO ✓    If Yes, please provide the following information:
Who (i.e. you, your spouse, or both)? _____ When? _____
What type of case? _____ Were you/spouse the foreperson? Yes _____ No _____
What Court was it in? _____ Did the jury assess damages? Yes ____ No ____
Is there anything about your/your spouse's experience as a juror in that case which would affect your service in this case? Yes ____ No ____ If yes, please give details: _____

Ex. 13 - 260

87.    HAVE YOU OR YOUR SPOUSE EVER BEEN A JUROR IN A CRIMINAL CASE?
           YES __✓__ NO _____            If Yes, please provide the following information:
       Who (i.e. you, your spouse, or both)? _I don't Remember_ When? _1980_
       What type of case? _Murder_            Were you/spouse the foreperson? Yes ___ No ___
       What Court was it in? _____ Did the jury reach a verdict? Yes ____ No ____
       What was your verdict? _get Psychiatic_ Help. The person had a menta Probl
       Was the jury called upon to assess punishment? Yes _____ No _____
       What was the punishment assessed: _____
       Is there anything about your/your spouse's experience as a juror in that case which would affect
       your service in this case?    Yes _____    No _____        If yes, please give    details:
       _____
       _____

88.    HAVE YOU, YOUR SPOUSE, A RELATIVE OR CLOSE FRIEND, PRESENTLY OR IN THE
       PAST, BEEN A MEMBER OR EMPLOYEE OF A LAW ENFORCEMENT AGENCY OR
       ORGANIZATION? (Example: city, county, state or federal police officer; constable; deputy
       sheriff; ranger; Texas Department of Public Safety officer; auxiliary or reserve of any such
       organization or agency?) If so, please give name and describe: _No_____
       _____
       _____
       _____

89.    HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER APPLIED FOR A
       JOB IN LAW ENFORCEMENT? If so, please describe: _No_____
       _____

90.    HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER BEEN
       CONNECTED WITH LAW ENFORCEMENT IN ANY OTHER WAY?
       If so, please describe: _No_____
       _____
       _____

91.    HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER STUDIED LAW?
       YES ____ NO __✓__ If yes, please give details: _____
       _____

92.    HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER HAD AN
       UNPLEASANT EXPERIENCE INVOLVING LAW ENFORCEMENT?
       YES _____ NO __✓__ If yes, please give details: _____
       _____

93.   HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER WORKED AS A SECURITY GUARD OR FOR A SECURITY SERVICE?   If so, please give details:
_No_

94.   Do you have any strong personal feelings about law enforcement in general, or police officers in particular?   YES _____ NO _V___
If yes, please explain: _____

95.   What is your personal opinion about the criminal justice system and the way it works? _I don't_ _Know at this Time_

95a   What is your opinion of plea bargaining? _Cop out._

95b   Do you believe the testimony of an accomplice to a violent crime is generally reliable?
Yes ____ No _✓_ . Please explain. _I believe they might have gotten_ _a deal and they need to be punish like every one that's involved_

95c   Do you believe that the testimony of witnesses that have admitted committing crimes and who have entered plea agreements with the government calling for the possibility of leniency for their assistance is generally reliable?   Yes _____ . No _✓_
Please explain _I don't believe no one should get off lightly_ _of a crime, that Any Crime_

96.   Do you believe that there are any changes which we could make in our criminal justice system which would make it more efficient in dealing with the problem of crime?   Yes ____ No _✓_
If so, what changes could be made?
_____

97.   Do you believe that trial by jury is the best system for the trial of criminal cases?
YES _✓_ NO ____   What factors about the jury trial system make you feel this way?
_____

98.   Do you believe the question of punishment, once a person has been found guilty of a crime, should be decided by a judge or by a jury?
_should be decided by the judge_

Ex. 13 - 262

99. Do you believe that the death penalty should be assessed by a judge or by a jury? _I don't know_
Why do you believe this method is more appropriate?_____
_____
_____

100. Do you believe that a person who is charged with committing a violent crime should be allowed to be released from custody on a reasonable bail pending the trial of that case? _No_
_____

101. Do you believe that most people charged with having committed a crime are actually guilty of that crime?   _No_
_____

102. Do you believe that most eyewitnesses to violent crimes are generally reliable in their recollections of the facts? _No_
_____
_____

103. HAVE YOU EVER BEEN ACCUSED OF DOING SOMETHING THAT YOU DID NOT DO?
If yes, please explain: _Been Accused of saying something because I was in the company of the person that was already made the statement_

104. HAVE YOU EVER VISITED INSIDE A PRISON OR A JAIL? YES _____ NO _✓_
If yes, what was your impression?_____
_____

105. Do you believe our penal system is ever successful in rehabilitating/reforming persons convicted of crime? YES ____ NO _✓_
Please explain your answer: _The_____
_____

106. Do you believe that innocent people ever actually get convicted of crimes? _Some times_

107. Do you believe that there is more, less, or about the same amount of violent crime in your community as there was ten years ago? _less_
If you believe there is more or less crime now, for what reason do you believe there has been a change? _More police on duly, 'Crime watch teams_

**Ex. 13 - 263**

## CASE SPECIFICS

108. DO YOU KNOW OR BELIEVE YOU KNOW, ANYTHING ABOUT THE FACTS OR PURPORTED FACTS OF THIS CASE, EITHER FROM THE NEWSPAPER, TV OR OTHER SOURCES? _No_____ If so, what facts or purported facts and from what source (be as specific as possible--include information about all publicity related to this case to which you have been exposed):

_____
_____
_____
_____
_____
_____
_____
_____

108a Did you know Rudolfo Resendez or any of his family members during his lifetime? Yes _____ No _✓_. If yes, in what capacity? _____.

108b Did you know Juan Reyes or any of his family members during his lifetime? Yes _____ No _✓_. If yes, in what capacity? _____.

108c Did you know Johnny Shelton or any of his family members during his lifetime? Yes _____ No _✓_. If yes, in what capacity? _____.

108d Have you ever been to Dermott, Arkansas? Yes _____ No _✓_. If yes, why, when and how long were you there? _____.

109. DO YOU KNOW OR HAVE YOUR HEARD OF EITHER OF THE DEFENSE ATTORNEYS IN THIS CASE, Wes Ball or Jack Strickland? YES _____ NO _✓_ If yes, how do you know them or what have your heard about them?

_____
_____
_____

110. DO YOU KNOW OR HAVE YOU HEARD OF ANY OF THE PROSECUTORS IN THIS CASE, Fred Schattman or Reed O'Connor ? YES _____ NO _✓_ If yes, how do you know them or what have your heard about them?

_____
_____
_____

111. DO YOU KNOW OR THINK YOU MIGHT KNOW THE DEFENDANT IN THIS CASE, JULIUS OMAR ROBINSON, OR ANY OF HIS FAMILY? YES _____ NO _✓_

Ex. 13 - 264

If yes, in what capacity? _____

112.. DO YOU KNOW JUDGE TERRY R. MEANS OR ANY OF THE COURT PERSONNEL?
YES _____ NO __✓__ If so, please list their names and in what capacity you know them:
_____
_____

113. DO YOU KNOW RICHARD STEPHENS, THE UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF TEXAS, OR ANY OTHER MEMBERS OF HIS STAFF?
YES _____ NO __✓__ If so, please list their names and in what capacity you know them:
_____

114. DO YOU KNOW ANY OF THE OTHER PROSPECTIVE JURORS IN THIS CASE?
YES _____ NO __✓__ If so, please list their names and in what capacity you know them:
_____
_____
_____

115. DO YOU CURRENTLY HAVE ANY PERSONAL PROBLEMS THAT WOULD PREVENT YOU FROM GIVING YOUR FULL ATTENTION TO THE TESTIMONY DURING THE TRIAL? YES _____ NO _____ If yes, please explain: _I have a child_
_that 5yrs old Attend School, I have to sign him in at_
_8:30 Am._

116. If you have any plans to be out of the Fort Worth area during February and/or early March 2002, please indicate the dates and the reason for your absence:
_No_ _____
_____
_____

117. How do you feel about being asked to answer the questions contained in this juror information sheet?
_____
_____

118. Have you, from any source, formed an opinion in this case? Yes _____ No __✓__
If yes, please explain what opinion you have: _____
_____
_____

119. Do you want to serve as a juror in this case? Yes __✓__ no _____ please explain: _____
_____

**Ex. 13 - 265**

120. Is there any information about you which you feel the judge and the attorneys should know in reference to your ability to serve as a juror in this case that has not been set forth above?

