# EXHIBIT 31

DECLARATION OF JOSEPHINE DOTSON

I, Josephine Dotson, declare:

1.  I am an older sister of Julius Robinson's mother, Rose Hollimon. I have eight siblings. My oldest brother, Roosevelt, was born in 1938. His father was Jessie Ford. All my mother's other children had John Hollimon as their father. After Roosevelt, came Margie, me, Robert, John Jr., Adolf, Rosie May, who is Julius Robinson's mother, and Mildred and Milton, who are twins. I think my mother also had two children who died in infancy.

2.  My father was born and raised in Camden, Arkansas. He went to school up to the fourth grade. He could spell and count. He worked as a field hand on farms, picking cotton and vegetables. My mother, Margaret, was born and raised in Lakeport and attended school until the third grade. She also worked as a field hand, chopping cotton and picking beans. Margaret doesn't read or write, although she knows some of the letters, but not all of them. My mother and father met while they were both working in the field. My daddy always told the story that my mom liked the way he wore his hat.

3.  My older brother and sister were born at home with a midwife. I was born in 1953 in a clinic in Lake Port, Arkansas. I believe all my younger brothers and sisters were born there also.

J.D.

1

**Ex. 31 - 416**

4. I was about four years old when I was outside playing and my daddy was chopping wood. A piece of wood went into his eye. I remember there was blood all over his face. That eye was blinded. His other eye became blind also, but I am not sure if that had anything to do with the piece of wood in his first eye. He had surgery on his eyes about 10 years later and he could tell light and dark for a while. Then a door hit his head during his recovery from the surgery, and he lost whatever vision he had gained back.

5. My family was on welfare because of my dad's blindness, but the amount was very little. My mother worked in the field. I began to do fieldwork when I was eleven years old and my brothers and sisters did also. The only one who didn't work in the fields was Rose. Rose went to live with Sarah Pittman when she was four or five years old. Sarah was a neighbor who was a widow and lived all alone. Rose was the only one in our family who lived with her. Sarah liked to keep Rose neat and she never wanted Rose to work in the fields. We worked during the summer when school was out. We chopped cotton, cutting the grass from between the cotton plants, and cut beans, cutting down the weeds around the beans.

6. My family's first house had outdoor plumbing and was on Sheppard Street. One time, our whole family drove to Texas for the funeral of my daddy's sister and when we returned, our house

2

_J.D_
J.D.

**Ex. 31 - 417**

had burned down. We lived in several houses, none with indoor plumbing, while a house was being built for us on Sheppard Street.

7. My elementary school was segregated. When I was ready to go to middle school, the schools were integrated, but I didn't want to go there. In the eighth grade, I went to Morris Booker School, which charged a small tuition. My family didn't have any extra money. I was able to pay for school myself by working as a teacher's aide while going to school. Morris Booker School was a college first, but when I went there, it was kindergarten through twelfth grade. After I graduated from Morris Booker, I moved to Witchita Falls, Texas and later to Chicago.

8. Before he started going to church, my daddy used to drink. He would go off with his friends on the weekends and drink whiskey. Sometimes, my mother would have to send me and by brother or sister to go get him. We had to hold him up and sometimes, he was so drunk, he fell over into the ditch. When he would come home late, he and my mother would argue. He never did hit her, though, because he was blind and my mother could get out of the way. My father was very jealous. He wouldn't let my mother go anywhere without him, except when she went to the fields with us. If she wanted to go to the store, she had to go with him.

9. When I was little, my mother took us to the Baptist

3

J. D.
J.D.

Church.  When I was about twelve years old, my family stopped going to church.  Later on, when I was about twenty years old, my parents started going back to church.  They went to the Church of God in Christ, which is a sanctified church.  When they went back to church my father stopped his drinking.

10.  My father would discipline his children by whipping them with a belt.  Even though he was blind, we never ran from him, we had to stay still.  When I was about eleven years old, he stopped whipping us.  He would talk to us about what we did wrong.

11.  My sister, Rose, did pretty good in school until she started having an affair with one of her teachers, Charles Carr.  My parents went to the school board to complain about this, but then Rose denied having relations with Mr. Carr, so nothing came of it.  Rose started sneaking out of Sarah's house by the window.  My dad would have talks with Sarah and he would bring Rose home for a while.  Rose would go back to live with Sarah and start right up again, sneaking out.

12.  Jimmie Lee Robinson and his family lived down the street from my family.  He was in the same class in elementary school as me.  He was raised as a Jehovah's Witness.  He could be violent.  One day when I was at home with Rose and her girlfriend Miki, Miki said something to Jimmie Lee that made him mad.  Jimmie Lee attacked Miki.  I came into the room and saw Jimmie

*J. D*

J.D.

4

**Ex. 31 - 419**

Lee hitting Miki.

13.    Rose got pregnant and dropped out of school when she was about sixteen.  She had Marcus in Lake Village Hospital.  I had moved away from Dermott by then, but our family would all get together in Dermott for holidays.  One time, Rose, Jimmie Lee and I were all together.  This was before Julius was born.  Jimmie Lee offered me a ride somewhere and on the way, he stopped the car and asked some people if they wanted to buy some marijuana.  I told him to take me home as soon as I realized he was selling marijuana.  Both Jimmie Lee and Rose smoked marijuana, starting early in their relationship.

14.    After they got married, Rose went to live with Jimmie Lee in Texas and later in North Carolina.  Jimmie Lee was in the military.  Sarah, the woman who raised Rose, was with Rose when Marcus was a baby, but when Rose got pregnant with Julius, Sarah came home to Dermott and brought Marcus with her.  Sarah talked about Jimmie Lee's violence toward Rose.  Sarah would hear them fighting and go into their room.  She saw Jimmie Lee hitting and punching Rose and kicking and stomping on her.  If she tried to intervene, Jimmie Lee yelled at her to leave them alone.  She told me that was why she had to leave.

15.    After Rose had Julius, she came back to Dermott and got Marcus.  Rose would call me every other month or so and ask for money.  Rose told me she didn't have any money for food and

5

J.D.
J.D.

she and her children were hungry.  I told Rose to go to where Jimmie Lee worked at the base and tell them she wasn't getting any money from Jimmie Lee.  Rose told me that she did that and they told her there wasn't anything they could do.  I sent her what money I could, $50 or $60 at a time.  I was living in Chicago at that time and I believe it was between 1978 and 1979 when I was sending Rose money.  By the time Rose and Jimmie Lee were in North Carolina, Jimmie Lee was living mostly with another woman.  Rose told me that when she met this other woman, the woman told Rose she was Jimmie Lee's wife.  Rose also got money from our father for rent.  There was a couple from the base, Billie Ray Plummer and his wife, who also helped her with food.

16.   At some point, Rose sent the children home to our parents in Dermott.  Soon after she got the two boys, Marcus and Julius, my mother came to visit me and my family in Chicago and she brought the babies with her.  I remember that Julius was a baby in diapers, not much more than eight months old.  My mother told me that social services was getting ready to take the children away from Rose.  That is the reason my parents raised Marcus and Julius.

17.   Children living in Dermott all played outside, in their yards and in the nearby fields.  There were crop duster airplanes which sprayed for mosquitos right on the kids where they played.  They also sprayed pesticides on the crops.  When I

6

J. D.
J.D.

was a child working in the fields, the planes would come and spray, right on top of the field workers.

18. There was a curfew in Dermott when Julius growing up there. The police would find Julius out on the street after curfew and they took him to the police station. My parents would have to come down to the police station and pick him up. When Julius was in high school, something happened and the police chief came to my father and told him if Julius didn't get out of town, he was going to get hurt. Julius went to live with his mother in Texas

19. My sister, Rose, was working in a nursing home when Julius came to live with her. My father told me she called him often and told him she didn't have any money for the rent or food. Even though my father lived on a fixed income and that income was minimal, he would wire the money for Rose's rent directly to her landlord. Then a woman fell on Rose at her work and she had surgery and wasn't working. Julius started selling marijuana and was able to help pay some of the bills.

20. After Julius was arrested, his lawyer called and spoke

\\\

\\\

\\\

\\\

\\\

7

$J.D.$

J.D.

to me.  He asked me if I would be willing to come to Texas and testify at his trial.  I told him I was willing to, but it turned out he didn't ask me to come.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___ day of September, 2005 in Dermott, Arkansas.

Josephine Dotson

8

**Ex. 31 - 423**

SUPPLEMENTAL DECLARATION OF JOSEPHINE DOTSON

I, Josephine Dotson, declare:

1.      I am Julius Robinson's maternal aunt.

2.      Around the time of Julius's trial, I received one phone call from someone on my nephew's legal team at my home in Dermott. I think it was before the trial began but I don't know for certain. I thought it was an attorney but it could have been an investigator. The phone call lasted around fifteen minutes.

3.      The man asked me a question about Julius and his school in Dermott. I do not remember what the question was. I told him that I wasn't living in Dermott when Julius was growing up and I just returned to live in Dermott after Julius had left town. I suggested to him that he contact my mother's half-sister, Bernice Johnson, and my sister, Mildred, if he had questions about Julius. They told me he never called. I told him my mother and father, Margaret and John Hollimon, had raised Julius but my father was deceased and my mother would not be really any help because she didn't remember a lot.

4.      The man asked me if I would be willing to travel to Texas to testify if they sent me the plane ticket. He asked me this question more than once although I told him I did not know Julius very well because I hadn't been around him when he was growing up in Dermott. I found it odd that he kept asking that I go to Texas to testify when I

1

JD

knew just a little.  The man told me that he would get back in touch with me if he needed more information.

5.    Apart from the question relating to Julius's school, I was not asked any questions about our family.  Specifically, I was not asked about any of the areas addressed in my previous declaration.  Also, I was not asked about any telephone calls I had with Julius from jail.

6.    Had I been asked, I would have told the investigator what I remembered about a telephone call I had with Julius where the name "One Love" came up.  The only thing that I can recall is that Julius mentioned his name.  I didn't believe at the time, and I don't believe now, that Julius was asking me to convey a message to anyone about "One Love."  Anyway, I certainly did not do anything following that conversation or talk anyone about it.

7.    On August 8th, 2006, I was contacted by an investigator from the Office of the Federal Public Defender.  The information above was provided at that time and on a subsequent phone call.

I declare under penalty of perjury under the laws of the United States of America on this 22 day of August, 2006.

Josephine Dotson  8/22/06
Josephine Dotson

2

# EXHIBIT 32

DECLARATION OF JERRY MELTON

I, Jerry Melton, declare:

1.      I was the Chief of Police for the City of Dermott, Arkansas, from 1978 until February of 1999. I do not remember Julius Robinson nor do I recognize his face in a photograph.

2.      The people I recall are John and Margaret Hollimon. I have been informed that they are Julius Robinson's grandparents. The Hollimons were at the Dermott Police Station often, picking up their grandson Spyri who was always getting in trouble. I locked him up several times. I would have remembered Julius Robinson if he had been getting into trouble. John Hollimon was blind and used a white cane, Margaret Hollimon helped him get around. I never could convince the Hollimons that their grandson Spyri had done anything wrong. John and Margaret didn't have any idea what they were doing; they had no control over the kids. Besides being old for reining in kids, Margaret was uneducated and on the slow side and John missed a lot on account of his blindness. I have a vague recollection of their house. I would say it was very poor. They lived on either Deer Street or Wolf Street in east Dermott.

3.      A guy from California came to Dermott in the eighties. The name John John Wright sounds familiar but I couldn't remember the name until it was mentioned to me. This guy tried to organize a gang. We kept an eye on him but we could see he

JM

**Ex. 32 - 426**

wasn't making much headway.

4.      There were some kids who called themselves the Crips and others claimed to be Bloods. They would wear blue or red colors accordingly. They didn't fight each other though and I looked at them as kids trying to imitate what they saw on television. They were little wannabes. One time I bought red and blue bandanas and had my officers wear the bandanas in their back pockets, just to poke fun at their silliness.

6.      On August 8, 2006, and some time last year I was contacted by investigators from the Office of the Federal Public Defender who informed me that their office represented a man named Julius Robinson. Had anyone asked me before, I would have provided the information contained herein and would have been willing to testify in court. I have read and reviewed this two page declaration.

I declare under penalty of perjury under the laws of the United States of America this 8th day of August, 2006.

Jerry Melton

2

JM

# EXHIBIT 33

## DECLARATION OF MALCOLM W. KLEIN

I, Malcolm W. Klein, Ph.D., declare as follows:

1. I am currently a Professor Emeritus of the University of Southern California and an independent consultant on street gang issues. While at USC, I served 13 years as the chairman of the sociology department and was the founder and director of the University's Social Science Research Institute. My research on gangs has been supported by sixty grants and contracts from major foundations and from government agencies, including federal funding from the U.S. Department of Justice. I have published my research in over one hundred articles and invited chapters, as well as written eighteen books. I am continuing my research consultations for various groups, including the National Youth Gang Center, The Eurogang Program, and the International Self-Report Delinquency Program. Over the course of my career, I have served as a consultant to scores of local, state, national and international private and public agencies and commissions. I have also served as a consultant or expert witness in over one hundred court cases involving gang matters. (See attached resume).

2. Referral Question

I was contacted by Julius Robinson's counsel, and asked to conduct an assessment of the gang situation in Dermott, Arkansas, as well as Mr. Robinson's

1

M.K.

**Ex. 33 - 428**

personal involvement in gang activity during his childhood and adolescent years. As part of my assessment, I reviewed over 2,500 pages of material, including trial transcripts, indictments, witness statements, school records, medical records, prison records, media reports, and the like.

### 3. Gang Research

As a result of my research, I developed a classification system identifying five general types of street gangs within the United States. Malcolm W. Klein, Cheryl L. Maxson, *Gang Structures, Crime Patterns, and Police Responses: A Summary Report* (2001).

### a. Traditional Gangs

Traditional gangs have generally been in existence for twenty or more years and continue to regenerate themselves. They contain fairly clear subgroups, usually separated by age, though occasionally by neighborhood. More than other gangs, traditional gangs tend to have a wide age range, ranging from nine or ten years of age into the thirties. These are usually very large gangs, numbering one hundred or even several hundred members. They are almost always territorial in the sense that they identify strongly with their "turf," and claim it as theirs alone. Generally, their turf includes the vicinity of their immediate neighborhood but may also extend to the surrounding area. In sum, this is a large, enduring, territorial gang with a wide range

2

M.K.

and several internal cliques based on age or area.

b. Neotraditional Gangs

The Neotraditional gang resembles the Traditional form, but has not been in existence as long, probably no more than ten years, and often less. It is usually medium size, between fifty to one hundred members, but may also extend into the hundreds. The Neotraditional gang most likely has developed subgroups or cliques based on age or area, but sometimes may not. The age range is usually smaller than the Traditional gangs. The Neotraditional gang is also very territorial, claiming turf and defending it. The Neotraditional gang often engages in subgrouping, but may or may not have achieved the size and wide age range of the Traditional gang. In sum, the neotraditional gang is a newer territorial gang and its subgrouping, temporality, and size, suggests that it is evolving into the Traditional form.

c. Compressed Gangs

The compressed gang is small, usually in the size range of up to fifty members, and has not formed subgroups. The age range is probably narrow, ten or fewer years between the younger and older members. The small size, absence of subgroups, and narrow age range may reflect the newness of the group, in existence less than ten years and maybe for only a few years. Some of these Compressed gangs have become territorial, but many have not. In sum, compressed gangs have a relatively

3

M.K.

short history, short enough that by size, duration, subgrouping and territoriality, it is unclear whether they will grow and solidify into the more traditional forms, or simply remain as less complex groups.

### d. Collective Gangs

The collective gang looks like the compressed form, but bigger and with a wider age range, approximately ten or more years between younger and older members. Size can be under a hundred, but is probably larger. Surprisingly, given these numbers, it has not developed subgroups, and may or may not be a territorial gang. It probably has a ten to fifteen-year existence. In sum, the collective gang resembles a kind of shapeless mass of adolescent and young adult members that has not developed the distinguishing characteristics of other gangs.

### e. Specialty Gangs

Unlike these other gangs that engage in a wide variety of criminal offenses, crime in this type of group is narrowly focussed on a few offenses; the group comes to be characterized by the specialty. The Specialty gang tends to be small, usually fifty or fewer members without any subgroups in most cases but there are exceptions. It probably has a history of less than ten years, but has developed a well-defined territory. The territory of the Speciality gang may be either residential or based on the opportunities, for the particular form of crime in which it specializes. The age

4

M.K.

**Ex. 33 - 431**

range of most Specialty gangs is narrow, but may be broad in others. In sum, the specialty gang is crime-focused in a narrow way. Its principal purpose is more criminal than social, and its smaller size and form of territoriality may be a reflection of this focused crime pattern.

4. Opinion

Of the five sub-types of street gangs in the U.S., the Dermott street gang of which Mr. Robinson was a member, the so-called "Playboy Hustler Crips," can be most accurately described as a Compressed gang. The Dermott street gang bore all of the common characteristics of Compressed gang, (short duration, small size, narrow age range, with no clear subgroups). The size of the group was relatively small, limited to individuals living in the small town of Dermott, Arkansas, with a population of less than 3,300. Moreover, the group was limited predominantly to preteen and teenage age males. Finally, the gang appears to have had an extremely short life-span. Although witness statements reflect that the Dermott Crips had been in existence during Mr. Robinson's preteen years, beginning in 1987, the gang has never been recognized by the National Youth Gang Center (N.Y.G.C.), an organization which has identified gang activity in 4,000 gang-involved jurisdictions.

5. Additional characteristics of the Dermott gang distinguish it from other more significant types of gangs. First, the criminal involvement of the Dermott Crips

5

M.K.

Ex. 33 - 432

was versatile without emphasis on violence or other serious offenses, thus, distinguishing the gang from Specialty gangs. Although there was evidence to indicate that drug use was fairly common, there was little evidence to indicate that the Dermott gang was involved in drug trafficking. Although one police officer noted that serious assaults, thefts, and drug activity increased around the time the Dermott Crip gang was formed, there was no indication that this activity was pervasive or continued over a significant period of time.

6. Finally, the assessment by local law enforcement dispels the notion that the Dermott gang resembled anything like Traditional gangs. According to then-Dermott Chief of Police Jerry Melton, although there was a group of teenagers that called themselves "Crips" and "Bloods," they were simply emulating what they saw on television. As Chief Melton observed, the Dermott gangs were nothing more than "little wannabes." In contrast to often bloody rivalry between Crips and Bloods often seen in urban areas, there was no fighting between the gangs in Dermott.

Apart from the limited danger that the Dermott Crips posed to the rural community, Mr. Robinson's role in the group was also quite limited. Mr. Robinson's activity in the Dermott gangs seems to derive from the particular vulnerabilities of his personal deficiencies and dysfunctional family situations, within the context of a segregated and poverty stricken community within Dermott. There is no evidence to

6

M.K.

indicate that he played a leadership role in his Crips gang. Indeed, Mr. Robinson seemed more of a follower who role modeled on several older youth, including the gang initiator known as "John-John." Finally, even though drug activity may have increased as a result of the gang, one of the local officers was not aware that Mr. Robinson had been involved in drug trafficking. The limitations on Mr. Robinson's involvement were essentially dictated by his young age, having been jumped into the gang between twelve and thirteen years old.

7. Conclusion

In sum, the Dermott Crip gang during Mr. Robinson's youth did not qualify as a Traditional gang. At most, the group of preteen and teenage youth resembled a Compressed gang of short duration. Although there was an initial rise in criminal conduct, this activity differed in both scope and severity from that of Traditional gangs. Finally, Mr. Robinson appears to have served only a minimal role in the

///

///

///

///

7

M.K.

Dermott gang, as evidenced by his young age and his narrow involvement with criminal activity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of May, 2007 in _Los Angeles_ California.

Malcolm W. Klein

8                                                                    M.K.

Ex. 33 - 435

# EXHIBIT 34

STATE OF TEXAS         )

                                                             **AFFIDAVIT**

COUNTY OF TARRANT    )

Before me, the undersigned authority, personally appeared **Walter S. Roach** who, after being by me duly sworn, deposed as follows:

My name is **Walter S. Roach**. I am over 21 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the Records Custodian of the City of Arlington, Texas, Police Department, and as such I am the custodian of records of said Police Department.

Attached hereto are 25 pages of records from the Arlington Police Department. These said 25 pages of records are pertaining to Arlington Police Department report 950019017.

These are kept by the Arlington Police Department in the regular course of business, and it was the regular course of business in the Arlington Police Department for an employee or representative of the Arlington Police Department with knowledge of the act, event, condition, opinion, or diagnosis recorded to make or receive memorandum or record or to transmit information thereof to be included in such memorandum or record; and the memorandum or record was received or made at or near the time of the act, event, condition, opinion, or diagnosis recorded or reasonably soon thereafter.

The record attached hereto is an exact duplicate of the original and it is a rule of the Arlington Police Department to not permit the original to leave the Arlington Police Department.

_____
AFFIANT'S SIGNATURE

SUBSCRIBED AND SWORN TO BEFORE ME BY _WALTER S. ROACH_ ,

on this the _30th_ day of _November_ , _2006_ .

_____
Notary Public in and for
The State of Texas

(notary seal)

> JOYCE A. MANSHIP
> Notary Public
> STATE OF TEXAS
> My Comm. Exp. 08/14/2009

**OR**

_____
Officer's Signature

_____
Printed Rank, Name and ID #

*Authorized to administer oaths by Texas Government Code Sec. 602.002*

X:\Shared\Records Section\Records Affidavit-Protected Form Fill.doc

**Ex. 34 - 436**

02/14/95                    ARLINGTON POLICE DEPARTMENT                    18:11

                                  ARREST REPORT

            PIN #:      0151484

            CALL #:     950019017

            DEFENDANT: ROBINSON JULIUS O

Ex. 34 - 437

ADULT ARREST REPORT

ARREST #: 0151484                              CALL SHEET:  950019017
RELATED OFFENSE #: _____                   P.C. REVIEW : 00690

MUGSHOT: X  FINGERPRINT: X                      IL REVIEW BY ID #: _____

DEFENDANT: ROBINSON          JULIUS            O  ___
            LAST NAME        FIRST NAME    MI  SUFFIX

RACE: BLACK       (NEG SEX: M  DATE OF BIRTH: 08/08/76  CLASS: MG]
***************************************************************************
***************************************************************************
***************************************************************************

PHYSICAL DESCRIPTORS

HEIGHT: 6'00  WEIGHT: 175  FACIAL HAIR: NONE.            GLASSES: N
   HAIR: BLACK              EYES: BROWN

LAST FINGERPRINT DATE: 02/08/95  LAST MUG SHOT DATE: 02/08/95

SCARS/MARKS/TATOOS:

BODY PART       DESCRIPTION

*** NO SCARS/MARKS/TATOOS ON FILE ***

CLOTHING REMARKS:

BLUE PANTS/BLK TEE SHIRT/BLK/WHI TENNIS SHOES

VISIBLE INJURY:

*** NO REMARKS ON FILE ***

INJURY OCCURED: _____
***************************************************************************
***************************************************************************
***************************************************************************

PERSON BIOGRAPHICAL

POB CITY/STATE: FAYETVILLE          NC CITIZEN: Y JAILER ID: 01477

**Ex. 34 - 438**

```
RES ADDR: 1413 N COOPER CI                    PHONE: _____
   APT #: A
     CITY: ARL                  STATE: TX  ZIP: 76011 ____

  BUS NAME: VENTURES
   BUS ADDR: _____ PHONE: 817-460_5115
   SUITE #: _____
     CITY: _____ STATE: __  ZIP: _____ ____
OCCUPATION: ATTENDANT

DRIVERS LICENSE: ██████████  STATE: TX  YEAR: 1996  SSN: ██████████
MARITAL STATUS : SINGLE           RELIGIOUS PREFERENCE: NO PREFERENCE
MISCELLANEOUS  : _____

ALIAS                              ALIAS BIRTHDAY
```

*** NO ALIASES ON FILE ***
```
*****************************************************************************
*****************************************************************************
*****************************************************************************
```

FRIEND/RELATIVE/EMERGENCY CONTACT

```
FRIEND
  NAME: ORAL HOLMES                   PHONE: 817 460-3932
  ADDRESS: _____ SUITE: _____
  CITY: _____ STATE: __ ZIP: 00000-00000
*****************************************************************************
*****************************************************************************
*****************************************************************************
```

BOOKING REMARKS

PHONE CALL STATUS: Y   DATE: 02/08/95   TIME: 0001453

*** NO BOOKING REMARKS FOUND ***
```
*****************************************************************************
*****************************************************************************
*****************************************************************************
```

CHARGES/ARRAIGNMENT

```
-----------------------------------------------------------------------------
VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A77349     AGENCY: ARL
```

Ex. 34 - 439

CHARGE AMOUNT:      110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930900

DISPOSITIONS:

DISP. TYPE:         TS
DISP. DATE:         02/09/95
DISP. TIME:         102513
DISP. ID :          01227
DOLLARS RECEIVED:        0.00
RECEIPT NUMBER      ------
CREDIT EARNED:           110.00
BOND AMOUNT:             0.00
SURETY:             ------------------------------
SUPERVISOR ID:      00000
COURT DATE:         02/09/95
COURT-TIME:         00000

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

-----------------------------------------------------------------

VIOL/PENAL DESC: FAIL TO MAINTAIN FINANCIAL RESPONSIBILIT
TICKET/WARRANT: 090627      AGENCY: ARL
CHARGE AMOUNT:      340.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

DISPOSITIONS:

DISP. TYPE:         TS
DISP. DATE:         02/09/95
DISP. TIME:         102517
DISP. ID :          01227
DOLLARS RECEIVED:        0.00
RECEIPT NUMBER      ------
CREDIT EARNED:           340.00
BOND AMOUNT:             0.00
SURETY:             ------------------------------
SUPERVISOR ID:      09059                    ** VOIDED CHARGE **
COURT DATE:         02/09/95
COURT-TIME:         00000

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

DISP. TYPE:         TS
DISP. DATE:         02/10/95
DISP. TIME:         001905
DISP. ID :          09070
DOLLARS RECEIVED:        0.00
RECEIPT NUMBER      ------
CREDIT EARNED:           340.00

Ex. 34 - 440

```
            BOND AMOUNT:                0.00
            SURETY:
            SUPERVISOR ID:       00000
            COURT DATE:          02/09/95
            COURT-TIME:          00000

            REMARKS:
```

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

--------------------------------------------------------------
```
VIOL/PENAL DESC: NO VALID INSPECTION CERTIFICATE
TICKET/WARRANT: 076632       AGENCY: ARL
CHARGE AMOUNT:           105.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

       DISPOSITIONS:

       DISP. TYPE:          TS
       DISP. DATE:          02/09/95
       DISP. TIME:          102523
       DISP. ID  :          01227
       DOLLARS RECEIVED:           0.00
       RECEIPT NUMBER
       CREDIT EARNED:             105.00
       BOND AMOUNT:                0.00
       SURETY:
       SUPERVISOR ID:       00000
       COURT DATE:          02/09/95
       COURT-TIME:          00000

       REMARKS:
```

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

--------------------------------------------------------------
```
VIOL/PENAL DESC: REGISTRATION VIOLATION-CAR OR TRUCK
TICKET/WARRANT: 076631       AGENCY: ARL
CHARGE AMOUNT:           105.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

       DISPOSITIONS:

       DISP. TYPE:          TS
       DISP. DATE:          02/09/95
       DISP. TIME:          102529
       DISP. ID  :          01227
       DOLLARS RECEIVED:           0.00
       RECEIPT NUMBER
       CREDIT EARNED:             105.00
       BOND AMOUNT:                0.00
       SURETY:
       SUPERVISOR ID:       00000
```

```
COURT DATE:          02/09/95
COURT-TIME:          00000


REMARKS:


*** NO REMARKS ON FILE FOR THIS DISPOSITION ***


---------------------------------------------------------------------------
VIOL/PENAL DESC: FAIL TO MAINTAIN FINANCIAL RESPONSIBILIT
TICKET/WARRANT: 076630      AGENCY: ARL
CHARGE AMOUNT:         340.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE:          TS
DISP. DATE:          02/09/95        1
DISP. TIME:          102536
DISP. ID    :        01227
DOLLARS RECEIVED:            0.00
RECEIPT NUMBER       ------
CREDIT EARNED:            340.00
BOND AMOUNT:               0.00
SURETY:              ------------------------------
SUPERVISOR ID:       09059            ** VOIDED CHARGE **
COURT DATE:          02/09/95
COURT-TIME:          00000


REMARKS:


*** NO REMARKS ON FILE FOR THIS DISPOSITION ***


DISP. TYPE:          TS
DISP. DATE:          02/10/95    1
DISP. TIME:          001914
DISP. ID   :         09070
DOLLARS RECEIVED:            0.00
RECEIPT NUMBER       ------
CREDIT EARNED:            340.00
BOND AMOUNT:               0.00
SURETY:              ------------------------------
SUPERVISOR ID:       00000
COURT DATE:          02/09/95
COURT-TIME:          00000


REMARKS:


*** NO REMARKS ON FILE FOR THIS DISPOSITION ***


---------------------------------------------------------------------------
```

