# EXHIBIT 51

# MARK D. CUNNINGHAM, PH.D., ABPP

**Clinical & Forensic Psychology**
*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260   Lewisville, Texas 75067
972-459-0658      Fax 972-459-0958      mdc@markdcunningham.com

*Licensed psychologist: Arizona #3662, Arkansas #98-17P, Colorado #2305, Connecticut #846, Idaho #PSY-379, Illinois #071-006010, Indiana #20041376, Louisiana #794, New Mexico #0768, Oklahoma #1002, Oregon #1333, South Carolina #764, Tennessee #2255, Texas #2351*

## Declaration of Mark D. Cunningham, Ph.D., ABPP

**Re:**   U.S. v Julius Omar Robinson

I, Mark D. Cunningham, Ph.D., ABPP, hereby declare:

1.       I am a clinical and forensic psychologist, licensed as a psychologist in the states of Texas, Arizona, Arkansas, Colorado, Connecticut, Idaho, Indiana, Illinois, Louisiana, New Mexico, Oklahoma, Oregon, South Carolina, and Tennessee. I am over age 21, have personal knowledge of the facts contained in this affidavit, and am competent to testify about them. My curriculum vitae is attached (Attachment A).

2.       I am the same Mark D. Cunningham, Ph.D. who testified as a teaching witness regarding violence risk assessment at the capital sentencing trial of Mr. Robinson in March 2002. Had it been requested, I was available at that time to provide an evaluation of factors that could have been considered in mitigation.

3.       I received a Bachelor's degree in Psychology from Abilene Christian College in 1973, a Master's degree in Psychology from Oklahoma State University in 1976, and a Ph.D. in Clinical Psychology from Oklahoma State University in 1977. I completed a one-year internship in clinical psychology at the National Naval Medical Center of Bethesda, Maryland. I subsequently served as an active duty Clinical Psychologist at the Naval Submarine Medical Center in Groton, Connecticut from 1978 to 1981. I was an assistant professor of psychology at Hardin-Simmons University in Abilene, Texas from 1981 to 1983. I have maintained a private practice in clinical and forensic psychology with offices in Texas since 1981.

4.       I was board certified in Forensic Psychology in 1995 by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology (ABPP). This distinction follows a rigorous examination process and is held by approximately 200 psychologists in the United States. I have served as a work sample reviewer and oral examiner for the American Board of Forensic Psychology. I have provided forensic evaluation services in over 450 cases. I have participated in extensive

**Ex. 51 - 654**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

continuing education in the area of forensic psychology. I have served as an ad hoc reviewer for three respected peer reviewed journals.

5.      I have been recognized as a clinical and forensic psychology expert in testifying regarding sentencing determination issues including mitigation and future dangerousness in both state and federal courts. I have been qualified and testified as a clinical and forensic psychology expert regarding sentencing determination issues in approximately 40 federal capital cases and approximately 65 state capital cases in state and/or federal courts in jurisdictions including Alabama, Arizona, Arkansas, California, Colorado, Idaho, Illinois, Indiana, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, Puerto Rico, Ohio, Oklahoma, Oregon, South Carolina, Virginia, and West Virginia. I have provided declarations/affidavits and testimony in state postconviction and federal habeas proceedings. Federal capital sentencing trials where my testimony has been heard include:

**U.S. v Louis Jones, Jr.** (1995),  Cause No. 5:95-CR-047-C in the U.S. District Court, Northern District of Texas.

**U.S. v Paul Hardy,** (1996), Cause No. CR94-381"C" (4) in the U.S. District Court, Eastern District of Louisiana.

**U.S. v Bruce Webster** (1996), Cause No. 4:94-CR121-Y in the U.S. District Court, Northern District of Texas.

**U.S. v Trinity Ingle**  (1997), Cause No. 96-60023 in the U.S. District Court, Western District of Arkansas, Hot Springs Division.

**U.S. v Dean Beckford** (1997), Cause No. 3:96CR66-01 in the U.S. District Court, Eastern District of Virginia, Richmond Division.

**U.S. v Darryl Johnson**  (1997), Cause No. 96 CR 379-1 in the U.S. District Court, North District of Illinois, Eastern Division.

**U.S. v Aquilia Marcivicci Barnette**  (1998), Criminal Docket 3:97CR23-P in the U.S. District Court, Western District of North Carolina, Charlotte Division.

**U.S. v LaFawn Bobbitt**  (1998), Criminal No. 3:97CLR169 in the U.S. District Court, Eastern District of Virginia, Richmond Division.

**U.S. v Anthony Ayeni Jones** (1998), Cause No. CR-WMN-96-0458 in U.S. District Court for the District of Maryland.

**U.S. v Marvin Holley** (1998), Cause No. CR96-B-0208-NE in U.S. District Court, Northern District of Alabama.

2

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**U.S. v Saheem Johnson and Raheem Johnson** (1998), Criminal No. 97-00241-A in the U.S. District Court, Eastern District of Virginia, Alexandria Division.

**U.S. v Daniel Lewis Lee** (1999), Case No. LR-CR-97-243(1) in the U.S. District Court, Eastern District of Arkansas.

**U.S. v Christopher Andre Vialva** (2000), Criminal No. W-99-CR-070 in the U.S. District Court, Western District of Texas, Waco Division.

**U.S. v Willis Haynes** (2000), Criminal No. PJM 98 0520 in the U.S. District Court for District of Maryland.

**U.S. v Daymon Smith** (2000), No. 1:909-CR-164(3) in U.S. District Court, Eastern District of Texas, Beaumont Division.

**U.S. v Coleman Leake Johnson, Jr.** (2001), No. 3:00CR00026 in U.S. District Court, Western District of Virginia, Charlottesville Division.

**U.S. v Khalfan Khamis Mohamed,** (2001), Criminal No. 98-CR-1023:008 in U.S. District Court of New York.

**U.S. v Keith Nelson** (2001), Cause No. 99-00303-01-CR-W-2, in the U.S. District Court, Western District of Missouri, Western Division.

**U.S. v Marvin Charles Gabrion, II** (2002), Cause No. 1:99-CR-76 in the U.S. District Court, Western District of Michigan.

**U.S. v Julius Omar Robinson** (2002), Cause No. 4:00-CR-260-Y in the U. S. District Court, Northern District of Texas, Fort Worth Division.

**U.S. v Samuel S. Ealy** (2002), Cause No. 1:00-CR-104 in the U.S. District Court, Western District of Virginia.

**U.S. v Carl Haskell** (2002), Cause No. 00-395-01-CR-W-2 in the U.S. District Court, Western District of Missouri, Western Division.

**U.S. v Aquilia Marcivicci Barnette** (2002), 3:97CR23-T in the U.S. District Court, Western District of North Carolina, Charlotte Division.

**U.S. v Aaron Haynes** (2003), CR-01-202-47 in the U.S. District Court, Western District of Tennessee, Western Division.

**U.S. v Wesley Purkey** (2003), 01-308-01-CR-W-FJG in the U.S. District Court, Western District of Missouri, Western Division.

3

Ex. 51 - 656

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

U.S. v **John Bass** (2003), 97-CR-80235 in the U.S. District Court for the Eastern District of Michigan.

U.S. v **Gary Sampson** (2003), CR-02-199964 in the U.S. District Court for Massachusetts.

U.S. v **Emile Dixon** (2003), 01 CR 389 (S-2)(RJD) in the U.S. District Court for the Eastern District of New York.

U.S. v **Keon Moses** (2004), CCB-02-0410 in the U.S. District Court for the District of Maryland, Northern Division.

U.S. v **Styles Taylor** (2004), Cause No 2:01-CR-0073, in the U.S. District Court, Northern District of Indiana, Hammond Division.

U.S. v **Dustin Honken** (2004), Case No. CR-01-3047MWB in U.S. District Court, Northern District of Iowa.

U.S. v **Nasih Ra'id (Odell Corley)** (2004), Case No. 3:02 CR 116 in the U.S. District Court, Northern District of Indiana, Hammond Division.

U.S. v **Hernaldo Medina-Villegas** (2005), Criminal No. 02-117 (PG) in the U.S. District Court, District of Puerto Rico.

United States v. **Xavier Williams, et al. (Michael Williams)** (2005), (S1) 00-CR-1008 (NRB) in the US District Court, Southern District of New York.

U.S. v **Denis Rivera et al, (Ismael Cisneros)** (2005) Criminal No: 1:04 CR283-A in U.S. District Court, Eastern District of Virginia, Alexandria Division.

U.S. v **Angela Jane Johnson** (2005), Case No. 01-CR-3046-MWB in the U.S. District Court, Northern District of Iowa.

U.S. v **John Richard Mayhew** (2005), Case No. CR 2-03-165 in the U.S. District Court, Southern District of Ohio, Eastern Division.

U.S. v **Kenneth Lighty** (2005), in the U.S. District Court, District of Maryland.

6.    I am the first author or co-author of over 20 scholarly papers related to forensic psychology published within the past seven years or currently in press in peer reviewed journals, scholarly texts, and professional periodicals. I am a nationally recognized scholar regarding psychological evaluations at capital sentencing. I am first author of the chapter on capital sentencing evaluations in the 12-volume <u>Handbook of Psychology</u>. I

4

**Ex. 51 - 657**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

have authored or co-authored a number of scholarly papers regarding capital sentencing determinations. These have analyzed case law and statutes relevant to mitigation and violence risk assessment considerations at capital sentencing, discussed routinely observed approaches to these issues by the prosecution and the defense, reviewed methodology that increases the scientific foundation and reliability of capital sentencing evaluations, and/or examined empirical studies and correctional data that can best inform these considerations. My scholarly papers relevant to capital sentencing considerations include the following:

Cunningham, M.D., & Reidy, T.J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 333-351.

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M.D., & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

Cunningham, M.D. (2001). Bias in capital sentencing evaluations [invited opinion column]. American Psychology and Law Society News, 21, 2, 8-9.

Cunningham, M.D. & Reidy, T.J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Reidy, T.J., Cunningham, M.D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Cunningham, M.D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (152-171). New York: Oxford University Press.

Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

Cunningham, M.D. & Goldstein, A.M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), Forensic psychology (vol. 11 of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

5

**Ex. 51 - 658**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. Criminal Justice Policy Review, 15, 365-376.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. Assessment, 12, 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. Behavioral Sciences & the Law, 23, 307-320.

Cunningham, M. D. & Sorensen, J. R. (*in press*). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. Criminal Justice and Behavior.

Cunningham, M.D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected criminal issues. To be published by the Capacity for Justice.

Cunningham, M. D. (*manuscript under review*). Unparalleled need to know: Informed consent in capital sentencing evaluations.

Cunningham, M. D. & Sorensen, J. R. (*manuscript under review*). An actuarial model for assessment of prison violence risk among high security inmates: A replication and extension.

7.    My scholarly activities have been noted by my peers. I have been selected to receive the *2006 American Psychological Association Award for Distinguished Contribution to Research in Public Policy*. This award is bestowed on one psychologist annually. The Distinguished Contribution awards, four of which recognize research activities, are among the highest recognitions extended by the American Psychological Association. The award for Distinguished Contribution to Research in Public Policy recognizes "a psychologist who has made distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work." To my knowledge, I am the first psychologist working outside of a university or research institute setting who has been given this research-related award. I am the recent recipient of the *2005 Texas Psychological Association Award for Outstanding Contribution to Science*. This is an annual award, given in recognition of significant scientific contribution in the discovery and development of new information to the body of psychological knowledge. My research and forensic consultation contributions to capital sentencing determinations have additionally been recognized with the *2004 John Augustus Award* from the National Association of Sentencing Advocates.

6

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

8.    The American Academy of Forensic Psychology is an association of psychologists who have been board certified by the American Board of Forensic Psychology. A primary mission of the Academy is to raise the standard of practice of psychology to the courts. Accordingly, the Academy conducts continuing education workshops on various forensic psychology applications. At the request of the Academy I provided full day workshops under their auspices on: "The role of the forensic psychologist in death penalty litigation" (March 1998 - Milwaukee, Wisconsin; February 1999 - Austin, Texas; January 2000 - Monterey, California; February 2002 - San Diego, California; September 2003 - Cincinnati, Ohio). These workshops emphasized research literature, statistics, and conceptualizations relevant to assessments of capital defendants. Under the auspices of the Texas Psychological Association, in November 2003 in Dallas, Texas I provided a similar full day continuing education workshop for psychologists.

9.    Federal habeas counsel for Mr. Robinson, Michael Charlton, Esq., has requested my expert forensic psychology consultation regarding what testimony and associated argument regarding mitigation could have been presented at the punishment phase of Julius Robinson's trial in March 2002. In providing this consultation I have reviewed the declarations of family members and other third parties, as well as the transcript of the punishment phase of the trial, and research regarding the influences and long-term effects of adverse developmental factors. These types of data and sources are of a sort that are reasonably relied upon by clinical and forensic psychologists in coming to conclusions on relevant issues in this field of expertise.

10.    Because records and third party reports are much less subject to assertions of self-serving distortion or misreport, these are emphasized in forensic psychology evaluations and were the primary basis of my findings. It is acknowledged that I have not interviewed Mr. Robinson. The principle caveat of not comprehensively interviewing Mr. Robinson is that additional mitigating factors may remain unidentified, and the psychosocial history lacks anecdotal detail that he might have provided in response to expert probing. However, the absence of an interview has no effect on conclusions that various adverse developmental factors present in his background increased the risk of a deviant or criminally violent life trajectory.

11.    To explain, direct evaluation in mental health practice, whether clinical or forensic, provides two functions: 1. obtaining a history; 2. assessing the presence of current symptoms of a mental disorder. There is little to no data obtained from an interview or testing that would demonstrate whether an adverse event in a patient's (or defendant's) developmental history "caused" a currently observed condition or outcome in adulthood. Rather, certain historical/developmental factors are identified as risk factors that contributed to the adult outcome with varying degrees of weight - based on research on groups of similarly situated individuals. The clinical practice of medicine and psychology rests on the application of such group derived "risk" data to the specific patient. Further, it is not anticipated that a patient or defendant has comprehensive insight into how he has been affected by these developmental risk factors, nor is the impact dependent on his recognition of it. The application of research findings to the

7

**Ex. 51 - 660**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

developmental experiences of a particular defendant is based on the presence or absence of these events in the defendant's history, not on whether this history was self-described or accompanied by insight. Thus, apart from the history obtained, interview observations and/or testing data do not illuminate the nexus between adverse developmental experience and criminal and/or violent outcome. Consistent with this conclusion, findings of the United States Department of Justice regarding the nexus between adverse developmental factors and criminal/violent outcome by late adolescence and early adulthood, and the associated prescription of preventative measures, are without recourse to interviewing or testing specific at-risk youth to determine whether the nexus applies to them.

12.    Accordingly, the following findings then are offered with a reasonable degree of psychological certainty.

13.    **Procedures of evaluation:** (In addition to documents reviewed prior to my trial testimony in March 2002)

*Declarations reviewed*

| | |
|---|---|
| Jimmie Lee Robinson | Father |
| Marcus Jwain Robinson | Brother |
| | |
| Mildred Holiman | Maternal aunt |
| Milton Holiman | Maternal uncle |
| John Hollimon, Jr. | Maternal uncle |
| Josephine Dotson | Maternal aunt |
| Bernice Johnson | Maternal great aunt |
| Terry Billups | Maternal cousin |
| Jana Holimon | Maternal cousin |
| Rodney White | Paternal cousin |
| | |
| Beotha Moore | Dermott neighbor and friend of maternal grandparents |
| Jamila Camp | Former girlfriend |
| | |
| Keith Edington | Younger Dermott peer |
| Louise Johnson | Dermott peer |
| Wayne Jordan | Younger Dermott peer |
| Alquantis Pitts | Dermott youth involved in robbery of Michael Williams |
| Michael Williams | Dermott drug dealer and 12-28-00 robbery victim |
| | |
| Leroy Kennedy | Former counselor for Delta Youth and Family Services |
| Carl McCree | Dermott native and former Dermott police officer and chief |
| Willie Nimmer | Former Dermott police officer |
| | |
| Guffrie Gorins | Dermott native and former school teacher |

8

Ex. 51 - 661

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

| | |
|---|---|
| Arlette Gorins | Former school teacher |
| Carol Wilson | High school teacher |
| Willie Parker | High school coach |
| Elvin Jones | High school football coach |
| David York | High school football coach |

| | |
|---|---|
| Stephen K. Martin, Ph.D., | Neuropsychologist |

*Records reviewed*

School records
Birth records

*Review of punishment phase transcripts*

### 14.    Findings:

**Section 1** describes the failures of Mr. Robinson's defense to articulate a coherent theory of mitigation; to present adequate evidence of damaging developmental and mental state factors, and/or to provide expert testimony regarding the nexus of those factors with problematic outcomes including criminal violence.

**Section 2** outlines adverse developmental factors and experiences in Julius Robinson's history that singularly and collectively increased the likelihood of psychological and social maladjustment, morality deficits, poor impulse control, poor judgment, criminal activity, and violent criminal offending. Only a few of these factors were touched on in a cursory fashion during evidence offered by the defense at Mr. Robinson's capital sentencing. Each adverse developmental factor detailed in this section is accompanied by a discussion of the mitigating implications of this factor, and in many cases, associated research available in March 2002. Expert perspectives on the linkage between damaging developmental factors and criminal violence were entirely absent from Mr. Robinson's capital sentencing phase. Accordingly, the jury was deprived of a scientifically informed basis to give weight to that history and psychological status. The mitigating factors and implications were, with even limited investigation, reasonably available to defense counsel and testifying mental health experts at Mr. Robinson's capital murder trial in March 2002.

**Section 3** describes the risk assessment perspectives that I could have testified to had I been queried regarding them by the defense. Additionally, I had prepared slides to illustrate some data, but was not prompted to present or explain these slides. Accordingly, I have included in an appendix all of the slides that I had prepared to illustrate my testimony in this case.

9

Ex. 51 - 662

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## Section 1

The defense failed to explain to the jury how they were to apply the very limited mitigating developmental history that they heard. In fact, defense inexplicably waived an opening statement at sentencing, and then offered only a few cryptically oblique sentences regarding how the jury should consider the developmental history:

> …[regarding Julius as a teen going to reside with his mother] Rosa has an appointment with a bottle and some primos, some marijuana cigarettes with crack rolled up in it, and that's the environment and ask yourself what kind of life that might be. And Jimmy Lee, the father, not present, not a card, not any help at all. And I'm not saying that's a reason to go out and deal drugs or shoot anybody, but I submit to you it's a factor. It's something you can consider. It's in the instructions. (sentencing phase, vol. 23: 78)

In addition to a failure to describe an extraordinary sequence of damaging developmental factors, the defense failed to articulate the role of "moral culpability" as the jury weighed these factors and the associated the deathworthiness of Julius Robinson. Moral culpability is a concept at the heart of mitigation (*Burger v. Kemp*, 1987), citing *Woodson v. North Carolina* (1976). An understanding of the concept of moral culpability was critical to the jury's consideration of the nexus between the mitigating factors presented to the jury and the capital offense. To explain, the concept of moral culpability acknowledges an elementary psychological reality: we do not all arrive at our choices out of equivalent raw material. It follows that the degree of "blameworthiness" of an individual for criminal or even murderous conduct may vary depending on what factors and experiences shaped, influenced, or compromised that choice. The relationship of developmental damage and other impairing factors to the exercise of choice, and subsequently to moral culpability is illustrated in the graphic models below. As the damage and impairing factors (e.g. neglect, abuse, psychological disorder, corruptive socialization, substance dependency/intoxication, etc.) increase, choice is exercised on an increasing slope, and moral culpability is correspondingly reduced.

10

**Ex. 51 - 663**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05



The greater the damaging or impairing factors, the steeper the angle or slope on which the choices are made; and thus the lower the level of moral culpability. This concept of moral culpability is central to the rationale of Wiggins v South Carolina, Atkins v Virginia and Roper v Simmons -- i.e. background factors, mental retardation and/or youthfulness all impact on the level of moral culpability of a capital defendant, and the associated death eligibility and deathworthiness of that defendant. The formative or limiting impact from any source of developmental damage or impairment is relevant in weighing of moral culpability. An appraisal of moral culpability involves an examination of the degree to which the background and circumstances of the defendant influenced, predisposed, or diminished the defendant's moral sensibilities and the exercise of volition or free will. Stated more plainly, how steep was the angle that the choices were made from?

The arguments of the Government were quite predictable. The typical theory of the Government at capital sentencing is that the defendant's criminal conduct, including the capital offense, is the result of the totally volitional, unfettered, free exercise of choice of the defendant arising solely from his malignantly evil heart. The equally typical and predictable argument that any pro-social behaviors represented a manipulation, as well as the focus on the depravity of the criminal offenses and/or lack of remorse/conscience at capital sentencing by the Government is to provide a clinical characterization of that "evil heart." Consistent with this observation, in final argument at Mr. Robinson's sentencing, the Government asserted:

> Why has Julius Robinson earned his way into this courtroom? Because Julius Robinson, the cold-blooded, calculated, manipulative killer that he is, has participated in three homicides. (sentencing phase, vol. 23: 96)

11

**Ex. 51 - 664**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> You know that Julius Robinson is, as Mr. Schattman, called it two-face. You know that Julius Robinson has a public persona and a private persona…You know the true Julius Robinson because you were able to hear the true Julius Robinson through those wiretaps. (sentencing phase, vol. 23: 98)

> I would submit to you that Julius Robinson lacks a conscience. (sentencing phase, vol. 23: 104)

> Not only does Julius Robinson lack a conscience, ladies and gentlemen, but Julius Robinson does not value the sanctity of life. (sentencing phase, vol. 23: 105)

> …And you know because of his lack of conscience, you know because of the value that he places on lives that are not important to him, that Julius Robinson does not value life appropriately. (sentencing phase, vol. 23: 107)

The theory of the defense at capital sentencing, by contrast, is typically that the defendant's choices in the capital offense were limited, shaped, and arose from the interaction of damaging and impairing bio-psycho-social factors and experiences. Unfortunately, Mr. Robinson's defense not only failed to provide an explanation of moral culpability or how the jury was to weigh the mitigating developmental factors, but also failed to either present or explain the relevance of the damaging developmental experiences that impacted on Mr. Robinson's development.

**Section 2: Mitigating Factors**

_Failure to present or explain the relevance of damaging developmental experiences:_

Apparently from a failure to investigate, Mr. Robinson's defense failed to identify the numerous damaging developmental factors present in Julius' background, and/or articulate these factors and the supporting evidence of them. By failing to identify and provide evidence of such factors, the defense effectively put almost no mitigation before the jury.
It is not surprising, then, that the jury would find Julius' level of moral culpability to be death-worthy.

_DOJ risk and protective factors in Julius' background:_

To initially illustrate that the failure of the defense to clearly identify mitigating factors in Mr. Robinson's background was not a result of a paucity of relevant developmental features, his developmental experience will be examined through the lens of research sponsored by the U.S. Department of Justice regarding the precursors of serious and chronic delinquency as well as youth violence. Risk factors and protective factors as specified by the U.S. Department of Justice (1995) are listed below. Risk and protective

12

**Ex. 51 - 665**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

factors that were present in Mr. Robinson's history are placed in *italics*. Inspection of these factors in light of Mr. Robinson's history reveals that Mr. Robinson had numerous risk factors identified by the U.S. Department of Justice as having cumulative impact in leading to chronic delinquency and youth violence; and few of the protective factors.

### U.S. Department of Justice Risk Factors (1995)

Conception to age 6

*Perinatal difficulties*
Minor physical abnormalities
*Brain damage*
*Family history of criminal behavior and substance abuse*
*Family management problems*
*Family conflict*
*Parental attitudes favorable toward, and parental involvement in, crime and substance abuse (alcohol abuse of parent figures)*

*(Julius had 6 of 7 of the above risk factors)*

Age 6 through adolescence

*Extreme economic deprivation*
*Community disorganization and low neighborhood attachment*
*Transitions and mobility*
*Availability of firearms*
*Media portrayals of violence*
*Family management problems*
*Family conflict*
*Parental attitudes favorable toward, and parental involvement in, crime and substance abuse*
*Early and persistent antisocial behavior*
Academic failure
Lack of commitment to school
Alienation and rebelliousness
*Association with peers who engage in delinquency and violence*
*Favorable attitudes towards delinquent and violent behaviors*
Constitutional factors (e.g. low intelligence, hyperactivity, attention-deficit disorders)

*(Note: Julius had 11 of 15 of the above risk factors)*

13

**Ex. 51 - 666**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

### U.S. Department of Justice risk factors for delinquency and violence (Hawkins et al., 2000)

Individual factors

Hyperactivity, concentration problems, restlessness, and risk taking (x 2 – 5)
Aggressiveness (x 1.5 – 6)
Early initiation of violent behavior (x 6)
*Involvement in other forms of antisocial behavior*
*Beliefs and attitudes favorable to deviant or antisocial behavior*

Family factors

*Parental criminality (x 0 – 3.8)*
*Child maltreatment*
*Poor family management practices (x 2)*
*Low levels of parental involvement*
*Poor family bonding and family conflict*
*Residential mobility (+)*
*Parental attitudes favorable to substance abuse and violence (x 2)*
*Parent-child separation*

School factors

*Academic failure*
Low bonding to school
Truancy and dropping out of school
Frequent school transitions
*High delinquency rate schools*

Peer-related factors

Delinquent siblings
*Delinquent peers*
*Gang membership (x 3-4)*

Community and neighborhood factors

*Poverty (x 2)*
*Community disorganization (crime, drug-selling, gangs, poor housing)*
*Availability of drugs and firearms*
*Neighborhood adults involved in crime*
*Exposure to violence and racial prejudice*

Situational factors

14

**Ex. 51 - 667**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## U.S. Department of Justice Protective Factors (1995)

Individual characteristics

Female gender
Intelligence
*Positive social orientation*
Resilient temperament

Social bonding to positive role models

*Family members* (note: very limited and marginal)
Teachers
*Coaches*
Youth leaders
Friends

Other protective factors

Healthy beliefs and clear standards for behavior, including those that promote
    nonviolence and abstinence from drugs.
Effective early interventions

The concentration of risk factors for delinquency and criminal violence in Julius' life would be characterized as *seriously* cumulative at best. Julius had the benefit of few of the protective factors.

In considering the nexus between damaging developmental factors and adverse outcomes in adulthood, it is important to note that everyone need not totally succumb to adverse developmental exposures in order for a "toxic" effect to be implicated. Correspondingly, all similarly situated persons need not commit acts of criminal violence or suffer adverse life outcomes, in order to demonstrate a relationship between background and outcome. The analysis of risk, vulnerabilities, and protective factors in the etiology of criminal violence and other adverse life outcomes is quite similar to explanations of why some individuals contract cancer and others do not (i.e. carcinogen exposure, predisposing factors, and protective factors). All of the children growing up in a neighborhood built on top of a toxic waste dump do not get cancer – rather these children as a group experience a markedly increased incidence of cancer as compared to more benign settings. Similarly, only 20% of heavy smokers eventually suffer from lung cancer – yet the role of this exposure in these cancers is well-established. A history of adverse developmental experiences does not invariably result in a criminally violent or markedly impaired adult outcome – only a much increased likelihood of it.

