IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

JULIUS OMAR ROBINSON,

              Petitioner,

v.

                                      No.     2:20-CV-640-JPH-DLP

T.J. WATSON,

              Respondent.

## APPENDIX TO GOVERNMENT'S MOTION TO DISMISS
## AND RESPONSE TO ROBINSON'S 28 U.S.C. § 2241 PETITION

Respectfully submitted,

John Childress
Acting United States Attorney
Southern District of Indiana

*s/ Jonathan Bradshaw*
Jonathan Bradshaw
Special Assistant United States Attorney
Colorado Bar No. 43838
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
E-mail: jonathan.bradshaw@usdoj.gov

Attorneys for Respondent

## **CERTIFICATE OF SERVICE**

I certify that on March 31, 2021 this appendix was filed electronically.   Notice of this filing will be sent to all ECF-registered counsel of record via email generated by the Court's ECF system.

*s/ Jonathan Bradshaw*
Jonathan Bradshaw
Special Assistant United States Attorney

1    (Witness sworn by the Court)

2    THE COURT:  You noticed my little finger there.

3    Lawnmower accident.

4    THE WITNESS:  All right.

5    MR. O'CONNOR:  May I proceed, Your Honor?

6    JERRELL GARDNER, testified under oath as follows:

7    DIRECT EXAMINATION

8    BY MR. O'CONNOR:

9    Q.  Tell us what your name is.

10   A.  My name is Jerrell Gardner.

11   Q.  And how old are you, Mr. Gardner?

12   A.  Twenty-eight.

13   Q.  And where do you live?

14   A.  I live in the Pleasant Grove area,    Bluff Creek.

15   Q.  Let me just stop you there.

16   It's important that everybody hears what you have to say.

17   A.  Oh, okay.

18   Q.  So we'll need you to speak up good and loud and into that

19   microphone?

20   A.  I live in Dallas, Texas,    Bluff Creek.

21   Q.  All right.  Thank you, sir.

22   What do you do for a living?

23   A.  I own my own mobile detail service.

24   Q.  And how long have you been doing that kind of work?

25   A.  Seven years.

1  Q.  All right, sir.  Do you know or did you know a person by

2  the name of Johnny Lee Shelton?

3  A.  Yes, I did.

4  Q.  Were you friends with him?

5  A.  Yes I was.

6  Q.  And were you friends with him on December 2, 1998?

7  A.  Yes, I was.

8  Q.  And when you say that you all are friends, or you were

9  friends on that day, what kind of things would you all do as

10  things?

11  A.  We went out to eat.  We dated the same girls, friends,

12  cousins.  We were really good friends.

13  Q.  All right, sir.  And do you have a memory of December 2,

14  1998 and the early morning hours of December 3, 1998?

15  A.  Yes, I do.

16  Q.  On December 2 of 1998, were you and Johnny hanging out

17  together?

18  A.  Yes, we were.

19  Q.  And where were you all hanging out together?

20  A.  We was at the Spy Club.  We went to a club that night,

21  concert.

22          THE COURT:  What was the name of the club?

23          THE WITNESS:  Spy Club.

24          THE COURT:  S-P-Y?

25          THE WITNESS:  Uh-huh.

1          THE COURT:  Okay.

2   Q.  (By Mr. O'Connor)  And you said something about a concert?

3   A.  Yes.  They were having a concert.  I'm not really -- I

4   really don't remember who it was, but it was a concert.

5   Q.  So you and Johnny had gone to the Spy Club?

6   A.  Yes, we did.

7   Q.  Where is the Spy Club?

8   A.  It's on Greenville and Lover's Lane.

9   Q.  Did you and Johnny go to the Spy Club together, or did you

10  all go separately?

11  A.  We went together.

12  Q.  Did you all go with anybody else?

13  A.  We had some friends that we met there that we knew were

14  going, but, no, initially we went together, just me and him.

15  Q.  You all drove together?

16  A.  Yes, sir.

17  Q.  Where was he living back on December 2, 1998, what city or

18  what part of town?

19  A.  He was living in the Oak Cliff area in Dallas.  I know it

20  was off of Ledbetter Road, but I don't actually know the name

21  of the apartments.

22  Q.  Do you remember about what time that you all would have

23  gotten to the Spy Club over there off Lover's Lane?

24  A.  I would say around 10:30, 11 o'clock.

25  Q.  Do you remember what day of the week?  Do you have a memory

1   of that at all?

2   A.   Wednesday, if I'm not mistaken.

3   Q.   Why do you remember it to be a Wednesday night?  Is there

4   anything special about that?

5   A.   Well, most of the time on Wednesday's.  That's what we did,

6   went to the club.  It was a popular club on Wednesday's.  A lot

7   of people went there.

8   Q.   Do you have a memory as you sit here today about how long

9   you and Johnny would have stayed at the club that night?

10  A.   We would have stayed until it closed.

11  Q.   Do you have a memory of what time it would have closed?

12  A.   2:00, 2:30.

13  Q.   Was there, in fact, a concert that night?  Do you have a

14  memory of that?

15  A.   Yes, there was.

16  Q.   And what sorts of things did you and Johnny do while you

17  were at the club that night?

18  A.   Normal things, walked around, talked to a couple of girls,

19  laughed, saw people we ain't seen in days, you know, normal

20  things, routine, really.  That's what we did on Wednesday's.

21  Q.   Okay, sir.  You said that you all stayed until the club

22  closed, which you think to be around 2:00 or 2:30.  During the

23  time period you were there, did you and Johnny stay together

24  most of the time, or did you all split up and then meet back up

25  at the end of the evening?

1  A.  No.  We stayed together the whole time.

2  Q.  All right.  At closing time, where -- would you tell us

3  what it is you and Johnny did when the club started closing?

4  A.  We walked out.  We valet parked.  We did like everyone else

5  did.  The valet gave him a ticket, got our keys, to leave.

6  Q.  Whose car were you all driving in?

7  A.  We were in Johnny's car.

8  Q.  And what kind of car did Johnny have?

9  A.  I believe it was a Sedan Deville '98, '97, Cadillac.

10  Q.  You said a Sedan Deville?

11  A.  Uh-huh.

12  Q.  What color was the Cadillac?

13  A.  Pearl white, if I'm not mistaken.

14  Q.  You also mentioned that you and Johnny had valet parked, is

15  that right, at the Spy Club?

16  A.  Yes, we did.

17  Q.  So they had a valet system to where you could just drive up

18  to the door and leave it and go on in?

19  A.  Yes.

20  Q.  And then at the end of the day, give them the ticket, and

21  they would bring it back to you?

22  A.  Uh-huh.

23  Q.  So when you all left -- and that's a yes, correct?

24  A.  Yes, yes.

25  Q.  So when you all left the club that night, the car had been

1    brought up to the door and you all got into the car to leave?

2    A.  Yes, we did.

3    Q.  Do you have a piece of paper in front of you that's marked

4    as Government's Exhibit 828 on a yellow sticker?

5    A.  Yes, I do.

6    Q.  Do -- are you familiar with the area that is depicted

7    there on Government's Exhibit 828?

8    A.  Yes, I am.

9    Q.  And does that Government's Exhibit 828 generally depict the

10   area that the Spy Club is located or was located there on

11   Lover's Lane in the Greenville area?

12   A.  Yes, it does.

13   Q.  And is there also depicted on that document in front of you

14   Highway 75, or Central Expressway?

15   A.  Yes, it is.

16   Q.  And some cross streets on down Central Expressway towards

17   Dallas?

18   A.  Yes.

19   Q.  Does that fairly and accurately represent that area,

20   although it's not to scale?

21   A.  Yes.  That's it.

22           MR. O'CONNOR:  Your Honor, we would ask that

23   Government's Exhibit 828 be admitted into evidence.

24           MR. BALL:  No objection.

25           THE COURT:  What was the number?

1          MR. O'CONNOR:  828.

2          THE COURT:  All right.  Admitted.

3    Q.  (By Mr. O'Connor)  Now, Jerrell, when you all got into the

4    car to leave the Spy Club, where did you go?  You went out of

5    the parking lot and on what street do you find yourself on?

6    A.  We went out the club and got on Greenville and Lover's.

7    Lover's crosses Greenville to get on 75.

8    Q.  You all were going to 75?

9    A.  Yes, sir, the freeway.

10   Q.  And when you hit the freeway, 75, which way are you going

11   to be going, south or north?  Towards Dallas or away from

12   Dallas?

13   A.  Towards Dallas.

14   Q.  The Spy Club there is north of Dallas, that is, towards the

15   Galleria from Dallas, on the north side of Dallas; is that

16   fair?

17   A.  Yeah, yeah.

18   Q.  So you all are leaving the Spy Club and going south towards

19   downtown Dallas?

20   A.  Yes.

21   Q.  Where are you all headed, you and Johnny?

22   A.  Home.

23   Q.  All right.  And who is driving the car, the Cadillac?

24   A.  Johnny.

25   Q.  All right.  And you all go out onto Lover's, and do you all

1    ultimately get up onto 75 Central Expressway?

2    A.  Yes, we do.

3    Q.  All right.  When you get onto Central Expressway and you're

4    going south to Dallas, describe for the jury what the traffic

5    is like or what the other cars are doing on the freeway when

6    you all left that night?

7    A.  It was a lot of people intoxicated.  Neither me nor Johnny

8    was because neither one of us drink.  But there was a lot of

9    speeding, a lot of driving crazy.  People going 90, 100 miles

10   an hour, racing.  It was just wild, you know.

11   Q.  When you all get onto Central Expressway there and you're

12   going south towards Dallas, do you have the radio on or not on,

13   or what are you all doing?  Are you all talking, what?

14   A.  We were talking, but we had the radio on.

15   Q.  All right.  And would you have the radio up loud, or what?

16   A.  Up loud.

17   Q.  As you all are going towards Dallas there on Highway 75,

18   does something happen that you think is out of the ordinary?

19   A.  Yes, it did.

20   Q.  Tell the jury what it is you remember happening on that

21   occasion.

22   A.  Is it all right for me to move this?

23   Q.  Sir?

24   A.  Is this all right for me to move this?

25          THE COURT:  Yes.  You can move it, but don't get too

1  far away from it so we can be sure and hear you.

2       THE WITNESS:  Okay.

3       We were riding down 75.  We got on.  As we crossed the

4  Mockingbird exit, I heard a lot of -- I could hear -- I could

5  hear -- I couldn't see like anything, but I heard shots, and I

6  could hear the bullets going passed the car, even through the

7  music and everything.  So it alarmed me.  So I raised up off

8  the seat, and I looked, and I saw where the bullets was hitting

9  the railing of the freeway.  I could see sparks.  So I knew

10  someone was shooting.  So I leaned over to Johnny, and I told

11  him, and he laughed at me and said -- because they was fixing

12  on the freeway at the time, that that was probably rocks or

13  something.  And as he said that, he was shot in the stomach.

14  Q.  Okay.  Now, you say, as he said that, they were fixing on

15  the freeway, you said he shot in the stomach.  What is it that

16  happened that led you to believe he was shot in the stomach?

17  A.  Well, he hollered loud, and I looked over, and I saw all

18  the blood, just a puddle of blood just spread like this over

19  his shirt, and I'm sitting right next to him.

20  Q.  Okay.  And when you say he hollered loud, did he holler

21  anything in particular or just holler in pain?

22  A.  He said, I'm hit.

23  Q.  All right.  And so when Johnny tells you, I'm hit, what you

24  did you do?

25  A.  I didn't panic surprisingly.  I was scared for my own life,

1   because it was just like I was hit, too.  I grabbed the

2   steering wheel, and I told him to put his foot on the break,

3   and he did so, and I pulled the car over.

4   Q.  All right, sir.  And you think this is around the

5   Mockingbird, or as you all pass, the Mockingbird exit?

6   A.  Yes, it was.

7   Q.  And is that Mockingbird exit shown there on Government's

8   Exhibit 828, the diagram we talked about?

9   A.  Yes, it is.

10          MR. O'CONNOR:  Can I publish that, please?

11          THE COURT:  Yes, sir.

12      I'm not sure I'm understanding you when you say the exhibit

13   number.

14          MR. SCHATTMAN:  828.

15          THE COURT:  I show summary chart.

16          MR. O'CONNOR:  Can I approach the witness, please?

17          THE COURT:  Yes.

18          MR. O'CONNOR:  That's the sticker number, Your Honor.

19          THE COURT:  On your chart it shows McAuliffe as the

20   sponsoring witness and summary chart.

21          MR. O'CONNOR:  Can I have just a moment?

22          THE COURT:  Sure.  You can keep it as 828.  You just

23   need to -- you may need to re-number what you previously had as

24   828.

25          MR. O'CONNOR:  Okay.  Thank you.

1        (Brief pause in proceedings)

2              MR. O'CONNOR:  May I proceed, Your Honor?

3              THE COURT:  Yes.  I'm sorry.

4    Q.  (By Mr. O'Connor)  On this exhibit that we have got

5    published, Mr. Gardner, up there kind of on the top right-hand

6    of the exhibit, do we have an item that's drawn as a square and

7    a line through it that says Spy Club?

8    A.  Yes, you do.

9    Q.  Is that, generally, where the Spy Club was on that corner

10   of Lover's Lane?

11   A.  Yes, it is.

12   Q.  And then, Mr. Gardner, as you're facing the exhibit, to the

13   left are some dark black bold lines going up and down that

14   exhibit; is that right?

15   A.  Yes, it is.

16   Q.  Does that represent Central Expressway or 75?

17   A.  Pretty much.

18   Q.  And then down towards the middle of this exhibit, there is

19   a line that goes through Central Expressway that says

20   Mockingbird Lane.  Do you see that?

21   A.  Yes, I do.

22   Q.  And does that represent the exit that you know to be

23   Mockingbird Lane?

24   A.  Okay.

25   Q.  Is that right?

1    A.   Yes.

2    Q.   Okay.  And that's when you remember hearing the shots?

3    A.   Yes, sir, after we passed that lane.

4    Q.   And then you mentioned seeing sparks off of something.

5    What do you remember them being off of?

6    A.   The railing up over us I could see.  When I seen them, I

7    saw the railing.

8    Q.   Let me show you what's been introduced into evidence as

9    Government's Exhibits 72 and 73.  Do you see the railing in

10   those two pictures, Mr. Gardner?

11   A.   No, sir.  I wouldn't see them in those pictures because I

12   drove the car down from where we pulled over from where the

13   shots started at.

14   Q.   Okay.  So in those pictures, Exhibits 72 and 73, it shows

15   the white Cadillac stopped.  That stopped after you started

16   driving the car?

17   A.   Yes.  I really couldn't say if it was railing because I

18   just saw the sparks.  I mean, if I said it was railing, I would

19   be lying.  I didn't see -- but I saw sparks.

20   Q.   Okay.

21   A.   Now, what it was hitting, I don't know, but I saw the

22   sparks.

23   Q.   No problem.

24        So you tell Johnny, put your foot on the brakes?

25   A.   Yes, I did.

1   Q.  And you do what?

2   A.  I grabbed the steering wheel and pulled the car over.

3   Q.  Pulled the car over.

4   A.  Yes.

5   Q.  Where did you pull it over to, on the left side or the

6   right side of the freeway?

7   A.  The right side.

8   Q.  And are you and Johnny able to bring the car to a stop on

9   the right side of the freeway?

10  A.  Yes, we was.

11  Q.  When you all stopped the car there on the right side of the

12  freeway, what do you do next?

13  A.  I put the car in park.  I lift the arm rest up.  I got out,

14  went to the other side, opened the door, and he had already

15  started trying to pull himself over.  I pushed him over.  I got

16  in, and I tried to drive the car.

17  Q.  All right.  And then as you're driving the car, what

18  happens?

19  A.  One of the cars was shot out.  The tire was flat.  I

20  couldn't drive the car.  So I stopped.  I got out, and I was

21  just trying to flag somebody down to help me with him because

22  he was jumping up and down in the car, choking blood coming out

23  of his mouth, just a terrible thing.  I really panicked at that

24  point.

25  Q.  Okay.  So are you able to flag anyone down?

1    A.  Yes, I did.

2    Q.  Tell us about that.  I mean, what kind of car did you flag

3    down or who?

4    A.  It was a green van -- it was some guys that I had knew, and

5    they saw us -- they saw the whole incident.  They pulled

6    over -- they turned around and pulled over, and they helped me

7    get Johnny out of the car and into the van.

8    Q.  And when you all get Johnny into the van, what do you all

9    do next?

10   A.  We drove to Parkland Hospital.

11   Q.  Parkland?

12   A.  We called on the mobile phone first, and they were waiting

13   for us when we got there in emergency.

14   Q.  So you and these guys you knew in the van took Johnny over

15   to Parkland?

16   A.  Yes, we did.

17   Q.  And when you all get over to Parkland, do you stay there?

18   A.  Yeah, I stayed.  Yes, I stayed.

19   Q.  And then at some point while you're at Parkland, do you

20   learn that Johnny had died?

21   A.  Yes, he did.

22          MR. O'CONNOR:  Can I have a moment, please?

23          THE COURT:  Yes, sir.

24      (Brief pause in proceedings)

25   Q.  (By Mr. O'Connor)  Jerrell, would you tell the jury,

1   please, how many -- how would you describe the bullets?  You

2   said you saw a lot of sparks and then you heard, I guess, some

3   gunfire.  How would you describe it, a lot, a little?  How

4   would you characterize it?

