IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

JULIUS OMAR ROBINSON,
           Petitioner,

v.

STEVE KALLIS,
           Respondent.

No.    2:20-CV-640-JPH-DLP

**GOVERNMENT'S AMENDED
RESPONSE TO ROBINSON'S 28 U.S.C. § 2241 PETITION**

Respectfully submitted,

Zachary A. Myers
United States Attorney
Southern District of Indiana

*s/ Jonathan Bradshaw*
Jonathan Bradshaw
Special Assistant United States Attorney
Colorado Bar No. 43838
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
E-mail: jonathan.bradshaw@usdoj.gov

Attorneys for Respondent

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES........................................................................................ iv

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    1.    Robinson, a drug dealer, murders two men and is sentenced to death.......... 3

    2.    The district court and the Fifth Circuit reject Robinson's numerous attacks on his criminal judgment. ............................................................................... 6

        A.    The Fifth Circuit affirms Robinson's conviction and sentence on direct appeal. ................................................................................ 6

        B.    Robinson files a series of collateral attacks, including many of the same issues he presents again here, all of which are rejected. ........... 7

LAW GOVERNING SECTION 2241 PETITIONS .......................................... 11

DISCUSSION....................................................................................................... 16

    1.    Robinson's first claim fails to satisfy the Savings Clause and is fundamentally meritless.   (Robinson's Claim I). ...................................... 17

        A.    Robinson's claim is a textbook abuse of the writ, which should be rejected under Seventh Circuit precedent. ..................................... 18

        B.    This Court lacks jurisdiction over Robinson's first claim because it cannot proceed via the Savings Clause. .......................................... 19

            i.    Robinson's reliance on *Alleyne* is misplaced........................ 19

            ii.    Robinson is wrong that his claim is "jurisdictional." ........... 22

**Page**

iii.    Even if one of his claims satisfies the Savings Clause, Robinson cannot pass his entire "application" through the Savings Clause. ...................................................................23

    a.    Seventh Circuit caselaw confirms that the Savings-Clause analysis is done claim-by-claim. ....................24

    b.    The text and structure of Section 2255(e) cut against Robinson's proposed rule............................................27

    c.    The Seventh Circuit has already rejected Robinson's interpretation in an analogous situation. ....................29

    d.    Robinson's interpretation would undermine Congressional intent....................................................30

iv.    Robinson is not entitled to relief in any event because any error was harmless..................................................32

2.    Robinson's second claim for relief fails to satisfy the Savings Clause and is meritless in any event.   (Robinson's Claim II). ..........................................33

    A.    Robinson cannot show that a structural defect prevented him from raising his *Napue*, *Brady*, and *Strickland* claims under Section 2255, so he cannot raise them for the first time under the Savings Clause. ...........................................................................................33

    i.    *Webster* does not help Robinson here. ..................................34

    ii.    Robinson has otherwise failed to satisfy the Savings Clause. ...........................................................................................39

    B.    Robinson's *Napue*, *Strickland*, and *Brady* claims are fundamentally meritless. ...................................................................................40

    i.    There was no violation of *Napue*. ........................................40

    a.    Carlson's testimony was not false.............................43

    b.    Any "omission" was not material. ............................50

ii

**Page**

        ii.      Robinson's related *Strickland* claim is meritless. ................51

        iii.     Robinson has failed to show a *Brady* violation.....................56

3.    Because Robinson raised—and the Texas District Court rejected—his remaining ineffective-assistance-of-counsel claims, he is barred from relitigating them here.   (Robinson's Claims III & IV).............................58

    A.    Robinson already litigated—and lost—his ineffective-assistance claims and abuses the writ in raising them here..............................58

    B.    Robinson cannot resort to the Savings Clause to relitigate these ineffective-assistance claims. ............................................61

    C.    In any event, Robinson's claims are meritless. ...............................65

        i.       The Texas District Court correctly rejected Robinson's argument that counsel was ineffective on direct appeal. ......65

        ii.     As the Texas District Court and a unanimous Fifth Circuit decided, Robinson's argument that trial counsel was ineffective at the penalty phase is meritless.........................67

            a.    Robinson has failed to show deficient performance or resulting prejudice with his attacks on counsel's defense against the government's case in aggravation. ...........................................................................68

            b.    Robinson has failed to show deficient performance or resulting prejudice in his attacks on counsel's mitigation presentation..............................................70

4.    As Robinson concedes, *Garza* forecloses his final claim.   (Robinson's Claim V). ...................................................................................75

CONCLUSION ........................................................................................................77

CERTIFICATE OF SERVICE................................................................................77

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                                                      **Page(s)**

*Alcorta v. Texas*, 355 U.S. 28 (1957) ................................................................................. 37, 48, 49

*Alleyne v. United States*, 570 U.S. 99 (2013) ............................................................................ 19, 20

*Atkins v. Virginia*, 536 U.S. 304 (2002) .......................................................................................... 34

*Batson v. Kentucky*, 476 U.S. 79 (1986) ...................................................................................... 8, 65

*Beason v. Marske*, 926 F.3d 932 (7th Cir. 2019) .............................................................................. 24

*Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020) ................................................................... passim

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................................................... 11

*Camacho v. English*, 872 F.3d 811 (7th Cir. 2017) ......................................................................... 21

*Carvajal v. Dominguez*, 542 F.3d 561 (7th Cir. 2008) ..................................................................... 57

*Chazen v. Marske*, 938 F.3d 851 (7th Cir. 2019) ................................................................. 14, 24, 31

*Davis v. United States*, 817 F.3d 319 (7th Cir. 2016) ................................................................. 29, 30

*Dhinsa v. Krueger*, 917 F.3d 70 (2d Cir. 2019) ............................................................................... 12

*Elonis v. United States*, 575 U.S. 723 (2015) .................................................................................. 26

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) .......................................................................... passim

*Gonzalez v. Crosby*, 545 U.S. 524 (2005) ....................................................................................... 10

*Gonzalez v. Thaler*, 565 U.S. 134 (2012) ................................................................................... 22, 56

*Hall v. Daniels*, No. 2:17-cv-176-JPH-DLP, 2020 WL 6701278 (S.D. Ind. Nov. 14, 2020) .................................................................................................................................................. 12

*Hall v. Watson*, 829 F. App'x 719 (7th Cir. 2020) ..................................................................... passim

*Hall v. Watson*, 829 F. App'x 721 (7th Cir. 2020) ........................................................................... 18

*Hall v. Watson*, No. 2:20-cv-599-JPH-DLP, 2020 WL 6785383 (S.D. Ind. Nov. 17, 2020) .................................................................................................................................... 34, 38, 39

*Harrington v. Richter*, 562 U.S. 86 (2011) ................................................................................. 52, 53

**Federal Cases, continued**                                                             **Page(s)**

*Higgs v. Watson*, 841 F. App'x 995 (7th Cir. 2021) .......................................................... 16

*In re Chapman*, 166 U.S. 661 (1897) .................................................................................. 30

*In re Davenport*, 147 F.3d 605 (7th Cir. 1998) ................................................. 12, 13, 24, 30

*In re Robinson*, 917 F.3d 856 (5th Cir. 2019) ............................................................. passim

*Jones v. Hendrix*, 8 F.4th 683 (8th Cir. 2021)................................................................... 14

*Lee v. Watson*, 964 F.3d 663 (7th Cir. 2020) .............................................................. passim

*Mabie v. Bell*, No. 19-2163, 2021 WL 5123705 (7th Cir. Nov. 4, 2021) ................... 26, 27

*McCleskey v. Zant*, 499 U.S. 467 (1991)............................................................................. 60

*Medellin v. Texas*, 552 U.S. 491 (2008) ....................................................................... 75, 76

*Mitchell v. United States*, 971 F.3d 1081 (9th Cir. 2020) ................................................. 76

*Montana v. Cross*, 829 F.3d 775 (7th Cir. 2016) .............................................................. 24

*Napue v. Illinois*, 360 U.S. 264 (1969)......................................................................... 11, 40

*Padilla v. Kentucky*, 559 U.S. 356 (2010)......................................................................... 56

*Poe v. LaRiva*, 834 F.3d 770 (7th Cir. 2016) .............................................................. passim

*Purkey v. United States*, 964 F.3d 603 (7th Cir. 2020) ............................................... passim

*Purkey v. United States*, No. 2:19-CV-414-JPH-DLP, 2019 WL 6170069
    (S.D. Ind. Nov. 20, 2019) ...................................................................... 23, 25, 26, 34

*Rector v. Johnson*, 120 F.3d 551 (5th Cir. 1997) .............................................................. 54

*Rhines v. Weber*, 544 U.S. 269 (2005) .............................................................................. 14

*Ring v. Arizona*, 536 U.S. 584 (2002) ................................................................................ 6

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997)................................................................ 28

*Robinson v. United States*, 140 S. Ct. 1128 (2020)...................................................... 2, 11

*Robinson v. United States*, 543 U.S. 1005 (2004).............................................................. 7

**Federal Cases, continued** **Page(s)**

*Robinson v. United States*, 565 U.S. 827 (2011) ............................................................. 2, 9

*Robinson v. United States*, Nos. 4:05-CV-756-Y & 4:00-CR-260-Y-2, 2008 WL 4906272 (N.D. Tex. 2008) .............................................................. passim

*Rompilla v. Beard*, 125 S. Ct. 2456 (2005) ....................................................................... 73

*Roper v. Simmons*, 543 U.S. 551 (2005) ........................................................................... 35

*Roundtree v. Krueger*, 910 F.3d 312 (7th Cir. 2018) .................................................. passim

*Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474 (2020) ......................................... 28

*Shepherd v. Krueger*, 911 F.3d 861 (7th Cir. 2018) .............................................. 11, 27, 64

*Shinn v. Ramirez*, 142 S. Ct. 1718 (2022) .................................................................... 31, 32

*Slack v. McDaniel*, 529 U.S. 473 (2000) ........................................................................... 67

*Smith v. United States*, 360 U.S. 1 (1959) .................................................................... 18, 20

*Stirone v. United States*, 361 U.S. 212 (1960) ................................................................... 18

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................................ passim

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988) ................................................................................................................................. 28

*United States v. Adcox*, 19 F.3d 290 (7th Cir. 1994) ......................................................... 49

*United States v. Are*, 590 F.3d 499 (7th Cir. 2009) ...................................................... 50, 51

*United States v. Caro*, 733 F. App'x 651 (4th Cir. 2018) .................................................. 53

*United States v. Cotton*, 535 U.S. 625 (2002) ................................................................... 22

*United States v. Dunkel*, 927 F.2d 955 (7th Cir. 1991) ..................................................... 23

*United States v. Hayman*, 342 U.S. 205 (1952) ............................................................ 12, 30

*United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000) ............................... 37, 43, 47, 54

*United States v. Johnson*, No. 02 C 6998, 2010 WL 11668097 (N.D. Ill. Dec. 13, 2010) 37

*United States v. Muresanu*, 951 F.3d 833 (7th Cir. 2020) ................................................ 22

**Federal Cases, continued** **Page(s)**

*United States v. Palivos*, 486 F.3d 250 (7th Cir. 2007)........................................................ 57

*United States v. Reed*, 986 F.2d 191 (7th Cir. 1993)............................................... 45, 46, 49

*United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004)............................................. passim

*United States v. Saadeh*, 61 F.3d 510 (7th Cir. 1995) ........................................................ 41

*United States v. Shields*, 789 F.3d 733 (7th Cir. 2017) ...................................................... 57

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ........................................................... 28

*Vialva v. Watson*, 975 F.3d 664 (7th Cir. 2020)........................................................... 16, 63

*Walker v. Crosby*, 341 F.3d 1240 (11th Cir. 2003) ..................................................... passim

*Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) ............................................................. 10

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc).................................... passim

*Westray v. Brookhart*, 36 F.4th 737 (7th Cir. 2022) ......................................................... 55

*Wiggins v. Smith*, 123 S. Ct. 2527 (2003) .......................................................................... 73

*Williams v. Taylor*, 529 U.S. 362 (2000)............................................................................ 73

*Woodford v. Garceau*, 538 U.S. 202 (2003)....................................................................... 31

*Zack v. Tucker*, 704 F.3d 917 (11th Cir. 2013) ........................................................... 28, 29

**Federal Statutes and Rules**

28 U.S.C. § 2253(c)(2) ......................................................................................................... 67

28 U.S.C. § 2255(e)............................................................................................................... 12

28 U.S.C. § 2255(h)............................................................................................................... 13

28 U.S.C. § 2255(h)(2) .......................................................................................................... 21

**Other Authorities**                                                                     **Page(s)**

*Johnson v. United States*, Brief in Opposition to Certiorari, 2001 WL 1193822
(Aug. 10, 2001)...............................................................................................43

## **INTRODUCTION**

Julius Robinson murdered two people.  *United States v. Robinson*, 367 F.3d 278, 282 (5th Cir. 2004).   His first victim, an unwitting stranger, was driving down a Texas highway when Robinson and a co-conspirator shot him with automatic rifles.  *Id.* Robinson shot his second victim with an automatic rifle at point-blank range.  *See id.* at 282-83.   He was also part of a drug-trafficking organization that killed a third victim. *Id.* at 283.   For these crimes, and others, a jury convicted Robinson and recommended that he be sentenced to death.   Following that binding recommendation, the district court imposed three death sentences and two life sentences as well as an additional sentence of 300 months.   That was in 2002.   *See In re Robinson*, 917 F.3d 856, 859 (5th Cir. 2019).

In the years since, Robinson has repeatedly—and unsuccessfully—attacked that judgment on direct appeal and in numerous collateral proceedings in district court and the Fifth Circuit.   Robinson argued on direct appeal that his indictment was defective because the grand jury did not consider the factors that made him eligible for a death sentence.  *Robinson*, 367 F.3d at 281.   Unsuccessful, Robinson tried to raise that same claim in a motion under 28 U.S.C. § 2255.  *See In re Robinson*, 917 F.3d at 860.   His Section 2255 motion also argued that his trial and appellate lawyers were ineffective in various ways.  *See Robinson v. United States*, Nos. 4:05-CV-756-Y & 4:00-CR-260-Y-2, 2008 WL 4906272, at *1 (N.D. Tex. 2008).   The district court rejected those claims, Robinson was denied a certificate of appealability, and the Supreme Court denied his

1

petition for a writ of certiorari.  *See Robinson v. United States*, 565 U.S. 827 (2011). Robinson then filed an unauthorized, successive collateral attack, raising *again* his defective-indictment claim, which he coupled with additional claims for relief.  *See In re Robinson*, 917 F.3d at 859.  Because Robinson did not obtain authorization before filing a second collateral attack, his motion was transferred to the Fifth Circuit, which affirmed the denial of relief and rejected Robinson's alternative request to file another Section 2255 motion under 28 U.S.C. § 2255(h)(2).  *Id.*  The Supreme Court denied certiorari. *Robinson v. United States*, 140 S. Ct. 1128 (2020).

Even that skeletal description of the procedural history shows that Robinson has litigated—and lost—numerous collateral attacks under Section 2255.  He now petitions this Court for relief under 28 U.S.C. § 2241, repeating several attacks that those courts have considered and rejected.  He again argues that the grand jury did not determine that his offenses were death eligible, along with two other claims he already litigated and lost, an additional claim he acknowledges could have been raised under Section 2255, and a final claim that is foreclosed by Circuit precedent.

This Court should dismiss Robinson's first four claims for relief at Section 2241's threshold.  Robinson has failed to show a structural defect that rendered Section 2255 inadequate or ineffective to test these claims.  He cannot use Section 2241 to relitigate claims he already litigated and lost—indeed, those claims are a paradigmatic abuse of the writ.  Nor can he raise claims that could have been adjudicated under Section 2255.