Yes _____ no _✓_

If yes, please explain: _____

_____

_____

121. Do you believe that there may be any reason why it would be difficult or impossible for you to be completely fair and impartial in this case? _None_____ if so, what reason is there?

_____

_____

**Ex. 13 - 266**

122. Do you know or have you heard of any of the following potential witnesses in this cause; if so, please circle their name(s):

**GOVERNMENT'S WITNESSES**

1.   Tim McAuliffe
2.   Ben Lopez
3.   Brian Finney
4.   Andrew Merlino
5.   Jamilla Camp
6.   Leteisha Barnett
7.   Jason Gehring
8.   Dakari Warner
9.   Carmen Byrd
10.  Nathan Henderson
11.  Luis Patino
12.  Wendy Patino
13.  Nicholas Marquez
14.  Raul Patino
15.  Vivian Clinkscales
16.  Willie Mae Merritt
17.  Anita Brown
18.  Yolanda Reyes
19.  Marcus Robinson
20.  Brandi Scales
21.  Paulino Toscano
22.  Sheila Spotswood, M.D.
23.  Terry Weber
24.  Juan Hinohosa
25.  Sgt. Bassinger
26.  Linda Crum
27.  Umberto Resendez
28.  Isaac Rodriguez
29.  Alfred Garcia
30.  Arlin Cheater
31.  Robert Cheater
32.  Jerry Robinson
33.  Detective David Rivers
34.  Leon Jenkins
35.  Maria Reyes
36.  Robert Plummer
37.  Officer Richards
38.  Toy Payne
39.  Investigator R.A. Pope

**Ex. 13 - 267**

40.   Dr. Guileyardo
41.   Dr. Ross
42.   Dr. Townsend-Parchman
43.   Dr. Joni McLain
44.   Dr. Barnard
45.   Dr. Joseph Prahlow
46.   Dr. Charles Odom
47.   Derrick Frazier
48.   Roderick Fridia
49.   Johntan Smith
50.   Dettective Danny Muniz
51.   CSSU Daniel Wojcik
52.   CSSU Donald Whitsitt
53.   CSSU Daniel Cannon
54.   Jerrell Gardner
55.   Donald Ray Britton
56.   Rodney O'Neal Wilson
57.   Cheryl Chappel
58.   Quinton Knox
59.   Sheila Shelton
60.   Mark A. Johnson
61.   Phillip E. Jones
62.   Tyrone Bryant
63.   Hendrick Ezell Tunstall
64.   Dr. Marc Krouse
65.   Dr. Nizam Peerwani
66.   Dr. Sissler
67.   Dr. Konzelmann
68.   J. Randy Owen
69.   Haitham Jabsheh
70.   Anita Bonds
71.   Clifford Rogers
72.   Andy Farrell
73.   Larry Taylor
74.   Paul Escamillo
75.   Edvette Russell
76.   Michael Williams
77.   Lisa Hernandez
78.   Crystal Mancilla
79.   Shannon Vega
80.   Ron Fazio
81.   Misty Grounds
82.   Shanita Tarvette Lewis
83.   Kiesha Johnson
84.   Dorothy Hodges

**Ex. 13 - 268**

85. Selena Carter
86. Jennifer Edwards
87. Lindsey Hoy
88. Richard Smart
89. Cantrall Huggins
90. Jewell Ewing
91. Myesha Harmon
92. Dalia Davidson
93. Trooper Brian Sturgill
94. LaQuita Delasbour
95. Lynn Griffin
96. Tom Ekis
97. Max Courtney
98. Richard Dawes
99. Karla Davis
100. Raymond E. Cooper
101. T.L. Armstrong
102. Leslie May
103. Herschel Tebay
104. Stephen Hester
105. Paul DesCamps
106. Ray Perez
107. Michael Kropff
108. Richard Clough
109. Stephen Farrow
110. Kevin Brown
111. Perry Moore
112. Dale Malugani
113. Ray Hinojosa
114. Terry Tabor
115. Richard Martinez
116. Bill Vivoni
117. Daniel Garza
118. Rico Lucero
119. Leslie Tate
120. Vince Ramsour
121. James Malloy
122. Nancy Gilchrest
123. Dan Poe
124. Jeff Rogers
125. Bob Calhoun
126. Dan Goss
127. Stephanie Stanley
128. Mindy Price
129. A.J. Reed

130. R.C. Adams
131. Robert Durko
132. Tim Pinckney
133. Tony Folkers
134. Kirk Dunlop
135. Jerry Wenzel
136. Gregory Cuppett
137. Stephanie Pearson
138. Mark Cox
139. Task Force Agent Thomas Vohsen
140. Frank Christopher
141. Andrew Christopher
142. Tim Heller
143. Tony Dyess
144. TFO Barry Ragsdale
145. Scott Giovanelli
146. Troy Lee Simpson
147. Victor Jiminez
148. Vic Routh
149. Juan Villareal
150. Joe Mata
151. Tim Gilpin
152. Kim Sanders
153. Tony Rivera
154. Matthew Fihlman
155. Anthony Shell
156. Frank Cook
157. Mike Hodges
158. Charmane Camp
159. Special Agent Michael R. Weir
160. Gerardo Briones
161. Carlos Aponte
162. William Claus
163. Patricia Fernandez
164. Ignacio Aranda
165. Wilberto Hernandez
166. Mary Lu Martinez
167. Vince Edsall
168. Richard Mendez
169. Dwayne Birton
170. N. Jeniece Heggins
171. Tim Starmer
172. Ryan Black
173. Dennis K. Pridgen
174. Claybion Cloud III

**Ex. 13 - 270**

Ex. 13 - 271

175.   Jeanna Oxenham
176.   Darin Marcinkiewicz
177.   Jody Augsberger
178.   Jeanne D. Wilkins
179.   Trooper Brian Wworley
180.   Sgt. David Beasley
181.   Iris Wade
182.   Dawn Wallace
183.   Takenya Weston
184.   Reginald Kinchen
185.   Angie Franco
186.   Kimball Hardeman
187.   Joey Branch
188.   Troy Pitcock
189.   Trooper Bruce Dalme
190.   Lidelle Kendrick
191.   Collin Hill
192.   Tommy Ballentine
193.   Andrew Jeager
194.   Cody Elliott
195.   Javier Aguilar
196.   Angela Leach
197.   Jennifer White
198.   Sean Sowards
199.   Jennifer Nelson
200.   Kimberly Johnson
201.   Brian Newell
202.   Tommy Sawyer
203.   Howard Ringer
204.   Michael Pines
205.   Chief Carl McCree
206.   Bobby Robinson
207.   Trooper J.D. Abernathy
208.   Brenda Anderson
209.   Jim Harris
210.   Terrence Holimon
211.   Timothy Caldwell
212.   Sandra Ramsey
213.   Steve Thomas
214.   Deputy Andrew Hawks
215.   Vicki Anderson
216.   Sherry Alsbury
217.   John McLemore
218.   Phil Foster
219.   Daria Hogg

Juror Questionnaire                    26                    Page 26 of 31

220. Jeff Green
221. Earl Hewitt
222. Detective Gary Sodoma
223. Detective Quinn Turner
224. Officer Peeler
225. Ginger Courtney
226. Officer Ryan Eastlick
227. Officer Glenn Norwood
228. Dennis Craig
229. Ozla Ann Tucker

## DEFENDANT'S WITNESSES

1. John Turner
2. Misty Grounds
3. Michael S. Poche
4. Fanisha Hill
5. Detective Karney
6. Hendrick (Hank) Tunstall
7. Isaac Rodriquez
8. Robert Henry
9. Margaret Holiman
10. Rosa Mae Robinson (Holiman)
11. Betty Britt
12. Lynette Wolfe
13. Sgt. Michael Wolfe
14. Kim Burnett
15. Michelle Washington
16. Katrina Washington
17. Cassandra Washington
18. Arlin Cheeter
19. Richard Smart
20. Jerry Robinson
21. Sheila Spotswood, M.D.
22. Jerell Gardner
23. Dakari Warner
24. Nicolas Marquez
25. Wendy Patina
26. Raul Patina
27. Chris Gant
28. Detective Crum