Ex. 34 - 442

VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73700        AGENCY: ARL
CHARGE AMOUNT:          110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

    DISPOSITIO

    DISP. TYPE:          TS
    DISP. DATE:          02/09/95      1
    DISP. TIME:          102540
    DISP. ID  :          01227
    DOLLARS RECEIVED:            0.00
    RECEIPT NUMBER       _____
    CREDIT EARNED:              110.00
    BOND AMOUNT:                 0.00
    SURETY:             _____
    SUPERVISOR ID:       00000
    COURT DATE:          02/09/95
    COURT-TIME:          00000

    REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

--------------------------------------------------------------------
VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73699        AGENCY: ARL
CHARGE AMOUNT:          110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

    DISPOSITIONS:

    DISP. TYPE:          TS
    DISP. DATE:          02/09/95
    DISP. TIME:          102544
    DISP. ID  :          01227
    DOLLARS RECEIVED:            0.00
    RECEIPT NUMBER       _____
    CREDIT EARNED:              110.00
    BOND AMOUNT:                 0.00
    SURETY:             _____
    SUPERVISOR ID:       00000
    COURT DATE:          02/09/95
    COURT-TIME:          00000

    REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

--------------------------------------------------------------------
VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73698        AGENCY: ARL
CHARGE AMOUNT:          110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

Ex. 34 - 443

```
DISPOSITIONS:

DISP. TYPE:          TS
DISP. DATE:          02/09/95
DISP. TIME:          102551
DISP. ID:            01227
DOLLARS RECEIVED:            0.00
RECEIPT NUMBER       -------
CREDIT EARNED:             110.00
BOND AMOUNT:                0.00
SURETY:              ----------------------------------
SUPERVISOR ID:       00000
COURT DATE:          02/09/95
COURT-TIME:          00000


REMARKS:


*** NO REMARKS ON FILE FOR THIS DISPOSITION ***
```

---

```
VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73697      AGENCY: ARL
CHARGE AMOUNT:        110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE          TS
DISP. DATE:          02/09/95
DISP. TIME:          102555
DISP. ID:            01227
DOLLARS RECEIVED:            0.00
RECEIPT NUMBER       -------
CREDIT EARNED:             110.00
BOND AMOUNT:                0.00
SURETY:              ----------------------------------
SUPERVISOR ID:       00000
COURT DATE:          02/09/95
COURT-TIME:          00000


REMARKS:


*** NO REMARKS ON FILE FOR THIS DISPOSITION ***
```

---

```
VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73696      AGENCY: ARL
CHARGE AMOUNT:        110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:
```

Ex. 34 - 444

```
        DISP. TYPE:          TS
        DISP. DATE:          02/09/95
        DISP. TIME:          102559
        DISP. ID :           01227
        DOLLARS RECEIVED:          0.00
        RECEIPT NUMBER       ------
        CREDIT EARNED:            110.00
        BOND AMOUNT:              0.00
        SURETY:              ---------------------------------------
        SUPERVISOR ID:       00000
        COURT DATE:          02/09/95
        COURT-TIME:          00000


        REMARKS:
```

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

------------------------------------------------------------------------

```
VIOL/PENAL DESC: FAILURE TO APPEAR (MUNICIPAL COURT)
TICKET/WARRANT: A73695      AGENCY: ARL
CHARGE AMOUNT:        110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


        DISPOSITIONS:

        DISP. TYPE:          TS
        DISP. DATE:          02/09/95
        DISP. TIME:          102604
        DISP. ID :           01227
        DOLLARS RECEIVED:          0.00
        RECEIPT NUMBER       ------
        CREDIT EARNED:            110.00
        BOND AMOUNT:              0.00
        SURETY:              ---------------------------------------
        SUPERVISOR ID:       00000
        COURT DATE:          02/09/95
        COURT-TIME:          00000


        REMARKS:
```

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

------------------------------------------------------------------------

```
VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A72487      AGENCY: ARL
CHARGE AMOUNT:        110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


        DISPOSITIONS:

        DISP. TYPE:          TS
        DISP. DATE:          02/09/95
```

Ex. 34 - 445

```
DISP. TIME:         102610
DISP. ID :          01227
DOLLARS RECEIVED:          0.00   1
RECEIPT NUMBER      ------
CREDIT EARNED:             110.00
BOND AMOUNT:               0.00
SURETY:            |-----------------------------------
SUPERVISOR ID:      00000
COURT DATE:         02/09/95
COURT-TIME:         00000


REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***


-----------------------------------------------------------------
VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A68444      AGENCY: ARL
CHARGE AMOUNT:        110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE:         TS
DISP. DATE:         02/09/95
DISP. TIME:         102643
DISP. ID :          01227
DOLLARS RECEIVED:          0.00   1
RECEIPT NUMBER      ------
CREDIT EARNED:             110.00
BOND AMOUNT:               0.00
SURETY:            |-----------------------------------
SUPERVISOR ID:      00000
COURT DATE:         02/09/95
COURT-TIME:         00000


REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***


-----------------------------------------------------------------
VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A68443      AGENCY: ARL
CHARGE AMOUNT:        110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE:         TS
DISP. DATE:         02/09/95
DISP. TIME:         102657
DISP. ID :          01227
DOLLARS RECEIVED:          0.00   1
```

Ex. 34 - 446

```
    RECEIPT NUMBER       _____
    CREDIT EARNED:           110.00
    BOND AMOUNT:               0.00
    SURETY:              _____
    SUPERVISOR ID:       00000
    COURT DATE:          02/09/95
    COURT-TIME:          00000

    REMARKS:
```

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

---

```
VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A6B442      AGENCY: ARL
CHARGE AMOUNT:       110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

    DISPOSITIONS:

    DISP. TYPE:          TS
    DISP. DATE:          02/09/95
    DISP. TIME:          102703
    DISP. ID  :          01227
    DOLLARS RECEIVED:        0.00
    RECEIPT NUMBER       _____
    CREDIT EARNED:           110.00
    BOND AMOUNT:               0.00
    SURETY:              _____
    SUPERVISOR ID:       00000
    COURT DATE:          02/09/95
    COURT-TIME:          00000

    REMARKS:
```

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

---

```
VIOL/PENAL DESC: REGISTRATION VIOLATION-CAR OR TRUCK
TICKET/WARRANT: 090629      AGENCY: ARL
CHARGE AMOUNT:       105.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000

    DISPOSITIONS:

    DISP. TYPE:          TS
    DISP. DATE:          02/09/95
    DISP. TIME:          102748
    DISP. ID  :          01227
    DOLLARS RECEIVED:        0.00
    RECEIPT NUMBER       _____
    CREDIT EARNED:           105.00
    BOND AMOUNT:               0.00
```

```
SURETY:
SUPERVISOR ID:        00000
COURT DATE:           02/09/95
COURT-TIME:           00000

REMARKS:


*** NO REMARKS ON FILE FOR THIS DISPOSITION ***


------------------------------------------------------------------
VIOL/PENAL DESC: NO VALID INSPECTION CERTIFICATE
TICKET/WARRANT: 090628      AGENCY: ARL
CHARGE AMOUNT:       105.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE:           TS
DISP. DATE:           02/09/95
DISP. TIME:           102754
DISP. ID              01227
DOLLARS RECEIVED:         0.00
RECEIPT NUMBER        ------
CREDIT EARNED:            105.00
BOND AMOUNT:              0.00
SURETY:               ------------------------------------------
SUPERVISOR ID:        00000
COURT DATE:           02/09/95
COURT-TIME:           00000


REMARKS:


*** NO REMARKS ON FILE FOR THIS DISPOSITION ***


------------------------------------------------------------------
VIOL/PENAL DESC: FAIL TO APPEAR IN 10 DAYS ON CERTAIN STA
TICKET/WARRANT: A77348      AGENCY: ARL
CHARGE AMOUNT:       110.00  PLEA: G ARRAIGN. DATE/TIME: 02/09/95  0930000


DISPOSITIONS:

DISP. TYPE:           TS
DISP. DATE:           02/09/95
DISP. TIME:           102801
DISP. ID :            01227
DOLLARS RECEIVED:         0.00
RECEIPT NUMBER        ------
CREDIT EARNED:            110.00
BOND AMOUNT:              0.00
SURETY:               ------------------------------------------
SUPERVISOR ID:        00000
COURT DATE:           02/09/95
```

COURT-TIME:          00000

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***

-----------------------------------------------------------------------

VIOL/PENAL DESC: CRIMINAL ATTEMPT - MURDER
TICKET/WARRANT: _____ AGENCY: ARL
CHARGE AMOUNT:    500,000.00  PLEA: N ARRAIGN. DATE/TIME: 02/09/95  0930000

DISPOSITIONS:

DISP. TYPE:          TCSO J
DISP. DATE:          02/14/95
DISP. TIME:          090909
DISP. ID :           09064
DOLLARS RECEIVED:         0.00
RECEIPT NUMBER       _____
CREDIT EARNED:           0.00
BOND AMOUNT:             0.00
SURETY:
SUPERVISOR ID:       00000
COURT DATE:          _____
COURT-TIME:          00000

REMARKS:

*** NO REMARKS ON FILE FOR THIS DISPOSITION ***


**************************************************************************
**************************************************************************
**************************************************************************


BOOKIN-IN/OUT INFORMATION


BOOK-IN DATE : 02/08/95  TIME: 01410  CELL: A06  JAILER: 01477
BOOK-OUT DATE: 02/14/95  TIME: 00913  JAILER: 01035  PROB REVKD: _


PROPERTY BIN : 007  DRAWER: 045


ARRESTING OFFICER: 01157  DATE: 02/08/95  TIME: 01320
PROBABLE CAUSE ID: 00690  CONT SHEETS: 00001  EVIDENCE REPORT: N
OFFENSE/PROPERTY RPT: N  PULL CARD: N  FI CARD: N  PREMISE: 1

*** NO ASSISTING OFFICERS ON FILE ***

Ex. 34 - 449

ADDRESS OF ARREST:

1400 W LAMAR BL                              SUITE: _____
CITY: AR                            STATE: TX _____-____

ADDRESS OF OFFENSE:

1400 W LAMAR BL                              SUITE: _____
CITY: AR                            STATE: TX _____-____              1

RELATED OFFENSE:
    AGENCY HOLDS
    PC WARRANTS

*** NO AGENCIES ON FILE ***
*****************************************************************************
*****************************************************************************
*****************************************************************************

ARREST REMARKS

ON 02-08-95 AT APPROXIMATELY 1300HRS, I OFFICER L JONES ID 1157,
ASSIGNED TO THE SCHOOL SERVICES DIVISION, WAS CONTACTED BY DETECTIVE
J STANTON ID 0743 REGARDING THE LISTED ARRESTEE, JULIUS ROBINSON.
DETECTIVE STANTON ADVISED THAT MR ROBINSON HAD APPROXIMATELY 18
OUTSTANDING TRAFFIC WARRANTS AND REQUESTED THAT I ARREST ROBINSON AND
BRING HIM TO JAIL.
    I CONTACTED MR GREG YOUNG, THE ASSISTANT PRINCIPAL AT LAMAR HIGH
SCHOOL.  MR YOUNG TOOK ME TO ROBINSON'S CLASS.  THERE I CONTACTED HIM
AND PLACED HIM UNDER ARREST FOR THE OUTSTANDING WARRANTS.  I HANDCUFFED
ROBINSON PURSUANT TO DEPARTMENT POLICY AND DOUBLE LOCKED THE HANDCUFFS.
ROBINSON RELEASED HIS SCHOOL BOOKS TO MR YOUNG.
    THE FOLLOWING TRAFFIC WARRANTS WERE CONFIRMED: #077349, #090627,
#076632, #076631, #076630, #A73700, #A73699, #A73698, #A73697, #A73696,
#A73695, #A72487, #A68444, #A68443, #A68442, #090629, #090628, AND
#A77348.  ALL 17 WARRANTS WERE CONFIRMED.  THE SUBJECT WAS PROCESSED
IN AND RELEASED TO THE JAILERS.
    I NOTIFIED DETECTIVE STANTON THAT THE SUBJECT WAS NOW IN THE
ARLINGTON JAIL.
    NO FURTHER.  NORTH##    JD  1424  02-08-95  1620HRS
*****************************************************************************
*****************************************************************************
*****************************************************************************

Ex. 34 - 450

```
A R L I N G T O N   P O L I C E   D E P A R T M E N T

OFFICER NO. 1476                    OFFENSE REPORT              CASE NO. 950018762
OFFICER NAME                   CRIMINAL ATTEMPT - MURDER          VICTIM 001 OF 001
JORJANI, NICKOLAS A.            LAKE O WOODS APARTMENTS                   PAGE 0001
-------------------------------------------------------------------------------
OFFENSE OCCURRED AT:               DATE OF OFFENSE: 02/07/95 TO
2401 SPILLWAY LN
                                   TIME OF OFFENSE: 21:05    TO
-------------------------------------------------------------------------------
VICTIM NAME                    RACE   SEX    DOB      OCCUPATION
TUCKER, SARA M.                  W     F   02/07/76

VICTIM ADDRESS                     BUSINESS NAME AND ADDRESS
1375 E JUAN PENICLE CIR
APARTMENT 523
EULESS, TX 76040                   WORK HOURS          TO
VICTIM HOME PHONE                  VICTIM BUSINESS PHONE
(000) 267-8999                     (000) 000-0000 EXT 0000
-------------------------------------------------------------------------------
BRIEF NARRATIVE: KNOWN SUSPECT KNOWINGLY FIRED A WEAPON AT THE VICTIM WITH
THE INTENT TO CAUSE HER DEATH.

-------------------------------------------------------------------------------
                            ** PROPERTY **
 ,9 SEIZED NO BRAND AMMUNITION
SERIAL:                        OAN:
DESCRIPTION:  9 MM SHELL CASINGS
                                              VALUE            $0

  1 DAMAGED
BLUE OVER GRAY FORD TRUCK PICKUP
LICENSE: TX 8052WM      EXP: 00 TRUCK LICENSE PLATE
VIN:
DESCRIPTION: - FORD RANGER PICKUP TRUCK
                                            $           0

-------------------------------------------------------------------------------
CRIME SCENE CALLED- YES    PROSECUTE- Y    DISP- ACTIVE
-------------------------------------------------------------------------------
```

ARLINGTON POLICE DEPARTMENT

| OFFICER NO. 1476 | OFFENSE REPORT | CASE NO. 950018762 |
| OFFICER NAME, | CRIMINAL ATTEMPT - MURDER | VICTIM 001 OF 001 |
| JORJANI, NICKOLAS A. | LAKE O WOODS APARTMENTS | PAGE 0002 |

REPORTEES NAME                          RACE   SEX    DOB        RELATIONSHIP
                                                     00/00/00   NO RELATION

            ID SUSPECT    FORGERY AFFIDAVIT    ACCT.HOLDER CONTACT
                N               N                     N

REPORTEE ADDRESS                    BUSINESS NAME AND ADDRESS
2401 SPILLWAY LN
APARTMENT 907
ARL, TX 00000
HOME PHONE: (000) 000-0000        BUS. PHONE: (000) 000-0000 EXT 0000

WITNESS NAME                            RACE   SEX    DOB        RELATIONSHIP
BECKHAM, TIM L.                          W      M     12/26/51   NO RELATION

            ID SUSPECT    FORGERY AFFIDAVIT    ACCT.HOLDER CONTACT
                N               N                     N

WITNESS ADDRESS                      BUSINESS NAME AND ADDRESS
2318 STREAMBED CT.
APARTMENT 101
ARL, TX 00000
HOME PHONE: (000) 633-7448        BUS. PHONE: (214) 315-0020 EXT 0000

SUSPECT NAME                            RACE   SEX    DOB        OCCUPATION
JULIUS                                   B      M     00/00/77   STUDENT

            ID CODE/DESCRIPTION                   ID CODE/DESCRIPTION
                 0                                      0

SUSPECT ADDRESS            DESC. BLACK MALE 5FT. 08", WEIGHT IS 175 LBS.,
ADDRESS IS UNKNOWN.             EYE COLOR IS UNKNOWN, BLACK HAIR
                               PARTS OF THE BODY / DESCRIPTION
                               FACE / SCAR

                          CLOTHING: ALSO KNOWN AS 'SCARFACE', APTS ON SE COO
                               PER AND RD TO 6 FLAG

SUSPECT HOME PHONE                  SUSPECT BUSINESS PHONE
(000) 828-4042        ARRESTED- NO

*** SUSPECT VEHICLE     ***
80 BROWN OVER BROWN DATSUN B-210 SEDAN, 2D(SIDE WINDOW FRAME)
LICENSE:            EXP:     LICENSE:
DESCRIPTION:  80'S MODEL, POSSIBLY A B210

**EVIDENCE**

ARLINGTON  POLICE  DEPARTMENT

OFFICER NO. 1476                    OFFENSE REPORT                CASE NO. 950018762
OFFICER NAME                  CRIMINAL ATTEMPT - MURDER          VICTIM 001 OF 001
JORJANI, NICKOLAS A.            LAKE O WOODS APARTMENTS                PAGE 0003
------------------------------------------------------------------------------
   PREMISE CODE:                          POINT OF ENTRY
   APT/TOWNHOUSE/CONDO                     NOT APPLICABLE
   METHOD OF ENTRY                         TOOL OR WEAPON.
   NOT APPLICABLE                          PISTOL

   SUSPECT ACTIONS
   KNEW/DATED VICTIM
   SHOT/DRUGGED VICTIM

------------------------------------------------------------------------------

   OFFICER NARRATIVE........# 01
ON TUESDAY , FEB 07, 1995 AT 2108 HOURS, N. JORJANI          , ID 1476,
AND OFFICER D GLENN, ID 1348, WERE DISPATCHED TO 2401 SPILLWAY LN #902. UPON
ARRIVAL, I MET WITH OFFICER GLENN, WHO HAD ARRIVED ON SCENE A FEW MINUTES PRIOR
THAN I. OFFICER GLENN WAS SPEAKING TO A LARGE GROUP OF PEOPLE WHO WERE
GATHERED OUT IN THE PARKING LOT AND WAS GETTING STATEMENTS FROM THEM.  I
APPROACHED OFFICER GLENN AND AFTER SPEAKING WITH HIM, WAS INFORMED THE SHOOTING
HAD TAKEN PLACE RIGHT THERE, WHICH WAS THE APARTMENT COMPLEX PARKING LOT,
DIRECTLY SOUTH OF APTS 902, 904, 905, AND 901, ALL OF WHICH ARE AT 2401
SPILLWAY LN.  AFTER MAKING SURE THAT NOBODY WAS HURT, DOING SO BY CHECKING EACH
APARTMENT IN WHICH THE FIRE OF THE HANDGUN SEEMED TO BE DIRECTED IN, OFFICER
GLENN AND I COMMENCED TO SECURE THE CRIME SCENE. THIS CONSISTED OF
PROTECTING THE 9 SHELL CASINGS WHICH WE HAD FOUND IN THE PARKING LOT DIRECTLY
SOUTH OF 2401, AND RIGHT NEXT TO THE VEHICLES PARKED IN FRONT OF THAT BUILDING.
    AFTER SECURING THE CRIME SCENE, I CONTACTED CRIME SCENE TO COME OUT TO THE
LOCATION FOR FURTHER INVESTIGATION AND DOCUMENTATION OF EVIDENCE. FROM THE
LOOKS OF THE CRIME SCENE, IT WAS OBVIOUS THAT THE INTENDED TARGET WAS A BLUE
AND SILVER FORD RANGER PICKUP, LICENSE PLATE ███████. ALSO, THERE SEEMED TO
HAVE BEEN SHOTS FIRED DIRECTLY IN FRONT OF APT 902. OFFICERS WERE SPEAKING TO
WITNESSES, BUT ONE HAD ONLY HEARD THE SHOTS AND HAD NOT SEEN THE VEHICLE OR ANY
OF THE SUSPECTS. THE CONSENSUS BETWEEN THE WITNESSES WERE THERE WERE 7-10
SHOTS FIRED.  A VOLLEY OF 4-6 SHOTS WITH A SHORT PERIOD IN BETWEEN, THEN
ANOTHER VOLLEY OF 3-4 SHOTS FIRED.
    ONE WITNESS DID NOTICE A BROWN OLDER MODEL COMPACT ECONOMY TYPE CAR,
LEAVING THE SCENE ALMOST IMMEDIATELY AFTER THE SHOTS WERE FIRED IN FRONT OF
THOSE APARTMENTS. THE WITNESS WAS TIM BECKHAM, W/M, 12/26/51, WHO LIVED
DIRECTLY ACROSS THE PARKING LOT, SOUTH OF THE RESIDENCE AND THE TRUCK WHICH
WAS FIRED UPON. I FOUND WHO THE DRIVER OF THE TRUCK WAS. THE DRIVER OF THE
TRUCK WAS A W/F, WHO WAS LATER IDENTIFIED AS SARA ANN TUCKER, W/F, 2/7/76.
I ASKED SARA TUCKER WHAT HAD TAKEN PLACE, AND TUCKER STATED SHE HAD NO IDEA
WHAT HAD HAPPENED. TUCKER DID SAY THAT WAS HER TRUCK THAT WAS HIT BY THE
BULLETS, THE APARTMENT THAT WAS HIT WAS HER PARENT'S APARTMENT, AND SHE HAD
BEEN WAITING IN APT 904 FOR HER MOTHER TO ARRIVE. THEY WERE SUPPOSED TO MEET

```
      A R L I N G T O N   P O L I C E   D E P A R T M E N T

OFFICER NO. 1476                  OFFENSE REPORT              CASE NO. 950018762
OFFICER NAME                CRIMINAL ATTEMPT - MURDER         VICTIM 001 OF 001
JORJANI, NICKOLAS A.         LAKE O WOODS APARTMENTS                  PAGE 0004
-------------------------------------------------------------------------------
```

OFFICER NARRATIVE........# 01
EACH OTHER.

OFFICER GLENN ALSO WALKED UP TO SARA TUCKER IN MY PRESENCE, AND ASKED HER IF SHE KNEW WHAT WAS GOING ON, IF SHE KNEW OF ANYBODY THAT MIGHT BE MAD AT HER, OR MIGHT CONSIDER HER AN ENEMY THAT MIGHT WANT TO HURT HER. TUCKER QUICKLY STATED THAT SHE HAD NO ENEMIES. THIS WAS HER PARENT'S HOUSE, AND HER FATHER HAS AN IDENTICAL TRUCK TO HERS, YET SHE DID NOT KNOW OF ANYBODY THAT WOULD BE HER FATHER'S ENEMY EITHER. AFTER A FEW MOMENTS OF SPEAKING WITH SARA TUCKER, HER MOTHER, OZLA ANN TUCKER, W/F, 3/7/52, ARRIVED ON SCENE AND APPROACHED THE OFFICERS AND HER DAUGHTER, SARA TUCKER. OZLA TUCKER WAS SLIGHTLY HYSTERICAL, AND WHEN SHE ARRIVED SHE WAS YELLING, MUMBLING, AND BASICALLY IN A PANICKY STATE. I DID NOTICE THAT SHE WAS STATING, 'WHAT IS IT THIS TIME. WHAT HAVE YOU DONE NOW.' AT THAT POINT MRS OZLA TUCKER ALLOWED US TO GO INTO HER RESIDENCE, IN ORDER TO SEE IF THERE HAD BEEN ANY DAMAGE INSIDE THE RESIDENCE. BEFORE GOING IN, I OBSERVED WHAT SEEMED TO BE 5 OR 6 ROUNDS THAT HAD HIT THE FORD PICKUP TRUCK. THERE WERE 2 ROUNDS FIRED TOWARDS THE REAR RIGHT QUARTER PANEL AND THE RIGHT MID-SECTION OF THE TRUCK, AND THERE WAS ONE SHOT THAT FIRED THROUGH THE TAILGATE, WHICH PENETRATED THE TAILGATE, AND WENT ALL THE WAY THROUGH HITTING THE BACK PART OF THE CAB DIRECTLY BEHIND THE PASSENGER SIDE SEAT. ANOTHER ROUND HIT THE FRONT LEFT TIRE, CAUSING IT TO GO FLAT. THERE WAS ALSO ANOTHER ROUND DIRECTLY IN FRONT OF THE TRUCK IN THE WALL OF APT 904. THERE WERE 3 OTHER ROUNDS THAT WERE FOUND TO HAVE PENETRATED AT THE POINTS OF APT 902, WHICH WAS THE TUCKER'S RESIDENCE BEDROOM WINDOW, AS WELL AS THE WALL THAT FACED THE LIVING ROOM.

AFTER BEING ALLOWED TO ENTER THE TUCKER RESIDENCE, I NOTICED THAT MS TUCKER WAS CONTINUOUSLY ASKING SARA TUCKER, 'WHO WAS IT THIS TIME. WHAT DO YOU KNOW ABOUT THIS. WHAT HAVE YOU GOT US INTO THIS TIME', AND THAT TYPE QUESTIONING ON AND ON. I SEPARATED SARA TUCKER FROM HER MOTHER AND SPOKE WITH SARA WHILE OFFICER GLENN TOOK THE MOTHER'S STATEMENT. AS I SPOKE TO SARA TUCKER, SHE SEEMED TO BE CHANGING HER STORY AND HINTING IN A WAY THAT SHE KNEW WHO THE SUSPECT WAS THAT HAD FIRED UPON HER WAS. THIS WAS DONE BY HER STATEMENT OF, 'THERE'S NOTHING YOU GUYS CAN REALLY DO ABOUT WHO DID THIS, THESE GUYS KNOW WHAT THEY'RE DOING AND THEY'RE SERIOUS. YOU GUYS CANNOT PROTECT ME.' I WAS CONTINUING TO SPEAK WITH SARA TUCKER WHEN HER MOTHER ENTERED THE BEDROOM WHERE WE WERE SPEAKING, AND WALKED TOWARDS THE ANSWERING MACHINE AND TURNED IT ON. ON THE ANSWERING MACHINE, THERE WAS A MESSAGE FROM SARA TUCKER'S EX-BOYFRIEND, TIM J TAYLOR, W/M, 3/1/69 OF RICHARDSON, TEXAS, PHONE NUMBER OF 214-234-1722. HE IS A MANAGER AT JACKSON PADRE IN DALLAS. THE PHONE NUMBER THERE IS 214-350-9200. THE MESSAGE ON THE ANSWERING MACHINE SAID, 'THIS MESSAGE IS FOR SARA. SARA, I'M GLAD THAT YOU AND YOUR FAMILY ARE OUT OF MY LIFE. YOU'RE ALL CRAZY. I DON'T EVER WANT TO SEE YOU AGAIN, AND I HOPE THAT YOU ALL GO TO HELL.'