15

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

*Developmental factors that could have been brought to the attention of the jury:*

A *significantly expanded* discussion *of a number of contributing developmental* factors experienced by Julius Robinson, as well as their history and implications are described in the paragraphs that follow.  In this section Mr. Robinson will be referred to as Julius as this reduces the likelihood of confusing him with other male relatives, and most accurately reflects his child status at the occurrence of these factors. Adverse developmental factors that will receive this expanded treatment are listed below:

## Wiring

**Prenatal drug and alcohol exposure**
**Recurrent exposure to herbicides and pesticides**
**Neuropsychological deficits**
**Learning problems**
**Teen onset alcohol abuse and subsequent dependence**
**Youthfulness at the outset of delinquency and gang activity**

## Generational Influences

**Generational family dysfunction**
**Genetic predisposition to alcohol and drug dependence**

## Parenting

**Teenage mother**
**Mother exhibited indications of sub-average intelligence**
**Alcohol and drug dependence of both parents**
**Parental drug trafficking**
**Disrupted and inadequate primary attachment**
**Observed domestic violence**
**Parental emotional neglect**
**Functional parental abandonment**
**Death of surrogate parent figure**
**Potential sexual abuse**
**Instability in family structure and residence**
**Inadequate supervision and discipline**

16

**Ex. 51 - 669**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## *Family and Community*

**Legacy of racial prejudice and discrimination**
**Systemic economic hardship and social desperation among Blacks in
    Dermott**
**Corruptive family and older peer influences**
**Corruptive community influences and gang recruitment**
**Teen recruitment into drug dealing**
**Inadequate interventions**

All of the above contributing factors were present in Julius' life. Testimony that could have
been provided the jury at Julius Robinson's sentencing phase to illustrate these factors, and
scholarly perspectives on their implications for adverse and criminally violent outcome will
be detailed in the sections that follow.

## *Wiring*

**Prenatal drug and alcohol exposure:** Both Julius' father and a family friend described
Rose substance abuse during her pregnancy with Julius. Jimmie Lee Robinson, Julius'
father described:

> During the pregnancy with Julius, Rose drank a minimum of two to three beers
> per day and smoked a half an ounce of marijuana, around twelve joints, every
> day. We would get drunk, smoke marijuana and get into huge fights. Our arguing
> and physical fights were so constant that Miss Sarah took Marcus [older brother
> of Julius] and went to stay with some friends who lived across the way. There was
> one incident that occurred when Rose was pregnant with Julius that I recall. We
> were riding in the car, both of us were drunk or high, or both, and we got into one
> of our arguments.

> ….While she was pregnant with Julius and after she gave birth, Rose held "Soap
> Opera" parties at our home. Ten or twelve women would get together at our house
> from noon to four o'clock and watch television, drink and smoke marijuana, while
> Rose tended to the customers who dropped by the house to buy drugs….I don't
> know for a fact that Rose used cocaine when she was pregnant with Julius, she
> probably did because of the money she was spending, but she certainly used it
> right after he was born….Rose thought there was nothing wrong with drinking
> while she was pregnant. I brought it up once. She claimed Margaret [Rose's
> mother] drank while she was pregnant, and that there was nothing wrong with it.
> (declaration of Jimmie Lee Robinson)

Beotha Moore, family friend and neighbor in Dermott, did not observe Rose abusing
illicit drugs during her pregnancy with Julius, but did observe Rose drinking during this
pregnancy. Ms. Moore described:

17

**Ex. 51 - 670**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> I saw Rose when she came to Dermott and was pregnant with her second son, Julius Robinson. While she was pregnant with Julius, I saw her drinking beer and smoking cigarettes. Although I believe it was early in her pregnancy, her pregnancy showed. I know Rose knew she was pregnant because she told me. Rose was drinking beer at least every weekend. (declaration of Beotha Morre, 11-10-05)

**Implications of prenatal drug and alcohol exposure:** Alcohol has a well-established teratogenic impact on a developing embryo and fetus in utero. The extent of this toxic effect is dependent on the timing, frequency, and extent of the maternal alcohol consumption during pregnancy (Day & Richardson, 1991; Mattson & Riley, 1998). As research on the damaging effects of alcohol on fetal brain development has progressed over the last several decades, the threshold of concern regarding the degree of alcohol exposure that is "toxic" in utero evolved from fetal alcohol syndrome, to fetal alcohol effects, to fetal alcohol exposure. Julius' alcohol exposures in utero would be considered profound in both amount and chronicity. According to the National Institute on Alcohol Abuse and Alcoholism (2000) prenatal exposure to alcohol is associated with the following brain-related deficits:

*Verbal Learning*
- Problems with language and memory, particularly with encoding verbal information

*Visual-Spatial Learning*
- Perform poorly on tasks that involve learning spatial relationships among objects.

*Attention*
- Attention problems are a hallmark of prenatal alcohol exposure.

*Reaction Time*
- Longer reaction times; slower, less efficient information processing.

*Executive Functions*
- Important deficits in executive functions (i.e., activities that require abstract thinking, such as planning and organizing).
- Difficulty abandoning ineffective strategies when approaching problem-solving tasks, a type of behavioral inflexibility referred to as perseveration.
- Distractibility and impulsivity – contributing to attention and learning problems.

A number of these are implicated in the pattern of neuropsychological deficits, learning disabilities, and attention-related problems exhibited by Julius.

**Recurrent exposure to herbicides and pesticides:** Julius and his older brother Marcus were repeatedly exposed to aerial herbicides and pesticides as children. Marcus described:

18

**Ex. 51 - 671**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> Julius and I played in the fields behind my grandparent's house all the time when we were kids. During the summer, we played ball there with our cousins or flew kites. Soybeans and cotton was grown there and during certain times of the year, especially in the summer, a crop duster sprayed pesticides on the fields. They sprayed at least three times a week. We would be playing out there and they sprayed right on top of us. (declaration of Marcus Jwain Robinson, 11-13-05)

Consistent with this report, maternal aunt Mildred Holliman described:

> Both my parents and my houses on Deer Street were backed by fields. Those fields were farmed by Bob Green. He grew soy beans. Bob Green would spray the fields. The kids would be playing outside in the fields and would get sprayed on. No one thought to come inside. (declaration of Mildred Holliman, 10-22-05)

As with many aspects of life in Dermott, this casual approach to direct exposure of children and other persons with agricultural chemicals had a long legacy. Julius' father described regarding his own childhood:

> I worked in the fields when I was around eight years old, picking cotton, beans and tomatoes....There were planes, crop dusters, dropping pesticides on the fields during harvest season. One could smell, feel and see the pesticides. The whole town was also sprayed for insects, mainly mosquitos. There were fields planted with cotton and soy beans in back of the Hollimans and my mother's house. My uncle Hoss had a cotton field directly behind my mother's house on Deere Street. Across the street, he planted corn. All of the neighborhood kids played in the crop fields when I was a child and when Marcus and Julius were kids. I saw my boys playing there. This is just what Dermott kids did and probably still do. (declaration of Jimmie Lee Robinson)

**Implications of exposure to herbicides and pesticides:** The effects of chronic exposure to organophosphate pesticides were summarized by Stephen K. Martin, Ph.D., neuropsychologist: "Research has demonstrated that chronic exposure to organophosphate pesticides and have negative behavioral effects involving learning capacity as well as other cognitive abilities" (declaration of Stephen K. Martin, Ph.D.)

**Neuropsychological deficits:** On the basis of his November 2005 neuropsychological evaluation, Dr. Martin summarized that Julius demonstrated the following deficits:

> More specifically, he [Julius] demonstrated mild deficits involving aspects of language including word finding problems, low average verbal recall for contextual information, mild constructional dyspraxia, as well as subtle deficits involving sustained auditory attention and mental flexibility. He also demonstrated mild to moderate bilateral impairment on a measure assessing simple motor skills. (declaration of Stephen K. Martin, Ph.D.)

19

**Ex. 51 - 672**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**Implications of neuropsychological deficits:** The presence of brain dysfunction is a risk factor for multiple adverse outcomes which may increase the likelihood of criminal conduct or violent offense. These adverse effects include academic frustration and failure, impulsivity, judgment deficits, emotional dyscontrol, and behavioral disturbance. Further, there is a growing body of psychological, psychiatric, and neurological literature which identifies that brain damage is present in disproportionately high incidence among violent offenders.

Lewis et al. (1986) in a study of 15 death row inmates identified that all 15 had histories of severe head injury.

Langevin et al., (1987) found neuropsychological variables to be significant in one fifth to one quarter of violent offenders and found that 1 in 3 killers exhibited clinically significant neuropsychological impairment.

Elliott (1987) stated: "Over the past twenty years it has become increasingly evident that overt and covert neurological and neuropsychological impairments are far more common in recurrently violent individuals than in non-violent populations."

Martell (1992) in a study of 50 randomly selected mentally disordered offenders found at least one indicator of potential brain dysfunction in 84% of the subjects. In those subjects in which an organic brain disorder was diagnosed, 75% have been charged with murder, manslaughter, or attempted murder. The remaining 25% had been charged with violent sex offenses.

Blake et al. (1995) reviewed the medical records of 31 individuals awaiting trial or sentencing for murder and found abnormal EEG's in 8 of 20 subjects, abnormal MRI's in 9 of 19, evidence of frontal lobe dysfunction in 64%, and evidence of temporal lobe dysfunction in 29% of the subjects. These references are by no means exhaustive of the literature on this subject.

There is additional research regarding the interactive effect of intoxication and brain dysfunction in the occurrence of aggressive conduct. This is particularly relevant, given the potential of Darrel's intoxication associated with one or both of the murders he has been convicted of. Hoaken, Assaad, and Pihl (1998) described that while individuals with intact brain functioning are able to inhibit the aggressive impulses that often accompany intoxication, brain impaired individuals may experience inhibition failure – with associated increased likelihood of violent conduct. Obviously, the combination of brain dysfunction, psychiatric disorders, and intoxication would present particularly problematic challenges to impulse control.

**Learning problems:** Julius' literacy problems persisted into his adulthood. When assessed by Stephen K. Martin, Ph.D., neuropsychologist, in early November 2005, Julius obtained the following grade equivalent scores on the Wide Range Achievement Test – Third Edition (WRAT-3): Reading – 7th grade, Spelling – 4th grade, and Arithmetic – 6th grade. These are

20

Ex. 51 - 673

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

well below the performance expected from his performance on intellectual assessment. Also consistent with a learning disability were "evidence of dsynomia, spelling apraxia and central dysarthia" (declaration of Stephen K. Martin, Ph.D.). Dr. Martin reported that Julius has exhibited variable school performance. He described Julius' self-report of having had longstanding problems with concentration and distractibility, as well as having had to work harder for his grades than other students in school.

Ms. Jamila Camp, former girlfriend, also observed Julius' literacy deficits and behaviors consistent with verbal processing deficits:

> When we were dating I used to tease Julius about his writing skills. His spelling was terrible, and sometimes he would word his sentences in a way you couldn't understand them. I used to say: What are you, dyslexic? From time to time, he would have the same trouble speaking. I had a hard time figuring what he was talking about. The problem would show up mostly in his writing. His letters were often difficult to figure out. (declaration of Jamila Camp, 11-10-05)

Julius' learning problems and associated deficient literacy do not appear to have been the result of chronic poor motivation. One of his alternative high school teachers described:

> I was Julius Robinson's twelfth grade Informal Geometry teacher at Venture School…Venture School is an Arlington School District alternative school for students who are at least one semester behind in their course work. It is not a school for students who present disciplinary problems. Most students at Venture are academically challenged. I was impressed with Julius' attitude. Julius never let his lack of knowledge sour him. He was always open to learning, and though he wanted to move on and get his high school requirements completed, Julius was never disdainful. Julius was not just killing time at school, he wanted his diploma. (declaration of Andrew Hagman)

Carol Williams who taught Julius as a high school also reported his struggling academically:

> Julius was not a strong academic student as is borne out by his transcripts. In reviewing his records, I notice that he had to repeat classes in summer school, indicated by the letter "R." The "M"s in the transcript refer to courses in which the material is modified for the student who has difficulties. These modifications provide the student with opportunities for passing the class. (declaration of Carol Williams, 11-18-05)

**Implications of learning problems:** The chronic frustration and failure associated with learning disabilities result in these deficits being a strong risk factor for disruptive school behavior and eventual dropout. This latter risk was realized in Julius' life. The literacy deficits exhibited by Julius in adulthood would have certainly acted to restrict the career opportunities open to him.

21

**Ex. 51 - 674**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**Teen onset alcohol abuse and subsequent dependence:** In his interviews with federal habeas investigators, Julius reported that "Miss Sarah," who had reared his mother and was involved in providing care to Julius during his childhood, gave him his first beer when he was about 7 or 8 years old. This account is consistent with Miss Sarah's earlier liaise faire approach to limit setting regarding the context of Julius' father courting Rose as a mid-teen. When he was 11 or 12, Julius reported that he got drunk for the first time. Julius recalled becoming quite ill and vomiting on that occasion. Subsequently, Julius and his friends would pool their money together and get "some drunk" who was hanging out at the liquor store to buy them beer. He frequently drank a 40 oz. or more of beer on these occasions. Julius described that in time the beer was replaced by increasing amounts of cognac. He reported that from 1998 until he was locked up, he drank approximately a fifth of cognac per day.

**Implications of teen onset alcohol abuse and subsequent dependence:** Primary risk factors for alcohol and/or drug dependence include genetic predisposition, modeling of substance abuse, developmental trauma, and Attention Deficit Hyperactivity Disorder. All but the latter of these risk factors were present in Julius' history.

<u>Susceptibility to alcohol and drug dependence:</u>

*Genetic predispositions:* As will be described in a subsequent section, there is a pattern of extensive substance abuse and dependence among members of both his paternal and maternal family systems. Also as will be described in a subsequent section, the presence of this genetic predisposition in his family history had significant implications for Julius' risk of substance abuse and dependence.

*Modeling:* Julius' family background involved routine modeling of alcohol abuse by his father, mother, brother, and extended family.

*Developmental trauma:* Developmental trauma is implicated by Julius' history of parental substance dependence, observed parental violence, parental neglect and disrupted primary attachment, parental abandonment, death of his paternal grandmother, potential sexual abuse, and other developmental emotional injuries. Among individuals with histories of developmental trauma, substance abuse can be conceptualized as an attempt at analgesic self-medication of the associated anxiety spectrum symptoms.

*Inadequate supervision:* The poor supervision that Julius received in the households of his maternal grandparents and his mother will be detailed in a subsequent section. Quite obviously, the parental supervision of Julius was deficient as he was able to maintain a routine pattern of heavy alcohol abuse as a minor. The absence of effective parental supervision or limit setting during adolescence is a further risk factor for alcohol and substance dependence. With three of four primary substance abuse risk factors present, as

22

**Ex. 51 - 675**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

well as inadequate supervision, Julius was at markedly increased risk to initiate a pattern of alcohol and substance dependence in early adolescence.

Effect of substance dependence on development:

Julius' choice to begin substance abuse was made as an immature early adolescent with the deficient reasoning and judgment that accompanies that developmental stage, as well as without the support of a stable, effective, sober, supportive family network. The resultant substance dependence impeded further gains in maturity. Substance dependence in adolescence significantly disrupts and blocks the developmental tasks of this stage including growth in maturity and coping capabilities, adaptive socialization, and responsible achievement.

Relationship of substance abuse and dependence to criminality and violence:

*Intoxication and violence:* Substance abuse and dependence may be implicated in criminally violent conduct in several ways. First, in the face of his routine consumption of a fifth of liquor daily, there is an increased likelihood that Julius was intoxicated and/or under the influence at the time of some or all of the capital offenses. Such intoxication or alcohol-related effects would represent a risk factor for violence in the community and have a nexus to his involvement in the capital offenses of conviction. To explain, a number of research studies identify a frequent intersection of alcohol/substance abuse and criminal violence. Murdock et al. (1990) reviewed 26 studies from 11 countries involving 9,000 crimes: 62% of violent offenders were drinking at the time of the crime. Beck et al. (1993) found that 52% of homicide offenders were under the influence of alcohol and/or drugs at the time of the homicide. Gustafson (1993) reviewed experiments of alcohol-related aggressive responding, concluding that intoxication results in increased perception of threat, the predominance of frustration / threat increases aggression when intoxicated. Gustafson explained that the perceptual experience of intoxicated individuals results in a focus on frustration and threat cues to the exclusion of broader perceptions. Added to that, Gustafson observed that intoxicated individuals are more responsive to peer pressure,

*Substance dependence and violence:* The presence of substance dependence, even apart from acute intoxication, is also a substantial risk factor for violence in the community. Research on incarcerated homicide offenders, collected and reported by the U.S. Department of Justice (Greenfeld, 1998), found that 32% of state prison inmates convicted of homicide had had a pattern of daily drinking. Swanson et al. (1990) reported on the interviews of 7000 community respondents in Durham and Los Angeles: alcohol abuse / dependence was associated with an 11-fold greater incidence of violent behavior (one year prevalence 2.28% vs. 23.62%); similar findings were reported for substance abuse; and an adverse combined effect was observed if a co-morbid psychological disorder was present. Such co-morbid psychological disorders were present in Julius.

23

**Ex. 51 - 676**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

*Broad impacts of substance dependence:* In examining the effects of substance dependence and/or acute intoxication on the etiology of a criminally violent act, it is not so simple as a dichotomy of being either acutely intoxicated on one hand or completely unaffected on the other. Instead, there is a continuum of the extent to which substance dependence and intoxication undermine the quality of personality and cognitive processes, with associated resentment, projection of blame, inappropriate emotional reactions, poor behavioral control, poor judgment, impaired capacity to consider alternatives, and poor planning. Thus it not necessary for someone to be staggeringly intoxicated before their judgment is impaired by substance abuse – particularly chronic substance abuse.

This is part of the rationale of the random drug testing of individuals in critical occupations - even though they show no overt evidence of intoxication. In other words, substance abuse/dependence can significantly affect the quality of judgment and behavioral responses though the individual is still capable of purposeful behavior and may not overtly appear to be under the influence. Further, substance dependence undermines the quality of judgment apart from episodes of intoxication. This is why recovery from substance dependence involves so much more than simply no longer abusing the substance. Rather Alcoholics Anonymous and other treatment efforts are typically necessary to restore adaptive perspectives regarding self and others, to develop healthy coping resources, to assume greater personal responsibility, and to establish psychological maturity. Thus as individuals in recovery from substance dependence reflect on their period of active abuse, they describe not only the behaviors associated with acute intoxication, but also the "stinking thinking" that typified their broader life decisions and interpersonal behaviors.

Thus, it was not necessary for Julius to have been intoxicated at the time of the capital offenses for his longstanding alcohol dependence to impact on his judgment, impulse control, and aggressiveness. Alcohol intoxication and dependency effects are also an potential explanation for why Julius' behavior might vary so widely in its aggressiveness.

**Youthfulness at the outset of delinquency and gang activity:** As will be described in a later section, Julius became involved in gang activity and associated delinquency in early adolescence.

**Implications of youthfulness at the outset of delinquency and gang activity:** Julius' teenage status at the time he began the gang and criminal activity trajectory that culminated in the capital offenses is important to an informed perspective regarding this teen activity. Unfortunately, there was no evidence presented at sentencing regarding the implications of his developmental immaturity. Adolescent immaturity has a clear neuro-developmental basis. To explain, brain development of the frontal lobes continues into the early twenties.

> …it is now known that mylenization of the frontal cortex and the reduction in the number of synaptic contacts (i.e. synaptic pruning) continues into this period. There is also a change in the brain's electrical activity. The transition from predominantly

24

**Ex. 51 - 677**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

low-frequency waves seen in children to the characteristic alpha rhythms of adults occurs during the period of adolescence. (Looney & Oldham, 1989)

Executive functions associated with frontal lobe functioning include insight, judgment, impulse control, frustration tolerance, recognition and appreciation of the emotional reactions of others, and recognition of consequences. Significant age related growth in these capabilities, conventionally referred to as "maturing" or "growing up," occurs even between the ages of 18 and 22 in all individuals. While the age-related endpoint of adolescence varies by function or role, neurologically it can be considered to continue through this full frontal lobe mylenization in the early to mid-twenties. All individuals less than 22 years old are thus "immature" in brain development and in relation to adults. This neurological immaturity is reflected in limitations in psychological functioning and behavioral control, and accounts for the poor decision-making and poor impulse control often observed in adolescents, even in their late teens.

Compounding the judgment and behavior control problems associated with frontal lobe immaturity, the adolescent male brain is experiencing markedly rising levels of testosterone, and subject to the aggression-inducing effects of this hormone. At the same time, physical development is rapidly proceeding, psychosocial roles are changing, and identity is being transformed.

Additionally, adolescence is also characterized by egocentric perceptions of self-uniqueness, with an associated "personal fable" that the risks and consequences that might befall others do not apply to them. These classically adolescent perspectives explain the involvement of teens in high risk and even illegal activities, and their deficits in identifying and empathizing with others. The almost irresistible striving for independence among adolescents, combined with their continuing perception of themselves as children rather than adults, interferes with their accepting behavioral direction, identifying with the collective community, or perceiving any sense of responsibility for upholding collective moral values. In other words, an adolescent is unable to see beyond his own world, his personal perceptions, and/or his own need to be separate sufficiently to experience a sense of moral responsibility to his community.

Thus an immature brain is confronted with the additional psychological instability of significant hormonal, interpersonal, and identity upheaval – at times with disastrous behavioral results. As Esman (1988) summarized:

> The young person traversing this phase is confronted by a number of crucial developmental "tasks" requiring major adaptations in many aspects of life....It is not an easy time, and a fair number of adolescents do succumb to the stresses of the phase or to the predisposition they bring with them from their earlier years and experience of significant psychopathology. (p. 219)

Accordingly, our society broadly regards 18 year olds as still in need of some social restriction, as reflected in age for alcohol purchasing. Further, in most families, 18 year olds

25

**Ex. 51 - 678**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

are still receiving some degree of financial and emotional support, as well as guidance. Their insufficient capacity for fully adult roles is also reflected in their deficient ability to adhere to the requirements of the law – particularly when outside of effective adult supervision for extended periods of time. To explain, adherence to the law among adults variously stems from effective impulse control, a realistic appraisal of apprehension, a recognition of long-term consequences to personal outcome, identification and empathy with potential victims, a clear identity as a law-abiding and/or moral individual, a sense of obligation to family and others, an identification with the community, an appreciation of the collective good, and/or a mature commitment to a religious or ethical belief system. Quite simply, teens lack the mental capability and psychological development to effectively exercise any of these characteristics, and thus are unable to act with the same level of moral culpability as adults.

Corroborative research findings formed the basis for a brief of the American Society for Adolescent Psychiatry and the American Orthopsychiatric Association filed as an *amici curiae* in *Thompson v Oklahoma* (1986) in the U.S. Supreme Court. Though commenting on the status of 16-17 year olds, these observations apply to some degree to teens closer to age 20. Regarding characteristics of adolescence confirmed by research, the brief summarized:

> …adolescents tend to be less mature, more impulsive, and less capable of controlling their conduct and thinking in terms of long-range consequences. Adolescence is a stage of human development in which one's character and moral judgment are incomplete and still undergoing formation. (p. 2)

> Psychiatrists, psychologists, and other child development experts recognize that adolescence is a transitional period between childhood and adulthood in which young people are still developing the cognitive ability, judgment and fully formed identity or character of adults. (p. 267)

Beyond the typical immaturity in cognitive capability, judgment, impulse control, modulation of emotion, and moral development, there is reason to believe that Julius was even more psychologically *immature* as a teen than most of his age mates. There are two lines of evidence supporting this assertion.

1. The neuropsychological deficits and learning problems exhibited by Julius point to mild nervous system dysfunction that would serve to reduce the effectiveness of cognitive processes associated with "maturity."

2. The adverse developmental factors in Julius' childhood would act to delay functional emotional maturity. This factors associated with this disrupted developmental trajectory are detailed in subsequent sections of this affidavit.

Regarding this second factor, Julius' insight regarding the impact of childhood deprivations as communicated to his then girlfriend, Jamila Camp, was mistaken. Jamila described:

> Julius told me that when he was a child, he and his brother got left with other people

26

**Ex. 51 - 679**

Ex. 51 - 680

**Re: U.S. v Julius Omar Robinson**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05**

> a lot. It forced Julius to grow up quickly. He matured faster, and better, than his brother, Marcus. (declaration of Jamila Camp, 11-10-05)

In reality, the premature assumption of self-responsibility does not result in an individual who is emotionally healthier or more mature. If such were the case, we would neglect and deprive our own children so as to create this advantage. Rather, neglect and trauma in childhood may produce a sort of pseudo-maturity that masks a fundamentally damaged or fractured core.

It should also be noted that engaging in delinquent activities and gang activity does not indicate that a teen is more psychologically or developmentally mature than his age would otherwise indicate.

The relevance of youthfulness to risk of criminality and violence in the community does not end with the teen years, rather peaks in the early twenties and then progressively falls across the later twenties, thirties, forties, and fifties. This trend is one of the most well-established in the field of criminality. Hirschi and Gottfredson (1989) presented arrest record data from an English cohort in 1842-1844 and a 1977 U.S. Department of Justice annual crime report which demonstrated almost identical and dramatically disproportionate over-representation of younger offenders (twenties). Miller, Dinitz, and Conrad (1982) reported similar decreasing incidences of arrest for aging cohorts after age 30 when tracking incidence of murder, rape, or robbery. Swanson, Holzer, Granju, and Jono (1990) described NIMH Epidemiologic Catchment Area data which found a marked progressive reduction in rates of community violence among successively older community members. This community data on preceding year prevalence of violent behavior by age is quite relevant to base rate estimates in risk assessments as demonstrated by findings for males shown in the graph below. These data on community violence and age parallel the historic age-arrest relationship described by Hirschi and Gottfredson.

27

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05



*Swanson et al.: Community prevalence of violent behavior by age*

This graph demonstrates that a male between the ages of 18-29 is 73 times more likely to commit an act of violence in the community in any given year than a male over age 65.