5   A.  Actually, like -- you mean like how many shots?  I would

6   say like seven or eight.

7   Q.  And were they like fast shots or close shots?

8   A.  Fast.

9   Q.  What do you mean by that?

10  A.  (Indicating).

11  Q.  Okay.  And were they coming -- do you remember where they

12  were coming from?

13  A.  Behind me.  All right.

14      Were you able to see any of the shooters?

15  A.  Well, I didn't try to see them.  When I know the bullets

16  was coming from behind me, I wasn't able to see anything.

17  Q.  Fair enough.

18  A.  I really blacked out.

19  Q.  Fair enough.  Okay.

20      And the exhibits that you have in front of you,

21  Government's Exhibit 72, is it, and 73?

22  A.  Uh-huh.

23  Q.  Are those the pictures of the Cadillac?

24  A.  Yes, it is.

25  Q.  And are those the pictures of Johnny's Cadillac that you

1   all were driving in that night after you all left the Spy Club?

2   A.  Yes, it is.

3   Q.  And when you all left the Spy Club, it's early in the

4   morning hours of the next day, December 3?

5   A.  Yes, it was.

6          MR. O'CONNOR:  Pass the witness.

7          THE COURT:  Is there cross examination?

8          MR. BALL:  Yes, Your Honor.

9          THE COURT:  You may proceed.

10         MR. BALL:  Thank you.

11                  CROSS EXAMINATION

12  BY MR. BALL:

13  Q.  Good afternoon, Mr. Gardner.

14      This particular trip that you and your friend, Mr. Shelton,

15  made to the Spy Club that night, you had done that on a number

16  of prior occasions; is that correct?

17  A.  Yes, it was.

18  Q.  All right.  And I think you said Wednesday night seemed to

19  be a special night where there would be a lot of folks there,

20  and you might see some friends or acquaintances at the club

21  maybe that you hadn't seen since the last time or for some

22  time.  Is that one of the social activities there?

23  A.  Yes.

24  Q.  When you went to the club, it was you and Mr. Shelton

25  alone?  In other words, no one went with you; is that true?

1     Ms. Chappel.

2               THE WITNESS:  You're welcome.

3               MR. BALL:  I'll pass the witness.

4               MR. O'Connor:  No more questions.

5               THE COURT:  You may step down, ma'am.  Thank you.

6               THE WITNESS:  Thank you.

7               THE COURT:  Is Ms. Chappel free to go?

8               MR. O'CONNOR:  Yes, Your Honor.

9               MR. BALL:  Yes, Your Honor.

10              THE COURT:  You're released as well.  Thank you.

11         Please call your next witness.

12              MR. O'CONNOR:  Your Honor, we would call Rodney

13    Wilson, Witness Number 57.  Same Count Number 1, Overt Act E,

14    Count Number 3, Paragraph 4, Counts 4, 5, 6 and 7.

15              THE COURT:  Thank you.

16         Raise your right hand and be sworn.

17         (Witness sworn by the Court)

18              RODNEY WILSON, testified under oath as follows:

19                        DIRECT EXAMINATION

20    BY MR. O'CONNOR:

21    Q.   State your name for the record, please.

22    A.   Rodney O'Neal Wilson.

23    Q.   Mr. Wilson, what do you do for a living?

24    A.   Right now I work with a contractor for The Room Store.

25    Q.   Okay.  How old are you?

1    A.   Twenty-nine.

2    Q.   What do you do, move furniture for them?

3    A.   Yes, sir.

4    Q.   And you've had some trouble with the law in the past,

5    haven't you, Mr. Wilson?

6    A.   Yes, sir.

7    Q.   What sort of trouble have you had?

8    A.   Possession of a controlled substance.

9         THE COURT:   Why don't you pull the microphone towards

10   you and get closer to yourself, because it's hard to hear in

11   this courtroom.

12        THE WITNESS:   Okay.

13   Q.   (By Mr. O'Connor)   Now, in fact, in connection with your

14   previous problems, you have been to prison before; is that

15   right?

16   A.   Yes, sir.

17   Q.   How long did you go to prison for?

18   A.   Just about five years.

19   Q.   And then after you were released from prison -- state

20   prison; is that right?

21   A.   Yes, sir.

22   Q.   And after you were released from state prison, did you come

23   back on parole here to the North Texas area?

24   A.   Dallas County.

25   Q.   Specifically, Dallas County?

1   A.  Yes, sir.

2   Q.  Is that where you're from?

3   A.  Yes, sir.  That's where I've been most of my life.  I was

4   born in Oklahoma City.

5   Q.  All right, sir.  When did you get out of prison?

6   A.  November 25, 1998.

7   Q.  All right.  When you got out of prison in November 1998,

8   did you go live with, what, some family members or on your own

9   or what?

10  A.  My brother, Lester Wilson.

11  Q.  Lester Wilson?

12  A.  Yes.

13  Q.  Did there come a time when you were living with your

14  brother, Lester Wilson, that you were asked to go with some

15  folks to a club in Dallas called the Spy Club?

16  A.  Yes, sir.

17  Q.  All right.  And do you remember that to be -- do you have a

18  specific date that you remember that to be?

19  A.  It's like December that same year, December 1998.

20  Q.  Okay.  Was it the first part of December?

21  A.  It was the early part of December because I hadn't been out

22  a month yet.

23  Q.  All right, sir.  And who did you go to the Spy Club with?

24  A.  Donald Britton and Chris.  I don't know his last name.

25  Q.  Donald Britton?

1    A.   Yes.

2    Q.   And Chris?

3    A.   Yes.

4    Q.   And you all went to the Spy Club, and when you got to the

5    Spy Club -- do you remember what time you got to the Spy Club,

6    Mr. Wilson?

7    A.   Probably about 12:00, 12:15.

8    Q.   And do you remember about what time you left the Spy Club?

9    A.   We left the parking lot -- I don't know exactly what time,

10   but we hung around the parking lot a little before we left.

11   Q.   Did you leave the Spy Club there when it was closed or was

12   closing?

13   A.   Yes, it was closing.

14   Q.   So you say you hung around the parking lot some and then

15   left?

16   A.   Yes.

17   Q.   And then did you leave with the same people that you had

18   came with?

19   A.   Yes.

20   Q.   Donald Britton and Chris?

21   A.   Yes.

22   Q.   Whose car were you in?

23   A.   Donald Britton.

24   Q.   Was he driving the car?

25   A.   Yes.

1    Q.  What kind of car did he have?

2    A.  It was a white Chevy, four-door Chevy, I think, Oldsmobile

3    or Chevy, Cutlass, something like that.

4    Q.  Just be sure you talk good and loud, okay, because you're

5    kind of fading on me?

6    A.  Okay.

7          MR. O'CONNOR:  Your Honor, can I approach the witness,

8    please?

9          THE COURT:  You may.

10   Q.  (By Mr. O'Connor)  Sir, I want to show you what's been

11   marked as Government's Exhibits 760, 761, 762, and 763.  Do you

12   recognize these exhibits?

13   A.  Yes.  I was there when they took the pictures.

14   Q.  And what are these pictures of?

15   A.  Donald Britton's car, the car I was riding in.

16   Q.  And that's the car you all were riding in when you all left

17   the Spy Club that night in early December?

18   A.  Yes, sir.

19          MR. O'CONNOR:  We would ask, Your Honor, that Exhibits

20   760, 761, 762, and 763 be admitted into evidence.

21          MR. BALL:  No objection.

22          THE COURT:  That's 760 through 763; is that correct?

23          MR. O'CONNOR:  Yes, sir.

24          THE COURT:  Admitted.

25   Q.  (By Mr. O'Connor)  When you all left the Spy Club that

1  night, or that morning, where were you all headed to?

2  A.  An after hours called Judy's in South Dallas.

3  Q.  Judy's in South Dallas?

4  A.  Yes.

5  Q.  And you said the words "after hours"?

6  A.  Yes, like after -- the spot that everyone goes to after the

7  club.

8  Q.  Do you all go eat?

9  A.  Yes.

10  Q.  Okay.  And are you going -- do you get on the freeway at

11  all?

12  A.  From Lover's Lane went southbound on 75.

13  Q.  Okay.  And as you're going southbound on Highway 75, you

14  said Donald Britton is driving, where are you in that car?

15  A.  On the passenger side in the front.

16  Q.  And then Chris, this dude Chris, is in the back seat?

17  A.  Yes.

18  Q.  And you all are going southbound?

19  A.  Right.

20  Q.  And what are you all doing as you all are driving

21  southbound?

22  A.  Just riding, listening to the music.

23  Q.  Listening to music?

24  A.  Right.

25  Q.  Are you all going -- how fast are you all going, or what

1   speed do you think you all are going at?

2   A.  Probably about 75, 80.

3   Q.  Do people typically drive that fast?

4   A.  After the club, it's like a speed zone.

5   Q.  Okay.  Everybody's driving fast?

6   A.  Everybody.

7   Q.  Do you remember what kind of traffic was on there as you

8   all are leaving?

9   A.  Well, we just was catching the light coming from Lemon to

10  get on the freeway.  It was like just a line of cars leaving

11  the club which usually go that way, and we headed southbound

12  there about that time.

13  Q.  All right.  And as you all are going southbound heading to

14  After Hours, do you notice anything unusual?

15  A.  Well, by that time this dark colored pickup truck is coming

16  up from behind us.  Well, first, I noticed the music changed

17  because he had the speakers in the back, you know, the music

18  changed, you know what I'm saying.  So ...

19  Q.  Okay.  So you noticed something happened to the music?

20  A.  Yeah.  And then glass hit my face.

21  Q.  Okay.  Let me stop you right there.  You mentioned

22  something about the speakers.

23      Your Honor, can I publish 760?

24          THE COURT:  You may.

25  Q.  (By Mr. O'Connor)  Sir, what is this picture of,

1    Government's Exhibit 760?

2    A.  It's the trunk of the car.  It's the sound system.

3    Q.  And up here at the top where this red dot is at the top of

4    the picture that's identified as Government's Exhibit 760, what

5    are those?

6    A.  Four speakers.

7    Q.  Okay.  Is that what you're talking about, the sound system?

8    A.  Yes.

9    Q.  And then you said as you're driving, you noticed that the

10   sound system changed?

11   A.  Yes.

12   Q.  In what way?

13   A.  Well, the bass changed.  You could tell there was a hole in

14   one of the speakers or something went wrong.

15   Q.  And what did you do or say when you noticed that?

16   A.  Well, we all started looking back.

17   Q.  All right.

18   A.  Well, I started looking back, and I told him that something

19   was wrong.  But at the same time as that, glass hit my face.

20   Q.  All right.

21   A.  And we started hearing shots, and as I was looking back, I

22   could see it was a dark-colored pickup truck, blue or black.

23   Q.  Okay.

24   A.  And they were shooting out of the window.

25   Q.  Okay.  And what do you remember about the people in the

1  dark-colored pickup truck?

2  A.   Well, it was three guys in the truck, and they were

3  shooting out the passenger side of the truck at a white

4  Cadillac.   And I couldn't see none of the guys' faces, but from

5  what I saw, one of the guy's skin complexion, probably my

6  color, he was lighter than the other two.   He wasn't as dark as

7  the other two.   And it was just a lot of shots, a lot of

8  shooting.

9  Q.   And in terms of the guy with the lighter skin complexion,

10  are you able to tell us where within the truck he's sitting?

11  A.   Well, the guy in the middle and the guy in the passenger

12  side, they both was at the window.   So it's like they was both

13  hanging out the window.

14  Q.   Okay.

15  A.   So I can't really tell.

16  Q.   No problem.

17       As you see this happening -- let me ask you this.   When is

18  it in this sequence that you first see a white Cadillac?

19  A.   Well, the Cadillac was getting on the freeway.   And I think

20  we was in the middle lane, and it was in the far right lane,

21  and the truck came up behind both of us as the white Cadillac,

22  because as we turned -- I think there's two turn lanes, and

23  they turned to get on the freeway, and we turned sometime when

24  we went around because we was going fast, and then the white

25  Cadillac was going.

1    Q.  All right.  So you saw it before it got on the freeway?

2    A.  Yes.

3    Q.  And you mentioned -- I guess why I'm asking this is, you

4    mentioned a minute ago that you thought the truck was shooting

5    at the white Cadillac?

6    A.  Yes.

7    Q.  And I'm just trying to get an idea from you.  Can you tell

8    us why you think that, what you were seeing that leads you to

9    believe that that was happening?

10   A.  Because all the shots that was headed toward the white

11   Cadillac.

12   Q.  All right.  So the guys who were hanging out the window

13   looked to be shooting towards that white Cadillac?

14   A.  Oh, they were definitely shooting toward that white

15   Cadillac.

16   Q.  Okay.  What do you remember happening?  Just take us

17   through the sequence.

18   A.  Well, as we was going southbound, as we speeding, as we

19   looking, you know what I'm saying, you could see the shots

20   hitting rails, you know part of the freeway, and the white

21   Cadillac pulled over to the side.  So as we was going, you

22   know, we could still hear shots coming.  So we didn't know if

23   they were shooting us or not.  So I think we exit Lemon Avenue

24   and stopped at a Texaco, and I told Donald -- I told him we

25   should go back to see what was going on because we thought he

1   was shooting at us, because me and Chris was questioning him

2   about what he had done because we wanted to know whether

3   somebody was shooting at him or not.  So we rode back around to

4   Lemon -- I mean, to Lover's, and we got back on the freeway

5   that we got back be on.  So by the time we made it back, we saw

6   the Cadillac, and it was an ambulance leaving, police cars,

7   some people standing on the side of the wall by the white

8   Cadillac, and we just road on by and went on.

9   Q.  All right, sir.  And you and Chris, when you say you all

10  were trying to figure out if Donald had gotten into it with

11  someone, that's the driver of the car?

12  A.  Right.

13  Q.  Donald Britton.

14  A.  So as we stopped -- we stopped at Texaco -- we realized

15  that his car had been hit.

16  Q.  All right.  Where was his car hit?

17  A.  In the back by the license plate.

18  Q.  Can we bring up Government's Exhibit Number 763, please?

19       Okay.  Is this the Cadillac -- the license plate you're

20  talking about, Mr. Wilson?

21  A.  Yes.

22  Q.  Okay.  And you said that you remember his car being -- his

23  license plate being hit.  Do you see that hole there and the

24  Texas flag there below the star?

25  A.  Yes.

1  Q.  And is that what you're talking about, the bullet hole

2  you're talking about?

3  A.  Yes.

4  Q.  And can we pull up Exhibit Number 761?  And you remember

5  seeing that at that time?

6  A.  Yes.

7  Q.  And Government's Exhibit 761, do you remember seeing the

8  bullet hole where the bullet appears to come into the trunk

9  area of that car?

10  A.  Yes.  It went through the license plate, went through the

11  trunk, through one of the speakers, through the back seat,

12  through the driver's seat.  As a matter of fact, the bullet

13  went through Donald Britton's shirt and hit the speed

14  speedometer thing.  That's where the glass came from.  And I

15  had the bullet, but I don't know what happened to it.

16  Q.  Okay.  Let's talk about that in a minute.  Can you pull up

17  762 before we get there?

18      This white car here, do you recognize it?

19  A.  Yes.  That's the car.

20  Q.  That's Donald Britton's car?

21  A.  Right.

22  Q.  That you all were driving?

23  A.  Right.

24  Q.  And it's the car with these bullet holes we talked about?

25  A.  Right.

1  Q.  All right.  And the glass you're saying you were hit with

2  was off the speedometer thing?

3  A.  Yes.

4  Q.  And Donald Britton was the driver, and you said something

5  about the bullets doing something to him?

6  A.  It went through his shirt.

7  Q.  All right.  And how do you know that?

8  A.  Because as we got out, when we saw the hole, you know what

9  I'm saying, everybody was checking themselves because of the

10  glass.  And when he was checking, he searched himself, and I

11  said, you have a hole in your shirt.  And he looked, and I was

12  with him because he had bought that shirt earlier that day, and

13  I was with him.

14  Q.  He bought that shirt that day when you were with him?

15  A.  The same day.

16  Q.  And you think the glass was off the speedometer?

17  A.  Yes.

18  Q.  Now, you said something about having the bullet, and you

19  don't know where the bullet is.  Tell us how it came about that

20  you had the bullet.

21  A.  Well, as we stopped at Texaco when we found out the car was

22  really hit, when we was checking ourselves, from the glass, you

23  know what I'm saying, we had glass on ourselves.  When I looked

24  on the floor, I just saw the bullet and I picked it up, and I

25  said this was the bullet.  And I said, what did you do?  And he

1   was like, I didn't do nothing.  I said, well, we should go

2   back.  So we just got back in the car and rode back by.

3   Q.  And then what did you do with that bullet?

4   A.  Well, I had it for awhile.  I think I left it in Wichita

5   Falls because my cousin, he played football -- well, he played

6   football with Midwestern State, and we would catch at home

7   games, and I had it.  From there, I don't know at what point

8   that I did with it or where it went to.  So ...

9   Q.  At some point, did you learn that the Dallas Police

10  Department had somehow gotten your name as a potential witness

11  to this shooting?