Seventh Circuit precedent forecloses Robinson's attempts to evade those limitations by casting his numerous appellate and post-conviction proceedings as a "sham" that denied him due process.   Thus, Claims I through IV must be dismissed.   And Claim V should be denied because, as Robinson concedes, it fails under binding precedent.

## BACKGROUND

**1.     Robinson, a drug dealer, murders two men and is sentenced to death.**

"Proving true to his Hollywood namesake, Robinson, also known by names such as 'Scarface,' entangled himself in a sadistic world of narcotics and violence in which he personally committed at least two senseless murders."   *Robinson*, 367 F.3d at 282. Robinson's victims were named Johnny Lee Shelton and Juan Reyes.

"The murder of Johnny Lee Shelton is a case of mistaken identity."   *Id.*   Shelton looked like a man whom Robinson blamed for a robbery months earlier.   *Id.*   Robinson and his coconspirators believed that they had found him, so they followed the victim onto a Dallas highway.   *Id.*   As they caught up to Shelton's car, Robinson yelled "that's him," leaned out the window, and began firing an AK-47.   *Id.*   "Capone," one of Robinson's coconspirators, "did the same."   *Id.*   Another car was travelling down the highway.   A stray bullet struck the other car in the trunk, blew through the back seat, and hit the speedometer, shattering and hitting another victim in the face.   (Appendix at 23-28.)

3

Shelton was even less fortunate.   He was shot in the stomach, and blood began to spread across his shirt.   (Appendix at 9.)   Shelton's passenger pulled the car over and tried to drive it to the hospital, but one tire was "shot out."   (Appendix at 9-13.)   The passenger then flagged down another motorist as Shelton writhed in his car, choking as blood came from his mouth.   (Appendix at 13-14.)   A good Samaritan took them to the hospital, where Shelton died.   (Appendix at 14.)

Robinson later murdered Juan Reyes.   *Robinson*, 367 F.3d at 283.   Reyes was standing in a driveway with Isaac Rodriguez when Robinson and another man walked up to Reyes "carrying automatic weapons, said something to him" and "then shot him in the foot."   *Id.*   Reyes fell to the ground.   He lay there as Robinson and a coconspirator shot him at least nine times at point blank range.   *Id.* (describing the distance as "less than five feet").   Reyes's wounds contained concrete fragments, suggesting that the bullets passed through his body, ricocheted off the pavement, and reentered his back.   *Id.* Several children were playing in a yard near the driveway and later identified Robinson as the man who had murdered Reyes.   (Appendix at 53-54.)   In addition to killing Reyes, Robinson and his coconspirator shot Rodriguez three times, and they also shot a third person who was sitting in a car and "riddled" his car with bullets.   *Robinson*, 367 F.3d at 283.

In addition to personally—and brutally—murdering these two victims, Robinson participated in a drug-trafficking conspiracy that led to the murder of a third man,

4

Rudolfo Resendez.  *Id.*  And through this conspiracy, Robinson and his coconspirators possessed kilograms of cocaine and numerous firearms, including a .357 caliber pistol, a SKS 7.62x39 assault rifle, and an UZI.  *Id.*

The United States charged Robinson with 16 crimes:

- conspiracy to distribute more than 100 kilograms of marijuana (Count One);

- conspiracy to distribute more than 5 kilograms of cocaine (Count Two);

- murder while engaging in a continuing criminal enterprise (Count Three);

- possession of a firearm in furtherance of a drug trafficking crime (Counts Four, Eight, and Seventeen);

- carrying/using a firearm during a drug trafficking crime (Counts Five, Nine, and Thirteen);

- carrying/using/discharging a firearm during a drug trafficking crime (Counts Six, Ten, and Fourteen);

- murder in the course of carrying/using a firearm during a drug trafficking crime (Counts Seven, Eleven, and Fifteen); and

- murder while engaged in possession of more than 5 kilograms of cocaine with intent to distribute (Count Twelve).

(*See* Pet. Ex. 3.)[1]  The government filed notice of its intent to seek the death penalty on Counts Three, Seven, Eleven, Twelve, and Fifteen.  (*See* Pet. Ex. 5.)  The jury found Robinson guilty on all 16 charges.  *In re Robinson*, 917 F.3d at 859.

---

[1] "Pet." refers to Robinson's Amended Petition for Writ of Habeas Corpus.  Pin cites to Robinson's petition refer to the page numbers printed at the bottom, not the number assigned by CM/ECF appearing in the banner.  The government's pin cites to Robinson's appendix refer to the Bates number at the bottom of the page.

At the penalty phase, the jury heard evidence that, in 1995, "Robinson fired several shots from a handgun at a woman who failed to pay him $120 for crack cocaine." *Robinson*, 367 F.3d at 283.   The jury also heard evidence that "Robinson, acting from his jail cell after his arrest in this case, arranged to have a government informant murdered." *Id.*   The jury recommended a death sentence on Counts Three, Seven, and Eleven, and life sentences on Counts Twelve and Fifteen.   *In re Robinson*, 917 F.3d at 860.   The district court imposed those sentences as well as an additional 300-month sentence on Count Seventeen.[2]   *Id.*   Robinson appealed.

**2.     The district court and the Fifth Circuit reject Robinson's numerous attacks on his criminal judgment.**

Robinson raised several claims on direct appeal.   Notable here, he argued that the indictment failed to allege the statutory aggravating factors that made him death eligible. *Robinson*, 367 F.3d at 283-89.[3]   The Fifth Circuit accepted the government's concession that the indictment was infirm in light of *Ring v. Arizona*, 536 U.S. 584 (2002).   *Id.* at 283-84.   But the court also agreed with the government that the error was harmless

---

[2] The district court did not impose sentences on Counts One, Two, Four through Six, Eight through Ten, Thirteen, or Fourteen as those convictions were for lesser included offenses.   *See In re Robinson*, 917 F.3d at 860 n.2.   Although the indictment listed 17 counts, Robinson was not charged in Count 16.   (*See* Pet. Ex. 3.)

[3] Robinson further: (1) argued that the Federal Death Penalty Act violated the Eighth Amendment's ban on cruel and unusual punishment and the Fifth Amendment's Indictment Clause and guarantee of due process; (2) challenged the admission of certain evidence at sentencing; (3) made "two challenges to the aggravating factors used against him"; (4) argued that two of the statutory aggravating factors were "unconstitutionally duplicative"; and (5) claimed that the FDPA did not authorize the use of non-statutory aggravating factors.   *Robinson*, 367 F.3d at 289-92.   The Fifth Circuit rejected these claims.   *Id.* at 293.

6

beyond a reasonable doubt because any rational grand juror would have found probable cause to charge Robinson with at least one of the statutory aggravating factors omitted from his indictment. *Id.* at 285-89.

The Supreme Court denied certiorari. *Robinson v. United States*, 543 U.S. 1005 (2004).

Robinson next filed a Section 2255 motion. *See Robinson*, 2008 WL 4906272, at *1. He raised "a number of issues in various claims for relief." *Id.* at *8. The Texas District Court described his claims as follows:

A.    The Court should vacate the death sentence based [on Robinson] having received ineffective assistance of counsel ("Ground I").

B.    The Court should vacate Robinson's convictions because they were obtained in violation of Robinson's equal-protection rights ("Ground II").

C.    The Court should vacate Robinson's convictions because the Federal Death-Penalty Act, as applied in Texas, violates Robinson's equal-protection rights ("Ground III").

D.    The Court should vacate Robinson's convictions because Robinson received ineffective assistance of appellate counsel ("Ground IV").

E.    The Court should vacate Robinson's convictions because the prosecution pursued fundamentally inconsistent theories at seriatim capital trials ("Ground V").

F.    The Court should vacate Robinson's convictions because the prosecution knowingly used false and misleading testimony to secure Robinson's death sentence ("Ground VI").

*Id.*

7

Within those six broad categories, Robinson raised numerous claims and sub-claims.   Specifically, Robinson claimed that his trial counsel was ineffective for: (1) failing to hire a "skilled" investigator; and (2) failing to adequately rebut the government's case of future dangerousness by failing to (a) investigate and rebut evidence "regarding the attempt on Michael 'One Love' Williams's Life," *id.* at *10; (b) adequately investigate and rebut the government's evidence regarding the alleged attempt to murder Sarah Tucker, *id.* at *11; (c) hire a mitigation expert or failing to sufficiently investigate mitigation factors, *id.* at *12, including "Robinson's mental state as well as his social history, including Robinson's life as a young child and teenager as well as alleged pesticide exposure and in utero exposure to dangerous substances," *id.* at *13.

Robinson also claimed that his appellate counsel was ineffective for failing to argue that the government violated the rule of *Batson v. Kentucky*, 476 U.S. 79 (1986), "when the government used peremptory challenges to prevent three African-American females, Charline Boulet, Dorothy Jean DeBose, and Marchesia Amarh from sitting on the jury and failed to articulate a credible race-neutral explanation for the challenges." 2008 WL 4906272, at *18.   Robinson later sought leave to add a claim that the indictment was defective because the government failed to include in it the aggravating factors that rendered Robinson death eligible.   *See In re Robinson*, 917 F.3d at 861 & n.3.

8

The district court denied leave to amend, however, because the Fifth Circuit had rejected the claim on direct appeal. *See id.* The district court also denied the balance of Robinson's Section 2255 claims, his motions for a new trial, and his request for an evidentiary hearing. *Robinson*, 2008 WL 4906272, at \*25. The district court later denied his motion under Federal Rule of Civil Procedure 59(e) for reconsideration, and it declined to issue a certificate of appealability. *In re Robinson*, 917 F.3d at 861.

Robinson appealed, but the Fifth Circuit denied his request for a certificate of appealability. *United States v. Robinson*, Order Denying Certificate of Appealability, No. 09-70020 (5th Cir. issued June 8, 2010); (Appendix at 78-88.) The Fifth Circuit also denied Robinson's petition for en banc review, *Robinson v. United States*, Order on Petition for Rehearing En Banc, No. 09-70020 (5th Cir. filed Aug. 24, 2010), and the Supreme Court denied certiorari in 2011. *Robinson*, 565 U.S. at 827.

In 2018, Robinson returned to the Texas District Court and moved to set aside the decision denying his Section 2255 motion under Rule 60(b)(6). *See In re Robinson*, 917 F.3d at 861. He alleged that the "lack of due process in his post-conviction proceedings constituted an extraordinary circumstance that justified re-opening the judgment in his case." *Id.* He urged that the district court: (1) "wrongly denied his ability to appeal" by applying "an erroneously high standard for obtaining" a certificate of appealability; (2) erroneously barred him from conducting a reasonable investigation; and (3) erroneously denied his "right to amend his § 2555 motion to include his defective-

9

indictment claim." *Id.* (cleaned up).   Regarding the latter, Robinson attacked the Fifth

Circuit's holding (on direct appeal) that his defective-indictment claim was subject to the

constitutional harmless-error standard.   *See Robinson v. United States*, No. 4:05-CV-

756-Y, Motion for Relief from Judgment Pursuant to Federal Rule of Civil Procedure

Rule 60(b)(6), Dkt. No. 10 at 16 (N.D. Tex. filed Feb. 28, 2018).   He also claimed that

*Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), "cast[] serious doubt" on the Fifth

Circuit's decision to reject his argument that the indictment error was structural.   *Id.* at

16-17.   The district court correctly treated Robinson's motion as an unauthorized Section

2255 motion and transferred it to the Fifth Circuit.   *See In re Robinson*, 917 F.3d at 861.

In the Fifth Circuit, Robinson sought to argue that the panel on direct appeal had

erred by holding that his indictment-error claim was harmless error 'beyond a reasonable

doubt.'"   *In re Robinson*, 917 F.3d at 866 (quoting *Robinson*, 367 F.3d at 289).

The Fifth Circuit disagreed, explaining that it had rejected that claim nearly 15

years earlier, and refused to let Robinson relitigate that issue under Rule 60(b).   *Id*. at

867-68.   That attempt was an impermissible end-run around AEDPA's bar on successive

collateral attacks.   *Id*. ("AEDPA forecloses such a claim here because it potentially

circumvents § 2255's successive-petition requirements.").   The Fifth Circuit also

rejected the balance of Robinson's arguments—*i.e.*, that the district court had erred in

treating his other claims as successive collateral attacks under *Gonzalez v. Crosby*, 545

U.S. 524 (2005)—and denied his alternative request for authorization to file another

10

motion under Section 2255.   917 F.3d at 863-66, 870.   The Supreme Court denied

certiorari.   *Robinson*, 140 S. Ct. 1128.

More than 15 years after he was sentenced to death, Robinson is now challenging

his judgment under Section 2241.   Once again, he raises his defective-indictment claim,

(Claim I).   (Pet. at 21-31.)   He also argues that his counsel was ineffective on direct

appeal, (Claim III), and at sentencing, (Claim IV)—claims based on the same arguments

and evidence already rejected by the Texas District Court and the Fifth Circuit.   (Pet. at

74-146.)   To these already-rejected claims, Robinson adds claims under *Napue v.*

*Illinois*, 360 U.S. 264 (1969), *Strickland v. Washington*, 466 U.S. 668 (1984), and *Brady*

*v. Maryland*, 373 U.S. 83 (1963), (Claim II)—claims that he acknowledges could have

been—but were not—raised in his first Section 2255 motion.   (Pet. at 36-71.)   Finally,

Robinson raises a concededly foreclosed claim that the United States violated his rights

under the American Declaration, (Claim V).   (Pet. at 153-54.)

### LAW GOVERNING SECTION 2241 PETITIONS

Congress chose to steer almost all collateral challenges to motions filed under

Section 2255.   *Shepherd v. Krueger*, 911 F.3d 861, 862 (7th Cir. 2018).   And in the

"great majority" of cases, Section 2255 is the "exclusive" remedy.   *Bourgeois v. Watson*,

977 F.3d 620, 632 (7th Cir. 2020) (internal quotation marks omitted).   "The purpose

behind the enactment of section 2255 was to change the venue of postconviction

proceedings brought by federal prisoners from the district of incarceration to the district

in which the prisoner had been sentenced." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998) (citing *United States v. Hayman*, 342 U.S. 205, 212-19 (1952)).

A federal prisoner may resort to 28 U.S.C. § 2241, the general habeas statute, only where he shows that Section 2255 is "inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e); *see also Hall v. Watson*, 829 F. App'x 719, 720 (7th Cir. 2020) (explaining that Section 2255(e) "opens a narrow pathway to § 2241, but to proceed down that path there must be something structurally inadequate or ineffective about § 2255 as a vehicle for the arguments raised in the § 2241 petition") (cleaned up, and citing *Lee v. Watson*, 964 F.3d 663, 666 (7th Cir. 2020)). Where a prisoner cannot make that showing, the district court should reject the petition at the threshold, without reaching its merits. *Webster v. Daniels*, 784 F.3d 1123, 1124 (7th Cir. 2015) (en banc) (petition "must be dismissed at the threshold" if § 2255(e) is not satisfied); *see also, e.g.*, *Hall v. Daniels*, No. 2:17-cv-176-JPH-DLP, 2020 WL 6701278, *4 (S.D. Ind. Nov. 14, 2020) (granting the government's motion to dismiss Hall's Section 2241 motion because he could not satisfy Section 2255(e)). Indeed, a district court has no jurisdiction over a claim that fails to satisfy Section 2241. *See Dhinsa v. Krueger*, 917 F.3d 70, 81 (2d Cir. 2019) ("Because the savings clause articulates a jurisdictional requirement, a court adjudicating a § 2241 petition must confirm that the savings clause can be applied at all before proceeding with a full merits review of the petitioner's claims.").