**Ex. 13 - 272**

29.    Victoria Nieto
30.    Yolanda Reyes
31.    Rodney Tilley
32.    Jason Barrett
33.    Polino Toscano
34.    Mike Aginada
35.    Marc Krouse, M.D.
36.    Ronald Fazio
37.    Detective Osegara
38.    Shannon Vega
39.    Benjamin Garcia
40.    Tim McAuliffe
41.    Ben Lopez
42.    Brian Finney
43.    Andrew Merlino
44.    Daniel McCauley
45.    S.G. Sabolchick
46.    John Holimon
47.    Josephine Holimon
48.    Willie White
49.    Eddy Peach
50.    Correctional Officer Wagner
51.    Correctional Officer Logan
52.    Correctional Officer Gibson
53.    Shanita Lewis
54.    LaToya Logan
55.    Travis Dixon
56.    Terrance Holimon
57.    Jamila Camp
58.    Spyra Holimon
59.    Mark Cunningham

**Ex. 13 - 273**

DIRECTIONS: Below, you will find a number of statements expressing different attitudes toward the Death Penalty. Place a check in one of the spaces next to each statement indicating your agreement and/or disagreement with the statement.

| | Strongly Agree | Agree | Slightly Agree | Slightly Disagree | Disagree | Strongly Disagree | |
|---|---|---|---|---|---|---|---|
| A. | | | | | ✓ | | The death penalty is wrong. |
| B. | | ✓ | | | | | The death penalty is the best crime preventative. |
| C. | | | ✓ | | | | The death penalty is absolutely never justified. |
| D. | | ✓ | | | | | I think the death penalty is necessary. |
| E. | ✓ | | | | | | I wish the death penalty were not necessary. |
| F. | | | ✓ | | | | Any person (man or woman; young or old) who commits murder should pay with his own life. |
| G. | | | ✓ | | | | The death penalty cannot be regarded as a sane method for dealing with crime. |
| H. | | | ✓ | | | | The death penalty is wrong, and it is unnecessary even in our imperfect civilization. |
| I. | | | | | ✓ | | The death penalty has never been effective in preventing crime. |
| J. | ✓ | | | | | | We must have the death penalty for some crimes. |
| K. | | | ✓ | | | | I think the return of the whipping post would be more effective than the death penalty. |
| L. | | | | ✓ | | | The death penalty is not necessary to modern civilization. |
| M. | | | ✓ | | | | Life imprisonment is more effective than the death penalty. |

**Ex. 13 - 274**

| | Strongly Agree | Agree | Slightly Agree | Slightly Disagree | Disagree | Strongly Disagree | |
|---|---|---|---|---|---|---|---|
| N. | ___ | ___ | ___ | ___ | ✓ | ___ | Execution of criminals is a disgrace to a civilized society. |
| O. | ___ | ✓ | ___ | ___ | ___ | ___ | The death penalty gives the criminal what he deserves. |
| P. | ___ | ___ | ___ | ✓ | ___ | ___ | The State cannot teach the sacredness of human life by destroying it. |
| Q. | ___ | ___ | ___ | ___ | ___ | ✓ | It doesn't make any difference to me whether we have the death penalty or not. |
| R. | ✓ | ___ | ___ | ___ | ___ | ___ | The death penalty is justified only for premeditated murder. |

DIRECTIONS: Please mark the blank that best corresponds with your opinion as to each of the following statements.

| | Strongly Agree | Slightly Agree | Agree | Disagree | Slightly Disagree | Strongly Disagree | |
|---|---|---|---|---|---|---|---|
| a. | ___ | ___ | ___ | ___ | ✓ | ___ | Black males commit most of the violent crimes in our society. |
| b. | ___ | ___ | ___ | ___ | ✓ | ___ | Today's welfare society is the major cause of crime. |
| c. | ___ | ___ | ___ | ___ | ✓ | ___ | People in prison live a better-quality life than most of the taxpayers who support their lifestyle. |
| d. | ___ | ___ | ___ | ___ | ✓ | ___ | Death by lethal injection is too good/easy for people convicted of capital murder. |
| e. | ✓ | ___ | ___ | ___ | ___ | ___ | There are too many technicalities in the law that allow guilty people to go free. |
| f. | ___ | ✓ | ___ | ___ | ✓ | ___ | The law should concern itself more with victims of crime than with those accused /convicted of crimes. |
| g. | ✓ | ___ | ___ | ___ | ___ | ___ | Police officers must be obeyed without question because they have society's best interests at heart. |

Ex. 13 - 275

|  | Strongly Agree | Slightly Agree | Agree | Disagree | Slightly Disagree | Strongly Disagree |  |
|---|---|---|---|---|---|---|---|
| h. |  |  |  | ✓ |  |  | It is not wrong to lie if it is for a good reason. |
| i. |  |  | ✓ |  |  |  | Only a guilty person would object to a warrantless search of their home, car, or person. |
| j. |  |  | ✓ |  |  |  | People sentenced to prison do not serve any significant portion of their punishment. |
| k. |  |  | ✓ |  |  |  | Parolees are the major cause of crime in today's society. |
| l. |  |  | ✓ |  |  |  | It is morally wrong to be racially prejudiced. |
| m. |  |  | ✓ |  |  |  | Black people who kill white people have received harsher punishment in the past than blacks who kill blacks. |
| o. |  |  | ✓ |  |  |  | The high incidence of violent crime in the United States is largely attributable to the fact that this country is a "melting pot" for different cultures, races, and religions. |
| p. |  |  | ✓ |  |  |  | Eyewitness testimony is the strongest evidence that could be offered to prove who committed a crime. |
| q. |  |  |  |  | ✓ |  | Minorities blame too many problems on racial discrimination. |

## DECLARATION

I declare under penalty of perjury that the information I have provided in this Juror Information Sheet is true and correct.

Executed on ___1·25·02____
(Date)

████████████████████████

Juror's Signature

Ex. 13 - 276

# EXHIBIT 14

Last Name

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:00-CR-0260-Y |
| | § | |
| JULIUS OMAR ROBINSON (02) | § | |

JUROR NO. 66

# JUROR INFORMATION SHEET

INSTRUCTIONS:

Your answers to the following questions are very important to the trial of this case, and are designed to shorten the jury selection process. Do not discuss any of these questions or your answers with anyone else, including any other prospective jurors. Please take as much time as is reasonably necessary to answer each question as completely and as honestly as possible. Please do not accept the assistance or the advice of anyone in answering these questions. If any questions should arise while completing this questionnaire, please contact the presiding judge. Do not speak to anyone else about the questionnaire or any questions you might have.

### YOUR ANSWERS TO THESE QUESTIONS ARE BEING GIVEN UNDER OATH

The answers to these questions will be used by the Court and the attorneys solely for the selection of the jury in this case and for no other reason. The confidentiality of your answers to these questions will be maintained by the Court.

Ex. 14 - 277

## PLEASE PRINT YOUR ANSWERS

### PERSONAL

1. NAME: ~~S~~_____ B_____ (first) (middle) (last) (maiden, if applicable)

DATE OF BIRTH: ___ 1956 AGE: 45 SEX: F RACE: White

BIRTHPLACE: CARnegie ___ OK ___
(city / town) (state)

2. ADDRESS: _____ Ft. Worth 76137
(number and street) (city / town) (zip)

HOME PHONE: ___ 0036 BUSINESS PHONE: ___ 1942 ext 207

3. LENGTH OF TIME AT PRESENT ADDRESS: 12 yrs

4. SINCE 1990 WHAT OTHER CITIES HAVE YOU LIVED IN AND FOR HOW LONG DID YOU LIVE IN EACH CITY? _____

### EMPLOYMENT

5. PLACE OF EMPLOYMENT: Delta Air Lines

6. JOB TITLE OR DESCRIPTION: Customer Care Rep

BUSINESS HOURS: 9:30- 6p LENGTH OF PRESENT EMPLOYMENT: 3 yr

SUPERVISOR: _____

7. PLEASE LIST YOUR OCCUPATION OR EMPLOYMENT FOR THE PAST TEN (10) YEARS: ~~Sales~~ phone sales Rep.

8. WHAT OTHER TYPES OF JOBS HAVE YOU HELD? Cashier /Asst mgr CONVienience store

If you could change your profession, what would you change it to? Pilot

Juror Questionnaire                    2                    Page 2 of 31

**Ex. 14 - 278**

# FAMILY

9.    MARTIAL STATUS: (circle appropriate answer(s))

a) Married                                    f). Previously Divorced
b). Single                                         (how many times _1_ )
c). Separated
d) Divorced                              g). Living With Someone
e). Spouse Deceased