I ASKED SARA WHAT THAT STATEMENT WAS ALL ABOUT, ONCE AGAIN, SARA STARTED TO BE UNCOOPERATIVE BY NOT ANSWERING ANY OF THE OFFICERS QUESTIONS. AT THIS TIME HER MOTHER INTERFERRED BY STATING TO THE OFFICERS THIS WAS HER BOYFRIEND WHO WAS HATEFUL AND HAD THREATENED THEIR FAMILY BEFORE. HE HAD KNOWN SARA FOR APPROX A YEAR, AND SINCE THEIR BREAKUP, HAD BEEN MAKING HARASSING PHONE CALLS TO THE SAME EFFECT OF THIS MESSAGE ON THE ANSWERING MACHINE FOR A COUPLE OF WEEKS NOW. ONCE AGAIN, SARA AND HER MOTHER WERE SEPARATED, AND I CONTINUED

ARLINGTON   POLICE   DEPARTMENT

OFFICER NO. 1476                        OFFENSE REPORT                CASE NO. 950018762
OFFICER NAME                       CRIMINAL ATTEMPT - MURDER          VICTIM 001 OF 001
JORJANI, NICKOLAS A.                LAKE O WOODS APARTMENTS                 PAGE 0005
------------------------------------------------------------------------------------

OFFICER NARRATIVE.........# 01
QUESTIONING SARAH, REFERENCE THIS PRESENT SITUATION.
     SARA AT THIS TIME ADMITTED THAT SHE HAD BEEN HAVING PROBLEMS WITH HER
BOYFRIEND, AND THE PROBLEM BEGAN FROM THE FACT THAT SHE HAD BECOME PREGNANT IN
EARLY JANUARY AND HAD DECIDED TO HAVE AN ABORTION.  HER BOYFRIEND, TAYLOR, HAD
DISAGREED WITH THE ABORTION, WANTED TO MARRY HER, AND SHE REFUSED TO MARRY HIM.
AT THIS POINT, TAYLOR HAD BECOME ANGRY WITH HER AND WANTED TO PUSH HER INTO A
MARRIAGE OR SOME TYPE OF FURTHER RELATIONSHIP, AND SARA HAD DECIDED TO CUT IT
OFF TOTALLY BETWEEN THEM.  SHE STARTED REFUSING TO ANSWER HIS CALLS OR HAVE
ANY 'IP' TO DO WITH HIM, WHICH RESULTED IN HIS CONTINUOUS PHONE CALLS TO HER
APARTMENT, AS WELL AS HER PARENT'S APARTMENT.  AT THIS TIME I INFORMED SARA
THAT HER CHANCES WERE GOOD THAT HER BOYFRIEND TAYLOR WOULD BE OUR PRIMARY
SUSPECT IN THIS SHOOTING, CONSIDERING THE TONE OF THE THREAT, AS WELL AS THE
TIMING OF THE MESSAGE ON THE ANSWERING MACHINE AND THE SHOOTING.  SARA
IMMEDIATELY BECAME DEFENSIVE AND WAS STATING THAT HER BOYFRIEND TAYLOR HAD
NOTHING TO DO WITH THE SHOOTING, AND SHE KNEW THIS AS A FACT.
     AT THIS POINT, I REALIZED SARA DID KNOW WHO DID THE SHOOTING.  FROM THAT
POINT ON, I DIRECTED THE QUESTIONING IN THAT DIRECTION.  AFTER CLOSE TO 2 HOURS
OF CONTINUOUS QUESTIONING OF SARA, THROUGH MUCH OF WHICH SARA REFUSED TO
ANSWERED.   AT SOME POINT SHE STATED THAT SHE WAS NOT WILLING TO PRESS CHARGES,
AND IN FACT THAT SHE HAD NEVER MADE A PHONE CALL TO 911, AND HAD THE NEIGHBORS
NOT CALLED, SHE WOULD HAVE NEVER CALLED.  I LEFT AT THIS POINT TO GET WITH
CRIME SCENE, WHICH ARRIVED ON SCENE, AND WAS BRIEFING THEM AND WORKING WITH
CRIME SCENE WHILE OFFICER GLENN SWITCHED PLACES WITH MYSELF AND THE QUESTIONING
OF SARA.
     AFTER SOME TIME, OFFICER GLENN AND MYSELF SWITCHED PLACES AGAIN.  AFTER
CONFERRING WITH EACH OTHER, I WAS TOLD THAT OFFICER GLENN HAD TOLD SARA THAT
HER PARENT'S LIVES WERE IN DANGER NOW, BECAUSE OF HER ACTIONS, AND IT WAS
INPERATIVE THAT SHE TELL US WHO WAS INVOLVED.  ONCE AGAIN SHE REFUSED TO DO SO
TO OFFICER GLENN.  AT THIS POINT, OFFICER GLENN AND I ONCE AGAIN SWITCHED
ROLLS, AND OFFICER GLENN STEPPED OUT TO HELP CRIME SCENE, AS WELL AS QUESTION
THE MOTHER SOME MORE.  ONCE AGAIN, I ENGAGED IN QUESTIONING WITH SARA TUCKER,
STILL PRESSING THE ISSUE THAT IT WAS IMPERATIVE THAT SHE TELL THIS OFFICER
EXACTLY WHAT SHE KNEW, AND THAT BY KEEPING INFORMATION, SHE NOT ONLY WAS
ENDANGERING HER LIFE, BUT HER PARENT'S LIVES AS WELL.  SARA TUCKER FINALLY
AGREED TO GIVE ME THE INFORMATION I WAS REQUESTING.
     SARA TUCKER STATED THAT AT APPROX 2030 HRS, SHE ATTEMPTED TO CONTACT HER
MOTHER.  AFTER BEING UNABLE TO CONTACT HER MOTHER, HAD DRIVEN FROM HER
APARTMENT TO HER MOTHER'S APARTMENT, IN HOPES OF BEING ABLE TO SPEAK WITH HER
MOTHER AND STAY WITH HER MOTHER.  HER REASONING FOR THIS WAS THEY HAD AN
ARGUMENT EARLIER ON, AND SHE WISHED TO MAKE UP WITH HER MOTHER.  SHE ARRIVED ON
SCENE SHORTLY AFTER 2030 HRS, AND PARKED HER FORD RANGER PICKUP IN A PARKING
SPOT IN FRONT AND TO THE RIGHT OF HER MOTHER'S APARTMENT.  SARA STATED THAT SHE
WAS SITTING IN HER TRUCK WAITING FOR HER MOTHER TO ARRIVE, WHEN SHE NOTICED IN
HER REAR VIEW MIRROR, THAT A BROWN OLDER TYPE EARLY 80'S MODEL DATSUN, POSSIBLY
A B210 TYPE, DROVE PAST HER TRUCK, HEADING EASTBOUND IN THE PARKING LOT.  SARA
WAS IMMEDIATELY FRIGHTENED DUE TO THE FACT SHE RECOGNIZED THE VEHICLE AS
BELONGING TO JULIUS 'SCARFACE', B/M, APPROX 18 YOA, WHO SARA KNEW THROUGH
DRUG DEALINGS.  SARA LATER ADMITTED TO ME THAT SHE HAD HAD SOME DRUG DEALINGS

Ex. 34 - 455

ARLINGTON POLICE DEPARTMENT

OFFICER NO. 1476 · · ·        · OFFENSE REPORT          CASE NO. 950018762
OFFICER NAME             CRIMINAL ATTEMPT - MURDER   VICTIM 001 OF 001
JORJANI, NICKOLAS A.       LAKE O WOODS APARTMENTS       PAGE 0006

OFFICER NARRATIVE........ 01
WITH THIS JULIUS PERSON. SHE STATED THAT AFTER RECOGNIZING THE CAR AS IT DROVE PAST THE BACK OF HER TRUCK, SHE PANICKED AND STARTED LOOKING AROUND TO SEE IF HE WAS GETTING OUT OF THE VEHICLE TO APPROACH HER. SARA STATED THE VEHICLE DID NOT STOP AND JUST DROVE BY DOWN THE DRIVEWAY EASTBOUND. AFTER REACHING THE MAILBOX AREA, DIRECTLY TO THE EAST OF THE DRIVEWAY, HE DID A UTURN, AND STARTED DRIVING BACK TOWARDS HER FORD RANGER TRUCK. SARA, WHILE LOOKING OUT OF THE BACK WINDOW OF HER CAB AND TRUCK, NOTICED THAT THE PASSENGER OF THE VEHICLE LOOKED DIRECTLY AT HER, AND SHE ASSUMED HE RECOGNIZED HER AT THAT POINT. SHE STATED AT THAT POINT SHE NOTICED HE DREW UP A WEAPON AND STARTED FIRING TOWARDS THE BACK OF THE CAB, THROUGH THE BACK WINDOW, TOWARDS THE DRIVERS SEAT WHERE SHE WAS SITTING. SARA IMMEDIATELY DUCKED DOWN AND STAYED DOWN, WHILE THE SUSPECT FIRED A TOTAL OF APPROX 6 ROUNDS TOWARDS THE FORD RANGER PICKUP. AFTER DRIVING BY THE TRUCK, THE SUSPECT ALSO FIRED, WHAT SEEMED TO BE 3 ROUNDS, TOWARDS THE APARTMENT BUILDING WHERE SARA'S PARENTS LIVE. SARA STATED THAT AT POINT, SHE JUMPED OUT OF THE VEHICLE AND AS SHE WAS LEAVING HER VEHICLE, SHE NOTICED THAT THE VEHICLE WAS A BROWNISH COLORED DATSUN B210 (POSSIBLY) EARLY 80'S MODEL. ONCE AGAIN, SHE STATED TO THIS OFFICER SHE RECOGNIZED THAT VEHICLE AND KNEW WHAT THE ORDEAL WAS ABOUT.
SARA STATED TO ME THAT SHE HAD A DRUG DEALING WITH THIS JULIUS 'SCARFACE' GUY IN EARLY JANUARY. SHE HAD BOUGHT $130 WORTH OF CRACK COCAINE FROM HIM, AND HAD NOT PAID HIM FOR IT. FOLLOWING THAT, JULIUS HAD CONTINOUSLY CALLED HER RESIDENCE AND HER PARENT'S RESIDENCE REQUESTING THE MONEY. SARA STATED THAT SHE NEVER CALLED HIM BACK, DUE TO THE FACT THAT SHE DID NOT HAVE THE MONEY, AND THOUGHT IF SHE JUST IGNORNED HIM, HE WOULD STOP BOTHERING HER. LET IT BE NOTED THAT SARA STATED THAT SHE KNEW JULIUS SINCE SHE WAS IN THE 7TH GRADE, EVEN THOUGH THEY HAD NOT BEEN FRIENDS, SHE KNEW OF HIM AND HE KNEW OF HER. SARA ALSO STATED THAT SHE KNEW THE VEHICLE DID NOT BELONG TO JULIUS, AND THAT HE HAD A FRIEND, ANOTHER B/M WHO WAS SKINNY AND TALL, DO THE DRIVING. SARA STATED THIS WAS DUE TO THE FACT THAT JULIUS HAD SOMEWHERE IN THE NEIGHBORHOOD OF 18 OUTSTANDING WARRANTS, AS WELL AS HIS DEALINGS WITH DRUGS AND GUNS. HE DID NOT WISH TO DRIVE A VEHICLE, BUT EVERYTIME SHE DEALT WITH HIM IN BUYING DRUGS, OR IN ANY OTHER MANNER, JULIUS ALWAYS WAS IN THE PASSENGER SEAT OF THIS BROWN B210 TYPE VEHICLE, EARLY 80'S MODEL, WHICH BELONGED TO THE THIN B/M DRIVER (UNKNOWN NAME).
AFTER SARA MADE THE STATEMENT TO THE OFFICER, I ATTEMPTED TO CONTACT THE GANG UNIT, IN ORDER TO FIND MORE INFORMATION ON JULIUS, BUT WAS UNABLE TO DO SO. SARA STATED TO THIS OFFICER THAT SHE EXTREMELY AFRAID THAT THEY WOULD TRY TO KILL HER AGAIN. THEY, BEING JULIUS AND HIS UNKNOWN DRIVER. SHE STATED THAT JULIUS WENT TO LAMAR HIGH SCHOOL AND WAS ON THE FOOTBALL TEAM, AS WELL AS THE TRACK TEAM, AND IS 18 YOA. THIS IS WHAT SHE KNEW OF HIM, OTHER THAN HE LIVED IN THE APARTMENTS THAT SAT IN THE SOUTHEAST CORNER OF COOPER AND ROAD TO SIX FLAGS. SHE DID NOT KNOW WHICH APARTMENT BY NUMBER, BUT TOLD OFFICERS SHE COULD SHOW WHOEVER NEEDED TO KNOW, THE EXACT LOCATION BY BEING TAKEN OUT THERE.
AT THIS POINT, CRIME SCENE HAD FINISHED THEIR INVESTIGATION, AND OFFICER GLENN AND MYSELF HAD GATHERED ALL THE INFORMATION WE NEEDED FROM WITNESSES AND THE VICTIM. IT SHOULD BE NOTED THAT OZLA TUCKER, SARA'S MOTHER, TOLD ME THAT SARA HAD BEEN INTO DRUGS AND SEMI-GANG ACTIVITY FOR QUITE A WHILE NOW. SHE STATED THAT SARA'S BEEN THROWN OUT OF SEVERAL SCHOOLS, AND THE REASON SHE WAS

Ex. 34 - 456

A R L I N G T O N    P O L I C E    D E P A R T M E N T

OFFICER NO. 1476                    OFFENSE REPORT              CASE NO. 950018762
OFFICER NAME                 CRIMINAL ATTEMPT - MURDER          VICTIM 001 OF 001
JORJANI, NICKOLAS A.           LAKE O WOODS APARTMENTS                 PAGE 0007
----------------------------------------------------------------------------------

OFFICER NARRATIVE........# 01

MADE TO MOVE OUT OF HER HOUSE, WAS BECAUSE SHE WOULD STEAL AND PAWN HER GOODS IN ORDER TO PAY FOR DRUGS.

AT THE END OF THE EVENING, BEFORE THESE OFFICERS LEFT, OZLA TUCKER AND SARA TUCKER TOLD THESE OFFICERS THAT THEY WOULD BE STAYING IN A HOTEL, UNKNOWN LOCATION, AND THEY WOULD CONTACT DETECTIVES IN THE MORNING, INCASE THEY NEEDED TO CONTACT THEM. THE MOTHER LEFT A PAGER NUMBER OF 669-0770, AND SARA'S PAGER NUMBER IS 214-408-1665.

BASED ON MY INVESTIGATION, THE REPORTS FROM WITNESSES AND THE STATEMENTS MADE BY SARAH TUCKER HERSELF, AND HER MOTHER, A KNOWN SUSPECT, THAT GOES BY THE NAME OF JULIUS OR "SCARFACE", B/M, APPROX 18 YOA, A STUDENT AT LAMAR HIGH SCHOOL, ALSO A KNOWN GANG MEMBER, ALONG WITH A DRIVER THAT DROVE AN EARLY MODEL BROWN DATSUN B210 TYPE, DID IN FACT DRIVE BY SARA TUCKER'S BLUE FOR RANGER PICKUP, KNOWING THAT SHE WAS IN THE VEHICLE. THE SUSPECT JULIUS, DID IN FACT RAISE A WEAPON, POINT IT TOWARDS SARA'S HEAD AREA, WITH THE INTENT TO CAUSE THE DEATH OF SARA. AFTER FIRING 6 ROUNDS TOWARDS THE TURK, HITTING THE TRUCK, JULIUS DROVE UP A FEW MORE FEET AND FIRED 3 OR 4 ADDITIONAL ROUNDS TOWARDS THE BUILDING WHERE TUCKER'S PARENTS LIVE. THESE ROUNDS ENTERED INTO THE WINDOW, AS WELL AS ENTERING A WALL IN THE LIVING ROOM, AND PENETRATING THROUGH THE COUCH, IN WHICH OZLA ANN TUCKER USUALLY SITS. THE SUSPECTS AT THIS TIME DROVE OFF. THIS SHOOTING WAS BASED UPON A DRUG TRANSACTION WHERE SARA TUCKER OWED $130 TO THIS JULIUS, FOR THE PURCHASE OF SOME CRACK COCAINE BACK IN EARLY JANUARY. BOTH ON HER NON-PAYMENT, JULIUS ATTEMPTED TO CAUSE THE DEATH OF SARA TUCKER. PLEASE FORWARD A COPY OF THIS REPORT TO THE DETECTIVES AT CRIME AGAINST PERSONS. ALSO, A COPY OF IT SHOULD BE FORWARDED TO THE GANG UNIT. NO FURTHER. NORTH    #1490

CONTINUATION NARRATIVE..# 01

ON TUESDAY, 2/7/95, AT APPROX 2108 HRS, I, OFFICER GLENN, ID 1348, ALONG WITH OFFICER JORJIANI, ID 1476, WAS DISPATCHED TO 2401 SPILLWAY LN APT 907, LAKE O THE WOODS APARTMENTS, IN REFERENCE TO AN INVESTIGATION. I ARRIVED ON THE SCENE PRIOR TO OFFICER JORJANI. WHILE I WAS RIDING IN THE PARKING LOT, I OBSERVED SEVERAL SUBJECTS STANDING OUT IN THE PARKING LOT JUST SOUTH OF BLDG 2401. I WAS WAY DOWN BY ONE OF THE SUBJECTS STANDING IN THE PARKING LOT. WHEN I PARKED MY VEHICLE AND GOT OUT, I WAS CONTACTED BY AN UNIDENTIFIED W/M, WHO STATED TO ME THAT SOMEONE WAS SHOOTING IN THE PARKING LOT. THE W/M STATED TO ME THAT HE LIVED IN 2401, APT 905. HE SHOWED ME SOME BULLET CASINGS THAT WERE IN THE PARKING LOT, THAT THE SUSPECT LEFT BEHIND IN THE PARKING LOT. THE W/M WHO LIVES IN APT 905, POINTED OUT A BLUE FORD RANGER PICKUP TRUCK DISPLAYING 1995 TEXAS PLATES, 8052WM. THE SUBJECT STATED TO ME THAT THE FRONT TIRE TO THIS VEHICLE WAS FLAT, WHICH OCCURRED DURING THE SHOOTING. THE SUBJECT ALSO SHOWED THIS OFFICER THAT THE SUSPECT ALSO SHOT THE RIGHT SIDE OF THE FORD RANGER PICKUP TRUCK. HE ALSO STATED TO ME THAT THERE WAS A FEMALE DRIVING THE VEHICLE DURING THE SHOOTING. WHEN I ASKED THE W/M WHERE WAS THE W/F DRIVER, HE

Ex. 34 - 457

```
A R L I N G T O N    P O L I C E    D E P A R T M E N T

OFFICER NO. 1476                    OFFENSE REPORT                CASE NO. 950018762
OFFICER NAME                    CRIMINAL ATTEMPT - MURDER         VICTIM 001 OF 001
JORJANI, NICKOLAS A.            LAKE O WOODS APARTMENTS                  PAGE 0008
```

CONTINUATION NARRATIVE..@ 01
STATED SHE RAN INTO APT 904, TO NOTIFY THE POLICE DEPT.  THE ARL POLICE DEPT
DID RECEIVE SEVERAL CALLS ABOUT THE SHOOTING.  AT THAT TIME, I ASKED THE W/M
TO HAVE THE W/F SUBJECT COME OUT OF APT 904, AND COME TALK TO THIS OFFICER.
    AT THAT TIME WHILE THE SUBJECT WENT TO GET THE FEMALE SUBJECT WHO WAS
INSIDE THE VEHICLE, I CONTINUED TO INVESTIGATE THE AREA WHERE THE SHOOTING
OCCURRED. I NOTICED THAT THE SUSPECT FIRED ONE ROUND IN THE TAIL GATE OF THE
BLUE FORD RANGER, WHICH THE W/F SUBJECT WAS IN. THAT BULLET WENT THROUGH THE
TAILGATE AND THROUGH THE BACK PORTION OF THE BED OF THE PICKUP TRUCK, BUT THE
BULLET DID NOT PENETRATE THROUGH THE CAB OF THE VEHICLE. I NOTICED ANOTHER
HOLE ON THE RIGHT SIDE OF THE FORD RANGER PICKUP TRUCK, RIGHT ABOVE THE
RIGHT REAR TIRE. THERE WAS ANOTHER BULLET HOLE JUST INCHES AWAY FROM THE
PASSENGER DOOR TO THE FORD PICKUP TRUCK. I NOTED THERE WERE SEVERAL BULLET
CASINGS ON THE GROUND, APPROX 60 TO 75 FEET SPREAD OUT. I DID NOT FIND ANY
OTHER BULLET HOLES IN ANY OF THE VEHICLES THAT WERE PARKED NEXT TO THE
FORD RANGER, THAT THE FEMALE OCCUPANT WAS IN.
    I OBSERVED APPROX 8 CASINGS ON THE GROUND. BY THIS TIME, THE FEMALE WHO
WAS INSIDE THE FORD RANGER PICKUP CAME OUT; SHE WAS LATER IDENTIFIED AS
SARAH TUCKER, W/F, DOB 02/07/76. MS TUCKER TOLD ME THAT SHE WAS INSIDE HER
PICKUP TRUCK WHEN THE SHOOTING OCCURRED. SHE TOLD ME THE REASON SHE WAS INSIDE
THE PICKUP TRUCK WAS BECAUSE SHE WAS WAITING ON HER MOTHER, WHO LIVES APT
902, BUILDING 2401, TO ARRIVE HOME. MS TUCKER STATED SHE WAS IN HER VEHICLE
APPROX 10 MINUTES WHEN SHE OBSERVED A BROWN CAR TRAVELING EASTBOUND THROUGH
THE PARKING LOT. MS TUCKER SAID SHE THEN NOTICED THAT THE VEHICLE MADE A
U-TURN. MS TUCKER STATED WHEN THE VEHICLE CAME BACK WESTBOUND IN THE LOT,
SHE SAID SHE HEARD SOME SHOOTING. SHE SAW THE SUSPECT ON THE PASSENGER SIDE
OF THE BROWN VEHICLE SHOOTING. SHE STATED SHE DUCKED DOWN IN THE DRIVERS
SEAT TO KEEP FROM GETTING HIT BY ONE OF THE BULLETS. SHE STATED THE SUSPECT
CONTINUED TO FIRE WHEN SHE LAID DOWN IN THE SEAT OF HER PICKUP TRUCK.
SHE STATED THE SUSPECT CONTINUED TO FIRE AND SHE NOTICED THE SUSPECT LEAVING
THE AREA, BUT THEY LEFT VERY SLOWLY, AS THOUGH THEY WERE NOT IN A HURRY
TO LEAVE THE APARTMENT COMPLEX AFTER SHOOTING SEVERAL ROUNDS IN THE AREA.
MS TUCKER STATED WHEN SHE NOTICED THE SUSPECTS WERE GONE, SHE RAN TO AND
KNOCKED ON HER MOTHER'S DOWNSTAIR NEIGHBOR'S DOOR TO GET INSIDE, WHICH
WAS APT 904. I ADVISED MS TUCKER THAT I BELIEVED THE SUSPECT WAS SHOOTING
AT HER, DUE TO THE FACT THAT THERE WERE NO OTHER VEHICLES IN THE PARKING
LOT WITH BULLET HOLES IN THEM, AND THAT HER VEHICLE WAS THE ONLY ONE THAT
HAD BULLET HOLES IN IT. MS TUCKER THEN TOLD ME THAT SHE DID NOT HAVE ANY
ENEMIES AND SHE COULD NOT ADVISE ME OF ANYONE WHO MIGHT WANT TO SHOOT AT
HER. MOMENTS LATER SHE TOLD ME THAT HER FATHER HAD AN IDENTICAL FORD RANGER
PICKUP TRUCK AS SHE DOES, BUT SHE ALSO STATED THAT HER FATHER DID NOT HAVE
ANY ENEMIES. I THEN ASKED MS TUCKER IF THERE WAS ANYONE WHO PROBABLY WOULD
BE MAD AT HER, THAT WOULD POSSIBLY SHOOT AT HER AND SHE STATED "NO." AT THIS
TIME OFFICER JORJANI ARRIVED AT THE SCENE. I ADVISED OFFICER JORJANI WHAT I
FOUND AND HAD DISCOVERED.
    OFFICER JORJANI AND I THEN TOOK OUT THE TRAFFIC CONES AND STARTED COVERING
UP THE BULLET CASINGS THAT WERE ON THE GROUND. I THEN ADVISED OFFICER JORJANI
TO CALL CRIME SCENE OUT, TO TAKE PHOTOGRAPHS OF THE CASINGS. THERE WAS A BULLET
FOUND IMBEDDED INTO THE WOOD OF BUILDING 2401, NEAR APT 904. OFFICER JORJANI

ARLINGTON   POLICE   DEPARTMENT

```
OFFICER NO. 1476              OFFENSE REPORT            CASE NO. 950018762
OFFICER NAME              CRIMINAL ATTEMPT - MURDER     VICTIM 001 OF 001
JORJANI, NICKOLAS A:         LAKE O WOODS APARTMENTS            PAGE 0009
```

CONTINUATION NARRATIVE..0 01
AND I THEN STARTED CHECKING ALL THE APARTMENTS IN THE AREA AND MAKING SURE
THAT NO ONE HAD BEEN SHOT. I KNOCKED ON SOME DOORS THAT I DID NOT GET ANY
ANSWER. I CHECKED THE WINDOWS TO EACH APARTMENT (UPSTAIRS & DOWNSTAIRS) TO MAKE
SURE NO BULLET HAD GONE THROUGH THE WINDOWS OR THE WALLS. I THEN WALKED NEAR
APT 902 (ON THE SOUTH SIDE) AND I NOTED THERE WAS A BULLET THAT HAD GONE
THROUGH ONE OF THE SCREENS, RIGHT INTO THE WINDOW THAT LED ONE OF THE BEDROOMS.
MS TUCKER TOLD ME THAT THIS APARTMENT BELONGS TO HER MOTHER.
MOMENTS LATER, MS TUCKER'S MOTHER ARRIVED AT THE SCENE. I THEN ASKED MS
TUCKER'S MOTHER, LATER IDENTIFIED AS OZELA ANN TUCKER, W/F, DOB 03/07/52,
IF WE COULD ENTER HER HOUSE (APARTMENT) AND MAKE SURE THAT NO BULLETS HAD
ENTERED. I THEN WENT TO THE BACK BEDROOM AND OBSERVED WHERE A BULLET HAD
ENTERED THE BEDROOM WINDOW, HITTING THE BLINDS.
WHEN CRIME SCENE TECHNICIAN JOEL STEPHENSON ID 1297 ARRIVED, I ADVISED
HIM WHERE THE BULLETS WE FOUND WERE LOCATED INSIDE OF MS OZELA TUCKER'S
APARTMENT. WE ADVISED CRIME SCENE TECHNICIAN STEPHENSON WHERE THE BULLET
WAS LOCATED OUTSIDE OF APT 904, WHICH WAS IMBEDDED INSIDE THE WOOD OUTSIDE.
I WAS INVITED INSIDE APT 904, TO MAKE SURE THAT NO BULLETS HAD GONE
THROUGH THE WALLS, TO WHICH I DID NOT FIND ANYTHING.
WHILE CRIME SCENE TECHNICIAN STEPHENSON WAS GETTING HIS EQUIPMENT
TOGETHER, I FOUND TWO MORE BULLET HOLES THAT WENT THROUGH THE WALL FROM
THE OUTSIDE, TO THE INSIDE OF OZELA TUCKER'S LIVING ROOM. I OBSERVED THAT
BOTH BULLET HOLES WERE APPROX 12 INCHES FROM ONE ANOTHER. I NOTICED THERE
WAS ONE BULLET THAT WENT THROUGH THE WALL, LAYING ON THE FLOOR NEXT TO
THE BIG SCREEN TELEVISION, IN THE LIVING ROOM, AND CRIME SCENE TECHNICIAN
STEPHENSON FOUND THE OTHER BULLET THAT TRAVELED THROUGH THE WALL, THEN WENT
THROUGH A PILLOW, THEN THROUGH THE COUCH ON THE NORTH WALL IN THE LIVING
ROOM. THE BULLET THEN TRAVELED THROUGH A WALL, WHERE IT FINALLY RESTED IN
A CLOSET INSIDE OF THE LIVING ROOM.
I ASKED SARAH TUCKER IF THERE WAS MORE TO THIS SITUATION THAN SHE WAS
TELLING US, AND THEN OFFICER JORJANI WENT INSIDE THE BEDROOM AND STARTED
TALKING TO SARAH TUCKER. OZELA TUCKER LET OFFICER JORJANI LISTEN TO A
MESSAGE THAT WAS LEFT ON THE ANSWERING MACHINE. APPARENTLY IT WAS SARAH
TUCKER'S EX-BOYFRIEND, WHO WAS UPSET WITH HER ABOUT THE SITUATION THAT THEY
BROKE UP. OFFICER JORJANI AND I THEN ASKED SARAH TUCKER WHY SHE DID NOT
TELL US AT THE BEGINNING THAT HER BOYFRIEND AND HER WERE HAVING SOME TYPE
OF FEUD AGAINST ONE ANOTHER? SHE TOLD OFFICER JORJANI AND MYSELF THAT IT
WAS NOT HER BOYFRIEND WHO DID THE SHOOTING. SHE THEN ONLY TOLD ME THAT IT
WAS "TWO BLACK GUYS WHO DONE THE SHOOTING." WHEN I ASKED HER WHY SHE DID NOT
TELL ME AT THE BEGINNING AT THE INTERVIEW WHAT OCCURRED, SHE STATED SHE WAS
AFRAID AND THERE WAS NOTHING THAT THE POLICE COULD DO TO THE TWO SUBJECTS
THAT WERE SHOOTING AT HER. SHE LATER TOLD ME THAT SHE KNEW WHO THE TWO
SUSPECTS WERE, BUT SHE WOULD NOT GIVE THEIR NAME OR ANY IDENTIFICATION. SHE
STATED SHE OBSERVED THE DRIVER OF THE VEHICLE AND SHE BELIEVES SHE KNOW THE
SUSPECT WELL. WHILE I WAS ASSISTING TECHNICIAN STEPHENSON IN LOCATING ONE
OF THE BULLETS THAT WENT INSIDE OF THE BEDROOM, THE VICTIM, WHO WAS VERY
UNCOOPERATIVE WITH OFFICERS AT FIRST, STARTED TALKING TO OFFICER JORJANI.
SHE TOLD OFFICER JORJANI WHO THE SUSPECTS WERE AND WHY THEY CAME TO HER
MOTHER'S APARTMENT AND STARTED SHOOTING AT HER AND AT THE APARTMENT. REFER

Ex. 34 - 459

ARLINGTON  POLICE  DEPARTMENT

OFFICER NO. 1476                    OFFENSE REPORT                 CASE NO. 950018762
OFFICER NAME                  CRIMINAL ATTEMPT - MURDER           VICTIM 001 OF 001
JORJANI, NICKOLAS A.              LAKE O WOODS APARTMENTS               PAGE 0010
--------------------------------------------------------------------------------

CONTINUATION NARRATIVE..# 01
TO OFFICER JORJANI'S REPORT ON SARAH TUCKER'S VERBAL STATEMENT THAT SHE
GAVE.
     NO FURTHER. NORTH SIDE  #1490/1381  AM/RAW

INVESTIGATOR NARRATIVE..# 01
VICTIM: TUCKER, SARA                      DET. ASSIGNED: J.T. STANTON #743
OFFENSE: ATT. MURDER                      DATE ASSIGNED: 2-8-95