## Generational Influences

**Generational family dysfunction:** Julius was the product of a family system that had been significantly dysfunctional for generations. Discovering this multi-generational family history required no more than interviewing Julius' parents and extended family regarding their family history. Had the defense conducted an adequate investigation, it would have discovered the following:

*Paternal family*

Julius' paternal great grandfather was described as a "bad alcoholic" who "beat his children mercilessly." Julius' paternal grandfather, Eddie Robison, was particularly targeted for this abuse. The paternal grandfather was also described as being involved in criminal activity, as he "made, sold, and delivered moonshine" (declaration of Jimmie Lee Robinson). Julius' paternal grandparents were Eddie and Bertha Scales Robinson. Like his father, Eddie was an

28

**Ex. 51 - 681**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

alcoholic who was routinely violent when intoxicated. Jimmie Lee Robinson, Julius' father, described:

> My father was a hard working man who was an alcoholic and loved to fight, according to my mother. He was the foreman at Bynant Farms for ten years prior to leaving Dermott. He and his farm crew worked in the fields from Monday to Saturday noon. It was customary for the men to then pick their families after they got off work and, with their earnings, head to the store to do their weekly shopping for staples. The store was owned by Mr. Bynant's brother. After shopping, my father would head to the local café in the black side of town for his weekend ritual: spending the rest of his wages and drinking moonshine until he was completely drunk. Inevitably, fights would break out, and my father was involved more often than not. At the close of the evening, someone would usually put my father in back of a pick-up truck and he would be tossed out at our front yard. Sometimes he slept off his drunkenness outside on the yard. Other times, he made it inside the house and slept all of Sunday. On Monday, he was back at his job.

Julius' paternal grandmother, Bertha Scales Robinson, was paralyzed from a gunshot wound. Jimmie, Julius' father, described this injury occurring under questionable circumstances:

> My mother was paralyzed from a shot fired from my father's rifle. The incident was described to me by my mother as having been an accident, something about the loaded rifle leaning against the wall and discharging when some thunder shook the house and the weapon fell. This is different from other renditions of what happened. It is possible that my mother didn't want to tell me the harder things about my father so as not to tarnish my image of him. (declaration of Jimmie Lee Robinson)

Marcus, Julius' older brother, had heard a different version of this shooting incident. He described:

> I heard from the family that my grandfather, who I never met, shot her accidentally when he was cleaning his gun. That never made any sense to me, why would he be cleaning his gun with bullets in it? (declaration of Marcus Jwain Robinson, 11-13-05)

Eddie abandoned his wife and children when Jimmie, Julius' father, was in middle childhood. Jimmie described:

> The last time I saw my father was when I was eight or nine years old. My father left for the Bellglade/Orlando area to work on the citrus harvest and never returned. (declaration of Jimmie Lee Robinson)

While Jimmie graduated from high school and enlisted in the military, he acknowledged that by early adulthood his life reflected familiar aspects of his family legacy. He was addicted to

29

Ex. 51 - 682

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

drugs and alcohol, trafficked in illicit drugs, was domestically violent, and functionally abandoned his children (declaration of Jimmie Lee Robinson).

Willie White, Jimmie's half-brother, has been treated for depression. Willie has six children: Rodney, Michael, Derrick, LaTasha, and Ashley. Rodney and Michael have criminal records for drug-related offenses. Rodney has a history of alcohol abuse, and fathered a child at age 17.

*Maternal family*

Margaret, Julius' maternal grandmother, had her first child, Roosevelt, by Jessie Ford. Her subsequent eight children, including Rose Hollimon, Julius' mother, were by John Hollimon. The Hollimon family "were known as hardworking people but also known for their partying" (declaration of Jimmie Lee Robinson). John Hollimon attended school to the 4th grade. He became blind as an adult. Margaret only attended school to the third grade. While she can recognize some letters of the alphabet, she is unable to read or write (declaration of Josephine Dotson, 9-18-05). John also drank abusively. His son (Julius' maternal uncle) described:

> When I was very little, my dad would go down the street to be with his friends. They would hang out and drink. My dad would bring me with him. He drank whiskey and most of his friends drank beer. He always bought me a soda pop. My dad would get drunk and then it was my job to guide him home. When we got home, my mom would be mad and they would argue. After 15 or 20 minutes of argument, my dad would go to bed. (declaration of Milton Holliman, 10-21-05)

Josephine Dotson also described her father's drunkenness:

> Before we started going to church, my daddy [John Hollimon] used to drink. He would go off with his friends on the weekends and drink whiskey. Sometimes, my mother would have to send me and by [sic] brother or sister to go get him. We had to hold him up and sometimes, he was so drunk, he fell over into the ditch. When he would come home late, he and my mother would argue. He never did hit her, though, because he was blind and my mother could get out of the way. (declaration of Josephine Dotson, 9-18-05)

The marriage of John and Margaret was also marred by his jealousy and possessiveness. Ms. Dotson explained:

> My father was very jealous. He wouldn't let my mother go anywhere without him, except when she went to the fields with us. If she wanted to go to the store, she had to go with him. (declaration of Josephine Dotson, 9-18-05)

The household of John and Margaret was chaotic and characterized by inconsistent parental involvement.

30

**Ex. 51 - 683**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> The mother [Julius' maternal grandmother], Margaret, was a little lax in her disciplining and the father was blind. The Hollimon children ruled the household, and there were always barbeques in their backyard with lots of drinking and music. The eldest sister, Marjorie, was the one who actually reared the kids, except for Rose who lived with a lady named Miss Sarah. (declaration of Jimmie Lee Robinson)

As noted above, from age four Rose was reared by a neighbor, Sarah "Miss Sarah" Pittman, who was also illiterate and lived next door to John and Margaret (declaration of John Hollimon, Jr., 11-13-05). Rose's placement out of the home, particularly in light of other children in the home being reared by a sibling, raises the specter of emotional neglect and disrupted attachment in Rose's own childhood.

Rose's emotional development was adversely impacted by being sexually abused by one of her school teachers. Her sister, Josephine, described:

> My sister, Rose, did pretty good in school until she started having an affair with one of her teachers, Charles Carr. My parents went to the school board to complain about this, but then Rose denied having relations with Mr. Carr, so nothing came of it. Rose started sneaking out of Sarah's house by the window. My dad would have talks with Sarah and he would bring Rose home for a while. Rose would go back to live with Sarah and start right up again, sneaking out. (declaration of Josephine Dotson, 9-18-05)

As the above reflects, Miss Sarah provided inadequate supervision of Rose. Jimmie characterized Rose as a "wild country girl," who was "what would be called easy – she slept around" (declaration of Jimmie Lee Robinson). Jimmie described Miss Sarah as being even more lax in her parenting than Margaret:

> Lax as she may have been, Margaret would require that young men who came courting her daughters stay on the porch. Miss Sarah thought it was all right to visit in the bedroom. (declaration of Jimmie Lee Robinson)

Predictably, Rose became pregnant by Jimmy. As will be illustrated in the sections that follow, Rose demonstrated the reverberations of her family legacy and the unstable parenting that she had received during her childhood in her own adult adjustment. She became drug dependent, promiscuous, and parasitic, as well as neglectful and functionally abandoning in her parenting of her own children.

Rose was not the only one of her siblings to become pregnant as a teenager, drop out of school, or have other problems that are part of the legacy of generational dysfunction. Margorie became pregnant when she was 15-16 years old and dropped out of school. She has had a longstanding dependency on crack cocaine. Margorie has two children, Shirley and Patrick. Shirley has been arrested for drug-related offenses.

31

**Ex. 51 - 684**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Josephine, Rose's sister, was pregnant at 17. Josephine has four children: Spyri, Terrence, Reggie, and Josephine. Spyri has a history of spousal abuse, as well as alcohol and marijuana abuse. FBI interviews indicate that he was involved in drug trafficking. Reggie has a history of drug abuse and arrest. Terrence was a member of the Gangster Disciples from his pre-teens, and faced juvenile adjudication for shoplifting, unlawful use of a firearm, and truancy (sentencing phase testimony, vol. 20:59,61-62). Terrence has been involved in drug trafficking and has three drug-related arrests.

Robert, Rose's brother, dropped out of school in 10th grade and had a drinking problem until approximately a year ago. John, Jr., Rose's brother, left school at age 14-15 when he impregnated his girlfriend.

Her sister, Mildred, dropped out of school and had her first child at age 15-16. Mildred has had five children: Kevin, Jana, Tony, Monique, and Cliff. Jana was pregnant at age 12 and dropped out of school. Jana was also a member of the Crips (declaration of Jana Holliman, 10-23-05). Tony began to get into trouble as a juvenile. He has a history of drug abuse and arrest for violent crimes. Monique had a baby at age 14. Cliff dropped out of school and has had problems with drug abuse.

Marcus, Julius' older brother, has also reenacted aspects of the generational family legacy. He acknowledges that he has used marijuana on a daily basis since 7th grade, and is currently a very heavy user (an ounce daily). He has children by two women, and has been in arrears on child support to both. Marcus had an arrest in 1995 for marijuana possession and was a co-defendant in the Nathan Henderson drug conspiracy case.

**Implications of generational family dysfunction:** Family history is critically important to character and background. There are several reasons for this. Some personality characteristics and vulnerabilities are genetically transmitted. Genetic susceptibility to substance abuse and psychological disorder that Julius faced will be discussed in subsequent sections. Other dysfunctional patterns are conveyed by scripts and modeling, as well as by sequential damage from generation to generation.

Family scripts are broad outlines of behavior and life sequence that are conveyed both verbally and more importantly by example in the lives of parents, grandparents, siblings, and extended family.  Such scripts in Julius' generational extended family included substance (alcohol) abuse and dependence, violence, irresponsibility, family instability, and emotional neglect or abandonment of children.

Individuals tend to model their behavior after the behavior of family members near them in childhood, whether or not these "role models" are positive. In Julius' multigenerational family system, "role models" presented mixed models. On one hand there were histories of education and employment. At the same time the lives of various models were characterized by substance abuse and dependence, volatile reactions and relationships, irresponsibility, poor sexual boundaries, and/or other deviant processes.

32

Ex. 51 - 685

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Maladaptive behaviors, including criminal activity and violence, may also be the result of sequential emotional damage. In other words, individuals who have been significantly emotionally damaged in childhood come into adulthood with limited emotional resources, and as a result may not parent their own children humanely or effectively. Consistent with this observation, Green (1988) reported that "the childhood history and background of abusing parents include a high frequency of physical abuse and neglect, scapegoating, maternal deprivation, and exploitation" (843). The children of these abusive parents are then in turn emotionally damaged themselves and thus at greater risk for broad adverse adult outcomes including parental abuse and neglect, substance dependence, criminal activity, and violence. Sequential generational neglect is particularly damaging. Because effective emotional regulation, interpersonal relationship capacity, and social functioning throughout life begin with stable secure attachments to a primary parent figure, deficient parental care and attachment results in fundamental damage to the foundations of personality and interpersonal functioning. The problematic effects of early abandonment and disrupted primary parental attachment may not be evident until adolescence or early adulthood.

**Genetic predisposition to alcohol and drug dependence:** As is detailed above, there is an extensive history of alcohol and drug abuse and dependence in Julius' extended family. This includes paternal great-grandfather, paternal grandfather, father, maternal grandfather, maternal uncle, mother, and brother.

**Implications of genetic predisposition to alcohol and drug dependence:** Heredity is the primary risk factor for alcohol and drug dependence. The incidence of alcoholism among first degree relatives of alcoholics is 4-5 times the rate in the general population (Cotton, 1979). Twin and adoption studies across 20 years of research have provided evidence of significant genetic influences on the familial transmission of alcoholism (Schuckit, 1987). A large scale, multidisciplinary study of 2,551 adult male biological relatives of alcoholics involving six research centers across the U.S. reported that two-thirds were heavy drinkers or severely affected alcoholics (Begleiter, 1995).

Consistent with Julius' abuse of alcohol and marijuana, clinical findings point toward a common biological vulnerability to dependence on alcohol and other drugs. Research findings clearly support a uniform theory for a neurochemical basis of alcohol and drug addiction (Miller & Gold, 1993). In a study of 150 cocaine addicts: 90% were alcoholic; half were cannabis dependent; and half had family history of alcoholism (Miller, Gold, & Belkin, 1989). In a study of 82 subjects: there was an 89% chance the cocaine addict was also an alcoholic; and half of the cocaine addicts had a family history of a first or second degree relative with alcoholism (Kosten, Rounsaville, & Kleber, 1987).

## *Parenting*

**Teenage mother:** Rose Hollimon, Julius' mother, was 16 years old when she gave birth to Marcus, and was 18 years old when Julius was born.

33

**Ex. 51 - 686**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**Implications of having a teenage mother:** Mothers who begin childbearing as teenagers place their sons at significant additional risk of criminality. Nagin and Tremblay (1999) reported that the age of the mother at initial childbearing is a key indicator of persistent antisocial behavior among sons whether the target child is first born or later born. The sons of teenage mothers are subject to a number of other developmental and subsequent life outcome risks (see Kids having kids: A Robin Hood Foundation special report on the costs of adolescent childbearing).

- More likely to be low birth weight (x 1.5)*

- Suffer poorer health in childhood but receive only half the level of medical care

- Much less likely to grow up in a family with a father

- Quality of the home is lower in emotional support and cognitive stimulation

- More likely to run away from home (x 2.5)

- Far more likely to be physically abused, abandoned, or neglected (x 2 compared to 20-21 year old mothers)

- 5% end up in foster care

- Do much worse in school. Less likely to be rated "excellent" by teachers (x 2-3)

- More likely to repeat a grade (x 1.5)

- More likely to drop out of school (x 2 – half related to teen mother)

- At age 24 approximately 30% are neither in school nor working (x 1.71 – half related to teen mother)

- Sons of teen mothers are more likely to land in prison (x 2.7 – 19% attributed to teen mother alone)

- Adolescent childbearing alone cost $1 billion annually in prison costs for their sons. Total annual social cost to taxpayers is $29 billion.

*x = odds ratios

**Mother exhibited indications of sub-average intelligence:** Though no records of formal intellectual assessment are available for Rose Hollimon, there are indications that her intellectual functioning was impaired. Her ex-husband and Julius' father described:

34

**Ex. 51 - 687**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> Some of the Hollimons are a little slow. It's very noticeable with Milton and Mildred, the twins. I wouldn't say that Rose was like her twin siblings but there was something off with her that wasn't obvious. She [Rose] seemed to have difficulty doing things differently that [sic] what she was accustomed to doing. For example, if the bundle of dirty clothes she took to the Laundromat was larger than what she usually washed, rather than washing another load, she would only wash the customary amount and bring back the rest unwashed. There was no convincing her to do otherwise – she wouldn't budge. (declaration of Jimmie Lee Robinson)

A conclusion that Rose suffered from some intellectual deficiency is also given some support by the observation of a former teacher:

> Rose Hollimon was in my class for two years. She was a quiet girl in school who stayed to herself. In this day and age Rose would be in Special Education class. The whole Hollimon family has learning problems. She left school when she became pregnant in her mid teens. (declaration of Guffrie Gorins, 10-21-05)

**Implications of mother exhibiting implications of sub-average intelligence:** Julius was faced with the alcohol and drug addictions of his parents, disrupted primary attachment, parental neglect and functional abandonment, observed domestic violence, learning problems, corruptive community, systemic racial prejudice, and other adverse developmental challenges. Accordingly, he required the most capable parenting, guidance, and assistance. The intellectual deficits of his mother would act to limit her ability to provide the understanding, interventions, or ameliorative experiences that Julius required. Rose's intellectual limitations also provide some understanding for her poor family-related decision making and the ensuing chronic domestic conflict, violence, and chaos.

**Alcohol and drug dependence of both parents:** Jimmie and Rose began drinking and drugging heavily before Julius was born. Jimmie described:

> Things between Rose and me started to fall apart when we got to Fort Bragg. Military life was wild. I lost all my principles then. Even before Julius was born, Rose and I had already started having extramarital affairs and partying. Partying meant drinking and doing drugs, mainly smoking marijuana. We lost all control of our lives. Rose went back to her old ways – she was promiscuous – and I didn't restrain myself from sleeping around either…Furthermore, I was drinking heavily, at least two six-packs per day and smoking weed. (declaration of Jimmie Lee Robinson)

Jimmie described Rose as drinking heavily at that time as well. Jimmie also reported that Rose became a heavy cocaine abuser during her pregnancy with Julius or soon after:

> One of the women, a New Yorker, introduced cocaine to the group [a recurring

35

**Ex. 51 - 688**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> Soap Opera party group at Rose's residence], I came to find out some months after Julius was born. I found out when I tried to purchase a car with twelve thousand dollars I thought we had in our bank account. Rather than twelve thousand, we had around eighteen hundred dollars. Rose had been giving me deposit slips but I wasn't aware that she was writing checks to buy drugs and who knows what else. I saw copies of the checks in the bank's microfiche records. Rose told me about what had happened when I confronted her. She said that when the New York woman first brought the cocaine they all chipped in to buy it. After some time, because it was so expensive, Rose was the only one who was paying for it. She had more cash available than the others from the drug sales going on in our place.

Rose continued a lifestyle of alcohol and drug abuse, neglect of her children, and chaotic domestic relationships after the marriage to Jimmie ended. Her brother John Hollimon Jr. described:

> Rose came and stayed with my family in Wichita Falls after she left Jimmie. Her two children stayed with my parents back in Dermott. She lived with us for about a year. She got a job in a nursing home…While she stayed with us, she was drinking and smoking marijuana. She also had several boyfriends during the time she stayed with us. I can remember only one of her boyfriends, Zebidiah Young. He was very rough and violent. One time, I came home and found that he had broken the coffee table and the chandelier was down. (declaration of John Holliman Jr., 11-13-05)

Jimmie reported that after leaving the U.S. Army in 1978 or 1979, he returned to Dermott, Arkansas, and became "a terrible alcoholic, drinking at least a case of beers per day and smoking marijuana" (declaration of Jimmie Lee Robinson). Rose had also returned to Dermott and left Marcus and Julius with her parents, while she lived with her sister, Josephine, and was "drinking and partying."

In 1986, following his divorce from his second wife, Linda, Jimmie reported that he began a 15-year addiction to crack cocaine. He described:

> The year 1986 was the beginning of my addiction to crack cocaine which became my crutch and my death. In 1987, I was arrested for Possession of Drugs. In 1992, I was arrested five times for the same crime. Rather than being sent to prison for so many possession charges, I was identified as an addict and was ordered to participate in a rehabilitation program. In 1994, I participated in a two year recovery program and stayed clean until 1998 when I was picked up again and did a ninety day jail program. I was clean again from 1999 to 2001 then had a six month relapse. In all, I was addicted to crack cocaine for fifteen years. I cannot claim that I am clean and sober because I will occasionally smoke a joint, a marijuana cigarette or drink a beer in social situations but I have not binged. (declaration of Jimmie Lee Robinson)

36

**Ex. 51 - 689**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**Implications of alcohol and drug dependence of both parents:** Alcoholism has a number of adverse impacts on parental functioning. First, as described above, the alcoholism and drug dependence of Julius' mother and father represented a genetic predisposition to alcohol and drug dependence for Julius, as well as affective and other psychological disorders.

Second, alcoholism of the mother increases the risk of fetal alcohol exposure for her children. This has already been described in an earlier section.

Third, parental substance dependence represents corruptive modeling of how to cope with life demands and stresses. A substantial aspect of parental socialization of a child occurs through modeling – as the child absorbs behavior patterns from observing the actions of parents, and subsequently imitates these. When this parental modeling is faulty or corruptive, the patterns that have been instilled from early childhood may wreak substantial havoc in the child's own adult behavior, including substance abuse/dependence.

Fourth, children who grow up in a home characterized by parental substance dependence are at substantially increased risk of psychological injury. Specifically, a parent who is substance dependent is more likely to be emotionally detached – a product of both being under the influence and being preoccupied with drug seeking behavior.

Fifth, the children of a substance abusing parent are more likely to be neglected and inadequately supervised. An alcoholic parent is both more likely to physically or emotionally abuse the children of the household, as well as to fail to protect the children from abuse perpetrated by the other parent of the household. Children in such a home often experience marked inconsistency and unpredictability associated with the wide fluctuations in parental reactions and competency. Rose's brother, John Hollimon Jr., described observations consistent with this risk on occasions of visiting Rose after she had resumed care of Julius in his teen years:

> I came to Arlington several times while Julius was in high school and I stayed with him and my sister, Rose. I was very concerned by what I saw. Rose was drinking and smoking marijuana. Julius was on his own. My sister was not capable of raising up a boy. Julius was more or less taking care of her. On my two visits, Rose was really out of it. She was often drunk. She would go to work and when she came home, she would begin drinking. She drank whiskey then. When she drank, you couldn't talk to her. She has a real temper. I would say to her, Rose, you have been drinking too much and I think you should slow down. She would get really mad at me, yell "don't tell me how to live my life," and walk out, slamming the door. She would be staggering drunk and slurring her words. (declaration of John Hollimon Jr., 11-13-05)

Similarly, Marcus described their mother as routinely intoxicated, verbally aggressive,

37

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

broadly neglectful in her supervision, and involved with corruptive partners:

> I moved to Arlington in 1994 or 1995. I lived with my mother and brother for about five months. My mother was working as a nurse's aide. When she came home from work she smoked marijuana. She smoked every day. She also drank. When she drank, her speech would become slurred and she would yell. Sometimes she would leave the apartment and sometimes she would just go to bed. I was always amazed that she could get up the next morning and go to work after how much she had been drinking the night before. Sometimes Julius would leave the apartment, also, and sometimes he wasn't even there. My mom had a boyfriend living with her then, a guy named Vernon Ozby, who I knew for a fact was on crack. He wasn't allowed to drive my mother's car so he had me give him a ride and I saw him buy crack. (declaration of Marcus Jwain Robinson, 11-13-05)

Sixth, In the face of the impairment of a substance abusing parent, the children of an alcoholic parent are frequently compelled to assume roles of premature responsibility. Such demands for precocious maturity are not a benign developmental event. This role reversal of the child assuming responsibility for the parent in an adaptation of precocious "maturity" is ultimately damaging to the child – who experiences increased traumatic and corruptive exposures, inadequate parental structure and guidance, chronic anxiety regarding the unpredictability of the home, feelings of incompetence in not being able to prevent the parent from drinking, and rejection at being abandoned to this role of the non-alcoholic parent. This role reversal of the child having to be responsible for both himself and the parent, as well as the ongoing distress in Julius' adulthood of his mother's addiction, were described by Ms. Jamila Camp, former girlfriend:

> Julius loved his mother more than I ever could have, given the circumstances. He was very hurt and embarrassed by her substance abuse and her behavior, but he always tried to include her in his life. He gave her money to move to Ohio, to get a fresh start, and he brought her back to Texas for his birthday party. I remember him getting tense if he saw her with a drink, because she wasn't the kind of person that could have one drink. She would get falling down drunk if he didn't stop her…Julius always needed to be responsible. Because he was forced to grow up early and take care of himself, he developed an attitude of: If I don't do it, it won't get done. He always tried to take care of the needs of his family and friends. (declaration of Jamila Camp, 11-10-05)

Profoundly ambivalent feelings toward both parents are common as the child feels protective on one hand but harbors much anger on the other at the lack of support, the demand to assume responsibilities that rightly belong to the parent, and the loss of childhood. Not uncommonly, these conflicted feelings are evidenced in significant depression, anger, and behavior problems. Marcus, Julius' older brother, described his own conflicted feelings about his mother in the face of her addiction:

38

**Ex. 51 - 691**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> I was a really angry young man my last years in high school. I felt our mother had abandoned us when we were kids. After spending time with our mother during the summers and seeing her drinking, smoking dope and running around with men, I thought she was just no good. Except for when she woke up in the morning, she was always drunk or high on marijuana or both. Julius would sometimes tell our mother that she needed to stop doing all the drinking and smoking she was doing, but that never changed her. I don't know if Julius was angry like I was because he kept his feelings from showing. (declaration of Marcus Jwain Robinson, 11-13-05)

In summary, parental alcoholism or substance dependence is a broad social/psychological risk factor for relationship problems, self-control deficits and behavior disorders, feelings of defectiveness, psychological disorders, and criminal behavior. This latter association between parental substance abuse, as well as attitudes favorable to substance abuse, and serious violence in adolescence and early adulthood has been confirmed by research reviews sponsored by the U.S. Department of Justice (1995; Hawkins et al., 2000).

**Parental drug trafficking:** Jimmie reported that he and Rose began dealing drugs while he was in the military. He described their trafficking in drugs while he was stationed at Fort Hood and Fort Bragg following his return from a two-year tour in Korea:

> I had already started selling drugs, marijuana and microdot acid, to increase my income. Both Rose and I were involved in the business. I hustled the drugs on the outside and Rose dispensed them out of our home. (declaration of Jimmie Lee Robinson)

Jimmie's drug dealing was also observed by Rose's sister Josephine, who recalled:

> One time, Rose, Jimmie Lee and I were all together. This was before Julius was born. Jimmie Lee offered me a ride somewhere and on the way, he stopped the car and asked some people if they wanted to buy some marijuana. I told him to take me home as soon as I realized he was selling marijuana. Both Jimmie Lee and Rose smoked marijuana, starting early in their relationship. (declaration of Josephine Dotson, 9-18-05)

Jimmie reported that he was arrested for possession of drugs in 1987, and in 1992 was arrested five times for the same offense. It is unclear whether the drug possession prompting these post-military arrests was simply associated with his crack cocaine addiction, or was also associated with drug dealing.

**Implications of addiction, irresponsibility, and drug trafficking by parents:**
Hawkins et al. (2000) in their comprehensive review of research identified parental criminality and parental attitudes favorable to substance abuse and violence as significant risk factors in the development of serious youth delinquency and violence. This makes intuitive sense. The value systems and behavior patterns of children are strongly

39

**Ex. 51 - 692**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

impacted by the behaviors and attitudes of family members – particularly older males and/or father figures who represent role models to them.

Strong positive male role models and relationships are an important part of male child development. In adolescence this assumes additional significance as the teenage male is creating a more adult identity and as the presence of an older male to whom the male teen is well-bonded provides limit-setting guidance.  Julius' father, Jimmie modeled addiction, criminality, violence, and irresponsibility.

**Disrupted and inadequate primary attachment:** The heavy alcohol and drug abuse, partying, drug trafficking, extramarital affairs, and chronic domestic conflict characterizing the behavior of both of Julius' parents during the first two years of his life point to neither being sufficiently stable or available to Julius to form an adequate primary parental bond with him. That neither Jimmie nor Rose was effectively bonded to Julius is additionally manifested by their respective failures to keep him in their care, provide for his support, or even remain involved with him. Jimmie described that following the marital break-up when Julius was 2-3 years old he had only limited contact with him for several years while living in Dermott. Jimmie then discontinued contact altogether until Julius' mid-adolescence (declaration of Jimmie Lee Robinson). Rose abdicated care of Julius and Marcus to her own mother and father, while she resided with her sister Josephine, and subsequently her brother, John, in Wichita Falls, Texas. Rose made little effort to remain an emotional presence or to exhibit any functional parental involvement in Julius' life.

Julius' care in childhood appears to have shifted between his parents, Miss Sarah, the maternal grandparents, and the paternal grandmother. For example, Miss Sarah assisted with Marcus and Julius for a period of time in Julius' first two years of life, but this relationship was disrupted by the divorce:

> Our parents split up when my brother and I were very young and we were sent to live with my mom's mother and father. Mama Sarah would also stay off and on with my grandparents and take care of us when we were little. I felt closer to her when I was growing up than I felt to either my mother or my grandmother, Margaret. (declaration of Marcus Jwain Robinson, 11-13-05)

Thus while adequately fed, clothed, and sheltered, Julius did not have an enduring, stable relationship with a single primary parent figure. In considering the impact of this, it is important to recognize that a child is not like a used car that can simply be moved from one garage to another with impunity. Rather, a child requires a stable, enduring primary emotional bond to a single human being for healthy psychological development.