12  A.  Yes.  They came to the house and picked me up.

13  Q.  To talk to you about what you had seen?

14  A.  That's the same day they took pictures of the car.

15  Q.  And did you tell them then that you had the bullet?

16  A.  Yes.  Well, when they picked me up, they knew about the

17  bullet, and that's what they wanted -- that's what he told me

18  he wanted me for.  They asked be about the bullet, and I told

19  them I no longer had it, and I gave a statement then.

20  Q.  Okay.  And then, Mr. Wilson, did there come a time when the

21  FBI tried to get in touch with you about coming down here to

22  testify like you are today?

23  A.  Yes, sir.

24  Q.  And during the time that they were trying to get in touch

25  with you, did you know that you had a parole warrant for your

1   arrest?

2   A.  Yes, sir.

3   Q.  What was that warrant -- that was that parole warrant for?

4   A.  A technical violation.

5   Q.  Tell us what that means, technical violation.

6   A.  Well, it was failure to report.

7   Q.  Okay.  And did you have concerns about talking to the FBI

8   about what you had seen because of your parole warrant?

9   A.  Right.

10  Q.  And did you express that to the FBI?

11  A.  Right.

12  Q.  Did you talk to them on the phone or through an

13  intermediary like --

14  A.  Well, I talked to them through -- I think he was an

15  investigator that was looking for me.  And I called him and

16  told him, you know what I'm saying, I'm just tired of all this

17  running, and, you know, what's the deal?  And he told me what

18  was going on.  I told him I had no problem that I would come

19  in.  So I went in.

20  Q.  Okay.  And did they agree to talk to the parole people for

21  you or do something about that warrant?

22  A.  Yes.  He had established that fact with me, told me that

23  everything would be taken care of, that they just wanted my

24  testimony and to come in and talk to them.  And I told them I

25  wasn't worried about it.  I was just ready to get everything

1    over it.  So I think I went in like January 18.

2    Q.  And that somebody is not this guy (indicating)?  It's some

3    other person?

4    A.  Yes.

5    Q.  All right.  But did you ultimately come in and meet with

6    this guy?

7    A.  Yes, sir.

8    Q.  And did that parole warrant -- did they arrest you, or did

9    that parole warrant get lifted for you or what?

10   A.  Well, as of now, I don't think the warrant is lifted, but I

11   went in and they talked to me, and she said that everything

12   would be all right.  And I told her, well, if that means if I

13   get stopped today, I will get arrested.  So I just came in.

14   You know, I don't know what's going on with it.  I haven't

15   heard back from them.  Every day they told me to come, I went.

16   Every day they told me to call, I called, and I don't know have

17   no idea what's going on.  I'm just trying to get over with it.

18          MR. O'CONNOR:  All right.  Pass the witness.

19          THE COURT:  Cross examination?

20          MR. BALL:  Yes, Your Honor.

21                    <u>CROSS EXAMINATION</u>

22   BY MR. BALL:

23   Q.  Mr. Wilson, it sounds to me from what you just said with

24   regard to this parole matter, you're still a little in the dark

25   on what's going to happen; is that right?



# IN UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA     )
                                  )
            v.                )     **SUPPLEMENTAL REPORT**
                                  )
JULIUS OMAR ROBINSON     )     **Case No. 4:00-CR-260-Y(02)**

---

**Prepared for:**         Federal Bureau of Prisons

**Prepared by:**         Vicki D. McMillan
                              Senior U.S. Probation Officer
                              Fort Worth, Texas
                              (817) 978-3633, Ext. 228

**Assistant U.S. Attorney** | **Defense Counsel** (Retained)
Reed C. O'Connor | Wes Ball and Jack V. Strickland
801 Cherry Street, Suite 1700 | 4025 Woodland Park Boulevard, Suite 100
Fort Worth, Texas 76102-6897 | Arlington, Texas 76013
(817) 252-5200 | (817) 860-5000

**Sentence Date:**         June 5, 2002

**Offense:**    Count 3:        Murder While Engaging in a Continuing Criminal Enterprise (21 USC § 848(e)) - Death, a Class A felony.

            Count 7:        Murder in Course of Carrying/Using a Firearm During a Drug Trafficking Crime (18 USC § 924(j)) - Life imprisonment, a Class A Felony.

            Count 11:      Murder in Course of Carrying/Using a Firearm During a Drug Trafficking Crime (18 USC § 924(j)) - Death, a Class A Felony.

            Count 12:      Murder While Engaging in Possession of More Than 5 Kilograms of Cocaine With Intent to Distribute (21 USC § 841(a)(1) & (b)(1)(A) and 848(e)) - Life imprisonment, a Class A Felony.

Count 15:     Murder in Course of Carrying/Using a Firearm During a Drug Trafficking Crime (18 USC § 924(j)) - Death, a Class A Felony.

Count 17:     Possession of a Firearm in Furtherance of a Drug Trafficking Crime (18 USC § 924(c)(1)(A)(ii) & 924(c)(1)(C)(i)) - 25 years consecutive, a Class A felony.

Sentences were not imposed on Counts 1 and 2 because they are lesser included offenses of Count 3. Sentences were not imposed on Counts 4, 5, and 6 because they are lesser included offenses of Count 7. Sentences were not imposed on Counts 8, 9, and 10 because they are lesser included offenses of Count 11. Sentences were not imposed on Counts 13 and 14 because they are lesser included offenses of Count 15.

**Date Offense Concluded:**     Count 3: November 8, 2000
Count 7: December 3, 1998
Count 11: May 9, 1999
Count 12: July 12, 1999
Count 15: July 12, 1999
Count 17: November 8, 2000

**Release Status:**     Arrested on November 2, 200; detained.

**Detainers:**     None

**Codefendants:**     See attached list.

**Related Cases:**     None

**Date Report Prepared:**     June 19, 2002

## Identifying Data:

| | |
|---|---|
| **Date of Birth:** | , 1976 |
| **Age:** | 26 |
| **Race:** | Black/Non-Hispanic |
| **Sex:** | Male |

| | |
|---|---|
| **Social Security No.:** | -6554 |
| **FBI No.:** | 764697PB6 |
| **U.S. Marshals No.:** | 26190-177 |
| **Other ID No.:** | Texas SID No. 05398223 |
| **TXN PACTS No.:** | 29000 |

| | |
|---|---|
| **Education:** | High School Graduate |
| **Dependents:** | None |
| **Citizenship:** | United States |

| | |
|---|---|
| **Mailing Address:** | Federal Medical Center - Jail Unit<br>3150 Horton Road<br>Fort Worth, Texas 76119 |
| **Residence Address:** | Federal Medical Center - Jail Unit<br>3150 Horton Road<br>Fort Worth, Texas 76119 |
| **Aliases:** | "Scarface"<br>"Scar"<br>"Face" |

**Photograph not available**

## DEFENDANT LIST
## 4:00-CR-260-Y

Nathan Deshawn Henderson (01):
(aka: "Cash," "Nate")

Pleaded guilty to Counts 1 and 16 of the superseding Indictment filed April 19, 2001. Pending sentencing.

Julius Omar Robinson (02):
(aka: "Scarface;" "Scar;" "Face")

Found guilty of Counts 1 through 15 and Count 17 of the second superseding Indictment filed on June 19, 2001. Sentencing is scheduled for June 17, 2002.

Jason Gehring (03):

Pleaded guilty to Counts 1 and 2 of a superseding Information. Pending sentencing.

Iris Wade (04):

Pleaded guilty to Counts 1 and 2 of a superseding Information. Pending sentencing.

Victor Jimenez (05):
(aka "Vic")

Pleaded guilty to Counts 1 and 2 of a superseding Information. Pending sentencing.

Javier Guadalupe Aguilar (06):

Pleaded guilty to Count 1 of the superseding Indictment filed on April 19, 2001. Pending sentencing.

Marcus Jwain Robinson (07):

Pleaded guilty to Count 1 of a superseding Information. Sentenced on December 10, 2001, to 14 months custody and 3 years supervised release.

John Turner (08):

Found guilty of Counts 1 and 2 of the superseding Indictment filed on April 19, 2001. Sentenced on December 10, 2001, to 262 months on Counts 1 and 2 to run concurrently, and 5 years supervised release on each count to run concurrently.

Jamila Marie Camp (09):

Pleaded guilty to Counts 1, 2, and 3 of a superseding Information. Pending sentencing.

Fanisha Hill (10):

Found not guilty.

Leteshia Lenore Barnett (11):

Pleaded guilty to Count 1 of a superseding Information. Pending sentencing.

| | |
|---|---|
| Jewell Ewing (12):<br>(aka: "Duke") | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Cantral Huggins (13):<br>(aka: "Crumb") | Pleaded guilty to Count 1 of a superseding Information. Sentenced on December 18, 2001, to 60 months custody and 3 years supervised release. |
| Terrence Holimon (14):<br>(aka: "Bone") | Pleaded guilty to Count 1 of the second superseding Indictment. Sentencing scheduled for May 20, 2002. |
| L. J. Britt (15):<br>(aka: "Capone") | Pending trial. |
| Richard Smart (16):<br>(aka: "Black") | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Troy Lee Simpson (17): | Pleaded guilty to Counts 1 and 2 of a superseding Information. Sentenced on December 10, 2001, to time served on Counts 1 and 2, and 3 years supervised release on each count to run concurrently. |
| Brandi Scales (18): | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Jeanne Denice Wilkins (19): | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Misty Grounds (20): | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Travis Dixon (21): | Pleaded guilty to Count 1 of a superseding Information. Sentenced on November 26, 2001, to 51 months custody. |
| Steven Toston (22): | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Angelo Harris (23):<br>(aka: "Step") | Pleaded guilty to Count 11 of the second superseding Indictment. Sentencing is scheduled for May 6, 2002. |

| Kimberly Johnson (24): | Pleaded guilty to Count 1 of a superseding Information. Sentenced on November 26, 2001, to 2 years probation. |
| --- | --- |
| Santana Minor (25): | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Tamieka Sibley (26): | On June 18, 2002, she was acquitted on Count 1 of the second superseding Indictment. |
| Timothy Dewayne Caldwell (27): (aka: "Timmy") | Pleaded guilty to Count 1 of a superseding Information. Sentenced on January 22, 2002, to 33 months custody and 1 year supervised release. |
| Howard Edward Ringer (28): | Pleaded guilty to Count 1 of a superseding Information. Sentenced on January 7, 2002, to 12 months custody and 3 years supervised release. |
| Cody Elliott (29): | Pleaded guilty to Count 1 of a superseding Information. Sentenced on November 26, 2001, to 30 months custody and 3 years supervised release. |
| Derrick Simon (30): (aka: "D") | Pleaded guilty to Count 1 of a superseding Information. Sentenced on November 26, 2001, to 3 years probation. |
| Lashandra Lynette Adams (31): | Pleaded guilty to Count 1 of a superseding Information. Sentenced on December 18, 2001, to 2 years probation. |
| Stephen Williams (32): | Pleaded guilty to Count 1 of a superseding Information. Sentenced on December 18, 2001, to time served and 1 year supervised release. |
| Reginald Kinchen (33): | Pleaded guilty to Count 1 of a superseding Information. Sentenced on December 10, 2001, to 2 years probation and $1,000 fine. |
| Carmen Nicole Byrd (34): | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Angela Leach (35): | Pleaded guilty to Count 1 of a superseding Information. Sentenced on December 10, 2001, to 12 months and one day custody, and 1 year supervised release. |

| Edward Jenkins (36):<br>(aka: "Bear") | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Dorothy Hodges (37):<br>(aka: "Dorry") | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Hendrick Ezell Tunstall (38) | Pleaded guilty to Count 12 of the second superseding Indictment. Pending sentencing. |
| Tyrone Bryant (39): | Pleaded guilty to Count 12 of the second superseding Indictment. Sentencing is scheduled for April 15, 2002. |
| Christhian Morales (40): | Pleaded guilty to Count 12 of the second superseding Indictment. Sentencing is scheduled for April 22, 2002. |
| Edy Sonia Zamudio (41): | Pleaded guilty to Count 12 of the second superseding Indictment. Sentencing is scheduled for April 22, 2002. |
| Crystal Mancilla (42): | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Dakari Warner (43):<br>(aka: "Dakari Sells," "DK") | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |
| Leon Jenkins (44): | Pleaded guilty to Count 1 of a superseding Information. Pending sentencing. |

## PART A. THE OFFENSE

### Charge and Conviction

1.  On June 19, 2001, defendants Nathan Deshawn Henderson (aka: "Cash," "Nate"); **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face"); Jason Gehring; Victor Jimenez (aka: "Vic"); Javier Guadalupe Aguilar; Marcus Jwain Robinson; John Turner; Fanisha Hill; Jewell Ewing (aka: "Duke"); Cantral Huggins (aka: "Crumb"); Terrence Holimon (aka: "Bone"); L. J. Britt (aka: "Capone"); Richard Smart (aka: "Black"); Travis Dixon; Steven Toston; Angelo Harris (Aka: "Step"); Kimberly Johnson; Tamieka Sibley; Hendrick Ezell Tunstall; Tyrone Bryant; Christhian Morales; Edy Sonia Zamudio; Dakari Warner (aka: "Dakari Sells," "DK"); and Leon Jenkins were named in a 17 count superseding Indictment filed in the Northern District of Texas, Fort Worth Division. This Indictment superseded the Indictments previously filed on November 2, 2000, and April 19, 2001. The second superseding Indictment added additional counts. Count 1 of the superseding Indictment charged the named defendants with Conspiracy to Distribute More Than 100 Kilograms of Marihuana, in violation of 21 USC §846, the penalty for which is found in 21 USC § 841(b)(1)(B). The various overt acts pertaining to Count 1 began on or about January 1, 1997, the exact date being unknown, and continued thereafter until at least November 8, 2000.

2.  Count 2 of the superseding Indictment charged **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face"); Victor Jimenez (aka: "Vic"); John Turner; L.J. Britt (aka: "Capone"); Angelo Harris (aka: "Step"); Hendrick Ezell Tunstall; Tyrone Bryant; Christhian Morales; Edy Sonia Zamudio; Dakari Warner (aka: "Dakari Sells," "DK"); and Leon Jenkins with Conspiracy to Distribute and Distribution of More Than 5 Kilograms of a Mixture and Substance Containing Cocaine, in violation of 21 USC § 846, the penalty for which is found in 21 USC § 841(b)(1)(A). The various overt acts pertaining to Count 2 began on or about January 1, 1997, and continued thereafter until November 8, 2000.

3.  Count 3 of the superseding Indictment charged **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face"); Jason Gehring; John Turner; Misty Grounds; Leteshia Lenore Barnett; Angelo Harris (aka: "Step"); Reginald Kinchen; Jewell Ewing (aka: "Duke"); Cantral Huggins (aka: "Crumb"); Jeanne Denise Wilkins; Steven Toston; Carmen Byrd; Brandi Scales; Edward G. Jenkins (aka: "Bear"); Jamila Marie Camp; Santana Minor; Dorothy Hodges (aka: "Dorry"); Marcus Jwain Robinson; L. J. Britt (aka: "Capone"); Richard Smart (aka: "Black"); Hendrick Ezell Tunstall; Tyrone Bryant; Christhian Morales; Dakari Warner (aka: "Dakari Sells," "DK"); and Leon Jenkins with Engaging in a Continuing Criminal Enterprise, in violation of 21 USC § 848. The continuing series of felonies pertaining to Count 3 began on or about January 1, 1997, and continued thereafter until the date of return of this Indictment.

4. Count 4 of the superseding Indictment charged defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face") and L. J. Britt (aka: "Capone") with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 USC § 924(c)(1)(A)(i).

5. Count 5 of the superseding Indictment charged defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face") and L. J. Britt (aka: "Capone") with Intentionally and Knowingly Carry and Use Firearms, and did brandish such firearms, During and in Relation to a Drug Trafficking Crime, in violation of 18 USC § 924(c)(1)(A)(ii).

6. Count 6 of the superseding Indictment charged defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face") and L. J. Britt (aka: "Capone") with Intentionally and Knowingly Carry and Use Firearms, and did discharge such firearms, During and in Relation to a Drug Trafficking Crime, in violation of 18 USC § 924(c)(1)(A)(iii).

7. Count 7 of the superseding Indictment charged defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face") and L. J. Britt (aka: "Capone") with Intentionally and Knowingly Carry and Use Firearms, and did discharge such firearms, During and in Relation to a Drug Trafficking Crime; and caused the death of Johnny Lee Shelton through the use of such firearms and such killing being murder as defined in 18 USC § 1111, in violation of 18 USC § 924(j).

8. The firearm violations identified in Counts 4, 5, 6, and 7 occurred on December 3, 1998, and are related to the offenses alleged in Counts 1 and 3 of the superseding Indictment.

9. Count 8 of the superseding Indictment charged defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face") and Angelo Harris (aka: "Step") with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 USC § 924(c)(1)(A)(i).

10. Count 9 of the superseding Indictment charged defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face") and Angelo Harris (aka: "Step") with Intentionally and Knowingly Carry and Use Firearms, and did brandish such firearms, During and in Relation to a Drug Trafficking Crime, in violation of 18 USC § 924(c)(1)(A)(ii).

11. Count 10 of the superseding Indictment charged defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face") and Angelo Harris (aka: "Step")with Intentionally and Knowingly Carry and Use Firearms, and did discharge such firearms, During and in Relation to a Drug Trafficking Crime, in violation of 18 USC § 924(c)(1)(A)(iii).