12

Although the Seventh Circuit has declined to define "rigid categories delineating when the safety valve is available," the Court has decided three cases "central" to the narrow limits of relief under the Savings Clause. *Purkey v. United States*, 964 F.3d 603, 614-15 (7th Cir. 2020). The first case, *In re Davenport*, involved appeals by two federal prisoners. 147 F.3d at 609. While one prisoner (Davenport) could not use Section 2241 to challenge his sentence under 18 U.S.C. § 924(c) because he could have raised his challenge on direct appeal and in a Section 2255 motion, another prisoner (Nichols) had unsuccessfully attacked his conviction in a Section 2255 motion before the Supreme Court later narrowed the meaning of the term "use" in Section 924(c). *Id.* For Nichols, Section 2255 was inadequate and ineffective to test the legality of his detention. *Id.* at 610-12. Nichols was "being held in prison for a nonexistent crime," and he could not have raised his claim on direct appeal or in his first Section 2255 motion because of then-binding precedent later abrogated by the Supreme Court. *Id.* at 610. Nor could he raise his "use" claim in a second or successive Section 2255 motion because that claim did not rely on either newly discovered evidence of his innocence or a new rule of constitutional law. *Id.*; *see also* 28 U.S.C. § 2255(h). The Seventh Circuit thus held that Nichols's claim could proceed under the Savings Clause because "he had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence" as "the law changed after his first [Section] 2255 motion" and the

13

change is both retroactive and "eludes the permission in section 2255 for successive

motions."  *Id.*

Following *Davenport*, the Seventh Circuit has clarified that this exception is

satisfied only where:

> (1) the claim relies on a statutory interpretation case, not a constitutional
> case, and thus could not have been invoked by a successive § 2255 motion;
> (2) the petitioner could not have invoked the decision in his first § 2255
> motion and the decision applies retroactively; and (3) the error is grave
> enough to be deemed a miscarriage of justice.

*Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019) (internal quotation marks omitted).[4]

The second case is *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001).   There, the

defendant relied on a report from the Inter-American Commission on Human Rights,

which concluded "that Garza's death sentence was a violation of international human

rights norms to which the United States had committed itself."  *Id.* at 920.   The Seventh

Circuit concluded that, because Garza could not have filed his petition with the

Commission until he had first exhausted his national remedies, his situation was

analogous to *Davenport* in that "it was literally impossible for him to have raised [his

---

[4] Although the majority of circuit courts apply a similar standard, there is a circuit split.  *See Jones v. Hendrix*, 8 F.4th 683, 686-87 (8th Cir. 2021), *cert. granted* No. 21-857, ___ S. Ct. ___, 2022 WL 1528372 (2022).   After the Supreme Court granted certiorari to resolve it, the Solicitor General notified the Court that the Department of Justice will not "defend the rationale of the court of appeals' decision" and noted that the Court "may wish to invite an amicus curiae" to do so.  *Jones v. Hendrix*, Letter, No. 21-857 (filed June 17, 2022).   As explained below, none of Robinson's claims satisfies this Circuit's *Davenport/Chazen* standard, so this Court can deny his claims without staying this litigation to await further guidance from the Supreme Court.   Nevertheless, the government acknowledges this Court's inherent authority to stay this case pending the Supreme Court's decision in *Jones v. Hendrix*.  *See generally Rhines v. Weber*, 544 U.S. 269, 276 (2005) (acknowledging a federal district court's authority to stay habeas litigation).

claim] at any time earlier than [] the date of the Commission's decision," and "[t]he argument therefore could not have been raised in his direct appeals or in his first § 2255 motion." *Id.* at 922-23. Notably, although Garza could raise his claim under the Savings Clause, the Seventh Circuit declined to stay Garza's execution so that he could pursue that ultimately meritless claim in federal district court. Because reports from the Commission do not create "privately enforceable rights," Garza "ha[d] not presented any substantial ground on which relief could be granted in his habeas corpus petition." *Id.* at 925-26.

Third, in *Webster*, the defendant obtained new evidence in support of his intellectual-disability claim—evidence that existed at the time of his trial but had been purportedly unavailable to him. 784 F.3d at 1132-34. Because Webster could not satisfy Section 2255(h)'s gatekeeping requirements for a successive motion—he did not rely on new evidence of innocence or a new rule of constitutional law—he filed a Section 2241 petition claiming that he was categorically ineligible for the death penalty based on that new evidence. *Id.* at 1134-35. In that "rare case," the Seventh Circuit (en banc) held that there was a "structural problem" or "lacuna" in Section 2255, and therefore Webster could invoke the Savings Clause. *Id.* at 1135-44. The Court in *Webster* "took great care to assure that its holding was narrow in scope." *Poe v. LaRiva*, 834 F.3d 770, 774 (7th Cir. 2016); *see also Webster*, 784 F.3d at 1140 n.9 (noting that the holding would have a "limited effect on future habeas corpus proceedings"). Indeed, "there is

15

nothing in *Webster* to suggest that its holding applies outside the context of new evidence." *Poe*, 834 F.3d at 774.

Beyond the limited circumstances presented in those three central cases, a prisoner can resort to the Savings Clause only if he shows "some kind of *structural* problem with section 2255." *Higgs v. Watson*, 841 F. App'x 995, 997 (7th Cir. 2021) (citing *Webster*, 784 F.3d at 1186) (internal quotation marks omitted, emphasis in original). "[A] § 2241 petition may not proceed under the Savings Clause absent 'a compelling showing' that it was 'impossible' to use § 2255 to cure the defect identified in the § 2241 petition." *Lee*, 964 F.3d at 666. "It is not enough that proper use of the statute results in a denial of relief." *Purkey*, 964 F.3d at 615; *see also Vialva v. Watson*, 975 F.3d 664, 665 (7th Cir. 2020) ("Vialva's contentions were entertained and resolved under § 2255," and "[t]he fact that Vialva lost does not entitle him to another collateral attack under § 2241"); *Hall*, 829 F. App'x at 720 ("[Hall] challenged his § 924(c) conviction in light of *Davis* and lost. There's nothing structurally inadequate or ineffective about § 2255 as a vehicle for this claim.").

## **DISCUSSION**

This Court should reject Robinson's claims. His first four claims should be dismissed at the threshold because Robinson cannot pass them through the Savings Clause. Robinson has identified no structural defect that made Section 2255 inadequate or ineffective to test the legality of his detention. Indeed, his Section 2241 petition

16

simply repeats three claims—Claims I, III, and IV—that he has already litigated and lost. He cannot use Section 2241 as a surrogate appeal, and those claims are a textbook example of an abusive writ.   Claim II—which includes his *Brady*, *Napue*, and *Strickland* claims—cannot proceed under Section 2241 because he could have raised it in his Section 2255 motion.   Although Robinson argues that all four claims can proceed under Section 2241 because Section 2255 proceedings in the Fifth Circuit are simply a "sham," his argument is foreclosed by Seventh Circuit precedent.

In any event, all five of Robinson's claims fail on their merits.   For these reasons, Robinson cannot overturn his convictions or capital sentences under Section 2241.

**1.      Robinson's first claim fails to satisfy the Savings Clause and is fundamentally meritless.   (Robinson's Claim I).**

The Fifth Circuit, on direct appeal, rejected Robinson's claim that the defective indictment entitles him to relief.   *Robinson*, 367 F.3d at 286-89.   That claim was rejected again as meritless in Robinson's Section 2255 motion, and it was rejected years later in his successive Section 2255 motion, which he disguised as a Rule 60(b) motion. *See In re* Robinson, 917 F.3d at 867-68 & n.3.   Having litigated and lost that claim no fewer than three times, Robinson tries again here.   This Court should dismiss this claim because it constitutes an abuse of the writ and fails to satisfy the Savings Clause. Alternatively, the Court should reject the claim as meritless.

17

**A.    Robinson's claim is a textbook abuse of the writ, which should be rejected under Seventh Circuit precedent.**

Robinson's first claim is barred as an abuse of the writ.    Absent an intervening change in the law, a prisoner cannot resort to Section 2241 to relitigate an argument that he lost on direct appeal.    *Roundtree v. Krueger*, 910 F.3d 312, 313-14 (7th Cir. 2018). Even before Congress passed the AEDPA, which imposed statutory limitations on successive post-conviction attacks, "[a]n attempt to relitigate a theory, in the absence of an intervening change of law, was taken as a paradigm abuse of the writ."    *Id.* at 314. The same is true for claims raised and rejected under Section 2255.    *Id.* at 313; *see, e.g.*, *Hall v. Watson*, 829 F. App'x 721, 722 (7th Cir. 2020) (affirming this Court's rejection of a "meritless" argument where Hall attempted to relitigate a claim that he "long ago raised and lost . . . in his first round of § 2255 litigation in the Northern District of Texas").

Robinson concedes that he raised his Fifth Amendment claim on direct appeal. (*See* Pet. at 35 ("Robinson had already raised the claim on direct review to no avail.").) But now—relying heavily on cases decided *before* his direct appeal[5]—he wants this Court to conclude that the Fifth Circuit erred in denying him relief.    (Pet. at 34 ("The Fifth Circuit's view of 'functional equivalents' as inferior to 'formal elements' necessarily, and improperly, colored its view of Robinson's indictment claim.").)    This Court should reject Robinson's *fourth* effort to relitigate that claim here.    It is an abuse

_____

[5] For example, Robinson cites *Stirone v. United States*, 361 U.S. 212 (1960), and *Smith v. United States*, 360 U.S. 1 (1959), (Pet. at 21).    Both cases were on the books for decades before Robinson committed his first murder.

of the writ. *Roundtree*, 910 F.3d at 314 ("An attempt to relitigate a theory, in the absence of an intervening change of law, was taken as a paradigm abuse of the writ."). This Court should dismiss it for that reason alone.

> **B.    This Court lacks jurisdiction over Robinson's first claim because it cannot proceed via the Savings Clause.**

Robinson also fails to show that his claim can proceed under the Savings Clause. He has identified no "structural defect" in Section 2255 that would allow him to raise this claim under Section 2241. *Hall*, 829 F. App'x at 720.  The Texas District Court denied the claim under Section 2255 because the Fifth Circuit had rejected it on direct appeal. Robinson had an opportunity to test the legality of his detention. *Roundtree*, 910 F.3d at 313.  Robinson's "problem lies not in § 2255" but in the fact that he has already litigated and lost this claim, combined with "the [Fifth] Circuit's conclusion" on direct appeal that the defective-indictment error was not structural. *Id.*   Under clear Seventh Circuit precedent, Robinson cannot use Section 2241 to relitigate this claim.

> **i.    Robinson's reliance on *Alleyne* is misplaced.**

Robinson attempts to work around that binding case law by relying on *Alleyne v. United States*, 570 U.S. 99 (2013).  Robinson argues that *Alleyne* "dispensed with" the distinction between "functional equivalents" of an element and "formal elements."  And because the Fifth Circuit "relied on [that] so-called distinction," he continues, this Court should find that his *Alleyne* claim satisfies Section 2241, disagree with the Fifth Circuit's holding that the error was harmless, and overturn his three death sentences and two life

sentences.   (Pet. at 32-35.)   *Alleyne* did no such thing, and Robinson's argument fails for numerous reasons.

First, *Alleyne* casts no doubt on the Fifth Circuit's holding that the indictment error was harmless beyond a reasonable doubt.[6]   Although Robinson focuses on language from *Alleyne* about the Sixth Amendment violation that results when facts that increase the statutory-mandatory minimum are not put before a jury, *Alleyne* says nothing about the type of indictment error that occurred here.   *Alleyne*, 570 U.S. at 116.   Nor does *Alleyne* undermine the Fifth Circuit's conclusions that the error here was harmless and not structural error.   After all, *Alleyne* dealt with neither capital sentencing nor errors in capital-case indictments.

If there were any doubt, however, Robinson's prior submissions in other courts belie the notion that *Alleyne* makes all the difference.   Indeed, when Robinson attempted to relitigate his claim of indictment error in 2018, he did not mention *Alleyne*.   *Robinson*, No. 4:05-CV-756-Y, Dkt. No. 10 at 25-28.   Instead, he tried to argue that *Weaver*, which was decided years after *Alleyne*, constituted an "intervening change in the law" entitling him to relief on his defective-indictment claim.   *Id.* at 18.   *Alleyne* is not an intervening change of law that would open the door to the Savings Clause.

---

[6] Since *Ring*, there has been no dispute that indictment error occurred.   Aggravating factors that render a defendant eligible for the death penalty—whether cast as "formal elements" or the "functional equivalents" thereof—must be submitted to the grand jury in capital cases.   *See Robinson*, 367 F.3d at 284.   *Ring*, which changed the law, was decided after Robinson was tried, convicted, and sentenced, but before his direct appeal was decided.   *See id.*

Second, Robinson cannot rely on *Alleyne* here because it does not apply retroactively to convictions—like his—that are final.   *See Poe*, 834 F.3d at 773.

Third, Robinson cannot rely on *Alleyne* because it is a decision interpreting the Constitution, not a statute.   *Camacho v. English*, 872 F.3d 811, 815 (7th Cir. 2017); *Poe*, 834 F.3d at 773 (making clear that a claim relying on *Alleyne* cannot satisfy the Savings Clause because "*Alleyne* is a constitutional case, not a statutory-interpretation case"). Section 2255 provides an avenue for raising constitutional claims even in successive motions, *see* 28 U.S.C. § 2255(h)(2), and the Seventh Circuit has made clear that Section 2241 cannot be used "to end-run around Section 2255(h)."   *Bourgeois*, 977 F.3d at 637. Thus, Section 2255 contains no structural defect that would allow Robinson to proceed with an *Alleyne* claim.

At bottom, Robinson asks this Court to reverse the Fifth Circuit's decision that the indictment error was harmless beyond a reasonable doubt.   The Supreme Court on certiorari review, not this Court under Section 2241, was the "right forum for his argument that the [Fifth] Circuit erred."   *Roundtree*, 910 F.3d at 314.   Seventh Circuit precedent is clear that Section 2241 is not the right avenue for such relief.   *Id.*; *Hall*, 829 F. App'x at 720 (because the Fifth Circuit considered Hall's "claim on the merits and rejected it," there was "nothing *structurally* inadequate or ineffective about § 2255 as a vehicle for this claim") (emphasis in original).

21

### ii.    Robinson is wrong that his claim is "jurisdictional."

Robinson relies on *Gonzalez v. Thaler*, 565 U.S. 134 (2012), to argue that his claim is "jurisdictional in nature," so he can raise it any time, in any court, regardless of either AEDPA's restrictions on successive collateral attacks or the fact that he has litigated and lost it repeatedly.   (Pet. at 36.)   Not so.

*Gonzalez* makes clear that "truly jurisdictional rules" govern a court's authority to adjudicate disputes.   565 U.S. at 141.   The indictment error in Robinson's case did not strip federal courts of jurisdiction over his crimes, so his claim is not "jurisdictional" within the meaning of *Gonzalez*.   *See Robinson*, 367 F.3d at 286 ("[T]he absence of an indictment on the aggravating factors used to justify a death sentence is not structural error and is susceptible to harmless error review."); *see also United States v. Cotton*, 535 U.S. 625, 631 (2002) ("[D]efects in an indictment do not deprive a court of its power to adjudicate a case.").   For that reason, Robinson's argument that the Texas court lacked "jurisdiction" over his death-eligible offenses is fundamentally meritless.   *United States v. Muresanu*, 951 F.3d 833, 837-38 (7th Cir. 2020) ("[D]efects in an indictment do not deprive the court of subject-matter jurisdiction, and this is so even when the defect is a failure to state a federal offense.").   *Gonzalez* does not hold that a federal prisoner may cast an argument as jurisdictional and thus raise it repeatedly in every court with jurisdiction over his case.   To the contrary, as Seventh Circuit precedent makes clear, Robinson cannot relitigate this claim now.   *Roundtree*, 910 F.3d at 314.