10.    NAME OF SPOUSE: ███████████████████████████ _____
                            (first)        (middle)        (last)        (maiden, if applicable)

11.    SPOUSE'S EMPLOYER: Federal Aviation Admin

       Job Title Or Description: Air Traffic Control

       Length Of Present Employment: 15 yrs

       What Other Types Of Jobs Has Your Spouse Held? None

12.    PLEASE INDICATE THE APPROXIMATE TOTAL ANNUAL GROSS INCOME OF YOUR HOUSEHOLD:
       Under $10,000 _____          $10,000 to $30,000 _____
       $30,000 to $50,000 _____     $50,000 to $70,000 _____
       $70,000 to $100,000 _____    Over $100,000 _105,000.00_

13.    PLEASE PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR CHILDREN AND STEPCHILDREN, IF ANY:

| | Name | Sex | Age | School or Occupation |
|---|---|---|---|---|
| a | ███████████████ | F | 28 | TCJC /Tarrant county title Clerk |
| b | | | | |
| c | | | | |
| d | | | | |
| e | | | | |
| f | | | | |

14.    IF YOU HAVE GRANDCHILDREN, HOW MANY? _1_

Juror Questionnaire                    3                    Page 3 of 31

**Ex. 14 - 279**

15. PLEASE PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR PARENTS AND YOUR STEPPARENTS, IF ANY:

|  | Name | Age | City of Residence | Retired | Occupation/Employment (before retirement, if applicable) |
|---|---|---|---|---|---|
| Father: | ▉▉▉ | 68 | LAwton OK | No | OK. Corporation Comm. |
| Mother: | Deceased | | | | |
| Stepfather: | | | | | |
| Stepmother: | | | | | |

Were Your Parents Ever Divorced? No

16. PLEASE PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR BROTHERS AND SISTERS, IF ANY?

|  | Name | Sex | Age | School or Occupation |
|---|---|---|---|---|
| a. | ▉▉▉ | F | 49 | None |
| b. | ▉▉▉ | F | 47 | None |
| c. | ▉▉▉ | m | 44 | Heating + Air Conditioning |
| d. | ▉▉▉ | F | 42 | Hospital Administration |
| e. | ▉▉▉ | | 40 | Heating & Air Conditioning |
| f. | | | | |

Ex. 14 - 280

## EDUCATION

17. Please give your educational background. Please include how far you went in school; the names of any technical or trade schools attended; any college and graduate schools you have attended, together with major subject and degrees received, if any:

_10th grade — GED — 1yr Cameron Univ Lawton OK_

18. Please give your spouse's educational background: _Graduate fork Union Military Academy / 1yr San Francisco State / 1yr Cameron Univ Lawton_

19. Are you or your spouse presently enrolled as a student? Yes _____ No ✓
If so, please give details: _____

## MILITARY

20. HAVE YOU EVER SERVED IN THE MILITARY? _NO_ IF SO, PLEASE GIVE THE FOLLOWING INFORMATION: Branch _____, Years of Service _____,
Enlist? _____, Re-enlist? _____
Highest grade or rank attained: _____
Duties: _____

Did you serve in combat? _____ Year Discharged? _____
Type of Discharge: _____ Did you participate in any
Courts Martial? _____ Please Explain: _____

Did you ever serve in the military police? _____

21. HAS YOUR SPOUSE EVER SERVED IN THE MILITARY? _____
IF SO, PLEASE GIVE THE FOLLOWING INFORMATION:
Branch _Army_, Years of Service _10_,
Enlist? _yes_, Re-enlist? _yes_
Highest grade or rank attained: _E6_
Duties: _Air Traffic Control_

Did he/she serve in combat? _No_ Year Discharged? _1986_
Type of Discharge: _Honorable_
Did he/she participate in any Courts Martial? _No_
    IF SO, Please Explain: _____

Did he/she ever serve in the military police? _No_

**Ex. 14 - 281**

## RELIGION

22. RELIGIOUS PREFERENCE: _Baptist_
Name And Location Of Church, Temple, Synagogue Or Other Religious Organization with which you are affiliated, if any: _None_

Have you studied for the ministry, priesthood, rabbinic order, or any other clergy position? _No_

23. How often do you attend services? _Never_
Past or present church offices held: _None_
Other than attendance, what activities do you participate in at your church? _None_
Have there been any recent changes in your religious activities? Yes ____ No ✓
If Yes, Please explain: ____

24. Were you raised in a religion different from the one you now practice? If so, please explain: _No_

25. Does your spouse practice a religion different from yours? _No_
If so, please explain: ____

26. Do you currently, or have you in the past, supported, or routinely watched or listened to any radio or television ministry?
If so, please indicate which ministry: _No_

27. Do you have a personal philosophy or favorite saying that reflects your personal philosophy that can be expressed in a few sentences or less? YES ✓ NO ____ If yes, please state it: _Life is short so get over it._

Ex. 14 - 282

## POLITICAL

28.   DO YOU HAVE A POLITICAL PREFERENCE? _Yes_____
      Democrat ____        Republican _✓___     Independent ____      Other _____
      Does your spouse have a different preference? _NO___
      If so, please explain: _____

29.   DO YOU IDENTIFY WITH OR SUPPORT A POLITICAL PARTY?  If so, which one?
      Democrat ____        Republican _✓___     Independent ____      Other _____
      Is your spouse a member or supporter of a different party? _NO_____
      If so, please explain: _____

30.   DO YOU CONSIDER YOURSELF TO BE POLITICALLY CONSERVATIVE, MODERATE,
      OR LIBERAL? _Moderate_____
      Does your spouse have a different political philosophy? _NO_
      If so, please explain: _____

31.   HAVE YOU EVER SOUGHT OR HELD A POLITICAL OFFICE? _No_____ If yes,
      please give details: _____
      _____

32.   Have you or your spouse ever worked in a political campaign for a candidate or for a political
      group, seeking change in a law or in enforcement of a law? _NO_____
      If so, please describe: _____
      _____


## PHYSICAL/MEDICAL

33.   DO YOU HAVE ANY DIFFICULTY IN READING OR WRITING? _No_____ If so,
      please explain: _____

34.   DO YOU HAVE ANY DIFFICULTY IN SIGHT OR HEARING, OR DO YOU HAVE ANY
      OTHER DISABILITY OR DISEASE THAT WOULD MAKE JURY SERVICE A HARDSHIP
      FOR YOU? _No__  If so, please explain: _____
      _____

35.   ARE YOU CURRENTLY TAKING ANY MEDICATION? _Yes_____
      If so, please give the name of the medication and the reason you take it:
      _Wellbutrin/Prozac/Clonezapam/Glaucophage/Glyberide_

Ex. 14 - 283

36. ARE YOU OR ANY OF THE MEMBERS OF YOUR FAMILY CURRENTLY BEING TREATED FOR A MEDICAL ILLNESS WHICH WOULD PREVENT OR IMPAIR YOUR JURY SERVICE?  *NO*
If so, please explain: _____
_____

37. HAVE YOU, ANY FAMILY MEMBERS, OR ANY CLOSE FRIENDS EVER UNDERGONE COUNSELING, TREATMENT, OR HOSPITALIZATION FOR PSYCHIATRIC, EMOTIONAL, FAMILY, BEHAVIORAL, OR SUBSTANCE ABUSE PROBLEMS?
*myself Yes - emotional /sister Diana Bryant   Bi Polar*
If so, please give details (including the name of the hospital and/or doctor/counselor seen):
*Springwood HEB   Dr Cecil*

38. DO YOU HAVE A FAMILY MEMBER, FRIEND, OR OTHER PERSON WITH WHOM YOU ARE ASSOCIATED WHO HAS BEEN DIAGNOSED AS MENTALLY RETARDED OR AS HAVING A LEARNING DISABILITY?  *NO* _____

39. HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER WORKED IN A MENTAL HEALTH FACILITY OR HOSPITAL OF ANY KIND?   If so, please describe:
*NO* _____

40. HAVE YOU EVER READ BOOKS OR ARTICLES DEALING WITH PSYCHIATRY, PSYCHOLOGY, MENTAL HEALTH OR MENTAL RETARDATION?  If so, please describe:
*yes   Books on dealing with Grief and depression*

41. DO YOU OR YOUR SPOUSE PERSONALLY KNOW ANY PSYCHIATRISTS OR PSYCHOLOGISTS? If so, please name: *Dr Rosemary Cecil*

42. HAVE YOU EVER TAKEN ANY COURSES IN THE FIELDS OF PSYCHIATRY OR PSYCHOLOGY? If so, please describe: *psychology I @ Cameron Univ*

43. DO YOU HAVE ANY PREJUDICE IN FAVOR OF, AGAINST, OR ANY FIXED OPINIONS CONCERNING PSYCHIATRIC OR PSYCHOLOGICAL TESTIMONY?  *No* If so, please explain: _____
_____

**Ex. 14 - 284**

## CAPITAL PUNISHMENT/DEATH PENALTY

44. DO YOU HAVE ANY MORAL, RELIGIOUS, OR PERSONAL BELIEFS THAT WOULD PREVENT YOU FROM SITTING IN JUDGMENT OF ANOTHER HUMAN BEING?