I WAS ASSIGNED THIS CASE INVOLVING THE SHOOTING OF VICTIM ON 2-7-95. THE VICTIM
AND HER PARENTS CALLED THE C.I.D. AND ASKED FOR HELP WITH THE VICTIM SINCE THEY
WERE AFRAID TO GO HOME. THE VICTIM WAS SCARED THAT THE SUSPECT WOULD TRACK HER
DOWN AND KILL HER OR HAVE SOME OF HIS FRIENDS KILL HER. THE PARENTS WERE
SECRETING THE VICTIM IN A LOCAL HOTEL AND THEY WERE TOLD BY SGT. SIMONDS TO
COME TO THE POLICE STATION AND THE INVESTIGATION WOULD GET STARTED.
        STANTON WAS ASSIGNED TO CONTACT THE PARENTS AND THE VICTIM. PRIOR TO THE
VICTIM'S ARRIVAL, STANTON REVIEWED THE CASE AND NOTED THAT THE SUSPECT WAS A
BLACK MALE WHO WAS KNOWN TO THE VICTIM AS 'JULIUS' AND WHO HAD THE STREET NAME
OF 'SCARFACE'. THE VICTIM TOLD THE REPORTING OFFICERS THAT JULIUS GOES TO LAMAR
HIGH AND IS ON THE FOOTBALL AND TRACK TEAMS. STANTON CALLED LAMAR AND SPOKE TO
ASST. PRINCIPAL GREG JUNG. THE ASST PRIN. STATED THAT MY SUSPECT WOULD BE
JULIUS O. ROBINSON, B/M, 8-8-76 WITH AN ADDRESS OF 1413 N. COOPER APT.#A. THE

Ex. 34 - 460

ARLINGTON POLICE DEPARTMENT

OFFICER NO. 1476                    OFFENSE REPORT                CASE NO. 950018762
OFFICER NAME                  CRIMINAL ATTEMPT - MURDER           VICTIM 001 OF 001
JORJANI, NICKOLAS A.          LAKE O WOODS APARTMENTS.                   PAGE 0011
--------------------------------------------------------------------------------

INVESTIGATOR NARRATIVE..# 01
SUSPECT WAS FOUND TO HAVE A RECENT ARREST RECORD IN THE APD AND HIS MUG PHOTO
WAS OBTAINED. STANTON COMPOSED THE PHOTO SPREAD AND THEN MET WITH THE VICTIM
AND HER FAMILY IN THE LOBBY. STANTON ARRANGED FOR THE GROUP TO MEET WITH THE
VICTIM'S ASSISTANCE COORDINATOR AND A STATEMENT WAS SCHEDULED TO BE TAKEN. THE
VICTIM WAS SHOWN THE COMPOSED SPREAD AND MADE AN IMMEDIATE AND POSITIVE
IDENTIFICATION OF THE PHOTO OF JULIUS O. ROBINSON AS THE MAN WHO SHOT AT HER
AND TRIED TO KILL HER. THE VICTIM'S SWORN STATEMENT WAS TAKEN AND SHE ADMITTED
THAT SHE DID OWE MR. ROBINSON $130.00 FOR SOME DRUGS (CRACK COCAINE) THAT SHE
HAD BOUGHT FROM HIM. THE VICTIM STATED THAT ROBINSON HAD BEEN CALLING AND
LEAVING MESSAGES ON HER HOME ANSWERING MACHINE AND LEAVING A "COUNTDOWN" ON HER
BEEPER. STANTON ASKED THE VICTIM WHAT A "COUNTDOWN" WAS AND SHE REPLIED THAT IT
WAS A PAGE THAT SHE WOULD GET EVERYDAY AND EACH DAY WOULD BE ONE NUMBER LESS
THAN THE DAY BEFORE. THE VICTIM STATED THAT THE COUNTDOWN HAD GOTTEN TO TODAY
BEING THE ZERO DAY, BUT THE CODE WAS "19" ON THE DAY OF THE SHOOTING. THE 19
WOULD SYMBOLIZE THE VICTIM'S 19TH BIRTHDAY, WHICH WAS ON THE DAY OF THE
SHOOTING. THE VICTIM AND HER FAMILY PROVIDED WHERE THEY WOULD BE STAYING, OUT
OF TOWN, TO STANTON.
        THIS CASE WAS PRESENTED TO THE D.A. AND MR. PRICE ADVISED THAT THE CASE
WOULD STILL BE FILEABLE EVEN IF IT WAS OVER A DRUG DEBT. STANTON RAN ROBINSON
AND FOUND THAT HE HAD 17 OUTSTANDING WARRANTS OUT OF THE ARLINGTON COURT FOR
HIS ARREST. STANTON CALLED SCHOOL RESOURCE OFFICER L. JONES AND ASKED JONES IF
MR. ROBINSON WAS IN SCHOOL. THE SRO REPLIED THAT ROBINSON WAS INDEED IN CLASS
ON THAT DAY. I ADVISED THE SRO OF THE OUTSTANDING WARRANTS AND OFFICER JONES
TOOK ROBINSON INTO CUSTODY FROM LAMAR HIGH. STANTON FINISHED THE NECESSARY
CASE REPORT FOR THE ATT. MURDER AND ADDED THE CHARGE TO THE SEVENTEEN ALREADY
ON MR. ROBINSON IN THE JAIL. THE CASE WAS FILED WITH THE D.A. AND ROBINSON HAD
A BOND SET AT $500,000.00
        STANTON HAD A BRIEF INTERVIEW WITH ROBINSON IN THE JAIL. ROBINSON DENIED
HAVING BEEN ANYWHERE NEAR THE VICTIM'S APARTMENTS ON THE PREVIOUS NIGHT. HE
CLAIMED TO HAVE BEEN WITH FRIENDS AT HIS APARTMENT WATCHING VIDEOS. ROBINSON
GAVE STANTON THE PHONE NUMBERS FOR HIS FRIENDS THAT WERE WITH HIM AND STANTON
WAS ABLE TO TALK TO ONE OF THEM NAMED RICHARD SMART. MR. SMART GAVE THE SAME
INFO AS MR. ROBINSON ABOUT THEM WATCHING VIDEOS AT ROBINSON'S APARTMENT. THE
OTHER FRIENDS GIVEN BY ROBINSON COULD NOT BE LOCATED. THIS CASE WILL BE CLEARED
BY DETECTIVE ARREST WITH THE CASE OF ATT. MURDER FILED ON MR. ROBINSON WHILE HE
WAS IN CUSTODY IN THE ARLINGTON JAIL.
        JTS #743                        CBA (DET)                         2-10-95

--------------------------------------------------------------------------------
DATE ENTERED - 02/08/95                    ENTERED BY -
REVIEWED BY -                              DET. ASSGN - STANTON, JOHN T.
--------------------------------------------------------------------------------

# EXHIBIT 35

## DECLARATION OF RICHARD SMART

I, Richard Smart, declare:

1.   I know Julius Robinson, we both went to Lamar High School in Arlington, Texas.

2.   In February of 1995, Julius was living in an apartment he shared with his mother in Arlington, but his mother was gone and had not paid the rent.  The electricity in the apartment was turned off.  Julius was angry and frustrated.  He was anxious to finish his last year of high school, but was having a difficult time, coming home to a dark apartment every evening.

3.   I drove Julius to the apartment of Sara Tucker, a friend of his who owed him money.  When we discovered that she was not home, we drove to her mother's house.  In the parking lot, we saw the pickup truck owned by Sara Tucker.  The truck appeared to be empty.  I drove into the parking lot and past the truck.  I was closest to the truck and no one was in the cab of the truck.  I made a u-turn and drove back past the truck again.  This time Julius, in the passenger seat, was the closest to the truck.  Julius rolled his window down, took out a gun and fired shots into the truck.  We did not see anyone inside it.  We both believed the truck was empty.  The incident happened in the night time when it was dark outside.

4.   No one from Julius Robinson's defense team ever contacted me, not before

1

R. S.

Ex. 35 - 462

or during his trial.  Had I been asked about the above information, I would have willingly discussed it.  I would have been willing to testify in court on Julius Robinson's behalf.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this day of September, 2006 in Chicago, Illinois.

Richard Smart

2

**Ex. 35 - 463**

# EXHIBIT 36

```
OFFICER NO. 1476                    OFFENSE REPORT              CASE NO. 95001876
OFFICER NAME                  CRIMINAL ATTEMPT - MURDER         VICTIM 001 OF 001
JORJANI, NICKOLAS A.           LAKE O WOODS APARTMENTS                PAGE 0008
```

CONTINUATION NARRATIVE..# 01

STATED SHE RAN INTO APT 904, TO NOTIFY THE POLICE DEPT. THE ARL POLICE DEPT DID RECEIVE SEVERAL CALLS ABOUT THE SHOOTING. AT THAT TIME, I ASKED THE W/M TO HAVE THE W/F SUBJECT COME OUT OF ███████ AND COME TALK TO THIS OFFICER.

AT THAT TIME WHILE THE SUBJECT WENT TO GET THE FEMALE SUBJECT WHO WAS INSIDE THE VEHICLE, I CONTINUED TO INVESTIGATE THE AREA WHERE THE SHOOTING OCCURRED. I NOTICED THAT THE SUSPECT FIRED ONE ROUND IN THE TAIL GATE OF THE BLUE FORD RANGER, WHICH THE W/F SUBJECT WAS IN. THAT BULLET WENT THROUGH THE TAILGATE AND THROUGH THE BACK PORTION OF THE BED OF THE PICKUP TRUCK, BUT THE BULLET DID NOT PENETRATE THROUGH THE CAB OF THE VEHICLE. I NOTICED ANOTHER HOLE ON THE RIGHT SIDE OF THE FORD RANGER PICKUP TRUCK, RIGHT ABOVE THE RIGHT REAR TIRE. THERE WAS ANOTHER BULLET HOLE JUST INCHES AWAY FROM THE PASSENGER DOOR TO THE FORD PICKUP TRUCK. I NOTED THERE WERE SEVERAL BULLET CASINGS ON THE GROUND, APPROX 60 TO 75 FEET SPREAD OUT. I DID NOT FIND ANY OTHER BULLET HOLES IN ANY OF THE VEHICLES THAT WERE PARKED NEXT TO THE FORD RANGER, THAT THE FEMALE OCCUPANT WAS IN.

I OBSERVED APPROX 8 CASINGS ON THE GROUND. BY THIS TIME, THE FEMALE WHO WAS INSIDE THE FORD RANGER PICKUP CAME OUT; SHE WAS LATER IDENTIFIED AS SARAH TUCKER, W/F, DOB ███████ 76. MS TUCKER TOLD ME THAT SHE WAS INSIDE HER PICKUP TRUCK WHEN THE SHOOTING OCCURRED. SHE TOLD ME THE REASON SHE WAS INSIDE THE PICKUP TRUCK WAS BECAUSE SHE WAS WAITING ON HER MOTHER, WHO LIVES APT ███████ BUILDING ███████ TO ARRIVE HOME. MS TUCKER STATED SHE WAS IN HER VEHICLE APPROX 10 MINUTES WHEN SHE OBSERVED A BROWN CAR TRAVELING EASTBOUND THROUGH THE PARKING LOT. MS TUCKER SAID SHE THEN NOTICED THAT THE VEHICLE MADE A U-TURN. MS TUCKER STATED WHEN THE VEHICLE CAME BACK WESTBOUND IN THE LOT, SHE SAID SHE HEARD SOME SHOOTING. SHE SAW THE SUSPECT ON THE PASSENGER SIDE OF THE BROWN VEHICLE SHOOTING. SHE STATED SHE DUCKED DOWN IN THE DRIVERS SEAT TO KEEP FROM GETTING HIT BY ONE OF THE BULLETS. SHE STATED THE SUSPECT CONTINUED TO FIRE WHEN SHE LAID DOWN IN THE SEAT OF HER PICKUP TRUCK. SHE STATED THE SUSPECT CONTINUED TO FIRE AND SHE NOTICED THE SUSPECT LEAVING THE AREA, BUT THEY LEFT VERY SLOWLY, AS THOUGH THEY WERE NOT IN A HURRY TO LEAVE THE APARTMENT COMPLEX AFTER SHOOTING SEVERAL ROUNDS IN THE AREA. MS TUCKER STATED WHEN SHE NOTICED THE SUSPECTS WERE GONE, SHE RAN TO AND KNOCKED ON HER MOTHER'S DOWNSTAIR NEIGHBOR'S DOOR TO GET INSIDE, WHICH WAS APT 904. I ADVISED MS TUCKER THAT I BELIEVED THE SUSPECT WAS SHOOTING AT HER, DUE TO THE FACT THAT THERE WERE NO OTHER VEHICLES IN THE PARKING LOT WITH BULLET HOLES IN THEM, AND THAT HER VEHICLE WAS THE ONLY ONE THAT HAD BULLET HOLES IN IT. MS TUCKER THEN TOLD ME THAT SHE DID NOT HAVE ANY ENEMIES AND SHE COULD NOT ADVISE ME OF ANYONE WHO MIGHT WANT TO SHOOT AT HER. MOMENTS LATER SHE TOLD ME THAT HER FATHER HAD AN IDENTICAL FORD RANGER PICKUP TRUCK AS SHE DOES, BUT SHE ALSO STATED THAT HER FATHER DID NOT HAVE ANY ENEMIES. I THEN ASKED MS TUCKER IF THERE WAS ANYONE WHO PROBABLY WOULD

NO. 0574361D

| | | |
|---|---|---|
| THE STATE OF TEXAS | {} | IN THE 213TH JUDICIAL |
| | {} | |
| VS. | {} | DISTRICT COURT OF |
| | {} | |
| JULIUS O. ROBINSON | {} | TARRANT COUNTY, TEXAS |

### PETITION TO PROCEED TO ADJUDICATION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, the State of Texas by and through Tim Curry, Criminal District Attorney of Tarrant County, Texas, and would respectfully show the Court that on March 11, 1996, JULIUS O. ROBINSON, hereinafter styled Defendant, appeared in Court with his or her attorney and the Court heard evidence in the above entitled and numbered cause and found that evidence substantiated the Defendant's guilt on a charge of Deadly Conduct; however, the Court found that further proceedings should be deferred without making an adjudication of guilt and the Court placed the Defendant on probation as set out in the order setting conditions of probation, for a term of five (5) years.

Your petitioner would show to the Court that said Defendant thereafter, during the effective period of said probation, violated the terms and conditions of said probation in that:

1. The Defendant, JULIUS O. ROBINSON, was ordered by the Court to commit no offense against the laws of this State or of any other State or of The United States. In violation of this condition the Defendant on or about the 9th day of May, 1998 , in the County of Hopkins and State of Texas, did then and there intentionally and knowingly possess a usable quantity of marihuana in an amount of less than two ounces.

2. The Defendant, JULIUS O. ROBINSON, was ordered by the Court to remain within Tarrant County, Texas, unless the Court or Supervision Officer authorizes Defendant to leave. In violation of this condition the Defendant on or about May 8, 1998, left Tarrant County without permission from the Court or Supervision Officer and went to Hopkins County.

PETITION TO PROCEED TO ADJUDICATION - PAGE 1 OF 3

Ex. 36 - 465

WHEREFORE, your Petitioner prays that this Honorable Court order and direct that the District Clerk forthwith issue an alias capias (or if Defendant is on good bond in this cause, the Clerk is ordered to issue a precept to serve), herein directing that the Defendant be arrested and brought before this Honorable Court to show cause, if he or she has any, why said probated sentence entered herein should not be set aside and why the Court should not proceed to adjudication of said case; that the Court further direct said District Clerk to serve upon said Defendant, as soon as possible, a true copy of this petition; and for such other orders the Court may direct.

Respectfully submitted,

TIM CURRY
CRIMINAL DISTRICT ATTORNEY
TARRANT COUNTY, TEXAS

Assistant Criminal District Attorney
Tarrant County, Texas

DATE: 4/22/4￼

___ X ___ ALIAS CAPIAS ORDERED

_____ DEFENDANT TO REMAIN ON BOND
          PRECEPT TO SERVE PETITION ORDERED.

BOND SET AT:_____

PETITION TO PROCEED TO ADJUDICATION - PAGE 2 OF 3

**Ex. 36 - 466**

Certified True Copy

THE STATE OF TEXAS          '

COUNTY OF TARRANT          '

I, Thomas A. Wilder, Clerk of the District Courts of Tarrant County, Texas, do hereby certify that the above and foregoing is a true and correct copy of all documents in Cause number 0574361D (52 pages).

In Cause Number 0574361D, THE STATE OF TEXAS vs. JULIUS O. ROBINSON as the same appears on the file and/or record in my said office.

WITNESS MY SIGNATURE and seal of the Court at office in the city of Fort Worth, Tarrant County, Texas, this date of January 25, 2007.

THOMAS A. WILDER
DISTRICT CLERK
TARRANT COUNTY, TEXAS

By _____
JUSTIN DAVIS, Deputy District Clerk

**Ex. 36 - 467**

STATE OF TEXAS Vs.

ROBINSON, JULIUS O    2B    B M 18
05743610    0213    76
No.    ATTEMPT MURDER + Deadly Conduct
Offense    CID# 0424050    CASE# 0574361    2/07/95
/08/95

DETAINER 2-15-2001

(CRIMINAL) DISTRICT COURT ___213___

TRANSFERRED TO _____

FEB - 9 1995    COMPLAINT FILED.    BOND SET AT $500,000

FEB 27 1995    Steve Stanson    appointed as counsel.

MAR 14 1995    INDICTMENT VOL. mil    PAGE 34

MAR 14 1995    State's Announcement of Ready Filed

✓ 3-14-95    Pro-Se Habeas Corpus for Relief from Excessive
Bail filed (copy to Def + Dist. attys)

APR 17 1995    ANNOUNCEMENT DOCKET CALL

✓ 4-1-95    Bond reduced to $10,000 w/ conditions

ANNOUNCEMENT DOCKET CALL

DEFENDANT'S APPLICATION FOR CONTINUANCE FILED + Granted

JUL 10 1995    ANNOUNCEMENT DOCKET CALL

SEP 18 1995    TRIAL DOCKET CALL

NOV - 6 1995    TRIAL DOCKET CALL

8-96    TRIAL DOCKET CALL

1-19-96    Bond Forfeited; Warrant Issued
Bond Reset at $20,000 w/ conditions (FX 1-24-96)

1-24-96    Bond reinstated with same conditions
Warrant recalled. Bond forfeiture set
aside without cost.

**CRIMINAL DOCKET**

Right
index-Finger
thumb

DISPOSITION OF CASE:

1. 5 years Unadjudicated Probation
2. Administrative Closure per Court
3. _____
4. _____

State's Attorney    Peter Keim

On Probation Revocation _____

Defendant's Attorney    Michael Gregory

On Probation Revocation _____

Surety John Gilmore; Jennifer D Adams

Appeals Attorney _____

MAR 11 1996    TRIAL DOCKET CALL

- over

**Thomas A. Wilder**
District Clerk
401 W. Belknap
Fort Worth, TX 76196-0402

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

**Ex. 36 - 468**



05743610

# CRIMINAL DOCKET

3-11-96 — Defendant waived arraignment. Waiver of jury signed by all parties in open Court and filed. -- Defendant, after being warned, entered plea of guilty to Deadly Conduct before the Court. After hearing the evidence, the Court found that the evidence substantiates the defendant's guilt. However, assessment of punishment is deferred under Article 42.12, Section 5 a. Defendant placed on probation for – 5 – years under terms and conditions that during the term of Probation the Defendant shall: Nos. (9) to (5) inclusive, regular term. Conditions of Probation served on Defendant in open Court. Plea bargaining agreement followed! Art. 26.13. Vol. 56 Page 327 A+B No right of appeal, Art. 44.08

CONDITIONS OF COMMUNITY SUPERVISION RECORDED.    VOL 56 PAGE 328 A+B

SUPPLEMENT/AMENDMENT TO CONDITIONS OF COMMUNITY SUPERVISION. DEFENDANT RECEIVED A COPY OF THE AMENDMENT.    VOL 56 PAGE 329 A

Presiding Judge, 213th District Court

MICROFILMED

4-23-98 — Petition to Proceed to Adjudication filed. Alias Capias issued, upon the Order of the Judge of this Court. No Bond (ef 6-25-98)

6-25-98 — Bond set at $2,500

JUL 17 1998 — PROBATION REVOCATION DOCKET CALL.
AUG – 7 1998 — PROBATION REVOCATION DOCKET CALL
SEP 4 1998 — PROBATION REVOCATION DOCKET CALL.

9.4.98 — DEFENDANT PLEAD NOT TRUE TO PARAGRAPHS ONE & TWO; TESTIMONY; No FINDINGS; COURT IN RECESS UNTIL 9-11-98 @ 1:30; DEFENDANT ALLOWED TO REMAIN ON BOND

9-11-98 — Petition to Proceed to Adjudication Dismissed. Defendant's Probation Reinstated.

6-23-00 — Motion for Early Release & Dismissal filed
FEB 13 2001 — Second Petition to Proceed to Adjudication (ee 7-25-02) filed. Alias Capias issued, upon the Order of the Judge of this Court. No Bond

7-25-02 — Second Petition to Proceed to Adjudication Dismissed, Warrant Recalled. Defendant's Probation Dismissed per Court Administrative Closure.

SMEAD 14 SP97547

## CASE NO. 0574361D

| THE STATE OF TEXAS | | IN THE 213TH DISTRICT |
| --- | --- | --- |
| VS. | | COURT OF |
| JULIUS O. ROBINSON | | TARRANT COUNTY, TEXAS |

### UNADJUDICATED JUDGMENT ON PLEA OF GUILTY OR NOLO CONTENDERE AND SUSPENDING IMPOSITION OF SENTENCE

| Judge Presiding | : HON. ROBERT K. GILL | Date of Judgment | : MARCH 11, 1996 |
| --- | --- | --- | --- |
| Attorney for State District Attorney | : TIM CURRY | Assistant District Attorney | : PETER H. KEIM |
| Attorney for Defendant | : MICHAEL GREGORY | Charging Instrument: | INDICTMENT |

| Offense Date | Offense |
| --- | --- |
| FEBRUARY 7, 1995 | DEADLY CONDUCT - DISCHARGE FIREARM AT INDIVIDUAL |

| Degree | Count | Plea |
| --- | --- | --- |
| 3RD | TWO | GUILTY |

| Findings on Deadly Weapon | : THE COURT AFFIRMATIVELY FINDS THAT THE DEFENDANT USED OR EXHIBITED A DEADLY WEAPON, TO-WIT: A FIREARM DURING THE COMMISSION OF THE OFFENSE OR DURING THE IMMEDIATE FLIGHT THEREFROM. |
| --- | --- |
| Plea to Enhancement Paragraph(s) | : NONE |
| Plea to Habitual Paragraph(s) | : NONE |
| Findings on Enhancement/ Habitual Paragraph(s) | : NONE |
| Punishment | : DEFERRED          Date to Commence : MARCH 11, 1996 |
| Probationary Term | : FIVE (5) YEARS |
| Fine Not Suspended | : NONE |

On this day, set forth above, this cause came for trial and came the State of Texas, by its above-named attorney, and the Defendant appeared in person and by the above-named attorney for the Defendant, or, where a Defendant is not represented by counsel, that the Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel; and announced ready for trial, the Defendant having been heretofore arraigned, or having waived arraignment in open court, and having agreed that the testimony may be stipulated in this cause and the Defendant, his counsel, and the State's attorney having agreed in writing in open court to waive a jury in the trial of this cause and to submit this cause to the Court, and the Court having agreed to the same, the said attorney for the State read the instrument charging the offense as shown or the reading of the charging instrument having been waived by Defendant, the Defendant entered his plea as shown above thereto, and it appearing to the Court that the Defendant is mentally competent and the plea is free and voluntary, and the Court having duly admonished the Defendant as to the consequences of such plea, including the range of punishment attached to the offense and the fact that any recommendation of the prosecuting attorney as to punishment is not binding on the Court, and the Defendant further having affirmatively stated awareness of the consequences of such plea and acknowledged to not having been misled or harmed by the admonishment of the Court, yet the Defendant persisted in entering such plea, said plea is by the Court received and now entered of record upon the minutes of the Court as the plea herein of said Defendant. The Court after receiving the plea shown and hearing the evidence, finds that it substantiates the Defendant's guilt and that further proceedings should be deferred without entering an adjudication of guilt and that Defendant should be placed on probation on reasonable terms and conditions as the Court may require.

The State of Texas do have and recover of the said Defendant all costs in this prosecution expended including any fine shown above for which let execution issue. And it is further ORDERED by the Court that the imposition of sentence of the judgment of conviction herein shall be suspended during the good behavior of the Defendant and that the Defendant be placed on probation during the period of time, fixed by the Court, under the conditions to be determined by the Court, as provided by law. However, when it is shown above that a fine applicable to the offense committed has been imposed by the Court and not suspended, then it is ORDERED that Defendant pay such fine and all costs in this prosecution expended and that Defendant be placed on probation during the period of time fixed by the Court, under the conditions to be determined by the Court, as provided by law.

IT IS THEREFORE CONSIDERED by the Court that the evidence substantiates the Defendant's guilt and that further proceedings should be Deferred without entering an adjudication of guilt, and that Defendant be placed on probation during the period of time prescribed by the Court on such reasonable terms and conditions as the Court may require in accordance with law.

VOLUME 56 PAGE 327A OF CASE NO. 0574361D



**Ex. 36 - 470**

## ORDER SETTING CONDITIONS OF COMMUNITY SUPERVISION

On this day, above shown, in open court, the Defendant, the above-named attorney for Defendant, and the attorney for the State, appeared and the Court considered the terms and conditions of probation in accordance with the judgment of conviction heretofore entered herein; and the Court being of the opinion that such terms and conditions should be subject to the supervision of the Court through the duly appointed and acting Director of Community Supervision and Corrections Department of Tarrant County, Texas;

It is therefore ORDERED by the Court that the Defendant be, and is hereby placed on probation for the above named term beginning on the date of entry of judgment herein under the supervision of the Court, through the Director of Community Supervision and Corrections Department of Tarrant County, Texas, subject to the following terms and conditions set out in the attached Conditions of Community Supervision which is incorporated and made a part thereof.

CONDITIONS OF COMMUNITY SUPERVISION INCORPORATED AS A PART OF THIS JUDGMENT AND ATTACHED HERETO RECORDED IN VOLUME 56, PAGE(S) 328A & B

SUPPLEMENT/AMENDMENT TO CONDITIONS OF COMMUNITY SUPERVISION RECORDED IN VOLUME 56, PAGE 329A

PRESIDING JUDGE

Date Signed    :    MARCH 15, 1996

Notice of Appeal    :    _____

Mandate Received    :    _____

VOLUME 56 PAGE 327B OF CASE NO. 0574361D

**Ex. 36 - 471**

Judicial District of Tarrant County, Texas
**COMMUNITY SUPERVISION AND CORRECTIONS DEPARTMENT**
200 West Belknap, Fort Worth, Texas 76196-0255
Telephone: (817) 884-2450    Office Hours: 7:30 a.m. to 5:30 p.m. Monday - Friday

☐ SJF

☐ **ADJUDICATED**          **CONDITIONS OF COMMUNITY SUPERVISION**     ☒ **DEFERRED ADJUDICATION**

**FILED**
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

**THE STATE OF TEXAS**                                                IN ___213 th___ **DISTRICT**

VS. NO. 0574361D          **MAR 1 1 1996**          COURT NO. _____ OF

Julius O Robinson                    X    9:45 AM          **TARRANT COUNTY, TEXAS**
                                Time _____

In accordance with the authority conferred by the Community Supervision Law of the State of Texas, you have been placed on Community Supervision as an alternative to incarceration on this ___11 th___ day of ___March___, 19 _96_, for the period of ___5___ years, having been sentenced for _____ years, for the offense of ___Deadly Conduct___ by the Honorable ___ROBERT GILL___, Judge/Magistrate in Criminal District Court No. _213_, Tarrant County, Texas.

IT IS THE ORDER OF THE COURT THAT YOU SHALL COMPLY WITH THE FOLLOWING TERMS AND CONDITIONS OF COMMUNITY SUPERVISION:

a. Commit no offense against the laws of this State or of any other State or of the United States.

b. Avoid injurious or vicious habits and abstain from the illegal use of controlled substances, marijuana, cannabinoids or excessive consumption of alcoholic beverages.

c. Avoid persons and places of disreputable or harmful character.

d. Report to the Community Supervision and Corrections Department of Tarrant County, Texas, immediately following this hearing, and no less than monthly thereafter, or as scheduled by the Court and/or Supervision Officer and obey all rules and regulations of the Department.

e. Permit the Supervision Officer to visit you at your home or elsewhere at any time.

f. Work faithfully at suitable employment as far as possible, furnish proof of employment to your Supervision Officer and, if unemployed, participate in the Community Supervision and Corrections Department's Jobs, Education and Training Skills (JETS) program, unless waived by the Court.

g. Remain within Tarrant County, Texas, unless the Court or Supervision Officer authorizes you to leave.

h. Support your dependents.

i. Notify the Supervision Officer of Tarrant County, Texas, if your address or employment is changed within five days from the date of change.

j. ~~Possess no firearms away from your residence.~~ No ownership or possession of any firearm.

k. Supervision is conditioned on your agreement to execute a pre-signed waiver of extradition.

l. Pay to and through the Community Supervision and Corrections Department of Tarrant County, Texas, the following:

1. COURT COSTS in the amount of $ __174 50__, at the rate of $ __10__ per month.

2. SUPERVISION FEE in the amount of $ __40__, each month during the period of supervision.

3. RESTITUTION in the amount of $ __502__, at the rate of $ __15__ per month.

4. FINE in the amount of $ _____, at the rate of $_____ per month.

5. ATTORNEY FEES in the amount of $_____, at the rate of $_____ per month.

6. CRIME STOPPERS FEE in the amount of $ __10__ to be paid within 30 days from the date shown above.

7. CRIME VICTIMS COMPENSATION ACT PAYMENT in the amount of $ __45__, at the rate of $ __5 00__ per month.

8. _____ in the amount of $_____, at the rate of $_____ per month.