**Implications of disrupted and inadequate primary attachment:** There is ample research demonstrating the devastating and potentially irreparable psychological damage that may accompany attachment failure. Psychological research unequivocally demonstrates that a secure attachment to a parent figure is crucial to healthy psychological

40

**Ex. 51 - 693**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

development, not only in infancy, but in later childhood as well (e.g. Ainsworth, 1979; Arend, Gove, & Sroufe, 1979; Cantelon, 1994; Curtis, 1980; Lewis, 1985; Matas, Arend, & Sroufe, 1978; Pardeck, 1983; Sroufe, 1979; Sroufe & Waters, 1977; Waters, Wippman, & Sroufe, 1979; Yarrow et al., 1973). Conversely, numerous studies have demonstrated that when a child is deprived of the opportunity to develop affectionate bonds early in life, his physical, intellectual, and emotional development may be seriously retarded -- and such early life experiences can have lasting effects which are not easily remedied (Curtis, 1980). Similarly, recurrently disrupted or broken attachments in childhood also result in lasting fundamental psychological harm. Bowlby (1966, 1971, 1973) and Rutter (1979) concluded that early parent separation is a risk factor for emotional disturbance in children and adults, constituting a psychological stress that could pose serious and potentially long-lasting harm to the child's psychological development. Thus, reviews by Rutter as well as Straus and Straus and again cited by Curtis summarize:

> Even the critics who challenge the empirical evidence admit that there is a consensus among psychologists that disruptions of a child's attachment to his parents risk detrimental effects. The findings relied upon here are bedrock, not seriously disputed among the contending schools and camps or by skeptical outsiders.

To simplify, an infant is not born because he is ready for independent functioning. Rather he is born while still extraordinarily dependent because he has outgrown the womb. The physical and emotional nurturance of intensive parental care forms a secondary "womb" that is essential for continued development. The attachment to a parental figure, particularly across the first several years of life, is the "umbilical cord" that provides the essential conduit for emotional nurturance in this family womb. It is through a secure, caring relationship with a parent figure that the child establishes the foundation for a stable identity, emotional self-regulation, empathy, capacity for intimacy, and responsible social behavior. As described above, there are multiple indications that neither Julius' mother nor anyone else established a strong, secure attachment or emotional bond to him in the first two years of life.

This deficiency would be expected to be particularly damaging in the face of the subsequent placement instability and insecurity. To explain, disruptions in family structure and physical setting may adversely affect development through insufficient structure and predictability, broken or disrupted attachments, excessive demands for adaptation, disrupted peer relationships, inadequate continuity of intervention services, and other deleterious processes. Disrupted attachment and the associated disrupted developmental trajectory are broad risk factors for psychological disorder, delinquency, criminal activity, and violent criminal activity.

To comment further on one of the sequelae of disrupted attachment mentioned above, in the absence of a stable and secure relationship with a parent figure, a structured and predictable routine, and limit-setting and guidance through discipline, the child does not have the opportunity to internalize stable external structures. In other words, during

41

**Ex. 51 - 694**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

childhood and adolescence, the stability and structure surrounding the developing child gradually moves "from the outside to the inside" – providing the basis for self-control. Without this internalized structure, there is grave risk to psychological health and positive socialization (Patterson, DeBaryshe, & Ramsey, 1989; Staub, 1996).

Damaged attachment in early childhood, whether from failure to establish a secure attachment or the loss of it, is frequently quite central to the etiology of conduct disorders in childhood and antisocial behaviors in adolescence and adulthood – including violent offenses (Meloy, 1988; Patterson, DeBaryshe, & Ramsey, 1989). It is illuminating to note that callousness and potential criminality can be conceptualized in many cases as severe attachment damage "all grown up" (Meloy, 1988). Green (1988) described the impact of deprivations like Julius suffered:

> Early and persistent exposure to parental rejections, assault, and deprivation impairs the child's capacity to form subsequent relationships….Most abused children are unable to achieve Erickson's (1950) stage of basic trust. They learn to regard violence and rejection as the major ingredients of human encounters. (850)

This nexus of disordered family/attachment damage and violent offending is not a matter of personal conjecture. Career investigators from the Behavioral Science Unit of the FBI in studying the causes of a particular type of homicide have asserted that the quality of the attachments to parents and other members of the family during childhood was central to the etiology of these offenses (Ressler, Burgess, & Douglas, 1988).

**Observed domestic violence:** The mutual alcohol and drug abuse of Jimmie and Rose contributed to chronic domestic conflict and violence. This began before Julius was born and continued during his early childhood. Beotha Moore, childhood friend and neighbor of Rose in Dermott, described the relationship between Jimmie and Rose as unstable and violent even when they were dating. She observed:

> Rose started seeing Jimmie Robinson when he and Rose were in school. They were always fighting, even back then. Jimmie would beat up Rose and she would have a black eye, a cut lip or bruises….I can remember [after Marcus was born] Rose and Jimmie fighting in the street, with both of them yelling at each other. They would fight about Jimmie's drinking and about him seeing other women. On at least one occasion, I stepped in between them when I thought Jimmie was going to hit Rose. On other occasions, I saw Jimmie hit Rose in the face with his fist and throw her to the ground. During this time, Rose and Jimmie had their older son, Marcus, with them. I saw them argue and fight in front of him. (declaration of Beotha Moore, 11-10-05)

Bernice Johnson, maternal great aunt, reported that Jimmie's violence toward Rose involved weapons as well. She reported:

> Rose started going out with Jimmie Lee Robinson. Jimmie Lee could be a wild

42

Ex. 51 - 695

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> person. He would go after Rose with a gun. One time, after Rose's first child, Marcus, was born, Jimmie Lee came into my house looking for Rose. He had a gun with him. I asked him what he was going to do with the gun. He told me "I'm going to kill her." I kept telling him Rose wasn't at my house and he better leave. (declaration of Bernice Johnson, 9-18-05)

Rose's sister, Josephine, described having heard about Jimmie's battering of Rose from Sarah following Sarah's return from living with Jimmie and Rose:

> Sarah would hear them fighting and would go into their room. She saw Jimmie Lee hitting and punching Rose and kicking and stomping on her. If she tried to intervene, Jimmie Lee yelled at her to leave them alone. She told me that was why she had to leave. (declaration of Josephine Dotson, 9-18-05)

Jimmie acknowledged that there was chronic conflict and violence from early in his marriage to Rose. He described:

> [during the pregnancy with Julius] We would get drunk, smoke marijuana and get into huge fights. Our arguing and physical fights were so constant that Miss Sarah took Marcus and went to stay with some friends who lived across the way. There was one incident that occurred when Rose was pregnant with Julius that I recall well. We were riding in the car, both of us were drunk or high, or both, and we got into one of our arguments. Rose jumped out of the car in the middle of the highway. When I got her back in the car, I punched her in the chest. She had bruises on her chest from me hitting her. I can't remember the exact incident but Rose had bruises on her ribs after one of our fights too.

> ...The last two years Rose and I were together, Julius' [sic] first two years of life, were really bad. After Julius was born, Rose wanted to party even more and did. I also rejected my responsibilities and wanted to party more and went ahead and did it. Drugs, alcohol and violence were the order of the day in our house. We would both get high and drunk and start fighting. We argued every day and I hit Rose several times, that I can remember. I would push and shove her more often. I was filled with jealousy and insecurity, and I would question Rose on her activities. Rose had a serious habit of picking things up and hitting me with them. One time, she hit me over the head with a bottle. I shoved her against the wall. Rather than mellowing out with marijuana, Rose became more aggressive.

> …Living on the base in Fort Hood sort of cramped our habits. We continued to have our loud rows, too loud for our, mainly white, neighbors. One time, during one of our fights, our neighbors called the Military Police and they took me away in handcuffs. I wasn't charged with anything and was sent home after six hours but Rose and the kids were gone by then. (declaration of Jimmie Lee Robinson)

The chronic domestic violence between Jimmie and Rose was also described by Marcus,

43

**Ex. 51 - 696**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Julius' brother who was two years older:

> My earliest memories are of me and Mama Sarah, who helped my mother take care of me and my brother, sitting outside of our house. I could hear my mother and father fighting inside the house. I heard their voices, yelling at each other…My parents were always arguing and when they fought, it was physical fights with hitting and punching. (declaration of Marcus Jwain Robinson, 11-13-05)

The domestic violence was of such severity, and perhaps associated with sufficient neglect, that a social service intervention was looming:

> I was still living at home with my parents on Deer Street in Dermott when Miss Sarah came back to Dermott from North Carolina [i.e., Fort Bragg]. She brought Rose's children, Marcus and Julius with her. They all stayed at our house. Julius was just a little boy still in diapers. Miss Sarah told us she came because Rose and Jimmie Lee were fighting too much and the authorities were getting ready to take the children away from them. (declaration of Milton Holliman, 10-21-05)

**Implications of observed domestic violence:** Children who are exposed to parental violence, even if they are not targets of this violence, have reactions similar to those of children exposed to other forms of child maltreatment (American Psychological Association Presidential Task Force on Violence and the Family, 1996). Thus the observation of violence directed towards others in the family is associated with an equivalent emotional distress, psychological disorder, and adverse outcome as is the direct experience of physical abuse. Thornberry (1994), in research sponsored by the U.S. Department of Justice, described data from the Rochester Youth Development Study regarding the association of family violence exposure and subsequent rates of serious youth violence from these families. Three types of family violence exposure were studied: spouse abuse, abuse of children, climate of violence and hostility. Among children without a history of family violence, the rate of serious youth violence was 38%. If one type of family violence was present the rate of serious youth violence was 60%; increasing to 73% and 78% with an exposure history to two and three types of family violence respectively. Kitzmann et al. (2003), in a meta-analysis of 118 studies (almost all published prior to 2002) concluded that about two-thirds of children exposed to parental violence fared more poorly than the average child who was not exposed to parental violence.

It is important to note that the occurrence of family violence in Julius' early childhood, and thus before the onset of continuous narrative autobiographical memory, does not lessen the impact of this exposure. The damaging impact of trauma in early childhood is independent of whether there are conscious memories of these events. Quite the contrary, some of the enduring effects of trauma exposure in childhood may occur through misshaping of the brain's architecture and processing as well as faulty learning.  For example, Schwarz and Perry (1994) identified a sustained neurobiological impact of trauma

44

Ex. 51 - 697

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

on the developing individual, describing that the plasticity of the developing brain makes it "more susceptible to the formation of malignant memories that affect not only the stress response system but also the emerging organization of neuro networks regulating other basic states and characteristics of the individual" (313). This plasticity of nervous system development in childhood may explain why youthfulness is the most consistently demonstrated pre-trauma risk factor for adverse responses to trauma, and subsequent development of Posttraumatic Stress Disorder (PTSD). It is notable in regard to this risk factor that the traumatic experiences impacting on Julius occurred during his childhood and adolescence.

More broadly, Terr (1991) described childhood psychic trauma as a crucial etiological factor in the development of a number of serious psychological disorders both in childhood and adulthood. Terr compared psychic trauma in childhood to rheumatic fever, in that both may set in motion a number of different problems that may emerge later in life. In the case of childhood psychological trauma, these reactions may eventually coalesce into personality disorders in adulthood. Thus traumatic experience in childhood often results in long-term developmental disturbances and undesirable changes in life trajectory (life direction and course). Schwarz and Perry also described that trauma induced influences on development can extend well beyond childhood. Primary developmental tasks may also be disrupted by childhood traumatic experience. Specifically, the intense negative emotion of childhood traumatic experience disrupts maturing mechanisms of emotional regulation. Traumatic experiences further have the potential to retard or accelerate critical developmental transitions.

Childhood trauma thus disrupts not just the subjective experience of childhood, but also both the trajectory of development and the psychological structures of middle and later adulthood. The fundamental alterations in the way the child perceives himself, others, and the world around him, as well as potential trauma-based adaptations in brain functioning, likely account for the sustained experience or resurgence of PTSD symptoms, or their character-engrained legacy, into adulthood. These "characterological" elements in childhood trauma exposure are quite important in understanding Julius' involvement in drug trafficking in his mid-teens. Stated simply, the maltreatment the child experiences becomes pathologically engrained into the developing child's personality structure, resulting in pervasively maladaptive and even antisocial functioning. These conceptualizations give some understanding to Julius' teen and adult life trajectory.

*Relationship of childhood trauma to psychological, behavioral, and relationship pathology:* Experienced and/or observed physical abuse as well as other forms of childhood trauma are associated with substantial mental health morbidity – frequently taking the form of Posttraumatic Stress Disorder (PTSD), depression, relationship disturbances, personality disorder, and/or antisocial behavior. **Traumatic experience in childhood from abuse or other insults can result in impairments of perception, judgment and behavior; vulnerability to poor role models and negative influences; chronic self-defeating behavior; chronic agitation; poor problem-solving skills; an inability to predict the consequences of one's behavior accurately; an inability to modulate or understand**

45

**Ex. 51 - 698**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**one's emotions; an inability to use emotions as guides for appropriate action; an inability to assign language to emotions; a constant state of internal and external fear; a foreshortened sense of future; chronic self-medication and substance addiction; a fragmented sense of self; an inability to successfully achieve developmental milestones; pervasive low self-esteem; a chronic and inescapable sense of shame and worthlessness; and behavioral misconduct and criminal conduct.** There is evidence that these symptoms and disorders stem from trauma initiated changes in brain structure and metabolism that can be persistent. Chronic victimization can also result in survival responses of attempting to emulate the toughness of those that perpetrated the victimization (i.e. identification with the aggressor). The legacy of traumatic experience is strongly implicated in Julius' developmental trajectory and outcome.

*Implications of father's anger management problems:* The violent temper displays of Julius' father not only represented a pathological model in early childhood. It also represented a potentially inherited vulnerability. Many psychological traits and proclivities, personality disorders, and other psychological disorders have a genetic transmission. Notably in this light, Julius was described as having unusually strong temper reactions from early childhood. His maternal great aunt observed:

> Julius always had a temper when he was young, often over nothing. If he wanted something and couldn't have it, he would have a temper and scream and cry. (declaration of Bernice Johnson, 9-18-05)

Obviously, in a young child as neglected and traumatized as Julius was, such emotional displays could result from maltreatment alone. Still, Julius' anger management problems are reminiscent of his father's. This was an potentially important point to make in blunting the Government's assertions of the violence Julius displayed representing his "two-faced" nature.

**Parental emotional neglect:** The failure of either of Julius' parents to provide a sober, stable, nurturing environment in his early childhood is detailed elsewhere in this declaration, as is their subsequent physical absence. There was, however, an additional, painful aspect of this maternal neglect in the paucity of emotional support for Julius and Marcus, even when this participation would have been little hardship. Marcus described:

> Our father would send clothes and shoes for me and my brother. He visited us maybe two or three times that I can remember. One of the times, he came with his second wife, Linda Love. I must have been eight or ten years old. Our father at least made an effort to do something for us. Our mom wasn't doing anything. She came to see us once or twice in all the time we lived with our grandparents and she never sent us anything. When our mother visited Dermott, she was on the go all the time, partying and going out with her friends. She really didn't spend the time with my brother and me. I cried when she would go out partying. (declaration of Marcus Jwain Robinson, 11-13-05)

46

**Ex. 51 - 699**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Marcus described that when Julius was in high school, Rose's neglect took on a physical aspect as well. Marcus recalled:

> I visited my mother and brother in Arlington twice, during the summers when I was going to high school. I stayed with them for about a month each time. My brother [Julius] was in high school. I remember not having anything to eat but potatoes with ketchup or hot sauce for days, waiting for my mother to get her paycheck. That's all the food there was in the house. When she got paid, she bought food and a big bottle of whiskey. The bottle would last her about four or five days. (declaration of Marcus Jwain Robinson, 11-13-05)

This neglect continued when Julius resided with his mother in Arlington, Texas as a high school student. One of his football coaches observed:

> Although Julius never mentioned anything about his family, I had the impression that Julius didn't really have anyone at home to care for him. My experience working with kids has taught me to recognize kids whose home life is compromised. (declaration of David York, 11-18-05)

**Implications of parental emotional neglect:** Child neglect may be physical or emotional. Regardless of its form, neglect has been identified as more psychologically and developmentally damaging than physical abuse. Widom (1989) described neglected children as being at greater risk for adult violence than abused children. This is a function of insufficient stability and/or security in parental attachments, daily life, or practical care; as well as unmet physical and emotional needs. The long-term impact of child neglect includes distorted cognitive, perceptual, emotional, and interpersonal capacities; pervasive anxiety; identity disturbance; insufficient capacity for emotional self-regulation and behavioral control; psychological disorder; behavior disturbance; and violent and criminal conduct.

Child maltreatment can also involve the failure to provide supervision, appropriate discipline, and moral guidance. Healthy child development requires not only practical nurturance in the context of a stable and secure relationship with a parent, but also limit-setting and guidance through structure and appropriate discipline. In the absence of ample structure and consistent, appropriate discipline and limit-setting, there is grave risk to psychological health and positive socialization. These fundamental tenets are supported by research (Friday, 1994; Patterson, DeBaryshe, & Ramsey, 1989; Staub, 1996). Quite simply, lack of parental structure and appropriate discipline contribute to aggressiveness and predisposes to violence in the community. In the absence of guidance, "self-control does not develop and aggression can unfold and bring instrumental gain" (p.122, Staub, 1996). Children need order and external structures to develop internal structures and capacity for self-guidance. Thus Patterson et al. described the relationship of poor parental structure/discipline/ limit-setting to childhood and adolescent conduct disturbances as a developmental progression.

47

**Ex. 51 - 700**

**Re: U.S. v Julius Omar Robinson**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05**

The American Psychological Association Presidential Task Force on Violence and the Family (1996) concluded that maltreated children may show a variety of initial and long-term psychological, emotional, physical, and cognitive effects including low self esteem, depression, anger, exaggerated fears, suicidal feelings, poor concentration, eating disorders, excessive compliance, regressive behavior, health problems, withdrawal, poor peer relations, acting out, anxiety disorders, sleep disturbance, lack of trust, secretive behavior, excessively rebellious behavior, drug or alcohol problems.  The task force further identified the following broad conclusions:

1. Child abuse and neglect can seriously affect a person's physical and intellectual development and can lead to difficulty in self control.

2. Abused and not treated children are more likely than non-abused children to be arrested for delinquency, adult criminal behavior, and violent criminal behavior.

3. When abused children are not given appropriate treatment for the effects of the abuse, the lifetime cost to society for an abused child is very high.

Research sponsored by the U.S. Department of Justice demonstrates a nexus between the experience of childhood maltreatment and delinquent, criminal, and criminally violent outcomes. English, Widom, & Brandford, (2001), in a DOJ published study,  reported on 15-24 year follow-up of over 800 children who had been abused or neglected, and a matched group of controls. The abused and/or neglected children were 4.8 times more likely to be arrested as juveniles; 2 times more likely to be arrested as adults; and 3.1 times more likely to be arrested for violent crime as adults.

These scholarly reports of the increased rate of criminal outcomes of children who are maltreated is consistent with the experience of David York, Julius' football coach, as he observed cohorts of teenage males move through his high school and athletic program:

> We have a lot of kids who come from difficult backgrounds and most of them don't make it. Many kids drop out or don't get enough preparation to live a stable and productive life. (declaration of David York, 11-18-05)

Importantly, Coach York regarded Julius as a teen who might have established a productive life had he had a healthy and supportive family. Coach York described:

> I am convinced that if Julius had grown up in a different environment, he would have had another kind of life. I say this because he tried so hard to do well. He showed a real need to take care of people. (declaration of David York, 11-18-05)

It is important to note that parental neglect is not an indication that the parent does not "love" the child. Rather, the quality of love that the parent is providing is inadequate. "Love" in this context is most accurately viewed as continuum from healthy and affirming

48

Ex. 51 - 701

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

to destructive and injurious. This is consistent with the earlier discussion of sequential emotional damage and other trans-generational influences that may result in poor parenting and "love" expressions that are on the lower end of the continuum.

**Functional parental abandonment:**

*Mother absence:* As has been described above, Julius' mother was psychologically absent for the first two years of his life, and subsequently had virtually no parental interaction with Julius to his middle adolescence when she resumed "care" of him. Because of her addiction, however, the care was without meaningful emotional support, parental structure, or supervision.

*Father absence*: As has been described above, Julius' father was psychologically absent when Julius was age 0-2 years old, only present for a handful of visits at best from the time Julius was age 2 to 8, entirely absent to Julius' middle adolescence, and inconsistently involved with him there after.

**Implications of functional parental abandonment:**

*Mother absence:* The impacts of mother absence have already been described in terms of inadequate and disrupted attachment, and neglect.

*Father absence:* Father absence has been broadly implicated in delinquent and criminal outcomes. More specifically, there is an extensive literature specifically addressing the developmental risks of father absence, including delinquency, criminal activity, and murder. Examples of these findings and the research citing them are listed below:

- The low supervision of adolescents frequently found in father-absent homes was more the cause of delinquency than poverty (Sampson & Laub, 1994).

- Father-absent adolescents are more likely to commit a school crime (Jenkins, 1995).

- The likelihood that a young male will engage in criminal activity doubles if he is raised without a father and triples if he lives in a neighborhood with a high concentration of single-parent families (Hill & O'Neil, 1993).

- 70% of the juveniles in state reform institutions grew up in single- or no-parent situations (Beck, Kline, & Greenfield, 1988).

- 72% of adolescent murderers grew up without fathers (Cornell, D. et. al., 1987).

49

**Ex. 51 - 702**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

- Children who grow up in a father-absent home are at a dramatically greater risk of drug and alcohol abuse, mental illness, suicide, poor educational performance, teen pregnancy and criminality (U.S. Department of Health and Human Services, 1993).

**Death of surrogate parent figure (paternal grandmother):** Though not a substitute for a primary parental attachment, Julius' paternal grandmother Bertha was a source of some "parental" support and supervision for the boys. Julius' older brother, Marcus, described:

> She may have been in a wheelchair [paralyzed from having been "accidentally" shot by paternal grandfather] but she could make us mind better than our grandmother, Margaret. Grandma Bertha was more aware, you couldn't slip anything past her. Unlike Grandma Margaret, Grandma Bertha didn't cuss but if we heard her say "Darn it!" we'd say. "Oh, Oh, she hot. We're in big trouble."

> Grandma Bertha was the only one who could help us with our school work because Grandma Margaret was illiterate. Our grandfather was blind so he had his limits, but he was good at math. We just had to tell him the problem and he would give us the answer. It didn't help us to learn just to get the answers, though. He didn't show us the process like Grandma Bertha did. We got all our school work help and guidance from her.

Marcus described that when Julius was age 10-11, Bertha deteriorated and died of cancer:

> It was hard when she got sick with cancer. It hurt to see her fall apart like she did, especially when she was getting chemotherapy. I was around twelve or thirteen when she died. The chemotherapy really changed her. She had long hair and all her hair fell off. It was scary the way she looked. We lost a really strong person in our lives when she died. (declaration of Marcus Jwain Robinson, 11-13-05)

**Implications of death of surrogate parent figure:** Grandma Bertha was as close to a functional parent figure as Julius had. The impact of this death is perhaps best understood, then, in light of scholarly perspectives on the effects of parental death on a child. To illustrate this research, Silverman and Worden (1992) found that even several months after the death of a parent a significant percentage of 6-17 year old children continued to experience marked distress, with symptoms such as frequent crying, sleep disturbance, headaches, difficulty concentrating in school, conversations with the deceased, frightening perceptions of being watched by the deceased, and/or behavior problems.

Samuels (1988) found that parental death during childhood resulted in multiple immediate effects:

50

**Ex. 51 - 703**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

| | | |
|---|---|---|
| sleep disturbance | phobic responses | angry outbursts |
| regressive behaviors | confusion | loss of resiliency |
| nightmares | separation reactions | increased tension |
| depression | | |

Samuels further identified serious psychological vulnerabilities that were still present 18 months later:

| | |
|---|---|
| lessened resiliency | preoccupation with illness |
| uncertainty about the future | separation problems |
| lowered self-esteem | worry about growing up |

Finkelstein (1988) in summarizing the research described parental death in childhood as not so much a single stressful event, as a series of events that pervaded almost all aspects of the child's life. Parental death in childhood was identified as reaching to the core of the way the child makes sense of the world around him. The research indicates that children whose parents die are at long-term increased risk for physical and mental illness, inability to cope with later life stresses, depression, alcoholism, suicide, problems with intimacy and autonomy, problems with sexual identity and behavior, marital difficulties, delinquency, and criminal activity.

The extent to which the above risk factors are realized in a given child is determined by factors such as:

The child's temperament and vulnerabilities – Julius exhibited problems with attention, learning, and neuropsychological functioning; in a family context of parental addiction, violence, neglect, and abandonment. Accordingly, he would be considered far from resilient.

The continuity of the child's daily life – Julius' daily life was disrupted by the loss of supervision and academic support, and eventually by rejoining his mother.

The stability of the home – The home setting with the maternal grandparents offered inadequate supervision and structure, and his later residence with his alcoholic, drug addicted mother even less.

Julius was thus at particular risk for problematic long term outcomes from his grandmother's death.

**Potential sexual abuse:** There is a report that Julius was sexually abused in childhood. His father, Jimmie, described:

> One of the times I visited, when Julius was around five years old, Margaret [maternal grandmother] told me that one of the neighborhood boys had touched Julius' private parts. Margaret wanted me to talk with Julius about it. I told Julius

51

**Ex. 51 - 704**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> that he had to tell momma, Margaret, if anyone tried to touch him again and that no one was to touch his privates. (declaration of Jimmie Lee Robinson)

That something did happen to Julius is given some support by the magnitude of Julius' reaction to this admonition. Jimmie described:

> When Julius heard me say that to him, he pitched a fit the likes of which I had never seen anyone throw in my life. Julius thrashed about, hitting and throwing himself against things and screaming uncontrollably, "Daddy, you don't love me. Daddy, you don't love me." (declaration of Jimmie Lee Robinson)

**Implications of potential sexual abuse:**  Finkelhor & Brown (1985) identified four broad traumatic impacts of being sexually abused as a child.  Traumatic sexualization may occur as the child's sexuality is inappropriately shaped by the abuse experience.  Being sexually abused represents a profound betrayal as someone whom the child was dependent or vulnerable to has caused them harm.  This may subsequently be associated with relationship distrust, feeling unlovable, interpersonal dependency, and retaliatory aggression.  The child experiences a profound sense of powerlessness in the face of sexual abuse as his will and sense of control are overwhelmed.  This may result in continuing feelings of incompetence, depression, anxiety, and adult victimization or domination.  The sexually abused child may experience a significant sense of stigmatization as badness, shame, and guilt become incorporated into the child's self image.  This may result in low self-esteem, anticipation of rejection, poor relationship choices, or promiscuity.  These four traumagenic dynamics of sexual abuse – traumatic sexualization, betrayal, powerlessness, and stigmatization  - were subsequently the conceptual basis for a brief four amicus curiae filed with the U.S. Supreme Court in Maryland v Craig (1989) by the American Psychological Association.