2

12. Count 11 of the superseding Indictment charged defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face") and Angelo Harris (aka: "Step") with Intentionally and Knowingly Carry and Use Firearms, and did discharge such firearms, During and in Relation to a Drug Trafficking Crime; and caused the death of Juan Reyes through the use of such firearms and such killing being murder as defined in 18 USC § 1111, in violation of 18 USC § 924(j).

13. The firearm violations identified in Counts 8, 9, 10, and 11 occurred on May 9, 1999, and are related to the offenses alleged in Counts 2 and 3 of the superseding Indictment.

14. Count 12, paragraph 1, of the superseding Indictment charged defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face"); L. J. Britt (aka: "Capone"); Hendrick Ezell Tunstall; Tyrone Bryant; Christhian Morales; and Edy Sonia Zamudio with Possession With Intent to Distribute More Than 5 Kilograms of a Mixture and Substance Containing Cocaine, and Aiding and Abetting, in violation of 21 USC § 841(a)(1) & (b)(1)(A). Paragraph 2 charged that the defendants did intentionally kill Rudolfo Resendez during the course of engaging in an offense (a violation of 21 USC § 841(a)(1)) punishable under 21 USC § 841(b)(1)(A), in violation of 21 USC § 848(e)(1)(A).

15. Count 13, paragraph 1, of the superseding Indictment charged defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face"); L. J. Britt (aka: "Capone"); Hendrick Ezell Tunstall; Tyrone Bryant; and Christhian Morales with Possession of Firearms in Furtherance of a Drug Trafficking Crime; paragraphs 2 and 3 of Count 13 reflects defendant Edy Sonia Zamudio aiding and abetting the aforementioned defendants in furtherance of the conspiracy and coconspirators conduct was reasonably foreseeable to Edy Sonia Zamudio; in violation of 18 USC §§ 924(c)(1)(A), 924(c)(1)(A)(i), & 924(c)(1)(C).

16. Count 14 of the superseding Indictment charged defendants L. J. Britt (aka: "Capone") and Hendrick Ezell Tunstall did intentionally and knowingly Carry and Use Firearms, and did discharge such firearms, During and in Relation to a Drug Trafficking Crime. Defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face"); Edy Sonia Zamudio; Tyrone Bryant; and Christhian Morales aided and abetted defendants L. J. Britt (aka: "Capone") and Hendrick Ezell Tunstall in furtherance of the conspiracy; and coconspirators conduct was reasonably foreseeable to defendants **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face"); Edy Sonia Zamudio; Tyrone Bryant; and Christhian Morales, in violation of 18 USC §§ 924(c)(1)(A), 924(c)(1)(A)(iii), & 924(c)(1)(C).

3

17. Count 15, paragraph 1, of the superseding Indictment charged defendants L. J. Britt (aka: "Capone") and Hendrick Ezell Tunstall did intentionally and knowingly Carry and Use Firearms, and did discharge such firearms, During and in Relation to a Drug Trafficking Crime, and cause the death of Rudolfo Resendez through the use of such firearms and such killing being murder as defined in 18 USC § 1111, in violation of 18 USC § 924(j). Paragraph 2 of Count 15, alleges defendants Edy Sonia Zamudio; **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face"); Tyrone Bryant; and Christhian Morales are each criminally responsible as coconspirators of defendants L. J. Britt (aka: "Capone") and Hendrick Ezell Tunstall because the conduct was committed in furtherance of the conspiracy and was reasonably foreseeable by defendants Edy Sonia Zamudio; **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face"); Tyrone Bryant; and Christhian Morales. Paragraph 3 of Count 15 charged defendants Edy Sonia Zamudio; **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face"); Tyrone Bryant; and Christhian Morales were criminally responsible in that they did willfully aid, abet, counsel, command, induce, and procure the commission of such conduct.

18. The violations alleged in Counts 12, 13, 14, and 15 occurred on July 12, 1999.

19. Count 16 of the superseding Indictment charged defendant Nathan Deshawn Henderson (aka: "Cash," "Nate") with Possession of a Firearm During a Drug Trafficking Crime. Specifically, he possessed two firearms, to wit: one BFI .223 caliber semi-automatic assault rifle, Serial No. P05130, and one .45 caliber UZI pistol, Serial No. UP52637, in furtherance of a drug trafficking crime and the possession with intent to distribute 4.316 kilograms of marihuana, in violation of 18 USC §§ 924(c)(1)(A) & 924(c)(1)(A)(i).

20. Count 17 of the superseding Indictment charged defendant **Julius Omar Robinson** (aka: "Scarface," "Scar," "Face") with Possession of a Firearm During a Drug Trafficking Crime. Specifically, he possessed three firearms, to wit: one .9mm UZI pistol, Serial No. 18740; one Smith and Wesson .357 caliber pistol, Serial No. 5224575; and one SKS 7.65x39 semi-automatic assault rifle, Serial No. 1510198P, in furtherance of a drug trafficking crime, in violation of 18 USC §§ 924(c)(1)(A), 924(c)(1)(A)(i), & 924(c)(1)(C).

21. The firearms violation alleged in Counts 16 and 17 occurred on November 8, 2000.

22. On November 2, 2000, defendant **Julius Omar Robinson** was arrested by federal authorities in Fort Worth, Texas, without incident. He was taken before U.S. Magistrate Judge Charles Bleil in Fort Worth for an initial appearance hearing. Following the hearing, the defendant was ordered detained pending trial. He remains in federal custody at Federal Medical Center-Jail Unit in Fort Worth, Texas.

4

23. On February 19, 2002, the defendant appeared before U. S. District Judge Terry R. Means, pleaded not guilty, and proceeded to trial on the second superseding Indictment filed June 19, 2001. On March 11, 2002, the jury found **Robinson** guilty of the offenses charged in Counts 1 through 15 and Count 17 of the second superseding Indictment. **Robinson** was not named in Count 16. On March 18, 2002, the jury recommended the death sentence on Counts 3, 7, and 11, and Life sentences on Counts 12 and 15.

24. The Court ordered the probation officer to prepare a Presentence Report, and scheduled *sentencing for June 17, 2002, in Fort Worth, Texas.*

25. On April 22, 2002, **Robinson's** attorneys, Jack V. Strickland and Wes Ball, filed a letter with the Court requesting the Presentence Report be waived and to proceed with sentencing. On May 8, 2002, the Court requested an agreed Motion to Waive the Presentence Report and Proceed to Sentencing be filed by the government and the defendant. The motion was subsequently filed.

26. On June 5, 2002, the defendant proceeded to sentencing. Under the provisions of Rule *32(b)(1), the Court dispensed with the requirement that a Presentence Report be prepared.* The Court found that the information in the record enabled the Court to exercise its sentencing authority meaningfully under 18 USC § 3553. The Court imposed sentences of Death on Counts 3, 7, and 11, and Life sentences on Counts 12 and 15 in accordance with the recommendation of the jury and found there was no legal or factual basis to set aside those recommendations. The sentence on Count 17 is a statutorily required minimum sentence. The Court imposed a 25 year prison term on Count 17 and ordered it to run consecutively to the Life sentences imposed on Counts 12 and 15.

27. *In the event the defendant should ever be released from custody to a term of supervised* release, the provisions of 18 USC § 4042 and the provisions of Section 3 of the DNA Analysis Backlog Elimination Act of 2000 would apply based upon the offenses of conviction.

## The Offense Conduct And The Defendant's Role

28. The information contained in this section of the Presentence Report was obtained from numerous documents filed in connection with this drug conspiracy, including the *Indictments, superseding Informations, and Factual Résumés of defendants.* Furthermore, investigative reports prepared by Drug Enforcement Administration (DEA), commonly referred to as "6's", and Federal Bureau of Investigation (FBI) investigative reports commonly referred to as "302's were utilized in the preparation of the Presentence Report. Additionally, other local law enforcement offense reports, and debriefing interviews, as

5

well as reports concerning telephone wire interceptions, arrests, and seizures were also reviewed. U.S. Probation Officers T. Lassiter, V. McMillan, C. Hammons, and D. Flynn interviewed DEA Special Agents T. McAuliffe and B. Finney, DEA Task Force Officer B. Lopez, Internal Revenue Service (IRS) Special Agent A. Merlino, FBI Special Agent A. Ferrell, and Assistant U.S. Attorneys Fred Schattman and Reed O'Connor to have them explain and clarify certain information and events contained in the investigative material. All of the information contained herein is based on evidence considered reliable by these probation officers.

29. In early March 1999, personnel from DEA, the Arlington, Texas Police Department, and the IRS initiated a joint investigation of an ongoing criminal enterprise termed the "Nathan Henderson Organization." The FBI joined the investigation in early 2000, and the joint investigation continued through at least November 8, 2000. The investigation involved the use of diverse investigation methods which included the use of physical surveillance, wire taps on conspiracy members' cellular telephones, telephone toll analysis, pen registers, confidential informants, traffic interdiction, and searches and seizures. Through the use of these techniques, officers and agents were able to identify the conspiracy members and track their illegal activities. The investigation revealed the "Nathan Henderson Organization" consisted of numerous individuals who had been operating a drug trafficking enterprise in and around Tarrant County, Texas; Little Rock, Arkansas; Conway, Arkansas; Dermott, Arkansas; Saint Louis, Missouri; and Oklahoma City, Oklahoma, since approximately January 1, 1997.

30. Between January 1999 and continuing through November 8, 2000, intelligence information identified Nathan Deshawn Henderson and **Julius Omar Robinson** as major distributors of marihuana. **Robinson** was also involved in the distribution of cocaine as well. From May until July 2000, wiretaps resulted in the interception of a large number of drug related conversations between Henderson and **Robinson**, and other coconspirators, including: Jamila Camp, Brandi Scales, Cantral Huggins, John Turner, Carmen Byrd, Jason Gehring, Jewell Ewing, Iris Wade, Victor Jimenez, Javier Aguilar, Marcus Robinson, Fanisha Hill, Leteshia Barnett, Terrence Holimon, L.J. Britt, Richard Smart, Troy Lee Simpson, Jeanne Denise Wilkins, Misty Grounds, Steven Toston, Santana Minor, Timothy Caldwell, Howard Ringer, Cody B. Elliott, Derrick Simon, Lashandra Lynette Adams, Stephen Williams, Reginald Kinchen, Edward Jenkins, and Dorothy Hodges.

31. Conspiracy members used code words to describe marihuana and the price of such. Also, conspiracy members used various automobiles, usually leased and/or rented, to transport marihuana and/or cocaine, and the proceeds derived from the sale of such. In furtherance of the conspiracy, the money derived from the sale and distribution of marihuana was used

6

to purchase additional quantities of marihuana. From time to time and during the course of the conspiracy, Henderson used counterfeit U.S. currency to pay for quantities of marihuana. Additionally, several conspiracy members possessed firearms which were used to protect the illegal drugs and the money earned from the sale of the drugs.

32. The investigation determined that **Robinson** and Henderson were leaders of the drug trafficking enterprise and they organized, supervised, and managed numerous individuals and received substantial income and resources from such activity. As the leaders of the drug trafficking enterprise, **Robinson** and Henderson employed people to drive drug shipments to other locations for re-sale, to mail and/or ship packages to other locations for re-sale, to broker deals for drugs, to store drugs, and to provide enforcement for drug related opportunities.

33. Information gleaned from the investigation revealed **Robinson** and Henderson established a long term relationship with two primary sources of supply in Dallas Texas: Victor Jimenez and Javier Guadalupe Aguilar. Both provided bulk quantities (in excess of 10 kilograms) of marihuana and cocaine. From time to time, **Robinson** and Henderson frequently used other sources of supply for drugs when their primary sources did not have drugs available. These alternative sources were: Iris Wade; Christhian Morales; Dakari Warner; Tyrone Bryant; Juan Reyes; Randy Perpall; Ronald Latodd Washington; and, Rodrick Fridia.

34. In furtherance of the conspiracy, both **Robinson** and Henderson shipped, by commercial interstate carrier and the U.S. mail, quantities of marihuana to others in the states of Arkansas and Kentucky. **Robinson** and Henderson used cellular telephones and the internet to monitor the progress of their shipments of marihuana. In addition, **Robinson** and Henderson pooled drug proceeds to purchase additional quantities of marihuana and/or cocaine.

35. Throughout the course of the conspiracy, agents utilized physical surveillance to corroborate illegal activities of conspiracy members. Business locations which included "That Sounds Good" (a CD music store) located at 916 Arkansas Lane in Arlington, Texas; and Mail Boxes Etc., located at 835 East Lamar Boulevard in Arlington, Texas, were also targeted by agents. The investigation determined "That Sounds Good" was owned by Henderson and primarily used by Henderson as a "front" for his narcotics trafficking activities. "That Sounds Good" was co-located with "Platinum Sounds" a business which was owned by John Turner. Coconspirator Leteshia Lenore Barnett (Barnett) was employed by Henderson at "That Sounds Good," In the fall and winter of 1999 through 2000, Barnett, while employed at "That Sounds Good," accepted Express Mail parcels delivered to those two businesses by the U. S. Postal Service from various

7

locations within the United States. The parcels would generally bear fictitious names of the sender(s). Barnett used a fictitious name when signing for those parcels which were from the drug customers of Henderson, **Robinson**, and Turner. Those parcels contained money sent by the customers to Henderson, **Robinson**, and Turner.

36. At the direction of **Julius Robinson** and/or Henderson, Jamila Marie Camp, Leteshia Barnett, Sharnita Tarvette Lewis, Jewell Ewing, Cantral Huggins, Alexander Jones, Myesha Harmon, Marcus Robinson, and Dalia Davidson opened and maintained places for the storage, processing, and distribution of bulk quantities of marihuana. The following residences, either owned or controlled by **Robinson** and/or Henderson, were used to store and package marihuana for redistribution:      Brookline Court, Apartment      , Arlington, Texas (Barnett's residence);      Ridgehaven, Apartment      , Arlington (Jamila Marie Camp's residence); Shareta Tarvet Lewis' residence (address unknown);      Alameda and      Booker, Little Rock, Arkansas (Jewell Ewing's and Cantral Huggins' residence's);      Marguerite Velda, Village Hills, Missouri (Alexander Jones' residence); Myesha Harmon's residence in Saint Louis, Missouri (address unknown);      Sun Ridge Circle, Apartment      , Fort Worth, Texas (Marcus Robinson's residence); and,      Forest Hollow Lane, Apartment      , Arlington, Texas (Dalia Davidson's residence).

37. In addition, Camp, Barnett, Jason Gehring, Carmen Byrd, and Marcus Robinson transported quantities of marihuana and cocaine to the facilities via interstate commercial carriers, which included United Parcel Services (UPS), for shipment to others in the states of Arkansas and Oklahoma. When using the services of common interstate commercial carriers, conspirators used false and fictitious names and/or addresses on shipping or mailing labels purporting to show the identity of the person sending the package. Coconspirators purchased shipping boxes and materials from commercial establishments to utilize in sending quantities of marihuana to other coconspirators by interstate commercial carriers.

38. **Robinson** and Henderson distributed bulk quantities of marihuana to the following local (Texas) individuals for further distribution: Quinton Knox; Dorothy Hodges; Santana Minor; Edward Jenkins; Misty Grounds; Reginald Kinchen; Antonio Ford; Rodrick Jamison; Tyrone Bryant; Hendrick Tunstall; Jamila Camp; Marcus Robinson; Troy Lee Simpson; John Turner; Richard Smart; Willie Roy Whitsaker; Donald Ray Simmons; Kendeverick Williams; Cody Elliott; Lashandra Adams; Derrick Simon; and Steven Williams.

8

39. In furtherance of the conspiracy, **Robinson** and Henderson arranged for the distribution of drugs to customers in Oklahoma using the following individuals: Angelo Harris; Jerry Robinson; Leon Jenkins; and Brandi Scales.

40. In furtherance of the conspiracy, **Robinson** and Henderson arranged for the distribution of drugs to customers in Missouri using the following individuals: Alexander Jones; Marlon Price; Myesha Harmon; and John Turner.

41. In furtherance of the conspiracy, **Robinson** and Henderson arranged for the distribution of drugs to customers in Arkansas using the following individuals: Arlin Cheeter; Michael Williams; Cantral Huggins; Jewell Ewing; Steven Toston; Antonio Toston; Terrence Holimon; L. J. Britt; Spyra Hollimon; Travis Dixon; and Freddy LNU. **Robinson** and Henderson shipped marihuana to Cantral Huggins and Jewell Ewing for them to store until **Robinson** arrived in Arkansas to sell the marihuana.

42. Huggins and Ewing were also engaged in the business of the sale and distribution of marihuana from at least January 1997 through the summer of 2000 and their primary supplier was **Robinson**; however, Huggins and Ewing were on occasion supplied marihuana by Jason Gehring. Between January 5, 1999, and November 18, 1999, UPS records indicate 32 deliveries were made to        Booker Street, Little Rock, Arkansas, to Cantral Huggins. Of the 32 deliveries, 13 receipts for these shipments included weight information, which totaled 306 pounds. Between December 30, 1999, and February 1, 2000, four boxes totaling 96 pounds were received at the residence of Jewell Ewing in Little Rock, Arkansas. Henderson, Ewing, and Barnett reported to agents that these shipments contained marihuana and were supplied by **Robinson**. **Robinson** would also transport the marihuana to Ewing using a female driver. **Robinson** paid his drivers between $500 and $1,000 for driving the marihuana to Arkansas. **Robinson** traveled to Little Rock on a regular basis and arranged for the delivery of 40 to 50 pounds of marihuana to be transported to Little Rock by drivers. **Robinson** traveled to Little Rock to collect the money owed to him by Huggins and Ewing for the marihuana. **Robinson** would either mail the money to himself in Arlington, Texas, or he would personally carry the money with him back to Arlington.