22

### iii.     Even if one of his claims satisfies the Savings Clause, Robinson cannot pass his entire "application" through the Savings Clause.

Robinson also alleges that if this Court agrees that any of his claims satisfy the Savings Clause, then his entire petition necessarily satisfies the Savings Clause.   (*See* Pet. at 154.)   The whole of his argument is one sentence, unexplained and unsupported by caselaw.   (Pet. at 154 ("Indeed, the savings clause refers to 'an application for writ of habeas corpus[,]' not individual claims within an application for writ of habeas corpus.").)   If this Court does not reject that argument as insufficiently briefed, *see United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim."), it should reject the argument because it is wrong.

The Seventh Circuit's stated standard requires district courts to examine whether individual claims—not entire habeas "applications"—may pass through the Savings Clause.   So, too, does the text of Section 2255.   The Seventh Circuit has made clear that other subsections of Section 2255 apply on a claim-by-claim basis; Section 2255(e) operates in the same way for the same reasons.

Robinson's interpretation would produce an absurd result.   If a petitioner could find just one cognizable—but concededly meritless—claim, then he would be freed from all of AEDPA's limitations on tardy, successive attacks.   Robinson's reading also threatens "the careful structure Congress has created."   *Purkey v. United States*, No. 2:19-CV-414-JPH-DLP, 2019 WL 6170069, at *11 (S.D. Ind. Nov. 20, 2019) (quoting

23

*Garza*, 253 F.3d at 921).   Robinson's proposed rule would mean litigating again every conceivable challenge to a capital conviction or sentence under Section 2241—without any regard to the timing of the petition, the redundancy of the claim, or the inefficiency of bringing a claim before a court unfamiliar with the case's facts or prior proceedings. Because Robinson's rule would stand Section 2255 on its head and frustrate its purpose, this Court should reject it.

> **a.     Seventh Circuit caselaw confirms that the Savings-Clause analysis is done claim-by-claim**.

The Seventh Circuit's three "central" cases interpreting the Savings Clause prove that Robinson's proposed rule is wrong.   In *Davenport*, *Webster*, and *Garza*, the Court examined the petitioners' particular claim(s), not their applications as a whole.   *See Davenport*, 147 F.3d at 611-12 (directing district courts to focus on whether the petitioner's claim actually relies on a cognizable change in the law)[7]; *Webster*, 784 F.3d at 1140 n.9 (rejecting the dissent's critique that allowing Webster to proceed via the Savings Clause would contravene Congress's intent in enacting AEDPA and explaining why Webster's unique claim satisfied the Savings Clause); *Garza*, 253 F.3d at 923

---

[7] The many cases interpreting and applying *Davenport* leave no room for doubt that it is a claim-by-claim inquiry.   *See Chazen*, 938 F.3d at 856 ("To pursue relief under § 2241, a petitioner must establish that '(1) the claim relies on a statutory interpretation case, not a constitutional case, and thus could not have been invoked by a successive § 2255 motion; (2) the petitioner could not have invoked the decision in his first § 2255 motion and the decision applies retroactively; and (3) the error is grave enough to be deemed a miscarriage of justice.'") (quoting *Beason v. Marske*, 926 F.3d 932, 935 (7th Cir. 2019)); *see also Montana v. Cross*, 829 F.3d 775, 777 (7th Cir. 2016) ("Mr. Montana cannot avail himself of the savings clause in 28 U.S.C. § 2255(e) because he could have brought the argument he now wishes to make in this § 2241 petition at an earlier time.").

24

(explaining why Garza's particular argument satisfied the Savings Clause: "As Garza frames the argument, it was literally impossible for him to have raised it at any time earlier than April 4, 2001, the date of the Commission's decision, because the United States had no judicially-cognizable treaty obligation not to execute Garza until that time. . . . This in turn means that Garza is entitled to raise his *argument* in a habeas corpus petition under § 2241, in the district of his incarceration.") (emphasis added).   These central cases confirm that this Court must examine whether a petitioner's claim satisfies the Savings Clause; if not, that claim "must be dismissed at the threshold."   *Webster*, 784 F.3d at 1124.

Beyond those three cases, every single Savings-Clause case that the government has found examines each one of a petitioner's claims to determine whether he or she can litigate that claim via Section 2241.   Wesley Purkey is a good example.   He raised eight purported errors in his Section 2241 petition.   *Purkey v. United States*, No. 2:19-CV-414-JPH-DLP, 2019 WL 6170069, at *3 (S.D. Ind. Nov. 20, 2019).   This Court examined whether Purkey could pass each of his individual claims through the Savings Clause.   *See id.* at *12 ("Unlike the limited types of claims that the Seventh Circuit has held to meet the Savings Clause in *Davenport* (statutory claims based on a retroactive change in the law), *Garza* (claims based on new decisions from international tribunals), and *Webster* (*Atkins* or *Roper* claims based on newly discovered evidence that existed at the time of the original proceedings and could not be discovered through reasonable

25

diligence), Mr. Purkey asks the Court to allow ineffective assistance of trial counsel claims to proceed through the Savings Clause on the basis that § 2255 counsel was ineffective.").   On appeal, the Seventh Circuit likewise examined each of Purkey's claims individually, determining whether any one of them satisfied the Savings Clause. *See Purkey*, 964 F.3d at 615-18 (examining, in turn, Purkey's claims that: (1) his trial counsel failed to spot the fact that a prospective juror explained on her jury questionnaire that she, too, had been the victim of attempted rape; (2) his trial counsel failed to build a comprehensive mitigation case; and (3) Section-2255 counsel failed to challenge the use of Purkey's testimony at his suppression hearing).   This Court and the appellate court's treatment of Purkey's claims confirm that the inquiry is case-by-case.

For another example take William Mabie's Section 2241 petition.   *See Mabie v. Bell*, No. 19-2163, 2021 WL 5123705 (7th Cir. Nov. 4, 2021).   Mabie raised numerous claims, including: (1) a claim that the trial court's jury instructions were erroneous after *Elonis v. United States*, 575 U.S. 723 (2015); and (2) claims "that his conviction is invalid for various other reasons, including withheld exculpatory evidence and perjured testimony from government witnesses."  *Mabie*, 2021 WL 5123705, at *1-4.   The Seventh Circuit considered whether Mabie could pass each of his claims through the Savings Clause.   For the *Elonis* claim, the Court held that he could not because—though he satisfied *Davenport*'s first and second prongs—he could not show a miscarriage of justice.   *Id.* at *4.   For the remaining claims, the Court applied a different analysis,

26

concluding that Mabie "cannot relitigate the same claims" that were raised and rejected under Section 2255.  *Id.*   The Seventh Circuit considered whether each of Mabie's claims—not his application—satisfied the Savings Clause.

*Davenport*, *Webster*, *Garza*, *Purkey*, and *Mabie* are not the only Seventh Circuit cases that illustrate the point.   Indeed, the Warden has searched but has not found a single case from this Circuit (or any other) applying Robinson's if-one, then-all interpretation of the Savings Clause.   Robinson certainly has cited no such decision. (*See* Pet. at 154.)   Rather, the body of Seventh Circuit caselaw shows that this Court must decide whether Section 2255 was inadequate or ineffective for litigating a particular claim and, if not, dismiss it.   *E.g.*, *Bourgeois*, 977 F.3d at 635-38.   This Court should reject Robinson's invitation to ignore that case law and fashion a novel rule for him.

### b.    The text and structure of Section 2255(e) cut against Robinson's proposed rule.

The text and structure of Section 2255(e) also confirm that Robinson's argument is mistaken.   When it passed Section 2255, Congress "steer[ed] almost all prisoner challenges to their convictions and sentences toward § 2255."   *Shepherd*, 911 F.3d at 862.   When it later amended Section 2255 as part of AEDPA, Congress placed strict limits on a prisoner's ability to collaterally attack his sentence.   These limitations include the strict statute of limitations codified in 28 U.S.C. § 2255(f) and the hurdles to filing successive attacks codified in 28 U.S.C. § 2255(h).   *See Garza*, 253 F.3d at 921.

27

"When construing a statutory provision, [the Court should] begin with the text." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474, 483 (2020).   Statutory interpretation must account for both "the specific context in which . . . language is used" and "the broader context of the statute as a whole."   *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).   A statutory "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *accord Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014).   Thus, when interpreting Section 2255(e), this Court must view the Savings Clause within the broader context of Section and the statutory framework as a whole.

Robinson's interpretation would undermine the statutory framework by destroying the limitations codified in subsections 2255(a), (e), and (f).   This case is the perfect example.   Robinson rightly acknowledges that *Garza* means he cannot succeed on his IACHR claim, (Pet. at 153), but he claims that his ability to raise a meritless IACHR claim under Section 2255(e) means the rest of his claims can bypass the limitations on Sections 2255(a), (f), and (h).   (Pet. at 154.)   That cannot be right.   *See Zack v. Tucker*, 704 F.3d 917, 927 (11th Cir. 2013) (en banc) (Carnes, J. concurring) (explaining why a prisoner's interpretation of an analogous provision of a habeas statute would produce an

28

absurd result.)    Because Robinson's interpretation would undermine the entire structure

of AEDPA's amendments to Section 2255, this Court should reject it.

> ### c.    The Seventh Circuit has already rejected Robinson's interpretation in an analogous situation.

As noted, Robinson offers only one justification for his novel interpretation of

Section 2255(e): "[T]he savings clause refers to 'an application for writ of habeas

corpus[,]' not individual claims within an application for writ of habeas corpus."    (Pet. at

154.)    The Seventh Circuit has already rejected that interpretation of an analogous

provision, Section 2244(d)(1), which dooms Robinson's argument here.

Section 2244(d)(1) provides that "[a] 1-year period of limitation shall apply to an

*application* for a writ of habeas corpus by a person in custody pursuant to the judgment

of a State court." (emphasis added).    State prisoners have long made the same argument

that Robinson makes here: because subsection (d)(1) refers to "applications," not claims,

one timely claim renders the entire application timely.    *See, e.g.*, *Walker v. Crosby*, 341

F.3d 1240, 1243 (11th Cir. 2003) ("The statute directs the court to look at whether the

'application' is timely, not whether the individual 'claims' within the application are

timely."), *overruled by Zack*, 704 F.3d at 926.    Like every other Circuit to consider that

argument, the Seventh Circuit has rejected it.    *Davis v. United States*, 817 F.3d 319, 327-

28 (7th Cir. 2016) ("But as every other circuit to have considered the question has

concluded, and we now hold, the timeliness of each claim asserted in either a section

2255 motion or a petition challenging a state-court conviction under 28 U.S.C. § 2254

29

must be considered independently."). In *Davis*, the Seventh Circuit explained that the "simple fact that Davis might have one timely claim to make under section 2255 based on a Supreme Court precedent issued years after his conviction otherwise became final does not allow him to tack on additional otherwise untimely claims to that one timely claim." *Id*. at 328.

What was true for Davis is true for Robinson. The "simple fact" that Robinson's IACHR claim might be cognizable but meritless under *Garza* does not "allow him to tack on additional" types of claims that clearly cannot proceed under the Savings Clause.

### d.      Robinson's interpretation would undermine Congressional intent.

Finally, this Court should reject Robinson's reading of the Savings Clause because it would undermine Congressional intent. "[N]othing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or absurd conclusion." *In re Chapman*, 166 U.S. 661, 667 (1897).

When it enacted Section 2255, Congress sought to alleviate the burden on courts (like this one) sitting in the district of their incarceration and to instead channel federal prisoners' challenges to their criminal judgments to the district court that imposed those judgments. *See Hayman*, 342 U.S. at 219; *In re Davenport*, 147 F.3d at 608-09. Congress later amended Section 2255 when it passed AEDPA. "Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences,

30

particularly in capital cases." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003).

Robinson's novel interpretation of the Savings Clause would frustrate Congress's clear intent to (1) avoid inefficiencies by having the district of incarceration, rather than the district of conviction, entertaining challenges to a federal prisoner's conviction and sentence, *see Chazen*, 938 F.3d at 865 (Barrett, J., concurring) (noting that courts "should be skeptical" about arguments that "risk[] recreating some of the problems that § 2255 was designed to fix"); and (2) prioritize efficient and final resolution of collateral attacks, *see Bourgeois*, 977 F.3d at 632-33 (highlighting Section 2255's "strict one year statute of limitations" and the restrictions on second or successive collateral attacks). As the Supreme Court has repeatedly stressed, "AEDPA limited rather than expanded the availability of habeas relief." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1736 (2022). Thus, it is "implausible" that when Congress enacted the Savings Clause, it "intended to liberalize the availability of habeas relief generally." *Id.* This Court should reject Robinson's novel interpretation, which would contravene Congressional intent.

For these reasons, this Court should decline Robinson's invitation to interpret the Savings Clause in a way that contravenes circuit precedent, the text of the statute, and the established intent of Congress.

31

### iv.    Robinson is not entitled to relief in any event because any error was harmless.

Any error in the indictment or violation of Robinson's right to have a grand jury pass on whether his charges are death-eligible warrants no relief.   As the Fifth Circuit explained nearly two decades ago, any error was harmless:

> Robinson killed Shelton by firing an AK–47 assault rifle from the window of a moving vehicle on a public highway, directly endangering Shelton's passenger and anyone else in range.   The record also shows that in the course of killing Reyes, Robinson and his co-assailant managed to shoot Rodriguez three times and to fire enough times at Marques's car fleeing the scene to leave it riddled with bullets.   All this took place in a residential neighborhood in close proximity to at least two adolescent eyewitnesses playing on a nearby porch, and across the street from a barbecue attended by at least ten people.
>
> No rational grand jury would fail to find that this evidence constituted anything less than probable cause to believe that, in the course of committing each murder, Robinson created a grave risk of death to someone other than the victim.   As a result, and beyond a reasonable doubt, the failure to charge those factors in an indictment did not contribute to Robinson's conviction or death sentence.

*Id.* at 289 (footnote 17 omitted).

The Fifth Circuit further explained that, while "it suffices that the grand jury would have charged one statutory aggravating factor," "there also is overwhelming evidence to support the remaining factors."   *Id.* at n.18.   "For example, the Reyes and Shelton murders were committed after substantial planning and premeditation, a factor also used to impose the death penalty on counts 3, 7, and 11."   *Id.*   Because any rational

32

grand juror would have found probable cause to find these statutory aggravating factors, any error was harmless.

This Court should dismiss Robinson's first claim for relief because it abuses the writ and cannot proceed by way of the Savings Clause.   Alternatively, the Court should deny it as meritless because the error was harmless.

**2.      Robinson's second claim for relief fails to satisfy the Savings Clause and is meritless in any event.   (Robinson's Claim II).**

**A.       Robinson cannot show that a structural defect prevented him from raising his *Napue*, *Brady*, and *Strickland* claims under Section 2255, so he cannot raise them for the first time under the Savings Clause.**

This Court should dismiss Robinson's second claim for relief because he has failed to show that he may raise it under the Savings Clause.   "To repeat: The Savings Clause is unavailable absent a structural defect in § 2255."   *Hall*, 829 F. App'x at 719 (citing *Lee*, 964 F.3d at 666).   Robinson has failed to identify any structural defect in Section 2255 that would open the gate to the Savings Clause.   Moreover, he misplaces his heavy reliance on *Webster* because he could have presented each of his grounds for relief under Section 2255.   The Court should thus reject Robinson's second claim at the threshold.   *Webster*, 784 F.3d at 1124.