   YES _____     NO _✓_

45. ARE YOU IN FAVOR OF THE DEATH PENALTY AS A PUNISHMENT FOR CRIME?

   YES _✓_     NO _____

   Please explain: _When you commit a murder without explanation or reason_

46. DO YOU BELIEVE THAT THE DEATH PENALTY SERVES ANY LEGITIMATE PURPOSE OR PURPOSES IN OUR SOCIETY?

   YES _✓_     NO _____

   If so, what purpose or purposes do you believe that it serves? _It says that certain types of behavior will not be Tolerated"_

47. WITH REFERENCE TO THE DEATH PENALTY, WHICH OF THE FOLLOWING SIX STATEMENTS BEST REPRESENT YOUR BELIEFS: (circle one)

   a.    "I believe that the death penalty is appropriate for all crimes involving murder."

   (b.)    "I believe that the death penalty is appropriate for some crimes involving murder and I could return a verdict which assessed the death penalty in a proper case."

   c.    "I believe that the death penalty is appropriate for some crimes involving murder, but I could never return a verdict which assessed the death penalty."

   d.    "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it, under the proper set of circumstances."

   e.    "I could never, regardless of the facts and circumstances, return a verdict which assessed the death penalty."

   f.    None of the above.

48. FOR WHAT CRIMES DO YOU THINK THE DEATH PENALTY SHOULD BE AVAILABLE?

   _murder   treason_

Ex. 14 - 285

49.  DO YOU BELIEVE THAT THE DEATH PENALTY SHOULD BE USED MORE FREQUENTLY, LESS FREQUENTLY, ABOUT THE SAME AS IT HAS BEEN, OR NOT AT ALL, AS A PUNISHMENT FOR CRIME?  *About the same*

50.  DO YOU KNOW WHETHER YOUR RELIGION OR YOUR SPOUSE'S RELIGION HAS AN OFFICIAL POSITION IN REGARD TO THE USE OF THE DEATH PENALTY AS A PUNISHMENT FOR CRIME?  YES _____  NO _✓_  If yes, what position has it taken?

_____

Does this conflict with your own personal feelings regarding the death penalty?

_____
_____

50a.  DO YOU AND YOUR SPOUSE HAVE CONFLICTING BELIEFS REGARDING THE USE OF THE DEATH PENALTY AS A PUNISHMENT FOR CRIME?  YES _____  NO _✓_
If yes, how do they conflict? _____

_____
_____

51.  DO YOU BELIEVE THAT THE DEATH PENALTY IS NOW BEING, OR HAS IN THE PAST BEEN, APPLIED IN A RACIALLY DISCRIMINATORY MANNER?  YES _✓_  NO _____
PLEASE EXPLAIN:  *I believe prior to the 1980's you were more likely to be sentenced to death if you were black or Hispanic*

52.  DO YOU HAVE ANY MORAL, RELIGIOUS, OR PERSONAL BELIEFS THAT WOULD PREVENT YOU FROM RETURNING A VERDICT WHICH WOULD ULTIMATELY RESULT IN THE EXECUTION OF ANOTHER HUMAN BEING?  YES _____  NO _✓_
If yes, please explain: _____

52a.  IF A SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE IS AN OPTION, COULD YOU NEVERTHELESS RECOMMEND A SENTENCE OF DEATH?
YES _✓_  NO _____
Please explain: *For some crimes Death is the only verdict that fits the crime*

52b.  DO YOU BELIEVE THAT AN INNOCENT PERSON HAS EVER BEEN EXECUTED FOR A CRIME IN THE UNITED STATES IN THE LAST 20 YEARS?  *yes*

**Ex. 14 - 286**

53c. DO YOU KNOW OF ANY CASES WHERE THE GOVERNMENT SOUGHT THE DEATH PENALTY AT TRIAL AND WAS UNSUCCESSFUL?
YES _✓_ NO ____.
IF YES, HOW DID YOU FEEL ABOUT THE OUTCOME OF THE CASE?
_I thought they got what they deserved_

## PERSONAL

53. DO YOU OR THE MEMBERS OF YOUR IMMEDIATE FAMILY OWN A PET(S).
If so, what kind? _Dog_

54. WHAT KIND OF VEHICLE DO YOU DRIVE? _Nisson Sentra_
WHAT KIND OF VEHICLE DOES YOUR SPOUSE DRIVE? _Nisson Pick up_

55. To which civic clubs, societies, professional associations, or other organizations do you belong? Please indicate offices held, if any:
_None_

56. Do you contribute money or services to any charitable organization?
If so, please describe: _United Way / Arlington mission_
_Red Cross – money_

57. Are you or your spouse a member of (Or have you ever been a member of) any neighborhood, local, state, or nationwide crime prevention watch organization? YES ____ NO _✗_
If yes, please describe: _____

58. WHAT ARE YOUR HOBBIES? _Reading mysteries going to the movies_

59. DO YOU SUBSCRIBE TO AND/OR REGULARLY READ A NEWSPAPER?
YES ____ NO _✗_ If yes, which one(s): _____

60. WHAT ARE YOUR FAVORITE MOVIES? _Return to me Gladiator  Casa Blanca  The Uninvited (1930?)_

Ex. 14 - 287

61. WHAT ARE YOUR FAVORITE TELEVISION SHOWS, OR WHICH SHOWS DO YOU REGULARLY WATCH? That 70's show   Will + Grace. Frasier   Dateline   whose line is it anyway   law And Order - All of them

62. WHAT WAS THE LAST BOOK YOU READ? Chosen Prey   John Sanford

63. WHAT IS YOUR LEAST FAVORITE TYPE OF READING MATERIAL? Technical manuals

64. HAVE YOU EVER READ A BOOK ABOUT A MURDER TRIAL? YES ✓ NO
Which book or trial? Can't remEmber the name - The Manson Murders

65. WHAT IS YOUR FAVORITE RADIO STATION? None

66. DO YOU SUBSCRIBE TO OR REGULARLY READ ANY MAGAZINES?
YES _____ NO X
If so, which one(s)? _____

67. Have you ever written a letter to the editor? YES X NO _____
If so, about what subject? The papers bias to one part gor another

68. Do you or have you displayed a bumper sticker on your car?
YES _____ NO X
If yes, what was the message: _____

69. HAVE YOU EVER BEEN OPPOSED TO ANY GOVERNMENT ACTION?
YES X NO _____
If so, did you express your opposition? Yes X No _____
How? Vietnam War / giving away Panama Canal Anything to do w/ Bill Clinton

70. Have you ever owned personalized licensed plates? YES _____ NO X If yes, what was the message: _____

71. LIST FIVE INDIVIDUALS WHO ARE PUBLICLY KNOWN WHOM YOU MOST RESPECT:
George Bush Jr          Ron Kirk
Ronald Reagan
Kay Bailey Hutchison    Colin Powell

**Ex. 14 - 288**

72.  HAVE YOU, A FAMILY MEMBER OR CLOSE FRIEND EVER HAD A BAD EXPERIENCE WITH A PERSON OF ANOTHER RACE?   YES ✓   NO ⊘ If yes, please explain:

My father was bitten by a Black Male while placing him under arrest - 1970's

Ex. 14 - 289

## CRIMINAL JUSTICE SYSTEM/LAW ENFORCEMENT

73. HAVE YOU, YOUR SPOUSE, ANY FAMILY MEMBER, OR CLOSE FRIEND EVER BEEN ACCUSED, ARRESTED, INDICTED, CHARGED BY ANY MEANS, OR CONVICTED (including probation, deferred adjudication, conditional discharge, etc.)   OF A CRIME OTHER THAN A TRAFFIC TICKET?   YES ✓    NO ___
If yes, please give details: _Daughter-drug paraphenalia - deferred adjudication_