9. _____ in the amount of $_____, at the rate of $_____ per month.

The first payments on the above to be made on the 15th of ___April___, 19 96, and like payments on the 15th day of each month thereafter until full payments are made. (Unless otherwise specified).

VOL. 56 PAGE 328A

**Ex. 36 - 472**

0574361 D9

**Conditions of Community Supervision**                                                                 Page 2

m.  If supervision is transferred to another jurisdiction, continue to report to Tarrant County by mail each month, and comply with the rules and regulations of the receiving jurisdiction. Pay fees to Tarrant County unless waived by the Court.

n.  (X) Complete __160__ hours of Community Service Restitution at the rate of no less than __5__ hours per month as scheduled by the Supervision Officer or Court, to be completed at an agency approved by the District Judges of Tarrant County.

o.  (X) Submit to urine testing for controlled substances and cannabinoids at the direction of the Supervision Officer and pay for urine testing as required.

p.  (√) Complete education programs as directed by the Supervision Officer. Obtain GED

q.  ( ) Observe a curfew as directed by the Supervision Officer or the Court.

r.  (X) Do not contact __W/ I.P. or any member of family__

s.  (√) Supplement(s) / Amendment(s) as attached.     submit your person, place of residence, or any vehicle under your control, to search, at any time, day or night, upon request of any peace officer, with or without a warrant

You are advised that under the laws of this State, the Court has determined and imposed the above terms and conditions of your Community Supervision, and may at any time during the period of Community Supervision alter or modify them. The Court also has the authority, at any time during the period of Community Supervision, to Revoke your Community Supervision for any violation of the conditions of your Community Supervision set out above.

_____
Judge / Magistrate

This day, a copy of the conditions of Community Supervision was handed to me by the Clerk of this Court.

_____          _____
Witness: Supervision Officer                     Probationer

_____
Witness: District Clerk

DC-106-CR
REV. 12-95

VOL. 56 PAGE 328B

**Ex. 36 - 473**

DATE: 3-11-96

THE STATE OF TEXAS )( IN __213ᵗʰ__ DISTRICT

VS. NO. 0574361D )( COURT NO. _____ OF

Julius O. Robinson )( TARRANT COUNTY, TEXAS

### SUPPLEMENT/AMENDMENT TO CONDITIONS OF COMMUNITY SUPERVISION

The defendant is ordered to participate fully in and comply with the rules and requirements of the Community Supervision and Corrections Department's program(s) indicated below, pay all fees required, and continue to participate and comply until released by the Court:

1. Submit to Electronic Monitoring/Home Confinement for a period of _____ days to begin upon completion of equipment installation.

   ☐ Breath Alcohol Testing          ☐ Visitel
   ☐ Continuous Radio Frequency Monitoring    ☐ Intruder Detection
                                              ☐ _____

2. Submit to testing for Controlled Substances/Cannabinoids, Alcohol as directed by the Supervision Officer or the Court.

(3.) Submit to screening, assessment, evaluation and/or testing for _Substance Abuse_ as directed by the Supervision Officer or Court.

4. Attend and complete education, counseling and/or treatment for the following as directed by the Supervision Officer or Court:

   _____    _____

   _____    _____

                                THOMAS A. WILDER, DIST. CLERK
   _____    TARRANT COUNTY, TEXAS

                                **FILED**
                                MAR 11 1996

5. Attend and complete Education Programs as directed by the Supervision Officer.

6. Attend and complete the state certified Texas Drug Offender Education Program.    Time 9:45Am
                                                                                     By _____ Deputy

7. Attend and complete the state certified Texas DWI Repeat Offender Program.

8. Do not operate any vehicle without an Ignition Interlock Device. Do not tamper with, attempt to bypass or allow any other person to activate the device.

9. Enter, reside and remain at the Restitution Center until released by the Court.

10. Enter, reside and remain at the Court Residential Center until released by the Court.

11. Enter, reside and remain at the Substance Abuse Treatment Facility until released by the Court.

12. Enter, reside and remain at the Shock Incarceration Facility (Boot Camp) until released by the Court.

13. Comply with the rules of Surveillance Probation.

14. Attend Victim-Defendant Mediation.

15. Confinement in the Tarrant County Jail, _____ days, beginning _____.

16. Confinement in a state jail facility for _____ days, to begin no later than 10 days from the date of this order.

17. Extension of Community Supervision Period of _____, beginning _____.

18. Abstain from the use of alcohol.

19. Observe a curfew as directed by the Supervision Officer or the Court.

20. Do not contact _____ in any manner.

21. _____

                                _____
                                Judge /Magistrate

This day, a copy of the above Supplement/Amendment to Conditions of Community Supervision was handed to me by the Clerk of this Court/Supervision Officer.

_____         _____
Witness: Supervision Officer       Probationer

_____ VOL. 56 PAGE 339A
Witness: Court Clerk              DC-10SA CR  GPC-1701  REV. 12-95

**Ex. 36 - 474**

ꓴꓴꓴ◻

& DEADLY CONDUCT

NAME        JULIUS O ROBINSON

OFFENSE  ATTEMPT MURDER

ADDRESS ▓▓▓▓▓▓▓▓▓▓▓

DATE  02-07-95

ARLINGTON        TX 76011

I.P.        SARA TUCKER

RACE  BSEX  MAGE  18DOB ▓▓▓ -76

C.C.

CASE NO. 0574361 FILED: (DATE)  02-09-95
PC HAS BEEN DETERMINED
TRANSFER:04COORT        DATE

AGENCY  ARLINGTON PD

OFFENSE NO. 950018762    COURT  D213

INDICTMENT NO. ___0574361 D___

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

THE GRAND JURORS OF TARRANT COUNTY, TEXAS, duly elected, tried, empaneled,

sworn and charged to inquire of offenses committed in Tarrant County, in the

State of Texas, upon their oaths do present in and to the  * * * * * * * * *

CRIMINAL DISTRICT COURT NO. 1                of said County that  * *

JULIUS O ROBINSON        hereinafter called Defendant, in the County of

Tarrant and State aforesaid, on or about the  7TH day of  FEBRUARY 19 95, did

THEN AND THERE INTENTIONALLY, WITH THE SPECIFIC INTENT TO COMMIT THE OFFENSE OF
MURDER OF SARA TUCKER, DO AN ACT, TO-WIT: SHOOT AT HER WITH A DEADLY WEAPON,
TO-WIT: A FIREARM, AND SAID ACT AMOUNTED TO MORE THAN MERE PREPARATION THAT
TENDED BUT FAILED TO EFFECT THE COMMISSION OF SAID MURDER,

COUNT TWO:  AND IT IS FURTHER PRESENTED IN AND TO SAID COURT THAT THE SAID
DEFENDANT IN THE COUNTY OF TARRANT AND STATE AFORESAID ON OR ABOUT THE 7TH
DAY OF FEBRUARY, 1995, DID THEN AND THERE KNOWINGLY DISCHARGE A FIREARM AT OR
IN THE DIRECTION OF SARA TUCKER,

Filed (Clerk's use only)

**FILED**
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAR 1 4 1995

Time _1015_

By _____ Deputy

AGAINST THE PEACE AND DIGNITY OF THE STATE.

_____
Criminal District Attorney
**INDICTMENT - ORIGINAL**

_____
Foreman of the Grand Jury

**Ex. 36 - 475**

'REC BOND = H

213 DISTRICT COURT

0574361

CID-0424050

THE STATE OF TEXAS
COUNTY OF TARRANT

**FILED**
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUN 2 6 2002

Time _4:00_
By _____
Deputy

No. 0574361D

TARRANT COUNTY

TO ANY PEACE OFFICER OF THE
STATE OF TEXAS, GREETINGS:

You are hereby commanded to take the body of
JULIUS O ROBINSON
and him safely

keep, so that you have him before the Honorable
213 DISTRICT COURT
, in and for

Tarrant County, at the Court House thereof,
in the City of Fort Worth, instanter, to answer
the State of Texas on a charge by indictment of

STATE'S APPLICATION TO REVOKE PROBATION
√ STATE'S APPLICATION TO PROCEED TO ADJUDICATION
Secured

YOU ARE FURTHER COMMANDED TO SERVE THE SAID DEFENDANT
WITH THE ATTACHED COPY OF THE APPLICATION.

a XXXXXXXXXXX misdemeanor felony.

issued under my hand and seal of office
in the City of Fort Worth, Texas
this 13TH day of FEBRUARY 2001

THOMAS A. WILDER

CLERK DISTRICT COURT
TARRANT COUNTY, TEXAS
By _____, Deputy

FORM C. C. 265

# WARRANT

THE STATE OF TEXAS
JULIUS O ROBINSON VS

ARLINGTON      TX 080876 B M
Issued the 13TH day of
FEBRUARY 2001

Came to hand on the
day of
and executed on the
day of
by _Recalled 9-25-00_

Tarrant      County,      Texas
By _____, Deputy.

Arrest . . . . . . .$_____
Mileage . . . . . . _____
Miscellaneous . . . _____
Total . . . . . . . _____
FEB 14 2001

CERTIFICATE OF PROCEEDINGS

CASE: 0574361    DATE: 7/25/08    DOCKET: 0574361D    CID: 0424050

DEFENDANT: ROBINSON,JULIUS O
MICRO:    ROBINSON,JULIUS O    INDICTED: Y    WARRANT: 0574361D
                                              DATE:    03/14/95

COURT: D213    HEARD:    TRANSFER COURT:

CHOV: __/__/__    I/O: ___    COUNTY:

CHARGE OFFENSE: 090125 ATTEMPT MURDER    DATE: 02/07/95    LSR INC:

DISPOSITION OFFENSE: 130052    DEADLY COND-DISCH FA/INDV

PLEA:    BOND TYPE:    FINE:

DISP: DFAC __/__/__    STATUS:    CT COST:

SENTENCE: __/__/__    EVENT:    MISC:

ACTION: PDIM __/__/__    DUE: __/__/__

PROB (MOS): WREC __/__/__    AMOUNT:    PAID:

FORFEIT: __/__/__

INST VERD:    BONDSMAN:

PROCEEDINGS: 2nd Pet. Dism    Warrant Recalled

Deft. convicted in Fed. Court

JUDGE/:    CLERK: Rebecca W. C___
~~MAGISTRATE~~

PETR    02/13/2001

√ Rn

Ex. 36 - 477



DEE ANDERSON
SHERIFF
817.884.1320
FAX 817.884.1317

WARRANT DIVISION
CRIMINAL COURTS BLDG
300 W BELKNAP
SECOND FLOOR
FT WORTH TX  76102-2084

## TARRANT COUNTY
## SHERIFF'S DEPARTMENT
2/15/01

FEDERAL CORRECTIONAL INSTITUTION
ATTN RECORDS
3150 HORTON RD
FORT WORTH, TX 76119

THOMAS A. WILDER
DISTRICT CLERK
2001 FEB 22  PM 2: 01
FILED
TARRANT COUNTY

Dear Sirs:
   Enclosed is a copy of our WARRANT NUMBER WART# 0574361D

For ACTOR  ROBINSON, JULIUS OMAR  , CHARGING   ATTEMPT MURDER

ISSUED 2/13/01, By JUDGE GILL , COURT   D213

DOB ████ 76 SEX/RACE M/B HAIR/EYES BLK/BRO HT/WT  5'11/210

ADDRESS  IN YOUR CUSTODY #26190-177

OTHER  BOND- HOLD NO BOND

   We have received information that the above actor may be in your:

____ JURISDICTION and/or ____X____ CUSTODY.

____ Please apprehend this actor on authority of this warrant and advise this department at
      817-884-1321 or 817-884-1170; also notify us by teletype at TX22000W0 or locally FWSW.

X Please place this warrant as a detainer.  Advise earliest date, if local charges pending, or if
   actor is ready for release to this agency or has been released on bond from your jurisdiction.

X WE WILL EXTRADITE.

____ This is to confirm that extradition proceedings are in process on the above actor.  Please
      accept this as a request for extension of extradition hearings in your state, pending arrival of
      a Governor's Warrant from the State of Texas.

____ Please return our warrant.  As of _____ the above actor is no longer wanted by
      this department.

You may be assured of our cooperation in all matters of mutual interest.

Sincerely

DEE ANDERSON, SHERIFF

BY:_____
      CRIMINAL WARRANT DIVISION

Cause No. 0574361 D

FILED
THOMAS A. WILDER, TARRANT COUNTY, DIST. CLERK, TEXAS
FEB 1 3 2001
Time _____
By _____ Deputy

| THE STATE OF TEXAS | IN THE 213ᵗʰ DISTRICT COURT |
| VS. | OF |
| JULIUS O. ROBINSON | TARRANT COUNTY, TEXAS |

## STATE'S SECOND
## PETITION TO PROCEED TO ADJUDICATION

DEFENDANT:                      JULIUS O. ROBINSON

OFFENSE:                        DEADLY CONDUCT - DISCHARGE
                                FIREARM AT INDIVIDUAL

DATE OF OFFENSE:                FEBRUARY 7, 1995

DATE OF PROBATION:              MARCH 11, 1996

LENGTH OF SENTENCE:             DEFERRED ADJUDICATION

LENGTH OF SUPERVISION:          FIVE (5) YEARS

---

NOW COMES the State of Texas, by and through Tim Curry, Criminal District Attorney for Tarrant County, Texas, and would show the Court that, on the date shown above, the Defendant named above appeared in Court with counsel and pled guilty to the offense shown above. The Court heard evidence and found that such evidence substantiated the Defendant's guilt of the offense shown above; however, the also Court found that further proceedings should be deferred without making an adjudication of the Defendant's guilt, and placed the Defendant on community supervision for the period shown above, subject to the terms and conditions set out in the Court's file.

The State of Texas would further show the Court that, during the effective period of such community supervision, the Defendant violated the terms and conditions set by the Court as follows:

1. **FAILURE TO REPORT**: The Defendant was ordered to report to the Community Supervision and Corrections Department of Tarrant County, Texas, immediately after being placed on probation and no less than monthly thereafter, or as scheduled by the Court or Supervision Officer, and obey all rules and regulations of the Department. In violation of this condition, the Defendant failed to report as scheduled by Defendant's Supervision Officer during the following periods:

   November, December, 2000; and January of 2001.

Ex. 36 - 479

2.  **CHANGE OF ADDRESS**:  The Defendant was ordered to notify the Supervision Officer of Tarrant County, Texas, if the Defendant's address or employment is changed within five days from the date of such change. In violation of this condition, the Defendant moved from 2602 Clayborn Court, Arlington, Texas on or before January 3, 2001, and failed to notify the supervision officer within five (5) days of change.

3.  **FAILURE TO PAY:**  The Defendant was ordered to pay to and through the Community Supervision and Corrections Department various sums on specific dates, beginning on the 15th day of April, 1996. In violation of that condition, the Defendant has failed to make such payments as follows:

    (A)  **Supervision Fee** in the amount of $40.00 each month due on the 15th day of each month. In violation of this condition, the Defendant failed to pay $40.00, or any other amount, on the 15th day or any other day in the month in the following months:

    June, September, October, 1996; February, March, April, October, 1997; March, June, September, October, November, 1998; May, July, August, October, November, December, 1999; February, March, June, July, August, October, November, December, 2000; and January of 2001.

    **CONSIDERING THE FOREGOING**, the State of Texas requests the Court to order and direct that the District Clerk immediately issue an Alias Capias (or a Precept To Serve if the Defendant is on good bond), requiring that the Defendant be arrested and brought before this Court (or directing the Defendant to appear on a date certain) and to show cause, if any he or she has, why the community supervision previously granted herein should not be set aside, and why the Court should not proceed to adjudication of guilt and assessment of punishment as the law provides. The State also requests the Court to direct the District Clerk to cause a true copy of this Petition to be served on the Defendant as soon as possible, and for such other orders as the Court may direct.

    Respectfully submitted,

    **TIM CURRY**
    CRIMINAL DISTRICT ATTORNEY
    TARRANT COUNTY, TEXAS
    401 W. Belknap
    Ft. Worth, Texas 76196-0201
    (817) 884-1400

    By:  _____
    Assistant Criminal District Attorney
    State Bar No. _____

    Date:  _____2-8-01_____

### ORDER

On this date, the foregoing Petition was presented to the Court in chambers, and the following is hereby ordered:

___X___ the District Clerk shall issue an Alias Capias for the arrest of the Defendant

_____ the Defendant shall remain on bond, and the District Clerk shall issue a Precept To Serve the foregoing Petition on the said Defendant

_____ bond is hereby set at $_____ with the following conditions:

Report to the Community Supervision and Corrections Department, 200 West Belknap, 2nd Floor, Fort Worth, Texas  76196-0255:
      (a)  immediately after release or the next working day, and
      (b)  report monthly and as directed until released by the Court.

Signed and Ordered Entered on _____2/1_____, 2001.

_____
Robert K. Gill, Judge Presiding
213th District Court
Tarrant County, Texas

CAUSE NO. 0574361D

THE STATE OF TEXAS      ☐    IN THE DISTRICT COURT

VS.      ☐    213ᵀᴴ JUDICIAL DISTRICT

JULIUS ROBINSON      ☐    TARRANT COUNTY, TEXAS

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
JUN 2 3 2000
Time ____
By ____ 11:25
____ Deputy

## MOTION FOR EARLY RELEASE AND DISMISSAL

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES JULIUS ROBINSON, Defendant in the above entitled and numbered cause, by and through his Attorney of Record, MICHAEL GREGORY, and files this his Motion for Early Release and Dismissal of this cause of action, pursuant to Article 42.12, Section 5 of the Texas Code of Criminal Procedure, and would show unto the Court as follows:

I.

That on or about March 11, 1996, the Defendant received a deferred adjudication in the above entitled and numbered cause, and was required to report to the Adult Community Supervision Department of Tarrant County, Texas, for a period of 5 years. That since said date, the Defendant has fully satisfied all terms and conditions of said deferred adjudication, including payment of all funds ordered by the Court, and that the best interests of society and the Defendant will be served by granting this Motion.

II.

That four years and three months has elapsed since the Defendant was placed on deferred adjudication, which is more than one-half (1/2) of the sentence imposed.

III.

That the Defendant is now a resident of Fort Worth, Tarrant County, Texas.

WHEREFORE, PREMISES CONSIDERED, the Defendant prays as follows:

1.   To be discharged from any further supervision by any community supervision department; and

2.   That the above entitled and numbered cases be dismissed pursuant to the Texas Code of Criminal Procedure; and

3.   For such other and further relief as Defendant may be justly entitled to.

RESPECTFULLY SUBMITTED,

MICHAEL GREGORY
ATTORNEY FOR DEFENDANT
State Bar No. 00790003
111 North Houston, Suite 200
Fort Worth, Texas 76102
Tel: (817) 335-1854
Fax: (817) 335-3193

CERTIFICATE OF SERVICE

As Attorney of Record for Defendant, I do hereby certify that a true and correct copy of the above and foregoing document was this date provided to the Attorney for the State and the Tarrant County Community Supervision Department.

Date:  June 22 , 2000.

Attorney for Defendant

CAUSE NO. 0574361D

THE STATE OF TEXAS      0    IN THE DISTRICT COURT

VS.      0    213TH JUDICIAL DISTRICT

JULIUS ROBINSON      0    TARRANT COUNTY, TEXAS

## O R D E R

ON THIS, the _____ day of _____, 2000, came on to be heard the foregoing Motion for Early Release and Dismissal, and the Court, after considering same, is of the opinion that it should be, in all things, granted; therefore, it is hereby ORDERED, ADJUDGED AND DECREED that:

1. The Defendant, JULIUS ROBINSON, be hereby discharged from any further supervision by any community supervision department; and

2. That pursuant to Article 42.12 of the Texas Code of Criminal Procedure, the Court hereby discharges the Defendant, JULIUS ROBINSON, from any further liability under said cause.

3. That pursuant to Article 42.12 of the Texas Code of Criminal Procedure, the above entitled and numbered cause is hereby dismissed with prejudice against refiling same.

SIGNED AND ENTERED this _____ day of _____, 2000.

_____
JUDGE PRESIDING

**Ex. 36 - 484**

CERTIFICATE OF PROCEEDINGS

CASE: 0574361   DATE: 9/11/98   DOCKET: 0574361D   CID: 0424050

DEFENDANT: ROBINSON,JULIUS O   WARRANT:
MICRO: ROBINSON,JULIUS O   INDICTED: Y   DATE: 03/14/95

COURT: D213   HEARD: _____   TRANSFER COURT: _____

CHGV: __/__/__   I/O: __   COUNTY: _____

CHARGE OFFENSE: 090125 ATTEMPT MURDER   DATE: 02/07/95   LSR INC: ____

DISPOSITION OFFENSE: 130052   DEADLY COND-DISCH FA/INDV

PLEA: _____   BOND TYPE: _____   FINE: _____
DISP: ____ __/__/__   STATUS: _____   CT COST: _____
SENTENCE: ____ __/__/__   EVENT: _____   MISC: _____
ACTION: PDIM __/__/__   DUE: __/__/__
PROB (MOS): ____ __/__/__   AMOUNT: _____   PAID: _____
   FORFEIT: __/__/__
INST VERD: _____   BONDSMAN: _____

PROCEEDINGS: 9-4-98 P NZ NT/No AUDINGS   9-11-98  Petition
Dismissed/Prob Reinstated

JUDGE/: _____   CLERK: _____
MAGISTRATE

PETR   06/23/1998

3rd  J. Evans   DW pending on 3-11-98   michael Gregory
   allene

**Ex. 36 - 485**

## CERTIFICATE OF PROCEEDINGS

CASE: 0574361    DATE: 9,4,98    DOCKET: 0574361D    CID: 0424050

DEFENDANT: ROBINSON,JULIUS O    WARRANT: 0574561B
MICRO:    ROBINSON,JULIUS O    INDICTED: Y    DATE: 03/14/95

COURT: D213    HEARD: _____    TRANSFER COURT: _____

CHOV: __/__/__    I/O: ___    COUNTY: _____

CHARGE OFFENSE: 090125 ATTEMPT MURDER    DATE: 02/07/95  LSR INC: ___

DISPOSITION OFFENSE: 130052    DEADLY COND-DISCH FA/INDV

PLEA: _____    BOND TYPE: _____    FINE: _____

DISP: _____ __/__/__    STATUS: _____    CT COST: _____

SENTENCE: _____ __/__/__    EVENT: _____    MISC: _____

ACTION: _____ __/__/__    DUE: __/__/__

PROB (MOS): _____ __/__/__    AMOUNT: _____    PAID: _____

FORFEIT: __/__/__

INST VERD: _____    BONDSMAN: _____

PROCEEDINGS: #4-02 NT/ Testimony; No findings; Court contested hearing in recess until 9-11-98 @ 1:30; DEFT ALLOWED TO REMAIN ON BOND (Today)

JUDGE/: _Robert H. Hill_    CLERK: _Jim Hill_
~~MAGISTRATE~~

PETR    06/23/1998

Michael Gregory

3rd    (Allene)

J.W. Evans

Ex. 36 - 486

**The State of Texas**

260572

**· COUNTY OF** TARRANT

A P P E A R A N C E   B O N D

INSTANTER

| Name: | ROBINSON, JULIUS O | | Race: | B | Near. Rel: | |
|---|---|---|---|---|---|---|
| | | | Sex: | M | Address: | |
| Addr: | | | Height: | 6' 0" | CSZ: | |
| CSZ: | ARLINGTON | TX 76012 | Weight: | 210 | Emp. Name: | THAT SOUND GOOD CD AND TAPE |
| Tel. #: | | | Eyes: | BRO | Emp. Address: | |
| D.L. #: 07583755 | State: | TX | Hair: | BLK | CSZ: | |
| DOB: | 1976 | Place of Birth: FAYETTEVILLE | NC | | Emp. Tel: | |

| Case No. | Bond No. | Date Executed | Bond Amt. | Charging Instrument | Warrant No. | Arresting No. | CID |
|---|---|---|---|---|---|---|---|
| 0574361 | 0427221-X | JUN 25, 1998 | $2,500.00 | INDICTMENT | 0574361D | | 0424058 |
| Principal | | | | Offense Charged | FELONY-ATTEMPTED MURDER | | |
| ROBINSON, JULIUS O | | | | | | (AFTER 9/1/94). | |
| Surety Name/Address | | | | Court of Jurisdiction | 213TH DISTRICT COURT, | | |
| ADAMS, JENNIFER D | | AB09 | | -4107 | TARRANT | COUNTY | |
| | | FT WORTH | | TX 76104 | | | |

KNOW ALL MEN BY THESE PRESENTS:

That we, the above named and undersigned principal and sureties, in our respective capacities, are held and firmly bound unto the State of Texas in the penal sum of the above shown amount of bond, in addition to costs of Court, post judgment interest, and interest accrued on the bond amount from the date of forfeiture in the same manner and at the same rate as provided for the accrual of prejudgment interest in civil cases, for the payment of which sum, well and truly to be made, and all additional fees and expenses that may be incurred by peace officers in rearresting the principal in the event the conditions of this bond are violated, we bind ourselves, our heirs, executors and administrators, jointly and severally by these presents. The condition of the above obligation is such that whereas the above named principal is being held in due course of law for the above shown offense and appeared in the above shown court, said principal was ordered and required as shown above, to give bail in the above amount for his/her personal appearance before the above named court. Said principal acknowledges and understands that at the time of the making of this bond, that charges have _____ been filed either by affidavit, information, complaint, or indictment, and said principal further understands and acknowledges that such charges if not filed may be filed at a later date. Said principal and said surety agree and hereby contract that they acknowledge the validity of this bond, charges being filed as outlined herein and said principal and surety hereby covenant and agree that they will not contest the enforceability of this bond on the grounds of charges not being filed in a court of jurisdiction provided that said formal charges are later filed in a court of jurisdiction. Now if the principal shall well and truly make personal appearance instanter before the court shown above of the above named County at the above shown location at the present term of said court if now in session, or at its next regular term if now in vacation and further shall well and truly make personal appearance before any other court in which the same may be filed or transferred and for any and all subsequent proceedings that may be had relative to the said charge in the course of the criminal action based on said charge, and there remain from day to day and from term to term of said court, until discharged by due process of law, then and there to answer said accusation against said principal, this obligation shall become void, otherwise to remain in full force and effect.

CONDITIONS OF THE BOND: IT IS A CONDITION OF THIS BOND THAT THE DEFENDANT/PRINCIPAL SHALL RETAIN AN ATTORNEY PRIOR TO THE FIRST TIME THE DEFENDANT/PRINCIPAL IS SUMMONED TO APPEAR IN COURT IN CONNECTION WITH THIS CASE.** A PERSON APPEARING FOR ANY COURT SETTING WITHOUT AN ATTORNEY MAY BE FOUND TO HAVE VIOLATED A CONDITION OF BOND AND MAY BE ARRESTED AND PLACED IN JAIL AND HIS BOND FORFEITED.** (THE GOLD COPY OF THIS BOND IS RECEIVED BY THE DEFENDANT/PRINCIPAL).

>> PRINCIPAL: _(signature)_

PERSONAL BOND:

I swear that I will appear before _____ at _____

_____ Texas,

on the _____ day of _____ at the hour of _____, or upon notice by the court, or to pay to the Court the principal sum of _____ plus all necessary and reasonable expenses incurred in any arrest for failure to appear.

AFFIDAVIT OF SUFFICIENCY OF SURETY:

I do swear that I am worth, in my own right, at least the sum of $59,007.00, after deducting from my property all that which is exempt by the Constitution and Laws of the State from forced sale, and after the payment of all my debts of every description, whether individual or security debts, and after satisfying all encumbrances upon my property which are known to me; that I reside in TARRANT County, and have property in this State liable to execution worth said amount or more.

I AM THE SURETY/BONDSPERSON FOR THE PRINCIPAL ON THIS BOND.