A history of childhood sexual victimization appears to be associated with equal levels of later psychological dysfunction in both male and female clinical subjects (Briere et al., 1988).  These psychological dysfunctions include dissociation, anxiety, depression, anger, sleep disturbance, and post sexual abuse trauma. Interestingly, males displayed as much psychological disturbance as females though reporting less extensive and less extended abuse.  This suggests one of two hypothesis:  (1) There is an equivalent impact of sexual abuse for males or females regardless of any differences in its severity or duration between the sexes, (2) sexual abuse is more traumatic for males since lower male abuse levels were associated with symptoms that were equal to that of more severely abused females.

A number of factors may negatively affect the recovery of males from sexual abuse.  These include reluctance to seek treatment, minimizing the experience of victimization, difficulty accepting shame and guilt, exaggerated efforts to reassert masculinity, difficulties with male intimacy, confusion about sexual identity, power/control behavior patterns, externalization of feelings, vulnerability to compulsive behaviors, greater difficulty in adjusting to stress, and difficulty in expressing and communicating affect (Struve, 1990; Urquiza & Keating, 1990).

52

Ex. 51 - 705

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Urquiza and Capra (1990) described that sexual abuse creates unique disclosure problems for male victims. In other words, males tend not to disclose their complaint about the sexual abuse experiences as readily as do females. The authors note that boys are sexualized with a male ethic of self-reliance that inhibits disclosure of victimization. Disclosing same sex abuse to peers or parents might threaten a boy's developing masculinity or pose a risk of being labeled as homosexual. Additionally, disclosure may result in a loss or curtailment of the boy's greater independence and freedom.

Urquiza and Capra described initial effects on males following sexual abuse as most commonly involving behavioral disturbances including aggression, delinquency, and non-compliance. Other problematic initial effects may include emotional distress; displays of guilt, shame, negative self-concept; psychosomatic symptoms; confusion regarding sexual identify and sexual preference; problematic sexual behaviors; and vulnerability to juvenile sexual offenses. Long-term effects of sexual abuse as described by Urquiza and Capra include increased risk for depression, somatic disturbance, self esteem deficits; difficulty maintaining intimate relationships; problems with sexual adjustment; alcohol and substance abuse; and sexual offending.

**Instability in family structure and residence:** During his childhood, care of Julius shifted from his parents, to Miss Sarah, to his maternal grandparents, to his paternal grandmother off and on, to his mother. Even when in the care of his maternal grandparents, the household configuration was transient and unstable. Mr. Leroy Kennedy, counselor for Delta Youth and Family Services organization in Dermott. Mr. Kennedy reported that Julius was referred to his caseload and received services from June 1989 to May 1990 – around the time gang activity started in Dermott. Mr. Kennedy indicated that he checked on Julius at home or school three times weekly. He described regarding the household:

> I remember being concerned that the grandparents' home was somewhat chaotic. They had a revolving door policy, with young people coming and going all the time. Friends and relatives seemed to live there for a few days, then disappear. It was not a stable environment. (declaration of Leroy Kennedy, 10-21-05)

This description of the household of the maternal grandparents where Julius spent the better part of his childhood is substantially at odds with the inexplicable and apparently uninformed characterization of this home by Mr. Wes Ball in final arguments of the sentencing proceeding:

> He had grandparents who are good, fine people, and I believe his grandmother – she's here right now, Margaret, fine salt of the earth kind of folks. And John, a blind man, and they did the best they could to help out and raise these two boys in Dermott, Arkansas when Rosa left them with them in a good environment. (sentencing phase, vol. 23: 78)

53

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

The defense characterization of the wholesomeness of this household is also inconsistent
with the generational dysfunction of the maternal family system outlined in an earlier
section. Additionally, as the perspectives in this declaration demonstrate, Dermott could not
reasonably be described as a "good environment" for a Black male to be growing up in
during the 1980's and 1990's.

**Implications of instability in family structure and residence:** Chronic instability (i.e.
transitions) in family structure is one of the delinquency risk factors identified by
Department of Justice research. Again, this is not surprising. Household instability has a
destabilizing impact in a child's life. As children require structure and stability for
healthy emotional and social development, mobility of residence or parent figure may
undermine this basic need. Transitions in family structure and "caretakers" are a notable
risk factor in adolescence as well. To explain, adolescence represents a stage of
development that depends on a stable parental/family structure for limit setting, guidance,
and emotional anchoring during vulnerable years of identity formation and social
identification. As the number of transitions in placement, family structure, and parental
figures increase, the risk to health adolescent development becomes correspondingly grave.
This conclusion is supported by large scale research sponsored and reported by the U.S.
Department of Justice (Thornberry et al., 1999). This series of studies found that as the
number of transitions (changes in caretakers) during the teen years increased, so did rates
of delinquency and drug use. Among youth experiencing three or more such transitions,
the delinquency rate was 80%. The number of transitions also had a significant effect on
rates of drug abuse.

**Inadequate supervision and discipline:** An aspect of the neglect that Julius experienced
was in inadequate discipline, supervision, and structure. This neglect did not simply occur
when in the care of his mother. Rather, his maternal grandmother, Margaret, who provided
the majority of his care in childhood, was poorly equipped to exercise these functions.
Julius' father described:

> Margaret was not the disciplining type of caretaker, as she hadn't been with her own
> children, unlike my mother who was loving but strict. Margaret is a simple person
> who could not deal with the difficulties the boys had. She [Margaret] fed them and
> provided shelter but she had to resort to John to keep them in line but John [maternal
> grandfather] with his blindness couldn't really keep on top of things either.
> (declaration of Jimmie Lee Robinson)

Similarly, Mildred Holliman, maternal aunt and daughter of John and Margaret, described:
"I never saw or heard of my parents disciplining the boys" (declaration of Mildred
Holliman, 10-22-05)

An inadequate degree of parental supervision in the Holliman household was also observed
by Mr. Kennedy:

54

**Ex. 51 - 707**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> Julius' grandfather was blind. His grandmother always believed whatever Julius told her. She was a bit naïve in that regard. (declaration of Leroy Kennedy, 10-21-05)

The poor limit setting, ineffectual and inconsistent discipline, and negligent supervision of Julius in the household of his maternal grandparents was also observed by Bernice Johnson, his maternal great aunt. Ms. Johnson described:

> When I would talk to Margaret about his [Julius'] behavior, Julius told her "Grandma, I didn't do it." Margaret said she would whip Julius but I never saw her do it. I did see Margaret try to whip Julius on some occasions, but John would always stop her. Margaret would say one thing and then John would say the opposite. If Julius asked Margaret for permission to do something and Margaret said no, he would go to his grandfather, John, who would say, oh, go on ahead. John was blind, so he wasn't always aware of what Julius was doing and he didn't really want to hear what was going on with him if it differed from the picture he had of Julius. Margaret was not that competent. She had a lot of memory loss and wasn't aware of Julius's problems. (declaration of Bernice Johnson, 9-18-05)

**Implications of inadequate supervision and discipline:** Healthy child development requires not only a stable and secure relationship with a parent, but also limit setting and guidance through discipline and supervision. In the absence of either of these fundamental parenting factors there is grave risk to psychological health and positive socialization. These fundamental tenets are supported by research (Friday, 1994; Patterson, DeBaryshe, & Ramsey, 1989; Staub, 1996. Quite simply, lack of parental discipline contributes to aggressiveness and predisposes to violence in the community. In the absence of guidance, "self-control does not develop and aggression can unfold and bring instrumental gain", i.e. children need order and external structures to develop internal structures and capacity for self-guidance (p.122, Staub, 1996).

## Community and Extended Family

The adverse developmental factors impacting on Julius were not limited to wiring, generational, and parenting arenas. Rather, all of these were occurring within a community context – and interacting with that community. Unfortunately, the social factors present in the Dermott community predating and during Julius' childhood were as toxic as those he encountered in the other primary developmental arenas detailed in earlier sections of this declaration.

**Legacy of racial prejudice and discrimination:** A legacy of racial discrimination, prejudice, and violence was described as characterizing social interactions in Dermott for generations. Jimmie Robinson, Julius' father described:

> I do not like to use derogatory terms but the word nigger was used frequently by

55

**Ex. 51 - 708**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

whites in Dermott. The races were completely separated in the town, physically by the railroad tracks, and socially by laws and customs. There were white businesses and a few black stores, white water fountains and no water fountains for the blacks. Black people had to follow prescribed guidelines when in the white part of town and they couldn't go there simply because they felt like it. Integration of the schools came to Dermott in 1971 but some small changes started to be seen the year before – the Dollar General Store discontinued its practice of prohibiting blacks from using the front door. This small opening of society was not widespread though, blacks could still not go to white restaurants and most places continued to be segregated.

It was very dangerous to violate the practice of keeping the races separate. When I was a boy, my mother and I saw a black man taking a drink from a white drinking fountain. The man seemed to be very tired. A white woman saw the man take a drink and called the police. The man ran back across the tracks but the police caught up with him and beat him fiercely. I saw the man, all bloodied, being dragged away to jail. The next day, the man was found dead in the middle of one of the streets in the black side of town. (declaration of Jimmie Lee Robinson)

The threat of racially motivated violence appears to have had an impact on the generational structure of Julius' paternal family. Jimmie described:

The last time I saw my father was when I was eight or nine years old. My father left for the Bellglade/Orlando area to work on the citrus harvest and never returned. I have a memory of trucks full of white men, police and hooded Klu Klux Klan men, driving up to my house and looking for my father. They said to my mother, "Where is he? We're gonna kill that nigger." My mother told them that my father had gone into the woods. This happened before my father went to Florida. My mother told me that the men were looking for my father because he had stood up to some police officers who wanted to keep the black men from getting together at a black café on Saturday nights. (declaration of Jimmie Lee Robinson)

**Systemic economic hardship and social desperation among Blacks in Dermott:**
Julius' father, Jimmie Robinson, described longstanding, deeply entrenched poverty among Blacks in Dermott, and associated feelings of desperation:

Being black in Dermott meant that life was going to be really hard. It wasn't that far from the days of slavery. Sheer desperation allowed people to survive. There was always a sense of desperation. People talked of getting out of the ghetto when they expressed their desire to break away from being downtrodden and poor. There was not only the history of blacks and whites to contend with but there were few jobs to be found in Dermott. I remember my mother and my grandmother, Mahaela Scales, going to Lake Village, some twenty miles away, with a cotton sack that would be filled with government assistance food.

56

**Ex. 51 - 709**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> (declaration of Jimmie Lee Robinson)

Julius' maternal uncle, John Hollimon Jr., also described the sharply limited opportunities in Dermott that contributed to a depressed and desperate social milieu among the Black residents there:

> In Dermott, there were no jobs for young people. When I was growing up in Dermott, the closest place to find a summer job would have been in Monticello or Pine Bluff and they were 50 miles away. Even adults didn't have many options outside of farm work, picking cotton and other crops. (declaration of John Hollimon Jr., 11-13-05)

Both the legacy of racism and the economic desperation of the Black community in Dermott made this a fertile field for the eruption of gang activity that occurred in Julius' early adolescence. As will be obvious in the sections that follow, Julius was not the originator of gang activity in Dermott, nor was he without unusually pronounced risk factors for gang identification, nor was he the only youth swept into the corruptive clutches of this deviant identification.

**Corruptive family and older peer influences:** A bi-product of the cancer illness of paternal Grandma Bertha was the importation of a paternal cousin, Rodney White, to assist in caring for her. Rodney remained after Bertha's death, residing with paternal great-grandmother, Mahaela. Julius' relationship with Rodney was pivotal in Julius' subsequent drift into delinquency and gang activity. Marcus, Julius' older brother described:

> Julius was really taken by Rodney, who was older. My brother admired Rodney and started spending as much time as he could with him. Rodney ran with a guy from California named John-John Wright. John-John brought the whole idea of gangs to Dermott. It was around this time that my brother started getting into trouble. He was listening to the wrong music and he was listening to the wrong people…he looked up to Rodney and John-John. (declaration of Marcus Jwain Robinson, 11-13-05)

Julius' father also described the significance of Rodney's influence on Julius:

> I believe that Julius' corruption started when my nephew, Rodney White, went to stay in Dermott. Julius was around ten years old when Rodney came into his life. Rodney was already involved in drugs and gangs in Little Rock and brought these ways with him to Dermott. Rodney became a role model for Julius who admired him very much. Both Rodney and Spyri, Josephine's son, were into the street lifestyle. (declaration of Jimmie Lee Robinson)

In an apparent savage beating, Julius was eventually initiated into the Crips. His father,

57

**Ex. 51 - 710**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Jimmie, described:

> When Julius was fourteen years old he came home one day all beaten up,
> Margaret told me. Julius told his grandmother that the other kids had hit him with
> bottles. It was his initiation into the Crips. He was so badly injured that it took
> Margaret one month to cure him. (declaration of Jimmie Lee Robinson)

**Implications of corruptive family and older peer influences:** In the face of the
abandonment by both parents, and in the supervision vacuum left by the ineffectual
supervision and guidance of his maternal grandparents, Julius was particularly vulnerable
in early adolescence to the structure and sense of belonging that gang membership would
have provided. With this affiliation came an increased concentration of exposure to
delinquent peers and deviant values. As was stated in an earlier section, these elections
were made from a developmentally immature position, without reasoned insight into the
nature of the values that were being adopted or the trajectory that this affiliation placed
him on.

**Corruptive community influences and gang recruitment:** Julius was not alone in
being enamored with John-John and gang activities. Marcus described:

> After John-John brought gangs to Dermott, most of the young boys became
> interested in belonging to a gang. You had to pick a side. Even if you weren't
> initiated, you had certain people you hung out with. I was never initiated but I was
> associated with the Gangster Disciples, started by Larry Hoover in Chicago….the
> kids in Dermott had a lot of little made-up gangs which were just the people you
> hung out with. (declaration of Marcus Jwain Robinson, 11-13-05)

Similarly, Tony Billups, second cousin, described:

> I grew up in Dermott, Arkansas. In the late 1980's, a man named Johnny Wright
> moved to Dermott. His nickname was *John-John* and he was a member of a *Crip*
> gang. He was from the Los Angeles area, and had been incarcerated. John-John
> lived in the Bellvue Apartments. We called them *The Projects*. John-John used to
> hang out at the playground by the projects and tell stories. The young kids were
> fascinated by his stories. Not long after John-John's arrival, a Crip gang formed in
> Dermott. After the Dermott gang formed, there were a lot more break-ins and a lot
> more drug activity. Also, I recall an ice storm one winter, possibly the winter of
> 1992, where the electrical power in Dermott was knocked out. During the black-
> out, a couple of pawn shops were burglarized and a number of guns were stolen.
> After that, there were incidents of people's houses being shot up. (declaration of
> Tony Billups, 10-21-05)

Mr. Leroy Kennedy, counselor for Delta Youth and Family Services organization in
Dermott also described a marked change in the delinquent activities among the youth in
Dermott with the introduction of gangs:

58

**Ex. 51 - 711**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> When the gang activity began in Dermott, I noticed a dramatic change generally. A change in attitude, a change in attendance, etc. There were more fights all of a sudden, and more break-ins. I remember that weapons were stolen and used to shoot up houses. (declaration of Leroy Kennedy, 10-21-05)

A similar account of the introduction of gangs into Dermott was provided by Carl McCree, officer and subsequently chief of police in Dermott. Mr. McCree described:

> In the late 1980's, a man by the name of Johnny Wright moved to Dermott from the Los Angeles area. He had a prison record and a number of tattoos. His nickname was *John-John*. He organized some of the young boys in Dermott, including Julius Robinson, into a *Crip* gang. After that gang organized, we saw a lot more criminal activity in Dermott. Julius Robinson was twelve or thirteen years old at the time. We had an 11:00 p.m. curfew in Dermott, which Julius and others began violating….In my generation, Dermott was just a quiet little country town. The boys played basketball…went hunting and fishing…did things like that. Johnny Wright and the Crip gang changed all that. Kids burned cars and houses as part of their initiation into the gang. There was a sharp rise in thefts and serious assaults. Also, once the gang was organized, the drug activity in Dermott increased dramatically. (declaration of Carl McCree, 10-20-05)

Teenage females as well as males were pulled into the orbit of the gangs that came to Dermott with John-John. Jana Holliman, first cousin of Julius, described the process of a gang initiation that she took part in:

> In the early 1980's, several people, Satra and John John, came from Los Angeles and brought the gangs with them. They began doing initiations. The person being initiated was put in the center of a circle of between seven and ten gang members. The O.G., or oldest gang member, would ask person in the center what he wanted to be. If he said a Playboy Hustler Crip, the O.G. would hit him in the face really hard with his closed fist. Then the other gang members from the circle would fight the newcomer for four or five minutes, hitting, kicking and punching him. The newcomer could fight back. If at the end of the time, the newcomer was still standing, he was initiated. If he fell down during the fighting, he would have to go another round. After the initiation, they would get drunk and high. The process was the same for the girls. I went through initiation myself…I was a member of the East Coast Crips. We hung out at the projects in Dermott and at the trailer court. (declaration of Jana Holliman, 10-23-05)

The allure of Johnny "John-John" Wright to the young people in Dermott was described by Julius' cousin, Rodney White:

> I remember when Johnny Wright came on the scene in Dermott. They called him *John-John*. He was from the Los Angeles area, and he told city stories. The kids in

59

Ex. 51 - 712

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> Dermott only knew country stories. The city stories excited the young kids; they sounded cool, sort of glamorous. John-John was older. He became a role model for the kids. It wasn't that he gave orders. The kids just wanted to be like him. John-John was on drugs. Inspired by John-John and his stories, the kids in Dermott formed a *Crip* gang. (declaration of Rodney White, 10-21-05)

**Implications of corruptive community influences and gang recruitment:** An economically deprived minority community setting such as Dermott has a strong interactive effect with parental and family deficiencies that are over-represented in such a social context. Such family and parenting vulnerabilities include mother head of household, poor supervision, and corruptive family influences. The combined effects of family vulnerability and corruptive community results in markedly increasing risk of youth delinquency and criminality/violence in early adulthood. This is evident in the rapid inroads gang activity made in Dermott after its emergence there in the late 1980's. Former Dermott police officer Carl McCree described the pervasiveness of penetration this gang activity achieved in that community:

> The gang problem in Dermott got so bad that Chief Melton was interviewed on the national news. Nearly all of the young African-American males in Dermott were jumped into the Crip gang. (declaration of Carl McCree, 10-20-05)

Consistent with the high prevalence rate of gang affiliation among Black youth in Dermott, Terrence Holiman (maternal cousin), testified that all of his friends from Chicago were involved in gang activity. The corruptive influence of such low income urban settings on male delinquency has long been reported, and is illustrated by research published by the U.S. Department of Justice (Chaiken, 2000). These findings are depicted in the pie chart below.

60

**Ex. 51 - 713**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

### Delinquency Rates of Male Teens in Three Violent DC Neighborhoods



Chaiken, M.R. (March, 2000). Violent neighborhoods, violent kids.
Office of Juvenile Justice and Delinquency Prevention. U.S.
Department of Justice.

Inspection of the above figure demonstrates that almost 80% of the male teens in these neighborhoods were actively involved in criminal activity. Such high rates cannot be explained by individual deviant choices. Rather, these rates point to epidemic level corruptive community influences that are pulling the majority of male youth in these neighborhoods into criminal activity. This study does not stand in isolation. A study sponsored by the NAACP and conducted by the Harvard Law School (Ogletree et al., 1995) reported that in 1991, on any given day, approximately half of the Black males aged 18-35 in Washington, D.C. and Baltimore were in the criminal justice system. The interaction of family, community, and social factors is also implicated in homicides (Pridemore, 2002 – note: published after 1999 but reviewing extensive data available in 1999). For example, the annual rate of homicide among Black males age 18-24 nationwide (1989-1994) was 237-347 per 100,000 community residents vs. 26-33 per 100,000 for white males (Pastore and Maguire, 1998). Pridemore emphasized that these differences are NOT a function of race. Rather, they reflect the disproportionate incidence of adverse family, community, and social factors in the lives of Black adolescents and young adults.

61

**Ex. 51 - 714**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

These findings are intuitively logical. Social and moral development are strongly influenced by the surrounding community values, mores, and models. Thus peer relationships, particularly during adolescence are quite influential in moral and social development. When community adults and peers are deviant, the risk of an anti-social developmental trajectory increases markedly – and with that the risk of criminality, violence, and homicide. These findings are also supported by crime map comparisons demonstrating the marked over-representation of general crime and violent crime in particular zones in a large metropolitan area. These data and perspectives, and the U.S. Department of Justice and scholarly literature supporting evidence, could have provided an additional explanation for Julius' criminal activity.

**Teen recruitment into drug dealing:** Former Dermott police officer Willie Nimmer also reported that drug activity increased markedly with the introduction of gangs into the community:

> With the gang activity came drug activity. They'd give it to the kids for free at first, to get them hooked. Then they'd sell it to them. They had kids working for them. We had young kids walking around Dermott with $400 or $500 in their pockets. People who had never worked a day in their lives were suddenly driving around in fancy cars. (declaration of Willie Nimmer, 10-20-05)

Drug dealing was also fostered in part by the quite limited employment and economic opportunities there for Black males. Marcus, Julius' older brother described:

> There was a lot of drugs in Dermott, even when I was growing up there. There was crack cocaine and marijuana. The same guys who sold it when I was in high school are still selling it today. In Dermott, you've got to survive and there is absolutely no work there. When I was growing up in Dermott, there were no jobs and there aren't any jobs. (declaration of Marcus Jwain Robinson, 11-13-05)

There was Government-sponsored testimony at trial from Sarah Michelle Tucker that Julius was one of the teens in Dermott engaged in drug dealing.

Julius' initial involvement in drug dealing in Arlington may have had some element of economic necessity in response to his mother's historic parasitic posture and her subsequent disability. Josephine Dotson explained:

> My sister, Rose, was working in a nursing home when Julius came to live with her. My father told me she called him often and told him she didn't have any money for the rent or food. Even though my father was on a fixed income and that income was minimal, he would wire the money for Rose's rent directly to her landlord. Then a woman fell on Rose at her work and she had surgery and wasn't working. Julius started selling marijuana and was able to help pay some of the bills. (declaration of Josephine Dotson, 9-18-05)

62

**Ex. 51 - 715**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**Implications of teen recruitment into drug dealing:** Julius' involvement in drug dealing as a teen was a corruptive influence that pulled him more deeply into criminal activity. Because violence is endemic in the illicit drug business, this involvement also markedly increased his risk of violent victimization or perpetration. He decision to begin this illegal activity was, again, made as an immature adolescent. Once that trajectory had been established, however, it was difficult to recover from.

Julius' involvement in drug dealing as a teen was much more than the deviant choice of an individual teen. Rather, beginning in the early to mid 1980's a broad evolution occurred in drug dealing nationwide to shift street level sales to juveniles who faced much milder sanctions when apprehended. An exemplar of this nationwide trend to involve children in drug trafficking was illustrated in the testimony of Terrence Holiman (maternal cousin), who reported that he was selling crack cocaine in Chicago in his early teens (sentencing phase vol. 20:61).

To illustrate this trend of involving juveniles in drug trafficking with the experience of a single metropolitan area, Stanton and Galbraith (1994) reported that arrests for drug dealing in Baltimore among African-American youth increased from 86 arrests in 1981 to 1,304 arrests in 1991. Environment factors that place youth at greater risk for involvement in drug trafficking have been specified (Leviton, Schindler, & Orleans, 1994; Stanton & Galbraith, 1994). These include:

*Community*
- Perception that neighbors are involved in drug trafficking.
- Recruitment and encouragement by adult drug dealers.

*Family*
- Poverty
- Single parent household
- Perception that family members are involved in drug trafficking.
- Ineffective parent-child communication.
- Poor parental monitoring

*Peers*
- Perception that friends are involved in drug trafficking.

A number of these factors were present in Julius' community and family environment in Dermott.

Finally, violence is endemic to drug trafficking. In the absence of social structures such as contracts, courts, arbitration, etc., violence and intimidation are the primary mechanisms utilized to maintain market share, reduce the likelihood of victimization, communicate deterrence, resolve conflicts, etc. Julius was a student of this social reality, not the originator of it. Much was made of Julius being "two-faced" or "manipulative" in the Government's final arguments – i.e. that his respectful, pro-social behaviors at school,

63

**Ex. 51 - 716**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

on the football field, or in custody were not the "real" Julius. Integration of the records and descriptions from numerous declarations, however, point to both "faces" being authentic. Julius' violence appears to be restricted to the social context of drug dealing. In other arenas of life or interpersonal interactions he does not exhibit violent behavior or belligerence. This does not point to an absence of conscience so much as a compartmentalized arena of life (i.e. drug dealing) where normal ethics and sensibilities do not apply. Analogous contexts where individuals may display a similar compartmentalization include warfare, mob action, used car selling, etc.

**Inadequate interventions:** Several critical phases of inadequate interventions are notable in Julius' history. First, there is no indication that any social service intervention or follow-up was initiated in response to the neglect Julius and Marcus were experiencing early childhood in the face of their parents' chronic substance abuse, drug trafficking, and domestic violence – even though this latter circumstance had come to the attention of the authorities. Second, a reasonable social service investigation and home study would have in all likelihood found the home of the maternal grandparents to be an inappropriate placement for young children. Third, the resources available to address the needs of the youth in Dermott, much less the systemic issues of generational racism, poverty, and economic disenfranchisement, were wholly inadequate. Mr. Leroy Kennedy, counselor for Delta Youth and Family Services explained:

> At the time I was supervising Julius, I had a case load of 60-70 kids. It was a bit overwhelming, and I often felt I was fighting a losing battle. There was simply not enough time for each child. I would have 10-15 minutes to talk with them, find out if they were okay, then I would have to move onto the next one. If one of the kids had been suspended from school, I would try to deal with that. I had very little in the way of tools at my disposal to assist the kids. There was no budget to take the kids on field trips and get them out of the area for awhile. I really needed more resources to affect a change in the lives of the kids I was counseling. More than that, I needed more time. The caseload just didn't allow that. (declaration of Leroy Kennedy, 10-21-05)

Fourth, and on a far broader scale, efforts to intervene in adolescent drug trafficking were characterized as "virtually non-existent" in the United States at the time of Julius' greatest vulnerability (Stanton & Galbraith, 1994). This absence of a coordinated national policy to address this almost epidemic phenomenon among African-American male youth living in poverty was not from an absence of scholarly perspectives regarding steps that could reduce teen drug trafficking. Such recommendations included (Leviton, Schindler, & Orleans, 1994):

- Reduce child poverty.
- Strengthen families.
- Enhance parenting skills.
- Provide adequate education for all children.
- Institute and evaluate programs within schools to prevent drug trafficking.