43. Terrence Holimon was engaged from time to time in the business of selling and distributing marihuana. One of the persons who supplied marihuana to Holimon for sale to others was **Julius Robinson**. Holimon routinely purchased marihuana from **Robinson** both on a consignment and cash basis. During his dealings with **Robinson**, Holimon met Nathan Henderson whom he learned was engaged in the sale and distribution of marihuana with **Robinson**.

9

44. In furtherance of the conspiracy, **Robinson** and Henderson arranged for the distribution of drugs to customers in Kentucky using the following individual: Harley June Gantt. On May 30, 2000, Henderson shipped approximately 19 pounds of marihuana to Louisville, Kentucky. The shipment of marihuana was interdicted by authorities after **Robinson's** telephone discussions regarding the shipment were intercepted by agents. In conjunction with the shipment of previous packages, Henderson received two cashier checks totaling $15,000 from Harley June Gantt. Henderson admitted to agents that the cashier checks were payment for previous marihuana shipments. Agents seized five additional packaging receipts for packages shipped to Gantt. Four of the five receipts contained weight information which totaled 118 pounds.

45. In furtherance of the conspiracy, **Robinson** and Henderson arranged for the distribution of drugs to customers in Louisiana using the following individuals: Charles Kessee; Bebe Stewart; Timothy Caldwell; and Tamika Sibley. On July 8, 2000, after agents intercepted telephone conversations between Henderson and Caldwell, agents seized 20 pounds of marihuana from Caldwell, who had traveled to Arlington, Texas from Shreveport, Louisiana. In addition, agents intercepted telephone conversations regarding a transaction for two kilograms of cocaine involving Kessee, **Robinson**, and Henderson.

46. In furtherance of the conspiracy, Robinson and Henderson arranged for the distribution of marijuana to Howard Ringer, a drug customer who lived in Florida.

47. In furtherance of the conspiracy, **Robinson** and Henderson arranged for the distribution of drugs to customers in New Jersey using the following individual: Damien Dunn.

48. In furtherance of the conspiracy, Jason Gehring and Richard Smart assisted **Robinson** in taking delivery of quantities of marihuana and in transporting quantities of money derived from the sale and distribution of marihuana. In addition, Lashandra Lynette Adams acted as an intermediary in assisting others to obtain marihuana from Henderson.

49. Information gleaned from the investigation revealed that as a part of the ongoing course of the drug trafficking business, **Julius Omar Robinson**, Nathan Deshawn Henderson, L.J. Britt, and Richard Smart identified opportunities to rob rival drug dealers of their drugs and/or money (referred to by defendants as a "lick.") According to case agents, at least 10 telephone wiretap conversations identify opportunities for a potential "lick" to occur. In one such instance, Henderson learned of a plumbing business which was used to store marihuana but was left unguarded at night. Henderson recruited **Robinson** to assist him in burglarizing the business to steal the marihuana. **Robinson** recruited L. J. Britt, Terrence Holimon, and Richard Smart to assist in the endeavor. Smart served as the lookout, but fell asleep. After the business was burglarized, approximately 150 pounds

10

of marihuana was stolen and taken to **Julius Robinson's** residence. Marcus Robinson was living at the residence at that time. When Smart's absence was noticed, one of the participants returned to the business, awakened Smart, and returned with him to **Julius Robinson's** residence. Smart assisted the others in repackaging the marihuana for further distribution to others. Typically, **Julius Robinson** utilized L. J. Britt to assist him in the robberies or burglaries because they had a close relationship. Tyrone Bryant reported to agents that L. J. Britt was utilized because he was from out of town and would not be easily recognized by their victims. Henderson and Gehring reported they would avoid **Julius Robinson** and L. J. Britt when Britt came to Texas, because they "knew something was going to happen." On June 2, 2000, following the seizure of 104 pounds of marihuana, agents intercepted a telephone call between **Robinson** and Britt, during which Britt asked **Robinson** if he (**Robinson**) needed any violent acts committed. During calls subsequently intercepted between **Robinson** and Richard Smart, **Robinson** told Smart that Britt was coming to town and, "We need to put a pistol on somebody this weekend when he gets down here."

50.    During the course of the conspiracy, three individuals were murdered in separate drug related incidents. A description of each murder is as follows:

51.    In September 1998, **Robinson** and Henderson made arrangements to purchase 100 pounds of marihuana from an individual known as "Big Friday" (true name Roderick Fridia) in Dallas, Texas. The delivery was to occur at a McDonald's restaurant in Dallas. **Robinson** and Quinton Knox arrived at the McDonald's with $35,000 in cash. While they were waiting on "Big Friday" to arrive, two individuals approached their vehicle and robbed them at gun point, taking the vehicle and the money. The vehicle ( owned by Henderson) was later recovered. **Robinson** and Henderson believed "Big Friday" was responsible for the robbery. **Robinson** told Jason Gehring that he thought "Big Friday" had "set them up" and he (**Robinson**) intended to "get even with Big Friday." Subsequently, on December 2,1998, Henderson, Gehring, and others were at the Spy Club in Dallas and Henderson saw "Big Friday" at the club. Henderson notified **Robinson** by telephone that he had seen "Big Friday." **Robinson** came to the nightclub with L. J. Britt, met Gehring and Henderson, and searched for "Big Friday." After failing to find "Big Friday" at the club, **Robinson**, Henderson, and others waited in a nearby parking lot. While they waited, in the early morning hours on December 3, 1998, as the nightclub closed and the patrons left, a Cadillac which **Robinson** believed to belong to "Big Friday" was seen by them driving away from the nightclub. Gehring, **Robinson**, and Britt, in a truck owned by Henderson, followed the Cadillac. Henderson followed Gehring, **Robinson**, and Britt in another vehicle. The Cadillac was followed onto Highway 75 (Central Expressway) which was then under reconstruction. **Robinson** and Britt had each brought assault rifles with them that evening and with them into Henderson's truck. As they drove down

11

Highway 75, **Robinson** and Britt took the weapons and began arguing over who was going to shoot at "Big Friday's" vehicle. During the argument, the weapons were fired inside the truck. **Robinson**, from the middle seat, and Britt, from the passenger seat, each leaned out of the passenger side window of the truck and fired their weapons at the Cadillac. The driver of the Cadillac, Johnny Lee Shelton, (an innocent party) was fatally wounded by one of the shots fired by Britt and **Robinson**. Shelton's vehicle was similar in appearance to "Big Friday's" vehicle and Shelton bore a physical resemblance to "Big Friday." This information was confirmed by Henderson and Gehring in debriefing interviews.

52. In May 1999, Angelo Harris contacted Julius **Robinson** in reference to purchasing one kilogram of cocaine; in turn, **Robinson** contacted Dakari Warner. **Robinson** advised Warner he (**Robinson**) had a customer who was interested in purchasing one kilogram of cocaine. Warner told **Robinson** that he (Warner) knew someone who would sell the cocaine to **Robinson** and **Robinson's** customer (Harris). Warner decided that he could "scam" **Robinson** and his customer by trading them a fake kilogram of cocaine in exchange for the market price ($17,000) for a kilogram of cocaine. Warner made arrangements with Paulino Toscano, a person known to provide fake kilograms of cocaine, to have a fake kilogram of cocaine prepared and also, for Toscano to pose as a seller of the cocaine. Toscano prepared a package of the appropriate size and shape of a kilogram of compressed cocaine. The package actually contained a small amount of cocaine and some sheetrock surrounding a block of wood, all of which was wrapped in opaque tape and duct tape.

53. On May 8, 1999, Harris and Brandi Scales traveled from Oklahoma City, Oklahoma to Dallas. Harris left Scales and went alone to meet with **Julius Robinson**, who was in contact with Dakari Warner. Warner traveled with Harris and **Robinson** around the Dallas, Texas area purporting to arrange for the purchase of the cocaine. At one point during their travels, Warner took Harris and **Robinson** to a residence located at 1925 Michigan Avenue, in Dallas, Texas. The house was the residence of Toscano's wife, Yolanda Reyes, who was also the sister of Juan Reyes. Warner learned the fake kilogram of cocaine was not ready and told Harris and **Robinson** that the transaction would take place later. Warner eventually took Harris and **Robinson** to meet Toscano at a convenience store parking lot in Dallas. There, Harris and **Robinson** paid Warner $17,000 in cash which he delivered to Toscano. In exchange for the money, Toscano delivered the fake kilogram of cocaine to Harris and **Robinson**. Warner and Toscano split the money paid by **Robinson** and Harris.

54. After the transaction was completed, Harris and Scales subsequently returned to Oklahoma with the kilogram of cocaine. Harris proceeded to Leon Jenkins' residence to "crack up" the powder cocaine. At that time, Harris unwrapped the "fake" kilogram of

12

cocaine, and learned he had been "ripped off." Harris contacted **Robinson** to report that Toscano had "ripped them off." **Robinson** attempted to contact Warner by calling Warner's digital pager. Later in the morning on May 9, 1999, Warner contacted **Robinson** by telephone. **Robinson** told Warner that he and Harris had been cheated and questioned Warner as to Warner's knowledge of the fake kilogram. Warner denied knowing anything about the fake kilogram and advised **Robinson** that he had nothing to do with it. **Robinson** told Warner that Harris was coming back to town to get his money.

55. In furtherance of the conspiracy, **Robinson** and Henderson arranged for the distribution of drugs to customers in Oklahoma using the following individuals: Angelo Harris; Jerry Robinson; Leon Jenkins; and Brandi Scales.

56. From 1997 through November 1999, Angelo Harris (Harris) was engaged in the business of the distribution of cocaine in Oklahoma City, Oklahoma. One the principal suppliers of cocaine to Harris was **Julius Robinson** of Arlington, Texas. Harris made arrangements to come to Arlington, Texas and meet with **Robinson** to purchase cocaine. Harris recruited various persons to travel to Arlington, Texas, in a vehicle separate from the vehicle in which Harris traveled. Harris had the confederate carry the purchase money to Texas and after arrival in Texas, Harris retrieved the money and purchased the cocaine. Harris then placed the cocaine in the confederate's vehicle and escorted the vehicle back to Oklahoma City, Oklahoma. Harris used the residence of Leon Jenkins, in Oklahoma City, as a place to prepare the cocaine for retail sale by converting the cocaine powder into "crack" cocaine, a rock-like form of cocaine base.

57. Harris made trips between Oklahoma City, Oklahoma, and Arlington, Texas several times each month between October 1998 and November 1999 to obtain cocaine from or through **Julius Robinson**. On many of these trips, Harris spent the night at motels in Arlington and registered under his name or under the name of his girlfriend, Brandi Scales. During these trips, Harris routinely utilized a cellular telephone, subscribed to by Scales, to communicate with **Robinson** and others. Between May 1999 and November 1999, Harris obtained kilogram quantities of cocaine from **Robinson** on a regular basis. Leon Jenkins assisted Harris in the sale and distribution of cocaine.

58. In early May 1999, Harris contacted **Julius Robinson** in reference to purchasing one kilogram of cocaine; in turn, **Robinson** contacted Dakari Warner. **Robinson** advised Warner he (**Robinson**) had a customer who was interested in purchasing one kilogram of cocaine. Warner told **Robinson** that he (Warner) knew someone who would sell the cocaine to **Robinson** and **Robinson's** customer (Harris). Warner decided that he could "scam" **Robinson** and his customer by trading them a fake kilogram of cocaine in exchange for the market price ($17,000) for a kilogram of cocaine. Warner made

13

arrangements with Paulino Toscano, a person known to provide fake kilograms of cocaine, to have a fake kilogram of cocaine prepared and also, for Toscano to pose as a seller of the cocaine. Toscano prepared a package of the appropriate size and shape of a kilogram of compressed cocaine. The package actually contained a small amount of cocaine and some sheetrock surrounding a block of wood, all of which was wrapped in opaque tape and duct tape.

59. On May 8, 1999, pursuant to the arrangement with **Robinson**, Harris and Brandi Scales traveled from Oklahoma City, Oklahoma to Dallas, Texas. Harris left Scales and went alone to meet with **Robinson**, who was in contact with Dakari Warner. Warner traveled with Harris and **Robinson** around the Dallas, Texas, area purporting to arrange for the purchase of the cocaine. At one point during their travels, Warner took Harris and **Robinson** to a residence located at 1925 Michigan Avenue, in Dallas, Texas. The house was the residence of Toscano's wife, Yolanda Reyes, who was also the sister of Juan Reyes. Warner learned the fake kilogram of cocaine was not ready and told Harris and **Robinson** that the transaction would take place later. Warner eventually took Harris and **Robinson** to meet Toscano at a convenience store parking lot in Dallas. There, Harris and **Robinson** paid Warner $17,000 in cash which he delivered to Toscano. In exchange for the money, Toscano delivered the fake kilogram of cocaine to Harris and **Robinson**. Warner and Toscano split the money paid by **Robinson** and Harris. **Robinson** and Harris drove back to **Robinson's** residence in Arlington, Texas.

60. After the transaction was completed, Harris and Scales subsequently returned to Oklahoma City in one vehicle, escorting a confederate who drove another vehicle in which the package of cocaine had been secreted. After arriving in Oklahoma City, Harris proceeded to Leon Jenkins' residence to "crack up" the powder cocaine for further sale. At that time, Harris unwrapped the "fake" kilogram of cocaine, and learned he had been "ripped off." Harris contacted **Robinson** to report that Toscano had "ripped them off." **Robinson** attempted to contact Warner by calling Warner's digital pager. Later in the morning on May 9, 1999, Warner contacted **Robinson** by telephone. **Robinson** told Warner that he and Harris had been cheated and questioned Warner as to Warner's knowledge of the fake kilogram. Warner denied knowing anything about the fake kilogram and advised **Robinson** that he had nothing to do with it. **Robinson** told Warner that Harris was coming back to town to get his money.

61. On May 9, 1999, Harris and Brandi Scales drove from Oklahoma City, Oklahoma, to Arlington, Texas, and again met with **Robinson**. Scales stayed at **Robinson's** residence while Harris and **Robinson** went out to look for the persons responsible for selling them the block of wood. Harris and **Robinson** traveled together to Marcus Robinson's apartment. Present at Marcus Robinson's apartment was Reginald Polk. **Julius Robinson**

14

and Harris borrowed Marcus Robinson's vehicle, a rented red Grand AM, and **Robinson**, another confederate, and Harris went together to Toscano's residence, Michigan Avenue, to confront Toscano. **Robinson** and a confederate were each carrying guns; however, no one was at home. **Julius Robinson**, Harris, and a confederate waited in front of a neighbor's residence. Juan Reyes, the brother of Yolanda Reyes, arrived at the residence driving a grey Lincoln, and he was followed by Issac Rodriguez and Nicolas Marquez. **Robinson** confronted Juan Reyes, who had come to the house to visit his sister. **Robinson** had previously obtained cocaine from Reyes and occasionally Toscano had been present during transactions. **Robinson** believed Reyes bore responsibility for the fake kilogram of cocaine which was sold to **Robinson** and Harris. **Robinson** demanded the return of the purchase money from Reyes; however, Reyes indicated he had no knowledge of the sale or "rip off." At that point, **Robinson** shot Reyes in the leg and Reyes fell to the ground. **Robinson** again demanded the return of the purchase money and Reyes again denied knowing anything about the matter. **Robinson** and a confederate then began shooting Reyes as he lay on the ground. They also shot at, and wounded, Isaac Rodriguez who had been talking to Reyes as they approached the house. They also shot at the vehicle in which Rodriguez had arrived. Nicholas Marquez drove off, but his vehicle was shot repeatedly. Reyes died as a result of multiple gunshot wounds inflicted by **Robinson** and the confederate. **Robinson**, Harris, and the person who accompanied them to the scene subsequently fled from the scene in the Grand AM, driven by Harris. Several children playing in an adjacent yard later identified **Julius Robinson** as the individual who shot Reyes. In addition, several cooperating witnesses provided details of the killing.

62. Later during the day on May 9, 1999, Warner learned that Juan Reyes had been murdered. Warner again spoke with **Julius Robinson** and told **Robinson** that Reyes did not have anything to do with the fake kilogram. **Robinson** admitted to Warner that he participated in the murder of Juan Reyes and told Warner that it was either the money or the drugs that he wanted, and he did not care if he had killed the wrong man. Following the murder of Juan Reyes, Warner avoided having any contact with **Julius Robinson**. This information was also confirmed by Henderson and Gehring during debriefing interviews.

63. On July 21, 1999, Harris and Scales were again in Arlington, Texas, to obtain cocaine from **Robinson**. **Robinson** obtained a kilogram of cocaine which he sold to Harris and Scales. Harris entrusted the kilogram of cocaine to Jerry Robinson who transported the cocaine to Oklahoma City, Oklahoma, by bus. Jerry Robinson was arrested in Oklahoma City on July 22, 1999, carrying the kilogram of cocaine. The cocaine had been packed inside of a duffel bag belonging to Scales.