Robinson's second claim is based on the argument that Peter Carlson, a former Assistant Director of the Bureau of Prisons (BOP), gave factually correct—but allegedly misleading—testimony.   (*See* Pet. at 54.)   Specifically, at the penalty phase, Carlson testified about the various federal-prison classifications, his opinion on how the BOP

33

might classify Robinson if he were sentenced to life, and the typical operations within high-security prisons. (Pet. Ex. 7 at 95-107.) Robinson now alleges that Carlson's testimony gave a "false impression" that the BOP would be unable to prevent Robinson from committing future crimes. (*See* Pet. at 54.) And on that premise, Robinson argues that the prosecutor violated *Napue* and *Brady*, and that, under *Strickland*, his trial counsel was ineffective for failing to cross-examine Carlson effectively or call an expert witness to rebut Carlson's "false" testimony. These claims are meritless.

Before this Court can reach the merits of these claims, however, Robinson must make "'a compelling showing' that it was 'impossible' to use § 2255 to cure the defect identified in the § 2241 petition." *Lee*, 964 F.3d at 666 (quoting *Purkey*, 964 F.3d at 615). This he cannot do.

### i. *Webster* does not help Robinson here.

There is no merit to Robinson's attempt to rely on the path that the Seventh Circuit described in *Webster*. (*See* Pet. at 71-72.) There, "the Seventh Circuit held for the first and only time that the Savings Clause was met for a constitutional claim." *Purkey v. United States*, No. 2:19-cv-414-JPH-DLP, 2019 WL 6170069, at *6 (S.D. Ind. Nov. 19, 2019) (Hanlon, J.); *Hall v. Watson*, No. 2:20-cv-599-JPH-DLP, 2020 WL 6785383, at *4 (S.D. Ind. Nov. 17, 2020). Webster sought to challenge the implementation of his death sentence—not his underlying conviction—as barred by *Atkins v. Virginia*, 536 U.S. 304 (2002). Although he had raised a claim under *Atkins* in his original Section 2255

34

motion, he turned to Section 2241 to present "newly discovered evidence" in support of that claim.   *Webster*, 784 F.3d at 1125.

The *Webster* court identified two structural flaws in Section 2255 that precluded Webster from raising his claims there: (1) Section 2255(h)(1) only provides for subsequent collateral attacks where new evidence shows that the prisoner is actually innocent of the conviction, not constitutionally ineligible to receive a sentence, and (2) the cases on which the petitioner relied, *Atkins* and *Roper v. Simmons*, 543 U.S. 551 (2005), were not decided until after Section 2255 was enacted.   *Webster*, 784 F.3d at 1134-35, 38.   But the Seventh Circuit "took great care to assure that [*Webster*'s] holding was narrow in scope."   *Poe*, 834 F.3d at 774.   That court specifically limited its holding to the narrow factual and legal circumstances presented in that unique case, and it acknowledged explicitly its "limited effect on future habeas corpus proceedings." *Webster*, 784 F.3d at 1140 n.9.

Indeed, "there is nothing in *Webster* to suggest that its holding applies outside the context of new evidence."   *Poe*, 834 F.3d at 774.   To be considered "new" within the meaning of *Webster*, evidence must satisfy three conditions:

> First, the evidence sought to be presented must have existed at the time of the original proceedings. . . .   Second, the evidence must have been unavailable at the time of the trial despite diligent efforts to obtain it. Third, and most importantly, the evidence must show that the petitioner is constitutionally ineligible for the penalty he received.   Because the Supreme Court has declared only two types of persons (minors and the intellectually disabled) categorically ineligible for a particulate type of punishment, our ruling is as a matter of law limited to that set of people—

35

those who assert that they fall into one of those categories at the time of the offense.

*Webster*, 784 F.3d at 1140 n.9.   The *Webster* court explained that "[t]hese three limitations are more than adequate to prevent the dissent's feared flood of section 2241 petitions."   *Id.*

Robinson cannot rely on *Webster* because none of his "evidence" is new.   To support his claim that Carlson's trial testimony was "misleading" to the point of leaving a false impression, Robinson argues that Carlson should have also told the jury about special housing, management, and confinement units; SAMs restrictions; "[t]he Court's ability to order special restrictive conditions pursuant to 18 U.S.C. [§] 3582"; and "[t]he BOP's ability to create an individualized confinement plan to suit Robinson's individualized needs."   (Pet. at 52.)   But such information certainly existed at the time of Robinson's trial, and thus reasonably diligent counsel could have been aware of specialized prison units, BOP policies, and sections of the United States Code.   *Webster*, 784 F.3d at 1140 n.9.   Indeed, Robinson admits that "[i]nformation rebutting Carlson's testimony, admissible either via cross-examination of Carlson or through a sur-rebuttal expert, *was readily available* to [Robinson's trial] counsel."   (Pet. at 63 (emphasis added).)   Robinson further concedes that his "counsel could have retained an expert with the same knowledge of BOP procedures and policies to rebut and correct Carlson's false testimony."   *Id.*   These concessions conclusively defeat his reliance on *Webster* because

36

they prove nothing "formally prevented" him from seeking relief on direct appeal or under Section 2255.  *Purkey*, 964 F.3d at 615.

There is no merit to Robinson's argument that he was "unaware of the nature" of his claims until a district court in an unrelated case granted Section 2255 relief on a claim that Robinson casts as "strikingly similar."  (Pet. at 43, 71 (citing *United States v. Johnson*, No. 02 C 6998, 2010 WL 11668097 (N.D. Ill. Dec. 13, 2010)).)  First, Robinson relies on no *new evidence* from Johnson's case to argue that Carlson's testimony was false in his case.  Second, Robinson's argument fails because "the nature" of Johnson's "strikingly-similar" claim was briefed and decided on direct appeal, in an opinion published years before Robinson was ever sentenced.  *See United States v. Johnson*, 223 F.3d 665, 671-76 (7th Cir. 2000).  Robinson's evidence is not new under *Webster*.

Moreover, the Supreme Court cases on which Robinson (and Johnson) relied were all decided decades earlier.  (*See, e.g.*, Pet. at 51, 55 (citing *Alcorta v. Texas*, 355 U.S. 28 (1957)).)  Robinson cannot proceed via Section 2241 simply by claiming that he was "unaware" of *Napue*, *Brady*, or *Strickland* until a different district court decided a different Section 2255 motion.

The same is true with respect to the government's concession in opposition to the grant of certiorari in Johnson's case, on which Robinson now relies.  (Pet. at 46.)  That

37

concession—which has no application here[8]—was publicly filed on August 10, 2001. *See* Opposition to Certiorari, *United States v. Johnson*, No. 00-8520 (U.S., Aug. 10, 2001), *cert. denied*, 534 U.S. 829 (2001).   Thus, there is nothing "new" about the *Brady*, *Napue*, and *Strickland* claims that Robinson seeks to raise for the first time under the Savings Clause.   *See, e.g.*, *Hall*, 2020 WL 6785383, at *6 (rejecting Section 2241 petitioner's reliance on *Webster* because "Mr. Hall's situation is not comparable to Mr. Webster's, where defense counsel sought the relevant Social Security records but was told they did not exist when in fact they did").

Robinson's reliance on *Webster* also falters at the "most important[]" step in the analysis.   *Webster*, 784 F.3d at 1140 n.9.   While Webster's new evidence ultimately proved that he was *constitutionally ineligible* for the death penalty, *see id.* at 1125, Robinson's claims under *Brady*, *Napue*, and/or *Strickland*—even if successful on their merits—would not preclude him from receiving a death sentence.   At most, Robinson would get a new proceeding, after which he could again be sentenced to death.   *See, e.g.*, *Hall*, 2020 WL 6785383, at *8 (rejecting Hall's reliance on *Webster* because "Mr. Hall cannot satisfy the third *Webster* factor because he is not categorically ineligible for the death penalty").)   For these reasons, Robinson cannot proceed to the Savings Clause under the path set out in *Webster*.

---

[8] To be sure, the government does not concede here that Carlson's testimony was false or misleading.   As explained below, it was not.   But this Court need not—and indeed should not—evaluate the merits of Robinson's allegations because he cannot raise them under Section 2241.

38

### ii.     Robinson has otherwise failed to satisfy the Savings Clause.

Binding precedent from the Seventh Circuit forecloses Robinson's additional attempts to satisfy the Savings Clause.   Robinson argues that Section 2255's one-year statute of limitations hindered his ability to "conduct an adequate investigation and present all viable claims for relief."   (Pet. at 72.)   Although *Webster* and other cases do not "rigidly define[]" the boundaries of the Savings Clause, the law is settled that the prisoner must make "a compelling showing that, as a practical matter, it would [have been] impossible to use section 2255 to cure a fundamental problem."   *Purkey*, 964 F.3d at 611, 615.   Robinson, who was represented by counsel on direct appeal and for the entirety of his Section 2255 proceedings, claims that the Federal Public Defender was not appointed until four months before his Section 2255 motion was due.   (Pet. at 72.) "These limitations, while real, did not make it *practically impossible* for [Robinson] to litigate his [*Napue*, *Brady*, and *Strickland*] claims.   Instead, they forced counsel to make difficult strategic decisions about how to litigate . . . with limited resources, including choosing which claims to bring and which claims to forgo."   *Hall*, 2020 WL 6785383, at *8.   Allowing Robinson to present these claims for the first time now would nullify Congress's choice to steer post-conviction attacks to Section 2255 and to limit repetitive, successive collateral attacks.   *See Garza*, 253 F.3d at 922.   The Savings Clause cannot be interpreted so expansively that it undermines "the careful structure Congress has created."   *Id*. at 921.

39

Finally, this Court should reject Robinson's alternative argument—that he can satisfy the Savings Clause by claiming that his Section 2255 counsel was ineffective for failing to argue that his trial or appellate lawyers were ineffective—because that argument is foreclosed.   (*See* Pet. at 73 (acknowledging that the argument is foreclosed but "preserv[ing] this argument for later review")); *see Purkey*, 964 F.3d at 614-15 ("[A]s the law now stands, once a Sixth Amendment claim of ineffective assistance of counsel has been raised, as happened in Purkey's case, that is the end of the line.").

**A.      Robinson's *Napue*, *Strickland*, and *Brady* claims are fundamentally meritless.**

Even if Robinson could pass his claims through the Savings Clause (he cannot), they all fail.   There was no violation of *Napue* or *Brady*, and Robinson's attempt to frame those claims alternatively under *Strickland* fails because he cannot show deficient performance or prejudice.

**i.      There was no violation of *Napue*.**

In *Napue*, the Supreme Court held that the knowing presentation of perjured testimony, or the knowing failure to correct false testimony, violates due process. *Napue*, 360 U.S. at 271 (defendant is entitled to new trial if false evidence presented by prosecution "may have had an effect on the outcome").   In order to receive a new penalty-phase proceeding on the basis that the government used perjured testimony, the defendant must establish that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is a

40

likelihood that the false testimony affected the judgment of the jury.   *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995).   Robinson cannot make any of those three showings.

First, the facts.   The government alleged, as a non-statutory aggravating factor, that Robinson was a future danger to the lives and safety of other persons.   *See Robinson*, 367 F.3d at 292.   This was evidenced by his lack of remorse, poor rehabilitative potential, and specific threats and acts of violence.   *Id.*

To show otherwise, Robinson called Mark Cunningham as an expert witness at trial.   (*See generally* Pet. Ex. 72.)   Cunningham testified about research that indicated that many people become less violent and dangerous once incarcerated.   (Pet. Ex. 72 at 1254, 1261-88.)   Cunningham testified that Robinson's BOP records showed that his adjustment to prison had "repeatedly [been] characterized as good" and his "current potential to harm to others" was "low."   (*Id.* at 1289-91.)

Cunningham also testified about the BOP's ability to limit a prisoner's ability to orchestrate or commit violence in prison.   Cunningham testified:

- the BOP operates an "administrative maximum" or "super max" prison in Florence, Colorado, which is referred to as ADX, (Pet. Ex. 72 at 1294-95);

- the BOP can commit a prisoner directly to ADX from their criminal trial, (*id.* at 1295);

- within the supermax facility at ADX Florence, there is a unit called the "control unit" that "is even more restrictive than the rest of super maximum is," (*id.*);

41

- in the control unit, "the individual is single celled rather than double celled"—meaning they "are in a cell by themselves," with "no cells across the hall," (*id.*);

- a typical prisoner at ADX would: (1) be celled for "23 hours a day"; (2) have about an hour of exercise a day around "two or three other inmates"; (3) only interact with staff when "he is handcuffed behind his back," with his feet "shackled," and "double escorted by staff members that are carrying a baton"; (4) have only two 15-minute phone calls a month, both monitored; (5) have no physical contact with outside visitors, (*id.*); and

- while few inmates are sent to ADX permanently, many stay a "minimum of three years" and "[t]here are certainly inmates that are held there for much longer than that." (*Id.* at 1300.)

In addition to those measures, Cunningham told the jury about restrictive housing units at other high-security penitentiaries. Cunningham testified that "[e]very [United States Penitentiary] has administrative detention capability where they can lock somebody down within that unit." (Pet. Ex. 72 at 1297.)

Cunningham also spoke—in both broad and general terms—to the BOP's ability to control inmates and prevent harm from befalling staff and other inmates. Specifically, Robinson's counsel asked Cunningham whether he "h[e]ld the opinion that the United States Bureau of Prisons certainly has sufficient experience and resources to make adequate arrangements for the housing of those prisoners both for the safety of not only the other inmates, but the safety, more importantly, [of] the guards and staff of those institutions." (*Id.*) Cunningham agreed that BOP had those resources. (*Id.*) He elaborated: "BOP can bring extraordinary levels of security to bear that markedly

42

minimize the likelihood of serious violence to other inmates or staff as they designate that someone requires.  It's not perfect control, but it is a high degree of security."  (*Id.* at 1301.)

In response to Cunningham's testimony, the government called Peter Carlson for a brief rebuttal.  Carlson was called to testify about: (1) whether Robinson was likely to be sent directly to ADX from his trial; and (2) the typical conditions imposed on inmates in high-security BOP facilities.  (*See* Pet. Ex. 7.)

### a.    Carlson's testimony was not false.

Robinson claims that Carlson's testimony was: (1) "false" like John Vanyur's testimony in *United States v. Johnson*, (Pet. at 43-46); or (2) at least "misleading" to the point of false because it did not detail *all* of the many ways the BOP can restrict an inmate's movements or limit his access to telephones, (Pet. at 52).  Neither claim is true.

*First*, Carlson's testimony was not false like the expert testimony from Vanyur at issue in the case of Darryl Lamont Johnson.  In *United States v. Johnson*, the government presented the testimony of Vanyur, the former associate warden at ADX Florence.  223 F.3d 665, 671-72 (7th Cir. 2000).  Vanyur was asked "about *legal* limits on BOP authority to place a prisoner in a control unit."  *Johnson v. United States*, Brief in Opposition to Certiorari, 2001 WL 1193822, at *4 (Aug. 10, 2001) (emphasis in original).  In response, Vanyur stated that, under 28 C.F.R. Part 541, an inmate cannot be placed in a control unit directly from a court because assignment to a control unit may not

43

be made solely on the basis of offenses committed before confinement.  *Id.*  But Vanyur did not describe *other* legal restrictions that could also be imposed on an inmate, "such as special administrative measures under 28 C.F.R. 501.3 or court orders under 18 U.S.C. § 3592(c)."  *Id.* at *7.  "That information (of which the warden and the prosecutors were unaware) would have given the jury a more complete understanding of the legal authority to limit prisoner communications and contacts."  *Id.*  "Without the information, the jury may have held the mistaken impression that no such legal authority existed."  *Id.*

Accordingly, in opposition to Johnson's petition for a writ of certiorari, the government acknowledged that Vanyur's testimony could have left the jury with "the mistaken impression that no legal authority existed to limit [Johnson's] communications and contacts while in prison."  *Id.*  The government did not, however, concede that Vanyur's testimony was *false*.  *See id.* at *8-10 (explaining that Johnson had failed to show a colorable claim under *Napue* because (1) Vanyur's "failure to discuss [additional legal] provisions did not make his testimony false," and (2) the government was unaware of the provisions about which Vanyur did not testify).