74. HAVE YOU, YOUR SPOUSE, OR ANY FAMILY MEMBER EVER USED THE SERVICES OF AN ATTORNEY FOR ANY REASON?   YES ✓   NO ___
If yes, please give details and name of attorney: _My Divorce And daughters Arrest    I can't remember thier Names_

75. DO YOU, YOUR SPOUSE, OR ANY FAMILY MEMBERS KNOW OR HAVE ANY FRIENDS WHO ARE ATTORNEYS?   YES ___   NO ✓
If yes, please give attorneys' names and the types of practice they have:

76. WHAT IS YOUR IMPRESSION OF PROSECUTORS IN GENERAL? _They prosecute_

77. WHAT IS YOUR IMPRESSION OF CRIMINAL DEFENSE ATTORNEYS IN GENERAL? _They defend_

78. PLEASE INDICATE WHICH OF THE FOLLOWING YOU BELIEVE WOULD BE THE GREATER WRONG:

___ For a jury to find a guilty person "not guilty;"
✗ For a jury to find an innocent person "guilty."

79. PLEASE RANK IN ORDER OF IMPORTANCE TO YOU THE FOLLOWING PURPOSES FOR PUNISHMENT IN A CRIMINAL CASE:

_3_ Punishment/retribution
_1_ Deterrence/prevention
_2_ Rehabilitation/reform

**Ex. 14 - 290**

80.  Do you know anyone who has been in jail, or who has been to prison, or who is in prison?
YES _____ NO ✓
If yes, please give details: _____
_____
_____

81.  Have you or any member of your family ever been associated or worked with any program involved with the prevention of crime, the apprehension or punishment of offenders, or the rehabilitation of persons convicted of a crime? YES ✓ NO _____ If yes, please give details: *my father used to be a Sheriffs deputy -in the 1970's*

82.  Have you, your spouse, any family member or close friend ever been the victim of a crime, a witness to a crime, or been interested in the outcome of any criminal case (either personally or through the media)?
YES ✓ NO _____ If yes, please give details: *OJ Simpson/ I was Molested when I was 14 yrs old*

83.  Have you ever been to any of the Federal, State, or County courthouses before?
YES ✓ NO _____
If yes, for what reason: *Jury duty*
_____
_____

84.  Have you ever used the services of the United States Attorney's office or any other prosecutor's office (for example: hot checks, child support)?
YES _____ NO ✓
If yes, please give details: _____

85.  HAVE YOU OR YOUR SPOUSE EVER SERVED ON A GRAND JURY?
YES _____ NO ✓
If yes, please give details: _____

86.  HAVE YOU OR YOUR SPOUSE EVER BEEN A JUROR IN A CIVIL CASE?
YES _____ NO ✓         If Yes, please provide the following information:
Who (i.e. you, your spouse, or both)? _____ When? _____
What type of case? _____ Were you/spouse the foreperson? Yes _____ No _____
What Court was it in? _____ Did the jury assess damages? Yes _____ No _____
Is there anything about your/your spouse's experience as a juror in that case which would affect your service in this case? Yes _____ No _____ If yes, please give details: _____

Ex. 14 - 291

87.  HAVE YOU OR YOUR SPOUSE EVER BEEN A JUROR IN A CRIMINAL CASE?
     YES _____ NO ⟋    If Yes, please provide the following information:
Who (i.e. you, your spouse, or both)? _____ When? _____
What type of case? _____ Were you/spouse the foreperson? Yes ___ No ___
What Court was it in? _____ Did the jury reach a verdict? Yes ___ No ___
What was your verdict? _____
Was the jury called upon to assess punishment? Yes ____ No ____
What was the punishment assessed: _____
Is there anything about your/your spouse's experience as a juror in that case which would affect your service in this case?   Yes _____   No _____    If yes, please give   details:
_____
_____

88.  HAVE YOU, YOUR SPOUSE, A RELATIVE OR CLOSE FRIEND, PRESENTLY OR IN THE PAST, BEEN A MEMBER OR EMPLOYEE OF A LAW ENFORCEMENT AGENCY OR ORGANIZATION? (Example: city, county, state or federal police officer; constable; deputy sheriff; ranger; Texas Department of Public Safety officer; auxiliary or reserve of any such organization or agency?) If so, please give name and describe: My Father was a Comanche County OK Sheriffs deputy
_____

89.  HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER APPLIED FOR A JOB IN LAW ENFORCEMENT? If so, please describe: No
_____

90.  HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER BEEN CONNECTED WITH LAW ENFORCEMENT IN ANY OTHER WAY?
If so, please describe: only as friends
_____
_____

91.  HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER STUDIED LAW?
YES ____ NO ⟋ If yes, please give details: _____
_____
_____

92.  HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER HAD AN UNPLEASANT EXPERIENCE INVOLVING LAW ENFORCEMENT?
YES ⟋ NO ____ If yes, please give details: The officer was questioning teenagers infront of the parent about a missing case of beer which I thought was stupid & told him so

93.  HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER WORKED AS A SECURITY GUARD OR FOR A SECURITY SERVICE?  If so, please give details:
_No_

94.  Do you have any strong personal feelings about law enforcement in general, or police officers in particular?    YES _____  NO _✓_
If yes, please explain: _____

95.  What is your personal opinion about the criminal justice system and the way it works? _Its a good system but moves too slowly to act as a deterrent_

95a  What is your opinion of plea bargaining? _it saves money_

95b  Do you believe the testimony of an accomplice to a violent crime is generally reliable?
Yes ____ No _✓_ Please explain. _They will put things in a way that they look less guilty_

95c  Do you believe that the testimony of witnesses that have admitted committing crimes and who have entered plea agreements with the government calling for the possibility of leniency for their assistance is generally reliable? Yes _✓_. No ___
Please explain _if they lie they loose the leniency_

96.  Do you believe that there are any changes which we could make in our criminal justice system which would make it more efficient in dealing with the problem of crime? Yes _✓_ No ___
If so, what changes could be made?
_More Judges to speed things up._

97.  Do you believe that trial by jury is the best system for the trial of criminal cases?
YES _✓_ NO ____  What factors about the jury trial system make you feel this way?
_____

98.  Do you believe the question of punishment, once a person has been found guilty of a crime, should be decided by a judge or by a jury?
_Jury_

**Juror Questionnaire**                              17                              **Page 17 of 31**

**Ex. 14 - 293**

99.   Do you believe that the death penalty should be assessed by a judge or by a jury? _jury_.
Why do you believe this method is more appropriate? _if you're able to assign guilt you should be able to make the decision as to punishment_

100.  Do you believe that a person who is charged with committing a violent crime should be allowed to be released from custody on a reasonable bail pending the trial of that case? _yes_

101.  Do you believe that most people charged with having committed a crime are actually guilty of that crime? _Yes_

102.  Do you believe that most eyewitnesses to violent crimes are generally reliable in their recollections of the facts? _NO_

103.  HAVE YOU EVER BEEN ACCUSED OF DOING SOMETHING THAT YOU DID NOT DO?
If yes, please explain: _No_

104.  HAVE YOU EVER VISITED INSIDE A PRISON OR A JAIL?   YES _____   NO _✓_
If yes, what was your impression? _____

105.  Do you believe our penal system is ever successful in rehabilitating/reforming persons convicted of crime?  YES _✓_ NO ____
Please explain your answer: _Some people are "scared straight"_

106.  Do you believe that innocent people ever actually get convicted of crimes? _yes_

107.  Do you believe that there is more, less, or about the same amount of violent crime in your community as there was ten years ago? _more_
If you believe there is _more_ or _less_ crime now, for what reason do you believe there has been a change? _Neighborhood has grown - A LOT._

Ex. 14 - 294

## CASE SPECIFICS

108.    DO YOU KNOW OR BELIEVE YOU KNOW, ANYTHING ABOUT THE FACTS OR PURPORTED FACTS OF THIS CASE, EITHER FROM THE NEWSPAPER, TV OR OTHER SOURCES? ___NO_____ If so, what facts or purported facts and from what source (be as specific as possible--include information about all publicity related to this case to which you have been exposed):

_____

_____

_____

_____

_____

_____

_____

108a    Did you know Rudolfo Resendez or any of his family members during his lifetime? Yes _____ No __X__. If yes, in what capacity? _____

108b    Did you know Juan Reyes or any of his family members during his lifetime? Yes _____ No __X__. If yes, in what capacity? _____

108c    Did you know Johnny Shelton or any of his family members during his lifetime? Yes _____ No __X__. If yes, in what capacity? _____

108d    Have you ever been to Dermott, Arkansas? Yes _____ No __X__. If yes, why, when and how long were you there? _____

109.    DO YOU KNOW OR HAVE YOUR HEARD OF EITHER OF THE DEFENSE ATTORNEYS IN THIS CASE, Wes Ball or Jack Strickland? YES _____ NO __X__ If yes, how do you know them or what have your heard about them?