Surety: _(signature)_

Principal: _(signature)_

Barbara J. Woods
Notary Public State of Texas
My Commission Expires
August 13, 2000

Sworn to and subscribed before me this 18th day of MAY 1998

Witness: _(signature)_

Notary: _(signature)_

Approved Magistrate: _____

| Taken and Approved this 25TH day of JUNE 1998. | I certify the surety named herein has collateral in the amount indicated and, if submitted for approval, I would accept same. | LEFT THUMB | RIGHT THUMB |
|---|---|---|---|
| Sheriff: DAVID WILLIAMS | DAVID WILLIAMS | | |
| County: TARRANT        Texas | TARRANT | Sheriff County, Texas | |
| By _(signature)_ , Deputy | By _____ , Deputy | | |

**Ex. 36 - 487**

REC BOND = HOLD

0574361

213 DISTRICT COURT

THE STATE OF TEXAS
COUNTY OF TARRANT

TO ANY PEACE OFFICER OF THE
STATE OF TEXAS, GREETINGS:

You are hereby commanded to take the body of
JULIUS O ROBINSON and him safely

keep, so that you have him before the Honorable
213 DISTRICT COURT , in and for

Tarrant County, at the Court House thereof,
in the City of Fort Worth, instanter, to answer
the State of Texas on a charge by indictment of

STATE'S APPLICATION TO REVOKE PROBATION
STATE'S APPLICATION TO PROCEED TO ADJUDICATION

YOU ARE FURTHER COMMANDED TO SERVE THE SAID DEFENDANT
WITH THE ATTACHED COPY OF THE APPLICATION.

aX¥¥¥¥¥¥¥¥¥¥¥¥r felony.

issued under my hand and seal of office
in the City of Fort Worth, Texas

this 23RD day of JUNE , 19 98

THOMAS A. WILDER

CLERK DISTRICT COURT

TARRANT COUNTY, TEXAS

By _____ Deputy

FORM D. C. 265-C R

---

CID-0424050

NIU

No. 0574361D

TARRANT COUNTY

# WARRANT

THE STATE OF TEXAS
vs.
JULIUS O ROBINSON

ARLINGTON TX 080876 B M
Issued the 23RD day of

JUNE, 19 98

Came to hand on the 23RD day of JUN , 19 98
and executed on the 26TH day of JUN A. D. 1998
by ARREST & BOND
PAPERS SERVED
DAVID WILLIAMS, SHERIFF
Tarrant County, Texas

By _____ , Deputy.

Arrest .......... $_____
Mileage ......... _____
Miscellaneous ... _____

Total .......... _____

---

CERTIFICATE OF PROCEEDINGS

CASE: 0574361    DATE: 6/25/98    DOCKET: 0574361D    CID: 0424050

DEFENDANT: ROBINSON, JULIUS O
MICRO:    ROBINSON, JULIUS O    INDICTED: Y    WARRANT: 0574361D    DATE: 03/14/95

COURT: D213    HEARD: _____    TRANSFER COURT: _____

CHOV: __/__/__    I/O: ___    COUNTY: _____

CHARGE OFFENSE: 090125 ATTEMPT MURDER    DATE: 02/07/95    LSR INC: ___

DISPOSITION OFFENSE: 130052    DEADLY COND-DISCH FA/INDV

PLEA: _____    BOND TYPE: _____    FINE: _____

DISP: _____ __/__/__    STATUS: _____    CT COST: _____

SENTENCE: _____ __/__/__    EVENT: _____    MISC: _____

ACTION: BSET __/__/__    DUE: __/__/__

PROB (MOS): _____ __/__/__    AMOUNT: _____    PAID: _____

FORFEIT: __/__/__

INST VERD: _____    BONDSMAN: _____

PROCEEDINGS: Bond set at $2,500/Prob Rev

atty: Michael Gregory

JUDGE/: S/ Robert K. Hill    CLERK: R.
MAGISTRATE/

PETR    06/23/1998

3rd    fees paid Stephen
up per Love

NO. 0574361D

| | | |
|---|---|---|
| THE STATE OF TEXAS | {} | IN THE 213TH JUDICIAL |
| | {} | |
| VS. | {} | DISTRICT COURT OF |
| | {} | |
| JULIUS O. ROBINSON | {} | TARRANT COUNTY, TEXAS |

## PETITION TO PROCEED TO ADJUDICATION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, the State of Texas by and through Tim Curry, Criminal District Attorney of Tarrant County, Texas, and would respectfully show the Court that on March 11, 1996, JULIUS O. ROBINSON, hereinafter styled Defendant, appeared in Court with his or her attorney and the Court heard evidence in the above entitled and numbered cause and found that evidence substantiated the Defendant's guilt on a charge of Deadly Conduct; however, the Court found that further proceedings should be deferred without making an adjudication of guilt and the Court placed the Defendant on probation as set out in the order setting conditions of probation, for a term of five (5) years.

Your petitioner would show to the Court that said Defendant thereafter, during the effective period of said probation, violated the terms and conditions of said probation in that:

1. The Defendant, JULIUS O. ROBINSON, was ordered by the Court to commit no offense against the laws of this State or of any other State or of The United States. In violation of this condition the Defendant on or about the 9th day of May, 1998, in the County of Hopkins and State of Texas, did then and there intentionally and knowingly possess a usable quantity of marihuana in an amount of less than two ounces.

2. The Defendant, JULIUS O. ROBINSON, was ordered by the Court to remain within Tarrant County, Texas, unless the Court or Supervision Officer authorizes Defendant to leave. In violation of this condition the Defendant on or about May 8, 1998, left Tarrant County without permission from the Court or Supervision Officer and went to Hopkins County.

PETITION TO PROCEED TO ADJUDICATION - PAGE 1 OF 3

WHEREFORE, your Petitioner prays that this Honorable Court order and direct that the District Clerk forthwith issue an alias capias (or if Defendant is on good bond in this cause, the Clerk is ordered to issue a precept to serve), herein directing that the Defendant be arrested and brought before this Honorable Court to show cause, if he or she has any, why said probated sentence entered herein should not be set aside and why the Court should not proceed to adjudication of said case; that the Court further direct said District Clerk to serve upon said Defendant, as soon as possible, a true copy of this petition; and for such other orders the Court may direct.

Respectfully submitted,

TIM CURRY
CRIMINAL DISTRICT ATTORNEY
TARRANT COUNTY, TEXAS

Assistant Criminal District Attorney
Tarrant County, Texas

DATE: 4/12/14

___X__ ALIAS CAPIAS ORDERED

_____ DEFENDANT TO REMAIN ON BOND
        PRECEPT TO SERVE PETITION ORDERED.

BOND SET AT:_____

PETITION TO PROCEED TO ADJUDICATION - PAGE 2 OF 3

Ex. 36 - 491

### * * *  CONDITIONS OF BOND  * * *

Report to the Community Supervision and Corrections Department, 200 West Belknap, 2nd Floor, Fort Worth, Texas 76196-0255.

A.    Immediately after release or the next working day.
B.    Report immediately or as directed until released by Court.

_____, PRESIDING JUDGE,
IN THE 213TH DISTRICT OF TARRANT COUNTY, TEXAS

PETITION TO PROCEED TO ADJUDICATION - PAGE 3 OF 3

TRN: 001 350 5513

**ARREST/IDENTIFICATION**

NAME (LAST, FIRST, MIDDLE): Robinson Julia

DATE OF BIRTH: [redacted]  PLACE OF BIRTH: NC

SEX: M/B  RACE/ETH  HGT: 6  WGT: 127  EYES  HAIR

SKIN TONE: DRK  SOCIAL SECURITY NO: [redacted] 4554  CTZ: U

DRIVER LICENSE NO: [redacted]  STATE: TX  TYPE: C  ID CARD NO  STATE

ALIAS NAME(S)

ADDRESS: [redacted]  CITY  STATE: TX  ZIP: 760[ ]

ORI: Dallas  ARRESTING AGENCY

GC PLATE NO  STATE  YEAR  DATE OF ARREST: 02 08 1995  AGENCY ARREST NO: 15145-

NAME: [ ]

AGENCY CASE NO: 95C019C12  FIREARM CODE

TRS: A001  OFFENSE CODE: 7799___  GOC: A  OFFENSE: Crim. Attempt - Murder  STATUTE CITATION: 19.52 (B)(1) PC  LEVEL  FELONY: degree capital 1, 2 or 3  MISDEMEANOR

DATE OF OFFENSE: 02 04 1995  ARREST DISPOSITION: Held  DISPOSITION DATE: 02 08 1995  PROSECUTOR ORI: TX 0015 A

IS CHARGE A RESULT OF ANOTHER AGENCY'S WARRANT? YES [ ] NO [ ]  PREPARED BY: Police ___ H ___  DATE: 02 08

**PROSECUTOR**

PROSECUTOR ORI: TX2200ISA  PROSECUTOR OFFICE: ICDA

PROSECUTOR ACTION CODE: A  DATE OF REJECTION

CHANGED OFFENSE CODE  GOC  OFFENSE  STATUTE CITATION

DEGREE OF CHANGED OFFENSE: FELONY [ ]  MISDEMEANOR [ ]  CHARGES FILED IN (COURT ORI): TX 22015SJ

COURT NAME: D213  ADDITIONAL CHARGES BY PROSECUTOR, NOT PRESENT AT ARREST? YES [ ] NO [X]  IF YES, FILL OUT SUPPLEMENTAL FORM

PREPARED BY: D. Price  DATE: 2/9/1995

**COURT**

COURT ORI: TX220155J  COURT NAME: 213th District Court  STATUTE CITATION: 22.05  PC

OFFENSE CODE: 5213 0005  GOC  OFFENSE: Deadly Conduct

DEGREE OF DISPOSED OFFENSE: FELONY [3] capital 1,2 or 3  MISDEMEANOR [ ] A or B  CAUSE NUMBER: 0574361D

FINAL PLEA: GUILTY [X]  NO CONTEST [ ]  NOT GUILTY [ ]  COURT DISPOSITION DATE: 03111996  SENTENCE DATE  COURT DISPOSITION: 312

CONFINEMENT  SENTENCE SUSPENDED TIME  PROBATION: 5 years  FINE  SENTENCE SUSPENDED FINE

COURT COST: 175  COURT PROVISION

MULTIPLE SENTENCES  CONCURRENT [ ]  CONSECUTIVE [ ]  AGENCY TO RECEIVE CUSTODY: TX 22001562

APPEAL DATE  OFFENDER STATUS DURING APPEAL  RESULT OF APPEAL

CHECK BOX TO INDICATE DIC-17 DATA IS PRESENT [ ]  BEGINNING DATE OF SUSPENSION  ENDING DATE OF SUSPENSION  DWI EDUCATION [ ]  EDUCATION PROGRAMS DRUGS [ ]  EDUCATION REQUIRED [ ]  EDUCATION COMPLETED [ ]  EDUCATION WAIVED  EDUCATION EXTENDED  REPEAT OFFENDER REQUIRED  REPEAT OFFENDERS COMPLETED

PREPARED BY: REBECCA MEINHART  DATE: 03111996

IS THE USE OF SUPPLEMENT REQUIRED ON THIS INCIDENT? YES [ ]  NO [ ]

MAIL TOP COPY TO: TEXAS DEPARTMENT OF PUBLIC SAFETY  PO BOX 4143  AUSTIN TX 78765-4143

WHITE—ARREST REPORTING SHEET    YELLOW—PROSECUTOR REPORTING SHEET    PINK—COURT REPORTING SHEET    CR-43 (REV)

Ex. 36 - 493

## CASE NO. 0574361D

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 213TH DISTRICT |
| VS. | § | COURT OF |
| JULIUS O. ROBINSON | § | TARRANT COUNTY, TEXAS |

### UNADJUDICATED JUDGMENT ON PLEA OF GUILTY OR NOLO CONTENDERE AND SUSPENDING IMPOSITION OF SENTENCE

| | | | |
|---|---|---|---|
| Judge Presiding | : HON. ROBERT K. GILL | Date of Judgment | : MARCH 11, 1996 |
| Attorney for State District Attorney | : TIM CURRY | Assistant District Attorney | : PETER H. KEIM |
| Attorney for Defendant | : MICHAEL GREGORY | Charging Instrument: | INDICTMENT |

| Offense Date | Offense |
|---|---|
| FEBRUARY 7, 1995 | DEADLY CONDUCT - DISCHARGE FIREARM AT INDIVIDUAL |

| Degree | Count | Plea |
|---|---|---|
| 3RD | TWO | GUILTY |

| | |
|---|---|
| Findings on Deadly Weapon | : THE COURT AFFIRMATIVELY FINDS THAT THE DEFENDANT USED OR EXHIBITED A DEADLY WEAPON, TO-WIT: A FIREARM DURING THE COMMISSION OF THE OFFENSE OR DURING THE IMMEDIATE FLIGHT THEREFROM. |
| Plea to Enhancement Paragraph(s) | : NONE |
| Plea to Habitual Paragraph(s) | : NONE |
| Findings on Enhancement/ Habitual Paragraph(s) | : NONE |
| Punishment | : DEFERRED    Date to Commence : MARCH 11, 1996 |
| Probationary Term | : FIVE (5) YEARS |
| Fine Not Suspended | : NONE |

On this day, set forth above, this cause came for trial and came the State of Texas, by its above-named attorney, and the Defendant appeared in person and by the above-named attorney for the Defendant, or, where a Defendant is not represented by counsel, that the Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel; and announced ready for trial, the Defendant having been heretofore arraigned, or having waived arraignment in open court, and having agreed that the testimony may be stipulated in this cause and the Defendant, his counsel, and the State's attorney having agreed in writing in open court to waive a jury in the trial of this cause and to submit this cause to the Court, and the Court having agreed to the same, the said attorney for the State read the instrument charging the offense as shown or the reading of the charging instrument having been waived by Defendant, the Defendant entered his pleas as shown above thereto, and it appearing to the Court that the Defendant is mentally competent and the plea is free and voluntary, and the Court having duly admonished the Defendant as to the consequences of such plea, including the range of punishment attached to the offense and the fact that any recommendation of the prosecuting attorney as to punishment is not binding on the Court, and the Defendant further having affirmatively stated awareness of the consequences of such plea and acknowledged to not having been misled or harmed by the admonishment of the Court, yet the Defendant persisted in entering such plea, said plea is by the Court received and now entered of record upon the minutes of the Court as the plea herein of said Defendant. The Court after receiving the plea shown and hearing the evidence, finds that it substantiates the Defendant's guilt and that further proceedings should be deferred without entering an adjudication of guilt and that Defendant should be placed on probation on reasonable terms and conditions as the Court may require.

The State of Texas do have and recover of the said Defendant all costs in this prosecution expended including any fine shown above for which let execution issue. And it is further ORDERED by the Court that the imposition of sentence of the judgment of conviction herein shall be suspended during the good behavior of the Defendant and that the Defendant be placed on probation during the period of time, fixed by the Court, under the conditions to be determined by law. However, when it is shown above that a fine applicable to the offense committed has been imposed by the Court and not suspended, then it is ORDERED that Defendant pay such fine and all costs in this prosecution expended and that Defendant be placed on probation during the period of time fixed by the Court, under the conditions to be determined by the Court, as provided by law.

IT IS THEREFORE CONSIDERED by the Court that the evidence substantiates the Defendant's guilt and that further proceedings should be Deferred without entering an adjudication of guilt, and that Defendant be placed on probation during the period of time prescribed by the Court on such reasonable terms and conditions as the Court may require in accordance with law.

VOLUME 56 PAGE 327A OF CASE NO. 0574361D



CERTIFICATE OF PROCEEDINGS

CASE: 0574361   DATE: 3/11/96   DOCKET: 0574361D   CID: 0424050

DEFENDANT: Robinson, Julius O.
MICRO:                                   INDICTED: Y        WARRANT: DATE: 3/14/95

COURT: 213th          HEARD: _____          TRANSFER COURT: _____

CHOV: __/__/__   I/O: ____   COUNTY: _____

CHARGE OFFENSE:                          DATE: / /   LSR INC: ____

DISPOSITION OFFENSE: 130052 Deadly conduct

PLEA: PGBC          BOND TYPE: _____          FINE: _____

DISP: DFAJ  /  /   STATUS: _____          CT COST: _____

SENTENCE: ___ __/__/__   EVENT: _____          MISC: _____

ACTION: ___ __/__/__                              DUE: __/__/__

PROB (MOS): 060  /  /   AMOUNT: _____          PAID: _____

                        FORFEIT: __/__/__

INST VERD: _____   BONDSMAN: _____

PROCEEDINGS: Court two    5 yrs Unadjud Prob,
             D.W. finding

JUDGE/: _Robert H. Hill_          CLERK: _____
MAGISTRATE

Peter Keim                        Michael Gregory
                    JRW

DA-559 , GPC-4767

COURT: __213__    CASE NO.: _057436/D_

DEFENDANT: _Julius D. Robinson_

OFFENSE: _Deadly Conduct (Count 2)_

OFFENSE CODE: _130052_    DEGREE: _3_

PENALTY: _2-10  $10,000_

AGREED
RECOMMENDATION: _5 DFAT + TAJP + GED_

_+ NO WEAPONS + NO. CONTACT W/ IP OR_

_FAMILY + $502 RESTITUTION_

*Please be advised that on
PROBATION CASES involving
1st DEGREE FELONY Offenses
(including 2nd DEGREE FELONY DRUG
Offenses) the Court WILL
REQUIRE a "Special Search Condition"
to Apply in those Cases.

Assistant District Attorney

The undersigned defendant and his attorney hereby agree to the above recommendation by the prosecutor and it is understood that if, upon a plea of guilty by this defendant, and the punishment assessed by the Court does not exceed the punishment recommended, an appeal may only be prosecuted with permission of the trial court. All pre-trial motions filed in this cause are waived.

Defendant

Attorney for Defendant

Bar Card No.: _00790003_

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAR 11 1996

Time _9:45 Am_
By _Rw_ Deputy

**Ex. 36 - 496**

NO. 0574361 0

| THE STATE OF TEXAS | {} | IN THE 213TH JUDICIAL |
| VS. | {} | DISTRICT COURT OF |
| _Julius D. Robinson_ | {} | TARRANT COUNTY, TEXAS |

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
MAR 11 1996
9:45 Am
by
Rn
Deputy

### WRITTEN PLEA ADMONISHMENTS

On this _11_ day of _March_, 199_6_, pursuant to the requirements of law, you, the defendant in this cause, are hereby admonished in writing as follows:

1. [X] You are charged with the felony offense of:

   DEADLY CONDUCT (COUNT 2)

   Offense Code: _130052_

   [ ] Your charge has been reduced to the lesser included offense of:

   _____

   Offense Code: _____

2. The plea bargain recommendation is: _5 DFAT + TMP + GED + NO WEAPONS + NO CONTACT W/ IP OR FAMILY + $502 RESTITUTION_

3. You are entitled to have a jury determine whether you are Guilty or not Guilty and if Guilty, to assess your punishment. Should you have more than one case pending, you may have them tried separately.

4. You may request that the indictment be read and explained to you in open court. You are not obligated to give evidence against yourself; you may require the State to prove the elements of the offense alleged in the indictment by legal and competent evidence beyond a reasonable doubt; you and your attorney may confront and cross-examine witnesses and you have the power of subpoena to bring witnesses into court to testify in you behalf.

5. If convicted, you face the following range of punishment:

   [ ] **FIRST DEGREE FELONY**: Life or any term of not more than 99 years nor less than 5 years in the Institutional Division of the Texas Department of Criminal Justice, and in addition, a fine not to exceed $10,000 may also be assessed.

   [ ] **SECOND DEGREE FELONY**: A term of not more than 20 years nor less than 2 years in the Institutional Division of the Texas Department of Criminal Justice, and in addition, a fine not to exceed $10,000 may also be assessed.

   [X] **THIRD DEGREE FELONY**: A term of not more than 10 years nor less than 2 years in the Institutional Division of the Texas Department of Criminal Justice and in addition, a fine not to exceed $10,000 may also be assessed. (If the offense was committed before September 1, 1994, a term of confinement in a community correctional facility for any term of not more than one (1) year may be assessed in lieu of confinement in the Institutional Division),

   [ ] **FIRST DEGREE ENHANCED**: Life or any term of not more than 99 years nor less than 15 years in the Institutional Division of the Texas Department of Criminal Justice, and in addition, a fine not to exceed $10,000 may also be assessed.

WRITTEN PLEA ADMONISHMENTS-PAGE 1 OF 4

**Ex. 36 - 497**

[ ] SECOND DEGREE ENHANCED: Life or any term of not more than 99 years nor less than 5 years in the Institutional Division of the Texas Department of Criminal Justice, and in addition, a fine not to exceed $10,000 may also be assessed.

[ ] THIRD DEGREE ENHANCED: A term of not more than 20 years nor less than 2 years in the Institutional Division of the Texas Department of Criminal Justice, and in addition, a fine not to exceed $10,000 may also be assessed.

[ ] HABITUAL OFFENDER: Life or any term of not more than 99 years nor less than 25 years in the Institutional Division of the Texas Department of Criminal Justice.

[ ] OTHER: _____

_____

_____

6. Plea Bargaining: A plea bargain or recommendation of punishment is not binding on the Court. The Court may set punishment anywhere within the range provided by law for this offense. If there is a plea bargain agreement, the Court will inform you in open Court whether the agreement will be followed before making any finding on your plea. Should the Court reject the agreement, you will be permitted to withdraw your plea should you desire.

7. Permission to Appeal: When the Court follows a plea bargain agreement, permission of the Court must be given before you can prosecute an appeal on any matter in the case, except for matter raised by written motion filed prior to trial. This Court seldom consents to an appeal where conviction is based upon a Guilty Plea.

8. Citizenship: If you are not a citizen of the United States of America, a plea of guilty or nolo contendere for this offense may result in deportation, the exclusion from admission to this country, or the denial of naturalization under federal law.

9. Deferred Adjudication: Should the Court defer adjudicating your guilt and place you on probation, upon violation of any imposed condition, you may be arrested and detained as provided by the law. You will then be entitled to a hearing limited to the determination by the Court, without a jury, whether to proceed with an adjudication of your guilt upon the original charge. No appeal may be taken from this determination. Upon adjudication of your guilt, the Court may assess your punishment anywhere within the range provided by law for this offense.

After adjudication of guilt, all proceedings including assessment of punishment, pronouncement of sentence, granting of probation and your right to appeal continue as if adjudication of guilt had not been deferred.

10. Probation: If the Court grants you straight probation as opposed to deferred adjudication, upon violation of any imposed condition, you may be arrested and detained as provided by law. You will then be entitled to a hearing limited to the determination by the court, without a jury, whether to revoke your probation and sentence you to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for a period of time not to exceed that originally assessed by the Court at the time you were found guilty,.

11. If no indictment has been returned by a Grand Jury charging you with this offense, you do not have to stand trial until such an indictment has been returned, and you then will be given ample time (at least 10 days) to consult with your attorney before trial.

12. If a victim impact statement has been returned to the prosecutor under Art. 26.13 C.C.P., the Judge has reviewed a copy of that report.

Admonishments given this defendant on the above noted date.

_____
ROBERT K. GILL, PRESIDING JUDGE

WRITTEN PLEA ADMONISHMENTS-PAGE 2 OF 4

Ex. 36 - 498

## WRITTEN WAIVER OF DEFENDANT-JOINED BY ATTORNEY

Comes now the Defendant, in open Court, joined by my attorney and state:

(1)   I am able to read the English language and fully understand each of the written plea admonishments by the Court and I have no questions;

(2)   I waive arraignment and formal reading of the indictment or felony information;

(3)   I am aware of the consequences of my plea;

(4)   I am mentally competent and my plea is knowingly, freely, and voluntarily entered;

(5)   Should my attorney be just recently appointed, I give up and waive any right I may have for further time to prepare for trial;

(6)   If I am proceeding on a felony information, I give up my right to indictment by a Grand Jury;

(7)   Should I be tried on more than one case, I agree that all may be heard and determined at one time;

(8)   I waive all pretrial motions that may have been filed in connection with my case(s);

(9)   I am totally satisfied with the representation given to me by my attorney. My attorney provided me fully effective and competent representation;

(10)  I also waive and give up in accordance with Art. 1.14 C.C.P. all rights given to me by law, whether of form, substance, or procedure;

(11)  Joined by my attorney, I waive and give up my right to a jury, both as to my guilt and assessment of my punishment, and in accordance with Art. 1.15 C.C.P., I waive and give up the right to appearance, confrontation, and cross-examination of the witnesses, and I consent to oral and written stipulations of evidence;

(12)  I give up my right not to incriminate myself and agree to testify under oath and judicially confess my guilt if requested by my attorney or the State's attorney;

(13)  If I am proceeding on a misdemeanor case, I request that a presentence investigation report not be made;

(14)  I request the Court to approve of the plea recommendation (in Paragraph 5 of the Plea Admonishments) and dispose of my case(s) in accordance therewith.

X _____
DEFENDANT

I have fully reviewed and explained the above and foregoing court admonishments, rights, and waivers to the Defendant and am satisfied that the Defendant is legally competent and has intelligently, knowingly, and voluntarily waived his rights and will plead guilty understanding the consequences thereof.

_____
ATTORNEY FOR DEFENDANT

WRITTEN PLEA ADMONISHMENTS-PAGE 3 OF 4

**Ex. 36 - 499**

## JUDICIAL CONFESSION

Upon my oath I swear my true name is ___Julius O. Robinson___ and I am __19__ years of age. I have read the indictment or information filed in this case and I committed each and every act as alleged therein, except those acts waived by the State. All the facts alleged in the indictment or information are true and correct. I am guilty of the offense(s) charged as well as all lesser included offenses. All the facts alleged in the indictment or information are true and correct. Any enhancement and habitual allegations set forth in the indictment or information are true and correct, except those waived by the State. I further admit my guilt on any unadjudicated offenses set forth in the plea recommendation (Paragraph 2 of the Plea Admonishments) and request the Court to take each into account in determining my sentence for the instant offense. I swear to all of the foregoing and I further swear that all testimony I give in the case will be the truth, the whole truth and nothing but the truth, so help me God.

X _Julius Robinson_____
DEFENDANT

### APPLICATION FOR PROBATION

I swear and it is my testimony here in open court that I have never before been convicted of a felony offense in any court of the State of Texas, any other state, nor in any Federal Court of the United States. I request the Court to consider this my application for a probated sentence.

X _Julius Robinson_____
DEFENDANT

SWORN AND SUBSCRIBED before me this _11th_ day of _March_, 1996.

_Rebecca M Out_____
DEPUTY DISTRICT CLERK
TARRANT COUNTY, TEXAS

*  *  *  *  *  *  *

In open court we join and approve the waiver of jury trial pursuant to Art. 1.13 C.C.P. and the stipulations of evidence pursuant to Art. 1.15 C.C.P. We further agree and consent to the admission of guilt of any unadjudicated offense under Section 12.45 of the Texas Penal Code. In addition, the Court finds as a fact that the Defendant is mentally competent and that his plea is intelligently, freely and voluntarily entered. It is agreed that the Court may take judicial notice of this document and all contents; and the Court takes judicial notice of same.

_Michael Gregory_____
ATTORNEY FOR THE DEFENDANT

SBN _00790003_

_____
ATTORNEY FOR THE STATE

SBN _15532500_

_____
ROBERT K. GILL, PRESIDING JUDGE

WRITTEN PLEA ADMONISHMENTS-PAGE 4 OF 4

**Ex. 36 - 500**

**Judicial District of Tarrant County, Texas**
**COMMUNITY SUPERVISION AND CORRECTIONS DEPARTMENT**          ☐ S J F
200 West Belknap, Fort Worth, Texas 76196-0255
Telephone: (817) 884-2450    Office Hours: 7:30 a.m. to 5:30 p.m. Monday - Friday

☐  **ADJUDICATED**          **CONDITIONS OF COMMUNITY SUPERVISION**          ☒  **DEFERRED ADJUDICATION**

**THE STATE OF TEXAS**

**FILED**
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS          IN ___213ᵗʰ___ DISTRICT

VS. NO. 0574361D          MAR 11 1996          COURT NO. _____ OF

Julius O Robinson          Time ___H  9:45 AM___          TARRANT COUNTY, TEXAS

In accordance with the authority conferred by the Community Supervision Law of the State of Texas, you have been placed on Community Supervision as an alternative to incarceration on this ___11 th___ day of ___March___, 19 _96_, for the period of ___5___ years, having been sentenced for _____ years, for the offense of ___Deadly Conduct___ by the Honorable ___ROBERT  GILL___, Judge/Magistrate in Criminal District Court No. ___213___, Tarrant County, Texas.