64

**Ex. 51 - 717**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

- Enhance programming to assist children and families before they enter the juvenile justice system.
- Fund job training programs.
- Establish alternatives to jailing youthful offenders.
- Expand diversion programs for first-time offenders.
- Encourage antiviolence strategies including gun control reform and alternative treatment approaches to dealing with substance abuse problems.

Consistent with approaching youth delinquency and violence from a public health model of risk and protective factors (as endorsed by the U.S. Department of Justice), the above recommendations focus on reducing risk factors and increasing protective factors rather than simplistically tasking youth to make better choices.

**Summary and analysis of sentencing phase evidence in mitigation:** My review of records and the declarations of family members and other third parties reveals the presence in Julius' history of many of the developmental risk factors for delinquency and violence identified in scholarly literature published by the U.S. Department of Justice. Julius had the benefit of few protective factors, and these were largely absent until his high school years – late in his development, after his exposure to gangs, and in the presence of an alcoholic and drug abusing mother. Additionally, I have distilled from these records and declarations _25 major adverse developmental factors_ that could have been identified and illustrated by the defense at Julius' capital sentencing. The implications of each factor for disrupted developmental trajectory, problematic adolescent and adult outcomes, and/or criminality and criminal violence could have been presented through expert testimony relying on scholarly literature available at the time of trial. These 25 factors include:

## Wiring

**Prenatal drug and alcohol exposure**
**Recurrent exposure to herbicides and pesticides**
**Neuropsychological deficits**
**Learning problems**
**Teen onset alcohol abuse and subsequent dependence**
**Youthfulness at the outset of delinquency and gang activity**

## Generational Influences

**Generational family dysfunction**
**Genetic predisposition to alcohol and drug dependence**

## Parenting

**Teenage mother**

65

Ex. 51 - 718

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Mother exhibited indications of sub-average intelligence
Alcohol and drug dependence of both parents
Parental drug trafficking
Disrupted and inadequate primary attachment
Observed domestic violence
Parental emotional neglect
Functional parental abandonment
Death of surrogate parent figure
Potential sexual abuse
Instability in family structure and residence
Inadequate supervision and discipline

## Family and Community

Legacy of racial prejudice and discrimination
Systemic economic hardship and social desperation among Blacks in
    Dermott:
Corruptive family and older peer influences
Corruptive community influences and gang recruitment
Teen recruitment into drug dealing
Inadequate interventions

Both the particularized DOJ risk and protective factors, and the 26 major adverse developmental factors represented essential information for the jury's consideration in weighing Julius' moral culpability and associated death worthiness. Had this same mitigation evaluation function been requested of me in the months prior to the sentencing phase, and had I been provided with the interview summaries or declarations of third parties, I or another informed mental health expert could have testified to these same factors and their implications as contained in this declaration. In the absence of such expert testimony regarding the nexus of these damaging developmental factors and deviant life trajectory and criminal violence, the jury would have no mechanism to give informed weight to the developmental factors that they heard testimony regarding from lay witnesses. Further, had these factors and their supporting data been identified prior to trial, additional family witnesses could have been called to provide this history and those who were called could have been examined more comprehensively.

My review of the sentencing phase transcript reveals that only a few of the above factors were even referenced in testimony, and those only in a partial and cursory manner. There was no expert testimony regarding the implications of the very limited and incomplete background presented. More specifically:

- There was no testimony regarding the prenatal alcohol and drug exposure of Julius.

- There was no testimony regarding the recurrent exposure to herbicides and

66

**Ex. 51 - 719**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

pesticides that Julius or his parents were exposed to.

- There was no testimony regarding neuropsychological deficits in Julius.

- There was no testimony regarding Julius' learning problems.

- There was no testimony regarding Julius' early adolescence onset alcohol abuse and subsequent alcohol dependence.

- There was no testimony regarding Julius youthfulness at the outset of his delinquency and gang activity.

- There was no testimony regarding the generational family dysfunction that pervaded both the paternal and maternal family systems. John Hollimon, Jr., maternal uncle, was not queried regarding the lack of supervision in his parents' household, his father's regular drunkenness when younger, or other family problems. Instead, the defense utilized him to inaccurately represent that his parents had a stable, nurturing household. Similarly, no other extended family members were called to describe the historic dysfunction of this family system.

- There was no testimony regarding the genetic predisposition to alcohol and drug dependence in the maternal and paternal family systems.

- Rose Hollimon acknowledged that she was age 15 when she married, but there was no testimony regarding her being a teen when she gave birth to Marcus and Julius.

- There was no testimony regarding Rose exhibiting indications of sub-average intelligence.

- Both Rose and her brother, John, testified regarding her alcohol and drug abuse. The extent of this and its impact on her parenting was not developed in testimony. There was no testimony regarding the role of alcohol and drug abuse in the neglect and family chaos during the critically important infancy and preschool years of Julius' life. There was no testimony regarding the alcohol and drug dependence of Jimmie Lee Robinson, Julius' father.

- There was no testimony regarding parental drug trafficking.

- There was no testimony regarding the disrupted and inadequate primary attachment suffered by Julius. Further, Rose's testimony that she kept the boys with her while residing in Wichita Falls following the divorce from Jimmie is inconsistent with the declarations of Jimmie Lee Robinson, John Hollimon, and Marcus Robinson.

67

Ex. 51 - 720

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

- There was no testimony regarding Julius and Marcus observing the domestic violence of their parents.

- Rose reported living separately from Julius for periods of time, but there was no testimony describing her emotional neglect of the children in early childhood secondary to her own alcohol and drug dependence, drug trafficking, chaotic marital relationship, and youthfulness. Further, there was no testimony regarding extent of her failure to remain emotionally/functionally involved with the children during their years with the maternal grandparents or when in her care as teens.

- The absence of Jimmie Lee from the children's lives was noted in Rose's testimony, though not the implications of this. Her own abandonment of the children was not clearly established in testimony.

- There was no testimony regarding the death of the paternal grandmother, a surrogate parent figure in Julius' life.

- There was no testimony regarding Julius potentially being sexually abused at age five.

- There was no testimony regarding the instability in family structure and residence of Julius' time with his parents in early childhood, the household of his maternal grandmother in middle childhood and early adolescence, or the household of his mother in his high school years.

- There was no testimony regarding the inadequate supervision and discipline Julius received in the households of his maternal grandparents or his mother.

- There was no testimony regarding the legacy of racial prejudice and discrimination in Dermott.

- There was no testimony regarding the systemic economic hardship and social desperation among Blacks in Dermott.

- There was no testimony regarding corruptive family and older peer influences in Julius' initial involvement in gang activity and drug dealing.

- There was no testimony regarding the corruptive community influences and gang recruitment that occurred in Dermott in Julius' early adolescence.

- There was testimony regarding Julius dealing drugs in high school. There was no testimony regarding his early teen recruitment into drug dealing in Dermott, or the larger phenomenon of teens being recruited into drug dealing nationally and the

68

**Ex. 51 - 721**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

associated risk factors for this.

• There was no testimony regarding the inadequate interventions made available to Julius.

**Section 3**

*Future danger:*

The Government alleged as a non-statutory aggravating factor that: "Robinson is a future danger to the lives and safety of other persons as evidenced by lack of remorse, poor rehabilitative potential, and specific threats and acts of violence" (sentencing phase, vol. 20:35). Had defense counsel consulted with me regarding this "future danger" wording of this aggravator, or inquired of me regarding this concept in my testimony, I would have noted that the relevant special issue as affirmed in *Jurek v Texas* is: "Whether there is a probability the defendant would commit acts of criminal violence that would constitute a continuing threat to society." This special issue is not an assessment of a static characteristic of dangerousness. Rather it calls for an evaluation of the likelihood of violent acts. This is not an inconsequential distinction (see Cunningham, in press; Cunningham & Goldstein, 2003; Cunningham & Reidy, 1998; 2001). If the special issue is re-framed as "danger," it ceases to be definable or measurable in a scientifically reliable and reasonably discriminating fashion. More problematically, when construed as "dangerousness" the issue loses any individualizing value in the application of the death penalty. All violent felons, and particularly all capital offenders, would be considered to be dangerous. Their "dangerousness" is a significant rationale for their long-term confinement in highly secure correctional facilities. It is understandable why the Government would seek to reframe this special issue as "future danger" as opposed to "probability of acts of criminal violence." A jury, having just convicted the defendant of a capital murder, is much more likely to agree with the proposition that a defendant is a "future danger" than they are to find that he is disproportionately probable to commit acts of criminal violence in prison - particularly when the jury has the benefit of expert testimony on the relevant probabilities. It is less understandable why the defense would not object to such a mischaracterization of the Supreme Court affirmed wording of this issue.

In fact, there is little evidence that the defense appreciated the difference between "future danger" and the "probability of acts of criminal violence." Indeed, Mr. Ball twice used the word "danger" in discussing this aggravator at the conclusion of his final argument (sentencing phase, vol. 23: 80, 81). Similarly, Mr. Strickland, far from objecting to it, early in his final argument repeatedly adopted the Government's mischaracterization of the issue:

Strickland: The first of the factors is this question of future dangerousness. Will the defendant present a future danger. (sentencing phase, vol. 23: 82)

69

**Ex. 51 - 722**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

> Strickland: But the question of future dangerousness is paramount. (sentencing phase, vol. 23: 83)

> Strickland:  And they talk to you about the question of future dangerousness. (sentencing phase, vol. 23: 84)

> Strickland: …that was directed to help you make a decision as to the question of future dangerousness.  (sentencing phase, vol. 23: 84)

> Strickland:  We don't have to infer whether that was a question of future dangerousness. (sentencing phase, vol. 23: 84)

> Strickland: …to periodically assess whether or not a defendant presents a future danger to other persons, not just staff, not just other inmates, other persons. (sentencing phase, vol. 23: 84)

> Strickland:  The government wants you to speculate that that's an indication of future dangerousness. (sentencing phase, vol. 23: 85)

*Risk of ordering violence from prison:*

Violence risk assessment at capital sentencing can address any or all of three primary risk contexts: 1. personally perpetrated violence in prison; 2. criminal violence of capital parole (if applicable); or, 3. risk of ordering violence from prison. In U.S. v Robinson, the risk of criminal violence on parole was a moot issue as a federal capital term is without possibility to parole. I was only requested by the defense to address the first risk context, that of personally perpetrating violence during a capital life term in the Bureau of Prisons. Review of the trial transcript, however, reflects that the third context (i.e., risk of ordering violence from prison) was a central focus of the Government's assertion of "future dangerousness." Final arguments asserting this issue included:

> One issue, one issue, that you have got to decide among a host of issues, certainly, not the only issue, but I would suggest to you that as long as Julius Robinson has access to a telephone, Julius Robinson continues to be a danger to society….So I would submit to you, ladies and gentlemen, that the overwhelming evidence on that future dangerousness issue sadly is that Julius Robinson will always be a future danger, and his target environment just got a little bit bigger because "H" and every one of the courageous individuals who came down here to testify against him is now a target. They have got a target sign on their chest to anyone that he can get word to to take care of. (sentencing phase, vol. 23: 102)

The Government's offering into evidence the transcripts of telephone calls by Mr. Robinson from federal pretrial confinement, as well as the testimony from Michael "One Love" Williams made the above assertions in final argument quite predictable. Had I

70

Ex. 51 - 723

**Re: U.S. v Julius Omar Robinson**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05**

been queried by the defense regarding assessment of this central risk assertion by the Government regarding ordered violence from prison, I could certainly have addressed factors involved in such a risk analysis. Indeed, I testified regarding such an analysis of risk of order violence in the community from prison as early as U.S. v Marvin Holley (1998). Factors involved in such a risk analysis include the following:

*Motivation*
- Was the solicitation of violence in the community motivated by a desire for retaliation or to prevent prosecution by witness intimidation or elimination? If vindictiveness or desire for retaliation is primary, then there is a continuing motivation and risk.

- If, however, the motive was to avoid prosecution, that motive has ended with the conviction. It would appear that Mr. Robinson's motive, if there was any solicitation, was of a prosecution avoidance nature and accordingly ended with his conviction

*Resources*
- Does the defendant continue to have operational control of a criminal enterprise that will carry out his commands? It would appear that most if not all of the Nathan Henderson crew were in custody and/or had cooperated with the Government. It is anticipated that Mr. Robinson's control over a younger generation of gang members in Dermott would rapidly deteriorate, if it ever existed, with his life-without-parole confinement.

- Does the defendant possess significant financial resources that could purchase violence in the community? I have no indication that Mr. Robinson continues to control significant financial resources.

*Credibility*
What evidence is there that the Government regarded the allegation of solicited violence as sufficiently creditable that it responded to the allegations with:

- restrictions on the defendant's telephone and mail communications? I saw no evidence from the sentencing transcript that the Government had sought Special Administrative Measures (SAMs) to restrict Mr. Robinson's access to the phone or mail?

- reducing the potential for the solicited violence to be accomplished by placing the purported target in protective custody (if incarcerated); enrolling the target in the Witness Protection Program, relocation of the target, or other protective measures? From the transcript I saw no testimony that would suggest that any of these measures were undertaken.

71

**Ex. 51 - 724**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Additionally, what is the evidence that the purported target responded with alarm?

*Prevention*

Should the DOJ or the Bureau of Prisons believe that an inmate represents a threat to effecting violence in the community, special conditions of confinement can be brought to bear that place extraordinary restrictions on that inmate's communications, including barring contact with other inmates and monitoring/restricting visitation, phone, and mail contacts. The authority of the Court, DOJ, and BOP to impose such restrictions was asserted by DOJ and subsequently upheld by the 2nd Circuit in U.S. v Luis Felipe. The Government's assertions that a telephone would be available to Mr. Robinson "at any prison setting" (sentencing phase, vol. 23: 105) is inconsistent with the special communication restrictions DOJ has indicated that they and BOP can order and enforce.

- Under such communication restrictions, the likelihood of being able to successfully effect violence in the community is regarded as near negligible.

I hereby declare under the penalty of perjury of the laws of the State of Texas and the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated this 28th day of November, 2005 at Orange County, California.

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

72

Ex. 51 - 725

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Additionally, what is the evidence that the purported target responded with alarm?

*Prevention*

Should the DOJ or the Bureau of Prisons believe that an inmate represents a threat to effecting violence in the community, special conditions of confinement can be brought to bear that place extraordinary restrictions on that inmate's communications, including barring contact with other inmates and monitoring/restricting visitation, phone, and mail contacts. The authority of the Court, DOJ, and BOP to impose such restrictions was asserted by DOJ and subsequently upheld by the 2nd Circuit in U.S. v Luis Felipe. The Government's assertions that a telephone would be available to Mr. Robinson "at any prison setting" (sentencing phase, vol. 23: 105) is inconsistent with the special communication restrictions DOJ has indicated that they and BOP can order and enforce.

- Under such communication restrictions, the likelihood of being able to successfully effect violence in the community is regarded as near negligible.

:

I hereby declare under the penalty of perjury of the laws of the State of Texas and the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated this 28th day of November, 2005 at Orange County, California.

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

72

Ex. 51 - 726

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## REFERENCES

Ainsworth, M.D.S. (1979). Infant-mother attachment. American Psychologist, 34, 932-937.

American Psychological Association (1996). Effects of abuse on children. Presidential Task Force on Violence and the Family. Author.

American Society for Adolescent Psychiatry & the American Orthopsychiatric Association filed as an amici curiae in Thompson v Oklahoma (1986).

Beck, A., Gilliard, D., Greenfeld, L., Harlow, C., Hester, T., Jankowski, L., Snell, T., Stephan, J., Morton, D., (1993). Survey of state prison inmates, 1991. U.S. Department of Justice, Bureau of Justice Statistics, NCJ-136949.

Begleiter, H. (1995). The collaborative study on the genetics of alcoholism. Alcohol Health & Research World,19, 228-236.

Blake, P., Pincus, J., & Buckner, C., (1995). Neurologic abnormalities in murderers. Neurology, 45, 1641 - 1647.

Bowlby, J. (1971). Attachment and loss: Vol. 1. Attachment. Hammondsworth, England: Pelican.

Bowlby, J. (1973) Attachment and loss: Vol. 2. Separation, anxiety, and anger. New York: Basic Books.

Cantelon, S.L. (1994). Family strengthening for high-risk youth. Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice. Fact sheet #8.

Cornell, D. et. al. (1987). Characteristics of adolescents charged with homicide. Behavioral Sciences and the Law, 5, 11-23.

Curtis, C. (1980). The psychological parent doctrine in custody disputes between foster parents and biological parents. Columbia Journal of Law and Social Problems, 16, 149-191.

Day, N.L. & Richardson, G.A. (1991). Prenatal alcohol exposure: A continuum of effects. Seminars in Perinatology, 15, 271-279.

Briere, J., Evans, D., Runtz, M., & Wall, T. (1988). Symptomatology in men who were molested as children: A comparison study. American Journal of Orthopsychiatry, 457- 461.

73

**Ex. 51 - 727**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Chaiken, M. R. (March, 2000). Violent neighborhoods, violent kids. Office of Juvenile Justice and Delinquency Prevention. U.S. Department of Justice.

Cotton, N.S. (1979). The familial incidence of alcoholism: A review. Journal of Studies on Alcohol, 40, 89-116.

Cunningham, M.D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected criminal issues. To be published by the Capacity for Justice.

Cunningham, M.D. & Goldstein, A.M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), Forensic psychology (vol. 11 of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M.D. & Reidy, T.J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Elliott, F.A. (1987). Neuroanatomy and neurology of aggression. Psychiatric Annals, 17, 385-388.

English, D.J., Widom, C.S., & Brandford, C. (2001). Childhood victimization and delinquency, adult criminality, and violent criminal behavior: A replication and extension, final report. National Institute of Justice, U.S. Department of Justice. NCJ 192291.

Esman, A.H. (1988). Assessment of the adolescent. In C.J. Kestenbaum & D.T. Williams (Eds.) Handbook of clinical assessment of children and adolescents (pp. 217-231). New York: New York University Press.

Finkelhor, D., & Brown, A. (1985). The traumatic impact of child sexual abuse, a conceptualization. American Journal of Orthopsychiatry, 55, 530-542.

Finkelstein, H. (1988). The long-term effects of early parent death: A review. Journal of Clinical Psychology, 44, 3-9.

Friday, J.C. (1994). The psychological impact of violence in underserved communities. Journal of Health Care for the Poor and Underserved, 6, 403-409.

Green, A.H. (1988). The abused child and adolescent. In C.J. Kestenbaum & D.T. Williams (Eds.) Handbook of clinical assessment of children and adolescents (pp. 842-863). New York: New York University Press.

74

**Ex. 51 - 728**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Greenfeld, L.A. (1998). Alcohol and crime: An analysis of alcohol involvement in crime, U.S. Department of Justice, Bureau of Justice Statistics, NCJ-168632

Gustafson, R. (1993). What do experimental paradigms tell us about alcohol-related aggressive responding? Journal of Studies on Alcohol, Supplement No. 11: 20-29.

Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Hill, M.A. & O'Neil, J. (1993). Underclass behaviors in the United States: Measurement and analysis of determinants. City University of New York, Baruch College.

Hirschi, T. & Gottfredson, M. (1989). Age and the explanation of crime. American Journal of Sociology, 89, 552-584.

Hoaken, P.N.S., Assaad, J.M, & Pihl, R.O. (1998). Cognitive functioning and the inhibition of alcohol-induced aggression. Journal of Studies of Alcohol, 59, 599-607.

Jenkins, P.H. (1995). School delinquency and school commitment. Sociology of Education, 68, 221-239.

Langevin, R., Ben-Aron, M., Wortzman, G., Dickey, R., & Handy, L. (1987). Brain damage, diagnosis, and substance abuse among violent offenders. Behavioral Sciences & the Law, 5, 77-94.

Leviton, S., Schindler, M.A., & Orleans, R.S. (1994). African-American Youth: Drug trafficking and the justice system. Pediatrics, 93, 1078-1084.

Lewis, D., Pincus, J., Feldman, M., Jackson, L., & Bard, B.(1986).Psychiatric, neurological and psychoeducational chararcteristics of 15 death row inmates in the United States. American Journal of Psychiatry, 143, 838-845.

Lewis, M. (1985). Predicting psychopathology in 6 year olds from early parental relations. Integrative Psychiatry, 3, 284-289.

Looney J.G. & Oldham, D.G. (1989). Normal adolescent development. In H.I. Kaplan & B.J. Sadock (Eds). Comprehensive textbook of psychiatry, 5th Edition (p.1710). Baltimore: Williams & Wilkins.

75

**Ex. 51 - 729**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Martell, D.A. (1992). Estimating the prevalence of organic brain dysfunction in maximum-security forensic psyciatric patients. Journal of Forensic Sciences, 37, 878-893.

Mattson, S.N. & Riley, E.P. (1998). A review of the neurobehavioral deficits in children with fetal alcohol syndrome or prenatal exposure to alcohol. Alcohol, Clinical and Experimental Research, 22, 279-294.

Meloy, J. R. (1988). Psychopathic mind: Origin, dynamics, and treatment. Northvale, NJ: Jason Aronson.

Miller, S. J., Dinitz, S., & Conrad, J. P. (1982). Careers of the violent: The dangerous offender and criminal justice. Lexington, MA: Lexington Books.

Murdock, D., Pihl, R. O., & Ross, D. (1990). Alcohol and crimes of violence: Present issues. The International Journal of the Addictions, 25, 1065-1081.

Nagin, D.S. & Tremblay, R.E. (1999). Trajectories of boys' physical aggression, opposition, and hyperactivity on the path to physically violent and nonviolent juvenile delinquency. Child Development, 70, 1181-1196.

National Institute on Alcohol Abuse and Alcoholism (December 2000). Fetal alcohol exposure and the brain. National Institute of Health, No. 50. Rockville, MD.

Pardeck, J.T. (1983). Empirical analysis of behavioral and emotional problems of foster children as related to re-placement in care. Child Abuse and Neglect, 7, 75-78.

Patterson, G. R., DeBaryshe, B. D., & Ramsey, E. (1989). A developmental perspective on antisocial behavior. American Psychologist, 44, 329-335.

Robin Hood Foundation. Kids having kids: A Robin Hood Foundation special report on the costs of adolescent childbearing. R.A. Maynard (Editor).

Rutter, M. (1979). Maternal deprivation, 1972-1978: New findings, new concepts, new approaches. Child Development, 50, 283-305.

Ogletree et al., (1995). Harvard Law School, NAACP

Pridemore, W. A. (2002). What we know about the social structure of homicide. A review of the theoretical and empirical literature. Violence and Victims, 17, 127-156.

Ressler, R.K., Burgess, A.W., & Douglas, J.E. (1988). Sexual homicide: Patterns and motives. New York: Lexington Books.

76

**Ex. 51 - 730**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Sampson, R.J. & Laub, J.H. (1994). Urban poverty and the family context of delinquency: A new look at structure and process in a classic study. Child Development, 65, 523-540.

Samuels, A. (1988). Parental death in childhood. In S. Altschul and G.H. Pollock (eds.) Childhood Bereavement and Its Aftermath. Madison, WI: International Universities Press.

Schwarz, E.D. and Perry, B.D. (1994). The post traumatic response in children and adolescents. Psychiatric Clinics of North America, 17, 311-358.

Silverman, P.R. & Worden, J.W. (1992). Children's reactions in the early months after the death of a parent. American Journal of Orthopsychiatry, 62, 93-104.

Sroufe, L.A. (1979). The coherence of individual development: Early care, attachment, and subsequent developmental issues. American Psychologist, 34, 834-841.

Stanton, B. & Galbraith, J. (1994). Drug trafficking among African-American early adolescents: Prevalence, consequences, and associated behaviors and beliefs. Pediatrics, 93, 1039-1043.

Staub, E. (1996). Cultural-societal roots of violence. American Psychologist, 51:2, 117-132.

Terr, L.C. (1991). Childhood traumas: An outline and overview. American Journal of Psychiatry, 148, 10-20.

U.S. Department of Health and Human Services (1993), National Center for Health Statistics, Survey of child health, Washington, D.C.

U.S. Department of Justice (1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders, Juvenile Justice Bulletin, Juvenile Justice Clearinghouse, Washington, D.C.

Yarrow, L.J., Goodwin, M.S., Manheimer, H., & Milowe, I.D. (1973). Infancy experiences and cognitive personality development at 10 years. In L.J. Stone, H.T. Smith, & L.B. Murphy (Eds.) (pp. 1274-1281), The competent infant: Research and commentary. New York: Basic Books.

Schuckit, M.A. (1987). Biological vulnerability to alcoholism. Journal of Consulting and Clinical Psychology, 55, 301-30.

Staub, E. (1996). Cultural-societal roots of violence. American Psychologist, 51, 117-132.

77

**Ex. 51 - 731**

Re:  U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Struve, J. (1990). Dancing with the patriarchy: The politics of sexual abuse. In M. Hunter(Ed.), The sexually abused male. New York: Lexington Books.

Swanson, J. W., Holzer, C. E. III, Granju, V.K., & Jono, R. T. (1990). Violence and psychiatric disorder in the community: Evidence from the epidemiologic catchment area surveys. Hospital and Community Psychiatry, 41, 761-770.

Thornberry, T.P. (December, 1994). Violent families and youth violence. Fact sheet #21. National Criminal Justice Resources and Statistics. U.S. Department of Justice.

Urquiza, A.J., & Capra, M., (1990).   The impact of sexual abuse:  Initial and long-term effects.In The sexually abused male, edited by M. Hunter, 106-135.  New York: Lexington Books.

Urquiza, A.J., &  Keating, L.M.,  (1990).   The prevalence of sexual victimization of males.  In The sexually abused male, edited by M. Hunter, 89-103.  New York: Lexington Books.

U.S. Department of Justice (1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders, Juvenile Justice Bulletin, Juvenile Justice Clearinghouse, Washington, D.C.

Widom, C.S. (1989).  Child abuse, neglect, and adult behavior:  Research design and findings on criminality, violence, and child abuse.  American Journal of Orthopsychiatric Association, 59, 355-367.