15

64. On September 28, 1999, Harris and Scales again came to Arlington, Texas, in the course of carrying on the cocaine business. They returned to Oklahoma City, Oklahoma, the next day. On their way back to Oklahoma City, their vehicle was stopped by a member of the Oklahoma Highway Patrol for speeding. Scales and Harris consented to a search of their vehicle. A small amount of marihuana residue and $8,000 was located within the vehicle and seized. Both Scales and Harris executed documents in which they each disclaimed any interest in the money and consented to its forfeiture as drug proceeds.

65. Angelo Harris has debriefed with investigating agents on several occasions during February and June 2000. In June 2000, he provided specific information to case agents regarding the murder of Juan Reyes.

66. In July 1999, a drug dealer, Valentine Ochoa, was robbed of 50 kilograms of cocaine in San Antonio, Texas. Ochoa contacted Edy Sonia Zamudio because he believed her son, Christhian Morales, assisted Rudolfo Resendez in the robbery of the cocaine. Ochoa instructed Zamudio to return his cocaine, or he would kill them. Subsequently, Zamudio and Morales devised a scheme to rob Resendez of 20 kilograms of cocaine. Zamudio contacted Resendez and advised she had purchasers for 20 kilograms of cocaine. On July 12, 1999, after a series of contacts, Resendez agreed to sell 20 kilograms of cocaine to Zamudio and Morales, at a prearranged meeting. Zamudio recruited Hendrick Tunstall to assist in robbing Resendez. Tunstall recruited Tyrone Bryant and Bryant recruited **Julius Robinson** and L. J. Britt to assist in the robbery and to also pose as the purchasers of the cocaine. Christhian Morales, L. J. Britt, and Hendrick Tunstall, riding in a Honda Accord which was driven by Morales, were followed by Julius Robinson and Tyrone Bryant in a second vehicle to Lisa Hernandez' (unindicted cooffender) residence to meet with Resendez. Resendez entered the Honda Accord and was seated in the front passenger seat; L. J. Britt was seated directly behind him and Tunstall was seated behind Morales. They proceeded to Interstate 30 and were followed by **Julius Robinson** and Tyrone Bryant. When the two vehicles arrived at a deserted spot, along a gravel road in Fort Worth, Resendez was shot twice in the head and at least six times in the back and shoulder with a .38 caliber handgun. Cooperating witnesses have reported that Tunstall and L. J. Britt shot and killed Resendez. After the murder, the 20 kilograms of cocaine was split between the participants, **Robinson** directing the spilt. Resendez' body was found by authorities on July 13, 1999. **Robinson** sold the 20 kilograms of cocaine to other individuals. In fact, on July 22, 1999, Jerry Robinson, an associate of Angelo Harris, was arrested in Oklahoma City, Oklahoma, in possession of one kilogram of cocaine, and the cocaine package had markings consistent with the kilogram packages acquired during Resendez' murder.

16

67.     Prior to the robbery/murder of Resendez, Crystal Mancilla, was aware that her mother, Edy Sonia Zamudio, and her half-brother, Christhian Morales, had recruited others to assist them in stealing a large quantity of cocaine from Resendez.     After the robbery/murder, Mancilla knew that Morales and Zamudio were in possession of over five kilograms of the cocaine stolen from Resendez and intended to distribute the cocaine to others.  The day after Resendez was killed, the car in which the murder occurred was parked in front of the residence of Zamudio, Morales, and Mancilla on the street.  Morales told Mancilla what had happened and told Mancilla he had to go clean the car.  Morales also told Mancilla that "Hank" (Hendrick Ezell Tunstall) and "Ty" (Tyrone Bryant) had ordered him to clean the blood out of the car.  Mancilla went with Morales to get the car cleaned.  Morales and Mancilla met a black male who was friend of "Hank" and "Ty" at an unknown detail shop in Arlington, Texas.  The black male asked Morales about the blood in the car, and Morales stated his dog had puppies in the car.  Mancilla and Morales spoke to each other in Spanish about Resendez' murder in front of the black male.  Later, either "Hank" or "Ty" told Mancilla and Morales not to speak Spanish in front of the black male, because he spoke Spanish.  Mancilla and Morales cleaned the car and took it back to their house.  Morales later took the passenger seat out of the car so that he (Morales) could clean the blood from underneath the seat.  Morales also cut out the passenger seatbelt, because it had blood on it.

68.     From at least January 1, 1997, until November 8, 2000, Javier Aguilar engaged in the business of the sale and distribution of marihuana. Javier Aguilar worked with his father, Alberto Aguilar in the carrying on of this business.  Among Javier Aguilar's regular customers were **Julius Robinson** and Henderson.  Javier Aguilar supplied **Robinson** and Henderson with approximately 35 to 70 pounds of marihuana each week during the early part of 1997, but Javier Aguilar's marihuana suppliers had become unreliable. Subsequently, through others, Javier Aguilar located another source, Victor Jimenez. Javier Aguilar had an indirect arrangement with Victor Jimenez for Jimenez to supply Aguilar with marihuana which he in turn sold to **Robinson** and Henderson.  After a few transactions brokered through Javier Aguilar, Jimenez began dealing directly with **Robinson** and Henderson.  However, Javier Aguilar continued to supply the marihuana needs of **Robinson** and Henderson even after they began dealing directly with Jimenez. Within the time period of January 1, 1997, through November 2000, Javier Aguilar supplied at least 1,500 pounds of marihuana to **Robinson** and Henderson and their confederates.  On at least one occasion, Javier Aguilar conducted a transaction with Henderson at the residence of Alberto Aguilar, 415 North Marsalis, Dallas, Texas. Alberto Aguilar (Javier Aguilar's father) assisted in the transaction, counting the money paid by Henderson for the marihuana which Henderson had purchased.

69. During the period of January 1997 through March 1999, Carmen Byrd assisted **Robinson** and Henderson in purchasing multiple pound quantities of marihuana from Javier Aguilar. In connection with her assistance in these purchases, on occasions, Byrd rode with **Robinson** while Henderson followed in a separate car to retrieve the marihuana from Javier Aguilar. However, **Robinson** and Henderson would meet with Javier Aguilar and make the purchase. Byrd knew that **Robinson** sold controlled substances to individuals in Arlington, Texas, Dallas, Texas, and Arkansas as part of an ongoing business enterprise operated by **Robinson** and Henderson. Furthermore, Byrd was aware that **Robinson** and Henderson would also recruit and direct other females to drive cars loaded with drugs to deliver to distributors and/or purchasers in Arkansas. On seven occasions, Byrd delivered kilogram quantities of cocaine to **Robinson's** Arkansas customers. The Arkansas distributors included individuals known to Byrd as "Freddie B.," "Lee," and "One Love." Byrd either rented cars or used her personal car to transport the drugs. To compensate Byrd for her efforts on behalf of the drug enterprise, **Robinson** deposited money into Byrd's bank account or paid money directly to her.

70. Throughout the time period of January 1997 through November 8, 2000, Victor Jimenez engaged in the sale and distribution of marihuana. During that same time period, Jimenez rented a residence located at        Winston Street in Dallas, Texas. Jimenez used the residence as a place to distribute cocaine and marihuana. Among the persons who purchased cocaine from Jimenez were **Julius Robinson**, whom Jimenez knew as "Scar," and Angelo Harris, whom Jimenez knew as "Step." In total, Jimenez distributed approximately five kilograms of cocaine to **Robinson** in four separate transactions. Among the persons who purchased marihuana from Jimenez were **Robinson**, Henderson, and Jason Gehring. For approximately 140 weeks, between the winter of 1997 and the summer of 2000, Jimenez delivered approximately 50 pounds of marihuana each week to Henderson and/or a person who Henderson sent to Jimenez to pick up marihuana for Henderson. Occasionally, the amount delivered would be 100 pounds. **Robinson** would pick up marihuana for Henderson and would also purchase marihuana from Jimenez on his own account. From time to time, Jason Gehring picked up marihuana from Jimenez for Henderson and **Robinson** and he would also purchase marihuana from Jimenez on his own account. In the latter part of May and early June 2000, Jimenez distributed approximately 200 pounds of marihuana to Henderson and **Robinson** on consignment, that is, in exchange for the promise of the future payment of money once Henderson and **Robinson** sold the marihuana. Of this amount (200 pounds), 104 pounds of marihuana was seized by law enforcement authorities on June 2, 2000, when Henderson and **Robinson** were attempting to transport it to Arkansas for further distribution.

18

71.  Victor Jimenez made several attempts to collect the money which Henderson and **Robinson** owed him for the 200 pounds of marihuana. During Jimenez' conversations with Henderson and **Robinson** concerning payment, Jimenez was asked several times by **Robinson** and Henderson, on separate occasions, if Jimenez knew of anyone **Robinson** and Henderson could rob for either money or drugs to help pay off the drug debt owed to Jimenez. Jason Gehring later warned Jimenez to be careful in pressing **Robinson** and Henderson for payment for the marihuana, saying that if Jimenez continued to call them that they had told Gehring that they would "take care of" Jimenez. Jimenez believed that meant that he would be harmed.

72.  On May 9, 1998, Officer C. Williams of the Sulphur Springs, Texas Police Department stopped **Robinson** for a traffic violation in Sulphur Springs. Sulphur Springs is approximately 100 miles east of Fort Worth, Texas, on Interstate 30, which runs through the Dallas/Fort Worth metroplex, and is the principal highway route to Arkansas. **Robinson** was driving a rented vehicle. **Robinson** consented to have his car searched and Officer Williams seized a small quantity of marihuana, electric scales, ziplock freezer bags, and $8,270. **Robinson** was subsequently arrested and charged with a state misdemeanor offense of Possession of Marihuana Under Two Ounces. The state misdemeanor case was subsequently dismissed on October 22, 1998.

73.  On September 17, 1998, U.S. Postal Inspectors from the Southwest Division Prohibited Mailings Team intercepted an Express Mail parcel addressed to "Platinum Sounds," East Pioneer Parkway in Arlington, Texas. A search warrant was executed on the parcel after a drug detecting canine produced a positive alert on the parcel. Postal inspectors seized $14,615 from inside the parcel. The parcel was addressed to John Turner, the owner of "Platinum Sounds." Subsequently, postal inspectors contacted Turner, who denied knowledge of the money, disclaimed ownership of the money, and refused delivery from the post office. "Platinum Sounds" shared the same retail outlet space as "That Sounds Good" at 2540 East Arkansas Lane, Suite 106, Arlington, Texas.

74.  On January 13, 1999, Arlington, Texas Police Detective K. Dunlap received a telephone call from a United Parcel Service (UPS) delivery driver, regarding a package that UPS had received to deliver to "That Sounds Good," 916 East Arkansas Lane in Arlington. The UPS delivery person advised the package was opened and a large amount of money was inside the package. Detective Dunlap met with the UPS delivery person and examined the package and determined it contained $3,500 in U.S. currency. The package was sent by Travis Dixon,      Donaghey, Apartment     , Conway, Arkansas, to "That Sounds Good." The money, enclosed in a cigar box, was wrapped in a scented fabric softener. Detective Dunlap counted the money, took pictures, and repackaged it for delivery to "That Sounds Good."

19

75. On January 19, 1999, UPS contacted Detective Dunlap regarding another package that was addressed to "That Sounds Good." The package was sent by Steven Toston, North Garland Road, Apartment    , Fayetteville, Arkansas. Detective Dunlap responded to the UPS center and seized $27,400 from the package.

76. On January 21, 1999, Arlington police officers initiated physical surveillance at "That Sounds Good." Officers observed Henderson leave the store and travel to Mail Boxes Etc., 835 East Lamar in Arlington. Mail Boxes Etc., is a designated pick-up site for UPS which is an interstate delivery service. Henderson purchased three or four large cardboard boxes and packaging tape. Henderson took the packaging material to Leteshia Barnett's residence, the Holly Ridge Apartments,    Brookline Court, Apartment    , Arlington. Henderson drove to a storage unit registered to Barnett at the Holly Ridge Apartments. Henderson removed a large suitcase from his car and returned to Barnett's apartment. Shortly thereafter, **Robinson**, driving an Infinity sedan, arrived at Barnett's apartment. Approximately 30 minutes later, Henderson walked out of the apartment and placed a large cardboard box into his (Henderson) car. Henderson drove to "Wrap N Mail," 2131 North Collins in Arlington. Henderson mailed the cardboard box via UPS. The package label contained the following information: Sender: James Stevens, telephone number    -7825; To: D&D Detail, 1126 Harkrider, Conway, Arkansas 72032. Pursuant to a state search warrant, Detective T. Pinckney seized the box. While Henderson mailed the box, **Robinson** was observed carrying a second, large cardboard box from Barnett's apartment and placing it into his car. Officers attempted to follow **Robinson**, however, they could not maintain contact due to **Robinson** driving at a high rate of speed.

77. From approximately 1996 until October 1999, Angela Leach purchased pound quantities of marihuana from Jason Gehring. Leach would break down the pounds of marihuana into smaller quantities and sell it to others. Leach purchased one or two pounds of marihuana from Gehring approximately two times a month during the time period. Leach obtained the marihuana by calling Gehring's digital pager. Gehring would then telephone Leach who would make arrangements with Gehring for Gehring to deliver marihuana to her. Gehring generally charged Leach approximately $600 per pound of marihuana. In May 1999, Leach placed a telephone call to Gehring's pager and Gehring returned the page via the use of a telephone. During the conversation, Leach made arrangements with Gehring to purchase approximately one pound of marihuana from him. On May 19, 1999, Leach sold to an undercover Arlington, Texas police officer approximately one-half ounce of marihuana which she had previously obtained from Gehring.

20

78.	From 1997 through November 1999, Leon Jenkins and Angelo Harris engaged together in the business of the distribution of cocaine in Oklahoma City, Oklahoma. During Jenkins' relationship with Harris, Jenkins learned that one of the principal suppliers of cocaine to Harris was **Julius Robinson** in Arlington, Texas. Harris made arrangements to come to Arlington, Texas and met with **Robinson** to purchase cocaine. Harris recruited various persons to travel to Arlington, Texas, in a vehicle separate from the vehicle in which Harris traveled. In addition, Harris had the confederates transport the money used to purchase the cocaine. After arrival in Texas, Harris retrieved the money from the confederate's vehicle and purchased the cocaine. Harris placed the cocaine in the confederate's vehicle and escorted the vehicle back to Oklahoma City, Oklahoma. Harris used Leon Jenkins' residence in Oklahoma City as a place to prepare the cocaine for retail sale. Harris made trips between Oklahoma City and Arlington several times each month between October 1998 and November 1999 to obtain cocaine from or through **Julius Robinson**. On many of these trips, Harris spent the night at motels in Arlington and registered under his name or under the name of his girlfriend, Brandi Scales.

79.	In 1998 and 1999, Leon Jenkins accompanied Harris on approximately four or five trips from Oklahoma City to Arlington. During which, Harris obtained quantities of cocaine from **Julius Robinson** or others.

80.	In May 1999, Angelo Harris made arrangements with **Julius Robinson** to obtain a kilogram of cocaine from **Robinson**. Harris obtained cocaine from **Robinson** and would transport the cocaine, or cause the cocaine to be transported, to Oklahoma City, Oklahoma. Harris was assisted in the endeavor by his girlfriend, Brandi Scales and Leon Jenkins. On May 8, 1999, pursuant to Harris' arrangement with **Robinson**, Harris and Scales drove to Arlington, Texas from Oklahoma City, Oklahoma. In Arlington, they went to **Robinson's** residence. Harris and **Robinson** left the residence to pick up the cocaine from **Robinson's** supplier. Harris returned with what appeared to be a kilogram package of cocaine. Harris and Scales returned to Oklahoma in one vehicle, escorting a confederate who drove another vehicle in which the package of cocaine had been secreted. After arriving in Oklahoma City, Harris took the kilogram package to Leon Jenkins so that it could be processed for sale. Harris returned a short time later and told Scales that the package contained a block of wood with only a small amount of cocaine packed around it. Harris called **Julius Robinson** and talked to **Robinson** about the package. On May 9, 1999, Harris and Scales drove from Oklahoma City to Arlington and again met with **Robinson**. Scales stayed at **Robinson's** residence while Harris and **Robinson** went out to look for the persons responsible for selling them the block of wood. Several hours later, **Robinson** and Harris returned to the residence.

21

81. On July 21, 1999, Harris, Scales, Leon Jenkins, and Jerry Robinson drove from Oklahoma City to Arlington to obtain a kilogram of cocaine from **Julius Robinson**. **Julius Robinson** obtained a kilogram of cocaine which he sold to Harris and Scales. Harris entrusted the kilogram of cocaine to Jerry Robinson, who transported the cocaine to Oklahoma City via a commercial bus on July 22, 1999. Jerry Robinson was arrested by Oklahoma authorities, at a local bus terminal, for possession of one kilogram of cocaine which was packed inside a duffle bag which belonged to Scales. Following Jerry Robinson's arrest, he reported that he had accompanied Angelo Harris to Arlington, Texas on a number of occasions and Harris would meet with **Julius Robinson** at Henderson's business, "That Sounds Good," in Arlington. According to Jerry Robinson, on the day of his arrest, he went with Harris to Arlington and Harris left him (Jerry Robinson) at a local hotel, and left him there briefly. Shortly thereafter, Harris returned with the cocaine which he gave to Jerry Robinson to transport to Oklahoma City.