Robinson's reliance on Vanyur's testimony is misplaced.  (Pet. at 43-47.) Carlson was not asked about—and did not purport to testify to—*legal* limits on the BOP's ability to control a prisoner's movements or communications.  (*See* Pet. Ex. 7 at 95-107.)  Thus, the fact that Carlson did not spontaneously offer a non-responsive

44

answer about those legal limits cannot make his testimony "false," meaning Robinson's reliance on Vanyur's testimony in *Johnson* is inapposite.

*Second*, Robinson is wrong that Carlson's testimony misled the jury because he did not describe every regulation and every possible measure that the BOP could take to limit an inmate's movements or telephone access.   (*See* Pet. at 52 (faulting Carlson because he never described "the Special Management Unit at USP Lewisburg," "the Special Confinement Units at USP Terre Haute," "the Special Housing Units at any of the U.S. Penitentiaries," "SAMs restrictions," "the Court's ability to order special restrictive conditions pursuant to 18 U.S.C. section 3582," or "the BOP's ability to create an individualized confinement plan to suit Robinson's individualized needs").)   Carlson was not asked to so testify.   Nor was he required to spontaneously testify to matters about which he was never asked.   *See United States v. Reed*, 986 F.2d 191, 193-94 (7th Cir. 1993) ("The oath to tell the whole truth does not preclude a witness from being misunderstood or *require witnesses to volunteer information beyond that perceived to be sought by the questioner*.") (emphasis added).   The fact that Carlson did not violate the Federal Rules of Evidence by offering non-responsive answers to the questions that he was asked does not make his testimony false under *Napue*.   *Reed*, 986 F.2d at 193-94.

Rather, Carlson *was* asked his opinion on the type of facility where BOP was likely to send Robinson.   (Pet. Ex. 7 at 104.)   Carlson opined that, if the jury sentenced

45

Robinson to death, he would serve his sentence on death row. (*Id.*) If not, he would likely go to a "high security prison." (*Id.*)

Carlson was also asked to describe the settings in high security prisons *generally*:

Q.    And in a high security prison, can you tell us, are they locked down 23 hours a day and let out only one hour for recreation?

A.    High security institutions operate in a very normal manner unless they happen to be in a lock down status because of a major incident going on. The normal routine in a United States Penitentiary would be to run a very open institution within the controlled security envelope. That would mean, basically, the Inmates in the penitentiary would be up to eat in the main dining room with several hundred other inmates. Would at work call 7:30 go to work somewhere in the facility.

Again, go to main line at noon with several other inmates supervised by the staff. Afternoon, work assignment again, back to the job, or a school assignment with other offenders. Following the evening count at 4:00 p.m., if they don't have an evening work assignment, the typical inmate's day ends as far as their assigned work, and they are then free for evening recreational activities throughout the facility. It's a rather open environment for the most part.

Q.    Within the prison?

A.    Within the prison.

Q.    In other words, there are walls and that sort of thing. It's not like the camp?

A.    Exactly.

Q.    But they will have interaction with other inmates and other guards and medical staff, that sort of thing?

A.    Yes.

46

Q.      Would they have access to telephones when they're in the general population at a high security prison that you've just described?

A.      During their off-duty hours, inmates have reasonable access to outside telephones.   There are some restrictions in terms of numbers of approved folks that can be on their phone list and how many minutes they can spend every month on the telephone, but it's, basically, fairly open and difficult to control given the lack of technology today in terms of third person phone calls connecting to an approved person and letting that person then connect you on to somebody else.

Q.      Does that pose some security risks as it relates to the Bureau of Prisons?

A.      Very much so.

Q.      Why is that?

A.      Well, it's certainly an issue in terms of the agency being worried about connections with colleagues on the outside in terms of institution security, in terms of continuing enterprise with illegal activities on the street that do impact the correctional environment.   And, finally, it's a public safety problem that they struggle with in terms of having a kingpin locked up who wants to continue directing illegal activities outside.

MR. O'CONNOR: Pass the witness, Your Honor.

(Pet. Ex. 7 at 104-06.)   Nothing in that testimony can be construed as false.   Robinson complains that the testimony was misleading because Carlson did not explain to the jury all the ways that BOP *could in theory* limit an inmate's movements and use of the telephone.   (*See* Pet. at 52.)   But Carlson was asked to explain—in general terms—how high-security prisons operate, not all of the ways in theory that the BOP can control an inmate's behavior.   Therefore, nothing in his testimony was false or misleading.   *See United States v. Johnson*, 223 F.3d 665, 672 (7th Cir. 2000).

47

*Third*, Robinson's reliance on the declaration from Mark A. Bezy suffers from the same fundamental flaw: Bezy faults Carlson for not testifying about the plethora of ways that the BOP can control an inmate's behavior, but Carlson was not asked to do so.[9]   For example, Bezy says that Carlson's testimony gave the jury (1) "the notion that the BOP is powerless to prohibit specific inmates from committing serious crimes while incarcerated," which is a "notion [that is] false," and (2) "improperly advanced an either/or proposition – i.e. either an individual is sentenced to death (or incarcerated at ADX) or he receives a great deal of freedom."   (Pet. Ex. 12 at 230, 232.)   As set out above, that is not what Carlson testified to.   Carlson was never asked to describe all the ways the BOP can impose limits on inmates, so Robinson cannot show that his failure to testify about those limits is any way "false."[10]

*Finally*, Robinson's reliance on *Alcorta v. Texas*, 355 U.S. 28 (1957), undermines—rather than supports—his attempt to show that Carlson's testimony was

---

[9] Bezy also opines that Carlson was "somewhat misleading" in testifying that "99 percent" of inmates are not directly committed to ADX.   (Pet. Ex. 12 at 230.)   Whether the true number is closer to "90%" as Bezy claims is irrelevant because the jury was told—by both Carlson, (Pet. Ex. 7 at 099), and Mark Cunningham, (Pet. Ex. 72 at 1294)—that an inmate can be sentenced directly to ADX.   Thus, Robinson cannot show that the jury was misled as to that possibility, however slim, let alone that any single-digit discrepancy in the odds was somehow material.

[10] Notably, in preparing an affidavit on Robinson's behalf, Bezy did not read the testimony of Mark Cunningham.   (*See* Pet. Ex. 12 at 226) (listing the materials that Robinson's current counsel had Bezy review, which did not include Cunningham's testimony).)   Had Bezy read Cunningham's testimony, he would have known that Cunningham told the jury about many of the "extraordinary levels of security" that BOP can "bring to bear" to prevent inmates from committing future violence; BOP's ability to "lock down" every high-security penitentiary; and that BOP had the "experience and resources to make adequate arrangements for the housing of [] prisoners both for the safety of not only the other inmates, but the safety, more importantly, [of] the guards and staff of those institutions."   (*See* Pet. Ex. 72 at 1297, 1301-02.)

48

false.   Alcorta was sentenced to death for killing his wife.   *Id.* at 29.   The prosecutor in *Alcorta* asked the witness, who had "sexual intercourse with [the victim] on many occasions," about their relationship.   *Id.* at 30.   The witness lied, claiming that his relationship with the victim was "nothing more than a casual friendship."   355 U.S. at 29.   The Supreme Court granted the petitioner relief because it could not be "seriously be disputed that [the witness's] testimony, taken as a whole, gave the jury the false impression that his relationship with petitioner's wife was nothing more than that of casual friendship."   *Id.* at 31.   That false testimony mattered because it squarely refuted the defendant's claim "that he had adequate cause for a surge of 'sudden passion' in which he killed his wife."   *Id.* at 31.

This case is nothing like *Alcorta*.   The witness in *Alcorta* was asked a question, and he lied.   Carlson did not lie.   He was never even asked to testify about the many ways that BOP could hypothetically "control Robinson or limit his contact with the outside world," (Pet. at 52); that was not his testimony's subject.   This Court should thus reject Robinson's claim that Carlson's testimony was in any way "false."[11]   *Reed*, 986 F.2d at 193-94.

---

[11] To show a violation of *Napue*, Robinson must also show that the prosecution *knowingly* offered false testimony.   *United States v. Adcox*, 19 F.3d 290, 295-96 (7th Cir. 1994).   Because Robinson cannot show that Carlson's testimony was false, he likewise cannot show that the government offered knowingly false testimony.

### b.    Any "omission" was not material.

Even if Robinson could establish that Carlson's testimony was "false" (he cannot), he cannot show that the testimony affected the jury's decision.   "Under *Napue*, when the prosecutor knowingly relies on false testimony, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."   *United States v. Are*, 590 F.3d 499, 509 (7th Cir. 2009) (cleaned up).

Robinson's attempt to show materiality fails in light of the testimony of his own expert witness, who told the jury about various ways that the BOP could restrict Robinson's freedom, movement, and ability to access the telephone.   (Pet. at 58-61.) Put simply, this is not a situation where the jury—having just heard Cunningham's testimony—could have been left with the mistaken impression that BOP was somehow powerless to place restrictions on inmates.

As noted above, Cunningham testified about (1) the BOP's manual that calls for assigning prisoners to institutions based on their particular risk level, (Pet. Ex. 72 at 1292); (2) how every United States penitentiary has "administrative detention capability where they can lock somebody down," (*id.* at 1297); (3) how more secure prisons have "increasingly restrictive" conditions, (*id.*); (4) the extremely secure "prisons within the prison" in the "control unit" at the ADX, (*id.*); (5) how, in the control unit, "the individual is single celled rather than double celled"—meaning they "are in a cell by themselves," with "no cells across the hall," (*id.*); and (6) the typical experience at ADX,

where a prisoner would be celled for "23 hours a day," get about an hour of exercise a day around "two or three other inmates," only interact with staff when he is handcuffed and shackled, get two 15-minute phone calls a month, both monitored, and have no physical contact with outside visitors, (*id.*). The jury also heard that "BOP can bring extraordinary levels of security to bear that markedly minimize the likelihood of serious violence to other inmates or staff as they designate that someone requires. It's not perfect control, but it is a high degree of security." (*Id.* at 1301.) Cunningham's explanations left no room for doubt in the mind of the jurors: BOP had the present ability to impose "extraordinary" restrictions on an inmate aimed at reducing his ability to cause harm to others. (*See id.* at 1301.)

Robinson's *Napue* claim is meritless.

### ii.    Robinson's related *Strickland* claim is meritless.

Robinson claims that trial counsel was ineffective for failing to show the jury that Carlson's testimony was untruthful and for failing to call an unspecified "sur-rebuttal" expert witness to testify about all the ways in which the BOP can control an inmate's behavior. (Pet. at 68-72.) As noted throughout, Robinson cannot pass this claim through the Savings Clause. On its merits, Robinson's *Strickland* claim fails because he has shown no deficient performance or prejudice. 466 U.S. at 686-88.

First, Robinson has failed to show deficient performance. *Strickland* requires that this Court "indulge a strong presumption that counsel's conduct [fell] within the wide

51

range of reasonable professional assistance." *Id.* at 669. "An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 689-90).

Here, Robinson's lawyers could reasonably conclude that the jury understood that the BOP could limit an inmate's future dangerousness. Indeed, Robinson's lawyers had already presented an expert witness, Cunningham, who testified about BOP's "experience and resources" to protect inmates and staff from dangerous inmates. (*See supra* Part 2 B i.) Cunningham told the jury that BOP could bring to bear "extraordinary levels of security" designed to ensure an inmate's compliance and the safety of other inmates, staff, and the public. (Pet. Ex. 72 at 1297-1301.) Robinson faults his trial lawyers for not further belaboring those points during the cross-examination of Carlson and/or calling an additional expert to testify to what Cunningham had already said, but he has failed to show that counsel's strategy was objectively unreasonable under *Strickland*. *Strickland*, 466 U.S. at 681 ("Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment.").

52

Robinson also suggests that Cunningham was merely a psychologist, unqualified to offer an opinion on many of the areas on which he opined.   (Pet. at 64.)   But that argument ignores reality and the record.   Cunningham told the jury that "while he wouldn't claim to have the expertise of someone who has been employed in some of these high security institutions," he had a "greater expertise" in BOP's incarceration "than most non-bureau prison psychologists or psychiatrists."   (Pet. Ex. 72 at 1291.) Cunningham's "expertise" grew out of his time touring BOP facilitates and "review of extensive regulations associated with the operation of those facilities."   (Pet. Ex. 72 at 1292.)   From those experiences, Cunningham was qualified to explain to the jury the BOP's "experience and resources"—up to, and including, near-total isolation and segregation, (Pet. Ex. 72 at 1296-1300)—to control an inmate to the best of BOP's ability.[12]   Robinson's counsel relied on Cunningham to drive the point home: "BOP can bring extraordinary levels of security to bear that markedly minimize the likelihood of serious violence to other inmates or staff as they designate that someone requires.   It's not perfect control, but it is a high degree of security."   (Pet. Ex. 72 at 1301.) Robinson's counsel was not objectively unreasonable to conclude that the jury heard— and credited—exactly what Cunningham had told them.   *See Harrington*, 562 U.S. at 105 (explaining that establishing deficient performance requires showing that the

---

[12] Indeed, other capital defendants have sponsored Cunningham to testify "as an expert witness in prison violence *and prison security measures*."   *See United States v. Caro*, 733 F. App'x 651, 655-56 (4th Cir. 2018) (emphasis added).

"attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom") (quoting *Strickland*, 562 U.S. at 105).

Moreover, Robinson's counsel was not constitutionally deficient for failing to *further* highlight the "existence of maximum-security federal prisons, decked out with control units." *Johnson*, 223 F.3d at 675. Evidence that the BOP had those capabilities is necessarily double-edged as it amounts to an argument that such measures are necessary for *Robinson* because *he* is extraordinarily dangerous. The Seventh Circuit has realized the inherently double-edged nature of such evidence: "[It] amounts to saying that because this defendant is *so* dangerous, he does not deserve to be sentenced to death, since his dangerousness will assure his secure confinement." *Johnson*, 223 F.3d at 675. Robinson cannot show that his counsel was ineffective for his handling of such double-edged evidence. *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997) (counsel's tactical decision "not to pursue and present mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance").

Robinson has failed to show that his counsel's performance was unreasonable. His claim fails for that reason alone. *Strickland*, 466 U.S. at 689-90.

Second, Robinson's claim fails for the independent reason that he has not shown prejudice. Robinson speculates that the jury would have recommended a life sentence if

54

only it had heard about the BOP's ability to impose even more limitations on an inmate's opportunity to make telephone calls and congregate with other inmates.   (Pet. at 66-67.) That argument is unpersuasive in light of Cunningham's testimony about the BOP's ability to impose "extraordinary levels of security on inmates that markedly minimize the likelihood of serious violence," (Pet. Ex. 72 at 1301), including—among other "resources"—administrative maximum facilities, super max, control units, and administrative detention unites, (*id.* at 1297).   Because the jury understood that BOP could impose "extraordinary levels of security" on Robinson, he cannot show that the jury would have reached a different result if only it had been told about the BOP's ability to restrict his phone usage or chances to speak with other inmates.   *See, e.g.*, *Westray v. Brookhart*, 36 F.4th 737, 753 (7th Cir. 2022) (rejecting the prisoner's attempt to show *Strickland* prejudice where the evidence the prisoner "says the jury should have heard was redundant").[13]

It is further unpersuasive because Robinson cannot show that any additional evidence of the specific measures BOP can deploy to control prisoners would have tipped the scales.   "Robinson's two brutal murders and complicity in a third would have remained in the fore."   (Appendix at 84.)   The jury's decision not to sentence Robinson to death for the killing of Rudolfo Resendez—but to recommend death for intentionally murdering Johnny Lee Shelton and Juan Reyes—suggests that it was Robinson's

---

[13] Bezy's assertion that the jury was left in the dark is unpersuasive because Bezy did not account for Cunningham's testimony.   (*See* Pet. Ex. 12 at 226-227.)