_____

_____

110.    DO YOU KNOW OR HAVE YOU HEARD OF ANY OF THE PROSECUTORS IN THIS CASE, Fred Schattman or Reed O'Connor ? YES _____ NO __X__ If yes, how do you know them or what have your heard about them?

_____

_____

111.    DO YOU KNOW OR THINK YOU MIGHT KNOW THE DEFENDANT IN THIS CASE, JULIUS OMAR ROBINSON, OR ANY OF HIS FAMILY? YES _____ NO __X__

**Ex. 14 - 295**

If yes, in what capacity? _____

112.. DO YOU KNOW JUDGE TERRY R. MEANS OR ANY OF THE COURT PERSONNEL?
YES _____ NO X If so, please list their names and in what capacity you know them:
_____
_____

113. DO YOU KNOW RICHARD STEPHENS, THE UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF TEXAS, OR ANY OTHER MEMBERS OF HIS STAFF?
YES _____ NO X If so, please list their names and in what capacity you know them:
_____

114. DO YOU KNOW ANY OF THE OTHER PROSPECTIVE JURORS IN THIS CASE?
YES _____ NO X If so, please list their names and in what capacity you know them:
_____
_____
_____

115. DO YOU CURRENTLY HAVE ANY PERSONAL PROBLEMS THAT WOULD PREVENT YOU FROM GIVING YOUR FULL ATTENTION TO THE TESTIMONY DURING THE TRIAL? YES _____ NO X If yes, please explain: _____
_____
_____

116. If you have any plans to be out of the Fort Worth area during February and/or early March 2002, please indicate the dates and the reason for your absence:
_____
_____
_____

117. How do you feel about being asked to answer the questions contained in this juror information sheet? _OK I guess you think you need to know_

118. Have you, from any source, formed an opinion in this case? Yes _____ No X
If yes, please explain what opinion you have: _____
_____
_____

119. Do you want to serve as a juror in this case? Yes X no _____ please explain: _Natural competitive nature. If I'm not I'll wonder why — plus it gives me real courtroom experience I think that it would be interesting._

Juror Questionnaire                    20                    Page 20 of 31

**Ex. 14 - 296**

120. Is there any information about you which you feel the judge and the attorneys should know in reference to your ability to serve as a juror in this case that has not been set forth above?
Yes _____ no ✔
If yes, please explain: _____
_____
_____

121. Do you believe that there may be any reason why it would be difficult or impossible for you to be completely fair and impartial in this case? __No_____ if so, what reason is there?
_____
_____

**Ex. 14 - 297**

122.    Do you know or have you heard of any of the following potential witnesses in this cause; if so, please circle their name(s):

### GOVERNMENT'S WITNESSES

1.   Tim McAuliffe
2.   Ben Lopez
3.   Brian Finney
4.   Andrew Merlino
5.   Jamilla Camp
6.   Leteisha Barnett
7.   Jason Gehring
8.   Dakari Warner
9.   Carmen Byrd
10.  Nathan Henderson
11.  Luis Patino
12.  Wendy Patino
13.  Nicholas Marquez
14.  Raul Patino
15.  Vivian Clinkscales
16.  Willie Mae Merritt
17.  Anita Brown
18.  Yolanda Reyes
19.  Marcus Robinson
20.  Brandi Scales
21.  Paulino Toscano
22.  Sheila Spotswood, M.D.
23.  Terry Weber
24.  Juan Hinohosa
25.  Sgt. Bassinger
26.  Linda Crum
27.  Umberto Resendez
28.  Isaac Rodriguez
29.  Alfred Garcia
30.  Arlin Cheater
31.  Robert Cheater
32.  Jerry Robinson
33.  Detective David Rivers
34.  Leon Jenkins
35.  Maria Reyes
36.  Robert Plummer
37.  Officer Richards
38.  Toy Payne
39.  Investigator R.A. Pope

**Ex. 14 - 298**

40.    Dr. Guileyardo
41.    Dr. Ross
42.    Dr. Townsend-Parchman
43.    Dr. Joni McLain
44.    Dr. Barnard
45.    Dr. Joseph Prahlow
46.    Dr. Charles Odom
47.    Derrick Frazier
48.    Roderick Fridia
49.    Johntan Smith
50.    Dettective Danny Muniz
51.    CSSU Daniel Wojcik
52.    CSSU Donald Whitsitt
53.    CSSU Daniel Cannon
54.    Jerrell Gardner
55.    Donald Ray Britton
56.    Rodney O'Neal Wilson
57.    Cheryl Chappel
58.    Quinton Knox
59.    Sheila Shelton
60.    Mark A. Johnson
61.    Phillip E. Jones
62.    Tyrone Bryant
63.    Hendrick Ezell Tunstall
64.    Dr. Marc Krouse
65.    Dr. Nizam Peerwani
66.    Dr. Sissler
67.    Dr. Konzelmann
68.    J. Randy Owen
69.    Haitham Jabsheh
70.    Anita Bonds
71.    Clifford Rogers
72.    Andy Farrell
73.    Larry Taylor
74.    Paul Escamillo
75.    Edvette Russell
76.    Michael Williams
77.    Lisa Hernandez
78.    Crystal Mancilla
79.    Shannon Vega
80.    Ron Fazio
81.    Misty Grounds
82.    Shanita Tarvette Lewis
83.    Kiesha Johnson
84.    Dorothy Hodges

**Ex. 14 - 299**

Ex. 14 - 300

85.  Selena Carter
86.  Jennifer Edwards
87.  Lindsey Hoy
88.  Richard Smart
89.  Cantrall Huggins
90.  Jewell Ewing
91.  Myesha Harmon
92.  Dalia Davidson
93.  Trooper Brian Sturgill
94.  LaQuita Delasbour
95.  Lynn Griffin
96.  Tom Ekis
97.  Max Courtney
98.  Richard Dawes
99.  Karla Davis
100. Raymond E. Cooper
101. T.L. Armstrong
102. Leslie May
103. Herschel Tebay
104. Stephen Hester
105. Paul DesCamps
106. Ray Perez
107. Michael Kropff
108. Richard Clough
109. Stephen Farrow
110. Kevin Brown
111. Perry Moore
112. Dale Malugani
113. Ray Hinojosa
114. Terry Tabor
115. Richard Martinez
116. Bill Vivoni
117. Daniel Garza
118. Rico Lucero
119. Leslie Tate
120. Vince Ramsour
121. James Malloy
122. Nancy Gilchrest
123. Dan Poe
124. Jeff Rogers
125. Bob Calhoun
126. Dan Goss
127. Stephanie Stanley
128. Mindy Price
129. A.J. Reed

130. R.C. Adams
131. Robert Durko
132. Tim Pinckney
133. Tony Folkers
134. Kirk Dunlop
135. Jerry Wenzel
136. Gregory Cuppett
137. Stephanie Pearson
138. Mark Cox
139. Task Force Agent Thomas Vohsen
140. Frank Christopher
141. Andrew Christopher
142. Tim Heller
143. Tony Dyess
144. TFO Barry Ragsdale
145. Scott Giovanelli
146. Troy Lee Simpson
147. Victor Jiminez
148. Vic Routh
149. Juan Villareal
150. Joe Mata
151. Tim Gilpin
152. Kim Sanders
153. Tony Rivera
154. Matthew Fihlman
155. Anthony Shell
156. Frank Cook
157. Mike Hodges
158. Charmane Camp
159. Special Agent Michael R. Weir
160. Gerardo Briones
161. Carlos Aponte
162. William Claus
163. Patricia Fernandez
164. Ignacio Aranda
165. Wilberto Hernandez
166. Mary Lu Martinez
167. Vince Edsall
168. Richard Mendez
169. Dwayne Birton
170. N. Jeniece Heggins
171. Tim Starmer
172. Ryan Black
173. Dennis K. Pridgen
174. Claybion Cloud III