IT IS THE ORDER OF THE COURT THAT YOU SHALL COMPLY WITH THE FOLLOWING TERMS AND CONDITIONS OF COMMUNITY SUPERVISION:

a.  Commit no offense against the laws of this State or of any other State or of the United States.

b.  Avoid injurious or vicious habits and abstain from the illegal use of controlled substances, marijuana, cannabinoids or excessive consumption of alcoholic beverages.

c.  Avoid persons and places of disreputable or harmful character.

d.  Report to the Community Supervision and Corrections Department of Tarrant County, Texas, immediately following this hearing, and no less than monthly thereafter, or as scheduled by the Court and/or Supervision Officer and obey all rules and regulations of the Department.

e.  Permit the Supervision Officer to visit you at your home or elsewhere at any time.

f.  Work faithfully at suitable employment as far as possible, furnish proof of employment to your Supervision Officer and, if unemployed, participate in the Community Supervision and Corrections Department's Jobs, Education and Training Skills (JETS) program, unless waived by the Court.

g.  Remain within Tarrant County, Texas, unless the Court or Supervision Officer authorizes you to leave.

h.  Support your dependents.

i.  Notify the Supervision Officer of Tarrant County, Texas, if your address or employment is changed within five days from the date of change.

j.  ~~Possess no firearms away from your residence.~~ No ownership or possession of any Firearm.

k.  Supervision is conditioned on your agreement to execute a pre-signed waiver of extradition.

l.  Pay to and through the Community Supervision and Corrections Department of Tarrant County, Texas, the following:

1.  COURT COSTS in the amount of $ __174 50__, at the rate of $ __10__ per month.

2.  SUPERVISION FEE in the amount of $ __40__, each month during the period of supervision.

3.  RESTITUTION in the amount of $ __502__, at the rate of $ __15__ per month.

4.  FINE in the amount of $ _____, at the rate of $_____ per month.

5.  ATTORNEY FEES in the amount of $_____, at the rate of $_____ per month.

6.  CRIME STOPPERS FEE in the amount of $ __10__ to be paid within 30 days from the date shown above.

7.  CRIME VICTIMS COMPENSATION ACT PAYMENT in the amount of $ __45__, at the rate of $ __5⁰⁰__ per month.

8.  _____ in the amount of $_____, at the rate of $_____ per month.

9.  _____ in the amount of $_____, at the rate of $_____ per month.

The first payments on the above to be made on the 15th of __April__, 19 _96_, and like payments on the 15th day of each month thereafter until full payments are made. (Unless otherwise specified).

VOL. 56 PAGE 328A

**Ex. 36 - 501**

0574361 DP

**Conditions of Community Supervision**                                                                          Page 2

m. If supervision is transferred to another jurisdiction, continue to report to Tarrant County by mail each month, and comply with the rules and regulations of the receiving jurisdiction. Pay fees to Tarrant County unless waived by the Court.

n. (X) Complete __110__ hours of Community Service Restitution at the rate of no less than __5__ hours per month as scheduled by the Supervision Officer or Court, to be completed at an agency approved by the District Judges of Tarrant County.

o. (X) Submit to urine testing for controlled substances and cannabinoids at the direction of the Supervision Officer and pay for urine testing as required.

p. (√) Complete education programs as directed by the Supervision Officer. Obtain GED

q. ( ) Observe a curfew as directed by the Supervision Officer or the Court.

r. (X) Do not contact __W/ I.P. or any member of family__

s. (√) Supplement(s) / Amendment(s) as attached.    Submit your person, place of residence, or any vehicle under your entity, to search, at any time, day or night, upon request of any peace officer, with or without a warrant.

You are advised that under the laws of this State, the Court has determined and imposed the above terms and conditions of your Community Supervision, and may at any time during the period of Community Supervision alter or modify them. The Court also has the authority, at any time during the period of Community Supervision, to Revoke your Community Supervision for any violation of the conditions of your Community Supervision set out above.

_____
Judge / Magistrate

This day, a copy of the conditions of Community Supervision was handed to me by the Clerk of this Court.

_____
Witness: Supervision Officer

_____
Witness: District Clerk

_____
Probationer



DC-105-CR
REV. 12-95

VOL. 56 PAGE 328B

**Ex. 36 - 502**

DATE: 3-11-96

| | | |
|---|---|---|
| THE STATE OF TEXAS | )( | IN 213th DISTRICT |
| VS. NO. 0574361D | )( | COURT NO. _____ OF |
| Julius O. Robinson | )( | TARRANT COUNTY, TEXAS |

### SUPPLEMENT/AMENDMENT TO CONDITIONS OF COMMUNITY SUPERVISION

The defendant is ordered to participate fully in and comply with the rules and requirements of the Community Supervision and Corrections Department's program(s) indicated below, pay all fees required, and continue to participate and comply until released by the Court:

1. Submit to Electronic Monitoring/Home Confinement for a period of _____ days to begin upon completion of equipment installation.

   ☐ Breath Alcohol Testing      ☐ Visitel
   ☐ Continuous Radio Frequency Monitoring      ☐ Intruder Detection
   ☐ _____

2. Submit to testing for Controlled Substances/Cannabinoids, Alcohol as directed by the Supervision Officer or the Court.

③. Submit to screening, assessment, evaluation and/or testing for _Substance Abuse_ as directed by the Supervision Officer or Court.

4. Attend and complete education, counseling and/or treatment for the following as directed by the Supervision Officer or Court:

   _____     _____
   _____     _____
   _____     _____

5. Attend and complete Education Programs as directed by the Supervision Officer.

6. Attend and complete the state certified Texas Drug Offender Education Program.

7. Attend and complete the state certified Texas DWI Repeat Offender Program.

8. Do not operate any vehicle without an Ignition Interlock Device. Do not tamper with, attempt to bypass or allow any other person to activate the device.

9. Enter, reside and remain at the Restitution Center until released by the Court.

10. Enter, reside and remain at the Court Residential Center until released by the Court.

11. Enter, reside and remain at the Substance Abuse Treatment Facility until released by the Court.

12. Enter, reside and remain at the Shock Incarceration Facility (Boot Camp) until released by the Court.

13. Comply with the rules of Surveillance Probation.

14. Attend Victim-Defendant Mediation.

15. Confinement in the Tarrant County Jail, _____ days, beginning _____.

16. Confinement in a state jail facility for _____ days, to begin no later than 10 days from the date of this order.

17. Extension of Community Supervision Period of _____, beginning _____.

18. Abstain from the use of alcohol.

19. Observe a curfew as directed by the Supervision Officer or the Court.

20. Do not contact _____ in any manner.

21. _____

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAR 11 1996

Time _9:45Am_
By _Rsr_ Deputy

_____
Judge /Magistrate

This day, a copy of the above Supplement/Amendment to Conditions of Community Supervision was handed to me by the Clerk of this Court/Supervision Officer.

_Sally Smith_
Witness: Supervision Officer

_Rebecca Wilard_
Witness: Court Clerk          VOL. 56 PAGE 339A

_Julius Robinson_
Probationer

DC-105A CR    CPC-1701    REV. 12-95

**Ex. 36 - 503**

COMMUNITY SUPERVISION AND CORRECTIONS DEPARTMENT
Tarrant County Criminal Justice Building
200 West Belknap Street
Fort Worth, Texas 76196-0255
817/884-1600

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAR 11 1996

AGREEMENT TO RETURN
WAIVER OF EXTRADITION

Time _____ 9:45 AM
By _____
_____ Deputy

THE STATE OF TEXAS

VS. NO. _____0574361_____          _213th District_____ COURT _____

_____Julius O. Robinson_____          TARRANT COUNTY, TEXAS

I, Julius O. Robinson                          , in consideration of being granted
probation by the Texas authorities, hereby agree:

1.  That I will comply with the conditions of probation in the
    cause shown above;

2.  That I will remain within the limits of Tarrant County,
    Texas, unless given permission by the Adult Probation
    Officer of Tarrant County to leave therefrom;

3.  That, should I be given permission to travel outside the
    State of Texas, I will, when duly instructed by the Texas
    authorities, return at any time to the State of Texas;

4.  That my failure to comply with the above will be deemed to
    be a violation of the terms and conditions of probation for
    which I may be returned to the State of Texas;

5.  That I hereby do waive extradition to the State of Texas
    from any jurisdiction in or outside the United States where
    I may be found, and also agree that I will not contest any
    effort by any jurisdiction to return me to the State of
    Texas.

Signed: _____Julius Robinson_____

Dated: _____3-11-96_____

Witness: _____

CSC-113   Rev. 11-91
GPC-1223

REC BOND = 20000.00

213 DISTRICT COURT

0574361

CID-0424050   ALIAS   NIC

BoFO

No.   0574361D   213

THE STATE OF TEXAS
COUNTY OF TARRANT

JAN 26

TARRANT COUNTY

TO ANY PEACE OFFICER OF THE
STATE OF TEXAS, GREETINGS:

# WARRANT

You are hereby commanded to take the body of
JULIUS O ROBINSON
and him safely

keep, so that you have him before the Honorable
213 DISTRICT COURT
, in and for

Tarrant County, at the Court House thereof,
in the City of Fort Worth, instanter, to answer
the State of Texas on a charge by indictment of
ATTEMPT MURDER

THE STATE OF TEXAS
JULIUS VS ROBINSON
A
ARLINGTON          TX 080876  B  M
19TH
Issued the        day of
JANUARY    19   96
3
68N

XXXXXXXXXXX
a misdemeanor felony.

issued under my hand and seal of office
in the City of Fort Worth, Texas
19TH          JANUARY          96
this        day of         , 19 .
THOMAS A. WILDER

CLERK DISTRICT COURT

TARRANT COUNTY, TEXAS

By Rebeca                Deputy

'ORM D.C. 265-C R

Recall 01-21-96
Came to hand on the 19th
day of January 1996
and executed on the 24th
day of January 19 96.
A. D.
by Placing in jail
Sheriff David Williams
Tarrant / County, Texas .
By J. Crowdie 1657, Deputy.

Arrest ......... $_____
Mileage ......... _____
Miscellaneous ... _____
JAN 22 1996
Total .......... _____
82

CERTIFICATE OF PROCEEDINGS

DATE: 1 24 96

DEFENDANT:

ACTION: BREI

PROCEEDINGS: Bond reinstated with surety approval / BF NC
WRNT recalled / cond. to remain same
approval:

Patricia Cline

## CERTIFICATE OF PROCEEDINGS

CASE: 0574361   DATE: 1/19/96   DOCKET: 0574361D   CID: 0424050

DEFENDANT: ROBINSON,JULIUS O                          WARRANT:
MICRO:     ROBINSON,JULIUS O        INDICTED: Y   DATE: 03/14/95

COURT: D213   HEARD: _____   TRANSFER COURT: _____

CHOV: ___/___/___ I/O: ___ COUNTY: _____

CHARGE OFFENSE: 090125 ATTEMPT MURDER   DATE: 02/07/95 LSR INC: ___

DISPOSITION OFFENSE: _____ _____

PLEA: _____        BOND TYPE: _____ FINE: _____

DISP: _____ ___/___/___ STATUS: _____ CT COST: _____

SENTENCE: _____ ___/___/___ EVENT: _____ MISC: _____

ACTION: BoFo ___/___/__                     DUE: ___/___/___

PROB (MOS): _____ ___/___/___ AMOUNT: _____ PAID: _____

                    FORFEIT: ___/___/___

INST VERD: _____   BONDSMAN: _____ _____

PROCEEDINGS: _____

Bond Forfeited; Warrant Issued;
Bond _Reset at $20,000 w/ Same previous conditions_
1,4 3 -B, 3-c, 3-e no possession or ownership of firearms
+ no contact with Sara Tucker  Release to Prob Officer

JUDGE/: _____   CLERK: _____
MAGISTRATE

Missed
Court on 1-8-96

NO. 0574361D

THE STATE OF TEXAS                 ()         IN THE 213TH JUDICIAL

VS.                                ()         DISTRICT COURT OF

Julius Robinson                    ()         TARRANT COUNTY, TEXAS

APPLICATION FOR CONTINUANCE

TO SAID HONORABLE COURT:

NOW COMES the Defendant in the above entitled and numbered cause and files this his/her _____1st_____ application for continuance. In support thereof, the Defendant would show the Court as follows:
(Check applicable cause).

_____  1.  That a witness necessary to the Defendant's case is not available at this time.

_____  2.  The attorney for the Defendant cannot be in attendance at this setting.

_____  3.  Defendant needs additional time to properly prepare for trial.

_____  4.  (Other) _____

_____

WHEREFORE, the Defendant moves the Court to continue this cause.

X _Julius Robin_____
DEFENDANT

_Michael Guzay_____
ATTORNEY FOR DEFENDANT

GRANTED _____X_____

DENIED _____

DATE _5/22/95_

_MM_____
ROBERT K. GILL, JUDGE
213TH JUDICIAL DISTRICT COURT

FILED   Thomas A. Wilder
THOMAS A. W   DIST CLERK  Tarrant County Texas
correcting clerical error
MAY 16 1995   may 22, 1995
Time 12:40 PM
By __Cm__ Deputy

Ex. 36 - 508

DC-63A   GPC-1831   REV. 12-94                CASE NO. _____ 0574361 _____

THE STATE OF TEXAS                    §        IN THE ___213TH___ DISTRICT

VS.                                   §        COURT _____

___JULIUS O. ROBINSON___              §        TARRANT COUNTY, TEXAS

### REQUEST FOR COUNSEL

On this ___27TH___ day of ___FEBRUARY___, 19 ___95___ have been advised by the Court of my right to representation by counsel in the trial of the charge pending against me. I certify that I am without means to employ counsel of my own choosing and I hereby request the Court to appoint counsel for me.

### OATH

I, ___JULIUS O. ROBINSON___ being presently incarcerated in Tarrant County Jail in Tarrant County, Texas, declare under penalty of perjury that the foregoing is true and correct.

Executed this ___27TH___ day of ___FEBRUARY___, 19 ___95___.

_____
DEFENDANT

### ORDER APPOINTING COUNSEL

The Court determines this defendant is indigent.

It is therefore ORDERED, ADJUDGED AND DECREED that _____ a practicing attorney of this Court, is appointed to defend said defendant.

Signed this ___27TH___ day of ___FEBRUARY___, 19 ___95___.

_____
JUDGE/MAGISTRATE

_____         Date ___FEBRUARY 27, 1995___

Ft Worth, Tx 76102

Please be advised that you have been appointed to represent the above defendant, who is charged with the offense of ___ATT MURDER___ and is now confined in the Tarrant County Jail, Fort Worth, Texas.

You will be notified by the Court of the Setting date.

**THOMAS A. WILDER, DISTRICT CLERK**

___BRIGGITTE WILSON___
Deputy District Clerk

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB 27 1995

Time ___2:00___
By ___BV___ Deputy

TO: JIMMY C. CAUSEY, AUDITOR, TARRANT COUNTY, TEXAS

This is to certify that the above attorney has appeared in this Court a total of ___-1-___ day(s) in representing the above named defendant in the above styled and numbered cause(s).

$ ___100___

Date ___5-10-95___

_____
JUDGE, 213TH DISTRICT.
COURT



B-106 - GENERAL PURPOSE BOND

**The State of Texas**

**COUNTY OF** _____

085690

TARRANT COUNTY

'95 MAY -3 P3:49

THOMAS A. WILDER
DISTRICT CLERK

JAIL RELEASE    JAIL RELEASE

'95 MAY -1 P9:51   '95 MAY -1 P9:20

| Name: | Race: | Near. Rel: |
| | Sex: | Address: |
| Addr: | Height: | CSZ: |
| CSZ: | Weight: | Emp. Name: |
| Tel. #: | Eyes: | Emp. Address: |
| D.L. #:          State: | Hair: | CSZ: |
| DOB:        Place of Birth: | | Emp. Tel: |

| Case No. | Bond No. | Date Executed | Bond Amt. | Charging Instrument | Warrant No. | Arresting No. | CID |
| Principal | | | | Offense Charged | | | |
| Surety Name/Address | | | | Court of Jurisdiction | | | |

**KNOW ALL MEN BY THESE PRESENTS:**

That we, the above named and undersigned principal and sureties, in our respective capacities, are held and firmly bound unto the State of Texas in the penal sum of the above shown amount of bond, in addition to costs of Court, post judgment interest, and interest accrued on the bond amount from the date of forfeiture in the same manner and at the same rate as provided for the accrual of prejudgment interest in civil cases, for the payment of which sum, well and truly to be made, and all additional fees and expenses that may be incurred by peace officers in rearresting the principal in the event the conditions of this bond are violated, we bind ourselves, our heirs, executors and administrators, jointly and severally by these presents. The condition of the above obligation is such that whereas the above named principal is being held in due course of law for the above shown offense and appeared in the above shown court, said principal was ordered and required as shown above, to give bail in the above shown amount for his/her personal appearance before the above named court. Said principal acknowledges and understands that at the time of the making of this bond, that charges have _____ been filed either by affidavit, information, complaint, or indictment, and said principal further understands and acknowledges that such charges if not filed may be filed at a later date. Said principal and said surety agree and hereby contract that they acknowledge the validity of this bond, charges being filed as outlined herein and said principal and surety hereby covenant and agree that they will not contest the enforceability of this bond on the grounds of charges not being filed in a court of jurisdiction provided that said formal charges are later filed in a court of jurisdiction. Now if the principal shall well and truly make personal appearance instanter before the court shown above of the above named County at the above shown location at the present term of said court if now in session, or at its next regular term if now in vacation and further shall well and truly make personal appearance before any other court in which the same may be filed or transferred and for any and all subsequent proceedings that may be had relative to the said charge in the course of the criminal action based on said charge, and there remain from day to day and from term to term of said court, until discharged by due process of law, then and there to answer said accusation against said principal, this obligation shall become void, otherwise to remain in full force and effect.

**CONDITIONS OF THE BOND:** IF YOU ARE CHARGED WITH A FELONY, THEN A CONDITION OF THIS BOND SHALL BE THAT THE PERSON ACCUSED SHALL RETAIN COUNSEL WITHIN THREE DAYS OF HIS/HER RELEASE. YOU ARE ORDERED TO APPEAR WITH YOUR ATTORNEY ON THE 10TH BUSINESS DAY FROM THE DATE OF THIS BOND, BEING 05/15/1995 AT 10 AM IN THE MAGISTRATE'S HEARING ROOM FOR TARRANT COUNTY, TEXAS ('B' LEVEL, 401 W. BELKNAP) ** A PERSON APPEARING FOR ANY COURT SETTING WITHOUT COUNSEL MAY BE FOUND TO HAVE VIOLATED A CONDITION OF BOND AND MAY BE ARRESTED AND PLACED IN JAIL AND HIS BOND FORFEITED **(THE GOLD COPY OF THIS BOND IS RECEIVED BY THE INMATE/PRINCIPAL).    >> PRINCIPAL/

BOND REDUCED WITH CONDITIONS: #1, #3-B, #3-C ONCE A MONTH AND PAY FOR TESTS, 3-E no POSSESSION OR OWNERSHIP OF FIREARMS AND NO CONTACT W/ SARA TUCKER.  RELEASE TO PROBATION OFFICER ONLY.
ATTY: RONALD AULTMAN

**PERSONAL BOND:**

I swear that I will appear before _____ at _____ Texas,

on the _____ day of _____ at the hour of _____, or upon notice by the court, or to pay to the Court the principal sum of _____ plus all necessary and reasonable expenses incurred in any arrest for failure to appear.

**AFFIDAVIT OF SUFFICIENCY OF SURETY:**

I do swear that I am worth, in my own right, at least the sum of /35,953.00 _____, after deducting from my property all that which is exempt by the Constitution and Laws of the State from forced sale, and after the payment of all my debts of every description, whether individual or security debts, and after satisfying all encumbrances upon my property which are known to me; that I reside in Tarrant County, and have property in this State liable to execution worth said amount or more.

Surety: _____

Principal: Julius O. Robinson

Sworn to and subscribed before me this 20 day of April 95

Witness: _____

Stephanie Calahan
Notary Public State of Texas
My Commission Expires
10-14-95

Stephanie Calahan
Notary

Approved Magistrate

| Taken and Approved this _____ day of _____ | I certify the surety named herein has collateral in the amount indicated and, if submitted for approval, I would accept same. | LEFT INDEX | RIGHT INDEX |
| Sherriff: _____ | | | |
| County: _____ Texas | | Sheriff County, Texas | |
| By _____, Deputy | By _____, Deputy | | |

**Ex. 36 - 510**

F6

CERTIFICATE OF PROCEEDINGS

DATE 4/24/95

ACTION: BDUP

PROCEEDINGS: Bond reduced to $10,000.00 w/ conditions: #1, #3-B

3-C once a month & pay for tests   3-e No possession or ownership of firearms and No CONTACT with Sara Tucker
atty: Ronald author    Release to Prob officer only

JUDGE/MAGISTRATE: Robert Hill    CLERK: Rebecca [_____]

copy to Prob Dept

√ Rw

CSC-178  GPC-1905

**CONDITIONS OF BOND**
☐ Probationer
☑ Non-Probationer

STATE OF TEXAS vs. _Julius O. Robinson_     DATE: _4-24-95_

CAUSE NO.: _0574361D_

CASE: _0574361_

CID: _0424050_

COURT: _213th District Court_

If on probation, it is the order of the court that you shall continue to comply with existing conditions of your probation and/or any additional conditions of bond.

☑ It is the order of the Court that you shall comply with the following terms and conditions of Bond.

  ☑ 1. Pay to and through the Community Supervision and Corrections Department of Tarrant County, Texas a supervisory fee of $40.00 per month up to a maximum of 12 months.

  ☐ 2. Report to the Community Supervision and Corrections Department of Tarrant County, Texas immediately following this hearing and as scheduled by the court. _____

  ☑ 3. Fully participate in and comply with the rules and requirements of the Community Supervision and Corrections Department's program(s) indicated below, pay all fees required, and continue to participate and comply until released by the court:

    ☐ a. Electronic monitoring/Home Confinement Programs.

    ☑ b. Abstain from the illegal use of controlled substances and cannabinoids or excessive consumption of alcoholic beverages.

    ☑ c. Testing for controlled substances and cannabinoids; _once a month & pay for tests_

    ☐ d. Participation in the Tarrant County Pretrial Supervision Drug Testing and Treatment Referral Program (TAIP).

    ☑ e. _No possession or ownership of firearms_
       _No contact with Sara Tucker_

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 24 1995

Time ____5:10 PM____
By ____Rm____ Deputy

_____ Judge

**Ex. 36 - 512**

WRIT,0574361D

**THE STATE OF TEXAS**

Writ to Serve Indictment

D213

COUNTY

To Any Peace Officer of the State of Texas – GREETINGS:

YOU ARE HEREBY COMMANDED to immediately deliver to

JULIUS O ROBINSON

'9' MAR 20 8:45

WILDER CLERK

the defendant, in person, in the case of the STATE OF TEXAS vs.

JULIUS O ROBINSON                    No.    0574361D

pending in the Criminal District Courts of Tarrant County,

the accompanying certified copy of Indictment in said cause.

HEREIN FAIL NOT, and make due return hereof FORTHWITH.

WITNESS my signature and official seal on this the

14TH   day of   MARCH   A.D. 19 95

THOMAS A. WILDER Clerk, District Courts, Tarrant County, Texas

By _____ , Deputy

OFFICER'S RETURN:

Came to hand the same day issued and executed by me

on the ___16th___ day of _MArech_ 19 _95_, by delivering to

_Julius Robinson_____ the within named

Defendant in person, the within named certified copy of indictment in said cause.

Returned on this the ___16th___ day of _MArech_ 19 _95_.

_DAVID WILLIAMS_ , Sheriff

By _Ernest Eakin_ , Deputy

Form D.C. 141A

D213

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAR 1 4 1995

Time _____

By _____ Deputy

To: THomas P. HugHes
   Tarrant County District Clerk
   401 West BelKNAp
   Ft. Worth, Tx 76/02-2004

From: Julius Robinson

057N360 D
Attempt-Murder)

Dear sir,

       I'm writing you to tell you
that I'm 18yrs old and that I go to Lamar High school in Arlington Tx.
I'm in the 12th grade and trying to get out of school. I work at Venture in
Arlington and also go to nightschool. And I hope you will give me my
Bond reduction for that I may have a chance to get out of highschool and
continue my career. And I think you for giving your time to hear one out.

                    THank you
                    Julius Robinson



Signed Julius Robinson
3-11-95

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAR 1 4 1995

Time _____
By _____ Deputy

Ch. 4

PRETRIAL RELEASE

91

SUBSCRIBED AND SWORN TO before me this the _11_ day of _____, 19___ at _____, Ft. Worth, Texas.

Notary Public
STATE OF TEXAS
My Comm. Exp. 07/28/97

Notary Public in and for _____ Texas County, Texas

Add an Order. See §1.11.

**§ 4.09   Habeas Corpus Application for Relief from Excessive Bond**

Where a person has been committed for failing to post bail in the amount set, he is entitled to the writ of habeas corpus if it is stated in his petition that the bail required is excessive. If the proof at hearing on the writ sustains the petition, the party is entitled to discharge or to have bail reduced. See Article 11.24 C.C.P. Remember for purposes of appeal that if the court reduces bond, the petitioner must show that he made an unsuccessful effort to furnish bail in the reduced amount. See *Ex Parte Garcia*, 491 S.W.2d 669 (Tex.Crim. App. 1973).

In felonies prior to indictment this application can be made to any district court. If the application is filed, the writ is returnable to any county in the state. After indictment on a felony charge and pending trial, the petitioner should apply to the judge of the court in which he is indicted or to the nearest district judge. See Article 11.08 C.C.P. The writ in such instances must be returned in the county where the offense is alleged to have occurred. See Article 11.07 C.C.P. If the petitioner is confined on a misdemeanor, he should first apply for relief to the county judge or a judge of a county court at law. See *Ex Parte Phelper*, 433 S.W.2d 897 (Tex. Crim.App. 1968).

If bail is reduced by the court at the hearing on the writ, before the petitioner can complain about the newly fixed amount on appeal, he has to demonstrate a failing effort to raise bail in that amount. See *Ex Parte Stembridge*, 472 S.W.2d 155 (Tex.Crim.App. 1971).

[Caption—*See* §1.04]

APPLICATION FOR WRIT OF HABEAS CORPUS

To The Honorable Judge Of Said Court:

COMES NOW *Julius Robinson*, Petitioner in the above entitled and numbered cause and presents this his petition for habeas corpus for the purpose of obtaining discharge from custody or, in the alternative, the reduction of the bond presently set, the failure to enter which serves as the reason for the present custody of the Petitioner. In support of this petition, the applicant-Petitioner swears to the Court as follows:

Ex. 36 - 515



92          CRIMINAL DEFENSE SOURCEBOOK          Ch. 4

### I.
### (Illegal restraint)

The Petitioner is illegally restrained and confined at the Ft Worth County Jail of Tarrant County, Texas by the Respondent, Sheriff David Williams.

### II.
### (Nature of confinement)

Petitioner's confinement is by virtue of his arrest on a complaint (or information or indictment) number 0574361 pending in the District Court of Tarrant County, Texas. A copy of said charge, together with the process issued thereon, is attached hereto. (Or: A copy of said instrument is not attached hereto because the Petitioner was unable to secure such.)

### III.
### (Failure to make bond)

The Petitioner was committed to custody for failing to enter into bond on said charge as set by NA in the amount of $500,000.00 and currently instated. A copy of the order setting bond in such amount is attached hereto. (Or: A copy of which is not attached hereto because it could not be obtained.)

### IV.
### (Effort to make bond)

The bail required of Petitioner is excessive.* Petitioner has made a genuine effort (add if applicable: both individually and through his family and friends) to post bond in the amount of $600,000.00 instated, but has been unsuccessful in raising the money necessary to pay the professional bondsman fee for the posting of bond in the amount of $100,000.00.

### V.
### (Amount of bond which could be made)

Petitioner is indigent (or a man of small wealth), but does have faithful friends and family who could adequately secure a surety bond in the amount of $25,000.00.

---

* Note that Article 11.24 C.C.P. requires that the petition state that the bail required is excessive or that there was no sufficient cause for requiring bail.



NO. 057438/

THE STATE OF TEXAS                    x          IN THE 717 JUDICIAL

VS.                                   x          DISTRICT COURT

Julius D. Robinson                    x          TARRANT COUNTY, TEXAS

STATE'S ANNOUNCEMENT OF READY

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES the State of Texas in the above styled and numbered cause and announces to the Court that the State is ready for trial in this case.

Respectfully submitted,

TIM CURRY
CRIMINAL DISTRICT ATTORNEY
TARRANT COUNTY, TEXAS

By:  _____
     Assistant Criminal
     District Attorney

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAR 1 4 1995

Time 10:15
By _____ Deputy

**Ex. 36 - 518**

UUUU

**NAME** JULIUS O ROBINSON    **OFFENSE** CAPITAL MURDER

**ADDRESS** [redacted]    **DATE** 02 07 95

ARLINGTON    TX    **I.P.** SARA TUCKER

**RACE** B **SEX** M **AGE** 18 **DOB** [redacted] 76    **C.C.**

**CASE NO.** 0573561 **FILED**: (DATE) 02-09-95    **AGENCY** ARLINGTON PD
PC HAS BEEN DETERMINED

**TRANSFER**: 0413056 **COURT**    **DATE**    **OFFENSE NO.** 95018742    **COURT** 0-13

**COMPLAINT NO.** _____ 0573561

## IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

Before me, the undersigned Assistant District Attorney of Tarrant County, Texas, this day personally appeared the undersigned affiant, who upon his oath says that he has good reason to believe and does believe that in the County of Tarrant and State of Texas ************

JULIUS O ROBINSON    hereinafter called Defendant, in the County of Tarrant and State aforesaid, on or about the 7TH day of FEBRUARY 19 95 , did

THEN AND THERE INTENTIONALLY, WITH THE SPECIFIC INTENT TO COMMIT THE OFFENSE OF MURDER OF SARA TUCKER, DO AN ACT, TO WIT: SHOOT AT HER WITH A FIREARM, AND SAID ACT AMOUNTED TO MORE THAN MERE PREPARATION THAT TENDED BUT FAILED TO EFFECT THE COMMISSION OF SAID MURDER.