78

**Ex. 51 - 732**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Attachment A

## CURRICULUM VITAE OF MARK D. CUNNINGHAM, PH.D., ABPP

### EDUCATION

**Undergraduate:**  Abilene Christian College, Abilene, Texas
*Bachelor of Arts*, (May 1973)
Majors: Psychology, Mass Communications

**Graduate:**  Oklahoma State University, Stillwater, Oklahoma
*Master of Science* (December 1976)
*Doctor of Philosophy* (December 1977)
Specialty: Clinical Psychology (APA accredited)

**Internship:**  National Naval Medical Center, Bethesda, Maryland
(February 1977 to February 1978)
Specialty: Clinical Psychology (APA accredited)

### BOARD CERTIFICATION

Forensic Psychology (1995), American Board of Professional Psychology (ABPP)

### PROFESSIONAL LICENSES

*Licensed Psychologist:*

| | | |
|---|---|---|
| Arizona #3662 | Arkansas #98-17P | Colorado #2305 |
| Connecticut #846 | Idaho #PSY-379 | Illinois #071-006010 |
| Indiana #20041376 | Louisiana #794 | New Mexico #0768 |
| Oklahoma #1002 | Oregon #1333 | South Carolina #764 |
| Tennessee #2255 | Texas #2351 | |

79

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

**CURRICULUM VITAE (2)**

## HONORS, AWARDS, AND DISTINCTIONS

*American Psychological Association Award for Distinguished Contribution to Research in Public Policy* – annual award bestowed for distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work, 2006 recipient

*Texas Psychological Association Award for Outstanding Contribution to Science* – annual award in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge, 2005 recipient

*John Augustus Award* - annual award bestowed for outstanding contributions to the profession of sentencing advocacy, National Association of Sentencing Advocates, 2004 recipient

*Fellow, American Academy of Forensic Psychology* – distinction reflecting diplomate in forensic psychology by the American Board of Professional Psychology, 1995-

*Al Brown Memorial Award* – award bestowed for outstanding achievement, NIMH Sex Therapy Training Program, Yale University School of Medicine, 1979-1981

*Navy Commendation Medal* – decoration for meritorious service as a clinical psychologist, Naval Submarine Medical Center, United States Navy, 1978-1980

*Magna cum Laude* - Bachelor of Arts, Abilene Christian College, 1973

## PROFESSIONAL PRACTICE

**1981 - date**    Clinical and Forensic Psychologist, Private practice

**1978 - 1981**    Clinical Psychologist (Lieutenant, MSC, USNR)
Naval Submarine Medical Center, Groton, Connecticut

## EDITORIAL

Ad hoc reviewer: *Assessment*
*Behavioral Sciences & the Law*
*Law & Human Behavior*

80

**Ex. 51 - 734**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

### CURRICULUM VITAE (3)

#### ACADEMIC APPOINTMENTS

**1981 - 1983**   Assistant Professor: Psychology Department,
Hardin-Simmons University, Abilene, Texas

**1978 - 1980**   Instructor (part-time): Psychology Department,
Old Dominion University (U.S. Submarine Base Extension);
Mohegan Community College, Norwich, Connecticut

**1974 - 1977**   Teaching Assistant: Psychology Department
Oklahoma State University, Stillwater, Oklahoma

#### PROFESSIONAL AFFILIATIONS

American Board of Professional Psychology (ABFP examiner)
American Academy of Forensic Psychology (workshop teaching faculty)
Certificate of Professional Qualification in Psychology (CPQ)
National Register of Health Service Providers in Psychology

American Psychological Association
Texas Psychological Association
National Association of Sentencing Advocates
American Association for Correctional Psychology

#### SCHOLARLY PUBLICATIONS

*Chapters in edited books:*

Cunningham, M. D. & Goldstein, A. M. (2003). Sentencing determinations in death
penalty cases (pp. 407-436). In A. Goldstein (Ed.), *Forensic psychology* (vol. 11 of
12). I. Weiner (Ed.), *Handbook of psychology*. New York: John Wiley & Sons.

Cunningham, M. D. (in press). Special issues in capital sentencing. In M.A. Conroy, P.
Lyons, & P. Kwartner (Eds.), *Forensic evaluations under Texas law: Selected
criminal issues*. To be published by the Capacity for Justice.

81

**Ex. 51 - 735**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## CURRICULUM VITAE (4)

*Papers in peer-reviewed journals:*

Cunningham, M. D. & Murphy, P. J. (1981). The effects of bilateral EEG biofeedback on verbal, visual-spatial, and creative skills in learning disabled male adolescents. *Journal of Learning Disabilities, 14,* 204 -208.

Cunningham, M. D. & Reidy, T. J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences & the Law, 16,* 71-95.

Cunningham, M. D., & Reidy, T. J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. *Behavioral Sciences & the Law, 16,* 333-351.

Cunningham, M. D., & Reidy, T. J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26,* 20-43.

Cunningham, M. D. & Vigen, M. P. (1999). Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi Death Row inmates. *Criminal Justice and Behavior, 26,* 293-321.

Reidy, T. J., Cunningham, M. D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. *Criminal Justice and Behavior, 28,* 62-82.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. *Behavioral Sciences & the Law, 19,* 473-490.

Cunningham, M. D. & Reidy, T .J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29,* 512-537.

Cunningham, M. D. & Vigen, M. P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. *Behavioral Sciences & the Law, 20,* 191-210.

Shuman, D. W., Cunningham, M. D., Connell, M. A, & Reid, W. H. (2003). Interstate forensic psychology consultations: A call for reform and proposal for a model rule. *Professional Psychology: Research and Practice, 34,* 233-239.

82

**Ex. 51 - 736**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## CURRICULUM VITAE (5)

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. *Criminal Justice Policy Review, 15,* 365-376.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. *Assessment, 12,* 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. *Behavioral Sciences & the Law, 23,* 307-320.

Cunningham, M. D. & Sorensen, J. R. (*in press*). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. *Criminal Justice and Behavior.*

*Papers in edited legal journals:*

Lyon, A. D. & Cunningham, M. D. (*in press*) Reason not the need: Does the lack of compelling state interest in maintaining a separate death row make it unlawful? *American Journal of Criminal Law.*

*Invited case reports and teaching points:*

Cunningham, M. D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (152-171). New York: Oxford University Press.

Cunningham, M. D. (2002). Competence to be executed [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (96-114). New York: Oxford University Press.

Cunningham, M. D. (2002). How do you evaluate the accuracy of different sources of third-party information? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (171-173). New York: Oxford University Press.

Cunningham, M. D. (2002). Why and how do you attribute information to sources in a forensic mental health assessment? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (114-115). New York: Oxford University Press.

83

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

## CURRICULUM VITAE (6)

*Articles in professional periodicals:*

Marcy, M. R., Hopkins, J. B. & Cunningham, M. D. (1978).  A behavioral treatment of nocturnal enuresis, *U.S. Navy Medicine, 69*, 26-28.

Cunningham, M. D. & Reidy, T. J. (1998).  Antisocial personality disorder vs. psychopathy as diagnostic tools. *Prosecutor's Brief: California District Attorneys Association, 20*, 9-11.

Cunningham, M. D. (2001). Bias in capital sentencing evaluations [invited opinion column]. *American Psychology and Law Society News, 21, 2*, 8-9.

*Manuscripts under review:*

Cunningham, M. D. (*manuscript under review).* Unparalleled need to know: Informed consent in capital sentencing evaluations.

Cunningham, M. D. & Sorensen, J. R. (*manuscript under review*).   Actuarial models for assessment of prison violence risk: Revisions and extensions of the Risk Assessment Scale for Prison (RASP).

Cunningham, M. D. & Sorensen, J. R. (*manuscript under review)* Predictive factors for violent misconduct in close custody.

*Manuscripts in preparation:*

Sorensen, J. R. & Cunningham, M. D. (*manuscript in preparation).*  Does the severity of the offense predict prison adjustment? A comparative study of the violent institutional misconduct rates of convicted murderers and other offenders.

## SCHOLARLY SYMPOSIUM

Competency to be executed. Symposium with Stanley Brodsky, Ph.D. & Patricia Zapf, Ph.D., American Psychology-Law Society Annual Conference, Austin, TX, March 2002.

Informed consent in forensic evaluations. Symposium with Mary Connell, Ph.D., William Foote, Ph.D., & Daniel Shuman, J.D., American Psychology-Law Society Annual Conference,  LaJolla, CA, March 2005.

84

**Ex. 51 - 738**

Re: U.S. v Julius Omar Robinson
Declaration of Mark D. Cunningham, Ph.D., ABPP, 11-28-05

Appendix B

Demonstrative Exhibits

(prepared to accompany my testimony at trial in March 2002)

85

**Ex. 51 - 739**

# Risk Assessment

Ex. 51 - 740

# Why capital offender base rates apply to capital inmates in BOP

- Offense histories sufficiently violent and aggravated that a death sentence was sought and returned.
- Inmate offense distribution is similar from state to state.
- Prison facilities and procedures have broad similarity.
- Consistency of findings

  diverse geographic regions

  diverse time periods

  diverse prison settings

  diverse capital statutes

  diverse capital offense characteristics

- Peer reviewed acceptance of broad applications

# Risk Components

## Will this driver have an accident?

1. What probability?
2. Of what type of accident?
3. At what age?
4. In what  locale?

## Will there be violence?

1. What probability?
2. Of what form of violence?
3. At what time period?
4. In what context?

# Risk Assessment Techniques

*More Scientific*

## 1. Actuarial

(insurance company method)

## 2. Pattern

(using <u>patterns</u> of how the individual behaved in the past to estimate behavior in <u>similar</u> situations)

## 3. Intensive clinical evaluation

(inferring violence risk from personality characteristics -- notoriously unreliable in forecasting long-term violence)

## 4. Hypothetical inference

(seeing animals in the stars)

*Less Scientific*

Morris, N., & Miller, M. (1985). Predictions of dangerousness. In M. Tonry & N. Morris (Eds.), *Crime and justice: An annual review of research (Vol. 6)* (pp.1-50). Chicago: University of Chicago Press.

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

# Base Rates Relevant to Likelihood of Violence in Prison

1. Capital offenders and murderers in the general prison population

2. Assaults by inmates in Federal prisons

3. Homicide of inmates or staff in state and Federal prison

4. Disciplinary infractions of short-term and long-term inmates

5. Aging effects on criminality and violence

Cunningham, M.D. & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26,* 20-43.

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

**Ex. 51 - 744**

# Furman Commutees:
# Serious Rule Violations Across 15 years

-533 former death row inmates nationwide
- prison behavior over a 15 year period after removal from death row



69.5%
No Serious Violations

Marquart, J. & Sorensen, J. (1989).  A national study of the *Furman*-commuted inmates: Assessing the threat to society from capital offenders.  *Loyola of Los Angeles Law Review, 23 (5), 5-28.*

**Ex. 51 - 745**

# Was being sentenced to death a life changing experience?

## Death Row Commutees

N = 47

32 years old

followed 1973-1988 (10yrs)

## Life Sentence Inmates

N = 156 (128 murd., 28rapists)

30 years old

followed 1973-1988 (11yrs)

No prison homicides

No prison homicides



*Serious Infractions*





*Aggravated Assault / Fighting with Weapon*





Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994). *The Rope, the chair, & the needle: Capital punishment in Texas, 1923-1990.* Austin: University of Texas Press

**Ex. 51 - 746**

# Indiana Commuted Capital Offenders

- 39 inmates commuted since 1972
- March 1999 review of general population disciplinary records



Reidy, T.J., Cunningham, M.D., & Sorensen, J. (in press) From death to life: Disciplinary behavior of former death row inmates in Indiana. *Criminal Justice and Behavior.*

**Ex. 51 - 747**

*Prison violence rates:*

# How Do Capital Inmates Compare to General and High Security Inmates?



(Number of violations* per 100 inmates each year)

*homicide, assault on inmate with weapon, sex by force, assault on staff

Marquart, J., Ekland-Olson, S., & Sorensen, J. (1989). Gazing into the crystal ball: Can jurors accurately predict dangerousness in capital cases? *Law & Society Review*, 23(3), 449-468.

**Ex. 51 - 748**

*Prison violence rates:*

# Other studies of murderers who are sentenced to life in prison

*Disciplinary records review 1977-1992*
(Missouri state prisons)

93 death row inmates
323 life-without-parole inmates
<u>232</u> life-with-parole inmates
648 total

## Three groups similar in assaultive rule violations

*Cumulative prevalence across 15 years:*



1/3 minor assaults    2/3 more serious assaults

1.2% inmate homicide

**78.2% no assaults**

Sorensen, J. & Wrinkle, R. D. (1996). No hope for parole: Disciplinary infractions among death-sentenced and life-without-parole inmates. <u>Criminal Justice and Behavior, 23,</u> 542-552.

**Ex. 51 - 749**

# BOP Assaultive Infractions
# Capital Defendants Convicted and Sentenced to Life

---

- 1995-1998
- 25 capital inmates reported

  2 inmates - aggravated assaults (8%)

  2 inmates  -  simple assaults (8%)

  1 inmate - weapons contraband charges (4%)



- 11 inmates had no disciplinary write-ups of any sort

*Source of data:* Correspondence of Miles Harer, BOP,  12-14-98

**Ex. 51 - 750**

## Individualized Actuarial Likelihood of Murderer Exhibiting Severe Violence in Prison

- 6,390 murderers convicted 1989-1999
- Followed an average of 4.55 years
- Rates of serious violence* extrapolated for life sentence

**Overall risk 16.4%**

Incremental increases or decreases in risk relative to the overall risk rate:

| | |
|---|---|
| • Robbery/burglary in capital offense | +7.4% |
| • Multiple murder victims in capital offense | + 5.6% |
| • Attempted murder/assault in capital offense | + 4.0% |
| • Prison gang membership | +10.4% |
| • Prior prison term (unless non-violent record) | + 5.3% |
| • Age less than 21 | + 5.5% |
| • Age 26-30 | - 7.2% |
| • Age 31-35 | -12.3% |
| • Age over 35 | -14.4% |

*(Depending on the factors present, the overall risk rate for a capital life term may vary from 2-50.6%)*

Risk of aggravated assault on a correctional officer = 1%
Risk of inmate-on-inmate homicide =  .2% (2 per thousand)

*Homicide, attempted homicide, assault with a weapon, fight with a weapon, sexual assault, robbery on inmate. Aggravated assault on correctional officer.

Sorensen J.R. & Pilgrim, R.L. (in press).  Actuarial assessments of future dangerousness in the punishment phase of capital trials. Journal of Criminal Law & Criminology

Ex. 51 - 751

# The Relationship of Offense History to Prison Adjustment

- ◆ Past violence in the community is not strongly or consistently associated with prison violence.

- ◆ Current offense, prior convictions, and escape history are only weakly associated with prison misconduct.

- ◆ Severity of offense is not a good predictor of prison adjustment.

Alexander, J. & Austin, J. (1992). *Handbook for Evaluating Objective Prison Classification Systems.* San Francisco: National Council on Crime and Delinquency. Sponsored by U.S. Department of Justice.

National Institute of Corrections, U.S. Department of Justice. (1992) *Jail Classification System Development: A Review of the Literature, revised edition.*

# Frequency of Assaults in Federal Prison: Total Population and High Security



Harer, M. (1992). Assaults on BOP staff and inmates – where and when they occur. *Research Forum*, 2, 1-19. U.S. Department of Justice, Federal Bureau of Prisons.

# Base Rate of
# Inmate and Staff Homicide

## Inmate-on-inmate homicide
Federal = 6   per 100,000 inmates (2000, 2001)
State    = 5.6 per 100,000 inmates (1997)

## Inmate-on-staff homicide
Federal       = 1 per 500,000 inmates
                (last in 1997)
State         = 1 per 1,000,000 inmates

## Comparison ( Murder & Non-negligent homicide- 1998):

| | | |
|---|---|---|
| United States | = | 6.3 per 100,000 |
| Texas | = | 6.8 per 100,000 |
| Ft. Worth | = | 12.9 per 100,000 |
| Dallas | = | 23.1 per 100,000 |

*Source of data:*
Maguire, K. & Pastore, A.L.,eds. (2000). Sourcebook of Criminal Justice
   Statistics – (1999). U.S. Department of Justice, Bureau of Justice Statistics.
   Washington,D.C.
Corrections Compendium, June 1998
U.S. Bureau of Prisons (January 2002)

**Ex. 51 - 754**

# Disciplinary Infraction Rates

## (Median, by age at admission and time served group)



*source of data:* Flanagan, T.J. (1979). *Long-term prisoners: A study of the characteristics, institutional experience and perspectives of long-term inmates in State correctional facilities.* Dissertation: School of Criminal Justice, State University of New York at Albany.

*see also:* Flanagan, T.J. (1980). Time served and institutional misconduct: Patterns of involvement in disciplinary infractions among long-term and short-term inmates. *Journal of Criminal Justice*, 8, 357-367.

86    M. D. Cunningham and T. J. Reidy



Figure 5. Incidence of prison infractions in NY, 1975, by age. (From: Hirschi & Gottfredson, 1989; copyright 1989 by The University of Chicago Press; used by permission of the publisher)

*Graph reproduced in:*

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

**Ex. 51 - 756**

# AVERAGE NUMBER OF PRISON RULE VIOLATIONS PER INMATE PER YEAR BY AGE



SOURCE: PRISON RULE VIOLATORS-BUREAU OF JUSTICE STATISTICS 1989

**Ex. 51 - 757**

# How the age affects the rate of violence in the community:



Swanson, J. W., Holzer, C. E. III, Granju, V.K., & Jono, R. T. (1990). Violence and psychiatric disorder in the community: Evidence from the epidemiologic catchment area surveys. Hospital and Community Psychiatry, 41, 761-770.

**Ex. 51 - 758**



Figure 3a. Age distribution of criminal offenders in the general population of England and Wales, 1842-1844. From: Hirschi & Gottredson, 1989; copyright 1989 by The University of Chicago Press; used by permission of the publisher.





Figure 3b. Age distribution of criminal offenders in the general population of the United States 1977. From: Hirschi & Gottredson, 1989; copyright 1989 by The University of Chicago Press; used by permission of the publisher.

*Graph reproduced in:*

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

# Summary of Prison Violence Base Rate Findings

- Capital inmates have low rates of violence in the general prison population
- Seriousness of offense does not predict prison violence.
- Infraction rates are progressively lower as an inmate ages. This is consistent with multiple studies which demonstrate markedly decreasing rates of criminality and violence with aging.

Anchoring Base Rates (Across capital life sentence):

- Assault                        = 20 - 30%
- Repetitive assault   = 10%
- Aggravated assault on staff = 1%
- Homicide of inmate =  .2 - 1%
- Homicide of staff   = 1 per 500,000 annual (BOP)

**Ex. 51 - 760**

# Custody Options
## (Federal)

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security), general population

U.S. Penitentiary  Marion (high security)

U.S. Penitentiary (high security)
    administrative detention / administrative safe

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)

Special security arrangements

Ex. 51 - 761

" A male inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) shall be housed in a High security level institution unless the PSF [Public Safety Factor] has been waived."

*Security Designation and Custody Classification Manual (5100.07, p. 4)*

Ex. 51 - 762



Cell at USP Florence

Source: Bureau of Prisons, Department of Justice

Ex. 51 - 763

# ADX Florence
# Super Maximum Custody

- single cell, bar door and steel door
- window faces inner recreation yard
- poured reinforced concrete fixtures
- 23 hour a day lockdown
- meals in cell



- double escort with baton, cuffed behind back, feet shackled
- 1-2 fifteen minute phone calls monthly, (monitored)
- no contact visits, glass has high hammer rating, (monitored)
- mail x-rayed, opened, read

**Ex. 51 - 764**



Ex. 51 - 765











# Administrative Maximum Penitentiary

### Florence, Colorado    6-19-98

## General Information

- Current Population          417 (405 on 3-4-02)
- Rated Capacity              490
- Percent Under Capacity      15%
- Housing Units               9
- General Population (3), Intermediate, Transitional, Pre-Transfer, Control, Special Housing, High Security

## Sentence Imposed

- 21 Years to Life (1997)      46.0%
- Life Sentences (1997)        25.0%
- Average Sentence             36.3 Years

## Reason for Referral

- Inmate murder/attempt                                      22.3%
- Assaults on inmates                                        20.0%
- Assaults on staff                                          17.1%
- Greater security - increased monitoring needs / concerns   12.9%
- Escape behavior                                            9.2%
- Rioting                                                    4.6%
- Court Commitment                                           4.1%

**Ex. 51 - 771**

ADX Florence
## General Population and Step-Down Unit Operations

# General Population Units

restraints and two officer escorts when removed from cells
12 hours weekly of out of cell exercise in small groups
meals in cell, shower in cell
*12 month minimum*

# Intermediate Unit

restraints and two officer escorts when removed from cells
several hours daily out of cell on ranges
meals in common area on range
out of cell exercise in large outside rec. yard / gymnasium

*7 month minimum*

# Transitional Unit

escorted off unit unrestrained in small groups to
    programming areas
*5 month minimum*

# Pre-Transfer Unit

unrestrained when out of cells and when escorted
employed in UNICOR for half the day
meals in institutional dining hall
*12 month minimum*

**Ex. 51 - 772**

# Assaults in ADX Florence

| Offense | 1996 | 1997 | 1998 | 1999 | 2000 (4) |
|---|---|---|---|---|---|
| *Assaults* | | | | | |
| On Inmate w/ weapon | 1 | 1 | 0 | 0 | 0 |
| On Inmate | 5 | 3 | 4 | 3 | 0 |
| On Staff w/ weapon | 1 | 0 | 2 | 2 | 1 |
| On Staff | 25 | 12 | 18 | 13 | 4 |
| Homicide of inmate | 0 | 0 | 0 | 0 | 0 |
| Homicide of staff | 0 | 0 | 0 | 0 | 0 |
| Escape | 0 | 0 | 0 | 0 | 0 |
| Total | 27 | 16 | 24 | 18 | 5 |
| Average daily census | 342 | 377 | 410 | 371 | 344 |

**Ex. 51 - 773**

# ADX Control Unit

- in cell 23 hours a day

- sliding outer steel door, sliding inner bar door

- legs shackled and hands handcuffed behind back before removed from cell or otherwise moved

- triple escort when out of cell

- 7 hours out-of-cell solitary exercise weekly

- meals taken in cell

- *duration:*
  *-until able to function in a less restrictive environment without posing a threat to others or to the orderly operation of the institution  (CFR 541.50)*

**Ex. 51 - 774**





C Unit D Range Detail

United States Penitentiary
Administrative Maximum
Florence, Colorado

U.S. Department of Justice
Federal Bureau of Prisons
North Central Region

Ex. 51 - 776

# Conclude

# Risk Assessment

Ex. 51 - 777

# EXHIBIT 52

DECLARATION OF LEROY KENNEDY

I, Leroy Kennedy, Declare:

1. During the late 1980's and early 1990's, I worked as a counselor for the Delta Youth and Family Services organization, in Dermott, Arkansas.

2. The Delta records indicated that Julius Robinson was referred to Delta for counseling from 6/1/89 to 5/1/90, and assigned to me. I cannot recall the specific reason for the referral, nor can I recall specifically who referred him. He could have been referred by his school or the juvenile court, for example. The reason for the referral could have been problems at school, or given the timing of the referral, gang activity. 1989 was around the time gang activity started in Dermott. I believe Julius had some gang involvement back then because of the people he associated with and the clothing he wore.

3. During the time I supervised Julius, I saw him three times per week. I checked on him at school and at his grandparents' house. I may have met with Julius a few times at my office, I can't specifically recall.

4. Julius was a pretty good kid. He was smart and had some initiative. Julius seemed to take responsibility for his actions. I liked Julius. He was always very respectful toward me.

5. Julius' grandfather was blind. His grandmother always believed whatever Julius told her. She was a bit naive in that regard. I remember being concerned that the grandparents' home was somewhat chaotic. They had a revolving door policy, with

1

L.K.

young people coming and going all the time. Friends and relatives seemed to live there for a few days, then disappear. It was not a stable environment.

6. At the time I supervised Julius, I had a case load of 60-70 kids. It was a bit overwhelming, and I often felt that I was fighting a losing battle. There simply was not enough time for each child. I would have 10-15 minutes to talk with them, find out if they were okay, then I would have to move on to the next one. If one of the kids had been suspended from school, I would try to deal with that.

7. I had very little in the way of tools at my disposal to assist the kids. There was no budget to take the kids on field trips and get them out of the area for awhile.

8. I really needed more resources to affect a change in the lives of the kids I was counseling. More than that, I needed more time. The caseload just didn't allow that.

9. When the gang activity began in Dermott, I noticed a dramatic change generally. A change in attitude, a change in attendance, etc. There were more fights all of a sudden, and more break-ins. I remember that weapons were stolen and used to shoot up houses.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

10-21        , 2005

LEROY KENNEDY

2

**Ex. 52 - 779**

# EXHIBIT 53

## DECLARATION OF CARL MCCREE

I, Carl McCree, Declare:

1.    I grew up in Dermott, Arkansas and graduated from high school there in 1984. After attending the University of Central Arkansas, I became a police officer. I worked for the McGehee, Arkansas Police Department for one year, and then joined the Dermott Police Department in September of 1988. I became the Chief of Police in 2000. I am currently a detective with the Marianna, Arkansas Police Department.

2.    In the late 1980's, a man by the name of Johnny Wright moved to Dermott from the Los Angeles area. He had a prison record and a number of tattoos. His nickname was *John-John*. He organized some of the young boys in Dermott, including Julius Robinson, into a *Crip* gang.

3.    After that gang was organized, we saw a lot more criminal activity in Dermott. Julius Robinson was twelve or thirteen years old at the time. We had an 11:00 p.m. curfew in Dermott, which Julius and others began violating.

4.    Julius Robinson lived with his grandparents back then. His grandfather was blind, and his grandmother thought Julius could do no wrong. If Julius got into trouble and made up some story to tell his grandmother, she would say to the police: "If that's what my boy said, that's what happened!" Julius' grandfather would later come down to the police station, apologize, and provide whatever additional information he had.

1

5.     The gang problem in Dermott got so bad that Chief Melton was interviewed on the national news. Nearly all of the young African-American males in Dermott were jumped into the Crip gang. In my generation, Dermott was just a quiet little country town. The boys played basketball... went hunting and fishing... did things like that. Johnny Wright and the Crip gang changed all that. Kids burned cars and houses as part of their initiation into the gang. There was a sharp rise in thefts and serious assaults. Also, once the gang was organized, the drug activity in Dermott increased dramatically. However, I do not specifically recall Julius Robinson being involved in drug activity prior to his moving to Texas.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

10 / 20 / _____ , 2005

_____

CARL MCCREE

2

**Ex. 53 - 781**

# EXHIBIT 54

MEMO TO FILE

RE:    UNITED STATES OF AMERICA V. JULIUS OMAR ROBINSON

DATE:        DECEMBER 4, 2001

On December 4, 2001 I went to the Federal Medical Center at Fort Worth, to visit Mr. Robinson. I was escorted from the main entrance to the jail unit by a Bureau of Prisons employee (correctional officer) S. G. Sabolchick. The officer asked me who I was going to visit, and I told him. He immediately commented that the defendant was well behaved. He said that if they were all like that in the jail unit, it would almost be fun working back there. He said they never had any problems with the defendant. He was quiet, read the newspaper and caused no problems. He said he did not know what the defendant was in for, and didn't want to know what he was in for.

I identified the officer by his name badge. I did not let him know the impact of his statements or that it might put him in a position of being a defense witness. When I got to the jail unit I asked the defendant about the officer, and he said that he knew him. I advised the defendant to keep up his good behavior. The time of the conversation with the officer was approximately 2PM.

Wes Ball

Ex. 54 - 782

# EXHIBIT 55

## DECLARATION OF DAVID YORK

I, David York, declare as follows:

1.    I am the Defensive Coordinator and Linebacker Coach for the football program at Lamar High School. Julius Robinson was a line backer for the football team in his senior year. I do not remember if Julius played the same position in his junior year. It was during Julius's senior year that I had the most contact with him.