82. On September 28, 1999, Harris and Scales again came to Arlington, Texas in the course of carrying on the cocaine business. They returned to Oklahoma City, Oklahoma the next day. On their way back to Oklahoma City, their vehicle was stopped by a member of the Garvin County, Oklahoma, Sheriffs Office for speeding. Scales and Harris consented to a search of their vehicle. A small quantity of marihuana residue and $8,000 was located within the vehicle and seized. Both Scales and Harris executed documents in which they each disclaimed any interest in the money and consented to its forfeiture as drug proceeds. Between May 1999 and November 1999, Harris obtained kilogram quantities of cocaine from **Robinson** at least two or three times each month.

83. In the fall of 1999, Agent McAuliffe became aware of a drug trafficking investigation conducted by the FBI and the Oklahoma City Police Department which subsequently led to the arrest of Angelo Harris on December 6, 1999. After his arrest, Harris reported to authorities that he met **Julius Robinson** in 1998 through Jamika Scales, and her sister, Brandi Scales, who was Harris' girlfriend and **Julius Robinson's** cousin. Harris reported that **Julius Robinson** sold pound quantities of marihuana and he had seen large quantities of marihuana stored in **Julius Robinson's** garage at : Clayborn Court in Arlington, Texas. Harris further reported that **Julius Robinson**, Nathan Henderson, and another individual jointly purchased 100 pounds of marihuana which was divided among them in **Julius Robinson's** garage.

84. On January 26, 2000, U.S. Postal Inspector W. Vivoni seized a package sent to "Platinum Sounds," 2540 East Lamar, Suite 106, in Arlington. The package was sent from a non-existent address in Saint Louis, Missouri. Postal Inspector Vivoni obtained a search warrant for the package and subsequently seized $5,500 from the package. Postal Inspector Vivoni contacted John Turner, who claimed no knowledge of the package being

22

sent to him, disclaimed ownership of the money, and refused delivery of the package. Postal Inspector Vivoni determined packages were mailed, via the United States Postal Service, from fictitious addresses in Berkeley, Missouri, to 2540 East Arkansas Lane, Suite 106, in Arlington, Texas on the following dates: December 21, 1999; December 23, 1999; and January 3, 4, 7, 11, and 12, 2000. Agents concluded the packages more than likely contained proceeds related to the sale of narcotics.

85. On February 8, 2000, James Lewis, later identified as Marcus Robinson, picked up $500 from Mail Box Etc., according to Western Union records. The money was wired from Terrence Holimon (Holimon), Dermott, Arkansas. On this same date, Marcus Robinson sent a package, via Federal Express, to Sam Dotson,      North Drew, Dermott, Arkansas 71638.

86. On February 19, 2000, DEA Agent McAuliffe was contacted by an employee of Mail Boxes Etc. The employee advised a box had been dropped off by an individual who was frequently seen in the company of **Julius Robinson**. Pursuant to a state search warrant, Task Force Officer Lopez opened the box and found approximately 441.3 grams of marihuana. The information on the packaging slip was as follows: Sender: James Lewis; To: Sam Dotson,      North Drew, Dermott, Arkansas. The Mail Box Etc., employee later identified the individual who dropped off the package from a photograph provided by DEA agents. Agents determined the individual was Marcus Robinson, the brother of **Julius Robinson**. Agents also determined the address,      North Drew, in Dermott, Arkansas was the residence of Terrence Holimon's (Holimon) parents, Willie and Josephine Dotson. Terrence Holimon was arrested in March 1997 for Possession With Intent to Distribute Approximately 17 Pounds of Marihuana. The arrest records reflected Holimon's address was      North Drew, Dermott, Arkansas.

87. On March 7, 2000, agents were notified by an employee of Mail Boxes Etc., 835 East Lamar Boulevard, in Arlington, Texas that two small boxes had been dropped off by "James Lewis" (Marcus Robinson). TFO Lopez obtained a state search warrant and opened the two boxes. TFO Lopez found approximately 3,067 grams of marihuana. The information contained on the packaging slip from the first box was as follows: Sender: James Lewis,      Brentwood, Fort Worth, Texas; To: Little Darlings,      West Speedway, Dermott, Arkansas 71638. The second box was addressed as follows: Sender: James Lewis,      Brentwood, Fort Worth, Texas; To: James Way,      Pinecomb, Little Rock, Arkansas 72209.

23

88. On March 9, 2000, Jewell Ewing (Ewing) traveled from Little Rock, Arkansas to Arlington, Texas and met with Jason Gehring. Ewing purchased 35 pounds of marihuana from Gehring. Ewing and Gehring packaged the marihuana in a box which Gehring delivered to a UPS shipping agent. The package was addressed to "Arnold Tate" at Ewing's address, Alameda Drive in Little Rock, Arkansas. Ewing intended to retrieve the package upon his return to Little Rock and sell it to customers in Little Rock. However, the package which contained 35 pounds of marihuana was intercepted by case agents. UPS records revealed between December 30, 1999, and February 1, 2000, four packages were shipped to Jewell Ewing at Alameda Drive and had a combined total weight of 96 pounds. Each of the packages contained marihuana and was sent by **Robinson** to Ewing for resale.

89. On March 16, 2000, Carmen Byrd traveled to the home of **Julius Robinson**, and retrieved one kilogram of cocaine. **Robinson** instructed Byrd to drive the cocaine to the Texas/Arkansas border and deliver it to **Robinson's** customers in Arkansas who would further distribute the cocaine to others. Byrd traveled in a 1999 Chevrolet Malibu from Arlington, Texas toward Arkansas via Interstate Highway 20 and was accompanied by Jennifer Edward Paige. Byrd knew the package she was transporting was cocaine to be delivered to **Robinson's** customers. Texas Department of Public Safety Trooper B. Dalme stopped the vehicle driven by Byrd on Interstate 20 in Van Zandt County, Texas. Trooper Dalme suspected the two were transporting narcotics and received consent from Byrd to search the vehicle. Byrd, while in jail, contacted **Robinson** and notified him that the police had intercepted the delivery of the package of cocaine. Subsequently, **Robinson** bailed Byrd out of jail.

90. On March 19, 2000, Cantral Huggins traveled from Little Rock, Arkansas to Arlington, Texas. On March 20, 2000, Jewell Ewing met with **Julius Robinson** and received from **Robinson** 10 pounds of marihuana. **Robinson** and Huggins packaged the marihuana in a box which was given to Jamila Camp to deliver to a UPS shipping agent. The package was addressed to "Mario Robinson," Booker, Little Rock, Arkansas. Subsequently, on March 20, 2000, Jamila Camp mailed approximately 10 pounds of marihuana to Booker Street, Little Rock, Arkansas, the residence of Cantral Huggins. Camp completed the shipping information form in accordance with instructions previously given to her by **Robinson** and Huggins. Huggins intended to retrieve the marihuana upon his return to Little Rock, Arkansas and sell it to customers in Little Rock. However, the package was intercepted and seized by law enforcement personnel. Camp knew that the package contained marihuana and knew that it was intended to be delivered to Huggins. Camp also knew that **Robinson** was selling the marihuana to Huggins as part of an ongoing business enterprise in which **Robinson** and others engaged in the distribution of drugs.

24

91. On May 26, 2000, Camp used a telephone to call **Julius Robinson** on his cellular telephone and reported to him that she had seen a police officer in a white truck near **Robinson's** house. Camp contacted **Robinson** to alert and assist him in his ongoing trafficking in marihuana for remuneration. Camp's use of the telephone to alert **Robinson** about the presence of the police officer facilitated the carrying on of his unlawful activity.

92. On May 28, 2000, Camp used a telephone to call **Julius Robinson** on his cellular telephone and engaged in a series of conversations with him regarding the sale by Robinson to others of 30 pounds of marihuana in exchange for money. Camp's use of the telephone assisted **Robinson** in his ongoing trafficking in marihuana and discussing the potential sale of marihuana facilitated the carrying on of his unlawful activity.

93. On May 30, 2000, case agents intercepted a telephone call between Misty Grounds and **Julius Robinson**. Grounds asked **Robinson** if he could come by her residence in south Arlington, Texas. **Robinson** and Grounds discussed possible locations where they could meet. Grounds told **Robinson** that she and her friend want to "get a whole one" (a reference to a pound of marihuana), but that Grounds did not have her half of the money, and "won't get paid until the next day." **Robinson** asked Grounds when she could do that "thing" for him that they talked about. Grounds asked if **Robinson** means "drive" and **Robinson** replied affirmatively. Grounds said that she did not know **Robinson** wanted her to, and further stated she had asked about doing that (driving) before. **Robinson** and Grounds then discussed payment terms for the one pound of marihuana. **Robinson** told Grounds he would take half of the money ($300) in cash tonight, and that Grounds could pay the remaining half the next day. Grounds agreed, and promised to pay **Robinson**, and then told him that she wanted to make sure the stuff "isn't dry." In subsequent telephone conversations, arrangements were made whereby **Robinson** distributed a pound of marihuana to Grounds.

94. During the summer months of 2000, Iris Wade engaged in the business of the sale and distribution of marihuana for profit or remuneration. From time to time, Wade purchased marihuana from **Julius Robinson** and Nathan Henderson. However, from time to time, Wade sold marihuana to **Robinson** and Henderson.

95. In June 2000, Santana Minor was engaged from time to time in the business of the sale and distribution of marihuana. One of the persons who supplied marihuana to Minor for sale to others was **Julius Robinson**. Minor routinely purchased marihuana in quantities of one pound from **Robinson**. Minor would purchase marihuana both on a consignment and a cash basis.

25

96. On June 1, 2000, Santana Minor engaged in a series of telephone conversations with **Julius Robinson**. The object of the discussions between Minor and **Robinson** was the distribution by **Robinson** to Minor of one pound of marihuana, which Minor would sell to others. On June 1, 2000, as a result of those telephone conversations, Minor met with **Robinson** at a convenience store in Arlington, Texas and took delivery of a pound of marihuana.

97. In June 2000, Reginald Kinchen was engaged from time to time in the business of the sale and distribution of marihuana. One of the persons who supplied marihuana to Kinchen for sale to others was Julius Robinson. Kinchen purchased marihuana from Robinson on a cash basis.

98. On June 2, 2000, Kinchen engaged in a series of telephone conversations with Robinson. The object of the discussions between Kinchen and Robinson was Kinchen's purchase of one pound of marihuana from Robinson. Kinchen agreed to pay Robinson $450 for one pound of marihuana. Kinchen would in turn sell the marihuana to others.

99. On June 2, 2000, Santana Minor engaged in a series of telephone conversations with Julius Robinson. The object of the discussions between Minor and Robinson was the distribution by Robinson to Minor of one pound of marihuana, which Minor would sell to others. On June 2, 2000, as a result of those telephone conversations, Minor met with Robinson at a convenience store in Arlington, Texas and took delivery of a pound of marihuana.

100. On June 2, 2000, Robinson and Henderson recruited Jeanne Denise Wilkins to transport 104 pounds of marihuana from Arlington, Texas, to Arkansas for delivery to customers of **Robinson**. **Robinson** and Henderson trailed Wilkins in another car as she drove to Arkansas. Wilkins' vehicle was stopped by Texas Department of Public Safety Troopers in Sulphur Springs, Van Zandt County, Texas, for a traffic violation. Officers found approximately 104 pounds of marihuana in the vehicle. Investigating agents conducting surveillance observed **Robinson** and Henderson following Wilkins' vehicle. **Robinson** and Henderson subsequently arranged for Wilkins to be released on bond following her arrest. The 104 pounds of marihuana was part of a 200 pound transaction that Henderson and **Robinson** had previously conducted with Victor Jimenez.

101. On June 4, 2000, and on June 18, 2000, **Robinson** attempted to recruit Misty Grounds to drive loads of marihuana for him from Arlington, Texas, to be delivered to others in the state of Arkansas.

26

102. On June 4, 2000, Edward Jenkins, also known as "Bear," engaged in telephone conversations with **Julius Robinson** and discussed with **Robinson** the purchase, by Jenkins from **Robinson**, a pound of marihuana. **Robinson** agreed to sell Jenkins a pound of marihuana for the purchase price of $450. **Robinson**, later that day, delivered the pound of marihuana to Jenkins. Jenkins paid Robinson $450.

103. On June 5, 2000, Dorothy Hodges engaged in a telephone conversation with Julius Robinson and discussed with him the purchase by Hodges from Robinson of a pound of marihuana. Robinson agreed to sell the marihuana to Hodges for the price of $500. Robinson, later that day, delivered the pound of marihuana to Hodges, who paid Robinson $500, the agreed upon price, for the pound of marihuana.

104. On June 8, 2000, Dorothy Hodges engaged in a telephone conversation with **Julius Robinson** and discussed with him the purchase by Hodges from **Robinson** of a pound of marihuana. **Robinson** agreed to sell the marihuana to Hodges for the price of $500. **Robinson**, later that day, delivered the pound of marihuana to Hodges, who paid **Robinson** $500, the agreed upon price, for the pound of marihuana.

105. On June 9, 2000, in an attempt to facilitate the distribution of marihuana, Terrence Holimon engaged in a series of telephone conversations with **Julius Robinson**. The object of the discussions between Holimon and **Robinson** was the distribution by **Robinson** to Holimon of marihuana, which Holimon would sell to others. At approximately 11:33 a.m., Holimon, who was in Arkansas, telephoned **Robinson**, who was in Arlington, Texas. During the conversation, **Robinson** asked Holimon who was going to "slab it for him," referring to the method by which Holimon transported the marihuana back to Arkansas. Holimon replied he would probably put it on a bus and that he would be "there" (in reference to Arlington, Texas) that evening. At approximately 9:09 p.m., **Robinson** and Holimon again spoke by telephone. Holimon discussed with **Robinson** where Holimon should get a room and advised **Robinson** that after he got a room he would come by **Robinson's** house. At approximately 9:39 p.m., Holimon again spoke by telephone to **Robinson** and told **Robinson** he had a room and that Holimon was on his way to **Robinson's** house.

106. On June 9, 2000, after the telephone calls, Holimon went to **Robinson's** house, 2602 Clayborn Court, Arlington, Texas, where he met with **Robinson** and received four pounds of marihuana from **Robinson** in exchange for money or the promise of money or other things of value. Holimon intended to take the marihuana to Little Rock, Arkansas to sell. Holimon drove to a bus station in an effort to purchase a ticket for travel back to

27

Arkansas, but was unsuccessful. Holimon traveled back to Arlington, Texas. Holimon was stopped by Arlington police officers and he consented to a search of his vehicle. The officers discovered the marihuana and arrested Holimon.

107. On June 13, 2000, Dorothy Hodges engaged in a telephone conversation with **Julius Robinson** and discussed with him the purchase by Hodges from **Robinson** of a pound of marihuana. **Robinson** agreed to sell the marihuana to Hodges for the price of $500. **Robinson**, later that day, delivered the pound of marihuana to Hodges, who paid **Robinson** $500, the agreed upon price, for the pound of marihuana.

108. On June 13, 2000, Iris Wade engaged in a telephone conversation with **Julius Robinson** and agreed to sell **Robinson** approximately 25 pounds of marihuana.

109. On June 14, 2000, pursuant to arrangements made during their conversation on June 13, 2000, Iris Wade met **Julius Robinson** at Wade's residence,     Debra Lane, Arlington, Texas, and distributed to **Robinson** approximately 25 pounds of marihuana in exchange for money.

110. On June 14, 2000, Reginald Kinchen engaged in a series of telephone conversations with **Julius Robinson**. The object of the telephone discussions between Kinchen and **Robinson** was the distribution by **Robinson** to Kinchen of one pound of marihuana, which Kinchen would sell to others. On June 14, 2000, as a result of those telephone conversations, Kinchen met **Robinson** in Arlington, Texas and took delivery of one pound of marihuana and paid **Robinson** $450 for the one pound of marihuana.

111. On June 15, 2000, Edward Jenkins (aka: "Bear") engaged in telephone conversations with **Julius Robinson** and discussed with **Robinson** the purchase, by Jenkins from **Robinson**, of a pound of marihuana. **Robinson** agreed to sell Jenkins a pound of marihuana for the purchase price of $450. **Robinson**, later that day, delivered the pound of marihuana to Jenkins, who paid **Robinson** $450, the agreed upon price.

112. On June 16, 2000, Dorothy Hodges engaged in a telephone conversation with **Julius Robinson** and discussed with him the purchase by Hodges from **Robinson** of a pound of marihuana. **Robinson** agreed to sell the marihuana to Hodges for the price of $500. **Robinson**, later that day, delivered the pound of marihuana to Hodges, who paid **Robinson** $500, the agreed upon price, for the pound of marihuana.

28

113. On June 16, 2000, Santana Minor engaged in a series of telephone conversations with **Julius Robinson**. The object of the discussions between Minor and **Robinson** was the distribution by **Robinson** to Minor of two pounds of marihuana, which Minor would sell to others. On June 16, 2000, as a result of those telephone conversations, Minor met with **Robinson** at Minor's residence, located at         Sunflower in Arlington, Texas, and took delivery of two pounds of marihuana.