55

culpability in those murders, not the BOP's ability to place him in a "side-pocket" or restrict his telephone usage at some point in the future, that drove the jury's decision-making.   (*Compare* Pet. Ex. 9 at 156, 162, *and* 163-65, 170 (finding that Robinson intentionally murdered two victims and recommending a sentence of death for those two murders), *with* Pet. Ex. 9 at 171 (finding that Robinson did not intentionally engage in conduct intending that Resendez be killed or that lethal force be employed against Resendez which conduct resulted in his death), *and id.* at 178 (recommending that Robinson be sentenced to life imprisonment for Resendez's killing).)   Robinson has failed to show prejudice.

"Surmounting *Strickland*'s high bar is never an easy task."   *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).   Robinson has failed to satisfy either prong of *Strickland*'s high bar, so this Court can reject the claim as meritless should the Court decide not to dismiss it for the reasons discussed throughout.

### iii.    Robinson has failed to show a *Brady* violation.

Robinson briefly suggests that the prosecution may have withheld some unspecified "information that could have rebutted Carlson's testimony" and thereby violated *Brady*.   (Pet. at 70.)   There was no *Brady* violation.

To succeed on a *Brady* claim, Robinson must establish "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant; and (3) that it

56

is material to an issue at trial."   *United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007).

Robinson cannot clear the first hurdle because no evidence was suppressed. "Suppression does *not* occur when the defendant could have discovered it himself through reasonable diligence."   *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008) (emphasis added and internal quotation marks omitted).   Robinson's suggestion that the government suppressed evidence is conclusively belied by his own petition, where he claims "[i]nformation rebutting Carlson's testimony . . . was readily available to counsel" because it was set out in in "Title 28 C.F.R. § 501.3(a)" and "Title 18 U.S.C. § 3582(e)."   (Pet. at 63.)   By definition, that information was not "suppressed" from Robinson's counsel.   *United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2017) (explaining that evidence is not "suppressed" where it is "publicly available").[14]

Even if some information was suppressed (it was not), Robinson cannot show that it was material for the reasons set out above.   (*Supra* Part 2 B iv.)   His *Brady* claim fails for that reason as well.

In sum, Robinson is not entitled to relief on his *Brady* claim because it cannot proceed under the Savings Clause and is meritless in any event.

---

[14] The trial record also suggests that Robinson's trial counsel was aware of the regulations allowing the BOP to place limits on prisoners and BOP's ability to do so.   Counsel elicited much of that information through direct examination of Cunningham, who testified about BOP's "extraordinary levels of security," (Pet. Ex. 72 at 1301), including—among other "resources"—administrative maximum facilities, super max, control units, and administrative detention units, (*id.* at 1297).

**3.     Because Robinson raised—and the Texas District Court rejected—his remaining ineffective-assistance-of-counsel claims, he is barred from relitigating them here.   (Robinson's Claims III & IV).**

The Court should reject at the threshold the balance of Robinson's ineffective-assistance-of-counsel claims for two independent reasons.   First, in attempting to relitigate claims that he has previously litigated and lost, Robinson is abusing the writ. Second, Robinson cannot use the Savings Clause to relitigate claims that the court of conviction rejected.   There is no merit to Robinson's argument that the Northern District of Texas and the Fifth Circuit deprive all federal capital defendants of due process and their rights under the Constitution.   This Court should reject Robinson's invitation to grant him relief on claims already rejected by those courts because doing so would contravene AEDPA and Seventh Circuit precedent.   This Court should dismiss his third and fourth claims for relief.

**A.     Robinson already litigated—and lost—his ineffective-assistance claims and abuses the writ in raising them here.**

Although Robinson does not say so explicitly, he raised each of his remaining ineffective-assistance claims in his Section 2255 motion.   The Texas District Court already rejected Robinson's post-conviction argument that his counsel was ineffective on direct appeal for failing to press a *Batson* claim.   *Compare Robinson*, 2008 WL 4906272, at *18 ("Robinson alleges that he was denied his constitutional rights by his counsel's failure to raise a *Batson* challenge on direct appeal," arguing that the government impermissibly "prevent[ed] three African-American females, Charline

58

Boulet, Dorothy Jean DeBose, and Marchesia Amarh from sitting on the jury"), *with* (Pet. at 77-88 (claiming again that his counsel was ineffective on appeal for failing to press a *Batson* claim about the same three jurors).)   The same is true for Robinson's claim that his counsel was deficient at the penalty phase.   *Compare Robinson*, 2008 WL 4906272, at *9 ("Robinson alleges several deficiencies on his trial counsel's part, including (1) failure to hire a skilled investigator[;] (2) failure to adequately investigate and rebut the government's evidence of the penalty-phase aggravating factor of future dangerousness; [and] (3) failure to adequately investigate and present evidence of mitigation at the penalty phase"), *and id.* at *9-18 (rejecting Robinson's claims that his lawyers were deficient at the penalty phase), *with* (Pet. at 94-145 (presenting the same arguments, and relying on the same evidence, rejected by the court of conviction).)

Robinson has litigated and lost all of these claims.   Indeed, Robinson makes no argument here that he has new evidence to offer in support of these claims or that the governing law has changed in his favor.   (*See, e.g.*, Pet. at 89-90 (acknowledging that he "raise[d] the *Batson* issues as ineffective-assistance-of-appellate-counsel claims in his section 2255 motion" but arguing that the district court erred when it "denied Robinson's section 2255 motion without a hearing"); Pet. at 146-47 (acknowledging that the court of conviction rejected his claims that his counsel was ineffective at the penalty stage but arguing that "the District Court's ruling is astonishing and a clear denial of Robinson's rights under section 2255").)

59

Robinson cannot use Section 2241 to relitigate an argument that he raised and lost in his Section 2255 motion.  *Roundtree*, 910 F.3d at 313-14.   Robinson points to no intervening change in law or fact.   Rather, he simply asks this Court to review his claims anew, even though they were already rejected by the court of conviction and the Fifth Circuit.   His attempt to "relitigate [these] theor[ies], in the absence of an intervening change of law," is "a paradigm abuse of the writ."  *Id.* at 314.   This Court should dismiss his third and fourth claims for relief on that basis alone.

The abuse-of-the-writ doctrine involves a principle distinct and independent from Section 2255's steering of claims away from Section 2241.   Indeed, while the abuse-of-the-writ doctrine predates the passage of AEDPA, *McCleskey v. Zant*, 499 U.S. 467 (1991), the Seventh Circuit has declined to relitigate abusive claims post-AEDPA, *Roundtree*, 910 F.3d at 314.   In other words, the abuse-of-the-writ doctrine does not depend on the text of Section 2255(e), meaning that Robinson's argument that the text allows all his claims to satisfy the Savings Clause has no bearing on whether his claims abuse the writ.   (Pet. at 154.)   They do.

Any suggestion that the abuse-of-the-writ doctrine applies to his entire petition, moreover, is baseless.   The Supreme Court has made clear that it considers whether particular *claims*—not entire *petitions*—abuse the writ.   *See McCleskey*, 499 U.S. at 470 ("The doctrine of abuse of the writ defines the circumstances in which federal courts decline to entertain *a claim* presented for the first time in a second or subsequent petition

60

for a writ of habeas corpus.") (emphasis added).   Robinson's claims abuse the writ, so they must be dismissed.

> **B.      Robinson cannot resort to the Savings Clause to relitigate these ineffective-assistance claims.**

Robinson argues that he is entitled here to a full review on the merits, even though the court of conviction rejected the same ineffective-assistance claims as meritless more than a decade ago.   That is so, his argument goes, because in adjudicating motions under Section 2255, every district judge in every district within the Fifth Circuit, along with the United States Court of Appeals for the Fifth Circuit, "violate[s]" the rights of capital defendants.   (Pet. at 7.)   He urges further that, in his case, the district court denied his Section 2255 motion without an evidentiary hearing, misapplied settled standards from *Strickland*, and—along with the Fifth Circuit—applied the wrong standards when it denied him a certificate of appealability—a result he calls "astonishing."   (Pet. at 146-50.)   Against this backdrop, Robinson advances a categorical rule: Federal capital prisoners convicted in the Fifth Circuit can always satisfy the Savings Clause for any subsequent collateral attack because that Circuit categorically denies them due process in "sham procedures," where "their post-conviction rights are honored in name only."   (*See* Pet. at 20.)   Robinson is wrong, and this Court should reject his argument because it is squarely foreclosed by this Circuit's precedent.

First, Robinson's categorical rule runs afoul of the fundamental principles of this Circuit's Savings Clause jurisprudence.   The Seventh Circuit has taken care not to open

61

the doors of the Savings Clause—which by its plain text applies only where "the remedy by [Section 2255] motion is inadequate or ineffective to test the legality of his detention"—to all comers.   The Court has repeatedly emphasized that the path is "narrow."   *Bourgeois*, 977 F.3d at 624; *Lee*, 964 F.3d at 666 (quoting *Purkey*, 964 F.3d at 611); *see also, e.g.*, *Poe*, 834 F.3d at 774 (explaining that the en banc court in *Webster* "took great care to assure that its holding was narrow in scope").   To proceed down it, the prisoner must show "something more" than a rejected collateral attack under Section 2255.   *Webster*, 784 F.3d at 1186; *Purkey*, 964 F.3d at 615.   Robinson's proposed rule—that a capital prisoner need only show that he was convicted and sentenced to death in any district court in the Fifth Circuit—finds no support anywhere.   Indeed, it would represent a return to the era of unlimited collateral attacks—an approach the Seventh Circuit expressly rejected in *Webster*.   *Webster*, 784 F.3d at 1140 n.9.

Similarly, this Court should reject Robinson's invitation for it—or the Seventh Circuit—to sit in judgment of the jurisprudence of courts in the Fifth Circuit.   By requiring that a federal prisoner show "something structurally inadequate or ineffective about section 2255 as a vehicle," *Purkey*, 964 F.3d at 636, Congress necessarily precluded courts in the district of incarceration from sitting in judgment of the courts from the district of conviction.   The Seventh Circuit has repeatedly declined to interpret the Savings Clause in a way that would allow it to overrule the law of other circuits. *See, e.g.*, *Bourgeois*, 977 F.3d at 636 ("In the end, though, it is not for us to decide

62

whether the § 2255 court got it right or wrong.").   Contrary to Robinson's argument, Congress did not create the Savings Clause as "simply another avenue for appeal."   *Id.*

Second, Robinson fails to cite a single authority from the Seventh Circuit (or any federal court) adopting such a categorical rule—or anything like it.   And he ignores a long line of cases in which the Seventh Circuit has held that a federal capital prisoner convicted in a court in the Fifth Circuit cannot bring his claims under the Savings Clause. For example, the Seventh Circuit recently rejected a similar argument—"that the Fifth Circuit did not give [the capital petitioner's] arguments the consideration they deserved"—because the Court does "not sit in judgment on the decisions of our sister circuits."   *Vialva*, 975 F.3d at 665-66.   Likewise, the Seventh Circuit rejected as irrelevant Bourgeois's arguments that the United States District Court for the Southern District of Texas erred in rejecting his Section 2255 motion.   *Bourgeois*, 977 F.3d at 636; *see also id.* ("In the end, though, it is not for us to decide whether the § 2255 court got it right or wrong.   That point seems lost on Bourgeois, who goes on at length about why, in his view, the § 2255 court was wrong.").   The same was true for Hall.   The Seventh Circuit recently affirmed this Court's denial of Hall's seriatim Section 2241 petitions, where he had previously litigated his Section 2255 claims in the Fifth Circuit— before the very same district judge who presided over Robinson's capital trial and denied Robinson's Section 2255 motion.   *Hall*, 829 F. App'x at 719 (rejecting Hall's attempt to relitigate his theory under Section 2241 where "the Fifth Circuit thoroughly addressed the

63

claim on the merits and rejected it"); *id*. at 721 (rejecting Hall's attempt to relitigate two additional theories under Section 2241 where he "litigated a *Batson* challenge, lost, and dropped further review of that claim on direct appeal and through multiple rounds of collateral litigation under § 2255," and "long ago raised and lost the systemic-bias claim in his first round of § 2255 litigation in the Northern District of Texas").

Third, Robinson's rule would impermissibly circumvent Congress's choice to route collateral attacks to the court of conviction, AEDPA's restrictions on successive collateral attacks, *and* the common-law bar on abusive writs—approaches that the Seventh Circuit has rejected repeatedly.  *See Shepherd*, 911 F.3d at 862 (explaining that Congress chose to steer almost all challenges to federal criminal judgments to 28 U.S.C. § 2255); *Bourgeois*, 977 F.3d at 637 (rejecting a capital prisoner's attempt to "end-run" around Congress's limitations on successive motions under Section 2255); *Roundtree*, 910 F.3d at 314 ("What he now wants is to use § 2241 in circumstances that would have been called an abuse of the writ before the 1996 Act replaced that common-law doctrine with § 2255(f) and (h). . . . The 1996 changes were designed to curtail relitigation of collateral attacks, yet Roundtree wants something that would have been unavailable even before 1996.   That's not permissible.") (cleaned up).

In sum, binding precedent forecloses Robinson's argument that post-conviction proceedings in the Fifth Circuit are such "shams" that a prisoner may always litigate or relitigate his theories under Section 2241.   Robinson's complaints boil down to

64

frustration with the district court that denied his Section 2255 motion, the Fifth Circuit

that denied him a certificate of appealability, and the Supreme Court that denied his

petition for a writ of certiorari.   But a lack of success does not entitle Robinson to

proceed under Section 2241, and "[t]he savings clause is not simply another avenue for

appeal."   *Bourgeois*, 977 F.3d at 620.   Because Robinson has plainly failed to show a

defect that rendered Section 2255 "inadequate or ineffective" to test his claims, this Court

should dismiss his third and fourth claims for relief.

> **C.**     **In any event, Robinson's claims are meritless.**

For the reasons cited by the Texas District Court, Robinson's claims are

fundamentally meritless.

> **i.**     **The Texas District Court correctly rejected Robinson's**
> **argument that counsel was ineffective on direct appeal.**

Robinson alleges that the prosecutors violated the rule of *Batson v. Kentucky*, 476

U.S. 79 (1986), and that his appellate counsel was constitutionally ineffective for failing

to raise that claim on direct appeal.   (Pet. at 77-88.)   After the Texas District Court

considered—and rejected—Robinson's claim in a well-reasoned decision, Robinson

abandoned that claim in both of his certificate-of-appealability applications.   *United*

*States v. Robinson*, Order Denying Certificate of Appealability at 4, No. 09-70020 (5th

Cir. issued June 8, 2010) (Appendix at 81) (noting that Robinson sought a COA in the

district court on different grounds).   Robinson has failed to show that the Texas District

Court was incorrect in rejecting this claim on the merits; should this Court reach the

65

merits, it should follow suit.