**Ex. 14 - 301**

175.   Jeanna Oxenham
176.   Darin Marcinkiewicz
177.   Jody Augsberger
178.   Jeanne D. Wilkins
179.   Trooper Brian Wworley
180.   Sgt. David Beasley
181.   Iris Wade
182.   Dawn Wallace
183.   Takenya Weston
184.   Reginald Kinchen
185.   Angie Franco
186.   Kimball Hardeman
187.   Joey Branch
188.   Troy Pitcock
189.   Trooper Bruce Dalme
190.   Lidelle Kendrick
191.   Collin Hill
192.   Tommy Ballentine
193.   Andrew Jeager
194.   Cody Elliott
195.   Javier Aguilar
196.   Angela Leach
197.   Jennifer White
198.   Sean Sowards
199.   Jennifer Nelson
200.   Kimberly Johnson
201.   Brian Newell
202.   Tommy Sawyer
203.   Howard Ringer
204.   Michael Pines
205.   Chief Carl McCree
206.   Bobby Robinson
207.   Trooper J.D. Abernathy
208.   Brenda Anderson
209.   Jim Harris
210.   Terrence Holimon
211.   Timothy Caldwell
212.   Sandra Ramsey
213.   Steve Thomas
214.   Deputy Andrew Hawks
215.   Vicki Anderson
216.   Sherry Alsbury
217.   John McLemore
218.   Phil Foster
219.   Daria Hogg

**Ex. 14 - 302**

220. Jeff Green
221. Earl Hewitt
222. Detective Gary Sodoma
223. Detective Quinn Turner
224. Officer Peeler
225. Ginger Courtney
226. Officer Ryan Eastlick
227. Officer Glenn Norwood
228. Dennis Craig
229. Ozla Ann Tucker

## DEFENDANT'S WITNESSES

1. John Turner
2. Misty Grounds
3. Michael S. Poche
4. Fanisha Hill
5. Detective Karney
6. Hendrick (Hank) Tunstall
7. Isaac Rodriquez
8. Robert Henry
9. Margaret Holiman
10. Rosa Mae Robinson (Holiman)
11. Betty Britt
12. Lynette Wolfe
13. Sgt. Michael Wolfe
14. Kim Burnett
15. Michelle Washington
16. Katrina Washington
17. Cassandra Washington
18. Arlin Cheeter
19. Richard Smart
20. Jerry Robinson
21. Sheila Spotswood, M.D.
22. Jerell Gardner
23. Dakari Warner
24. Nicolas Marquez
25. Wendy Patina
26. Raul Patina
27. Chris Gant
28. Detective Crum

Ex. 14 - 303

29.  Victoria Nieto
30.  Yolanda Reyes
31.  Rodney Tilley
32.  Jason Barrett
33.  Polino Toscano
34.  Mike Aginada
35.  Marc Krouse, M.D.
36.  Ronald Fazio
37.  Detective Osegara
38.  Shannon Vega
39.  Benjamin Garcia
40.  Tim McAuliffe
41.  Ben Lopez
42.  Brian Finney
43.  Andrew Merlino
44.  Daniel McCauley
45.  S.G. Sabolchick
46.  John Holimon
47.  Josephine Holimon
48.  Willie White
49.  Eddy Peach
50.  Correctional Officer Wagner
51.  Correctional Officer Logan
52.  Correctional Officer Gibson
53.  Shanita Lewis
54.  LaToya Logan
55.  Travis Dixon
56.  Terrance Holimon
57.  Jamila Camp
58.  Spyra Holimon
59.  Mark Cunningham

**Ex. 14 - 304**

DIRECTIONS:   Below, you will find a number of statements expressing different attitudes toward the Death Penalty.  Place a check in one of the spaces next to each statement indicating your agreement and/or disagreement with the statement.

| | Strongly Agree | Agree | Slightly Agree | Slightly Disagree | Disagree | Strongly Disagree | |
|---|---|---|---|---|---|---|---|
| A. | | | | | X | | The death penalty is wrong. |
| B. | | | | | | X | The death penalty is the best crime preventative. |
| C. | | | | | | X | The death penalty is absolutely never justified. |
| D. | X | | | | | | I think the death penalty is necessary. |
| E. | | X | | | | | I wish the death penalty were not necessary. |
| F. | | | | | X | | Any person (man or woman; young or old) who commits murder should pay with his own life. |
| G. | | | | | | X | The death penalty cannot be regarded as a sane method for dealing with crime. |
| H. | | | | | | X | The death penalty is wrong, and it is unnecessary even in our imperfect civilization. |
| I. | | | | | X | | The death penalty has never been effective in preventing crime. |
| J. | | X | | | | | We must have the death penalty for some crimes. |
| K. | | | | | | X | I think the return of the whipping post would be more effective than the death penalty. |
| L. | | | | | X | | The death penalty is not necessary to modern civilization. |
| M. | | | | X | | | Life imprisonment is more effective than the death penalty. |

Juror Questionnaire                                    29                  Page 29 of 31

**Ex. 14 - 305**

|   | Strongly Agree | Agree | Slightly Agree | Slightly Disagree | Disagree | Strongly Disagree |   |
|---|---|---|---|---|---|---|---|
| N. | ___ | ___ | ___ | ___ | ___ | X | Execution of criminals is a disgrace to a civilized society. |
| O. | ___ | ___ | ___ | ___ | X | ___ | The death penalty gives the criminal what he deserves. |
| P. | ___ | ___ | ___ | ___ | ___ | X | The State cannot teach the sacredness of human life by destroying it. |
| Q. | ___ | ___ | ___ | ___ | X | ___ | It doesn't make any difference to me whether we have the death penalty or not. |
| R. | ___ | ___ | ___ | ___ | X | ___ | The death penalty is justified only for premeditated murder. |

DIRECTIONS: Please mark the blank that best corresponds with your opinion as to each of the following statements.

|   | Strongly Agree | Slightly Agree | Agree | Disagree | Slightly Disagree | Strongly Disagree |   |
|---|---|---|---|---|---|---|---|
| a. | ___ | ___ | ___ | X | ___ | ___ | Black males commit most of the violent crimes in our society. |
| b. | ___ | ___ | X | ___ | ___ | ___ | Today's welfare society is the major cause of crime. |
| c. | ___ | ___ | ___ | ___ | ___ | X | People in prison live a better-quality life than most of the taxpayers who support their lifestyle. |
| d. | ___ | ___ | ___ | ___ | ___ | X | Death by lethal injection is too good/easy for people convicted of capital murder. |
| e. | ___ | ___ | X | ___ | ___ | ___ | There are too many technicalities in the law that allow guilty people to go free. |
| f. | ___ | ___ | X | ___ | ___ | ___ | The law should concern itself more with victims of crime than with those accused /convicted of crimes. |
| g. | ___ | ___ | ___ | X | ___ | ___ | Police officers must be obeyed without question because they have society's best interests at heart. |

**Juror Questionnaire**                        30              Page 30 of 31

**Ex. 14 - 306**

|  | Strongly Agree | Slightly Agree | Agree | Disagree | Slightly Disagree | Strongly Disagree |  |
|---|---|---|---|---|---|---|---|
| h. |  |  |  |  |  | X | It is not wrong to lie if it is for a good reason. |
| i. |  |  |  |  |  | X | Only a guilty person would object to a warrantless search of their home, car, or person. |
| j. |  |  |  | X |  |  | People sentenced to prison do not serve any significant portion of their punishment. |
| k. |  |  | X |  |  |  | Parolees are the major cause of crime in today's society. |
| l. | X |  |  |  |  |  | It is morally wrong to be racially prejudiced. |
| m. | X |  |  |  |  |  | Black people who kill white people have received harsher punishment in the past than blacks who kill blacks. |
| o. |  |  |  | X |  |  | The high incidence of violent crime in the United States is largely attributable to the fact that this country is a "melting pot" for different cultures, races, and religions. |
| p. |  |  |  | X |  |  | Eyewitness testimony is the strongest evidence that could be offered to prove who committed a crime. |
| q. |  | X |  |  |  |  | Minorities blame too many problems on racial discrimination. |

## DECLARATION

I declare under penalty of perjury that the information I have provided in this Juror Information Sheet is true and correct.

Executed on ___Jan 25 2002___
         (Date)



Juror's Signature

**Ex. 14 - 307**