COUNT TWO    AND IT IS FURTHER PRESENTED IN AND TO SAID COURT THAT THE SAID DEFENDANT IN THE COUNTY OF TARRANT AND STATE AFORESAID ON OR ABOUT THE 7TH DAY OF FEBRUARY, 1995, DID THEN AND THERE KNOWINGLY DISCHARGE A FIREARM AT OR IN THE DIRECTION OF SARA TUCKER.

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Sworn to and subscribed before me on this the 9th day of FEB 1995

_____
Affiant
COMPLAINT

_____
Assistant District Attorney of
Tarrant County, Texas

Filed (Clerk's use only)

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB - 9 1995

Time _____
By _____ Deputy

**Ex. 36 - 519**

# EXHIBIT 37

**AFFIDAVIT OF MICHAEL L. GREGORY**

Michael L. Gregory, being first duly sworn, state and depose as follows:

1.      I am an attorney, licensed to practice law in the State of Texas. My current office address is 2450 Burney Rd., Arlington, Texas 76006. I was licensed to practice law in Texas on July 1994. My first two years in practice were spent under the supervision and mentorship of Ronald Aultman (deceased), a long time attorney in Texas. His level of experience spanned over 35 years in criminal law practice. It was common for me to work on both misdemeanor and felony cases. It was during this time that I accepted and worked on Julius Robinson's Deadly Conduct Case.

2.      In February 1995, I represented Julius Robinson in the case, *State of Texas v. Julius Robinson*, Case No. 0574361D. Mr. Robinson was indicted on one count of attempted murder and another count of deadly conduct. In brief, Mr. Robinson was accused of shooting at a pickup which was occupied by Sarah Tucker on the evening of February 8, 1995. The alleged victim claimed that Robinson shot at her because she owed him $130 for drugs she had purchased from him. At the time of the alleged offense, Mr. Robinson was a high school student at Lamar High School in Arlington, Texas. Mr. Robinson's bond was originally set at $500,000. In April, 1995, Mr. Robinson's bond was reduced to $10,000 and he was released when bond was posted.

3.      It was my standard practice and routine, when taking a case, to interview the client, gather and review any and all possible evidence, including witness statements and police reports, and then discuss the merits of the case with the assigned Assistant District Attorney. Tarrant County had an open file policy, so formal discovery was not required. My recollections of the plea negotiations were that because (1) the State's primary witness was unfavorable to the State's case, (2) the forensic evidence did not attach to the client and (3) other perpetrators could have committed the crime; the State's attorney was open to reduction to Deadly Conduct. My client was concerned about the fact that he was black and did not want to be subject to a potential jury pool that might occur in Tarrant County and with a judge who was notorious for harsh sentences. Because of his concerns, I was able to negotiate a Deferred Adjudication which satisfied both parties, the State and the Client.

Attempted murder is a second degree felony in Texas with a range of punishment of confinement in the state penitentiary for a term of from two to twenty years. One who has never before been convicted of a felony is eligible for probation for a term of between two and ten years. A fine of up to $10,000 can be imposed upon conviction. Deadly conduct is a third degree felony, punishable by confinement in the state penitentiary for a term of from two to ten years. A fine of up to $10,000 can be imposed upon conviction for this offense. Probation is also available to one who has never been convicted of a felony before.

On March 11, 1996, Mr. Robinson pled guilty to deadly conduct, reducing his maximum exposure by ten years. Mr. Robinson was given a probationary term which was only three years more than the minimum. In addition to allowing Mr. Robinson to plead to the lesser offense, the

1

Court deferred adjudication of the conviction and sentence and placed Robinson on probation.

4.     The negotiated plea satisfied the needs of all, taking into account the strengths and weaknesses of the prosecution evidence. The plea offer, which was ultimately accepted by Mr. Robinson, was made by the State because the evidence may not have supported a finding that there was any intent to kill Sara Tucker. Further, the credibility of the purported victim was questionable based on her mother's disclosure to law enforcement that she was involved in drug use and gang activity. The fact that a deferred probation was offered also indicates that the State did not feel that Mr. Robinson was a threat to commit further acts of violence.

Further, affiant saith naught.

        Sworn to and signed this 24th day of November, 2008

_Michael Gregory_
Michael Gregory
SBN TEXAS  00790003

_Rebecca Compton_
Notary Public No._____

My Commission Expires ____10|11|12____

```
REBECCA COMPTON
Notary Public, State of Texas
My Commission Expires
June 11, 2012
```

2

Ex. 37 - 521

# EXHIBIT 38

## DECLARATION OF JIMMIE LEE ROBINSON

I, Jimmie Lee Robinson, declare:

1.      I am Julius Robinson's father.  Rose Hollimon, his mother, and I married after she became pregnant with our first son, Marcus Robinson.  Julius is almost two years younger than Marcus.

2.      I was born in 1953 in Dermott, Arkansas, and grew up there.  My mother was Bertha Scales Robinson and my father was named Eddie Robinson. The last time I saw my father was when I was eight or nine years old.  My father left for the Bellglade/Orlando area to work on the citrus harvest and never returned.  I have a memory of trucks full of white men, police and hooded Klu Klux Klan men, driving up to my house looking for my father.  They said to my mother, "Where is he?  We're gonna kill that nigger."  My mother told them that my father had gone into the woods.  This happened before my father went to Florida.  My mother told me that the men were looking for my father because he had stood up to some police officers who wanted to keep the black men from getting together at a black cafe on Saturday nights.

3.      My father was a hard working man who was an alcoholic and loved to fight, according to my mother.  He was the foreman at Bynant Farms for ten years

1

JLR

**Ex. 38 - 522**

prior to leaving Dermott. He and his farm crew worked in the fields from Monday to Saturday at noon. It was customary for the men to then pick up their families after they got off work and, with their earnings, head to the store to do their weekly shopping for staples. The store was owned by Mr. Bynant's brother. After shopping, my father would head to the local cafe in the black side of town for his weekend ritual: spending the rest of his wages and drinking moonshine until he was completely drunk. Inevitably, fights would break out, and my father was involved more often than not. At the close of the evening, someone would usually put my father in the back of a pick-up truck and he would be tossed out at our front yard. Sometimes he slept off his drunkenness outside on the yard. Other times, he made it inside the house and slept all of Sunday. On Monday, he was back at his job.

4.    My mother was paralyzed from a shot fired from my father's rifle. The incident was described to me by my mother as having been an accident, something about the loaded rifle leaning against the wall and discharging when some thunder shook the house and the weapon fell. This is different from other renditions of what happened. It is possible that my mother didn't want to tell me the harder things about my father so as not to tarnish my image of him. My

2

JLR
‾‾‾
JLR

mother always said that no matter what a person does, I had to forgive them because God forgives.

5. I used to call my grandfather from my father's side, Mr. Robinson, never grandfather. I don't know what his first name was. I never met my father's mother. As far as I know, my father had two sisters, one of them was named Abigail. I don't know the other one's name. My Aunt Gail told me that their father used to beat his children mercilessly. And, the one he beat the most was my father. My grandfather made, sold and delivered moonshine. He drank a lot of it. Just like my father, he was a bad alcoholic.

6. In contrast to my father's family, my mom's side, the Scales, were church people. My grandfather Scales was a Baptist preacher. My mother converted to the Jehovah's Witness faith when I was a child. My mother was a very spiritual woman. She felt that her new faith allowed her to tell truth from falsity, "God's word from man's philosophy", is how she described it to me. In the Jehovah's Witness church, my mother found equality between the races, the church was integrated, and there was no emphasis on conflict as she had experienced in the Baptist church. The first biracial couples I saw were at the Jehovah's Witness conventions, a completely different situation from what existed

JLR

3                                                          JLR

Ex. 38 - 524

in Dermott. My mother always told me that God's love is the same for every person, regardless of their color. "In God's eyes everyone is equal.", she said. My mother's teachings are what eventually rescued me from being totally destroyed by drugs and alcohol.

7.      I worked in the fields when I was around eight years old, picking cotton, beans and tomatoes. We were not slaves, because we were paid for the work but we were treated like animals. A person could be fired or beaten for the smallest reason, if the boss felt like it. If the beating was severe and the worker badly hurt, the boss might take him to the clinic, not a real hospital but the place for black people. A black person couldn't appeal to the law for a white on black crime. The police were white and they would never punish a white person for harming a black person.

8.      There were planes, crop dusters, dropping pesticides on the fields during the harvest season. One could smell, feel and see the pesticides. The whole town was also sprayed for insects, mainly mosquitoes. There were fields planted with cotton and soy beans in back of the Hollimons and my mother's house. My Uncle Hoss had a cotton field directly behind my mother's house on Deere Street. Across the street, he planted corn. All of the neighborhood kids

4

_JLR_
JLR

played in the crop fields when I was a child and when Marcus and Julius were kids. I saw my boys playing there. This is just what Dermott kids did and probably still do. Another activity kids have there is going into the woods. You have to walk through the fields to get to the woods.

9.    Being black in Dermott meant that life was going to be really hard. It wasn't that far from the days of slavery. Sheer desperation allowed people to survive. There was always a sense of desperation. People talked of getting out of the ghetto when they expressed their desire to break away from being downtrodden and poor. There was not only the history of blacks and whites to contend with but there were few jobs to be found in Dermott. I remember my mother and my grandmother, Mahaela Scales, going to Lake Village, some twenty miles away, with a cotton sack that would be filled with government assistance food. Everyone who could, planted vegetables and people hunted and fished. People bartered if they had something to exchange for what they needed. There was no electricity in my house until I was seven or eight years old, in the early 60s. For cooking we used a wood stove, meats were preserved in the smoke house and refrigeration was provided by the blocks of ice delivered by the iceman.

10.    I do not like to use derogatory terms but the word nigger was used

JLR
JLR

5

frequently by whites in Dermott. The races were completely separated in the town, physically by the railroad tracks, and socially by laws and customs. There were white businesses and a few black stores, white water fountains and no water fountains for the blacks. Black people had to follow prescribed guidelines when in the white part of town and they couldn't go there simply because they felt like it. Integration of the schools came to Dermott in 1971 but some small changes started to be seen the year before - the Dollar General Store discontinued its practice of prohibiting blacks from using the front door. This small opening of society was not widespread though, blacks could still not go to white restaurants and most places continued to be segregated.

11.    It was very dangerous to violate the practice of keeping the races separate. When I was a boy, my mother and I saw a black man taking a drink from a white drinking fountain. The man seemed to be very tired. A white woman saw the man take a drink and called the police. The man ran back across the tracks but the police caught up with him and beat him fiercely. I saw the man, all bloodied , being dragged away to jail. The next day, the man was found dead in the middle of one of the streets in the black side of town.

12.    I graduated from Dermott High School, the integrated school, and prior to that I went to the black school, Chicot County School. I did well the last couple of

6

JLR

years in school so I was offered scholarships to a couple of schools, the University of Arkansas at Fayetteville and a technical school but I was impatient and wanted to make money and buy a car. I was in a hurry to have a better life. I first went to Little Rock and worked at Cast Iron Motor Company, where motors for boats were made.

13. It was at that time that I started courting my buddy, John Hollimon's sister, Rose. John and I were almost the same age and we had done a lot of hunting and fishing together. It was common for boys to start hunting at age twelve. Our families ate what we hunted and we bartered the excess.

14. My mother didn't take my infatuation with Rose very seriously at first. She thought that I would eventually get together with a girl from the Jehovah's Witness faith. My home was very religious, unlike the Hollimons who were known as hard working people but also known for their partying. The Hollimons had nine children. The mother, Margaret, was a little lax in her disciplining and the father was blind. The Hollimon children ruled the household, and there were always barbeques in their backyard with lots of drinking and music. The eldest sister, Marjorie, was the one who actually reared the rest of the kids, except for Rose who lived with a lady named Miss Sarah.

15. Rose was a wild country girl. She was what would be called easy - she

7

JLR

slept around. I had already started to stray from my roots when I fell in love with her. Rose had lived with Miss Sarah from the time she was very young and when Rose was around eight years old, Miss Sarah moved next door to the Hollimons. Lax as she may have been, Margaret would require that the young men who came courting her daughters stay on the porch. Miss Sarah thought it was all right to visit in the bedroom. Once Rose became pregnant and I told my mother that I was planning to marry her, my mother advised me to try to instill in Rose some values. My mother explained to me that I had to do it because Rose had not had much instruction. She said it was up to me to educate Rose. It turned out that I was in no position to teach anybody anything because I got hooked on alcohol and drugs. We both fell into a very unhealthy lifestyle.

16.    I ended up joining the Army in November of 1974, the same month Marcus was born. I did the six weeks basic training at Fort Polk, Louisiana. Then I was sent to Fort Hicks, New Jersey, to train in television technology as I had been promised when I signed up. After Fort Hicks, I was sent to Korea on a two year tour. Rose, meanwhile, stayed in Dermott with the baby. She seemed to have calmed down and, as far as I knew, became more like a wife and mother. I came back on a thirty day pass when grandfather Scales died.

*J* ← *R*

JLR

8

17.    After my tour in Korea, I was assigned to Fort Bragg, North Carolina. Rose and Marcus did not join me right away. They, along with Miss Sarah, came once I had settled in. We lived in a trailer. Miss Sarah came to help take care of Marcus. Things between Rose and me started to fall apart when we got to Fort Bragg. Military life was wild. I lost all my principles then. Even before Julius was born, Rose and I had already started having extramarital affairs and partying. Partying meant drinking and doing drugs, mainly smoking marijuana. We lost all control of our lives. Rose went back to her old ways - she was promiscuous - and I didn't restrain myself from sleeping around either. I had already started selling drugs, marijuana and microdot acid, to increase my income. Both Rose and I were involved in the business. I hustled the drugs on the outside and Rose dispensed them out of our home. Furthermore, I was drinking heavily, at least two six-packs per day and smoking weed. During the pregnancy with Julius, Rose drank a minimum of two to three beers per day and smoked a half an ounce of marijuana, around twelve joints, every day. We would get drunk, smoke marijuana and get into huge fights. Our arguing and physical fights were so constant that Miss Sarah took Marcus and went to stay with some friends who lived across the way. There was one incident that occurred when Rose was pregnant with Julius that I recall well. We were riding in the car, both of us were drunk or high,

9                    JLR
                     JLR

Ex. 38 - 530

or both, and we got into one of our arguments. Rose jumped out of the car in the middle of the highway. When I got her back in the car, I punched her in the chest. She had bruises on her chest from me hitting her. I can't remember the exact incident, but Rose had bruises on her ribs after another one of our fights too. Rose did not smoke marijuana when she was pregnant with Marcus, and the drinking, to my knowledge, did not start until we were in North Carolina.

18.    While she was pregnant with Julius and after she gave birth, Rose held "Soap Opera" parties at our home. Ten or twelve women would get together at our house from noon to four o'clock and watch television, drink and smoke marijuana, while Rose tended to the customers who dropped by the house to buy drugs. One of the women, a New Yorker, introduced cocaine to the group, I came to find out some months after Julius was born. I found out when I tried to purchase a car with the twelve thousand dollars I thought we had in our bank account. Rather than twelve thousand, we had around eighteen hundred dollars. Rose had been giving me the deposit slips but I wasn't aware that she was writing checks to buy drugs and who knows what else. I saw copies of the checks in the bank's microfiche records. Rose told me about what had happened when I confronted her. She said that when the New York woman first brought the cocaine they all chipped in to buy it. After some time, because it was so expensive, Rose was the only

10

JLR

one who was paying for it. She had more cash available than the others from the drug sales going on in our place. I don't know for a fact that Rose used cocaine when she was pregnant with Julius, she probably did because of the money she was spending, but she certainly used it right after he was born.

19.    The last two years Rose and I were together, Julius's first two years of life, were really bad. After Julius was born, Rose wanted to party even more and did. I also rejected my responsibilities and wanted to party more and went ahead and did it. Drugs, alcohol and violence were the order of the day in our home. We would both get high and drunk and start fighting. We argued every day and I hit Rose several times, that I can remember. I would push and shove her more often. I was filled with jealousy and insecurity, and I would question Rose on her activities. Rose had the serious habit of picking things up and hitting me with them. One time, she hit me over the head with a bottle. I shoved her against a wall. Rather than mellowing out with marijuana, Rose became more aggressive.

20.    I was transferred to Fort Hood, Texas, in 1978. We spent thirty days back in Dermott before heading to my new assignment. Miss Sarah had left Fort Bragg a couple of months before we did. Fort Hood was even more of a problem. Rose had gotten used to her independent lifestyle and took the same pattern to Fort Hood but all of our money

11    JLR

was blown so things were tight. We could not afford to rent our own place so we ended up staying with friends . I started hustling drugs again and after three months of living with our friends, I could afford to rent an apartment. Rose couldn't get used to Fort Hood, she didn't like it, and told me that she was going to Wichita Falls to stay with some of her kin. She took the kids but promised to be back when I got housing on the base. I was finally able to get us a place on base but Rose only lasted three months. She tried working on the base washing dishes but it didn't work out. Living on the base in Fort Hood sort of cramped our habits. We continued to have our loud rows, too loud for our, mainly white, neighbors. One time, during one of our fights, our neighbors called the Military Police and they took me away in handcuffs. I wasn't charged with anything and was sent home after six hours but Rose and the kids were gone by then. I got a hold of an old car and attempted to drive it to Arkansas to get Rose and the boys but the car broke down in Louisiana.

21.    At Fort Hood, I was told that I had to take the Sergeant IV exam and complete a ninety day cross training for artillery in order to qualify for the promotion. I was under the impression that I would be able to return to my television technician duties after the cross training but that was not the case. I appealed the order because it contradicted the condition under which I had enlisted but I was told that I either went

12

JLR

Ex. 38 - 533

along with it or resign. I chose to resign.

22.    I went back to Dermott and lived with my mother. I saw Julius and Marcus while I was there. Rose stayed in Dermott for a couple of months after leaving Fort Hood. The kids were with their grandmother and grandfather, Rose's parents, and Rose stayed with her sister, Josephine, who hadn't moved away from Dermott yet. She wasn't really living with Josephine, just hanging out with her. Josephine was not a party girl like Rose but she wouldn't knock Rose's comings and goings. I would see Rose at the cafes drinking and partying.

23.    Leaving the Army and going back to Dermott was completely demoralizing for me. The Army allowed me to see some of the world and gave me a broader view. Although I was losing myself because of the alcohol and the way of life I had embarked upon, I still harbored some aspirations to do something worthwhile with my life. I had traveled, I had gotten married and had children, a family, but everything had disintegrated. In Dermott, I hit rock bottom. I was filled with shame and became a terrible alcoholic, drinking at least a case of beer per day and smoking some marijuana.

24.    In Dermott, I got a job at the Monticello Boat Company. When I got together a little money, I bought a car and moved in with my brother, Willie White, in Little Rock. I had the hope of getting work in television but couldn't find anything.

JLR

13          JLR

25. I hated it when Rose and I separated. I had a great love for my boys but I never developed the structure to continue the role of a father. I would have to say that I didn't know how to be a father. There were some things I could do, like provide a few material things, before I let drugs and alcohol take over my life, but the boys needed me there with them to guide them and to be with them. In reality, my boys ended up without a mother or a father. I was lost in my addictions and in my sense of failure about my life. I didn't want to face anything and I know that my children have suffered because of that.

26. In 1979, I obtained a Veteran's Educational Grant and enrolled at the University of Arkansas, Fayetteville. I attended one semester and lived in that town part of 1979 and 1980. During a visit to the town of McGehee, close by to Dermott, I met my second wife, Linda Love. We lived together for six months in McGehee, and I went back to work at the Monticello Boat Company during our stay. In 1981, Linda and I moved to Hollywood, Florida, where I attended Prospect Hall College. I graduated with an Associate of Arts degree in Business and Restaurant Management in 1983. I managed a Kentucky Fried Chicken franchise in Fort Lauderdale from 1984 to 1986.

27. Linda and I had no children and we divorced in 1986. I really loved Linda and the divorce sent me over the edge. I was overcome with all my failures and I basically checked out of my life. The year 1986 was the beginning of my addiction to

14

JLR

Ex. 38 - 535

crack cocaine which became my crutch and my death.

28.    In 1987, I was arrested for Possession of Drugs. In 1992, I was arrested five times for the same crime. Rather than being sent to prison for so many possession charges, I was identified as an addict and was ordered to participate in a rehabilitation program. In 1994, I participated in a two year recovery program and stayed clean until 1998 when I was picked up again and did a ninety day jail program. I was clean again from 1999 to 2001 then had a six month relapse. In all, I was addicted to crack cocaine for fifteen years.

29.    I cannot claim that I am clean and sober because I will occasionally smoke a joint, a marijuana cigarette, or drink a beer in social situations but I have not binged. I have a network of Alcoholics Anonymous friends and my Church Faith Center people who care for me. I have a girlfriend who I stay with who is also an addict.

30.    I do not take medication for the depression which grips me many times. What helps me cope are faith and prayer. There are times when I blossom, when my spirit is so pure. I work as a cook, and there are days that I have a full spirit and am filled with inspiration - everything is easy and I can do anything. Then I have times when I give it all away because of the pain, times when I lose focus of my purpose. When I come into depression, there's nothing I can do but take to prayer and ask the Lord to help me. I

JLR

15

JLR

Ex. 38 - 536

went through four months of depression when I found out about the situation Julius is in.
Again I lost focus and was overwhelmed. I feel responsible.

31.    I had no contact whatsoever with Julius from 1989 to the mid to late 90s. I isolated myself. I was too embarrassed to let my family see what I had gotten into and I became sicker and sicker. Prior to those years, I saw the boys in Dermott a few times during my vacation.

32.    Marcus and Julius were reared by their grandparents, Margaret and John Hollimon and my mother, Bertha Robinson. The boys lived with Margaret and John but spent a lot of time with my mother who lived next door. My mother and grandmother, Mahaela Scales, lived together. My mother died first in the late 80s and my grandmother died one year later. My mother told me that Julius had a temper just like my father. She said that there was something odd about Julius. When he became angry, he would sit in a corner and cry and stew for an inordinate amount of time for a child.

33.    One of the times I visited, when Julius was around five years old, Margaret told me that one of the neighborhood boys had touched Julius's private parts. Margaret wanted me to talk with Julius about it. I told Julius that he had to tell momma, Margaret, if anyone tried to touch him again and that no one was to touch his privates. When Julius heard me say that to him, he pitched a fit the likes of which I had never seen anyone

16

JLR

throw in my life.  Julius thrashed about, hitting and throwing himself against things and screaming uncontrollably , "Daddy, you don't love me.  Daddy, you don't love me." My mother told me that Julius would go to extremes with his tantrums and cry and cry and cry.

34.    Although I didn't see him often, I believe that Julius and I had a connection. It was special when I went to Dermott.

35.    When Julius was fourteen years old he came home one day all beaten up, Margaret told me.  Julius told his grandmother that the other kids had hit him with bottles. It was his initiation into the Crips.  He was so badly injured that it took Margaret one month to cure him.  She used home remedies and didn't take him to the doctor.

36.    Margaret was not the disciplining type of caretaker, as she hadn't been with her own children, unlike my mother who was loving but strict.  Margaret is a simple person who could not deal with the difficulties the boys had.  She fed them and provided shelter but she had to resort to John to keep them in line but John with his blindness couldn't really keep on top of things either.  She also relied on my mother for many things.  Margaret would send the kids to my mother's for help with school work and other problems.

37.    Some of the Hollimons are a little slow.  It 's very noticeable with Milton

17

JLR

and Mildred, the twins. I wouldn't say that Rose was like her twin siblings but there was something off with her which wasn't as obvious. She seemed to have difficulty doing things differently that what she was accustomed to doing. For example, if the bundle of dirty clothes she took to the laundromat was larger than what she usually washed, rather than washing another load, she would only wash the customary amount and bring back the rest unwashed. There was no convincing her to do otherwise - she wouldn't budge.

38. Rose was very lenient with the kids. In terms of educating the children, Rose used to say, "What's wrong with what we got?" I would tell her that we may not be in jail, though I later had some of that myself, but we're not that good. Much later I learned that the term which describes us is dysfunctional. Rose thought there was nothing wrong with drinking while she was pregnant. I brought it up once. She claimed that Margaret drank while she was pregnant, and that there was nothing wrong with it. When I first got together with Rose, I saw John Hollimon drink but not Margaret. I don't know if what Rose said was true. There was alcoholism in Rose's family as well as mine. I remember her Uncle Red was drunk all the time.

39. I myself have certain difficulties when I try to concentrate. I get distracted easily, it's hard for me to maintain my attention focused. I feel as if I have a mental block.

18

JLR

40.    I believe that Julius's corruption started when my nephew, Rodney White, went to stay in Dermott. Julius was around ten years old when Rodney came into his life. Rodney was already involved in drugs and gangs in Little Rock and brought these ways with him to Dermott. Rodney became a role model for Julius who admired him very much. Both Rodney and Spyri, Josephine's son, were into the street lifestyle.

41.    In October of this year, I was contacted by an investigator from the Office of the Federal Public Defender who indicated that the Office of the Federal Public Defender and attorney Michael Charlton represent my son, Julius Robinson, in a federal court proceeding reviewing Julius's conviction and death sentence. This was the first time attorneys representing my son have contacted me. Had I been asked before about the above information, I would have been willing to talk about it and testify regarding the same. I have read and reviewed this _19_ page declaration.

I declare under penalty of perjury under the laws of the United State of America this _18_ day of November, 2005, in Fort Lauderdale, Florida.

Jimmie Lee Robinson

19

**Ex. 38 - 540**

# EXHIBIT 39

## DECLARATION OF GUFFRIE GORINS

I, Guffrie Gorins declare as follows:

1. I have been a resident of Dermott, Arkansas, my whole life and have reared my family in this town. Both my wife and I were teachers at the Dermott School and, before integration in 1971, at the Chicot County School, the black school. I have taught mathematics and computer science at the middle school and high school levels. In 1999, I retired after thirty-one years due to health problems. I know the Holliman and the Robinson families and taught Rose Holliman, Julius Robinson's mother, and other Hollimans and Robinsons.

2. Rose Holliman was in my class for two years. She was a quiet girl in school who stayed to herself. In this day and age Rose would be in a Special Education class. The whole Holliman family had learning problems. She left school because she became pregnant in her mid teens.

3. Many people in Dermott planted cotton to supplement their income, and many still do. There are fields strewn all around Dermott. Crop dusters are very active in the spring but principally in the late summer. They drop clouds of pesticides to kill the pests which attack the crops. DDT was used for a long time but it's been outlawed *since the early 80s but some people used it if they could get it.* The same pesticide, DDT, was used for mosquito abatement. Mosquitoes are a problem in this region. I don't know what is being used now.

4. Living in Dermott has always been difficult. The few industries we had

1      GG

here started moving away in the eighties and nineties. The situation in the town has been dismal for a while now. People are living in miserable conditions. I saw the product of the depressed state of the town when I taught school, so many children were and are in need.

5.    The first time I was contacted by a member of Julius Robinson's legal team was on September 17, 2005. Had I been asked before, I would have willingly provided the information herein.

I declare under penalty of perjury under the laws of the United States of America this 21 day of October, 2005, at Dermott, Arkansas.


Guffrie Gorins

2

GG

**Ex. 39 - 542**

# EXHIBIT 40

## DECLARATION OF BEOTHA MOORE

I, Beotha Moore, declare:

1. I grew up in Dermott, Arkansas, across the street from John and Margaret Holliman and their family. My parents were godparents to Milton and Mildred Holliman. I was good friends with Rose Holliman since we were children.

2. Rose started seeing Jimmie Robinson when he and Rose were in school. They were always fighting, even back then. Jimmie would beat up Rose and she would have a black eye, a cut lip or bruises.

3. I saw Rose when she came to Dermott and was pregnant with her second son, Julius Robinson. While she was pregnant with Julius, I saw her drinking beer and smoking cigarettes. Although I believe it was early in her pregnancy, her pregnancy showed. I know Rose knew she was pregnant because she told me. Rose was drinking beer at least every weekend.

4. I can remember Rose and Jimmie fighting in the street, with both of them yelling at each other. They would fight about Jimmie's drinking and about him seeing other women. On at least one occasion, I stepped in between them when I thought Jimmie was going to hit Rose. On other occasions, I saw

1

B.M.

Jimmie hit Rose in the face with his fist and throw her to the ground. During this time, Rose and Jimmie had their older son, Marcus, with them. I saw them argue and fight in front of him.

5. Jimmie was disrespectful to Miss Sarah. Miss Sarah raised Rose and she helped take care of Rose's children. Miss Sarah would tell Jimmie to leave Rose alone and not fight with her or hit her because Rose was pregnant. Jimmie would use profanity and not listen to Miss Sarah, continuing to argue with Rose and to hit her.

6. I have never been interviewed by anyone representing Julius Robinson in his criminal case until now. Had I been asked before, I would have willingly provided the information contained in this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of November, 2005 in Fayetteville, Arkansas.

_Beotha Moore_

Beotha Moore

2

**Ex. 40 - 544**