2.    Although Julius never mentioned anything about his family, I had the impression that Julius didn't really have anyone at home to care for him. My experience working with kids has taught me to recognize the kids whose home life is compromised. I am convinced that if Julius had grown up in a different environment, he would have had another kind of life. I say this because he tried so hard to do well. He showed a real need to take care of people. He brought someone from his family to us, the coaches, to see if we could help him out. We have a lot of kids who come from difficult backgrounds and most of them don't make it. Many kids drop out or don't get enough preparation to live a stable and productive life.

3.    We were not counting on Julius to do anything worthwhile in football

DY

his senior year. His junior year had been so-so. It took a while for him to catch on, Julius was not a quick learner. In order to play senior year, Julius had to work really hard, but he did it. On the field, he was on a mission. He had a goal and he showed us he could reach it. I have had the experience with some kids who think that they can finagle themselves onto the field - I call these kids the "Eddie Haskells", not so Julius. He had the ability to talk with people, but on the field what counts is not what you say, but what you do and what you've done to prepare yourself.

4.     The coaching staff never had any disruptive behavior from Julius. He was respectful.

5.     In 1994, Lamar High School had about 15-20 percent minority students. About 20percent of the football team was black. This percentage has increased over the years the last ten years. When Julius was attending the school, there were many kids who came from very affluent families.

//

//

DY

6.    I and the other coaches were contacted by a man connected with Julius's legal team when he was on trial. He may have been an investigator. He is the only one with whom I spoke prior to testifying. I don't know if Julius had been convicted already but I do know that I testified at his trial. ~~About~~ *I BELIEVE D.Y.* two weeks to one month transpired between the time the man contacted us and when I testified.

I declare under penalty of perjury under the laws of the United States of America this _18_ day of November, 2005, in Arlington, Texas.

David York

# EXHIBIT 56

## DECLARATION OF JAMILA CAMP

I, Jamila Camp, declare:

1. I was born December 11, 1978.

2. In 1998, I met Julius Robinson. I was introduced to him by a woman named Kenya who was dating Nathan Henderson at the time. Julius and Nathan worked together. I started dating Julius in 1999.

3. Once we began dating, I saw Julius every day. I kept my own apartment, but we spent most nights together, either at his apartment or mine. Even on the nights we spent apart, I would usually see him during the day.

4. Julius was my first serious romantic relationship. He was very sweet and supportive toward me. When we first started dating, I was a little on the chunky side. Julius made me feel loved. When I told him I wanted to get in better shape, he offered to help me. We began working out together. Julius and I would go jogging. He was a good motivator.

5. Julius supported me in other ways. I was taking classes at Tarrant County Junior College when we started dating, and he helped me financially so that I could stay in school. Also, around that time, two women were murdered in my apartment complex. They were known as *The Bathroom Murders*. To protect myself, I bought a small hand



1

**Ex. 56 - 786**

gun. One night, I was out driving after midnight. A police officer ran my tags and found that I had some unpaid traffic tickets, so he pulled me over. He discovered the gun in my purse. It was unregistered, so I caught a case for that. Julius helped my mother handle the situation. He helped her find a lawyer, etc.

6. Julius was never violent around me. I never felt that he would hurt me.

7. Julius often went out of his way to be nice to me. On Valentine's Day, 2000, he had two dozen red roses delivered to me. Later that Spring, I experienced some pelvic pain and he took me to the emergency room and stayed with me the whole time I was there.

8. In June of 2000, my sister and my best friend gave birth to babies on the same day. I didn't have a car then, so Julius drove me to Mesquite, Texas, and took me to both hospitals. Because of where I was in my cycle, they didn't want me to hold the newborns. Julius held both babies. He was very sweet with them.

9. Julius loved babies and children. My sister's baby suffered from acid reflux, so I offered to babysit and give my sister a break when the baby was two or three months old. Julius helped me. He changed and burped the baby, did everything.

10. Julius taught me how to cook. He would get up on Sunday mornings and go shop for groceries. Then he would come home and show me how to make a roast, things like that.

11. Julius told me that when he was a child, he and his brother got left with other

2

Ex. 56 - 787

people a lot. It forced Julius to grow up quickly. He matured faster, and better, than his brother, Marcus. Julius always tried to provide for and take care of his family members, including his brother. Marcus never appreciated what Julius did for him. Marcus always lived off women. Julius ended up being more of a father to Marcus' kids than Marcus.

12. Julius loved his mother more than I ever could have, given the circumstances. He was very hurt and embarrassed by her substance abuse and her behavior, but he always tried to include her in his life. He gave her money to move to Ohio, to get a fresh start, and he brought her back to Texas for his birthday party. I remember him getting tense if he saw her with a drink, because she wasn't the kind of person that could have just one drink. She would get falling down drunk if he didn't stop her.

13. I never heard Julius talk about his father.

14. Julius always needed to be responsible. Because he was forced to grow up early and take care of himself, he developed an attitude of: If I don't do it, it won't get done. He always tried to take care of the needs of his family and friends.

15. Julius didn't use drugs, and he barely drank.

16. When we were dating, I used to tease Julius about his writing skills. His spelling was terrible, and sometimes he would word his sentences in a way you couldn't understand them. I used to say: What are you, dyslexic? From time to time, he would have the same trouble speaking. I had a hard time figuring what he was talking about.



3

The problem would show up mostly in his writing. His letters were often very difficult to figure out.

17. I was never contacted by Julius' trial attorneys. If I had been, I would have provided all the information in this declaration.

I declare under penalty of perjury under the laws of the United States of America this 10 day of November, 2005.

JAMILA CAMP

4

**Ex. 56 - 789**

# EXHIBIT 57

## DECLARATION ROBERT HOLLIMON

I, Robert Hollimon, declare:

1.   I am an older brother of Julius Robinson's mother.  I was born in 1950 in Dermott, Arkansas, the second son of my mother, Margaret Hollimon and the eldest son of my father, John Hollimon.

2.   My father was a farmer until one day when I was about five years old.  He was cutting wood in our yard when a splinter from the log got stuck in his eyeball.  He had to have an operation and somehow, the operation put out his other eye and he became totally blind.  My mother stayed at home except when she could get work chopping and picking cotton.  When my mother worked in the fields, my dad did the cooking.

3.   My dad got a welfare check, but our family couldn't live on it.  I started chopping cotton when I was about seven or eight years old.  I always went to school, but would work in the fields in the summers and weekends when work was available.  When I first started working in the fields, I would get paid $2.25 per day.  I can remember my dad repairing our shoes with bailing wire when the soles came loose.  Our family didn't have extra money to buy new shoes.

*Robert Hollimon*
R.H.

1

Ex. 57 - 790

4.  My sister, Rose, went to live with our next door neighbor, Mama Sarah, when she was about ten years old.  Mama Sarah was widow who didn't have anyone and she always liked Rose.  She couldn't read or write.  She had a bedroom in her house all for Rose.  In our house, we had two bedrooms, one for my mother and father, and one for all nine children.  So, Rose was able to help out Mama Sarah and my family was grateful for the help she gave Rose.

5.  When Rose went to live with Mama Sarah, she still played with us and we all still walked to school together.  But Rose was a spoiled brat.  Mama Sarah would give her anything she wanted.  If Rose said she wanted a new dress, Mama Sarah would get it for her.  If Rose said she needed ten dollars, Mama Sarah would give it to her.

6.  I left Dermott in 1969 when I was 19 years old.  I came to Wichita Falls and got a job working for Pioneer Restaurant.  I worked there for many years.  In the last four years, I have been working as a supervisor and dietician in the Red River Hospital kitchen.

7.  After Rose left her husband, Jimmie Robinson, she came to Wichita Falls.  She worked as a nurse's aide in a nursing home.  She had a boyfriend named Donald Spence who was very abusive to her.  I lived with both of them

2

*Robert S Holliman*
R.H.

**Ex. 57 - 791**

for a few months and I saw for myself what he did to her. They both drank alcohol and smoked marijuana daily. If they had enough money for it, they preferred to drink whiskey. When they drank and smoked, they would get into arguments and yell at each other. Donald would lock Rose in their room and beat her. She would come out of the room crying and bruised.

8. Donald couldn't hold a job, but his mom and step-dad supported him. They gave him money and he would use it to buy alcohol and drugs. During the time she was with him, my sister was very thin. She is a small woman anyway, but they spent all their money on drugs and alcohol and not on food. One time, Rose called me at my job and told me she was hungry and needed money for food.

9. I saw Rose and Donald shoot some drug when we all lived together. I don't know what the drug was, but they melted it down and then they put it in a syringe and both of them injected it.

10. One time we all went fishing. Rose and Donald were drinking and they started fighting. Donald tried to push Rose into the water and drown her. That was the final fight for Rose. Soon after that fight, Rose left Wichita Falls and moved to Arlington, Texas. I saw very little of her after that. During the

3                                                                    R.H.

time she lived in Wichita Falls, I never knew her to go home to Dermott and visit her two sons.

11. When I was growing up in Dermott, Arkansas, the population was about three quarters white and one quarter black. Almost the exact opposite is true today. The white folks tended to live in town and the black families lived in the country. When I was a young man, I was taught that if a white lady was coming down the street, I needed to look away. I can remember on three different occasions seeing the body of a black man hanging from a rope at the train station. One of the hanged men was said to have whistled at a white woman.

12. When I was growing up in Dermott, there were no black restaurants. If you wanted to get food from a restaurant, you had to go to the back and even then, sometimes you wouldn't get served. There were no school buses for the black kids, so we all had to walk to school, the buses were all for the white kids. And even if a black person had the money, they couldn't buy a new car, they had to buy a used car. There were no jobs for blacks except for work in the fields. In Dermott, Arkansas in the 1950's and 1960's, the place for a black man was in the cotton fields, not working in a restaurant. When I came to Wichita Falls,

4

R.H.

Ex. 57 - 793

there were jobs for me.

13.   No one from my nephew, Julius Robinson's legal team has ever contacted before.  Had I been asked, I would have willingly provided the information which appears in this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21 day of November, 2005 in Wichita Falls, Texas.

_Robert Hollimon_

Robert Hollimon

5

# EXHIBIT 58

## DECLARATION OF CAROL WILSON

I, Carol Wilson, declare as follows:

1.     I was Julius Robinson's Child Development teacher at Lamar High School when he was in the twelfth grade. I am currently a counselor at Lamar.

2.     Child Development is an elective. It's an easy and fun class which a lot of athletes take. I liked teaching it because the kids enjoyed it and I felt that the information I imparted was useful to them.

3.     Julius was a good kid who was always positive and smiling. After leaving the school, Julius came back to Lamar to enroll his younger cousin who was having some trouble. He spoke with me about the cousin. I thought that it was amazing that Julius was doing this. He was a child himself and yet he was taking on the role of caretaker.

4.     I had the impression that Julius did not have a good home life from little comments he made and from listening to other kids talking about him. I do not remember specific remarks.

5.     Julius was not a strong academic student as is borne out by his transcripts. In reviewing his records, I notice that he had to repeat classes in summer school, indicated by the letter "R." The "M"s in the transcript refer to

CW

1

Ex. 58 - 795

courses in which the material is modified for the student who has difficulties. These modifications provide the student with opportunities for passing the class. Julius's grade point average was a 4.9 out of a possible 12, that is in the 70-72 or C- range. Omission of his Physical Education grades in the calculation would lower his Grade Point Average even further. His ranking in the school, 387 out of 482, places him in the lower third of his class. Julius lost credits in the 11th grade due to his absences.

6.     Julius ended up at Venture Alternative School because he lacked the credits to graduate. He attended the first part of his 12th grade at Lamar and then moved to Venture. The Venture Alternative School is not an institution for students with discipline problems but rather one for students who cannot deal with regular instruction, for whatever reason. Kids with disciplinary issues are referred to Turning Point School. At Venture, students can work at their own pace. There is a lot more interaction with the instructors. Hours are also more flexible so as to take into account the needs of students who have to work.

7.     Differences between the economic classes at Lamar High School are pronounced. There are students here who have a lot of money and lots of opportunities. The disparity was even greater when Julius was attending the

2

*CW*

Ex. 58 - 796

school. There were around eighteen hundred students then, in contrast to the more than thirty-seven hundred who are currently enrolled. At that time, there were fewer middle class students so the school had the two extremes, rich and poor. The student parking lot had Porsches and other luxury cars while other students had barely enough money for the bus. The gap was huge. The kids were aware of these differences and reflected this in comments they made.

8.    Had I been asked previously, I would have provided the information contained in this declaration.

I declare under penalty of perjury under the laws of the United States of America on this _18_ day of November, 2005, at Arlington, Texas.

Carol Wilson
Carol Wilson

3

**Ex. 58 - 797**

# EXHIBIT 59

## Statement of Stephen K. Martin, Ph.D.

**State of Texas**                          *

**County of Smith**                         *

BEFORE ME, the undersigned official, personally appeared Stephen K. Martin, Ph.D., a person known to me, who, after being sworn upon his oath, deposed and stated:

**Professional Background Information**: Dr. Martin received his B.A. degree in psychology from Millsaps College in Jackson, MS (5/86) and his M.A. & Ph.D. in Clinical Psychology from the University of Southern Mississippi (12/91). He has completed a two year post-doctoral fellowship in Neuropsychology from the University of Texas Southwestern Medical Center (9/94). He worked as a Neuropsychologist from HealthSouth Rehabilitation Hospital of Tyler from 10/94 until 8/00, and is currently in private practice in Tyler, TX. Dr. Martin has provided neuropsychological evaluations in a variety of forensic settings and has extensive background in the evaluation and treatment of neurological conditions.

**Tests Administered**: Wechsler Adult Intelligence Scale-3 (WAIS-3); Wechsler Memory Scale-3rd (WMS-3); Halstead Reitan Neuropsychological Test Battery; Wide Range Achievement Test-3 (WRAT-3); Lateral Dominance Exam; Grip Strength; Aphasia Screening Exam; Wisconsin Card Sorting Test (WCST); Paced Auditory Serial Addition Test (PASAT); Ruff 2 & 7 Test; Stroop Neuropsychological Screening Test; Controlled Oral Word Association (COWA); Sensory Perceptual Exam; Trail Making Test A&B; California Verbal Learning Test-2 (CVLT-2); Rey-O Complex Figure; Grooved Pegboard; Clock Drawing; Rey-15 Item test; Portland Digit Recognition Test (PDRT)

**Behavioral Observations**: The patient was tested in a visitation booth at the Federal Prison in Terre Haute, Indiana on November 3rd and 4th, 2005. The patient was noted to wear glasses throughout the evaluation and appeared to put forth excellent effort during the evaluation. On the Rey-15 item test and the PDRT, two malingering inventories, the patient's score was not suggestive of malingering. Overall, these results are considered to be a valid estimate of his current cognitive abilities.

**Test Results:** On the WAIS-3, he demonstrated a verbal IQ of 102 (average), a performance IQ of 113 (high average), for a full scale IQ of 107 (average). There was a noteworthy difference between his verbal and performance scores with his verbal score being lower. There was a degree of subtest variability noted within the verbal and performance subtests. In terms of his verbal skills, he demonstrated low average skills on a measure assessing verbal concept formation. He demonstrated average skills on measures assessing knowledge of vocabulary words and simple and complex auditory attention. High average skills were noted on a measure assessing general fund of knowledge. He demonstrated superior skills on a measure assessing social comprehension. In terms of his performance skills, he demonstrated low average skills on a sensitive measure of brain dysfunction assessing visual motor learning and motor persistence. Average skills were noted on a measure assessing visual perceptual reasoning and problems solving. He demonstrated high average skills on measures assessing attention to detail and visual sequencing. On a measure assessing abstraction and problem solving he demonstrated very superior skills.

On the WRAT-3, he demonstrated the following grade equivalents: Reading-7th grade, Spelling-4th grade, and Arithmetic-6th grade. These are equivalent to the standard scores of 82 (12th percentile), 72 (3rd percentile) and 80 (9th percentile), respectively. These scores are lower than expected given his level of education and intellectual status, and may represent long term learning difficulties.

On tests more sensitive to the biological integrity of the brain, the patient demonstrated a Halstead Impairment Index of 0.3 (30% of components test within the brain damage range). On the General Neuropsychological Deficit Scale, his score of 24 falls at the low end of the average range.

In terms of his auditory attention, he demonstrated moderately impaired performance while attending to slowly paced material and average skills while attending to more rapidly paced auditory information. On a complex auditory attention task requiring the patient to rapidly add a sequence of numbers, his scores tended to fall in the average to high average ranges. He also demonstrated average simple visual attention and tracking skills. On a complex visual attention and tracking task requiring flexibility of thought and motor sequencing ability, he demonstrated above average performance. On a complex visual attention task requiring rapid visual sequencing and the ability to quickly shift cognitive sets, the patient demonstrated mildly impaired skills. On another visual attention task requiring rapid visual sequencing, sustained vigilance, and the ability to shift cognitive sets, the patient demonstrated above average speed and accuracy skills.

On other complex cognitive measures, he demonstrated average skills on a semi structured task requiring flexibility of thought, ability to shift cognitive sets and problem solving ability. However, he demonstrated a single "failure to maintain set" error, suggesting some disruption in sustained problem solving skills. On another measure assessing abstraction ability and logical analysis, he demonstrated average skills. On this test, he was required to "figure out" the underlying principle to use in a problem solving situation. Finally, on a complex psychomotor problem solving task (placing blocks in a form board while blindfolded), he demonstrated average skills.

On a brief aphasia screening exam he demonstrated evidence of dysnomia, spelling dyspraxia and central dysarthria. He demonstrated low average verbal fluency skills on a measure requiring him to generate as many words as possible beginning with a specific letter.

The patient demonstrated evidence of mild constructional dyspraxia upon examination. He performed adequately on a clock drawing task. Average performance was noted on a WAIS-3 measure requiring visual spatial and visual motor integration skills. He demonstrated average performance on a psychomotor problem solving task that has a strong spatial component.

In terms of his ability to incidentally learn information that he did not specifically set out to learn, he demonstrated average skills with simple information and above average skills with complex information.

In terms of his verbal memory, he demonstrated low average immediate recall (SS=8) and average 30 minute delayed recall (SS=9) for simple, paragraph length material. On a less structured list learning task, he demonstrated average memory storage, as he was able to learn thirteen of sixteen words after five trials. He did not benefit greatly from verbal cuing. His recognition memory was in the low average range.

In terms of his visual memory, he demonstrated average immediate recall (SS=9) and superior 30 minute delayed recall (SS=14) for simple visual information. On a more complex visual memory measure, he demonstrated an adequate performance while reconstructing a complex geometrical design. His immediate and 30 minute delayed recalls were also within normal limits. His recognition of the specific details and the overall gestalt was in the average range.

On simple motor measures assessing finger tapping speed and grip strength he demonstrated bilaterally impaired skills. In addition, on the finger tapping measures his left hand was slower than expected when compared with his right. On a measure assessing fine motor dexterity the patient demonstrated bilaterally adequate skills. He did not demonstrate any simple sensory errors in the tactile, auditory or visual modalities, nor did he demonstrate any finger agnosia errors. He demonstrated a single left sided finger tip number writing error. His tactile form

recognition performance was within normal limits. He did not demonstrate any visual field cuts upon gross visual field examination.

**Summary:** Results of this evaluation are valid and reflect that Mr. Robinson gave excellent effort while being evaluated. His neuropsychological profile reflects variable abilities including several areas of mild impairment along with multiple areas of cognition that fell within normal limits. These results are generally consistent with subtle cognitive deficits associated with chronic exposure to organophosphate pesticides combined with general learning disabilities. More specifically, he demonstrated mild deficits involving aspects of language including word finding problems, low average verbal recall for contextual information, mild constructional dyspraxia, as well as subtle deficits involving sustained auditory attention and mental flexibility. He also demonstrated mild to moderate bilateral impairment on a measure assessing simple motor skills. General learning problems were evidenced by the discrepancy between his intellectual quotient which fell in the average range (Full Scale IQ = 107) and his scores on measures assessing basic academic abilities (Reading SS = 82, Spelling SS = 72, Math SS = 80). In contrast, areas of relative strength involved aspects of attention / concentration, visual processing speed, simple problem solving, abstraction skills, psychomotor problem solving, performance IQ, incidental memory, verbal memory for non-contextual information, visual memory for simple and complex information, as well as simple and complex sensory skills.

Research has demonstrated that chronic exposure to organophosphate pesticides can have negative behavioral effects involving learning capacity as well as other cognitive abilities. Review of Mr. Robinson's academic and medical history suggests that although he was never diagnosed with ADD or any specific learning disabilities, his school performance was quite variable over the years. Upon clinical interview, he also reported longstanding problems with aspects of concentration and distractibility, and feels that he had to work harder than other students to make good grades.

**FURTHER AFFIANT SAYETH NOT.**

Stephen K. Martin, Ph. D.
**Clinical Neuropsychologist**

**SWORN TO AND SUBSCRIBED** before me, the undersigned official, on this the 23rd day of November, 2005.

**Notary Public in and for**
**THE STATE OF TEXAS**
My comm.. Exp _10-15-06_

MELISSA A. NICHOLSON
Notary Public, State of Texas
My Commission Exp. 10-15-2006

**Ex. 59 - 800**

Supplemental Statement of Stephen K. Martin, Ph.D.

State of Texas                    *

County of Smith                   *       .

BEFORE ME, the undersigned official, personally appeared Stephen K. Martin, Ph.D., a person known to me, who, after being sworn upon his oath, deposed and stated:

On November 23, 2005, I issued a statement discussing the observations and results from my neuropsychological evaluation of Julius Omar Robinson. At that time, I had not been provided any material addressing possible drug or alcohol use by Mr. Robinson's mother during her pregnancy with Mr. Robinson.

Since that time, I have had the opportunity to review the following documents:

Declaration of Rosa Mae Hollimon
Declaration of Jimmie Lee Robinson
Declaration of Beotha Moore

Based upon my review, it is my opinion that Mr. Robinson suffered chronic exposure to cannabis and alcohol in utero.

The neuropsychological profile associated with pesticide exposure can share common neurocognitive characteristics with the neuropsychological profile associated with the teratogenic effects of fetal alcohol and fetal cannabis exposures. Although it remains my opinion that the results of Mr. Robinson's testing are generally consistent with subtle cognitive deficits associated with chronic exposure to organophosphate pesticides, fetal alcohol and cannabis exposure could serve as an additional etiological basis for Mr. Robinson's neuropsychological impairments.

FURTHER AFFIANT SAYETH NOT.



Stephen K. Martin, Ph. D.
Clinical Neuropsychologist

SWORN TO AND SUBSCRIBED before me, the undersigned official on this the _28th_ day of August, 2006.



Notary Public in and for
THE STATE OF TEXAS
My comm., Exp. _4-6-10_

LOUELLEN HANNA
Notary Public, State of Texas
My Commission Expires 04-06-10

**Ex. 59 - 801**

# EXHIBIT 60

## DECLARATION OF BRENDA HOLLIMON

I, Brenda Hollimon, declare:

1.     I am John Hollimon's wife. My husband is Julius Robinson's maternal uncle.

2.     Before Julius's trial started, I received a telephone call from the office of Julius's attorneys. The person was phoning to make an appointment with my husband and me. The attorney wanted us to go to his office to talk about Julius's case and to bring the clothes Julius would be wearing in court. I had been expecting a phone call because my husband told me they would be contacting us.

3.     On the day of the appointment, my husband and I went to an office located at 4025 Woodland Park in Arlington. We brought Julius's clothes which his girlfriend Jamila had dropped off. I do not remember the name of the attorney we saw.

4.     The attorney directed his questions to my husband. I did not provide any information to that man, nor anyone else in his legal team during the trial. No one ever asked me about Julius's background or life in Dermott.

5.     The only times I spoke with Julius's attorneys or anyone associated

1

*BH*

with them was when someone called my home to set up the appointment and when John and I went to the attorney's office.

6.    On August 11, 2006, my husband and I met with an investigator from the Office of the Federal Public Defender and I provided the above information.

I declare under penalty of perjury under the laws of the United States of America this 25th day of August, 2006.

Brenda Hollimon

2

# EXHIBIT 61

STATE OF ARKANSAS                    )
                                     )
COUNTY OF WASHINGTON                 )
                                     )
                                     )


AFFIDAVIT OF STEVEN TOSTON

I, Steven Toston, being first duly sworn, state and depose as follows:

1. I currently reside at 1303 Silent Grove, Springdale, Arkansas. Julius Robinson is one of my distant relatives.

2. In 2000, I was charged, along with several other co-defendants, with drug offenses in the case *United States of America v. Nathan Henderson, et al* Case No. 4:00-CR-260. Since my conviction in that case, I spoke with an investigator from the Office of the Federal Public Defender representing Julius Robinson. The investigator informed me that Nathan Henderson testified at Robinson's trial. According to the investigator, Nate said that Julius spoke to Nate about Michael "One Love" Williams while they were incarcerated together at the Federal Medical Center in Fort Worth, Texas. According to the investigator, Nate testified that Julius said he hoped someone would get Williams and that he, Julius, called to his hometown telling someone to do something to Williams. Nate said that Julius's conversation about "One Love" took place in the cell where Nate and I were staying. Nate also said that I was present when the conversation took place. I was asked to respond to this allegation.

3. After my arrest for federal drug offenses on November 8, 2000, I was placed in the same cell as Nate Henderson. At the time we were incarcerated, Nate, Julius and I used to hang out a lot and we would often talk generally about life. Julius used to come over to our cell and we used to go to his cell or we would meet in the day room to play dominoes. The only time all of three of us talked about our cases was after we filed the motion for discovery and obtained statements from the witnesses. One of the statements was from "One Love." I remember being angry about One Love's statement because he claimed to know things about me and my brother and I barely even said hello to him before I was arrested. I felt like One Love was trying to save himself and give the DEA whatever they wanted. I remember Julius thought it was funny and even laughed about what One Love said. It seemed like Julius was not even worried about it because he thought once we got to court no one would be believe one Love.

ST

1

**Ex. 61 - 804**

4. At no time did Julius ever say to Nate in my presence that Julius intended to harm or "get" One Love or anyone else, or that he intended to ask someone in Dermott to harm One Love. Even when I was by myself without Nate present, Julius never told me that he, Julius, intended to harm or "get" One Love or anyone else or intended to ask someone to get One Love.

5. The Office of the Federal Public Defender were the first attorneys for Julius Robinson to ever contact me. Had I been asked previously, I would have supplied the foregoing information and would have testified thereto.

Further, affiant saith naught.

I swear under penalty of perjury under the laws of the United States of America this 21 day of November, 2008.

_Steven Toston_

Steven Toston

"NOTARY SEAL"
Debra P. Anderson, Notary Public
Washington Co, State of Arkansas
My Commission Expires July 28, 2014.

_Debra P. Anderson_

Notary Public No._____

My Commission Expires __28 July 2014__.

2

**Ex. 61 - 805**