114. On June 20, 2000, Santana Minor engaged in a series of telephone conversations with **Julius Robinson**. The object of the discussions between Minor and **Robinson** was the distribution by **Robinson** to Minor of two pounds of marihuana, which Minor would sell to others. On June 20, 2000, as a result of those telephone conversations, Minor met with **Robinson** at Minor's residence, located at         Sunflower in Arlington, Texas, and took delivery of two pounds of marihuana.

115. On June 22, 2000, DEA agents and task force officers established physical surveillance at Javier Aguilar's residence,         South Brighton in Dallas, Texas. Agents observed **Julius Robinson** and Richard Smart arrive together at the residence in a white 1999 Nissan Altima. **Robinson** was observed by agents entering the residence. Shortly thereafter, a black Ford Expedition arrived at the residence. **Robinson** exited the residence and entered the Nissan Altima. **Robinson** drove to the 200 block of South Marlborough Avenue in Dallas and met with a Hispanic male who worked for Javier Aguilar. Approximately 70 pounds of marihuana was delivered to **Robinson** by the Hispanic male.

116. On June 27, 2000, Iris Wade engaged in a series of telephone conversations with Nathan Henderson and agreed to sell Henderson approximately 25 pounds of marihuana. Later that day, Wade met with Henderson and distributed to Henderson approximately 25 pounds of marihuana in exchange for money and the promise of payment of money. After the delivery, Henderson called Wade and complained to him that one of the pounds of marihuana was "all seeds." Wade promised Henderson that he (Wade) would "make it up" to Henderson.

117. In the summer of 2000, Troy Lee Simpson was engaged from time to time in the business of the sale and distribution of marihuana for profit and remuneration. From time to time, one of the persons who supplied marihuana to Simpson was Nathan Henderson. Simpson purchased marihuana from Henderson and then distributed the marihuana to his (Simpson's) customers.

29

118. On June 26, 2000, Troy Lee Simpson engaged in a telephone conversation with Nathan Henderson. Simpson agreed to buy from Henderson 25 pounds of marihuana, which Simpson would sell to others. On June 27, 2000, pursuant to their conversation on June 26, 2000, Simpson met Henderson at Simpson's residence located in Tarrant County, Texas, and there Henderson distributed 25 pounds of marihuana to Simpson in exchange for money. Simpson accepted the marihuana which he intended to distribute to his customers for money.

119. On June 27, and June 28, 2000, Simpson engaged in a series of telephone conversations with Nathan Henderson and agreed to buy from Henderson approximately 10 pounds of marihuana. On June 28, 2000, pursuant to their telephone conversations, Simpson met with Henderson and Henderson distributed approximately 10 pounds of marihuana to Simpson in exchange for money and the promise of payment of money. Simpson accepted the marihuana which he intended to distribute to his customers for money.

120. In June 2000, Timothy Caldwell was engaged from time to time in the business of the sale and distribution of marihuana. One of the persons who supplied marihuana to Caldwell was Nathan Henderson. Caldwell routinely purchased marihuana from Henderson. Caldwell purchased marihuana from Henderson both on a consignment and a cash basis.

121. On June 28, and June 29, 2000, Timothy Caldwell engaged in a series of telephone conversations with Nathan Henderson. The object of those discussions between Caldwell and Henderson was the distribution by Henderson to Caldwell of 33 pounds of marihuana, which Caldwell would sell to others.

122. On June 29, 2000, in the early morning hours, Howard Ringer met with Nathan Henderson at Henderson's residence, Lost Creek Drive, Arlington, Texas. Henderson delivered to Ringer approximately 24 pounds of marihuana. Ringer intended to distribute the marihuana to his customers for money in the state of Florida. Ringer had agreed to pay Henderson in excess of $13,000 for the marihuana. Ringer loaded the marihuana into his own vehicle and proceeded to drive eastbound on Interstate 30 in an effort to return to the state of Florida, where Ringer resided. While enroute to Florida, Ringer was stopped by law enforcement officers in Van Zandt County, Texas. Police officers seized the marihuana from Ringer's vehicle.

123. On June 30, 2000, at approximately 12:19 p.m., case agents intercepted a telephone call between Nathan Henderson and Lashandra Lynette Adams, whereby Adams caused and facilitated the distribution of marihuana by Henderson to Adams' cousin, Derrick Simon. During the conversation, Adams told Henderson that she was going out of town, but her

30

cousin wanted "10 CD's" from Henderson. The reference to CD's was coded language for 10 pounds of marihuana. In a subsequent telephone conversation, Adams told Henderson her cousin's name is "Derrick." Adams and Henderson discussed where Henderson should meet with "Derrick" to complete the marihuana transaction.

124. On July 1, 2000, pursuant to Henderson's conversation with Adams on June 30, 2000, Henderson engaged in a series of telephone conversations with Derrick Simon, making final arrangements for the delivery of 10 pounds of marihuana to Simon. Pursuant to those arrangements, Simon met Henderson and took delivery of 10 pounds of marihuana in exchange for money and the promise to pay money.

125. In June and July 2000, Stephen Williams was engaged from time to time in the business of the sale and distribution of marihuana. One of the persons who supplied marihuana to Williams for sale to others was Nathan Henderson. Williams routinely purchased marihuana in pound quantities from Henderson. Williams purchased marihuana from Henderson on both consignment and a cash basis. On several occasions, Williams met Henderson to take delivery of the marihuana and Henderson was accompanied by Fanisha Hill. The exchange of money and marihuana between Henderson and Williams took place in the presence of Fanisha Hill.

126. On July 1, and July 2, 2000, Stephen Williams engaged in a series of telephone conversations with Nathan Henderson. The object of those conversations was the distribution by Henderson to Williams of one pound of marihuana, which Williams would sell to others. On July 2, 2000, as a result of previous telephone conversations, Williams met Henderson and took delivery of one pound of marihuana.

127. On July 7, 2000, Dallas police officers executed a search warrant at      North Marsalis in Dallas, Texas, the residence of Javier Aguilar's father, Alberto Aguilar, and seized $194,000 and 55 pounds of marihuana.

128. On July 8, 2000, Timothy Caldwell engaged in a series of telephone conversations with Nathan Henderson. The object of the discussions between Caldwell and Henderson was the distribution by Henderson to Caldwell of another 20 pounds of marihuana, which Caldwell would sell to others. Caldwell agreed to pay Henderson $400 per pound of marihuana. On July 8, 2000, Caldwell took possession of the marihuana. Caldwell was subsequently arrested with the marihuana and he contacted Henderson to make bail for him.

31

129. On July 12, 2000, Arlington, Texas police officers seized $22,546 from Javier Aguilar after he departed from a meeting with Henderson and **Robinson** at "That Sounds Good" music store in Arlington.

130. On July 13, 2000, DEA agents in Little Rock, Arkansas, seized $4,880, a 38 caliber revolver, marihuana, and drug paraphernalia from Jewell Ewing at        Alameda Drive, Little Rock, Arkansas.

131. In July 2000, Cody Elliott was engaged from time to time in the business of the sale and distribution of marihuana. One of the persons who supplied marihuana to Elliott for distribution to others was Nathan Henderson. Elliott routinely purchased marihuana in quantities of one pound from Henderson. Elliott purchased marihuana from Henderson both on a consignment and a cash basis.

132. On July 17, 2000, Elliott engaged in a series of telephone conversations with Henderson. The object of the discussions between Elliott and Henderson was the distribution by Henderson to Elliott of five pounds of marihuana, which Elliott intended to sell to others for money. On July 17, 2000, as a result of those telephone conversations, Elliott met Henderson at a bowling alley in Arlington, Texas, and took delivery of five pounds of marihuana. The price Elliott agreed to pay to Henderson was $450 per pound of marihuana.

133. On November 8, 2000, following the return of the federal Indictment, agents and task force officers executed 13 search warrants at the following residences and businesses of the conspiracy members: 2540 East Arkansas Lane, Suite 106, Arlington, Texas (That Sounds Good and Platinum Sounds);        Lost Creek Drive, Arlington, Texas (Nathan Henderson's residence);        Clayborn Court, Arlington, Texas (**Julius Robinson's** residence);        Bunny Run, Apartment    , Arlington, Texas (Jason Gehring's residence);        Judy Lynn Drive, Arlington, Texas (John Turner's residence); Ridgehaven, Apartment    , Arlington, Texas (Jamila Camp's residence);        Carter Avenue, Fort Worth, Texas (Troy Simpson's residence);        Canberra Court, Fort Worth, Texas (Troy Simpson's residence);        Courtney Oaks Drive, Apartment    , Fort Worth, Texas (Leteshia Barnett's residence);        Sunflower, Arlington, Texas (Santana Minor's residence);        Winston, Dallas, Texas (Victor Jimenez' residence); South Brighton, Dallas, Texas (Victor Jimenez' residence);        Bobwhite, Mesquite, Texas (Victor Jimenez' residence); and        South Brighton, Dallas, Texas (Javier Aguilar's residence).

32

134. Subsequent to their arrest on November 8, 2000, several conspiracy members agreed to cooperate by providing agents with information which clarified and supported facts already known by the government. In some instances, conspiracy members also provided additional information that was not known by the government. During the investigation, agents seized approximately $317,985 in U.S. currency, 12 kilograms of cocaine, and over 650 pounds of marihuana.

## Victim Impact

135. As outlined in the Offense Conduct section of the Presentence Report, three individuals, Johnny Shelton, Rudolofo Resendez, and Juan Reyes were murdered by the defendant and coconspirators during the conspiracy. In addition, Issac Rodriguez sustained non-fatal physical injuries during the murder of Juan Reyes.

136. This officer contacted Johnny Shelton's sister, Shelia Shelton. Ms. Shelton was given the opportunity to complete a Declaration of Victim Losses statement. In addition, Shelia Shelton and her father, Mr. Shelton, met with this officer and provided the following information regarding the emotional impact the crime has had on their family: The death of her brother, Johnny Shelton, was very, very devastating to her and their family, and it caused Shelia Shelton to postpone her wedding for two years. Ms. Shelton advised that her father looks very sad and there are times when he "just wants to give up." Ms. Shelton revealed she can see the "hurt and pain" in her father's eyes, from someone taking "away his child." In addition to the emotional pain and suffering, Johnny Shelton's family lost a total of $548 for funeral expenses which were not covered by the Texas Crime Victim's Compensation Fund and lost wages.

137. Efforts to locate Rudolfo Resendez' family members have been unsuccessful. Although the victim occupied a residence in Dallas, Texas, his extended family resided in the Republic of Mexico. According to case agents, an individual who claimed to be Resendez' cousin, contacted the Tarrant County Medical Examiner's Office in Fort Worth, Texas, and identified Resendez' body, and had the body transported to Mexico for burial. Investigative agents contacted the Mexican Consulate's office to assist in locating the victim's family, however, no one has come forward to cooperate or provide any information concerning the victim. Therefore, this officer is unable to determine the amount of restitution owed to Resendez' family.

138. This officer was contacted on March 8, 2002, by Maria Reyes, the wife of Juan Reyes. Ms. Reyes revealed the death of Juan has deeply impacted his family; their emotions run from extreme sadness to anger, and they continue to grieve daily. Ms. Reyes advised it

33

continues to be very painful for her to think of her children being without their father. Not only have they lost him, but they have also lost his income. Mrs. Reyes reported a total monetary loss amount of $11,220, as a result of the offense.

139. Issac Rodriguez reported he was shot several times during the murder of Juan Reyes. Mr. Rodriguez advised his loss of wages and hospital bills totaled $11,000. In addition, Mr. Rodriguez continues to have, from time to time, dreams/nightmares, relating to the shooting of Juan Reyes.

140. The total restitution amount is $22,220 and is subject to the Mandatory Victim Restitution Act of 1996. 18 USC § 3663A.

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudications

141. None.

### Adult Criminal Convictions

| | Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline/ Points | |
|---|---|---|---|---|---|
| 142. | 2/8/1995 (Age 18) | Deadly Conduct - Discharging a Firearm 0574361 213th District Court of Tarrant County Fort Worth, Texas | 3/11/1996: Pleaded guilty. Sentence deferred; placed on 5 years deferred adjudication probation. | USSG § 4A1.1(c) | **1** |

The defendant was represented by attorney Michael Gregory.

### Criminal History Computation

143. The adult criminal conviction above results in a subtotal criminal history score of 1.

144. The defendant committed the instant offense while under a criminal justice sentence of probation, Case No. 0574361. Two criminal history points are added. USSG § 4A1.1(d).

34

145. The total criminal history score is 3 which results in a Criminal History Category of II. USSG Ch.5, Pt.A.

**Other Criminal Conduct**

146. None.

**Pending Charges**

147. None.

**Other Arrests**

| Date of Arrest | Charge/Court | Agency | Disposition |
|---|---|---|---|
| 148. 5/9/1998 | Possession of Marijuana | Sulphur Springs Police Department Sulphur Springs, Texas | 10/22/1998: Charged dismissed. |

## PART C. OFFENDER CHARACTERISTICS

149. The defendant was not interviewed at the request of his attorney. The defendant waived the preparation of a Presentence Report. The information reported in this section was obtained from U.S. Pretrial Services records.

**Personal and Family Data**

150. The defendant was born _____, 1976, in Fairville, North Carolina to the union of Jimmy Robinson and Rose Hollimon. He is the older of two children born to this union.

151. The defendant lived in North Carolina from birth to age 1 and then in Arkansas until age 13. His parents divorced shortly after his birth. He lived with his mother and also with his maternal grandmother. The defendant's family moved to the Dallas/Fort Worth metroplex area when the defendant was age 13. He has lived in Arlington, Texas since that time. At the time of his arrest for the instant offense, he lived at _____ Clayborn Court in Arlington, Texas.

35

152. The defendant's mother, Rose Holliman, currently resides in Dayton, Ohio, and his father, Jimmy Robinson, lives in Fort Lauderdale, Florida. The defendant maintains regular contact with his parents. The defendant's brother, Marcus Jwain Robinson, was a codefendant in the instant offense, and he is currently serving a term of supervised release.

153. The defendant has never been married, and he does not have any children.

154. The defendant's family members are identified as follows:

| Name | Relation | Age | Residence |
|------|----------|-----|-----------|
| Jimmy Robinson | Father | Unknown | Fort Lauderdale, Florida |
| Rose Holliman | Mother | Unknown | Dayton, Ohio |
| Marcus Robinson | Brother | 27 | Airport Freeway, No. Hurst, Texas 76054 |

**Physical Condition**

155. The defendant is 5 feet, 11 inches tall, weighs 208 pounds and has brown eyes and black hair. The defendant reported the following tattoos: a lion's head on his left arm and "playboy" on his right arm.

156. The defendant advised pretrial services he was shot in the back in 1994. The defendant further advised he currently enjoys good physical health.

**Mental and Emotional Health**

157. The defendant reported no history of mental or emotional problems.

**Substance Abuse**

158. The defendant admitted he has consumed alcohol, socially on the weekends, since the age of 12. He denied the use of any illegal controlled substances.

36

### Educational and Vocational Skills

159. The defendant reported he graduated from Lamar High School in Arlington, Texas in 1996.

160. According to the defendant, he attended Tyler Junior College in Tyler, Texas for approximately one year, from 1996 until 1997.

161. At the time of his arrest for the instant offense, the defendant advised he was attending CCI Training School in Arlington, Texas, pursuing a computer certification. He expected to complete the program in December 2000.

### Employment Record

162. The defendant has been in custody since November 8, 2000.

163. The defendant reported he was self-employed as a clothes salesman for approximately one year, prior to his arrest for the instant.

### Military

164. None.

### Financial Condition: Ability to Pay

165. The defendant is indigent and does not have the financial resources to pay a fine. The loss amounts in this case are subject to the Mandatory Victim Restitution Act of 1996. Pursuant to 18 USC § 3664(f)(1)(A), the Court ordered restitution to each victim in the full amount of each victim's losses without consideration of the economic circumstances of the defendant.

## PART D. Summary of Significant Findings by the Court

166. The Court found on the record that it only had sentencing discretion as to one count, Count 17. No sentence is to imposed on Counts 1, 2, 4, 5, 6, 8, 9, 10, 13, or 14, because these counts are lesser included offenses of Counts 3, 7, 11, and 15. With respect to Counts 3, 7, 11, 12, and 15, the punishment verdict of the jury in this case controls. Moreover, as to Counts 3, 7, 11, 12, and 15, the law expressly provides that no Presentence Report shall be prepared.

37

167. The sentences of death on Counts 3, 7, and 11, and the Life sentences on Counts 12 and 15 are in accordance with the recommendation of the jury in this case and the Court found there is no legal or factual basis to set aside those recommendations. The sentence on Count 17 is the statutorily required minimum sentence and is the sentence called for by application of the sentencing guidelines to the facts of this case.

168. Count 17 charged the defendant with Possession of a Firearm in Furtherance of a Drug Trafficking Crime. The sentence imposed on Count 17 is a term of not less than 25 years, to be served consecutively to any other sentence, 18 USC § 924(c)(1)(C)(i). The guideline sentence under USSG § 2K2.4 provides that the guideline sentence is "the minimum term of imprisonment required by statute."

Respectfully submitted,

Vicki McMillan
Senior U.S. Probation Officer

VDM
June 20, 2002

APPROVED:

Vicki McMullan, SRUSPO

for Barry Case
Supervising U.S. Probation Officer

38