First, appellate counsel was not ineffective for failing to raise a *Batson* claim with respect to the dismissal of prospective juror C.B.   This is because (a) the government properly justified the strike, (b) Robinson's trial counsel also exercised a peremptory challenge to C.B., (c) C.B.'s son frequented the CD shop where Robinson and his coconspirators gathered and which was a front for his drug-trafficking business, and (d) Robinson's trial counsel's choices to exercise a peremptory challenge to C.B. and to forgo a *Batson* challenge at trial would have doomed that claim on direct appeal.   (Pet. at 87-88); *Robinson*, 2008 WL 4906272, at *19.   Robinson has failed to show that counsel was deficient or any resulting prejudice.

Second, appellate counsel was not ineffective for failing to raise a *Batson* claim with respect to the dismissal of prospective juror D.D.   (Pet. at 84-87.)   As the Texas District Court explained, D.D. was permissibly struck, and Robinson's trial counsel failed to establish otherwise.   *Robinson*, 2008 WL 4906272, at *20.   Therefore, Robinson cannot show that his counsel was ineffective for failing to litigate that issue on direct appeal.   *Id.*

So, too, for counsel's decision not to raise a *Batson* claim vis-à-vis prospective juror M.A.   (Pet. at 80-83.)   For the reasons cited by the Texas District Court, including the prosecutor's explanations of why he struck M.A.—like her views on the death penalty—Robinson has failed to show that his appellate counsel was constitutionally

66

ineffective for failing to press that claim on direct appeal. *Robinson*, 2008 WL 4906272, at *20-21.

Robinson's claim cannot proceed under the Savings Clause, is a paradigmatic abuse of the writ, and it is meritless. This Court should reject it.

> **ii.** **As the Texas District Court and a unanimous Fifth Circuit decided, Robinson's argument that trial counsel was ineffective at the penalty phase is meritless.**

Robinson also raised under Section 2255 claims that his trial counsel was ineffective at the penalty phase. The Texas District Court also carefully considered and rejected them. *Robinson*, 2008 WL 4906272, at *8-18. Robinson sought a certificate of appealability, but both the district court and the Fifth Circuit denied him one, *see United States v. Robinson*, Order Denying Certificate of Appealability at 4, No. 09-70020 (5th Cir. issued June 8, 2010) (Appendix at 78-88), meaning that his claims were not even *debatable* among jurists of reason. 28 U.S.C. § 2253(c)(2); *see Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (to obtain a certificate of appealability, the applicant must show that "jurists of reason" would find the district court's assessment of his purported constitutional violation "debatable"). Should this Court reach the merits of those claims, it should reach the same conclusion as the Texas District Court and the Fifth Circuit.

          **a.**       **Robinson has failed to show deficient performance or resulting prejudice with his attacks on counsel's defense against the government's case in aggravation.**

Robinson alleges that his trial counsel violated his Sixth Amendment rights with respect to counsel's defense against (a) the allegation that Robinson ordered a hit on Michael "One Love" Williams, (Pet. at 108-110); (b) the claim that Robinson tried to kill Sarah Tucker over a drug debt, (*id.* at 112-14); and (c) the accusation that Robinson was a member of a gang called the Dermott Crips, (*id.* at 110-12). These claims fail both *Strickland* prongs.

The Texas District Court explained why Robinson's claims fail to establish deficient performance. Regarding Robinson's hit on Williams, Robinson submitted to the Texas District Court all the evidence that he resubmits here. *Compare* (Pet. at 108-110), *with Robinson*, 2008 WL 4906272, at *10-12. That evidence "certainly do[es] not establish the falsity of corroborating versions of events Williams and Henderson gave at trial," and Robinson's submissions simply fail to "establish that Robinson's trial counsel acted unreasonably in the way that they handled the prosecution's evidence at trial." *Robinson*, 2008 WL 4906272, at *11. For the reasons given by the Texas District Court, Robinson's claim fails at *Strickland*'s first prong.

The same holds true of Robinson's counsel's handling of the allegation that he tried to kill Sarah Tucker. Robinson claims that he did not; he merely fired his gun into an empty truck and her parents' apartment. (Pet. at 112.) But the Texas District

68

Court—who heard Tucker testify at Robinson's trial that she ducked down inside the truck after Robinson tried to kill her—found that Robinson's post-conviction submissions failed to show that his counsel was constitutionally unreasonable under *Strickland*. *Robinson*, 2008 WL 4906272, at *12.   This Court should reach the same conclusion as the Texas District Court because Robinson has failed to show deficient performance.

The same fate befalls Robinson's argument that this trial counsel mishandled the government's evidence about the Dermott Crips.   (Pet. at 110-12.)   The Texas District Court found that Robinson failed to establish deficient performance, crediting Robinson's counsel's averments that he "strategically chose" not to emphasize evidence about Robinson's gang involvement at trial because, "in [trial counsel's] experience, 'gang evidence is almost always detrimental to a defendant as jurors are very frightened of gangs.'"   *Robinson*, 2008 WL 4906272, at *15.   Robinson, in hindsight, claims his counsel should have argued that his gang was merely "wayward young boys and teenagers," but his counsel chose to move the spotlight away from that "wayward" activity and onto "Mr. Robinson's upbringing in Arkansas," which was "largely positive" and to "concentrate on the changes that began to occur when he was living with his drug-abusing mother in Arlington."   *Robinson*, 2008 WL 4906272, at *15.   That strategic choice was *reasonable*.   *Strickland*, 466 U.S. at 681.   ("Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed

69

decisions, strategic choices must be respected in these circumstances if they are based on professional judgment.").   Robinson has failed to show deficient performance.

Robinson has also failed to show prejudice.   Exactly as the Fifth Circuit explained:

> [N]o reasonable jurist would find that Robinson was prejudiced by the above alleged deficiencies.   Even if Robinson had been able to introduce all of his newfound rebuttal evidence, the jury would have been left with plausible evidence that Robinson ordered a hit from prison; his open admission that he fired shots into a car and apartment in anger over a $120 debt; and nothing new about the Dermott Crips.
>
> And most importantly, Robinson's two brutal murders and complicity in a third would have remained in the fore.   Though the future dangerousness evidence was a significant element in the verdict, *see Robinson I*, 367 F.3d at 283, no jurist of reason would believe that the dent in that evidence, which Robinson alleges, would have created a reasonable probability of a different verdict.

(Appendix at 84.)

Because Robinson has failed to show deficient performance or prejudice, his claims are meritless.

> **b.   Robinson has failed to show deficient performance or resulting prejudice in his attacks on counsel's mitigation presentation.**

Robinson alleges that his trial counsel was ineffective for failing to gather and present additional mitigation evidence.   (Pet. at 118-45.)   Specifically, Robinson claims that his counsel failed to uncover/present evidence of:

70

- Robinson's family's history of alcohol and drug abuse, (Pet. at 120-22);

- in-utero exposure to alcohol, drugs, and pesticides, (Pet. at 121-22);

- physical violence in Robinson's family and household, (Pet. at 122-24);

- Robinson's family's history of "learning disabilities" and "other cognitive problems," (Pet. at 123);

- Robinson's abandonment by his parents, (Pet. at 125);

- Robinson's grandfather's blindness, (Pet. at 126);

- Robinson's grandparents' difficulty in raising their grandchildren, including financial woes, physical ailments, and inability to provide "emotional support," (Pet. at 127);

- Robinson's exposure to pesticides and toxic sprays designed to kill mosquitos, which were sprayed on a farm nearby his grandparents' home, (Pet. at 127-28);

- An allegation that Robinson was sexually assaulted by a neighbor when he was five years old, (Pet. at 128);

- Robinson's own history of abusing alcohol, beginning at age five, (Pet. at 128);

- Robinson's initiation into a "pseudo-gang, the Playboy Hustler Crips,[15] through violent beatings," (Pet. at 130);

- the difficulties of Robinson's life in Arlington, including his mother's persistent drug and alcohol use, her erratic behavior, and her inability to provide for herself or Robinson, (Pet. at 131-33);

---

[15] This is the same "pseudo-gang" that Robinson also claims his counsel was ineffective for failing to realize was no gang at all. (*Compare* Pet. at 130, *with* Pet. at 130 (describing the Crips as "wayward" youth).)

71

- the well-documented problems stemming from exposure to pesticides and mosquito-spray, and Robinson's demonstrated learning difficulties, (Pet. at 134-36); and

- the effects that neglect had on Robinson, (Pet. at 137).

As he did in his first Section 2255 motion, Robinson also claims that his counsel should have hired mental health expert(s). (Pet. at 138-39.) Again, Robinson's claims fail both *Strickland* prongs.

Robinson has failed to show that his trial counsel's decision not to hire mental-health experts or track down his elementary school records was unreasonable strategy. For the reasons set out in the Texas District Court's order denying these claims, Robinson has failed to establish deficient performance. *Robinson*, 2008 WL 4906272, at *13-14 (finding that Robinson failed to show deficient performance vis-à-vis his lawyers' decision not to hire an expert witness or obtain his elementary school records where the record evidence "demonstrate[d] that Robinson was an average to above-average student in the years preceding the offenses for which he was convicted"); *id.* at *14 (rejecting Robinson's argument that his counsel was ineffective for failing to investigate and offer evidence on Robinson's exposure to alcohol in utero, experience with drugs and/or alcohol in his youth, and exposure to pesticides and mosquito spray where "numerous witnesses testified that Robinson's words and actions demonstrated that he was a person of normal intelligence," meaning "his attorneys' strategic decision not to attempt to portray him as a person with mental deficiencies sufficient to mitigate

72

the murderous behavior he engaged in was a reasonable one" under *Strickland*); *id.* at \*15

(rejecting Robinson's allegation that his counsel was ineffective for failing to investigate

his social history where much of Robinson's new evidence was actually "cumulative" or

involved events that occurred before Robinson was even born); *id.* (crediting Robinson's

lawyers' decision not to introduce additional evidence about the Dermott Crips because

(1) "gang evidence is almost always detrimental to a defendant as jurors are very

frightened of gangs," and (2) the defense strategy was to focus the jury's attention on the

positive aspects of Robinson's upbringing and life); *id.* at \*16-17 (explaining why

Robinson's analogies to *Williams*,[16] *Wiggins*,[17] and *Rompilla*[18] were inapposite).   For

those same reasons, this Court should find that Robinson has failed to show that his

lawyers fell below the *Strickland* standard.

Robinson's claim also fails because he cannot establish *Strickland* prejudice.   The

Texas District Court—the very same judge who presided over the entirety of Robinson's

capital trial—found exactly that: "When the Court examines *all* of Robinson's mitigation

evidence, including the evidence that was gathered post-conviction, the Court cannot

conclude that it is reasonably likely a jury would have reached a different conclusion had

---

[16] *Williams v. Taylor*, 529 U.S. 362 (2000).

[17] *Wiggins v. Smith*, 123 S. Ct. 2527 (2003).

[18] *Rompilla v. Beard*, 125 S. Ct. 2456 (2005).

the evidence that was discovered post-trial been admitted." *Robinson*, 2008 WL 4906272, at *17 (emphasis added).

The Fifth Circuit reached the same conclusion when it denied Robinson a certificate of appealability. *United States v. Robinson*, Order Denying Certificate of Appealability at 9, No. 09-70020 (5th Cir. issued June 8, 2010) (explaining that all jurists of reason would concur with the district court's assessment that Robinson had failed to show *Strickland* prejudice); (Appendix at 85-86.)   When viewed in light of all the evidence that was before the jury, Robinson cannot establish a realistic probability that the outcome would have been different had his counsel opted for the strategy he now claims would have carried the day.   Indeed, in repeating his claims, he has not grappled with the reasoning of the four judges—the Texas District Court judge and three Fifth Circuit judges—who decided against him on that point.   (*See* Pet. at 142-45.)   Those courts' reasoning is persuasive, and this Court should follow it.

In sum, applying binding Seventh Circuit caselaw, this Court should find that Robinson's claims cannot proceed via the Savings Clause, *Bourgeois*, 977 F.3d at 636 ("In the end, though, it is not for us to decide whether the § 2255 court got it right or wrong."), and decline to address them because they abuse the writ, *Roundtree*, 910 F.3d at 314 ("An attempt to relitigate a theory, in the absence of an intervening change of law, was taken as a paradigm abuse of the writ.").   In any event, these claims are meritless. This Court should reject them.

74

**4.      As Robinson concedes, *Garza* forecloses his final claim.   (Robinson's Claim V).**

In his final claim for relief, Robinson states that the Inter-American Commission on Human Rights (IACHR) found that the United States violated the American Declaration, and he petitions this Court to grant him "relief for each" such "violation." (Pet. at 153-54.)   But, as Robinson correctly acknowledges, the Seventh Circuit's decision in *Garza* forecloses his attempt to translate the IACHR's decision into a cognizable claim in federal court.   (Pet. at 153 (citing *Garza*, 253 F.3d at 925).)

In *Garza*, a federal death-row inmate petitioned a federal district court under Section 2241 to enforce his rights under the American Declaration.   253 F.3d at 920. The district court denied relief, and the Seventh Circuit affirmed.   The Seventh Circuit explained that the American Declaration was merely "an aspirational document that, in itself, creates no directly enforceable rights."   *Id.* at 923.   That court further held that decisions from the IACHR do not create "judicially cognizable rights in individuals." *Id.* at 926.   Thus, the federal prisoner could not use Section 2241 to vindicate his rights under the American Declaration in federal court.

*Garza* controls here, and it forecloses Robinson's attempt to petition this Court to enforce his rights under the American Declaration.   Robinson is correct to concede as much.   (*See* Pet. at 153.)

Despite his concession, Robinson cites *Medellin v. Texas*, 552 U.S. 491 (2008), but that Supreme Court decision affirms—not undermines—the Seventh Circuit's logic in

75

*Garza*.   In *Medellin*, the Court confirmed that, where an international treaty creates no "binding federal law in the absence of implementing legislation," parties cannot use domestic courts to enforce their rights under that treaty.   *Id.* at 506.   The Supreme Court's explanation confirms what the Seventh Circuit held in *Garza*: "[A]n international agreement can be considered to create judicially-enforceable private rights only where such rights are contemplated in the agreement itself."   253 F.3d at 924; *see also id.* at 926 ("By their very nature, non-binding recommendations to a government on how to conduct its affairs would appear to be addressed to the executive and *legislative* branches of the government, not to the courts.") (emphasis added).   The treaties on which Garza relied (and on which Robinson attempts to rely) create no such rights.   *Id.* at 924 ("We can find no indication in the treaties Garza relies on that the parties to the treaties intended for the Inter–American Commission's reports to create privately-enforceable rights, and ample evidence that they did not.").   Thus, *Medellin* provides no basis to depart from the binding decision in *Garza*.   *See Mitchell v. United States*, 971 F.3d 1081, 1084 (9th Cir. 2020) (collecting cases and explaining that "every federal court of appeals that has addressed this issue has concluded that IACHR decisions do not have domestic legal force." (internal citation and quotation marks omitted)).   *Garza* squarely forecloses Robinson's final claim for relief.

## CONCLUSION

This Court should dismiss claims I through IV because they fail to satisfy the Savings Clause.   The Court should deny claim V as meritless.

Respectfully submitted,

Zachary A. Myers
United States Attorney
Southern District of Indiana

*s/ Jonathan Bradshaw*
Jonathan Bradshaw
Assistant United States Attorney
Colorado Bar No. 43838
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
jonathan.bradshaw@usdoj.gov

Attorneys for Respondent

## CERTIFICATE OF SERVICE

I certify that on July 8, 2022, this response was filed electronically.   Notice of this filing will be sent to all ECF-registered counsel of record via email generated by the Court's ECF system.

*s/ Jonathan Bradshaw*
Jonathan Bradshaw
Special Assistant United States Attorney

77